UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

JAMES D. SULLIVAN, ET AL                    )

              VS                            )CASE NO: 5:16-CV-125

SAINT-GOBAIN PERFORMANCE PLASTICS           )

_____ )   MOTION HEARING


BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE



APPEARANCES:  EMILY J. JOSELSON, ESQUIRE
              Langrock Sperry & Wool, LLP
              P.O. Drawer 351
              Middlebury, Vermont   05753
              Representing The Plaintiffs



              DAVID F. SILVER, ESQUIRE
              Barr, Sternberg, Moss, Lawrence &
              Silver, P.C.
              507 Main Street
              Bennington, Vermont   05201
              Representing The Plaintiffs


              (Appearances continued:)

DATE:       October 11, 2016


          TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Reporter

               P.O. Box 1932
          Brattleboro, Vermont   05302

```
1                    APPEARANCES CONTINUED:

2           GARY A. DAVIS, ESQUIRE
            JOHN STASNY, ESQUIRE
3           DOUGLAS A. RULEY, ESQUIRE
                  Davis & Whitlock, P.C.
4                 21 Battery Park Avenue
                  Asheville, North Carolina   28801
5                 Representing the Plaintiffs

6

7           PATRICK J. BERNAL, ESQUIRE
                  Woolmington, Campbell, Bernal & Bent, P.C.
8                 P.O. Box 2748
                  Manchester Center, Vermont    05255
9                 Representing the Plaintiffs

10

11          R. BRADFORD FAWLEY, ESQUIRE
                  Downs, Rachlin & Martin, PLLC
12                P.O. Box 9
                  Brattleboro, Vermont   05302
13                Representing the Defendant

14

15          MARK S. CHEFFO, ESQUIRE
            PATRICK D. CURRAN, ESQUIRE
16                Quinn Emanuel Urquhart & Sullivan, LLP
                  51 Madison Avenue, 22nd Floor
17                New York, New York   10010
                  Representing the Defendant

18

19

20

21

22

23

24

25
```

```
 1              (The Court opened at 1:30 p.m.)

 2              THE CLERK:  Your Honor, the matter before the

 3  Court is civil number 16-125, James D. Sullivan, et al

 4  versus Saint-Gobain Performance Plastics Corporation.

 5  Present on behalf of the plaintiffs are Emily Joselson, Gary

 6  Davis, Patrick Bernal, John Stasny, Douglas Ruley and David

 7  Silver.

 8              Present on behalf of the defendant are Mark

 9  Cheffo, Patrick Curran and Bradford Fawley.  And we are here

10  for a hearing on defendant's motion to dismiss or stay

11  proceedings.

12              THE COURT:  All right.  Afternoon.  Thank you all

13  for coming.  Why don't we hear from the defendant.

14              MR. CHEFFO:  Thank you, Your Honor.  Good morning.

15  Thank you for the opportunity to be here today.

16              I have a few, not many, power points, which I was

17  going to use to aid.

18              THE COURT:  Sure.

19              MR. CHEFFO:  But before if there's anything

20  specific that Your Honor would like me to address, otherwise

21  I'd be happy to just give a brief presentation.

22              THE COURT:  No, I'll probably interrupt you along

23  the way.

24              MR. CHEFFO:  That's expected and appreciated.

25              So, Your Honor, I think the crux of plaintiff's
```

1    argument here is that this, this litigation is somehow

2    separate and distinct from the underlying litigation around

3    some of the regulations that the Vermont regulators have

4    enacted and that it really should not in any way kind of

5    interfere with this litigation.  So I think that's a fair

6    characterization.

7            And, you know, and these are, you know, excellent

8    lawyers on the other side.  I think that our issue is that's

9    inconsistent with the actual complaint both on its face and

10   really the kind of sum and substance and a fair reading of

11   the complaint.

12           So if we could just go to this next slide.  So I'm

13   going to be talking a little bit about what I think the

14   complaint says and why I think there's an overlap.  And then

15   also Your Honor I'm sure has had a chance to at least review

16   our papers.

17           You know, why both agency and primary

18   jurisdiction, I think they are used interchangeably or

19   Burford Abstention.  And Your Honor these can be persnickety

20   rules.  I think in this case the kind of general arguments

21   and themes that we apply to both as I think we'll talk

22   about.  So I don't know that Your Honor needs to or we need

23   to necessarily parse each one, though I'm happy to talk

24   about that.  And I think as Your Honor knows these are

25   doctrines that are not to be applied in a kind of mechanical

1    way.  I think they are up to the discretion of the Court.

2           And I would say to begin before we get into the

3    substance Your Honor we fully recognize that this is a

4    discretionary doctrine, right.  So, you know, I think the

5    plaintiffs may have said that our argument is that you must

6    do X. or you must do Y.  That's not it at all.  Nor are we

7    suggesting at this point that the plaintiffs lack

8    jurisdiction here.

9           I think our arguments are both for efficiencies

10   and for inconsistent judgments and some of the other things

11   we'll talk about that it makes sense to at least consider a

12   stay.  And I think I would also highlight that because this

13   is such a discretionary doctrine, and I know in one of your

14   orders Your Honor referenced a concern at least, the way I

15   took it, of the time factor, you know, that this could take

16   two years or so for it to play down, play itself out.

17          And I would urge the Court to at least be

18   openminded in the sense that because this is a discretionary

19   doctrine, and because Your Honor can look at this

20   throughout, that it doesn't have to be an all or nothing.

