UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |
|---|---|
| JAMES D. SULLIVAN, LESLIE ADDISON, SHARYN JONES, and BISHOP ROBIN HOOD GREENE, individually, and on behalf of a Class of persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION, <br><br> Defendant. | Case No. 5:16-cv-125 |

**OPINION AND ORDER**
(Doc. 8)

Plaintiffs James D. Sullivan, Leslie Addison, Sharyn Jones, and Bishop Robin Hood Greene reside in the towns of Bennington and North Bennington, Vermont. They bring this putative class action for negligence, nuisance, trespass, battery, and strict liability against Defendant Saint-Gobain Performance Plastics Corporation ("Saint-Gobain"). Plaintiffs allege that Saint-Gobain and its predecessor ChemFab Corporation ("ChemFab") caused groundwater and property contamination by discharging perfluorooctanoic acid ("PFOA") from facilities in Bennington and North Bennington, and that the contamination resulted in diminished property values and other economic loss. (*See* Doc. 1.) Saint-Gobain has filed a Motion to Dismiss or Stay under Fed. R. Civ. P. 12(b)(1), pending the outcome of Saint-Gobain's state-court challenges to PFOA groundwater rules recently promulgated in Vermont. (*See* Doc. 8.) The court heard argument on the Motion on October 11, 2016, at which time the motion was taken under advisement.

## Background

The allegations in the Complaint include the following. PFOA is a man-made perfluorinated chemical. Because it repels lipids and water, it is used in a variety of manufacturing and industrial processes and commercial applications. For example, it is used to manufacture non-stick cookware, stain-resistant carpets and fabrics, water-repellant clothing, and food packaging. It is a stable chemical for which there is no known environmental breakdown mechanism; it is readily absorbed into biota and accumulates with repeated exposure. Accumulation of PFOA in humans causes damage to the blood, liver, kidneys, immune system, and other organs, and causes diseases such as cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. The United States Environmental Protection Agency ("EPA") has classified PFOA as an "Emerging Contaminant of Concern." (*See* Doc. 1 ¶¶ 13–22.)

ChemFab, Saint-Gobain's predecessor by merger,[1] conducted manufacturing operations at a plant in Bennington, Vermont beginning in 1968, and transferred those operations to a plant in North Bennington, Vermont in 1977. (*Id.* ¶¶ 31, 33.) ChemFab, and then Saint-Gobain, operated the North Bennington facility from approximately 1977 through 2002. (*Id.* ¶ 30.) The operation involved manufacturing polytetrafluoroethylene ("Teflon") coated woven fiberglass fabrics, and used chemical solutions containing PFOA in that process. (*See id.*) According to Plaintiffs, inadequate and unsafe practices related to the handling, cleanup, or disposal of PFOA caused Saint-Gobain to discharge PFOA from its North Bennington facility into the soil and water, causing environmental contamination around the facility, including contamination of the local groundwater aquifer and numerous private drinking water wells. (*Id.* ¶ 53.)

---

[1] Saint-Gobain acquired ChemFab through a merger agreement in August 2000. (*See id.* ¶ 37.)

In February 2016, after the discovery of PFOA contamination from another Saint-Gobain facility in nearby Hoosick Falls, New York, the Vermont Department of Environmental Conservation ("DEC") sampled three private drinking water wells and two commercial wells near the site of the Saint-Gobain plant in North Bennington. All five wells were found to contain PFOA levels above 20 parts per trillion ("ppt"). (*Id.* ¶ 55.) In March 2016—on the recommendation of the Vermont Department of Health ("DOH")—DEC designated a Vermont drinking water Health Advisory limit/interim groundwater enforcement standard for PFOA of 20 ppt. (*Id.* ¶ 24.)

