STATE OF VERMONT

SUPERIOR COURT                        CIVIL DIVISION
BENNINGTON UNIT                       Docket No.        Bncv

STATE OF VERMONT, AGENCY OF
NATURAL RESOURCES,
                    Plaintiff,

            v.

SAINT-GOBAIN PERFORMANCE
PLASTICS CORPORATION,
                    Defendant.

## PLEADINGS BY AGREEMENT

The State of Vermont, Agency of Natural Resources, by and through

Vermont Attorney General Thomas J. Donovan, Jr., and Defendant Saint-

Gobain Performance Plastics Corporation, by their undersigned counsel, hereby

submit these pleadings by agreement pursuant to Vermont Rule of Civil

Procedure 8(g).

## THE STATE'S ALLEGATIONS

### The Parties

1.  The State of Vermont Agency of Natural Resources (ANR) is a state

agency created through 3 V.S.A. § 2802.

2.  Saint-Gobain Performance Plastics Corporation (Defendant) is a

California corporation with offices and operations in the United States.  From

approximately 2000-2002, Defendant owned and operated a fabric coating

facility at 1030 Water Street in the Village of North Bennington, Vermont.

Office of the
**ATTORNEY
GENERAL**
109 State Street
Montpelier, VT
05609

1

**Exhibit 034**

*Statutory Scheme*

3.  ANR has authority to regulate hazardous materials and solid and hazardous waste through 10 V.S.A. Chapter 159 and administrative rules and procedures adopted under that authority.

4.  Pursuant to 10 V.S.A. § 6615(a) and (b) and 10 V.S.A. § 1283(c), ANR may recover its costs of investigation, removal, mitigation, and remediation for releases of hazardous materials, and may require a responsible person to take necessary removal and remedial actions.

5.  Pursuant to 3 V.S.A. Chapter 7, the Attorney General has the general supervision of matters and actions on behalf of the State, and may settle such matters as the interests of the State require.

*Facts*

Perfluorooctanoic Acid (PFOA) Release and Agency Response

6.  From approximately 1968 to 1978, Chemical Fabrics Corporation (Chemfab) operated a fabric coating facility at 108 Northside Drive in the Town of Bennington, Vermont.

7.  In 1978, Chemfab moved from the Northside Drive facility to a facility at 1030 Water Street in the Village of North Bennington, Vermont.

8.  In 2000, Defendant acquired Chemfab.

9.  From approximately 2000-2002, Defendant continued fabric coating operations at the Water Street facility.

**Office of the ATTORNEY GENERAL 109 State Street Montpelier, VT 05609**

2

10. PFOA was contained in certain polytetrafluoroethylene (PTFE) coatings purchased by Chemfab and Saint-Gobain from third parties and used at the Northside Drive and Water Street facilities (Facilities) to coat fabrics.

11. PFOA is a synthetic, fully fluorinated, organic acid used in a variety of consumer products and industrial applications.

12. In February 2016, ANR received a complaint that Defendant's fabric coating operation may have resulted in the release of PFOA into the environment.

13. In response to the complaint, ANR sampled several drinking water wells in the area of the Water Street facility and found PFOA to be present in the wells.

14. As a result of the presence of PFOA in drinking water wells, ANR initiated a response action that has included sampling additional wells, providing bottled water, and overseeing State contractor and Defendant's response activities.

    a. ANR has sampled approximately 592 drinking water wells in the Village of North Bennington, Town of Bennington, and Town of Shaftsbury.

    b. Of those 592 wells sampled, 298 contained PFOA concentrations at or above 20 parts per trillion (ppt). 20 ppt is Vermont's primary groundwater quality standard for PFOA.

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

3

### Defendant's Response Activities

15. By letter dated March 1, 2016, ANR notified Defendant that ANR had determined Defendant may be responsible for cleanup actions.

16. Defendant has voluntarily cooperated with ANR with respect to response activities, including paying for the sampling of soils, surface water, groundwater, and drinking water supply wells in the Bennington and North Bennington area; providing bottled water to residents in Bennington and North Bennington; paying for the installation of point-of-entry treatment (POET) systems on private drinking water wells in which PFOA has been detected at concentrations at or above 20 ppt; and paying for municipal water lines to be extended to certain residences along Northside Drive.

17. Defendant has developed a Conceptual Site Model identifying potential sources and pathways of PFOA in portions of the Village of North Bennington, Town of Bennington, and Town of Shaftsbury.

18. Defendant has developed a comparative analysis of corrective action alternatives with respect to drinking water and groundwater remediation in Corrective Action Area I as defined in Appendix B to the Consent Order.

19. The response activities performed to date by Defendant and the State have ensured that residents have drinking water that meets state and federal standards and advisory levels while the State and Defendant cooperate to implement the additional response activities provided for in the Consent Order.

**Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609**

<u>ANR's Determinations</u>

20. The Facilities released PFOA and caused and/or contributed to PFOA contamination in areas including, but not necessarily limited to, Corrective Action Area I.

21. Pathways for the PFOA contamination include, but are not necessarily limited to, airborne emissions through stacks at the Facilities.

22. Saint-Gobain is liable pursuant to 10 V.S.A. § 6615 and 10 V.S.A. § 1283 for the release of the hazardous material PFOA, response costs, and resulting contamination in the area including, but not necessarily limited to, Corrective Action Area I.

## DEFENDANT'S RESPONSE TO THE ALLEGATIONS

Defendant answers the preceding allegations as follows:

23. Defendant admits the allegations set forth in paragraphs 1 through 2, 6 through 11, and 15 through 19.

24. The allegations in paragraphs 3 through 5 set forth the purported statutory scheme in Vermont, to which no response is necessary.

25. Defendant denies the allegations and conclusions set forth in paragraphs 12 through 14 and 20 through 22.

## STIPULATION

26. Notwithstanding paragraph 25, the State and Defendant have agreed to a Stipulation for Entry of Consent Order and Consent Order, which has been executed by the parties and is being filed in this action together with these

**Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609**

5

Pleadings by Agreement and stipulation.  This agreement is made in compromise of disputed claims and is not an admission of liability by Defendant, and Defendant expressly denies the allegations as set forth in paragraph 25.

27. The Consent Order is in the parties' interests because it will memorialize areas of agreement between the State and Defendant and facilitate remediation and long-term management of groundwater and drinking water in Corrective Action Area I.

28. The parties agree and request that the Court withhold entry of the Consent Order for 30 days to allow for public notice and comment with ANR.

Office of the
ATTORNEY
GENERAL
109 State Street
Montpelier, VT
05609

6

DATED at Montpelier, Vermont this 25th day of July, 2017.

STATE OF VERMONT

THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By: _____

Robert F. McDougall
ERN 2973
Laura B. Murphy
ERN 5042
Assistant Attorneys General
Attorney General's Office
109 State Street
Montpelier, VT 05609-1001

STATE OF VERMONT
AGENCY OF NATURAL RESOURCES

JULIA S. MOORE
SECRETARY

By: _____

Jennifer Duggan, General Counsel
ERN 7/63
Matthew Chapman, General Counsel DEC
ERN 7943
1 National Life Drive
Davis 2
Montpelier, VT 05620-3901

7

Dated at Brattleboro, Vermont, this 24th day of July, 2017.

SAINT-GOBAIN PERFORMANCE PLASTICS
CORPORATION

By: _____

Brad Fawley, Esq.
Downs Rachlin Martin PLLC
28 Vernon Street, Suite 501
P.O. Box 9
Brattleboro, VT 05302
ERN 3514

STATE OF VERMONT

SUPERIOR COURT                                   CIVIL DIVISION
BENNINGTON UNIT                                  Docket No.        Bncv

STATE OF VERMONT, AGENCY OF
NATURAL RESOURCES,
              Plaintiff,

        v.

SAINT-GOBAIN PERFORMANCE
PLASTICS CORPORATION,
              Defendant.


**STIPULATION FOR THE ENTRY OF CONSENT ORDER**


    Plaintiff, the State of Vermont, Agency of Natural Resources ("ANR" or "the State"), through the Office of the Attorney General, and Saint-Gobain Performance Plastics Corporation ("Settling Defendant"), individually, and through the undersigned counsel, stipulate and agree as follows:

    WHEREAS, the Chemical Fabrics Corporation (Chemfab) previously operated a fabric coating facility at 108 Northside Drive in the Town of Bennington from approximately 1968 to 1978.

    WHEREAS, Chemfab moved from the Northside Drive facility to a facility at 1030 Water Street in the Village of North Bennington in 1978.

    WHEREAS, Settling Defendant acquired Chemfab in 2000 and continued to perform fabric coating operations at the Water Street facility until the facility closed in February 2002.

    WHEREAS, perfluorooctanoic acid (PFOA) was contained in certain polytetrafluoroethylene (PTFE) coatings purchased by Chemfab and Saint-Gobain from third parties and used by Saint-Gobain at the Water Street facility to coat fabrics, and used by Chemfab at the Northside Drive and Water Street facilities to coat fabrics.

    WHEREAS, in February 2016, the State received a complaint that Settling Defendant's fabric coating operation may have resulted in the release of PFOA into the environment.

WHEREAS, as a result of this complaint, the State sampled several wells in the area of the Water Street Facility and found PFOA to be present in the wells.

WHEREAS, as a result of the presence of PFOA, the State initiated a response action pursuant to 10 V.S.A. §§ 1283 and 6615 that has included the sampling of approximately 592 water supply wells, 298 of which have been found to contain PFOA at concentrations at or above 20 parts per trillion (ppt).

WHEREAS, as a part of its response, the State has incurred costs, including costs associated with sampling drinking water supplies for PFOA, providing bottled water, and oversight of both State contractor and Settling Defendant's response activities.

WHEREAS, Settling Defendant was formally notified of the release by the State in a letter dated March 1, 2016.

WHEREAS, Settling Defendant has voluntarily cooperated with the State with respect to the response activities to date, including paying for the sampling of soils, surface water, groundwater, and drinking water supply wells throughout Corrective Action Area I and II; providing bottled water to residents in Bennington and North Bennington; paying for the installation of point-of-entry treatment (POET) systems on private supply wells in which PFOA has been detected at concentrations at or above 20 ppt; paying for municipal water lines to be extended to certain residences along Northside Drive; and agreeing to pay for engineering designs for potential expansions of municipal water lines in Corrective Action Area I.

WHEREAS, Settling Defendant has also voluntarily performed additional response activities at the Site, including the submission of a Conceptual Site Model modeling potential PFOA impacts from the Northside Drive and Water Street facilities and a comparative analysis of corrective action alternatives.

WHEREAS, the response activities performed to date by Settling Defendant and the State have ensured that residents have drinking water that meets state and federal standards and advisory levels while the State and Settling Defendant cooperate to implement the additional response activities provided for in this Consent Order.

WHEREAS, the State and Settling Defendant now seek to memorialize their agreement concerning additional response activities to be performed at the Site.

WHEREAS, the Attorney General pursuant to 3 V.S.A. Chapter 7 has the general supervision of matters and actions on behalf of the State and may settle such matters as the interests of the State require; and

2

WHEREAS, the Attorney General believes this settlement is in the State's interest as it will facilitate the prompt remediation and long-term management of groundwater and drinking water in Corrective Action Area I, expedite investigation and remediation for the remainder of the Site, and further the goals of the statutory program in 10 V.S.A. Chapter 159.

NOW, THEREFORE, the State and Settling Defendant hereby stipulate and agree as follows:

1.    The Consent Order which follows immediately below ("Consent Order") may be entered by the Court;

2.    The State and Settling Defendant agree to voluntarily dismiss without prejudice the case titled "Saint-Gobain v. State of Vermont," Docket No. 30-1-17 Wncv;

3.    The Consent Order has been negotiated by and between the State and Settling Defendant in good faith and is in the State's interest;

4.    The State and Settling Defendant hereby waive all rights to contest or appeal the Consent Order and they shall not challenge, in this or any other proceeding, the validity of the Consent Order or this Court's jurisdiction to enter or enforce the Consent Order;

5.    The Consent Order sets forth the complete agreement of the parties, and it may be altered, amended, or otherwise modified only as provided in Section XXIII (Modification) of the Consent Order; and

6.    This Consent Order may be executed in identical counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.

DATED at Montpelier, Vermont this 25th day of July, 2017.

STATE OF VERMONT

THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By: _____
Robert F. McDougall
ERN 2973
Laura B. Murphy
ERN 5042
Assistant Attorneys General
Attorney General's Office
109 State Street
Montpelier, VT  05609-1001

STATE OF VERMONT
AGENCY OF NATURAL RESOURCES

JULIA S. MOORE
SECRETARY

By: _____
Jennifer Duggan, General Counsel
ERN 7163
Matthew Chapman, General Counsel DEC
ERN 4943
1 National Life Drive, Davis 2
Montpelier, VT 05620

4

Dated at Brattleboro, Vermont, this 24th day of July, 2017.

