AR 226 - 1176

IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

JACK W. LEACH, et al.,

       Plaintiffs,

v.

                                       CIVIL ACTION NO. 01-C- 608

E. I. DU PONT DE NEMOURS AND COMPANY
and LUBECK PUBLIC SERVICE DISTRICT,
                                       (Judge George W. Hill )

       Defendants.

## ORDER ON CLASS CERTIFICATION AND RELATED MOTIONS

### I. SUMMARY OF RULINGS

This matter came before the Court on the following Motions of the parties: 1) Plaintiffs' Motion for Class Certification; 2) Defendant E.I. duPont de Nemours and Company's ("DuPont's") Motion Seeking Relief From Order Setting Class Certification ("DuPont's Relief Motion"); and 3) Plaintiffs' Motion for Judgment on the Pleadings Against DuPont. Based upon the oral argument of the parties during a hearing on all of these Motions on March 22, 2002, along with careful consideration of all of the filings of the parties on each of these issues, including all submitted affidavits, the Court hereby rules as follows: 1) the Court GRANTS Plaintiffs' Motion For Class Certification and hereby CERTIFIES this case to proceed as a class action on behalf of a class of all persons whose drinking water is or has been contaminated with ammonium perfluorooctanoate (a/k/a/ "C-8") attributable to releases from DuPont's Washington Works plant (hereinafter "the Class") with respect to all issues relating to Defendants' underlying liability and Plaintiffs' claims for equitable, injunctive, and declaratory relief, including liability for punitive damages; all damage issues involving any determination of individual harm of the Class members and the amount of any punitive damages are hereby STAYED and RESERVED for later litigation, pursuant to Rule 23 of the West Virginia Rules of Civil Procedure; 2) the Court DENIES DuPont's Relief Motion; and 3) the Court DENIES Plaintiffs' Motion For Judgment on the Pleadings Against DuPont. The undisputed procedural background, undisputed findings of fact, and the Court's conclusions of law supporting each of these rulings is summarized below.

CONTAINS NO CBI

000064

ENTERED
AT O.D. No 34
PAGE 987

APR 1 0 2002

Exhibit 052

## II. UNDISPUTED PROCEDURAL BACKGROUND

Plaintiffs' filed their Amended Complaint [1] against DuPont and Defendant Lubeck Public Service District ("LPSD") in Kanawha County Circuit Court on August 30, 2001. In their Amended Complaint, Plaintiffs allege that the Defendants are responsible for contamination of Plaintiffs' drinking water and assert claims against Defendants based upon common law torts and violation of West Virginia's consumer protection statutes for which Plaintiffs claim they are entitled to various forms of relief, including medical monitoring, punitive damages, compensatory damages, and equitable/injunctive relief to abate the water contamination. (See Amended Complaint.) Plaintiffs also request in the Amended Complaint that the Court enter an order "that this is an appropriate action to be prosecuted as a class action pursuant to Rule 23 and finding that Plaintiffs and their counsel are appropriate representatives and appropriate counsel for the Class and that this action shall proceed as a class action on all common issues of law and fact." *(Id., at 18.)*

On October 1, 2001, DuPont filed a Motion to Dismiss Counts I, II, III, VI, and VII of Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted under Civil Rule 12(b)(6). DuPont also filed on that same day a separate Motion to Dismiss Plaintiffs' Amended Complaint for improper venue. pursuant to Civil Rule 12(b)(3). The LPSD also filed on October 1, 2001, a Motion to Dismiss Plaintiffs' Amended Complaint on various grounds. pursuant to Rule 12(b)(6), including the specific argument that Plaintiffs allegedly had failed to state a claim upon which this case could proceed as a class action under Rule 23.

On October 15, 2001, DuPont filed a Motion seeking a protective order to stay all discovery in response to the First Set of Requests for Production of Documents that Plaintiffs had served on DuPont and the LPSD when the Amended Complaint was filed. The LPSD joined DuPont's request for a stay of all discovery in a filing dated October 30. 2001, followed by the filing of its own Motion for a protective order on November 16, 3001. Plaintiffs not only filed memoranda opposing

---

[1]   Plaintiffs' filed an Amended Complaint on the same day of their original Complaint simply to correct a typographical error in the name of Defendant E.I. duPont de Nemours and Company.

000065

the Defendants' requests for protective orders to stay discovery, but also filed on November 26, 2001, their own Motion seeking an order compelling both Defendants to move forward with their discovery obligations.  During a hearing on November 28, 2001, Judge Bloom of the Kaiiawha County Circuit Court granted Defendants' request to transfer this case to Wood County, but did not address any of the other pending Motions.  Judge Bloom's ruling was eventually memorialized in an Order entered December 14, 2001, and the case was then transferred to this Court.  Soon thereafter, the LPSD filed on December 21, 2001, another Motion to Dismiss this case, this time asserting several additional arguments.

On Friday. January 11, 2002. after the briefing on all of the then-pending Motions was complete, this Court sent a letter to counsel announcing its rulings on each of those Motions.  In that letter, the Court stated that it had denied all of the Defendants' Motions to Dismiss and Motions for Protective Orders, and that the Court had granted Plaintiffs' Motion to Compel discovery responses. On January 14, 2002, DuPont filed another Motion to Stay the case. this time arguing that the entire case should be stayed on primary jurisdiction grounds or. alternatively, that a case management order should be entered requiring Plaintiffs to prove the substantive merits of their claims for medical monitoring relief before any decision is rendered on whether the case can proceed as a class action under Rule 23.  During a hearing on February 1. 2002. the Court entered an Order confirming the Court's January 11. 2002. rulings. which denied DuPont's Motions to Dismiss. including DuPont's request for dismissal of Counts II and VI.  After DuPont failed to file any additional answer to Counts II or VI of the Amended Complaint within ten days after that ruling.  Plaintiffs filed a Motion for Judgment on the Pleadings against DuPont on both Counts II and VI, arguing that DuPont had not complied with Rule 12(a)(3)(A) of the West Virginia Rules of Civil Procedure.

During the hearing on February 1. 2002. the Court denied DuPont's request to stay this case on primary jurisdiction grounds and denied DuPont's request that the Court issue an order requiring Plaintiffs to prove the substantive merits of their medical monitoring claims before considering whether the case can proceed as a class action under Rule 23.  The Court's rulings were memorialized in an Order dated February 27. 2002.  The Court specifically rejected DuPont's

3

000066

arguments as "frivolous" and held that Plaintiffs are not required to prove the merits of their claims before the Court can consider class certification issues. In response to Plaintiffs' request for the prompt scheduling of a hearing to resolve class certification issues, the Court rejected DuPont's arguments that no such hearing should be held until after DuPont had been given more time to depose each of the Plaintiffs and to prepare experts witnesses. It was noted that, although the case had been pending for over five months, DuPont had not undertaken the discovery that it claimed it needed, nor were any expert opinions necessaiy to resolve class certification issues. The Court stated that class certification issues could be resolved on the affidavits of the parties without tlie need for any expert opinions or live testimony from any witness, and instructed Plaintiffs to serve affidavits from each of the Plaintiffs by no later than February 8, 2002.

