

# Expert Statement

Groundwater Damages in the Matter of:

*Sullivan et al. v. Saint-Gobain Performance Plastics Corporation*

Case No. 5:16-cv-00125-GWC

Prepared for:

Douglas A. Ruley, Esq.
Davis and Whitlock, P.C.
Attorneys at Law
21 Battery Park Avenue, Suite 206
Asheville, NC 28801

And

Emily J. Joselson, Esq.
Langrock Sperry & Wool, LLP
P.O. Drawer 351
Middlebury, VT 05753

31 August 2017

Attorney-Client Privileged Work Product

Prepared by:

Robert E. Unsworth
Principal and Director
Industrial Economics, Incorporated
2067 Massachusetts Avenue
Cambridge, MA 02140

Robert E. Unsworth

INDUSTRIAL ECONOMICS, INCORPORATED

Unsworth Exhibit 001

## INTRODUCTION

This expert statement is submitted in connection with *Sullivan et al. v. Saint-Gobain Performance Plastics Corporation*, 5:16-cv-00125-GWC.  In this opinion I address the potential for damages from the release of perfluorooctanoic acid (PFOA)[1] to groundwater in the Town of Bennington and the Village of North Bennington, Vermont. In particular, I consider groundwater damages that are not being addressed by the current remedial action plan being negotiated by the State of Vermont with Saint-Gobain. The opinions contained in this report are based on my personal and professional knowledge.  My conclusions are expressed to a reasonable degree of certainty and are consistent with the standards of the profession of environmental damage assessment.  Staff at Industrial Economics, Incorporated (IEc) provided me with technical and administrative support in completion of this work, all under my direction.  Given that I continue to gather information, and that the situation continues to evolve, I reserve the right to update this opinion and my technical approach as new information becomes available.

## SUMMARY OF OPINION

I was asked to identify reliable and appropriate measures of groundwater damages to the Plaintiffs in this matter.  My opinions are summarized as follows:

- 10 V.S.A. § 1410(c) describes a cause of action for "unreasonable harm" caused to Vermont's groundwater:   "Any person may maintain under this section an action for equitable relief or an action in tort to recover damages, or both, for the unreasonable harm caused by another person withdrawing, diverting or altering the character or quality of groundwater."

- Hundreds of residents of the Town of Bennington and the Village of North Bennington, Vermont, have relied on groundwater obtained from individual, private wells as their primary water source.

- The discovery of PFOA in the aquifer underlying these communities has resulted in actions by the State of Vermont to require some of these residents to either seal their wells and hook-up to one of two municipal water systems, or to operate point-of-entry treatment systems (POETs) to remove these compounds from their well water supply. These actions are being taken in order to protect public health.

- Municipal water hookup is ongoing, and as yet involves only some residences on the western side of what has been described as the zone of

---

[1] In this report I refer to the contaminant of concern as "PFOA", which includes PFOA-related contaminants also present in groundwater, including but not limited to PFOS.

contamination (State of Vermont, 2017a). The State is still negotiating with Saint-Gobain regarding those residences on the eastern side of the contaminated zone, and the proposed remedial action plan does not contemplate providing a municipal water hook-up to certain properties on the western side (State of Vermont, 2017a).

- Prior to this contamination event, groundwater in these communities met State and Federal drinking water standards, and was abundant.

- Bennington and North Bennington operate separate public water utilities. Both of these systems have agreed to add customers to their systems, where possible.

- While the primary cost of adding these residences and businesses to the municipal water systems will be borne by Saint-Gobain as the responsible party, these water users will experience uncompensated added costs and inconvenience into the future.

- These costs will take the form of quarterly water bills, net of certain costs no longer incurred in operating a well, or the burden of maintaining a POET.

- In addition, all residents of these communities have experienced the loss of a source of clean groundwater, leaving these communities reliant on the existing municipal water systems and associated remaining water sources.

- In addition to compensating for added costs, in order to make the public whole for the loss of the option to utilize groundwater, actions should be taken to (1) assure the quality of municipal water systems is maintained; (2) assure the capacity of these systems meets the added demand for water; and, (3) assure that the remaining sources of water are protected and enhanced to offset the loss of the community's groundwater resource.

- The costs associated with these actions represent "replacement costs", that is, the cost of actions to fully replace the services previously provided by groundwater. The goal of these actions is to bring the harmed parties back to the condition they would have been in absent contamination.

- These economic damages approaches are well-suited to measure losses to a group or groups of citizens, or for purposes of establishing damages under the Groundwater Protection Act and other claims. The calculations performed, assumptions made, and information relied upon are common to all of the Plaintiffs in this matter.  As such, addressing losses incurred by members of these communities as a group provides a reasonable and efficient means to establish these damages.

I am currently working to obtain the information needed to develop final damages figures using these approaches. I expect to present my damages analysis in a later report. The remainder of this report describes my qualifications, my general understanding of the facts regarding groundwater contamination in Bennington and North Bennington, the two approaches I will use to calculate groundwater damages, and the suitability of these approaches to address harms to a common set of Plaintiffs.

### QUALIFICATIONS TO OFFER THIS EXPERT OPINION

I am Principal and Director of IEc, an economics and environmental policy consultancy located in Cambridge, Massachusetts. I have been employed with IEc since 1985. I was hired as a full-time Associate with IEc in 1986, promoted to Senior Associate in 1990, and elected to Principal in 1993. From 2000 to 2011 I served as a Managing Director and President of the firm. Prior to joining IEc, I received a Bachelor's in Forestry from the State University of New York at Syracuse in 1984, and a Master's of Forest Science from Yale University in 1986, where my studies focused on environmental and natural resource economics.

My consulting practice focuses on applied natural resource and environmental economics. Specifically, I provide consulting services and expert support in the assessment of economic damages resulting from adverse changes in the environment, including environmental contamination, as well as the benefits associated with improvements in environmental conditions. My clients have included the United States (U.S.) Department of Justice, the National Oceanic and Atmospheric Administration, the U.S. Environmental Protection Agency, the U.S. Department of Transportation, the U.S. Department of Energy, the U.S. Department of the Interior, numerous U.S. states and Indian Tribes, foreign governments, non-governmental organizations, private companies, and private attorneys.

I have assessed economic losses resulting from the release of oil and other hazardous substances to the environment at a variety of sites throughout the U.S. and the Caribbean. Over the past 30 years I have worked on over 100 environmental damage assessments, including numerous assessments of economic damage resulting from groundwater contamination. I have worked on matters involving private claims for property value diminution due to groundwater contamination, private claims for added costs associated with groundwater contamination, public claims for replacement costs of groundwater resources, valued groundwater resources in the context of cost-benefit analyses of regulatory actions undertaken by the U.S. Department of the Interior under the Endangered Species Act, and addressed economic issues in the context of an interstate dispute involving groundwater resources. In past work, I have managed and conducted

3

assessments of economic losses associated with contamination of groundwater in Colorado, Connecticut, Illinois, Florida, Kansas, Maine, Massachusetts, Minnesota, Missouri, New Jersey, New Mexico, New York, Ohio, Oklahoma, Pennsylvania, Puerto Rico, Rhode Island, Tennessee, Washington, and the U.S. Virgin Islands. I have assisted and continue to assist several state environmental agencies in the development of approaches to groundwater damage assessment. I have provided expert reports, affidavits, deposition and trial testimony on several aspects of environmental damage assessment, including groundwater damage assessment and the application of resource equivalency methods. This work has included serving as an expert for both defendants and plaintiffs.

