# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

JAMES D. SULLIVAN, ET AL        )

            VS                  )   CASE NO:  5:16-CV-125

SAINT-GOBAIN PERFORMANCE        )
PLASTICS CORPORATION
_____)   HEARING ON MOTION TO COMPEL

BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE

APPEARANCES:  DOUGLAS A. RULEY, ESQUIRE
                    Davis & Whitlock, P.C.
                    21 Battery Park Avenue
                    Asheville, North Carolina  28801
                    Representing The Plaintiff

              EMILY J. JOSELSON, ESQUIRE
                    Langrock Sperry & Wool, LLP
                    P.O. Drawer 351
                    Middlebury, Vermont   05753
                    Representing The Plaintiff

                    (Appearances continued:)

DATE:         August 28, 2017

          TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Reporter
                    P.O. Box 1932
                    Brattleboro, Vermont   05302

```
1                        APPEARANCES CONTINUED:

2


3           PATRICK J. BERNAL, ESQUIRE
                Woolmington, Campbell, Bernal & Bent, P.C.
4               P.O. Box 2748
                Manchester Center, Vermont    05255
5               Representing the Plaintiff

6


7           MARK S. CHEFFO, ESQUIRE
                Quinn Emanuel Urquhart & Sullivan, LLP
8               51 Madison Avenue, 22nd Floor
                New York, New York   10010
9               Representing the Defendant

10


11          R. BRADLEY FAWLEY, ESQUIRE
                Downs, Rachlin & Martin, PLLC
12              28 Vernon Street, Ste. 501
                Brattleboro, Vermont    05301
13              Representing the Defendant

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (The Court opened at 10:35 a.m.)

2              THE CLERK:  Your Honor, the matter before the

3    Court is civil number 16-125, James Sullivan et al versus

4    Saint-Gobain Performance Plastics Corporation.  Present on

5    behalf of the plaintiffs are Douglas Ruley, Emily Joselson

6    and Patrick Bernal.  Present on behalf of the defendant are

7    Mark Cheffo and Brad Fawley is joining us by video

8    conference from Burlington.

9              THE COURT:  All right.

10             THE CLERK:  And we are here for a hearing on the

11   motion to compel the production of medical records and

12   information.

13             THE COURT:  All right.  Morning.  I'm sorry to be

14   late.  I was supposed to see the dentist at 8 and he was

15   already running late.  So I apologize for getting a late

16   start.  And I appreciate your all making the trip.

17             Here's what I would suggest, I would like to hear

18   from the plaintiffs first as to what they plan to

19   demonstrate in order to achieve class certification and

20   which subsection of 23, Rule 23 we're proceeding under.  And

21   it doesn't have to be an elaborate presentation at all, but

22   I think that will frame the issue, the discovery issue for

23   both of us.  And then I'll turn things over to Mr. Cheffo

24   and we'll proceed with the motion in the normal phase.

25             So if you could just kind of outline what you plan

1    to prove in order to achieve class certification

2    particularly with respect to the medical monitoring issue.

3            MR. RULEY:  Yes, Your Honor.  Let me just start

4    with medical monitoring since that's --

5            THE COURT:  Right.

6            MR. RULEY:  -- really the part of this case that's

7    at issue in this motion.

8            What we intend to show, to prove class

9    certification for medical monitoring is that there is a

10   class or group of plaintiffs in Bennington who have been

11   exposed to the defendant's PFOA in their drinking water and

12   therefore have above background levels of PFOA in their

13   blood serum.  That, so that's the first part.  Exposure.

14           The second part is that that exposure leads to a

15   common set of increased risks or altered biomarkers for

16   various system functions of the body.

17           So part one is common exposure.  Part two is a

18   common set of increased significant risks.  And then part

19   three is the expert testimony that based on that exposure

20   and the resulting risks that there's a series or a program

21   of medical monitoring that can respond to those risks,

22   address those risks and put people in the position to be

23   able to get needed healthcare should the exposure and the

24   risks manifest themselves in members of the group.

25           So we believe all of those things can be proven

```
1    through common proof.  And that that, that what, what

2    defines medical monitoring, whether it's a remedy, whether

3    it's a cause of action and what plaintiffs need to show is

4    entirely a matter of state law.  And that's true even under

5    the cases that the defendant cites.

6              We're still considering exactly which parts of

7    Rule 23.  Certainly Rule 23(b)(3) and probably Rule 23(b)(2)

8    as well seeing the remedy of medical monitoring as a court

9    supervised program, which is a form of injunctive relief

10   appropriate under 23(b)(2).

11             THE COURT:  All right.  And when will I know

12   whether you're going under, which subsection of the rule

13   you're going to proceed?

14             MR. RULEY:  When we file the motion for class

15   certification --

16             THE COURT:  Fair enough.

17             MR. RULEY:  -- at the end of September.

18             THE COURT:  Fair enough.  Okay.

19             MR. RULEY:  Do you want me to address other

20   elements of our -- okay, I'll sit down.

21             THE COURT:  I think that lays it out.  And I have

22   it in mind.  And I'll turn things over to Mr. Cheffo because

23   it's his motion and give you a chance.

24             MR. RULEY:  Thank you, Your Honor.

25             MR. CHEFFO:  Your Honor, good morning.
```

1           THE COURT:  Good morning.

2           MR. CHEFFO:  Thanks, as always, for entertaining

3    this hearing today.  So I have a few kind of core comments.

4    And, obviously, if Your Honor has some specific questions,

5    this is our motion to compel.  This is an important issue to

6    us, but I would submit it's a pretty straight forward issue

7    under Rule 26.  I think I'd start with the fact, you know,

8    that not only do we think that the case law is on our side,

9    in fact, we've not been able to find a single case that has

10   kind of sided with plaintiff's position that defendants are

11   not entitled to, to this type of discovery.

12          And I think Your Honor asked some very good

13   questions as always.  And I would just maybe start with what

14   counsel kind of articulated.  And I appreciate their candor

15   on this that they are still working through it, but what I

16   would suggest is that notwithstanding how they may

17   ultimately, you know, if you kind of parse what they are

18   suggesting, it's we're going to hear kind of what their plan

19   is and then really they're saying it's experts that will

20   have a, you know, tell us what this medical monitoring plan

21   is.  So at that point kind of discovery will have been done.

22          What we're talking about -- and he also suggested

23   that there has to be a common exposure and then it's a

24   common set of increased risk.  Well, when you think about

25   that, that's essentially saying, you know, we're going to

1  define what this increased risk might be and that kind of

2  stands on its head, medical monitoring, at least our ability

3  to challenge this.

4         You know, for purposes of today I'm not going to

5  keep suggesting that we don't agree with medical monitoring.

6  I think Your Honor knows that we don't think that there's a

7  cause of action nor is it appropriate for certification.

8  But if you were to kind of get to that point what we're

9  talking right now is not whether you certify or not, it's

10 whether we can have an ability to present to you evidence to

11 suggest that there are individual issues which predominate.

12        What we have right now, frankly, is a situation

13 where the case law, as I've seen it and read it and

14 understand it, there's no case that says that you can't get

15 this type of discovery, frankly, in my experience this

16 doesn't even usually come up because the plaintiffs, of

17 course, give authorizations as to medical records.

18        When you read the cases that both parties cite,

19 even the ones that don't address the issue of a motion to

20 compel, they all talk about medical records.  And, of

21 course, the reason why the courts talk about that is because

22 they received them and both parties are able to look at the

23 medical history of the class reps.  This is not a situation

24 where we're seeking at this point certification -- discovery

25 beyond the class reps.

1          THE COURT:  How many are there, four now or six?

2          MR. CHEFFO:  There are four.  And, you know, and

3    um, --

4          THE COURT:  And they are essentially random except

5    that they are the people that have the fortitude to put up

6    their hand and say --

7          MR. CHEFFO:  Yeah.  Though I would suggest it's a,

8    you know, it's a little bit of a, you know, there's been a

9    little bit of a goose gander.  And as I suggested many times

10   at this podium, you know, we have very good lawyers on the

11   other side, right.  They are very experienced.  But there

12   has to be some parody here in terms of kind of how you use

13   it.

14         So, for example, when they had two reps and they

15   suggested that they were going to withdraw them and amend

16   their complaint, they basically said, in some great detail,

17   some pretty confidential information about their medical

18   history.

19         THE COURT:  Right.

20         MR. CHEFFO:  Here's why.  And that's still on the

21   record today.  So this idea that somehow this is information

22   that no one can get, well, obviously they got the

23   information and when they wanted to use that medical history

24   to suggest that these people had had injuries or medical

25   conditions that were not related to PFOA, but somehow would

1    complicate their ability for class reps, they came forward
2    and presented that information.
3              And, you know, so -- and it can't be that the
4    Court and defendants don't have access to that same level of
5    information.  So that's one thing, is that this has been
6    used before.  And, you know, I don't think anyone's going to
7    suggest that there's something called kind of medical
8    monitoring 101, right.  In other words, that if you were
9    able to get a class of medical monitoring certified that
10   means that every disease endpoint ever known to man or woman
11   is something that people would be subject to, right.  It has
12   to be, you know, and I think even the plaintiffs have
13   suggested that there's certain diseases that they believe
14   that they've focused on, certain ailments.
15             Well, in order to identify that -- so, for
16   example, one is high cholesterol.  You know, that's not
17   exactly uncommon in our society.  And as they've said a few
18   times and today is they not only have to show exposure and
19   common issues, but they have to show that, that the folks
20   would get monitoring above and beyond what they normally
21   would have gotten, right.
22             So to the extent that Mr. Smith or Mrs. Jones has
23   cholesterol and is taking Lipitor or Crestor or something
24   else and goes to a cardiologist, well, that's something that
25   we would certainly be able to -- should be able to show, you

1   know, at the class certification stage that this isn't

2   something that's above and beyond.  And that's just, you

3   know, one example for what they've kind of highlighted.

4           So really at this point what we're talking about

5   is a situation where we need to have the ability to show

6   that there are individual issues and they predominate.

7           Now, the plaintiffs have said, we will agree with

8   you and we'll kind of stipulate that all people are

9   different.  Okay.  We can agree on that.

10          THE COURT:  Right.

11          MR. CHEFFO:  But if they came in and they said, we

12  will agree that these differences predominant such that you

13  can't have class certification obviously we wouldn't be

14  here.  But that's not their point.  Their point is, you

15  know, essentially we want this information, we have it,

16  apparently they've talked to their plaintiffs, they can get

17  this information.  These are just their reps.  They've used

18  it when they think it's appropriate and for strategic

19  reasons.  And I think kind of most importantly are really

20  the two core issues.  This is discovery.  The plaintiffs,

21  you know, as we're kind of standing here today, there's been

22  extensive discovery requests from the plaintiffs, which

23  we're endeavoring to provide.  They are taking depositions

24  kind of as we speak.  I think one was last week, a 30(b)(6).

25  And there will be other ongoing discovery all towards the

1    plan that Your Honor put in place in terms of having, you

2    know, core amount of information on class cert available so

3    that we can appropriately contest it.  And that's really

4    what this is about.

5            And, again, from our perspective, Your Honor, this

6    isn't a close call.  And I don't mean that to be

7    presumptuous.  I just say when I read the cases I don't --

8    there's not even a case that I feel like I have to stand up

9    and distinguish as kind of being wrongly decided or against

10   the weight because there is no case that says in a medical

11   monitoring situation defendants are not entitled to it.  I

12   think all of the cases they've cited either talk about kind

13   of class certification per se, but the vast majority that

14   they've cited actually talk about courts looking at the

15   individual medical differences.  And in most cases, actually

16   even in their cases, the courts deny class certification

17   based on the specific differences of the parties.

18           And, again, the only way you know -- of the class

19   reps.  The only way that Your Honor would know that, and we

20   would know that and be able to present that, is to get this

21   core information.

22           So I've actually not been in a situation in these

23   medical monitoring cases that I can recall where the

24   plaintiffs haven't given medical authorizations for the

25   reason that they need -- they understand that they are going

1    to need to show some kind of program.  Their experts are

2    ultimately going to need to show some kind of program that

3    fits under their view of the world the parameters of what

4    the exposure is and what's an appropriate medical

5    monitoring.

6            Again, I may be wrong, but I suspect they are not

7    going to come in and say, you know, exposure, there's this

8    thing called medical monitoring and, therefore, every

9    possible thing that every doctor could ever monitor for we

10   want Your Honor to certify that class.

11           Again, I think they are more sophisticated than

12   that.  What they are presumably going to say is we think

13   that there are certain associated disease endpoints or

14   certain problems and we think a medical monitoring program

15   can be developed in this way.  And, again, without

16   repeating, Your Honor, I think for us to be able to say,

17   well, it's not appropriate to or may not be appropriate to

18   have as part of a medical monitoring program, you know,

19   looking at high cholesterol levels because we've taken this

20   deposition of Mr. Jones and here's what he's doing.

21           And those are the kind of things that again, Your

22   Honor, we don't need to argue class cert today.  All we are

23   asking for is an ability to be able to appropriately defend

24   ourselves and to present to Your Honor the defenses that we

25   need.

