# EXHIBIT 21

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| **JAMES D. SULLIVAN and LESLIE** | ) | |
| **ADDISON, WILLIAM S. SUMNER, JR.,** | ) | |
| **RONALD S. HAUSTHOR, GORDON** | ) | |
| **GARRISON, TED and LINDA CRAWFORD,** | ) | |
| **and BILLY J. KNIGHT,** | ) | |
| **Individually, and on behalf of a Class of** | ) | |
| **persons similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 5:16-cv-000125-GWC** |
| **v.** | ) | |
| | ) | |
| **SAINT-GOBAIN PERFORMANCE** | ) | |
| **PLASTICS CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## EXPERT REPORT OF EDGAR C. GENTLE, III, ESQ.

1.      I have been asked to provide this report as a Medical Monitoring administration

expert respecting the proposed Medical Monitoring Program, recommended in the expert report of

Alan Ducatman, M.D., in the above-styled matter (the "Bennington Medical Monitoring Program").

In preparing this report, I have reviewed the following documents: Area-of-Interest Bennington,

State of Vermont map; Declaration of Alan Ducatman, M.D.; Plaintiffs' Memorandum in Support

of Motion for Class Certification; Reports of Alan Ducatman, M.D.; Vermont Health Department:

Exposure to Perfluorooctanoic Acid (PFOA) in Bennington and North Bennington, Vermont: Results

of Blood Testing and Exposure Assessment (September 2017; Declaration of Richard Spiese; Third

Amended Complaint; and the Decision on Motion to Compel Production of Medical Records and

Information.

1

2.      My education and experience are summarized as follows. I have been a licensed attorney, practicing in the State of Alabama, since September 25, 1981. As part of my practice, I have had the opportunity to serve as the Special Master or Claims Administrator of the Settlements depicted in my resume attached as Exhibit A. In that capacity, I have had the opportunity to administer medical testing as well as medical clinics in <u>Tolbert et al. v Monsanto Company, et al.,</u> in the United States District Court for the Northern District of Alabama, Southern Division, Civil Actions No. 2:01-cv-1407-UWC and 2:02-cv-0836-UWC (the "Tolbert Case"); <u>Lenora Perrine, et al. v. E.I. DuPont De Nemours & Company, et al.,</u> in the Circuit Court of Harrison County, West Virginia, Civil Action No. 04-C-296-2, before the Honorable Thomas A. Bedell, having been appointed in 2009 (the "Perrine Case"); and, <u>In Re: Mingo County Coal Slurry Litigation,</u> in the Circuit Court of Ohio County, West Virginia, Civil Action No. 10-C-5000, before the Honorable James P. Mazzone, having been appointed in 2013 (the "Mingo Case"). I have been involved in the creation and administration of a variety of mass tort settlements with expenditures exceeding a total of $2 Billion.

3.      In serving as Administrator of these above three medical programs, two being for medical monitoring, and one being for a claimant medical testing facility and clinic, we usually provide the following services:

A.      Participants are recruited and registered for the program. We confirm or deny patient medical monitoring eligibility. Participant addresses are updated, and the participants are encouraged to participate and are updated about the program with newsletters and periodic on the ground meetings. We often convene a small claimants committee to facilitate this process.

B.      We budget and financially administer the program, providing counsel for the Parties Financial Reports and preparing budgets, accountings and tax returns for the program. We review

2

and pay program expenses with sound accounting internal controls. We often use a Qualified Settlement Fund (a "QSF") in Medical Monitoring Administration as a means by which Settlement funds are held and disbursed as approved by the Court.

   C.  We organize and conduct periodic oversight meetings with a finance committee (comprised of Party representatives and ourselves), the program third party administrator described below and the claimants committee.

   D.  We facilitate the compilation of medical monitoring and epidemiological study data for use in monitoring planning and possible research while safeguarding participant confidentiality.

   E.  We often provide on-the-ground presence for medical monitoring programs by utilizing a local office to interface with participants and medical staff. By having a local office, we are often able to answer any questions and assist participants in a more timely fashion and be more accessible to the participants.

   F.  We charge for our services at hourly rates agreed to by the finance committee and within a budget. We have found that our administrative expenses run on average 10% of program outlay.

   4.  Based on our administrative experience, we recommend that the following medical monitoring program design parameters be followed in the Bennington Medical Monitoring Program:

   A.  Participant Time is Valuable. To recognize that the participant is taking the time to participate, participant monetary incentives for each stage of the program are recommended, including program recruitment and registration, and program participation. In the Mingo and Tolbert Cases, participants received a personal injury payment before Medical Monitoring began, which acted as an incentive for the participants to register for the medical monitoring program. In the Perrine case, Medical Monitoring Class Members were originally paid an initial registration cash payment of $200 for their verified registration. The Perrine Court, as found in Exhibit B, increased this registration cash payment to $400.

B.     Use a Retail Model. To facilitate claimant convenience and save money for the program, we suggest that the program use a retail HMO[1] model where a third party administer like CTIA, with whom we worked in the Tolbert Case and the Perrine Case, negotiates with participating medical providers a per unit of medical monitoring services price by CPT code[2], and where more than one medical practitioner can participate, if necessary. This retail approach encourages claimant participation, runs the program more economically and facilitates claimant convenience by providing a choice of medical providers and monitoring times, if necessary. It facilitates use of doctors the participants already know and trust, with the doctors recommended by the participants being identified in the participant registration process through the use of a simple questionnaire.  It costs the program nothing extra, because only units of service are being paid for. In the Tolbert program, we initially used one clinic with a wholesale model (paying participating doctors and overhead) which put economic stress on the Settlement.  Switching to a referral model allowed us to balance the Tolbert Case budget.  In the Perrine Medical Monitoring Program, participants are given the option of using a number of doctors, many of whom were already their primary care physicians. Utilizing the CPT code rates, participating physicians are paid uniformly.

