# EXHIBIT 49

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| JAMES D. SULLIVAN and LESLIE ADDISON, WILLIAM S. SUMNER, JR., RONALD S. HAUSTHOR, GORDON GARRISON, TED and LINDA CRAWFORD, and BILLY J. KNIGHT, Individually and on behalf of Class of persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION,<br><br>Defendant. | Civil Action<br><br>Docket No. 5:16-cv-00125-gwc |

## EXPERT REBUTTAL REPORT OF DAVID K. MEARS, J.D.

**INTRODUCTION**

This rebuttal expert report is provided on behalf of Plaintiffs in the above-captioned case and is provided, pursuant to Fed. R. Civ. P. 26(a)(2)(D)(ii), to rebut Defendant's expert report of Mr. Felix Fletchas.

I have included a summary of my qualifications in this report and have attached my C.V., which lists my publications during the past ten years. I have not testified in a deposition or trial during the past four years.

I am charging $400 per hour for my time in this case.

I reserve the right to supplement this report if additional information becomes available as discovery progresses in this case.

David K. Mears, J.D.

## QUALIFICATIONS

I am an environmental attorney with 27 years' experience in environmental law, regulation, and policy. My most recent professional position was as Associate Dean for Environmental Programs at Vermont Law School, Environmental Law Center, where I managed the academic programs associated with the law school's environmental law and policy curriculum for Juris Doctor, Master of Laws (LLM) in Environmental Law, and several environmental masters degrees. I was previously the Director of the Environmental Law Clinic and an Assistant Professor of Law at Vermont Law School.

Prior to my recent position at Vermont Law School, I served as the Commissioner of the Vermont Department of Environmental Conservation ("DEC"), the environmental regulatory agency for Vermont. I directed and managed a department of three hundred staff responsible for conserving Vermont's natural resources and protecting public health and the environment through implementing educational, regulatory, and funding programs to protect air, water and soil. In this position I was ultimately responsible for implementing Vermont's air pollution statute and regulations.

I have been an attorney with the Ecology Division of the Washington State Office of the Attorney General where I was Chief of the Ecology Division and represented the Department on a range of environmental issues including air pollution laws. I have also been an attorney with the U.S. Department of Justice, Environment and Natural Resources Division, enforcing federal environmental laws and regulations, including the federal Clean Air Act ("CAA"). In Texas, I was the Energy and Environmental Policy Director of the Texas Office of State-Federal Relations, a Senior Attorney with the Texas Natural Resource Conservation Commission, and an Assistant Attorney General with the Texas Office of the Attorney General, Environmental Protection Division.

My J.D. is from Vermont Law School, where I also was awarded a Masters of Studies in Environmental Law. I also have a B.S. in Environmental Engineering Technology from Cornell University. I am a member of the Vermont Bar and the U.S. District Court for the District of Vermont, among other courts.

In my position as Commissioner of the Vermont DEC and in my teaching and research at Vermont Law School, I have become knowledgeable about the Vermont air pollution laws and regulations, including the enforcement programs for which I was ultimately responsible as Commissioner. By my prior experience and education, I am also knowledgeable about the federal CAA and the enforcement of CAA rules and permits.

My C.V. is attached to this report as Exhibit 1.

## OPINIONS

I have reviewed the expert report of Mr. Felix Flechas submitted by Defendant Saint-Gobain Performance Plastics, Inc., in the above-captioned case. I have also reviewed the expert report of Dr. Phillip Hopke submitted by Plaintiffs in this case. I agree with and adopt Dr. Hopke's opinions

concerning Defendant's violations of Vermont's air pollution regulations and rely upon the documents he relied upon. Following are my opinions in rebuttal to Mr. Flechas' report in which he responds to Dr. Hopke's opinions.

1. **MR. FLECHAS SHOWS LIMITED FAMILIARITY WITH VERMONT'S AIR POLLUTION STATUTE AND REGULATIONS AND THEIR ENFORCEMENT.**

Mr. Flechas has limited familiarity with Vermont's air pollution statute and regulations. Other than reviewing documents provided to him by Saint-Gobain, he has no prior experience with the Vermont regulatory scheme. His resume also reveals no prior experience with the federal CAA air pollution control regulatory scheme.

