# EXHIBIT 50

Page 1

1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF VERMONT
2
3    ------------------------------
     JAMES D. SULLIVAN, et al.,      )
4    Individually and on behalf of )
     a Class of persons similarly   )
5    situated,                       )
                Plaintiffs,          )
6                                    ) CIVIL ACTION NO.
         V.                          ) 5:16-cv-00125
7                                    )
     SAINT-GOBAIN PERFORMANCE        )
8    PLASTICS CORPORATION,           )
                Defendant.           )
9    ------------------------------
10
11
12                VIDEO-RECORDED DEPOSITION
                          - of -
13                   DAVID K. MEARS
14
15
16       taken on behalf of the Defendant on Monday,
         September 24, 2018, at the offices of Biggam
17       Fox Skinner LLP, 453 Stone Cutters Way,
         Montpelier, Vermont, commencing at 8:58 AM.
18
19
20                VIDEOGRAPHER:  MARY DOUD
21        COURT REPORTER:  JOHANNA MASSÉ, RMR, CRR
22
23
24
25

Page 2

1    APPEARANCES:
2    ON BEHALF OF THE PLAINTIFFS:
          EMILY J. JOSELSON, ESQUIRE
3         Langrock, Sperry & Wool, L.L.P.
          111 South Pleasant Street, P. O. Drawer 351
4         Middlebury, Vermont 05753-0351
          (802) 388-6356 | ejoselson@langrock.com
5
6
7
     ON BEHALF OF THE DEFENDANT:
8         DAVID WEINRAUB, ESQUIRE
          Dechert LLP
9         Three Bryant Park
          1095 Avenue of the Americas
10        New York, New York 10036-6797
          (212) 641-5611 | david.weinraub@dechert.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    I N D E X
 2
 3   DAVID K. MEARS                                PAGE
         EXAMINATION BY MR. WEINRAUB                 7
 4       EXAMINATION BY MS. JOSELSON               175
         EXAMINATION BY MR. WEINRAUB               180
 5       EXAMINATION BY MS. JOSELSON               187
 6
 7
 8                  E X H I B I T S
 9
10   NUMBER      DESCRIPTION                       PAGE
     Exh 1       Expert Rebuttal Report of David K.   8
11               Mears, J.D.
12   Exh 2       12/15/17 Merits Report of Philip K.  26
                 Hopke, Ph.D.
13
     Exh 3       David Mears's Billing Records as of  28
14               8/30/18
15   Exh 4       Vermont Air Pollution Control        40
                 Regulations through 11/30/16
16
     Exh 5       8/1/18 Rebuttal Report of Philip K.  55
17               Hopke, Ph.D.
18   Exh 6       7/21/92 Federal Register             81
19   Exh 7       5/24/96 Federal Register Excerpt     82
20   Exh 8       5/4/18 Report of Felix Flechas, P.E. 87
21   Exh 9       6/8/90 ChemFab Permit                89
22   Exh 10      12/9/98 Memo to ChemFab Corporation 109
                 A2 File from Chris Jones
23
24
25                    (Continued)
```

Page 4

1                      E X H I B I T S
                         (Continued)
2
3    NUMBER      DESCRIPTION                              PAGE
     Exh 11      October 1972 Statutes and Regulations    118
4                Concerning Air Pollution Control,
                 SGPPLVT04022752-799
5
     Exh 12      2/12/98 Memo to A2 File from Philip       123
6                Etter
7    Exh 13      10/1/86 Agency Memo to Jonathan Lash      126
                 from Harold Garabedian
8
     Exh 14      11/3/81 Air Pollution Control            136
9                Regulations, SGPPLVT04023511-560
10   Exh 15      NATA Overview from epa.gov Website        141
11   Exh 16      Memo to Harold Garabedian from            143
                 Bill Bress re "Chemical Fabrics
12               Preliminary Report"
13   Exh 17      2/28/16 E-mail to Alyssa Schuren,         158
                 et al., from Chuck Schwer
14
     Exh 18      3/4/16 E-mail String re "North            159
15               Bennington Question"
16   Exh 19      Trip Report for 7/12/89 Inspection        163
17   Exh 20      9/20/99 Memo to A2 File from Philip       166
                 Etter
18
                 (The original exhibits were included
19               with the original transcript.)
20
21
22
23
24
25

1              S T I P U L A T I O N S

2              IT IS HEREBY STIPULATED AND AGREED

3    by and between Counsel for the respective parties that

4    this deposition is being taken in accordance with the

5    Federal Rules of Civil Procedure; that all objections

6    except as to form are reserved until the time of trial;

7    that all objections as to Notice of this deposition are

8    hereby waived; and that the witness has reserved the

9    right to read and sign the deposition transcript.

10                     *    *    *

11                  MONDAY, SEPTEMBER 24, 2018

12                        8:58 AM

13   ---------------------------------------------------------

14          THE VIDEOGRAPHER:  Good morning.  We're on the

15   record at 8:58 AM, September 24th, 2018.  Please note

16   that the microphones are sensitive and may pick up

17   whispering, private conversations, and cell

18   interference.

19          This is media unit number 1 of the

20   video-recorded deposition of David Kruger Mears taken

21   by counsel for the defendant in the matter of James D.

22   Sullivan vs. Saint-Gobain Performance Plastics filed in

23   the U.S. District Court, District of Vermont, Civil

24   Action No. 5:16-cv-00125.  This deposition is being

25   held at Biggam Fox Skinner, 453 Stone Cutters Way,

```
                                              Page 6
 1   Montpelier, Vermont.
 2              My name is Mary Doud from the firm Veritext,
 3   and I'm the videographer.  Court reporter is Johanna
 4   Massé from Veritext.  Okay.  I'm not related to any
 5   party in this action, nor am I financially interested
 6   in the outcome.
 7              Counsel and all present in the room and
 8   everyone attending remotely will now state their
 9   appearances and affiliations for the record.  If there
10   are any objections to proceeding, please state them at
11   the time of your appearance beginning with the noticing
12   attorney.
13              MR. WEINRAUB:  Good morning.  This is David
14   Weinraub from Dechert LLP on behalf of the defendant,
15   Saint-Gobain.
16              MS. JOSELSON:  Emily Joselson, Langrock,
17   Sperry & Wool, on behalf of the plaintiffs.
18              THE VIDEOGRAPHER:  Will the court reporter
19   please swear in the witness.  Thank you.  We may
20   proceed.
21              (The witness was sworn.)
22              THE REPORTER:  Counsel, usual stips okay?
23              MR. WEINRAUB:  Yes.
24              MS. JOSELSON:  Yes.
25              THE REPORTER:  Thank you.
```

```
 1                    DAVID K. MEARS,

 2     having been first duly sworn, testified as follows:

 3                      EXAMINATION

 4   BY MR. WEINRAUB:

 5        Q.   Good morning, Mr. Mears.

 6        A.   Good morning.

 7        Q.   Have you ever given a deposition before?

 8        A.   I have not.

 9        Q.   Okay.  Have you ever taken depositions before

10   as an attorney?

11        A.   Yes.

12        Q.   Okay.  So you're on the other side of the

13   table, as it were.  Are you generally familiar with

14   the -- with the ground rules for how depositions

15   proceed?

16        A.   Yes.

17        Q.   And in what jurisdictions have you taken

18   depositions as an attorney?

19        A.   Generally I have taken depositions in Texas,

20   in Washington state, and Vermont.  I have also during

21   my time as an attorney for the U.S. Department of

22   Justice taken depositions in Florida and New Jersey and

23   Massachusetts.  There may be others that I just can't

24   recall.

25        Q.   Okay.  Fair enough.  Let's go ahead and mark
```

```
                                              Page 8
 1   your expert report.
 2            (Deposition Exhibit No. 1 was
 3            marked for identification.)
 4   BY MR. WEINRAUB:
 5        Q.   Now, the document that's been marked as
 6   Exhibit 1, is this the expert report that you've
 7   submitted in this case?
 8        A.   It is.
 9        Q.   And is your CV attached to the exhibit?
10        A.   Yes.
11        Q.   Okay.  Could you turn to your CV, please.
12            And under the heading "Experience," your CV
13   lists your professional experience beginning with your
14   job with the Texas Water Commission in February 1987;
15   is that correct?
16        A.   Correct.
17        Q.   And is this a current, accurate list of your
18   professional positions?
19        A.   It's not up-to-date.  I have just recently,
20   starting on September 5th, taken a position with the
21   National Audubon Society as the director of the Audubon
22   Vermont office.
23        Q.   Is that a full-time position?
24        A.   It is.
25        Q.   So I take it you are no longer employed by
```

Page 9

1    Vermont Law School.  Is that correct?

2         A.    Correct.

3         Q.    And could you describe just in general terms

4    the circumstances of your departure from Vermont Law

5    School.

6         A.    I resigned from the law school at the end of

7    June of this year to pursue other opportunities.

8         Q.    In connection with any of the positions listed

9    on your CV, did you ever address issues related to

10   PFOA?

11        A.    Yes.  In a tangential way.  When I taught a

12   course on hazardous and toxic substances last fall, we

13   discussed the situation in North Bennington as part of

14   my classroom discussions.

15        Q.    Approximately how many classroom discussions

16   did you have that touched on the topic of PFOA?

17        A.    It would have been a portion of one class.

18        Q.    Did you distribute any printed material in

19   connection with that course that addressed PFOA?

20        A.    No.  But I did distribute the -- or asked the

21   students to review electronic versions of news articles

22   related to PFOA.

23        Q.    Do you recall any particular news articles

24   that you asked the students to review?

25        A.    I do.  One was an article from the New York --

1    I believe it was New York Times Magazine about Rob

2    Bilott, and the other was a series of articles in

3    VTDigger called something along the lines of "Teflon

4    Town."

5         Q.   You were commissioner of the Vermont

6    Department of Environmental Conservation for a period

7    of time; is that correct?

8         A.   Correct.

9         Q.   And that was during December 2011 to July

10   2015?

11        A.   Correct.

12        Q.   So I take it that you did not specifically

13   address any PFOA issues during your time with Vermont

14   DEC?

15        A.   Correct.

16        Q.   Were you personally involved in any

17   enforcement proceedings during your time at Vermont

18   DEC?

19        A.   Yes.

20        Q.   Approximately how many?

21        A.   It's hard to give a specific answer because I

22   had varying levels of involvement with enforcement

23   actions while I was there.  Partic- -- encouraging the

24   enforcement program was one of my priorities, but in

25   terms of kind of personal involvement, I would say it

1   was probably fewer than a half dozen.

2       Q.   And could you generally describe what those

3   fewer than half dozen enforcement actions consisted of

4   in general terms?

5       A.   In general they involved a couple of cases

6   where there were substantial violations and substantial

7   penalties or referrals to the Attorney General's

8   Office, or they involved particularly thorny policy or

9   legal questions.

10      Q.   And is it fair to say that it was the

11  substantiality of those violations and the thorniness

12  of the policy and legal questions that warranted

13  elevating it to the level where the director was

14  personally involved with those proceedings?

15          MS. JOSELSON:  Object to the form.

16          But you can answer.

17      A.   Yes.

18      Q.   You mentioned also being involved in

19  encouraging enforcement actions.  Could you describe

20  what -- what you mean by that.

21      A.   The -- there were many processes in the

22  department, including in the enforcement program, that

23  I wanted to improve the efficiency and effectiveness of

24  the programs, and I also wanted it to be clear to the

25  staff and to the leadership of that program that there

1   was -- that they were independent of any concerns about

2   political pressure.  I saw it as one of my roles to

3   make sure that they had unimpeded ability to make

4   decisions about the enforcement work that they were

5   doing.

6        Q.    Did you feel that prior to your taking on the

7   commissioner role, that political pressure within the

8   department had been a problem?

9        A.    Anec- -- I had no personal or direct knowledge

10  of that, but anecdotally and from staff accounts, there

11  had been occasions in which pressure from governors or

12  secretaries of the agency or in some cases legislators

13  had interfered with the enforcement actions.

14       Q.    And referring to those anecdotes that you had

15  heard about during that time frame, do you recall what

16  any of the companies involved were?

17       A.    I don't recall specifics.  I do recall that

18  there was a reference to a ski area case, a reference

19  to IBM.  Beyond that I can't -- and maybe Husky, but I

20  can't -- I can't recall specifics of those particular

21  cases.

22       Q.    Okay.  During your time with Vermont DEC, did

23  you focus on any particular regulatory programs more

24  than others, or would you say you were evenly

25  distributed across all regulatory programs?  Or however

Page 13

1    you would like to describe it.

2         A.    I would say that I spent the most significant

3    amount of my time on clean water issues involving Lake

4    Champlain, but not dramatically so.  I -- I worked

5    fairly broadly across all of the various programs.

6         Q.    Did you do any work in connection with

7    Vermont's air toxics program?

8         A.    I'm not recalling any specific project or

9    issue that I worked on related to air toxics off the

10   top of my head, but I definitely worked with that team

11   of folks and with the air program generally.

12        Q.    And who were the members of the air program

13   during your time at Vermont DEC?

14        A.    The director was Dick Valentinetti of the --

15   what became then known as the Air and Climate division;

16   and following Dick Valentinetti, Elaine O'Grady was the

17   director.  And there was -- of course, that was a large

18   division, so there were quite a number of folks.

19        Q.    Did you interact with the secretary of

20   Vermont's Agency for Natural Resources during your time

21   at Vermont DEC?

22        A.    Daily, yes.

23        Q.    And who was the ANR secretary during that

24   time?

25        A.    Deb Markowitz.

1     Q.   Did you ever discuss any air toxics issues

2   with Deb Markowitz during your time with Vermont DEC?

3     A.   Not that I recall.  But I'm remembering --

4   there was an issue involving a distillery, and this

5   isn't a classic air toxics issue, but there was an

6   issue of the ethanol that escapes from the barrels at

7   distilleries that have -- can have the effect of

8   fostering a toxic kind of mold that can grow around

9   those facilities, so not exactly air toxics, but just

10   to amend my prior answer.  But in terms of Secretary

11   Markowitz, I don't recall specifically discussing air

12   toxics issues with her.

13     Q.   Did you interact with any toxicologists at --

14   within ANR during your time at Vermont DEC?

15     A.   Not that I recall.  We relied on the state

16   toxicologist at the Department of Health primarily for

17   issues related to toxics.

18     Q.   And you -- you perfectly anticipated my next

19   question, which is, Did you interact with any

20   toxicologists within the state Department of Health?

21     A.   Yes.

22     Q.   And for what general purposes?

23     A.   For generally tackling issues of are -- were

24   we doing enough to deal with known contaminants, known

25   toxics, as well as emerging toxics.  It covered quite a

1    broad number of chemicals and issues.

2         Q.    And did those discussions with the Department

3    of Health toxicologist encompass varying regulatory

4    programs, water, air, or otherwise?

5         A.    Primarily drinking water, some surface water.

6    I'm not recalling a discussion about air toxics in

7    particular, but that doesn't mean that we didn't have

8    those discussions.  I just can't recall them.

9         Q.    Fair enough.  Do you recall the names of any

10   Department of Health toxicologists that you worked

11   with?

12        A.    The one that I worked with initially was Bill

13   Bress, who had been there, of course, quite a long

14   time, was very well respected.  I'm -- there was

15   another toxicologist we worked with after he left, but

16   I cannot recall her name off the top of my head.  She

17   was also quite impressive.

18        Q.    Have you ever been retained as an expert

19   witness in any cases besides this one?

20        A.    No.

21        Q.    Within the scope of this litigation, what do

22   you consider to be your field or fields of expertise?

23        A.    Environmental law and policy with a particular

24   focus on pollution laws and pollution control policy.

25        Q.    Are you an expert in environmental

1   engineering?

2       A.   No.

3       Q.   Who retained you as an expert in this case?

4       A.   The attorneys for the plaintiffs.

5       Q.   And when were you retained?

6       A.   I can't remember the precise date, but it was

7   in the -- the late spring, early summer, May or June,

8   of 2018.

9       Q.   And what were you asked to do, or what was the

10  scope of your retention?

11      A.   I was asked to review an expert report that

12  had been filed by Felix Flechas and to provide an

13  opinion in response to that.

14      Q.   And turning back to Exhibit 1, which is your

15  expert report, is this the report that you prepared in

16  response to Mr. Flechas' report?

17      A.   Yes.

18      Q.   And did you draft this report yourself?

19      A.   I did draft it in collaboration with the

20  attorneys for the plaintiffs.

21      Q.   Have you prepared any other reports in this

22  case besides what's been marked as Exhibit 1?

23      A.   No.

24      Q.   Are all of your opinions that you intend to

25  offer in this case set forth in the report?

1      A.   Yes.

2      Q.   Have you been asked to do any work in this

3  case that is not reflected in the report?

4      A.   No.

5      Q.   And are all the materials that you relied on

6  in forming your opinions, are they referenced in your

7  report?

8      A.   Yes.

9      Q.   Did you consider any additional materials that

10  you did not rely on and that are not referenced in the

11  report?

12      A.   I'm sorry.  I didn't understand the question.

13      Q.   Yeah.  It wasn't a very good question.  Other

14  than the materials that you identified in -- in your

15  report as materials that you relied on, did you

16  consider any additional materials?

17      A.   I'm not sure what you mean by "consider."  I

18  mean, I certainly have -- you know, through the course

19  of my work and experience working on pollution issues

20  and toxics, I have a whole set of contexts that inform

21  my opinion.  I also have been paying attention to the

22  unfolding issues in North Bennington over the past

23  several years, so that backdrop and context was all

24  information that informed my opinion, but I can't think

25  of any specific materials or information that I

1    considered outside of the scope of the information

2    provided to me by the plaintiffs and -- and Mr.

3    Flechas' report and Dr. Hopke's report.

4         Q.    Have you ever resided in Bennington, Vermont?

5         A.    I have not.

6         Q.    Ever resided in North Bennington?

7         A.    No.

8         Q.    Have you ever worked in either Bennington or

9    North Bennington?

10        A.    I've never had a position of employment

11   where -- where it was located in those places.

12        Q.    Have you ever personally consumed drinking

13   water in Bennington or North Bennington?

14        A.    Probably.  I can't recall, but I've certainly

15   been to restaurants and people's homes in the

16   community.

17        Q.    Okay.  Was there ever a period of time where

18   you were regularly consuming drinking water in

19   Bennington or North Bennington?

20        A.    No.

21        Q.    Okay.  Sitting here today, is there anything

22   in your expert report that you want to correct or

23   supplement?

24        A.    I do want to -- well, I think I've already

25   referenced the fact that I now have a different

1   position than is reflected in my CV, but beyond that,

2   no.

3        Q.   So other than updating your employment

4   history, there are no other changes to your -- your

5   prior employment history?

6        A.   Correct.

7        Q.   And no changes to the -- to the opinions that

8   you're offering?

9        A.   Correct.

10       Q.   Okay.  Have you ever met Dr. Hopke?

11       A.   I have not.

12       Q.   Have you ever spoken with him by phone or

13   e-mail or otherwise?

14       A.   No.

15       Q.   To your knowledge, did Dr. Hopke review your

16   report before it was finalized?

17       A.   I don't believe that he did.  He may have, but

18   I don't think so.

19       Q.   Have you discussed your work in this case with

20   anyone other than plaintiffs' counsel?

21       A.   No.

22       Q.   Since leaving your position as director of

23   Vermont DEC, have you stayed in contact with any of

24   your former colleagues there?

25       A.   Yes.

1    Q.   And which colleagues have you stayed in touch

2    with?

3    A.   Many of them.  Some who have left.  Alyssa

4    Schuren is a -- is a friend and colleague.  Trey Martin

5    is a friend and colleague.  I interact with Matt

6    Chapman fairly frequently at bar events and bump into

7    John Schmeltzer once in a while at cross country races.

8    And then I go to social events where many of those

9    folks are present, but those are the folks I can think

10   of that may have had something or anything to do with

11   the North Bennington issues.

12   Q.   Have you ever discussed PFOA issues with any

13   of your former DEC colleagues?

14   A.   Yes.

15   Q.   On approximately how many occasions?

16   A.   Maybe a dozen.

17   Q.   And which of the colleagues that -- that

18   you've listed that you keep in touch with have you

19   discussed PFOA with?

20   A.   All of them.

21   Q.   And over what time period did you have those

22   discussions?

23   A.   The last -- really since the information

24   emerged about the contamination, which I can't recall

25   the precise dates, but it seems to me it's been at

Page 21

1   least two years.

2       Q.   What was the sum and substance of those

3   conversations?

4       A.   I can't recall the specifics.  I mean,

5   generally it -- it is one of the most significant

6   environmental issues and contam- -- groundwater

7   contamination issues in the state for many years, so

8   would typically ask for an update.  You know, not that

9   they had any obligation to tell me anything, but, you

10  know, just out of curiosity, like what's the latest?

11          So I might get an update from John about --

12  John Schmeltzer about his last visit and what they had

13  learned in terms of monitoring, or I might learn from

14  Alyssa when she was at the department what their latest

15  efforts were to do outreach to the community, or from

16  Matt I might have heard about the latest procedural

17  steps in the negotiation -- or the litigation between

18  the State and Saint-Gobain.  It was all general.

19  Nothing specific.

20      Q.   Did any of these conversations occur after you

21  were retained as an expert in this case earlier this

22  year?

23      A.   Not that I can recall, but I couldn't swear to

24  that.  But if there were conversations, they were at a

25  general level.

 1      Q.   As best as you can recall, have you told any
 2   of these folks that you've been retained as an expert
 3   in this case?
 4      A.   I think I've mentioned it to Matt Chapman.
 5   I'm not certain.
 6      Q.   And do you recall anything that Matt Chapman
 7   may have said in response?
 8      A.   No.  It wasn't a substantive conversation, if
 9   we had it.
10      Q.   During any of these conversations, did any of
11   these individuals say anything on the subject of
12   ChemFab's or Saint-Gobain's regulatory compliance
13   during the period that they were operating plants in
14   Bennington and North Bennington?
15           MS. JOSELSON:  Object to the form.
16           But you can answer.
17      A.    No.  I can't recall talking about anything
18   that's kind of the substance of this in terms of the
19   history of ChemFab's interactions with the State.  It
20   was mostly about what's -- what have we learned
21   recently about the science of the site, the
22   hydrogeology, the -- the communications with the
23   community, and of looking forward what are the -- the
24   solutions.
25      Q.   Have you had any written communications with

1   any of these folks regarding PFOA issues?

2        A.   No.

3        Q.   We've discussed Dr. Hopke.  Have you had any

4   conversations with any other plaintiffs' experts in

5   this case?

6        A.   No.

7        Q.   And have you discussed PFOA issues with any

8   current or former residents of Bennington or North

9   Bennington?

10       A.   Yes.

11       Q.   And which residents have you had conversations

12  with?

13       A.   I don't recall their names.

14       Q.   Do you recall approximately how many

15  conversations?

16       A.   It would have been a relatively short burst of

17  conversations that happened while I was -- maybe in

18  2015 or '16.  Right -- right when the first information

19  came out about the groundwater contamination, I was at

20  the time the head of the Environmental and Natural

21  Resources Law Clinic at Vermont Law School, and we were

22  working with the Toxics Action Center in arranging for

23  some community meetings with residents and citizens of

24  North Bennington, and we had two kind of meetings that

25  I recall that would have been in people's living rooms.

1    Q.   And what were the sum and substance of those

2    living room conversations?

3    A.   They were simply explaining to them the nature

4    of the -- the legal framework, the regulatory system

5    around the pollution laws and what their -- what was

6    likely to happen in terms of the regulatory process and

7    what their opportunities to engage in that process

8    would be.

9    Q.   And was there a particular regulatory process

10   that you discussed during those conversations?

11   A.   At that time -- it's a little fuzzy, but my

12   recollection is at the time the State had begun to have

13   a set of public meetings and was inviting the public to

14   weigh in and -- with their concerns and also to -- to

15   share what the State was planning to do.  So my

16   recollection is that it would have been fairly general

17   that I would have been explaining the way the Hazardous

18   Waste Cleanup Program worked, how decisions were made

19   under that program, and also how the enforcement

20   program generally worked and their opportunities to

21   weigh in on that.  Again, it's -- enough years have

22   gone by now, I can't -- can't remember the details.

23   Q.   And apart from the two living room

24   conversations, did you attend any public meetings on

25   PFOA issues?

1      A.    I did not.

2      Q.    Were you involved in arranging any of those

3   meetings?

4      A.    The public meetings?

5      Q.    Yes.

6      A.    No.

7      Q.    So if you'll turn to your report, at the very

8   bottom of page 2 and then carrying over to top of page

9   3.  So the carry-over sentence that begins at the end

10   of page 2 states, I agree with and adopt Dr. Hopke's

11   opinions concerning defendant's violations of Vermont

12   air pollution regulations and rely upon the documents

13   he relied upon.

14          Do you see that?

15      A.    I do.

16      Q.    How did you determine which documents Dr.

17   Hopke relied on in connection with his regulatory

18   opinions as opposed to his opinions on other issues?

19      A.    I read his report, and I was also given access

20   to the documents that he cited.

21      Q.    Did you personally identify which documents

22   related to regulatory issues as opposed to other

23   issues?

24      A.    I don't recall making that distinction in my

25   review.  There was quite a lot of documents, and I read

```
 1   as many of them as I could.

 2        Q.   And are you aware that Dr. Hopke has issued

 3   more than one report in this case?

 4        A.   I have seen reference to other reports, though

 5   I have not reviewed them.

 6        Q.   Did you read just one of his reports?

 7        A.   Yes.

 8             MR. WEINRAUB:  Could we mark this one as

 9   Exhibit 2.

10             (Deposition Exhibit No. 2 was

11             marked for identification.)

12   BY MR. WEINRAUB:

13        Q.   And do you recognize the document that's been

14   marked as Exhibit 2?

15        A.   Yes, I do.

16        Q.   Is this the report that -- of Dr. Hopke's that

17   you reviewed in connection with your report?

18        A.   Yes.

19        Q.   And did you adopt all of Dr. Hopke's opinions

20   stated in this report?

21        A.   Yes.

22        Q.   Are there any statements in this report by Dr.

23   Hopke that you disagree with?

24        A.   No.  There -- there is one characterization

25   that I can't recall off the top of my head that I
```

1    thought he might have had -- there was a memo that he

2    referenced that I thought he might have misunderstood

3    who had been the origin of the memo.  It was a phone --

4    phone memo from Chris Jones to somebody, and I think in

5    Dr. Hopke's report he referenced it as though it was

6    coming from the -- the person at ChemFab that Mr. Jones

7    had spoken to when I think in fact it was Mr. Jones

8    describing his conversation.  So it was a small error,

9    but other than that, I didn't see anything that I

10   disagreed with or had questions about.

11        Q.   In your report did you rely on any documents

12   beyond those that Dr. Hopke relied on in his report?

13        A.   No.

14        Q.   Do you know how Dr. Hopke determined which

15   documents to rely upon in preparing his report?

16        A.   I do not.

17        Q.   Do you know who provided Dr. Hopke with those

18   documents?

19        A.   I do not.

20        Q.   Do you know whether Dr. Hopke did any

21   independent literature review or document review of his

22   own before selecting those documents?

23        A.   I have the impression from the compilation

24   that he did of citizen complaints that he had done some

25   independent investigation, but I'm not certain.

```
 1        Q.   Have you yourself done any independent
 2   literature or document review in connection with your
 3   report?
 4        A.   No.
 5             MR. WEINRAUB:  Can we mark this one as Exhibit
 6   3, please.
 7             (Deposition Exhibit No. 3 was
 8             marked for identification.)
 9   BY MR. WEINRAUB:
10        Q.   Do you recognize the document marked as
11   Exhibit 3?
12        A.   I do.
13        Q.   Is this your billing records in this case
14   through August 30 of 2018?
15        A.   Yes.
16        Q.   And do you recognize this as a document that
17   was produced to us in connection with a subpoena?
18        A.   Yes.
19        Q.   At the top the document refers to a billing
20   rate of $400 per hour.  Do you see that?
21        A.   Yes.
22        Q.   And is that in fact your billing rate in this
23   case?
24        A.   Yes.
25        Q.   Do you charge any different rate for
```

1   testifying at today's deposition?

2        A.    No.

3        Q.    Should you testify at trial, do you expect to

4   charge a different rate for trial testimony?

5        A.    No.

6        Q.    Does this document accurately summarize your

7   work on this case through August 30 of 2018?

8        A.    Yes.

9        Q.    And have you done additional work on this case

10  since August 30 of 2018?

11       A.    Yes.

12       Q.    And approximately how many hours, as best as

13  you can estimate?

14       A.    Somewhere between another six or eight hours.

15       Q.    And was that in preparation for today's

16  deposition?

17       A.    Yes.

18       Q.    Did you do any work after August 30 other than

19  preparing for today's deposition?

20       A.    Not that I recall.

21       Q.    In general terms, what did you do to prepare

22  for the deposition?

23       A.    Mostly I just read through the documents a

24  second time, reading -- read through the various

25  reports and going back to the underlying source

```
 1   documents.
 2       Q.   Other than any discussion with plaintiffs'
 3   counsel, have you had any discussions with anyone else
 4   in preparation for your deposition today?
 5       A.   No.
 6       Q.   Exhibit 3 includes one entry dated July 16 of
 7   one hour spent "Reviewing new July 2018 DEC report on
 8   PFAS sampling."  Do you see that?
 9       A.   I do.
10       Q.   Why did you review that report?
11       A.   Counsel for plaintiffs e-mailed it, I believe
12   to a number of the experts, and so I took the time to
13   read it.
14       Q.   Does that report have any particular
15   significance to your opinions in this case?
16       A.   No.
17       Q.   Switching topics, I'd like to discuss the
18   Clean Air Act at a sort of Clean Air Act 101 level to
19   make sure I understand in general how the system works.
20            Am I correct that the Clean Air Act
21   establishes various regulatory programs?
22       A.   Yes.
23       Q.   And one category of those programs involves
24   regulation of new and existing sources of air
25   pollution?
```

1      A.    Yes.

2      Q.    And do those programs focus in part on

3  ensuring attainment and maintenance of National Ambient

4  Air Quality Standards?

5      A.    Yes.

6      Q.    And that's abbreviated NAAQS?

7      A.    Correct.

8      Q.    In connection with the NAAQS program, does the

9  Clean Air Act distinguish between attainment areas and

10  nonattainment areas?

11      A.    Yes.

12      Q.    And is an attainment area a geographic region

13  that is at that time attaining the NAAQS standards?

14      A.    Correct.  Although it -- it's important to

15  note that an area can be an attainment for some

16  criteria pollutants and not an attainment for others.

17      Q.    And depending on the status of an area as

18  attainment or nonattainment for a particular criteria

19  pollutant, do the regulations differ for sources within

20  that area?

21      A.    Yes.

22      Q.    And are the regulations more strict for

23  sources located within nonattainment areas?

24      A.    Yes.

25      Q.    During the time that ChemFab operated its

1   Bennington facility, was that facility located in an

2   attainment or nonattainment area with respect to the

3   NAAQS criteria pollutants?

4        A.   I don't know.

5        Q.   And same question for the North Bennington

6   facility.

7        A.   I don't know, either.

8        Q.   Does the NAAQS program also distinguish

9   between major and minor sources?

10       A.   Yes.

11       Q.   And to your knowledge, was ChemFab's

12   Bennington facility a major or minor source with

13   respect to the NAAQS program?

14       A.   I don't know.

15       Q.   Same question for the North Bennington

16   facility.

17       A.   I don't know.

18       Q.   Under the Clean Air Act, are new sources

19   subject to preconstruction review to ensure attainment

20   of NAAQS standards and to ensure application of

21   up-to-date control technologies?

22            MS. JOSELSON:   Object to the form.

23            But you can answer.

24       A.   There was kind of two questions embedded in

25   there.

1      Q.   Yeah.  That's fair enough.  I was -- I was
2   getting ahead of myself.  Let me break that down.
3           Under the Clean Air Act, are new sources
4   subject to preconstruction review?
5      A.   Yes.
6      Q.   And is one purpose of preconstruction review
7   to -- to ensure attainment of NAAQS standards?
8      A.   That's the ultimate goal, although they
9   typically use technology-based standards, and they may
10  also require offsets or mitigation depending on whether
11  it's an attainment or nonattainment area.
12     Q.   Under the Clean Air Act, is each state
13  responsible for developing a state implementation plan
14  to regulate sources within its borders?
15     A.   Yes.
16     Q.   Is each state's implementation plan required
17  to be at least as stringent as the Clean Air Act?
18     A.   Correct.  Meaning that the state program can
19  be more stringent than the federal program.
20     Q.   And state implementation plans, or SIPs for
21  short, are subject to EPA review and approval, correct?
22     A.   Correct.
23     Q.   SIPs can vary from one state to the next,
24  right?
25     A.   Yes.

1    Q.   Is it fair to say, though, that all states'

2    SIPs have many features in common?

3    A.   Yes.  And that's because EPA has a set of

4    minimum requirements that apply to all states.  Also

5    the strategies -- states tend to replicate successful

6    strategies from each other.

7    Q.   Can you identify any features of Vermont's SIP

8    that make it significantly more stringent than the

9    Clean Air Act?

10   A.   Not off the top of my head, although generally

11   Vermont has taken a much more stringent approach to

12   toxics across all of its programs, but I can't think of

13   a -- I'm not sufficiently familiar with the details of

14   Vermont's state implementation plan at the moment to be

15   able to recite a specific area in which it's

16   significantly more stringent.

17   Q.   Focusing on toxics programs, in what ways is

18   Vermont's SIP significantly more stringent than the

19   Clean Air Act?

20   A.   I can't give you a specific example.  I was

21   just noting that as a general matter Vermont, between

22   the Department of Environmental Conservation and the

23   Health Department, had generally taken a more cautious

24   approach, a more conservative approach, to protecting

25   public health than has EPA.

1      Q.   Has that been true throughout the 1970s to the

2    present, or has it changed at some point along the

3    line?

4      A.   That's been a consistent theme in the state of

5    Vermont through -- through the passage of all the

6    environmental laws.

7      Q.   And as a related question, can you identify

8    any feature of Vermont's SIP that makes it

9    significantly more stringent than other states' SIPs?

10     A.   I can't identify a specific example.

11     Q.   So we've discussed criteria pollutants in

12   connection with the Clean Air Act's NAAQS program.

13     A.   I'm sorry.  Can I -- can I go back and amend

14   my answer briefly?

15     Q.   Yeah.  Please.

16     A.   I just realized one area I am -- I am more

17   familiar with that I'm -- know that Vermont's program

18   is more stringent is in the area of mobile sources.

19   Vermont has joined with a number of other states,

20   including California, to adopt more stringent

21   restrictions on mobile source emissions.

22     Q.   Mobile sources would include things like

23   vehicles?

24     A.   Correct.

25     Q.   Are there any particular requirements on

```
1   mobile sources that Vermont's program focuses on?
2        A.    There's a set of standards that are often
3   referred in shorthand to as the California standards
4   because in addition to the national standards set by
5   EPA, California's allowed to set its own standards.
6   It's the only state that's given that option.  But
7   other states are allowed to opt in to the California
8   standards, and Vermont is one of a handful of states
9   that have done so.
10       Q.    Has Vermont also joined with other states in
11  regulating greenhouse gases?
12       A.    Yes.
13       Q.    And do you have any personal experience with
14  that -- with that program from your time at Vermont
15  DEC?
16       A.    Yes.
17       Q.    And could you describe just the sum and
18  substance of what that -- what that set of requirements
19  is and how Vermont cooperates with other states in
20  implementing it.
21            MS. JOSELSON:  Object to the form.
22            But you can answer.
23       A.    I understand the question.  There's a --
24  there's a couple of -- of ways.  One relates to the
25  mobile source controls along with a group of other
```

1    states.  The California standards are in part focused

2    on addressing greenhouse gas emissions.

3           In addition, there's a collaborative of states

4    that are engaged in promoting the use of battery

5    electric vehicles, and I'm not certain if that's worked

6    its way into the state implementation plan or not.

7           The third area that I know is -- is an active

8    area of development over the past decade has been the

9    State's collaboration as part of the Regional

10   Greenhouse Gas Initiative to promote investment in

11   efficiency but also using a cap and trade program

12   associated with greenhouse gas emissions as the basis

13   of raising the funds for the efficiency investments.

14       Q.   Okay.  Thank you.  Turning back to criteria

15   pollutants, we've discussed these in connection with

16   the NAAQS program.  Has PFOA or APFO ever been

17   identified as a criteria pollutant?

18       A.   No.

19       Q.   And just to put a finer point on it, has APFO

20   or PFOA ever been identified either by EPA or by

21   Vermont regulators as a criteria pollutant?

22       A.   No.

23       Q.   In addition to national air quality standards,

24   the Clean Air Act also addresses certain specific air

25   pollution problems, correct?

1      A.    Yes.

2      Q.    One being acid rain?

3      A.    Correct.

4      Q.    And another being hazardous air pollutants?

5      A.    Correct.

6      Q.    Does the Clean Air Act require EPA to regulate

7   emissions of hazardous air pollutants?

8      A.    Yes.

9      Q.    And in connection with that requirement, does

10   EPA publish a list of hazardous air pollutants?

11      A.    Yes.

12      Q.    Has PFOA or APFO ever appeared on EPA's list

13   of hazardous air pollutants?

14      A.    No.

15      Q.    To your knowledge, can anyone petition EPA to

16   request that a new substance be considered for

17   inclusion on EPA's hazardous air pollutant list?

18      A.    Yes.

19      Q.    And to your knowledge, has Vermont DEC ever

20   petitioned EPA to include PFOA or APFO on its hazardous

21   air pollutant list?

22      A.    Not to my knowledge.

23      Q.    Have you yourself ever petitioned EPA to

24   include PFOA or APFO on the hazardous air pollutant

25   list?

1      A.    No.

2      Q.    Does Vermont separately maintain a list of

3   hazardous air contaminants?

4      A.    Yes.

5      Q.    Has PFOA or APFO ever appeared on Vermont's

6   hazardous air contaminant list?

7      A.    I don't know.  But as far as -- to my

8   knowledge, no.  I mean, it may have.  I don't know

9   what's happened in recent -- the past year or so.

10      Q.    In any of your discussions with current or

11   former DEC personnel, has the subject of adding PFOA or

12   APFO to Vermont's hazardous air contaminants list ever

13   come up?

14      A.    Not specifically, although I recall, you know,

15   having a conversation, asking the question of whether

16   or not the State would consider -- was considering that

17   either in the context of the -- any of the programs,

18   drinking water, air pollution, hazardous waste

19   management.

20      Q.    Did you ask that question generally without

21   referencing any specific programs, or did you ask it

22   specifically for each program?

23      A.    Generally.  Without reference to specific

24   programs.

25      Q.    And do you recall what the response was to

1    your question?

2         A.    That it was something that the State was

3    considering.

4         Q.    Who -- who made that statement?

5         A.    I honestly can't remember.  It was probably

6    Matt Chapman, would have been the person.  The reason I

7    think it was probably Matt is I was asking the -- as I

8    recall, I was asking the question during the time that

9    I taught my course and we had the class discussion on

10   the North Bennington situation within the class, and

11   I -- I think I called Matt just to ask him what was

12   going on, but I'm not certain.  It might have been John

13   or Chuck Schwer or someone else in the program.

14        Q.    Okay.  Fair enough.  So whoever it was, Matt

15   or Chuck or whoever else, when they said that the State

16   was considering regulating APFO or PFOA, did they

17   specifically reference the hazardous air contaminant

18   list or any other regulatory program?

19             MS. JOSELSON:  Object to the form.

20             But you can answer.

21        A.    Not that I recall.

22             MR. WEINRAUB:  Can we mark Exhibit 4, please.

23             (Deposition Exhibit No. 4 was

24             marked for identification.)

25   / / /

```
                                              Page 41
 1   BY MR. WEINRAUB:
 2        Q.   And, Mr. Mears, I'll represent to you that
 3   Exhibit 4 is an excerpt of the Vermont air pollution
 4   control rules, including -- including amendments
 5   through November 30, 2016, and the excerpt consists of
 6   Appendix B, which is the hazardous air contaminants
 7   list.
 8             You're familiar with the Vermont air pollution
 9   control rules, I take it?
10        A.   Yes.
11        Q.   Does that -- does my characterization of the
12   document appear accurate?
13        A.   I understand, yes.  This looks -- yes.
14   That -- this is the right list.
15        Q.   Okay.  So -- and you're welcome to peruse the
16   list as long as you need, but I'll -- I'll just preview
17   my question for you.  My question is, Can we agree that
18   at least as of November 2016 APFO and PFOA were not
19   included on Vermont's HAC list?
20        A.   Yes.
21        Q.   Okay.  Thank you.
22             Okay.  Let's turn back to your report, which
23   is Exhibit 1.
24             MR. WEINRAUB:  Actually, I'll pause for a
25   moment.  I'm at a transition point, and I am happy to
```

Page 42

1   keep going, but if anybody would like a break,

2   please --

3           MS. JOSELSON:  I like to take a break every

4   hour for just a little while.

5           MR. WEINRAUB:  Sure.  That's fine with me.

6           THE WITNESS:  That would be great.

7           MR. WEINRAUB:  So take ten minutes?

8           THE VIDEOGRAPHER:  Going off the record at

9   9:57.

10          (A recess was taken.)

11          THE VIDEOGRAPHER:  We're back on the record at

12  10:07.

13  BY MR. WEINRAUB:

14      Q.   Mr. Mears, if we could turn to your report at

15  page 3.

16      A.   Yes.

17      Q.   And specifically at the -- the heading number

18  1, which states "Mr. Flechas shows limited familiarity

19  with Vermont's air pollution statute and regulations

20  and their enforcement."

21          And then below that is the statement that "Mr.

22  Flechas has limited familiarity with Vermont's air

23  pollution statute and regulations.  Other than

24  reviewing documents provided to him by Saint-Gobain, he

25  has no prior experience with the Vermont regulatory

                                                      Page 43

1    scheme."  Do you see that?

2         A.   Yes.

3         Q.   And is that language that you entered into

4    this report?

5         A.   Yes.

6         Q.   Now, you have adopted all of Dr. Hopke's

7    regulatory opinions in this case, correct?

8         A.   Correct.

9         Q.   And to your understanding, does Dr. Hopke have

10   any personal history or involvement with Vermont's air

11   pollution -- air pollution control rules?

12        A.   Not that I'm aware of.

13        Q.   I take it that Dr. Hopke's lack of prior

14   experience with Vermont regulation was not a concern

15   for you?

16        A.   No.  He did a very careful job of evaluating

17   the record, and that was the primary use that I made of

18   his report was the very careful analysis of the

19   regulatory record.

20        Q.   Your report also makes the statement that Mr.

21   Flechas' résumé -- and I'm still at that first

22   paragraph under the heading on page 3.  Your report

23   states that Mr. Flechas' résumé "reveals no prior

24   experience with the federal CAA air pollution control

25   regulatory scheme."  Do you see that?

 1      A.   I do.
 2      Q.   Are you aware that Mr. Flechas was an
 3   enforcement officer at EPA for 30 years?
 4      A.   I did see that.  It -- my impression was that
 5   his focus was on enforcement of the Resource
 6   Conservation Recovery Act.
 7      Q.   Would you agree, though, that the EPA
 8   enforcement program trains inspectors to determine
 9   regulatory requirements across all environmental
10   programs?
11           MS. JOSELSON:  Object to the form.
12           But you can answer.
13      A.   I don't know how they train their inspectors
14   and enforcement teams within the programs.
15      Q.   Do you know the criteria for EPA issuing
16   inspector credentials to its enforcement officers?
17      A.   I do not.
18      Q.   I want to talk generally about methodology.
19   And to begin, at pages 4 through 7 of your report,
20   you've opined that ChemFab and Saint-Gobain violated
21   various provisions of Vermont's air pollution control
22   rules.  Correct?
23      A.   I'm sorry.  Could you repeat the question?
24      Q.   So looking generally at pages 4 through 7 of
25   your report.

1      A.    Correct.

2      Q.    And maybe the best way to do it is if we stay

3   on page 4 and look at heading number 2.

4      A.    Okay.

5      Q.    Where it says "ChemFab/Saint-Gobain violated

6   Vermont air pollution control permits and regulations."

7      A.    Yes.

8      Q.    And that section continues through the first

9   half of page 7, correct?

10      A.    Yes.

11      Q.    And within those pages, you've identified

12   various subsets of regulatory violations, correct?

13      A.    Yes.

14      Q.    Could you describe the methodology that you

15   used in reaching these opinions.

16      A.    Yes.  I looked primarily at the record and

17   exchanges between DEC and ChemFab and looked to the

18   record of complaints about odors, the inspection

19   reports from DEC inspectors, and the formal enforcement

20   actions that were taken, as well as the correspondence

21   that referenced noncompliance or areas where there was

22   serious questions about compliance.

23      Q.    How did you distinguish between areas where

24   there was noncompliance versus areas where there were

25   serious questions about compliance?

1     A.    Well, the most obvious areas where there was

2   clear noncompliance were where there were the

3   assurances of discontinuance, where there were clearly

4   documented violations, agreement by ChemFab that there

5   were violations, and then a formal agreement to resolve

6   those.

7              There were also violations that were noted in

8   the -- some of the inspection reports.

9              There were -- and then at another level was

10   the unresolved odor complaints.

11             And the final category, I can recall in

12   particular a memo from Dick Valentinetti referencing --

13   a 1999 report referencing emissions from the cupolas

14   that -- that raised a serious question of whether or

15   not there had been an ongoing noncompliance.

16             So there was a range from -- from formally

17   designated, agreed to, and identified to identified in

18   inspection reports to indicated by the odor complaints

19   to at least a question raised in a -- an inspection

20   report or a memo.

21     Q.    Does your report ever speak in terms of

22   serious questions of potential noncompliance, or does

23   it consistently speak in terms of actual violations?

24     A.    Speaks primarily in terms of actual

25   violations.

1    Q.   So when there are merely questions of

2    potential noncompliance, did you treat those as

3    violations?

4    A.   No.

5    Q.   When what you consider to be a violation

6    occurred but it was not designated as such in an AOD or

7    in an inspection report, how did you determine that an

8    actual violation had occurred?

9         MS. JOSELSON:   Object to the form.

10        But you can answer.

11   A.   If the facts in the record as indicated by

12   either an inspector, which I would give the most

13   credibility to, raises -- identifies something as a

14   violation, I counted that as a violation.  The fact of

15   the ongoing odor complaints that were never resolved

16   seems self-evident that -- that that was a set of

17   unresolved problems at the plant that reflected

18   violations.

19        Beyond that, the -- the concerns or questions

20   that were raised I did not treat as violations, but I

21   think it's important context in response to Mr.

22   Flechas' assertions that the State was in full support

23   of the actions that ChemFab was taking.

24   Q.   Do you consider ongoing complaints to

25   constitute violations?

1      A.    No.   But I would construe the emissions that

2   gave rise to those complaints to be violations --

3      Q.    Speaking of --

4      A.    -- and the complaints themselves to be

5   significant and important evidence of that.

6      Q.    So you referenced odor complaints in

7   particular.   Is each individual odor complaint

8   tantamount to a violation?

9      A.    An isolated complaint standing alone and

10   unverified by either anyone at the plant or a state

11   inspector, no.   But if it's verified, then I would

12   consider that to be significant evidence of a

13   violation.   And if it were corroborated by multiple

14   other people in the community who experienced the same,

15   you know, sort of emissions as a -- as a nuisance

16   condition, then I would consider that to be significant

17   evidence of a violation.

18      Q.    During your time at Vermont DEC, did you ever

19   make regulatory determinations regarding odor

20   complaints?

21      A.    Personally, no.

22      Q.    During your time at Vermont DEC, did you ever

23   make regulatory determinations regarding visible

24   emissions?

25      A.    Regarding what kind of emissions?

1    Q.    Visible emissions.

2    A.    Visible emissions.  No.

3    Q.    During your time at Vermont DEC, did you ever

4  make determinations regarding the maintenance of

5  catalytic abators?

6    A.    No.

7    Q.    Are you familiar with the regulatory criteria

8  for determining whether an odor complaint rises to the

9  level of an objectionable odor violation?

10   A.    Generally, yes.  I have not -- as you noted

11  earlier, I have not made that determination myself.

12   Q.    In reviewing the regulatory record regarding

13  odor complaints in this case, did you apply those

14  criteria to determine whether an objectionable odor

15  violation had been demonstrated?

16   A.    I did not apply them myself directly, but I

17  did rely on the statements of the DEC inspectors as

18  well as some statements by ChemFab environmental staff.

19  Or I'm not sure what their job was at ChemFab, but

20  there were definitely ChemFab employees that also

21  described and acknowledged the nuisance conditions.

22   Q.    Do you know what the regulatory criteria are

23  for determining whether a nuisance violation has

24  occurred as distinct from an objectionable odor

25  violation?

1      A.   I'm not sure that they're that distinct, but

2   yes, I'm generally familiar with the -- the criteria

3   for nuisance conditions, which could include

4   objectionable odors.

5      Q.   During your time at Vermont DEC, did you ever

6   personally make a regulatory determination regarding

7   nuisance violations?

8      A.   Not to the extent that I personally made the

9   determination, but I certainly signed off on

10  enforcement orders and accepted the determinations of

11  my expert staff who made those determinations.

12     Q.   To make sure I understand your methodology,

13  you reviewed the documents identified by Mr. Hopke,

14  correct?

15     A.   Yes.

16     Q.   And through your review of the documents, you

17  identified what you take to be the relevant facts?

18     A.   Correct.

19     Q.   And then you drew inferences from those facts?

20     A.   Yes.

21     Q.   And you identified what you consider to be the

22  relevant law or regulations?

23     A.   Yes.  There's an interim step in there, which

24  is also that the -- the inferences were based on who

25  the -- kind of the weight of the evidence, including

1    the nature of the people -- the experts on-site making

2    interpretations of that evidence.

3         Q.   And then as a next step, did you identify what

4    you consider to be the relevant law and regulations?

5         A.   Yes.

6         Q.   And then you would apply the law to the facts

7    and the inferences as you understand them to be?

8              MS. JOSELSON:  Object to the form.

9              But you can answer.

10        A.   Yes.  But again, in many ways I also give

11   significant deference to the interpretations of the --

12   that information and the -- the application of that to

13   the permit requirements and the -- specifically the

14   restrictions on creating nuisance and odor conditions

15   that were applied by the DEC inspectors and air

16   pollution control experts.

17        Q.   So in reviewing the regulatory record, did you

18   generally grant deference to discretionary

19   determinations of the Vermont regulators that were on

20   the scene during the relevant time period?

21        A.   I wouldn't describe them as discretionary, but

22   yes, I did give significant credence to their -- their

23   determinations.  I mean, they were -- just to clarify,

24   if I might, the word "discretionary" might suggest that

25   it was somehow arbitrary, and that's not my experience

1  of the way that they applied the -- the criteria to the

2  complaints and their own observations.

3       Q.   And to be clear, I don't mean to suggest that

4  the terms are synonymous.  You can have discretion

5  which you can apply arbitrarily or you can apply it

6  nonarbitrarily.  So when I say "discretion," I mean it

7  in a neutral sense.

8       A.   I understand.

9       Q.   Is there any other component of your

10 methodology that we have not addressed?

11      A.   Well, the other -- there are pieces of Mr.

12 Flechas' opinions and reports that describe the broad

13 public policy and legal framework around air pollution

14 control and the regulation of hazardous air pollutants

15 that I disagree with that come not from the record but

16 from my own experience as someone who's worked for many

17 years in the -- the implementation of -- of

18 environmental law and policy as applied to pollutants

19 and hazardous pollution in particular.

20      Q.   But with respect to whether a violation has or

21 hasn't occurred, is your methodology essentially the

22 steps that we've discussed already, or is there some

23 additional component that we have not discussed?

24      A.   No.  That's -- that's correct.  We've -- we've

25 discussed my methodology.

1      Q.   Did you apply any engineering principles in
2   the course of reaching your opinions in this case?
3      A.   Not to form an independent opinion.  I have to
4   say it's been helpful that I have had some engineering
5   experience in terms of understanding the -- the
6   terminology and language, but I relied entirely on
7   people who have expertise in those areas.
8      Q.   And specifically the -- the regulatory staff
9   during the time period that ChemFab and Saint-Gobain
10  were operating in Vermont?
11     A.   Correct.  As well as the information provided
12  by Dr. Hopke.
13     Q.   Okay.  Turning now to some of your other
14  opinions beginning at page 7.  And heading 3 states
15  "Air emissions of APFO were a regulatory concern by
16  1997."  Do you see that?
17     A.   I do.
18     Q.   What was your methodology in reaching that
19  opinion?
20     A.   That was based on my review of the record, of
21  information that Dr. Hopke had compiled and that I
22  reviewed, as well as my own knowledge of the evolution
23  of regulatory responses to PFOA.
24     Q.   What is your understanding of regulatory
25  responses to PFOA?

1      A.    That's a long -- long answer.  I'll give the

2   highlights, and you can tell me where to spend more

3   time.  But there were -- from the time that PFOA first

4   began to be used anywhere through really the -- the --

5   I mean, there were some exchanges, I understand, that

6   happened, like, down in West Virginia and some parts of

7   the country around PFOA and DuPont that I can't recall

8   specifically, but I know there were at least some

9   exchanges in the '70s or maybe the '80s, but the first

10   time that there was a serious public conversation about

11   PFOA and the regulatory process was in the -- the late

12   '90s.

13          There was -- there were clues in Vermont when

14   you look at the record about the -- the risks

15   associated with the emissions at the North Bennington

16   ChemFab plant that should have given rise both to the

17   State and to ChemFab that more attention should have

18   been paid to it.  But really the -- the most

19   significant public discussion and discourse around a

20   regulatory response specific to PFOA was in the late

21   '90s and into the early 2000s as publicity around the

22   litigation involving the West Virginia case and then

23   the class-action suit filed by Rob Bilott as well as

24   the exchanges with EPA began to emerge onto the scene

25   and then EPA and the states began to have a greater

1   awareness of the risks.

2        Q.    And to be clear, your understanding of this

3   regulatory history is something that you developed

4   after your time with Vermont DEC; is that correct?

5        A.    That's correct.

6        Q.    So I believe you testified that there were

7   clues in Vermont apparent in the record that should

8   have given rise both to the State and to ChemFab that

9   more attention should have been paid to PFOA.  Is -- is

10  that your testimony?

11       A.    Yes.

12       Q.    So is it your testimony that the State was on

13  notice of PFOA issues in the late 1990s that it should

14  have brought more attention to bear on?

15       A.    And ChemFab.  Both, yes.

16       Q.    But also the State?

17       A.    Yes.

18       Q.    Okay.  If we could turn to Mr. -- well, strike

19  that.  I need to show you a different exhibit.

20             (Deposition Exhibit No. 5 was

21             marked for identification.)

22  BY MR. WEINRAUB:

23       Q.    So Exhibit 5 is Dr. Hopke's rebuttal report

24  dated August 1, 2018.  Am I correct that you have not

25  seen this document before?

1      A.    That is correct.

2      Q.    And you're welcome to read as much of it as

3  you like, but my -- my question will focus on the final

4  paragraph on page 4.  And so there's a heading number

5  5, "Rebuttal of opinions of Felix W. Flechas, P.E.,"

6  and towards the end of that paragraph, Dr. Hopke

7  states, "I will note that Mr. Flechas offered no

8  scientific opinions about whether ChemFab/Saint-Gobain

9  knew or should have known about its emissions of PFOA

10  or whether the company failed to utilize available

11  control technologies for control of its emissions of

12  PFOA."

13          Now, recognizing that you have not seen

14  this -- this report before, I'd like to ask you about

15  the use of the term "scientific opinions."  This will

16  sound more flip than I mean it to, but essentially my

17  question is, Is there any such thing as a scientific

18  opinion about whether a company knew or should have

19  known something?

20          MS. JOSELSON:  Object to the form.

21      A.    I mean, that seems a matter of grammar and

22  semantics.  I -- I would note that it may be that he

23  meant that there was -- you know, he wasn't going

24  through to do kind of a forensic analysis of what

25  ChemFab knew and when they knew it.  I'll note, though,

1    for what it's worth, since we're on this topic, that I

2    will offer a nonscientific opinion but one grounded

3    in the -- the record and the facts that the -- the

4    combination of the complaints, the nature of the

5    citizen complaints, the nature of the information known

6    back as early as the early '80s about Chem- -- by

7    ChemFab about the impacts of the exposure to their

8    process that were having on their employees, that there

9    were substantial questions about the public health

10   impacts of the chemicals they were using, and this to

11   me suggests that there was a failure to fulfill their

12   responsibility to really figure out what those -- the

13   causes of those problems were and to communicate those

14   to the State of Vermont.

15        MR. WEINRAUB:  I'm going to move to strike

16   that as nonresponsive.

17     Q.   And I won't ask you to speak for Dr. Hopke

18   because that would not be fair, but let me just ask

19   you, in your experience is -- is a "should have known"

20   standard part of the reasonableness standard of conduct

21   in a tort case?

22        MS. JOSELSON:  Object to the form.

23     A.   I mean, tort law depends on the -- the

24   jurisdiction, and how reasonableness is defined is

25   often defined by reference to specific case law, but as

Page 58

```
1    a general matter, I would agree with that statement.
2         Q.    Does the phrase "should have known" appear
3    anywhere in the Vermont Air Pollution Control
4    Regulations?
5         A.    I don't know.
6         Q.    During your time with Vermont DEC, did you
7    ever make regulatory determinations regarding whether a
8    plant owner/operator knew or should have known any
9    particular fact?
10        A.    Yes.
11        Q.    And could you describe that experience.
12        A.    It's frequently the case that people in the
13   regulated community, whether it's a company or
14   developer, are taking actions on the landscape that
15   have a negative impact on the environment or the public
16   health, and in pursuing an enforcement case, in terms
17   of determining whether to pursue it; what level of
18   gravity the penalty to pursue, whether to pursue it as
19   a civil, administrative, or criminal; considerations of
20   what they should have anticipated to be the results as
21   a consequence of their actions were very often a
22   consideration.
23        Q.    And so "knew or should have known" is -- is
24   something that you've applied in the enforcement
25   context, correct?
```

1      A.   Correct.  Although that -- that relates in

2   some ways to the questions of whether or not someone

3   should have applied for a permit or should have

4   identified a particular chemical as a potential

5   contaminant of concern that should be investigated or

6   considered for an emissions limitation.

7      Q.   So whether a permit violation occurred depends

8   in part on whether the company knew or should have

9   known something; is that your testimony?

10      A.   It -- it can, yes.  I mean, I appreciate that

11   from the perspective of the regulated community they

12   frequently turn as a default, and should, to the list

13   of identified chemicals that are regulated, but the

14   statutes as -- in general and in the case of the Clean

15   Air Act and in the state air pollution laws also note

16   that where there's information about public health or

17   environmental risks of other chemicals, those are --

18   are subject to regulation, and companies are on notice

19   of that and have been for many decades.

20      Q.   And is there a particular regulation that

21   you're referencing in that testimony?

22      A.   There's -- each of the regulations that I can

23   think of that involve toxics provisions, whether it's

24   drinking water, surface water, hazardous waste, or air,

25   all include definitions of hazardous or toxic chemicals

1    that include open-ended language that allow the

2    regulators, the agency or DEC commissioner, and the

3    regulated community to identify chemicals that are not

4    listed but pose a threat to public health or the

5    environment.

6        Q.   And so in the air context, are you referring

7    to the regulatory definition of a hazardous air

8    contaminant?

9        A.   That would be a good example of one, yes.

10       Q.   Are there any other examples in the air

11   context of situations where a regulated source needs to

12   go beyond specific lists of -- of chemicals of concern?

13       A.   Although it's seldom used, there actually is

14   the discretion of the State and EPA to expand the list

15   of criteria pollutants as well.

16       Q.   But is there ever a situation where a source

17   is required to take any action with respect to

18   pollutants that are not listed as criteria pollutants

19   in connection with Ambient Air Quality Standards?

20       A.   Beyond the ones -- beyond the hazardous air

21   pollutant one, not that I can recall specifically.

22   There may be others.  I just am not familiar with them.

23       Q.   Do you recall any particular entities or

24   violations in which you personally made a regulatory

25   finding regarding what a company knew or should have

1    known?

2         A.    That goes back over most of my career, and so

3    I can't recall a specific example.  The time --

4    certainly when I was in the State of Vermont as the DEC

5    commissioner, I did not make those determinations

6    personally.  Those determinations were made typically

7    by my inspectors and enforcement staff or their direct

8    and immediate supervisors.  But there have been times

9    over the course of my career where I've been on the

10   front line of either performing inspections or working

11   with inspectors as an attorney in which we've made

12   those determinations.

13        Q.    And what would those determinations look like?

14   Would they be findings of fact, would they be arguments

15   in a legal brief, or something else?

16        A.    They would be primarily findings of fact, but

17   findings of fact that are oriented around the criteria

18   and also what was known in the industry, what specific

19   facts the regulated entity had before them, looking at

20   monitoring information, assessments by their own

21   experts, correspondence with regulators.

22        Q.    Have you ever made findings of fact of that

23   nature based solely on historical records without

24   speaking to any of the people with contemporaneous

25   knowledge of those facts?

1     A.   Certainly I've used documents that were

2   drafted by or developed by people that were not

3   available to me to speak to because they were -- those

4   people were no longer with those organizations or

5   had -- had moved on or -- depending on how long ago

6   they were.  But to the implication of the question,

7   that it's always better to speak in person to the

8   people involved making those determinations, I would

9   agree with that implication.

10    Q.   Are you familiar with any legal authorities

11  holding that a corporation's knowledge or intent or

12  other states of mind are not proper subjects for expert

13  testimony?

14    A.   No.

15    Q.   You've never heard of any such authorities

16  during your time as a lawyer?

17    A.   No.

18    Q.   Or during your time as a law school professor?

19    A.   No.  I'm -- I'm certainly familiar with the

20  Daubert standard and the nature of expert opinions.

21  What I'm struggling with is the nature of the use of

22  the word "opinion."  There are -- when determining

23  states of mind, there are, of course -- when you have

24  the opportunity for the Court or the tribunal or the

25  person making the opinion to speak to that person, to

Page 63

1    observe their demeanor, those are all valuable, but

2    it's also important to look at documentation,

3    documents, testimony from others, correspondence that

4    happened at the same time, to be able to determine what

5    the nature is of what the company knew and at what

6    levels they knew it, what level of staff or leadership.

7        Q.   And you're not familiar with any authority

8    discussing whether it's appropriate for experts to

9    review the documents and give opinions regarding a

10   company's knowledge or other state of mind?

11            MS. JOSELSON:  Object to the form.

12       A.   It seems unusual to -- to have someone who's

13   serving as an expert that's evaluating the nature of

14   the regulatory response by regulatory agency.

15   Typically it's not so much a matter of an expert

16   witness that a government agency relies on to make

17   determinations of violations or what level of

18   enforcement to take.  That's usually made by the

19   agencies themself.

20            But I've been called into this case in

21   response to assertions by Mr. Flechas that the State

22   somehow was -- was okay with or even affirmatively in

23   support of or approving the actions that ChemFab took

24   that led to the emission of PFOA, and so that's -- I

25   just -- frankly, this is the first time I've ever

Page 64

```
 1    experienced an expert being involved in a case like
 2    this, but that doesn't mean it hasn't happened before.
 3    It's just not something I'm familiar with.
 4        Q.   And -- and to be clear -- and I'm not sure my
 5    questions were clear.  This is just to clarify that.
 6    What I'm really asking is your understanding of an
 7    expert's role in testifying in a lawsuit about what a
 8    company knew or didn't know or should have known.  You
 9    know, as a former law school dean, former law school
10    professor, and -- and an attorney, are you familiar
11    with any legal authorities talking about whether it's
12    appropriate for an expert witness to testify in a court
13    case about what a company knew or should have known?
14            MS. JOSELSON:   Objection.
15        A.   No, I'm not.
16        Q.   Do you view that to be a proper subject of
17    expert testimony?
18        A.    It's an interesting question in that Mr.
19    Flechas makes a set of assertions in his testimony as
20    to essentially what he asserts to be the regulatory
21    state of mind of the State of Vermont officials and in
22    a way that is inconsistent with my experience and work
23    as a regulator and within state agencies, and it's that
24    set of assertions that I'm engaging with to respond to,
25    and -- and that does seem to me inappropriate.
```

1          To the extent that Mr. Flechas is -- is

2     authorized to provide an expert opinion on the state

3     of -- the state of the relationship between the State

4     of Vermont and ChemFab, to present a different

5     perspective from the perspective of someone who's

6     worked in the State of Vermont on the Clean Air Act

7     issues seems an appropriate set of information to be

8     included before the tribunal.

9          Q.    And you understand that Mr. Flechas in turn

10    was responding to opinions by Dr. Hopke regarding the

11    knowledge and state of mind of ChemFab and

12    Saint-Gobain, correct?

13          MS. JOSELSON:  Object to the form.

14          A.    I'm not sure the -- the reasons for -- for Mr.

15    Flechas' testimony.

16          Q.    Could you turn with me to Exhibit 2, which is

17    Dr. Hopke's merits report.  And at the bottom of page

18    6, heading number 5 states, "ChemFab/Saint-Gobain knew

19    or should have known it was emitting PFOA in North

20    Bennington."  Do you see that?

21          A.    Yes.

22          Q.    Is that one of the opinions of Dr. Hopke's

23    that you adopted for purposes of this case?

24          A.    I'm not sure if "adopt" is the right word, but

25    I agree with -- with it in the sense like I'm not

1    accepting his assertions because of his expertise.  I

2    agree with his assertions based on my own review of the

3    same record and documents.

4        Q.   And do you believe that it requires a

5    regulatory expert to read documents and draw inferences

6    regarding what a company knew or didn't know?

7            MS. JOSELSON:  Object to the form.

8        A.   It's -- it is somewhat of a puzzle that --

9    that this set of issues are being presented as -- as a

10   matter of expert testimony in that I assume the

11   tribunal will look at the same facts and form its own

12   opinion, but I do think it's -- it's relevant and

13   useful that someone with Dr. Hopke's background and

14   experience of looking through technical documents can

15   compile them and describe and explain the -- the

16   logical conclusions that would flow from those

17   documents, as I also think it's valuable for someone

18   like me as a lawyer to be able to provide to the

19   process an opinion on what these documents suggest in

20   terms of how -- how an agency -- how a company -- a

21   regulated company and an agency should work through

22   emerging knowledge about contaminants of concern such

23   as PFOA.

24       Q.   I believe you testified that you're not aware

25   that Dr. Hopke had any prior regulatory experience of

```
                                            Page 67
 1   his own.  Correct?
 2        A.   Yeah.  I'm unaware if he has had any such
 3   experience.
 4        Q.   And you're also aware -- you also testified
 5   that you are not aware how Dr. Hopke selected the
 6   documents that he compiled and based his opinions on,
 7   correct?
 8        A.   Correct.
 9        Q.   Now, you have practiced law on behalf of
10   clients in the past, correct?
11        A.   Yes.
12        Q.   And have you drafted and submitted legal
13   briefs on behalf of your clients?
14        A.   Yes.
15        Q.   Have you given oral arguments to courts on
16   behalf of your clients?
17        A.   Yes.
18        Q.   Have you tried cases?
19        A.   Yes.
20        Q.   Have you delivered closing arguments?
21        A.   Yes.
22        Q.   And in doing so, you were advocating on behalf
23   of your clients, correct?
24        A.   Correct.
25        Q.   Now, in this case you've been proffered as an
```

1   expert witness and not as an advocate, right?

2       A.   Yes.

3       Q.   So in preparing your report, did you make any

4   conscious effort to avoid writing in the style of an

5   advocate and instead write in a more objective style?

6       A.   Yes, I did.

7       Q.   How so?  Let me -- let me put a little meat on

8   that -- on that bone.  How did your writing process

9   here differ from how you might draft a legal brief on

10  behalf of one of your clients?

11          MS. JOSELSON:  Object to the form.

12      A.   The -- for me the writing process and the

13  process of forming an opinion and the substance are all

14  intersected, so it's less -- my response is less in

15  response to the question of how I write and more about

16  how do I form opinions, and in the role of a

17  commissioner, for instance, at a department, the role I

18  played at Vermont DEC and as a state official, which

19  I've done over the years, I often -- always am trying

20  to take in the information that's available without

21  judging it based on trying to get to a particular

22  outcome but more in terms of trying to assess what

23  is -- what is an appropriate and neutral interpretation

24  of that information, and so that was the process I was

25  going through.

 1          I -- I read Mr. Flechas' report carefully and
 2     the documents he relied on; I looked through the
 3     information that Dr. Hopke had carefully compiled,
 4     which I found to be more complete; and -- and then
 5     formed my own opinion from that.
 6          Q.   If I could refer you back to your report,
 7     which is Exhibit 1, and ask you to turn to page 4.
 8               MS. JOSELSON:   Exhibit 1, page 4?
 9               MR. WEINRAUB:   Correct.
10          A.   Yes.  I see.
11          Q.   And looking at the top paragraph of heading
12     number 2, about five lines from the top, there's a
13     sentence that reads, "Furthermore, as can be seen in
14     this case, it has been state policy to attempt to
15     secure compliance through cooperation with industry
16     whenever possible.  Unfortunately, ChemFab/Saint-Gobain
17     took advantage of this policy of cooperation to
18     continue polluting for many years until it found it
19     economically more attractive to move its operations to
20     New Hampshire where air pollution controls were not
21     required at the time."  Do you see that?
22          A.   I do.
23          Q.   The phrase "took advantage of this policy," is
24     that a regulatory term of art?
25          A.   No.

Page 70

1      Q.    What are the criteria for determining whether

2    a company is taking advantage of versus working

3    cooperatively with regulators?

4

Page 71



20        Q.    Is that a personal opinion or is that an

21   expert opinion, Mr. Mears?

22        A.    It's an opinion born of my experience working

23   with the regulated community on pollution cases dating

24   back to the -- 1987, when I first began doing

25   enforcement work for the State of Texas.

Page 72



1

17        Q.    And throughout that period, you're aware that

18   there were ongoing communications between ChemFab and

19   Vermont DEC to address how best to respond to odor

20   issues, correct?

21        A.    Yes.

22              MS. JOSELSON:  Object to the form.

23              THE WITNESS:  Sorry.

24        A.    Yes.

25        Q.    During the time in North Bennington, was there

1    ever a fine imposed because of odor issues?

2        A.    No.

3        Q.    You testified earlier that you deferred

4    substantially to the judgment of regulators on the

5    ground that were making determinations within their

6    discretion during the relevant time period.  Correct?

7        A.    Correct.

8        Q.    Do you disagree with the lack of formal

9    enforcement proceedings against ChemFab or Saint-Gobain

10   during that time period?

11          MS. JOSELSON:  Object to the form.

12          But you can answer.

13       A.    With respect to the issue of odors, I do not

14   challenge the -- the department's decision not to bring

15   an enforcement action or hold -- to assess fines

16   specifically for that set of violations, and I can

17   explain if helpful.

18       Q.    So you are not offering an opinion that

19   ChemFab or Saint-Gobain should have been fined or

20   penalized during that time period for not doing more to

21   address odor issues, correct?

22       A.    No.  I'm suggesting that I don't second-guess

23   the department's decision to not assess penalties for

24   the odor violations in and of themselves.  Odor and

25   nuisance conditions are very difficult to prove, and

1  when a defendant or a violator in this case challenges

2  them, it can be very expensive, and the outcomes are

3  uncertain.  But the nature of those odor complaints,

4  the persistent nature of them, combined with the fact

5  that the company did not have and hadn't sought the

6  necessary regulatory approvals for -- for permits for

7  me raised serious questions of whether the State should

8  have taken stronger enforcement actions, not

9  necessarily -- I -- I don't offer an opinion with

10  regard to penalty specifically, but it seems clear to

11  me that there should have been stronger injunctive

12  relief and orders in terms of further investigation of

13  alternatives and of treatment systems and ways to

14  mitigate or eliminate the odor and nuisance complaints.

15       Q.   So in your opinion, the State should have --

16  should have taken stronger enforcement actions during

17  the time that ChemFab and Saint-Gobain operated in

18  Vermont?

19       A.   Yes.

20       Q.   But the officials in charge at that time did

21  not share that opinion, apparently; would you agree?

22            MS. JOSELSON:  Object to the form.

23       A.   I don't know who agreed and didn't agree

24  within the -- the Agency of Natural Resource and the

25  Department of Environmental Conservation.  There's no

1    clear record that I could find of what was communicated

2    between the -- the head of the air pollution control

3    program and the DEC commissioner and the ANR secretary

4    and the Governor's Office.  So, you know, state

5    government and a department like that is not

6    monolithic, so I'm not sure.  There are some

7    indications from some of the inspections; for instance,

8    from Chris Jones, that suggest -- and a letter from

9    Dick Valentinetti that suggest that they were

10   considering particularly in the late 1990s taking a

11   stronger action.

12        Q.    You testified that odor and -- and nuisance

13   can be very difficult to prove, right?

14        A.    Correct.

15        Q.    And so the fact that an odor complaint or a

16   nuisance complaint is made does not mean that an odor

17   or nuisance violation actually occurred, correct?

18        A.    No.  It's more -- the point I was trying to

19   make is that it can be very difficult to prove to a

20   tribunal, to a judge, that an odor or nuisance

21   complaint has occurred because it relies on the -- on

22   the judgment, even expert informed judgment, of

23   inspectors, and it's relatively easy for a defendant or

24   an alleged violator in those circumstances to -- to

25   challenge that.  So frequently for very practical

1    reasons state regulatory agencies do not pursue

2    nuisance or odor violations in and of themselves.  They

3    typically use those as indicators to look for other --

4    other emissions or problems at the site and when at all

5    possible try, as they did in this case, to work

6    collaboratively with the company to find ways to

7    address those.

8         Q.   Do you have any way of knowing whether formal

9    enforcement proceedings charging ChemFab or

10   Saint-Gobain with odor or nuisance violations would

11   have met the standard of proof to establish such

12   violations in a court?

13             MS. JOSELSON:  Object to the form.

14        A.   I have some information.  As I noted earlier,

15   the fact that there were frequent complaints by

16   multiple different complainants that were corroborated

17   by trained inspectors from the State are strong

18   indication to me that there were in fact violations

19   that could have been brought.

20        Q.   And had violations been brought, ChemFab and

21   Saint-Gobain would have had the right to challenge that

22   evidence and attempt to show that no such violation

23   actually occurred, right?

24        A.   Correct.

25        Q.   And because there was no enforcement

1   proceeding, you have no way of knowing which viewpoint

2   would have prevailed in any such proceeding, correct?

3        A.   I don't know that I would agree that I would

4   have no way of knowing, but it would certainly be very

5   difficult to predict.

6        Q.   So when you say that violations occurred,

7   you're not necessarily opining that violations could

8   have been established had an enforcement proceeding

9   been brought at the time, right?

10            MS. JOSELSON:  Object.

11       A.   Yes.  No.  As I -- as I explained earlier,

12  it's -- it's very hard to predict how a tribunal will

13  rule on odor and nuisance complaints.

14       Q.   So you're giving a personal opinion that in

15  your view violations occurred, but you don't know

16  whether that opinion would have prevailed if

17  challenged?

18            MS. JOSELSON:  Objection.

19       A.   In my opinion, but as I noted, informed by the

20  inspections and inspection reports by DEC inspectors

21  who were on the scene and at the site and observed

22  the -- the smoke and the odors and the other impacts.

23       Q.   Okay.

24            MR. WEINRAUB:  I'm at a transition point.

25  Happy to move on, but if you'd like to take a -- take a

Page 78

 1   break, that's fine.

 2              MS. JOSELSON:  That would be great.  Thanks.

 3              MR. WEINRAUB:  Sure.  Thank you.

 4              THE VIDEOGRAPHER:  Going off the record at

 5   11:05.

 6              (A recess was taken.)

 7              THE VIDEOGRAPHER:  We are back on the record

 8   at 11:20.

 9   BY MR. WEINRAUB:

10       Q.   Okay, Mr. Mears.  Let's turn to page 3 of your

11   report.  And under heading 1, the second paragraph

12   down, there's a discussion of the two types of permits

13   required by the Clean Air Act.  Do you see that?

14       A.   I do.

15       Q.   And the third sentence in that paragraph

16   states, "Operating permits are required under Title V

17   of the CAA, as amended in 1990, to operate air

18   contaminant sources."  Do you see that?

19       A.   I do.

20       Q.   Then down in the next paragraph, towards the

21   end, there's a sentence that reads, "ChemFab did not

22   apply for a Title V operating permit until April 26,

23   1996."  And the paragraph ends, "The operating permit

24   was never granted by DEC."  Do you see that language?

25       A.   I do.

Page 79

1          Q.   Is it your opinion that ChemFab violated the
2     operating permit requirement under Clean Air Act Title
3     V?
4          A.   No.
5          Q.   And Dr. Hopke didn't identify any such
6     violation of the operating permit requirements,
7     correct?
8          A.   Correct.
9          Q.   In fact, Dr. Hopke's report does not cite the
10    operating permit requirement under the Clean Air Act or
11    Vermont's rules, does it?
12         A.   He does cite Vermont's rules, but he does not
13    reference a violation of the operating permit that was
14    never issued.
15         Q.   So when you state that operating permits were
16    required under the Clean Air Act as amended in 1990 and
17    that ChemFab applied for an operating permit in April
18    of 1996, you're not suggesting that ChemFab's
19    application was untimely, are you?
20         A.   I am suggesting that it's not at all clear
21    that they had an operating permit authorizing them to
22    operate their various processing facilities even though
23    there was a clear requirement in the statute, state law
24    and federal law, that required operating permits for
25    sources of pollution.

1     Q.   So just so I'm clear, is it your opinion that
2  ChemFab violated the requirement to have an operating
3  permit?
4     A.   No.  As I said earlier, that's not my
5  contention, although it is of serious question of
6  whether or not they should have had one.  But I offer
7  this primarily in response to Mr. Flechas' suggestion
8  that ChemFab was operating in full compliance with all
9  of the Clean Air Act requirements of the State of
10  Vermont and the Clean Air Act.
11     Q.   We'll talk about Mr. Flechas' opinions in a
12  moment, but for now I want to make sure that I
13  understand your opinions.  You say that ChemFab applied
14  for an operating permit on April 26, 1996.  Is it your
15  opinion that that application was timely, or do you
16  believe that application occurred after ChemFab's
17  deadline to apply for a permit?
18     A.   I don't know enough.  There's not enough
19  information for me to determine whether they were --
20  when they were required to apply for it, an operating
21  permit, or whether or not DEC would have required one
22  had they applied --
23     Q.   What information --
24     A.   -- but it's very clear to me that if the
25  requirement -- if they were required to apply for an

1    operating permit, they should have had one -- they

2    should have applied much sooner than April of 1996 in

3    response to a requirement that came into effect in the

4    early 1990s.

5         Q.   What is your understanding of when companies

6    were required to apply for operating permits under

7    Title V of the Clean Air Act?

8         A.   It -- my understanding is that it varied

9    depending on the state and when the states adopted

10   those requirements into their state implementation plan

11   and updated their regulations, but typically it was

12   within a year or two of 1990.

13            MR. WEINRAUB:  Mark this, please.  This will

14   be Exhibit 6.

15            (Deposition Exhibit No. 6 was

16            marked for identification.)

17   BY MR. WEINRAUB:

18        Q.   Bear with me for a moment, please.

19            Okay.  Apologies for the delay.  I'm a

20   paperless guy trying to make my way in a world full of

21   paper.

22            If you'll turn with me to the page that's --

23   that has page number 32250 in the upper left.  And then

24   about halfway down the page, there's a paragraph that

25   reads, "Title V establishes timeframes for developing

1   and implementing the State permit programs.  Within 3

2   years of enactment (i.e., no later than November 15,

3   1993), States must submit proposed permit programs to

4   EPA for approval.  The EPA must act to approve or

5   disapprove a State program within 1 year of submittal

6   by the State to EPA."  Do you see that?

7       A.   I do.

8       Q.   So Vermont had until November of 1993 to

9   submit its proposed operating permit program to EPA,

10  correct?

11      A.   Correct.

12      Q.   And -- and whenever Vermont submitted its

13  program, EPA had one year to approve or disapprove the

14  program, correct?

15      A.   Correct.

16      Q.   Do you know when Vermont submitted its

17  operating permit program to EPA?

18      A.   I do not.

19           MR. WEINRAUB:  Let's mark this one, please.

20  This will be Exhibit 7.

21           (Deposition Exhibit No. 7 was

22           marked for identification.)

23  BY MR. WEINRAUB:

24      Q.   On the first page of Exhibit 7, if you'll read

25  with me, in the bottom right-hand corner, there's a

1   heading, 1, that reads "Title V Program Support

2   Materials."  Under that it states, "Vermont's title V

3   program was submitted by the State on April 28, 1995.

4   The submittal was found to be administratively complete

5   on June 12, 1995."  Do you see that language?

6        A.   I do.

7        Q.   Do you have any reason to dispute that

8   Vermont --

9        A.   I --

10        Q.   -- that Vermont submitted its program to EPA

11   in 1995?

12        A.   No.

13        Q.   Do you know when EPA granted interim approval

14   of Vermont's operating permit program?

15        A.   I do not.

16        Q.   Do you have any reason to dispute that it

17   granted such approval in October of 1996?

18        A.   No, I do not.

19        Q.   Do you have any -- any reason to dispute that

20   under CAA Title V ChemFab had until October 1997 to

21   apply for an operating permit program?  And I'm not

22   asking you to agree with me.  Just asking if you have

23   any reason to dispute that that's --

24        A.   I have no reason to dispute that.

25        Q.   Do you know what the date was under -- under

1  the state program by which ChemFab needed to apply for

2  an operating permit?

3      A.   No, I do not.

4      Q.   So is it fair to say that as you sit here

5  today you don't have any basis to opine that ChemFab's

6  application for an operating permit was untimely under

7  the Clean Air Act?

8      A.   No.  And I appreciate the clarification of the

9  review of the Federal Register, which makes it clear

10  that they were probably not.

11      Q.   Now, you state -- well, let's turn back to

12  that same language in your report at page 3.  And the

13  third paragraph under heading 1 is where we've been

14  reading from.  The final sentence states, "The

15  operating permit was never granted by DEC."  Do you see

16  that?

17      A.   I do.

18      Q.   To your knowledge, did DEC ever take any final

19  application -- strike that.

20          To your knowledge, did DEC ever take any final

21  action on the application?

22      A.   As far as I'm aware, they did not.

23      Q.   And is it your view that ChemFab violated the

24  Title V operating permit requirement by continuing to

25  operate while its application was pending before DEC?

1      A.    Not on that basis.  Not on the basis that you
2  just described, no.
3      Q.    Was there some other violation of the
4  operating permit requirement that you have in mind?
5      A.    There was no operating permit for them to have
6  violated.
7      Q.    Was there any other basis on which you would
8  opine that they violated the operating permit rules?
9      A.    I don't know the extent to which the -- those
10  rules described the nature of -- of operations, what
11  substantive obligations need to be met during the
12  pendency of a decision on a permit, but in terms of the
13  procedure of a failure to apply for the permit, no, I
14  would assume that there was -- I have no reason to
15  think that there was a violation of that particular
16  procedural requirement.
17      Q.    Do you think your report on page 3 is
18  sufficiently clear in informing the Court that you are
19  not asserting a violation of the operating permit
20  rules?
21          MS. JOSELSON:  Object to the form.
22      A.    The main point that I was trying to make and
23  that I think is clear enough is that the assertion by
24  Mr. Flechas that ChemFab was operating under -- with
25  the approval of -- of a permit issued by the department

Page 86

1    was incorrect.  That was the main point that I was

2    trying to make.

3        Q.   But in -- and again, we'll turn to Mr.

4    Flechas' language in a moment, but when your report

5    states that there was a requirement to have an

6    operating permit under the 1990 amendments and that

7    ChemFab didn't apply until April 1996 and that the

8    permit was never granted, do you think it would have

9    been helpful to inform the Court of what the applicable

10   deadlines were and of whether it was appropriate for

11   ChemFab to continue operating while its application was

12   pending?

13            MS. JOSELSON:  Objection to the form.

14       A.   It might have been helpful, but that was not

15   the point of my testimony.  My point of my testimony,

16   as I've indicated, was to respond to Mr. Flechas'

17   assertion that they were operating in compliance with

18   an operating permit or with all of -- you know, permit

19   obligations that were required, and it's not at all

20   clear to me that they were.

21       Q.   Without the benefit of the Federal Register

22   provisions that we've just walked through, do you think

23   a court reading through page 3 would have come away

24   with the impression that you were suggesting a

25   violation of the operating permit rules?

1           MS. JOSELSON:  Objection to the form.

2       A.   I think it suggests that there's a question

3   about what regulatory status they had and what

4   approvals they were operating under.

5       Q.   But at present there is no question, correct?

6   There's no question as -- in your mind as you sit here

7   as to whether the application was timely?

8           MS. JOSELSON:  Object to the form.

9       A.   No, I do not.  At this point given the

10  information you just shared from the Federal Register,

11  I don't have any question that their application was

12  timely.

13          MR. WEINRAUB:  So let's mark Mr. Flechas'

14  report as Exhibit 8.

15          (Deposition Exhibit No. 8 was

16          marked for identification.)

17  BY MR. WEINRAUB:

18      Q.   And before turning to that, another moment

19  on -- on pages 3 and 4 of your report.  On page 3,

20  third paragraph down, your report states, "On page 15

21  of his testimony, Mr. Flechas confuses the two types of

22  permits by erroneously describing the permit issued in

23  1990 by Vermont DEC as an operating permit."  Do you

24  see that language?

25      A.   I do.

 1      Q.    And then on the next page, page 4 at the very
 2   top, just the introductory phrase states, "In addition
 3   to confusing the nature and extent of ChemFab's permit
 4   authorizations," and the sentence continues.  Do you
 5   see that language?
 6      A.    I do, yes.
 7      Q.    So let's turn now to Mr. Flechas' report
 8   marked as Exhibit 8 and specifically to page 15.  And
 9   in the second complete paragraph, the final sentence of
10   the paragraph states, "ChemFab had an operating permit
11   well before this date in 1990."  Do you see that?
12      A.    I do.
13      Q.    And is that the -- the sentence that you
14   believe misstates the two types -- confuses the two
15   types of permits?
16      A.    Yes.
17      Q.    Now, in the preceding sentences in that same
18   paragraph, would you agree that Mr. Flechas clearly
19   distinguishes between "a permit for construction" and
20   "operating permits"?
21      A.    Yes.
22      Q.    And in the parenthetical that follows the
23   statement that -- that you were critical of, would you
24   agree that Mr. Flechas accurately describes the 1990
25   permit as a permit to construct?

 1      A.   I'm sorry.  I -- I lost -- I must have lost
 2   the --
 3      Q.   Yeah.
 4      A.   -- reference.
 5      Q.   That's my fault.  So I'm at the very end of
 6   that same paragraph, and there's a parenthetical.  This
 7   is the citation --
 8      A.   Oh, I see.  "Letter" -- pardon.
 9      Q.   So -- and it cites to "Valintinetti, Letter
10   transmitting permit to Construct, 1990."  You see that?
11      A.   Yes.  Yes.
12           MR. WEINRAUB:  And let's mark Exhibit 9.
13           (Deposition Exhibit No. 9 was
14           marked for identification.)
15   BY MR. WEINRAUB:
16      Q.   Do you recognize Exhibit 9 to be the 1990
17   construction permit?
18      A.   I do.
19      Q.   If you could turn with me to the last page of
20   the exhibit, which is DEC's cover letter to ChemFab
21   transmitting the permit.  In the "Re" line, DEC
22   describes this permit as a permit "to Construct and
23   Operate a PTFE (Teflon) Coating Unit."  Do you see
24   that?
25      A.   I do.

1      Q.   And then down in the body of the letter, do

2  you see -- and let's look at the second paragraph in

3  particular.  In the body of the letter, do you see that

4  DEC is granting "approval to install and operate said

5  coating unit and associated equipment"?

6      A.   I do.

7      Q.   Is it fairly clear to you from that context

8  that what Mr. Flechas' statement was referring to is

9  that ChemFab had DEC's permission to operate the towers

10  in place at that time?

11         MS. JOSELSON:  Object to the form.

12      A.   That may have been his -- his intention, and

13  my -- the point of my report is that it's important in

14  this context to be clear, and there is confusion when

15  you refer -- when one refers to an operating permit,

16  because it has specific legal meaning in the context of

17  the Clean Air Act, and that's different -- when one

18  gets a preconstruction permit and it's approved, you

19  are entitled to operate the particular unit that has

20  been approved, you know, subject to the conditions of

21  that permit, so the term "operate" in its non-Clean Air

22  Act legal sense applies.  So my point was to show that

23  there's a distinct legal meaning and it's important to

24  clarify that the entire facility did not have an

25  operating permit as that term is used under the Clean

                                                  Page 91

1    Air Act.

2         Q.   And so taking into account your -- your view

3    that Mr. Flechas could have worded his statement

4    differently, does it nevertheless appear from his

5    report that he knows the difference between a

6    construction permit and an operating permit?

7              MS. JOSELSON:   Object.

8         A.   I can't be certain, but he certainly uses the

9    two terms distinctly, and so it's -- it's clear to me

10   he understands the basic structure, although he

11   blurred -- blurred that structure in his statement --

12   or opinion.

13        Q.   Okay.  Let's turn now to the subject of

14   construction permits and to your report at -- back to

15   page 3.  And first I'd like to focus on the time period

16   prior to 1979.

17             Well, as a preface to that, the bottom

18   paragraph in your report on page 3, you state,

19   "Further, Vermont adopted rules in 1979 requiring

20   permits for construction, installation or modification

21   of any air contaminant source."  Do you see that?

22        A.   I do.

23        Q.   And so now focusing on the period before 1979,

24   Vermont did not require construction permits before

25   1979, correct?

Page 92

1       A.    Correct.

2       Q.    So is it fair to say there was no construction

3   permit requirement during the time that ChemFab

4   operated its facility in Bennington?

5       A.    It's fair to say that in the sense that there

6   was no preconstruction review permit requirement.

7   There were other requirements in terms of notifying the

8   State and getting approvals.

9       Q.    Okay.  But in terms of just the requirement to

10  apply for and obtain a construction permit, there was

11  no such requirement during operations in Bennington?

12      A.    I believe that to be true.

13      Q.    Would you also agree that there was no

14  construction permit requirement during the time that

15  ChemFab initially relocated to its North Bennington

16  facility in 1978?

17      A.    Again, with the caveat that there were other

18  requirements in place, but yes, in terms of the -- the

19  preconstruction review of the new source review

20  requirements of the Clean Air Act, which weren't

21  adopted until the 1977 Clean Air Act amendments and

22  implemented in the 1970 rules by the State of Vermont,

23  yes.

24      Q.    And let's -- let's talk about those other

25  requirements.  You state that despite the lack of a

1    construction permit requirement prior to 1979, "such
2    sources were not exempted from regulation."  Correct?
3        A.    Correct.
4        Q.    Do you think that Mr. Flechas claimed
5    otherwise in his report?
6        A.    Just off the top of my head, I can't recall
7    the specific statements that Mr. Flechas said with
8    regard to the pre-1979 compliance, but just sitting
9    here recalling, the impression I came away with from
10   his report was the suggestion that ChemFab had always
11   been in compliance with all the requirements of the
12   act.
13       Q.    Okay.  But you don't recall Mr. Flechas
14   opining that -- that the Bennington facility was
15   exempted from regulation prior to 1979, do you?
16       A.    No, I don't recall that.
17       Q.    All right.  You also state that -- let me find
18   where we are on the page for a moment.  So second to
19   last paragraph in your report on page 3, and at the end
20   of that paragraph, you state that "Section 5-408 of the
21   1972 rules required a person constructing new sources
22   to submit information to the Agency about the new
23   sources."  Do you see that language?
24       A.    I do.
25       Q.    That's the only time your report mentioned

1    Section 5-408 of the 1978 rules, correct?

2         A.   Correct.  '72 rules.

3         Q.   '72.  Thank you.  Have you opined that ChemFab

4    violated Section 5-408 of the 1972 rules?

5         A.   I have not opined that, but it seems

6    self-evident from the fact that there was an assurance

7    of discontinuance issued by the State and then modified

8    in 1975 and then in -- modified in 1977.

9         Q.   And do you believe that that assurance -- the

10   assurance of discontinuance related specifically to

11   violations of Section 5-408?

12        A.   I don't recall without looking back at

13   those -- the 1975 and 1977 orders what the specific

14   allegations were, whether they cited 5-408 or not.

15        Q.   Does your report identify any specific

16   information known to ChemFab in or prior to 1978 that

17   ChemFab was required to disclose pursuant to Section

18   5-408?

19        A.   I'm sorry.  Could you repeat the question?

20        Q.   So in connection with Section 5 -- 5-408, that

21   section requires sources to submit information to the

22   agency about new sources, correct?

23        A.   Correct.

24        Q.   Does your report identify any specific

25   information that ChemFab was required to submit prior

1    to constructing new sources during the pre-1979 time

2    period that ChemFab did not submit?

3         A.   No, it does not.

4         Q.   So when stating that ChemFab was not exempt

5    from regulation and that Section 5-408 requires certain

6    disclosures, that's not a response to any opinion

7    offered by Mr. Flechas or Mr. Hopke, is it?

8         A.   It's in response to the general assertions by

9    Mr. Flechas that the company always operated in full

10   compliance with the State's requirements and

11   authorization -- continuous authorization.

12        Q.   But how does Section 5-408 play into that

13   response?

14        A.   The fact that there was no preconstruction

15   permit requirement prior to 1979 doesn't mean that

16   there weren't obligations on sources of air pollution

17   to engage with the agency over whether or not they had

18   to apply for permits or at least share information.

19   That was the -- the point that I'm making.

20        Q.   But as we've discussed, Mr. Flechas didn't

21   opine otherwise.  He didn't opine that there was no

22   duty to submit information, did he?

23             MS. JOSELSON:  Objection.

24        A.   Not specifically.  Again, I was responding to

25   the general theme that runs through Mr. Flechas' report

Page 96

1    that the company complied with all permitting

2    requirements from the outset.

3        Q.   How does citing a provision that you don't

4    claim ChemFab violated have anything to do with your

5    analysis?

6            MS. JOSELSON:  Objection.

7        A.   Because the -- it's -- I don't -- I simply

8    don't know what the exchange was from -- from ChemFab,

9    but there's no evidence that I saw or indicated in the

10   record that there was -- that the company was actively

11   submitting information about its new sources to the

12   agency except in response to the assurance of

13   discontinuance.  So it relates in the sense of

14   responding to the assertions that the company operated

15   in full compliance and with the agreement of the -- the

16   State.

17       Q.   So isn't it fair to say that that sentence

18   regarding Section 5-408 implies that there might have

19   been a violation that you have no basis to actually

20   assert occurred?

21           MS. JOSELSON:  Object.

22       A.   No.  No.  I'm not trying to imply a violation.

23   I'm just noting that there were in fact requirements in

24   place, and if nothing else, the assurances of

25   discontinuance make clear that the company was not

```
                                            Page 97
 1    sharing -- fully sharing information except in response
 2    to an enforcement response from the State.
 3         Q.   How do you know they weren't sharing
 4    information except in response to enforcement
 5    proceedings?
 6         A.   Just by -- by virtue of -- I mean, your point
 7    is well taken.  I don't know for certain.  But the --
 8    there's a strong evidence of the failure to share
 9    information with the State by the fact of the 1975
10    assurance of discontinuance.
11         Q.   But you testified earlier that you don't know
12    whether the assurance of discontinuance had anything to
13    do with a violation of Section 5-408, correct?
14         A.   Correct.
15         Q.   So let's turn to the 1979 to 1990 time period.
16    You assert in general terms that ChemFab violated the
17    construction permit throughout that period, 1979 to
18    1990, with respect to six new coating towers built
19    during that time period, correct?
20         A.   Can you repeat the question?
21         Q.   Yeah.  Let me find some language here.  So
22    your report, page 3, bottom paragraph, and about three
23    sentences in, it states, "As discussed by Dr. Hopke,
24    ChemFab failed to comply with this construction permit
25    requirement from 1979 to 1990, when it finally
```

1    submitted a permit application for the 6 new coating

2    towers it had constructed at the North Bennington

3    facility during that time period."  Do you see that

4    language?

5         A.   Yes.

6         Q.   What was the effective date of the 1979 air

7    pollution control rules?

8         A.   I don't know off the top of my head.

9         Q.   When was the first of those six new towers

10   constructed?

11        A.   I don't recall off the top of my head.

12        Q.   Do you recall whether it was in 1979?

13        A.   I believe it was.  Right when they first

14   moved.

15        Q.   To your knowledge, when were the rest of those

16   six coating towers constructed?

17        A.   My recollection without looking back through

18   the facts is that there was an additional three that

19   were constructed in the -- fairly soon after that and

20   then there was a couple more later, like in the late

21   '80s, early '90s.  But I'd have to go back and look at

22   the -- the various documents.

23             I'm sorry.  It must -- they applied in 1990.

24   It must have all been before 1990, but I recall some

25   were -- it seems to me that there was a flurry of lines

Page 99

1    that were built in the early '80s and then some -- a
2    couple that were later on.
3        Q.   Okay.  Now, your report on page 4, in the
4    bottom paragraph, refers to a June 5, 1984, meeting
5    between DEC representatives and ChemFab management.
6        A.   I see that.
7        Q.   Bear with me for one sec.  Okay.  Apologies
8    for the dead air.  I seem to be missing my exhibit, but
9    let me see if we can get by without it, but if not, we
10   can come back to it later.
11           So referring back to that June 1984 meeting,
12   do you recall generally whether that meeting included a
13   tour of ChemFab's facilities?
14       A.   I don't recall.
15       Q.   Okay.  So let's come back to that later today,
16   maybe.
17           And let's turn to the 1990 permit that's been
18   previously marked.
19           MS. JOSELSON:  Exhibit 9?  Is that what it
20   was?
21           MR. WEINRAUB:  I think so.  Let me
22   double-check.  Yes.  Exhibit 9.
23       A.   Oh, here it is.
24       Q.   So this is the first construction permit
25   issued to ChemFab for the North Bennington facilities,

```
                                          Page 100
 1   correct?
 2        A.   Yes.
 3        Q.   And on the front page of the permit -- well,
 4   strike that.
 5             Yeah.  Front page of the permit, next to
 6   paragraph 1, it states that ChemFab shall install and
 7   operate the PTFE coating units.  Do you see that?
 8        A.   I do.
 9        Q.   So even though some of these units presumably
10   had been installed prior to 1990, DEC is directing
11   ChemFab to install and operate those units, correct?
12        A.   Correct.
13        Q.   And DEC knew that those units had previously
14   been installed, right?
15        A.   Correct.
16        Q.   The permit conditions address -- well, strike
17   that.
18             The permit was granted subject to various
19   conditions; would you agree?
20        A.   Agreed.
21        Q.   And those conditions included the use of
22   catalytic abators?
23        A.   Yes.
24        Q.   Would you agree that the permit conditions
25   generally relate to control of odor and visible
```

Page 101

1   emissions?

2       A.    No.

3       Q.    What --

4       A.    No.

5       Q.    What other -- how would you amend that

6   statement?

7       A.    I -- it's hard to speak generally about the --

8   the nature of a complex air treatment system.  There's

9   a whole -- that would deal with a whole array of

10  pollutants from particulate matter to volatile organic

11  compounds.

12  ██    ████   ███████████████████████████████████████

██  █████████████████████████   ████████████████████████

██  ████████████████████████████████████████████

██  ██████████████████████████████████

██  ██   █████████████████████████████████████████████████

██  ████████████████████████████████████████████

██  ██████████████████████████████████   ████████████████

██  ██████████████████████████████████████████████

██  ██████████████████████████████████████████

██  ████████████   ████████████████████████████

██  █████████████████████████████████████████████████

██  █████████████████████

██  ██   ████████████████████████████████████████████████

██  ██████████████████████████████████████████

Page 102



2          Q.    So if we could turn to page 4 of your report

3     and the second paragraph from the bottom.  Make that

4     the third paragraph from the bottom.  It states at the

5     end of that paragraph, "DEC's awareness of the

6     operations did not excuse ChemFab from the permit

7     requirement, and the failure to obtain construction

8     permits was a serious violation that could have

9     subjected ChemFab to substantial penalties."  Do you

10    see that?

11         A.    Oh, yes, I see that.  Yup.

12         Q.    Now, Vermont DEC knew when the towers were

13    constructed; wouldn't you agree?

14         A.    Yes.

15         Q.    And Vermont DEC knew when ChemFab filed its

16    permit application in 1990, correct?

17         A.    Yes.

18         Q.    So this was not a situation where the

19    regulatory agency's limited resources prevented it from

20    learning the relevant facts in terms of the violation

21    that you've asserted, correct?

22         A.    I'm not understanding which violation you're

23    suggesting that I asserted.

24         Q.    You've asserted that ChemFab committed a

25    serious violation of the permitting requirements by not

1    obtaining a construction permit until 1990 for the six

2    towers constructed over the prior ten years, right?

3        A.   Correct.

4        Q.   And Vermont DEC had all the information to

5    make that determination itself in terms of when the

6    towers were built and in terms of when the application

7    was filed, right?

8        A.   Yes.

9        Q.   If Vermont DEC considered the timing of

10   ChemFab's permit application to be a serious violation

11   that warranted substantial penalties, it had the

12   authority to impose those penalties, correct?

13       A.   Yes.

14       Q.   But DEC did not initiate any enforcement

15   proceedings, right?

16           MS. JOSELSON:  Object to the form.

17       A.   Specific to the context of these questions in

18   which you're suggest- --

19       Q.   Yes.

20       A.   -- talking about the operating permit in that

21   period of time in the '80s -- I'm sorry.  I lost the --

22   my train of thought.

23       Q.   No.  That was a good clarification of my -- my

24   poor question, so let me start over.

25           With regard to the timing of -- of ChemFab's

Page 105

```
1    permit application in 1990, given the fact that towers
2    had previously been built, Vermont DEC did not initiate
3    a notice of violation regarding those issues, correct?
4         A.    Correct.
5         Q.    And Vermont DEC did not impose any penalties
6    regarding those issues?
7         A.    Correct.
8         Q.    Instead, Vermont DEC issued the construction
9    permit for the six new towers?
10        A.    Correct.
11        Q.    And that was within Vermont DEC's discretion?
12        A.    Yes.
13        Q.    And Vermont DEC is charged with protecting
14   human health and the environment, correct?
15        A.    Correct.
16        Q.    Is that what you tried to do when you were DEC
17   commissioner?
18        A.    Yes.
19        Q.    Do you have any reason to think that DEC
20   officials were any less committed to that principle in
21   the 1979 to 1990 time period?
22        A.    I have a couple of questions about what
23   occurred during that time frame at the department.  One
24   is the degree to which they focused sufficient
25   resources on understanding the nature of the emissions
```

Page 106

1   from the ChemFab plant in light of the nature of the

2   chemicals used, the impacts on employees of the

3   facility, and the near continuous set of complaints.

4        The second set of questions I have relate to

5   the engagement of elected officials in communicating to

6   the agency that they were concerned about the impacts

7   of the regulatory requirements on the company's

8   willingness to stay in Vermont.

9        So both of those questions for me call into

10  question why the State did not take a stronger

11  regulatory action.

12       Q.   So do you believe that during this 1979 to

13  1990 time period Vermont DEC did not fulfill its

14  obligation to protect the health and the environment of

15  Vermont citizens?

16       A.   In retrospect it's quite clear with 20/20

17  hindsight that had ChemFab proactively identified

18  and -- the nature of the emissions and proactively

19  applied for appropriate air pollution control equipment

20  and that had the State implemented that through its

21  permits and regulations, that a significant amount of

22  pollution could have been avoided that has resulted in

23  long-standing contamination in North Bennington that

24  I'm sure we all find regrettable.

25       Q.   Okay.  So putting 20/20 hindsight aside and

Page 107

1  focusing only on the timing of the permit application
2  vis-à-vis the construction of the towers, is there any
3  indication that Vermont DEC considered that to be a
4  significant violation?
5        MS. JOSELSON:  Object to the form.
6     A.   I do recall some of the inspections raising
7  questions about the -- what -- whether the company
8  should be required to get permits, but there's not a
9  lot.  I would agree that there's no clear assertions by
10  the State that there was a significant violation.
11     Q.   And is there any indication in the regulatory
12  record that DEC officials believed that the
13  construction permit process was needed to provide them
14  access to information regarding ChemFab's facilities?
15        MS. JOSELSON:  Object to the form.
16     A.   Not in the record, no, that I saw.
17     Q.   So turning now to the 1998 time period and to
18  your report at page 5.  So you've referenced ChemFab's
19  construction of two new coating towers without a
20  construction permit in 1998, correct?
21     A.   Correct.
22     Q.   And that resulted in a $2,500 fine?
23     A.   $2,500 fine, yes.  I believe -- is -- I'm just
24  clarifying.  Is that what you said?  Because that's the
25  number I recall.

```
 1        Q.   Yes.  2,500.  So I'm on page 5 of your report.
 2   First full paragraph at the top, and the last sentence.
 3   You state that "The penalty imposed by DEC was minor,
 4   but, as Dr. Hopke pointed out, penalties for failure to
 5   obtain a construction permit for new sources can be
 6   severe."  Do you see that?
 7        A.   I do.
 8        Q.   Do you disagree with the $2,500 penalty
 9   imposed by Vermont DEC on that occasion?
10        A.   Yes.
11        Q.   On what basis?
12        A.   On the basis of the past history of the
13   company of failure to apply for permits or to give
14   notice when they were constructing towers in the past
15   and the fact that they had applied for a permit and
16   knew how to apply for a permit and -- so there's no
17   question that -- that they knew what the requirements
18   were and then chose not to fulfill them.
19        Q.   Did Vermont DEC act within its authority in
20   imposing a $2,500 penalty?
21        A.   Yes.
22        Q.   What factors does Vermont DEC take into
23   account when deciding what penalty to impose?
24        A.   They take two large categories of factors.
25   One relates to the economic benefit of the violation
```

Page 109

1    obtained by the violator or alleged violator, and the
2    second is the gravity of the violation.  And the
3    gravity of the violation is informed by a variety of
4    other subfactors and criteria, including the
5    seriousness of the harm and risk to public health, the
6    extent and duration of the violation, the degree to
7    which the violation undermines the integrity of the
8    regulatory program, and the past history of
9    noncompliance.
10        Q.   Do you know whether Vermont DEC applied those
11   criteria in determining what penalty to apply in this
12   case?
13        A.   I assume that they did, because it was -- it's
14   been a matter of policy for many years, but I do not
15   know for certain that they did.
16        Q.   So you have not seen any documentation
17   explaining their analysis of those -- of those
18   elements, gravity and economic benefit?
19        A.   Correct.  Actually, I -- I -- there may have
20   been a reference in the -- in the record, a memo from
21   Chris Jones, suggesting that the company did not get an
22   economic benefit.
23             MR. WEINRAUB:  Let's mark Exhibit 10.
24             (Deposition Exhibit No. 10 was
25             marked for identification.)

Page 110

1   BY MR. WEINRAUB:

2       Q.   Is Exhibit 10 the memo that you referenced a

3   moment ago?

4       A.   Yes.

5       Q.   Okay.  So you have seen this document before?

6       A.   I have.

7       Q.   Looking at page two of the memo -- my mistake.

8   Let's turn back to page one.  In the middle of the

9   first full paragraph, and I'm starting partway through

10  a sentence, it states, "all parties agreed that there

11  was no evidence that ChemFab had started operation of

12  either tower prior to the issuance of the air pollution

13  control permit."  Do you see that language?

14      A.   I do.

15      Q.   Is that something that could reasonably be

16  taken into account under the gravity prong?

17      A.   Yes, it could.  I would note, though, that

18  the -- the public policy underlying the nature of the

19  preconstruction requirement is to avoid the

20  construction of these types of equipment, to avoid the

21  kind of pressure in regulatory agencies that occurs

22  once a company's made a substantial capital investment

23  in a project that then becomes a significant economic

24  burden on the company.  So the purpose of the

25  preconstruction is to have the permit in place before

1   the construction occurs.  So it's -- while it's

2   mitigating, it's only slightly mitigating that they had

3   not actually operated the facility.

4       Q.   So it would not have been a significantly more

5   substantial violation to operate those new towers for

6   years without a construction permit?

7       A.   It would have been substantially more grave in

8   terms of the gravity of the violation had they done it

9   for years, but simply turning on the -- the --

10  operating the equipment for a short period of time

11  would have been slightly worse, but not substantially.

12  The real violation of the intent of the preconstruction

13  requirement really goes to the fact of the construction

14  of the towers without preapproval.

15      Q.   If we could turn now to page two of that same

16  memo.  And at the end of the carry-over paragraph, the

17  last few sentences state, "Mr. Tilgner said that it was

18  necessary for the company to move forward quickly in

19  order to fill the contract for fabric for Saudi Arabia

20  and that when they contacted the Air Division they

21  believed that we had given them a waiver of the need to

22  obtain a permit prior to installing the new -- the two

23  towers.  Mr. Tilgner said that he understood now that

24  there was a misunderstanding, and he acknowledged that

25  they were in violation of the construction permit

Page 112

1    requirements of the Air Pollution Control Act."  Do you

2    see that?

3        A.    I do.

4        Q.    Could Vermont DEC have taken that explanation

5    into account under the gravity prong?

6        A.    They -- they might well have taken his

7    apparent apology or acknowledgment into account.

8        Q.    You say "apparent."  Are you doubting the

9    sincerity of the statement that was made?

10       A.    No, I'm not doubting the sincerity of it.  I

11   was describing it as an apparent apology.

12   Acknowledgment is the actual words that he used.

13       Q.    And when Mr. Tilgner refers to a

14   misunderstanding, do you have any reason to dispute

15   that there was a legitimate misunderstanding on the

16   part of Mr. Tilgner mistakenly believing that the

17   construction permit application had been waived in

18   light of the time frame to ramp up for this -- for this

19   manufacturing run?

20       A.    I do have -- nothing to do with Mr. Tilgner's

21   credibility but simply the circumstances -- the nature

22   of the circumstances where there was a substantial new

23   investment and product and contract that was trying to

24   be fulfilled, the nature of the conversations between

25   ChemFab and the governor all suggest that the company

Page 113

1    was pushing hard to get a waiver or to move past any
2    regulatory obligations in their haste to get the
3    project under way.
4        Q.   Earlier you testified in connection with the
5    gravity prong that -- that you disagreed with the
6    $2,500 penalty, correct?
7        A.   (Witness nods head).
8        Q.   One of the reasons was the company's prior
9    construction without a construction permit and the fact
10   that they knew how to do a construction permit and they
11   didn't do it.  Do you think that Mr. Tilgner's
12   statement that this was actually a misunderstanding
13   rather than a deliberate course of action to -- to act
14   without a necessary permit is something that Vermont
15   DEC could legitimately take into account?
16           MS. JOSELSON:  Object to the form.
17       A.   I think they could take it in -- into account,
18   certainly, but a mere statement post hoc is not
19   sufficient to overcome the broader context of this
20   violation.
21       Q.   And as a result, regardless of that
22   explanation, Vermont DEC imposed a $2,500 penalty,
23   correct?
24       A.   Correct.
25       Q.   And the memo states towards the bottom, "Mr.

                                        Page 114

1    Spinosa and Jones proposed that ChemFab pay a penalty
2    of $2,500 to reflect the seriousness of the permitting
3    violation as regards the integrity of the air pollution
4    control program."  Do you see that?
5         A.    I do.
6         Q.    So would you agree that Vermont DEC took the
7    integrity of the program and the requirement of
8    construction permits into account when setting that
9    $2,500 penalty?
10             MS. JOSELSON:   Object.
11        A.    I think the statement speaks for itself, that
12   they -- they did.  And this is a memo, I believe, that
13   was drafted, yes, by Chris Jones, so it's his -- his
14   impression that this was significant and that he agreed
15   with Mr. Spinosa that it was in fact a significant
16   penalty.
17        Q.    And Mr. Spinosa and Mr. -- Mr. Jones had the
18   opportunity to actually sit down and directly interact
19   with the players on the ChemFab side, correct?
20        A.    Correct.
21        Q.    And you have not had that opportunity?
22        A.    Yes.  No, I did not.  Nor did I have any
23   contact with the governor, who apparently was
24   interested in their decision.
25        Q.    And so do you have any basis to say that

1   Vermont DEC got it wrong and that the $2,500 penalty
2   was inadequate?
3       A.   Yes.  As I said, the -- the very nature of the
4   violation, the construction of a new set of operating
5   lines to build a new product, without getting
6   preapproval, knowing and having past experience with
7   the obligation to get that approval, suggests to me
8   something that goes straight to the integrity of the
9   regulatory program and should have been given a more
10  substantial penalty.  And also it's not clear to me
11  given the number of days that would have been
12  associated with this penalty how they could possibly
13  have limited the penalty to only $2,500.
14      Q.   Did Vermont DEC abuse its discretion in
15  setting the penalty at that level?
16      A.   No.
17      Q.   Did Vermont DEC act arbitrarily or
18  capriciously in setting the penalty at that level?
19      A.   No.  I mean, that's a legal conclusion, but
20  I'm -- I'm using those words in the -- you know, the
21  ordinary sense that they're intend- -- I assume that
22  they were intended, that it was not -- they clearly had
23  a set of information and context and facts that they
24  relied upon to make their decision, and they did at
25  least assess some level of a penalty.

1      Q.   And the fact that you would have landed

2   differently on the gravity prong doesn't necessarily

3   mean that the regulators in charge at that time got it

4   wrong, does it?

5      A.   Wrong is a subjective term, but I accept that

6   they were in those seats and I was not.

7           MR. WEINRAUB:  I think this might be a good

8   point for a break, and I'm fine to make it either a

9   ten-minute break or a lunch break depending on what

10  people want to do.

11          MS. JOSELSON:  Should we go off the record?

12          THE VIDEOGRAPHER:  Going off the record at

13  12:25.

14          (A lunch recess was taken.)

15          THE VIDEOGRAPHER:  We're back on the record at

16  1:34.

17  BY MR. WEINRAUB:

18     Q.   Okay.  Ready to proceed, Mr. Mears?

19     A.   Yes.

20     Q.   Okay.  Now that we've had lunch, let's talk

21  about objectionable odors.  So if we could look at your

22  report at the bottom of page 5 and top of page 6.  And

23  in the carry-over paragraph and towards the end of the

24  paragraph, there's a reference to over 100 documented

25  violations.  Do you see that?

    1        A.    I do.

    2        Q.    What's the basis for that number, over a

    3    hundred?

    4        A.    The -- the complaints.  The various complaints

    5    that were purported.

    6        Q.    Okay.  And so is that the 60 or so complaints

    7    identified by Dr. Hopke plus the additional 42

    8    complaints referenced in your report?

    9        A.    Correct.

   10        Q.    Is it your opinion that each one of those

   11    complaints constitutes a distinct violation?

   12        A.    No.  It's an overstatement in my report.

   13        Q.    Are you able to estimate the number of

   14    violations that you believe occurred?

   15        A.    I'd have to go back and -- and look through

   16    and see how many of the same complaints occurred on

   17    each day and which ones were verified or corroborated,

   18    so not off the top of my head, no.

   19        Q.    Do you know whether Dr. Hopke has performed

   20    any analysis along those lines?

   21        A.    Not that I have seen.

   22        Q.    And just so I'm clear, have you yourself

   23    performed any analysis like that that you just don't

   24    recall, or have you not performed that kind of

   25    analysis?

1       A.   I have not performed that analysis.

2       Q.   Is that an analysis that you ever performed

3   while working at Vermont DEC?

4       A.   No.

5            MR. WEINRAUB:  Let's mark Exhibit 11.

6            (Deposition Exhibit No. 11 was

7            marked for identification.)

8   BY MR. WEINRAUB:

9       Q.   Do you recognize Exhibit 11 to be the 1972 air

10  pollution control rules?

11      A.   I do.

12      Q.   Actually, before we proceed, let me make sure

13  I didn't already mark this before.

14           MS. JOSELSON:  Not today.

15           MR. WEINRAUB:  Not today?  Okay.  My memory is

16  playing tricks on me.

17      Q.   So let's stick with Exhibit 11, and let's turn

18  to Section 5-241.  And subsection 2 under Section 5-241

19  is titled "Odors."  Do you see that?

20      A.   I do.

21      Q.   Does that subsection contain the regulatory

22  definition for offensive odors?

23      A.   Yes.

24      Q.   And are you generally familiar with that

25  definition?

1      A.   Yes.

2      Q.   Has that --

3      A.   I'm sorry.  I hesitate just briefly because I

4   can't recall if that's changed in recent years, but

5   yes, this is clearly the -- the regulation in place in

6   1972.

7      Q.   Okay.  And you -- you anticipated my next

8   question, which is, As you sit here, do you know

9   whether this regulatory definition is substantially

10  similar to the definition that exists today?

11     A.   My recollection is that it is, but I wouldn't

12  be certain without looking at the current regulations.

13     Q.   So under the 1972 rules, to meet the

14  regulatory definition, an odor would need to be deemed

15  objectionable by a specific percentage of exposed

16  people, correct?

17     A.   Correct.

18     Q.   And the percentage that's required depends in

19  part on the sample size?

20     A.   Yes.

21     Q.   And so for a sample of 20 people or more, at

22  least 15 percent of those people would have to deem the

23  odor to be objectionable for it to satisfy that

24  regulatory definition?

25     A.   I think you just repeated what was in the

```
                                                Page 120
 1    statute -- I mean the regulation.
 2         Q.   Yeah.   That's what -- I'm trying to
 3    essentially paraphrase and make sure I'm understanding
 4    what the -- what the regulation is.
 5         A.   Yes.
 6         Q.   So is my encapsulation of the regulatory
 7    language so far, so good?
 8         A.   So -- so far, so good.
 9         Q.   And then if the -- if you have fewer than 20
10    people in your sample, am I correct that you need to
11    have at least four people that are not from the same
12    household?
13         A.   Correct.
14         Q.   And in that sample that's more than four but
15    less than 20, at least 75 percent of that sample would
16    have to deem the odor to be objectionable?
17         A.   Correct.
18         Q.   And are those the criteria or are those
19    substantially similar to the criteria that you would
20    need to apply in reviewing the complaint record to
21    determine how many distinct objectionable odor
22    violations occurred?
23         A.   Yes.   I mean, there's two things.   I'd want to
24    confirm what the specifics are of the regulations in
25    place at the relevant time frame, but yes, and to look
```

Page 121

1   at the number of people exposed and -- and whether

2   they're, you know, in the same family or not -- or in

3   the same household or not.

4      Q.   And at least during the period that the 1972

5   rules were in effect, you would need to apply those

6   criteria to each instance of odor complaints, correct?

7   Let me -- let me try to make that a little more clear.

8           You'd need to -- you'd need to talk to people

9   exposed on the same day, right?

10     A.   That would be the easiest, but spread out over

11  time, even, if you had -- you know, within a relatively

12  contiguous amount of time you had a substantial number

13  of people all complaining of -- of odors, that would be

14  relevant to determining whether or not there had been a

15  violation.

16     Q.   Would the source of the odor need to be

17  consistent if you were looking at a contiguous period

18  of time of longer than one day?  So, for example, if on

19  Tuesday you have a complaint of odor during the point

20  where a particular tower is being run and on Wednesday

21  a different tower's being run, could you talk to people

22  exposed during those two days and aggregate them

23  together to determine whether there was an odor

24  violation?

25           MS. JOSELSON:  Object to the form.

1      A.   Yes.  Because the -- the prohibition relates

2   to the whole facility, not just a particular unit.

3      Q.   To your knowledge, is there any limit on the

4   contiguous period of time that you can aggregate

5   together in that way?

6      A.   I am not certain what the past practice or

7   guidance documents might have been developed within DEC

8   to try to constrain the potential open-endedness of

9   that.  I would assume it would be a reasonableness

10  standard.  And as I described earlier, I mean, that's

11  one of this -- the complexity in proving these cases is

12  one of the reasons that agencies frequently do not take

13  an enforcement action limited solely to a question

14  of -- of odor complaints.

15     Q.   Does your report quote or summarize the

16  criteria for determining -- determining objectionable

17  odor under this regulatory provision?

18     A.   No.

19     Q.   Does Dr. Hopke's report quote or summarize

20  these criteria?

21     A.   No.

22     Q.   If you can turn to page 6 of your report.

23  Middle of the page under "Visible Air Emission

24  Exceedances."  There's a sentence that reads, "The 1998

25  and 1999 inspections made it clear that odor and

Page 123

1    visible emissions were continuing."  Do you see that?

2        A.    I do.

3        Q.    And there's a citation to inspection reports

4    by Philip Etter dated February 12, 1998, and April 13,

5    1999?

6        A.    Yes.

7              MR. WEINRAUB:  Let's mark Exhibit 12.

8              (Deposition Exhibit No. 12 was

9              marked for identification.)

10   BY MR. WEINRAUB:

11       Q.    Feel free to take more time to read it if you

12   want, but I'll -- I'll preview my question for you,

13   which is, Is Exhibit 12 the February 12, 1998,

14   inspection report referenced on page 6 of your report?

15       A.    Yes.

16       Q.    And could you turn to the last page of this

17   exhibit.

18       A.    Yes.

19       Q.    And there's a Section V, "Findings," and then

20   finding number 4 states, "We did not determine that

21   Chemfab was emitting objectionable odors beyond the

22   property line of the company during this inspection"?

23       A.    Yes.

24       Q.    So at least during the 1998 inspection, would

25   you agree that no objectionable odor violation was

Page 124

1    noted?

2        A.    By Mr. Etter, yes.

3        Q.    So is it accurate to say that that report

4    makes it clear that odor and visible emissions were

5    continuing?

6        A.    Yes, it does.  Under Section V.1., it makes it

7    clear that they were emitting significant visible

8    emissions when they first arrived.

9        Q.    But focusing on the word "odor," though, does

10   the 199- -- does the 1998 report support that statement

11   with respect to odor?

12       A.    Not in a concrete way, but he definitely -- he

13   acknowledges and notes that there were odors at the

14   facility.  He just couldn't attribute them to the

15   ChemFab plant.

16       Q.    Okay.  And not all odors constitute violations

17   of the air pollution control rules, correct?

18       A.    Correct.

19       Q.    The permit conditions that were operative

20   beginning with the 1990 permit require ChemFab to take

21   reasonable precautions to prevent the discharge of

22   objectionable odors beyond the property line; would you

23   agree?  And we can turn to the exhibit if you need.

24       A.    I -- I agree.  If you don't mind, I wouldn't

25   mind looking at the permit.

1     Q.   Sure.

2     A.   It's Exhibit 9.  Yes.  I see that condition

3 number 7 states that they shall make -- take reasonable

4 precautions.

5     Q.   Is it possible for precautions to be

6 reasonable at the time they're taken even if they

7 subsequently don't prove to have been a hundred percent

8 effective in preventing odor?

9        MS. JOSELSON:  Object to the form.

10    A.   It might be a reasonable effort.  Whether or

11 not that satisfies the obligation to continue to alter

12 the operations or find the source of the -- the odors

13 and then to modify the activities or install new

14 pollution controls is a -- is a different question.  It

15 might be reasonable in a time-limited way.  It's not

16 reasonable over a long-term period, like 20 or 30

17 years.

18    Q.   Are you generally familiar with odor surveys

19 that ChemFab commissioned during the 1980s?

20    A.   Yes.  I was -- I mean, I'm not familiar -- I

21 didn't read all those documents, but I'm familiar that

22 there was an assessment done.

23    Q.   And you're aware that those odor surveys were

24 performed by DuPont?

25    A.   Yes.

1      Q.   And that DuPont recommended certain steps

2   to -- to mitigate odor?

3      A.   I don't recall what the recommendations were.

4   I just recall reference to a survey by DuPont.

5           MR. WEINRAUB:  Let's mark Exhibit 13.

6           (Deposition Exhibit No. 13 was

7           marked for identification.)

8   BY MR. WEINRAUB:

9      Q.   Have you seen this document before?

10     A.   I have.

11     Q.   And if you'll turn with me to the last page

12  and the final paragraph, it states, "The Air Division's

13  position has been that while some limited interim steps

14  can be taken by Chem Fab (and have been) to abate odor

15  emissions, such as improving fume capture into the

16  control equipment, significant capital expenditures

17  should not be made until the nature of the hazardous

18  air contaminant problem (if any) is better understood."

19  Do you see that?

20     A.   I do.

21     Q.   Are you generally aware that ChemFab was

22  prepared to make capital improvements at this time but

23  that DEC preferred to wait until further emissions

24  analysis had been conducted?

25          MS. JOSELSON:  Objection.

1      A.   Well, there was certainly an implication in

2   this document, but I wasn't aware of that in terms of

3   other specific information.

4      Q.   Let's switch topics to -- to abators.  One of

5   the violations asserted in your report is failure to

6   maintain abator temperature; is that correct?

7      A.   Correct.

8      Q.   What is your understanding of how catalytic

9   abators work?

10      A.   I don't actually know how catalytic abators

11   work.

12      Q.   Do you have an understanding as to how the

13   operating temperature of a catalytic abator affects its

14   efficacy?

15      A.   I have assumed without knowing that the higher

16   the temperature, the more destruction of pollution

17   occurs and the cleaner the emissions.

18      Q.   And do you have an understanding as to whether

19   that's a linear process or some other sort of curve in

20   terms of effectiveness in relation to temperature?

21      A.   I do not.

22      Q.   So, you know, in this case ChemFab's abators

23   were meant to be operated at 600 -- 600 degrees

24   Fahrenheit or above, correct?

25      A.   That is my understanding.

Page 128

1      Q.   Do you have any understanding as to whether,

2   you know, the effectiveness of catalytic abators falls

3   off a cliff if you're at 599 degrees or whether -- you

4   know, whether that would make a material difference in

5   efficacy?

6      A.   I do not.

7      Q.   At page 6 of your report, in the bottom

8   paragraph, you note that inspections in 1998 and 1999

9   showed that temperatures were below the 600 degrees

10  Fahrenheit required by the permit, correct?

11     A.   Correct.

12     Q.   And those temperatures were 590 degrees and

13  580 degrees, respectively.  So my question is, Do you

14  have any understanding as to whether those deviations

15  below 600 degrees had any material effect on the

16  operation of the abators?

17     A.   I assume that they -- that the regulators and

18  the scientists who chose the 600 degrees Fahrenheit had

19  a reason for doing so and that there was a loss of

20  effectiveness below that, but that's an assumption.  I

21  don't have any personal knowledge of how the abators

22  work or whether or not the nature of that violation was

23  material in terms of the relationship to the amount of

24  emissions.

25          I would note that one of the -- the issues

Page 129

1    that comes out through the record is that there was a

2    fair amount of confusion that continued through the

3    '90s about the ability of the catalytic abators to

4    remove -- remove the chemicals and how -- and whether

5    they were maintained up correctly and -- or replaced

6    appropriately and which -- which pollutants they

7    actually removed.  The entire period of time that the

8    State and ChemFab were discussing the abators, there is

9    a fair amount of disagreement and confusion about what

10   the appropriate treatment method is.

11

23       Q.   One reason the company used abators is that

24   the permits required them to use abators; isn't that

25   true?

1      A.   It is true.  But the -- the way that the

2   permitting process works is that the state permit

3   writers rely upon the application, the applicant, to

4   identify the source of the -- the kinds of contaminants

5   that are occurring and the best means of treatment of

6   those contaminants and so would have relied heavily on

7   ChemFab.

8           Now, there would have been some exchange, as

9   you can see in the record, between ChemFab and the

10  state permit writers over what the appropriate method

11  is, but ultimately it's ChemFab's responsibility to

12  identify and apply for the appropriate treatment.

13     Q.   Do you have any understanding as to whether

14  the abators were intended to remove PFOA or APFO from

15  ChemFab's emissions?

16     A.   It seems relatively clear that ChemFab did not

17  choose its pollution control equipment based on any

18  concerns about PFOA or -- or other related chemicals

19  that might be resulting from its process, so no, I

20  don't think that they chose the treatment based on

21  concerns about PFOA.

22     Q.   And do you have any opinion as to whether

23  abators are effective in removing PFOA or APFO?

24     A.   Yes.

25     Q.   What is your opinion?

Page 131

1       A.    No.

2       Q.    It is your opinion that they are not effective

3   in removing PFOA or APFO?

4       A.    Correct.

5       Q.    So to the extent that allowing the abator

6   temperature to fall to 590 degrees Fahrenheit and 580

7   degrees Fahrenheit as noted in the two inspection

8   reports, those violations, if they were violations,

9   would have no bearing on emission of PFOA or APFO,

10  correct?

11          MS. JOSELSON:  Objection.

12      A.    I don't know if they would or would not have

13  had any effect.  I have to assume that there -- at

14  higher temperatures there might have been greater

15  removal levels, again, based on my common understanding

16  of pollution control equipment.  I would -- I would

17  also note that the purpose of this portion of my report

18  really go, again, to refuting statements that were made

19  that are very strong statements that Mr. Flechas made

20  that the State was in -- approved of what ChemFab did,

21  that ChemFab was operating in full compliance and with

22  the cooperation of the State, and this is just one

23  example of a way in which even under the clearly

24  inadequate controls that ChemFab had, that they weren't

25  even operating those consistently with the requirements

1    in their permit.

2        Q.   If I understand your testimony correctly, your

3    opinion is that abators are categorically ineffective

4    at removing PFOA and APFO from a plant's emissions; is

5    that accurate?

6        A.   Categorically in the sense of it's

7    self-evident that they were not.  Now, the extent to

8    which they removed some portion of PFOA or other

9    related constituents I'm -- I really -- I don't know

10   and don't have an expert opinion about.

11       Q.   Do you have any opinion as to whether

12   operating abators at 590 or 580 degrees as opposed to

13   600 degrees had any material impact on any PFOA or APFO

14   emissions from the ChemFab plant?

15           MS. JOSELSON:  Objection.

16       A.   The -- I have an opinion that typically

17   conditions like a 6- -- or temperature -- minimum

18   temperature requirement for abators are based on the --

19   the minimum acceptable removals that are necessary, you

20   know, under the operation of that equipment, so I

21   understand that there was some effect of going below

22   600 degrees, but I really don't have an expert opinion

23   about that.  I don't know how these -- this piece of

24   equipment operates or what the, you know, 10- or

25   20-degree difference would make on its effectiveness

Page 133

1    generally, much less with regard to PFOA.

2        Q.   So as you sit here, you have no opinion as to

3    whether these asserted violations had any impact on

4    PFOA or APFO emissions at ChemFab's plant, correct?

5            MS. JOSELSON:   Objection.

6        A.   The challenge I'm just having is the way you

7    phrase the question with "any impact."  I have an

8    opinion that there may have been an impact.  Again,

9    assuming that the 600-degree limit was selected by

10   experts for a reason, I assume that it may have had an

11   effect on the effectiveness of it, but beyond that

12   assumption, I don't have any expert knowledge or

13   expertise with regard to the operation of these kinds

14   of abators.

15       Q.   And your assumption that the 600-degree

16   Fahrenheit requirement implies some drop-off in

17   efficacy, that relates primarily to the chemicals that

18   the abators were intended to remove, does it not?

19       A.   I don't know what chemicals they were designed

20   to remove and whether or not it was -- typically

21   they're not designed for, like, a specific chemical

22   atom or molecule.  They're designed to deal with

23   categories and sometimes multiple categories.  Often

24   pollution control equipment removes -- will destroy

25   both particulate matter and -- and remove volatile

1    organic chemicals and a broad family of volatile

2    organic chemicals, like toluene and benzene and others,

3    so I just don't know the -- the nature of these

4    particular abators and what families of chemicals or

5    pollutants they might have been intended to remove.

6         Q.   And again, to make sure I understand, is it

7    your opinion that the abators used in Bennington and

8    North Bennington had no significant impact in reducing

9    any APFO or PFOA emissions?

10             MS. JOSELSON:  Same objection.  Asked and

11   answered at least three times.  Objection to the form.

12             THE WITNESS:  Should I answer?

13             MS. JOSELSON:  Yup.

14        A.   So my response is that the -- I apologize.  I

15   thought I understood the question, but do you mind

16   repeating it?

17        Q.   Sure.  Let me -- let me try to start over and

18   I'll -- you know, I'll assume the same objections

19   apply.

20             Am I correct that your opinion is that the use

21   of abators in the Bennington and North Bennington

22   facility would not have had any significant impact in

23   reducing any emissions of APFO and PFOA?

24             MS. JOSELSON:  Objection.

25        A.   It's the -- it's the "any" in terms of

1    significant.  It clearly did not effectively remove

2    PFOA, but whether it had some effect, whether it

3    removed some portion of -- of those -- that family of

4    chemicals, I just don't know.

5        Q.   And so to be clear, I'm not asking you to

6    definitively opine that there was zero effect, but if

7    you -- if you don't know whether there was any effect,

8    can you say with any confidence that operating 10 or 20

9    degrees below 600 degrees Fahrenheit made any

10   appreciable difference in APFO or PFOA emissions?

11       MS. JOSELSON:  Same objection.  Asked and

12   answered.  I think we're probably on question number

13   ten of the same subject matter.

14       A.   Yeah.  I just -- I don't -- I don't have

15   enough technical expertise with regard to this type of

16   pollution control equipment to have any sense of what

17   that change in temperature -- how material that would

18   be and how substantial.

19       Q.   Okay.  Okay.  Let's change tacks and discuss

20   hazardous air contaminants.  And if you could turn to

21   your report at page 7.  In the first paragraph under

22   heading 3, you state that Vermont hazardous air

23   contaminant guideline- -- well, strike that.

24           In the first paragraph under heading 3, you

25   state that "the Vermont hazardous air contaminant rule

Page 136

1   went into effect in 1981."  Do you see that?

2       A.   I do.

3       Q.   And you further state that the 1981 rule

4   "placed the burden on the source to identify hazardous

5   air contaminants that meet the definition in Section

6   5-101 subparagraph 26"?

7       A.   Correct.

8       Q.   Let's take a look at the 1981 regs.

9            MR. WEINRAUB:  And this will be Exhibit 14.

10           (Deposition Exhibit No. 14 was

11           marked for identification.)

12  BY MR. WEINRAUB:

13      Q.   So turning first to -- to that definition,

14  5-101 subparagraph 26, which is on page 3 of the

15  exhibit.

16      A.   I'm sorry.  Which -- which definition?

17      Q.   This is the definition of hazardous air

18  contaminant.

19      A.   Got it.

20      Q.   And so this definition states that "'Hazardous

21  Air Contaminant' means an air contaminant for which no

22  ambient air quality standard has been adopted and which

23  in the judgment of the Secretary, taking into account

24  its quantity, concentration or physical, chemical or

25  infectious characteristics, causes, or contributes to,

Page 137

1   air pollution which may reasonably be anticipated to

2   result in an increase in mortality or an increase in

3   serious irreversible, or incapacitating reversible

4   illness."  Did I read that correctly?

5        A.   Yes.

6        Q.   Am I correct in understanding that definition

7   to say that, among other things, to meet the definition

8   of a hazardous air contaminant, the contaminant must

9   cause or contribute to air pollution?

10       A.   Yes.

11       Q.   Let's turn to the definition at subsection 5

12  of air pollution.  And subsection 5 states that "'Air

13  Pollution' means the presence in the outdoor atmosphere

14  of one or more air contaminants in such quantities, and

15  duration as is or tends to be injurious to human health

16  or welfare," and the definition continues.

17            Did I read that portion of the definition

18  correctly?

19       A.   Yes.

20       Q.   Am I correct in understanding that under the

21  regulatory definition of air pollution any health

22  hazards must be associated with the presence of a

23  contaminant in the outdoor atmosphere?

24       A.   Yes.  That's the nature of -- of an emission

25  is that it's emitted into the atmosphere.  It doesn't

Page 138

1  mean that the harm needs to occur in the atmosphere.

2      Q.  So you would not, then, agree with me that

3  Vermont's hazardous air contaminant rules relate to

4  exposures to contaminants that are present in the

5  outdoor atmosphere?

6      A.  They include that but are not limited to harm

7  that occurs in the outdoor atmosphere.

8      Q.  What is your basis for saying that they're not

9  limited to harms that occur from exposure to

10  contaminants in the outdoor atmosphere?

11      A.  Well, assuming you mean by -- one means by

12  "atmosphere," which I think this does, the -- the

13  ambient air that surrounds us all, then that's too

14  limiting.  The harm may be that -- that the contaminant

15  is -- you know, falls into the soil or into surface

16  water or groundwater and has an impact, and that would

17  still constitute a hazardous air contaminant.

18      Q.  What is your basis for saying that -- that a

19  contaminant where the only hazards relate to its

20  eventual presence in soil, surface water, or

21  groundwater could still be a hazardous air contaminant?

22      MS. JOSELSON:  Objection to the form.

23      A.  I didn't say that it would be solely -- those

24  harms would be solely limited to that, but I suppose

25  you might have a chemical that would somehow magically

1   not be harmful in the atmosphere and yet be harmful in

2   groundwater due to some chemical reaction with water, I

3   suppose, but most likely in my experience what happens

4   is these chemicals are toxic all the way through their

5   life, but when they're -- the place where they're

6   readily measured and found tends to be in the soil or

7   water, and so the fact that you didn't measure it when

8   it was in the air doesn't mean that it didn't come from

9   the air or that it isn't considered a hazardous air

10  contaminant.

11      Q.   Can you give me any example of a substance

12  that is not hazardous in the outdoor atmosphere but

13  that is nevertheless considered a hazardous air

14  contaminant because of subsequent hazards associated

15  with its presence in other media?

16      A.   No.  And I feel like we're getting -- going

17  down a rabbit hole.  I mean, you asked me the question

18  of whether or not an air contaminant needed to be

19  something that was limited to its presence in the

20  outdoor atmosphere, and what I was saying was that it's

21  not limited to a contaminant that is only present in

22  the outdoor atmosphere, but if it comes to land in the

23  soil or water, for instance, it could also have been a

24  hazardous air contaminant.

25      Q.   Can you cite any authority supporting that

1    interpretation of air pollution under the Vermont

2    regulations?

3         A.   I suppose I could if I did some research.  Not

4    off the top of my head.

5         Q.   Looking at the definition of air pollution, it

6    specifically refers to the presence in the outdoor

7    atmosphere of one or more air contaminants, correct?

8         A.   Correct.

9         Q.   And it refers to the presence of those

10   contaminants in the outdoor atmosphere in such

11   quantities and duration as is or tends to be injurious,

12   correct?

13        A.   That's what it says.

14        Q.   Based on this definition, how could a

15   contaminant's presence in the outdoor atmosphere below

16   levels deemed injurious constitute air pollution,

17   regardless of downstream effects in soil or

18   groundwater?

19             MS. JOSELSON:  Objection to form.

20        A.   There's nothing in this definition to suggest

21   that the injury has to occur only while the pollutant

22   is in the atmosphere.  The injury could occur after the

23   pollutant has accumulated in the soil or water.

24        Q.   Are you familiar with EPA's National Air

25   Toxics Assessment program?

                                        Page 141

1        A.   Generally.  Not specifically in the sense of

2    I'm not deeply familiar with it, but I know that it

3    exists.

4             MR. WEINRAUB:  Let's mark Exhibit 15.

5             (Deposition Exhibit No. 15 was

6             marked for identification.)

7    BY MR. WEINRAUB:

8        Q.   I'll represent to you that this comes from

9    EPA's website.  And if I could ask you to look at the

10   first sentence under the heading "What is NATA?"  It

11   states, The National Air Toxic Assessment, NATA, is

12   EPA's ongoing review of air toxics in the United

13   States.

14             You see that?

15       A.   I do.

16       Q.   And turning to the top of the second page,

17   there's a heading that says "What NATA is not."  And in

18   the second paragraph under that heading towards the end

19   of the paragraph, it states, "NATA only considers

20   health effects from breathing these air toxics.  It

21   ignores indoor hazards, contacting or ingesting toxics,

22   and any other ways people might be exposed."  Do you

23   see that language?

24       A.   I do.

25       Q.   Is it fair to say that EPA's National Air

1  Toxics Program considers only inhalation hazards and
2  not hazards that might result from contaminants
3  formerly present in the air but subsequently present in
4  other media?
5       A.   I -- the -- it's not a -- this is not a
6  regulatory entity.  It's -- it's doing a set of
7  assessments, and so it's distinguishing the toxicity
8  associated with breathing from other types of toxicity
9  for the purposes of, you know -- you know, targeting
10  its scientific review and analysis.  It's not an
11  interpretation of the breadth of -- of the national air
12  pollution toxics program as implemented by EPA in the
13  states.  Certainly it's not, you know, a -- an
14  interpretation that's relevant to understanding what
15  Vermont's definition of hazardous air contaminant
16  means.
17       Q.   Would you agree that NATA does what it does to
18  inform EPA's administration of its hazardous air
19  pollution rules?
20            MS. JOSELSON:  Object to the form.
21       A.   I assume that it is -- and would hope that
22  it's one of the major sources of information that the
23  EPA permitting programs and enforcement programs rely
24  upon in determining the relevant, you know, effects
25  of -- of air emissions when inhaled, but it's not --

Page 143

1    there's nothing that would suggest to me that it's

2    intended to somehow limit the breadth and reach of the

3    authority of the EPA to regulate air toxics.

4            MR. WEINRAUB:  Let's mark Exhibit 15 -- oh,

5    16.  Apologies.

6            (Deposition Exhibit No. 16 was

7            marked for identification.)

8    BY MR. WEINRAUB:

9        Q.    Have you seen this document before?

10       A.    I saw reference to this document, but I have

11   not seen the actual document.

12       Q.    Do you recognize the name Bill Bress, Ph.D.?

13       A.    I do.

14       Q.    He is an environmental toxicologist with

15   Vermont's Department of Health?

16       A.    He is.  And as I noted earlier, highly

17   respected.

18   ██    ██████████████████████████████████████

██   ████████████████████████████████████████

██   ██████████████████████████    ████████████████████

██   ██████████████████████████████████████████████

██   ██████████████████████████████████

██   ████████████████████████████████████████████

██   ████████████████████████████████████████████

██   ██████████████████████████████



25      Q.    And you think that was a mistake?

1      A.   It was obviously a mistake in retrospect.  Now

2   we know that, you know, surrounding the site are very

3   high levels of PFOA in the soil and groundwater and

4   that the most likely source of those -- of that

5   contamination was from ChemFab's emissions, air

6   emissions.  Secondly, that he didn't understand or

7   appreciate that he didn't have the full spectrum of

8   potential contaminants to -- to evaluate.

9      Q.   So Dr. Bress is a toxicologist whom you've

10  spoken very highly of today, correct?

11     A.   Yes.

12     Q.   You've worked with him personally?

13     A.   Yes.

14     Q.   You had glowing words to say about him at the

15  beginning of today's deposition?

16          MS. JOSELSON:  Object to the form.

17     A.   Glowing.  Well, he's highly respected, and I

18  respect him.

19     Q.   His apparent understanding of definition of

20  hazardous air contaminant aligns more closely with my

21  interpretation than with yours; wouldn't you agree?

22     A.   No.  I don't see any interpretation whatsoever

23  in here of hazardous air contaminant.

24     Q.   Do you see any reference to potential hazards

25  of any contaminant in any media other than in the

1  ambient air?

2      A.   No.

3      Q.   And you think it was a mistake that Dr. Bress

4  focused only on hazards related to the presence of

5  contaminants in the ambient air and not in other media,

6  correct?

7          MS. JOSELSON:  Object to the form.

8      A.   Yes.  And I'll note from my personal

9  experience with -- with Dr. Bress that he was very

10 concerned about -- ultimately and primarily about

11 public health impacts.  He would not have been in the

12 business of drawing arbitrary lines between whether or

13 not the -- the chemicals or toxic substances were in

14 the air or in the soil or in the water.  He would have

15 been concerned ultimately about the impacts on public

16 health, so I see here only that he probably limited his

17 assessment to what he was asked to do, which is what

18 he -- review of the information about what was present

19 in the air.

20     Q.   And who do you think asked him to do that?

21     A.   I assume that it was to Harold Garabedian, to

22 which he directed his opinion and report.

23     Q.   During your time at Vermont DEC -- strike

24 that.

25          Would you be able to point me to any document

```
 1    like this in the regulatory record in this case or that
 2    crossed your desk while you were commissioner of
 3    Vermont DEC where Bill Bress or any other toxicologist
 4    evaluated air emissions under the hazardous air
 5    contaminant rule based on potential hazards associated
 6    with exposure in medias other than the ambient air?
 7            MS. JOSELSON:  Objection.
 8        A.   I don't recall a specific instance of that.
 9    It wouldn't surprise me.  Again, for Dr. Bress and for
10    the folks at the Department of Environmental
11    Conservation, they might at some point in a -- in the
12    context of implementing a regulation and program try to
13    sort out and clarify which regulatory program was the
14    appropriate one to apply in terms of -- of how to
15    regulate it and which vehicle, whether it was a
16    hazardous waste or clean air or clean water or drinking
17    water program, but their first and primary interactions
18    at this level, you know, substantive level about the
19    technical scientific piece, would have been to assess
20    ultimately what were the ultimate effects on public
21    health.
22            They would not -- they would be working well
23    beyond their own particular programmatic and
24    jurisdictional limitations to try to figure out what
25    were the nature of those problems, and then in an
```

1    instance like this, if there were other programs that

2    should be involved or engaged, then they would broaden

3    the technical and scientific inquiry.  It would be up

4    to the lawyers later on in the process to determine

5    what to do with that information and how the agency

6    should apply it in terms of the regulatory programs.

7        Q.   But in this e-mail, which is focusing

8    specifically on air toxics, we don't see any of that

9    occurring, do we?

10            MS. JOSELSON:  Object to the form.

11       Q.   We don't see any focus beyond exposures in the

12   ambient air?

13       A.   His -- his statement here is -- is definitely

14   responsive to an apparent question of what are the

15   hazard levels in the ambient air, and he says he

16   doesn't see anything above the hazard levels.

17       Q.   And as you note, there are other regulatory

18   programs to regulate hazards in other media, such as

19   drinking water or groundwater or soil, correct?

20       A.   Correct.

21       Q.   To your knowledge, has Vermont ever set

22   hazard-limiting values for the presence of PFOA or APFO

23   in the ambient air?

24       A.   For PFOA, no.

25       Q.   Or APFO?

1      A.    No.

2      Q.    To your knowledge, has EPA ever set

3  hazard-limiting values for PFOA or APFO in the ambient

4  air?

5      A.    Not to my knowledge.

6      Q.    To your knowledge, has Vermont DEC ever

7  required a company to test its emissions for PFOA or

8  APFO?

9      A.    I don't know that, but I would be surprised --

10  I would not be surprised if they weren't looking at

11  emissions across the state, potential sources, and

12  engaged in a discussion with those sources about

13  whether or not they needed permit limits for it, but I

14  don't -- I don't have any personal knowledge of that.

15  That's just an assumption.

16      Q.    In the absence of any hazard-limiting values

17  for the presence of APFO or PFOA in the ambient air, do

18  you have any understanding as to how Vermont DEC would

19  evaluate emissions tests showing that PFOA or APFO were

20  being emitted?

21      A.    Yes.

22      Q.    What's your understanding?

23      A.    They would have a dialogue with the Department

24  of Health toxicologist; they would be looking at the

25  nature of the -- the toxicity, the potential sources

1   or -- not -- potential recipients who would be

2   vulnerable to it, the pathways for exposure; and they

3   would be also engaged in conversation with EPA, which,

4   of course, has much greater scientific resources;

5   they'd be looking at other states like California, to

6   the European Union; for literature reviews; and then

7   they would be making their best judgment based on all

8   that information on whether there should be a numeric

9   limitation based on risk or a prohibition or to require

10  further study.

11      Q.   To your knowledge, nothing like that has

12  occurred to date in connection with emissions of PFOA

13  or APFO in Vermont, correct?

14      A.   I just -- would be surprised if there was not

15  a very active conversation that's been happening over

16  the last two or three years around that very topic, but

17  I have not been personally involved in those, so I

18  cannot say one way or the other.

19      Q.   Let's turn to page 5 of your report.  I'll

20  warn you in advance I'm pretty sure I got the page

21  wrong.  Let me find out where I'm supposed to be.  Make

22  that page 8 of your report.

23          At the end of the first paragraph, it states,

24  "Had the Vermont DEC been informed by Saint-Gobain that

25  it was emitting APFO from the North Bennington Plant,

1   the Department had the authority to require the company

2   to perform the analysis required by the Hazardous Air

3   Contaminant Rule."  Do you see that?

4       A.    I do.

5       Q.    And would you agree that that authority would

6   depend, at least in part, on the judgment of the

7   secretary of ANR as to whether APFO or PFOA were

8   hazardous air contaminants?

9           MS. JOSELSON:  Object to the form.

10      A.    The secretary is informed by his or her, you

11  know, scientific staff.

12      Q.    And let me -- that was a poorly teed-up

13  question.  Apologies for jumping around, but let's go

14  back to the 1981 regs and to the definition of

15  hazardous air contaminant --

16      A.    Yeah.

17      Q.    -- which is paragraph 26.

18      A.    Yup.

19          MS. JOSELSON:  Exhibit 14, are we?

20          MR. WEINRAUB:  Yes.  14.

21      A.    Yup.

22      Q.    So subparagraph 26 defines hazardous air

23  contaminant to mean "an air contaminant for which no

24  ambient air quality standard has been adopted and which

25  in the judgment of the Secretary, taking into account

1   its quantity," et cetera, then no longer quoting, may

2   reasonably be anticipated to result in increased

3   mortality or illness.

4           Do you see that?

5       A.   I do.

6       Q.   So part of the criteria for whether an air

7   contaminant constitutes a hazardous air contaminant is

8   whether the secretary judges there to be a health

9   hazard, correct?

10      A.   You're using "health hazard" to kind of

11  summarize that phrase at the end about its physical,

12  chemical characteristics, et cetera, but yes, that's

13  fundamentally -- the primary concern around hazardous

14  air contaminants are the impacts on human health,

15  although impacts on the environment may also be

16  considered.

17      Q.   Okay.  And we have a disagreement about

18  whether the risks to the environment or health needs to

19  relate to the presence in the outdoor atmosphere, but

20  putting that aside, ANR has the ability to add a

21  contaminant to its hazardous air contaminant list and

22  remove all doubt about whether this definition applies,

23  does it not?

24          MS. JOSELSON:  Object to the form.

25      A.   It does, yes.

Page 153

1      Q.   And you believe that Saint-Gobain and ChemFab

2   should have spontaneously identified PFOA or APFO as

3   hazardous air contaminants prior to 2002, correct?

4           MS. JOSELSON:   Objection.

5      A.   I'm not sure what you mean by "spontaneous,"

6   and certainly it wasn't their obligation to list it.

7   That's up to the department to list a contaminant, but

8   it is the obligation -- the entire Clean Air Act and

9   the implementation by the State of Vermont relies upon

10  companies that in the first instance know what their

11  process is, know what chemicals they're using, and have

12  the capacity and ability to determine how best to treat

13  those, to identify those, and, where they have

14  questions or concerns, to dig deeper and to do the

15  research necessary for the secretary to be able to make

16  those types of determinations.

17     Q.   So turning back to your report on page 8, just

18  to reread that quote at the end of that first

19  paragraph, you state that "Had the Vermont DEC been

20  informed by Saint-Gobain that it was emitting APFO from

21  the North Bennington Plant, the Department had the

22  authority to require the company to perform the

23  analysis required by the Hazardous Air Contaminant

24  Rule."  Correct?

25     A.   Correct.

Page 154

1       Q.    And yet to this day in 2018, Vermont has not

2   added PFOA or APFO to its list of hazardous air

3   contaminants, correct?

4       A.    As far as I know, they have not.

5       Q.    Do you have any reason to think that learning

6   of APFO emissions in 1997 would have resulted in DEC or

7   ANR identifying APFO as a hazardous air contaminant?

8       A.    Yes.

9       Q.    What's the basis for that understanding?

10      A.    Given the information that has come out and

11  came out, you know, in the years following that about

12  the health impacts of APFO and PFOA on human health, I

13  have no doubt that they would have given consideration

14  to listing it as a hazardous air contaminant by virtue

15  of the definition that you read earlier, you know, from

16  the 1981 rules about chemicals that -- or contaminants

17  that may cause an increase in mortality or serious

18  reversible -- or irreversible illnesses.

19      Q.    Then why haven't they done so?

20      A.    As of -- well, there's two reasons.  One is

21  the major source of air emissions of APFO or PFOA,

22  ChemFab, closed in 2002 and hasn't been present.

23  Secondly, until just two or three years ago, the State

24  of Vermont was not aware that the air emission of PFOA

25  could cause such substantial harm to public health.

1      Q.   If ChemFab or Saint-Gobain had disclosed in

2   the late 1990s that any emissions of APFO or PFOA were

3   occurring, Vermont DEC wouldn't have had that health

4   information, would they?

5           MS. JOSELSON:   Object to the form.

6      A.   There has been -- as -- as is played out

7   nationally and in the state, there's a growing

8   awareness that there was a fair amount of information

9   from DuPont and even from ChemFab, you know, from its

10  own health study, that there were unexplained health

11  impacts of exposure to chemicals, now most likely

12  determined to be PFOA, that would have raised serious

13  red flags for the Department of Health and for the

14  Agency of Natural Resources, and at a minimum there

15  would have been an obligation placed on ChemFab to the

16  extent it had continued operating to pay for extensive

17  additional analysis and study of that.

18          So whether they would have actually listed it

19  or they simply would have required additional analysis

20  or they would have participated in a national

21  conversation about the nature of the risks, it's pure

22  speculation, but there's ample information to suggest

23  that had ChemFab at the time identified and notified

24  the State of the nature of these chemicals and the

25  potential risks, that there would have been additional

```
 1    regulatory action.
 2        Q.   You predicted my next question again, which
 3    is, You are currently engaging in pure speculation
 4    about what Vermont DEC would have done had it been
 5    informed of those emissions in 1997, are you not?
 6            MS. JOSELSON:  Object to the form.
 7        A.   I don't think I said pure speculation, but I
 8    did say speculation, and it would be informed
 9    speculation in that I have observed over the years that
10    when health and safety and environmental regulatory
11    agencies are presented with information that suggests
12    significant potential health risks, that they will
13    require additional analysis and engage with the
14    regulated entities, with other states, and with EPA to
15    understand those risks and determine the appropriate
16    regulatory action, which could -- could have included
17    listing it as a hazardous air contaminant.  But I don't
18    know because ChemFab did not in fact notify or pursue
19    the risks associated with the chemicals it was using or
20    the unexplained impacts on the health of its employees
21    or the -- the persistent public complaints around odor
22    and nuisance.
23        Q.   Do you have any information -- my apologies.
24    I didn't mean to interrupt.
25        A.   Nuisance was the last word I said.
```

1  Q.  Do you have any information that ChemFab

2  attributed any health effects among its employees to

3  exposure to PFOA or APFO?

4  A.  No, I do not.

5  Q.  Okay.  Let's test your theory about what would

6  have happened in this counterfactual world.  Are you

7  aware that Vermont DEC was asked on at least two

8  occasions in 2016 whether residents who have inhaled

9  fumes were at increased risk?

10      MS. JOSELSON:  Object to the form of the

11  question.  Object to the rudeness implied in the

12  question.  If you want to reask the question in a more

13  respectful way, that would be much appreciated.

14      MR. WEINRAUB:  I did not -- I did not intend

15  to be disrespectful, and I don't think I was, but --

16  but I won't argue the point and I will repeat it.

17  Q.  Are you aware that Vermont DEC was asked on at

18  least two occasions in 2016 whether residents who had

19  been exposed to fumes were at increased risk as a

20  result of breathing the fumes during the period that

21  ChemFab was operating in North Bennington?

22      MS. JOSELSON:  Object to the form.

23  A.  No, I was not aware of that round of -- two

24  rounds of questions.

25      MR. WEINRAUB:  Let's mark Exhibit 17.

1          (Deposition Exhibit No. 17 was

2          marked for identification.)

3    BY MR. WEINRAUB:

4       Q.   So I take it you have not seen this -- this

5    document before?

6       A.   No, I have not.

7       Q.   This is an e-mail chain involving some names

8    that I think we've discussed earlier.  Chuck Schwer,

9    that's someone that you are familiar with?

10      A.   Yes, I am.  And I'm seeing Sarah Vose.  That's

11   the -- the toxicologist at the Department of Health

12   that I referenced earlier that replaced Bill Bress.

13      Q.   And I think you also referred to Alyssa

14   Schuren at one point?

15      A.   Yup.  She was at this time the commissioner of

16   the department.  I know all these folks.  And Richard

17   Spiese works for Chuck in the -- the waste division,

18   and Lori Cragin works with Sarah at the Health

19   Department.

20      Q.   So Chuck's e-mail - this is dated February 28,

21   2016 - states, "Here is the list of questions from

22   Friday's meeting.  We should start filling in the

23   answers."

24           And then if you could turn to question number

25   18.  I'm looking at the wrong document.  Hang on one

1  moment.  I've got the right one.  Question number 18:

2  "Was there an inhalation danger while the plant was

3  operating" -- or "when the plant was operating?"  Do

4  you see that?

5       A.   I do.

6       Q.   And then just turning quickly to the second

7  instance.

8            MR. WEINRAUB:  This will be Exhibit 18.

9            (Deposition Exhibit No. 18 was

10           marked for identification.)

11           MS. JOSELSON:  I'll just note we've been going

12  about an hour, so you decide when you're ready.

13           MR. WEINRAUB:  Sure.  Let's do this exhibit

14  and then maybe take a break.

15  BY MR. WEINRAUB:

16       Q.   So this is an e-mail chain where the -- the

17  top e-mail is dated March 4, 2016, with some of the

18  same personnel.  Do you see that?

19       A.   I do.

20       Q.   Then if you turn to the back page, in the top

21  carry-over paragraph, there's a -- well, let me back

22  up.

23           Bottom of the first page, there's an e-mail

24  from Gail Mauricette to Chuck Schwer?

25       A.   Um-hum.

 1      Q.   And Ms. Mauricette identifies herself as a
 2  resident who lives on Polygraphic Lane in North
 3  Bennington.  And then on the carry -- at the end of the
 4  carry-over paragraph, she says, We have municipal
 5  water.  I know that the priority now has to be testing
 6  wells, but all of us in the area that spent years
 7  inhaling the smoke from the ChemFab plant are concerned
 8  about the long-term health effects, especially on our
 9  children who grew up smelling the chemicals.  Should we
10  all have blood work done?
11          Do you see that?
12      A.   I do.
13      Q.   To your knowledge, has Vermont DEC or ANR ever
14  indicated that there was reason for concern among
15  residents exposed only via inhalation during the time
16  that ChemFab was operating?
17          MS. JOSELSON:  Object to the form.
18      A.   Now we're outside of the scope of the
19  documents I reviewed as part of the deposition, but --
20  and you're asking a question that kind of goes beyond
21  my opinion, but I -- I do recall that there has been a
22  concern about -- that's been expressed by a variety of
23  people, and I don't know exactly who, but including
24  public officials, about whether or not people who
25  worked at the plant may have been exposed in ways that

1   caused them to have health impacts.  I don't recall

2   whether it had to do with inhalation or other types of

3   exposure.

4          But I -- I also recall that some of the

5   question and concern related to people who also smoked

6   cigarettes and worked in the plant and that there

7   may -- they may not have cleaned their hands before

8   smoking and that there may have been some exposure

9   through that pathway, but really I'm -- I'm out -- out

10  of my comfort level in terms of I don't have a specific

11  document or anything I'm relying on.  That's just my

12  recollection from general discussions.

13     Q.   Okay.  That's fair enough.  And putting aside

14  these specific e-mails, do you have any knowledge of

15  any statement by Vermont ANR to the effect that there's

16  any particular concern related to inhalation exposure

17  by nonemployees?

18     A.   I am not aware of that.  I would be surprised

19  if they were crossing any concerns off the list of

20  things to be worried about, but I understand that the

21  primary concern has been the -- the groundwater present

22  in people's water.

23          MR. WEINRAUB:  Okay.  Why don't we take a

24  ten-minute break.

25          THE VIDEOGRAPHER:  Going off the record at

Page 162

1    2:47.

2              (A recess was taken.)

3              THE VIDEOGRAPHER:   We're back on the record at

4    3 o'clock.

5    BY MR. WEINRAUB:

6         Q.   Let's take a look at Dr. Hopke's merits report

7    real quick.   That's Exhibit 2.

8         A.   Yes.

9    █         ████████████████████████████████████████████████

█    ██████████████████████████████████████████████████████

█    ████████████████████████████████████████████████████

█    ███████████████████████████████████████████████

█    █         ████████████   █████████████████████████

█    █████

█         █████████   ████████████   ███████████████████████

█         █████   █████████   ██████████

█         ██████████████████████████████████████████

█    ████████████████████   ██████████████████████████████

█    █████████

█         ████   █████

█         ███████████████████████████████████████████████

█    ████████████████████████████████████████████████████

█    ████████████████████████████████████████████████████

█    ██████████████   ████████████████████

█         ████   ██████████

Page 163

1      Q.   And then one of the documents cited in the
2   parenthetical that follows is a June 17, 1985,
3   Environmental One report.  Do you see that?
4      A.   I do.
5      Q.   Have you read Dr. Hopke's deposition
6   transcript?
7      A.   No, I have not.
8      Q.   Okay.  Do you have any knowledge as to whether
9   that 1985 Environmental One report was submitted to
10  Vermont DEC in 1985?
11     A.   I do not.
12     Q.   Do you have any basis to dispute that by 1985
13  Vermont DEC was informed that ChemFab's process
14  included use of PFOA as a constituent of the PTFE
15  dispersion?
16     A.   No.  I have -- I have no basis to say one way
17  or the other.
18          MR. WEINRAUB:  Let's mark Exhibit 19.
19          (Deposition Exhibit No. 19 was
20          marked for identification.)
21  BY MR. WEINRAUB:
22     Q.   Have you seen this document before?
23     A.   No, I have not.
24     Q.   So the document is titled "Trip Report," and
25  next to "Participants," one participant is identified

```
                                             Page 164
1    as Michael Nelson of Vermont ANR.  Do you see that?
2         A.   I do.
3         Q.   Do you know Michael Nelson?
4         A.   I do not.
5         Q.   So it refers to an inspection on July 12,
6    1989.  And if you look at the second paragraph under
7    the heading "General Description."
8         A.   Yes.
9         ██      ██████████████████████████████████
     ████████████████████████████████████████████████████
     ████████████████████████████████████████████████████
     ████████████████████████████     ████████████████████
     ██       ██     ██████
14        Q.   And then the paragraph ends, "This material is
15   not considered to be hazardous."  Do you see that?
16        A.   I do.
17        Q.   Can we turn back to page 8 of your report?
18   And in the top paragraph, second sentence, it states,
19   The New York Department of Environmental Conservation
20   became concerned about emission of APFO, in
21   parentheses, the ammonium salt of PFOA, from similar
22   Teflon coating processes in 1997.
23             Do you see that?
24        A.   I do.
25        Q.   And then your report references a memo dated
```

                                                    Page 165

1    March 21, 1997, found in the Vermont DEC files.

2         A.    Yes.

3         Q.    First of all, do you have any information as

4    to whether ChemFab was informed of New York DEC's

5    concerns in 1997?

6         A.    Well, A, the presence of this in the DEC file

7    suggests that someone was aware of it in the

8    department.  I also recall - I can't remember the

9    date - that there was an exchange in which someone at

10   DEC referenced the -- the New York plant and issues

11   with PFOA there, but I can't recall the specifics off

12   the top of my head.  It may be later in the report.

13        Q.    So the 1997 report, that is an internal DEC

14   memo; is that correct?

15        A.    No, I don't believe so.  I believe that the

16   March 21 -- is that the one you said?  March 21?

17        Q.    Yes.  The March 21, 1997, memo.

18        A.    I believe --

19        Q.    Apologies.  Was that a memo from Vermont --

20   from New York DEC to Vermont DEC?

21        A.    No.  My recollection is that it was an

22   internal memo within New York DEC, but it had obviously

23   been sent to somebody at Vermont DEC.  That's my

24   recollection.  I mean, we could pull it up and look at

25   it, but that's what I recall.

1      Q.   Do you have any information as to whether the

2   memo was ever shared with ChemFab?

3      A.   I don't know.

4      Q.   ChemFab was still operating in Vermont in

5   1997, correct?

6      A.   Correct.

7      Q.   After receiving this information regarding

8   New York DEC's concerns, did Vermont DEC ask ChemFab to

9   test its emissions for PFOA or APFO?

10          MS. JOSELSON:  Object to the form.

11      A.   As far as I know, they did not.

12          MR. WEINRAUB:  Let's mark Exhibit 20.

13          (Deposition Exhibit No. 20 was

14          marked for identification.)

15   BY MR. WEINRAUB:

16      Q.   Have you seen this document before?

17      A.   Yes.

18      Q.   And this is a September 20, 1999, memo from

19   Philip Etter to Chris Jones, correct?

20      A.   Correct.

21      Q.   And if you'll turn to the final paragraph on

22   page 2, Mr. Etter's report states, "I am uncertain that

23   any of the testing done at Chemfab has specifically

24   tried to identify perfluoroisobutylene (CAS number:

25   382-21-8) or ammonium perfluorooctanoate."  Do you see

Page 167

1    that?

2        A.    I do.

3        Q.    And ammonium perfluorooctanoate is APFO?

4        A.    Correct.

5        Q.    Mr. Etter goes on, If not, I recommend that,

6    during future testing, we test for these specific

7    chemicals which are mentioned in a March 21, 1997, memo

8    from the New York DEC as being problematic from a

9    toxicity standpoint.

10            Do you see that?

11       A.    I do.

12       Q.    And at no time after this September 20, 1999,

13   memo did Vermont DEC ask ChemFab to test its emissions

14   for PFOA or APFO, correct?

15            MS. JOSELSON:  Objection.

16       A.    I actually don't know that to be true one way

17   or the other, but as far as I know, they did not.  I

18   mean, there's certainly nothing in the records I

19   reviewed that suggested that they had.  Whether or not

20   there was informal exchanges around that or other

21   documents that I haven't reviewed, I just don't know.

22       Q.    If Vermont DEC knew in 1997 of New York DEC's

23   concerns about APFO emissions from a Teflon plant and

24   didn't ask ChemFab to test its emissions for APFO, why

25   do you think that Vermont DEC would have required

```
                                              Page 168
 1    ChemFab to test its emissions for APFO if ChemFab had
 2    told them that that was a possible component of their
 3    emissions?
 4            MS. JOSELSON:  Object to the form.
 5       A.   I'm -- I lost the premise of the question.  If
 6    ChemFab had --
 7       Q.   So earlier on I had asked you if -- if Vermont
 8    DEC had known that APFO was being emitted from the
 9    ChemFab plants, would it have taken any action.
10       A.   Right.  I understand.
11       Q.   And so in 1997 Vermont DEC was informed that
12    New York DEC had concerns about PFOA emissions from a
13    Teflon plant, right?
14       A.    (Witness nods head).
15       Q.   And yet they didn't ask ChemFab to test its
16    emissions for PFOA.  Why do you think that DEC would
17    have taken a different approach if ChemFab had
18    identified PFOA as one of its potential emissions?
19       A.   I see what you're saying.  Well, as -- as a
20    first point, you know, it's clear that the -- the
21    department should have, in hindsight should have,
22    followed up on this with the -- with the company.  So
23    that -- that's the first point.
24            The second point is that -- that failure to do
25    that doesn't mean that ChemFab fulfilled its
```

1    obligations to independently identify and raise the

2    question and to pursue it with the department.

3        Q.   ChemFab's obligations under the hazardous air

4    contaminant rule depend on the assumption that ANR's

5    secretary would consider PFOA or APFO to meet the

6    regulatory definition of a hazardous air contaminant,

7    do they not?

8            MS. JOSELSON:  Objection.

9        A.   I mean, it's ultimately up to the secretary of

10   the Agency of Natural Resources to designate things.

11   That's their responsibility.  But who petitions them to

12   do that, it could be the company petitions them; it

13   could be an out- -- external entity; it could be the

14   staff that make the recommendation.

15       Q.   But putting aside, you know, the HAC list, the

16   judgment of ANR's secretary is explicitly built into

17   the definition of a hazardous air contaminant, correct?

18       A.   Correct.

19       Q.   And so unless the secretary would consider a

20   substance to be a hazardous air contaminant, the

21   hazardous air contaminant rules don't apply; isn't that

22   right?

23           MS. JOSELSON:  Objection.

24       A.   If a company has a chemical that they know or

25   should know has the potential to cause human health

1   risks, they have an obligation to notify the secretary

2   and/or his or her staff of that risk so the secretary

3   can make that determination.  They're not -- it's

4   not -- it's not that they have no obligation until the

5   secretary identifies the risk.  I mean, if the

6   secretary puts something on the list, then yes, they

7   must respond to that, but the fact that it's not on the

8   list doesn't mean that they are not obligated to know

9   what they're emitting and to assess the risks of that

10  chemical and to make sure that the secretary and his or

11  her staff know what those risks are.

12      Q.   Is it possible that the reason that DEC did

13  not respond to this information in 1997 and Mr.

14  Etter's -- Mr. Etter's recommendation in 1999, is it

15  possible that the reason that they didn't ask ChemFab

16  to test its emissions for PFOA or APFO is that Vermont

17  ANR does not consider PFOA or APFO to meet the

18  regulatory definition of a hazardous air contaminant?

19           MS. JOSELSON:  Objection.

20      A.   That's possible as -- it's also possible that

21  they just didn't have the time to get to it, that the

22  memo got lost, that Phil Etter was transferred, that

23  another bigger issue came up and they dealt with that

24  first.  There's a variety of reasons why they might not

25  have moved forward with it.  As I said, in retrospect,

1    I'm sure if you asked these folks, they -- they would

2    probably say they wished that they had done that

3    additional testing and analysis or, you know, done

4    additional evaluation.

5         Q.   Are you familiar with Dr. Hopke's opinion that

6    ChemFab or Saint-Gobain should have used different

7    control technologies to remove PFOA from plant

8    emissions?

9         A.   Yes.  I saw that.

10        Q.   And specifically Dr. Hopke references

11   scrubbers and wet electrostatic precipitators as

12   alternate technologies?

13        A.   Yes.

14        Q.   Do you know what a scrubber is?

15        A.   In a general sense, yes.

16        Q.   Do you know how scrubbers work with regard to

17   removing PFOA from emissions?

18        A.   I don't know.  I think it would -- it's a --

19   it's a technology that works best on particulate

20   matter, but I think it assumes that the -- the form,

21   the physical form, of the PFOA would be in particulate

22   matter or attached to particulate matter.

23        Q.   Do you know what a wet electrostatic

24   precipitator is?

25        A.   Generally.

Case 5:16-cv-00125-gwc Document 220-13 Filed 11/27/18 Page 173 of 236

Q. Do you know how that technology works in removing PFOA from emissions?

A. I don't know specifically how that works. That's a little further afield for me.

Q. Your report does not address scrubbers or wet electrostatic precipitators, correct?

A. Correct.

Q. Do you have an opinion as to whether ChemFab or Saint-Gobain violated any Vermont regulations by not using one or both of those technologies?

A. The reason I'm hesitating is I'm not sure quite how to characterize it. There seemed to me to be substantial circumstantial evidence suggesting that large volumes of PFOA escaped the plant and have caused health impacts, and that -- that set of facts, if -- if proven correct, are absolutely -- would be a violation of the air pollution control laws, but I don't have any specific -- you know, it's -- the specific failure to install these particular control technologies is not in and of itself a violation.

Q. The emission of PFOA in and of itself constitutes a violation; is that your opinion?

A. The emission of a chemical that causes public health and environmental harm is -- raises a substantial question about whether or not there was a

Page 173

1    violation, yes.

2        Q.   Have you opined in your report to a reasonable

3    degree of certainty that release of PFOA in and of

4    itself constitutes a violation?

5        A.   I did not make that assertion.  Most of my

6    report is really focused on responding to -- to Mr.

7    Flechas' overbroad statements about the degree to which

8    the department knew, comprehended, participated in,

9    gave guidance to, and permitted ChemFab to operate in

10   the way that it did, resulting in the emission of PFOA.

11   That -- that is an overstatement, and that's the main

12   point that I'm trying to make in my report.

13       Q.   To your knowledge, during your tenure at

14   Vermont DEC, did DEC ever require any companies to use

15   scrubbers or wet electrostatic precipitators?

16       A.   I don't know specifically, but I -- I would be

17   shocked if we didn't.  It's a very common requirement

18   to be put on any industrial facility.

19       Q.   And what -- do you have any understanding as

20   to what chemicals those technologies are used to

21   remove?

22       A.   The collection of pollution control equipment

23   you just described remove a pretty broad array of -- of

24   chemicals, including particulate, criteria pollutants

25   like sulfur dioxide and NOx, a variety of toxic air

```
                                              Page 174
 1   pollutants, so -- but I don't know the specifics.
 2        Q.   And just to -- just to be clear, during your
 3   time at Vermont DEC, to your knowledge, did DEC ever
 4   require any companies to use those technologies
 5   specifically to remove PFOA from their emissions?
 6        A.   Oh, I'm sure they did not.
 7        Q.   Are you aware of any company anywhere in the
 8   world that was using scrubbers or wet electrostatic
 9   precipitators during the period that ChemFab operated
10   in Vermont to remove PFOA emissions?
11        A.   I'm unaware of -- of that one way or the
12   other.
13             MR. WEINRAUB:  So I think I may actually be
14   close to done, so I want to propose we take another
15   ten-minute break and I'll just quickly go through my
16   notes.  I trust no one would be horribly offended if we
17   made it an early day, so, yeah, why don't we go off.
18             THE VIDEOGRAPHER:  Going off the record at
19   3:23.
20             (A recess was taken.)
21             THE VIDEOGRAPHER:  We're back on the record at
22   3:34.
23             MR. WEINRAUB:  Nothing further from me at this
24   time.  Thank you very much, Mr. Mears.
25             THE WITNESS:  Thank you.
```

```
                                              Page 175

 1                      EXAMINATION

 2    BY MS. JOSELSON:

 3         Q.   Mr. Mears, in the last round of questions, you

 4    were asked about Exhibit 20 and whether or not Vermont

 5    DEC acted in a timely manner to request

 6    ChemFab/Saint-Gobain to test for PFOA in its emissions.

 7    Do you remember that line of questions?

 8         A.   Yes.  Yes.

 9              MR. WEINRAUB:  Just note my objection to the

10    form.

11         Q.   Do you know how long it was after the date of

12    Exhibit 20, September 20th, 1999, that the company

13    closed its plant in Vermont and moved out of state?

14         A.   My recollection is it was 2002.

15         Q.   Could it have been earlier?

16         A.   It could have been.  I know that there were

17    discussions in some of the documents suggesting that

18    they were considering moving their operations earlier

19    in discussions with state economic development

20    officials.

21         Q.   Did you have anything else you wanted to

22    testify to with regard to the 1997 to 1999 period when

23    Vermont DEC is apparently in communication with the

24    New York DEC regarding testing for -- requiring testing

25    for PFOA in ChemFab's emissions?
```

1              MR. WEINRAUB:  Objection to form.

2         A.   I want to thank you for asking that.  The one

3    other thing that I felt like is relevant and it's

4    somewhat uncomfortable to talk about because I have

5    great respect for -- for Chris Jones and for Phil Etter

6    and for Dick Valentinetti and Harold Garabedian, but I

7    do think that -- I wonder given the nature of the other

8    communications that are kind of running in parallel to

9    this that involve Secretary Ripley and the Governor's

10   Office and others whether or not the concerns about the

11   company leaving caused them to go slow in terms of

12   moving forward on the concerns that they'd heard from

13   New York, and I just -- I just don't know what happened

14   informally within the department, what happened back

15   and forth between ChemFab, but the question had been

16   kind of why -- why didn't the State move forward, and I

17   really don't have a great explanation, because in

18   retrospect it seems clear that they should have moved

19   more promptly, but I -- I have to think that there was

20   a broader context that was making it complicated for

21   the regulators to -- to act.

22        Q.   Regardless of whether the regulators acted in

23   that period or earlier to require ChemFab to do other

24   testing or take other actions, what is the burden on an

25   industry like ChemFab under Vermont's air pollution

1    regulatory scheme?

2          MR. WEINRAUB:  Objection to the form.

3       A.    The primary obligation on -- in all of the

4    major pollution laws is on the applicant to identify

5    any pollutants that it's going to be emitting and to

6    propose and recommend ways to control that.  The

7    agencies necessarily have to rely on the expertise of

8    the sophisticated companies who are much more familiar

9    with the nature of the chemicals they're using, the

10   chemical process, and what the industry practices are

11   around that, so while ultimately the department or the

12   agency make the decisions on what the permits contain,

13   the -- these statutes and programs are premised on the

14   idea that the State can't be everywhere and know

15   everything and that it relies on a significant level of

16   self-disclosure.

17         So that's -- that's a major gap that's

18   occurred in this particular situation, and the failure

19   of the State to take stronger regulatory action is not

20   an indication that they approved, and so kind of

21   contrary to -- to Mr. Flechas' report and statements

22   that the State was aware of and cooperated in and

23   approved and permitted the emission of PFOA by the

24   company, it's just -- it's -- that's not the case.  It

25   was primarily on the company to identify that risk and

1    those chemicals and to come up with an appropriate

2    removal system.

3        Q.   And if -- you -- do you recall your testimony

4    in the last hour regarding whether if the PFOA that has

5    contaminated hundreds of wells in the Bennington and

6    North Bennington area were determined to be -- to have

7    originated from ChemFab's operations, then that would

8    be substantial evidence of a violation of Vermont's

9    regulatory laws and -- and rules, can you explain a

10   little bit more what you meant by that?

11        MR. WEINRAUB:  Objection to the form.

12        A.   Yes.  If you work -- if one works backwards

13   from the -- the policies and goals stated at the outset

14   of each of these statutes, that are in the legislative

15   history and are captured in the language, which include

16   language like prohibiting the discharge or emission of

17   pollutants that would cause harm to public health or

18   the environment, then the very presence of substantial

19   harm to public health and the environment as, you know,

20   has been found by the State of Vermont as a result of

21   ChemFab's or now Saint-Gobain's emissions is kind of a

22   de facto evidence that the statute purposes weren't

23   fulfilled, and then so working backwards from that, you

24   know, one of the ways in which that should have been

25   fulfilled is that the chemicals should have been

1   identified and should have been treated and removed, so
2   it's -- given that the company's no longer in
3   operation, it's somewhat of an academic exercise to
4   state whether or not it would have been a violation or
5   not, but it's clearly an overstatement to suggest that
6   they were in compliance with the air pollution control
7   laws of the State of Vermont given that -- the nature
8   of the contamination that's occurred.
9       Q.   So are you saying that had the company from
10  the outset complied with the requirements of Vermont's
11  regulatory scheme, then they would not have emitted
12  chemicals, including PFOA, that contaminated the
13  environment?
14          MR. WEINRAUB:  Objection to the form.
15      A.   Correct.
16      Q.   And what are the obligations on a company once
17  it has made the decision to close shop and move out of
18  state, as ChemFab did in this case, Saint-Gobain, to
19  look back over its conduct during the years it did
20  operate in a state and come forward with information to
21  notify the State that its operations while it was in
22  the state may have caused harm to the environment or to
23  its neighbors?
24          MR. WEINRAUB:  Objection to the form.
25      A.   Yes.  Under -- under the State's waste --

Page 180

1    waste laws, it's the -- any company retains an
2    obligation and liability for any harm that it's caused
3    to soil or -- or groundwater or surface water, for that
4    matter, that occur as a result of its emissions and
5    discharges, and so the fact that it stopped operations
6    did not remove it from having an obligation and
7    liability for any -- any harm that it left behind or
8    any chemicals left behind.
9            So in this case ChemFab/Saint-Gobain had and
10   has an obligation to continue to address the
11   contamination that it was responsible for, and that's,
12   I know, you know, a major focus of the interaction
13   between the State and the company today.
14       Q.   Are there any other opinions that you'd like
15   to clarify as you expressed them during the course of
16   the depo?
17       A.   No.   Thank you.
18            MR. WEINRAUB:   And I'll have a few follow-ups
19   starting with the last one first.
20                          EXAMINATION
21   BY MR. WEINRAUB:
22       Q.   You just testified regarding a company's
23   obligations after moving out of the state to look back
24   over its conduct while it was in the state and inform
25   Vermont regulators of any issues.   Did you offer any

1    such opinions on that obligation in your report?

2         A.    No.

3         Q.    You referenced that those obligations arise

4    under the waste laws.  Did you offer any opinions

5    regarding waste laws in your report?

6         A.    No.

7         Q.    Did you offer any opinions in your report

8    under any regulatory program under -- other than the

9    air pollution control rules?

10        A.    No.

11        Q.    You were asked questions about the period

12   after 1999 -- strike that.

13              You were asked about how long after Mr.

14   Etter's 1999 memo recommending emissions testing for

15   APFO before ChemFab closed up shop and left the state.

16   Do you remember that testimony?

17        A.    I do.

18        Q.    Do you know whether Vermont DEC after the date

19   of Mr. Etter's memo asked ChemFab for any additional

20   information regarding its emissions?

21        A.    I don't recall.

22        Q.    You testified that you had some uncomfortable

23   concerns about political issues, communications with

24   the governor, things of that nature.  Do you recall

25   that testimony?

Page 182

1      A.   I do.

2      Q.   Do you have any basis to opine to a reasonable

3  degree of certainty that that was the reason that

4  Vermont DEC did not require ChemFab to test its

5  emissions for APFO or PFOA?

6           MS. JOSELSON:   Object.

7      A.   No.  I mean, beyond what I -- what I stated,

8  which is there's kind of a parallel set of

9  communications involving cabinet-level officials.

10     Q.   And do you believe that the DEC officials that

11  you referenced and that you hold in high esteem acted

12  in dereliction of their responsibilities in response to

13  those communications?

14          MS. JOSELSON:   Object to the form.

15     A.   I -- I wouldn't use the word "dereliction,"

16  but it's clear in retrospect that they failed to

17  fulfill the promise that we expect of -- of our public

18  agencies that are tasked with protecting public health

19  and the environment to pursue risks where they're

20  notified of some potential risk to human health and the

21  environment, and I -- you know, they -- they share that

22  along with the officials at ChemFab, who also failed in

23  their duty to identify and address those risks.

24     Q.   If APFO and PFOA are not hazardous air

25  contaminants within the regulatory definition, and I'm

1    not asking you to accept that, but if you assume it for

2    the moment, would ChemFab have violated its duties by

3    not testing its emissions for those chemicals?

4        A.   Maybe.  And I say maybe because it depends on

5    what they knew or should have known, and it depends on

6    what the State would have asked them to do in response

7    to that.  If they had -- if the nature of these laws

8    are such that had the company fully disclosed what it

9    knew about the risks or potential risks and the State

10   made an affirmative decision to not act on that, then

11   the company would have done -- would have met its

12   obligations vis-à-vis the regulatory program.

13            Now, it's a whole different situation, and as

14   is noted in the permits and in the statutes, the

15   failure of a state to regulate or the approval that it

16   gives in the course of a permit to authorize a

17   discharge does not relieve the -- the emitter or

18   polluter or discharger from any liability they have for

19   harm to private property or to personal -- to people's

20   persons, but in terms of their liability and

21   obligations under the regulatory program, had they

22   identified all of the risks and all the information

23   they knew about the nature of their chemicals and the

24   State decided not to act on that, then they would have

25   met their obligations.

1      Q.   You testified that the presence of harmful

2   contaminants in environmental media that can be traced

3   backwards to a plant's emissions inherently demonstrate

4   regulatory violations.  Is that a fair encapsulation of

5   your testimony a moment ago?

6      A.   It's a little more specific than I said, I

7   mean, but that's the essence of it, but the -- the

8   difference is it's difficult to know what the

9   regulatory violation would have been, but I'm just

10  going backwards from the point of saying if the purpose

11  of the statutes and of the clean air program at the

12  federal and state level as it is is to protect public

13  health and the environment and to prevent the emission

14  of harmful chemicals, the very presence -- the fact

15  that those chemicals were released through air

16  emissions and caused public health and environmental

17  harm is proof that the regulatory program was not

18  effectively implemented.

19           Now, you asked the question whether or not

20  that would constitute a regulatory violation, and --

21  and as over the course of the day we've explored, there

22  are lots of specific ways in which those -- the goal

23  and purpose of the statute have to be translated by the

24  company and the State into actual permit conditions

25  before one can determine whether or not there was a

Page 185

1   specific violation, and, of course, that did not

2   happen.

3       Q.   Is it fair to say that you are operating from

4   the premise that there has to have been a regulatory

5   violation of some sort and that all that remains to be

6   done is to identify which particular regulation was

7   violated?

8       A.   I suppose so.  And we should be clear, too,

9   I'm not suggesting that there were not violations at

10  the plant or the facility.  There -- there were

11  violations, and we talked about the full range of -- of

12  those kinds of violations, from allegations based on

13  odors all the way to the -- the findings that resulted

14  in assurances of discontinuance.  But with regard to

15  the specific emission of PFOA, yes, there would --

16  there are no -- there were no specific violations that

17  occurred in terms of PFOA being on a list of regulated

18  chemicals or in a permit that was violated.

19          What I'm suggesting is that the statute itself

20  prohibits the public health and environmental harms

21  that have resulted when caused by air emissions, and

22  if, for instance, the company were operating today, I'm

23  confident given what it has learned that the State

24  would be taking action to require additional treatment

25  or to -- or shut down the facility to avoid the

Page 186

1   continuation of that harm.

2       Q.   I believe you testified earlier that

3   regulation of PFOA in air emissions essentially became

4   moot after ChemFab moved out of the state.

5           MS. JOSELSON:  Objection.

6       Q.   Is that a fair summary of your position on

7   that issue?

8       A.   No, I didn't say it was moot, but I was

9   just -- you had asked if there was an explanation for

10  why they might not have already issued a hazardous air

11  pollutant limit now, and I don't know, but I was

12  suggesting that one factor may be the fact that a

13  primary source of PFOA emissions has left the state.

14      Q.   Could PFOA have continued to be emitted after

15  ChemFab's departure in industrial waste contexts?

16      A.   Absolutely, yes.

17      Q.   And could PFOA have continued to be emitted in

18  municipal waste?  Waste incineration?  Let me specify.

19          MS. JOSELSON:  Object to the form.

20      A.   I suppose so.  I'm not aware of any municipal

21  waste incineration in -- in Vermont.

22      Q.   Could manufacturing facilities other than

23  ChemFab have been emitting PFOA or APFO after ChemFab's

24  departure without the knowledge of Vermont DEC?

25          MS. JOSELSON:  Object to the form.

```
                                          Page 187
 1        A.   Yes, that's possible.
 2             MR. WEINRAUB:  Okay.  Nothing further.
 3                       EXAMINATION
 4   BY MS. JOSELSON:
 5        Q.   To your knowledge, has the State of Vermont
 6   identified ChemFab as the source of PFOA contamination
 7   in Bennington and North Bennington?
 8        A.   Certainly -- I mean, there's different areas
 9   of contamination, but I know immediately around the
10   plant there seems to be a high level of confidence that
11   that's a result of ChemFab's operations, yes.
12        Q.   And that's stated in the consent order that
13   the State reached with ChemFab last year?
14        A.   Correct.
15        Q.   Do you know if the State has identified any
16   other sources of the PFOA contamination in
17   Bennington-North Bennington area that the State of
18   Vermont has identified as the impacted area on its
19   maps?
20        A.   Not that I know with the one exception that
21   there may have been some spots around the landfill that
22   may -- may be associated with the landfill, but I'm
23   operating on -- on information that's really at this
24   point a year old, so there may have been more recent
25   information about that, so -- but in general the
```

Page 188

1    predominance -- my understanding is the predominance of

2    contamination as determined by the State of Vermont of

3    groundwater with PFOA is a result of the ChemFab

4    facility.

5        Q.   And do you know if the State has identified

6    any industrial entity other than ChemFab who may have

7    deposited PFOA-laden waste in any landfills in the

8    area?

9        A.   No.

10           MS. JOSELSON:  That's all.

11           THE VIDEOGRAPHER:  All set?

12           MR. WEINRAUB:  Nothing further.

13           THE VIDEOGRAPHER:  Okay.  Stand by a moment.

14           We are off the record at 3:55.  This concludes

15    today's testimony given by David Kruger Mears.  Total

16    number of media units was one and will be retained by

17    Veritext Corporation Legal Solutions.

18           Off the record at 3:55.

19           (The deposition concluded at 3:55 PM.)

20

21

22

23

24

25

Page 189

1          ACKNOWLEDGMENT OF DEPONENT
2          I, DAVID K. MEARS, do hereby certify
3    that I have read the foregoing transcript of my
4    testimony taken on 9/24/18, and further certify
5    that it is a true and accurate record of my
6    testimony (with the exception of the corrections
7    listed below):
8    Page    Line                    Correction
9    _____|_____|_____|_____
10   _____|_____|_____|_____
11   _____|_____|_____|_____
12   _____|_____|_____|_____
13   _____|_____|_____|_____
14   _____|_____|_____|_____
15   _____|_____|_____|_____
16   _____|_____|_____|_____
17   _____|_____|_____|_____
18   _____|_____|_____|_____
19   _____|_____|_____|_____
20   _____|_____|_____|_____
21                      _____
                              DAVID K. MEARS
22

     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS _____ DAY OF _____, 20___.
24

     _____      _____
25   (NOTARY PUBLIC)              MY COMMISSION EXPIRES:

Page 190

```
 1                 C E R T I F I C A T E

 2

 3          I, Johanna Massé, RMR, CRR, Court Reporter and

 4   Notary Public, do hereby certify that the foregoing

 5   pages, numbered 5 through 188, inclusive, are a true

 6   and accurate transcription of my stenographic notes of

 7   the Deposition of David K. Mears, who was first duly

 8   sworn by me, taken before me on Monday, September 24,

 9   2018, commencing at 8:58 AM, in the matter of James D.

10   Sullivan, et al., Individually and on behalf of a Class

11   of persons similarly situated v. Saint-Gobain

12   Performance Plastics Corporation, Civil Action No.

13   5:16-cv-00125-gwc, as to which a transcript was duly

14   ordered.  Review of the transcript was requested.

15          I further certify that I am neither attorney

16   nor counsel for, nor related to or employed by any of

17   the parties to the action in which this transcript was

18   produced, and further that I am not a relative or

19   employee of any attorney or counsel employed in this

20   case, nor am I financially interested in this action.

21

22

23

24

             JOHANNA MASSÉ, RMR, CRR

25           Comm. expires:  2/10/19
```

[& - 2:47]

**&**

**&** 2:3 6:17

**0**

**00125** 1:6 5:24
190:13
**05753-0351** 2:4

**1**

**1** 3:10 5:19 8:2,6
16:14,22 41:23
42:18 55:24 69:7
69:8 78:11 82:5
83:1 84:13 100:6
**10** 3:22 109:23,24
110:2 132:24
135:8
**10/1/86** 4:7
**100** 116:24
**10036-6797** 2:10
**101** 30:18
**109** 3:22
**1095** 2:9
**10:07** 42:12
**11** 4:3 118:5,6,9,17
**11/3/81** 4:8
**11/30/16** 3:15
**111** 2:3
**118** 4:3
**11:05** 78:5
**11:20** 78:8
**12** 4:5 83:5 123:4
123:7,8,13,13
164:5
**12/15/17** 3:12
**12/9/98** 3:22
**123** 4:5
**126** 4:7
**12:25** 116:13
**13** 4:7 123:4 126:5
126:6

**136** 4:8
**14** 4:8 136:9,10
151:19,20
**141** 4:10
**143** 4:11
**15** 4:10 82:2 87:20
88:8 119:22 141:4
141:5 143:4
**158** 4:13
**159** 4:14
**16** 4:11 23:18 30:6
143:5,6
**163** 4:16
**166** 4:17
**17** 4:13 157:25
158:1 163:2
**175** 3:4
**18** 4:14 158:25
159:1,8,9
**180** 3:4
**187** 3:5
**188** 190:5
**19** 4:16 163:18,19
**1970** 92:22
**1970s** 35:1
**1972** 4:3 93:21
94:4 118:9 119:6
119:13 121:4
**1975** 94:8,13 97:9
**1977** 92:21 94:8,13
**1978** 92:16 94:1,16
**1979** 91:16,19,23
91:25 93:1,8,15
95:1,15 97:15,17
97:25 98:6,12
102:1,11,25
105:21 106:12
**1980s** 125:19
**1981** 136:1,3,8
151:14 154:16

**1984** 99:4,11
**1985** 163:2,9,10,12
**1987** 8:14 71:24
**1989** 164:6
**199** 124:10
**1990** 78:17 79:16
81:12 86:6 87:23
88:11,24 89:10,16
97:15,18,25 98:23
98:24 99:17
100:10 102:1,11
102:25 103:16
104:1 105:1,21
106:13 124:20
**1990s** 55:13 75:10
81:4 144:14 155:2
**1993** 82:3,8
**1995** 83:3,5,11
**1996** 78:23 79:18
80:14 81:2 83:17
86:7
**1997** 53:16 83:20
154:6 156:5
164:22 165:1,5,13
165:17 166:5
167:7,22 168:11
170:13 175:22
**1998** 107:17,20
122:24 123:4,13
123:24 124:10
128:8
**1999** 46:13 122:25
123:5 128:8
166:18 167:12
170:14 175:12,22
181:12,14
**1:34** 116:16

**2**

**2** 3:12 25:8,10
26:9,10,14 45:3
65:16 69:12

**118:18** 162:7
166:22
**2,500** 107:22,23
108:1,8,20 113:6
113:22 114:2,9
115:1,13
**2/10/19** 190:25
**2/12/98** 4:5
**2/28/16** 4:13
**20** 4:17 119:21
120:9,15 125:16
132:25 135:8
166:12,13,18
167:12 175:4,12
189:23
**20/20** 106:16,25
**2000s** 54:21
**2002** 153:3 154:22
175:14
**2011** 10:9
**2015** 10:10 23:18
**2016** 41:5,18 157:8
157:18 158:21
159:17
**2018** 1:16 5:11,15
16:8 28:14 29:7
29:10 30:7 55:24
154:1 190:9
**20th** 175:12
**21** 165:1,16,16,17
167:7
**212** 2:10
**24** 1:16 5:11 190:8
**24th** 5:15
**26** 3:12 78:22
80:14 136:6,14
151:17,22
**28** 3:13 83:3
158:20
**2:47** 162:1

**[3 - act]** Page 2

**3**

**3**  3:13 25:9 28:6,7 28:11 30:6 42:15 43:22 53:14 78:10 82:1 84:12 85:17 86:23 87:19,19 91:15,18 93:19 97:22 101:13 135:22,24 136:14 162:4
**3/4/16**  4:14
**30**  28:14 29:7,10 29:18 41:5 44:3 70:23 125:16
**32250**  81:23
**351**  2:3
**382-21-8**  166:25
**388-6356**  2:4
**3:23**  174:19
**3:34**  174:22
**3:55**  188:14,18,19

**4**

**4**  3:15 40:22,23 41:3 44:19,24 45:3 56:4 69:7,8 87:19 88:1 99:3 103:2 123:20 159:17 162:15
**40**  3:15
**400**  28:20
**42**  117:7
**453**  1:17 5:25

**5**

**5**  3:16 55:20,23 56:5 65:18 94:20 99:4 107:18 108:1 116:22 137:11,12 150:19 190:5
**5-101**  136:6,14

**5-241**  118:18,18
**5-408**  93:20 94:1,4 94:11,14,18,20 95:5,12 96:18 97:13
**5/24/96**  3:19
**5/4/18**  3:20
**55**  3:16
**580**  128:13 131:6 132:12
**590**  128:12 131:6 132:12
**599**  128:3
**5:16**  1:6 5:24 190:13
**5th**  8:20

**6**

**6**  3:18 65:18 81:14 81:15 98:1 101:12 101:16,24 102:13 102:15 116:22 122:22 123:14 128:7 132:17
**6/8/90**  3:21
**60**  117:6
**600**  127:23,23 128:9,15,18 132:13,22 133:9 133:15 135:9
**641-5611**  2:10

**7**

**7**  3:3,19 44:19,24 45:9 53:14 82:20 82:21,24 101:12 101:21,24 102:13 125:3 135:21
**7/12/89**  4:16
**7/21/92**  3:18
**70s**  54:9

**72**  94:2,3
**75**  120:15

**8**

**8**  3:10,20 87:14,15 88:8 150:22 153:17 164:17
**8/1/18**  3:16
**8/30/18**  3:14
**802**  2:4
**80s**  54:9 57:6 71:4 98:21 99:1 104:21
**81**  3:18
**82**  3:19
**87**  3:20
**89**  3:21
**8:58**  1:17 5:12,15 190:9

**9**

**9**  3:21 89:12,13,16 99:19,22 125:2
**9/20/99**  4:17
**9/24/18**  189:4
**90s**  54:12,21 98:21 129:3
**9442**  190:24
**9:57**  42:9

**a**

**a2**  3:22 4:5,17
**abate**  126:14
**abator**  127:6,13 131:5
**abators**  49:5 100:22 127:4,9,10 127:22 128:2,16 128:21 129:3,8,12 129:15,21,23,24 130:14,23 132:3 132:12,18 133:14 133:18 134:4,7,21

**abbreviated**  31:6
**ability**  12:3 129:3 152:20 153:12
**able**  34:15 63:4 66:18 117:13 146:25 153:15
**absence**  149:16
**absolutely**  172:16 186:16
**abuse**  115:14
**academic**  179:3
**accept**  116:5 183:1
**acceptable**  132:19
**accepted**  50:10
**accepting**  66:1
**access**  25:19 107:14
**account**  91:2 108:23 110:16 112:5,7 113:15,17 114:8 136:23 151:25
**accounts**  12:10
**accumulated**  140:23
**accurate**  8:17 41:12 124:3 132:5 189:5 190:6
**accurately**  29:6 88:24
**acid**  38:2
**acknowledged**  49:21 111:24
**acknowledges**  124:13
**acknowledgment**  112:7,12 189:1
**act**  30:18,18,20 31:9 32:18 33:3 33:12,17 34:9,19 37:24 38:6 44:6

59:15 65:6 78:13
79:2,10,16 80:9,10
81:7 82:4 84:7
90:17,22 91:1
92:20,21 93:12
108:19 112:1
113:13 115:17
153:8 176:21
183:10,24
**act's** 35:12
**acted** 175:5
176:22 182:11
**action** 1:6 5:24 6:5
23:22 54:23 60:17
73:15 75:11 84:21
106:11 113:13
122:13 156:1,16
168:9 177:19
185:24 190:12,17
190:20
**actions** 10:23 11:3
11:19 12:13 45:20
47:23 58:14,21
63:23 71:16 74:8
74:16 176:24
**active** 37:7 150:15
**actively** 96:10
**activities** 125:13
**actual** 46:23,24
47:8 112:12
143:11 184:24
**add** 152:20
**added** 154:2
**adding** 39:11
**addition** 36:4 37:3
37:23 88:2
**additional** 17:9,16
29:9 52:23 98:18
117:7 155:17,19
155:25 156:13
171:3,4 181:19

185:24
**address** 9:9 10:13
72:3,19 73:21
76:7 100:16
102:18 172:5
180:10 182:23
**addressed** 9:19
52:10 101:24
102:12
**addresses** 37:24
102:17
**addressing** 37:2
101:22 102:1
129:16
**administration**
142:18
**administrative**
58:19
**administratively**
83:4
**adopt** 25:10 26:19
35:20 65:24
**adopted** 43:6
65:23 81:9 91:19
92:21 136:22
151:24
**advance** 150:20
**advantage** 69:17
69:23 70:2,19
**advocate** 68:1,5
**advocating** 67:22
**affiliations** 6:9
**affinity** 144:18
**affirmative** 183:10
**affirmatively**
63:22
**afield** 172:4
**agencies** 63:19
64:23 76:1 110:21
122:12 156:11
177:7 182:18

**agency** 4:7 12:12
13:20 60:2 63:14
63:16 66:20,21
74:24 93:22 94:22
95:17 96:12 106:6
148:5 155:14
169:10 177:12
**agency's** 103:19
**aggregate** 121:22
122:4
**ago** 62:5 110:3
154:23 184:5
**agree** 25:10 41:17
44:7 58:1 62:9
65:25 66:2 74:21
74:23 77:3 83:22
88:18,24 92:13
100:19,24 101:13
101:16,21 102:25
103:1,13 107:9
114:6 123:25
124:23,24 138:2
142:17 145:21
151:5
**agreed** 5:2 46:17
74:23 100:20
110:10 114:14
**agreement** 46:4,5
96:15
**ahead** 7:25 33:2
**aimed** 143:24
**air** 3:15 4:4,8 13:7
13:9,11,12,15 14:1
14:5,9,11 15:4,6
25:12 30:18,18,20
30:24 31:4,9
32:18 33:3,12,17
34:9,19 35:12
37:23,24,24 38:4,6
38:7,10,13,17,21
38:24 39:3,6,12,18

40:17 41:3,6,8
42:19,22 43:10,11
43:24 44:21 45:6
51:15 52:13,14
53:15 58:3 59:15
59:15,24 60:6,7,10
60:19,20 65:6
69:20 70:11 75:2
78:13,17 79:2,10
79:16 80:9,10
81:7 84:7 90:17
90:21 91:1,21
92:20,21 95:16
98:6 99:8 101:8
101:14,20 102:16
102:17 106:19
110:12 111:20
112:1 114:3 118:9
122:23 124:17
126:12,18 135:20
135:22,25 136:5
136:17,21,21,22
137:1,8,9,12,12,14
137:21 138:3,13
138:17,21 139:8,9
139:9,13,18,24
140:1,5,7,16,24
141:11,12,20,25
142:3,11,15,18,25
143:3,19,24 144:6
144:10,23 145:5
145:20,23 146:1,5
146:14,19 147:4,4
147:6,16 148:8,12
148:15,23 149:4
149:17 151:2,8,15
151:22,23,24
152:6,7,14,21
153:3,8,23 154:2,7
154:14,21,24
156:17 169:3,6,17

169:20,21 170:18
172:17 173:25
176:25 179:6
181:9 182:24
184:11,15 185:21
186:3,10
al  1:3 4:13 190:10
aligns  145:20
allegations  94:14
185:12
alleged  75:24
109:1
alliance  162:12,22
allow  60:1
allowed  36:5,7
allowing  131:5
alter  125:11
alternate  171:12
alternatives  72:15
74:13
alyssa  4:13 20:3
21:14 158:13
ambient  31:3
60:19 136:22
138:13 143:24
144:6,23 146:1,5
147:6 148:12,15
148:23 149:3,17
151:24
amend  14:10
35:13 101:5
amended  78:17
79:16
amendments  41:4
86:6 92:21
americas  2:9
ammonium
164:21 166:25
167:3
amount  13:3
106:21 121:12

128:23 129:2,9
155:8
ample  155:22
analysis  43:18
56:24 96:5 109:17
117:20,23,25
118:1,2 126:24
142:10 151:2
153:23 155:17,19
156:13 171:3
anec  12:9
anecdotally  12:10
anecdotes  12:14
anr  13:23 14:14
75:3 151:7 152:20
154:7 160:13
161:15 164:1
170:17
anr's  169:4,16
answer  10:21
11:16 14:10 22:16
32:23 35:14 36:22
40:20 44:12 47:10
51:9 54:1 73:12
134:12
answered  134:11
135:12
answers  158:23
anticipated  14:18
58:20 119:7 137:1
152:2
anybody  42:1
aod  47:6
apart  24:23
apfo  37:16,19
38:12,20,24 39:5
39:12 40:16 41:18
53:15 130:14,23
131:3,9 132:4,13
133:4 134:9,23
135:10 148:22,25

149:3,8,17,19
150:13,25 151:7
153:2,20 154:2,6,7
154:12,21 155:2
157:3 164:20
166:9 167:3,14,23
167:24 168:1,8
169:5 170:16,17
181:15 182:5,24
186:23
apologies  81:19
99:7 143:5 151:13
156:23 165:19
apologize  134:14
apology  112:7,11
apparent  55:7
112:7,8,11 145:19
148:14
apparently  74:21
114:23 175:23
appear  41:12 58:2
91:4 143:20
appearance  6:11
appearances  2:1
6:9
appeared  38:12
39:5
appears  72:6
appendix  41:6
applicable  86:9
applicant  130:3
177:4
application  32:20
51:12 79:19 80:15
80:16 84:6,19,21
84:25 86:11 87:7
87:11 98:1 103:16
104:6,10 105:1
107:1 112:17
130:3

applied  51:15 52:1
52:18 58:24 59:3
79:17 80:13,22
81:2 98:23 106:19
108:15 109:10
applies  90:22
152:22
apply  34:4 49:13
49:16 51:6 52:5,5
53:1 78:22 80:17
80:20,25 81:6
83:21 84:1 85:13
86:7 92:10 95:18
108:13,16 109:11
120:20 121:5
130:12 134:19
147:14 148:6
169:21
applying  70:20
appreciable
135:10
appreciate  59:10
72:5 84:8 144:15
145:7
appreciated
157:13
approach  34:11
34:24,24 168:17
appropriate  63:8
64:12 65:7 68:23
86:10 106:19
129:10 130:10,12
147:14 156:15
178:1
appropriately
129:6
approval  33:21
82:4 83:13,17
85:25 90:4 115:7
183:15

**approvals** 74:6
87:4 92:8
**approve** 82:4,13
**approved** 90:18
90:20 131:20
177:20,23
**approving** 63:23
**approximately**
9:15 10:20 20:15
23:14 29:12
**april** 78:22 79:17
80:14 81:2 83:3
86:7 123:4
**arabia** 111:19
**arbitrarily** 52:5
115:17
**arbitrary** 51:25
146:12
**area** 12:18 31:12
31:15,17,20 32:2
33:11 34:15 35:16
35:18 37:7,8 71:1
160:6 178:6
187:17,18 188:8
**areas** 31:9,10,23
45:21,23,24 46:1
53:7 187:8
**argue** 157:16
**arguments** 61:14
67:15,20
**arranging** 23:22
25:2
**array** 101:9
173:23
**arrived** 124:8
**art** 69:24
**article** 9:25
**articles** 9:21,23
10:2
**aside** 106:25
144:20 152:20

161:13 169:15
**asked** 9:20,24 16:9
16:11 17:2 134:10
135:11 139:17
146:17,20 157:7
157:17 168:7
171:1 175:4
181:11,13,19
183:6 184:19
186:9
**asking** 39:15 40:7
40:8 64:6 83:22
83:22 135:5
160:20 176:2
183:1
**assert** 96:20 97:16
**asserted** 103:21,23
103:24 127:5
133:3
**asserting** 85:19
**assertion** 85:23
86:17 173:5
**assertions** 47:22
63:21 64:19,24
66:1,2 95:8 96:14
107:9
**asserts** 64:20
**assess** 68:22 73:15
73:23 115:25
147:19 170:9
**assessed** 144:16
**assessment** 125:22
140:25 141:11
146:17
**assessments** 61:20
142:7
**assigning** 72:1
**associated** 37:12
54:15 90:5 101:19
102:8 115:12
137:22 139:14

142:8 147:5
156:19 187:22
**assume** 66:10
85:14 109:13
115:21 122:9
128:17 131:13
133:10 134:18
142:21 146:21
183:1
**assumed** 127:15
**assumes** 171:20
**assuming** 133:9
138:11
**assumption**
128:20 133:12,15
149:15 169:4
**assurance** 94:6,9
94:10 96:12 97:10
97:12
**assurances** 46:3
96:24 185:14
**atmosphere**
137:13,23,25
138:1,5,7,10,12
139:1,12,20,22
140:7,10,15,22
152:19
**atom** 133:22
**attached** 8:9
171:22
**attaining** 31:13
**attainment** 31:3,9
31:12,15,16,18
32:2,19 33:7,11
**attempt** 69:14
76:22
**attend** 24:24
**attending** 6:8
**attention** 17:21
54:17 55:9,14
143:24

**attorney** 6:12 7:10
7:18,21 11:7
61:11 64:10
190:15,19
**attorneys** 16:4,20
**attractive** 69:19
**attribute** 124:14
**attributed** 157:2
**audubon** 8:21,21
**august** 28:14 29:7
29:10,18 55:24
**authorities** 62:10
62:15 64:11
**authority** 63:7
104:12 108:19
139:25 143:3
151:1,5 153:22
**authorization**
95:11,11
**authorizations**
88:4
**authorize** 183:16
**authorized** 65:2
**authorizing** 79:21
**available** 56:10
62:3 68:20
**avenue** 2:9
**avoid** 68:4 110:19
110:20 185:25
**avoided** 106:22
**aware** 26:2 43:12
44:2 66:24 67:4,5
72:17 84:22
125:23 126:21
127:2 144:11,17
154:24 157:7,17
157:23 161:18
165:7 174:7
177:22 186:20
**awareness** 55:1
103:5 155:8

**[b - capacity]**

**b**

**b** 3:8 4:1 41:6
**back** 16:14 29:25
35:13 37:14 41:22
42:11 57:6 61:2
69:6 70:17 71:24
78:7 84:11 91:14
94:12 98:17,21
99:10,11,15 110:8
116:15 117:15
151:14 153:17
159:20,21 162:3
164:17 174:21
176:14 179:19
180:23
**backdrop** 17:23
**background** 66:13
**backwards** 178:12
178:23 184:3,10
**bar** 20:6
**barrels** 14:6
**based** 33:9 50:24
53:20 61:23 66:2
67:6 68:21 130:17
130:20 131:15
132:18 140:14
147:5 150:7,9
185:12
**basic** 91:10
**basis** 37:12 71:16
84:5 85:1,1,7
96:19 108:11,12
114:25 117:2
138:8,18 154:9
163:12,16 182:2
**battery** 37:4
**bear** 55:14 81:18
99:7
**bearing** 131:9
**began** 54:4,24,25
71:24

**beginning** 6:11
8:13 53:14 124:20
145:15
**begins** 25:9
**begun** 24:12
**behalf** 1:4,16 2:2,7
6:14,17 67:9,13,16
67:22 68:10
190:10
**behavior** 71:18
**believe** 10:1 19:17
30:11 55:6 66:4
66:24 80:16 88:14
92:12 94:9 98:13
106:12 107:23
114:12 117:14
153:1 165:15,15
165:18 182:10
186:2
**believed** 107:12
111:21
**believing** 112:16
**benefit** 86:21
108:25 109:18,22
**benefits** 102:20
**bennington** 4:15
9:13 17:22 18:4,6
18:8,9,13,13,19,19
20:11 22:14,14
23:8,9,24 32:1,5
32:12,15 40:10
54:15 65:20 72:3
72:4,25 92:4,11,15
93:14 98:2 99:25
106:23 134:7,8,21
134:21 143:20
150:25 153:21
157:21 160:3
178:5,6 187:7,7,17
187:17

**benzene** 134:2
**best** 22:1 29:12
45:2 72:19 130:5
150:7 153:12
171:19
**better** 62:7 70:12
126:18
**beyond** 12:19 19:1
27:12 47:19 60:12
60:20,20 123:21
124:22 133:11
147:23 148:11
160:20 182:7
**biggam** 1:16 5:25
**bigger** 170:23
**bill** 4:11 15:12
143:12 147:3
158:12
**billing** 3:13 28:13
28:19,22
**bilott** 10:2 54:23
**bit** 178:10
**blood** 160:10
**blurred** 91:11,11
**body** 90:1,3
**bone** 68:8
**borders** 33:14
**born** 71:22
**bottom** 25:8 65:17
82:25 91:17 97:22
99:4 103:3,4
113:25 116:22
128:7 159:23
**breadth** 142:11
143:2
**break** 33:2 42:1,3
78:1 116:8,9,9
159:14 161:24
174:15
**breathing** 141:20
142:8 157:20

**bress** 4:11 15:13
143:12 144:4,5,21
145:9 146:3,9
147:3,9 158:12
**brief** 61:15 68:9
**briefly** 35:14
119:3
**briefs** 67:13
**bring** 73:14
**broad** 15:1 52:12
134:1 173:23
**broaden** 148:2
**broader** 113:19
144:14 176:20
**broadly** 13:5
**brought** 55:14
76:19,20 77:9
**bryant** 2:9
**build** 115:5
**built** 97:18 99:1
104:6 105:2
169:16
**bump** 20:6
**burden** 110:24
136:4 176:24
**burst** 23:16
**business** 146:12

**c**

**c** 190:1,1
**caa** 43:24 78:17
83:20
**cabinet** 182:9
**california** 35:20
36:3,7 37:1 150:5
**california's** 36:5
**call** 106:9
**called** 10:3 40:11
63:20
**cap** 37:11
**capacity** 153:12

[capital - chemical]                                                                 Page 7

capital   110:22
   126:16,22
capriciously
   115:18
capture   126:15
captured   178:15
career   61:2,9
careful   43:16,18
carefully   69:1,3
carry   25:9 111:16
   116:23 159:21
   160:3,4
carrying   25:8
cas   166:24
case   8:7 12:18
   16:3,22,25 17:3
   19:19 21:21 22:3
   23:5 26:3 28:13
   28:23 29:7,9
   30:15 43:7 49:13
   53:2 54:22 57:21
   57:25 58:12,16
   59:14 63:20 64:1
   64:13 65:23 67:25
   69:14 70:5 71:9
   74:1 76:5 109:12
   127:22 129:22
   147:1 177:24
   179:18 180:9
   190:20
cases   11:5 12:12
   12:21 15:19 67:18
   71:23 122:11
catalytic   49:5
   100:22 127:8,10
   127:13 128:2
   129:3
categorically
   132:3,6
categories   108:24
   133:23,23

category   30:23
   46:11
cause   102:22
   137:9 154:17,25
   169:25 178:17
caused   161:1
   172:14 176:11
   179:22 180:2
   184:16 185:21
causes   57:13
   136:25 172:23
causing   72:14
   101:20
cautious   34:23
caveat   92:17
cell   5:17
center   23:22
certain   22:5 27:25
   37:5,24 40:12
   91:8 95:5 97:7
   109:15 119:12
   122:6 126:1
certainly   17:18
   18:14 50:9 61:4
   62:1,19 71:3,17
   77:4 91:8 113:18
   127:1 142:13
   153:6 167:18
   187:8
certainty   173:3
   182:3
certify   189:2,4
   190:4,15
cetera   152:1,12
chain   158:7
   159:16
challenge   73:14
   75:25 76:21 133:6
challenged   77:17
challenges   74:1

champlain   13:4
change   135:17,19
changed   35:2
   119:4
changes   19:4,7
chapman   20:6
   22:4,6 40:6
characteristics
   136:25 152:12
characterization
   26:24 41:11
characterize
   172:12
charge   28:25 29:4
   74:20 116:3
charged   105:13
charging   76:9
check   99:22
chem   57:6 126:14
chemfab   3:21,22
   27:6 31:25 44:20
   45:5,17 46:4
   47:23 49:18,19,20
   53:9 54:16,17
   55:8,15 56:8,25
   57:7 63:23 65:4
   65:11,18 69:16
   70:16,19 71:9
   72:2,18 73:9,19
   74:17 76:9,20
   78:21 79:1,17
   80:2,8,13 83:20
   84:1,23 85:24
   86:7,11 88:10
   89:20 90:9 92:3
   92:15 93:10 94:3
   94:16,17,25 95:2,4
   96:4,8 97:16,24
   99:5,25 100:6,11
   101:25 102:7,10
   102:24 103:6,9,15

103:24 106:1,17
   110:11 112:25
   114:1,19 123:21
   124:15,20 125:19
   126:21 129:8
   130:7,9,16 131:20
   131:21,24 132:14
   153:1 154:22
   155:1,9,15,23
   156:18 157:1,21
   160:7,16 165:4
   166:2,4,8,23
   167:13,24 168:1,1
   168:6,9,15,17,25
   170:15 171:6
   172:8 173:9 174:9
   175:6 176:15,23
   176:25 179:18
   180:9 181:15,19
   182:4,22 183:2
   186:4,23 187:6,13
   188:3,6
chemfab's   22:12
   22:19 32:11 70:9
   79:18 80:16 84:5
   88:3 99:13 104:10
   104:25 107:14,18
   127:22 130:11,15
   133:4 144:4,21
   145:5 163:13
   169:3 175:25
   178:7,21 186:15
   186:23 187:11
chemical   4:11
   59:4 70:10 71:1
   133:21 136:24
   138:25 139:2
   143:19,21 152:12
   169:24 170:10
   172:23 177:10

**chemicals**  15:1
  57:10 59:13,17,25
  60:3,12 71:2,5,11
  72:14 101:19
  102:8,21 106:2
  129:4,11,17
  130:18 133:17,19
  134:1,2,4 135:4
  139:4 146:13
  153:11 154:16
  155:11,24 156:19
  160:9 167:7
  173:20,24 177:9
  178:1,25 179:12
  180:8 183:3,23
  184:14,15 185:18
**children**  160:9
**choose**  130:17
**chose**  108:18
  128:18 130:20
**chris**  3:22 27:4
  75:8 109:21
  114:13 166:19
  176:5
**chuck**  4:13 40:13
  40:15 158:8,17
  159:24
**chuck's**  158:20
**cigarettes**  161:6
**circumstances**  9:4
  75:24 112:21,22
**circumstantial**
  172:13
**citation**  89:7 123:3
**cite**  79:9,12 139:25
**cited**  25:20 94:14
  163:1
**cites**  89:9
**citing**  96:3
**citizen**  27:24 57:5

**citizens**  23:23
  106:15
**civil**  1:6 5:5,23
  58:19 190:12
**claim**  96:4
**claimed**  93:4
**clarification**  84:8
  104:23
**clarify**  51:23 64:5
  90:24 147:13
  180:15
**clarifying**  107:24
**class**  1:4 9:17 40:9
  40:10 54:23
  190:10
**classic**  14:5
**classroom**  9:14,15
**clean**  13:3 30:18
  30:18,20 31:9
  32:18 33:3,12,17
  34:9,19 35:12
  37:24 38:6 59:14
  65:6 78:13 79:2
  79:10,16 80:9,10
  81:7 84:7 90:17
  90:21,25 92:20,21
  147:16,16 153:8
  184:11
**cleaned**  161:7
**cleaner**  127:17
**cleanup**  24:18
**clear**  11:24 46:2
  52:3 55:2 64:4,5
  70:6 71:9 74:10
  75:1 79:20,23
  80:1,24 84:9
  85:18,23 86:20
  90:7,14 91:9
  96:25 106:16
  107:9 115:10
  117:22 121:7

122:25 124:4,7
  129:20 130:16
  135:5 144:8
  168:20 174:2
  176:18 182:16
  185:8
**clearly**  46:3 88:18
  102:7 115:22
  119:5 131:23
  135:1 179:5
**clients**  67:10,13,16
  67:23 68:10
**cliff**  128:3
**climate**  13:15
**clinic**  23:21
**close**  174:14
  179:17
**closed**  154:22
  175:13 181:15
**closely**  145:20
**closing**  67:20
**clues**  54:13 55:7
**coated**  162:23
**coating**  89:23 90:5
  97:18 98:1,16
  100:7 107:19
  164:22
**collaboration**
  16:19 37:9
**collaborative**  37:3
**collaboratively**
  76:6
**colleague**  20:4,5
**colleagues**  19:24
  20:1,13,17
**collected**  164:11
**collection**  173:22
**combination**  57:4
**combined**  74:4
**come**  39:13 52:15
  86:23 99:10,15

139:8 154:10
  178:1 179:20
**comes**  129:1
  139:22 141:8
**comfort**  161:10
**coming**  27:6
**comm**  190:25
**commencing**  1:17
  190:9
**commission**  8:14
  189:25
**commissioned**
  125:19
**commissioner**
  10:5 12:7 60:2
  61:5 68:17 75:3
  105:17 147:2
  158:15
**committed**  103:24
  105:20
**common**  34:2
  131:15 173:17
**communicate**
  57:13
**communicated**
  75:1
**communicating**
  106:5
**communication**
  175:23
**communications**
  22:22,25 72:18
  102:10 176:8
  181:23 182:9,13
**community**  18:16
  21:15 22:23 23:23
  48:14 58:13 59:11
  60:3 70:25 71:23
**companies**  12:16
  59:18 70:25 71:7
  81:5 153:10

173:14 174:4 177:8

**company** 56:10,18 58:13 59:8 60:25 63:5 64:8,13 66:6 66:20,21 70:2 72:6 74:5 76:6 95:9 96:1,10,14,25 107:7 108:13 109:21 110:24 111:18 112:25 123:22 129:23 149:7 151:1 153:22 168:22 169:12,24 174:7 175:12 176:11 177:24,25 179:9 179:16 180:1,13 183:8,11 184:24 185:22

**company's** 63:10 106:7 110:22 113:8 129:20 179:2 180:22

**compilation** 27:23

**compile** 66:15

**compiled** 53:21 67:6 69:3

**complainants** 76:16

**complaining** 121:13

**complaint** 48:7,9 49:8 75:15,16,21 120:20 121:19

**complaints** 27:24 45:18 46:10,18 47:15,24 48:2,4,6 48:20 49:13 52:2 57:4,5 71:10 74:3 74:14 76:15 77:13

102:6 106:3 117:4 117:4,6,8,11,16 121:6 122:14 156:21

**complete** 69:4 83:4 88:9

**complex** 101:8

**complexity** 122:11

**compliance** 22:12 45:22,25 69:15 70:24 80:8 86:17 93:8,11 95:10 96:15 131:21 179:6

**complicated** 176:20

**complied** 96:1 179:10

**comply** 97:24

**component** 52:9 52:23 168:2

**compounds** 101:11 102:21 143:23

**comprehended** 173:8

**concentration** 136:24

**concern** 43:14 53:15 59:5 60:12 66:22 102:5,18 152:13 160:14,22 161:5,16,21

**concerned** 106:6 143:21 146:10,15 160:7 164:20

**concerning** 4:4 25:11

**concerns** 12:1 24:14 47:19 101:18 130:18,21

153:14 161:19 165:5 166:8 167:23 168:12 176:10,12 181:23

**concluded** 188:19

**concludes** 188:14

**conclusion** 115:19

**conclusions** 66:16

**concrete** 124:12

**condition** 48:16 101:21 102:15 125:2

**conditions** 49:21 50:3 51:14 70:7 73:25 90:20 100:16,19,21,24 101:12,14,18,23 101:24 102:13 124:19 132:17 184:24

**conduct** 57:20 179:19 180:24

**conducted** 126:24

**confidence** 135:8 187:10

**confident** 144:12 185:23

**confirm** 120:24

**confuses** 87:21 88:14

**confusing** 88:3

**confusion** 90:14 129:2,9

**connection** 9:8,19 13:6 25:17 26:17 28:2,17 31:8 35:12 37:15 38:9 60:19 94:20 113:4 150:12

**conscious** 68:4

**consent** 187:12

**consequence** 58:21

**conservation** 10:6 34:22 44:6 74:25 147:11 164:19

**conservative** 34:24

**consider** 15:22 17:9,16,17 39:16 47:5,24 48:12,16 50:21 51:4 169:5 169:19 170:17

**consideration** 58:22 154:13

**considerations** 58:19

**considered** 18:1 38:16 59:6 104:9 107:3 139:9,13 152:16 164:15

**considering** 39:16 40:3,16 75:10 175:18

**considers** 141:19 142:1

**consisted** 11:3

**consistent** 35:4 121:17

**consistently** 46:23 131:25

**consists** 41:5

**constituent** 162:12 162:23 163:14

**constituents** 132:9

**constitute** 47:25 124:16 138:17 140:16 184:20

**constitutes** 117:11 152:7 172:22 173:4

**constrain** 122:8
**construct** 88:25
  89:10,22
**constructed** 98:2
  98:10,16,19
  103:13 104:2
**constructing**
  93:21 95:1 108:14
**construction**
  88:19 89:17 91:6
  91:14,20,24 92:2
  92:10,14 93:1
  97:17,24 99:24
  103:7 104:1 105:8
  107:2,13,19,20
  108:5 110:20
  111:1,6,13,25
  112:17 113:9,9,10
  114:8 115:4
**construe** 48:1
**consumed** 18:12
**consuming** 18:18
**contact** 19:23
  114:23
**contacted** 111:20
**contacting** 141:21
**contain** 118:21
  177:12
**containing** 164:10
**contam** 21:6
**contaminant** 39:6
  40:17 59:5 60:8
  78:18 91:21
  126:18 135:23,25
  136:18,21,21
  137:8,8,23 138:3
  138:14,17,19,21
  139:10,14,18,21
  139:24 142:15
  145:20,23,25
  147:5 151:3,15,23

151:23 152:7,7,21
  152:21 153:7,23
  154:7,14 156:17
  169:4,6,17,20,21
  170:18
**contaminant's**
  140:15
**contaminants**
  14:24 39:3,12
  41:6 66:22 101:15
  101:21 102:9,16
  102:17 130:4,6
  135:20 136:5
  137:14 138:4,10
  140:7,10 142:2
  144:6,16,23 145:8
  146:5 151:8
  152:14 153:3
  154:3,16 182:25
  184:2
**contaminated**
  178:5 179:12
**contamination**
  20:24 21:7 23:19
  106:23 145:5
  179:8 180:11
  187:6,9,16 188:2
**contemporaneous**
  61:24
**contention** 80:5
**context** 17:23
  39:17 47:21 58:25
  60:6,11 70:22
  90:7,14,16 104:17
  113:19 115:23
  147:12 176:20
**contexts** 17:20
  186:15
**contiguous** 121:12
  121:17 122:4

**continuation**
  186:1
**continue** 69:18
  86:11 125:11
  180:10
**continued** 3:25 4:1
  71:16 129:2
  155:16 186:14,17
**continues** 45:8
  88:4 137:16
**continuing** 84:24
  123:1 124:5
**continuous** 95:11
  106:3
**contract** 111:19
  112:23
**contrary** 177:21
**contribute** 137:9
**contributes**
  136:25
**control** 3:15 4:4,8
  15:24 32:21 41:4
  41:9 43:11,24
  44:21 45:6 51:16
  52:14 56:11,11
  58:3 75:2 98:7
  100:25 102:16
  106:19 110:13
  112:1 114:4
  118:10 124:17
  126:16 129:22
  130:17 131:16
  133:24 135:16
  171:7 172:17,19
  173:22 177:6
  179:6 181:9
**controls** 36:25
  69:20 70:14 71:19
  72:10,10 125:14
  131:24

**conversation** 22:8
  27:8 39:15 54:10
  150:3,15 155:21
**conversations**
  5:17 21:3,20,24
  22:10 23:4,11,15
  23:17 24:2,10,24
  112:24
**cooperated** 177:22
**cooperates** 36:19
**cooperation** 69:15
  69:17 70:20
  131:22
**cooperatively** 70:3
**corner** 82:25
**corporation** 1:8
  3:22 143:20
  188:17 190:12
**corporation's**
  62:11
**correct** 8:15,16
  9:1,2 10:7,8,11,15
  18:22 19:6,9
  30:20 31:7,14
  33:18,21,22 35:24
  37:25 38:3,5 43:7
  43:8 44:22 45:1,9
  45:12 50:14,18
  52:24 53:11 55:4
  55:5,24 56:1
  58:25 59:1 65:12
  67:1,7,8,10,23,24
  69:9 72:20 73:6,7
  73:21 75:14,17
  76:24 77:2 79:7,8
  82:10,11,14,15
  87:5 91:25 92:1
  93:2,3 94:1,2,22
  94:23 97:13,14,19
  100:1,11,12,15
  103:16,21 104:3

104:12 105:3,4,7
105:10,14,15
107:20,21 109:19
113:6,23,24
114:19,20 117:9
119:16,17 120:10
120:13,17 121:6
124:17,18 127:6,7
127:24 128:10,11
131:4,10 133:4
134:20 136:7
137:6,20 140:7,8
140:12 144:23,24
145:10 146:6
148:19,20 150:13
152:9 153:3,24,25
154:3 165:14
166:5,6,19,20
167:4,14 169:17
169:18 172:6,7,16
179:15 187:14
**correction** 189:8
**corrections** 189:6
**correctly** 129:5
132:2 137:4,18
**correspondence**
45:20 61:21 63:3
**corroborated**
48:13 76:16
117:17
**counsel** 5:3,21 6:7
6:22 19:20 30:3
30:11 190:16,19
**counted** 47:14
**counterfactual**
157:6
**country** 20:7 54:7
**couple** 11:5 36:24
98:20 99:2 105:22
**course** 9:12,19
13:17 15:13 17:18

40:9 53:2 61:9
62:23 113:13
150:4 180:15
183:16 184:21
185:1
**court** 1:1,21 5:23
6:3,18 62:24
64:12 76:12 85:1
86:9,23 190:3
**courts** 67:15
**cover** 89:20
**covered** 14:25
**cragin** 158:18
**created** 72:12
**creating** 51:14
**credence** 51:22
**credentials** 44:16
**credibility** 47:13
112:21
**criminal** 58:19
**criteria** 31:16,18
32:3 35:11 37:14
37:17,21 44:15
49:7,14,22 50:2
52:1 60:15,18
61:17 70:1,20
109:4,11 120:18
120:19 121:6
122:16,20 152:6
173:24
**critical** 88:23
**cross** 20:7
**crossed** 147:2
**crossing** 161:19
**crr** 1:21 190:3,24
**cupolas** 46:13
**curiosity** 21:10
**current** 8:17 23:8
39:10 119:12
**currently** 156:3

**curve** 127:19
**cutters** 1:17 5:25
**cv** 1:6 5:24 8:9,11
8:12 9:9 19:1
190:13

**d**

**d** 1:3 3:1 5:21
190:9
**daily** 13:22
**danger** 159:2
**date** 8:19 16:6
32:21 83:25 88:11
98:6 144:11
150:12 165:9
175:11 181:18
**dated** 30:6 55:24
123:4 158:20
159:17 164:25
**dates** 20:25
**dating** 71:23
**daubert** 62:20
**david** 1:13 2:8 3:3
3:10,13 5:20 6:13
7:1 188:15 189:2
189:21 190:7
**david.weinraub**
2:10
**day** 117:17 121:9
121:18 154:1
174:17 184:21
189:23
**days** 115:11
121:22
**de** 178:22
**dead** 99:8
**deadline** 80:17
**deadlines** 86:10
**deal** 14:24 101:9
133:22
**dealt** 170:23

**dean** 64:9
**deb** 13:25 14:2
**dec** 10:14,18 12:22
13:13,21 14:2,14
19:23 20:13 30:7
36:15 38:19 39:11
45:17,19 48:18,22
49:3,17 50:5
51:15 55:4 58:6
60:2 61:4 68:18
72:19 75:3 77:20
78:24 80:21 84:15
84:18,20,25 87:23
89:21 90:4 99:5
100:10,13 102:1,7
102:10,24 103:12
103:15 104:4,9,14
105:2,5,8,13,16,19
106:13 107:3,12
108:3,9,19,22
109:10 112:4
113:15,22 114:6
115:1,14,17 118:3
122:7 126:23
146:23 147:3
149:6,18 150:24
153:19 154:6
155:3 156:4 157:7
157:17 160:13
163:10,13 165:1,6
165:10,13,20,20
165:22,23 166:8
167:8,13,22,25
168:8,11,12,16
170:12 173:14,14
174:3,3 175:5,23
175:24 181:18
182:4,10 186:24
**dec's** 89:20 90:9
103:5 105:11
165:4 166:8

167:22
decade  37:8
decades  59:19
december  10:9
dechert  2:8 6:14
dechert.com  2:10
decide  159:12
decided  183:24
deciding  108:23
decision  73:14,23
  85:12 114:24
  115:24 179:17
  183:10
decisions  12:4
  24:18 177:12
deem  119:22
  120:16
deemed  119:14
  140:16
deeper  153:14
deeply  141:2
default  59:12
defendant  1:8,16
  2:7 5:21 6:14 74:1
  75:23
defendant's  25:11
deference  51:11
  51:18
deferred  73:3
defined  57:24,25
defines  151:22
definitely  13:10
  49:20 102:4
  124:12 148:13
definition  60:7
  118:22,25 119:9
  119:10,14,24
  136:5,13,16,17,20
  137:6,7,11,16,17
  137:21 140:5,14
  140:20 142:15

145:19 151:14
152:22 154:15
169:6,17 170:18
182:25
definitions  59:25
definitively  135:6
degree  105:24
  109:6 132:25
  133:9,15 173:3,7
  182:3
degrees  127:23
  128:3,9,12,13,15
  128:18 131:6,7
  132:12,13,22
  135:9,9
delay  81:19
deliberate  113:13
delivered  67:20
demeanor  63:1
demonstrate
  184:3
demonstrated
  49:15
department  7:21
  10:6 11:22 12:8
  14:16,20 15:2,10
  21:14 34:22,23
  68:17 74:25 75:5
  85:25 105:23
  143:15 147:10
  149:23 151:1
  153:7,21 155:13
  158:11,16,19
  164:19 165:8
  168:21 169:2
  173:8 176:14
  177:11
department's
  73:14,23
departure  9:4
  186:15,24

depend  151:6
  169:4
depending  31:17
  33:10 62:5 81:9
  116:9
depends  57:23
  59:7 119:18 183:4
  183:5
depo  180:16
deponent  189:1
deposited  188:7
deposition  1:12
  5:4,7,9,20,24 7:7
  8:2 26:10 28:7
  29:1,16,19,22 30:4
  40:23 55:20 81:15
  82:21 87:15 89:13
  109:24 118:6
  123:8 126:6
  136:10 141:5
  143:6 145:15
  158:1 159:9
  160:19 163:5,19
  166:13 188:19
  190:7
depositions  7:9,14
  7:18,19,22
dereliction  182:12
  182:15
describe  9:3 11:2
  11:19 13:1 36:17
  45:14 51:21 52:12
  58:11 66:15
described  49:21
  85:2,10 122:10
  173:23
describes  88:24
  89:22
describing  27:8
  87:22 112:11

description  3:10
  4:3 164:7
design  129:18
designate  169:10
designated  46:17
  47:6
designed  133:19
  133:21,22
desk  147:2
despite  92:25
  162:10,18,21
destroy  133:24
destruction
  127:16
details  24:22
  34:13
determination
  49:11 50:6,9
  104:5 170:3
determinations
  48:19,23 49:4
  50:10,11 51:19,23
  58:7 61:5,6,12,13
  62:8 63:17 73:5
  153:16
determine  25:16
  44:8 47:7 49:14
  63:4 80:19 102:8
  120:21 121:23
  123:20 148:4
  153:12 156:15
  184:25
determined  27:14
  155:12 178:6
  188:2
determining  49:8
  49:23 58:17 62:22
  70:1 109:11
  121:14 122:16,16
  142:24

[developed - drafted]                                                    Page 13

**developed** 55:3 62:2 122:7
**developer** 58:14
**developing** 33:13 81:25
**development** 37:8 175:19
**deviations** 128:14
**dialogue** 149:23
**dick** 13:14,16 46:12 75:9 176:6
**differ** 31:19 68:9
**difference** 91:5 128:4 132:25 135:10 184:8
**different** 18:25 28:25 29:4 55:19 65:4 70:10 76:16 90:17 121:21 125:14 129:13,13 168:17 171:6 183:13 187:8
**differently** 91:4 116:2
**difficult** 73:25 75:13,19 77:5 184:8
**dig** 153:14
**dilution** 70:15
**dioxide** 173:25
**direct** 12:9 61:7
**directed** 146:22
**directing** 100:10
**directly** 49:16 114:18
**director** 8:21 11:13 13:14,17 19:22
**disagree** 26:23 52:15 73:8 108:8

**disagreed** 27:10 113:5
**disagreement** 129:9 152:17
**disapprove** 82:5 82:13
**discharge** 124:21 178:16 183:17
**discharger** 183:18
**discharges** 180:5
**disclose** 94:17
**disclosed** 155:1 183:8
**disclosure** 177:16
**disclosures** 95:6
**discontinuance** 46:3 94:7,10 96:13,25 97:10,12 185:14
**discourse** 54:19
**discretion** 52:4,6 60:14 73:6 105:11 115:14
**discretionary** 51:18,21,24
**discuss** 14:1 30:17 135:19
**discussed** 9:13 19:19 20:12,19 23:3,7 24:10 35:11 37:15 52:22 52:23,25 95:20 97:23 102:24 158:8
**discussing** 14:11 63:8 129:8
**discussion** 15:6 30:2 40:9 54:19 78:12 149:12
**discussions** 9:14 9:15 15:2,8 20:22

30:3 39:10 161:12 175:17,19
**dispersion** 162:23 163:15
**dispute** 83:7,16,19 83:23,24 112:14 163:12
**disrespectful** 157:15
**distilleries** 14:7
**distillery** 14:4
**distinct** 49:24 50:1 90:23 117:11 120:21
**distinction** 25:24
**distinctly** 91:9
**distinguish** 31:9 32:8 45:23
**distinguishes** 88:19
**distinguishing** 142:7
**distribute** 9:18,20
**distributed** 12:25
**district** 1:1,1 5:23 5:23
**division** 13:15,18 111:20 158:17
**division's** 126:12
**document** 8:5 26:13 27:21 28:2 28:10,16,19 29:6 41:12 55:25 110:5 126:9 127:2 143:9 143:10,11 146:25 158:5,25 161:11 163:22,24 166:16
**documentation** 63:2 109:16
**documented** 46:4 116:24

**documents** 25:12 25:16,20,21,25 27:11,15,18,22 29:23 30:1 42:24 50:13,16 62:1 63:3,9 66:3,5,14 66:17,19 67:6 69:2 98:22 122:7 125:21 160:19 163:1 167:21 175:17
**doing** 12:5 14:24 67:22 71:24 73:20 128:19 142:6
**double** 99:22
**doubt** 152:22 154:13
**doubting** 112:8,10
**doud** 1:20 6:2
**downstream** 140:17
**dozen** 11:1,3 20:16
**dr** 18:3 19:10,15 23:3 25:10,16 26:2,16,19,22 27:5 27:12,14,17,20 43:6,9,13 53:12,21 55:23 56:6 57:17 65:10,17,22 66:13 66:25 67:5 69:3 79:5,9 97:23 108:4 117:7,19 122:19 144:5,21 145:9 146:3,9 147:9 162:6 163:5 171:5,10
**draft** 16:18,19 68:9
**drafted** 62:2 67:12 114:13

**dramatically** 13:4
**draw** 66:5
**drawer** 2:3
**drawing** 146:12
**drew** 50:19
**drinking** 15:5
　18:12,18 39:18
　59:24 147:16
　148:19
**drop** 133:16
**due** 139:2
**duly** 7:2 190:7,13
**dupont** 54:7
　125:24 126:1,4
　155:9
**duration** 109:6
　137:15 140:11
**duties** 183:2
**duty** 95:22 182:23

**e**

**e** 3:1,8 4:1,13,14
　19:13 30:11
　143:18 148:7
　158:7,20 159:16
　159:17,23 161:14
　190:1,1
**earlier** 21:21
　49:11 73:3 76:14
　77:11 80:4 97:11
　113:4 122:10
　143:16 154:15
　158:8,12 168:7
　175:15,18 176:23
　186:2
**early** 16:7 54:21
　57:6,6 81:4 98:21
　99:1 174:17
**easiest** 121:10
**easy** 75:23
**economic** 108:25
　109:18,22 110:23

　175:19
**economically**
　69:19
**effect** 14:7 81:3
　121:5 128:15
　131:13 132:21
　133:11 135:2,6,7
　136:1 161:15
**effective** 71:6 98:6
　125:8 130:23
　131:2
**effectively** 135:1
　184:18
**effectiveness**
　11:23 127:20
　128:2,20 132:25
　133:11
**effects** 140:17
　141:20 142:24
　147:20 157:2
　160:8
**efficacy** 127:14
　128:5 133:17
**efficiency** 11:23
　37:11,13
**effort** 68:4 125:10
**efforts** 21:15 70:6
**eight** 29:14
**either** 18:8 32:7
　37:20 39:17 47:12
　48:10 61:10
　110:12 116:8
　129:18
**ejoselson** 2:4
**elaine** 13:16
**elected** 106:5
**electric** 37:5
**electronic** 9:21
**electrostatic**
　171:11,23 172:6
　173:15 174:8

**elements** 109:18
**elevating** 11:13
**eliminate** 74:14
**embedded** 32:24
**embraced** 72:11
**emerge** 54:24
**emerged** 20:24
**emerging** 14:25
　66:22
**emily** 2:2 6:16
**emission** 63:24
　122:23 131:9
　137:24 154:24
　164:20 172:21,23
　173:10 177:23
　178:16 184:13
　185:15
**emissions** 35:21
　37:2,12 38:7
　46:13 48:1,15,24
　48:25 49:1,2
　53:15 54:15 56:9
　56:11 59:6 72:9
　72:13 76:4 101:1
　101:14,17 102:9
　105:25 106:18
　123:1 124:4,8
　126:15,23 127:17
　128:24 129:16
　130:15 132:4,14
　133:4 134:9,23
　135:10 142:25
　143:21 144:4,10
　144:21 145:5,6
　147:4 149:7,11,19
　150:12 154:6,21
　155:2 156:5
　162:11,22 166:9
　167:13,23,24
　168:1,3,12,16,18
　170:16 171:8,17

　172:2 174:5,10
　175:6,25 178:21
　180:4 181:14,20
　182:5 183:3 184:3
　184:16 185:21
　186:3,13
**emitted** 137:25
　149:20 168:8
　179:11 186:14,17
**emitter** 183:17
**emitting** 65:19
　123:21 124:7
　150:25 153:20
　170:9 177:5
　186:23
**employed** 8:25
　190:16,19
**employee** 190:19
**employees** 49:20
　57:8 71:12 106:2
　156:20 157:2
**employment** 18:10
　19:3,5
**enactment** 82:2
**encapsulation**
　120:6 184:4
**encompass** 15:3
**encouraging** 10:23
　11:19
**ended** 60:1
**endedness** 122:8
**ends** 78:23 164:14
**enforcement**
　10:17,22,24 11:3
　11:19,22 12:4,13
　24:19 42:20 44:3
　44:5,8,14,16 45:19
　50:10 58:16,24
　61:7 63:18 71:14
　71:25 73:9,15
　74:8,16 76:9,25

[enforcement - exhibits]                                                      Page 15

77:8 97:2,4
104:14 122:13
142:23
**engage**   24:7 95:17
156:13
**engaged**   37:4
148:2 149:12
150:3
**engagement**   72:8
106:5
**engaging**   64:24
156:3
**engineering**   16:1
53:1,4
**ensure**   32:19,20
33:7
**ensuring**   31:3
**entered**   43:3
**entire**   90:24 129:7
153:8
**entirely**   53:6
**entities**   60:23
156:14
**entitled**   90:19
**entity**   61:19 142:6
169:13 188:6
**entry**   30:6
**environment**
58:15 60:5 105:14
106:14 144:19
152:15,18 162:11
162:22 178:18,19
179:13,22 182:19
182:21 184:13
**environmental**
10:6 15:23,25
21:6 23:20 34:22
35:6 44:9 49:18
52:18 59:17 70:24
74:25 143:14
147:10 156:10

163:3,9 164:19
172:24 184:2,16
185:20
**epa**   33:21 34:3,25
36:5 37:20 38:6
38:10,15,20,23
44:3,7,15 54:24,25
60:14 82:4,4,6,9
82:13,17 83:10,13
142:12,23 143:3
149:2 150:3
156:14
**epa's**   38:12,17
140:24 141:9,12
141:25 142:18
**epa.gov**   4:10
**equipment**   90:5
102:16 106:19
110:20 111:10
126:16 129:22
130:17 131:16
132:20,24 133:24
135:16 173:22
**erroneously**   87:22
**error**   27:8 70:17
**escaped**   172:14
**escapes**   14:6
**especially**   160:8
**esquire**   2:2,8
**essence**   184:7
**essentially**   52:21
56:16 64:20 120:3
186:3
**establish**   76:11
**established**   77:8
**establishes**   30:21
81:25
**esteem**   182:11
**estimate**   29:13
117:13

**et**   1:3 4:13 152:1
152:12 190:10
**ethanol**   14:6
**etter**   4:6,17 123:4
124:2 166:19
167:5 170:22
176:5
**etter's**   166:22
170:14,14 181:14
181:19
**european**   150:6
**evaluate**   145:8
149:19
**evaluated**   147:4
**evaluating**   43:16
63:13 70:10 144:3
144:21
**evaluation**   171:4
**evenly**   12:24
**events**   20:6,8
**eventual**   138:20
**evidence**   48:5,12
48:17 50:25 51:2
70:6 71:9 76:22
96:9 97:8 110:11
172:13 178:8,22
**evident**   47:16 94:6
132:7
**evolution**   53:22
**exactly**   14:9
129:20 160:23
**examination**   3:3,4
3:4,5 7:3 175:1
180:20 187:3
**example**   34:20
35:10 60:9 61:3
121:18 131:23
139:11
**examples**   60:10
**exceedances**
122:24

**exception**   187:20
189:6
**excerpt**   3:19 41:3
41:5
**exchange**   96:8
130:8 165:9
**exchanges**   45:17
54:5,9,24 102:7
167:20
**excuse**   103:6
**exempt**   95:4
**exempted**   93:2,15
**exercise**   179:3
**exh**   3:10,12,13,15
3:16,18,19,20,21
3:22 4:3,5,7,8,10
4:11,13,14,16,17
**exhibit**   8:2,6,9
16:14,22 26:9,10
26:14 28:5,7,11
30:6 40:22,23
41:3,23 55:19,20
55:23 65:16 69:7
69:8 81:14,15
82:20,21,24 87:14
87:15 88:8 89:12
89:13,16,20 99:8
99:19,22 109:23
109:24 110:2
118:5,6,9,17 123:7
123:8,13,17
124:23 125:2
126:5,6 136:9,10
136:15 141:4,5
143:4,6 151:19
157:25 158:1
159:8,9,13 162:7
163:18,19 166:12
166:13 175:4,12
**exhibits**   4:18

**existing**  30:24
**exists**  119:10
  141:3
**expand**  60:14
**expect**  29:3 182:17
**expenditures**  72:2
  126:16
**expensive**  74:2
**experience**  8:12
  8:13 17:19 36:13
  42:25 43:14,24
  51:25 52:16 53:5
  57:19 58:11 64:22
  66:14,25 67:3
  70:23 71:22 115:6
  139:3 146:9
**experienced**  48:14
  64:1
**expert**  3:10 8:1,6
  15:18,25 16:3,11
  16:15 18:22 21:21
  22:2 50:11 62:12
  62:20 63:13,15
  64:1,12,17 65:2
  66:5,10 68:1
  71:21 75:22
  132:10,22 133:12
**expert's**  64:7
**expertise**  15:22
  53:7 66:1 133:13
  135:15 177:7
**experts**  23:4 30:12
  51:1,16 61:21
  63:8 133:10
**expires**  189:25
  190:25
**explain**  66:15
  73:17 178:9
**explained**  77:11
**explaining**  24:3,17
  109:17

**explanation**  112:4
  113:22 176:17
  186:9
**explicitly**  169:16
**explored**  184:21
**exposed**  119:15
  121:1,9,22 141:22
  157:19 160:15,25
**exposure**  57:7
  138:9 147:6 150:2
  155:11 157:3
  161:3,8,16
**exposures**  138:4
  148:11
**expressed**  160:22
  180:15
**extensive**  102:12
  155:16
**extent**  50:8 65:1
  85:9 88:3 109:6
  131:5 132:7
  155:16
**external**  169:13

## f

**f**  190:1
**fab**  126:14
**fabric**  111:19
  162:24
**fabrics**  4:11
  143:19
**facilities**  14:9
  79:22 99:13,25
  107:14 186:22
**facility**  32:1,1,6,12
  32:16 90:24 92:4
  92:16 93:14 98:3
  106:3 111:3 122:2
  124:14 134:22
  173:18 185:10,25
  188:4

**fact**  18:25 27:7
  28:22 47:14 58:9
  61:14,16,17,22
  74:4 75:15 76:15
  76:18 79:9 94:6
  95:14 96:23 97:9
  105:1 108:15
  111:13 113:9
  114:15 116:1
  139:7 156:18
  170:7 180:5
  184:14 186:12
**facto**  178:22
**factor**  186:12
**factors**  108:22,24
**facts**  47:11 50:17
  50:19 51:6 57:3
  61:19,25 66:11
  70:19 98:18
  103:20 115:23
  172:15
**fahrenheit**  127:24
  128:10,18 131:6,7
  133:16 135:9
**failed**  56:10 97:24
  182:16,22
**failure**  57:11
  85:13 97:8 103:7
  108:4,13 127:5
  168:24 172:18
  177:18 183:15
**fair**  7:25 11:10
  15:9 33:1 34:1
  40:14 57:18 84:4
  92:2,5 96:17
  129:2,9 141:25
  144:3 155:8
  161:13 184:4
  185:3 186:6
**fairly**  13:5 20:6
  24:16 90:7 98:19

**fall**  9:12 131:6
**falls**  128:2 138:15
**familiar**  7:13
  34:13 35:17 41:8
  49:7 50:2 60:22
  62:10,19 63:7
  64:3,10 118:24
  125:18,20,21
  140:24 141:2
  158:9 171:5 177:8
**familiarity**  42:18
  42:22
**families**  134:4
**family**  121:2 134:1
  135:3
**far**  39:7 84:22
  120:7,8 154:4
  166:11 167:17
**fault**  89:5
**feature**  35:8
**features**  34:2,7
**february**  8:14
  123:4,13 158:20
**federal**  3:18,19 5:5
  33:19 43:24 79:24
  84:9 86:21 87:10
  184:12
**feel**  12:6 123:11
  139:16
**felix**  3:20 16:12
  56:5
**felt**  176:3
**fewer**  11:1,3 120:9
**field**  15:22
**fields**  15:22
**figure**  57:12
  147:24
**file**  3:22 4:5,17
  165:6
**filed**  5:22 16:12
  54:23 103:15

104:7
files 165:1
fill 111:19
filling 158:22
final 46:11 56:3
84:14,18,20 88:9
126:12 166:21
finalized 19:16
finally 97:25
financially 6:5
190:20
find 72:15 75:1
76:6 93:17 97:21
106:24 125:12
150:21
finding 60:25
123:20
findings 61:14,16
61:17,22 123:19
185:13
fine 42:5 73:1 78:1
107:22,23 116:8
fined 73:19
finer 37:19
fines 73:15
firm 6:2
first 7:2 23:18
43:21 45:8 54:3,9
63:25 71:24 82:24
91:15 98:9,13
99:24 108:2 110:9
124:8 135:21,24
136:13 141:10
147:17 150:23
153:10,18 159:23
162:9,17 165:3
168:20,23 170:24
180:19 190:7
five 69:12
flags 155:13

flechas 3:20 16:12
16:16 18:3 42:18
42:22 43:21,23
44:2 47:22 52:12
56:5,7 63:21
64:19 65:1,9,15
69:1 80:7,11
85:24 86:4,16
87:13,21 88:7,18
88:24 90:8 91:3
93:4,7,13 95:7,9
95:20,25 131:19
173:7 177:21
flip 56:16
florida 7:22
flow 66:16
flurry 98:25
focus 12:23 15:24
31:2 44:5 56:3
91:15 101:12
102:5 148:11
180:12
focused 37:1
105:24 129:15
146:4 173:6
focuses 36:1
focusing 34:17
91:23 107:1 124:9
144:5,22 148:7
folks 13:11,18
20:9,9 22:2 23:1
147:10 158:16
171:1
follow 180:18
followed 168:22
following 13:16
154:11
follows 7:2 88:22
163:2
foregoing 189:3
190:4

forensic 56:24
form 5:6 11:15
22:15 32:22 36:21
40:19 44:11 47:9
51:8 53:3 56:20
57:22 63:11 65:13
66:7,11 68:11,16
72:22 73:11 74:22
76:13 85:21 86:13
87:1,8 90:11
102:3 104:16
107:5,15 113:16
121:25 125:9
134:11 138:22
140:19 142:20
144:7 145:16
146:7 148:10
151:9 152:24
155:5 156:6
157:10,22 160:17
166:10 168:4
171:20,21 175:10
176:1 177:2
178:11 179:14,24
182:14 186:19,25
formal 45:19 46:5
73:8 76:8
formally 46:16
formed 69:5
former 19:24
20:13 23:8 39:11
64:9,9
formerly 142:3
forming 17:6
68:13
forth 16:25 176:15
forward 22:23
111:18 170:25
176:12,16 179:20
fostering 14:8

found 69:4,18 83:4
139:6 165:1
178:20
four 120:11,14
fox 1:17 5:25
frame 12:15
105:23 112:18
120:25
framework 24:4
52:13
frankly 63:25
free 123:11
frequent 76:15
frequently 20:6
58:12 59:12 75:25
122:12
friday's 158:22
friend 20:4,5
front 61:10 100:3
100:5
fulfill 57:11
106:13 108:18
182:17
fulfilled 112:24
168:25 178:23,25
full 8:23 47:22
80:8 81:20 95:9
96:15 108:2 110:9
131:21 145:7
162:9,17 185:11
fully 72:11 97:1
183:8
fume 126:15
fumes 157:9,19,20
fundamentally
152:13
funds 37:13
further 74:12
91:19 126:23
136:3 150:10
172:4 174:23

187:2 188:12
189:4 190:15,18
**furthermore**
69:13
**future** 167:6
**fuzzy** 24:11

**g**

**gail** 159:24
**gap** 177:17
**garabedian** 4:7,11
146:21 176:6
**gas** 37:2,10,12
**gases** 36:11
**general** 9:3 11:4,5
14:22 21:18,25
24:16 29:21 30:19
34:21 58:1 59:14
95:8,25 97:16
161:12 164:7
171:15 187:25
**general's** 11:7
**generally** 7:13,19
11:2 13:11 14:23
21:5 24:20 34:10
34:23 39:20,23
44:18,24 49:10
50:2 51:18 99:12
100:25 101:7,25
118:24 125:18
126:21 133:1
141:1 171:25
**geographic** 31:12
**getting** 33:2 92:8
115:5 139:16
**give** 10:21 34:20
47:12 51:10,22
54:1 63:9 108:13
139:11
**given** 7:7 25:19
36:6 54:16 55:8
67:15 87:9 105:1

111:21 115:9,11
154:10,13 176:7
179:2,7 185:23
188:15
**gives** 183:16
**giving** 72:1 77:14
**glowing** 145:14,17
**go** 7:25 20:8 35:13
60:12 98:21
116:11 117:15
131:18 151:13
174:15,17 176:11
**goal** 33:8 184:22
**goals** 178:13
**gobain** 1:7 5:22
6:15 21:18 42:24
44:20 45:5 53:9
56:8 65:12,18
69:16 70:17 73:9
73:19 74:17 76:10
76:21 150:24
153:1,20 155:1
171:6 172:9 175:6
179:18 180:9
190:11
**gobain's** 22:12
178:21
**goes** 61:2 101:18
111:13 115:8
160:20 167:5
**going** 29:25 40:12
42:1,8 56:23
57:15 68:25 78:4
116:12 132:21
139:16 159:11
161:25 174:18
177:5 184:10
**good** 5:14 6:13 7:5
7:6 17:13 60:9
104:23 116:7
120:7,8

**government** 63:16
75:5
**governor** 112:25
114:23 181:24
**governor's** 75:4
176:9
**governors** 12:11
**grammar** 56:21
**grant** 51:18
**granted** 78:24
83:13,17 84:15
86:8 100:18
**granting** 90:4
**grave** 111:7
**gravity** 58:18
109:2,3,18 110:16
111:8 112:5 113:5
116:2
**great** 42:6 78:2
176:5,17
**greater** 54:25
131:14 150:4
**greenhouse** 36:11
37:2,10,12
**grew** 160:9
**ground** 7:14 73:5
**grounded** 57:2
**groundwater** 21:6
23:19 138:16,21
139:2 140:18
145:3 148:19
161:21 180:3
188:3
**group** 36:25
**grow** 14:8
**growing** 155:7
**guess** 70:22 73:22
**guidance** 122:7
173:9
**guideline** 135:23

**guy** 81:20
**gwc** 190:13

**h**

**h** 3:8 4:1
**hac** 41:19 169:15
**half** 11:1,3 45:9
**halfway** 81:24
162:9,17
**hampshire** 69:20
**hand** 82:25
**handful** 36:8
**hands** 161:7
**hang** 158:25
**happen** 24:6 185:2
**happened** 23:17
39:9 54:6 63:4
64:2 157:6 176:13
176:14
**happening** 150:15
**happens** 139:3
**happy** 41:25 77:25
**hard** 10:21 77:12
101:7 113:1
**harm** 109:5 138:1
138:6,14 154:25
172:24 178:17,19
179:22 180:2,7
183:19 184:17
186:1
**harmful** 139:1,1
184:1,14
**harms** 138:9,24
185:20
**harold** 4:7,11
146:21 176:6
**haste** 113:2
**hazard** 143:22
148:15,16,22
149:3,16 152:9,10
**hazardous** 9:12
24:17 38:4,7,10,13

38:17,20,24 39:3,6
39:12,18 40:17
41:6 52:14,19
59:24,25 60:7,20
126:17 135:20,22
135:25 136:4,17
136:20 137:8
138:3,17,21 139:9
139:12,13,24
142:15,18 143:23
144:6,22 145:20
145:23 147:4,16
151:2,8,15,22
152:7,13,21 153:3
153:23 154:2,7,14
156:17 164:15
169:3,6,17,20,21
170:18 182:24
186:10
**hazards**  137:22
138:19 139:14
141:21 142:1,2
145:24 146:4
147:5 148:18
**head**  13:10 15:16
23:20 26:25 34:10
75:2 93:6 98:8,11
113:7 117:18
140:4 165:12
168:14
**heading**  8:12
42:17 43:22 45:3
53:14 56:4 65:18
69:11 78:11 83:1
84:13 135:22,24
141:10,17,18
164:7
**health**  14:16,20
15:3,10 34:23,25
57:9 58:16 59:16
60:4 105:14

106:14 109:5
137:15,21 141:20
143:15 146:11,16
147:21 149:24
152:8,10,14,18
154:12,12,25
155:3,10,10,13
156:10,12,20
157:2 158:11,18
160:8 161:1
169:25 172:15,24
178:17,19 182:18
182:20 184:13,16
185:20
**heard**  12:15 21:16
62:15 176:12
**heavily**  130:6
**held**  5:25
**helpful**  53:4 73:17
86:9,14
**hesitate**  119:3
**hesitating**  172:11
**high**  145:3 182:11
187:10
**higher**  127:15
131:14
**highlights**  54:2
**highly**  143:16
145:10,17
**hindsight**  106:17
106:25 168:21
**historical**  61:23
**history**  19:4,5
22:19 43:10 55:3
108:12 109:8
178:15
**hlvs**  143:22
**hoc**  113:18
**hold**  73:15 182:11
**holding**  62:11
164:12

**hole**  139:17
**homes**  18:15
**honestly**  40:5
**hope**  70:16 142:21
**hopke**  3:12,17
19:10,15 23:3
25:17 26:2,23
27:12,14,17,20
43:9 50:13 53:12
53:21 56:6 57:17
65:10 66:25 67:5
69:3 79:5 95:7
97:23 108:4 117:7
117:19 171:10
**hopke's**  18:3
25:10 26:16,19
27:5 43:6,13
55:23 65:17,22
66:13 79:9 122:19
162:6,15 163:5
171:5
**horribly**  174:16
**hour**  28:20 30:7
42:4 159:12 178:4
**hours**  29:12,14
**household**  120:12
121:3
**hum**  159:25
**human**  105:14
137:15 152:14
154:12 169:25
182:20
**hundred**  117:3
125:7
**hundreds**  178:5
**husky**  12:19
**hydrogeology**
22:22

**i**

**i.e.**  82:2
**ibm**  12:19
**idea**  71:17 177:14
**identification**  8:3
26:11 28:8 40:24
55:21 81:16 82:22
87:16 89:14
109:25 118:7
123:9 126:7
136:11 141:6
143:7 158:2
159:10 163:20
166:14
**identified**  17:14
37:17,20 45:11
46:17,17 50:13,17
50:21 59:4,13
72:9 106:17 117:7
153:2 155:23
162:12,22 163:25
168:18 179:1
183:22 187:6,15
187:18 188:5
**identifies**  47:13
160:1 170:5
**identify**  25:21
34:7 35:7,10 51:3
60:3 71:6 72:12
72:13 79:5 94:15
94:24 130:4,12
136:4 153:13
166:24 169:1
177:4,25 182:23
185:6
**identifying**  71:5
154:7
**ignores**  141:21
**illness**  137:4 152:3
**illnesses**  154:18

**immediate**  61:8
**immediately**  187:9
**impact**  58:15
 132:13 133:3,7,8
 134:8,22 138:16
**impacted**  187:18
**impacts**  57:7,10
 71:11 77:22 106:2
 106:6 143:19
 146:11,15 152:14
 152:15 154:12
 155:11 156:20
 161:1 172:15
**implementation**
 33:13,16,20 34:14
 37:6 52:17 81:10
 153:9
**implemented**
 92:22 106:20
 142:12 184:18
**implementing**
 36:20 82:1 147:12
**implication**  62:6,9
 127:1
**implied**  157:11
**implies**  96:18
 133:16
**imply**  96:22
**importance**  71:4
**important**  31:14
 47:21 48:5 63:2
 90:13,23
**impose**  104:12
 105:5 108:23
**imposed**  73:1
 108:3,9 113:22
**imposing**  108:20
**impression**  27:23
 44:4 86:24 93:9
 114:14

**impressive**  15:17
**improve**  11:23
**improvements**
 126:22
**improving**  126:15
**inadequate**  115:2
 131:24
**inappropriate**
 64:25
**incapacitating**
 137:3
**incidentally**
 129:18
**incineration**
 186:18,21
**include**  35:22
 38:20,24 50:3
 59:25 60:1 138:6
 178:15
**included**  4:18
 41:19 65:8 99:12
 100:21 156:16
 163:14
**includes**  30:6
**including**  11:22
 35:20 41:4,4
 50:25 109:4
 160:23 173:24
 179:12
**inclusion**  38:17
**inclusive**  190:5
**inconsistent**  64:22
**incorrect**  86:1
**increase**  137:2,2
 154:17
**increased**  152:2
 157:9,19
**independent**  12:1
 27:21,25 28:1
 53:3

**independently**
 169:1
**indicated**  46:18
 47:11 86:16 96:9
 160:14
**indication**  76:18
 107:3,11 177:20
**indications**  75:7
**indicators**  76:3
**individual**  48:7
**individually**  1:4
 190:10
**individuals**  22:11
**indoor**  141:21
**industrial**  173:18
 186:15 188:6
**industry**  61:18
 69:15 176:25
 177:10
**ineffective**  132:3
**infectious**  136:25
**inferences**  50:19
 50:24 51:7 66:5
**inferring**  70:18
**inform**  17:20 86:9
 142:18 180:24
**informal**  167:20
**informally**  176:14
**information**  17:24
 17:25 18:1 20:23
 23:18 51:12 53:11
 53:21 57:5 59:16
 61:20 65:7 68:20
 68:24 69:3 76:14
 80:19,23 87:10
 93:22 94:16,21,25
 95:18,22 96:11
 97:1,4,9 104:4
 107:14 115:23
 127:3 142:22
 146:18 148:5

 150:8 154:10
 155:4,8,22 156:11
 156:23 157:1
 165:3 166:1,7
 170:13 179:20
 181:20 183:22
 187:23,25
**informed**  17:24
 75:22 77:19 109:3
 150:24 151:10
 153:20 156:5,8
 163:13 165:4
 168:11
**informing**  85:18
**ingesting**  141:21
**inhalation**  142:1
 159:2 160:15
 161:2,16
**inhaled**  142:25
 157:8
**inhaling**  160:7
**inherently**  184:3
**initially**  15:12
 92:15
**initiate**  104:14
 105:2
**initiative**  37:10
**injunctive**  74:11
**injurious**  137:15
 140:11,16
**injury**  140:21,22
**inquiry**  148:3
**inspection**  4:16
 45:18 46:8,18,19
 47:7 77:20 123:3
 123:14,22,24
 131:7 164:5
**inspections**  61:10
 75:7 77:20 107:6
 122:25 128:8

**inspector** 44:16
  47:12 48:11
**inspectors** 44:8,13
  45:19 49:17 51:15
  61:7,11 75:23
  76:17 77:20
**install** 72:10 90:4
  100:6,11 125:13
  172:19
**installation** 91:20
**installed** 100:10
  100:14
**installing** 111:22
**instance** 68:17
  75:7 121:6 139:23
  147:8 148:1
  153:10 159:7
  185:22
**integrity** 109:7
  114:3,7 115:8
**intend** 16:24
  115:21 157:14
**intended** 115:22
  129:12 130:14
  133:18 134:5
  143:2
**intent** 62:11
  111:12
**intention** 90:12
**interact** 13:19
  14:13,19 20:5
  114:18
**interaction** 180:12
**interactions** 22:19
  147:17
**interested** 6:5
  114:24 190:20
**interesting** 64:18
**interfered** 12:13
**interference** 5:18

**interim** 50:23
  83:13 126:13
**internal** 71:11
  165:13,22
**interpretation**
  68:23 140:1
  142:11,14 145:21
  145:22
**interpretations**
  51:2,11
**interrupt** 156:24
**intersected** 68:14
**introductory** 88:2
**investigated** 59:5
**investigation**
  27:25 74:12
**investment** 37:10
  110:22 112:23
**investments** 37:13
**inviting** 24:13
**involve** 59:23
  176:9
**involved** 10:16
  11:5,8,14,18 12:16
  25:2 62:8 64:1
  70:24 148:2
  150:17
**involvement** 10:22
  10:25 43:10
**involves** 30:23
**involving** 13:3
  14:4 54:22 158:7
  182:9
**irreversible** 137:3
  154:18
**isolated** 48:9
**issuance** 110:12
**issue** 13:9 14:4,5,6
  73:13 170:23
  186:7

**issued** 26:2 79:14
  85:25 87:22 94:7
  99:25 105:8
  186:10
**issues** 9:9 10:13
  13:3 14:1,12,17,23
  15:1 17:19,22
  20:11,12 21:6,7
  23:1,7 24:25
  25:18,22,23 55:13
  65:7 66:9 70:24
  72:3,20 73:1,21
  101:15,24,25
  105:3,6 128:25
  165:10 180:25
  181:23
**issuing** 44:15

**j**

**j** 2:2
**j.d.** 3:11
**james** 1:3 5:21
  190:9
**jersey** 7:22
**job** 8:14 43:16
  49:19
**johanna** 1:21 6:3
  190:3,24
**john** 20:7 21:11,12
  40:12
**joined** 35:19 36:10
**jonathan** 4:7
**jones** 3:22 27:4,6,7
  75:8 109:21 114:1
  114:13,17 166:19
  176:5
**joselson** 2:2 3:4,5
  6:16,16,24 11:15
  22:15 32:22 36:21
  40:19 42:3 44:11
  47:9 51:8 56:20
  57:22 63:11 64:14

65:13 66:7 68:11
  69:8 72:22 73:11
  74:22 76:13 77:10
  77:18 78:2 85:21
  86:13 87:1,8
  90:11 91:7 95:23
  96:6,21 99:19
  102:3 104:16
  107:5,15 113:16
  114:10 116:11
  118:14 121:25
  125:9 126:25
  131:11 132:15
  133:5 134:10,13
  134:24 135:11
  138:22 140:19
  142:20 144:7
  145:16 146:7
  147:7 148:10
  151:9,19 152:24
  153:4 155:5 156:6
  157:10,22 159:11
  160:17 166:10
  167:15 168:4
  169:8,23 170:19
  175:2 182:6,14
  186:5,19,25 187:4
  188:10
**judge** 75:20
**judges** 152:8
**judging** 68:21
**judgment** 73:4
  75:22,22 136:23
  150:7 151:6,25
  169:16
**july** 10:9 30:6,7
  164:5
**jumping** 151:13
**june** 9:7 16:7 83:5
  99:4,11 163:2

**jurisdiction** 57:24
**jurisdictional**
   147:24
**jurisdictions** 7:17
**justice** 7:22

**k**

**k** 1:13 3:3,10,12
   3:16 7:1 189:2,21
   190:7
**keep** 20:18 42:1
**kind** 10:25 14:8
   22:18 23:24 32:24
   48:25 50:25 56:24
   70:6 110:21
   117:24 152:10
   160:20 176:8,16
   177:20 178:21
   182:8
**kinds** 130:4
   133:13 185:12
**knew** 56:9,18,25
   56:25 58:8,23
   59:8 60:25 63:5,6
   64:8,13 65:18
   66:6 71:12 100:13
   103:12,15 108:16
   108:17 113:10
   144:9 167:22
   173:8 183:5,9,23
**know** 17:18 21:8
   21:10 27:14,17,20
   32:4,7,14,17 35:17
   37:7 39:7,8,14
   44:13,15 48:15
   49:22 54:8 56:23
   58:5 64:8,9 66:6
   70:21 71:3 74:23
   75:4 77:3,15
   80:18 82:16 83:13
   83:25 85:9 86:18
   90:20 96:8 97:3,7

97:11 98:8 109:10
109:15 115:20
117:19 119:8
121:2,11 127:10
127:22 128:2,4
131:12 132:9,20
132:23,24 133:19
134:3,18 135:4,7
138:15 141:2
142:9,9,13,24
144:17 145:2,2
147:18 149:9
151:11 153:10,11
154:4,11,15 155:9
156:18 158:16
160:5,23 164:3
166:3,11 167:16
167:17,21 168:20
169:15,24,25
170:8,11 171:3,14
171:16,18,23
172:1,3,18 173:16
174:1 175:11,16
176:13 177:14
178:19,24 180:12
180:12 181:18
182:21 184:8
186:11 187:9,15
187:20 188:5
**knowing** 76:8 77:1
   77:4 115:6 127:15
**knowledge** 12:9
   19:15 32:11 38:15
   38:19,22 39:8
   53:22 61:25 62:11
   63:10 65:11 66:22
   71:10 84:18,20
   98:15 122:3
   128:21 133:12
   148:21 149:2,5,6
   149:14 150:11

160:13 161:14
163:8 173:13
174:3 186:24
187:5
**known** 13:15
   14:24,24 56:9,19
   57:5,19 58:2,8,23
   59:9 61:1,18 64:8
   64:13 65:19 71:12
   94:16 168:8 183:5
**knows** 91:5
**kruger** 5:20
   188:15

**l**

**l** 5:1
**l.l.p.** 2:3
**lack** 43:13 71:13
   73:8 92:25
**laden** 188:7
**lake** 13:3
**land** 139:22
**landed** 116:1
**landfill** 187:21,22
**landfills** 188:7
**landscape** 58:14
**lane** 160:2
**langrock** 2:3 6:16
**langrock.com** 2:4
**language** 43:3
   53:6 60:1 78:24
   83:5 84:12 86:4
   87:24 88:5 93:23
   97:21 98:4 110:13
   120:7 141:23
   178:15,16
**large** 13:17 108:24
   172:14
**lash** 4:7
**late** 16:7 54:11,20
   55:13 75:10 98:20
   144:14 155:2

**latest** 21:10,14,16
**law** 9:1,4,6 15:23
   23:21,21 50:22
   51:4,6 52:18
   57:23,25 62:18
   64:9,9 67:9 79:23
   79:24
**laws** 15:24 24:5
   35:6 59:15 172:17
   177:4 178:9 179:7
   180:1 181:4,5
   183:7
**lawsuit** 64:7
**lawyer** 62:16
   66:18
**lawyers** 148:4
**leadership** 11:25
   63:6
**leaps** 70:4
**learn** 21:13
**learned** 21:13
   22:20 185:23
**learning** 103:20
   154:5
**leaving** 19:22
   176:11
**led** 63:24
**left** 15:15 20:3
   81:23 180:7,8
   181:15 186:13
**legal** 11:9,12 24:4
   52:13 61:15 62:10
   64:11 67:12 68:9
   90:16,22,23
   115:19 188:17
**legislative** 178:14
**legislators** 12:12
**legitimate** 112:15
**legitimately**
   113:15

**[letter - massé]**

**letter** 75:8 89:8,9
89:20 90:1,3
**level** 11:13 21:25
30:18 46:9 49:9
58:17 63:6,17
115:15,18,25
147:18,18 161:10
177:15 182:9
184:12 187:10
**levels** 10:22 63:6
131:15 140:16
143:23 144:6,22
145:3 148:15,16
**liability** 180:2,7
183:18,20
**life** 139:5
**light** 102:5 106:1
112:18
**limit** 122:3 133:9
143:2 186:11
**limitation** 59:6
150:9
**limitations** 147:24
**limited** 42:18,22
72:7 101:17
103:19 115:13
122:13 125:15
126:13 138:6,9,24
139:19,21 146:16
**limiting** 138:14
143:22 144:9
148:22 149:3,16
**limits** 149:13
**line** 35:3 61:10
89:21 123:22
124:22 175:7
189:8
**linear** 127:19
**lines** 10:3 69:12
98:25 115:5
117:20 146:12

**list** 8:17 38:10,12
38:17,21,25 39:2,6
39:12 40:18 41:7
41:14,16,19 59:12
60:14 152:21
153:6,7 154:2
158:21 161:19
169:15 170:6,8
185:17
**listed** 9:8 20:18
60:4,18 155:18
189:7
**listing** 154:14
156:17
**lists** 8:13 60:12
**literature** 27:21
28:2 150:6
**litigation** 15:21
21:17 54:22
**little** 24:11 42:4
68:7 121:7 172:4
178:10 184:6
**lives** 160:2
**living** 23:25 24:2
24:23
**llp** 1:17 2:8 6:14
**located** 18:11
31:23 32:1
**logical** 66:16
**long** 15:13 41:16
54:1,1 62:5
106:23 125:16
160:8 175:11
181:13
**longer** 8:25 62:4
121:18 152:1
179:2
**look** 45:3 54:14
61:13 63:2 66:11
70:17 76:3 90:2
98:21 116:21

117:15 120:25
136:8 141:9 162:6
164:6 165:24
179:19 180:23
**looked** 45:16,17
69:2
**looking** 22:23
44:24 61:19 66:14
69:11 94:12 98:17
110:7 119:12
121:17 124:25
140:5 149:10,24
150:5 158:25
**looks** 41:13
**lori** 158:18
**loss** 128:19
**lost** 89:1,1 104:21
168:5 170:22
**lot** 25:25 107:9
**lots** 184:22
**lunch** 116:9,14,20

**m**

**magazine** 10:1
**magically** 138:25
**mail** 4:13,14 19:13
143:18 148:7
158:7,20 159:16
159:17,23
**mailed** 30:11
**mails** 161:14
**main** 85:22 86:1
173:11
**maintain** 39:2
72:11 127:6
**maintained** 129:5
**maintenance** 31:3
49:4
**major** 32:9,12
102:5 142:22
143:24 154:21
177:4,17 180:12

**making** 25:24 51:1
62:8,25 73:5
95:19 150:7
176:20
**management**
39:19 99:5
**manner** 175:5
**manufacturing**
71:2 112:19
186:22
**maps** 187:19
**march** 159:17
165:1,16,16,17
167:7
**mark** 7:25 26:8
28:5 40:22 81:13
82:19 87:13 89:12
109:23 118:5,13
123:7 126:5 141:4
143:4 157:25
163:18 166:12
**marked** 8:3,5
16:22 26:11,14
28:8,10 40:24
55:21 81:16 82:22
87:16 88:8 89:14
99:18 109:25
118:7 123:9 126:7
136:11 141:6
143:7 158:2
159:10 163:20
166:14
**markowitz** 13:25
14:2,11
**martin** 20:4
**mary** 1:20 6:2
**massachusetts**
7:23
**massé** 1:21 6:4
190:3,24

**material** 9:18
128:4,15,23
132:13 135:17
164:14
**materials** 17:5,9
17:14,15,16,25
83:2
**matt** 20:5 21:16
22:4,6 40:6,7,11
40:14
**matter** 5:21 34:21
56:21 58:1 63:15
66:10 101:10,19
102:12 109:14
133:25 135:13
171:20,22,22
180:4 190:9
**mauricette** 159:24
160:1
**mean** 11:20 15:7
17:17,18 21:4
39:8 51:23 52:3,6
54:5 56:16,21
57:23 59:10 64:2
75:16 95:15 97:6
115:19 116:3
120:1,23 122:10
125:20 138:1,11
139:8,17 151:23
153:5 156:24
165:24 167:18
168:25 169:9
170:5,8 182:7
184:7 187:8
**meaning** 33:18
90:16,23
**means** 130:5
136:21 137:13
138:11 142:16
**meant** 56:23
127:23 178:10

**mears** 1:13 3:3,11
5:20 7:1,5 41:2
42:14 71:21 78:10
116:18 174:24
175:3 188:15
189:2,21 190:7
**mears's** 3:13
**measure** 139:7
**measured** 139:6
**meat** 68:7
**media** 5:19 139:15
142:4 145:25
146:5 148:18
184:2 188:16
**medias** 147:6
**meet** 119:13 136:5
137:7 169:5
170:17
**meeting** 99:4,11
99:12 158:22
**meetings** 23:23,24
24:13,24 25:3,4
**members** 13:12
**memo** 3:22 4:5,7
4:11,17 27:1,3,4
46:12,20 109:20
110:2,7 111:16
113:25 114:12
164:25 165:14,17
165:19,22 166:2
166:18 167:7,13
170:22 181:14,19
**memory** 118:15
**mentioned** 11:18
22:4 93:25 167:7
**mere** 113:18
**merely** 47:1
**merits** 3:12 65:17
162:6
**met** 19:10 76:11
85:11 183:11,25

**method** 129:10
130:10
**methodology**
44:18 45:14 50:12
52:10,21,25 53:18
70:15
**michael** 164:1,3
**microphones** 5:16
**middle** 110:8
122:23
**middlebury** 2:4
**midway** 164:9
**mind** 62:12,23
63:10 64:21 65:11
85:4 87:6 124:24
124:25 134:15
**minimum** 34:4
132:17,19 155:14
**minor** 32:9,12
108:3
**minority** 71:7
**minute** 116:9
161:24 174:15
**minutes** 42:7
**missing** 99:8
**misstates** 88:14
**mistake** 110:7
144:8,25 145:1
146:3
**mistakenly** 112:16
**misunderstanding**
111:24 112:14,15
113:12
**misunderstood**
27:2
**mitigate** 74:14
126:2
**mitigating** 111:2,2
**mitigation** 33:10
**mobile** 35:18,21
35:22 36:1,25

**modification**
91:20
**modified** 94:7,8
**modify** 125:13
**mold** 14:8
**molecule** 133:22
**moment** 34:14
41:25 80:12 81:18
86:4 87:18 93:18
110:3 159:1 183:2
184:5 188:13
**monday** 1:16 5:11
190:8
**monitoring** 21:13
61:20
**monolithic** 75:6
**montpelier** 1:17
6:1
**moot** 186:4,8
**morning** 5:14 6:13
7:5,6
**mortality** 137:2
152:3 154:17
**move** 57:15 69:19
77:25 111:18
113:1 176:16
179:17
**moved** 62:5 98:14
170:25 175:13
176:18 186:4
**moving** 175:18
176:12 180:23
**multiple** 48:13
76:16 133:23
**municipal** 160:4
186:18,20

**n**

**n** 3:1 5:1
**naaqs** 31:6,8,13
32:3,8,13,20 33:7
35:12 37:16

**name** 6:2 15:16 143:12
**names** 15:9 23:13 158:7
**nata** 4:10 141:10 141:11,17,19 142:17
**national** 8:21 31:3 36:4 37:23 140:24 141:11,25 142:11 155:20
**nationally** 155:7
**natural** 13:20 23:20 74:24 155:14 169:10
**nature** 24:3 51:1 57:4,5 61:23 62:20,21 63:5,13 70:8,12 71:10 74:3,4 85:10 88:3 101:8 105:25 106:1,18 110:18 112:21,24 115:3 126:17 128:22 134:3 137:24 147:25 149:25 155:21,24 176:7 177:9 179:7 181:24 183:7,23
**near** 106:3
**necessarily** 74:9 77:7 116:2 177:7
**necessary** 74:6 111:18 113:14 132:19 153:15
**need** 41:16 55:19 70:13 72:9 85:11 111:21 119:14 120:10,20 121:5,8 121:8,16 124:23

**needed** 84:1 107:13 139:18 149:13
**needing** 144:16
**needs** 60:11 138:1 152:18
**negative** 58:15
**negotiation** 21:17
**neighbors** 179:23
**neither** 190:15
**nelson** 164:1,3
**neutral** 52:7 68:23
**never** 18:10 47:15 62:15 72:11 78:24 79:14 84:15 86:8
**nevertheless** 91:4 139:13
**new** 2:10,10 7:2 9:25 10:1 30:7,24 32:18 33:3 38:16 69:20 70:10 92:19 93:21,22 94:22 95:1 96:11 97:18 98:1,9 105:9 107:19 108:5 111:5,22 112:22 115:4,5 125:13 164:19 165:4,10 165:20,22 166:8 167:8,22 168:12 175:24 176:13
**news** 9:21,23
**nods** 113:7 168:14
**non** 90:21
**nonarbitrarily** 52:6
**nonattainment** 31:10,18,23 32:2 33:11
**noncompliance** 45:21,24 46:2,15

46:22 47:2 109:9
**nonemployees** 161:17
**nonresponsive** 57:16
**nonscientific** 57:2
**north** 4:14 9:13 17:22 18:6,9,13,19 20:11 22:14 23:8 23:24 32:5,15 40:10 54:15 65:19 72:4,25 92:15 98:2 99:25 106:23 134:8,21 143:20 150:25 153:21 157:21 160:2 178:6 187:7,17
**notary** 189:25 190:4
**note** 5:15 31:15 56:7,22,25 59:15 110:17 128:8,25 131:17 146:8 148:17 159:11 175:9
**noted** 46:7 49:10 76:14 77:19 124:1 131:7 143:16 183:14
**notes** 124:13 174:16 190:6
**notice** 5:7 55:13 59:18 105:3 108:14
**noticing** 6:11
**notified** 155:23 182:20
**notify** 156:18 170:1 179:21
**notifying** 92:7

**noting** 34:21 96:23
**november** 41:5,18 82:2,8
**nox** 173:25
**nuisance** 48:15 49:21,23 50:3,7 51:14 70:7 73:25 74:14 75:12,16,17 75:20 76:2,10 77:13 101:18,22 102:6 129:16 156:22,25
**number** 3:10 4:3 5:19 13:18 15:1 30:12 35:19 42:17 45:3 56:4 65:18 69:12 81:23 107:25 115:11 117:2,13 121:1,12 123:20 125:3 135:12 158:24 159:1 166:24 188:16
**numbered** 190:5
**numeric** 150:8

**o**
**o** 2:3 5:1
**o'clock** 162:4
**o'grady** 13:16
**object** 11:15 22:15 32:22 36:21 40:19 44:11 47:9 51:8 56:20 57:22 63:11 65:13 66:7 68:11 72:22 73:11 74:22 76:13 77:10 85:21 87:8 90:11 91:7 96:21 102:3 104:16 107:5,15 113:16 114:10 121:25 125:9

142:20 144:7
145:16 146:7
148:10 151:9
152:24 155:5
156:6 157:10,11
157:22 160:17
166:10 168:4
182:6,14 186:19
186:25
**objection** 64:14
77:18 86:13 87:1
95:23 96:6 126:25
131:11 132:15
133:5 134:10,11
134:24 135:11
138:22 140:19
147:7 153:4
167:15 169:8,23
170:19 175:9
176:1 177:2
178:11 179:14,24
186:5
**objectionable** 49:9
49:14,24 50:4
102:19 116:21
119:15,23 120:16
120:21 122:16
123:21,25 124:22
**objections** 5:5,7
6:10 134:18
**objective** 68:5
**obligated** 170:8
**obligation** 21:9
72:12 106:14
115:7 125:11
153:6,8 155:15
170:1,4 177:3
180:2,6,10 181:1
**obligations** 85:11
86:19 95:16 113:2
169:1,3 179:16

180:23 181:3
183:12,21,25
**observations** 52:2
**observe** 63:1
**observed** 77:21
156:9
**obtain** 92:10 103:7
108:5 111:22
**obtained** 109:1
**obtaining** 104:1
**obvious** 46:1
**obviously** 145:1
165:22
**occasion** 108:9
**occasions** 12:11
20:15 157:8,18
**occur** 21:20 138:1
138:9 140:21,22
180:4
**occurred** 47:6,8
49:24 52:21 59:7
75:17,21 76:23
77:6,15 80:16
96:20 105:23
117:14,16 120:22
144:13 150:12
177:18 179:8
185:17
**occurring** 130:5
148:9 155:3
**occurs** 110:21
111:1 127:17
138:7
**october** 4:3 83:17
83:20
**odor** 46:10,18
47:15 48:6,7,19
49:8,9,13,14,24
51:14 71:10 72:3
72:19 73:1,21,24
73:24 74:3,14

75:12,15,16,20
76:2,10 77:13
100:25 101:15,23
102:5,22 119:14
119:23 120:16,21
121:6,16,19,23
122:14,17,25
123:25 124:4,9,11
125:8,18,23 126:2
126:14 129:16
156:21
**odors** 45:18 50:4
73:13 77:22
102:19,23 116:21
118:19,22 121:13
123:21 124:13,16
124:22 125:12
143:25 185:13
**offended** 174:16
**offensive** 102:23
118:22 143:25
**offer** 16:25 57:2
74:9 80:6 180:25
181:4,7
**offered** 56:7 95:7
**offering** 19:8
73:18
**office** 8:22 11:8
75:4 176:10
**officer** 44:3
**officers** 44:16
**offices** 1:16
**official** 68:18
**officials** 64:21
70:9,17 74:20
105:20 106:5
107:12 160:24
175:20 182:9,10
182:22
**offsets** 33:10

**oh** 89:8 99:23
103:11 143:4
162:15 174:6
**okay** 6:4,22 7:9,12
7:25 8:11 12:22
18:17,21 19:10
37:14 40:14 41:15
41:21,22 45:4
53:13 55:18 63:22
77:23 78:10 81:19
91:13 92:9 93:13
99:3,7,15 101:12
106:25 110:5
116:18,20 117:6
118:15 119:7
124:16 135:19,19
152:17 157:5
161:13,23 163:8
187:2 188:13
**old** 187:24
**once** 20:7 110:22
179:16
**ones** 60:20 117:17
**ongoing** 46:15
47:15,24 70:7
72:18 141:12
**open** 60:1 122:8
**operate** 78:17
79:22 84:25 89:23
90:4,9,19,21 100:7
100:11 111:5
173:9 179:20
**operated** 31:25
74:17 92:4 95:9
96:14 111:3
127:23 174:9
**operates** 132:24
**operating** 22:13
53:10 78:16,22,23
79:2,6,10,13,15,17
79:21,24 80:2,8,14

80:20 81:1,6 82:9
82:17 83:14,21
84:2,6,15,24 85:4
85:5,8,19,24 86:6
86:11,17,18,25
87:4,23 88:10,20
90:15,25 91:6
104:20 111:10
115:4 127:13
131:21,25 132:12
135:8 155:16
157:21 159:3,3
160:16 166:4
185:3,22 187:23
**operation** 110:11
128:16 132:20
133:13 179:3
**operations** 69:19
85:10 92:11 103:6
125:12 175:18
178:7 179:21
180:5 187:11
**operative** 124:19
**operator** 58:8
**opine** 84:5 85:8
95:21,21 135:6
182:2
**opined** 44:20 94:3
94:5 173:2
**opining** 77:7 93:14
**opinion** 16:13
17:21,24 53:3,19
56:18 57:2 62:22
62:25 65:2 66:12
66:19 68:13 69:5
71:20,21,22 72:1
73:18 74:9,15,21
77:14,16,19 79:1
80:1,15 91:12
95:6 117:10
130:22,25 131:2

132:3,10,11,16,22
133:2,8 134:7,20
146:22 160:21
171:5 172:8,22
**opinions** 16:24
17:6 19:7 25:11
25:18,18 26:19
30:15 43:7 45:15
52:12 53:2,14
56:5,8,15 62:20
63:9 65:10,22
67:6 68:16 80:11
80:13 180:14
181:1,4,7
**opportunities** 9:7
24:7,20
**opportunity** 62:24
114:18,21
**opposed** 25:18,22
132:12
**opt** 36:7
**option** 36:6
**oral** 67:15
**order** 111:19
187:12
**ordered** 190:14
**orders** 50:10
74:12 94:13
**ordinary** 115:21
**organic** 101:10
102:21 134:1,2
**organizations** 62:4
**oriented** 61:17
**origin** 27:3
**original** 4:18,19
**originated** 178:7
**outcome** 6:6 68:22
**outcomes** 74:2
**outdoor** 137:13,23
138:5,7,10 139:12
139:20,22 140:6

140:10,15 152:19
**outreach** 21:15
**outset** 96:2 178:13
179:10
**outside** 18:1
160:18
**overbroad** 173:7
**overcome** 113:19
**overstatement**
117:12 173:11
179:5
**overview** 4:10
**owner** 58:8

**p**

**p** 2:3 5:1
**p.e.** 3:20 56:5
**page** 3:3,10 4:3
25:8,8,10 42:15
43:22 45:3,9
53:14 56:4 65:17
69:7,8 78:10
81:22,23,24 82:24
84:12 85:17 86:23
87:19,20 88:1,1,8
89:19 91:15,18
93:18,19 97:22
99:3 100:3,5
101:13 103:2
107:18 108:1
110:7,8 111:15
116:22,22 122:22
122:23 123:14,16
126:11 128:7
135:21 136:14
141:16 150:19,20
150:22 153:17
159:20,23 162:14
162:15 164:17
166:22 189:8
**pages** 44:19,24
45:11 87:19 190:5

**paid** 54:18 55:9
**paper** 81:21
**paperless** 81:20
**paragraph** 43:22
56:4,6 69:11
78:11,15,20,23
81:24 84:13 87:20
88:9,10,18 89:6
90:2 91:18 93:19
93:20 97:22 99:4
100:6 103:3,4,5
108:2 110:9
111:16 116:23,24
126:12 128:8
135:21,24 141:18
141:19 150:23
151:17 153:19
159:21 160:4
162:9,17 164:6,10
164:14,18 166:21
**parallel** 176:8
182:8
**paraphrase** 120:3
**pardon** 89:8
**parentheses**
164:21
**parenthetical**
88:22 89:6 163:2
**park** 2:9
**part** 9:13 31:2
37:1,9 57:20 59:8
70:4 112:16
119:19 151:6
152:6 160:19
**partially** 72:10,11
**partic** 10:23
**participant** 163:25
**participants**
163:25
**participated**
155:20 173:8

particular 9:23
  12:20,23 15:7,23
  24:9 30:14 31:18
  35:25 46:12 48:7
  52:19 58:9 59:4
  59:20 60:23 68:21
  70:5 85:15 90:3
  90:19 121:20
  122:2 134:4
  147:23 161:16
  172:19 177:18
  185:6
particularly 11:8
  71:1 75:10
particulate 101:10
  101:19 133:25
  164:10 171:19,21
  171:22 173:24
parties 5:3 110:10
  190:17
parts 54:6
partway 110:9
party 6:5
passage 35:5
pathway 161:9
pathways 150:2
pause 41:24
pay 114:1 155:16
paying 17:21
penalized 73:20
penalties 11:7
  73:23 103:9
  104:11,12 105:5
  108:4
penalty 58:18
  74:10 108:3,8,20
  108:23 109:11
  113:6,22 114:1,9
  114:16 115:1,10
  115:12,13,15,18
  115:25

pendency 85:12
pending 84:25
  86:12
people 48:14 51:1
  53:7 58:12 61:24
  62:2,4,8 116:10
  119:16,21,22
  120:10,11 121:1,8
  121:13,21 141:22
  160:23,24 161:5
people's 18:15
  23:25 161:22
  183:19
percent 119:22
  120:15 125:7
percentage 119:15
  119:18
perfectly 14:18
perfluoroisobuty...
  166:24
perfluorooctano...
  166:25 167:3
perform 151:2
  153:22
performance 1:7
  5:22 190:12
performed 117:19
  117:23,24 118:1,2
  125:24
performing 61:10
period 10:6 18:17
  20:21 22:13 51:20
  53:9 72:17 73:6
  73:10,20 91:15,23
  95:2 97:15,17,19
  98:3 102:2,11,25
  104:21 105:21
  106:13 107:17
  111:10 121:4,17
  122:4 125:16
  129:7 157:20

174:9 175:22
  176:23 181:11
permission 90:9
permit 3:21 51:13
  59:3,7 78:22,23
  79:2,6,10,13,17,21
  80:3,14,17,21 81:1
  82:1,3,9,17 83:14
  83:21 84:2,6,15,24
  85:4,5,8,12,13,19
  85:25 86:6,8,18,18
  86:25 87:22,23
  88:3,10,19,25,25
  89:10,17,21,22,22
  90:15,18,21,25
  91:6,6 92:3,6,10
  92:14 93:1 95:15
  97:17,24 98:1
  99:17,24 100:3,5
  100:16,18,24
  101:13 102:13
  103:6,16 104:1,10
  104:20 105:1,9
  107:1,13,20 108:5
  108:15,16 110:13
  110:25 111:6,22
  111:25 112:17
  113:9,10,14
  124:19,20,25
  128:10 130:2,10
  132:1 149:13
  183:16 184:24
  185:18
permits 45:6 74:6
  78:12,16 79:15,24
  81:6 87:22 88:15
  88:20 91:14,20,24
  95:18 103:8
  106:21 107:8
  108:13 114:8
  129:24 177:12

183:14
permitted 173:9
  177:23
permitting 71:14
  96:1 103:25 114:2
  130:2 142:23
persistence 144:18
persistent 74:4
  156:21
person 27:6 40:6
  62:7,25,25 93:21
personal 10:25
  12:9 36:13 43:10
  71:20 77:14
  128:21 146:8
  149:14 183:19
personally 10:16
  11:14 18:12 25:21
  48:21 50:6,8
  60:24 61:6 145:12
  150:17
personnel 39:11
  159:18
persons 1:4
  183:20 190:11
perspective 59:11
  65:5,5
persuade 70:13
peruse 41:15
petition 38:15
petitioned 38:20
  38:23
petitions 169:11
  169:12
pfas 30:8
pfoa 9:10,16,19,22
  10:13 20:12,19
  23:1,7 24:25
  37:16,20 38:12,20
  38:24 39:5,11
  40:16 41:18 53:23

53:25 54:3,7,11,20
55:9,13 56:9,12
63:24 65:19 66:23
130:14,18,21,23
131:3,9 132:4,8,13
133:1,4 134:9,23
135:2,10 144:11
144:14,15,18,20
145:3 148:22,24
149:3,7,17,19
150:12 151:7
153:2 154:2,12,21
154:24 155:2,12
157:3 162:11,12
162:21,23 163:14
164:21 165:11
166:9 167:14
168:12,16,18
169:5 170:16,17
171:7,17,21 172:2
172:14,21 173:3
173:10 174:5,10
175:6,25 177:23
178:4 179:12
182:5,24 185:15
185:17 186:3,13
186:14,17,23
187:6,16 188:3,7
**ph.d.** 3:12,17
143:12
**phil** 170:22 176:5
**philip** 3:12,16 4:5
4:17 123:4 166:19
**phone** 19:12 27:3
27:4
**phrase** 58:2 69:23
88:2 133:7 152:11
**physical** 136:24
152:11 171:21
**pick** 5:16

**piece** 132:23
147:19
**pieces** 52:11
**place** 70:22 90:10
92:18 96:24
110:25 119:5
120:25 139:5
**placed** 136:4
155:15
**places** 18:11
**plaintiffs** 1:5 2:2
6:17 16:4,20 18:2
19:20 23:4 30:2
30:11
**plan** 33:13,16
34:14 37:6 81:10
**planning** 24:15
**plans** 33:20
**plant** 47:17 48:10
54:16 58:8 106:1
124:15 132:14
133:4 150:25
153:21 159:2,3
160:7,25 161:6
165:10 167:23
168:13 171:7
172:14 175:13
185:10 187:10
**plant's** 132:4
184:3
**plants** 22:13 168:9
**plastics** 1:8 5:22
190:12
**play** 95:12
**played** 68:18
155:6
**players** 114:19
**playing** 118:16
**pleasant** 2:3
**please** 5:15 6:10
6:19 8:11 28:6

35:15 40:22 42:2
81:13,18 82:19
**plus** 117:7
**pm** 188:19
**point** 35:2 37:19
41:25 75:18 77:24
85:22 86:1,15,15
87:9 90:13,22
95:19 97:6 116:8
121:19 146:25
147:11 157:16
158:14 168:20,23
168:24 173:12
184:10 187:24
**pointed** 108:4
**points** 129:14
**policies** 178:13
**policy** 11:8,12
15:23,24 52:13,18
69:14,17,23 70:19
109:14 110:18
**political** 12:2,7
181:23
**pollutant** 31:19
37:17,21 38:17,21
38:24 60:21
140:21,23 186:11
**pollutants** 31:16
32:3 35:11 37:15
38:4,7,10,13 52:14
52:18 60:15,18,18
70:8 101:10
102:18 129:6
134:5 173:24
174:1 177:5
178:17
**polluter** 183:18
**polluting** 69:18
**pollution** 3:15 4:4
4:8 15:24,24
17:19 24:5 25:12

30:25 37:25 39:18
41:3,8 42:19,23
43:11,11,24 44:21
45:6 51:16 52:13
52:19 58:3 59:15
69:20 70:11,14
71:19,23 75:2
79:25 95:16 98:7
102:16 106:19,22
110:12 112:1
114:3 118:10
124:17 125:14
127:16 129:22
130:17 131:16
133:24 135:16
137:1,9,12,13,21
140:1,5,16 142:12
142:19 172:17
173:22 176:25
177:4 179:6 181:9
**polygraphic** 160:2
**poor** 104:24
**poorly** 151:12
**portion** 9:17
131:17 132:8
135:3 137:17
**pose** 60:4
**position** 8:20,23
18:10 19:1,22
126:13 186:6
**positions** 8:18 9:8
**possible** 69:16
76:5 125:5 168:2
170:12,15,20,20
187:1
**possibly** 115:12
**post** 113:18
**potential** 46:22
47:2 59:4 122:8
145:8,24 147:5
149:11,25 150:1

[potential - programs]                                                                 Page 30

155:25 156:12
168:18 169:25
182:20 183:9
**practical** 75:25
**practice** 122:6
**practiced** 67:9
**practices** 177:10
**pre** 93:8 95:1
**preapproval**
111:14 115:6
**precautions**
124:21 125:4,5
**preceding** 88:17
**precipitator**
171:24
**precipitators**
171:11 172:6
173:15 174:9
**precise** 16:6 20:25
**preconstruction**
32:19 33:4,6
90:18 92:6,19
95:14 110:19,25
111:12
**predict** 77:5,12
**predicted** 156:2
**predominance**
188:1,1
**preface** 91:17
**preferred** 126:23
**preliminary** 4:12
**premise** 168:5
185:4
**premised** 177:13
**preparation** 29:15
30:4
**prepare** 29:21
**prepared** 16:15,21
126:22
**preparing** 27:15
29:19 68:3

**presence** 137:13
137:22 138:20
139:15,19 140:6,9
140:15 144:9
146:4 148:22
149:17 152:19
165:6 178:18
184:1,14
**present** 6:7 20:9
35:2 65:4 87:5
138:4 139:21
142:3,3 143:23
146:18 154:22
161:21
**presented** 66:9
156:11
**pressing** 71:18
**pressure** 12:2,7,11
110:21
**presumably** 100:9
**pretty** 150:20
173:23
**prevailed** 77:2,16
**prevent** 124:21
184:13
**prevented** 103:19
**preventing** 125:8
**prevention** 102:19
102:23
**preview** 41:16
123:12
**previously** 99:18
100:13 105:2
**primarily** 14:16
15:5 45:16 46:24
61:16 80:7 129:15
133:17 146:10
177:25
**primary** 43:17
147:17 152:13
161:21 177:3

186:13
**principle** 105:20
**principles** 53:1
**printed** 9:18
**prior** 12:6 14:10
19:5 42:25 43:13
43:23 66:25 91:16
93:1,15 94:16,25
95:15 100:10
104:2 110:12
111:22 113:8
153:3
**priorities** 10:24
**priority** 160:5
**private** 5:17
183:19
**proactive** 71:5
**proactively** 72:12
72:13,15 106:17
106:18
**probably** 11:1
18:14 40:5,7
84:10 135:12
146:16 171:2
**problem** 12:8
126:18 162:15
**problematic** 167:8
**problems** 37:25
47:17 57:13 72:14
76:4 147:25
**procedural** 21:16
85:16
**procedure** 5:5
85:13
**proceed** 6:20 7:15
116:18 118:12
**proceeding** 6:10
77:1,2,8
**proceedings** 10:17
11:14 73:9 76:9
97:5 104:15

**process** 24:6,7,9
54:11 57:8 66:19
68:8,12,13,24 71:2
107:13 127:19
130:2,19 148:4
153:11 163:13
177:10
**processes** 11:21
164:22
**processing** 79:22
**produced** 28:17
190:18
**product** 112:23
115:5
**professional** 8:13
8:18
**professor** 62:18
64:10
**proffered** 67:25
**program** 10:24
11:22,25 13:7,11
13:12 24:18,19,20
31:8 32:8,13
33:18,19 35:12,17
36:1,14 37:11,16
39:22 40:13,18
44:8 75:3 82:5,9
82:13,14,17 83:1,3
83:10,14,21 84:1
109:8 114:4,7
115:9 140:25
142:1,12 147:12
147:13,17 181:8
183:12,21 184:11
184:17
**programmatic**
147:23
**programs** 11:24
12:23,25 13:5
15:4 30:21,23
31:2 34:12,17

39:17,21,24 44:10
44:14 82:1,3
142:23,23 148:1,6
148:18 177:13
**prohibiting**
178:16
**prohibition** 122:1
150:9
**prohibits** 185:20
**project** 13:8
110:23 113:3
**promise** 182:17
**promote** 37:10
**promoting** 37:4
**promptly** 176:19
**prong** 110:16
112:5 113:5 116:2
**proof** 76:11
184:17
**proper** 62:12
64:16
**property** 123:22
124:22 183:19
**propose** 174:14
177:6
**proposed** 82:3,9
114:1
**protect** 106:14
184:12
**protecting** 34:24
105:13 182:18
**prove** 73:25 75:13
75:19 125:7
**proven** 172:16
**provide** 16:12
65:2 66:18 107:13
**provided** 18:2
27:17 42:24 53:11
102:6
**proving** 122:11

**provision** 96:3
101:16 122:17
**provisions** 44:21
59:23 86:22
**ptfe** 89:23 100:7
162:23 163:14
**public** 24:13,13,24
25:4 34:25 52:13
54:10,19 57:9
58:15 59:16 60:4
109:5 110:18
146:11,15 147:20
154:25 156:21
160:24 172:23
178:17,19 182:17
182:18 184:12,16
185:20 189:25
190:4
**publicity** 54:21
**publish** 38:10
**pull** 165:24
**pure** 155:21 156:3
156:7
**purported** 117:5
**purpose** 33:6
110:24 129:15
131:17 184:10,23
**purposes** 14:22
65:23 142:9
178:22
**pursuant** 94:17
**pursue** 9:7 58:17
58:18,18 76:1
156:18 169:2
182:19
**pursuing** 58:16
**pushing** 113:1
**put** 37:19 68:7
173:18
**puts** 170:6

**putting** 106:25
144:20 152:20
161:13 169:15
**puzzle** 66:8

**q**

**quality** 31:4 37:23
60:19 136:22
143:19 151:24
**quantities** 137:14
140:11
**quantity** 136:24
152:1
**question** 4:15
14:19 17:12,13
32:5,15 35:7
36:23 39:15,20
40:1,8 41:17,17
44:23 46:14,19
56:3,17 62:6
64:18 68:15 80:5
87:2,5,6,11 94:19
97:20 104:24
106:10 108:17
119:8 122:13
123:12 125:14
128:13 133:7
134:15 135:12
139:17 148:14
151:13 156:2
157:11,12,12
158:24 159:1
160:20 161:5
168:5 169:2
172:25 176:15
184:19
**questions** 11:9,12
27:10 32:24 45:22
45:25 46:22 47:1
47:19 57:9 59:2
64:5 70:7 74:7
104:17 105:22

106:4,9 107:7
153:14 157:24
158:21 175:3,7
181:11
**quick** 162:7
**quickly** 111:18
159:6 174:15
**quite** 13:18 14:25
15:13,17 25:25
106:16 172:12
**quote** 122:15,19
153:18
**quoting** 152:1

**r**

**r** 190:1
**rabbit** 139:17
**races** 20:7
**rain** 38:2
**raise** 169:1
**raised** 46:14,19
47:20 74:7 155:12
**raises** 47:13
172:24
**raising** 37:13
107:6
**ramp** 112:18
**range** 46:16
185:11
**rate** 28:20,22,25
29:4
**reach** 143:2
**reached** 187:13
**reaching** 45:15
53:2,18
**reaction** 139:2
**read** 5:9 25:19,25
26:6 29:23,24
30:13 56:2 66:5
69:1 82:24 123:11
125:21 137:4,17
154:15 163:5

189:3
**readily**  139:6
**reading**  29:24
84:14 86:23
**reads**  69:13 78:21
81:25 83:1 122:24
**ready**  116:18
159:12
**real**  111:12 162:7
**realized**  35:16
**realizing**  162:13
**really**  20:23 54:4
54:18 57:12 64:6
71:3 111:13
131:18 132:9,22
161:9 173:6
176:17 187:23
**reask**  157:12
**reason**  40:6 83:7
83:16,19,23,24
85:14 105:19
112:14 128:19
129:23 133:10
154:5 160:14
170:12,15 172:11
182:3
**reasonable**  124:21
125:3,6,10,15,16
173:2 182:2
**reasonableness**
57:20,24 122:9
**reasonably**  110:15
137:1 152:2
**reasons**  65:14 76:1
113:8 122:12
129:20 154:20
170:24
**rebuttal**  3:10,16
55:23 56:5
**recall**  7:24 9:23
12:15,17,17,20

14:3,11,15 15:8,9
15:16 18:14 20:24
21:4,23 22:1,6,17
23:13,14,25 25:24
26:25 29:20 39:14
39:25 40:8,21
46:11 54:7 60:21
60:23 61:3 93:6
93:13,16 94:12
98:11,12,24 99:12
99:14 107:6,25
117:24 119:4
126:3,4 147:8
160:21 161:1,4
165:8,11,25 178:3
181:21,24
**recalling**  13:8 15:6
93:9
**receiving**  166:7
**recess**  42:10 78:6
116:14 162:2
174:20
**recipients**  150:1
**recite**  34:15
**recognize**  26:13
28:10,16 89:16
118:9 143:12
**recognizing**  56:13
71:4
**recollection**  24:12
24:16 98:17
119:11 144:12
161:12 165:21,24
175:14
**recommend**  167:5
177:6
**recommendation**
169:14 170:14
**recommendations**
126:3

**recommended**
126:1
**recommending**
181:14
**record**  5:15 6:9
42:8,11 43:17,19
45:16,18 47:11
49:12 51:17 52:15
53:20 54:14 55:7
57:3 66:3 70:5
75:1 78:4,7 96:10
107:12,16 109:20
116:11,12,15
120:20 129:1,19
130:9 147:1
161:25 162:3
174:18,21 188:14
188:18 189:5
**recorded**  1:12
5:20
**records**  3:13 28:13
61:23 167:18
**recovery**  44:6
**red**  155:13
**reduced**  71:19
**reducing**  102:20
134:8,23 143:25
**refer**  69:6 90:15
**reference**  12:18,18
26:4 39:23 40:17
57:25 79:13 89:4
109:20 116:24
126:4 129:14
143:10 145:24
**referenced**  17:6
17:10 18:25 27:2
27:5 45:21 48:6
107:18 110:2
117:8 123:14
158:12 165:10
181:3 182:11

**references**  129:17
164:25 171:10
**referencing**  39:21
46:12,13 59:21
**referrals**  11:7
**referred**  36:3
158:13
**referring**  12:14
60:6 90:8 99:11
**refers**  28:19 90:15
99:4 112:13 140:6
140:9 164:5
**reflect**  114:2
**reflected**  17:3 19:1
47:17
**refuting**  131:18
**regard**  74:10 93:8
104:25 133:1,13
135:15 171:16
175:22 185:14
**regarding**  23:1
48:19,23,25 49:4
49:12 50:6 58:7
60:25 63:9 65:10
66:6 96:18 105:3
105:6 107:14
166:7 175:24
178:4 180:22
181:5,20
**regardless**  113:21
140:17 176:22
**regards**  114:3
**region**  31:12
**regional**  37:9
**register**  3:18,19
84:9 86:21 87:10
**regrettable**  106:24
**regs**  136:8 151:14
**regularly**  18:18
**regulate**  33:14
38:6 143:3 147:15

148:18 183:15
regulated 58:13
59:11,13 60:3,11
61:19 66:21 70:25
71:23 156:14
185:17
regulating 36:11
40:16
regulation 30:24
43:14 52:14 59:18
59:20 93:2,15
95:5 119:5 120:1
120:4 147:12
185:6 186:3
regulations 3:15
4:3,9 25:12 31:19
31:22 42:19,23
45:6 50:22 51:4
58:4 59:22 81:11
106:21 119:12
120:24 140:2
172:9
regulator 64:23
regulators 37:21
51:19 60:2 61:21
70:3 73:4 116:3
128:17 176:21,22
180:25
regulatory 12:23
12:25 15:3 22:12
24:4,6,9 25:17,22
30:21 40:18 42:25
43:7,19,25 44:9
45:12 48:19,23
49:7,12,22 50:6
51:17 53:8,15,23
53:24 54:11,20
55:3 58:7 60:7,24
63:14,14 64:20
66:5,25 69:24
74:6 76:1 87:3

103:19 106:7,11
107:11 109:8
110:21 113:2
115:9 118:21
119:9,14,24 120:6
122:17 137:21
142:6 147:1,13
148:6,17 156:1,10
156:16 169:6
170:18 177:1,19
178:9 179:11
181:8 182:25
183:12,21 184:4,9
184:17,20 185:4
relate 100:25
101:14 106:4
138:3,19 152:19
related 6:4 9:9,22
13:9 14:17 25:22
35:7 94:10 101:25
130:18 132:9
146:4 161:5,16
190:16
relates 36:24 59:1
96:13 101:16
108:25 122:1
133:17
relating 102:15
relation 127:20
relationship 65:3
128:23
relative 190:18
relatively 23:16
75:23 121:11
130:16
release 173:3
released 184:15
relevant 50:17,22
51:4,20 66:12
73:6 103:20
120:25 121:14

142:14,24 176:3
relied 14:15 17:5
17:15 25:13,17
27:12 53:6 69:2
115:24 130:6
relief 74:12
relies 63:16 75:21
153:9 177:15
relieve 183:17
relocated 92:15
rely 17:10 25:12
27:11,15 49:17
130:3 142:23
177:7
relying 161:11
remains 185:5
remember 16:6
24:22 40:5 165:8
175:7 181:16
remembering 14:3
remotely 6:8
removal 131:15
178:2
removals 132:19
remove 129:4,4,12
129:18 130:14
133:18,20,25
134:5 135:1
152:22 171:7
173:21,23 174:5
174:10 180:6
removed 129:7
132:8 135:3 179:1
removes 133:24
removing 130:23
131:3 132:4
171:17 172:2
repeat 44:23 94:19
97:20 157:16
repeated 119:25

repeating 134:16
replaced 129:5
158:12
replicate 34:5
report 3:10,12,16
3:20 4:12,16 8:1,6
16:11,15,15,16,18
16:25 17:3,7,11,15
18:3,3,22 19:16
25:7,19 26:3,16,17
26:20,22 27:5,11
27:12,15 28:3
30:7,10,14 41:22
42:14 43:4,18,20
43:22 44:19,25
46:13,20,21 47:7
55:23 56:14 65:17
68:3 69:1,6 78:11
79:9 84:12 85:17
86:4 87:14,19,20
88:7 90:13 91:5
91:14,18 93:5,10
93:19,25 94:15,24
95:25 97:22 99:3
103:2 107:18
108:1 116:22
117:8,12 122:15
122:19,22 123:14
123:14 124:3,10
127:5 128:7
131:17 135:21
143:18 144:4
146:22 150:19,22
153:17 162:6,15
163:3,9,24 164:17
164:25 165:12,13
166:22 172:5
173:2,6,12 177:21
181:1,5,7
reporter 1:21 6:3
6:18,22,25 190:3

**reports** 16:21 26:4
26:6 29:25 45:19
46:8,18 52:12
77:20 123:3
129:14 131:8
**represent** 41:2
141:8
**representatives**
99:5
**request** 38:16
175:5
**requested** 190:14
**require** 33:10 38:6
91:24 124:20
150:9 151:1
153:22 156:13
173:14 174:4
176:23 182:4
185:24
**required** 33:16
60:17 69:21 78:13
78:16 79:16,24
80:20,21,25 81:6
86:19 93:21 94:17
94:25 107:8
119:18 128:10
129:24 149:7
151:2 153:23
155:19 167:25
**requirement** 38:9
79:2,10,23 80:2,25
81:3 84:24 85:4
85:16 86:5 92:3,6
92:9,11,14 93:1
95:15 97:25 103:7
110:19 111:13
114:7 132:18
133:16 173:17
**requirements** 34:4
35:25 36:18 44:9
51:13 71:15 79:6

80:9 81:10 92:7
92:18,20,25 93:11
95:10 96:2,23
103:25 106:7
108:17 112:1
131:25 179:10
**requires** 66:4
94:21 95:5
**requiring** 91:19
175:24
**reread** 153:18
**research** 140:3
153:15
**reserved** 5:6,8
**resided** 18:4,6
**resident** 160:2
**residents** 23:8,11
23:23 157:8,18
160:15
**resigned** 9:6
**resolve** 46:5
**resolved** 47:15
**resource** 44:5
74:24
**resources** 13:20
23:21 103:19
105:25 150:4
155:14 169:10
**respect** 32:2,13
52:20 60:17 73:13
97:18 124:11
145:18 176:5
**respected** 15:14
143:17 145:17
**respectful** 157:13
**respective** 5:3
**respectively**
128:13
**respond** 64:24
72:19 86:16 170:7
170:13

**responding** 65:10
95:24 96:14 173:6
**response** 16:13,16
22:7 39:25 47:21
54:20 63:14,21
68:14,15 72:7
80:7 81:3 95:6,8
95:13 96:12 97:1
97:2,4 134:14
182:12 183:6
**responses** 53:23
53:25
**responsibilities**
182:12
**responsibility**
57:12 130:11
169:11
**responsible** 33:13
180:11
**responsive** 148:14
**rest** 98:15
**restaurants** 18:15
**restrictions** 35:21
51:14
**result** 113:21
137:2 142:2 152:2
157:20 178:20
180:4 187:11
188:3
**resulted** 106:22
107:22 154:6
185:13,21
**resulting** 130:19
173:10
**results** 58:20
**retained** 15:18
16:3,5 21:21 22:2
188:16
**retains** 180:1
**retention** 16:10

**retrospect** 70:16
106:16 145:1
170:25 176:18
182:16
**reveals** 43:23
**reversible** 137:3
154:18
**review** 9:21,24
16:11 19:15 25:25
27:21,21 28:2
30:10 32:19 33:4
33:6,21 50:16
53:20 63:9 66:2
70:4 84:9 92:6,19
92:19 129:19
141:12 142:10
144:9 146:18
190:14
**reviewed** 26:5,17
50:13 53:22
143:18 160:19
167:19,21
**reviewing** 30:7
42:24 49:12 51:17
120:20
**reviews** 150:6
**richard** 158:16
**right** 5:9 23:18,18
33:24 41:14 65:24
68:1 75:13 76:21
76:23 77:9 82:25
93:17 98:13
100:14 104:2,7,15
121:9 159:1
162:18 168:10,13
169:22
**ripley** 176:9
**rise** 48:2 54:16
55:8
**rises** 49:8

**risk** 72:12 109:5
  150:9 157:9,19
  170:2,5 177:25
  182:20
**risks** 54:14 55:1
  59:17 70:12 71:13
  72:13 152:18
  155:21,25 156:12
  156:15,19 170:1,9
  170:11 182:19,23
  183:9,9,22
**rmr** 1:21 190:3,24
**rob** 10:1 54:23
**role** 12:7 64:7
  68:16,17
**roles** 12:2
**room** 6:7 24:2,23
**rooms** 23:25
**round** 157:23
  175:3
**rounds** 157:24
**rudeness** 157:11
**rule** 77:13 135:25
  136:3 147:5 151:3
  153:24 169:4
**rules** 5:5 7:14 41:4
  41:9 43:11 44:22
  79:11,12 85:8,10
  85:20 86:25 91:19
  92:22 93:21 94:1
  94:2,4 98:7
  118:10 119:13
  121:5 124:17
  138:3 142:19
  154:16 169:21
  178:9 181:9
**run** 71:17 112:19
  121:20,21
**running** 176:8
**runs** 95:25

**résumé** 43:21,23

**s**

**s** 3:8 4:1 5:1,1
**safety** 156:10
**saint** 1:7 5:22 6:15
  21:18 22:12 42:24
  44:20 45:5 53:9
  56:8 65:12,18
  69:16 70:17 73:9
  73:19 74:17 76:10
  76:21 150:24
  153:1,20 155:1
  171:6 172:9 175:6
  178:21 179:18
  180:9 190:11
**salt** 164:21
**sample** 119:19,21
  120:10,14,15
**sampling** 30:8
**sarah** 158:10,18
**satisfies** 125:11
**satisfy** 119:23
**saudi** 111:19
**saw** 12:2 96:9
  107:16 143:10
  171:9
**saying** 138:8,18
  139:20 168:19
  179:9 184:10
**says** 45:5 140:13
  141:17 148:15
  160:4
**scene** 51:20 54:24
  77:21
**scheme** 43:1,25
  177:1 179:11
**schmeltzer** 20:7
  21:12
**school** 9:1,5,6
  23:21 62:18 64:9
  64:9

**schuren** 4:13 20:4
  158:14
**schwer** 4:13 40:13
  158:8 159:24
**science** 22:21
**scientific** 56:8,15
  56:17 142:10
  147:19 148:3
  150:4 151:11
**scientists** 128:18
**scope** 15:21 16:10
  18:1 160:18
**scrubber** 171:14
**scrubbers** 171:11
  171:16 172:5
  173:15 174:8
**seats** 116:6
**sec** 99:7
**second** 29:24
  73:22 78:11 88:9
  90:2 93:18 103:3
  106:4 109:2
  141:16,18 159:6
  164:6,18 168:24
**secondly** 145:6
  154:23
**secretaries** 12:12
**secretary** 13:19,23
  14:10 75:3 136:23
  151:7,10,25 152:8
  153:15 169:5,9,16
  169:19 170:1,2,5,6
  170:10 176:9
**section** 45:8 93:20
  94:1,4,11,17,20,21
  95:5,12 96:18
  97:13 118:18,18
  123:19 124:6
  136:5
**secure** 69:15

**see** 25:14 27:9
  28:20 30:8 43:1
  43:25 44:4 53:16
  65:20 69:10,21
  70:21 78:13,18,24
  82:6 83:5 84:15
  87:24 88:5,11
  89:8,10,23 90:2,3
  91:21 93:23 98:3
  99:6,9 100:7
  103:10,11 108:6
  110:13 112:2
  114:4 116:25
  117:16 118:19
  123:1 125:2
  126:19 130:9
  136:1 141:14,23
  144:1,11 145:22
  145:24 146:16
  148:8,11,16 151:3
  152:4 159:4,18
  160:11 162:24
  163:3 164:1,12,15
  164:23 166:25
  167:10 168:19
**seeing** 158:10
**seeking** 129:21
**seen** 26:4 55:25
  56:13 69:13
  109:16 110:5
  117:21 126:9
  143:9,11 158:4
  163:22 166:16
**seldom** 60:13
**selected** 67:5
  133:9
**selecting** 27:22
**self** 47:16 94:6
  132:7 177:16
**semantics** 56:22

sense 52:7 65:25 90:22 92:5 96:13 115:21 132:6 135:16 141:1 171:15
sensitive 5:16
sent 165:23
sentence 25:9 69:13 78:15,21 84:14 88:4,9,13 96:17 108:2 110:10 122:24 141:10 164:9,18
sentences 88:17 97:23 111:17
separately 39:2
september 1:16 5:11,15 8:20 166:18 167:12 175:12 190:8
series 10:2
serious 45:22,25 46:14,22 54:10 74:7 80:5 103:8 103:25 104:10 137:3 154:17 155:12
seriousness 109:5 114:2
serving 63:13
set 16:25 17:20 24:13 34:3 36:2,4 36:5,18 47:16 64:19,24 65:7 66:9 73:16 106:3 106:4 115:4,23 142:6 148:21 149:2 172:15 182:8 188:11
setting 114:8 115:15,18

severe 108:6
sgpplvt0402275... 4:4
sgpplvt0402351... 4:9
share 24:15 74:21 95:18 97:8 182:21
shared 87:10 166:2
sharing 97:1,1,3
shocked 173:17
shop 179:17 181:15
short 23:16 33:21 111:10
shorthand 36:3
show 55:19 76:22 90:22
showed 128:9
showing 149:19
shows 42:18
shut 185:25
side 7:12 114:19
sign 5:9
signature 190:24
signed 50:9
significance 30:15
significant 13:2 21:5 48:5,12,16 51:11,22 54:19 106:21 107:4,10 110:23 114:14,15 124:7 126:16 134:8,22 135:1 156:12 177:15
significantly 34:8 34:16,18 35:9 111:4
similar 119:10 120:19 164:21

similarly 1:4 102:19 190:11
simply 24:3 96:7 111:9 112:21 155:19
sincerity 112:9,10
sip 34:7,18 35:8
sips 33:20,23 34:2 35:9
sit 84:4 87:6 114:18 119:8 133:2
site 22:21 51:1 76:4 77:21 143:25 145:2
sitting 18:21 93:8
situated 1:5 190:11
situation 9:13 40:10 60:16 103:18 177:18 183:13
situations 60:11
six 29:14 97:18 98:9,16 104:1 105:9
size 119:19
ski 12:18
skinner 1:17 5:25
slightly 111:2,11
slow 176:11
small 27:8 71:7
smelling 160:9
smoke 77:22 160:7
smoked 161:5
smoking 161:8
social 20:8
society 8:21
soil 138:15,20 139:6,23 140:17 140:23 145:3

146:14 148:19 180:3
solely 61:23 122:13 138:23,24
solutions 22:24 188:17
somebody 27:4 165:23
somewhat 66:8 176:4 179:3
soon 98:19
sooner 81:2
sophisticated 70:25 177:8
sorry 17:12 35:13 44:23 72:23 89:1 94:19 98:23 104:21 119:3 136:16 144:5 162:13
sort 30:18 48:15 127:19 147:13 185:5
sought 74:5
sound 56:16
source 29:25 32:12 35:21 36:25 60:11,16 91:21 92:19 121:16 125:12 130:4 136:4 145:4 154:21 186:13 187:6
sources 30:24 31:19,23 32:9,18 33:3,14 35:18,22 36:1 78:18 79:25 93:2,21,23 94:21 94:22 95:1,16 96:11 108:5 142:22 149:11,12

149:25 187:16
**south** 2:3
**speak** 46:21,23
57:17 62:3,7,25
101:7
**speaking** 48:3
61:24
**speaks** 46:24
114:11
**specific** 10:21 13:8
17:25 21:19 34:15
34:20 35:10 37:24
39:21,23 54:20
57:25 60:12 61:3
61:18 90:16 93:7
94:13,15,24
104:17 119:15
127:3 133:21
147:8 161:10,14
167:6 172:18,18
184:6,22 185:1,15
185:16
**specifically** 10:12
14:11 39:14,22
40:17 42:17 51:13
53:8 54:8 60:21
73:16 74:10 88:8
94:10 95:24
101:22 140:6
141:1 148:8
166:23 171:10
172:3 173:16
174:5
**specifics** 12:17,20
21:4 120:24
165:11 174:1
**specify** 186:18
**spectrum** 145:7
**speculation**
155:22 156:3,7,8,9

**spend** 54:2
**spent** 13:2 30:7
160:6
**sperry** 2:3 6:17
**spiese** 158:17
**spinosa** 114:1,15
114:17
**spite** 70:6
**spoken** 19:12 27:7
145:10
**spontaneous** 153:5
**spontaneously**
153:2
**spots** 187:21
**spread** 121:10
**spring** 16:7
**staff** 11:25 12:10
49:18 50:11 53:8
61:7 63:6 151:11
169:14 170:2,11
**stand** 188:13
**standard** 57:20,20
62:20 76:11
122:10 136:22
151:24
**standards** 31:4,13
32:20 33:7,9 36:2
36:3,4,5,8 37:1,23
60:19
**standing** 48:9
106:23
**standpoint** 167:9
**start** 104:24
134:17 158:22
**started** 110:11
**starting** 8:20
110:9 180:19
**starts** 162:18
**state** 6:8,10 7:20
14:15,20 21:7,18
22:19 24:12,15

33:12,13,18,20,23
34:14 35:4 36:6
37:6 39:16 40:2
40:15 47:22 48:10
54:17 55:8,12,16
57:14 59:15 60:14
61:4 63:10,21
64:21,21,23 65:2,3
65:3,6,11 68:18
69:14 70:13 71:14
71:15,18,25 72:8,8
74:7,15 75:4 76:1
76:17 79:15,23
80:9 81:9,10 82:1
82:5,6 83:3 84:1
84:11 91:18 92:8
92:22,25 93:17,20
94:7 96:16 97:2,9
106:10,20 107:10
108:3 111:17
129:8 130:2,10
131:20,22 135:22
135:25 136:3
149:11 153:9,19
154:23 155:7,24
175:13,19 176:16
177:14,19,22
178:20 179:4,7,18
179:20,21,22
180:13,23,24
181:15 183:6,9,15
183:24 184:12,24
185:23 186:4,13
187:5,13,15,17
188:2,5
**state's** 33:16 37:9
95:10 179:25
**stated** 26:20
178:13 182:7
187:12

**statement** 40:4
42:21 43:20 58:1
88:23 90:8 91:3
91:11 101:6 112:9
113:12,18 114:11
124:10 148:13
161:15
**statements** 26:22
49:17,18 93:7
129:13 131:18,19
173:7 177:21
**states** 1:1 25:10
34:1,4,5 35:9,19
36:7,8,10,19 37:1
37:3 42:18 43:23
53:14 54:25 56:7
62:12,23 65:18
78:16 81:9 82:3
83:2 84:14 86:5
87:20 88:2,10
97:23 100:6 103:4
110:10 113:25
123:20 125:3
126:12 136:20
137:12 141:11,13
141:19 142:13
143:18 150:5,23
156:14 158:21
162:10 164:10,18
166:22
**stating** 95:4
**status** 31:17 87:3
**statute** 42:19,23
79:23 120:1
178:22 184:23
185:19
**statutes** 4:3 59:14
177:13 178:14
183:14 184:11
**stay** 45:2 106:8

**stayed** 19:23 20:1
**stenographic**
  190:6
**step** 50:23 51:3
  72:7
**steps** 21:17 52:22
  72:6 126:1,13
**stick** 118:17
**stips** 6:22
**stipulated** 5:2
**stone** 1:17 5:25
**stopped** 180:5
**straight** 115:8
**strategies** 34:5,6
**street** 2:3
**strict** 31:22
**strike** 55:18 57:15
  84:19 100:4,16
  135:23 146:23
  181:12
**string** 4:14
**stringent** 33:17,19
  34:8,11,16,18 35:9
  35:18,20 71:14
**strong** 76:17 97:8
  131:19
**stronger** 74:8,11
  74:16 75:11
  106:10 177:19
**structure** 91:10,11
**struggling** 62:21
**students** 9:21,24
**study** 150:10
  155:10,17
**style** 68:4,5
**subfactors** 109:4
**subject** 22:11
  32:19 33:4,21
  39:11 59:18 64:16
  90:20 91:13
  100:18 102:12,23

135:13
**subjected** 103:9
**subjective** 116:5
**subjects** 62:12
**submit** 82:3,9
  93:22 94:21,25
  95:2,22
**submittal** 82:5
  83:4
**submitted** 8:7
  67:12 82:12,16
  83:3,10 98:1
  163:9
**submitting** 96:11
**subparagraph**
  136:6,14 151:22
**subpoena** 28:17
**subscribed** 189:22
**subsection** 118:18
  118:21 137:11,12
**subsequent** 139:14
**subsequently**
  125:7 142:3
**subsets** 45:12
**substance** 21:2
  22:18 24:1 36:18
  38:16 68:13
  139:11 169:20
**substances** 9:12
  146:13
**substantial** 11:6,6
  57:9 103:9 104:11
  110:22 111:5
  112:22 115:10
  121:12 135:18
  154:25 172:13,25
  178:8,18
**substantiality**
  11:11
**substantially** 73:4
  111:7,11 119:9

120:19
**substantive** 22:8
  85:11 147:18
**successful** 34:5
**sufficient** 105:24
  113:19
**sufficiently** 34:13
  85:18
**suggest** 51:24 52:3
  66:19 75:8,9
  104:18 112:25
  140:20 143:1
  155:22 179:5
**suggested** 167:19
**suggesting** 73:22
  79:18,20 86:24
  103:23 109:21
  172:13 175:17
  185:9,19 186:12
**suggestion** 80:7
  93:10
**suggests** 57:11
  87:2 115:7 156:11
  165:7
**suit** 54:23
**sulfur** 173:25
**sullivan** 1:3 5:22
  190:10
**sum** 21:2 24:1
  36:17
**summarize** 29:6
  122:15,19 152:11
**summary** 186:6
**summer** 16:7
**supervisors** 61:8
**supplement** 18:23
**support** 47:22
  63:23 83:1 124:10
**supporting** 139:25
**suppose** 138:24
  139:3 140:3 185:8

186:20
**supposed** 150:21
**sure** 12:3 17:17
  30:19 42:5 49:19
  50:1,12 64:4
  65:14,24 75:6
  78:3 80:12 106:24
  118:12 120:3
  125:1 134:6,17
  150:20 153:5
  159:13 170:10
  171:1 172:11
  174:6
**surface** 15:5 59:24
  138:15,20 180:3
**surprise** 147:9
**surprised** 149:9
  149:10 150:14
  161:18
**surrounding**
  145:2
**surrounds** 138:13
**survey** 126:4
**surveys** 125:18,23
**suspension** 164:11
**swear** 6:19 21:23
**switch** 127:4
**switching** 30:17
**sworn** 6:21 7:2
  189:22 190:8
**synonymous** 52:4
**system** 24:4 30:19
  101:8 178:2
**systems** 71:6
  72:16 74:13

---

**t**

**t** 3:8 4:1 5:1,1
  190:1,1
**table** 7:13
**tackling** 14:23
  71:13

tacks   135:19

take   8:25 10:12
 41:9 42:3,7 43:13
 50:17 60:17 63:18
 68:20 70:18 72:6
 77:25,25 84:18,20
 106:10 108:22,24
 113:15,17 122:12
 123:11 124:20
 125:3 136:8 158:4
 159:14 161:23
 162:6 174:14
 176:24 177:19

taken   1:16 5:4,20
 7:9,17,19,22 8:20
 34:11,23 42:10
 45:20 74:8,16
 78:6 97:7 110:16
 112:4,6 116:14
 125:6 126:14
 162:2 168:9,17
 174:20 189:4
 190:8

talk   44:18 80:11
 92:24 116:20
 121:8,21 176:4

talked   185:11

talking   22:17
 64:11 104:20

tangential   9:11

tanks   164:12

tantamount   48:8

targeted   101:22

targeting   142:9

tasked   182:18

taught   9:11 40:9

team   13:10

teams   44:14

technical   66:14
 135:15 147:19
 148:3

technologies   32:21
 56:11 171:7,12
 172:10,19 173:20
 174:4

technology   33:9
 171:19 172:1

teed   151:12

teflon   10:3 89:23
 164:11,22 167:23
 168:13

tell   21:9 54:2

temperature
 127:6,13,16,20
 131:6 132:17,18
 135:17

temperatures
 128:9,12 131:14

ten   42:7 104:2
 116:9 135:13
 161:24 174:15

tend   34:5

tends   137:15
 139:6 140:11

tenure   173:13

term   56:15 69:24
 90:21,25 116:5
 125:16 160:8

terminology   53:6

terms   9:3 10:25
 11:4 14:10 21:13
 22:18 24:6 29:21
 46:21,23,24 52:4
 53:5 58:16 66:20
 68:22 74:12 85:12
 91:9 92:7,9,18
 97:16 103:20
 104:5,6 111:8
 127:2,20 128:23
 134:25 147:14
 148:6 161:10
 176:11 183:20

185:17

test   149:7 157:5
 166:9 167:6,13,24
 168:1,15 170:16
 175:6 182:4

testified   7:2 55:6
 66:24 67:4 73:3
 75:12 97:11 113:4
 180:22 181:22
 184:1 186:2

testify   29:3 64:12
 175:22

testifying   29:1
 64:7

testimony   29:4
 55:10,12 59:9,21
 62:13 63:3 64:17
 64:19 65:15 66:10
 86:15,15 87:21
 102:14 132:2
 178:3 181:16,25
 184:5 188:15
 189:4,6

testing   160:5
 162:10,19,21
 166:23 167:6
 171:3 175:24,24
 176:24 181:14
 183:3

tests   149:19

tetrafluoroethyle...
 164:11

texas   7:19 8:14
 71:25

thank   6:19,25
 37:14 41:21 78:3
 94:3 162:16
 174:24,25 176:2
 180:17

thanks   78:2

theme   35:4 95:25

themself   63:19

theory   157:5

thing   56:17 176:3

things   35:22
 120:23 137:7
 161:20 169:10
 181:24

think   17:24 18:24
 19:18 20:9 22:4
 27:4,7 34:12 40:7
 40:11 47:21 59:23
 66:12,17 85:15,17
 85:23 86:8,22
 87:2 93:4 99:21
 105:19 113:11,17
 114:11 116:7
 119:25 130:20
 135:12 138:12
 144:25 146:3,20
 154:5 156:7
 157:15 158:8,13
 167:25 168:16
 171:18,20 174:13
 176:7,19

third   37:7 78:15
 84:13 87:20 103:4

thorniness   11:11

thorny   11:8

thought   27:1,2
 104:22 134:15

threat   60:4

three   2:9 97:22
 98:18 134:11
 150:16 154:23

tilgner   111:17,23
 112:13,16

tilgner's   112:20
 113:11

time   5:6 6:11 7:21
 8:23 10:7,13,17

12:15,22 13:3,13
  13:20,24 14:2,14
  15:14 18:17 20:21
  23:20 24:11,12
  29:24 30:12 31:13
  31:25 36:14 40:8
  48:18,22 49:3
  50:5 51:20 53:9
  54:3,3,10 55:4
  58:6 61:3 62:16
  62:18 63:4,25
  69:21 70:8 72:3
  72:25 73:6,10,20
  74:17,20 77:9
  90:10 91:15 92:3
  92:14 93:25 95:1
  97:15,19 98:3
  102:1,11,25
  104:21 105:21,23
  106:13 107:17
  111:10 112:18
  116:3 120:25
  121:11,12,18
  122:4 123:11
  125:6,15 126:22
  129:7,14 144:10
  144:11 146:23
  155:23 158:15
  160:15 167:12
  170:21 174:3,24
timeframes  81:25
timely  80:15 87:7
  87:12 175:5
times  10:1 61:8
  102:24 129:17
  134:11
timing  104:9,25
  107:1
title  78:16,22 79:2
  81:7,25 83:1,2,20
  84:24

titled  118:19
  163:24
today  18:21 30:4
  84:5 99:15 118:14
  118:15 119:10
  145:10 180:13
  185:22
today's  29:1,15,19
  145:15 188:15
told  22:1 168:2
toluene  134:2
top  13:10 15:16
  25:8 26:25 28:19
  34:10 69:11,12
  88:2 93:6 98:8,11
  108:2 116:22
  117:18 140:4
  141:16 159:17,20
  164:18 165:12
topic  9:16 57:1
  150:16
topics  30:17 127:4
tort  57:21,23
total  188:15
touch  20:1,18
touched  9:16
tour  99:13
tower  110:12
  121:20
tower's  121:21
towers  90:9 97:18
  98:2,9,16 103:12
  104:2,6 105:1,9
  107:2,19 108:14
  111:5,14,23
town  10:4
toxic  9:12 14:8
  59:25 139:4
  141:11 143:21
  144:10 146:13
  173:25

toxicity  142:7,8
  149:25 167:9
toxicologist  14:16
  15:3,15 143:14
  145:9 147:3
  149:24 158:11
toxicologists  14:13
  14:20 15:10
toxics  13:7,9 14:1
  14:5,9,12,17,25,25
  15:6 17:20 23:22
  34:12,17 59:23
  140:25 141:12,20
  141:21 142:1,12
  143:3 148:8
traced  184:2
trade  37:11
train  44:13 104:22
trained  76:17
trains  44:8
transcript  4:19
  5:9 163:6 189:3
  190:13,14,17
transcription
  190:6
transferred
  170:22
transition  41:25
  77:24
translated  184:23
transmitting
  89:10,21
treat  47:2,20
  153:12
treated  179:1
treatment  71:6
  72:16 74:13 101:8
  129:10 130:5,12
  130:20 185:24
treatments  70:11
  70:11

trey  20:4
trial  5:6 29:3,4
tribunal  62:24
  65:8 66:11 75:20
  77:12
tricks  118:16
tried  67:18 105:16
  166:24
trip  4:16 163:24
true  35:1 92:12
  129:25 130:1
  167:16 189:5
  190:5
trust  174:16
try  72:2 76:5
  121:7 122:8
  134:17 147:12,24
trying  68:19,21,22
  70:11,13 75:18
  81:20 85:22 86:2
  96:22 102:7
  112:23 120:2
  173:12
tuesday  121:19
turn  8:11 25:7
  41:22 42:14 55:18
  59:12 65:9,16
  69:7 78:10 81:22
  84:11 86:3 88:7
  89:19 91:13 97:15
  99:17 103:2 110:8
  111:15 118:17
  122:22 123:16
  124:23 126:11
  135:20 137:11
  150:19 158:24
  159:20 164:17
  166:21
turning  16:14
  37:14 53:13 87:18
  107:17 111:9

136:13 141:16
153:17 159:6
**two**  21:1 23:24
24:23 32:24 78:12
81:12 87:21 88:14
88:14 91:9 101:13
107:19 108:24
110:7 111:15,22
120:23 121:22
131:7 150:16
154:20,23 157:7
157:18,23
**type**  72:9 135:15
**types**  70:10 78:12
87:21 88:14,15
102:20 110:20
142:8 153:16
161:2
**typically**  21:8 33:9
61:6 63:15 76:3
81:11 132:16
133:20

**u**

**u**  5:1
**u.s.**  5:23 7:21
**ultimate**  33:8
147:20
**ultimately**  130:11
146:10,15 147:20
169:9 177:11
**um**  159:25
**unaware**  67:2
174:11
**uncertain**  74:3
166:22
**uncomfortable**
176:4 181:22
**underlying**  29:25
110:18
**undermines**  109:7

**understand**  17:12
30:19 36:23 41:13
50:12 51:7 52:8
54:5 65:9 70:12
80:13 132:2,21
134:6 145:6
156:15 161:20
168:10
**understanding**
43:9 53:5,24 55:2
64:6 81:5,8
103:22 105:25
120:3 127:8,12,18
127:25 128:1,14
129:11 130:13
131:15 137:6,20
142:14 144:14
145:19 149:18,22
154:9 173:19
188:1
**understands**  91:10
**understood**  72:15
111:23 126:18
134:15
**unexplained**
155:10 156:20
**unfolding**  17:22
**unfortunately**
69:16
**unimpeded**  12:3
**union**  150:6
**unit**  5:19 89:23
90:5,19 122:2
**united**  1:1 141:12
**units**  100:7,9,11
100:13 188:16
**unresolved**  46:10
47:17
**untimely**  79:19
84:6

**unusual**  63:12
**unverified**  48:10
**update**  21:8,11
**updated**  81:11
**updating**  19:3
**upper**  81:23
**ups**  180:18
**use**  33:9 37:4
43:17 56:15 62:21
70:15 71:2 76:3
100:21 129:21,24
134:20 163:14
173:14 174:4
182:15
**useful**  66:13
**uses**  91:8
**usual**  6:22
**usually**  63:18
**utilize**  56:10

**v**

**v**  1:6 78:16,22
79:3 81:7,25 83:1
83:2,20 84:24
123:19 190:11
**v.1.**  124:6
**valentinetti**  13:14
13:16 46:12 75:9
176:6
**valintinetti**  89:9
**valuable**  63:1
66:17
**values**  143:22
148:22 149:3,16
**varied**  81:8
**variety**  109:3
160:22 170:24
173:25
**various**  13:5 29:24
30:21 44:21 45:12
79:22 98:22
100:18 117:4

**vary**  33:23
**varying**  10:22
15:3
**vehicle**  147:15
**vehicles**  35:23
37:5
**verified**  48:11
117:17
**veritext**  6:2,4
188:17
**vermont**  1:1,17
2:4 3:15 5:23 6:1
7:20 8:22 9:1,4
10:5,13,17 12:22
13:13,21 14:2,14
18:4 19:23 23:21
25:11 34:11,21
35:5,19 36:8,10,14
36:19 37:21 38:19
39:2 41:3,8 42:25
43:14 45:6 48:18
48:22 49:3 50:5
51:19 53:10 54:13
55:4,7 57:14 58:3
58:6 61:4 64:21
65:4,6 68:18
72:19 74:18 80:10
82:8,12,16 83:8,10
87:23 91:19,24
92:22 103:12,15
104:4,9 105:2,5,8
105:11,13 106:8
106:13,15 107:3
108:9,19,22
109:10 112:4
113:14,22 114:6
115:1,14,17 118:3
135:22,25 140:1
146:23 147:3
148:21 149:6,18
150:13,24 153:9

153:19 154:1,24
155:3 156:4 157:7
157:17 160:13
161:15 163:10,13
164:1 165:1,19,20
165:23 166:4,8
167:13,22,25
168:7,11 170:16
172:9 173:14
174:3,10 175:4,13
175:23 178:20
179:7 180:25
181:18 182:4
186:21,24 187:5
187:18 188:2
**vermont's** 13:7,20
34:7,14,18 35:8,17
36:1 39:5,12
41:19 42:19,22
43:10 44:21 79:11
79:12 83:2,14
138:3 142:15
143:15 176:25
178:8 179:10
**versions** 9:21
**versus** 45:24 70:2
**video** 1:12 5:20
**videographer** 1:20
5:14 6:3,18 42:8
42:11 78:4,7
116:12,15 161:25
162:3 174:18,21
188:11,13
**view** 64:16 77:15
84:23 91:2
**viewpoint** 77:1
**violated** 44:20
45:5 79:1 80:2
84:23 85:6,8 94:4
96:4 97:16 172:9
183:2 185:7,18

**violation** 47:5,8,14
47:14 48:8,13,17
49:9,15,23,25
52:20 59:7 75:17
76:22 79:6,13
85:3,15,19 86:25
96:19,22 97:13
103:8,20,22,25
104:10 105:3
107:4,10 108:25
109:2,3,6,7 111:5
111:8,12,25
113:20 114:3
115:4 117:11
121:15,24 123:25
128:22 172:16,20
172:22 173:1,4
178:8 179:4 184:9
184:20 185:1,5
**violations** 11:6,11
25:11 45:12 46:4
46:5,7,23,25 47:3
47:18,20,25 48:2
50:7 60:24 63:17
73:16,24 76:2,10
76:12,18,20 77:6,7
77:15 94:11
116:25 117:14
120:22 124:16
127:5 131:8,8
133:3 184:4 185:9
185:11,12,16
**violator** 74:1
75:24 109:1,1
**virginia** 54:6,22
**virtue** 97:6 154:14
**vis** 107:2,2 183:12
183:12
**visible** 48:23 49:1
49:2 100:25
101:14,17,20

102:16,17 122:23
123:1 124:4,7
129:16
**visit** 21:12
**volatile** 101:10
102:21 133:25
134:1
**volumes** 172:14
**vose** 158:10
**vs** 5:22
**vtdigger** 10:3
**vulnerable** 150:2

### w

**w** 56:5
**wait** 126:23
**waived** 5:8 112:17
**waiver** 111:21
113:1
**walked** 86:22
129:19
**want** 18:22,24
44:18 80:12
116:10 120:23
123:12 157:12
174:14 176:2
**wanted** 11:23,24
175:21
**warn** 150:20
**warranted** 11:12
104:11
**washington** 7:20
**waste** 24:18 39:18
59:24 147:16
158:17 179:25
180:1 181:4,5
186:15,18,18,21
188:7
**water** 8:14 13:3
15:4,5,5 18:13,18
39:18 59:24,24
138:16,20 139:2,7

139:23 140:23
144:18 146:14
147:16,17 148:19
160:5 161:22
164:10 180:3
**way** 1:17 5:25
9:11 24:17 37:6
45:2 52:1 64:22
76:8 77:1,4 81:20
113:3 122:5
124:12 125:15
130:1 131:23
133:6 139:4
150:18 157:13
163:16 167:16
173:10 174:11
185:13
**ways** 34:17 36:24
51:10 59:2 74:13
76:6 141:22
160:25 177:6
178:24 184:22
**we've** 23:3 35:11
37:15 52:22,24,24
61:11 84:13 86:22
95:20 116:20
158:8 159:11
184:21
**website** 4:10 141:9
**wednesday** 121:20
**weigh** 24:14,21
**weight** 50:25 72:2
**weinraub** 2:8 3:3
3:4 6:13,14,23 7:4
8:4 26:8,12 28:5,9
40:22 41:1,24
42:5,7,13 55:22
57:15 69:9 77:24
78:3,9 81:13,17
82:19,23 87:13,17
89:12,15 99:21

109:23 110:1
116:7,17 118:5,8
118:15 123:7,10
126:5,8 136:9,12
141:4,7 143:4,8
151:20 157:14,25
158:3 159:8,13,15
161:23 162:5
163:18,21 166:12
166:15 174:13,23
175:9 176:1 177:2
178:11 179:14,24
180:18,21 187:2
188:12
**welcome**   41:15
56:2
**welfare**   137:16
**wells**   160:6 178:5
**went**   136:1
**west**   54:6,22
**wet**   171:11,23
172:5 173:15
174:8
**whatsoever**
145:22
**whispering**   5:17
**willingness**   106:8
**wished**   171:2
**witness**   5:8 6:19
6:21 15:19 42:6
63:16 64:12 68:1
72:23 113:7
134:12 168:14
174:25
**wonder**   176:7
**wool**   2:3 6:17
**word**   51:24 62:22
65:24 124:9
156:25 182:15
**worded**   91:3

**words**   112:12
115:20 145:14
**work**   12:4 13:6
17:2,19 19:19
29:7,9,18 64:22
66:21 71:7,25
76:5 127:9,11
128:22 160:10
171:16 178:12
**worked**   13:4,9,10
15:10,12,15 18:8
24:18,20 37:5
52:16 65:6 145:12
160:25 161:6
**working**   17:19
23:22 61:10 70:2
70:9 71:1,5,22
72:16 118:3
147:22 178:23
**works**   30:19 130:2
158:17,18 171:19
172:1,3 178:12
**world**   81:20 157:6
174:8
**worried**   161:20
**worse**   111:11
**worth**   57:1
**write**   68:5,15
**writers**   130:3,10
**writing**   68:4,8,12
**written**   22:25
**wrong**   115:1 116:4
116:5 150:21
158:25 162:13

| x |
| --- |

**x**   3:1,8 4:1

| y |
| --- |

**yeah**   17:13 33:1
35:15 67:2 89:3
97:21 100:5 120:2

135:14 151:16
174:17
**year**   9:7 21:22
39:9 81:12 82:5
82:13 187:13,24
**years**   17:23 21:1,7
24:21 44:3 52:17
68:19 69:18 70:23
82:2 104:2 109:14
111:6,9 119:4
125:17 150:16
154:11,23 156:9
160:6 179:19
**york**   2:10,10 9:25
10:1 164:19 165:4
165:10,20,22
166:8 167:8,22
168:12 175:24
176:13
**yup**   103:11 134:13
151:18,21 158:15

| z |
| --- |

**zero**   135:6

| à |
| --- |

**à**   107:2 183:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.