21   In other words, were Your Honor to be inclined to adopt some

22   of our arguments or all of them you could essentially say,

23   okay, I'm going to do this for three months and then I want

24   to have a scheduling conference and then come back.  And

25   we'll talk about how that might apply.  So --

1          THE COURT:  Let me --

2          MR. CHEFFO:  Yes.

3          THE COURT:  -- as I see the timeline playing out,

4   I appreciate the fact that you've had to play catch up, you

5   know, with the interim rule and the first emergency rule and

6   the second emergency rule.  And it sounds as if shortly the

7   final rule issue, and really that will be the focus of your

8   litigation, assuming that it is used in the form of the

9   first three versions, right?

10         MR. CHEFFO:  I think that's fair.

11         THE COURT:  So that must be some weeks or months

12   away.  It's, at that point the Superior Court lawsuit is

13   filed, the fourth one challenging the final rule.  We'd have

14   to allow that a year.  And then an appeal, I don't want to

15   be unkind, but a year would be short.  So really this, from

16   your perspective, everything would have to come to a halt

17   for at least two years and three would not be inconceivable.

18   So how would I look in the middle of that and say, well, the

19   motion is filed, but we don't have a ruling, it's been too

20   long, I'm too impatient, we need to go.  Or the trial courts

21   ruled and I'm too impatient, we need to go, we can't wait

22   for an appeal.

23         Once I take your position then I think I'm locked

24   into the full period of waiting.  I can't see a responsible

25   way for leaving the party halfway through.

1          MR. CHEFFO:  Well, let me see if I can hopefully

2     address that, Your Honor.  I think that, you know, obviously

3     I want to talk about how our -- these doctrines apply

4     completely to the case.  But, you know, again, because it's

5     discretionary and because we can look at this a few

6     different ways I think it would be disingenuous, and I

7     certainly wouldn't suggest it, to say that this doctrine I

8     think has probably the strongest applicability for the

9     injunctive claims, right.

10          So, in other words, the plaintiffs, and it's not

11    totally clear, but I think if you look at the last page of

12    their complaint or the second to the last what they are

13    seeking are, you know, new water hookups and medical

14    monitoring.

15          THE COURT:  Right.

16          MR. CHEFFO:  So as to that, those are things that

17    are literally going on today.  I mean, there is -- all you

18    need to do is read the newspaper, is there's discussions

19    between Saint-Gobain and the state about whether there will

20    be water hookups, how that's going to work, you know, what

21    the appropriate levels are going to be.  Whether POET's,

22    these point-of-entry systems are appropriate or not, right.

23          So these are things literally that there's boots

24    on the ground, folks, people's expertise who do this for a

25    living are working on it.

1              The same with medical monitoring and blood

2     testing, right.  So that's all going to happen if it happens

3     through an infrastructure of the public health system and

4     the good folks in this state would work hard, you know, on

5     those issues.

6              So I would say if you were to look at those issues

7     separately you could easily see a situation where, you know,

8     you are going to know, is there going to be, you know, PEOT

9     Systems, are there going to be hookups, are there going to

10    be X. are there going to be Y.  And that could be a three or

11    four month at least, you know, I would suggest if we came

12    back in three months on those we'd all have some learning as

13    to those issues.

14             And the same would be, you know, for some of the

15    medical monitoring claims.  Though, candidly, I think that

16    could be longer, right, to the extent there's infrastructure

17    in place.

18             So I would agree with you that if we were totally

19    looking only at the 20 limit and were the state to come and

20    kind of make that a primary rule, then I think that there

21    could be a longer timeframe.

22             But here's also another suggestion, right.  The

23    plaintiffs have basically said we reference those, those

24    standards, but we're really not relying on them, at least as

25    I kind of understand their position.  Well, one option too,

1   if that's true, I don't think that's a fair reading, so I

2   think we have one of the screens here from their complaint.

3   So there's really two issues I think we have, right.

4        The main issue is that it's kind of pervasive

5   throughout their complaint that they talk about this level

6   of 20.  It could have been something else, but it clearly is

7   the 20.  What I think the more instructive factor is this,

8   they say that it's, and we're talking about the class

9   definition, right, folks who have interest in real property

10  within the zone of contamination.  So, you know, you kind of

11  scratch your head, what is that.  It's not within a mile,

12  it's not within X., it's not people who have only 20, in

13  fact, they say it could be 20, it could be somebody else,

14  it's unclear exactly what that class would be.  But we then

15  say, because they define it, the zone of contamination,

16  those areas most recently designated by the State of Vermont

17  as designated areas of concern.

18       All right.  So what they are saying is on the one

19  hand this litigation has nothing to do with the underlying

20  activities of the state, but yet if you were to determine or

21  I was to determine reading the complaint whose in this case

22  potentially and whose not in terms of a class, the only way

23  we would know it is to look at what the state is doing in

24  this designated area of concern.

25       And then they also say in paragraph 74 of their

complaint, and by the way, that could change.  It could be

more, it could be less, right.  So we're not here today to

argue whether, in fact, these are class cert. allegations,

whether Your Honor should strike them, whether we should

move to strike them, whether they could actually be, but I

think for purposes of today, at least as this is written,

you know, the plaintiffs, again, these are excellent

lawyers, and this is an area that they know well and they

practice in, but they decided to craft this complaint,

right.  They could have done it any number of ways.

          What they did was essentially incorporate and

tether their entire class definition, their putative class

definition to an underlying state court regulatory process.