Also in March 2016, DEC developed an initial plan to sample all private drinking water wells and water sources within a 1.5-mile radius of the plant. (*Id.* ¶ 56.) As part of that initial plan, DEC sampled approximately 180 private drinking water wells. Approximately 116 of those wells contained some level of PFOA contamination, and approximately 105 were contaminated with PFOA in excess of 20 ppt. (*Id.* ¶ 57.) DEC expanded its testing beyond the original 1.5-mile radius, and by late April 2016 had sampled 232 private drinking wells, of which approximately 126 showed PFOA levels above 20 ppt. (*See id.* ¶¶ 59–62.) Plaintiffs allege that, as a result of the ground water and soil contamination, they and members of the putative class have suffered diminution of property value. (*Id.* ¶ 67.)

> Plaintiffs define the putative class (with certain exclusions) as:
>
> All natural persons, whether minor or adult, including any person claiming by, through or under a Class Member, who have interests in real property within the Zone of Contamination, including, but not limited to, those persons whose private water supply wells have been found to be contaminated with PFOA above 20 ppt.

(*Id.* ¶¶ 75–76.)[2] The "Zone of Contamination" is defined as "those areas of North Bennington and Bennington, Vermont, most recently designated by the State of Vermont as 'Designated Areas of Concern in North Bennington and Bennington' on April 26, 2016." (*Id.* ¶ 74.)

Plaintiffs filed their Complaint on May 6, 2016. (Doc. 1.) For relief, they seek, among other things, an injunction and more than $5,000,000 in damages. (*See id.* at 25–26.) The injunction that Plaintiffs seek would require:

> (1) connect[ion] [of] each impacted water supply within the Zone of Contamination onto municipal water; (2) the establishment and implementation of remedial measures sufficient to permanently prevent PFOAs from further contaminating Plaintiffs' and Class Members' drinking water supplies and/or properties; (3) the establishment and implementation of a long-term medical testing protocol for Plaintiffs and Class Members to monitor their health and diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA; and (4) the establishment of additional steps, to be proven at trial, that are determined necessary to remediate Plaintiffs' and all Class Members' properties and/or residences to eliminate the presence of PFOA . . . .

(*Id.* at 26.)

### Saint-Gobain's State-Court Challenges to Vermont PFOA Groundwater Rules

The following additional facts relate to Saint-Gobain's Rule 12(b)(1) Motion to Dismiss or Stay. In 2009, the EPA set 400 ppt as a "provisional health advisory level" for PFOA. (*See* Doc. 8-6.) On March 7, 2016—after sampling showed PFOA contamination in wells in North Bennington—DOH issued a health advisory recommending against drinking water with PFOA concentrations in excess of 20 ppt. (Doc. 8-10 at 3.) DOH's health advisory stated that the 20 ppt value was based on EPA's draft 2014 Health Effects Document for PFOA, which was under review at that time and had not yet been finalized. (*See id.* at 3 & n.1.)

---

[2] Notably excluded from the proposed class are "[a]ll persons who suffered any personal injury or illness as a result of their exposure to the contaminated water." (*Id.* ¶ 76(d).)

4

On March 16, 2016, based on the DOH advisory, DEC set 20 ppt as the interim groundwater enforcement standard for PFOA. (*Id.* at 2.) On April 13, 2016, the Vermont Agency of Natural Resources ("ANR") initiated the process for adoption of emergency rules concerning PFOA, seeking to designate PFOA as "hazardous waste" and to establish a primary groundwater enforcement standard of 20 ppt. (Doc. 8-11.) The emergency rules were set to become effective on April 29, 2016, and to remain in effect until August 26, 2016. (*Id.* at 5.)