SAINT-GOBAIN PERFORMANCE PLASTICS
CORPORATION

By:

Brad Fawley, Esq.
Downs Rachlin Martin PLLC
28 Vernon Street, Suite 501
P.O. Box 9
Brattleboro, VT 05302
ERN _3514_

## CONSENT ORDER AND FINAL JUDGEMENT

## I.     JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action

pursuant to 10 V.S.A. Chapter 159.  This Court also has personal jurisdiction over

Settling Defendant. Solely for the purposes of this Consent Order and the

underlying Pleadings by Agreement, Settling Defendant waives all objections and

defenses that it may have to jurisdiction of the Court.  Settling Defendant shall not

challenge the Consent Order or this Court's jurisdiction to enter and enforce this

Consent Order.

## II.     PARTIES BOUND

2.      This Consent Order is binding upon the State of Vermont and upon

Settling Defendant and its successors and assigns.  Any change in Settling

Defendant's ownership or corporate or other legal status including, but not limited

to, any transfer of assets or real or personal property, shall in no way alter Settling

Defendant's responsibilities under this Consent Order.

3.      Settling Defendant shall provide a copy of this Consent Order to each

contractor hired to perform the Site Work and to each person representing Settling

Defendant with respect to the Site Work, and shall condition all contracts entered

into hereunder upon performance of the Site Work in conformity with this Consent

Order.  Settling Defendant or its contractors shall provide written notice of the

Consent Order to all subcontractors hired to perform any portion of the Site Work.

Settling Defendant shall nonetheless be responsible for ensuring that all contractors and subcontractors perform the Site Work in accordance with this Consent Order. Each contractor and subcontractor undertaking any activity involving or relating to the performance of the Site Work shall be deemed to be in a contractual relationship with Settling Defendant within the meaning of 10 V.S.A. § 6615(d)(1)(C).

## III.   DEFINITIONS

4.      Unless otherwise defined in this Consent Order, terms used in this Consent Order that are defined in 10 V.S.A. Chapter 159 (the Vermont Waste Management Act) or in the procedure entitled "Investigation and Remediation of Contaminated Properties Rule" (IROCPR), dated July, 2017, shall have the meaning assigned to them by statute or procedure.

5.      Whenever terms listed below are used in this Consent Order or its appendices, the following definitions shall apply solely for purposes of this Consent Order:

"Affected Property" shall mean all real property at the Site and any other real property where the State determines, at any time, that access, land, water, or other resource-use restrictions, and/or Institutional Controls are needed to implement the Corrective Action.

7

"Consent Order" shall mean this Consent Order and all appendices attached hereto (listed in Section XXII). In the event of a conflict between this Consent Order and any appendix, this Consent Order shall control.

"Corrective Action" means those actions taken under this Consent Order to implement the Work, and other actions consistent with the Work taken in response to a release or threatened release of PFOA into the environment to prevent a threat or potential threat to present or future public health or welfare or the environment.

"Corrective Action Area I" means the area identified in Appendix B as Corrective Action Area I that the parties agree is subject to the corrective action required by the terms of this Consent Order.

"Corrective Action Area II" means the area identified as Corrective Action Area II in Appendix B.

"Corrective Action Plan" or "CAP" shall mean the technical analysis and procedures which follow the selection of a remedy for Corrective Action Area I and result in a detailed set of plans and specifications for implementation of the corrective action.  The CAP shall incorporate the Site Work and the Water Extensions Work and be in conformance with the requirements of Appendix A and the IROCPR.

"Day" or "day" shall mean a calendar day. In computing any period of time under this Consent Order, where the last day would fall on a Saturday, Sunday, or

8

federal or Vermont State holiday, the period shall run until the close of business of the next day that is not a Saturday, Sunday, or federal or Vermont State holiday.

"Effective Date" shall mean the date upon which this Court enters this Consent Order as a Court order.

"Future Oversight Costs" shall mean that portion of Future Response Costs that the State incurs in monitoring and supervising Settling Defendant's performance of the Site Work to determine whether such performance is consistent with this Consent Order, including costs incurred in reviewing deliverables submitted pursuant to this Consent Order, as well as costs incurred in overseeing implementation of the Site Work or Water Extensions Works; however, Future Oversight Costs do not include, *inter alia*: the costs incurred by the State of Vermont pursuant to  Section VI (Remedy Review),  and ¶  22 (Access to Financial Assurance), or the costs incurred by the State of Vermont in enforcing this Consent Order, including all costs incurred pursuant to Section XII (Dispute Resolution), and all litigation costs.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the State of Vermont incurs in reviewing or developing deliverables submitted pursuant to this Consent Order, in overseeing implementation of the Site Work or Water Extensions Work, or otherwise implementing, overseeing, or enforcing this Consent Order, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, and the costs

9

incurred pursuant to, ¶ 22 (Access to Financial Assurance), Section VI (Remedy Review), and Section XII (Dispute Resolution). Future Response Costs shall also include all Interim Response Costs. "Future Response Costs" shall not include any direct or indirect costs incurred by the State in connection with Corrective Action Area II, including the provision of alternative water, the operation and maintenance of POET systems, the extension of municipal water lines, or any other response activities undertaken by the State.

"Include" or "including" shall mean including but not limited to.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to PFOA at or in connection with Corrective Action Area I; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the Corrective Action; or (c) provide information intended to modify or guide human behavior at or in connection with Corrective Action Area I.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the State of Vermont in connection with Corrective Action Area I between June 30, 2017 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date but excluding Past Response Costs. Interim Response Costs shall not include any direct or indirect

10

costs incurred by the State in connection with Corrective Action Area II, including the provision of alternative water, the operation and maintenance of POET systems, the extension of municipal water lines, or any other response activities undertaken by the State.

"Interest" shall mean the interest rate established at 12 V.S.A. § 2903(c) (interest on judgment liens) and 9 V.S.A. § 41a (pre-judgment interest).

"Municipalities" shall mean the Town of Bennington and the Village of North Bennington.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the Corrective Action as specified in the Corrective Action Plan.

"Paragraph" or "¶" shall mean a portion of this Consent Order identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the State of Vermont and Settling Defendant.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the State of Vermont paid at or in connection with Corrective Action Area I  through June 30, 2017.

"Performance Standards" shall mean the applicable and relevant cleanup levels or other measures of achievement of the Corrective Action objectives as set forth for each operable unit in Appendix A.

"PFOA" shall mean perfluorooctanoic acid.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the municipal land records.

"Response Costs" shall mean Past Response Costs, Interim Response Costs, and Future Response Costs.

"Secretary" shall mean the Secretary of the Agency of Natural Resources.

"Section" shall mean a portion of this Consent Order identified by a Roman numeral.

"Settling Defendant" shall mean Saint-Gobain Performance Plastics Corporation.

"Site" shall mean any location in the Town of Bennington, Town of Shaftsbury, or the Village of North Bennington where the release of PFOA associated with former operations at the Northside Drive or Water Street facilities has come to be located.

12

"Site Work" shall mean that portion of the work set forth in Appendix A, and detailed in the Corrective Action Plan, that is to be directly performed by Settling Defendant or its contractors in connection with the investigation and remediation of the former Northside Drive and Water Street facilities; the installation, operation, and maintenance of POETs; the provision of alternative water supplies; and long-term monitoring and well-testing.  Site Work shall also include site investigation work performed by Settling Defendant in Corrective Action Area II.  Site Work shall not include the Water Extensions Work.

"Supervising Contractor" shall mean the principal contractor retained by Settling Defendant to supervise and direct the implementation of the Site Work under this Consent Order.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or, where used as a noun, a sale, assignment, conveyance, lease, mortgage, grant of security interest, or other disposition of any interest by operation of law or otherwise.

"Validated Sample" shall mean a sample that is collected and analyzed in accordance with a workplan approved by the Secretary that addresses quality assurance and quality control, which may be included in a sampling and analysis plan or a quality assurance program plan.

13

"Water Extension Work" shall mean that portion of the work set forth in Appendix A, and detailed in the Corrective Action Plan, that Settling Defendant is obligated to fund under this Consent Order but that Settling Defendant will not be directly performing, specifically including the work associated with the extension of municipal water lines to homes in Corrective Action Area I—Operable Unit A, as described in Appendix B.  Water Extension Work shall not include costs associated with operation and maintenance of municipal water line extensions once construction is complete.

"Work" shall mean all activities and obligations Settling Defendant is required to perform or pay for under this Consent Order, including all activities set forth in Appendix A and, upon approval, the Corrective Action Plan, except the activities required under Section XVIII (Retention of Records).

## IV.   GENERAL PROVISIONS

6.   **Objectives of the Parties**. The objectives of the Parties in entering into this Consent Order are to provide for the investigation, design, and implementation of corrective actions in Corrective Action Area I, and for site investigation in Corrective Action Area II; to pay the State's Response Costs; and to resolve the State's claims against Settling Defendant under 10 V.S.A. §§ 1283 and 6615 with respect to releases of PFOA in Corrective Action Area I.

7.   **Commitments by Settling Defendant**. Settling Defendant shall pay for or perform the Work in accordance with this Consent Order, Appendix A,

14

Appendix E, and all deliverables approved by the State pursuant to this Consent Order. Settling Defendant shall pay the State for its Response Costs as provided in this Consent Order.

8.    **Compliance with Applicable Law**. Nothing in this Consent Order limits Settling Defendant's obligations to comply with all applicable state and federal laws and regulations, including all applicable or relevant and appropriate requirements of all state and federal environmental laws.  The activities conducted pursuant to this Consent Order, if approved by the Secretary, shall be deemed to be consistent with the IROCPR.

9.    **Permits**.

a.    Settling Defendant must submit timely and complete applications for all permits or approvals required by law or regulation in order to perform the Site Work, and take all other actions (including payment of fees) necessary to obtain such permits or approvals.

b.    Settling Defendant shall timely notify the State's Project Coordinator, and provide the Coordinator with electronic copies, of all applications submitted under ¶ 9(a).

c.    Settling Defendant may seek relief under the provisions of Section XI (Force Majeure) for any delay in the performance of the Site Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval

15

required for the Site Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

d.     This Consent Order is not, and shall not be construed to be, a permit issued pursuant to any state statute or rule.

## V.     PERFORMANCE OF THE WORK

10.   **Coordination and Supervision**.

a.     **Project Coordinator**.

(1)     Settling Defendant's Project Coordinator must have sufficient technical expertise to coordinate the Site Work.  Settling Defendant's Project Coordinator may not be an attorney representing any Settling Defendant in this matter.  Settling Defendant's Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Site Work.

(2)     The State shall designate and notify Settling Defendant of the State's Project Coordinator and Alternate Project Coordinator.  The State may designate other representatives, which may include its employees, contractors or consultants, to oversee the Site Work.  Subject to the dispute resolution procedures set forth in Section XII, this oversight includes the authority to halt the Site Work or to conduct or direct any necessary response

16

action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of PFOA.

(3)     Settling Defendant's Project Coordinator shall meet with the State's Project Coordinator at a frequency determined by the State Project Coordinator.

b.     **Supervising Contractor**. Settling Defendant's proposed Supervising Contractor must have sufficient technical expertise to supervise the Site Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.     **Procedures for Disapproval/Notice to Proceed**.

(1)     Settling Defendant shall designate, and notify the State, within 10 days after the Effective Date, of the name, contact information, and qualifications of the Settling Defendant's proposed Project Coordinator and Supervising Contractor.

(2)     The State shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable.  If the State issues a notice of disapproval, Settling Defendant shall, within 30 days, submit to the State a

17

list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each.  The State shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. Settling Defendant may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify the State of Settling Defendant's selection.

(3)     Settling Defendant may change its Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 10(c)(1) and 10(c)(2).

(4)     Notwithstanding the procedures of ¶¶ 10(c)(1) and 10(c)(2), Settling Defendant has proposed, and the State has authorized Settling Defendant to proceed, with the following Project Coordinator and Supervising Contractor:

> Kirk Moline
> C.T. Male Associates
> 50 Century Hill Drive
> Latham, New York 12110
>
> Ray Wuolo
> Barr Engineering
> 4300 MarketPointe Drive, Suite 200
> Minneapolis, Minnesota 55435

11.     **Performance of Work in Accordance with Appendix A**.