Plaintiffs served their affidavits on Defendants on February 8, 2002. Although Plaintiffs had agreed to make the named Plaintiffs available for depositions before the class certification hearing, pursuant to notices served by DuPont on February 26, 2002, DuPont voluntarily cancelled those depositions after Plaintiffs served their responses to DuPont's interrogatories and document requests on class certification issues on March 11. 2002. Plaintiffs filed their formal Motion for Class Certification: with a supporting Memorandum of Law, on March 13. 2002. Later in the day on March 13, 2002, DuPont filed its Relief Motion in which it argued that Plaintiffs had not yet served a forinal Motion for Class Certification, mandating deferral of the class certification hearing. Plaintiffs filed a Memorandum in Opposition to that Motion on March 15. 2002, pointing out that the formal Motion For Class Certification had, in fact. been filed. On March 20, 2002, DuPont filed a Response in Opposition to Plaintiffs' Motion for Class Certification, which was supported by an attached Affidavit of a medical doctor, Dr. Philip S. Guzelian. The LPSD did not file any documents opposing or joining any of the pending Motions. The Court heard oral argument of all the parties on each of the pending Motions during a hearing on March 22, 2002.

000067

## III. <u>FINDINGS OF FACT</u>

Plaintiffs submitted to the Court a lengthy statement of facts. Neither DuPont nor LPSD submitted any statement of facts for the Court to consider. The Court, therefore, finds the following facts in support of its rulings on the Motions at issue:

This case involves claims arising from the alleged contamination of human drinking water supplies with, among other things,[2] a chemical known as ammonium perfluorooctanoate (a/k/a APFO/PFOA/ FC-143/C-8) (Chemical Abstract Services # 3825-26-1) (hereinafter "C-8"). C-8 is a chemical DuPont has used at its Washington Works facility in Wood County, West Virginia (the "Washington Works") since approximately 1951. Historically. DuPont purchased C-8 from the Minnesota Mining and Manufacturing Company ("3M") for use as a raw material in its various fluoropolymer production processes, including the manufacture of Teflon®. C-8-containing wastes from the Washington Works have been discharged into the air. the Ohio River, various landfills, and soils and groundwater at the Washington Works. Although C-8 is identified and regulated as a toxic or hazardous substance in a number of other jurisdictions, none of the environmental discharge permits ever issued to DuPont for its Washington Works by any Federal or State agency have ever contained any limits on DuPont's releases of C-8 into the environment. Consequently, DuPont has released C-8 into the environment from its Washington Works since the early 1950s without any governmental permit limits or restrictions of any kind. Although 3M announced in May of 2000 that it would stop making C-8 after internal studies

raised increasing concerns about the biopersistance[3] and toxicity of the chemical. DuPont continues to use C-8 and recently announced that it would begin to make its own C-8 at a DuPont plant in North Carolina.

---

[2]   Discovery is still on-going with respect to the nature of the other chemicals that may be in the water supply. At this time, Plaintiffs asked for certification only with respect to their claims involving C-8 water contamination.

[3]   DuPont has defined "persistent" in this context as referring to the fact that C-8 "remains in the body and is slow to be metabolized or eliminated from the body."

000068

Concerns regarding the toxicity of C-8 had surfaced within DuPont's own employees as early as 1954. In response to such concerns, DuPont began its own internal investigation into the toxicity of C-8 that confirmed by at least 1961 that C-S was toxic in animals and caused observable changes in certain organ functions, resulting in an internal warning being issued by DuPont's Toxicology Section Chief that the chemical "be handled with extreme care." 3M also pursued its own internal studies and confirmed by 1978 that C-8 was being detected in the blood of 3M's "potentially exposed workers." In response, DuPont authorized an internal program to monitor the health of its employees exposed to C-8 at the Washington Works. DuPont was "disturbed" that this new testing revealed that C-8 might be causing "toxic effects" among some of the Washington Works employees. DuPont decided that this new toxicity information would not, however, be disclosed outside the company except "on a need-to-know basis" and that DuPont would not "be informing the appropriate regulatory agencies of this situation."

After 3M disclosed to DuPont the results of additional internal C-8 studies confirming toxicity among rats and monkeys, DuPont's in-house toxicologist recommended even more testing. DuPont also decided that additional. special personal protective equipment needed to be used by DuPont's workers to minimize their exposure to C-S . When the results of the additional testing were reviewed in 1980. DuPont determined that "C-8 is toxic." "people accumulate C-8." and "continued exposure is not tolerable," prompting DuPont to implement additional medical testing of the Washington Works employees. including new, special sampling of the workers' blood for C-S. 3M also commissioned its own internal medical monitoring program among its potentially exposed employees, including special x-rays, lung function tests, blood counts, and blood chemistries, etc. designed to test for and assess the extent of C-8 exposure.

In response to the mounting internal toxicity data on C-8, DuPont's own Director of Employee Relations recommended to management in 1982 that all "available practical steps be taken to reduce this [C-8] exposure because," among other things, "[a]ll employees, not just Teflon@ area workers, are exposed" and "[t]here is obviously great potential for current or future exposure of members of the local community from emissions leaving the Plant perimeter." Soon thereafter,

000069

DuPont commenced an internal investigation to determine the extent to which C-S was escaping from the Washington Works and getting into community water supplies. In that regard, DuPont began an internal investigation into the extent of human exposure to C-8 from drinking Ohio River water, and collected water samples from several private area taps being supplied by the then-immediately-adjacent Lubeck Public Service District ("LPSD") well field and from the Little Hocking, Ohio water supply located across the Ohio River from the Washington Works. The samples, which were sent to DuPont's own Experimental Station Lab ("ESL") in Delaware for analysis, confirmed by March, 1984 that C-S was present in both the LPSD water supply (as high as 1.5 parts per billion ("ppb")) and in the Little Hocking water supply (as high as 0.6-0.8 ppb). In response, DuPont prepared internal "standby statements" for its employees to use in case the public found out about the C-8 being detected in the local community water supplies and started asking questions.

Additional internal testing by DuPont confirmed C-S in the local community water supply again in 1987, 1988, and in 1989. DuPont assumed that the C-8 being picked up in the water was being caused by leakage from three old, unlined ponds at the Washington Works that DuPont had used for the disposal of thousands of tons of C-8 waste over the years. In response. DuPont removed thousands of tons of C-8 wastes from the ponds in 1988, worked out a deal with Defendant LPSD to purchase the LPSD well field that was immediately adjacent to the Washington Works at the time for approximately $3 million, and helped facilitate the move of the LPSD well field to a new location approximately two miles further down the Ohio River.

In the meantime, Washington Works employees. after becoming aware that C-S had been picked up in the local community water supply, asked DuPont's own Haskell Laboratory in 1987 to establish "an acceptable level for C-8 in community drinking water." In April, 1991, DuPont's Washington Works, recognizing that the level of C-S in local community drinking water at that time was "around 2.7 ppb" asked DuPont's Haskell Lab to specifically "consider the actual health effects to residents adjacent to our Washington Works Plant from exposure to C-8" and asked that the company adopt a "Community Exposure Guideline" (CEG) that is "by definition one that we can

7

000070

expect 'lifetime' exposure of community residents without any expected ill effects."  By the summer of 1991, DuPont had agreed to an internal CEG for C-8 in water of 1 ppb.  Around the same time, DuPont collected additional water samples and confirmed through analysis at its own ESL that, not only was C-8 still present in the original LPSD well field (now as high as 3.9 ppb) but that C-8 also was in drinking water supplied by the new LPSD well field two miles further down river as high as 2.4 ppb - more than two times higher than the 1 ppb internal safety standard for C-8 in community drinking water that DuPont had just adopted.  DuPont again prepared a "Standby Press Release" in case the public found out about the C-8 in the new LPSD wells but apparently never officially released it.