I have published in peer-reviewed journals on topics involving environmental damage assessment and am frequently called upon to discuss this topic at professional meetings. I was a member of the National Academy of Sciences, Transportation Research Board, Committee on Alternative Tanker Designs. I also have served as an expert peer reviewer on applied approaches to environmental damage and benefits assessment for the U.S. Environmental Protection Agency, the U.S. Department of the Interior, and the U.S. Department of Justice; and I served on a review committee for the European Union regarding development of approaches for environmental liability assessment. In addition, I have authored several guidance documents on environmental damage assessment for state and Federal agencies, including guidance on groundwater damage assessment. I am currently serving as an expert witness for the Republic of Nicaragua in an environmental damage case brought before the International Court of Justice.

A partial list of the projects in which I have been involved is included in my Curriculum Vitae (Attachment A). This vita also lists peer reviewed published papers I have authored. I have presented sworn deposition testimony in one case in the past four years. That testimony was for the U.S. Department of Justice and addressed the appropriate measurement of the economic benefits of environmental restoration (in the matter of: U.S. and the State of Wisconsin v. NCR Corporation, et al., Civil Action No. 1-CV-00910).

### GROUNDWATER CONTAMINATION IN BENNINGTON AND NORTH BENNINGTON

In this section I provide a summary of my understanding of the situation.  This information is provided for context and to frame the economic damages approaches I propose to use.

- As a result of past activities at industrial facilities in Bennington (1968-1978) and North Bennington (1978-2001), PFOA was released into the environment and came to be located in groundwater underlying both

Bennington and North Bennington (MSK Engineering & Design, 2016; Otter Creek Engineering, Inc., 2016).

- Some residents of Bennington and North Bennington, Vermont, have historically relied on groundwater obtained from individual, private wells as their primary water source (MSK Engineering & Design, 2016; Otter Creek Engineering, Inc., 2016)

- Prior to the discovery of widespread PFOA contamination, groundwater in these communities met State and Federal drinking water standards, and was abundant.

- PFOA is considered a toxic contaminant (State of Vermont, 2016; EPA, 2016), and thus its presence has led to the need for actions to protect residents of these communities from further exposure.

- It is expected that PFOA contamination will persist for an indefinite period of time (MSK Engineering & Design, 2016). As it is not known how long the groundwater will remain contaminated, the only solution for these areas is an extension of the municipal water systems.

- Actions taken to-date to protect public health include the testing of well water and subsequent reporting on the results of these tests, provision of POETs at some residences reliant on well water to remove this contaminant prior to use of the groundwater, and provision of bottled water (State of Vermont, 2017a).[2]

- To provide a more long-term solution to the health risks associated with exposure to PFOA, the State of Vermont has taken actions to require residents to either seal their wells and hook-up to one of two municipal water systems, or to operate POETs into the foreseeable future to remove these compounds from their well water.[3] Construction of the additional required infrastructure and tie-ins to provide municipal water to affected parties is expected to occur in the fall of 2017 (State of Vermont, 2017a).[4]

---

[2] In addition, in Bennington several residences that were adjacent to town water lines were hooked-up to the municipal system in 2016.

[3] The State is also considering the development of deeper wells for those residences out of range of the municipal systems (State of Vermont, 2017e).

[4] Residents placed on municipal water will be required to "seal" their wells, which will render these wells inoperable.  In addition, PFOA contamination is expected to persist in groundwater well into the future. As such, it is unlikely that any current well owners who are sealing their wells will be permitted to return to the use of groundwater.

- Bennington and North Bennington both operate municipal water systems that distribute water in these communities.[5]  Both of these systems have agreed to add customers to their systems, where possible.[6]

- The Town of Bennington's municipal water system relies on two sources of water: Morgan Spring, a groundwater source located in the center of town, and a surface water source, Bolles Brook, in Woodford, Vermont, to the east of the Town.

- North Bennington separately relies on two related sources of water: a surface water intake on Basin Brook in Shaftsbury, and a set of shallow gathering wells located downstream of the surface water source in the same drainage.

- Both municipalities' systems operate water filtration plants, water treatment facilities, water storage facilities, and the distribution system through which water is delivered.

- It is expected that approximately 200 residences and other water users in Bennington will hook-up to the Bennington utility as a result of the PFOA. It is expected that about 50 residences and other water users will hook-up to the North Bennington utility as a result of PFOA (Village of North Bennington, 2017; Town of Bennington, 2017).

- Some residences may choose not to join these municipal systems, due to concerns over cost, taste, or a desire to remain independent and self-sufficient (personal communication, Terrence Morse). These residents will need to operate and maintain POETs into the foreseeable future.  In addition, according to the findings of the State of Vermont and Saint-Gobain in their proposed Consent Order, some residences are too distant or difficult to reach from the current water distribution systems maintained by these municipalities, and thus also will need to continue to operate and maintain POETs into the foreseeable future (State of Vermont, 2017e).[7]

- The litigation entitled *Sullivan et al. v. Saint-Gobain Performance Plastics Corporation*, 5:16-cv-000125-GWC, has been filed as a putative class action to address various unaddressed harms resulting from Saint-Gobain's PFOA contamination (United States District Court, Sullivan et al. v. Saint-Gobain Performance Plastics, 2017).

---

[5] These communities also provide water to some areas of neighboring towns.

[6] In the case of North Bennington, some of these new connections are outside of the Village limits.

[7] As noted earlier, the State is considering the option of deeper wells for these households.

- Based on Grand List data, there are roughly 2,150 Bennington and North Bennington residential properties lying above the Zone of Contamination.[8]

- Based on Census data, there are approximately 8,342 residents within this zone.[9]

- Under the remedial action plan currently being finalized between the State of Vermont and Saint-Gobain, the cost of adding affected residences on the western side of the zone of contamination to the municipal water systems will be primarily borne by Saint-Gobain, as the responsible party. Saint-Gobain will also bear the cost of maintaining and operating POETs for those residences on the western side of the contamination zone that cannot be added to one of the municipal systems (Vermont Agency of Natural Resources, 2017).[10]

- However, these water users will experience uncompensated added costs and inconvenience into the future.

  o Added cost damages reflect the additional out-of-pocket financial burden placed on the harmed parties as a result of groundwater contamination. Specifically, residents of these communities who join the municipal water system will now have to pay a quarterly water bill. These well owners may also be able to avoid some of the costs associated with operating a well.

  o Inconvenience damages reflect out-of-pocket costs and time and effort spent undertaking actions to address groundwater contamination by maintaining and operating a POET, for those residents who will not be joining the municipal system.

- In addition, these and other residents of these communities have experienced the loss of a source of clean groundwater, leaving these

---

[8] A shapefile of the boundary of the Zone of Contamination was obtained from the Vermont Department of Environmental Conservation. A list of addresses located in the Bennington and North Bennington Zone of Contamination was obtained from the Bennington Assessors' Office Grand List. Commercial properties were excluded from this list. Data layers were spatially overlaid on ArcGIS.

[9] Census block population data were downloaded from the U.S. Census Bureau's American Community Survey 2015 5-year estimate. Population data for Bennington County were joined to the Census Bureau's TIGER spatial reference data. For census blocks that lie completely within the zone of contamination, 100 percent of the block's population was counted in this estimate. For census blocks that are partially located within the Zone, the total population was multiplied by a scaling factor based on the percentage of the block's area lying within the zone of contamination (For example, if 50 percent of a block group lies within the Zone of Contamination, its total population estimate was multiplied by 0.5).

[10] At some point these residences may become responsible for the costs of operating the POET systems, if "Saint-Gobain has demonstrated a stable or decreasing trend of PFOA levels for eight consecutive rounds of quarterly sampling."  (State's Fact Sheet re Consent Order)

communities reliant on the existing municipal water systems and associated water sources.