```
 1              THE COURT:  Let me push back gently a little bit.
 2              MR. CHEFFO:  Yes, sure.
 3              THE COURT:  You need 50 years including, in many
 4    cases, pediatric records?
 5              MR. CHEFFO:  Well, you know, I think there has
 6    been -- well, here's what I would say is if the plaintiff's
 7    view of the world was, you know, that's totally burdensome
 8    and we'd like to limit it or there's some reason why we
 9    can't do it or they are not available, as we all know many
10    medical providers don't --
11              THE COURT:  They die and they close their offices.
12              MR. CHEFFO:  And they keep records I think seven
13    years.  So, sure, I mean, that, you know, when you're asking
14    for things, I mean, to the extent -- so let me give you an
15    example.  To the extent that one of them had in their house,
16    you know, a file cabinet that had all of their medical
17    history going back 50 years, you know, I mean, again, I
18    think if you or I were going to the doctor outside of
19    litigation, right, and you had some kind of serious injury
20    or serious illness the doctor, you know, they all want as
21    much information so that if you had the mumps as a child or
22    rubella or polio, or things like that, it possibly could
23    impact your current state.
24              Now, we live in the real world, right.  And, you
25    know, no one's suggesting that we should do something
```

```
1   that's, you know, incredibly onerous or that we need to go

2   and find records that don't exist.  So the request, of

3   course, is for all of this information.  But if they come

4   back and say, you know, here's the authorizations, here's

5   the people that we know of, and, again, all we're talking

6   about here is authorizations, right.

7           I mean, if they have the information, and if they

8   are aware of it in their interrogatories, we're not asking

9   them to go out and find out about other people.  It's

10  basically going to their own clients and saying let's sit

11  for an hour, you know, what were all of your childhood

12  illnesses, who were the doctors that you saw or what can you

13  remember.

14          To the extent that they then take authorizations

15  and give those medical records we'll go and collect them.

16  We'll provide a copy to the plaintiffs.  So, you know, as

17  this works kind of in the real world and practically it's

18  not particularly burdensome.  And to the extent that they

19  have a specific concern or objection they can voice it.  But

20  I will tell you essentially the position has been, you know,

21  you get no documents whatsoever, not even currently a single

22  record or material.

23          And so the conversation about, you know, could you

24  live with X. or, you know, this particular person doesn't

25  remember it, we'd like to do it, we've worked very
```

```
 1   cooperatively with the plaintiffs.  I mean, you know, that's
 2   why we're not before Your Honor on every minute.
 3             THE COURT:  Yeah, I appreciate it.
 4             MR. CHEFFO:  So I think that the rule of reason
 5   would apply if they had a particular concern about a
 6   particular record.
 7             THE COURT:  And then a lifetime of employment
 8   records too?
 9             MR. CHEFFO:  Yeah.  Well, there's, you know, so
10   that's I think, you know, an even easier one.  Again, to the
11   extent it exists.  But, you know, --
12             THE COURT:  Most people have been employed so
13   there's some kind of record.
14             MR. CHEFFO:  Right.  And even, you know, again,
15   the plaintiff's position, and I'm not in any way being
16   pejorative, I think I understand it, and I understand that
17   the plaintiffs believe that they have an exposure and they
18   believe that they may have some health consequences.  We
19   disagree with that, but I respect their opinion.
20             THE COURT:  Sure.
21             MR. CHEFFO:  But PFOA has been around for 50 years
22   or more than 50 years or these chemicals.
23             THE COURT:  Right.  Right.
24             MR. CHEFFO:  So, you know, employment, well, what
25   would happen if somebody worked, you know, 50 years ago for
```