C.     Follow One Step and not Two. The two steps, of a blood draw, then looking at the results and asking the claimant to come back for a second visit and wellness exam isn't recommended. The participants often don't come back. Instead, we have found that a one step

---

[1] A Health Maintenance Organization ("HMO") is a type of health insurance plan that usually limits coverage to care from doctors who work for or contract with the HMO.  It generally will not cover out-of-network care except in an emergency.  An HMO may require a participant to live or work in its service area to be eligible for coverage.  HMOs often provide integrated care and focus on prevention and wellness.

[2] The Current Procedural Terminology ("CPT") code set is a medical code set maintained by the American Medical Association through the CPT Editorial Panel.  The CPT code set describes medical, surgical, and diagnostic services and is designed to communicated uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes.

4

approach of a blood draw and a consultation in the same participant visit is more efficient and complete. The participant is then sent a confidential letter with the test results.

D.      Participant Data Can Only Be Used for Research by Consent. To facilitate use of the resulting medical monitoring data for scientific research, we suggest that participants be given the option of consenting to such use of their data in a de-identified manner. An example of a participant consent and the Order approving the form is attached as Exhibit C. With encouragement, we found the consent rate usually to exceed 90%.

E.      If You Can't Load Data, You Can't Use It. Uniformity is the key to using the data for the participants' medical benefit in the future and for possible valuable future research data. For example, you need a uniform monitoring patient medical exam interview form SO THE DATA CAN BE LOADED into a database, for retrieval by the participant's doctor or for future research. We strive to keep this data uniform so information may be retrieved for a participant should there be a medical necessity for providing it.

F.      Collect Data Efficiently. Coupling an epidemiological survey on the front end with medical monitoring itself instead of sending them to the participants later hoping they will fill them out will result in the data actually being collected.

5.      I was the Claims Administrator for the Tolbert Case, having been appointed at Thanksgiving 2003. As Claims Administrator, I was responsible for conducting all the blood tests for the Tolbert Case and making all the resulting Claimant Benefit Payments from the Tolbert Fund. The medical aspects of the Tolbert Case concluded in October 2016.

6.      Under the terms of the Settlement, the Tolbert Claimants are also entitled to receive periodic testing, primary and preventive care; dental  and prescription drug benefits for a period of time, at the Tolbert Healthcare Clinic.

7.      CTIA acted as the third party administrator of the testing and medical  benefits.

5

8. I am also the Claims Administrator for the Perrine Case, which includes a 30 year biennial (every two years) Medical Monitoring Program that began in November 2011 and concludes in November 2041. As the Claims Administrator, I am responsible for supervising the Medical Monitoring Program.

9. In the Perrine Case, we also engaged CTIA to act as the third-party administrator. As part of the Program, CTIA calls participants to schedule their appointments with the approved providers in the vicinity of Spelter, West Virginia. Participants that live outside of a 50 mile radius are considered "out of area," with a different protocol that enables the participants to see their own physician if verified by the plan first. The Program staff attempts to call these "out of area" participants two times.

10. The Program staff also works with the approved primary care physician clinics to update the scheduling times they have available for scheduling appointments.

11. Pursuant to the Program, CTIA provides the biennial testing to participants as follows:

> Under Age 15 – Blood Test Only
> Age 15-17 -Blood and Urinalysis Test.
> Age 18 and older - Blood, Urinalysis, & Stool Sample Test
> Age 35 and older are eligible for CT Scans (if they meet testing protocols)

12. In addition to the above in paragraph 10, participants who are 15 years old and above may be tested for urinary system problems, cancer, and gastrointestinal system problems, and participants who are 35 years old and above may also be tested for lung cancer.

13. CT scans may be provided only when a competent physician determines the CT scan is diagnostically medically necessary as relevant to the possible exposure to heavy metals. If a CT scan is needed for a female participant from the age of 35-55, she must have a pregnancy test performed, which is paid by the plan.

6

14. Lab testing (per the Biennial Testing Protocols) is performed by the contracted primary care physicians at participating clinics that the Plan has negotiated set fees. The labs are then sent to LabCorp, with whom the Plan has also negotiated steep discounts for evaluation.

15. <u>During the same visit</u>, the Primary Care Physician ("PCP") performs a whole body physical examination. Participants are to be told from the PCP that the plan only pays for testing, and any treatment is not covered under the Program, using a uniform wellness study form. The clinic will mail the results of the lab test to the participants and contact them by telephone if additional testing or a referral to a specialist is necessary. If a referral to a specialist is necessary, the clinic will also send a referral sheet stating where the specialist location is and to remind the participant what is covered under the medical monitoring plan.

16. If either the results from the initial Primary Care Visit or the lab results come back abnormal, the participant will be referred from the PCP clinic to a participating specialist in the Medical Monitoring Plan. The specialists included in the plan are: Dermatology, Nephrology, Urology, Gastroenterology, Psychology, Anesthesiology, Radiology, Pulmonology, Toxicology, and Cardiothoracic Surgeon. Participants are to be told by the Specialists that the plan only pays for testing, and any treatment is not covered under the plan.

17. The Primary Care Clinic, LabCorp, and the Specialist that participate in the plan send their claims electronically to CTIA for adjudication according to the Plan's protocols and guidelines. CTIA verifies the participant is an eligible participant in the Medical Monitoring Plan and verifies the charges are covered under the plan and pays according to the negotiated rates.

18. CTIA also has an established encrypted portal with LabCorp to receive all the laboratory results. CTIA then identifies the data and only keeps the data allowed from the participants who have authorized CTIA to keep it for research purposes.