There are two types of permits required by the Clean Air Act and by state programs with authorization to implement the CAA regulatory scheme. Construction permits are required prior to construction, installation or modification of air contaminant sources. Operating permits are required under Title V of the CAA, as amended in 1990, to operate air contaminant sources. The purpose of Title V operating permits is to consolidate all applicable CAA requirements in one permit which must be periodically renewed. ChemFab never obtained an operating permit.

On page 15 of his testimony, Mr. Flechas confuses the two types of permits by erroneously describing the permit issued in 1990 by Vermont DEC as an operating permit. (Vermont DEC, Permit #AP-90-007, June 8, 1990). As a matter of law and by its terms, this permit was a construction permit, not a Title V operating permit. ChemFab did not apply for a Title V operating permit until April 26, 1996. (ChemFab Corp., Application for Air Pollution Operating Permit, April 26, 1996). The operating permit was never granted by DEC.

While Mr. Flechas is correct, in his testimony at page 15, that the 1972 Vermont Air Pollution Control Rules did not require construction permits to be issued by the Vermont Agency for Environmental Conservation for new air contaminant sources, such sources were not exempted from regulation. For example, Section 5-408 of the 1972 rules required a person constructing new sources to submit information to the Agency about the new sources.

Further, Vermont adopted rules in 1979 requiring permits for construction, installation or modification of any air contaminant source. In his testimony, Mr. Flechas mentioned the adoption of rules in 1995 requiring certain stationary air contaminant sources to have operating permits, but he downplayed the adoption the 1979 rules. As discussed by Dr. Hopke, ChemFab failed to comply with this construction permit requirement from 1979 to 1990, when it finally submitted a permit application for the 6 new coating towers it had constructed at the North Bennington facility during that time period. While Section 5-501(3) of the rules provided a permit could be issued by default if the agency did not approve or deny an application within 30 days after receipt of complete plans and specifications, there was no application submitted by ChemFab during the period before 1990, despite the construction of the new towers, and there was no default permit issued. Furthermore, the United States Environmental Protection Agency disapproved of Section 5-501(3) in its review of the Vermont State Implementation Plan in 1979 and 1980.[1] Any default permit would have had to be identified as such and would not have been effective in the eyes of the EPA.

---

[1] 44 Fed. Reg. 40081 (July 9, 1979); 45 Fed. Reg. 10779 (Feb. 19, 1980).

In addition to confusing the nature and extent of ChemFab's permit authorizations, a fundamental flaw in Mr. Fletchas' opinions is that he concludes that lack of formal enforcement action by the Vermont DEC and its predecessors means there were no violations of air pollution regulations. To the contrary, the numerous violations set out by Dr. Hopke, were significant violations that could have resulted in the imposition of severe penalties and the revocation of ChemFab/Saint-Gobain's permits. At the time, the federal CAA provided penalties of up to $25,000 for each day of each violation and Vermont's air pollution statute also authorized penalties. However, the Vermont DEC and its predecessors, like most state environmental regulatory agencies, have limited resources for enforcement and cannot address every violation of the regulations through formal enforcement actions. Furthermore, as can be seen in this case, it has been state policy to attempt to secure compliance through cooperation with industry whenever possible. Unfortunately, ChemFab/Saint-Gobain took advantage of this policy of cooperation to continue polluting for many years until it found it economically more attractive to move its operations to New Hampshire where air pollution controls were not required at the time.

## 2. CHEMFAB/SAINT-GOBAIN VIOLATED VERMONT AIR POLLUTION CONTROL PERMITS AND REGULATIONS.

### NO AIR POLLUTION CONTROL PERMIT UNTIL 1990

Mr. Flechas attempts to downplay ChemFab's failure to obtain a permit for construction of any of its air contaminant sources during the ten years from 1979 to 1990, based on the premise that the Vermont DEC was aware of the facility's operation. DEC's awareness of the operations did not excuse ChemFab from the permit requirement, and the failure to obtain construction permits was a serious violation that could have subjected ChemFab to substantial penalties.