          And this was where I think under primary

jurisdiction and the Abstention Doctrine, you know, if you

look at the factors, I mean, I think we have strong

arguments on the 20 factor, but I think Your Honor doesn't

even need to reach that.  I think when you look at this

designated area of concern, right, whose more in a better

position to determine what that means, right.  I think this

is their document.  But, you know, may I?

          THE COURT:  Sure.  Of course.

          MR. CHEFFO:  Thank you.  I'll try to keep my voice

up.  You know, this is at least one of the maps of the

designated area of concern, right.  This is what the

1  regulators have talked about.

2          Now, presumably, because it's not just throwing a

3  dart board, whether I agree with this or not, they probably

4  looked at the 20 factor, right.  So that plays in.  And

5  let's say it was 18 or 100 or 70, I have to assume that this

6  would change in some way or could change, right.  And it's

7  also not just based on a specific number, but this is, I

8  have to assume, though I can only tell Your Honor I don't

9  have specific knowledge of it, but there's modeling issues,

10  there's concerns, there's geography.  There may be air

11  deposition issues, water deposition issues, hydrology.

12          I mean, these are things that certainly Your Honor

13  could read and understand and address if you determined to

14  do that.  And we'd have experts that would deal with it.

15  But in the first instance the plaintiffs have basically said

16  we want to be just like them, right.  And that's very

17  complicated constellation of factors are what the regulatory

18  agency has put together and done.  And then, you know, to

19  argue that we have nothing to do with that, and Your Honor

20  shouldn't be guided by what the regulators are doing when

21  their entire litigation scheme is based on it, I think, you

22  know, is a problem that is not of Saint-Gobain's creation.

23          So I think there are a few issues.  One is, I

24  think Your Honor could divorce very easily the injunctive

25  type claims and the medical monitoring.  I also think that,

1  and we'll hear what, you know, my kind of learned colleagues

2  will say, and hopefully I will have a chance to respond.

3  But if they tell us this was inartfully plead then perhaps

4  they should replead their complaint, redefine their, their

5  putative class so we could then better understand exactly

6  what they are talking about and whether there is an issue

7  here of primary jurisdiction.

8          But our position I think, and I think the case law

9  supports it, I think their own allegations support it, is

10  that based on what they have plead this is a situation where

11  Your Honor would be getting literally in the middle of what

12  the regulators are doing, how they've come to their

13  determinations, whether it's reasonable, exactly at a time

14  when under particularly Burford, which I think focuses more

15  on whether there's litigation that may be addressing some of

16  these things, I mean Your Honor would essentially have, we'd

17  have coordinate litigations, potentially inconsistent

18  rulings.

19          And, again, I would just say that while the time

20  factor may be something of concern to Your Honor, and I get

21  that, this is something that is only though really created

22  as a result of the way the plaintiffs have plead this

23  litigation.

24          THE COURT:  So what, if they had said 70, which I

25  understand is the E.P.A., some kind of E.P.A. limit, maybe

1    not their last word, but a number that the E.P.A. has put

2    out, then all this, this motion would drop off the table and

3    you would just say, fine, we'll deal with 70, we'll hear

4    from the experts?

5         MR. CHEFFO:  Well, a quick answer, I'm not sure we

6    would, you know, we may have other challenges to it, but I'm

7    not sure that if they just said 70.  So I think there is two

8    components, right.  It's not just the number, though I think

9    that is a factor.  I think our argument would be much harder

10   if it was just the number, frankly, because they would

11   argue, well, you know, the fact that we happened to pick the

12   same number as the regulators that doesn't mean that it

13   could be potentially inconsistent and I think you'd have a

14   pathway.

15        So quite honestly, Your Honor, I'm not sure we

16   would have made this motion if it was just 20 or 70.  I

17   think the core issue here is who they've defined, right.  So

18   they basically told us, again, putting aside the fact that

19   it's almost like a failsafe class, it's people who are in --

20   as I understand it, what they are saying is the 20 is not

21   really a factor, and I'm not sure how that can be, but it's

22   20, or more or less, if you're trying to look at whose in

23   this class, right.  And then it's people in this zone of or

24   the designated area of concern.  And we know that by looking

25   at what the regulators have determined.  And they say that

1    may change or it may not.

2          So I'm not sure how you could have a class

3    definition that, you know, it's kind of a moving target.

4    But what I would say is that's why I think, frankly, the

5    Abstention Doctrine and the primary jurisdiction or agency

6    arguments there applicable because it's kind of a double

7    shot that you have the number but you also have a definition

8    that is exactly overlaid on top of what the regulatory

9    agency is doing.  And that's something that is unusual.

10         THE COURT:  All right.  And I wasn't sure what the

11   nature of your challenge in the Superior Court was to, to

12   the agency regs.  Some of it I saw related to lack of notice

13   and rule making deficiencies.  Presumably those will be

14   cured by the time you get to final rule.

15         MR. CHEFFO:  That's correct.

16         THE COURT:  So what is the rest of it?

17         MR. CHEFFO:  Sure, Your Honor.  And I think, you

18   know, Mr. Fawley is also here with me today is actually very

19   much involved in that.  But the sum and substance is, you

20   know, I think you saw in our papers, there was an emergency

21   rule, right.  There was no -- there was an interim rule and

22   an emergency rule.