Saint-Gobain filed legal challenges to the interim standard and the emergency rules. On April 13, 2016, Saint-Gobain filed suit in the Vermont Superior Court, Washington Unit (*see* Doc. 8-13) (the "Interim Standard Washington Unit Complaint"), and in the Vermont Superior Court, Environmental Division (*see* Doc. 8-14) (the "Interim Standard Environmental Division Appeal").[3] In the Interim Standard Washington Unit Complaint, Saint-Gobain alleged that DEC's March 16, 2016 interim groundwater enforcement standard was not in compliance with the Vermont Administrative Procedure Act ("APA"), and was not supported by science. (*See* Doc. 8-13 ¶ 23.) In the Interim Standard Environmental Division Appeal, Saint-Gobain asserted that DEC lacked power to enforce any PFOA standard prior to the designation of the interim groundwater enforcement standard, and that the standard was unsupported. (*See* Doc. 8-14 at 3.) On May 13, 2016, Saint-Gobain filed suit in the Vermont Superior Court, Washington Unit, challenging the validity of the emergency rules promulgated by ANR (*see* Doc. 8-15) (the "Emergency Rule Complaint").[4] In that action, Saint-Gobain alleged that the emergency rules

---

[3] The Interim Standard Washington Unit Complaint was docketed *Saint-Gobain Performance Plastics v. State of Vermont, Agency of Natural Resources*, No. 214-4-16 Wncv. The Interim Standard Environmental Division Appeal was docketed *In re: Interim Groundwater Enforcement Standard for PFOA*, No. 40-4-16 Vtec.

[4] The Emergency Rule Complaint was docketed *Saint-Gobain Performance Plastics v. State of Vermont, Agency of Natural Resources*, No. 288-5-16 Wncv.

were not adopted in compliance with the APA, and were not supported by science. (*See* Doc. 8-15 ¶¶ 33, 36, 48, 51.)

In May 2016, the EPA issued a drinking water health advisory for PFOA at a recommended level of 70 ppt (not the more stringent 20 ppt level that had appeared in the draft 2014 health effects document). (*See* Doc. 8-8.)

## Analysis

### I.     Rule 12(b)(1) Standard

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it . . . .'" *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). On a Rule 12(b)(1) motion, the court accepts as true "'all material allegations of the complaint[] and . . . construe[s] the complaint in favor the complaining party.'" *Id.* (first brackets in original) (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)). "In deciding a Rule 12(b)(1) motion, the court may also rely on evidence outside the complaint." *Id.*

### II.    *Burford* Abstention

"The abstention doctrine comprises four 'extraordinary and narrow exception[s]' to a federal court's duty to exercise jurisdiction." *In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 775 (2d Cir. 1996) (alteration in original) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)). Those four exceptions are known as *Pullman*, *Younger*, *Colorado River*, and *Burford* abstention. *See id.* (citing *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), *Younger v. Harris*, 401 U.S. 37 (1971), *Colorado River*,

6

424 U.S. 800, and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)). "But for these excepted areas, the federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *Id.* (omission in original) (quoting *Colorado River*, 424 U.S. at 817). Saint-Gobain asserts that the court should abstain under the *Burford* abstention doctrine. (Doc. 8-1 at 25.)[5]

"*Burford* abstention respects the states' specialized and comprehensive regulatory schemes, in the way that *Rooker-Feldman* respects the judicial processes of the states." *Hachamovitch v. DeBuono*, 159 F.3d 687, 697 (2d Cir. 1998). There are two circumstances in which a federal court should apply *Burford* abstention:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Id.* (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989) (internal quotation marks omitted)). The court evaluates three factors to determine whether *Burford* abstention is appropriate: "(1) the degree of specificity of the state regulatory scheme; (2) the need to give one or another debatable construction to a state statute; and (3) whether the subject matter of the litigation is traditionally one of state concern." *Bethphage Lutheran Serv., Inc. v. Weicker*, 965 F.2d 1239, 1243 (2d Cir. 1992); *see also Cranley v. Nat'l Life Ins. Co. of Vt.*, 144 F. Supp. 2d 291, 299 (D. Vt. 2001).