18

a.      Settling Defendant shall perform the Work as set forth in Appendix A and the approved CAP until:

(1)     all applicable Performance Standards identified in Appendix A have been achieved; and

(2)     the Secretary has issued a Certification of Corrective Action Completion, provided, however, that the Parties agree that Settling Defendant may cease the portion of the Work associated with a particular operable unit upon the Secretary's issuance of a Certification of Corrective Action Completion for that particular operable unit.  Likewise, the parties agree that Settling Defendant may not be required to perform further actions with respect to individual wells if Performance Standards have been achieved for such wells.

b.      Following the completion of the extensions of municipal water lines associated with the Water Extension Work, the State shall reclassify the groundwater in these potions of the Site as Class IV non-potable groundwater in accordance with the IROCPR and state groundwater protection rules to prohibit future use of this groundwater for human consumptive or other residential purposes in areas served by the municipal water line.  To the extent allowed by law, the State may use its reclassification authority to develop well construction standards to the extent that such standards may avoid the consumption or use of water containing

19

PFOA.  The particular areas where groundwater will be reclassified are identified in Appendix B.

      c.  All deliverables required to be submitted for approval under the Consent Order, Appendix A, or the IROCPR shall be subject to approval by the State in accordance with Appendix A and the IROCPR.

      d.  If Settling Defendant is responsible for PFOA at the Site, outside Corrective Action Area I, the Consent Order specific cleanup value shall be 20 ppt for PFOA.  The parties agree that if Settling Defendant is required to undertake corrective action in an area or areas of the Site outside Corrective Action Area I, an amendment of this Consent Order or another settlement document is required.  The Parties agree that, if consensus can be reached with respect to the selected remedy, the State will provide releases that are substantially in the same form as this agreement.  If the State determines that Saint-Gobain is not liable for releases of PFOA in an area or areas of the Site outside Corrective Action Area I, it will issue such a determination in writing.  The terms of this Consent Order shall not require Settling Defendant to take corrective action in Corrective Action Area II or other areas of the Site not included in Corrective Action Area I, and shall not restrict the State from initiating an action in the future to require a corrective action in other areas of the Site not in Corrective Action Area I.

20

## VI.    REMEDY REVIEW

12.    **Periodic Review**. Settling Defendant shall conduct, in accordance with the approved Corrective Action Plan, studies and investigations to support the State's review to ensure that the Corrective Action and Corrective Action Plan are protective of human health and the environment.  The Consent Order specific cleanup value shall be 20 ppt for a periodic review required by this section.

13.    **State Selection of Further Response Actions**. If the State determines, at any time, that the Corrective Action or Corrective Action Plan is not protective of human health and the environment, the State may determine that further response actions or modifications to the Corrective Action Plan may be necessary in accordance with the requirements of the Vermont Waste Management Act and the IROCPR.  The corrective action Consent Order specific cleanup value for PFOA shall be 20 ppt for a selection of further response actions under this section.

14.    **Opportunity to Comment**. Settling Defendant will be provided with an opportunity to comment on any further response actions or modifications to the Corrective Action Plan proposed by the State as a result of the review to determine that the Corrective Action is protective of human health and the environment, and to submit written comments for the record.

15.    **Settling Defendant's Obligation to Perform Further Corrective Actions**. If the State determines that further response actions relating to

21

Corrective Action Area I may be necessary, the State may direct Settling Defendant to fund or perform such further corrective actions, but only if the reopener conditions in ¶¶ 56, 57, or 59 (State's Pre-Certification, Post-Certification, and General Reservations) are satisfied.  Settling Defendant may invoke the procedures set forth in Section XII (Dispute Resolution) to dispute (a) the State's determination that the reopener conditions of ¶¶ 56 or 57 are satisfied, (b) the State's determination that the Corrective Action is not protective of human health and the environment, or (c) the State's selection of the further response actions.  Disputes regarding the State's determination that the Corrective Action is not protective or the State's selection of further corrective actions shall be resolved pursuant to ¶ 41 (Record Review).  Settling Defendant reserves all rights and defenses it may have to an action brought by the State to compel additional response actions under one of the reservations provided in ¶ 59.

16.    **Submission of Plans**. If Settling Defendant is required to perform further corrective actions pursuant to ¶ 15, it shall submit a Corrective Action Plan to the State for approval in accordance with the IROCPR.  The Corrective Action Plan shall be submitted within 30 days of the State's request for such plan, unless otherwise agreed by the State.  Settling Defendant shall implement the approved Corrective Action Plan in accordance with this Consent Order.

# VII.   ACCESS REQUIREMENTS

17.    **Agreements Regarding Access and Non-Interference.** Settling Defendant shall, with respect to any Affected Property, use best efforts to secure from the owner of such property an agreement, enforceable by Settling Defendant and by the State, that such owner: (i) will provide the State and Settling Defendant — and their representatives, contractors, and subcontractors — with access at all reasonable times to such Affected Property to conduct any activity regarding the Consent Order, including those listed in ¶ 17(a) (Access Requirements); and (ii) will refrain from using such Affected Property in any manner that the State determines will pose an unacceptable risk to human health or to the environment due to exposure to PFOA, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Corrective Action.

a.    **Access Requirements**. The following is a list of activities for which access may be required regarding the Affected Property:

(1)    Monitoring the Work;

(2)    Verifying any data or information submitted to the State of Vermont;

(3)    Conducting investigations regarding contamination at or near the Site;

(4)     Obtaining samples of water, air, or any other resource meant to be protected by the Corrective Action;

(5)     Assessing the need for, planning, or implementing additional corrective actions at or near the Site;

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved quality assurance quality control plan as provided in Appendix A;

(7)     Implementing the Work pursuant to the conditions set forth in ¶ 60 (Work Takeover);

(8)     Assessing Settling Defendant's compliance with the Consent Order;

(9)     Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Consent Order; and

(10)    Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions.

18.     **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of Settling Defendant would use to achieve the goal in a timely manner, including the cost of employing professional assistance

24

to secure access.  However, nothing herein shall obligate Settling Defendant to file litigation to obtain access to the Affected Property.  If Settling Defendant is unable to accomplish what is required through "best efforts" in a timely manner, it shall notify the State, and include a description of the steps taken to comply with the requirements.  If the State deems it appropriate, it may assist Settling Defendant, or take independent action, in obtaining such access.  All costs incurred by the State in providing such assistance or taking such action constitute Future Response Costs to be reimbursed under Section IX (Payments for Response Costs).

## VIII.   FINANCIAL ASSURANCE

19.    In order to ensure completion of the Site Work, within 30 days of the Effective Date, Settling Defendant shall secure financial assurance, initially in the amount of $ 2,500,000.00 ("Estimated Cost of the Work"), for the benefit of the State. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to the State.  Settling Defendant may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, and/or insurance policies.

a.    A surety bond guaranteeing payment and/or performance of the Site Work that is issued by a surety company among those listed as acceptable

sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

  b. An irrevocable letter of credit, payable to or at the direction of the State, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

  c. A trust fund established for the benefit of the State that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

  d. A policy of insurance that provides the State with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in Vermont and whose insurance operations are regulated and examined by a federal or state agency;

  e. A demonstration by Settling Defendant that Settling Defendant meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

  f. A guarantee to fund or perform the Site Work executed in favor of the State by one of the following: (1) a direct or indirect parent company of

Settling Defendant; or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with Settling Defendant; provided, however, that any company providing such a guarantee must demonstrate to the State's satisfaction that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee.

20.    If Settling Defendant provides financial assurance by means of a demonstration or guarantee under ¶ 19(e) or 19(f), Settling Defendant shall also comply with, and shall ensure that its guarantors comply with, the other relevant criteria and requirements of 40 C.F.R. § 264.143(f) and this Section, including, but not limited to: (a) the initial submission to the State of required documents from the affected entity's chief financial officer and independent certified public accountant no later than 30 days after the Effective Date; (b) the annual resubmission of such documents within 90 days after the close of each such entity's fiscal year; and (c) notification to the State no later than 30 days, in accordance with ¶ 21  after any such entity determines that it no longer satisfies the relevant financial test criteria and requirements set forth at 40 C.F.R. § 264.143(f)(1).  Settling Defendant agrees that the State may also, based on a belief that an affected entity may no longer meet the financial test requirements of ¶ 19(e) or 19(f), require reports of financial condition at any time from such entity in addition to those specified in this

27

Paragraph.  For purposes of this Section, references in 40 C.F.R. Part 264, Subpart H, to: (1) the terms "current closure cost estimate," "current post-closure cost estimate," and "current plugging and abandonment cost estimate" include the Estimated Cost of the Work; (2) the phrase "the sum of the current closure and post-closure cost estimates and the current plugging and abandonment cost estimates" includes the sum of all environmental obligations guaranteed by such company or for which such company is otherwise financially obligated in addition to the Estimated Cost of the Work under this Consent Order; (3) the terms "owner" and "operator" include Settling Defendant making a demonstration or obtaining a guarantee under ¶ 19(e) or 19(f); and (4) the terms "facility" and "hazardous waste management facility" include the Site.

21.     Settling Defendant shall diligently monitor the adequacy of the financial assurance.  If Settling Defendant becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, Settling Defendant shall notify the State of such information within 7 days.  If the State determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, the State will notify Settling Defendant of such determination.  Settling Defendant shall, within 30 days after notifying the State or receiving notice from the State under this Paragraph, secure and submit to the State for approval a proposal for a revised or alternative financial

assurance mechanism that satisfies the requirements of this Section.  The State may extend this deadline for such time as is reasonably necessary for Settling Defendant, in the exercise of due diligence, to secure and submit to the State a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days.  Settling Defendant shall follow the procedures of ¶ 23 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism.  Settling Defendant's inability to secure and submit to the State financial assurance in accordance with this Section shall in no way excuse performance of any other requirements of this Consent Order, including, without limitation, the obligation of Settling Defendant to complete or fund the Site Work in accordance with the terms of this Consent Order.

22.   **Access to Financial Assurance**.

a.   If the State issues a notice of implementation of a Work Takeover under ¶ 60 then, in accordance with any applicable financial assurance mechanism, the State is entitled to require that any funds guaranteed be paid in accordance with ¶ 22(d).

b.   If the State is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and Settling Defendant fails to provide an alternative financial assurance mechanism in accordance with this

Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 22(d).

c.      If, upon issuance of a notice of implementation of a Work Takeover under ¶ 60, either: (1) the State is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism, whether in cash or in kind, to continue and complete the Site Work; or (2) the financial assurance is provided under ¶19(e) or 19(f), then the State may demand an amount, as determined by the State, sufficient to cover the cost of the remaining Site Work to be performed.  Subject to any defenses it may have, Settling Defendant shall, within 10 days of such demand, pay the amount demanded as directed by the State.

d.      Any amounts required to be paid under this ¶ 22 shall be, as directed by the State: (i) paid to the State in order to facilitate the completion of the Site Work by the State or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the Federal Deposit Insurance Corporation (FDIC), in order to facilitate the completion of the Site Work by another person.  If payment is made to the State, the State may deposit the payment into the Contingency Fund to be retained and used to conduct or finance response actions at or in connection with the Site.

e.      All State Work Takeover costs not paid under this ¶ 22, and for which no valid defense is available to Settling Defendant, must be reimbursed as Future Response Costs under Section IX (Payments for Response Costs).

23.     **Modification of Amount, Form, or Terms of Financial Assurance**. Settling Defendant may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism.  Any such request must be submitted to the State, and must include an estimate of the cost of the remaining Site Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance.  The State will notify Settling Defendant of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph.  Settling Defendant may reduce the amount of the financial assurance mechanism only in accordance with: (a) the State's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XII (Dispute Resolution).  Any decision made by the State on a request submitted under this Paragraph to change the form or terms (other than the amount) of a financial assurance mechanism shall be made in the State's sole and unreviewable discretion, and such decision shall not be subject to challenge by Settling Defendant pursuant to the dispute resolution provisions of this Consent Order or in any other forum.  Within 30 days after receipt of the State's approval of,

31

or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, Settling Defendant shall submit to the State documentation of the reduced, revised, or alternative financial assurance mechanism.

24.    **Release, Cancellation, or Discontinuation of Financial Assurance**. Settling Defendant may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if the State issues a Certification of Work Completion under Appendix A; (b) in accordance with the State's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation, or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XII (Dispute Resolution).

## IX.    PAYMENTS FOR RESPONSE COSTS

25.    **Payment by Settling Defendant for State's Past Response Costs**.  Within 30 days after the Effective Date, Settling Defendant shall pay to the State $1,857,853.87 in payment for Past Response Costs.  Payment shall be made in accordance with ¶ 27 (Payment Instructions for Settling Defendant).

26.    **Payments by Settling Defendant for Interim and Future Response Costs**. Settling Defendant shall pay to the State all Interim and Future Response Costs, which are not inconsistent with the Vermont Waste Management Act.

a.  **Periodic Bills**. The State will send Settling Defendant a monthly bill requiring payment that includes a cost summary, which includes Response Costs incurred by the Agency of Natural Resources and the Department of Health, and their contractors, subcontractors, and agents; the Attorney General's Office; and any other State agencies or departments that have incurred Response Costs.  Settling Defendant shall make all payments within 30 days after Settling Defendant's receipt of each bill requiring payment, except as otherwise provided in ¶ 28, in accordance with ¶ 27 (Payment Instructions for Settling Defendant).

b.  **Deposit of Future Response Costs Payments**.  The total amount to be paid by Settling Defendant pursuant to ¶ 26(a) (Periodic Bills) shall be deposited in the Contingency Fund.