Soon after receiving the new LPSD C-S results from ESL. DuPont decided to switch to an outside contractor to take all future C-S water samples for DuPont, and advised the contractor to collect those future samples in glass containers. as opposed to the plastic containers that DuPont had been using.  In response to a reminder by the contractor that C-S has a tendency to adsorb to glass, which could result in the reporting of "lower concentrations [of C-8] than what may actually exist" in the water, DuPont, nevertheless, instructed the outside contractor to go ahead with using the glass containers.  A comparison of DuPont's own C-S sampling results with the new outside contractor's analysis of the same water indicated lower C-8 readings using the new contractor and new sampling procedure.  DuPont then decided to keep using an outside contractor and kept using that new sampling procedure for the next 10 years.  It was not until August, 2001. after the USEPA and the State of West Virginia's Department of Environmental Protection ("WVDEP") asked DuPont to begin explaining its C-8 sampling procedures. that DuPont switched back to using plastic sampling containers that had a lower potential for adsorbing the C-8.  This new sampling methodology is the sampling methodology that was used by DuPont's new contractor - Exygen - to recently reconfirm the presence of C-S in the Little Hocking, Ohio water supply. this time as high as 7.7-37 ppb.

In the years since DuPont first discovered the potential toxicity of C-8 and its potential impact on its workers, DuPont has provided special medical testing for employees who DuPont believes to have had the potential for exposure to any C-S on the job.  Such special medical testing

8

programs were provided for DuPont's Washington Works employees **beginning** as early as **1979,** with the **special** medical testing being conducted as frequently as on an annual basis.  When DuPont began sending its C-8 wastes from the Washington Works to DuPont's Chambers Works facility in New Jersey for recovery in 1999, all Chambers Works employees who had "any potential for exposure to C-8" also were provided with special medical testing, including:

> "•      automated chemistry profile. . . SMA-12 (includes HDL, cholesterol, glucose, uric acid, BUN, calcium, phosphorus, total protein, albumin, bilirubin, alkaline phosphatase, LDH, AST (SGOT), total cholesterol, creatinine and ALT (SGPT)
> ■      complete blood count. . .
> ■      perfluorooctanoic acid (PFOA) in blood . . .
> ■      total fluorine in blood."

DuPont even agreed to provide the special medical testing to at least one outside contractor whose employees may have been exposed to C-8 at the Washington Works.  DuPont also has provided its employees with potential exposure to C-8 at the workplace with special personal protective equipment, such as gloves, special apparel, and breathing equipment, to try to protect them from exposure to C-8 handled on the job.

DuPont even originally planned to acknowledge its responsibility to provide special medical testing to all members of the local community outside the Washington Works who may have been exposed to drinking water contaminated with any amount of C-8 as recently as the fall of 2000, when DuPont believed that the public would be finding out about the C-8 contamination in their drinking water.  It was at that time that plaintiffs' counsel in a case styled *Tennant v. E I.duPont de Nemours & Co., Inc.*, Case No. CA-6:99-048 (S.D. W. Va.), disclosed to DuPont that they had discovered DuPont's C-8 contamination and began making public filings in court about the problem.  DuPont's public relations officials and attorneys coordinated with the LPSD and its attorneys in the co-drafting of an October 31, 2000, letter to be sent on the LPSD's letterhead to all of the LPSD's customers to disclose the existence of the C-8 in the water, while simultaneously assuring everyone that the water was safe.  DuPont's public relations staff also drafted another set of approved "standby questions and answers," for its employees to use in responding to any inquiries from the public about the C-8 problem.  One of the anticipated questions was: "DuPont monitors employees' blood for

*000072*

PFOA [C-8].   Will DuPont test citizens' blood?"  DuPont's "standby" response to the community was:

> Yes, as requested by residents of the LPSD area, using established practices; that is, collection at one location and use of the same lab used for analysis of employees' samples.

At the time DuPont prepared this response acknowledging its agreement to provide testing for those who may have been exposed to C-8 in their drinking water, DuPont was claiming that levels of C-S in the LPSD water system were as low as 0.1 ppb - below the 1 ppb CEG that DuPont has internally adopted and reaffirmed as recently as November of 2001, as the "safe level" for C-8 in community drinking water.  DuPont also has acknowledged that "DuPont Washington Works is responsible for the presence of PFOA [C-8] in the [LPSD] wells."

As of today's date, there are thousands of individuals who have been  exposed to drinking water contaminated with C-8 from DuPont's Washington Works.  As indicated above, C-S has been detected and confirmed to be present in at least the water supplied by both the LPSD, which currently serves several thousand customers, and in the Little Hocking. Ohio water supply, which currently serves over 12,000 customers.  DuPont's own records indicate that C-8 was first detected in these public water supplies by at least 1984. indicating that potentially there are thousands of additional former customers of the LPSD and the Little Hocking. Ohio water supply that also were exposed to C-8 in their drinking water.  Based upon the documents produced to date by DuPont. "high C-8" levels also have been confirmed in at least one private residential water well adjacent to the Washington Works, and C-8 has been confirmed in the water supply of the General Electric Plastics plant adjacent to the Washington Works.  C-8 also has been present for years in the water supply of the Washington Works itself, which employs "approximately 2,300 persons."  The levels of C-8 in the Washington Works drinking water have been as high as at least 3.3 ppb.

Under a November, 2001 Consent Order entered between DuPont and the State of West Virginia (the "Consent Order"), DuPont is working with WVDEP and the West Virginia Department of Health and Human Resources to determine whether additional water supplies have been contaminated with C-8.  These efforts confirmed as recently as March 2. 2002. that C-8 now also

000073

has been detected in the water supplies for Belpre, Ohio, which serves "about 7,000 people," and in the Tuppers Plains - Chester Water District in Ohio.  WVDEP already confirmed, as recently as January 15, 2002, that the levels of C-8 in the human drinking water supplies "presented possible health risks to the public" and that such C-8 "has been linked to possible health problems related to long-term exposure."

During the March 22, 2002, hearing, counsel for Plaintiffs submitted to the Court a copy of a Consent Order entered between DuPont and the United States Environmental Protection Agency (Regions 3 and 5) on March 7, 2002.  Under the Consent Order, DuPont has agreed to provide "a temporary alternate drinking water supply for users of any private drinking water well and PWS [public water system] in West Virginia or Ohio where such [validated sampling] results show the level of C-8 exceeds 14 [ppb]."  There is no requirement in the Consent Order that the impacted water supplies be used for any particular length of time, that any specified quantities of such water first be consumed. or that the precise geographic boundaries of the potentially-impacted water supplies be determined before DuPont is required to provide the alternate drinking water under the Consent Order.

The Amended Complaint and the undisputed Affidavits of the Plaintiffs establish that each of the named Plaintiffs are individuals who are using or have used one or more of the water supplies identified above that are or have been contaminated with C-S.  These individuals include persons who currently own real property with the contaminated drinking water.

## IV.  CONCLUSIONS OF LAW

A.    **Plaintiffs' Motion For Class Certification is Granted.**

It is well-settled in West Virginia that, as long as the prerequisites to class certification set forth in Rule 23 are met, a case should be allowed to proceed on behalf of the class proposed by a plaintiff.  *See* W. Va. R. Civ. P. 23; *Mitchem v  Melton*, 167 W. Va. 21, 277 S. E2d 895, S99 (1981) ("If the requirements of Rule 23 are met, then the Class should be allowed."); *Evans v. Huntington Pub.* Co., 163 W. Va. 222, 283 S.E. 2d 854, S55 (1981).  Under Rule 23, the only prerequisites to certifying a case to proceed on behalf of a class are: (1) that the class is so numerous that joinder of

ff

all members is impractical (the "numerosity" requirement); *(2)*that there are questions of law or fact common to the class (the "commonality" requirement); (3) that the claims or defenses of the represented parties are typical of those of the class (the "typicality" requirement); **(4)**  that the represented parties will fairly and adequately protect the interest of the class (the "adequacy" requirement); and that at least one of the three potential bases for seeking class relief set forth in Rule **23(b)** exists. See W. Va. R. Civ. 23(a), (b).  If appropriate, the Court may allow the action to be brought or maintained as a class action with respect to only particular issues or may allow the class to be divided into subclasses.  *Id.* at Rule 23(c)(4).  In this regard, the Court has the discretion to enter whatever order it feels will best provide for the orderly conduct and management of issues to be handled in a class action proceeding under Rule 23, including entry of an order reserving any "unmanageable" issues for litigation at a later time.  See W. Va. R. Civ. P. 16, 23(d); *Gasperoni v. Metabolife Int'l., Inc.*, 2000 WL 33365945, slip. op. at *4  (E.D.Mich. Sept. 27, 2000) (citing *In re Diet Drugs Prod. Liab. Litig.*, *2000* WL 1222042  (E.D.Pa. Aug. 28, 2000)).