Approaches to calculate these economic damages – added cost and replacement cost -- are described below.

### ADDED COST APPROACH

As noted above, in some cases the presence of a hazardous substance in the environment may impose "added costs" on the harmed public. Added costs, also referred to as "averting costs," are widely accepted as a measure of environmental damage (EPA 2014).

In this matter, while the cost of connecting affected residences and businesses to the municipal water systems will be borne by the responsible party, these water users will experience added costs and inconvenience into the future. These changes will come in the form of water bills for those residents who join the municipal water system, net of some expected costs of using well water. Residents who do not receive a hook-up to the municipal systems will incur the inconvenience and cost of having to rely on and manage a POET system to protect the quality of the water they use.

In constructing an added cost model, the first step is to establish a "but-for" condition: that is, the conditions that would exist had PFOA not been found in local wells. In this case, the but-for condition reflects the continued use of groundwater by all affected residences. This includes, typically, operation of the well-pump and a pressure tank. In some cases residences may also have used a filtering device. Under this but-for framework, the provision of a municipal hook-up to the residence in effect replaces the well and associated equipment as a source of water.  I note that there was little interest among the affected groundwater users in joining either municipal system prior to this event (communications with operators of the water systems in Bennington and North Bennington). That is, over the past decade, only a small number of connections were added to these systems, and neither system reports having had many requests for additional service.  This fact reflects the preference of these residents for well water, and the desire not to incur the added cost of municipal water.

In this case I will assess added costs by considering the following:

- The number of residences hooking-up to each municipal water utility.

- The number of residences choosing not to join the municipal system, but to continue to use a well.

- The number of residences not being offered a hook-up to the municipal system, who will need to continue to utilize a POET for the foreseeable future.

- Current water rates: in Bennington this is generally a flat charge per quarter, but for some water customers in Bennington and all water customers in North Bennington the rate is based on usage.[11]   The cost associated with obtaining water from these municipal systems is significant; for example, a household in Bennington that opts to pay the flat rate will pay $532 / year (at current rates) (Bennington water utility rate schedule).  The average water consumer in North Bennington will pay $354 a year for this service.[12]

- The average volume of water consumed by a residential water customer.

- The expected rate of increase in water rates in the future (at this time, both systems expect increases in future years to be on the order of two to three percent per year, which is consistent with past increases) (Personal communication, Joan Pinsonnault, review of pattern of historical water rates).

- The time and effort required to maintain a POET.

- The nominal discount rate applicable to private parties involved in this claim, for use in calculating a present value damage claim. In this case, the appropriate rate to use is the nominal tax-adjusted cost of capital, based on a 30-year fixed rate conventional mortgage in the Bennington area.[13]

I will also consider whether there are any relevant cost savings to these class members associated with provision of municipal water.  This may include items such as:

---

[11] It appears that 2,500 customers in Bennington chose to be billed the flat rate, and 1,130 users chose to be billed based on usage (some of whom are non-residential) (personal communication, Joan Pinsonnault).  New customers will need to choose at the time of hook-up: if they choose not to have a meter installed at this time they will need to pay for it at a later date to be billed based on the quantity of water used (personal communication, Joan Pinsonnault).

[12] North Bennington charges all users a $44/year fee associated with a bond assessment, and $4.25/1,000 gallons used (North Bennington Water Utility).  The average user consumes about 200 gallons per day, which generates a usage charge of $310.25/year, or a total of $354/year (personal communication, Ted Fela).

[13] The Bank of Bennington 30-year fixed mortgage rate is 3.875 percent (Bank of Bennington, 2017).

- The avoided cost of an annual water test for bacteriological contamination (Vermont Department of Health, 2017).[14]

- The avoided cost of electricity to operate the well pump.

- The expected rate of increase in the cost of these items in the future.

These costs will be netted from the cost of paying municipal water bills.[15]

For class members choosing not to join the municipal system, I will assume that their losses are at least as great as those experienced by the class members who are joining the municipal system.  In some cases these decisions appear to be based on cost, in which case provision of compensation would lead these individuals to use municipal water. In others it appears to be based on preference for well water and other factors. In any case, I consider the cost of paying a municipal water bill as a proxy measure of loss for these parties. For class members who the State of Vermont and Saint-Gobain have determined cannot join the municipal system, I will consider the time and effort required to maintain and operate the POET system, as well as other issues associated with the use of and need for a POET.

### REPLACEMENT COST APPROACH

While residents of Bennington and North Bennington whose wells were impacted by the presence of PFOA will receive municipal water hook-ups or POETs, the community as a whole has lost a source of clean groundwater.  While in this case this groundwater cannot be replaced *in situ*, actions can be taken to replace the full-range of services provided by this resource in order to return the community to the conditions that would have existed absent the contamination event.[16]

This category of damages represents "replacement costs." That is, these damages will reflect the cost of actions to replace the services previously provided by groundwater. Specifically, I will consider the cost of actions to: (1) assure the quality of municipal water is maintained given additional demands on these systems; (2) assure the capacity of these systems meets the added demand for

---

[14] The Vermont Department of Health charges $14.00 for a home water test to detect the presence of bacteriological contamination.

[15] It is possible that some residences will experience increased lead levels in tap water as a result of the switching of source water from well water to municipal water (State of Vermont, 2017c). There are provisions in place to test residential tap water.  Solutions to this problem, should it occur, include the addition of chemical by the utility to its finished water (to reduce the leaching of lead), or the replacement of fixtures that may contain lead.  Any fixture replacement will be at the owner's expense.

[16] The National Research Council, Committee on Valuing Ground Water, addressed the need for full consideration of all services when addressing the value of groundwater (NRS 1997).

water; and, (3) assure that the remaining sources of water are protected and enhanced to off-set the loss of the community's groundwater resource.

In this matter I plan to assess reasonable replacement costs by considering:

- Changes in the demand for water in both of the municipal systems.

- Actions to ensure water quality is maintained throughout the municipal systems (in particular, the management of levels of disinfection by-products in tap water).

- Actions to ensure the same production capacity, including reserve capacity, exists within the systems as existed in the but-for condition.

- Actions to ensure source water quality is maintained.

- Actions to ensure that these systems are reliable and have the necessary redundancy to minimize service disruption.

- The expected rate of increase in these costs in the future.

- The time period over which these actions would be effective.

- The present value cost of these actions, including capital costs as well as operations and maintenance.

For example, North Bennington has historically limited the addition of new customers to its system (personal communication, Ted Fela).  Adding customers as a result of the PFOA event will require allocation of about 15 percent of their remaining capacity to these users.  As a result, to return this community to its "but-for" condition, an additional shallow well will be needed to replace this expended reserve capacity.  Similarly, in Bennington, treatment plant upgrades will be needed to assure that the added demands on the system, including its geographic expansion, do not result in decreased water quality at users' taps.  The efficacy of these and other actions will be considered as a means to replace lost groundwater services.

### THESE APPROACHES ARE WELL SUITED TO VERMONT'S GROUNDWATER PROTECTION ACT AND A PUBLIC REMEDY

The groundwater and economic damages approaches I describe above, addressing both added costs and replacement costs associated with groundwater contamination at this site, appropriately compensate for losses to individual households, as well as the communities collectively, through a public remedy to replace lost groundwater services.  The calculations to be performed, assumptions made, and information relied upon are common to all of the Plaintiffs in this matter.  Given similarities in the losses suffered by the residents and property owners in the zone of contamination, it is reasonable and efficient to calculate

11

these losses using these damages models. I believe that this approach provides a measure of damages consistent with the remedies available under Vermont's Groundwater Protection Act for "unreasonable harm" to groundwater.