```
 1   X., Y., Z. company that manufactured this or they worked for
 2   a ski wax company that used these materials, because this
 3   isn't a ubiquitous chemical.  It's not just Saint-Gobain.
 4   You know, Saint-Gobain didn't manufacture this.  It used it.
 5   So it's a DuPont, there's others.
 6           So, again, you know, this is discovery.  If they
 7   didn't work at any of those -- if they worked in a candy
 8   store and they -- or whatever, they sat in an office doing
 9   an accountant they would just write that.  But I think it
10   would be imprudent of us, right, representing out client,
11   knowing that there were very substantial industrial and
12   other uses for this chemical and similar chemicals.
13           And one other point is, you know, --
14           THE COURT:  So let me interrupt.
15           MR. CHEFFO:  Sure.
16           THE COURT:  So what you need is a list of
17   employment, and then you can look at that, and when you
18   discover somebody who was an elementary school teacher you
19   probably don't need 30 years of his or her records, right?
20           MR. CHEFFO:  I think that would be right.  You
21   know, with the one caveat of this, and, again, you know, you
22   -- it doesn't, it never kind of hurts to ask again.  They
23   are not going to be burdened by doing it.
24           So, for example, if in the elementary school
25   teacher there's records -- there happens to be medical
```

records where she saw a doctor for 10 years for X., Y. or

Z., or took a medical leave because she had heart

palpitations, right, and is now claiming cardiac injuries,

see the whole point here is that the plaintiffs are

suggesting that PFOA somehow causes all these diseases, that

it's a given, right.  Again, we understand what their

position is, but we don't agree with that.  And what our

suggestion is there is a host of chemical exposure workplace

and other injuries that could potentially cause these exact

things because these are not signature type injuries, right.

It's a cancer, it's a, it's a high cholesterol, it's

ulcerative colitis, right.

          I think we all agree that these occur in some

people, right, absent exposure to PFOA.  So what we're

trying to do at the discovery stage is highlight that, to

basically say that, you know, you are basically suggesting a

medical monitoring program that's focused only on PFOA, but

these people had life experiences.  They could have worked

at a nuclear power plant, they could have worked in a scrap

yard when they were younger.  You know, a paper

manufacturing plant, an asbestos company.

          I mean, again, I don't know, you know, but we

wouldn't be doing our jobs.  And I think these are the kind

of discovery that courts routinely grant because at the end

of the day if they signed an authorization for 30 years of

1    school records and we send it in and we get a letter back

2    that says we no longer maintain them or they send a letter

3    back and, again, these are all subject to a protective

4    order, that said that, you know, Mr. Jones had a perfect

5    history, there's nothing in here.  Well, then, that goes in

6    the pile of information that is not going to be relevant to

7    this case.

8              But we don't know what's there.  And these are

9    some very serious allegations that they've had a chance to

10   right pick, to kind of hand select these few

11   representatives.

12             So at least as to those we feel that should get,

13   you know, some broad discovery so we can properly mount a

14   defense.  And I think that the types of defenses and issues

15   that I'm highlighting, you know, I'm not making them up,

16   right, for the first time, right.  There's been other smart

17   lawyers before on the defense side who have highlighted

18   these all.  And the reason why they've been able to do that

19   is because courts have given some latitude at the discovery

20   stage under Rule 26 to allow us to marshal our defenses and

21   to at least look.  And if we find that it's not there, you

22   know, then that's -- they've wasted, you know, an

23   authorization and we've wasted $50 in seeking, you know,

24   these records.

25             THE COURT:  Your estimate might be low, but that's

1    more on your side than on mine.

2              MR. CHEFFO:  It could be $500 or more, right.

3              THE COURT:  And then what, Worker's Comp, was that

4    the third category?

5              MR. CHEFFO:  Yes.  Right.  Worker's Comp, the

6    medical records and employment.  And, again, those are the

7    places that you would expect to, to, if you saw things

8    outside -- and, you know, and the plaintiff's answering the

9    interrogatories which ask for this information.

10             THE COURT:  Right.  So that's just practicalities.

11   So you build these dossiers and then you come back when we

12   have the hearing on class certification and you tell me that

13   these four people are very different, no surprise, different

14   ages, different genders, different work histories, different

15   everything.  And one has high cholesterol and one has low

16   cholesterol and keep our fingers crossed nobody has cancer.

17   What am I supposed to do?

18             The piece I couldn't find, as I kept trying to

19   think through it, is I don't think you have an expert that's

20   going to say these two have a high risk of developing a PFOA

21   related disease and these two, rule them out, they are

22   healthy as can be.  I think the expert is going to say, I

23   don't know if they are going to get it or not, right?

24             MR. CHEFFO:  Well, again, Your Honor, two things.

25   One is a fair question, right, we're not here to argue class

 1   cert yet, but certainly I'm happy to tell you what I think,

 2   I mean, I don't have the expert reports in my hand so I

 3   don't want to presuppose what an expert's going to say.  But

 4   I would just suggest -- I look at it maybe a little

 5   differently, Your Honor.

 6           You know, it's the plaintiff's burden, right, to

 7   come forward and suggest why a class should be certified,

 8   right.  They are going to have the burden of meeting the

 9   Rule 23 criteria and showing that individual issues

10   predominate, right.

11           THE COURT:  Right.

12           MR. CHEFFO:  So our expert doesn't necessarily

13   have to say at this stage, and, in fact, that would probably

14   be merits, you know, that I can rule out that someone's

15   injury was or wasn't caused by that.

16           But what the core issue is, the experts on both

17   sides need to be able to do is they are going to come

18   forward and say, here's a medical monitoring plan, here's

19   why it's appropriate for a class of thousands of people,

20   right.  And we're dealt the hand we can get.  We can only

21   take discovery at this point of the class reps.

22           So in addition what our expert would likely say

23   beyond these class reps, there are other issues and

24   causation, you know, every court that's looked at these kind

25   of things looks at the class rep, you know, prism and says,

```
1    well, here's why we can't certify because they are seeking
2    X. and this person, you know, we just dealt with the two
3    folks that they withdrew, right.  One had --
4              THE COURT:  But to be fair, I thought the
5    discussion about those two people got a little, what's the
6    right word, distracting.  Two people got sick and had to
7    leave because, as I understand it, they couldn't kind of
8    bear up under the obligations of being a class
9    representative.
10             I mean, so be it.  I didn't think there was any
11   kind of deviousness or anything complex.
12             MR. CHEFFO:  No.
13             THE COURT:  I thought probably those illnesses
14   that were described were absolutely true and, like, they
15   were older people.  And I think we just wish them well.  I
16   don't think it really -- that doesn't say to me finding
17   class representatives is an impossible task.
18             MR. CHEFFO:  No.  No.  And I agree with that.
19   Just to be clear why, because no one's picking on the
20   plaintiffs or certainly these folks.  I mean, they have
21   every right to join or not join.
22             THE COURT:  Right.  Right.
23             MR. CHEFFO:  I think the point only there was, at
24   least as we read it, I mean, look, if somebody, you know, if
25   we have a witness whose elderly and has a stroke off a bit
```

1     or something we're going to come to the Court and say they

2     can't participate and seek relief.  And we fully respect

3     that.

4              THE COURT:  Sure.

5              MR. CHEFFO:  I think the point was, these folks

6     had, in our view, some of the same types of medical issues

7     that came up during this that would have undercut their

8     ability to be class reps because it was caused by the

9     plaintiff's own admission by things other than PFOA.

10             So it complicated their legal case in addition to

11    perhaps making it difficult for them to proceed.  And that's

12    kind of the point, right, in terms of if these reps will

13    otherwise have to be monitored for the same types of things

14    that we're seeking now, right, and it's whether they will or

15    it's normal course.

16             So, in other words, there's certain things that we

17    probably all as men when we're 50, you know, doctors say

18    what we should do and women when they are 40 and, you know,

19    folks when they are 70, there are certain medical

20    guidelines, right, our children, that you're supposed to

21    adhere to.  And at least as I understand the medical

22    monitoring law what you have to show not just, you know,

23    that you pay for every potential medical cost ever, but it

24    has to be something above and beyond what someone normally

25    would get.

1          So if someone would normally get a heightened

2     level of medical attention because either they fit within

3     some type of guideline, or they have a family history, or

4     they have a work exposure, or they have family history, or

5     things like that.  So the only way, right, all of those

6     factors that I just articulated, the only way you know that

7     is through discovery, right.  We cannot divine, you know, a

8     particular person's, you know, medical history or work

9     exposure.

10          So, and I think that's one factor.  So I think

11    what our, you know, expert would likely look at -- and two

12    things.  It's not just what our expert would say, but we're

13    going to also have an opportunity to depose their expert,

14    right.  So in things that Your Honor would read into the

15    transcript or, you know, our culling of it.  And, you know,

16    in terms of whether there's a Daubert motion or whether it's

17    just something that you're going to basically use to

18    determine your ruling on Rule 23.

19          We need to be able to basically question the

20    expert, well, did you consider that, how is it that you find

21    that this is an appropriate medical monitoring when

22    Mr. Jones or Mr. Smith also is being monitored for this.  Or

23    were you aware that they had been diagnosed four years ago

24    with this same thing prior to PFOA exposure or were you

25    aware that they also worked at a factory where they

1    manufactured X. which had probably 10 times more PFOA

2    exposure than they ever could have gotten from drinking at

3    home.

4              It's hard for me to give you all the examples, but

5    these are the types of kind of issues that arise and the

6    only way we get to them is discovery.  And, again, you know,

7    if we were coming in and saying the plaintiffs are not

8    entitled to any discovery and we just want to kind of do

9    this de novo that would be one thing.  But the plaintiffs

10   have asked for a lot of information going back 25, 30 years,

11   you know.  And some of that, in fairness, is because the

12   plant closed, you know, a long time ago.

13             But we're having to do 30(b)(6) depositions and

14   recreating documents and admissions based on the best

15   information that we can have going back 25, 30 years.  And I

16   suspect both sides are going to be talking about science and

17   studies that are going back some period of time.

18             So, you know, this is, this is something that is

19   really, you know, again, in my experience, and I think the

20   case law, pretty well defined.  Like, in other words, as I

21   said, I have not seen a court which says at this stage you

22   can't even get to see it because that would really, that

23   would make our task almost impossible.  I mean, it would

24   almost be like what's the point of having a class rep,

25   right.  If the plaintiffs can just come and say we picked

```
 1    somebody, all we're going to do is give you their PFOA level

 2    maybe or tell you that they were exposed.  And then we're

 3    going to have an expert come in and say, we think that they

 4    are entitled to medical monitoring.

 5              I mean, if that was the standard what would we be

 6    able to ask this person if we can't get their medical

 7    records, if we can't get their educational history, we can't

 8    understand if they were ever injured in a case involving

 9    medical monitoring and personal injuries.  I mean, that

10    seems to be the core.

11              And the final thing I'll say, Your Honor, is that

12    if, even if the Court were not to, and we hope that it

13    wouldn't certify, these folks still have their individual

14    claims of which they are seeking medical monitoring.  All

15    right.

16              So, you know, the idea that they would be seeking

17    medical monitoring and not want to produce any information,

18    their own medical history when they have alleged medical

19    injuries in their complaint, you know, seems, again, to be

20    turning everything on its head.