7

19.     Quarterly meetings with a Finance Committee (with representatives of the Parties), myself, a Class Committee and CTIA are held to review the success and efficiency of the Perrine Case, just as we do with the Tolbert Case.

20.     As the Claims Administrator in the Mingo Case, I am responsible for conducting the 30 year biennial medical monitoring testing.

21.     In the Mingo Case, the Court approved a Medical Monitoring Plan, that provides the protocols for medical testing of adults and children.

22.     For any Settlement that I administer, my office has protocols and guidelines in place that are strictly adhered to with respect to medical testing, in order to adequately and properly administer Settlements, as well as maintain confidentiality.

23.     In my experience, our staff and Clinics have thoroughly followed the protocols developed for each of the Settlements in which I have been involved. An audit of the Clinics is often performed at my direction so that I can confirm that the Settlement protocols are being followed.

**FURTHER THE AFFIANT SAYETH NOT.**

Edgar C. Gentle, III

Sworn to and Subscribed
this _15th_ Day of December, 2017.

Jacqueline R. Rhodes
Notary Public      **My Commission Expires:**
                   **August 2, 2020**
[Notary Seal]

8

# Schedule of Exhibits

Exhibit A:                    Resume of Edgar C. Gentle, III, Esq.

Exhibit B:                    Incentive Order

Exhibit C:                    Consent to Use of Participant Data for
                              Research

# EXHIBIT A

# Resume of Edgar C. Gentle, III, Esq.

November 2, 2017

## CURRICULUM VITA

| | |
|---|---|
| **Name of Attorney**: | Edgar C. Gentle, III, Esq. |
| **Name of Firm**: | Gentle, Turner, Sexton & Harbison, LLC |
| **Profession**: | Attorney |
| **Date of Birth**: | February 17, 1953 |
| **Years with Firm**: | 25 |
| **Nationality**: | U.S.A. |
| **Memberships in Professional Societies**: | Admitted to Alabama State Bar (1981) and various Federal District Court and Appellate Court Bars |

### A.    Key Qualifications

Ed Gentle was born in Birmingham, Alabama, February 17, 1953. He graduated summa cum laude in 1975 from Auburn University—where he was a Danforth Scholar and earned a Bachelor of Science degree. In 1977 he received a Master of Science (summa cum laude) from the University of Miami as a Maytag Fellow—where he became familiar with the law of the sea and international resource planning issues involving competing nations.

He was a Rhodes Scholar (Auburn's second and Miami's first) at Oxford University—where he earned a B.A. degree with honors in Jurisprudence in 1979 and a M.A. degree in 1980. He then attended the University of Alabama School of Law as a Hugo Black Scholar. He earned his J.D. and was admitted to the Alabama State Bar in 1981.

Mr. Gentle has comprehensive experience in serving as Special Master and Claims Administrator in Mass Tort Litigation, and providing claims administration and financial and business advice to Courts, Settling Parties, and Mass Tort Settlements. Approximately 90% of his professional time is devoted to this practice. He has helped create and administer over $2 Billion in Settlements during the past 25 years. He has also provided affidavit, deposition and hearing testimony on the fairness of Mass Tort Settlements.

From 1992 to 2014, Mr. Gentle served as Special Master and Escrow Agent for the MDL 926 Global Breast Implant Settlement, paying $1.2 Billion in claims for 300,000 claimants. From 2001 until 2003, he was Interim Financial Advisor for the Settlement Facility - Dow Corning Trust (the Dow

-1-

Corning Breast Implant Settlement) overseeing the investment of over $1 Billion and providing tax and accounting support for the Settlement, during part of Dow Corning's Chapter 11 Bankruptcy.

Commencing in December 2003, Mr. Gentle was appointed as the Settlement Administrator in the $300 Million Anniston, Alabama Tolbert PCB Settlement with Monsanto and Solutia in connection with the administration of a Global Settlement before the Federal District Court for the Northern District of Alabama applicable to 18,000 claimants with respect to PCB contamination of property and PCB personal injury claims. In administering the $300 Million settlement, Mr. Gentle designed the claimant payment program for property damage and personal injury, collected criteria for payments to each of the 18,000 claimants, ranked the claimants for payment amounts, satisfied private and government liens, and remitted payments to each of the claimants. The Settlement also provided primary medical and dental care and prescriptions to claimants, with this portion of the settlement being completed in 2016.

One of Mr. Gentle's specialties is serving as Settlement Administrator for Community Tort Settlements, such as a C-8 groundwater contamination case in Camden, New Jersey (with water filtration and damages), Warehouse Fire Settlements in Conyers, Georgia and Louisville, Kentucky (personal injury and property claims), Zinc Smelter Settlements in Spelter, West Virginia (medical monitoring and property remediation) and Blackwell, Oklahoma (property remediation), a coal slurry groundwater contamination Settlement in Mingo County, West Virginia (medical monitoring), and two train wrecks in Kentucky, one in Alabama and one in West Virginia (personal injury and property claims).

In November, 2009, Mr. Gentle was appointed Claims Administrator in the Jefferson County, Alabama, Occupation Tax Refund Case before the Honorable David Rains, in the Circuit Court of Jefferson County. On May 14, 2010, the Supreme Court of Alabama upheld the $37 Million Judgment. The Parties entered into a Settlement, which was approved by the Court, and tax refunds were issued to over 300,000 claimants. The case was completed in 2014.

In June 2010, Mr. Gentle was appointed Special Master and Settlement Administrator in the Total Body Multi-district Litigation, MDL 1985. Working closely with the Court, Mr. Gentle facilitated the aggregate settlement of all cases, in August 2010. Mr. Gentle and his staff determined the value of each of the settled cases, which was consented to by all Plaintiffs, and Mr. Gentle administered the Settlement, satisfied private and government liens, and paid all claimants, which was completed in 2013.