The DEC was aware of the ChemFab facility's operation during this period of time due to numerous complaints from the community of smoke and odors in violation of DEC air pollution rules. DEC attempted over several years to cooperatively bring the facility into compliance with the prohibition in the Vermont Air Pollution Control Rules against nuisance and odor, but this never happened. As discussed by Dr. Hopke, there was also a petition by members of the community to the North Bennington Zoning Board to enforce the local ordinance prohibiting smoke, odors, and pollution. There were not routine inspections by DEC during this time period. These did not commence until after ChemFab finally applied for and received construction permits. The focus of DEC was to abate the smoke and odors, which it attempted to do by requiring ChemFab to test its emissions to determine the source of the odors.

Mr. Flechas cannot point to any communication by DEC to ChemFab excusing compliance with the construction permit requirement. To the contrary, on June 5, 1984, DEC representatives met with ChemFab management and, among other things, discussed the need to "update point source permit applications especially in regards to the near future installation of new coating towers." (Memo from Raymond DeMeis, ChemFab, June 6, 1984, SGPPLVT04023429-4023431). Although ChemFab submitted emission test results to DEC, there were no applications or other information submitted to DEC when the company constructed each of 6 new coating towers with new emission points. ChemFab failed to comply with the permit requirement for more than 10

years (from November 1979 to June 1990), until it obtained its first permit in June 1990 (Air Pollution Control Permit from the State of Vermont Agency of Natural Resources, June 8, 1990).

Even after being educated on the necessity of applying for and receiving permits to construct before constructing new air contaminant sources, ChemFab violated the construction permit requirement again by constructing new coating towers R1 and R2 in 1998 without a construction permit. DEC and the company entered into an Assurance of Discontinuance entered on February 17, 1999, in which it ChemFab admitted the violation. (Order, Vermont Environmental Court, March 12, 1999, Exhibit 40 to Deposition of Robert Prohaska). The penalty imposed by DEC was minor, but, as Dr. Hopke pointed out, penalties for failure to obtain a construction permit for new sources can be severe.

VIOLATION OF AIR POLLUTION REGULATIONS AND ORDERS

Mr. Flechas did not attempt to address the specific violations of Vermont air pollution regulations, permits and orders by ChemFab/Saint Gobain. He also makes a fundamental error in assuming that the lack of formal enforcement actions by the Vermont DEC indicates lack of violations by ChemFab/Saint-Gobain.

First, Vermont law for environmental enforcement provides the Agency with the authority to accept an Assurance of Discontinuance from a violator as an alternative to administrative or judicial proceedings.[2] The sequence of Assurances of Discontinuance after the Notice of Noncompliance in July 1974 was, therefore, the culmination of formal enforcement actions taken because ChemFab was not complying with the Air Pollution Rules. These enforcement actions included ChemFab's admission to the original violation and admission that it did not comply with one of the Assurances of Discontinuance requiring the installation of control equipment on the large coating tower at the Bennington facility for over two years after agreeing to do so. (Letter from Canute E. Dalmasse, Agency Permit Administrator, Vermont Agency of Environmental Conservation, October 31, 1977, SGPPLVT04022741-4022749).

Mr. Flechas did not address the numerous violations of Vermont Air Pollution Rules, which, as of 1972, contained prohibitions on nuisances and objectionable odors (Sec. 5-241). The prohibitions continued in substantially similar form throughout ChemFab/Saint-Gobain's operation of the facilities in Bennington and North Bennington. Similar prohibitions were imposed in Air Pollution Control construction permits beginning in June 1990 and in effect throughout the remaining years of operation. Dr. Hopke reviewed documents obtained in discovery and found that available records show at least 60 times when odors were discharged beyond property lines and a nuisance was created. The last complaint record reviewed by Dr. Hopke was dated March 23, 2000 ("strong

---

[2] 10 V.S.A. § 8007 states:
(a) As an alternative to administrative or judicial proceedings, the Secretary, or the Natural Resources Board, may accept from a respondent an assurance of discontinuance of a violation. An assurance of discontinuance shall include:
(1) a statement of the facts which provide the basis for claiming the violation exists and a description of the alleged violation determined by the Secretary or the Natural Resources Board; and
(2) an agreement by the respondent to perform specific actions to prevent, abate, or alleviate environmental problems caused by the violation, or to restore the environment to its condition before the violation, including financial responsibility for such actions.