23         THE COURT:  Right.

24         MR. CHEFFO:  And I think the bottom line is that

25   based on, you know, what the federal regs., it's really a

challenge to the process.  There was no ability to see what the record was.  There was no ability to have public comment.  There was no, in our view, kind of basis for, for that number of 20.

So it's basically a challenge to determine what the -- whether the agency and the record upon which they relied in order to come to the 20 was, in fact, something that was supportable and supported based on both the science and the underlying studies and whatever else.

But right now, from our perspective at least, and, again, we, these folks are, you know, operating in good faith.  And they have a job to do.  And we have no issue with public health authorities.  The issue really here is that all of a sudden we had this kind of 20 number, which seemed somewhat arbitrary at the time, and now we know that even the federal government has come out with a 70 number, but backed up on a record and showed at least what they have -- the reasons why at least they believe 70 is appropriate.

So that's really the sum and substance.  It's a kind of a challenge to the process and the lack of a record and essentially accountability and accessibility of that record.

THE COURT:  So how much of that would drop away with respect to the final rule?  Because presumably, I

```
 1    understand about emergencies, I understand about interim

 2    measures, we all read in the press about the, you know,

 3    public concern and political concern and regulatory concern

 4    that may lead to rapid decision making, but presumably the

 5    final rule everybody takes a deep breath, follows the book

 6    and does the steps.

 7              So what would be your challenge if the process

 8    oriented complaints that you didn't have time to come, you

 9    didn't know it, you were addressing, whatever it is, when

10    those drop away what's left?

11              MR. CHEFFO:  Well, Your Honor, look, I don't want

12    to suggest that it's, because I think we have a good

13    faith -- it's not a fait accompli that we will challenge it,

14    right.  I mean, that's a -- I think what we will do, like

15    what you would expect us, and I think the agencies would, is

16    to look at what their final rule is, look at what their

17    record is, look at what they tell us, right, if anything.

18              And then we will make a good faith determination.

19    You know, we may say we still don't have any information, we

20    don't understand it.  We may say we fundamentally disagree

21    with this number, but at this point, you know, we believe

22    it's within the discretion and the purview of the agency to

23    do that.

24              So, you know, it's not something we necessarily

25    have determined no matter what they do we're going to
```

1    challenge it.

2          THE COURT:  So when are we, maybe your colleague

3    knows better, but when is it likely that the final rule

4    makes that decision?

5          MR. CHEFFO:  I think -- well, here's what I would

6    say is I think that the state has asked us for a 60 day

7    extension on the briefing of the emergency issue.  So,

8    again, if I was reading tea leaves I would say that they

9    believe that it will be within the 60 days.  Again, that's a

10   little bit of an assumption.

11         THE COURT:  Yeah, I see what you mean.  They said

12   give us 60 days and events are going to overtake the

13   emergency.

14         MR. CHEFFO:  It may mute the underlying

15   litigation.  So, again, they can come back to us on day 59

16   and say, you want another 60 days.  But I'm making an

17   assumption that they believe that it's -- please.

18         MR. FAWLEY:  Brad Fawley, Downs, Rachlin and

19   Martin.  We actually have a letter from the attorneys for

20   the state saying that the reason they want the 60 day

21   extension is because events will overtake.  And they expect

22   to promulgate their final rule within that time period,

23   therefore, rendering our current appeal of the second

24   emergency rule mute.

25         THE COURT:  Right.

1          MR. FAWLEY:  And so they won't even have to answer

2     that challenge.

3          THE COURT:  All right.

4          MR. FAWLEY:  And will move on.

5          THE COURT:  And that sounds plausible.

6          MR. FAWLEY:  Yes.

7          THE COURT:  Okay, thanks.

8          MR. CHEFFO:  Your Honor, I had some other slides,

9     but I think, again, unless you have -- I think I've frankly

10    covered most of what I would have said.  Our kind of main

11    argument, as I said, is this is an overlap.  I think there's

12    a lot of -- it's in our brief as well, a lot of times where

13    they rely on the 20.

14         I think, again, when you apply the primary

15    jurisdiction agency and Burford Abstention Doctrine it's

16    rare that, we fully recognize that, it's not for every case,

17    but we think in this case it absolutely applies.

18         THE COURT:  Okay.  And I'll give you a chance

19    after we hear from the plaintiffs.

20         MR. CHEFFO:  Absolutely.  Thank you, Your Honor.

21         THE COURT:  Thanks.  Miss Joselson?

22         MS. JOSELSON:  Good afternoon, Your Honor.

23         THE COURT:  Good afternoon.  Nice to see you.

24         MS. JOSELSON:  I think you've met pretty much

25    everyone at our table.  You know David Silver, Gary Davis

1    sitting at counsel table, Patrick Bernal from Rob

2    Woolmington's firm.  And you met Doug Ruley.

3            THE COURT:  Right.

4            MS. JOSELSON:  And in the back we've got Avi

5    Springer who is a new associate with our office from New

6    York, but he had previously clerked for Judge Sessions.

7            THE COURT:  Great.  Glad to have you back.

8            MR. SPRINGER:  Thank you.

9            THE COURT:  And also with your, some of your

10   potential class members?

11           MS. JOSELSON:  Is Mr. Sullivan here?  Yes, we've

12   got Jim Sullivan.  Oh, and we do have Leslie Addison.  I'm

13   so sorry.  They came in while my back was turned.

14           So in essence we believe that the defendant's

15   motion rests on two mischaracterizations, both that the

16   complaint is reliant on the state's PFOA Standard and

17   mischaracterization of the law of abstention.