---

[5] Although a decision to abstain is not necessarily a conclusion that the court lacks jurisdiction, "[a] motion to dismiss based on the abstention doctrine may be analyzed under Rule 12(b)(1)." *Vereline v. Woodsville Guar. Sav. Bank*, No. 5:15-cv-00176, 2015 WL 9216684, at *2 (D. Vt. Dec. 16, 2015) (discussing *Colorado River* abstention); *see also Hanlin Grp., Inc. v. Power Auth. of State of N.Y.*, 703 F. Supp. 305, 306 (S.D.N.Y. 1989) (granting Rule 12(b)(1) motion on *Burford* abstention grounds).

A.     **Specificity of Regulatory Scheme**

Saint-Gobain asserts that the first *Bethphage* factor is met because Vermont state law "provides a comprehensive statutory framework to formulate policy and decide cases, including opportunities for state court review." *Bethphage*, 965 F.2d at 1243. It is true that Vermont has a statutory framework to formulate policies concerning groundwater and drinking water,[6] and there are opportunities for state court review.[7] But that alone is insufficient to satisfy the first factor. *See New Orleans Pub. Serv., Inc.*, 491 U.S. at 362 ("While *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy."). Rather, the focus is "on the extent to which the federal claim requires the federal court to *meddle* in a complex state scheme." *Hachamovitch*, 159 F.3d at 697.

Here, nothing about Plaintiffs' litigation will require the court to "meddle" in Vermont's regulatory scheme regarding PFOA. Saint-Gobain asserts that Plaintiffs' case is "based on" the state PFOA groundwater rules that Saint-Gobain is challenging in state court, and that Plaintiffs are attempting to "leverage" those rules into common-law tort claims. (Doc. 24 at 9.) According to Saint-Gobain, "[i]f this case proceeds based on ultimately vacated standards and an obviated

---

[6] *See, e.g.*, 10 V.S.A. § 1392(a) (ANR secretary empowered to develop "a comprehensive groundwater management program to protect the quality of groundwater resources"); 18 V.S.A. § 104(d) (commissioner of health charged with investigating upon receiving "information regarding a condition that may be a public health hazard").

[7] *See, e.g.*, 3 V.S.A. § 807 (authorizing action for declaratory judgment to challenge validity or applicability of an agency's rule); 10 V.S.A. § 8504(a) (authorizing appeals to Environmental Division); V.R.C.P. 74 (appeals from decisions of governmental agencies); V.R.C.P. 75 (review of governmental action).

designation of areas of 'concern,' Vermont's treatment of PFOA will be anything but uniform." (*Id.*)

In their Complaint, Plaintiffs do indeed mention the 20 ppt threshold and the state "designated areas of concern," but litigating Plaintiffs' state-law tort claims will not require interference with those state designations or Saint-Gobain's state-court challenges. No ruling on issues of negligence, nuisance, trespass, or Plaintiffs' other common-law theories, will necessarily conflict with Vermont's regulatory scheme or process regarding PFOA. *See Martin v. Shell Oil Co.*, 198 F.R.D. 580, 586 (D. Conn. 2000) ("[N]o ruling as to whether the defendants trespassed on the plaintiffs' property will necessarily conflict with any finding of the state agency."). If there is any lack of "uniformity" between state regulations and the common law concerning PFOA, it is because the two bodies of law are simultaneously different and complementary. *Cf. CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 668 (1993) (negligence liability could complement federal regulations); *see also Martin*, 198 F.R.D. at 587 (state agency was charged with protecting the environment for the public's health and safety, but not with "vindicating individual property rights such as those asserted by the plaintiffs in this case").

B. **Necessity of Statutory Construction**

Saint-Gobain contends that, because Plaintiffs have pled their class definition and their allegations of injury with reference to Vermont's PFOA groundwater rules, this litigation will necessarily require interpretation of state statutes and standards. (*See* Doc. 8-1 at 26.) According to Saint-Gobain, "the determination of these groundwater standards is within the unique discretion and authority of the Vermont agencies." (*Id.* at 27.) For the same reasons discussed above, however, this litigation does not call for determination of administrative

groundwater standards. Those standards may be part of the evidence for Plaintiffs' common-law theories, but interpreting the standards will not be necessary to adjudicate Plaintiffs' claims.