27.  **Payment Instructions for Settling Defendant**.  All payments shall be made to the attention of:

Tracy LaFrance, Financial Operations Director
Administration and Innovation Division
Department of Environmental Conservation
1 National Life Drive, Davis 1
Montpelier, Vermont 05620-3802

28.  **Contesting Interim or Future Response Costs**. Settling Defendant may submit a notice of dispute, initiating the procedures of Section XII (Dispute Resolution), regarding any Interim or Future Response Costs billed under ¶ 26 (Payments by Settling Defendant for Interim and Future Response Costs) if it

33

believes that the State has made a mathematical error, included a cost item that is

not within the definition of Interim or Future Response Costs, or if it believes the

State incurred excess costs as a direct result of State action that was inconsistent

with a specific provision or provisions of the Vermont Waste Management Act.

Such notice of dispute shall be submitted in writing within 30 days after receipt of

the bill and must be sent to the State pursuant to Section XIX (Notices and

Submissions).  Such notice of dispute shall specifically identify the contested

Interim or Future Response Costs and the basis for objection.  If Settling Defendant

submits a notice of dispute, Settling Defendant shall within the 30-day period, also

as a requirement for initiating the dispute, (a) pay all uncontested Interim or

Future Response Costs to the State, and (b) establish, in a duly chartered bank or

trust company, an interest-bearing escrow account that is insured by the FDIC in

the full amount of the contested Interim or Future Response Costs.  Settling

Defendant shall send to the State, as provided in Section XIX (Notices and

Submissions), a copy of the transmittal letter and check paying the uncontested

Interim or Future Response Costs, and a copy of the correspondence that

establishes and funds the escrow account, including, but not limited to, the identity

of the bank and bank account number as well as a bank statement showing the

initial balance of the escrow account.  If the State prevails in the dispute, Settling

Defendant shall pay the sums due (with accrued Interest) to the State within 7 days

after the resolution of the dispute.  If Settling Defendant prevails concerning any

aspect of the contested costs, Settling Defendant shall pay that portion of the costs (plus associated accrued Interest) for which they did not prevail to the State within 7 days after the resolution of the dispute. After such payment, Settling Defendant shall be disbursed any balance of the escrow account. All payments to the State under this Paragraph shall be made in accordance with ¶ 27 (Payment Instructions for Settling Defendant). The dispute-resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Settling Defendant's obligation to reimburse the State for its Interim or Future Response Costs.

## X.      DEFENSE, INDEMNIFICATION, AND INSURANCE
### 29.      **Settling Defendant's Defense and Indemnification of the State**.

a.      The State of Vermont does not assume any liability by entering into this Consent Order. The Settling Defendant shall defend, indemnify, save, and hold harmless the State and its officers and employees against all third-party claims or suits arising in whole or in part from any act or omission of the Settling Defendant in connection with the performance of the Site Work or by a failure of Settling Defendant to fund the Account, as defined in Appendix E, for the Water Extension Work provided that all prerequisites to payment set forth in Appendix E have been met and Settling Defendant has still failed to fund the Account for the Water Extension Work. The State shall notify Settling Defendant in the event of

35

any such claim or suit, and the Settling Defendant shall immediately retain counsel and provide a complete defense against the entire claim or suit.  The State retains the right to participate at its own expense in the defense of any such claim or suit. The State shall have the right to approve all proposed settlements of such claims or suits.  If the State withholds consent to settle any such claim, then the Settling Defendant shall proceed with the defense of the claim but Settling Defendant's indemnification obligation shall be limited to the amount of the proposed settlement rejected by the State.  The State shall not be held out as a party to any contract entered into by or on behalf of Settling Defendant in carrying out the Site Work. Neither Settling Defendant nor any such contractor shall be considered an agent of the State.

   b.   The State shall give Settling Defendant notice of any claim for which the State plans to seek defense or indemnification pursuant to this ¶ 29, and shall consult with Settling Defendant prior to settling such claim.

   30.   Settling Defendant covenants not to sue and agrees not to assert any claims or causes of action against the State for damages or reimbursement or for set-off of any payments made or to be made to the State, arising from or on account of any contract, agreement, and any person for performance of the Site Work, including, but not limited to, claims on account of construction delays.  In addition, Settling Defendant shall defend, indemnify, save and hold harmless the State with respect to any and all claims for damages or reimbursement arising from or on

account of any contract, agreement, or person for performance of the Site Work, including, but not limited to, claims on account of construction delays.

31.     **Insurance**. No later than 15 days before commencing any Site Work, Settling Defendant or its contractors or subcontractors shall secure and shall maintain until the first anniversary after issuance of the State's Certification of Corrective Action Completion pursuant to Appendix A, commercial general liability insurance with limits of $1,000,000.00, for any one occurrence, and automobile liability insurance with limits of $2,000,000.00, combined single limit, naming the State as an additional insured with respect to all liability arising out of the activities performed by or on behalf of Settling Defendant pursuant to this Consent Order.  In addition, for the duration of this Consent Order, Settling Defendant shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Site Work.  Prior to commencement of the Site Work, Settling Defendant shall provide to the State certificates of such insurance and a copy of each insurance policy, including for all contractors and subcontractors. Settling Defendant shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date.

## XI.     FORCE MAJEURE

32.     "Force Majeure," for purposes of this Consent Order, is defined as any event arising from causes beyond the control of Settling Defendant, of any entity

37

controlled by Settling Defendant, or of Settling Defendant's contractors, subcontractors, or agents, that delays or prevents the performance of any obligation under this Consent Order despite Settling Defendant's best efforts to fulfill the obligation.  The requirement that Settling Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure and best efforts to address the effects of any Force Majeure (a) as it is occurring and (b) following the Force Majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible.  "Force Majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

33.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Order for which Settling Defendant intends or may intend to assert a claim of Force Majeure, Settling Defendant shall notify the State's Project Coordinator orally or, in his or her absence, the State's Alternate Project Coordinator or, in the event both of the State's Coordinators are unavailable, the Director of the Waste Management and Prevention Division of the Agency of Natural Resources.  Such notice must be given within 7 days of when Settling Defendant first believed that the event might cause a delay.  Within 10 days after the initial notice, Settling Defendant shall provide the State a written explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a

38

schedule for implementation of any measures to be taken to prevent or mitigate the delay or its effects; Settling Defendant's rationale for attributing such delay to a Force Majeure; and a statement as to whether  Defendant believes such event may cause or contribute to an endangerment to public health, welfare, or the environment.  Settling Defendant shall include with any notice all available documentation supporting its claim that the delay was attributable to a Force Majeure.  Settling Defendant shall be deemed to know of any circumstance of which Settling Defendant, any entity controlled by Settling Defendant, or Settling Defendant's contractors, subcontractors, or agents knew or should have known. Failure to comply with the above requirements regarding an event shall preclude Settling Defendant from asserting Force Majeure regarding that event, provided, however, that the State may, in its unreviewable discretion, excuse Settling Defendant's failure to submit timely or complete notices under this Paragraph. Where Force Majeure is asserted, Settling Defendant must also prove that it made all reasonable efforts to remove, eliminate, or minimize such cause of delay or damages, diligently attempted to perform the obligations from which it seeks to be excused, and timely fulfilled all non-excused obligations.

34.     If the State agrees that the delay or anticipated delay is attributable to a Force Majeure, the time to perform the obligations affected by the Force Majeure will be extended by the State as necessary in the State's judgment to complete those obligations.  An extension of the time based on the Force Majeure shall not, of itself,

extend the time to perform any other obligation.  If the State agrees that the delay is attributable to a Force Majeure, the State will notify Settling Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure.

35.     If the State does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure, the State will notify Settling Defendant in writing of its decision.

36.     If Settling Defendant elects to invoke the procedures set forth in Section XII (Dispute Resolution), it shall do so no later than 15 days after receiving the State's notice.  In any such proceeding, Settling Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure, that the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the delay, and that Settling Defendant complied with the requirements of ¶ 32.  If Settling Defendant carries this burden, the delay at issue shall be deemed not to be a violation of this Consent Order.  However, Settling Defendant must complete the work affected by the delay within a timeline to be established by the State.

37.     The State's failure to timely complete any obligation under the Consent Order or the Corrective Action Plan is not a violation of the Consent Order, provided, however, that if such failure prevents Settling Defendant from meeting

40

one or more deadlines in the Consent Order or the CAP, Settling Defendant may seek relief under this Section.

## XII.   DISPUTE RESOLUTION

38.     Unless otherwise expressly provided for in this Consent Order, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this Consent Order.  However, the procedures set forth in this Section shall not apply to actions by the State of Vermont to enforce obligations of Settling Defendant that have not been disputed in accordance with this Section.

39.     A dispute shall be considered to have arisen when one party sends the other a written notice of dispute.  Any dispute regarding this Consent Order shall in the first instance be the subject of informal negotiations between the parties.  The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties.

40.     **Statements of Position**.

a.     If the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by the State shall be binding unless, within 10 business days after the conclusion of the informal negotiation period, Settling Defendant invokes the formal dispute resolution procedures of this Section by providing the State a written Statement of Position on

41

the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation.

      b.    Within 10 days after receipt of Settling Defendant's Statement of Position, the State shall provide Settling Defendant its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation.  Within 5 business days after receipt of the State's Statement of Position, Settling Defendant may provide a Reply.

41.    **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph.  For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by the State under this Consent Order, and the adequacy of the performance of response actions taken pursuant to this Consent Order.  Nothing in this Consent Order shall be construed to allow any dispute by Settling Defendant regarding the validity of Appendix A.

      a.    The State shall maintain an administrative record of the dispute.  That record shall contain all statements of position, including supporting documentation, submitted pursuant to this Section.  Where appropriate, the State may allow submission of supplemental statements of position by the parties.

42

b.     The Director of the Agency of Natural Resources' Waste Management and Prevention Division will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 41(a). This decision shall be binding upon Settling Defendant, subject only to the right to seek judicial review pursuant to ¶ 41(c).

c.     The Director's decision shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by Settling Defendant with the Court under this docket and served on all Parties within 10 business days after receipt of the State's decision.  The review shall be conducted pursuant to Rule 75 of the Vermont Rules of Civil Procedure.  The State may file an opposition to Settling Defendant's motion, and Settling Defendant may file a Reply, as allowed by the Vermont Rules of Civil Procedure.

42.    The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way Settling Defendant's obligations under this Consent Order, except as provided in ¶ 28 (Contesting Interim or Future Response Costs), as agreed by the State, or as determined by the Court.  Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 28.  Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Order.  In the event that Settling Defendant does not prevail on the disputed issue,

43

stipulated penalties shall be assessed and paid as provided in Section XIII (Stipulated Penalties).

## XIII.  STIPULATED PENALTIES

43.      Settling Defendant shall be liable for stipulated penalties in the amounts set forth in ¶¶ 44 and 45 to the State for failure to comply with the requirements of this Consent Order specified below, unless excused under Section XI (Force Majeure).  "Compliance" by Settling Defendant shall include completion of all activities and obligations, including payments, required under this Consent Order or any deliverable approved under this Consent Order, in accordance with all applicable requirements of law, this Consent Order, Appendix A, and any deliverables approved under this Consent Order or Appendix A and within the specified time schedules established by and approved under this Consent Order and Appendix A.

44.      **Stipulated Penalty Amounts – Consent Order (Including Payments)**.  The following stipulated penalties shall accrue per violation per day

44

for the failure to submit a timely deliverable or comply with any term of this

Consent Order:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500 |
| 15th through 30th day | $ 750 |
| 31st day and beyond | $ 1,000 |

45.    **Stipulated Penalty Amounts - Corrective Action Plan**.  The

following stipulated penalties shall accrue per violation per day for failure to comply

with, or submit timely deliverables pursuant to, the approved Corrective Action

Plan:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $100 |
| 15th through 30th day | $ 250 |
| 31st day and beyond | $ 500 |

46.    The provisions of Section XII (Dispute Resolution) and Section XIII

(Stipulated Penalties) shall govern the accrual and payment of any stipulated

penalties regarding Settling Defendant's submissions under this Consent Order or an approved Corrective Action Plan.

47.     In the event the State assumes performance of a portion or all of the Work pursuant to ¶ 60 (Work Takeover), Settling Defendant shall be liable for a stipulated penalty in the amount of $2,200,000.00. Defendant hereby expressly waives any claim that this stipulated penalty is excessive or otherwise contrary to law in any way.  Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 22 (Access to Financial Assurance) and 60 (Work Takeover).