Although the Court is required to perform a "rigorous analysis" in determining whether the prerequisites to class certification exist under Rule 23, *see, e.g., General Tel. Co. v. Falcon*, **457 U.S. 147**, 160 (1952). the Court also recognizes that "[t]he recent trend in class certification decisions is to interpret Rule 23 flexibly and give it a liberal construction."  *Black v Rhone-Poulenc, Inc.*. 173 F.R.D. 156. 169 (S.D. W.Va. 1996). In performing such a rigorous analysis, a court should not focus on whether a plaintiff will prevail on the actual merits of any substantive aspect of the plaintiff-s claims, but should focus, instead, only on whether the procedural requirements of Rule 23 are met. *See Eisen v. Carlisle and Jacequelin*, 417 U.S. 156, 177 **(1974)** ("nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"); *Burh v. Wymer*, 172 W. Va. **47'8,486,307** S.E. 2d **647, 653** (1983). **Allowing** any inquiry into the merits of any of the plaintiffs substantive claims during a Rule 23 class certification inquiry would effectively deprive the plaintiff of the right to trial by jury on the claims.  *See Guar. Ins. Agency Co. v. Mid-Continental Realty Corp.*, *57* F.R.D. 555, 564 (D.C. Ill. **1972**). This point was confirmed by this

000075

Court in its February 37,2002, Order. Moreover, the West Virginia Supreme Court of Appeals has recognized "as have other state courts, that the failure to permit the maintenance of a class action by a trial court can have grave procedural consequences to the parties who are denied class participation as if a final judgment has been rendered against them on the merits." *Mitchem*, 277 S.E. 2d at 901. Thus, any question as to whether the case should proceed as a class in a doubtful case should be resolved in favor of allowing class certification. *See, e.g., Esplin v. Hirschi* 402 F.2d 94, 101 (10th Cir. 1968), *cert. denied,* 394 U.S. 928 (1969)("[t]he interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing the class action."); *Gasperoni*, slip. op. at *8.

1.    Certification of the Class is appropriate under Rule 23(a).

  a.    The proposed Class satisfies *the* "numerosity" requirement of Rule 23(a)(1) .

   The proposed Class, which includes the thousands of individuals whose drinking water has been contaminated with C-8, satisfies the "numerosity" requirement of Rule 23(a)(1). Contrary to DuPont's arguments, it is well-settled that Plaintiffs are not required to establish the esact number of individuals falling within the definition of the proposed Class, as long as there is adequate evidence that the number of potential class members is "large" enough to make joinder of all the potential class members impractical. *See. e.g. Olden v. LaFarge Corp* . Case No. 99-10176-BC, slip. op., at 23  (E.DMich. Oct. 24. 2001) (citing *In re Cons. Power Co. Secur. Litig.,* 105 F.R.D.583, 601  (E.DMich.1985) ("Where the exact size of the class in unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Orantes-Hernandez v. Smith,* 541 F. Supp. 351. 370 (C.D. Cal. 1982)).) Although courts generally have found the "numerosity" requirement satisfied when the proposed class consists of as few as 40 or more members,[4] it is commonly accepted that a proposed class consisting of thousands of members is more than sufficient to satisfy the "numerosity" requirement of Rule 23(a)(1). *See, e.g. , State ex rel Miller v. Sencindiver,* 170 W. Va. 288, 294 S.E.2d 90. 92 (1982) (numerosity satisfied

---

[4] *See, e.g., Robidoux v.  Celani*, 987 F.2d 931, 926 (2nd Cir.  1993).

000076

with allegations of 1,135 class members); *Mitchem*, 277 S.E. 2d at 902 (numerosity satisfied with several thousand members of a proposed class of prisoners).

In this case, it is undisputed that there are many thousands of potential Class members, rendering it impractical to join all the class members. As described in the undisputed facts set forth in Plaintiffs' Motion for Class Certification, C-8 is currently present in at least the water supplied by the LPSD, the Little Hocking Water Association, the City of Belpre, and the Tuppers Plains-Chester Water District, all of which collectively serve thousands of customers. C-8 also is present in the drinking water at the Washington Works, which provides water to thousands of people, and in the drinking water at the adjacent General Electric Plastics plant. It is, therefore, undisputed that there are many thousands of members of the Class proposed by Plaintiffs, which is more than sufficient to satisfy the "numerosity" requirement of Rule 23(a)(1). In addition, DuPont's agreement under its recent Consent Order with the USEPA to provide alternate water to a class of all users of any private drinking water well or public water system anywhere in Ohio or West Virginia where C-8 levels are above a certain level undermines DuPont's argument that it is impossible to deal with a class that is not limited by precise geographic limits, duration of time of exposure, or quantity of water consumed.

b.      **The proposed Class satisfies the "commonality" requirement of Rule 23(a)(2).**

The "commonality" requirement of Rule 23(a)(2) also is satisfied with respect to the Class proposed by Plaintiffs. All that is necessary to satisfy the "commonality" requirement is that "there are questions of law or fact common to the class." W. Va. Civ. P. 23(a)(2). "[T]he existence of significant common, legal, or factual issues is enough to satisfy Rule 23(a)(2)'s threshold commonality requirement." *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 64 (S.D.Ohio 1991). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement." *Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992). *See also In re School Asbestos Litig* ., 789 F.2d 996, 1010 (5th Cir. 1986) (the "threshold of commonality is not high"); *Jenkins v Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986) ("threshold of 'commonality' is not high." it "requires only that resolution of common questions affect all or a substantial number of the class

14

*000077*

members").  "Not every issue in the case must be common to all class members."  *O'Connor v. Boeing North Amer., Inc.*, 184 F.R.D. at 311, 329 (C.D. Cal. 1998). "The simple question is whether there are issues common to all class members."  *Yslava v. Hughes Aircraft & Co.*, 845 F. Supp. 705, 712 (D. Ark. 1993).

In this case, DuPont  previously argued to this Court that there are certain key, underlying common issues relating to the "potential toxicity and environmental impact of [C-8] . . . and the potential exposure of nearby residents to C-8" that are so pervasive and fundamental to resolution of all of the claims of all of the parties in this case that the entire case should be stayed until there has been a "resolution" of such common issues by State administrative agencies.  (*See* DuPont's Memorandum of Law in Support of Motion to Stay or, Alternatively, for Entry of Case Management Order Phasing Discovery, at 1-20.)  According to DuPont, all of the claims on behalf of all of the Plaintiffs in this case are nothing more than a single, common "toxic tort" claim that when reduced "to its essence, . . . is a 'medical monitoring' case. . . of a purported class allegedly exposed to a substance." (DuPont's Memorandum of Law in Response to Plaintiffs' Motion to Compel Discovery from Defendants, at 1.)  According to DuPont, common issues of "risk of human health and the environment from C-8 exposures or releases" are "central to this lawsuit" and "resolution of the technical issues associated with exposure to and releases of C-8" and all "other such technical and complex issues raised by Plaintiffs' Complaint" are common, fundamental underlying issues affecting resolution of all claims of Plaintiffs and each of the proposed Class members. (*Id.*, at 3, 7, and 13.)