### COMPENSATION

My 2017 rate for expert services in this case is $375/hour. My rate for testimony in this matter is the same.

### INFORMATION RELIED UPON

I considered and relied on the following documents in developing this opinion. I also reviewed various maps of the municipal water systems as well as maps of the PFOA remediation proposed service areas.

The Bank of Bennington (2017). Mortgage Rates. Accessed August 29, 2017. Available at: https://thebankofbennington.com/mortgage-rates/

Barr Engineering (2017). Draft Conceptual Modeling of PFOA Fate and Transport, North Bennington, Vermont. Prepared for Saint-Gobain Performance Plastics. June.

Kopp, Raymond J. (2001) Expert Report. *LeClercq, et al. v. Lockformer, et al.*, No. 00 C 7164 in the United States District Court for the Northern District of Illinois, Eastern Division. December 3.

MSK Engineering (2016). Preliminary Engineering Report. Bennington Water Distribution System Expansion, Bennington, VT. May.

Organisation for Economic Co-operation and Development (2017). Inflation forecast. Accessed August 28, 2017. Available at: https://data.oecd.org/price/inflation-forecast.htm

Otter Creek Engineering (2016). Village of North Bennington – Preliminary Engineering Report. June.

Personal communication, Ted Fela, Town of North Bennington, Vermont. August 2017.

Personal communication, Terrance Morse, Water Resources Superintendent, Town of Bennington, Vermont, August 2017.

Personal communication, Joan Pinsonnault, Collections Director, Town Treasurer, Town of Bennington, Vermont. August 2017.

Personal communication, Mark Youngstrom, Otter Creek Engineering (outside consultant to the Village of North Bennington's water utility), Rutland, Vermont. August 2017.

Second Amended Complaint – Class Action. United States District Court, District of Vermont. James D. Sullivan et al. v. Saint-Gobain Performance Plastics Corporation. Civil Action No. 5:16-cv-00125-GWC. Filed 26 June 2017.

State of Vermont. 10 V.S.A. §1410 (Groundwater Right of Action. Title 10 (Conservation and Development), Chapter 048 (Groundwater Protection), Subchapter 004 (Groundwater Cause of Action).

State of Vermont, Department of Environmental Conservation (2016). Summary for Legislators: PFOA Contamination in North Bennington. March. Available at: http://dec.vermont.gov/sites/dec/files/documents/PFOASummaryForLegislatorsvFINAL3.25.16.pdf

State of Vermont (2017a). Summary of Bennington and North Bennington PFOA Community Meeting on April 27, 2017. May. Available at: http://dec.vermont.gov/sites/dec/files/co/pfoa/documents/2017_05_04_FINAL_MEMO-Summary-Community-Meeting.pdf

State of Vermont (2017b). Agency of Natural Resources, Department of Environmental Conservation. Fact Sheet, State of Vermont Consent Order with Saint-Gobain. July 26.

State of Vermont, Agency of Natural Resources, Department of Environmental Conservation (2017c). Frequently Asked Questions: State of Vermont Consent Order with Saint-Gobain. July 26.

State of Vermont, Agency of Natural Resources, Department of Environmental Conservation (2017d). Interim Measures Corrective Action Plan For Public Water System (PWS) Extensions Corrective Action Area I, Operable Unit A, North Bennington and Bennington, August 11, 2017.

State of Vermont, Agency of Natural Resources v. Saint-Gobain Performance Plastics Corporation (2017e). Consent Order and Final Judgement. July. Available at: https://anrweb.vt.gov/PubDocs/DEC/PFOA/Consent%20Order%20and%20Technical%20Documents/Consent%20Order/2-20170726%20SG%20Consent%20Order.pdf

State of Vermont, Agency of Natural Resources v. Saint-Gobain Performance Plastics Corporation (2017f). Consent Order Appendix A: Corrective Action Work Items and Schedule. June. Available at: https://anrweb.vt.gov/PubDocs/DEC/PFOA/Consent%20Order%20and%20Technical%20Documents/Consent%20Order/3-20170726%20SG%20Consent%20Order%20Appendix%20A.pdf

Town of Bennington, Vermont, Water/Sewer System Regulation Ordinance. Appendix II. July 1, 2017-June 30, 2018.

Town of Bennington, Vermont, Water Quality Reports, various.

Town of Bennington, Water Utility Rate Schedule.

Town of Bennington, Vermont (2017). 2017 0811 Bennington Landowners (Microsoft Excel Spreadsheet).

13

U.S. Environmental Protection Agency (2014). Guidelines for Preparing Economic Analyses (Section 7.3.1.4).

U.S. Environmental Protection Agency (2016). Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA). Available at: https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_health_advisory_final-plain.pdf

Vermont Agency of Natural Resources (2017). Fact Sheet: State of Vermont Consent Order with Saint-Gobain. July. Available at: https://anrweb.vt.gov/PubDocs/DEC/PFOA/Consent%20Order%20and%20Technical%20Documents/Consent%20Order/00-2017_07_25_FINAL_Consent%20Order%20Fact%20Sheet.pdf

Vermont Department of Environmental Conservation (2017). Community Updates. August.

Vermont Department of Health Laboratory (2017). Water and Radon Test Order Form. Available at: http://www.healthvermont.gov/sites/default/files/documents/2017/03/Admin%20501%20Rev%20%209%20%20Feb%2022%202017%20water%20and%20radon%20test%20order%20form.pdf

Video, Public Meeting on Status of Bennington Groundwater Issues. 27 April 2017.

Village of North Bennington, Vermont, Water Quality Reports, various.

Village of North Bennington, Vermont (2017). North Bennington Land Owners (Microsoft Excel spreadsheet).

Wuolo, Ray. 2016. Proposed Scope of Work for Domestic Well Assessment and Replacement. Barr Engineering Co. November 11.

14

IEc

ATTACHMENT A: CURRICULUM VITAE OF ROBERT E. UNSWORTH

**ROBERT E. UNSWORTH**                                 **PRINCIPAL AND DIRECTOR**

## Overview

Mr. Unsworth, Principal and Director of Industrial Economics, Incorporated (IEc), is a recognized expert in the field of natural resource economics and environmental damage assessment. In his 32 years of experience he has addressed the full range of issues encountered in environmental damage valuation. From 2005 to 2011 he served as IEc's President, responsible for strategic planning as well as day-today operations.  In addition to his consulting practice, he currently serves on the Board of the Student Conservation Association, an organization dedicated to the development of environmental conservation skills and work experience in young people of all backgrounds.

Of particular relevance to this matter, his work has addressed  private claims for property value diminution due to groundwater contamination, private claims for added costs associated with groundwater contamination, public claims for replacement costs of groundwater resources, valuation of groundwater resources in the context of cost-benefit analyses of regulatory actions undertaken by the U.S. Department of the Interior under the Endangered Species Act, and addressed economic issues in the context of an interstate dispute involving groundwater resources.  Specific examples of Mr. Unsworth's qualifications of relevance to this case include:

- Serving as an expert witness and consultant to a range of water economics matters, including:

  - Providing an expert opinion on the conceptually sound approach to groundwater valuation for the City of Memphis, in the context of an intestate water dispute between Memphis and the State of Mississippi.