21              THE COURT:  All right.  So if I've heard you

22    right, really from your perspective, the most helpful thing

23    that you could find in opposing the certification would be

24    evidence that the class representatives had alternative

25    significant exposure opportunities in other settings, work
```

1   or, probably work, but maybe something I'm not thinking of.

2           MR. CHEFFO:  Well, and just to be clear, Your

3   Honor, that's certainly one, right.

4           THE COURT:  Right.

5           MR. CHEFFO:  I'm trying to give some examples.  So

6   on this one it's important that I don't leave the Court with

7   a false impression on my part.  My apologies.

8           So certainly alternate is one other issue.  But

9   there could be, let's say the expert says, I think as a

10  result of this someone should have a certain kind of blood

11  test once a year or a certain kind of chest x-ray.  Again,

12  I'm just making it up, right.

13          THE COURT:  Yeah, I understand.

14          MR. CHEFFO:  But we then look at their medical

15  history and say, well, you are a, you know, 50 year old

16  woman, you have a family history of cancer, you smoked for

17  20 years, X., Y. and Z.  And a doctor with that

18  characteristic, that profile, that medical history would

19  recommend that you get a chest x-ray once a year and get

20  that medical test, right.

21          That has nothing to do with alternate exposure to

22  PFOA.  That's basically whether that person is entitled to

23  medical monitoring above and beyond what they normally would

24  get.  And in that situation the answer would be no

25  irrespective of whether they were ever exposed to PFOA or

1  not, they would have a medical regimen that was required

2  and, therefore, that's not a basis of medical monitoring

3  damages.

4           If they worked in a certain facility or plant or

5  exposed to, you know, any number of chemicals, that could

6  have ultimately caused potential injury, put them at higher

7  risk.  If they were, received an injury, a head trauma, if

8  they had heart palpitations before, all of these are things

9  that would presumably require some level of medical focus

10  and attention, right.

11           THE COURT:  Anyway.

12           MR. CHEFFO:  Anyway.  And if that's true, you

13  can't kind of double dip.  I mean, that's what -- at least

14  -- and that's what the plaintiffs I think have said a few

15  times in the last hearing, that you need to be something

16  above and beyond what you would normally receive even if

17  it's available.  And in order to show --

18           THE COURT:  Like the guy taking two umbrellas out?

19  Like a guy going out in the rain with two umbrellas?

20           MR. CHEFFO:  Exactly.  A defendant can't be kind

21  of made to pay for medical procedures that someone would

22  ultimately have to have themselves.  And the only way to

23  figure out what that person may or may not be entitled to or

24  required or suggested of their doctor to do you have to

25  understand that.

1              And, again, this is just, these would just be

2    exemplars.  You know, we're not -- and I would suggest, you

3    know, if the Court has any kind of doubt on which way to err

4    remember you're being asked to potentially certify an entire

5    class of people who we don't even have that opportunity to

6    talk to.

7              THE COURT:  Right.

8              MR. CHEFFO:  So as to the folks who have kind of

9    stepped up who are the class reps, you know, we should have

10   at least a broad ability to ask these types of questions so

11   that we can present these defenses to the Court.

12             THE COURT:  All right.  That's helpful.  Thank

13   you.

14             MR. CHEFFO:  Thank you, Your Honor.

15             THE COURT:  Sir?

16             MR. RULEY:  Thank you, Your Honor.  In their

17   briefs, and throughout this hearing to this point, the

18   defendant has avoided the central issue that their motion

19   presents, which is, are the medical records and medical

20   histories of our named plaintiffs relevant to the claim for

21   medical monitoring.

22             And relevancy, what is relevant is determined by

23   state law.  And that's as evidenced in the cases they cite

24   as the cases we cite.  They lead with the Fiorentino case

25   from Pennsylvania.  The first thing the special master said

```
1    is, to determine what's relevant I need to look at the
2    elements of medical monitoring under Pennsylvania law.
3              Now, we contend she misinterpreted one of those
4    elements, but at least as to the mode of her analysis that
5    was correct.
6              The second main case they cited is the Rowe case
7    from New Jersey.  Here again, we might have some arguments
8    about what New Jersey law really is, but clearly what the
9    judge did in that case was apply New Jersey law.
10             THE COURT:  Right.
11             MR. RULEY:  And, of course, that case didn't even
12   involve medical records or a motion to compel.  It was a
13   straight class certification decision.
14             And so what's -- the cases they cite from other
15   states, like New Jersey and Florida, just aren't
16   determinative because they don't address what's necessary to
17   show entitlement to the remedy of medical monitoring under
18   Vermont law.
19             And so if you look at the states that have
20   recognized some sort of recovery for medical monitoring they
21   generally fall into two camps.  The first camp, exemplified
22   by states like New Jersey, I mean, New York and
23   Massachusetts and Missouri tend to treat medical monitoring
24   as a remedy for an existing tort, nuisance, negligent.  And
25   they have adopted a test for that remedy that is primarily
```

1    exposure based.

2             Exposure leading to risk leading to the need for

3    monitoring.  And specifically some of those cases, while

4    they didn't address motions to compel, they did address

5    whether individualized considerations among the people who

6    were exposed were relevant.  That was raised in the Askey

7    case in New York.  It was rejected.  And Askey adopted an

8    exposure based remedy.

9             And, in fact, the later New York cases of Abusio

10   and Allen basically say if you are exposed, and you can show

11   that you have a significant basis for concern, i.e., prove

12   that the toxin is in your body, you're entitled to medical

13   monitoring.  Medical records have nothing to do with that.

14            The Meyer case out of Missouri, specifically held

15   individual issues, individualized consideration and medical

16   histories, if you were making a claim for personal injury,

17   yes, that would be relevant.  But because medical

18   monitoring, under Missouri law, is an exposure based remedy,

19   and that was their words, those considerations weren't

20   relevant.  And so that's the first camp.  That's the camp

21   that we think Vermont would fall into.

22            The other camp is exemplified by states that have

23   adopted medical monitoring as an independent cause of action

24   and tend to have adopted sort of a multi-factorially either

25   six or seven factor test.

 1          And then they have cited cases from, a couple of

 2   those states, primarily New Jersey and Florida, where

 3   federal courts have interpreted one or more of those

 4   elements to require an individualized approach to medical

 5   monitoring as opposed to the more common or group based

 6   approach of New York, Massachusetts and Missouri.

 7          And so that's the central issue here.  Will -- is

 8   Vermont part of the first group of states or would it be

 9   more in the second group of cases.  That is an issue of law

10   that is for the Court to decide.  And it's an issue that

11   they have said nothing about because while Vermont doesn't

12   have a case that has fully detailed and explained the

13   remedy, such as the Askey case in New York or the Donovan

14   case in Massachusetts, all indications are that Vermont

15   looks or would -- accepts medical monitoring as an exposure

16   based remedy beginning with the Stead case from this Court.

17          There were two significant parts to that case.

18   The decision clearly treated medical monitoring as part of

19   the remedy for other torts, the primary tort being

20   negligence, and it allowed expert testimony that the

21   exposure of those particular plaintiffs, the oil in their

22   water, led to increased risks of cancer which justified

23   medical monitoring over time.

24          So it certainly is consistent with the exposure

25   based approach.  And then if you look at the principles

1   behind that approach that the courts in these other states
2   have relied on, the primary principle is the idea that a
3   plaintiff is entitled to recover for all damages past,
4   present and future, which can include medical monitoring.
5   That's well-established in the re-statement.  That principle
6   is well established also in Vermont law generally.
7           Given that that principle has been the animating
8   basis of these decisions in other states we think that's the
9   direction Vermont would go in.
10          And so the first thing to do is for the Court to
11  define its view of Vermont law so that we can all know what
12  is relevant and what isn't.  So that's the legal part of
13  this.
14          The factual part is that, as we all can recognize,
15  whether we're talking about, it's actually six named
16  plaintiffs, but only four had significant PFOA in their
17  drinking water.  Whether we're looking at that group of
18  people, whether you look at the group of people in the
19  courtroom today or the hundreds of people in Bennington who
20  have drunk the defendant's PFOA in their well water, you're
21  going to find individual difference, whether it's in age,
22  sex, family history, genetic background, what conditions
23  they have, medical history, what prescriptions they've
24  taken, body mass index, anything and everything.
25          It's the truism that we all are individuals.  And,

1    of course, that's going to be reflected in somebody's

2    medical history.  That is a given.

3            And the legal question that needs to be decided

4    here can be decided on that basis.  Is medical monitoring an

5    exposure based remedy that can be approached on a group or

6    common basis or is it inevitably an individualized remedy

7    that has to be approached on a person by person basis.

8            And everything Mr. Cheffo argued just presumes

9    that it's the latter.  When, in fact, under multiple states,

10   including our neighboring states, it's the four.

11           And so let's look at the Rowe decision, which is

12   cited more in their briefs than any other decision.  That

13   case did not address specific differences among the named

14   plaintiffs and say, well, so and so had this and said so and

15   so had that.  It just addressed that inevitably under the

16   elements of that Court's interpretation of New Jersey law,

17   medical monitoring was an individualized remedy which could

18   not be available on a group basis.

19           That's the decision that needs to be made in this

20   case.  We think the appropriate time to make it is incident

21   to the motion for class certification, but if it needs to be

22   made now to resolve this motion then fine.

23           I'd also like to address just a little bit and be

24   clear.  As the Court noted, they have made exceedingly

25   broad, exceedingly extensive discovery requests.  And on the

 1   subject of work history, we have provided a listing of the

 2   places that the named plaintiffs have worked and I believe

 3   when they worked there and what their job was.

 4           THE COURT:  Right.

 5           MR. RULEY:  And they're welcome to ask questions

 6   about that.  And we have provided information that shows

 7   exposure and their blood serum levels.

 8           THE COURT:  Each, sorry to interrupt, each of the

 9   named proposed class members has been, blood has been drawn

10   and some serum level has been conducted?

11           MR. RULEY:  Well, for the class members who had

12   PFOA in their well water that they drank.  We do have a

13   class member, for example, who was on town water.  And so

14   didn't have the blood tested pursuant to the state program.

15           And so to produce these records and start down

16   this path would be significantly burdensome.  It would be

17   very time consuming and expensive.  And it would be highly

18   invasive for these folks.  And --

19           THE COURT:  But to be fair, no more invasive than

20   the burden placed on someone who has a broken ankle, right,

21   and makes a claim at a slip and fall?

22           MR. RULEY:  Yes, Your Honor.  And --

23           THE COURT:  Probably not 50 years.  I have never

24   seen a request for 50 years before, but I think that's

25   negotiable.

1          MR. RULEY:  Well, and when someone breaks an ankle

2    and brings a claim for personal injury you know you make

3    that decision to put your medical condition into issue.  And

4    that, that's just, that's the law.  That's what it is.

5          What we're saying is before we start down that

6    path in this case we need, we need some clear definition of

7    what the law is because under the law of various states that

8    information just isn't relevant.  And particularly isn't

9    relevant to the decision on class certification.

10          If the main issue on class certification is can

11    the elements of medical monitoring be met on a group basis

12    or is it inevitably an individualized basis and individual

13    questions predominate.  That's a question of law.  And it

14    can be decided without references to specific plaintiff's

15    medical records just as it was in the Rowe case.

16          And so --

17          THE COURT:  Let me push back a little bit.  Don't

18    both sides have the right to develop the case in the way

19    that they want to present it to create the record that they

20    want?  It would be silly to do this case, you know, the

21    older I get, I really only have one motto in this room which

22    is I only want to do the case one time.  I'm pretty neutral

23    except on that one issue.

24          MR. RULEY:  I think we can all agree on that.

25          THE COURT:  Because I don't want to do it twice.

And it seems to me you're leading a bit with your chin if
you say, close the defendant down, they get no information
on the medical condition of the named, the named class
representatives, for the reasons that you've articulated
very clearly.  It wouldn't be hard to have it sent back if a
reviewing panel takes a different view.  You'll say, at
least find out, right.

I mean, what if all four class reps worked in
another Teflon company and they have come here trying to, I
don't mean to be conspiratorial about it, but as an extreme
example, they have allied themselves and come here in order
to lay this problem off on this defendant.  Not very
probable.  But that would be troublesome to the Rule 23
process and probably something that should be known, right?

MR. RULEY:  Well, and that's why we have provided
the basic summary of each plaintiffs' work history.

THE COURT:  Right.  Right.

MR. RULEY:  And the issue isn't so much, are they
entitled to develop the case the way they want, the issue is
what is relevant under Rule 26.

And under the law of various states
individualized -- when we're talking about medical
monitoring based on exposure to a toxin individualized
medical histories and individualized considerations aren't
relevant because it is an exposure based remedy.

1            Under the law of other states, as interpreted by

2     the federal courts, it would be relevant.  That's what we

3     need to know.

4            And for purposes of class certification we all can

5     operate under the truism that these people are individuals.

6     And they are going to have, any difference that their expert

7     wants to say should make a difference.

8            Our expert says, look, when you have this stuff in

9     your water and you drink it and you get an above background

10    level in your blood here's a set of health impacts and risks

11    that flow from that and that should be monitored for.

12    Whatever someone brings to the table in their individual

13    history because whatever their individual background the

14    PFOA elevates their risk.  Whatever their preexisting risk

15    was, it just went up.

16           To the extent someone may already be being treated

17    for something like high cholesterol you address that not in

18    determining whether a medical monitoring program is

19    appropriate for this group, you address it in the

20    administration and implementation of the program through a

21    well designed questionnaire that seeks to bring out that

22    sort of background information.  And it --

23           THE COURT:  You mean after judgment, at the far

24    end when the remedy is being implemented?

25           MR. RULEY:  Well, as part of -- right.  As part of

1    administration and implementation of that.  And it's not so

2    much to determine whether the monitoring is justified, it's

3    to work with -- to the extent somebody gets odd tests back

4    or something like that to then be able to follow-up

5    appropriately.

6           And there's -- to the extent Saint-Gobain wants to

7    argue, well, we shouldn't have to pay for this test for

8    person X. or that test for person Y., it can be handled at

9    that stage.  As a matter of efficiency, when you are

10   basically doing primarily blood testing, that's what a lot

11   of this is, there may be a few other elements, but a lot of

12   it is basically various tests on blood.

13          Once you are going to do a series of tests to try

14   to pick out, run this on that sample, but not that on that

15   sample, it's just far cheaper just to do it on all.  But

16   anyway, those are details that we can get into later.

17          The primary point for today is before you get

18   discovery you have to show relevance.  Relevance is

19   determined by state law.  Under some state laws

20   individualized considerations are not relevant.  Under some

21   they are.

22          Before we go down this path we need -- and we ask

23   you to further define or give us your view of Vermont law.

24   And to start down this path before we know that is, would be

25   unfair, inefficient and we believe unnecessary, given where

1  we think Vermont law is on this subject.

2          THE COURT:  All right.  That's helpful.  Change

3  the subject slightly.  I'm not sure I understand the harm to

4  these class representatives if they are obligated to comply

5  with the discovery requests.

6          MR. RULEY:  Well, the harm is they, they would at

7  that point basically be exposing their lives because a lot

8  of a person's life is captured in their medical records.

9  They would be exposing their lives to the company that, in

10  their view, poisoned them.

11          That's not something they want to do.  If they

12  bring a claim for, right, if they bring a claim for personal

13  injury then, then that's the way it is.

14          And essentially, I mean, the essence of the

15  defendant's argument is medical monitoring, personal injury,

16  it's the same thing.  It's got to be treated the same.  But

17  clearly, under the law of various states, that is not true.

18          And so we need, we need to know what the law is in

19  Vermont before we would go down this path.  And the truth is

20  if, if medical monitoring is an individualized inquiry then

21  it's going to be very, very difficult to get a class

22  certified.  If it can be approached --

23          THE COURT:  On that issue?

24          MR. RULEY:  On that issue.  Yes.  Thank you.

25          THE COURT:  You have other claims?