Mr. Gentle is Special Master in the national MDL Blue Cross Antitrust Litigation, MDL 2406, with putative provider and subscriber classes, before the Honorable R. David Proctor, having been appointed in 2012. The case has 3 groups of litigants: the Policy Subscribers, the Medical Providers and the 37 Blue Cross cases.

From 2012 to 2014, Mr. Gentle, as Special Master, facilitated the creation and administration of a 93 claimant settlement with an undisclosed manufacturer and hospital concerning CT-Scan radiation exposure.

In 2013 and 2014, Mr. Gentle administered four separate Pfizer Chantix Aggregate Settlements, designing the payment matrix, handling claimant appeals, resolving liens, and paying claimants.

In 2014, Mr. Gentle was appointed Plaintiff Lien Administrator for the Hydroxycut Settlement.

In 2015, 2016, and 2017, Mr. Gentle was hired by Smith & Nephew and Plaintiffs' Counsel to facilitate three Memphis, Tennessee aggregate settlements involving artificial hips and to resolve related plaintiff liens.

In May 2016, Mr. Gentle was appointed Claims Administrator by the Escambia County, Florida, Circuit Court in <u>Allen v. A.E. New</u>, the Pensacola jail fire and explosion case, to facilitate the potential settlement of the case.

In October 2016, Mr. Gentle was appointed Special Master by the Fulton County, Georgia, Circuit Court in <u>Smart v. Brenntag</u>, to carry out the administration of a chemical spill settlement.

In September 2017, Mr. Gentle was appointed Claims Administrator for a GE factory fire in Louisville, Kentucky.

In October 2017, Mr. Gentle was appointed Special Master by the West Virginia Federal District Court for the Southern District of West Virginia to administer the Mt. Carbon 400 claimant aggregate trail derailment settlement with <u>Sperry</u> (personal injury and property damage).

In October 2017, Mr. Gentle was appointed Escrow Agent for the Common Benefit Fund in the <u>Storz Morcellator Litigation</u> in the Superior Court of California, of Los Angeles County.

**B.**   **Education**

| Class Rank | School |
|---|---|
| 4 | J.D., University of Alabama School of Law 1981 (Hugo Black Scholarship) |
| Middle | M.A., Jurisprudence, Oxford University 1980 (Rhodes Scholarship) |
| Middle | B.A., Honours Jurisprudence, Oxford University 1979 (Rhodes Scholarship) |
| 1 | M.S., <u>Summa Cum Laude</u>, University of Miami 1977 (Maytag Fellowship [washing machines]) |
| 1 | B.S., <u>Summa Cum Laude</u>, Auburn University 1975 (Danforth Scholarship [Purina]) |

## C.    Employment Record

June 1992 - Present

Gentle, Turner, Sexton & Harbison, LLC
Managing Partner
Birmingham, Alabama

September 1991 - June 1992

Miller, Hamilton, Snider & Odom
Partner
Manager of Birmingham, Alabama Office

January 1987 - September 1991

Schoel, Ogle, Benton, Gentle & Centeno
Partner
Birmingham, Alabama

December 1985 - January 1987

Law Offices of James L. North
Associate
Birmingham, Alabama

June 1983 - December 1985

AT&T
Senior Staff Attorney
Atlanta, Georgia

May 1981 - June 1983

North, Haskell, Slaughter, Young & Lewis
Associate
Birmingham, Alabama

## D.    Contact Information

**Website: www.gtandslaw.com**

E-mail address:  egentle@gtandslaw.com

Telephone number:    205-716-3000

Fax number:          205-716-3010

Cell Phone:          205-560-2533

## E.    References

The Honorable Thomas A. Bedell
Circuit Court Judge of Harrison County, West Virginia
Harrison County Courthouse
301 West Main Street, Room 321
Clarksburg, West Virginia 26301
(304) 624-8593

Kevin W. Thompson, Esq.
Thompson Barney
2030 Kanawha Boulevard East
Charleston, WV 25311
(304) 343-4401
Email address: kwthompsonwv@gmail.com

Kim West, Esq.
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, Alabama 35209
(205) 870-0555
Email address: kwest@wallacejordan.com

Van Bunch, Esq.
Bonnett, Fairbourn, Friedman & Balint, P.C.
2325 E. Camelback Road, Ste 300
Phoenix, Arizona 85016
(602) 274-1100
Email address: vbunch@earthlink.net

The Honorable U. W. Clemon
Retired Federal District Court Judge
5202 Mountain Ridge Parkway
Birmingham, Alabama 35222
(205) 837-2898
Email address: clemonu@bellsouth.net

The Honorable R. David Proctor
United States District Court Judge
Hugo L. Black U. S. Courthouse, 7th Floor
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205) 278-1982

The Honorable Karon O. Bowdre
United States District Court Judge
Hugo L. Black U. S. Courthouse
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205) 278-1802

The Honorable T. Michael Putnam
Magistrate Judge
Hugo L. Black U. S. Courthouse
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205) 278-1900

Robert B. Roden, Esq.
Shelby, Roden & Cartee
2956 Rhodes Circle
Birmingham, Alabama 35205
(205) 933-8383
Email address: bob@shelbyroden.com

Virginia Buchanan, Esq.
Levin, Papantonio, Thomas, Mitchell, Rafferty and Proctor, P.A.
316 South Baylen Street
Pensacola, FL 32502
(850) 435-7023
Email address: vbuchanan@levinlaw.com

J. Farrest Taylor, Esq.
The Cochran Firm
111 East Main Street
Dothan, Alabama 36301
(334) 673-1555
Email address: farresttaylor@cochranfirm.com

Chris Hellums, Esq.
1100 Park Place Tower
2001 Park Place North
Birmingham, Alabama 35203
(205) 322-8880
Email address: chrish@pittmandutton.com

Lewis C. Sutherland, Esq.
Vinson & Elkins, LLP
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
(713) 758-2367
Email address: lsutherland@velaw.com

# EXHIBIT B

# Incentive Order

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

LENORA PERRINE, et al.,

        Plaintiffs,

v.