5

plume of emission; strong smell"). In addition to the documents reviewed by Dr. Hopke, Plaintiffs' counsel have provided me with a document recently discovered which records an additional 42 complaints from community members during March 2000 to March 2001. (Emissions Log 2000 – NBVT, SGPPLVT17000567-17000572). Despite the efforts of DEC to secure compliance through the cooperation of ChemFab/Saint-Gobain, the violations of the nuisance and objectionable odor rules continued throughout the operation of the two plants with over 100 documented violations.

While DEC was attempting to achieve voluntary compliance with the Air Pollution Rules and permit requirements over this 25-year period of time, instead of seeking improved air pollution controls, ChemFab/Saint-Gobain was attempting to remove the only controls it had, the abators. The company began a lobbying campaign to convince Vermont officials and politicians that it should not have to continue to use the air pollution controls it agreed to in 1975, even threatening to move its operations to New Hampshire where these controls were not required. The company also applied for and received a temporary variance for operating two new towers without the abators but failed to comply with the terms of the variance. The Vermont DEC resisted the lobbying efforts and continued to insist on the use of controls for the air emissions from the North Bennington plant. However, after Saint-Gobain purchased ChemFab in 2000, the company closed the plant and moved the production equipment, without air pollution controls, to the company's facility in Merrimack, New Hampshire, closing the Vermont plant in early 2002.

## VISIBLE AIR EMISSION EXCEEDANCES

Mr. Flechas does not attempt to refute the violations. He simply points to the lack of formal enforcement action and the occasions when the infrequent inspections did not note violations. The one-year variance granted to ChemFab in 1997 did not excuse violations of visible emissions permit requirements. Instead, it provided for revocation of the variance if odor and visible emissions continued. The 1998 and 1999 inspections made it clear that odor and visible emissions were continuing. (Philip Etter, VT DEC, Compliance Inspection/Investigation of ChemFab Corporation, Feb. 12, 1998, April 13, 1999).

## FAILURE TO MAINTAIN ABATOR TEMPERATURES

Mr. Flechas does not attempt to refute the violations referenced by Dr. Hopke. His statement that "state inspectors never found abator temperatures to be a violation of permits or state regulations that allowed the ChemFab facilities to operate" is erroneous. For instance, in the – inspection report, Mr. Etter with the DEC stated, "[t]emperature reading for the Towers P and Q abaters were 590° and 580° respectively. These temperatures were below the 600° F required by the permit." (Philip Etter, VT DEC, Compliance Inspection/Investigation of ChemFab Corporation, April 13, 1999).

FAILURE TO IDENTIFY AND CONTROL HAZARDOUS AIR CONTAMINANTS

Mr. Flechas attempts to place the burden of identifying and controlling hazardous air contaminants on the Vermont DEC, when the rule made it clear it was the burden of ChemFab/Saint-Gobain, which failed to identify and control PFOA emissions from its facilities (See Section 3, below). Dr. Hopke discusses the attempts by DEC to require ChemFab/Saint-Gobain to identify hazardous air contaminants and the fact that the testing performed by the company never satisfied DEC requirements. (See Letter from Richard Valetinetti, DEC, to David Stiles, ChemFab, Nov. 1, 1999).

FAILURE TO PROPERLY MAINTAIN AND OPERATE AIR POLLUTION CONTROLS

Mr. Flechas does not attempt to refute the violations discussed by Dr. Hopke for failure to properly maintain and operate the air pollution controls on the processes. He simply points to the lack of formal enforcement action. According to Dr. Hopke the failure to properly operate and maintain the abators continued throughout the operation of the plants. As late as February 17, 2000, Richard Valentinetti, Director of the Air Pollution Control Division, wrote to ChemFab "[o]ur recent inspections have identified serious shortcomings in the condition and maintenance of the catalysts for the abaters." (Vermont DEC Letter Valentinetti to David Stiles, ChemFab, Feb. 17, 2000).