18           We believe they cite no case that allows

19   abstention in a common law nuisance case such as this

20   alleging property diminution.

21           Simply stated --

22           THE COURT:  Can I ask you a question?  Only really

23   for my own background and understanding.  I went back

24   through the complaint again today with a little more incite

25   than when I first read it, why did you take out people that

1   have suffered personal injuries?

2           MS. JOSELSON:  Well, because we expect that

3   personal injury claims won't be suitable for class treatment

4   and they will probably be making separate claims for them.

5           THE COURT:  Okay.  Thanks.

6           MS. JOSELSON:  So we maintain that no part of our

7   complaint relies on the current standard of 20 parts per

8   trillion.  And we will not in any point in this litigation

9   be asking this Court to review the propriety of the 20 parts

10  per trillion standard or anything else the state is doing in

11  its regulatory function.

12          We don't rely on the 20 parts per trillion

13  standard in our complaint either to identify those who have

14  been injured or those who are entitled to damages or those

15  who fall within the class.

16          The real gravamen of our complaint is that

17  plaintiffs all own property within this zone of

18  contamination.

19          And if I may, the Court may be aware that

20  initially when the state first became aware of the potential

21  contamination it simply drew a 1.5 mile radius circle around

22  the location of the plant and started testing wells.  And

23  sort of like a biopsy in a cancer diagnosis, when you get to

24  the margins and you've got cancer cells on the edges you

25  keep looking.  And that's what the Court, the regulatory

1    agency did over time.

2          And so now starting, this process started in

3    March, by the end of August, now we're in October, although

4    this is the most recent state map, we pretty much have, the

5    boundaries haven't changed much over the last three months.

6    We've got, if you start at the circle we've got a little dip

7    here going up to the northwest along the boundary of New

8    York.  We've got down a little bit southwest.  We can

9    continue around the circle and we go a little further south,

10   all the way along the old factory is here, and the old

11   landfill is here.

12         And then we go straight north.  The less old old

13   landfill is here.  And then the state has simply gone along

14   the border between North Bennington and Shaftsbury.  There

15   are a few hits, as the Court may be able to see, of

16   non-detect, but also above 20 to 100 parts per trillion in

17   this area here.

18         And so the, the boundary may be extended a little

19   bit, but we don't expect either that the standards are going

20   to change or that the map will change as a result of that.

21         And the basis of our complaint in choosing to

22   identify the putative class as within the state identified

23   zone of contamination is that it's been public knowledge now

24   for months, and publicly disseminated information, that the

25   area of concern with regard to PFOA contamination in

1    Bennington and North Bennington is this outline.

2          And everyone who owns property within that

3    outline, whether they have contaminated wells, above or

4    below the 20 parts per trillion, or whether they are on town

5    water, are suddenly owners of property that are contaminated

6    with PFOA and no longer have the same rights and abilities

7    and value of the property, their rights and abilities to use

8    and enjoy their property in the same way they did before

9    they discovered the contamination.

10         So we can go through the complaint paragraph by

11   paragraph if the Court would find that useful.  But nowhere

12   in any of the paragraphs that define the causes of action or

13   the claims for damages or the class definition are we

14   reliant in any way on the 20 parts per trillion.

15         Would the Court find that a useful exercise?

16         THE COURT:  No.  I see, I mean, it's, you're kind

17   of missing each other.  You say that, but at the same time

18   your map with the, what I think of as the cat seers poking

19   off and catching a few additional tests, that's determined

20   by the state regulators and their reliance on the 20 parts

21   per trillion measure.  So it's kind of, it's kind of brought

22   into your analysis that way.  It's, somebody else did the 20

23   parts per trillion.

24         MS. JOSELSON:  In the 35 or so years that I have

25   been doing these cases there is always a relationship

1    between a common law nuisance in a property diminution case

2    and the conduct of the regulators.  They're parallel

3    processes.  And together private lawsuits and public

4    lawsuits or regulatory proceedings work together to enforce

5    environmental protections.

6            And standards frequently change throughout the

7    course of a litigation as the science catches up with the

8    rules.  And, frankly, in my experience, I've never had an

9    abstention argument in these cases.  I had one preemption

10   that was based on statutory language that went all the way

11   up to the U.S. Supreme Court, but not abstention because

12   when we're seeking to protect private property rights and

13   private property values and the associated rights related to

14   property ownership under Vermont law that really has nothing

15   to do with what the state is doing in its regulatory

16   proceedings, especially in a case like this, where there is

17   no agency within the state or the federal system were they

18   involved charged with protecting private property rights.

19           And there's no part of what the state is doing or

20   intends to do that has anything to do with that.  There's

21   no -- there's just simply no overlap between what the state

22   is doing and will continue to do and what we're doing.

23           There are no claims in this case that are outside

24   the normal purview of judge or jury.  Common law claims in

25   nuisance, negligence, strict liability, battery, trespass

1   are wholly within the realm of expertise of this Court.

2            And none of the particular experience or expertise

3   charged with regulatory agencies will enter this litigation.

4   There will be expert witnesses, there will be reasonableness

5   arguments, but, you know, in order to prove negligence we

6   have to prove unreasonable conduct.  In order to prove

7   nuisance we have to prove unreasonable interference with use

8   and enjoyment of property.  In order to prove trespass we

9   simply have to prove the presence of contaminates on

10  people's properties.

11           And as the defense has conceded, there's nothing

12  about the class certification process that needs to be

13  argued at this point.  We're way premature for that.