Saint-Gobain relies upon the *Bethphage* case itself, but that case is distinguishable. There, the Second Circuit upheld the district court's decision to abstain in a Medicaid case brought by a provider—Bethphage—that challenged the reasonableness of its individual rates as set by Connecticut state officials. But part of the difficulty in that case was that the federal court could not set Bethphage's rates "without reference to the state statutes and regulations that establish how those rates are to be set." *Bethphage*, 965 F.2d at 1247. In contrast, this case does not require the court to set or interpret Vermont's administrative groundwater rules, but instead involves the common law rules for doctrines such as negligence and trespass.

Saint-Gobain insists that the court will be required to apply Vermont's PFOA groundwater rules "in order to determine injury, class membership, and alleged entitlement to remediation." (Doc. 8-1 at 27.) The court does not read the Complaint that way. The Complaint does not use the 20 ppt threshold as a measure to determine whether any Plaintiff has experienced the diminished property values that Plaintiffs allege as an "injury." The Complaint refers to that threshold in several instances,[8] but the alleged diminution in property values is not strictly tethered to 20 ppt. The 20 ppt threshold also does not define the putative class; the class definition includes—but is explicitly "not limited to"—those persons whose private water supply wells have PFOA concentrations above 20 ppt. (*See* Doc. 1 ¶ 75.) The "Zone of Contamination"

---

[8] (*See, e.g.*, Doc. 1 ¶¶ 5–7 (testing at named Plaintiffs' private water wells showed PFOA concentrations of 293 ppt, 338 ppt, and 62.3 ppt—all above the 20 ppt threshold); ¶ 62 ("Between February and late-April of 2016, DEC sampled no fewer than 232 private drinking water wells for PFOA contamination, and of these wells, approximately 126 wells showed levels of PFOA contamination above the DOH Health Advisory Limit of 20 ppt."); ¶ 65 ("Plaintiffs and Members of the Class whose wells have been contaminated with PFOA above the 20 ppt limit have been advised not to use their well water for drinking or cooking purposes.").)

10

or "Designated Areas of Concern" *does* define the class, but—giving Plaintiffs the benefit of all reasonable inferences—that area is not defined by the 20 ppt threshold.[9]

### C.   Subject Matter of the Litigation

The third *Bethphage* factor is an inquiry into "whether the subject matter is traditionally one of state concern." *Hachamovitch*, 159 F.3d at 698. Providing for public health and safety is an area of state concern and one of every state's paramount policy priorities. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens."). Vermont's groundwater protection statutes explicitly identify health and safety as policy reasons for management of groundwater. 10 V.S.A. § 1390(2). Management of hazardous waste is in a similar category. *See Onondaga Landfill Sys., Inc. v. Williams*, 624 F. Supp. 25, 30 (N.D.N.Y. 1985) (management of hazardous waste disposal and pollution in general is "an area of strong public interest which has traditionally been left to the states").

Plaintiffs concede these points, but assert that the same issues are also of significant federal interest. (Doc. 17 at 25.) The court's task is not to ascertain which sovereign's interest in these issues might be greater.[10] Instead, the court notes that the subject matter of this litigation primarily concerns private property rights. To the extent that that topic overlaps with questions of public health and safety, the court concludes that the overlap is not sufficient to trigger application of the extraordinary *Burford* exception to the court's obligation to exercise its

---

[9] Indeed, according to the most recent map of designated "Areas of Concern" or "Areas of Interest," PFOA was not detected at all at many sites within the original 1.5-mile radius or in the expanded area of testing outside that radius. *See* Sampling Test Results – December 7, 2016, http://dec.vermont.gov/sites/dec/files/co/pfoa/documents/Area-of-Interest-No-Bennington.pdf (lasted visited Dec. 28, 2016).