48.     Following the State's determination that Settling Defendant has failed to comply with a requirement of this Consent Order or the Corrective Action Plan, the State shall give Settling Defendant written notification of the same and describe the noncompliance.  Settling Defendant shall have 10 days from the date of such notification to cure the deficiency identified by the State before penalties may begin to accrue.  All penalties shall begin to accrue on the 10th day after the State provides Settling Defendant with notice of noncompliance, and shall continue to accrue until the noncompliance is corrected or the activity completed.  However, stipulated penalties shall not accrue: (a) with respect to a decision by the Director of the Waste Management and Prevention Division, under ¶ 41(b), during the period, if any, beginning on the 1st day after the State's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (b)

46

with respect to judicial review by this Court of any dispute under Section XII (Dispute Resolution), during the period, if any, beginning on the 1st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute.  Nothing in this Consent Order shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Order or the Corrective Action Plan.

49.    All penalties accruing under this Section shall be due and payable to the State within 30 days after Settling Defendant's receipt from the State of a demand for payment of the penalties, unless Settling Defendant invokes the Dispute Resolution procedures under Section XII (Dispute Resolution) within the 30-day period.  All payments to the State under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 27 (Payment Instructions for Settling Defendant).

50.    Except as provided in ¶ 48, penalties shall continue to accrue during any dispute resolution period, but need not be paid until the following:

a.    If the dispute is resolved by agreement of the parties or by a decision of the State that is not appealed to this Court, accrued penalties determined to be owed shall be paid to the State within 15 days after the agreement or the receipt of the State's decision or order;

b.      If the dispute is appealed to this Court and the State prevails in whole or in part, Settling Defendant shall pay all accrued penalties determined by the Court to be owed to the State within 60 days after receipt of the Court's decision or order, except as provided in ¶ 48;

c.      If this Court's decision is appealed by any Party, Settling Defendant shall pay all accrued penalties determined by this Court to be owed to the State into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order.  Penalties shall be paid into this account as they continue to accrue, at least every 60 days.  Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to the State or to Settling Defendant to the extent that each prevails.

51.     If Settling Defendant fails to pay stipulated penalties when due, Settling Defendant shall pay Interest on the unpaid stipulated penalties as follows: (a) if Settling Defendant has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 43 until the date of payment; and (b) if Settling Defendant fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 43 until the date of payment.  If Settling Defendant fails to pay stipulated

penalties and Interest when due, the State may institute proceedings to collect the penalties and Interest.

52.     The payment of penalties and Interest, if any, shall not alter in any way Settling Defendant's obligation to complete or fund the Work.

53.     Nothing in this Consent Order shall be construed as prohibiting, altering, or in any way limiting the State's ability to seek any other remedies or sanctions available by virtue of Settling Defendant's violation of this Consent Order or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to 10 V.S.A. § 8221, provided, however, that the State shall not seek civil penalties pursuant to 10 V.S.A. § 8221 for any violation for which a stipulated penalty is provided in this Consent Order, except in the case of a willful violation of this Consent Order.

54.     Notwithstanding any other provision of this Section, the State may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Consent Order.

## XIV.   COVENANTS BY THE STATE

55.     Except as provided in this paragraph and in ¶¶ 56, 57 (State's Pre- and Post-Certification Reservations), and 59 (General Reservations of Rights), the State covenants not to sue or take administrative action relating to releases of PFOA in Corrective Action Area I against Settling Defendant pursuant to 10 V.S.A. §§ 1283,

1410, 6610a, 6615, 6615d, 6615e, 6616, 8003, 8221 and 42 U.S.C. §§ 6972, 9607, 9659 or the common law, including claims for natural resource damages.  In addition, the State covenants not to sue or take administrative action against Settling Defendant under any future law or regulation to compel Settling Defendant to pay for water line extensions for PFOA contamination in Corrective Action Area I except as provided for in this Consent Order.  Except with respect to future liability, these covenants shall take effect upon the Effective Date.  With respect to future liability, these covenants shall take effect upon Certification of Corrective Action Completion for Corrective Action Area I by the State pursuant to Appendix A. These covenants extend to Settling Defendant and any of its corporate successors; and corporate parents, subsidiaries, predecessors, or other corporate affiliates identified in Appendix F, but do not extend to any other person.  These covenants are conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Consent Order.

56.  **State's Pre-Certification Reservations**. Notwithstanding any other provision of this Consent Order, the State reserves, and this Consent Order is without prejudice to, the State's right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel Settling Defendant to perform further corrective actions relating to the Site and/or to pay the State for additional costs of response or penalties if:

50

(a) prior to Certification of Corrective Action Completion for Corrective Action Area I:

(1) conditions at the Site, previously unknown to the State, are discovered, or

(2) information, previously unknown to the State, becomes known, in whole or in part, and

(b) the State determines that these previously unknown conditions or information together with any other relevant information indicate that the Corrective Action is not protective of human health or the environment.

57. **State's Post-Certification Reservations**. Notwithstanding any other provision of this Consent Order, the State reserves, and this Consent Order is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel Settling Defendant to perform further corrective actions relating to the Site and/or to pay the State for additional costs of response or penalties if:

a.      subsequent to Certification of Corrective Action Completion for Corrective Action Area I:

(1) conditions at the Site, previously unknown to the State, are discovered, or

51

(2) information, previously unknown to the State, becomes

known, in whole or in part, and

b. the State determines that these previously unknown conditions or
this information together with any other relevant information indicate that the
Corrective Action is not protective of human health or the environment.

58.     For purposes of ¶ 56 (State's Pre-Certification Reservations), the
information and the conditions known to the State will be limited to all factual
information or quantitative data collected by the State and all factual information
and quantitative data submitted to the State by Settling Defendant as of the
effective date of this Consent Order.  For purposes of ¶ 57 (State's Post-Certification
Reservations), the information and the conditions known to the State shall include
all information and those conditions known to the State as of the date of
Certification of Corrective Action Completion for Corrective Action Area I, the
administrative record supporting the Corrective Action Plan, and any information
received by the State pursuant to the requirements of this Consent Order prior to
said Certification of Corrective Action Completion.

59.     **General Reservations of Rights**. The State reserves at all times the
right to seek an order compelling Settling Defendant to perform its obligations
under the Corrective Action Plan and this Consent Order.  The State reserves, and
this Consent Order is without prejudice to, all rights against Settling Defendant
with respect to all matters not expressly included within the State's covenants.

Notwithstanding any other provision of this Consent Order, the State reserves all rights it may have against Settling Defendant with respect to:

a.    liability for failure by Settling Defendant to meet a requirement of this Consent Order;

b.    liability arising from any past, present, or future disposal, release, or threat of release of PFOA in an area or areas of the Site outside Corrective Action Area I;

c.    liability arising from the past, present, or future disposal, release, or threat of release of PFOA outside of the Site;

d.    liability arising from releases after the Effective Date of this Consent Order;

e.    criminal liability;

f.    civil penalty liability;

g.    liability for violations of federal or state law not expressly released as a part of this Consent Order; and

h.    subject to the provisions of ¶¶ 13,  14, and 15, liability, prior to achievement of Performance Standards, for additional response actions that the State determines are necessary to achieve and maintain Performance Standards or

53

to carry out and maintain the effectiveness of the remedy set forth in the approved Corrective Action Plan.

    60.   **Work Takeover**.

      a.    In the event the State determines that Settling Defendant: (1) has ceased implementation of any portion of the Site Work; (2) is seriously or repeatedly deficient or late in its performance of the Site Work; or (3) is implementing the Site Work in a manner that may endanger human health or the environment, the State may issue a written notice ("Work Takeover Notice") to Settling Defendant.  Any Work Takeover Notice will specify the grounds upon which it was issued and will provide Settling Defendant a period of 10 days within which to remedy the circumstances set forth in the notice.

      b.    If, after expiration of the 10-day notice period specified in ¶ 60(a), Settling Defendant has not remedied to the State's satisfaction the circumstances giving rise to the State's issuance of the relevant Work Takeover Notice, the State may at any time thereafter assume the performance of all or any portion(s) of the Site Work the State deems necessary ("Work Takeover").  The State will notify Settling Defendant in writing (which writing may be electronic) if the State determines that a Work Takeover is warranted. Funding of Work Takeover costs is addressed under ¶ 22 (Access to Financial Assurance).  The Stipulated Penalty for a Work Takeover is addressed in ¶ 47.

c.    Settling Defendant may invoke the procedures set forth in ¶ 41 (Record Review), to dispute the Work Takeover.  However, notwithstanding Settling Defendant's invocation of such dispute resolution procedures, and during the pendency of any such dispute, the State may in its sole discretion commence and continue a Work Takeover until the earlier of (1) the date that Settling Defendant remedies, to the State's satisfaction, the circumstances giving rise to the State's issuance of the Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 41 (Record Review) requiring the State to terminate such Work Takeover.

61.    Notwithstanding any other provision of this Consent Order, the State retains all authority and reserves all rights to take any and all response actions authorized by law.

## XV.   COVENANTS BY SETTLING DEFENDANT

62.    Settling Defendant covenants not to sue and agrees not to assert any claims or causes of action against the State with respect to the Work, past response actions regarding the Site, Past Response Costs, Interim Response Costs, or Future Response Costs.  This includes, but is not limited to:

a.    any claims arising under state law regarding the Work, past response actions regarding the Site, Past Response Costs, Interim Response Costs, Future Response Costs, Settling Defendant's Past Response Costs, Settling

55

Defendant's Interim Response Costs, Settling Defendant's Future Response Costs, and this Consent Order; and

b.    any claims arising out of response actions at or in connection with the Site, including claims under the United States Constitution, the Vermont Constitution, or at common law.

63.    Except as provided in ¶ 69 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the State brings a cause of action or issues an order to compel corrective action pursuant to any of the reservations in Section XIV (Covenants by the State), other than in ¶¶ 59(a) (claims for failure to meet a requirement of the Consent Order), 59(e)(criminal liability), and 59(g) (violations of federal/state law during or after implementation of the Work), but only to the extent that Settling Defendant's claims arise from the same response action, response costs, or damages that the State is seeking pursuant to the applicable reservation.

## XVI.   EFFECT OF SETTLEMENT; CONTRIBUTION

64.    Except as provided in ¶¶ 65 and 66 (protection from contribution), nothing in this Consent Order shall be construed to create any rights in, or grant or deny any cause of action to, any person not a Party to this Consent Order.  This Consent Order shall not create any third-party beneficiary status to any person who is not a party to this Consent Order.  Each of the Parties expressly reserves any and all rights, defenses, claims, demands, and causes of action that each Party may

56

have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto, and nothing herein shall be construed as any admission of or any evidence of any fault, wrongdoing, or liability by Settling Defendant in this action or any other action or proceeding.  Nothing in this Consent Order diminishes the right of the State to pursue any Person not a party hereto to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection.

65.     The Parties agree, and by entering this Consent Order this Court finds, that this Consent Order constitutes a judicially-approved settlement pursuant to which the Settling Defendant has, as of the Effective Date and subject to satisfactory completion of the Work, resolved liability to the State for PFOA contamination in Corrective Action Area I within the meaning of 10 V.S.A. §§ 1283 and 6615 for the matters addressed in this Consent Order.

66.     The Parties further agree, and by entering this Consent Order this Court finds, that this Consent Order constitutes a judicially-approved settlement pursuant to which Settling Defendant has, as of the Effective Date and subject to satisfactory completion of the Work, resolved liability to the State for PFOA contamination in Corrective Action Area I within the meaning of 10 V.S.A. § 6615, and Settling Defendant is entitled, as of the Effective Date, to protection from contribution actions or contribution claims as provided by any and all applicable laws, for the "matters addressed" in this Consent Order.  The "matters addressed"

57

in this Consent Order are the Work, Past Response Costs, and Interim and Future Response Costs.

67.     Settling Defendant shall, with respect to any suit or claim brought by it for matters addressed in this Consent Order as described above (namely, the Work, Past Response Costs, and Interim and Future Response Costs), notify the State in writing no later than 15 days prior to the initiation of such suit or claim.

68.     Settling Defendant shall, with respect to any suit or claim brought against it for matters addressed in this Consent Order as described above (namely, the Work, Past Response Costs, and Interim and Future Response Costs), notify in writing the State within 10 days after service of the complaint on Settling Defendant.  In any such action, Settling Defendant shall notify the State within 10 days after service or receipt of any Motion for Summary Judgment on such claim and within 10 days after receipt of any order from a court setting such a case for trial.

69.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the State for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, Settling Defendant shall not assert, and may not maintain, any defense or claim against the State based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the State in the subsequent proceeding were or should have been

58

brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XIV (Covenants by the State).