DuPont specifically argued that at least the following common issues affect all of the claims of all Plaintiffs and each proposed Class member in this case: 1) "whether a particular chemical [C-8] poses a risk to human health, and if so. at what doses and through what routes of exposure (*e.g.* ingestion, inhalation, or dermal contact)": 2) "whether a particular chemical [C-8] has the propensity to accumulate and persist in human populations and the environment": and 3) "whether a particular chemical [C-8] has been released into the environment at sufficiently high concentrations so as to cause human populations distances away to be exposed above-risk incurring levels." (*Id.*, at 15.)

*000078*

According to DuPont, the jury will have to resolve each of these common issues in order to determine whether any of the Plaintiffs or proposed Class members are entitled to "compensatory damages, medical monitoring, and injunctive relief." *(Id.)* The LPSD has never objected to or in any way disagreed with any of DuPont's arguments in this regard.[5]

After Plaintiffs filed their Motion For Class Certification, DuPont argued that the complexity of various individualized issues involving the individual Class members' medical histories, the individual Class members' lifestyles, individual exposures, and other individualized issues of potential exposure and damages overshadowed all other potentially common issues in this case, precluding any finding of commonality, even though DuPont does not dispute that such common issues esist. In support of this argument, DuPont submitted tlie Affidavit of Dr. Philip S. Guzeliaii , a purported medical monitoring "expert" who commented on tlie nature of the various individualized issues that may arise in this case, particularly with respect to the issue of whether medical monitoring is appropriate for tlie Class. DuPont did not, however, explain why its previous arguments that common issues relating to the toxicity of C-8 predominated in this case were no longer accurate or should now be ignored. Upon careful consideration of DuPont's arguments and the information submitted through the Affidavit of Dr. Guzelian, the Court is not persuaded that any such individualized issues overshadow the common issues previously identified by DuPont for the Court or that the potential individual differences among the Class members preclude a finding of commonality in this case. After all, tlie commonality requirement of Rule 23(a)(2) does not require that tlie common issues "predominate" - only that they exist.  DuPont does not dispute that fundamental common issues exist.

The finding of commonality in this case is well-supported in the case law. In cases like this iiivolving claims arising from a chemical release, commonality is readily found, particularly where medical monitoring claims are involved.  *See, e.g., O'Connor*, 154 F.R.D. at 331 (commonality

---

[5]   In addition, a review of the claims set forth in Plaintiffs' Amended Complaint confirms that there are many coninion issues of law or fact at issue in this case. (See Plaintiffs' Amended Complaint, at ¶ 49.)

000079

exists where key issues relating to defendant's liability and whether the alleged release of chemical placed the medical monitoring class at a potentially increased risk of health problems). *See also Foust v. Southeastern Penn. Transp. Auth.*, 756 A. 2d 112, 120-121 (Pa. Commw. Ct. 2000) ("While individual issues may arise, including length and extent of exposure, age, gender, medical history, family history, lifestyle, preexisting conditions, intervening factors and the like, these items will be addressed when and if a medical monitoring program is created. Thus, in light of the liberal attitude afforded the grant of class action status, we must affirm the trial court's decision" to certify the class); *Gasperoni,* slip. op., at 120-121; *In re Asbestos School Litig.*, 104 F.R.D. at 422; *In re Three-Mile Island Litig.*, 87 F.R.D. 433 (h4.D. Pa. 1980); *Yslava.* 845 F. Supp. at 713 (for medical monitoring claims, "proof of an exact or individual amount of exposure or particular risk level is not necessary.   The   core   issues   of   liability   and   exposure   are   common   to   all   class   members. Commonality among the members exists notwithstanding certain factual variations."). The Court agrees with these cases that commonality exists in a case like this given common underlying exposure and liability issues, despite potential individualized issues relating to individual damages.

    *c.*    **The proposed Class satisfies the "typicality" requirement of Rule** 23(a)(3).

The "typicality" requirement of Rule 23(a)(3) also is satisfied in this case. It is well-settled that the requirements of "commonality" and "typicality" under Rule 23(a) teiid to merge in most cases, because both requirements serve as nierely guideposts for determining whether the maintenance of a particular class action is economical and whether the plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected. See, *e.g., General Telep. Co. v. Falcon,* 457 U.S. 137 (1982); *Olden,* slip. op. at 23 (citing *Rutherford* v. *City of Cleveland,* 137 F.3d 905 (6th Cir. 1998)). A plaintiffs claim is sufficiently "typical," regardless of any factual differences among the class members, if it "arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Newberg on Class Actions* (3d ed. 1992), § 3.15, at 3-78. *See also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)(the claim of the named plaintiff and the claiiiis of the class at large need only share the "same

000080

essential characteristics as the claims of the class at large"). In the assessment of whether the "typicality" requirement of Rule 23(a)(2) is satisfied, the requirement "should be loosely construed." *Weinberger v. Jackson*, 102 F.R.D. 839, 844 (N.D. Cal. 1984).

In this case, the claims asserted by the named Plaintiffs are "typical" of the claims of the entire proposed Class. All of the named Plaintiffs' claims arise from the same releases of C-8 into the environment from the Washington Works that give rise to the claim of each of the Class members, and are all based upon the same tortious conduct of the Defendants that gives rise to the named Plaintiffs' claims. *(See* Amended Complaint, at ¶¶ 1-102.) Although the damage claims of individual Plaintiffs may vary to some extent in value, the same actions, practices, and course of conduct by the Defendants that caused the water contamination and torts at issue serves as the basis for all of the proposed Class members' claims. This common factual basis for the Class members' claims, based upon the same underlying legal theories and conduct of the Defendants, is more than sufficient to satisfy the "typicality" requirement of Rule 23(a)(3). *See Olden*, slip. op. at 25 (claims are "typical" where plaintiffs allege chemical emissions as basis for claims, even though "putative class members claims may differ in the amount of damages due to each individual"). Thus, the Court rejects DuPont's argument, as again supported by the Affidavit of Dr. Guzelian. that potential individualized issues, particularly with respect to Plaintiffs' claims for medical monitoring. preclude any finding of typicality.

d.   **The proposed Class satisfies the "adequacy" requirement of Rule 23(a)(4).**

The "adequacy" of Rule 23(a)(4) requirement is satisfied as long as the proposed class counsel is qualified, experienced. and generally able to conduct the litigation, and the named class representatives' interests are not shown to be antagonistic to the other class members. *See. e g.. Gasperoni*, slip. op. at *3; *O'Connor*, 1 S4 F . R . Dat 335; *Olden*, slip. op. at 25. As explained below, the proposed Class counsel is sufficiently qualified to conduct the litigation and the interests of the named Class representatives are not antagonistic to the other members of the proposed Class.

In this case, neither Defendant has challenged or disputed the adequacy of Plaintiffs' counsel. It is, therefore, undisputed that Plaintiffs' counsel are adequately qualified. experienced, and

000081

generally able to conduct litigation on behalf of the proposed Class involving class claims related to C-8 contamination of drinking water.

As indicated in the Affidavits submitted by each of the named Plaintiffs, none of the named Plaintiffs are aware of any interests they would have that are in any way antagonistic to the interests to any of the other members of the proposed Class. As explained above, the claims of each of the named Plaintiffs, are "typical" of the claims of the Class, the merits of which will be determined through resolution of numerous common issues of law and fact. To the extent that any potential conflict may arise between any individual Plaintiff and any member of the proposed Class, the Court retains the discretion to address such potential conflicts later through creation of subclasses or other appropriate case management tools. See W. Va. R. Civ. P. 16, 23(c)(4), (d).