  - Providing expert opinions in a wide-range of groundwater contamination cases brought by public trustees for groundwater resources.  For example, Mr. Unsworth served as an expert witness in a damage claim brought by the State of Ohio against the U.S. Department of Energy (DOE) for damages associated with radionuclide contamination of groundwater at DOE's former Fernald, Ohio facility, and is currently an expert witness in a series of claims for damages due to MTBE contamination of groundwater in New Jersey.

  - Providing technical support to a claim for damages brought by a community of well owners impacted by hazardous contamination, including the added costs of providing municipal water and the use of POETs.

Mr. Unsworth has testified in the context of environmental litigation and before state commissions, including Vermont's Public Service Board.

## Education and Professional Experience

Master of Forest Science, Yale University.

Bachelor of Science *magna cum laude* in Forestry, State University of New York.

Mr. Unsworth has served as a member of several expert panels, including the National Research Council, Transportation Safety Board, Committee to Evaluate Alternative Tanker Designs; the Atlantic States Marine Fisheries Commission, Horseshoe Crab and Tautog Management Committees; European panels on environmental liability assessment; and U.S. Environmental Protection Agency panels on approaches to estimate the economic benefits of the Clean Water Act and changes in atmospheric visibility  He is frequently called upon to present on the topic of environmental damage assessment, including groundwater damage assessment.

Industrial Economics, Incorporated
2067 Massachusetts Avenue
Cambridge, MA 02140   USA
617.354.0074 | 617.354.0463 fax
www.indecon.com

2

## Project Experience

### Natural Resource Damage Assessment

Examples of Mr. Unsworth's experience in natural resource damage assessment are summarized below.

- For the Hanford Natural Resource Trustee Council, directing the development of an Injury Assessment Plan, a Preliminary Estimate of Damages, and other documents to support planning for one of the most extensive and complex natural resource damage assessments conducted to-date.  Injuries considered include terrestrial and aquatic biota, surface water, groundwater, and Tribal lost use services.  Trustees include two states, three Tribal governments, and three Federal agencies.

- For the Los Alamos Natural Resource Trustee Council, directing the development of a Damage Assessment Plan, a preliminary injury evaluation, and other documents required to support restoration planning at this site. Resources of concern include groundwater, surface water, terrestrial and aquatic biota, and Tribal lost use services. Trustees include the State of New Mexico, five Federal agencies, and four Pueblo governments. Mr. Unsworth is currently serving as Program Manager for this multi-year, multi-million dollar assessment.

- For State and Federal Trustees, provided technical support in assessing the likely benefits of early restoration projects following the BP Deepwater. Made technical presentations in the context of early restoration settlement negotiations with BP on behalf of the Trustees.

- For the Department of the Interior, assisting in the development of a white paper on issues in assessing cultural lost services in the context of natural resource damage assessment.

- Providing support to the Navajo Nation in assessing impacts due to the Gold King Mine spill.

- Assisting the trustees for Leech Lake, Minnesota in assessing the damages associated with hazardous contamination at that site.

- For the Commonwealth of Massachusetts, developing a general oil spill damage assessment model to be applied to assign damages from small and moderate scale oil spills in terrestrial, aquatic and marine environments.

- For the State of New York, estimated damages resulting from groundwater injuries associated with a catastrophic salt mine collapse.  Participated in settlement negotiations with the responsible party.

- For various trustees, providing support in assessing the natural resource damage assessment credits to be assigned to early restoration actions taken in several large scale damage assessments.

- For the U.S. Department of Energy and the U.S. Department of Justice, provided expert testimony and technical support in settlement negotiations in a claim brought by the State of Ohio against the U.S. for groundwater damages resulting from radionuclide releases from the Fernald Ohio site.

- For the U.S. Department of Justice, U.S. Attorney's Office, and the U.S. Forest Service, assessed natural resource damages associated with several large-scale wildland fires, including the Moonlight, Storrie, Big Creek, Freds, Sims and Witch fires.  Provided expert deposition testimony in several of these cases.

- For the City of San Diego, assessed natural resource and other economic damages associated with the Witch and Guejito fires.  Developed expert opinion on damages and assisted in settlement negotiations.

- For Sonoma County, California, assessed natural resource damages associated with the Geyser's fire.  Assisted in settlement negotiations.

3

• For the Territorial Government of the U.S. Virgin Islands, provided an expert opinion and expert testimony regarding natural resource damages resulting from groundwater contamination at the Tutu well fields site on St. Thomas. Research considered added costs, the public's willingness to pay for a replacement water supply, and the non-use values associated with the contaminated aquifer.

• For the U.S. Department of Justice and the U.S. Army, assessed damages associated with groundwater contamination at the Twin Cities Army Ammunitions Plant in Minnesota.  Assisted in settlement negotiations between the Federal government and the state.

• For the State of New York, assessed groundwater damages associated with a large-scale salt mine collapse.

• For the States of Kansas, Oklahoma, and Missouri, provided an expert opinion in the context of a bankruptcy proceeding as to groundwater damages due to mining activity in the Tristate Mining district.

• For the State of New Jersey, provided expert opinions of groundwater damages at over a dozen sites in the State.

• Assisting in the resolution of a claim for ecological injury and recreational fishing losses resulting from the release of PCBs to Lake Hartwell, South Carolina/Georgia, and an associated tributary.  Provided technical support to a cooperative assessment of damages and in the development of a formal Restoration and Compensation Determination Plan.

• Assisting in the development of a preliminary damage estimate and providing technical support to negotiations between Trustees and the responsible party at the Palmerton Zinc Superfund site in Pennsylvania.  Categories of loss considered include ecological services associated with injured forested and aquatic ecosystems, as well as recreational fishing, hunting and timber harvest opportunities.

• Assisting in a cooperative assessment of damages due to the release of mercury, PCBs, and radionuclides at Oak Ridge Reservation in Tennessee.  Constructed a habitat equivalency analysis for aquatic injuries, and assessed the scale of ecological and human use restoration credits provided by a large parcel of forested land at the site.  Currently working with the U.S. Department of Energy and the State of Tennessee to resolve claims for groundwater damages as well as damages associated with remaining terrestrial and aquatic injuries.

• Serving as an expert for the U.S. Department of Justice and the Navy on the economic valuation of injuries to the Allen Harbor clam fishery in Rhode Island, as well as damages associated with contamination of groundwater at the site.

• Serving as an expert for the U.S. Department of Justice and the Army on the economic valuation of contamination of groundwater at the Rocky Mountain Arsenal site in Colorado.

• Assessing a proposed set of restoration options offered by Maine Yankee to compensate for injury to groundwater and marine resources at this former nuclear powered generating station.

• Assisting the States of New Jersey, Massachusetts, and Missouri in the development of guidance for natural resource damage assessment associated with injury to groundwater and habitat resources.

• Providing technical support to a cooperative assessment of damages associated with a large-scale bird kill at Lake Apopka, Florida.

• Providing technical support to the National Park Service in the assessment of damages due to an oil spill on the Obed River, Tennessee.

- Directing efforts to assess natural resource damages due to the collapse of a major coal ash storage impoundment on the Tennessee River in Tennessee.

- Conducting and managing various damage assessment activities and developing a formal, publicly released plan for the assessment of damages and the development of restoration options associated with injuries to the Grand Calumet River and Indiana Harbor in northwest Indiana.

- Directing an assessment of economic damages to Fish Creek in Indiana as a result of a fuel oil pipeline break. This assessment focused on potential damages associated with a federally listed endangered species in the creek.

- Assisting New York State in negotiations regarding recreational fishing losses due to the release of mirex to Lake Ontario.  Also conducted a source allocation of PCBs, dioxins and mirex in the Niagara River and Lake Ontario, and assessed the likely persistence of these contaminants in Lake Ontario.