```
1              MR. RULEY:  Yes, indeed.

2              THE COURT:  Yeah.  Right.  Okay.

3              MR. RULEY:  If it can be approached on a basis of

4  common exposure and, therefore, a common set of increased

5  risks, relative to the general population, that's, you know,

6  you know, when, when Mr. Cheffo mischaracterizes certain

7  things it's, it's do they face increased risks relative to

8  the general population that is not exposed or to the

9  unexposed population.

10             That's the inquiry, in our view, under the law.

11  And that's what we're prepared to show.  And they are

12  welcome to any sort of discovery they want on that.  But to

13  get into the individual lives of each of our named

14  plaintiffs and then flowing on, if that's the view of the

15  law of every one of the hundreds of the people who have

16  drunk PFOA, it's going to be very expensive, very

17  burdensome, very invasive.  And, in our view, unnecessary.

18  And so what we are asking for is a clear definition of the

19  law of Vermont --

20             THE COURT:  Right.

21             MR. RULEY:  -- before we go there.

22             THE COURT:  All right.  Just one more question.

23  Looking way down the road, in your, in your best case, what

24  does a successful medical monitoring program look like on

25  the ground?  You're not proposing to send one of these
```

1    medical buses and have people go in?  This would be more

2    like an order from the Court that extra monitoring by their

3    family physician would be paid for by the defendant,

4    something like that?

5         MR. RULEY:  I would say probably -- probably what,

6    what we will propose would be an order from the Court

7    setting up a court supervised program, probably administered

8    by a special master, that would say here's a series of tests

9    that are available to this exposed population in some

10   regularity, yearly, bi, whatever, whatever the, is justified

11   by the expert testimony.

12        THE COURT:  Right.

13        MR. RULEY:  And then the program will be

14   administered and the data collected through that special

15   master.  And I'm, I'm hesitant to go into much greater

16   detail than that at this stage.  We do propose to put our

17   proposal to the medical monitoring class in front of the

18   Court when we file a motion for class cert.

19        THE COURT:  I wasn't trying to tie you down to a

20   specific plan.  I just wanted to understand the outline of

21   what it would look like.  It would use people's existing

22   medical primary care physician arrangements and they'd get

23   extra testing that way or is this a whole, kind of a whole

24   other matter?

25        MR. RULEY:  Well, I don't envision the Court

```
1    requiring Saint-Gobain to buy a bus and equipment and all
2    that sort of thing and send it down to Bennington.
3                 THE COURT:  Right.
4                 MR. RULEY:  There are adequate facilities at the
5    Southwestern Vermont Medical Center.  My guess is that's
6    where most people would go to get these tests, to have the
7    blood drawn for the various tests to be run on.  And then,
8    yes, certainly the results would be available to their
9    primary care physician.
10                THE COURT:  They are worthless otherwise, right?
11                MR. RULEY:  But there also, you know, ideally, in
12   a medical monitoring program, part of the side benefits of
13   the program are data collection and generation to help the,
14   help the, help all of us better understand the effects, but
15   also follow-up with the individuals participating in the
16   program.
17                THE COURT:  Right.
18                MR. RULEY:  Which, here again, primarily would be
19   through, I think, their local physician.  But someone with
20   the program coordinating and working with that local
21   physician, yes.
22                THE COURT:  All right.  Thank you.  That's
23   helpful. I couldn't, I couldn't bring it into focus what it
24   would actually look like.
25                MR. RULEY:  Thank you, Your Honor.
```

```
 1              THE COURT:  Mr. Cheffo?

 2              MR. CHEFFO:  Yes, Your Honor.  Thank you.

 3              THE COURT:  What do you say to his primary point,

 4    which is that there's a sort of two schools, and before we

 5    start discovery we have to figure out which school we're

 6    going to be in?

 7              MR. CHEFFO:  I say I've never heard something like

 8    that.  Again, I think it's a creative argument by very good

 9    lawyers, but this is not -- this is Rule 26.  We're in

10    federal court, right.  We understand procedural versus

11    substantive, substantive law ultimately.  This is a

12    discovery motion, right.