                                     Case No. 04-C-296-2
                                     Judge Thomas A. Bedell

E. I. DUPONT DE NEMOURS &
COMPANY, et al.,

        Defendants.

## FINAL ORDER INCREASING MEDICAL MONITORING VERIFIED REGISTRANT CASH PAYMENT FROM $200 TO $400

Presently before the Court is the Claims Administrator's request to increase the Medical Monitoring Verified Registrant cash payment from $200 to $400, based upon the registration rate experienced in the first two months of the six month Medical Monitoring Program registration period.

After a careful review of the Claims Administrator's submission, and in consideration of the applicable law, the Court **ORDERS** that the proposal is hereby **APPROVED** and shall be carried out during the administration of the Settlement. Medical Monitoring Verified Registrants who have previously received a $200 cash payment shall receive the additional $200 cash payment as soon as possible, and future cash Medical Monitoring Verified Registrant payments shall equal $400, pending further Orders of this Court.

**IT IS SO ORDERED.**

The Clerk of this Court shall provide certified copies of this Order to the following:

Stephanie Thacker, Esq.
Allen, Guthrie & Thomas, PLLC
P.O. Box 3394
Charleston, WV 25333-3394
DuPont's Finance Committee Representative

Meredith McCarthy, Esq.
Guardian Ad Litem for Children
901 W. Main St.
Bridgeport, WV 26330

Virginia Buchanan, Esq.
Levin, Papantonio, Thomas, Mitchell,
    Rafferty & Proctor, P.A.
P.O. Box 12308
Pensacola, FL 32591
Plaintiffs' Finance Committee Representative

This Order Agreed to By:

_Stephanie D. Thacker_
Stephanie Thacker, Esq.
Allen, Guthrie & Thomas, PLLC
P.O. Box 3394
Charleston, WV 25333-3394
DuPont's Finance Committee
Representative

_Virginia Buchanan_
Virginia Buchanan, Esq.
Levin, Papantonio, Thomas, Mitchell,
    Rafferty & Proctor, P.A.
P.O. Box 12308
Pensacola, FL 32591
Plaintiffs' Finance Committee/Representative

2.

_(signature)_

Meredith McCarthy, Esq.
Guardian Ad Litem for Children
901 W. Main Street
Bridgeport, WV 26330


Order Prepared By:

_(signature)_

Edgar C. Gentle, III, Claims Administrator
Gentle, Turner & Sexton
P. O. Box 257
Spelter, WV 26438


_(signature)_

Michael A. Jacks, Esq.
Gentle, Turner & Sexton
W.Va. Bar No 11044
Gentle, Turner & Sexton
P. O. Box 257
Spelter, WV 26438


ENTER: _April 28, 2011_

_(signature)_

Thomas A. Bedell, Circuit Judge


3

# EXHIBIT C

# Consent to Use of Participant Data for Research

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

LENORA PERRINE, et al., individuals
residing in West Virginia, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

v.

                               Case No. 04-C-296-2
                               Thomas A. Bedell, Circuit Judge

E. I. DUPONT DE NEMOURS &
COMPANY, et al.,

        Defendants.

## ORDER RESOLVING PENDING MEDICAL MONITORING PROGRAM ISSUES IN PREPARATION FOR NOVEMBER 1, 2011 IMPLEMENTATION DATE

Presently before the Court are the unresolved issues described below and related to the November 1, 2011 implementation of the Medical Monitoring Program.

In order to allow the Parties to be heard on these issues and all other issues related to the implementation of the Medical Monitoring Program, this matter came on to be heard on October 17, 2011, at 10:00 o'clock a.m., and said hearing was held before the Honorable Thomas A. Bedell, Judge of the Circuit Court of Harrison County, West Virginia, in the Division 2 Courtroom located on the 4th Floor of the Harrison County Courthouse, 301 West Main Street, Clarksburg, West Virginia.

At the Hearing, the Claims Administrator submitted his Report respecting the recommended resolution of the issues, while presenting the alternative positions of the Parties. Also appearing was Dr. Jubal Watts, an expert sponsored by the Claims Administrator, to address the CT Scan issue. The Claims Administrator and Dr. Watts subjected themselves to cross-examination by the Parties, with the Claims Administrator, as a neutral for the Court, then

resting. Class Counsel, the Guardian ad Litem for Children and DuPont then presented their positions for the Court's consideration.

After a careful review of the Claims Administrator's submission and the submissions of the Parties, and having weighed the evidence and the presentations made at the October 17, 2011 hearing, and in consideration of the applicable law, the Court ORDERS the following:

1.   The Parties have stipulated that the Medical Monitoring Program is a primary plan for medical testing benefits, with DuPont being responsible for all costs thereof.  The Court accepts this stipulation of the Parties.

2.   To facilitate the collection of Medical Monitoring Plan data for possible future scientific and medical research, the Court hereby approves the use by the Medical Monitoring Plan of the final Optional Data Collection Consent Form submitted by the Claims Administrator in Attachment II to his October 10, 2011 Report, with Claimants being allowed to complete and sign the Form, at their option, during their initial Medical Monitoring Provider visit.

3.   The Court has carefully considered the positions of the Guardian ad Litem and DuPont on how to handle "No" box minor Medical Monitoring Claimants, whose parent or guardian checked the "No" box and therefore did not choose Medical Monitoring, when these minor "No" box Claimants become adults.   The Court further considered their positions on when an "Inactive" Medical Monitoring Claimant (a Claimant who signed up for Medical Monitoring but then fails to use it) may become "Active" again.