3.   **AIR EMISSIONS OF APFO WERE A REGULATORY CONCERN BY 1997.**

Mr. Flechas claims that there was no regulatory concern about air emissions of PFOA during the time that ChemFab/Saint-Gobain operated in Vermont, pointing to the lack of listing of PFOA in the Vermont Hazardous Air Contaminant Guidelines in 1984. However, the Vermont Hazardous Air Contaminant Rule went into effect in 1981, (Section 5-261), without the list, and placed the burden on the source to identify hazardous air contaminants that meet the definition in Section 5-101(26):

> "Hazardous Air Contaminant" means an air contaminant for which no ambient air quality standard has been adopted and which in the judgment of the Secretary, taking into account its quantity, concentration or physical, chemical or infectious characteristics, causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible illness.

The Hazardous Air Contaminant Guidelines adopted in 1984 made it clear that the list was not exclusive. The Guidelines state, "exclusion from the list is not exclusion from the [Hazardous Air Contaminant] Regulation. A substance not on the list would require individual evaluation of properties to determine if it meets the definition of a hazardous air contaminant." The guidelines go on to state "[i]n the event the contaminant of review is not listed in the following table, the applicant must identify the substance, its hazardous and toxic properties and its total maximum emission rate from the facility. The Agency will on a case-by-case basis determine the appropriate level of review."

It is clear that other states in which Saint-Gobain operated similar facilities with PFOA emissions were concerned about PFOA during the time the company operated the plant in Vermont and that Saint-Gobain was aware of those concerns. The New York Department of Environmental Conservation became concerned about emissions of APFO (the ammonium salt of PFOA) from similar Teflon coating processes in 1997 (Memo from Arline Sumner, Environmental Chemist, Toxic Assessment Section, Division of Air Resources, New York State Department of Environmental Conservation, March 21, 1997, found in the VT DEC files). The release of APFO air emissions from these types of facilities was also communicated to the Vermont DEC at the time (Memo from Brian J. Fitzgerald, Engineering Services Supervisor, Air Pollution Control Division of State of Vermont Agency of Natural Resources, dated March 19, 1997). Had the Vermont DEC been informed by Saint-Gobain that it was emitting APFO from the North Bennington Plant, the Department had the authority to require the company to perform the analysis required by the Hazardous Air Contaminant Rule.

At the time Saint-Gobain purchased the Furon Teflon coating plant in Hoosick Falls, NY, in 1999, Saint-Gobain would likely have known that New York was regulating emissions of APFO. The state required Furon to test its stacks for APFO in 1997, along with other hazardous air contaminants. The report of the stack tests in New York was submitted by Saint-Gobain as part of its air permit application in New Hampshire in 2001 Application for Temporary Air Permit, prepared by C.T. Male Associates, PC for Saint-Gobain, dated October 16, 2001, SGPPLVT13000081-13000101).

In May 2000, 3M Company, the major producer of PFOA, announced plans to phase out the production and use of PFOA and another major perfluorinated chemical PFOS (perfluorooctane sulfonate) and agreed to provide information to EPA about their use, toxicity, and environmental releases. Based on the potential for new regulation of PFOA by EPA, Saint-Gobain began a project in 2001 to develop formulations to replace APFO. (APFO Reformation project notes, SGPPLVT05000713).

Similarly, New Hampshire regulated APFO as a Regulated Toxic Air Pollutant as early as 2001 (APFO Reformation project notes, SGPPLVT05000713). When Saint-Gobain began the process of applying for a new air pollution permit at its Merrimack facility in 2001, it calculated its APFO releases from both the Merrimack and North Bennington Plants, based on the assumption that all the APFO contained in the coating formulations was emitted as a RTAP. Clearly, Saint-Gobain was aware of the need to test for and limit PFOA emissions during the time it continued to operate its plant in North Bennington, Vermont.