14           And so we believe that the rights of our clients

15  who have already suffered such distress at learning that,

16  for some of them, for the last 30 years they've been

17  drinking and feeding their children water contaminated with

18  PFOA.  I mean, that's just so enormously destructive it

19  takes me a while sometimes to remember when I pick up a

20  glass of water at my house that what it would mean to me to

21  know that I raised my children on what I subsequently

22  learned to be contaminated water and the importance of

23  proceeding with discovery and learning how we can prove the

24  claims that we believe are, to a large extent, going to be

25  indisputable.  Moving forward with that process will

1    not/interfere in any way with what Saint-Gobain has decided

2    to challenge that the state is doing.  Nor is there any

3    possibility of any inconsistent rulings coming from the

4    regulatory agencies or this Court.  There just simply isn't.

5            And that -- the fact that the defense can cite no

6    case, we believe, on similar facts, where it's a common law

7    nuisance, negligence, property damage claim in no case has

8    any court found that abstention is proper.

9            It's only where dispositive issues are already

10   being litigated in the agency jurisdiction that, and

11   identical claims are being raised in the federal court case

12   that abstention is proper.  So it just, it seems to us to be

13   an argument that is very far from the mark.

14           THE COURT:  I guess I would ask the question this

15   way, if at the end of the state regulatory process, which

16   I'm told is in months, not years, the state says we acted in

17   good faith, but under pressure, and we really think, in

18   looking at the science, that 70 parts per trillion, the

19   E.P.A. measure, that is the tipping point for concern, then

20   how does your case change?

21           MS. JOSELSON:  Not a whit.  Not at all.

22           THE COURT:  You still say that --

23           MS. JOSELSON:  We still say that our properties

24   are within the area, which happens to be most adjacent to

25   the sources of PFOA contamination, within which there is

PFOA contamination and, therefore, that, among other things,
a willing buyer is not likely to be willing to pay fair
market value for that property as it would if the same
property were somewhere distant in Bennington, somewhere
else away from the PFOA contamination.

          These maps have been in the news, they've been at
regular almost monthly public meetings.  Everyone knows and,
in fact, anecdotally people are constantly asking when they
are looking at properties in Bennington and North
Bennington, well, where is it.  Is it within the zone of
contamination?  Thanks, but no thanks.  Or maybe speculators
will say --

          THE COURT:  So sort of a stigma problem?

          MS. JOSELSON:  It is.  And Vermont law fortunately
recognizes stigma damages in cases like this.

          THE COURT:  All right.  Thank you.  That's
helpful.

          MS. JOSELSON:  You know, again, there are numerous
cases that we believe are wholly distinguishable that
they've cited, but more importantly, there are at least
three cases which we think are most similar to ours.  And
the courts have refused to find abstention.  In the Martin
case in Connecticut, Martin versus Shell, the Court holds
that, the Federal District Court holds that there should be
no primary jurisdiction abstention because the state

1    standards aren't dispositive of the common law claims.  In

2    trespass there's no limit to the amount of toxin that --

3                  THE COURT:  Right.

4                  MS. JOSELSON:  -- justifies the claim.  And

5    there's no administrative agency with jurisdiction

6    protecting private property rights.  On all fours with ours.

7                  The same with Town of New Windsor versus Avery

8    Dennison in the Southern District of New York, the federal

9    trial court holds no primary jurisdiction abstention because

10   agency expertise isn't necessary to adjudicate these common

11   law claims.  The agency couldn't award damages of the sort

12   that the plaintiffs are seeking.  Though the agency's

13   findings may be relevant factually to the plaintiff's claims

14   they are not dispositive in any way.  And also recognizes

15   the tendency of agency proceedings to take a long time.  And

16   justice delayed is justice denied especially with people who

17   are so freaked out, and justifiably so, about this pretty

18   horrendous contamination of their properties.  And having to

19   explain to them why we haven't yet been able to even get an

20   answer to our complaint let alone commence discovery is

21   difficult.

22                  THE COURT:  So what will happen, if the motion is

23   denied what will be your, what, would you move immediately

24   to the certification issue or --

25                  MS. JOSELSON:  No, no, no.

1          THE COURT:  -- do you look for a period of

2    discovery, to see if you can lay out what, in months what

3    you see coming from your perspective?

4          MS. JOSELSON:  Yeah.  So the first thing we'd like

5    to do, and as this Court knows we have tried to do that, is

6    set out a reasonable discovery schedule.  And let's learn

7    what issues, you know, what evidence there is, what

8    documents can be produced, what issues are in dispute and

9    what issues aren't.

10          We expect that there will likely be requests to

11   find because we think a lot of issues will not be disputed.

12   We'll be identifying experts.  They'll be probably -- I'm

13   sure this isn't the first motion to dismiss that we'll see.

14          THE COURT:  Right.

15          MS. JOSELSON:  But discovery is the first goal.

16   And so any, yeah, that's what we hope to do first.  And only

17   at the end of that will it be reasonable to either redefine

18   class or simply move for class certification or, you know,

19   not --

20          THE COURT:  So from your perspective it's

21   discovery first and certification second?

22          MS. JOSELSON:  Absolutely.

23          THE COURT:  After like a six or 12 month period?

24          MS. JOSELSON:  Yes.

25          THE COURT:  All right.  Thank you.  Because that

1    buys time, there wouldn't be need for a court ruling on any

2    significant issue, I mean, maybe a discovery fuss, but other

3    than that, until well after the regulators have run their --

4    have issued their final ruling?