[10] And, as the court understands Plaintiffs' claims, the court in this case will likely be applying Vermont state tort law rather than any substantive federal environmental law.

11

jurisdiction. For the reasons discussed above, although the subject matter of this litigation may relate to significant Vermont state interests, nothing about the litigation will disrupt the Vermont agencies' efforts to establish a coherent policy with respect to those interests.

### III.   Primary Jurisdiction

The doctrine of primary jurisdiction can be another basis for abstention. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 353 (1963) (primary jurisdiction "requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme").[11] If the court finds that the doctrine of primary jurisdiction applies, it "either stays the pending action or dismisses it without prejudice." *Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996). Courts apply the doctrine of primary jurisdiction "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)). There is no precise formula for applying the doctrine of primary jurisdiction, but courts typically consider the following four factors:

(1)   whether the question at issue is within the conventional expertise of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
(2)   whether the question at issue is particularly within the agency's discretion;
(3)   whether there exists a substantial danger of inconsistent rulings; and
(4)   whether a prior application to the agency has been made.

---

[11] Rule 12(b)(1) may not strictly apply to motions based on the doctrine of primary jurisdiction, *see Meau v. Sentry Cas. Co.*, No. 5:15-cv-67, 2016 WL 4491626, at *4 & n.5 (D. Vt. Aug. 25, 2016), but courts have reviewed the doctrine in that procedural context. *See Pejepscot Indus. Park, Inc. v. Me. Cent. R.R. Co.*, 215 F.3d 195, 198 (1st Cir. 2000); *Varughese v. Mount Sinai Med. Ctr.*, No. 12 Civ. 8812(CM), 2013 WL 1385015, at *1 (S.D.N.Y. Apr. 3, 2013); *ITT World Commc'ns Inc. v. W. Union Tel. Co.*, 524 F. Supp. 702, 703 (S.D.N.Y. 1981).

*Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 295 (2d Cir. 2006) (quoting *Ellis*, 443 F.3d at 82–83). "The court must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 223 (2d Cir. 1995).

### A.   Agency Expertise and Discretion

The questions raised by Plaintiffs' state-law tort claims are all within the conventional expertise of judges. Saint-Gobain asserts that Plaintiffs do more than allege state-law tort claims, and instead "purport to plead such claims based on test results that exceeded a challenged regulatory standard on behalf of a putative class that is defined by and with reference to that challenged regulatory standard." (Doc. 24 at 6.) Selection of an administrative PFOA concentration threshold is an issue that involves technical or policy considerations within the expertise and discretion of ANR, DEC, and DOH. But for the reasons discussed above, Plaintiffs' claims and their class definition do not hinge on the 20 ppt standard. The first two factors do not favor abstention.

### B.   No Danger of Inconsistent Rulings

Nor is there a danger of inconsistent rulings. Saint-Gobain contends that Vermont's PFOA groundwater rules are "essential" to Plaintiffs' class definition and legal theories, and that if Saint-Gobain's legal challenge to those rules is successful, the court's adjudication of class certification and Plaintiffs' theory of liability could be upset. (*See* Doc. 8-1 at 22–23.) The court disagrees. As discussed above, Vermont's PFOA groundwater rules are not essential to Plaintiffs' class definition or their legal theories. *See Martin*, 198 F.R.D. at 586 ("Although standards of public health and public safety may provide relevant evidence or material for argumentation in the case, they are not dispositive of the claims in the case, all of which, except

13

negligence per se, sound in private tort actions at common law, independent of any statutory standard.").