## XVII. ACCESS TO INFORMATION

70.     Settling Defendant shall provide to the State, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within Settling Defendant's possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Consent Order, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work.  Settling Defendant shall also make available to the State, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

71.     **Privileged or Protected Claims**.

a.     Settling Defendant may assert that all or part of a Record requested by the State is privileged or protected as provided under applicable law, in lieu of providing the Record, provided Settling Defendant complies with ¶ 71(b).

b.      If Settling Defendant asserts a claim of privilege or protection, it shall provide the State with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted.  If a claim of privilege or protection applies only to a portion of a Record, Settling Defendant shall provide the Record to the State in redacted form to mask the privileged or protected portion only.  Settling Defendant shall retain all Records that it claims to be privileged or protected until the State has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the Settling Defendant's favor.

c.      Settling Defendant hereby expressly agrees to produce to the State upon request, and agrees not to assert claims of privilege or protection against the State (but reserves any such claim as against all other persons or parties, and reserves all trade-secret and business-confidential claims as described below), information regarding: (1) any quantitative data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological, or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that Settling Defendant is required to create or generate pursuant to this Consent Order.

60

72.     **Trade-Secret and Business-Confidential Claims**. Settling

Defendant may assert that all or part of a Record provided to the State under this

Section or Section XVIII (Retention of Records) is either a trade secret or business

confidential to the extent permitted by and in accordance with 10 V.S.A. § 6615c(f).

Settling Defendant shall segregate and clearly identify all Records or parts thereof

submitted under this Consent Order for which Settling Defendant asserts such

claims.  Records determined to be confidential will be afforded the protection

specified in 10 V.S.A. § 6615c(f) and 1 V.S.A. § 317(c)(9).  If no claim of

confidentiality accompanies Records when they are submitted to the State or if the

State has notified Settling Defendant that the Records are not confidential, the

public may be given access to such Records without further notice to Settling

Defendant.

73.     If relevant to the proceeding, the Parties agree that validated sampling

or monitoring data generated during the performance of the Work and reviewed and

approved by the State shall be admissible as evidence, without objection, in any

proceeding under this Consent Order.

74.     Notwithstanding any provision of this Consent Order, the State retains

all of its information-gathering and inspection authorities and rights, including

enforcement actions related thereto, under the Vermont Waste Management Act,

and any other applicable statutes or rules.

61

## XVIII.        RETENTION OF RECORDS

75.    Until 10 years after the State's Certification of Work Completion for Corrective Action Area I under Appendix A, Settling Defendant shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability or potential liability under the Vermont Waste Management Act with respect to the Site.  Settling Defendant must also retain all Records that relate to the liability or potential liability of any other person under the Vermont Waste Management Act with respect to the Site.  Settling Defendant must also retain, and instruct its contractors, sub-contractors, and agents to preserve, for the same period of time specified above, all non-identical copies of the final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, and copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained.  Each of the above record-retention requirements shall apply regardless of any corporate retention policy to the contrary.

76.    At the conclusion of this record-retention period, Settling Defendant shall notify the State at least 30 days prior to the destruction of any such Records, and, upon request by the State, and except as provided in ¶ 71 (Privileged or Protected Claims), Settling Defendant shall deliver any such Records to the State.

62

77.     Settling Defendant certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its liability or potential liability regarding the Site since notification of potential liability by the State and that it has fully complied or is working in good faith towards compliance with any and all State requests for information regarding the Site.

## XIX.   NOTICES AND SUBMISSIONS

78.     All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this Consent Order must be in writing unless otherwise specified.  Whenever, under this Consent Order, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified in Appendix G.  Any Party may change the person and/or address applicable to it by providing notice of such change to the other Party.  All notices under this Section are effective upon receipt, unless otherwise specified.  Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the Consent Order regarding such Party.

## XX.   RETENTION OF JURISDICTION

79.     This Court retains jurisdiction over both the subject matter of this Consent Order and Settling Defendant for the duration of the performance of the terms and provisions of this Consent Order for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Order, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XII (Dispute Resolution).

## XXI.   WAIVER

80.     The failure of any Party at any time to require performance by the other Party of the provisions of this Consent Order will not be deemed a waiver of that provision or a waiver of any other provision of this Consent Order and will in no way affect the right to require such performance from such other Party at any time thereafter.

## XXII. APPENDICES

81.     The following appendices are attached to and incorporated as terms of this Consent Order:

"Appendix A" is Corrective Action Work Items and Schedule.

"Appendix B" is the map of the area designated as Corrective Action Area I, including Operable Units A and B, and Corrective Action Area II.

"Appendix C" is the Comparitive Analysis of Corrective Action Options: North Bennington, Vermont.

"Appendix D" is the Agency of Natural Resources Record of Decision and Selection of Remedy for Corrective Action Area I.

"Appendix E" is the Agreement for Payment for Expansion of Municipal Water Lines.

"Appendix F" is a list of Settling Defendant's related entities for purposes of the covenant not to sue in Paragraph 55.

"Appendix G" is a list of contacts for purposes of providing notice under this Consent Order.

## XXIII.   MODIFICATION

82.     Settling Defendant may request that the Secretary modify any deadline established in the Consent Order or any work plan required by the Consent Order.  The Parties understand and agree that circumstances may make it difficult for Settling Defendant to comply with deadlines at times, including but not limited to the timeline of deliverables set forth in Appendix A, and the Secretary agrees to grant requests for extensions made by Settling Defendant provided that such requests are not unreasonable.  When making a request for an extension, Settling Defendant shall propose an alternative deadline and provide a brief justification for why the change is necessary.

65

83.     All material modifications to this Consent Order shall be in writing, signed by the State and Settling Defendant, and shall be effective only upon approval by this Court.  A modification shall be considered material if it fundamentally alters the Parties' obligations.

84.     Non-material modifications to this Consent Order shall be in writing and shall be effective when signed by duly authorized representatives of the State and Settling Defendant.  Any modification agreed to by the Parties that does not fundamentally alter the parties' obligations is a non-material modification.

## XXIV.     LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

85.     This Consent Order shall be lodged with the Court for at least 30 days for public notice and comment.  The State will provide notice of the proposed Consent Order on its website, and in other media as the State in its sole discretion deems appropriate.  The State reserves the right to withdraw or withhold its consent if comments sent to the Agency of Natural Resources regarding the Consent Order contain facts or considerations that indicate that the Consent Order is inappropriate, improper, or inadequate.  Settling Defendant consents to the entry of this Consent Order without further notice after it is lodged with the Court.

86.     If for any reason the Court should decline to approve this Consent Order in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXV. SIGNATORIES/SERVICE

87.    The undersigned representatives of Settling Defendant and the State hereby certify that they are fully authorized to enter into this Consent Order and to execute and legally bind such Party to it.

88.    Settling Defendant agrees not to oppose entry of this Consent Order by this Court or to challenge any provision of this Consent Order unless the State has notified Settling Defendant in writing that it no longer supports entry of the Consent Order.

89.    Settling Defendant shall identify, on the attached signature page, the name, address, email, and telephone number of an agent who is authorized to accept service by mail or email on behalf of Settling Defendant with respect to all matters arising under or relating to this Consent Order.  Settling Defendant agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Vermont Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons.

## XXVI. FINAL JUDGMENT

90.    This Consent Order constitutes the final, complete, and exclusive agreement and understanding between the Parties regarding the settlement embodied in the Consent Order.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Order.

91.     Upon entry of this Consent Order by the Court, this Consent Order shall constitute a final judgment between the State and Settling Defendant.

SO ORDERED THIS __ DAY OF _____, 20__.

_____
Superior Court Judge

DATED at Montpelier, Vermont this 25th day of July, 2017.

STATE OF VERMONT

THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By: _____

Robert F. McDougall
ERN 2973
Laura B. Murphy
ERN 5042
Assistant Attorneys General
Attorney General's Office
109 State Street
Montpelier, VT  05609-1001

STATE OF VERMONT
AGENCY OF NATURAL RESOURCES

JULIA S. MOORE
SECRETARY

By: _____

Jennifer Duggan, General Counsel
ERN  7163
Matthew Chapman, General Counsel DEC
ERN  4943
1 National Life Drive, Davis 2
Montpelier, VT 05620

69

DATED at _Malvern_____, Pennsylvania this _24_ day of July, 2017.

SAINT-GOBAIN PERFORMANCE PLASTICS
CORPORATION

By: _____

Thomas Kinisky, President
Saint-Gobain Corporation
20 Moores Road
Malvern, PA 19355

DATED at Brattleboro, Vermont this 24th day of July, 2017.

                                      SAINT-GOBAIN PERFORMANCE PLASTICS
                                        CORPORATION

By: _____

                                        Brad Fawley, Esq.
                                        Downs Rachlin Martin PLLC
                                        28 Vernon Street, Suite 501
                                        P.O. Box 9
                                        Brattleboro, VT 05302
                                        ERN ___3514___

# APPENDIX A
# CORRECTIVE ACTION WORK ITEMS AND SCHEDULE

## I.      SAMPLING.

1.      Any sampling required by this Consent Order shall be collected and analyzed in accordance with a workplan approved by the Secretary that addresses quality assurance and quality control, which may be included in a sampling and analysis plan or a quality assurance program plan.

2.      All analytical results from sampling required by this Consent Order shall be provided to the Secretary within 10 days of Settling Defendant's receipt of the validated sampling results from the lab or 30 days from the date the sample was collected, whichever is sooner.

## II.     CORRECTIVE ACTION AREA I – OPERABLE UNIT A.

3.      Within 30 days of receiving notice from the State, Settling Defendant shall make an initial payment to the State in the amount of $ 3,400,000, and thereafter shall fund, in accordance with the terms of Appendix E, all costs associated with the planning, design, oversight, and construction associated with the extension of municipal water lines, the connection of homes to the municipal water line, and proper closure of potable water supplies in the area designated as Corrective Action Area I— Operable Unit A in Appendix B.  These costs shall include costs reasonably incurred by the State, the Town of Bennington, Village of North Bennington, and their contractors, sub-contractors, and agents.  These costs shall not include costs associated with operation and maintenance of municipal water line extensions once construction is complete.  This work shall be deemed to have been completed, and all Performance

Standards for this work in Paragraph II(3) shall have been met, upon completion of the Water Extension Work.

### III.   CORRECTIVE ACTION AREA I – OPERABLE UNIT B.

4.   Within 90 days of the Effective Date, Settling Defendant shall provide the ANR with a Corrective Action Plan that:

a.   Includes a plan for siting, drilling, and testing of new wells for homes that have POETs as of the Effective Date of this Order, where technically feasible.

b.   Includes provisions for testing of new wells and implementation of remedy, as follows:

i.   The State shall notify Settling Defendant within 120 days of the permitting of any new well in Corrective Action Area I.  This notice shall include the location of the new well.  After the installation of any new well, Settling Defendant shall offer to test that well for PFOA at no cost to the homeowner

ii.   If Settling Defendant or the Agency of Natural Resources is permitted to test the new well and the well test result is at or exceeds 20 parts per trillion, Settling Defendant shall: (1) immediately provide bottled water to the home owner; (2) immediately notify the State of the test results; and (3) within 30 days of receipt of the laboratory results, install a POET.  The Secretary may, subject to prior consultation with Settling Defendant, require Settling Defendant to connect the home to a municipal water line, if reasonable and cost effective, or drill a new well for the home served by the impacted well if

73

technically feasible, in accordance with Paragraph 4.a, rather than install a POET.   If the Parties cannot agree on an appropriate remedy, either Party may implement the dispute resolution procedures set forth in Section XII of the Consent Order.

      c.     Settling Defendant must provide bottled water to a homeowner until:

           i.     Settling Defendant has completed the start-up testing under the approved POET operation and maintenance sampling plan and has demonstrated that the POET is operating effectively;

           ii.     The home is connected to a municipal water supply; or

           iii.     Settling Defendant has demonstrated that the concentration of PFOA in a newly installed well is below 20 ppt and establishes a stable or decreasing trend, meaning PFOA below 20 ppt for eight (8) consecutive rounds of quarterly sampling and the statistical trend analysis for eight quarters of sampling shows an overall downward trend in PFOA contaminant levels in the water supply or a flat trend if the contaminant levels are below the 20 ppt limit.

      d.     Incorporates the Operation and Maintenance Manual Point of Entry Systems (POET) Private Water Supply Systems dated February 24, 2017, which provides for long-term monitoring, operation, and maintenance of POETs, whether installed before, after, or on the Effective Date of this Order.

      e.     Performance Standard for POETs:  Settling Defendant shall maintain any POET in Corrective Action Area I—Operable Unit B until the Settling Defendant has demonstrated that the concentration of PFOA in the applicable well is

below 20 ppt and establishes a stable or decreasing trend, meaning PFOA below 20 ppt for eight (8) consecutive rounds of quarterly sampling and the statistical trend analysis for eight quarters of sampling shows an overall downward trend in PFOA contaminant levels in the water supply or a flat trend if the contaminant levels are below the 20 ppt limit, after which time Settling Defendant will remove the POET or, if preferred by the homeowner, allow the owner of the well to retain the POET at the owner's expense.