2.    Certification of the Class is appropriate under Rule 23(b).

      a.    Certification of the Class is appropriate under Rule 23(b)(1)(A).

Under Rule 23(b)(1) of the West Virginia Rules of Civil Procedure, certification of this case is appropriate to proceed on behalf of the Class if "[t]he prosecution of separate actions by or against individual members of the class would create a risk of. . .[i]nconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." W. Va. R. Civ. P. 23(b)(1)(A). Courts have, therefore, certified cases to proceed on behalf of a class, seeking both monetary damages and medical monitoring, where it is shown that the pursuit of such claims through separate actions could create a risk of inconsistent or varying adjudications for the individual members of the class that could establish incompatible standards or conduct for the defendants. *See, e.g., Boggs*, 141 F.R.D. at 67. Other courts have recognized the appropriateness of certifying a class to proceed pursuant to Rule 12(b)(1)(A), at least with respect to claims for medical monitoring relief. *See, e.g., Burch v. Amer. Home Prod. Corp.*, Civil Action No. 97-C-204 (1-11), slip. op., at 35-38 (Brooke Cty. W. Va. Cir. Ct. Feb. 11, 1999). For example, in the opinion issued by the Circuit Court of Brooke County, West Virginia, the court noted that:

19

000082

> [T]he issue of defendants' responsibility for financing an equitable medical monitoring fund should be the same for every member of the class. If the plaintiffs and the class members prosecute separate actions for medical monitoring the potential exists for inconsistent or varying adjudications with respect to individual members of the class. The Court FINDS that the potential for inconsistent adjudications would establish incompatible standards of conduct for the defendants both in the decision to create the fund and any particular plaintiffs' entitlement to the benefits of the fund. Several courts have adopted this logic and have certified medical monitoring classes based on Rule 23 (b)(1). See *In re Teletronics Pacing Systems, Inc., Accufix Atrial J Leads Products Liability Litigation*, 172 F.R.D. 271, 285 (S.D.Ohio 1997); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 67 (S.D.Ohio 1991).
>
> The Court is persuaded by these cases and FINDS that the requirements of Rule 23(b)(1)(A) are met. The Court FINDS that the potential for inconsistent adjudications would establish incompatible standards of conduct for the defendants both in the decision to create the fund, the appropriate monitoring to be provided, and the particular requirements for entitlement to the benefits of the fund.

*Burch*, slip. op., at 35-36.

In this case, DuPont already has strenuously argued that the existence of more than one proceeding to consider the common factual and legal issues raised in this case "creates a real danger of inconsistent rulings." (DuPont's Memorandum in Support of Motion to Stay or, Alternatively, For Entry of Case Management Order Phasing Discovery, at 14) According to DuPont, the simultaneous existence of more than one proceeding in which the common "technical issues" regarding the potential toxicity of C-8 and its effect on Human health and the environment are addressed "gives rise to a real risk that DuPont could be subjected to inconsistent or even mutually-repugnant determinations." (*Id.*) Thus, DuPont argued to this Court that the claims for which Plaintiffs seek certification under Rule 23 in this case satisfy the conditions for certifying those claims to proceed on behalf of the entire Class, pursuant to Rule 23(b)(1)(A). As of today's date, the LPSD has never objected to or disputed DuPont's characterization of the claims of the Class in this regard. This case is, therefore, appropriately certified under Rule 23(b)(1)(A).

   **b.    Certification of the Class also is appropriate under Rule 23(b)(2).**

Rule 23(b)(2) expressly provides that certification is appropriate when the "party opposing the class has acted or refuses to act on grounds generally applicable to the class, thereby making

**000083**

appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." W. Va. R. Civ. P. 23(b)(2). The claims seeking equitable, declaratory, or injunctive relief to force a defendant to abate or cease emissions of chemicals being released from a defendant's operations are the types of claims that are squarely within the boundaries of Rule 23(b)(2). See, *e.g.*, *Olden*, slip. op. at 26 (court certifies claims to proceed under Rule 23(b)(2) where plaintiffs seek injunctive relief to order defendant to cease emissions of dust from cement plant). In addition, it is widely-recognized that claims seeking medical monitoring relief on behalf of a class are included within the types of claims that are essentially injunctive and equitable in nature, thereby also falling within the scope of appropriate certification under Rule 23(b)(2). *See, e.g., Gibbs v. E. I. duPont de Nemours & Co., Inc.*, 876 F. Supp. 475, 481 (W.D.N.1995) ("A court-administered fund which goes beyond payment of the cost of monitoring an individual plaintiffs health to establish pooled resources for the early detection of advances in treatment of the disease is injunctive in nature rather than 'predominantly money damages' and therefore is properly certified under Rule 23(b)(2)").[6] The establishment of a court-supervised program through which class members can obtain periodic medical examinations in order to promote early detection of physical harm is recognized as a "paradigmatic request for injunctive relief." *In re Inter-Op Hip Prosthesis Litig.*, 2001 WL 1540546, at 1S (N.D. Ohio Aug. 31, 2001).

Contrary to DuPont's arguments, certification remains appropriate under Rule 23(b)(2), even if claims for monetary damages are included with the plaintiffs claims for equitable or injunctive relief, as long as the overall nature of the case is predominately one for equitable and injunctive relief, as opposed to one seeking exclusively or predominately money damages. *See, e.g., In re School Asbestos Litig.*, 789 F. 2d at 1008; *Day*, 851 F. Supp. At SSG-87 ("the fact that the Plaintiffs are seeking monetary damages need not disturb our certification under Rule 23(b)(2)"); *Yslava*, 485 F. Supp. at 713 (court confirmed that certification remains appropriate under Rule 23(b)(2) in case

_____

[6]       *See also, e.g., Burch*, slip. op. at 5-38; *Day v. NLO, Inc.*, 851 F. Supp. 869, 866-87 (S.D. Ohio 1993) (medical monitoring program is "injunctive relief as required by Rule 23(b)(2)"); *Yslava*, 485 F. Supp. at 705; *O'Connor*, 184 F.R.D. at 311; *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378-87 (D. Co. 1993); *Boggs*, 131 F.R.D. at 67.

000084

where both monetary damages and injunctive relief in the form of medical monitoring is sought, as along as the claims for monetary relief are not the exclusive or predominate claim); *O'Connor*, 184 F.R.D. at 337 ("Rule 23(b)(2) may include cases seeking monetary damages where such relief is 'merely incidental to their primary claim for injunctive relief'") (citing *Probe v. State Teachers' Retirement Sys.*, 780 F. 2d 776, 780 (9th Cir. 1986)); *In re Inter-Op Hip Prosthesis Litig.*, slip. op., at 18 (court certifies case to proceed on behalf of class under Rule 23(b)(2) seeking both damages and medical monitoring where medical monitoring "is more than tangential and is an appropriate element of the redress awarded to the class as a whole.").