- Assessing damages to natural resources resulting from the release of PCBs to the Housatonic River in Massachusetts and Connecticut.  Assisting the trustees in settlement negotiations.  Assisting in the development of a Restoration Project Selection Criteria document and in a Programmatic Environmental Assessment under NEPA for restoration actions at this site.

- Developing a guidance manual on the use of economics in natural resource damage assessment, and conducting a series of training sessions on this topic for the U.S. Fish and Wildlife Service.

- Providing technical and managerial support in the Federal effort to estimate economic damages resulting from the *Exxon Valdez* oil spill.  This included assisting in the preparation and analysis of results from a nationwide contingent valuation survey designed to estimate changes in the passive-use value of Prince William Sound as a result of this oil spill.

- Participating in a cooperative damage assessment at the John C. Heinz National Wildlife Refuge, Philadelphia, Pennsylvania.  This effort involves assessment of ecological and human use losses resulting from an oil pipeline spill within the Refuge.

- Providing general case management support to Federal and tribal trustees pursuing a claim for natural resource damages associated with mine tailings-related injuries to the Cheyenne River in South Dakota.  This support included development of case strategy, participation in settlement negotiations, and preparation for a focused damage assessment.

- Providing technical and economic support to the Trustees of Lavaca Bay, Texas.  Efforts include estimating economic losses suffered by recreational anglers and losses resulting from increased dredging costs associated with mercury contaminated sediments; case management support, including direction of a geostatistical analysis of mercury contamination of bay sediments and direction of a detailed review of historical releases from the site; and developing a draft preassessment screening document.

- Providing case strategy and technical support to the National Park Service in assessment of damages to Grant-Kohrs National Historical Site, Deer Lodge, Montana, resulting from contamination of portions of the Park with mining-related wastes.

- Providing a technical report and affidavit for the U.S. Department of the Interior, National Park Service, regarding economic damages associated with PCB contamination of Valley Creek in Valley Forge National Park.

- Developing a guidance document on damage assessment under Section 19(jj) of the Park Service Protection Act, for the National Park Service's Damage Assessment group.

- Providing support to a hedonic property valuation study designed to assess the impact of PCB contamination on housing values in New Bedford, MA.

- Preparing a formal preassessment screen and damage assessment plan for the PCB-contaminated Hudson River site for Federal and state trustee agencies.  Directed the development of a recreational fishing damage model and damage estimates.

- Providing support to the National Oceanic Atmospheric Administration in the development of expedited damage assessment regulations and guidelines under the Oil Pollution Act of 1990.

- Assisting in the analysis of settlement components to support trustee claims arising from the January 2, 1990 Arthur Kill, New York Harbor oil spill.

- Assisting the State of Florida in the development of state guidelines for the conduct of natural resource damage assessments following major oil spills.

- Assisting the State of New York in the development of a natural resource damage assessment plan for the Onondaga Lake System.

- Providing an Expert Witness Narrative for the U.S. Department of Justice and National Oceanic Atmospheric Administration on the application of the habitat equivalency approach to the assessment of natural resource damages resulting from the Blackbird Mine site in Idaho.

- Providing technical and expert witness preparation support to the U.S. Department of the Interior, Fish and Wildlife Service, and the Department of Justice in natural resource damage claims resulting from the release of asbestos and other hazardous substances in the Great Swamp National Wildlife Refuge, New Jersey.

- Providing technical and expert witness preparation support to the Department of Justice and National Oceanic Atmospheric Administration to support claims arising from the grounding of the freighter Elpis in the Key Largo Natural Marine Sanctuary, Florida.

- Providing litigation preparation and expert witness support to National Oceanic Atmospheric Administration and the U.S. Department of Justice to support claims for injury to marine bird populations resulting from the Apex Houston oil spill, California.

- Providing technical support to National Oceanic Atmospheric Administration in the development of a contract management system to facilitate tracking and recovery of costs incurred in the conduct of natural resource damage assessment cases.

- In addition to the above cases, provided damage assessment and case strategy support at over 50 other sites in the U.S. and Caribbean, such as the Bayou Meto ("Vertac") dioxin site in Arkansas; Saginaw Bay in Michigan; Elliott Bay in Seattle; Jamaica Bay,  Newtown Creek, Westside site, and Buffalo River, New York;  SRS site in Connecticut; White River in Indiana; Union City site in Indiana; Holden Mine and Upper Columbia River sites, Washington; Metal Bank, Pennsylvania; Midnight Mine, Idaho; Sauget site, Illinois; Saltville, South River and Avtex sites in Virginia; Calf Pasture Point, Rhode Island; Acorn Fork in Kentucky; Colrain Acid Spill, Massachusetts; Koch Oil site, Minnesota; Christina River and several other confidential sites in Delaware.

- In addition to the above cases, providing technical support in the development of damage claims for tribal resources, such as Clark Fork River Basin of western Montana for the Confederated Salish and Kootenai Tribes of the Flathead Reservation; along the Cheyenne River in South Dakota for the Cheyenne River Sioux Tribe; in Akwesasne for the St. Regis Mohawk Tribe, Massena, New York; for the Penobscot Nation, Penobscot River, Maine; Spokane Tribe of Indians and the Confederated Tribes of the Colville Reservation for the Midnight Mine site, and the Upper Columbia River site; for the Suquamish Tribe for damages associated with

the Point Wells oil spill and the Duwamish River site; for the Wampanoag on Martha's Vineyard following the *Bouchard* oil spill in Buzzards Bay, Massachusetts; for the Leech Lake Band of Ojibwa at the St. Regis Paper site; and for the Navajo Nation for impacts due to the Gold King Mine release. Mr. Unsworth has also provided technical support to the U.S. Department of Justice (representing the U.S. as defendant) for natural resource damage claims brought by the Quapaw Nation.

## Private and State Claims for Damages

Mr. Unsworth provides technical and case strategy support in the context of private claims for damages associated with environmental contamination, oil spills, and forest fires, and other changes in the natural environment and natural resources.  Examples of this work include:

• Assessing the economic impacts to Mississippi associated with groundwater withdrawals by the City of Memphis.  With Dr. Raymond Kopp, provided expert testimony for the defendant, the City of Memphis and Memphis Light, Gas and Power, on the correct approach to value any economic impacts to Mississippi. Case was ultimately dismissed.

• Assessed the damages to a private landowner in New Jersey resulting from the Warren Grove Gunnery Range wildland fire.  Provided expert testimony for the U.S. Air Force and Department of Justice as defendants in this matter on the correct approach to value the plaintiff's losses.

• Serving as an expert in the valuation of losses suffered by lobstermen impacted by the collapse of the western Long Island Sound lobster fishery.

• Serving as an expert in assessing damages to residential property owners associated with air emissions from a meat packing plant.

• Providing technical support, in cooperation with Dr. Raymond Kopp, to an assessment of added costs and property value losses associated with groundwater contamination of a residential neighborhood in suburban Chicago.

• Assessing the impacts on residential property values resulting from a plume of petroleum products under a residential neighborhood in Indiana.

• Estimating the diminution in value of a potential real estate development associated with groundwater contamination at a site in the Caribbean.

• Serving as an expert witness in a private claim for property value diminution resulting from the presence of contaminated groundwater at a site in Lakeland, FL.  Mr. Unsworth applied hedonic property value techniques as well as benefits transfer to estimate the magnitude of the loss to homeowners at this site.  He also provided support in estimation of the size of the class of plaintiffs who would benefit from the settlement.