13              This idea that you would, you would issue kind of

14    an advisory opinion on what the law of medical monitoring

15    might be before you even got a motion or, or an expert

16    report, that that would somehow frame discovery.

17              I mean, you said it well, which is, the plaintiffs

18    have their theory.  I think it's untenable in terms of how

19    that they are going to have this amorphous theory, you don't

20    need to talk to anyone, you basically just have a medical

21    monitoring and then at some point some court appointed

22    mediator, someone fills out a form and that's the first time

23    we find out whether they actually do or don't.  I mean,

24    again, that's -- they are going to have to convince the

25    Court of that.
```

```
 1            What we're talking about is just Rule 26
 2   fundamental discovery, what's relevant, what's appropriate.
 3   And that's what's relevant, what's likely to lead to
 4   admissible evidence, right.  I mean, that's what the
 5   standard is.
 6            Counsel talked a few things on these cases.  I
 7   mean, and I think, you know, the best time sometimes is just
 8   to go, you know, to the cases.  I'm sure Your Honor has had
 9   a chance to at least review them.  But, you know, the Rowe
10   case it was -- I mean, it's a case against DuPont, not my
11   client in this case.  It was a class action for alleged
12   release of PFOA.  And it's a medical monitoring case.  And
13   it's in a district court in New Jersey.
14            THE COURT:  For five years I saw, not with
15   enthusiasm.
16            MR. CHEFFO:  Yes.  Well, you've had a much more
17   aggressive schedule perhaps than this.  But I don't want to
18   throw stones at this Court in any way since I might be
19   before that judge and there may be other circumstances.
20            But what the Court said was that the plethora of
21   individualized issues underlying the plaintiff's claims,
22   such as the amount of exposure, the increased risk of
23   disease and the necessity of medical monitoring, render
24   class certification inappropriate.
25            And it said that -- and the Court explained, and
```

1    this is a quote, plaintiffs must show that each class

2    member, this goes to the burden issue, needs medical

3    monitoring above and beyond what he or she would ordinarily

4    need absent the exposure to PFOA.  And I'm adding in, this

5    burden of proof.  Quote, implicates the background exposure

6    to other PFOA sources, health history, medical needs of each

7    individual class member.  And then it said, each class

8    member's risk of disease will differ depending largely on

9    individual circumstances such as gender, age, drug, alcohol

10   use, nutrition, and it goes on.

11          Now counsel's point was, well, we all know people

12   are different, but the fact that the Court didn't call out

13   specific people it understood from the record you can't

14   just -- I couldn't just stand up and say, Judge, you should

15   just assume that everybody is different, you know, there's

16   going to be some level of proof.  And I think that the fact

17   that the folks -- that that Court didn't call out people

18   just kind of highlights the point.  But the Perez case,

19   which we've also cited, which is in the Southern District of

20   Florida, another district court case, that court basically

21   said, you know, for instance, one plaintiff had health

22   problems while another had several health problems,

23   including Chrohn's Disease, right.

24          So, in other words, looking at not just exposure,

25   but what their disease point to answer the underlying

1   question of, do you need something above and beyond.  And at

2   the risk -- I don't want to misquote.  And Your Honor can

3   look at the record.  But this is from, I think it was from

4   one of the hearing transcripts where basically I understood

5   it that counsel basically said that you have to have

6   something, you know, above and beyond what was already --

7   what the folks might already need.  And we've cited that

8   hearing transcript so Your Honor can look at that for

9   yourself.

10          One other point here.  The plaintiffs say, well,

11   this is not personal injury.  And, frankly, you know, that's

12   not so clear at this point based on their complaint.

13          So in opposition to the motion for judgment on the

14   pleadings they said that they have quote, plead physical

15   harm to their person.  You know, that's when they were

16   trying to avoid certain of the other issues, right, on their

17   motion.

18          They said in their opposition at page 6 that

19   quote, their bodies have been invaded by PFOA.  They said in

20   their second amended complaint and in their opposition to

21   the motion for judgment on the pleadings and again at the

22   April 10th hearing, that they have quote, damage to their

23   blood, liver, kidneys, immune systems and other organs.

24   That's what the plaintiffs are saying.

25          They said that their medical monitoring claims

1    seek the cost of additional medical testing that are quote,

2    above and beyond the medical testing they normally

3    undertake.  And Your Honor can read that.  That's at the

4    April 10th hearing at 37-25 to 38-8.

5              And then, frankly, they've changed their class

6    definition such that the most recent amended complaint

7    proposed a class definition that includes those with

8    physical injuries but who have not yet filed suit.

9              So that's kind of a, you know, it seems like a

10   nuance, but their prior definition basically had people --

11   they excluded people who have personal injuries.  Now

12   they've not excluded those folks, it's just that they've

13   filed a separate lawsuit, right.

14             So, again, at this point they are the masters of

15   their complaint.  They've certainly at least put enough of

16   these issues so to the extent that this has nothing to do

17   with personal injuries, I don't know that that's necessarily

18   true from their own complaints.

19             So I think it brings us back to a word we probably

20   will agree with which is efficiency, right.  Counsel talked

21   about that.  And I think it would be, with all due respect,

22   sort of kind of widely inefficient to basically get to this

23   point, you know, of class cert and hearing without having

24   this core, kind of fundamental information.

25             Every defendant provides and presents this

1    information to a court.  We need to have that obligation.

2    This is not a situation where you need to decide underlying

3    case law and then determine what's relevant.  This is a

4    straightforward Rule 26.  This is information that every

5    court, every court that's looked at it has allowed.  And the

6    converse is they have not cited a single case ever that says

7    a defendant is not entitled to this information.

8            What they are essentially trying to do is put this

9    Court on an island, which would be a very unusual and

10   aggressive and kind of outlier position that prevents

11   defendants from getting what is really plain vanilla

12   discovery.

13           And the final thing is, you know, we understand

14   there's some burdens to that.  And we'll certainly be

15   respectful in terms of how we deal with it.  There's a

16   protective order in place.  But at the same time that you're

17   hearing, you know, that there's some burden about filling

18   out authorizations, you know, Saint-Gobain has its position,

19   right, that there's no liability and there's no -- class

20   cert should be appropriate, but yet it's spending hundreds

21   of thousands or millions of dollars to accommodate what we

22   understand are their requests for discovery.  And that's

23   kind of the way the process needs to work so that we can

24   have a fair opportunity to present our defenses to Your

25   Honor.

```
 1                THE COURT:  All right.

 2                MR. RULEY:  May I be heard for maybe three more

 3     minutes, Your Honor?

 4                THE COURT:  Sure.  Sure.

 5                MR. RULEY:  First, Rule 26, the current version,

 6     just addresses relevant.  You're entitled to discovery of

 7     information that is relevant.

 8                THE COURT:  Yeah.  Relevant or likely to lead.

 9                MR. RULEY:  I'm not -- I question whether the

10     likely to lead language is still in Rule 26.  But, in any

11     event, in any event, if Saint-Gobain wants to challenge or

12     wanted to challenge any of our discovery requests as seeking

13     information that was not relevant, they were welcome to do

14     that.  All of our requests have been relevant.  They all go

15     to the issues of liability and other issues in this case.

16     End of story.

17                We're here to determine whether what this

18     particular part, most of everything else they've asked for

19     we have responded to.  So what we're here today for is to

20     determine whether this part of what they are asking for is

21     relevant or not.

22                Our central argument is, depending on the law of

23     Vermont, it may be relevant or it may not.  And the very

24     cases Mr. Cheffo just got up here and cited and quoted to

25     you make the point.  The Rowe case was expressly and very
```

1    clearly and extensively decided pursuant to New Jersey law.

2    And Mr. Cheffo wants to go ahead and say, well, he, he

3    clearly, that court was able to decide whether class

4    certification was appropriate because it can be proved on a

5    common basis or not appropriate because it involves a set of

6    highly individualized issues.  That court reached that

7    decision based on New Jersey law and without discussion of

8    any details relative to the individual plaintiffs.  It was

9    just the general.  There are differences in age, sex,

10   gender, all of that.  That's a given.

11         The second case he cited, Perez case Florida law,

12   here again, the court clearly applied Florida law which has

13   been interpreted as making medical monitoring an

14   individualized remedy as opposed to a remedy based on a

15   common threshold of exposure.

16         So that's the central issue here.  And speaking of

17   putting the cart before the horse, to require our plaintiffs

18   to expose their lives and medical history to Saint-Gobain

19   before that central legal issue is decided that's what would

20   be putting the cart before the horse.

21         He also used the term, advisory opinion.  Not so.

22   This is the central legal issue in the medical monitoring

23   part of this case.  And it's going to have to be decided.

24   And so they've come at it through a motion to compel.  I

25   think it would have been more sensible to address it just a

```
1    straight part of the motion for class certification, but one

2    way or the other it's got to be decided.  And it should be

3    decided before our plaintiffs are required to produce their

4    entire medical history or some sub-set of it to this

5    defendant because that, that will be quite a process.

6              And for that to happen, but then for the Court to

7    later decide, oh, we didn't mean to do that, that would --

8    speaking of unfair and inefficient.  So let's, let's settle

9    the law and then we can proceed based on that.  Thank you,

10   Your Honor.

11             THE COURT:  All right.  I think you've both been

12   super complete in your presentation.

13             MR. CHEFFO:  Sure.

14             THE COURT:  And we'll give it some thought and

15   I'll get something out as quick as I can.

16             Anything else we can take up while you're both

17   here?  Everything else is progressing?