The Guardian ad Litem suggests that the Medical Monitoring Plan is a right which cannot be waived through a lack of use by a Claimant, while DuPont argues that the Medical Monitoring Plan is a right that can be waived by a Claimant through lack of use.

2

DuPont also objects to the use of resources to continue to notify such inactive Claimants of the Program and invite them back in.  DuPont, however, does not object to current minors whose parents have marked the "no" box on their behalf being notified once they turn 18 and given the option themselves of participating in the Program.  But, DuPont contends that this should be a one-time notification.

Although this is a difficult issue, the Court makes the following determination:

The Medical Monitoring Plan is a right of a Claimant that cannot be waived, with such a waiver not being reflected anywhere in the Settlement Memorandum of Understanding ("MOU") or any related Orders.  The Court therefore decides that the Claims Administrator's suggested procedures to notice these Claimants, with the procedures being contained in Attachment III to the Claims Administrator's October 10, 2011 Report, are well taken and are hereby approved.

4.  In connection with CT Scans, the Court has carefully reviewed the proposed CT Rule and CT Scan Verification Form provided by the Claims Administrator in his October 10, 2011 Report, as modified on October 19, 2011, based on the October 17, 2011 hearing.  The Court understands that DuPont supports the Claims Administrator's suggested approach to CT Scanning and these related forms, but the Guardian ad Litem for Children and Class Counsel suggest that there first be baseline CT scanning made available to all CT Scan eligible Claimants during their first round of Medical Monitoring, and for younger Claimants as they reach age 35, with the CT Rule and the CT Scan Verification Form suggested by the Claims Administrator then being implemented thereafter.

After careful consideration of the submission of the Claims Administrator and the positions of DuPont, the Guardian ad Litem for Children and Class Counsel in this matter, the Court hereby makes the following determination:

3

The approach suggested by the Claims Administrator best carries out the terms of the MOU which provide that:

> "The program shall provide those examinations and tests set forth in the Court's Order of February 25, 2008 with the exception that <u>no routine CT Scans shall be performed as part of the Medical Monitoring Program</u>. The Defendant does agree to provide CT Scans that are diagnostically medically necessary as determined by a competent physician as relevant to <u>possible</u> exposure to the heavy metal contamination at issue in this litigation." [Emphasis added].

That is, CT Scans cannot be baseline or routine even at the commencement of Medical Monitoring. However, as suggested by all Parties, the Claims Administrator's CT Rule and CT Scan Verification Form vouchsafes the diagnosis of a CT Scan by the attending physician for a decision. Exposure to heavy metals and not a specific diagnosis are all that is required to diagnose a CT Scan.

5. The Claims Administrator has submitted his proposed Budget for Medical Monitoring implementation from November 1, 2011 through August 31, 2012, which is divided into (i) a separate Medical Monitoring Implementation Budget <u>without</u> incremental CT Scan Costs totaling $1,977,207.41 and (ii) an incremental CT Scan Costs Budget, in an effort to ensure the timely commencement of Medical Monitoring on November 1, 2011 even if the CT Scan issue is further litigated.

The two major objections by DuPont to the finalization of the Budget at this time are that the number of Medical Monitoring Participating Claimants is unknown and the Medical Monitoring Medical Provider prices are not finalized.

However, as suggested by the Claims Administrator in his Report and in his Budget and supporting documentation in Attachment VII thereto, a materially accurate projection of the number of Medical Monitoring Participating Claimants was provided on October 3, 2011, and totals 4,000. In addition, Medical Monitoring Provider contracts are in the process of being

finalized, with a letter containing the prices, that was previously vetted with the Parties, having been submitted to the Providers on October 6, 2011, and with Medical Provider contracts; after vetting with the Parties, having been submitted to the Providers for review and possible signature.

The Court also understands that the Medical Monitoring prices that were ably negotiated by CTIA, the Third Party Administrator, are substantially below that originally budgeted on August 19, 2011. The Court therefore finds that these two variables have been reasonably established so that setting a Budget now, funding it by October 31, 2011, and commencing the Medical Monitoring Program on November 1, 2011 are appropriate.

Respecting the second component of the Medical Monitoring Budget, the amount of funding necessary to fund CT scans, the Claims Administrator reports that the amount of funding required depends on (i) whether the CT Rule and CT Scan Verification Form suggested by the Claims Administrator are implemented at the beginning of the Medical Monitoring Plan; or (ii) the baseline CT Scan approach suggested by Class Counsel and the Guardian ad Litem is implemented at the beginning of the Medical Monitoring Plan and as younger Claimants reach age 35; (iii) with the Incremental CT Scan Budget under the Claims Administrator's Proposal being $839,302.10 and with the incremental CT Scan Budget under Class Counsel's and the Guardian ad Litem's proposal being $1,192,414.93.

After carefully considering this matter, the Court makes the following decision:

The Claims Administrator's approach to CT Scans is the correct one, so that the Incremental CT Scan Budget is $839,302.10.

THEREFORE, THE FIRST ALTERNATIVE MEDICAL MONITORING BUDGET IS APPROVED AND THE NEW CONTRIBUTION OF DUPONT TO THE MEDICAL MONITORING FUND DUE TO BE PAID OCTOBER 31, 2011 (FOR NON-CT SCAN AND FOR CT SCAN MEDICAL MONITORING) IS $2,789,984.94.