# D A V I D   K R U G E R   M E A R S

164 Chelsea Street, P.O. Box 96
South Royalton, Vermont  05068
(802) 831-1136
dmears@vermontlaw.edu

E X P E R I E N C E

VERMONT LAW SCHOOL, Environmental Law Center, South Royalton, VT
*Associate Dean for Environmental Programs*, August 2017 to Present
Manage the academic programs associated with the the law school's environmental law and policy curriculum for Juris Doctor, Master of Laws (LLM) in Environmental Law, and several environmental masters degrees. Teach and write in the area of environmental law. Support and coordinate the work of the law school's environmental and natural resources programs including a variety of institutes and centers.

VERMONT LAW SCHOOL, South Royalton, VT
*Vice Dean for Faculty*, July 2016 to July 2017
Provided oversight of the law school's academic programs and student services, and managed the instructional budget.  Coordinated implementation of strategic priorities including the establishment of an online hybrid Juris Doctor degree, launch of a new Center for Justice Reform, and expanding international programs.

VERMONT LAW SCHOOL, Environmental & Natural Resources Law Clinic, South Royalton, VT
*Director/Associate Professor of Law*, August 2015 to June 2016
Directed Clinic again (after four and a half years away working for the State of Vermont), litigated cases, and taught Environmental Law. Led efforts to obtain a grant for the Clinic to support a new environmental justice initiative.

VERMONT DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Montpelier, VT
*Commissioner*, December 2011 to July 2015
Directed and managed a department of three hundred staff responsible for conserving Vermont's natural resources and protecting public health and the environment through implementing educational, regulatory, and funding programs to protect air, water and soil. Major initiatives included a cleanup and restoration plan for the Lake Champlain watershed and implementation of a new mandatory recycling law.

VERMONT LAW SCHOOL, Environmental & Natural Resources Law Clinic, South Royalton, VT
*Assistant Director/Assistant Professor of Law,* June 2005 to August 2007
Assisted in running a legal clinic in which students practiced in the areas of environmental and natural resources law with a focus on litigation. Litigated cases in state and federal court at trial and appellate levels. Taught Property Law.
*Director/Associate Professor of Law*, September 2007 to December 2011
Directed the Clinic and continued to litigate cases. Raised funds from private foundations to support the Clinic. Team-taught Summer Environmental Law course with two other faculty, and taught Watershed Protection and Management seminar.
*U.S. Fulbright Scholar*, Sun Yat Sen University in Guangzhou, China, August 2010 to December 2011
Taught Chinese law students regarding the United States Judicial System and United States Environmental Law. In addition to teaching courses at Sun Yat Sen University, lectured at Renmin University School of Law, China University of Politics and Law, Wuhan University School of Law, South China University of Technology, and Ningbo University School of Law on topics related to environmental law. Consulted with environmental law clinics at Sun Yat Sen University and China University of Politics and Law on behalf of Vermont Law School United States-China Partnership.

1

**WASHINGTON OFFICE OF THE ATTORNEY GENERAL**, Ecology Division, Olympia, WA
*Senior Assistant Attorney General and Division Chief*, December 1998 to June 2005
Managed a division of twenty-five attorneys representing the Department of Ecology, the State Conservation Commission, the Pollution Liability and Insurance Agency, and the Puget Sound Action Team. Provided legal advice to these state agencies and also litigated on behalf of the agencies before administrative hearings boards, as well as trial and appellate courts at both the state and federal levels.

**U.S. DEPARTMENT OF JUSTICE**, Environment and Natural Resources Div., Washington, D.C.
*Counselor for State & Local Affairs*, January 1998 to December 1998
Served as liaison to state and local governments and worked with Department of Justice attorneys to ensure cooperation and good working relations with states and local governments in environmental litigation.
*Trial Attorney*, May 1995 to January 1998
Represented the United States in affirmative federal court litigation filed under Superfund, the Clean Water Act, the Clean Air Act, the Safe Drinking Water Act and other federal environmental statutes.

**TEXAS OFFICE OF STATE-FEDERAL RELATIONS**, Washington, DC
*Energy and Environment Policy Director*, December 1993 to May 1995
Developed policy positions and coordinated federal lobbying efforts on behalf of the State of Texas on federal environmental, agricultural and energy policy in conjunction with state elected and appointed leadership, with a focus on issues affecting the United States/Mexico border.