5           MS. JOSELSON:  Exactly.  Exactly.

6           And, as I said, the standard could be anything.

7    And it doesn't affect our case because our plaintiffs are

8    already holding property within the zone of contamination.

9    And reasonably that's where the contamination is.  And, you

10   know, we are concerned regardless of whether it's one part

11   per trillion or over a thousand parts per trillion with good

12   reason because our plaintiffs are already, as the state's

13   acknowledged, are already experiencing levels of PFOA in

14   their blood that are well, well, well above the national

15   average.

16          So I think it's important that none of the cases

17   that the defense has cited are anywhere near a common law

18   claim where there is any abstention order granted.  They

19   simply don't exist for these very good reasons.

20          And really, you know, the same arguments go for

21   Burford Abstention.  This case does not, you know, the

22   standard, does the case present difficult questions of state

23   law bearing on policy problems of substantial public

24   importance whose importance transcends the result in the

25   case then at bar.

1          Clearly it, the state is doing important work.

2  But the importance of this case and the ability of these

3  plaintiffs to seek relief in this Court, which clearly has

4  proper jurisdiction, doesn't warrant the very extraordinary

5  relief of this Court declining that proper jurisdiction.  As

6  this Court said in Vereline even if there were an analogous

7  proceeding in state court, which there is not, even if, you

8  know, it just is not an abstention situation.

9          THE COURT:  All right.  Thank you.

10          MS. JOSELSON:  Thank you.

11          MR. DAVIS:  Your Honor, may I clarify one thing?

12          THE COURT:  Of course.

13          MR. DAVIS:  Gary Davis for plaintiffs.  When Miss

14  Joselson was talking about the map and how the map was drawn

15  by the state --

16          THE COURT:  Right.

17          MR. DAVIS:  -- Your Honor asked a question about

18  that, was it drawn with regard to the 20 part per trillion

19  standard that the state has set.  And the answer is no.  The

20  answer is it was drawn to find the contaminates where ever

21  they may be.  And the area of concern has been expanding

22  based upon the finding of more wells that were contaminated

23  beyond the original one and a half mile circle.

24          So the 20 parts per trillion is the rule that they

25  are challenging.  And it's the state standard for what's

 1   acceptable for drinking water, but that in no way determined

 2   how the state drew this map and where they are sampling to

 3   try to find areas of the contamination they can.

 4              THE COURT:  You mean including wells that tested

 5   below 20?

 6              MR. DAVIS:  That's true, Your Honor.  The blue

 7   dots are the ones where it was non-detect.  And then the

 8   yellow dots are between detect and 20.  And then orange is

 9   20 to 100 and then above.

10              So what you see on that is the state's efforts to

11   determine the scope of the contamination, not just with

12   regard to 20 parts per trillion.  I hope that clarifies

13   that.

14              THE COURT:  No, that does.  Thank you.

15              MR. DAVIS:  And just one thing that was

16   interesting in the defendant's presentation is that they

17   conceded that they may not be interested in challenging the

18   final rule.  And that, you know, means that the potential

19   overlap or conflict is purely speculative at this point,

20   Your Honor.

21              And I would bet, however, that if the state does

22   end up adopting the 20 parts per trillion as a final rule

23   that we're still going to have an argument in this courtroom

24   over whether the amount of contaminates in people's wells

25   present a risk.

1        They are going to bring in, no matter what the

2   standard is they are going to bring in their experts and

3   we're going to have our experts to argue about whether it's

4   a risk to people to drink this water.  And so that's really

5   the question that this Court's going to deal with in the

6   end.

7        THE COURT:  Oh, regardless of where the regulator

8   puts --

9        MR. DAVIS:  That's right, Your Honor.  Unless they

10  concede that whatever the state adopts that they'll come in

11  and they won't argue with, but I doubt that's the case.

12       THE COURT:  All right.  And on your side you have

13  people lined up that, experts that believe that 20 parts per

14  trillion presents a health risk?

15       MR. DAVIS:  There are experts who believe that

16  less than 20 parts per trillion presents a health risk,

17  including the state of New Jersey who has proposed 14 parts

18  per trillion, Your Honor.

19       THE COURT:  Okay.

20       MR. DAVIS:  Thank you.

21       MR. CHEFFO:  Thank you, Your Honor.  If I could

22  just address a few quick points.  Just in, I think Your

23  Honor asked this question, you know, we've heard about, you

24  know, kind of health risks and everything else, but we've

25  also heard this has, at least as I understand it, nothing to

1    do with personal injury.

2              THE COURT:  This is sort of a slam run title kind

3    of a case?

4              MR. CHEFFO:  Yeah.  Right.  I mean, if they -- so,

5    again, I'm not minimizing that, but this idea of the

6    drinking the water and the health risk it's not what this

7    case is about.

8              THE COURT:  Right.  I didn't appreciate that until

9    this morning when I went back and read it again.

10             MR. CHEFFO:  Right.  And there are no personal

11   injury cases that are at least filed in this state that I'm

12   aware of.

13             THE COURT:  Right.  Right.

14             MR. CHEFFO:  So where I think there is a

15   disconnect is that, and I think Your Honor asked this

16   question, is that, you know, the plaintiffs haven't really

17   addressed this zone of contamination concern.  You know, and

18   again on the one hand they say, well, you know, we have

19   nothing to do with the state, but that map is not created by

20   the plaintiffs or their experts or they went out and hired

21   somebody.  I mean, that's literally off the website of the

22   state, right.