Moreover, there will be no interference with the Vermont agencies' regulation of PFOA if Plaintiffs prevail on their theories and are entitled to remedies. An award of damages is unlikely to interfere with the state agencies' efforts. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 618 (S.D.N.Y. 2001) ("[C]ourts generally do not defer jurisdiction where plaintiffs seek damages for injuries to their property or person."). Plaintiffs also seek equitable relief, which Saint-Gobain asserts "depends" on Vermont's PFOA groundwater rules. (Doc. 24 at 8.) Again, as discussed above, the Complaint does not depend on the 20 ppt threshold, and neither does the equitable relief that Plaintiffs seek.

Saint-Gobain appears to suggest that an award of equitable relief might conflict with the work of or relief ordered by ANR, DEC, or DOH. But Saint-Gobain does not articulate how any of the equitable relief that Plaintiffs seek might conflict with any particular order of those agencies. *See In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d at 618 (where injunctive relief sought by plaintiffs was not provided by the various administrative agencies, and did not appear to be forthcoming, it was unlikely that court-ordered relief would be inconsistent with relief available through state statutory or regulatory programs). At the October 11, 2016 hearing, counsel for Saint-Gobain suggested that the company and the State of Vermont were in discussions regarding water hookups and medical monitoring—issues specifically mentioned in Plaintiffs' request for injunctive relief. Rather than being an impediment or potential conflict, the court views those discussions as potentially helpful to this case, since they might obviate some of the relief that Plaintiffs seek.

14

C.  **Prior Application**

Saint-Gobain contends that the propriety of Vermont's PFOA groundwater rules is already before the Vermont agencies (and the Vermont state courts). (*See* Doc. 8-1 at 24.)[12] But for the reasons discussed above, the Complaint is not coupled to the 20 ppt standard. Saint-Gobain's challenge to the rules setting that standard is not a request that any Vermont agency or state court decide the questions raised by Plaintiffs' common-law claims in this court. The "prior application" is irrelevant to the primary-jurisdiction analysis because the questions presented in this case are not questions that the Vermont agencies or courts handling Saint-Gobain's challenge are expected to decide. *See Schiller*, 449 F.3d at 295 (fourth factor was "simply irrelevant" where "the question presented is not one that the Commission would be expected to decide").

D.  **Costs Outweigh Advantages**

Finally, the costs of applying the primary-jurisdiction doctrine in this case far outweigh the benefits. The final administrative rules regarding groundwater and hazardous waste management have only just been issued. Assuming that Saint-Gobain elects to challenge those final rules in state court, the court process (including appeal to the Vermont Supreme Court) will

---

[12] The court understands that the Interim Standard Washington Unit Complaint and the Emergency Rule Complaint have been dismissed. *See* "Vermont Courts Online," https://secure.vermont.gov/vtcdas/user (last visited Dec. 28, 2016) (registration required) (search for Docket Numbers "214-4-16 Wncv" and "288-5-16 Wncv"). The status of the Interim Standard Environmental Division Appeal is not clear, but at the October 11, 2016 hearing, counsel for Saint-Gobain conceded that the company would likely focus its state-court litigation on the final rules. The court understands that the final rules were adopted on December 16, 2016, and that the final rules set 20 ppt as the enforcement standard for PFOA. *See* DEC, Groundwater Protection Rule and Strategy, http://dec.vermont.gov/sites/dec/files/documents/2016_12_16_GWPR%26Sadopted.pdf; *see also* ANR, Hazardous Waste Management Regulations, http://dec.vermont.gov/sites/dec/files/wmp/HazWaste/Documents/Regulations/2016_12_16VermontHWMRAdopted.pdf.

likely take years. Awaiting resolution of the state administrative and appeals process would cause substantial delay in this case. Moreover, the benefit of abstaining in favor of that process is marginal at best. For the reasons described above, resolution of the enforcement standard for PFOA concentrations will have little bearing on resolution of Plaintiffs' state-law tort claims.

### Conclusion

Saint-Gobain's Motion to Dismiss or Stay (Doc. 8) is DENIED.

Dated at Rutland, in the District of Vermont, this 28th day of December, 2016.

Geoffrey W. Crawford, Judge
United States District Court