f.      Includes a long-term monitoring plan for all wells in Corrective Action Area I—Operable Unit B without POETs, including existing wells that have not been tested as of the Effective Date, new wells that have been drilled after the Effective Date, and wells that had a POET as of the Effective Date but the POET has either been removed or is no longer required because the performance standards in Paragraph 4.e. have been met.  If in the course of this sampling program, a well test is 20 parts per trillion or greater, Settling Defendant shall respond in the same manner as provided in Paragraphs 4.b.ii and 4.c.  Settling Defendant shall perform this monitoring until the Performance Standards identified in Paragraph 4.h have been achieved.

g.      A long-term monitoring plan to evaluate the effectiveness of natural attenuation of PFOA in the soils and groundwater in Corrective Action Area I.

h.  Performance Standards for Soil and Groundwater:  Monitoring in accordance with the long-term monitoring plan shall be required until: (a)  PFOA concentrations are below 20 parts per trillion at groundwater compliance points established by the Secretary for Corrective Action Area I and Settling Defendant has established that there is a stable or decreasing trend, meaning PFOA below 20 ppt for eight (8) consecutive rounds of quarterly sampling and the statistical trend analysis for

75

eight quarters of sampling  shows an overall downward trend in PFOA contaminant levels in the water supply or a flat trend if the contaminant levels are below the 20 ppt limit; (b) PFOA concentrations are below 300 parts per billion at soil compliance points established by the Secretary for Corrective Action Area I or appropriate institutional controls are in place; (c) PFOA is not present in any drinking water supply wells at concentrations at or above 20 ppt and Settling Defendant establishes a stable or decreasing trend, meaning PFOA below 20 ppt for eight (8) consecutive rounds of quarterly sampling and the statistical trend analysis for eight quarters of sampling shows an overall downward trend in PFOA contaminant levels in the water supply or a flat trend if the contaminant levels are below the 20 ppt limit; (d) Vermont water quality standards have been achieved at any surface water compliance point established for Corrective Action Area I; (e) all required institutional controls, engineered controls, and inspection plans are in place; (f) all groundwater monitoring wells have been properly closed unless such wells are required for any required institutional controls, engineered controls, or inspection plans, or otherwise approved by the State to remain open; (g) all site remedial infrastructure or monitoring points have been properly closed, unless such equipment is required for any required institutional controls, engineered controls, or inspection plans, or otherwise approved by the State to remain open; and (h) any outstanding or overdue balances owed to the State have been paid.

      i.      Corrective Action Area I Institutional Control Plan.

5.     The Corrective Action Plan required by this Section III is subject to review and approval of the Secretary in accordance with the IROCPR.

6.     Upon entry of this Consent Order, Settling Defendant shall commence implementation of the above-described plans and provisions.

## IV.     FIVE YEAR REVIEW.

7.     Five Year Review of Corrective Action Approach and Monitoring Data. Five years following the commencement of the corrective actions, and every five years thereafter, the Settling Defendant shall provide the Secretary with a review of the Site and make recommendations as to whether any further investigation or corrective action is required.  At a minimum, the Five-Year Review shall include:

a.     A summary of any environmental sampling results, including those collected from implementing the long-term monitoring plan, well testing, and monitoring of POETs;

b.     A review of the conceptual site model in light of monitoring results collected as a part of the corrective action.

c.     If revisions to the conceptual site model indicate that additional sampling is necessary, Settling Defendant shall submit a site investigation work plan concurrent with the five-year review.

d.     A brief discussion of any new or innovative remedial technologies that are or may be reasonable, feasible, cost-effective, and accelerate Site compliance with the Performance Standards.

e.     Any recommendations for additional corrective action at the Site.

8.      Within 60 days of receiving questions or comments on the Five-Year Review, Settling Defendant shall respond to those questions or comments by the Secretary.

## V.          CORRECTIVE ACTION AREA II.

9.      In the area designated as Corrective Action Area II in Appendix B, Settling Defendant shall undertake a site investigation in accordance with the document titled "CSM Site Investigation: Bennington, Vermont" prepared by Barr Engineering, dated May, 2017, subject to the comments provided by the Agency of Natural Resources, dated May 30, 2017 and the U.S. EPA Region 1 Comments dated June 28, 2017, and as follows:

a.      Field investigation.

i.      Subject to Settling Defendant being provided timely access to the properties to be sampled, Settling Defendant shall begin the field investigation in July 2017.

ii.      Subject to Settling Defendant being provided timely access to all of the properties to be sampled, Settling Defendant shall complete the field investigation no later than October 30, 2017.

b.      Draft Site Investigation Report: Subject to Settling Defendant being provided timely access to all of the properties to be sampled, Settling Defendant shall submit a draft site investigation report to the Secretary no later than December 15, 2017.

c.      Final Site Investigation Report: Settling Defendant shall respond to any questions or comments received from the Secretary and provide the Secretary with

a Final Site Investigation Report no later than February 15, 2018, provided that Settling Defendant is provided timely access to all properties to be sampled so that the deadlines set forth above may be met.

        d.      Draft Evaluation of Corrective Action Alternatives and Corrective Action Plan: Within 90 days of receiving approval from the Secretary of the final Site Investigation Report, Settling Defendant may provide the Secretary with a corrective action feasibility investigation report.  However, nothing herein requires Settling Defendant to submit such a report or conduct any corrective action in Corrective Action Area II.  If Settling Defendant elects to submit a draft corrective action feasibility investigation report, the  report shall contain: (1) an executive summary of the corrective action alternatives considered, including a recommended alternative based on the criteria in 40 C.F.R. § 300.430(e)(9)(iii); (2) a detailed evaluation of the criteria established under 40 C.F.R. § 300.430(e)(9)(iii) for each remedial option evaluated under this paragraph; and (3) a detailed justification for the recommended remedy.  At a minimum, the corrective action feasibility investigation shall examine the following alternatives:

        i.      An alternative that reduces the toxicity, mobility, or volume of the hazardous materials released to the extent feasible.  Settling Defendant shall review innovative and alternative treatment techniques for PFOA.  In addition to evaluating whether a treatment technique will meet standards at compliance points established for Corrective Action Area II, the Settling Defendant shall evaluate the effectiveness of the treatment technique for plume containment and for reducing the concentration of PFOA throughout the plume.

79

This alternative shall minimize the need for long-term management at Corrective Action Area II.

> ii.      An alternative that involves little or no treatment but controls impacts to sensitive receptors through engineered controls, containment, long-term monitoring, and institutional controls.

> e.      Corrective Action Area II Remedy Selection.  Provided that Settling Defendant has agreed to conduct an Evaluation of Cleanup Alternatives under Paragraph 9(d):

> > i.      The Secretary shall provide a written response to the Settling Defendant that:

> > > A.      Approves the corrective action alternative recommended in the report;

> > > B.      Approves an alternative that was considered but not recommended based on the Secretary's written assessment of the factors established pursuant to 40 C.F.R. § 300.430(e)(9)(iii);

> > > C.      Requests additional alternatives be evaluated; or

> > > D.      Requests additional analysis of one of the alternatives reviewed as a part of the report.

> > ii.      Within 60 days of the Secretary's response, the Settling Defendant may provide the Secretary with a revised corrective action feasibility investigation or a corrective action plan for the selected alternative.

## VI.    NORTHSIDE DRIVE AND WATER STREET SITE INVESTIGATION.

10.     For Northside Drive:

a.      Subject to Settling Defendant's ability to gain access to the property, within 60 days of the Effective Date of this Order or the time access is obtained, Settling Defendant shall provide the Secretary with a draft Site Investigation Work Plan to gather data to fill any data gaps identified in the conceptual site model.

b.      Within 30 days of receiving comments from the Secretary on the draft Site Investigation Work Plan, Settling Defendant shall respond to any questions or comments received from the Secretary.  Within 30 days of the resolution of the Secretary's comments, Settling Defendant shall provide the Secretary with a final Site Investigation Work Plan.

11.     For Water Street:

a.      Subject to Settling Defendant's ability to gain access to the property, within 60 days of the Effective Date of this Order or the date access is obtained, Settling Defendant shall provide the ANR with a draft supplemental Site Investigation Work Plan to investigate the inside of the Water Street facility.

b.      Within 30 days of receiving comments from the Secretary on the draft Site Investigation Work Plan, Settling Defendant shall respond to any questions or comments from the Secretary.  Within 30 days of the resolution of the Secretary's comments, Settling Defendant shall provide the Secretary with a final Site Investigation Work Plan.

12.     For the Northside Drive and Water Street Facilities:

a.      In accordance with the timelines in the final Site Investigation Work Plans approved by the Secretary for the Water Street and Northside Drive

81

facilities, Settling Defendant shall submit a final Site Investigation Report for both

Northside Drive and Water Street detailing the results of the approved site

investigation.

      b.     Within 30 days of receiving comments from the Secretary on the

Site Investigation Report, Settling Defendant shall respond to any questions or

comments received from the Secretary.  Within 30 days of resolution of the Secretary's

comments, Settling Defendant shall provide the Secretary with a revised Site

Investigation Report and a revised CSM.

      c.     Within 90 days of receiving approval from the Secretary of the final

Site Investigation Report and revised CSM, Settling Defendant shall provide the

Secretary with a corrective action feasibility investigation.  The corrective action

feasibility investigation shall contain: (1) an executive summary of the corrective action

alternatives considered, including a recommended alternative based on the criteria in

40 C.F.R. § 300.430(e)(9)(iii); (2) a detailed evaluation of the criteria established under

40 C.F.R. § 300.430(e)(9)(iii) for each remedial option evaluated under this paragraph;

and (3) a detailed justification for the recommended remedy.  At a minimum, the

corrective action feasibility investigation shall examine the following alternatives:

         i.     An alternative that reduces the toxicity, mobility, or volume

of the hazardous materials released to the extent feasible.  Settling Defendant

shall review innovative and alternative treatment techniques for PFOA.  In

addition to evaluating whether a treatment technique will meet standards at

compliance points established for the Facility, the Settling Defendant shall

evaluate the effectiveness of the treatment technique for plume containment and

for reducing the concentration of PFOA throughout the plume.  This alternative shall minimize the need for long-term management at the Facility.

      ii.    An alternative that involves little or no treatment but controls impacts to sensitive receptors through engineered controls, containment, long-term monitoring, and institutional controls.  To the extent that the corrective action alternative selected for the Northside Drive or Water Street Facility requires the use of any Institutional Controls, including any Proprietary Controls, Settling Defendant shall comply with all applicable regulations or requirements to obtain such controls.

      13.    Performance Standards for Northside Drive and Water Street Facilities. The corrective action alternative selected for the Northside Drive and Water Street Facilities shall ensure that: (a) any source area or areas are removed, remediated or adequately controlled using one or more or more methods consistent with the IROCPR; (b) PFOA levels do not exceed 300 ppb in soil at compliance points, or, if soil standards have not been met, then approved engineering and institutional controls have been implemented to prevent contact to such soils; (c) vapor intrusion has been evaluated and addressed, as necessary, in accordance with the IROCPR; (d) all groundwater monitoring wells have been properly closed unless such wells are required for the on-going monitoring of approved engineering and institutional controls or otherwise permitted by the State to remain open; (e) all site remedial infrastructure or monitoring points are properly closed unless such site remedial infrastructure or monitoring points are required for the on-going monitoring of approved engineering and institutional controls or otherwise permitted by the State to remain open; (f) any

remediation wastes have been properly treated or disposed; and (g) all required institutional controls, engineered controls, and inspection plans are in place.

14.     The Secretary shall provide a written response to the Settling Defendant that:

a.     Approves the corrective action alternative recommended in the report;

b.     Approves an alternative that was considered but not recommended based on the Secretary's written assessment of the factors established pursuant to 40 C.F.R. § 300.430(e)(9)(iii);

c.     Requires additional alternatives be evaluated; or

d.     Requires additional analysis of one of the alternatives reviewed as a part of the report.

15.     Within 60 days of the Secretary's response, the Settling Defendant shall provide the Secretary with a revised corrective action feasibility investigation or a corrective action plan for the selected alternative.

16.     Within the timeline in the corrective action plan approved by the Secretary, Settling Defendant shall implement the approved corrective action plan.

17.     Within 60 days of completion of the approved corrective action plan, Settling Defendant shall provide a report to the Secretary that documents that the corrective action was completed in accordance with the requirements of the approved corrective action plan.

18.     Within 30 days of receiving questions or comments on the report required by Paragraph 17, Settling Defendant shall respond to those questions or comments by the Secretary.

84

## VII.   CERTIFICATION OF CORRECTIVE ACTION COMPLETION.

19.     The Settling Defendant shall comply with all provisions contained within this Appendix A and the Corrective Action Plan until the Secretary has granted a Certification of Corrective Action Completion under this Section.