This case also is appropriate for certification under Rule 23(b)(2). Plaintiffs' common claims for equitable, declaratory, and injunctive relief to abate and remediate DuPont's C-8 releases into the environment and Defendants' refusal to do so involve claims where the "party opposing the class has acted or refused to act on grounds generally applicable to the class. thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." W. Va. R. Civ. 23(b)(2).  In addition, DuPont has recognized that the law of this State currently authorizes the certification of a class to pursue medical monitoring claims under Rule 23.[7] Moreover, DuPont has vigorously argued to this Court that. regardless of Plaintiffs' assertion of claims seeking monetary damages. the entire case. when reduced "to its essence . . . is a 'medical monitoring' case . . . of a purported class allegedly exposed to a substance." (DuPont's Memorandum of Law in Response to Plaintiffs' Motion to Compel Discovery from Defendants. at 1.)  Thus, DuPont has argued that, regardless of the existence of any claims for monetary damages in this case, Plaintiffs' claims are predominately claims for equitable and/or injunctive relief.  The LPSD has

---

[7]    In response to a question "How is medical monitoring different in West Virginia from most other states?" DuPont stated as recently as November 2001 that:

> Based on West Virginia Supreme Court of Appeals rulings, West Virginia allows:  class action status, lump-sum cash payments rather than reimbursement of medical monitoring expenses, fear of exposure to harmful elements as a case of action, medical monitoring when testing is not deemed to be medically necessary, and monitoring even when no beneficial treatment is available.

*000085*

never disputed or taken issue with DuPont's position in this regard. Consequently, all of Plaintiffs' claims for relief, including Plaintiffs' claims for medical monitoring and damages, are appropriately certified under either Rule 23(b)(1)(A) or Rule 23(b)(2).

      c.    **This case also is appropriate for certification under Rule 23(b)(3).**

Plaintiffs' claims also are appropriately certified under Rule 23(b)(3). Under Rule 23(b)(3), a case may be certified to proceed on behalf of a class if:

> The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the finding include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesireability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

W. Va. R. Civ. P. 23(b)(3). Thus, certification of a class is appropriate under Rule 23(b)(3), if the Court is persuaded that common issues "predominate" and that handling the claims through a class action is "superior" to other potential methods of adjudicating the claims.

In this case, the Court is persuaded that there are common questions of law or fact that predominate over any individual issues that may arise among the Class members. Despite DuPont's recent arguments that certain individualized exposure and damages issues overshadow all other common issues in this case relating to the toxicity and effects of C-8, the Court agrees with DuPont's earlier argument and the case law cited by Plaintiffs in support that certain allegedly common, underlying issues relating to the potential toxicity of C-8 and its impact on human health and the environment predominate over all other potential issues that may arise in this case. The LPSD has never disputed nor taken any issue with DuPont's arguments in this regard.

Even if DuPont had not already argued that common issues predominate over individual ones in this case, courts routinely have recognized that tort claims asserted on behalf of a class in connection with widespread environmental contamination or exposure from a common cause ("mass tort claims") traditionally involve basic common issues of the defendant's liability and the common

23

000055

tortious conduct of the defendant that necessarily predominate over any individualized issue of

damages that may arise in such cases.  For example, in *Sterling v. Velsicol Corp.*, 855 F. 2d 1188,

1197 (6th Cir. 1988), the Sixth Circuit affirmed class certification under Rule 23(b)(3) for plaintiffs

who were injured by water contaminated by chemicals released from a chemical company's landfill,

stating that:

> In mass tort accidents, the factual and legal issues of a defendant's
> liability do not differ dramatically from one plaintiff to the next.  No
> matter how individualized the issue of damages may be, these issues
> may be reserved for individual treatment with the question of liability
> tried as a class action.  Consequently, the mere fact that questions
> peculiar to each individual member of the class remain after the
> common questions of the defendant's liability have been resolved
> does not dictate the conclusion that a class action is
> impermissible. . . . [W]here the defendant's liability can be
> determined on a class-wide basis because the cause of a disaster is a
> single course of conduct which is identical for each of the plaintiffs,
> a class action may be the best suited vehicle to resolve such a
> controversy.

*See also Gasperoni*, slip. op.. at *7 (class certified with respect to claims arising from esposure to

diet drugs because common issues relating to liability of defendant and nature of claimed relief

including medical monitoring, predominated over any individual issues between class members);

*Yslava*, 835 F. Supp. at 713 (certifying case involving claims for monetary damages and medical

monitoring "because the class involves questions of law and fact that predominate over any

individual issues"); *In re School Asbestos Litig.*. 789 F. 2d at 1010 (certifying class for claims related

to asbestos damages under Rule 23(b)(3)); *O'Connor*. 184 F.R.Dat 342 (certifying class for

property damage claims arising from water contamination under Rule 23(b)(3)); *Black*. 173 F.R.D.

at 160; *In re Three Mile Island Litig.*, 87 F.R.D. at 440 (certifying class for claims relating to

exposure to nuclear emissions under Rule 23(b)(3) because "common questions or law and fact

predominate over questions affecting only individual members.  The common issues will relate to

defendant's liability").  These courts routinely reject the argument made by DuPont, as supported

with the Affidavit of Dr. Guzelian, that mass tort claims necessarily raise too many idiosyncratic

variables requiring individualized proof of damages that overwhelm any common issues that

otherwise might "predominate."  *See, e.g., Bogosian* v. *Gulf Oil Cory.*, 561 F. 2d 434, 456 (3rd Cir.

000087

1997), *cert. denied* 434 U.S. 1086 (1973) ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate"); *In re Inter-Op Hip Prosthesis Litig.*, slip. op. at 13 ("the Rule [23(b)(3)] states that common issues need only predominate, not outnumber individual issues."); *In re Diet Drug Litig.*, slip. op. at 41-42; *Burch*, slip. op. at 41; *Olden*, slip. op. at 26-27.

Prosecution of this case as a class action also is superior to the other available methods for adjudicating this controversy. As indicated in this Court's Order of February 27, 2002, allowing any of the common claims that predominate in this case to be resolved by governmental agencies outside of this action would not be a superior method for adjudicating the claims in this case. More specifically, because Plaintiffs and the Class members are not able to obtain any relief from any of the State administrative agencies that may become involved in evaluating issues relating to the potential toxicity of C-8 and its impact on human health and the environment, allowing their claims to be resolved outside the context of this case would not be preferable to allowing the claims of the parties to proceed before this Court. (*See* Order, dated February 27, 2002.)

In addition, courts routinely have recognized that allowing common tort claims to proceed on behalf of a class under Rule 23(b)(3) is far superior to requiring all of the individual class members to pursue their claims through individual litigation, particularly when requests for medical monitoring relief are involved. *See, e.g., In re Three Mile Island Litig.*, 87 F.R.D. at 440 (court found certification of mass tort class seeking damages and medical monitoring arising from release of radioactive emissions to be superior form of adjudication under Rule 23(b)(3)); *In re Hip-Op Prosthesis Litig.*, slip. op. at 16 (court found class action for medical monitoring relief was "superior" form of adjudication because the "small monetary amount involved for the medical monitoring claim" makes any individual claim for monitoring "prohibitive in the absence of class treatment") (citing *In re Diet Drug Litig.*, slip. op. at 56) (court found class action seeking damages and medical monitoring for diet drug exposure to be superior method of adjudication because "judicial efficiency will be improved through the class mechanism as opposed to re-litigating these

000088

same issues in a series of individual cases")); *Burch*, slip. op. at 41 (in mass tort case seeking monetary damages and medical monitoring, "any difficulties in managing this case as a class action pale in comparison to the difficulties in individually trying these cases 1, 2, or even several at a time. As noted above, the utility of Rule 23, properly used, in the mass tort context benefits the plaintiffs and the defendants in the form of lower litigation costs and the court system in a more efficient use of scarce judicial resources."). See also *O'Connor*, 154 F.R.D. at 342 (court found class action under Rule 23(b)(3) for water contamination claims to be a superior method of adjudication because class-wide litigation of common issues would reduce litigation costs and promote greater efficiency among the class members).