## Primary Economic Research

Mr. Unsworth has directed a wide-range of primary research efforts in the field of environmental and resource economics.  Examples of this work include:

• Directing a random utility analysis of economic losses resulting from contamination of Onondaga Lake, N.Y. This study combines existing data from a 1980s survey of recreational angling behavior with recently collected data to estimate economic welfare losses to the citizens of New York State.

- Directing a multi-year study on the economic value of visits to a range of National Park units.  Studies include stated preference surveys at two historic forts in Charleston, S.C.; a random utility model of beach visitation, including temporal substitution, in Texas; and a multi-site, revealed preference study in Southern Utah.

- Directing a series of surveys to gather data to support a claim for damages to the visitor experience at historic El Morro fort in San Juan, Puerto Rico.  Damages in this case resulted from the presence of a grounded Russian cement freighter, which was hard-aground off the Fort for nearly five months.

- Managing a series of studies for the Electric Power Research Institute designed to estimate the magnitude of economic damage that could result from long-term climate change.  Market sectors analyzed include coastal development, agriculture, recreation, and commercial fishing.

- Managing a series of studies to assess the public's perceptions and attitudes toward the potential ecological effects of climate change.  This effort involves a team of academic economists, psychologists, survey researchers and physical and biological scientists, and includes a range of research approaches to address this issue.

- Assessing the regional economic contribution of beach use on the Texas Gulf Coast. This research effort included development and implementation of a telephone survey to determine the number of trips taken to various beaches in Texas, as well as consumer expenditures associated with those trips.

## Regulatory Economics

Examples of Mr. Unsworth's work in the area of regulatory economics include:

- For the State of Tennessee, developed a guidance document on the application of economics to decision-making under the Clean Water Act's anti-degradation standards (i.e., justifying whether the economic and social benefits of the project are significant enough to justify the proposed degradation).

- For the California Energy Commission, assessing the state of the science for monetizing the ecological impacts associated with once-through cooling at electricity generating facilities.

- For the Department of the Interior's Office of Surface Mining, developed a regulatory impact analysis and economic and social portions of the environmental impact statement for the revised Stream Protection Rule rulemaking.  This effort involved working with a variety of expert subcontractors addressing coal market economics, coal mine engineering, and regional economics.

- Conducting an assessment of potential changes in ecological and human use services within a bay system in California resulting from changes in cooling technology at two large electricity generating facilities.

- Conducting an economic assessment of management alternatives for the Environmental Impact Statement on the incidental take of small numbers of Florida manatees resulting from government programs related to watercraft operation and watercraft access in the State of Florida.

- Participating in developing a programmatic Environmental Impact Statement of Coast Guard actions under the Oil Pollution Act to enhance oil spill response capabilities.

- Directing a series of analyses of the economic efficiency (social welfare) and regional economic effect of critical habitat designation under the Endangered Species Act. Over 50 separate analyses to date, involving habitat throughout the continental U.S and Hawaii.  Many of these studies have been conducted under tight court-ordered deadlines.

- Providing guidance to the U.S. Fish and Wildlife Service on the legal requirements for, and appropriate economic approach to, analyses of relicensing proposals for hydropower projects.

- Managing a meta-analysis of 150 contingent valuation and travel cost-based sport fishing valuation studies in order to provide an analytic tool to be used in damage assessment and policy analyses conducted by the U.S. Department of the Interior.

- Supporting the development of an analytical framework for assessing the costs and economic, environmental, and human health benefits associated with regulatory initiatives intended to improve pipeline performance and safety for the Department of Transportation's Office of Pipeline Safety.

- Providing technical and administrative support to the National Oceanic Atmospheric Administration, including support in selecting methods that could be used to estimate economic damages; determining the strengths and weaknesses of each relevant assessment methodology for the determination of damages to a variety of resource categories; and selecting principal investigators to perform these damage assessments.

- Managing efforts to compile review and apply human health and environmental benefit estimates, models, and data sets to support retrospective and prospective benefits assessment under Section 812 of the Clean Air Act.

- Developing and implementing an ecological benefits assessment approach based on probabilistic economic benefit assessment for use in the Environmental Protection Agency's chemical risk management review process.

- Conducting an analysis for the Environmental Protection Agency of the economic benefits that would result from proposed pharmaceutical industry effluent guidelines.

- Estimating the economic benefits associated with environmental quality improvements that could result from reductions in the release of chloroparaffins to three representative aquatic systems.

- Managing a series of case studies for the Environmental Protection Agency to assess the extent to which firms have closed operations as a result of the Clean Air Act, and to identify factors that could be used to predict such closures.

- Managing an economic analysis for the Environmental Protection Agency of the impact on the integrated U.S. steel industry of proposed regulations limiting emissions of hazardous air pollutants.

- Managing an assessment for the Environmental Protection Agency of financial, regulatory, legislative, and market factors facing chlorofluorocarbon producers and users in moving to production and use of non-CFC substitutes.

- Managing the assessment of social costs and economic impacts for the Regulatory Impact Analysis of regulations restricting land disposal of hazardous wastes.

- Assisting in an analysis of the economic impacts of regulations constraining the burning of hazardous waste-as-fuel in industrial boilers and furnaces for the Environmental Protection Agency.

- Providing technical and econometric analysis to support expert testimony for the American Newspaper Publishers Association in hearings before the U.S. Postal Rate Commission.

## Public Policy Analysis

Examples of Mr. Unsworth's work in the field of public policy analysis include:

- For the Atlanta Regional Commission, directed the development of a linked hydrological-economic model of the regional and national economic effects of changes in management regime by the Corps of Engineers Buford Dam Project (Lake Lanier).

- For the Kaibab Paiute Tribe, assessing the economic benefits to the State of Utah of a water pipeline right-of-way across the Kaibab Paiute Indian Reservation.

- For the U.S. Department of the Interior, Bureau of Ocean Energy Management, directed substantial updates to the Bureau's Offshore Environmental Cost Model (OECM) and MarketSim models. The OECM allows the Bureau to understand the environmental and social costs and benefits of varying offshore oil and gas development leasing scenarios. The MarketSim model allows for an understanding of the market implications of offshore oil and gas leasing by the U.S. Department of the Interior.

- For the Confederated Tribes of the Umatilla Indian Reservation, estimated the economic benefits associated with enhanced fisheries management and other ecosystem service benefits of the proposed Columbia River Water Exchange Project.

- For the U.S. Department of the Interior, Minerals Management Service, assessed the comparative externalities associated with a range of conventional and offshore renewable energy sources.

- Assisting the Navajo Nation in understanding the level of use payment due to the Hopi Nation under the existing agreement for partition of Navajo and Hopi lands.

- Conducted a study of the economic benefits that have resulted from the successful restoration of the Atlantic coast striped bass fishery.

- Directing an analysis of the regional economic and social impacts of efforts to reintroduce the Mexican wolf to Arizona and New Mexico.

- Conducting an economic analysis of piping plover recovery activities on the Atlantic coast, for the U.S. Department of the Interior, Fish and Wildlife Service.  The paper that will result from this research will consider regional economic impacts as well as welfare effects at six case study sites.

- Conducting a study to assess the likely effect of a change in the departure point for Fort Sumter on Park visitation and the local economy.  This study involved a series of in-person surveys with Park visitors and tourists in Charleston, S.C.

- Directing a study of the regional welfare economic importance of the horseshoe crab.  This study considered the role the crab plays on the pharmaceutical industry, ecotourism, and the commercial fishing industry, and estimated jobs, economic activity, and welfare values associated with each of these uses of the crab.