18             MR. CHEFFO:  Yes, Your Honor.

19             MR. RULEY:  Yes, Your Honor.

20             THE COURT:  All right.  I'll let you get home.

21   Thanks for making the trip.

22             MR. RULEY:  Thank you, Your Honor.

23             MR. CHEFFO:  Thank you, Your Honor.

24             (The Court recessed at 11:44 a.m.)

25
```

```
 1              C E R T I F I C A T E

 2

 3         I, Anne Marie Henry, Official Court Reporter for

 4    the United States District Court, for the District of

 5    Vermont, do hereby certify that the foregoing pages are a

 6    true and accurate transcription of my shorthand notes taken

 7    in the aforementioned matter to the best of my skill and

 8    ability.

 9
                          _____
10

11                            Anne Marie Henry, RPR
                              Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   the Court opened at 11:50 p.m.

 2            THE CLERK:  Your Honor the matter before the Court

 3   is criminal number 16/148/three, United States of America

 4   versus Brandon low.  Present on we have the government is

 5   Assistant United States Attorney Gregory Waples.  The

 6   defendant is present with his attorney hands her math son

 7   and we are here for a change of plea.

 8            THE COURT:  All right.  Story to be behind T. I

 9   appreciate your patience.

10            MR. CHEFFO:  Good morning Your Honor.

11            THE COURT:  Good morning good to see you.  All

12   three of you.  Mr. Low, before I can except your guilty plea

13   I need to ask you some questions to make certain that you

14   tries are protected and that your plea is voluntary.

15   Everything we say here is recorded.  And so I know if I ask

16   you a question you'll answer allowed.  If you don't

17   understand my question or you don't understand some part of

18   this proceeding please say so.  It's my job to take the time

19   to explain your rights fully T. it's important that you

20   understand my questions and everything else that's can said

21   and if you wish to at any points to speak privately with

22   your attorney, with Mr. Matson just say so and we'll take a

23   break and afford optants do that he will privately in a

24   conference room or something like that.  Do you understand

25   what I have seed so far?
```

```
 1              MR. RULEY:  Yes.
 2              THE COURT:  At this time I'm going to ask that you
 3    been placed under oath.  Do you understand if you make a
 4    statement today which is not true that the statement could
 5    be used against you in a separate prosecution for perjury or
 6    for making atolls statement?
 7              MR. RULEY:  Yes, Your Honor.
 8              THE COURT:  F.
 9              The Witness, after being duly sworn, testified as
10    follows:
11              DIRECT EXAMINATION BY THE COURT:
12    Q.   Could you state your full name please?
13    A.   Low.
14    Q.   And Mr. Low how old?
15    A.   What.
16    Q.   Is is your age?
17    A.   I'm 25.
18    Q.   And what the is the extent of your school education?
19    A.   Actually to go the university right now.
20    Q.   Currently a university students?
21    A.   Yes.
22    Q.   Okay.  And do you have any employment outside of your
23    school work?
24    A.   Yup is.
25    Q.   Where do you work point Is see a seeing and company.
```

```
1    Q.    What kind of company?

2    A.    Seeing appearing company.  For hands bags.

3    Q.    I'm their Matson?

4              MR. CHEFFO:  Seeing and company for hand bags Your

5    Honor.

6              THE COURT:  Oh abiding company.  Oh okay.  I got

7    it.

8    Q.    And do you speak and understandings English?

9    A.    Yes, sir.

10   Q.    And what is your citizenship?

11   A.    Canadian.

12   Q.    And are you currently under the care of a doctor or

13   psychiatrist?

14   A.    No, Your Honor.

15   Q.    Have you recently be hospitalized object treated for

16   drug addiction?

17   A.    No, Your Honor.

18   Q.    Have you taken any drugs or medicine or any pills or

19   consumed alcohol within the last 24 hours?

20   A.    No.

21   Q.    Do you feel that you yourself of a clear understanding

22   of this proceeding today?

23   A.    Can you repeat that Your Honor plea.

24   Q.    Do you feel that you a clear understanding of this

25   change of plea proceeding?
```

1    A.    Yes, Your Honor.

2    Q.    And counsel for the defense or government of any doubt

3    to enter a val I flied?

4            MR. CHEFFO:  No, Your Honor.

5            MR. RULEY:  The government does not turn.

6            THE COURT:  I received a copy proposed plea

7    agreement Mr. Low.  My first question is this, are you fully

8    satisfied with counsel and advise given to you in the case

9    by your attorney hand here Matson.

10           MR. RULEY:  Yes, Your Honor.

11   Q.    And did you have an opportunity to read and talk Dover

12   the plea agreement with him before you signed it?

13   A.    Yes, Your Honor.

14   Q.    And was by to answer all the questions you may have had

15   about it?

16   A.    Yes, sir.

17   Q.    And did you then yourself sign the plea agreement?

18   A.    Yes, Your Honor.

19   Q.    Does the plea agreement represent the complete

20   understanding you have with the government?

21   A.    Yes, Your Honor.

22   Q.    Is there any further agreement with the government by

23   isn't written down in the plea agreement?

24   A.    No, Your Honor.

25   Q.    Do you understand the terms of the plea agreement you

1    yourself?

2    A.   Yes, Your Honor.

3    Q.   Sometimes there's an exhibit I be.  I I want to make

4    sure I didn't overlook it.  Is there one in this case?

5         MR. RULEY:  No, Your Honor.

6         THE COURT:  Thanks.

7    Q.   Has anyone made any promise or assurance to you that's

8    not contained in the flee agreement to zipper persuade you

9    to accept it?  (Conferring off the record with his lawyer )?

10   A.   No, Your Honor.

11   Q.   Has any one threatened you in any way to persuade you

12   to accept the plea agreement?

13   A.   No, Your Honor.

14   Q.   Do you understand that the terms of the plea agreement

15   are recommendations to the Court, the plea agreement

16   contains no limit on tenths length of any sentence other

17   than of course the scenario fence not exceed the length

18   allowed bylaw?

19   A.   Yes, Your Honor.

20   Q.   Mr. Matson with flaw formal plea offers give the

21   government conveyed to their low?

22        MR. CHEFFO:  Yup.

23   Q.   Do you understand that the offense to which you are

24   pleading guilty is is a felony offense and that if your plea

25   is accepted you'll be judged guilty of that offense and that

1    that judgment will deprive you have or may cause you to be

2    excluded, not admitted, to the United States if you were to

3    seek admission in the future?

4    A.   Yes, Your Honor.

5    Q.   And do you understand that the maximum penalty provided

6    bylaw is up to five years of I'm prison many, a fine of up

7    to $250,000, a period of the supervised release of not more

8    than three years and take 100 teds special assessment?

9    A.   Yes, Your Honor.

10   Q.   I need to tell you that your sentence will be

11   determined in the ends by a come by operation of advisory

12   sentencing guidelines, possible authorized departures from

13   those guidelines and other stat tore eye sentencing factors.

14   Have you and your attorney talked about how these advisory

15   guidelines night apply in your case?

16   A.   Yes, Your Honor.

17   Q.   And do you understand that the Court will not would be

18   to determine the advisory guideline range for your case

19   until after the Pre-Sentence Report hats be to complete ted

20   and you and the government can have have had an opportunity

21   to challenge the reported facts and the application of the

22   guidelines recommended also by the probation to have search

23   and that the sentence ultimately impose had may be different

24   from any estimate that you are attorney or anyone else may

25   have given you?

1   A.   Yes, Your Honor.

2   Q.   Do you understand is an has been determined the Court

3   has the authority in some circumstances to depart upwards or

4   downwards from that range and it will it will other

5   statutory sentencing factors under the law thiemia result in

6   the sentence that's either greater or less n than the

7   advisory guideline sentence?

8   A.   Yes, Your Honor.

9   Q.   Do you understand that parole has been abolish inned if

10  federal system and in your sentenced to prison you will not

11  be released on parole?

12  A.   Yes, Your Honor.

13  Q.   Do you understand under some circumstances you or the

14  government may have the right to appeal any sentence that I

15  impose?

16  A.   Yes, Your Honor.

17  Q.   I'm going to talk to you will about your trial rights.

18  These are important constitutional rights which you have now

19  but in effect you give them up when you need guilty and

20  that's because you give up your trial at that point many so

21  that's why we take the time to talk about them T. do you

22  understand fir that you have ever right to plead not guilty

23  to any offense charged against you and to take the case to

24  trial?

25  A.   Yes, Your Honor.

1   Q.    Do you understand that you will would then have the

2   right to a trial in front of a jury?

3   A.    Yes, Your Honor.

4   Q.    Do you understand that if you requested a jury trial

5   all members of the jury wrote of to agree that you were

6   guilty before you could be found guilty?

7   A.    Yes, Your Honor.

8   Q.    Do you understand that you'd have the right to

9   participate in collecting those jury members from members of

10  the community?

11  A.    Yes, Your Honor.

12  Q.    Do you understand that at trial you'd be presumed to be

13  innocent, the government would have to prove you guilty

14  beyond a reasonable doubt?

15  A.    Yes, Your Honor.

16  Q.    Do you understand you'd have the truth to the

17  assistance of counsel for your defense appointed by the

18  Court if necessary at trial and at every other stage of the

19  case?

20  A.    Yes, Your Honor.

21  Q.    Do you understand you'd have the right to see and hear

22  all the witnesses and of them cross-examined in your

23  defense?

24  A.    Yes, Your Honor.

25  Q.    Do you understand you'd have the right on your own part