6.  In his August 24, 2011 and September 1, 2011 Reports to the Court, the Claims Administrator suggested that the Court consider whether DuPont should pay an additional $26,524.57 for expenses incurred by CTIA, the Third Party Administrator for the Medical Monitoring Plan, during September and October 2011, as being post-implementation expenses, or whether these expenses should be paid from old money already contributed by DuPont at Settlement, as pre-implementation expenses.  In his October 10, 2011, Report, the Claims Administrator now suggests that these expenses are not materially great and the appropriate payment is debatable.  He also reports that approximately half of this amount, or $15,440, is attributed to monthly charges of CTIA under its contract with the Settlement, which are not directly related to actual testing. The other costs are for communications materials, production and distribution of ID cards, and the scheduling of appointments and reminder letters and design consulting services. Although some of these costs are reasonably related to actual testing, there is a reasonable basis to find that none of them deal with testing itself until the testing actually begins.

Therefore, the Court accepts the Claims Administrator's proposal that these Bridge Funding expenses will be paid from the initial $4,000,000.00 previously paid by DuPont to start up the Medical Monitoring Program.

7.  In his October 14, 2011 Supplement to his October 10, 2011 Report, the Claims Administrator describes a Medicare reporting compliance proposal without admitting that Medicare is applicable to the Medical Monitoring Program.  One of the Class Counsel has challenged the need for such reporting, while the Claims Administrator suggests that it is prudent.

After considering this matter carefully, the Court decides the following:

The Claims Administrator is hereby authorized to carry out the Medicare reporting proposal.

**IT IS SO ORDERED.**

Finally, it is **ORDERED** that the Clerk of this Court shall provide certified copies of this Order to the following:

David B. Thomas
James S. Arnold
Stephanie Thacker
Guthrie & Thomas, PLLC
P.O. Box 3394
Charleston, WV 25333-3394

Meredith McCarthy
901 W. Main St.,
Bridgeport, WV 26330
*Guardian ad litem*

Virginia Buchanan
Levin, Papantonio, Thomas, Mitchell,
    Eshner & Proctor, P.A.
316 South Baylen St., Suite 600
Pensacola, FL 32591

J. Farrest Taylor
Cochran, Cherry, Givens, Smith
    Lane & Taylor, P.C.
163 West Main Street
Dothan, AL 36301

Edgar C. Gentle, III
Michael A. Jacks
Gentle, Turner & Sexton
P. O. Box 257
Spelter, WV 26438
*Special Master*

ENTER: *October 21, 2011*

Thomas A. Bedell, Circuit Judge

7

THE PERRINE MEDICAL MONITORING PROGRAM
A PRODUCT OF THE PERRINE DUPONT SETTLEMENT
OPTIONAL CLAIMANT AUTHORIZATION OF LIMITED ANONYMOUS DISCLOSURE
OF PROTECTED HEALTH INFORMATION FOR POSSIBLE
SCIENTIFIC AND HEALTH RESEARCH

I authorize the disclosure of my protected health information,[1] or the protected health information for
_____ (minor child/incompetent adult), as described below. This
authorization is voluntary and made because I want this information to be released for possible scientific
and health research as described below. I understand that the Claims Administrator will take
reasonable measures to protect the information, but it is possible that the information which is
being released may be sent to an individual or entity (described below) which may not be subject
to federal or state privacy laws and may be later disclosed again by that individual or entity and
no longer be protected. I understand that I do not have to sign this form, and that signing this form is
not a condition to enrollment in The Perrine Medical Monitoring Program a product of the Perrine
DuPont Settlement.

1.   I authorize the following person(s) and/or organization(s) (specified below) to disclose my
     protected health information:

         ED GENTLE
         CLAIMS ADMINISTRATOR
         THE PERRINE MEDICAL MONITORING PROGRAM, A PRODUCT OF THE
         PERRINE DUPONT SETTLEMENT
         P.O. Box 257
         Spelter, WV 26438
         (800) 345-0837
         www.perrinedupont.com

2.   I authorize the following person(s) and/or organization(s) to receive my protected health
     information, as disclosed by the person(s) and/or organization(s) above:

_____

[1] Protected health information means health information, that identifies a person, and which
relates to that person's 1) past, present, or future physical or mental health or condition; 2) the
provision of health care to that person; or 3) the past, present, or future payment for the provision of
health care to that person. 45 C.F.R. § 164.501. Here, the protected health information will be the
results of medical tests, physical examinations, and the collection of medical histories in the Perrine
Medical Monitoring Program.

THE PERRINE MEDICAL MONITORING PROGRAM, A PRODUCT OF THE PERRINE DUPONT
SETTLEMENT, AUTHORIZATION OF LIMITED ANONYMOUS DISCLOSURE OF PROTECTED HEALTH
INFORMATION FOR POSSIBLE SCIENTIFIC AND HEALTH RESEARCH
PAGE 1 OF 4

The Perrine Medical Monitoring Program, c/o the Claims Administrator
The Circuit Court of Harrison County, West Virginia
Judge Thomas A. Bedell
Any and All Special Masters Appointed By the Circuit Court of Harrison County, West Virginia, Who Work On or With the Perrine DuPont Settlement

3.    I authorize the following person(s) and/or organization(s)    to receive my depersonalized protected health information, with unique identifiers instead of individual information as disclosed by the person(s) and/or organization(s) above, if so ordered by the Court (with any and all information that would permit the identification of the subject of the test and the use of unique identifiers in place of such identifying information. My name, address, and social security number shall not be disclosed under any circumstances to the person(s) or organization(s) identified in paragraph 3),.