**TEXAS NATURAL RESOURCE CONSERVATION COMMISSION**, Austin, TX
*Senior Attorney*, June 1992 to November 1993
Managed the Commission's water quality practice including the following duties: supervising twelve attorneys; providing legal and policy advice; drafting and reviewing proposed regulations and legislation; and, representing the Commission at enforcement and permitting hearings.

**TEXAS OFFICE OF THE ATTORNEY GENERAL**, Environmental Protection Division, Austin, TX
*Assistant Attorney General*, June 1991 to May 1992
Represented Texas agencies, primarily in enforcement lawsuits, in the areas of water quality, drinking water, water rights, and wildlife protection.

**VERMONT OFFICE OF THE ATTORNEY GENERAL**, Environmental Unit, Montpelier, VT
*Law Clerk*, Summer 1990

**TEXAS WATER COMMISSION**, Water Quality Division, Austin, TX
*Enforcement Coordinator*, February 1987 to July 1988
Inspected and evaluated the compliance status of municipal and industrial waste water treatment plants and prepared recommendations for penalties and corrective action.
*Administrative Technician*, September 1985 to February 1987
Implemented a hazardous waste fee program.

# E D U C A T I O N

**VERMONT LAW SCHOOL**, South Royalton, VT
*Juris Doctor*, Summa Cum Laude (Class Rank: 1st of 153), May 1991
*Masters of Studies in Environmental Law*, Summa Cum Laude, May 1991
- National Environmental Moot Court Competition, Pace University: Member of the 1991 Vermont Law School Team that won Best Overall Team and Best Overall Brief
- Teaching Assistant, Legal Writing I (Fall 1990)
- Student Trustee, Vermont Law School Board of Trustees

2

CORNELL UNIVERSITY, College of Agriculture and Life Sciences, Ithaca, NY
*Bachelor of Science*, May 1985   Major:  Environmental Engineering Technology
- Cornell National Scholar
- Teaching Assistant, Department of Government, Urban Affairs Laboratory
- Varsity Cross-Country, and Track and Field

# PROFESSIONAL AFFILIATIONS – BOARDS

VERMONT CITIZENS ADVISORY COMMITTEE, Lake Champlain Basin Program, 2016 to Present
Appointed by the Governor of Vermont to advise the State of Vermont and the Lake Champlain Basin Program regarding the environmental protection of Lake Champlain.

CONNECTICUT RIVER CONSERVANCY, Board of Trustees, 2016 to Present
Non-profit organization committed to the protection and restoration of water quality, habitat and recreational opportunities on the Connecticut River and its tributaries.

HIGH MEADOWS FUND, Board of Directors, 2015 to Present
Foundation that provides funding for environmental organizations, engages in mission-investing, and convenes thought leaders and public officials for conversations in the areas of land use, agriculture, and environmental protection.

VERMONT LEAGUE OF CONSERVATION VOTERS, Board of Directors, 2006 to 2010
Non-profit organization that engages in political organizing and campaign work in support of candidates who support environmental protection, and also lobbies the Vermont General Assembly to support environmental legislation.

WASHINGTON FOUNDATION FOR THE ENVIRONMENT, Board of Directors, 2000 to 2005
Foundation that provides funding for organizations engaged in environmental advocacy, education and outreach.

# PROFESSIONAL AFFILIATIONS – VLS

VERMONT LAW SCHOOL ALUMNI ASSOCIATION, Board of Directors, 2003 to 2010
Served two terms as an elected alumni representative on the VLS national alumni association.

VERMONT LAW SCHOOL D.C. ALUMNI ASSOCIATION, Board of Governors, 1995 to 1998
Helped to found and served as the president of the first regional VLS alumni association.

VERMONT LAW SCHOOL ENVIRONMENTAL LAW CENTER ADVISORY COMMITTEE, 1992 to 1995
Served as part of this advisory committee to the Environmental Law Center Director, first Jonathan Lash, then Patrick Parenteau.