23             And this idea that it has nothing to do with 20

24   and, again, you know, I don't know where that comes from, I

25   have not seen that record, I can't certainly speak to

1    authority that if all of a sudden they came in and they said

2    70 that that wouldn't change, you know, but the reality is

3    it has changed over time.

4          And this is what the plaintiffs say in their own

5    complaint, page 74, under the class action allegations.

6    They say, the zone of contamination in those areas of North

7    Bennington and Bennington, Vermont, most recently designated

8    by the State of Vermont, has designated areas of concern of

9    North Bennington and Bennington on April 26, 2016.

10         As discussed in herein DEC has continued to expand

11   boundaries of the zone of contamination as the extent of the

12   PFOA contamination has continued to expand beyond the

13   original and subsequently revised areas of interest.  And,

14   as such, the zone of contamination may continue to expand

15   and require amendment and/or modification as defined.

16         So here's where I think we're a little bit talking

17   past each other.  I think Your Honor understands, we are not

18   suggesting that this is an everyday type motion that's made

19   that, in every case.  Nor are we suggesting that you can't

20   have coordinate state enforcement and federal court

21   coordination.  What I think you don't see in any of these

22   cases is where a plaintiff decides to go to their word

23   processor and put out a complaint and define their class

24   that is absolutely coordinate and rests on the state's

25   action.

1          So in these other cases where there's differences

2    and it's not dependent on it, there are differences, as I

3    think conceded and suggested to you earlier, Your Honor.  So

4    that's what's different about this case.

5          So I think at a very minimum, you know, Your Honor

6    suggested something that frankly makes perfect sense.  One

7    is, we know within a few months that the state is going to

8    be doing something with the 20.  At that time they may or

9    may not issue different regs., different information.  They

10   may or may not define this map any differently depending on

11   those regulations.  The plaintiffs may or may not decide

12   whether they really want to tether their class to something

13   that could change based on a regulator's decision one day

14   and how Your Honor would determine if that's a class that we

15   even know whose in.

16         So, in other words, you know, even tomorrow if

17   someone said we made a mistake or we want to change this, I

18   mean, in terms of just fundamental fairness to Saint-Gobain

19   in this, you know, we have to understand what the scope of

20   discovery is, whose going to be in, what the potential

21   issues are, right.  And it can't really be based on what,

22   you know, a regulator may or may not do that's completely

23   outside the Court's purview.

24         So that's really I think simply our point here is

25   that this case is fundamentally different than many, many

 1    others because I'm not aware of cases where someone puts in

 2    the state's kind of regulatory scheme as part of their class

 3    definition.  And that's what the plaintiffs chose to do

 4    here, Your Honor.

 5              THE COURT:  All right.  Thank you.

 6              MR. CHEFFO:  Thank you.

 7              THE COURT:  Miss Joselson?  Sure.

 8              MS. JOSELSON:  This map is the definition of who

 9    is living within and who owns property within the zone of

10    contamination.  It is unlikely that that will change.  But

11    the discovery on liability issues can productively be

12    ongoing over the next six months or more and we will know if

13    that changes, but --

14              THE COURT:  The test results won't change, that's

15    what you're saying?

16              MS. JOSELSON:  The test results won't change.  The

17    areas of concern won't change.

18              THE COURT:  The state's views on who, who is in

19    peril and who isn't?  Who is at risk and who isn't?

20              MS. JOSELSON:  How much peril, who is in.

21              THE COURT:  That, that may evolve?

22              MS. JOSELSON:  But nothing about our claims

23    changes because now we have and have for months had the

24    identification of those property owners whose properties are

25    contaminated or next to properties that are contaminated

1   according to the best results available to the public.

2   And the defense has not challenged, as we

3   understand it, the map.  In their proceedings against the

4   state they're only challenging the 20 parts per trillion.

5   THE COURT:  You mean as scientifically

6   unsupportable?

7   MS. JOSELSON:  Apparently.

8   THE COURT:  Right.

9   MS. JOSELSON:  But we know that whether it's 20,

10  70, or even a hundred, that doesn't impact our common law

11  claims.  Our common law claims are based on the fact that we

12  now own property that is contaminated to a greater extent or

13  a lesser extent.  And, you know, some people may have

14  different concerns based on how contaminated their wells are

15  and how long they've been living there and how long they've

16  been drinking water, how high their blood levels are, but

17  nuisance law does include, as this Court is well aware, the

18  upset and annoyance and inconvenience and distress

19  associated with living with a nuisance.

20  And so while we are not making personal injury

21  claims in this lawsuit the human damages, as opposed to the

22  property damages, are clearly part of this lawsuit.  And

23  none of that changes based on whether the state maintains

24  the 20 parts per trillion or changes it higher or lower.

25  THE COURT:  All right.  Thank you.  That was

1    really helpful both of you.   Thank you very much.

2              I'll get something out as quickly as I can.

3    Probably about a month.   Thanks.

4              (The Court recessed at 2:15 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                   C E R T I F I C A T E

2

3           I, Anne Marie Henry, Official Court Reporter for

4    the United States District Court, for the District of

5    Vermont, do hereby certify that the foregoing pages are a

6    true and accurate transcription of my shorthand notes taken

7    in the aforementioned matter to the best of my skill and

8    ability.

9

10                    _____

11                         Anne Marie Henry, RPR
                           Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```