20.     The Settling Defendant may petition the Secretary to issue a Certification of Corrective Action Completion for Corrective Action Area I or an Operable Unit within Corrective Action Area I, the Northside Drive facility, or the Water Street facility.  Any petition shall demonstrate how the specific area has achieved the Performance Standards.  Upon submitting a petition, Settling Defendant shall provide notice to the public in the same manner as required for a corrective action plan.

21.     Within 30 days of receiving questions or comments on the Petition, Settling Defendant shall respond to those questions or comments.  The Secretary shall only grant a Certification of Corrective Action Completion upon the Secretary's determination that the Corrective Action has satisfied the Performance Standards for the relevant area as specified above.





**FREQUENTLY ASKED QUESTIONS: STATE OF VERMONT
CONSENT ORDER WITH SAINT-GOBAIN**

July 26, 2017

*Drinking Water Remedy*

*Q: How did the Agency of Natural Resources determine what the permanent drinking water remedy would be for homes in Corrective Action Area I?*

A: The Agency of Natural Resources (ANR) must evaluate several criteria when selecting a remedy: (1) compliance with legal requirements; (2) protection of human health and the environment; (3) long-term effectiveness and permanence: (4) reduction in toxicity, mobility, or volume of contamination through treatment; (5) short-term effectiveness; (6) implementability; (7) cost; and (8) community acceptance.  As a general matter, ANR's preference to address contaminated wells is to connect impacted owners to a municipal water line given the certainty, stability, and predictability associated with a municipal water source.  However, connection to a municipal water system in some cases may not be practicable for a variety of factors.  For example, connecting one home at the end of a long water line may create water quality problems (e.g., harmful disinfection by-products) because water may sit stagnant in the line. Appendix D of the consent order describes the process and the rationale for ANR's approval of the drinking water remedies for Corrective Action Area I—a combination of connection to municipal water, installation of a replacement well where technically feasible, and operation and maintenance of a Point of Entry Treatment System (POET).

*Q: What long-term drinking water options did ANR evaluate?*

A: ANR considered connection to a municipal water line, installation of a replacement well, and long-term use of POETs.

*Q: Are POETs a long-term solution for removing PFOA?*

A: POETs are effective at removing PFOA and PFOS from drinking water.  As a general matter, the State's preference to address contaminated wells is to connect impacted owners to a municipal water line given the certainty, stability, and predictability associated with a municipal water source.  However, connection to a municipal water system in some cases may not be practicable for a variety of factors, including water quality considerations and costs. When properly monitored and maintained, POETs are an effective long-term remedy to address releases of PFOA.  The State evaluates POETs to determine if POETs are an appropriate long-term remedy based on several factors, including permanence, community acceptance, cost-effectiveness, and other factors.  There is an annual cost to replacing UV lamps and carbon filters

1

yearly, with filters sometimes requiring even more frequent replacement, and costs associated with regular sampling. Under the terms of the consent order, Saint-Gobain is responsible for costs associated with long-term operation and maintenance of POETs in Corrective Action Area I – Operable Unit B.

*Q: The current level of PFOA in my well is below 20 ppt. What happens if levels increase above 20 ppt in the future?*

A: Under the terms of the consent order, Saint-Gobain must comply with a long-term sampling program to monitor PFOA levels for homes that are currently below 20 ppt. At any time, if PFOA levels are at or above 20 ppt, Saint-Gobain must immediately provide bottled water and install a POET within 30 days of receipt of the laboratory analysis. ANR may authorize Saint-Gobain to connect the home to a municipal water line or install a replacement well if technically feasible.

*Q: Why doesn't the consent order include a drinking water remedy for homes in Corrective Action Area II?*

A: Based on available information, it is ANR's position that air deposition from Saint-Gobain's facilities on Water Street and Northside Drive are sources of the PFOA identified in North Bennington and Bennington, including areas east of the railroad tracks near Route 7a. Saint-Gobain does not agree with ANR at this time. To allow the long-term drinking water remedy and final resolution to move forward where ANR and Saint-Gobain agree (Corrective Action Area I), ANR and Saint-Gobain entered into the consent order. The Agency and Saint-Gobain both agree that additional data collection in the area east of 7a should help resolve this disagreement.

Under the terms of the consent order, Saint-Gobain must complete a site investigation on an expedited schedule. Following that investigation, Saint-Gobain must submit a plan to address PFOA, including a proposed drinking water remedy, no later than 90 days from ANR's approval of the site investigation report if Saint-Gobain and the State reach agreement that Saint-Gobain is responsible for PFOA in this area. Saint-Gobain would then be required to perform corrective actions and provide the permanent drinking water remedy in accordance with a schedule approved by ANR.

If the State and Saint-Gobain are unable to reach an agreement, the State will use all authority provided by Vermont law to pursue long-term drinking water solutions for all impacted residents.

*Q: Will I have any input into determinations about my drinking water remedy?*

A: Yes. The engineers and ANR met with many individuals during the final phase of the water line design process. ANR also met with each homeowner with PFOA levels above 20 ppt in Corrective Action Area I – Operable Unit B to discuss why connection to the municipal water line was not feasible and alternative options for a long-term drinking water solution. ANR is

accepting comments from the public until August 25, 2017 on the terms and conditions of the consent order before finalizing the consent order.

### *Municipal Water Line Connections*

**Q: Will construction of municipal water line extensions begin in 2017?**

A: Construction for both projects is expected to begin in the fall of 2017.  North Bennington is expected to begin the bid process on August 1, 2017 with a bid opening date of August 24, 2017. Bennington is expected to begin the bid process on August 7, 2017 with a bid opening date of August 30, 2017.

**Q: What type of water quality concerns might arise with connection to the municipal water line?**

A: In January 2010, Vermont adopted a law to limit the amount of lead allowed in plumbing fixtures, solider and flux used in plumbing.  Many homes and businesses with internal plumbing installed prior to the passage of this law may contain higher concentrations of lead content. Changing the building's source of drinking water may temporarily cause older plumbing fixtures located within existing residential structures to leach lead into the drinking water.  This is due to the change in water chemistry, and is normally corrected by corrosion control measures routinely being implemented by the municipal water district to minimize lead concentration in drinking water being provided to their customers.  To ensure the safety of the users during the transition, water sampling for lead will occur at homes and businesses to establish baseline understanding of the chemistry changes and lead level concentrations in high risk homes.  Based on these results and other risk factors, the municipalities will conduct follow-up lead sampling after the connection to public water and will continue to sample until lead levels are decreasing and below the lead action level of 15 parts per billion.  This sampling is being done as a precaution to ensure the water provided is below the lead action level.  Neither the Bennington nor the North Bennington public water systems have exceeded the lead action level since 1993.

**Q: I like my well water.  I feel that the water is safe with the point-of-entry treatment (POET) system and bottled water provided.  Can I keep my well connection?  If so, will Saint-Gobain pay the costs associated with operating and maintaining the POET and bottled water delivery?**

A:  ANR recommends that all homes that are eligible to connect to a municipal water line connect to the municipal water line.  Where it is feasible, the State's preference to address contaminated wells is to connect impacted owners to a municipal water line given the certainty, stability, and predictability associated with a municipal water source.  If an eligible homeowner chooses not to connect to the municipal water line, Saint-Gobain is not obligated under the consent order to pay for the costs associated with operation and maintenance of the POET and/or bottled water.  These costs would be the responsibility of the homeowner who chooses not to connect to municipal water.

*Q: Is Municipal Water Safe to Drink?*

A:  Yes. The Village of North Bennington Water Department and the Bennington Water Department are both Public Community Water Systems regulated by ANR, subject to the Federal Safe Drinking Water Act and the Vermont Water Supply Rule.  These regulations contain stringent requirements that ensure the water provided to the system's users is protective of public health and does not pose a public health risk.  These regulations include routine monitoring requirements that require water systems to collect routine samples for analysis of almost 100 regulated contaminants.  These systems routinely collect samples from source water, treated water entering the distribution system, as well as throughout the distribution pipe network for analysis of inorganic and organic chemicals, lead and copper concentrations, disinfection byproduct concentrations, and the presence of pathogens such as cryptosporidium and E.coli or fecal coliform bacteria.  During the design of the municipal waterline extensions, the professional engineers responsible for the designs performed technical analyses to evaluate water quality data from the existing water systems and employ construction alternatives designed to meet all applicable regulatory criteria regarding water quality.

*Q:  Who will pay the quarterly water fees?*

A:  Once a connection has been established, the homeowner is responsible for payment of quarterly water fees under the terms of the consent order.  The scope of work associated with extension of the municipal water line service includes connecting municipal water lines to the existing internal plumbing within the home or business; closure of existing well and removal of well pump, POET, and pressure tank; and restoration of property disturbance.  It does not include water usage costs or replacement of existing internal plumbing.  The consent order does not provide Saint-Gobain with a release for liability of private legal claims.

*Q: Will my property be restored to its existing condition after construction of the municipal water line connection is complete?*

A: Yes. The construction contracts will require that all work done on private property be done carefully and restored to existing or better condition.  The engineer will discuss the work beforehand with each homeowner.

*Q:  Can I keep my well open to water my garden, wash my car, fill my pool etc.?  Can I switch back to my well, if for any reason I do not like the municipal water service?*

A:  No.  Once a connection to municipal water has been established, the drinking water well will be sealed and abandoned pursuant to ANR regulations unless it is designated as a monitoring well for long-term groundwater monitoring.

*Q:  What will happen to my well and associated equipment (pump, pressure tank) when I connect to Town water?*

A:  Your well will be sealed and abandoned in accordance with ANR regulations once your home is connected to municipal water.  The scope of work associated with connection to the

4

municipal water line includes well closure and removal of the well pump, POET, and pressure tank.  Under the terms of the consent decree, Saint-Gobain is responsible for costs associated with this work for homes in Corrective Action Area I – Operable Unit A.

***Q:  Could I elect to drill a separate well on my property to water my garden/lawn, feed livestock, etc. if I connect to the municipal system?***

A:  No.  In Corrective Action Area I, the groundwater will be reclassified as Class IV non-potable groundwater in accordance with the Investigation and Remediation of Contaminated Properties Rule and state groundwater protection rules to prohibit future use of this groundwater for human consumptive or other residential purposes in areas served by the municipal water line.

**Q:  *Do I have to pay to have the new water service line installed in my home?***

A:  No.  If you are eligible to connect to the municipal water line under the terms of the consent order, you do not have to pay for the connection to the municipal water line.  The scope of work associated with extension of the municipal water line service includes connecting municipal water lines to the existing internal plumbing within the home or business; closure of existing well and removal of well pump, POET, and pressure tank; and restoration of property disturbance.

If you decide not to connect to municipal water at this time, the contractor will install a service line stub and valve (curb stop) on the distribution system main line.  *You may be able to connect to the municipal water main at a future date, but you would be responsible for all expenses associated with the installation of the new service line, including any necessary permitting fees.*

**Q:  *Will I still need a water softener system?***

A:  No.  The water quality of the Town of Bennington/Village of North Bennington is such that a water softener is not required to provide soft water to the home.

**Q:  *Where does the Town water come from?***

A:  The water that supplies the water systems to the Town of Bennington and the Village of North Bennington's municipal water supplies originate in the Green Mountains located to the east of Bennington.  Drinking water is supplied from both groundwater and surface water supply sources for the Town of Bennington and the Village of North Bennington community water supply systems.

**Q:  *Does the Town have enough capacity to serve these additional homes?***

Yes.  The capacity of the municipal water systems was evaluated during the engineering design process, and ANR has reviewed these assessments and concluded that both systems have adequate capacity to serve these additional connections.

### *Site Investigation Activities for Corrective Action Area II*

*Q: Is the landfill a source of PFOA?*

A: At this time, ANR has no information that suggests the Bennington landfill is a source of the PFOA in the water supplies near and south of the landfill.  Based on air modeling and initial groundwater sampling, ANR believes that air deposition from Saint-Gobain's Water Street and Northside Drive Facilities are sources of PFOA in this area.

Saint-Gobain does not agree with ANR's conclusions about the scope and extent of air deposition and the landfill at this time.  However, ANR and Saint-Gobain both agree that additional data collection in the area east of the railroad tracks near Route 7a should help resolve this disagreement.  There may be other sources of PFOA in Bennington and North Bennington, and ANR will continue to work with Saint-Gobain to evaluate other potential sources.

*Q: What additional information does the State need?*

A: The additional investigation for the area east of the railroad tracks near Route 7a is designed to investigate the degree and extent of PFOA in this area, confirm the source(s) of PFOA, and identify the appropriate drinking water and clean up remedy for this area.  The broad scope of work for the site investigation will close data gaps in the investigation completed to date and include: background and area-wide soil sampling, additional groundwater sampling in the area near the landfill, and additional investigation into other possible sources of PFOA.