In this case, adjudicating the claims of the Class through a class action is far superior to the alternative, which would be litigation of each of the many thousands of individuals claims through separate litigation, which could overwhelm the courts. This is particularly true in this case, when viewed in connection with the four factors that are "pertinent" to an evaluation as to whether a case should proceed as a class under Rule 23(b)(3). First, there is no indication that any individual members of the Class have expressed any interest in individually controlling the prosecution of any separate actions against either defendant in connection with the matters at issue in this case. *See* W. Va. R. Civ. P. 23(b)(3)(A). Second, on a closely-related matter, no evidence was submitted of any other litigation concerning any of the matters at issue in this case that is already commenced by or against any members of the Class, which could present potential difficulty in allowing this case to proceed on behalf of the entire Class. *See id.* at Rule 23(b)(3)(B). Third, no evidence has been submitted of any challenge having been raised to date to the desireability of handling the claims of the Class in this forum. In fact, both Defendants strenuously argued for the transfer of these claims into this particular forum. (*See* Defendants' Motions to Dismiss for Lack of Venue; W. Va. R. Civ. P. 23(b)(3)(C)). Fourth, no evidence has been submitted of any particular difficulties that are likely to be encountered in the management of this case as a Class, given that all of the prerequisites to the proper maintenance of the Class are established under Rule 23. *See id.*, at Rule 23(b)(3)(D). Consequently, the claims of the Class are appropriate for certification under Rule 23(b)(3).

*000089*

Because certification is appropriate under Rule 23(b)(1)(A), Rule 23(b)(2), and Rule 23(b)(3), the Class is hereby CERTIFIED under Rules 23(b)(1)(A) and 23(b)(2). See, *e.g.*, *Yslava*, 845 F. Supp. at 713 ("when class certification is sought in the alternative under 23(b)(2) and (b)(3), the 23(b)(2) class is preferred")(citing *Cook*, 151 F.R.D. at 388; *Bing v. Roadway Express, Inc.*, 485 F.2d 441, 447 (5th Cir. 1973).)

3.   **All individual damages issues requiring individualized proof will be reserved for later litigation, pursuant *to* Rule 23(d).**

As indicated above, all common fact and legal issues relating to the Defendants' underlying liability for all claims in this case, and all fact and legal issues relating to Plaintiffs' claims for equitable, declaratory, and injunctive relief, including medical monitoring, are appropriate for certification under Rule 23. Plaintiffs proposed, however, and neither Defendant disputed that, in order to advance the orderly and efficient resolution of the Class issues and ultimate resolution of this case, matters requiring individualized proof of damages, including each individual class member's specific personal injuries and/or property damage, should be reserved for litigation after resolution of the common Class issues, pursuant to Rule 23(c)(4), (d). W. Va. R. Civ. P. 23 (c)(4), (d) ("when appropriate. . . an action may be brought or maintained as a class action with respect to particular issues"). This Court recognizes that it also has the authority to enter orders to bifurcate the litigation in this matter, pursuant to Rule 16. Consequently this Court·CERTIFIES this case to proceed on behalf of the Class, pursuant to Rule 23, with respect to all underlying liability claims and Plaintiffs' claims for equitable, injunctive, and declaratory relief, including medical monitoring and liability for punitive damages, while all matters relating to proof of the amount of any punitive damages and calculation of individual damages of the individual Class members, including all individual personal injury and property damage are hereby STAYED and RESERVED for litigation after resolution of the Class claims.

B.   **DuPont's Relief Motion Is Denied.**

In its Relief Motion, DuPont argued, in essence, that the Court should delay the class certification hearing because Plaintiffs had not filed any formal written motion setting forth the

27                                             000090

factual or legal basis for certification of the Class, and because DuPont had not yet had a chance to take the discovery it believed it needed from the named Class representatives. As mentioned above, however, DuPont's Relief Motion was filed the same day Plaintiffs filed their formal written Motion For Class Certification, along with their Memorandum of Law in Support. Plaintiffs' Motion papers actually were filed before DuPont filed its Relief Motion. In addition, it is undisputed that Plaintiffs had agreed to provide the named Plaintiffs for depositions and had provided answers to DuPont's written discovery on class certification issues before the class certification hearing, but DuPont voluntarily cancelled all of those depositions before the hearing.   DuPont's Relief Motion is, therefore, baseless, and is hereby DENIED.

**C.    Plaintiffs' Motion For Judgment On The Pleadings Is Denied.**

In their Motion for Judgment on the Pleadings Against Dupont, Plaintiffs argued, in essence, that DuPont's failure to specifically deny the allegations set forth in Counts II and VI of Plaintiffs' Amended Complaint within ten days after the Court denied DuPont's Motion to Dismiss those counts was sufficient to support judgement against DuPont on those counts, as a matter of law. Although the Court rejects DuPont's argument that its catch-all denial of all allegations not specifically admitted in paragraph 104 of its original Answer is sufficient to constitute a specific denial of the facts alleged in Counts II and VI, the Court is not persuaded that DuPont has actually admitted the key factual allegations of both Counts II and VI in its pleadings sufficient to support a judgment against DuPont on the pleadings.   Plaintiffs' Motion for such a judgment on the pleadings is, therefore: DENIED.

**D.    Purpose of Findings of Fact.**

The Findings of Fact set forth herein are made for the purpose of resolving the Motions and are not intended to be final and binding or usurp the function of the jury.

000091

ENTERED this _10th_ day of _April_, 2002.

_[signature]_
George W. Hill, Judge

PRESENTED BY:

_[signature]_
Larry A. Winter (WVSB #4094)
WINTER JOHNSON & HILL PLLC
P.O. Box 2187
Charleston, WV  25328-2187
(304) 345-7800


R. Edison Hill (WVSB #1734)
Harry G. Deitzler (WVSB#981)
Hill, Peterson, Carper, Bee
 & DEITZLER, P.L.L.C.
NorthGate Business Park
500 Tracy Way
Charleston, West Virginia  25311-1261
(304) 345-5667


Gerald J. Rapien
Robert A. Bilott
TAFT. STETTINIUS & HOLLISTER, LLP
1800 Firstar Tower
425 Walnut Street
Cincinnati, OH  45202-3957
(513) 381-2838
_Counsel for Plaintiffs_


RECEIVED A COPY OF:

_[signature]_
Charles L. Woody, Esq. (WVSB#4130)
Heather Heiskell Jones, Esq. (WVSB#4913)
Paula L. Durst, Esq. (WVSB#5805)
SPILMAN THOMAS & BATTLE PLLC
Spilman Center
300 Kanawha Boulevard East
Charleston, WV  25301
(304) 340-3800


Laurence F. Janssen
STEPTOE & JOHNSON. LLP
633 West 5th Street. Suite 700
Los Angeles, CA  90071
(213) 438-9400
_Counsel for E. I. du Pont de Nemours and
Company_


_[signature]_
Richard E. Holtzapfel. Esq. (WVSB#7723)
John R. McGhee Jr.. Esq. (WVSB#5205)
KAY CASTO & CHANEY PLLC
1600 Bank One Center
Virginia Street East
Charleston. WV  25301
(304) 345-8900


Richard A. Hayhurst, Esq.
P.O. Box 86
Parkersburg, WV  26102
(304) 422-1445
_Counsel for Lubeck Public Service District_

STATE OF WEST VIRGINIA.
COUNTY OF WOOD, TO-WIT:

I, CAROLE JONES, Clerk of the Circuit Court of
Wood County. West Virginia. hereby certify that
the foregoing is a true and complete copy of an
order entered in said Court, on the __ day of
_April 2002_ as fully as the same appears
to me of record.
Given under my hand and seal of said Circuit
Court, this the __ day of _April_, _2002_

_[signature]_
Clerk of the Circuit Court of
Wood County, West Virginia

000092

29