- Assessing the regional economic impact that would result from the proposed Aldo Leopold National Wildlife Refuge, Wisconsin. Considered the likely baseline use of the area that would be included in the extant boundaries of the Refuge, under several scenarios.

- Assessing the role the Monomoy National Wildlife Refuge plays in the local economy of Chatham, Massachusetts, and in the entire Cape Cod region.  Constructed a set of response functions that describe the change in regional economic conditions (i.e., jobs, revenues, etc.) that would result from various changes in allowed uses of the Refuge.

- Assessing the regional economic importance of four National Wildlife Refuges near Bristol Bay, Alaska.

- Estimating the value of recreational fishing improvements associated with proposals to increase water temperatures below a dam on the Guadalupe River in Texas.  The analysis used benefits transfer techniques

and studies of fish populations and fishing activity to estimate increased angler days and related welfare benefits.

• Developing estimates of the contribution to the local economy of the Necedah National Wildlife Refuge in central Wisconsin, for the U.S. Fish and Wildlife Service.

• Developing an analysis of flowage (i.e., flood water) easement valuation, including the role of less-than-fee acquisition in non-structural flood control, for the U.S. Department of the Interior, Fish and Wildlife Service.

• Developed a report describing the potential uses of welfare economics in the assessment of hydropower dam projects for the World Commission on Dams, South Africa.

• Reviewing and providing technical comments for the World Bank on the environmental and human health valuation methodologies used in a draft National Environmental Action Plan for Moldova.

• Assessing the potential magnitude of market and non-market economic damages from the loss of forest land in the southeastern United States expected to result from climate change.

• Managing a screening analysis to determine the degree of financial burden imposed on Massachusetts' cities and towns as a result of existing and proposed state and federal environmental requirements.

• Participating in a review of the characteristics and effectiveness of non-regulatory agricultural non-point source reduction programs run by various state authorities.

• Conducting an assessment of historical applications of hazardous substance release events data in environmental policy analysis, as part of an EPA effort to assess the needs for a chemical accident prevention database.

• Managing a data gathering effort to support an assessment of the marginal impact of federally mandated materials separation requirements on proposed municipal solid waste combustion facilities.

• Managing an analysis of consumer purchasing behavior in response to a variety of municipal solid waste management initiatives.

• Managing the development of a computer software package to be used by Local Emergency Planning Committees to set priorities under SARA Title III.

• Developing a chemical and fuel input-output model of the U.S. economy, for use in estimating chemical and fuel expenditures by manufacturing and non-manufacturing facilities.

• Analyzing the structure of the commercial hazardous waste treatment and disposal industry to support an assessment of the impact of federal regulations on this industry.

• Assisting in the preparation of a long-term forecast of capacity for various commercially available hazardous waste treatment technologies, including an assessment of the impact of proposed regulations on capacity.

### Publications and Presentations

Mendelsohn, Robert, Daniel Hellerstein, Michael Huguenin, Richard Brazee, and R. Unsworth, 1992, "Measuring Hazardous Waste Damages with Panel Models," *Journal of Environmental Economics and Management* 22:259-271.

Bishop, Richard and Robert Unsworth, 1994, "Assessing Natural Resource Damages Using Environmental Annuities," *Ecological Economics* 11:35-41.

Environmental Performance of Tanker Designs in Collision and Grounding: Method for Comparison. Committee for Evaluation Double-Hull Tanker Design Alternatives, Marine Board, Transportation Research Board, The National Academies. Washington, DC. 2001.

Issues and Environmental Impacts Associated with Once-Through Cooling at California's Coastal Power Plants, Support Studies and Technical Appendices. Appendix E: Economic Costs of Once-Through Cooling Impacts. California Energy Commission, Staff Report, June 2005. CEC-700-2005-013-AP-A.

Issues and Environmental Impacts Associated with Once-Through Cooling at California's Coastal Power Plants, in support of the *2005 Environmental Performance* Report and *2005 Integrated Energy Policy Report* (Docket 04-Iep-1). California Energy Commission, Staff Report, June 2005.  CEC-700-2005-013  Chapter 7.

Economic Valuation of Natural Resource Damages: Groundwater. Presentation to the Law Seminars International, Natural Resource Damages Litigation. Santa Fe, NM, July 9-10, 2009

Equivalency Methods in Natural Resource Damage Assessment. Presentation to the Law Seminars International, Natural Resource Damages. Newark, NJ, November 12-13, 2009

Factors Trustees Consider in Selecting Damage Assessment Approaches. Presentation to the Fourth Annual Advanced Conference on Natural Resource Damages, Law Seminars International. Santa Fe, NM, July 15-16, 2010.

Identifying and Accounting for Cultural Use of Natural Resources in the NRDAR Process, Economic and Other Methodologies. Presentation to the State and Tribal Government Working Group, 2011 Natural Resource Damage Assessment and Restoration Workgroup. Albuquerque, NM, February 15-16, 2011.

Assessment of Lost Cultural Use in the NRDAR Process. Presentation to the DOI Annual NRDA Restoration Workshop, Tribal Session. Phoenix, AZ, March 28, 2011.

An Introduction to Tribal Natural Resource Damage Claims. Prepared (with Dr. Gerald (Taiaiake) Alfred) for the Law Seminars International Conference on Natural Resource Damages. Santa Fe, NM, July 14-15, 2011.

Thoughts on Early Restoration and the Measurement of the Benefits of Enhanced Remediation in the Context of Natural Resource Damage Assessment. Presentation to the Ad-Hoc Industry Natural Resource Damage Group 8th Annual Natural Resource Damage Symposium. Washington, DC, October 25-26, 2011.

Genova, Leslie, Robert E. Unsworth, and David S. Brookshire. 2012 "Impacts of Endangered Species Protection on Water Management, Allocation and Use in New Mexico." In: Water Policy in New Mexico: Addressing the Challenge of an Uncertain Future. Resources for the Future Press, Washington, DC.

Natural Resource Damage Claims Using Habitat and Resource Equivalency: The Case of Wildland Fire. Law Seminars International, Natural Resource Damages: *Evolving strategic, tactical and substantive issues*. Washington, DC, February 14-15, 2013.

Natural Resource Damage Assessment in the Context of Tribal Trusteeship. With Robert Unsworth,  Leah Shearer, Leslie Genova, and Nadia Martin, Law Seminars International, Natural Resource Damages: Santa Fe, NM, July 19, 2013.

California Assembly Bill 1492: An Economist's View of Implications for Wildland Fire Damages Claims. Wildland Fire Litigation Conference.  Monterey, CA, April 21, 2013.

Trustee Considerations in Applying Non-use Valuation Methods for Purposes of NRDA.  Law Seminars International, 8th Annual Advanced Conference on Litigating Natural Resource Damages (NRD), Santa Fe, NM, 24-25 July 2014.

An Introduction to Natural Resource Damage Assessment. Regional Response Team III. Virginia Beach, VA May 20, 2015.

"Experience of remedial measures taken after an armed conflict."  Seminar on the Protection of the Environment in relation to Armed Conflict. For: the Permanent Missions to the United Nations of Sweden, Denmark, Finland, Iceland and Norway, Rutgers University, the Environmental Law Institute and the

International Union for Conservation of Nature World Commission on Environmental Law, New York, NY, 29 October 2015.

"The Role of Science and Economics to Advance Tribal Interests in an Uncertain World." With Jane Israel. 2016 Tribal Lands & Environment Forum: A National Conversation on Tribal land and Water Resources. August 17, 2016.

"Natural Resource Damage Assessment: Groundwater" For: Invited Regulatory Development Session. State of Vermont, Department of Environmental Conservation.  24 August 2016.

704872.1