```
1    to decline to testify unless you voluntarily elected to do
2    so in your own defense?
3    A.   Yes.
4    Q.   Do you understand you'd have the right to testify and
5    to put on your own evidence at a trial?
6    A.   Yell Your Honor.
7    Q.   Do you understand that'd E. have the right to compel
8    witnesses to attends to testify in you defense?
9    A.   Yes, Your Honor.
10   Q.   In other words do you understand you could if the your
11   own witnesses and evidence at a trial?
12   A.   Yes, Your Honor.
13   Q.   Do you understand that if a witness didn't wish to come
14   the Court could order him or her to come and testify anyway?
15   A.   Yes, Your Honor.
16   Q.   Do you understand that if you decided not to testify or
17   not the put on any evidence that this, these facts could not
18   be used against you at trial?
19   A.   Yes.
20        THE COURT:  Story I appreciate it.  I cut you off.
21   Q.   Do you understand that nobody could force you to
22   testify because you have a privilege against incriminating
23   yourself?
24   A.   Yes, Your Honor.
25   Q.   Do you understand that if you were found guilt see
```

1    after a trial you could appeal your conviction to a higher
2    court?
3    A.   Yes, Your Honor.
4    Q.   Do you understand that by entering a flee of guilt eat
5    if that flee is accepted by the Court there will be no trial
6    and you'll of waved or given up your right to take trial as
7    well as those so rights associated with a trial which I've
8    just described?
9    A.   Yes, Your Honor.
10   Q.   I want to return for just a second to my discussion
11   about the consequence eases of a felony convictions for you.
12   You Canadian citizen correct?
13   A.   I'm what sir.
14             THE COURT:  Repeat.  Do you understand that as I
15   said a moment ago one consequence of the conviction is
16   likely to be that you'll be excluded, not granted entry into
17   the United States.
18             MR. RULEY:  Yes, Your Honor.
19   BY THE COURT:
20   Q.   Do you understand that if, and that's not a decision
21   that the Court makes, that's a immigration decision, do you
22   understand that if you did with granted admission to the
23   United States that that felony offense would have
24   consequence did he say during your period of the rest den
25   seal in the U.S.?

1    A.   Yes, Your Honor.

2    Q.   Such as that it may, night well deprive you have

3    important still rights such as the right to vote the truth

4    to hold public office the truth to serve on a jury and the

5    truth to know he is any kind of firearm?

6    A.   Yes, Your Honor.

7    Q.   But that as is a practical matter the nose immediate

8    consequence of this felony conviction is likely to be you

9    exclusion from the us?

10   A.   Yes, Your Honor.

11   Q.   Okay.

12   BY THE COURT:

13   Q.   Do you understand that at trial the government would

14   have to prove the essential elements to the offense to which

15   you are plead guilty couldn't one, which is charged of

16   conspiracy to commit access device fraud.  It would of to

17   prove threes essential elements beyond a reasonable doubt?

18   A.   Yes, Your Honor.

19   Q.   And I'll go over the elements of that offense were you.

20        MR. RULEY:  Do you need my copy judge civil of

21   the.

22        MR. RULEY:  From last time.  The tell he T. of the

23   C. C. conspiracy.

24        THE COURT:  I was just making sure.  I have it

25   here.  I was just making sure that was exactly 1029 about

1   two?

2            MR. RULEY:  Yes.

3            THE COURT:  Got it.  Thank you.  Do you understand

4   that the elements are as follows Mr. Low.  T. one, at a

5   particular time which is charged as from him in or about

6   March 2016 to October 24, 2016 T. two at a particular place

7   which is charged as the District of Vermont which means

8   within the State of Vermont and well are elsewhere.  Three,

9   you were a member of a conspiracy which in this case means

10   an agreement among two or more people to commit fraud in

11   connection with use of an unauthorized access device.  And

12   four, at least one member of the conspiracy engaged in

13   conduct in that you are they are answer of the fraud.  Five

14   you talk Ted knowingly and were in tend to did you fraud in

15   joining in the conspiracy.  #, the fraud at issue concerned

16   the use of an unauthorized access did he vice which is say a

17   credit card plate code such as affine, B. that can be used

18   alone or in come by ammunition with another access device.

19   C. to obtain money goods services oh other or to initiate a

20   trance other of funds other than the transfer original had

21   by paper the.  Seven in the course of the from you the

22   defendant and other members of the conspiracy received money

23   or value within a one year period of in exhibit test of

24   $1000.  And eight the fraud, the conduct conspiracy taught

25   go the fraud affect ted interstate or foreign commerce.  Do

you understand that those are the legal elements of the couldn't one the charge of conspiracy to commit C. C. fraud or access devise fraud.

MR. RULEY: Yes, Your Honor.

THE COURT: Can the government provide a summary of the facts you'd be prepared to November at trial.

MR. RULEY: I can judge. Before that could I invite the Court to make certain that Mr. Low understands that by reason of his guilty plea the Court will not be hearing his motion to suppress that is still technically pinned doctoring.

THE COURT: Yes absolutely. Do you understand that counsel makes a good point that you have through your attorney filed a motion to suppress certain evidence. That is tea an important correct led step to take. But that one consequence of pleading guilty is that the Court will not schedule a hearing and issue a decision on your motion that it will instead be marked as, as withdrawn because you need guilty.

MR. RULEY: Yes, Your Honor.

THE COURT: Sock T.

MR. RULEY: Thank you Your Honor. Your Honor, we believe that the evidence in this case would show that beginning in around March have 2016 other co-conspirators formed an agreement to commit access did he industries fraud

```
 1    in the United States basically by using counterfeit C. C. z

 2    to obtain money.  At some point the defendant became a

 3    member of the conspiracy.  We believe at the invitation of

 4    the co-defendant Mr. Book a Lee knee.  In the course of this

 5    conspiracy Mr. Book a Lee knee obtained again Wayne credit

 6    cards numbers again we believe they were skim had from the

 7    users have taxicabs in the none tree all area.  Those

 8    persons can both can aid E. and and European citizens many

 9    at some point the C. C. numbers with brought to the United

10    States biz conspirators and the numbers with even encoded

11    this to blank gift starred stock at which point those

12    guideline range cards became the functional equivalent of

13    counterfeit debit cards.  Overstaff recall into period

14    between about may and September have 2016 their low and

15    other co-conspirators used these counterfeit access device

16    did he say to obtain approximately a hundred thousand

17    dollars in money from banks in Vermont give use the

18    counterfeit C. C. cards at ATM's to withdraw cash.  Mr. Low

19    himself came to the United States in the company of sear un

20    charged co-conspirator on September 22, 2016.  He stayed

21    approximately three days and during that period among other

22    things, he used counterfeit C. characterize to obtain money

23    from banks in Vermont.

24             In the course of the conspiracy the defendant and

25    others committed the overt acts that are charge inned the
```

1    indictment specifically on September 22 have 2016 their

2    throw traveled from Canada into Vermont for the purpose of

3    participating in the C. C. fraud.

4    Q.    Mr. Low, has the prosecution accurately described the

5    offense and your role in it?

6    A.    Yes, Your Honor.

7    Q.    And do you dieses agree with any portion of the

8    prosecutions description of you conduct?

9    A.    No, Your Honor.

10   Q.    And do you intend to plead guilty to count one, the

11   conspiracy to commit access device fraud or C. C. fraud

12   because you r in fact guilty of that charge?

13   A.    Yes, Your Honor.

14   Q.    How do you plead to count one guilty or not guilty?

15   A.    Guilty.  It's the find thing of the Court in the case

16   of United States verse he is bran ton low that the defendant

17   is fully competent and capable of entering an informed plea

18   the defendant is aware of the nature of the charges answer

19   the consequences of the plea and the plea of Guilty Street a

20   take forward basis in fact contains each of the essential

21   elements of the offense.  The plaintiff flee is therefore

22   accepted and the defendant is adjudged guilty of that

23   offense.  I'll set sentencing date in a minute at this time

24   and talk to you about what will happen between now and then.

25   A principle think is a Pre-Sentence Report there been

```
1    prepared by the probation office to assist the judge in
2    sentencing T. the probation officer is here today.  I know
3    she'll speak with you and Mr. Matson at the other ends of
4    this hearing.  You'll be asked to give information for this
5    report.  Your attorney will be present for any interview if
6    you wish.  At the sentencing hearing before the sentencing
7    hearing the Court will permit you and your attorney to read
8    the Pre-Sentence Report and file any objection to the report
9    before the hearing.  At the hearing you and your attorney
10   will both of a opportunity to speak to you behalf.  I'll
11   refer the case to the probation officer for a Pre-Sentence
12   Report and well E. set a sentencing date.
13           THE CLERK:  Sentencing is satisfied waled for
14   Thursday December 28 at 1:30 here in Rutland slammed.  Again
15   that's Thursday December 28 at 1:30 in Rutland.
16           THE COURT:  All right.  Mr. Waples any objection
17   their lows continued release on candescent.
18           MR. RULEY:  No I believe the defense can neat it
19   is burden when I proving by clear and convincing evidence
20   that Mr. Low does not prove to be either aiding error is a
21   risk of flight.
22           THE COURT:  Good.  Thank you many anything further
23   from seat other side.  I appreciate your help T. all right.
24   Good enough.
25           MR. CHEFFO:  So fish all lie on the record the
```

1    defense street withdrawing the previously filed motion to

2    suppress.

3              THE COURT:  Good enough.  Well E. insurance it

4    that way.  Thank you both.

5              The Court recessed at 12:14 p.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3         I, Anne Marie Henry, Official Court Reporter for

 4    the United States District Court, for the District of

 5    Vermont, do hereby certify that the foregoing pages are a

 6    true and accurate transcription of my shorthand notes taken

 7    in the aforementioned matter to the best of my skill and

 8    ability.

 9
                             _____
10

11                              Anne Marie Henry, RPR
                                Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```