Meredith McCarthy - Current Guardian Ad Litem for the Minor Plaintiffs in the Perrine DuPont Settlement
Any Other Guardian Ad Litem for Minor Plaintiffs in the Perrine DuPont Settlement
Plaintiffs' Counsel and Plaintiffs' Liaison Counsel in connection with the Perrine DuPont Settlement
Research Departments of Accredited (as determined by the Court) Universities and Colleges
Research Department of Accredited (as determined by the Court) Research Hospitals and Medical Institutions
E. I. DuPont DeNemours and Company
The United States of America and any department or agency or service thereof
The State of West Virginia and any department or agency or service thereof
The United States Environmental Protection Agency
The United States Food and Drug Administration
The United States Occupational Safety and Health Administration
The World Health Organization
Environmental Protection Agency
Agency for Toxic Substances and Disease Registry
Centers for Disease Control
United States Department of Health and Human Services
National Health and Nutrition Examination Survey
National Institutes of Health

4.    I direct that all protected health information that may be in the possession of the CLAIMS ADMINISTRATOR, THE PERRINE MEDICAL MONITORING PROGRAM (the "Claims Administrator") may be disclosed, released, revealed, and otherwise given to all person(s) and/or organization(s) identified in number 2 above.  In addition, I specifically direct that the following information may be disclosed, released, revealed, and otherwise given   to those person(s) and/or organization(s) identified in number 3 above:

Depersonalized, with unique identifiers instead of individual information, samples, reports, results, diagnoses, findings, and other depersonalized information obtained from the Perrine Medical Monitoring Program.

THE PERRINE MEDICAL MONITORING PROGRAM, A PRODUCT OF THE PERRINE DUPONT SETTLEMENT, AUTHORIZATION OF LIMITED ANONYMOUS DISCLOSURE OF PROTECTED HEALTH INFORMATION FOR POSSIBLE SCIENTIFIC AND HEALTH RESEARCH
PAGE 2 OF 4

5.    The additional specific reason and purpose for the disclosure as described above is as follows:

To allow the individuals, institutions and organizations named in sections 2 and 3 above to facilitate and to engage in scientific research, studies, investigations, environmental evaluations and comparisons, statistical analysis, and the development of programs to further understanding regarding the health effects of the potential, possible or alleged prolonged exposure to arsenic, cadmium, zinc and lead in Spelter, West Virginia, and like areas, and other scientific and health studies and purposes,

6.    I understand that I may revoke this authorization in writing at any time, except to the extent that the person(s) and or organization(s) named above have taken action in reliance on this authorization. This authorization may be revoked through a letter stating my name, address, telephone number, date of birth, and social security number, along with the following statement or similar statement: "I wish to revoke the AUTHORIZATION OF DISCLOSURE OF PROTECTED HEALTH INFORMATION which I signed and gave to your office." I must then sign the letter and date it, and have my signature witnessed.  Then mail the letter to the following address:

ED GENTLE
CLAIMS ADMINISTRATOR
THE PERRINE MEDICAL MONITORING PROGRAM, A PRODUCT OF THE
PERRINE DUPONT SETTLEMENT
P.O. Box.257
Spelter, WV 26438
(800) 345-0837
www.perrinedupont.com

After the Claims Administrator receives my signed and witnessed letter, in the proper format, his office will notify me by phone or letter and confirm that my consent has been revoked.

7.    I understand that I may inspect or copy my protected health information to be used and/or disclosed, as long as said information is in the possession of the Claims Administrator. I also understand that I have no right to inspect or copy the following: 1) psychotherapy notes; 2) information compiled in reasonable anticipation of, or for use in, a civil, criminal, or administrative action or proceeding; and 3) protected health information in the possession of the Claims Administrator to which federal law prohibits my access.

8.    I understand that I may refuse to sign this authorization.

9.    I understand that the Claims Administrator is creating information for the purpose, in whole or in part, of scientific or health research. I understand that the extent to which the information will be used to carry out the Medical Monitoring Program, includes: using my Protected Health Information (as authorized in section 4 above), to further scientific or health research into the human health effects of prolonged potential, alleged or possible contamination of arsenic, cadmium, zinc, and lead in Spelter, West Virginia.  In addition, this Protected Health Information may be used to investigate other sites and compare contamination in those sites as

THE PERRINE MEDICAL MONITORING PROGRAM , A PRODUCT OF THE PERRINE DUPONT SETTLEMENT, AUTHORIZATION OF LIMITED ANONYMOUS DISCLOSURE OF PROTECTED HEALTH INFORMATION FOR POSSIBLE SCIENTIFIC AND HEALTH RESEARCH
PAGE 3 OF 4

well, and treat other individuals exposed to similar contamination.  I understand that this Protected Health Information could be used for scientific research, studies, investigations, environmental evaluations and comparisons, statistical analysis, and the development of programs to further understanding regarding the health effects of the potential, alleged or possible contamination in Spelter, West Virginia, and like areas, and other scientific studies and purposes.  I also understand that it could be used by other entities to aid in preventing other types of contamination, or treating other types of contamination or sickness.  It might also be used solely for statistical purposes or any other purpose deemed useful by the individuals, institutions, or organizations named in section 3.

10.     I understand that no protected health information will be used or disclosed unless I agree to such disclosure herein.

11.     I understand that the statements made in this document are binding.

I understand and acknowledge that the Perrine Medical Monitoring Program does not include any provision for the funding of any of the potential scientific research, studies, investigations or other programs outlined in this disclosure and that this authorization does not create any expectation by me or by the medical monitoring class or any obligation on the part of Plaintiffs Counsel, DuPont or the Claims Administrator to provide any money to support such programs.

I have had the opportunity to read or have had this document read to me, and have considered the contents of this authorization.  I confirm that the contents are consistent with my direction.  I have been given a copy of this authorization.

Signed _____     Date _____

Print Name: _____

Address: _____

Telephone: _____

D.O.B.: _____

Social Security Number: _____

☐     Check here if Social Security number is for a minor child

_____
Relationship or Authority of Personal Representative (if applicable)
*(If you have signed this form as a personal representative of the individual whose personal health information is being released, state your relationship to the individual, or your authority for signing for the individual here.)*