# PROFESSIONAL AFFILIATIONS – BAR ASSOCIATIONS

VERMONT STATE BAR, Member, 2005 to Present

WASHINGTON STATE BAR, Member, 1998 to 2011

TEXAS STATE BAR, Member, 1991 to Present (Currently "inactive" status)

FEDERAL COURTS:
- SUPREME COURT
- FIRST CIRCUIT

- SECOND CIRCUIT
- FOURTH CIRCUIT
- NINTH CIRCUIT
- WESTERN DISTRICT OF TEXAS
- EASTERN DISTRICT OF WASHINGTON
- DISTRICT OF VERMONT

P U B L I C A T I O N S

*Flint, Michigan: An essential lesson for state drinking water regulators*, Trends: American Bar Association Section of Environment, Energy, and Resources Newsletter, Volume 48, Number 4, March/April 2017 (casting the Flint, Michigan drinking water lead contamination catastrophe and subsequent public scrutiny of Michigan's Department of Environmental Quality as a lesson for other state environmental regulators).

*Foreword: Restoring and Maintaining the Ecological Integrity of Lake Champlain,* with co-author Trey Martin, Vermont Journal of Environmental Law, Volume 17, Issue 4, Spring 2016 (introducing the "The Lake Champlain Edition" and providing background on the Clean Water Act and factual and scientific context for the papers included in this edition).

*Lessons for Lake Champlain from Chesapeake Bay: Returning Both Waters to the "Land of Living,"* with co-author Rebecca Blackmon, Vermont Journal of Environmental Law, Volume 17, Issue 4, Spring 2016 (comparing the clean water restoration plans developed using the federal Clean Water Act "total maximum daily load" or "TMDL" provisions for both the Chesapeake Bay and Lake Champlain and proposing that a similar model for restoration be used for other major, complex watersheds).

*Rivers and Resilience: Lessons Learned from Tropical Storm Irene,* with co-author Sarah McKearnan, Vermont Journal of Environmental Law, Volume 14, 2012-2013 (exploring ideas for adapting land use and river management policies to better protect public safety and the environment from increasingly intense and frequent flood events resulting from climate disruption).

*Observations of an Illiterate Law Professor: The Pearl River and Chinese Traffic Laws, Among Other Important Topics,* Vermont Journal of Environmental Law, Volume 13, 2011-2012, (a compilation of blog postings from my time in China, using anecdotes from that experience to illustrate environmental law and policy challenges and opportunities for China and the United States).

*Entergy Corp. v. Env. Prot. Agency,* Amicus Brief filed in the United States Supreme Court on behalf of National Wildlife Federation and Sierra Club, Fall Term 2008 (arguing that EPA does not have authority to conduct a cost-benefit analysis when determining pollution technology requirements applicable to cooling water intake structures at existing power plants under Section 316(b) of the Clean Water Act). Research assistance provided by student clinicians.

*S.D. Warren v. Maine Board of Environmental Protection*, Amicus Brief filed in the United States Supreme Court on behalf of fifty-two national, regional and local non-profit environmental organizations, Spring Term 2006 (arguing that states have authority to issue water quality certifications for hydropower dams under Section 401 of the Clean Water Act). Research assistance provided by student clinicians.

*Natural Resources Defense Council v. Abraham:  Preventing the Department of Energy from Defining Away High-Level Nuclear Waste*, with co-author John Ruple, Utah Journal of Land, Resources & Environmental Law, 2004, Volume 24, Issue 1 (providing the state perspective on the battle over the U.S. Department of Energy's efforts to seek authority to reclassify high-level radioactive waste).

*Better to Work Outside Courts to Mix Roles*, The Environmental Forum – The Policy Journal of the Environmental Law Institute, July/August 2002, Volume 19, Number 4, Page 54 (positing that U.S. Supreme Court federalism cases have little impact on on-the-ground state environmental protection

regulation, as part of a series of articles entitled "Forum: Who's In Charge?" relating to the Supreme Court's federalism jurisprudence).

*The Mississippi Basin: A National Treasure, A National Challenge*, with co-author Scott Siff, Tulane Environmental Law Journal, Volume 12, Issue 2, Spring 1999 (discussing joint state/federal efforts to protect the water quality of the Mississippi River).

Case 5:16-cv-00125-gwc   Document 210-50   Filed 11/27/18   Page 14 of 14