# EXHIBIT 83

Page 1

1            UNITED STATES DISTRICT COURT

2                DISTRICT OF VERMONT

3            Civil Action No. 5:16-cv-00125

4   - - - - - - - - - - - - - - - - - -x

5   JAMES D. SULLIVAN, et al.,          :

6   individually and on behalf of    :

7   a Class of persons similarly     :

8   situated,                        :

9                   Plaintiffs,      :

10      v.                            :

11  SAINT-GOBAIN PERFORMANCE          :

12  PLASTICS CORPORATION,             :

13                   Defendant.       :

14  - - - - - - - - - - - - - - - - - -x

15

16      VIDEOTAPED DEPOSITION OF ROBERT UNSWORTH

17

18      Thursday, March 29, 2018, at 8:56 a.m.

19

20                Sugarman & Sugarman

21           800 Boylston Street, 30th Floor

22             Boston, Massachusetts 02199

23

24

25      REPORTED BY:  Deanna J. Dean, RDR, CRR

Page 2

```
 1                A P P E A R A N C E S
 2
    Representing the Plaintiffs:
 3       LANGROCK SPERRY & WOOL, LLP
         111 S. Pleasant Street, PO Drawer 351
 4       Middlebury , VT 05753
         (802) 388-6356
 5       By:  Emily J. Joselson, Esq.
              ejoselson@langrock.com
 6
 7  Representing the Defendant:
         QUINN EMANUEL URQUHART & SULLIVAN, LLP
 8       51 Madison Avenue, 22nd Floor
         New York, NY 10010
 9       (212) 849-7000
         By:  Lincoln Wilson, Esq.
10            lincolnwilson@quinnemanuel.com
         By:  Bert L. Wolff, Esq.
11            bertwolff@quinnemanuel.com
12
13
14  ALSO PRESENT:
         Patrick Blaskopf
15       Certified Legal Video Specialist
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                    I N D E X

2

3   Examination                                 Page

4   ROBERT UNSWORTH

5      By Mr. Wilson                              7

6      By Ms. Joselson                          252

7

8

9                  E X H I B I T S

10

11  Unsworth      Description                   Page

12  Exhibit 1     8/31/17 Expert Statement of R.   10

13                Unsworth

14  Exhibit 2     Declaration of R. Unsworth       11

15  Exhibit 3     12/15/17 Expert Statement by R.  14

16                Unsworth on Monetary Damages

17  Exhibit 4     12/12/17 Email from E. Joselson  17

18                to T. Raymond and M. Chapman

19  Exhibit 5     Expert Report of R. Kopp         32

20  Exhibit 6     2010 Vermont Groundwater         69

21                Protection Statute Title 10,

22                Chapter 48

23  Exhibit 7     9/1/17 Email from E. Joselson    87

24                to J. Rong, R. Unsworth, and G.

25                Davis

1              E X H I B I T S (cont'd.)

2

3    Unsworth        Description                    Page

4    Exhibit 8       Declaration of Linda Crawford    111

5                    in Support of Plaintiffs'

6                    Motion for Class Certification

7    Exhibit 9       Vermont Dept. of Health          140

8                    Brochure titled "Testing

9                    Drinking Water from Private

10                   Water Supplies"

11   Exhibit 10      Excel Spreadsheet                144

12   Exhibit 11      Article from The Chicago         147

13                   Tribune on Well Pressure Tanks

14   Exhibit 12      Angie's List Article titled      148

15                   "Signs You May Need a New Well

16                   Pump"

17   Exhibit 13      Homeadvisor.com Article titled   155

18                   "How Much Does a Well Pump Cost

19                   to Replace or Install?"

20   Exhibit 14      12/17/10 EPA Guidelines for      177

21                   Preparing Economic Analyses

22   Exhibit 15      Printout from Skillings & Sons   193

23                   Website titled "What To Do If a

24                   Water Well Runs Dry"

25

Page 5

1            E X H I B I T S (cont'd.)

2

3    Unsworth        Description                    Page

4    Exhibit 16      Otter Creek Engineering 6/2016  222

5                    Preliminary Engineering Report

6    Exhibit 17      MSK Engineering & Design       226

7                    5/25/16 Preliminary Engineering

8                    Report

9    Exhibit 18      Email Chain                    246

10   Exhibit 19      Economic Graph                 249

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2           THE VIDEOGRAPHER:  We are now on the

3      record.

4           The date today is March 29, 2018, and the

5      time is approximately 8:56 a.m.

6           Please note that the microphones are

7      sensitive and may pick up whispering, private

8      conversations, and cellular interference.

9      Please turn off all cell phones or place them

10     away from the microphones as they can interfere

11     with the deposition audio.  Audio and video

12     recording will continue to take place unless all

13     parties agree to go off the record.

14          This is Media Unit No. 1 of the video

15     recorded deposition of Robert Unsworth, taken by

16     counsel for defendants in the matter of James D.

17     Sullivan, et al., versus Saint-Gobain

18     Performance Plastics Corporation, filed in the

19     US District Court, District of Vermont.

20          The deposition today is being held at

21     Sugarman & Sugarman, located at 800 Boylston

22     Street, Boston, Massachusetts.

23          My name is Patrick Blaskopf from the firm

24     Veritext and I'm the videographer.  The court

25     reporter is Deanna Dean, also from Veritext.

1    I'm not related to any party in this

2    action, nor am I financially interested in the

3    outcome.

4        Counsel and all present in the room and

5    everyone attending remotely will now -- there's

6    no one attending remotely, but everyone will now

7    identify themselves and the parties they

8    represent, and afterwards our court reporter

9    will swear in the witness and we can proceed.

10        Counsel?

11        MR. WILSON:  Lincoln Wilson of Quinn

12    Emanuel Urquhart & Sullivan for Saint-Gobain

13    Performance Plastics Corp.

14        MR. WOLFF:  Bert Wolff for defendant.

15        MS. JOSELSON:  Emily Joselson, Langrock

16    Sperry & Wool, for the plaintiffs.

17                    ROBERT UNSWORTH

18    a witness called for examination by counsel for the

19    Defendant, having been satisfactorily identified by

20    the production of his driver's license and being

21    first duly sworn by the Notary Public, was examined

22    and testified as follows:

23                    EXAMINATION

24    BY MR. WILSON:

25        Q.   Good morning.  Would you please state your

1  name for the record.

2      A.   Robert Unsworth.

3      Q.   And Mr. Unsworth, we've been introduced

4  off the record.  My name is Lincoln Wilson.  I'll

5  be taking your deposition today.  I know you've

6  been deposed before, but I'd like to just go over a

7  couple of the ground rules for deposition.

8          As you're aware, it's important that we

9  give the court reporter an opportunity to create a

10  clean record of transcription of the deposition

11  you're giving today.  So it will be important for

12  you to give verbal answers to the questions that I

13  ask today.

14          Do you understand?

15      A.   Yes.

16      Q.   And as you mentioned off the record, you

17  may sometimes be inclined to mumble, but if you

18  can, please speak clearly so the court reporter and

19  the videographer can clearly pick up what you're

20  saying today.  It will be appreciated.

21          If you need a break at any time, feel free

22  to ask your counsel and we'll be happy to arrange

23  for that.  Just not while a question is pending.

24      A.   Mm-hmm.

25      Q.   And you may be inclined at some points to

1   jump in and answer my questions because you have a

2   clear sense of where I'm going, and you may be

3   right about where I'm going; but just for the court

4   reporter's sake, if you could wait until I'm

5   finished with the question before you answer, that

6   would be much appreciated.

7        A.   Sure.

8        Q.   So plaintiffs' lawyers retained you in

9   this case to identify measures of groundwater

10  damages to the plaintiffs in this matter and to

11  estimate the magnitude of monetary damages.  Is

12  that correct?

13       A.   That's --

14            MS. JOSELSON:   Object to the form, but you

15     can answer.

16       A.   That is correct.  I think there's

17  obviously more detail to it than that.  But, yes,

18  that's correct.

19       Q.   And you've provided an expert report in

20  this case on the issue of class certification.  Is

21  that correct?

22       A.   Well, the report is -- I'm not a lawyer,

23  but as I understand it, what I was asked was

24  whether I thought the damages could be estimated on

25  a classwide basis, and that's what -- my opinions

```
 1   relate to that in part.
 2            (Unsworth Exhibit 1 handed to the
 3            witness.)
 4   BY MR. WILSON:
 5       Q.   And I'm handing you what's been premarked
 6   for identification as Unsworth Exhibit 1.  Is this
 7   the class certification report you provided in this
 8   case?
 9       A.   It looks to be a correct copy of my August
10   report.  Again, I'm not an attorney, so I'm not
11   sure what you mean by the class certification
12   report.
13            So I had a report in August which -- in
14   which I stated some facts associated with the
15   matter and talked about what methodologies I could
16   apply that could be applied on a classwide basis.
17   All that information is incorporated in the later
18   report, which is the December report, in which I
19   actually present damages.  So . . .
20       Q.   Fair enough.
21            And you also provided a sworn declaration
22   in this case in support of plaintiffs' motion for
23   class certification.  Is that correct?
24       A.   That's correct, yeah.
25
```

Page 11

```
 1            (Unsworth Exhibit 2 handed to the
 2            witness.)
 3   BY MR. WILSON:
 4      Q.   I'm handing you what's been premarked for
 5   identification as Unsworth Exhibit 2.  Is this a
 6   copy of that declaration?
 7      A.   It seems to be, yeah.
 8            MR. WILSON:  And, Emily, I'll just note
 9      just for housekeeping purpose that it appears
10      that on the docket, when that was filed,
11      Mr. Unsworth's report was not attached to the
12      declaration.  So that might be something that
13      plaintiffs want to clean up.  But just a
14      heads-up.
15            MS. JOSELSON:  Okay.  Could I have a copy
16      of Exhibit 2?
17            MR. WILSON:  (Handing.)
18   BY MR. WILSON:
19      Q.   So taking a look at your declaration, does
20   your -- and just for ease of reference, I know
21   you've given some qualifications about the initial
22   report you provided.  I'm going to refer to that as
23   the class certification report, just for ease of
24   reference, if that's all right.
25      A.   Okay.
```

1    Q.   Does your class certification report

2  contain a complete statement of all opinions you'll

3  express relevant to the issue of class

4  certification?

5    A.   I would say that the December report,

6  which some of the language changes slightly and I

7  go on to present the analysis, I think would be a

8  more complete representation of that -- on that

9  issue.

10    Q.   I'd like you to take a look at Unsworth

11  Exhibit 2.  Do you see in the second sentence of

12  paragraph 1 there, it says, "I have prepared an

13  expert report attached as Exhibit 1 which contains

14  a complete statement of all opinions I will express

15  relevant to the issue of class certification and

16  the basis and reasons for them as well as the

17  materials I considered in forming these opinions"?

18         Did I read that correctly?

19    A.   You did.

20    Q.   And is it true, then, that your class

21  certification report does contain a complete

22  statement of all opinions you'll give relevant to

23  the issue of classification?

24    A.   Well, I also state in the report which was

25  submitted with it that if new information became

1    available, I would incorporate it in my opinion.

2            So to the extent that that is reflected in

3    the December report, I would say the December

4    report better reflects my opinions.

5        Q.   Since this declaration has been filed with

6    the court and is a sworn declaration, do you feel

7    the need to correct your representations to the

8    court?

9        A.   I don't think so.

10       Q.   Did you draft your class certification

11   report yourself?

12       A.   I did.

13       Q.   And your class certification report does

14   not contain an estimate or quantification of

15   monetary damages for the class -- the putative

16   class members, does it?

17       A.   No.  That's in the December report.

18       Q.   Do you believe your class certification

19   report is accurate?

20       A.   Well, it's accurate within -- as I

21   mentioned, there may have been changes between the

22   August and December.  But, yes, I believe it's

23   accurate.

24       Q.   To the best of your knowledge, everything

25   stated in your class certification report is true.

Page 14

1    Is that correct?

2        A.    Yes.

3        Q.    And you also provided an expert report on

4    certain issues pertaining to the merits in this

5    case.  Is that correct?

6        A.    Again, I'm not a lawyer, so as I

7    understand it, the term "merits" means damages,

8    what I would refer to as damages.  So that would be

9    the December report.

10               (Unsworth Exhibit 3 handed to the

11               witness.)

12   BY MR. WILSON:

13       Q.    I'm handing you what's been premarked for

14   identification as Unsworth Exhibit 3.

15               MR. WILSON:  And there's a copy for you,

16      Emily.

17               MS. JOSELSON:  Thank you.

18       A.    That's the next one.

19       Q.    Whoops.

20               Is this the report, the second report that

21   you submitted on of damages in this matter?

22               MS. JOSELSON:  Object to the form

23      quantification.

24       A.    This looks to be a correct copy of my

25   December report.

1      Q.   And, again, just as a housekeeping matter,

2   I'll be referring to that as the merits report --

3      A.   Okay.  Thank you.

4      Q.   -- throughout this deposition.

5           Does your merits report contain a complete

6   statement of all opinions you'll express on the

7   merits of this case?

8      A.   I think it covers all the topics on which

9   I'll be -- I would be testifying and all the

10  opinions.  It covers topically all of the opinions

11  I would have.

12     Q.   Does your merits report contain the facts

13  or data you considered in forming your opinions?

14     A.   It does.

15     Q.   Do you plan to offer any other opinions

16  about the merits of this case that do not appear in

17  your merits report?

18     A.   Depends on the questions you ask today.

19     Q.   Are you aware of the requirement under the

20  federal rules that an expert submit in their report

21  all opinions they'll express in the case and the

22  basis and reasons therefore?

23     A.   Yeah.  I'm broadly familiar with that,

24  right.

25     Q.   Do you believe it's proper for you to

1   express new opinions for the first time at

2   deposition in this case?

3       A.   I think if you ask me a question that was

4   on a topic that wasn't addressed in the report, I

5   may have an opinion on that.  So . . .

6       Q.   Did you draft your merits report yourself?

7       A.   I did.

8       Q.   Do you believe your report is accurate?

9       A.   Yes.

10      Q.   To the best of your knowledge, is

11  everything stated in your merits report true?

12      A.   Yes.

13      Q.   Does the "Information Relied Upon" section

14  of your report list the full set of documents that

15  you reviewed on preparing each of those reports,

16  respectively?

17      A.   So what I list are the specific documents

18  that I relied upon for this report.  I also

19  reference my experience and the economics

20  literature.  So there are obviously items and

21  authorities I'm aware of that relate to this that

22  helped form my opinion.  But these are the specific

23  documents that I relied upon.

24      Q.   Approximately how many hours have you

25  spent working on this case?

1    A.   I would -- I'm going to have to guess.  I

2   think it's about 100.  It might be less than that.

3   But that would just be a guess.

4    Q.   In the course of forming your opinions in

5   this case, did you ask plaintiffs' counsel to

6   provide you with certain documents?

7    A.   Plaintiffs' counsel did provide me with

8   documents.  I don't -- I don't think I -- I don't

9   recall requesting any specific documents from

10   plaintiffs' counsel.

11           (Unsworth Exhibit 4 handed to the

12           witness.)

13   BY MR. WILSON:

14    Q.   I'm going to hand you what's been

15   premarked for identification as Unsworth Exhibit 4.

16    A.   Mm-hmm.

17           MR. WILSON:  A copy for you, Emily.

18    Q.   So this is an email chain between Ms.

19   Joselson, who is counsel for plaintiffs; Tim

20   Raymond of the state of Vermont; and Matt Chapman

21   of the state of Vermont, who is cc'ed.

22    A.   Mm-hmm.

23    Q.   And the date of this email chain is

24   December 12, 2017.  Is that correct?

25    A.   That's correct, yeah.

1      Q.   So that was three days before you

2  submitted your merits report.  Is that correct?

3      A.   That's correct.

4      Q.   And in this email chain, Ms. Joselson says

5  she's now seeking a copy of a document submitted to

6  the state of Vermont by Jason Dolmetsch of MSK

7  Engineering on behalf of North Bennington's water

8  line extension analysis.  "It is his preliminary

9  engineering report (and specifically his 20 percent

10  design memo), all submitted in November 2016."

11          Did I read that correctly?

12      A.   You did.

13      Q.   And Ms. Joselson goes on to say that "Our

14  experts need this document ASAP for incorporation

15  into their expert reports, which are due on

16  Friday."

17          Did I read that correctly?

18      A.   You did.

19      Q.   Were you aware that your merits report is

20  the only report in this litigation that cites the

21  MSK Engineering report referred to in Ms.

22  Joselson's email?

23      A.   I wouldn't know.  I haven't read any of

24  the other expert reports.

25      Q.   Would it be fair to say that Ms. Joselson

```
 1   requested that report from the state so that you
 2   could review it and incorporate it into your
 3   opinion?
 4          MS. JOSELSON:  Object to the form.
 5      A.   It appears that way.  I don't -- sitting
 6   here now, I don't recall how I would have used that
 7   or did use that document.
 8      Q.   Can you tell me what information that
 9   report contained that you incorporated into your
10   opinion three days before it was due?
11      A.   I'd have to look at the document to see if
12   I, in fact, did cite it.  I don't recall what this
13   particular document -- what it would have been used
14   for.
15      Q.   So you hold yourself out as an expert in
16   the assessment of economic damages resulting from
17   adverse changes in the environment, including
18   environmental contamination, as well as the
19   benefits associated with improvements in
20   environmental conditions.  Is that correct?
21      A.   I am recognized as an expert in those
22   areas, yes.
23      Q.   And you hold yourself out as an expert in
24   those areas.  Is that correct?
25      A.   I'm not sure what that -- what that
```

1    phraseology means.  That's the business that I'm

2    in.  That's what I do as a consultant.

3         Q.   And you have stated that you are an expert

4    in those fields.  Is that correct?

5         A.   Yes.

6         Q.   You are not an expert in air emissions

7    modeling, are you?

8         A.   I work with air emissions models.  It's

9    not unusual for us to have to work with air

10   emissions models.  For example, we recently

11   completed some work for the city of Accra in Ghana,

12   looking at causes of air pollution there.

13             So I'm familiar with interpreting data

14   from those models, but I do not typically run those

15   models or wouldn't present myself as an expert in

16   air modeling.  But I do understand them.

17        Q.   You would be doing an economic analysis of

18   an air model performed by someone else.  Is that

19   correct?

20        A.   I would be using the information from the

21   model to understand the biophysical changes in the

22   environment or the chemical changes in the

23   environment.

24        Q.   But as you said, you don't develop those

25   models yourself?

                                                      Page 21

1         A.    I have not developed any air models in

2     recent years, no.

3         Q.    And you wouldn't be qualified to develop

4     them, would you?

5         A.    I wouldn't put myself forth for that, no.

6         Q.    You're not an epidemiologist, are you?

7         A.    No, I'm not an epidemiologist.

8         Q.    You're not a medical doctor?

9         A.    No.

10        Q.    You're not a property valuation expert?

11        A.    I would disagree with that.  It's not

12    unusual in my work to do hedonic valuation of

13    property diminution or use other techniques to get

14    a property diminution.  So I've actually had --

15    have written expert reports on that topic.

16        Q.    Hedonic valuation would be a form of

17    economic modeling.  Is that correct?

18        A.    It's a form of econometric modeling.  So

19    what you do with a hedonic model -- and the word

20    "hedonic" has a very different meaning in economics

21    than it does in the law.

22              But within economics, hedonic models are

23    used -- you're using data on various attributes of

24    properties to explain their prices.  And so by

25    doing that, you can use regression analysis and

```
 1    other techniques to discern whether a particular
 2    attribute has an effect on property values.
 3        Q.   And is that necessary only where there is
 4    not available market information about the value of
 5    property?
 6        A.   No.  Typically it's the opposite.  It's
 7    using market data on the value of the property, so
 8    you have to have market data.
 9        Q.   You have to have market data.
10        A.   And I should say, you know, there are
11    other data that are similar to market data.  So
12    there are -- there are census data; there are --
13    you know, there are data now available online from
14    Zillow and other providers of data that simulate
15    market data.
16        Q.   But you're not an expert in real estate,
17    are you?
18        A.   I'm not sure what that means.
19             I do economic analysis -- I have done
20    economic analysis of property values as they're
21    affected by various amenities and disamenities.
22    I'm not a real estate agent or I don't -- I don't
23    build models of valuation of commercial real estate
24    or anything like that.
25        Q.   And those be amenities and disamenities
```

1    that would be environmental in nature.  Is that

2    correct?

3        A.    Typically for me, they're environmental in

4    nature, although my firm works on other attributes.

5    And you also -- you might have to get involved in

6    valuing other things, like whether or not they're

7    similar school systems or similar crime rates or

8    things like that.  So . . .

9        Q.    You wouldn't be able to tell me how much

10   adding granite countertops to a three-bedroom

11   apartment in Manhattan is going to increase the

12   sale price of my condo, is it?

13       A.    No.

14       Q.    No.

15       A.    And I would assume it already has granite

16   countertops if it's a condo in Manhattan.

17       Q.    It's a cheap one.

18            You never worked for a state regulatory

19   agency, have you?

20       A.    I've been a consultant to several state

21   regulatory agencies, but I haven't been an employee

22   of a state regulatory agency.

23       Q.    Have you ever worked for a federal

24   regulatory agency?

25       A.    Same thing.  I've been a consultant to

1    numerous federal regulatory agencies but never been

2    an employee of a regulatory agency.

3         Q.   And the opinions that you're offering in

4    this case are limited to the field of economics.

5    Is that correct?

6         A.   Well, I think I'm expressing opinions that

7    relate to understanding the law and how applied

8    economics might be applied to the law using

9    information on environmental conditions and

10   information on engineering possibilities to resolve

11   some of those conditions.  So -- but all of those

12   things fall within what an economist does in

13   interpreting those data and using those data.

14        Q.   So you may be looking at other disciplines

15   here, but it's all through the lens of economics.

16   Is that correct?

17        A.   Yeah.  Typically what I'm doing in all my

18   projects is looking at how has -- how have changes

19   in the environment, positive or negative, affected

20   people's behaviors, affected the valuation of

21   natural assets and private assets, affected

22   revenues to municipalities or other -- other

23   functions of things had happen due to a change in

24   the environment.

25        Q.   And as you mentioned earlier, you're not a

Page 25

```
 1   lawyer, are you?
 2        A.   No, I'm not.
 3        Q.   What percentage of your work is litigation
 4   consulting?
 5        A.   In terms of expert witnessing percent, or
 6   cases where I'm going to be an expert witness?  Is
 7   that what you mean?  Or --
 8        Q.   That would be a fair qualification.
 9        A.   I would say it's -- in terms of my
10   revenue, it's probably 10 percent.
11        Q.   And what's the balance of your revenue?
12        A.   Well, within industrial economics, we work
13   on a whole range of public policy projects and
14   damage assessment cases involving federal claims
15   against private parties or private-party claims
16   against the federal government, et cetera.  So
17   there's a whole lot of things that we're involved
18   in.
19        Q.   But that work that you do for governmental
20   entities against private parties, that's litigation
21   as well, isn't it?
22        A.   Often -- I guess what I'm distinguishing
23   is almost all of my work is on projects that are
24   either in settlement negotiations with no intention
25   of going to litigation or they're in some kind of
```

1    cooperative assessments or they're providing

2    support more broadly to programmatic issues, so not

3    headed for litigation.

4        Q.   So when I say "litigation consulting," I

5    mean any area where you're providing an opinion

6    relevant to a dispute between two parties,

7    regardless of whether it ultimately ends up in

8    court, arbitration, mediation, settlement.

9             With that understanding, how much of your

10   work is litigation consulting?

11       A.   So where the work we do might contribute

12   at some point to a claim by one party against

13   another?

14       Q.   Yes.

15       A.   It's probably half.

16       Q.   Half.  And the balance --

17       A.   And I'd have to distinguish my personal

18   work from the work at the rest of my firm, which it

19   would be less than that for the rest of the firm.

20       Q.   Okay.  So for you specifically, it would

21   be half of your work is litigation consulting?

22       A.   Something like that.  Would be related to

23   claims that individuals have against other

24   individuals.

25       Q.   Or entities have against individuals or

```
 1   other entities?
 2       A.   Yes.
 3       Q.   And what's -- the balance of your work
 4   would be public policy.  Is that correct?
 5       A.   I think that's -- public policy or
 6   economic research.
 7       Q.   What percentage of the litigation
 8   consulting work that you do is for the government
 9   as opposed to private parties?
10       A.   It's probably 80 percent government, 20
11   percent private.  It also depends -- in some cases,
12   we're retained by private law firms, for example,
13   to work with Indian nations.  So the ultimate
14   client would be a government of sorts, of the
15   Indian nation.  So I'd have to guess, but it's
16   probably 80/20.
17       Q.   What portion of your litigation work
18   involves habitability assessments?
19       A.   I'm not sure what that means.
20       Q.   Have you performed a habitability
21   assessment before?
22       A.   Never heard of it.
23       Q.   What portion of your litigation work
24   involves evaluating groundwater damages?
25       A.   So of the piece that might involve
```

1  litigation, groundwater is probably a quarter.

2  That would -- that would imply that 20 percent of

3  my work is on groundwater.  It's probably less than

4  that, actually.  But my own personal work.  Not the

5  firm's work, but my own personal work.

6      Q.   Okay.  I know you're the economist, not

7  me, and your math might be better than mine.  But I

8  understood that 50 percent of your work is

9  litigation-focused, and if a quarter of that is

10  groundwater, then would that be 12.5 percent that

11  you do?

12      A.   Oh, I thought we were still talking about

13  the government side.

14           Of overall work I do, how much is on

15  groundwater damages?

16      Q.   Yes.

17      A.   It's -- yeah, it's probably 10 or 15

18  percent.

19      Q.   Okay.  And within that work on groundwater

20  damages, how much is for the government as opposed

21  to private parties?

22      A.   It's probably more of government-funded

23  than private party-funded.

24      Q.   How much is government?

25      A.   I don't know.  I'd have to -- I'd have to

Page 29

```
 1   go back and do the math.
 2       Q.   Can you count on one hand the number you
 3   of times you've done groundwater assessments for
 4   private parties?
 5       A.   For private parties?
 6       Q.   Where the ultimate client was a private
 7   party.
 8       A.   A private entity --
 9       Q.   Yeah.
10       A.   -- not a governmental agency?
11       Q.   Yeah.
12       A.   I would think probably that's right, yeah.
13       Q.   And how many of your fingers on that one
14   hand do you need to count those assessments?
15       A.   I'd have to go back.  I think it's five or
16   7.
17       Q.   Okay.
18       A.   I'd have to have an extra digit, possibly,
19   on one hand.
20       Q.   Maybe a second hand?
21       A.   Yeah.
22       Q.   Can you tell me how evaluating groundwater
23   damages for the government is different than doing
24   so for a private party?
25       A.   It actually isn't -- from an economic
```

1   perspective, the fundamentals aren't all that

2   different, where, as economists, we're always

3   looking at changes in behavior or distribution of

4   assets.

5          So, you know, for example, in this case,

6   it's not really all that different.  The techniques

7   are very similar.  There may be some categories of

8   damage which would accrue to a private party that

9   are -- would be atypical of a governmental party

10  and vice versa.  But it's usually not all that

11  different.

12     Q.   Would it be correct to say, though, that

13  you have to evaluate groundwater damages specific

14  to the rights of the party whose damages you're

15  evaluating?

16     A.   I mean, as an economist, what we do is

17  assess damages, and those would -- that may have to

18  do with individual rights.  Again, as I mentioned,

19  a private party may have rights the federal

20  government doesn't have, for example.  But we're

21  looking at damages, and then typically it's the law

22  that's deciding what's recoverable for an

23  individual.

24     Q.   But when you're looking at damages, you

25  need to make sure that you're looking at the

Page 31

1    damages of the person you're evaluating and not the

2    damages of someone else.  Is that correct?

3           MS. JOSELSON:  Object to the form.

4      A.   I think if someone were asking us to

5    assess damages, they probably wouldn't want to

6    spend a lot of effort on something they can't

7    recover damages for.  But that would be a legal

8    decision.

9      Q.   Have you ever done a groundwater

10   assessment on behalf of a putative class prior to

11   this case?

12     A.   The -- yeah, I -- well, I'd have to go

13   back and look.  I have worked on claims that have

14   involved what amount to class actions.  I don't

15   know if they were actually entered as classes or

16   not.

17     Q.   What cases would those be?

18     A.   I mean, some examples would be the

19   Lockformer case in Chicago where I worked with Dr.

20   Kopp on that assessment.  There was a case in

21   Florida involving contamination of groundwater,

22   contamination of soils in a neighborhood.  I worked

23   on a project in -- east of St. Louis in Illinois

24   that involved groundwater damages.

25           MR. WILSON:  I'd like to mark this as

1    Exhibit 5.

2           (Unsworth Exhibit 5 marked for

3           identification.)

4    BY MR. WILSON:

5       Q.   Can you tell me what this is,

6    Mr. Unsworth?

7       A.   It appears to be Dr. Kopp's expert report

8    from LeClercq versus Lockformer, which was a claim

9    for damages associated with groundwater

10   contamination in Naperville, Illinois, which is a

11   bedroom community of Chicago, which we worked on.

12      Q.   And your name is also listed on this

13   report.  Is that correct?

14      A.   That's right.

15      Q.   And you cited this report from the

16   LeClercq v. Lockformer case in your reports in this

17   case.  Is that correct?

18      A.   I know I included it as a reference.  I

19   don't remember where we cited it.  I'd have to

20   look.  But I did include it as a reference for

21   sure.

22      Q.   Can you tell me why you relied on this

23   report in forming your opinions in this case?

24           MS. JOSELSON:  Object to the form.

25      A.   So I provided this report -- this case

1    involved some similar economic issues, and also

2    forms a nice basis for considering the added costs

3    associated with folks having to switch to municipal

4    water and pay a water bill.

5        Q.   And can you describe to me exactly what

6    your role was in preparing this report in the

7    LeClercq case?

8        A.   Sure.  At that time I was principal of my

9    firm, and Jennifer Renshaw -- who is now Jennifer

10   Baxter -- and Robert Patterson, who are both now

11   partners in the firm, were the staff working with

12   me and we were providing technical support to Dr.

13   Kopp.

14       Q.   What do you mean by "technical support"?

15       A.   We were gathering data at his direction

16   and doing calculations at his direction.

17       Q.   So how was his role in preparing this

18   report distinct from your role?

19       A.   He was the expert witness, so he was

20   the -- in this particular report, he was the expert

21   witness.  He was the guy who got deposed.

22            I work a lot with Ray, so in some cases I

23   file joint reports with him.  In some cases he's

24   the expert; in some cases I'm the expert.

25       Q.   Did you refer to this report in the course

Page 34

1    of developing your opinions in this case because
2    it's the only other case where you've provided a
3    damages assessment of groundwater on behalf of a
4    putative class?
5           MS. JOSELSON:  Object to the form.
6        A.   No.
7        Q.   You also mentioned a case in Florida.  Can
8    you tell me who the parties were in that case in
9    Florida?
10       A.   The -- I'm forgetting the name of the
11   town.  It's in northern Florida, just east of
12   Tampa.  The parties were a neighborhood near a
13   pesticide and fertilizer grinding facility.  So, as
14   I understand it, sometimes pesticides and
15   fertilizer is delivered in sort of block form and
16   it's mixed at a facility.  That facility was doing
17   that mixing, and because of fugitive emissions and
18   because of overland runoff, the neighborhood had
19   very high levels of nitrate in their water.  And so
20   we were looking at the effect on salability of
21   homes and property values associated with the
22   presence of nitrate.
23       Q.   Did you provide an opinion in that case
24   about how property values were affected?
25       A.   I did.

```
 1        Q.    On behalf of the putative class?
 2        A.    I don't remember if it was a class or not.
 3   It was a neighborhood of, you know, similar homes,
 4   and the methodology I used was conducted on a
 5   neighborhood basis, so, you know, what you might
 6   call a class basis.  But I don't remember if it was
 7   a class action.
 8        Q.    Do you recall the name of the defendant in
 9   that case?
10        A.    I don't.
11        Q.    Do you recall any of the named plaintiffs?
12        A.    I don't.
13        Q.    Is it perhaps listed on your expert
14   report?
15        A.    It would take me a while to go through
16   this.  It may be in here.
17        Q.    We can come back to that if there's an
18   opportunity at a break and if we're able to
19   identify it.
20        A.    That's fine.  Yeah.
21        Q.    We'll all be the first to know.
22        A.    And I provided an opinion in that matter,
23   and I believe I also provided an expert affidavit
24   on the settlement to the court on the
25   reasonableness of the settlement.
```

1      Q.   Now, you mentioned in your report that

2   you've been retained by both plaintiffs and

3   defendants as an expert witness.

4           Can you give some examples of defendants

5   for whom you've previously provided an expert

6   opinion?

7      A.   Yeah.  I just -- I represented as an

8   expert Nicaragua in a claim brought by Costa Rica

9   in the world court.  It was just -- a trial that

10  was just heard.  They were the defendant.

11  Nicaragua was the accused party.

12          I've represented the Navy, the Air Force,

13  and Department of Defense as defendants in claims

14  for environmental damages, which they were

15  responsible for.  There may be other -- there may

16  be other instances where I've represented

17  defendants in some matters.

18     Q.   Have you ever represented a private

19  corporation?

20     A.   Not in a damage claim, no.  We do do work

21  with private corporations.  I do work on, for

22  example, on Clean Water Act 316(b) analyses for

23  power companies.  So we do do work for private

24  entities.

25     Q.   Approximately when were you first retained

Page 37

1   by plaintiffs' counsel in this case?

2       A.   It would have been spring of last year.

3       Q.   Would you agree that an economic analysis

4   of environmental damages must be conducted relative

5   to the property rights of the plaintiff, that is,

6   the person whose damages you're analyzing?

7           MS. JOSELSON:  Object to the form.

8       A.   So, again, you could have economic losses

9   that are true for which a person may not have

10  property rights.  So the person may not -- may not

11  be able to recover those damages.

12          You also -- at times, for example, we are

13  able to assess damages and recover damages, for

14  example, for Indian nations because they have

15  unique rights that go along with their treaties or

16  something that, in effect, provide a property

17  right.  So it can matter.  The damages themselves

18  occur no matter what.  The question is whether

19  courts would let people get relief for them.

20      Q.   When you talk about loss, you have to talk

21  about whose loss it is.  Right?

22      A.   Well, we typically talk about the loss,

23  and then it typically accrues to a human, if that's

24  what you mean.  So that's typically what we're

25  dealing with:  a human or to a company or to a

1   governmental entity.

2        Q.   And so you have to look at the losses that

3   are specific to the person whose damages you're

4   evaluating.  Is that correct?

5             MS. JOSELSON:  Object to the form.

6        A.   Again, it's not -- I don't have to.  There

7   may not be a great deal of purpose in looking at

8   damages if it's not something that the party can

9   recover.  A great example of this is is if I'm

10  driving to work and two other parties have an

11  accident, and because of that -- I'm not touched at

12  all, I'm not bothered by it, but I'm late to work.

13  I accrue a real loss for being late to work, but I

14  can't recover damages for it.  But the damage is

15  real.

16       Q.   Do you pay attention to whether the

17  damages you tried to assess are legally recoverable

18  by the plaintiffs in this case?

19            MS. JOSELSON:  Object to the form.

20       A.   Yeah.  I'm not sure what you mean by "pay

21  attention."

22            It's -- I don't recall having

23  conversations about that, but that's not an unusual

24  conversation for me to have with clients, to ask as

25  we go into a case what sorts of remedies are

1     available in the law for their -- for the client

2     and how my analysis might assist in those --

3     improving those -- you know, supporting those

4     remedies if in fact we find a damage.

5          Q.   And so even as an economist, if you've

6     been retained to evaluate damages to Andy, you

7     can't say you're just going to look at losses to

8     Barry and someone else to determine Andy's losses.

9     Is that correct?

10         A.   No, that would be wrong.

11         Q.   So when you're working for governmental

12    entities, you have to evaluate damages with respect

13    to the public property and the natural resources

14    that are at issue in those cases.  Is that correct?

15         A.   No, that also wouldn't be correct.

16         Q.   Why not?

17         A.   You said public property.  So, for

18    example, under -- under federal law, government

19    entities can recover losses on behalf of the

20    public.  So those losses, in fact, may have accrued

21    to individuals -- my inability to go to a beach if

22    there's been an oil spill, for example.  But the

23    federal government is allowed to accrue those

24    losses and try to remedy them in some manner.

25         Q.   But those public rights are with reference

1    to property held by the government.  Is that
2    correct?
3         A.   No, that's not necessarily correct,
4    either.  It -- you know, an oil spill that affects
5    beaches, some of those beaches might be private
6    beaches, but the federal government still has
7    within federal law the right to recover the
8    damages.
9         Q.   But that's different from evaluating
10   damages for a private party because they have
11   different property rights.  Is that correct?
12        A.    Again, property rights can be important in
13   whether or not a remedy is available within the
14   law.  And it may be important for me to know
15   because the client may not want me to spend money
16   assessing losses that they're not going to be able
17   to recover.  But the damage models are -- can be
18   influenced by property rights but are not dependent
19   upon them.
20        Q.   And private parties are not like the
21   federal government, where the federal government,
22   you're telling me -- the federal government, you're
23   saying, can recover for damage to a private beach.
24   Private parties can't do the same thing, can they?
25             MS. JOSELSON:  Object to the form.

1       A.   That's a good question.  I mean, you know,

2    I'm not a lawyer, but within our field, for

3    example, private nonprofits can file suits against

4    parties if they feel that they need to act where

5    the government isn't acting.

6            And so, yeah, that's a good question.  I

7    mean, it could be complicated.

8       Q.   But those public-interest organizations

9    aren't plaintiffs in this case, are they?

10      A.   I'm not -- I'm not aware if there's any

11   public nonprofits or nonprofits involved as

12   plaintiffs in this case.

13      Q.   And in that earlier example of if you're

14   evaluating damages for Andy you don't look at

15   Barry's loss, Andy can't recover for Barry's loss,

16   can he?

17      A.   Well, those are two different questions.

18   So one is a question of how you model the losses,

19   and it's not at all unusual within economics to --

20   for example, we talked about hedonic models.  If

21   I'm looking at diminution in property prices, I'm

22   typically looking at transactions that have

23   occurred, but I am inferring from that losses to

24   parties who may not have sold their homes.  They

25   still own their homes.  And I would infer those

1    losses to those other parties.

2             Similarly, if I'm building a recreational

3    damages model, which we do a lot, I may infer

4    losses to the general public associated with loss

5    of opportunity to recreate.  And that would be

6    based on data I have for certain individuals who

7    represent the rest of the public.

8        Q.   So that's a question about the -- or an

9    issue about the availability of data that you seem

10   to be discussing there.  Is that fair?

11            MS. JOSELSON:  Object to the form.

12       A.   No.  It's not -- I mean, typically, we

13   don't -- in building the models, we don't need data

14   on every single individual.  We're building models

15   that reflect damages and reflect changes in

16   behavior or changes in cost to individuals and we

17   apply that to broader groups.

18       Q.   And I --

19       A.   We don't need a census of all of the

20   individuals.

21       Q.   That is what I'm asking, though, is that

22   you're using those techniques where you have

23   information on one person's loss to estimate

24   another person's loss.  But that wouldn't -- that

25   does not mean, however, that one person may recover

```
 1   for another person's loss.
 2          MS. JOSELSON:  Object to the form.
 3      Q.   Is that correct?
 4      A.   Yeah.  So that would be a different issue,
 5   and to me, that's a legal issue.  I don't know.  I
 6   don't know how that might work.
 7      Q.   Are you aware of any provision of the law
 8   that allows private persons to recover for a public
 9   entity's loss?
10      A.   I'm not a lawyer, and I wouldn't -- I
11   wouldn't want to speculate on that.
12      Q.   But you're not aware of any provision that
13   would allow that?
14          MS. JOSELSON:  Object to the form.
15      A.   Can you repeat the question?
16      Q.   You're not aware of any provision that
17   allows a private party to recover for a public
18   entity's loss?
19      A.   Not as I sit here, but I'm not sure.  I'd
20   have to know -- I'd have to know the context.  That
21   might work within economics.
22      Q.   Because you told me earlier you're aware
23   of provisions that you're saying allow a public
24   entity to recover for a private loss in the example
25   of the government recovering for private beaches.
```

1          But you're not aware of something going

2     the other way, are you?

3          A.   Well, as I said, I mean, you know, groups

4     like Conservation Law Foundation will take actions

5     if they believe the government is not doing so and

6     may in fact recover -- it might be a private entity

7     recovering for the public's loss.  So . . .

8          Q.   Don't those private entities, Conservation

9     Law Foundation, for example, aren't they typically

10    seeking injunctive relief rather than monetary

11    damages?

12         A.   Depends.

13         Q.   Are you aware of cases where Conservation

14    Law Foundation has been permitted to recover

15    monetary damages for public loss?

16         A.   I'm not aware of any specific cases, but I

17    am aware of instances where sort of public advocacy

18    groups have sought damages.  I'm not sure where

19    that falls within injunctive relief, but -- again,

20    I'd have to think about that.  I'm not sure that's

21    true.

22         Q.   Are you aware of any cases where a private

23    individual, not a public-interest organization, is

24    empowered to recover for loss to a public entity?

25              MS. JOSELSON:  Objection.

1    A.   I'm not aware of any examples right now.

2  But, again, I'm not an attorney, so there may be

3  areas within the law where you're allowed to do

4  that.

5    Q.   Would you also agree that an economic

6  damages analysis requires you to evaluate the

7  but-for world that would have existed in the

8  absence of the conduct that's at issue?

9         MS. JOSELSON:  Object to the form.

10   A.   So the but-for model is a -- is a standard

11  model.  You asked the question what the world would

12  look like had the event in question had not

13  occurred, and you try to assess what the world

14  would look like but for that event.  So that's a

15  pretty standard model.  There are other frameworks,

16  but that's the standard framework.  And that is the

17  framework I used here.  So . . .

18   Q.   So using that but-for model on events

19  relative to damages if it occurred in the actual

20  world but would not have occurred in the but-for

21  world.

22        MS. JOSELSON:  Object to the form.

23   Q.   Is that correct?

24   A.   I'm not sure I followed that.

25   Q.   Okay.  So something might be potentially

Page 46

1    relevant to damages if it did occur in the actual

2    world, but it would not have occurred in the

3    but-for world.  Is that correct?

4         A.   Again, that's not the way I would say it.

5    What you're typically asking the question is you

6    have -- something has happened and that's the --

7    that's the world with the event.  And you're

8    comparing it to the but-for condition, which is but

9    for that event, what would the world look like?

10        Q.   But if there is a particular consequence

11   that you're trying to quantify and measure, and

12   that consequence did occur in the actual world but

13   would not have occurred in the but-for world, then

14   that may be relevant to damages.  Is that correct?

15             MS. JOSELSON:  Object to the form.

16        A.   If that -- if that consequence is the

17   thing you're trying to measure, yes.  Again, I'm

18   not quite sure I would say it that way, but . . .

19        Q.   Now, if an event occurred in the actual

20   world -- or let's call it a consequence.

21             If a consequence occurred in the actual

22   world but it would have also occurred in the

23   but-for world, then it's not relevant to damages,

24   is it?

25             MS. JOSELSON:  Object to the form.

1      A.    I would say that's not true, no.

2      Q.    So if the sun rises in the east in the

3   actual world and it also rises in the east in the

4   but-for world, that wouldn't be relevant to

5   damages, would it?

6      A.    Oh.  You had -- I thought what you had

7   said is that if something else changed in those two

8   time periods, or during those -- from those two

9   scenarios.

10     Q.    If the two worlds are the same, then

11  there's not a damages issue?

12     A.    Then the but-for is only -- would only be

13  the consequence that you're trying to measure the

14  effects of.

15     Q.    Okay.  And would you agree that once we've

16  described the difference between the actual world

17  and the but-for world, the next task is to

18  determine how to quantify that difference?

19          MS. JOSELSON:  Object to the form.

20     A.    Broadly speaking, and when you say

21  quantify, that could include literally a

22  quantification of something or it could include a

23  monetization of something.

24     Q.    And in doing so, it wouldn't be

25  permissible to speculate, would it?

Page 48

1      A.   We don't typically speculate, no.

2      Q.   Not typically?  Sometimes?

3      A.   If I am talking to my daughter or

4  something, I might speculate.  Typically in

5  business, I do not speculate.  So . . .

6      Q.   Okay.  You have to be able to decide a

7  basis for our quantification of the difference

8  between the actual world and the but-for world.  Is

9  that correct?

10     A.   Yeah.  You'd usually want to be able to

11 support the notion that there has been a change

12 associated with the thing that you're trying to

13 measure the consequences of, or the event you're

14 trying to measure the consequences of.

15     Q.   And as you're trying to quantify that

16 difference, it's appropriate to consider all

17 available data.  Is that correct?

18     A.   I wouldn't say that.  That's too broad.

19 We may not need all data.  We would need data that

20 are relevant to the thing you're trying to measure.

21     Q.   Yes.  Relative to the thing that you're

22 trying to measure.  It's appropriate to consider

23 all data relative to the thing you're trying to

24 measure?

25     A.   I think it's appropriate to consider

Page 49

1    sufficient information to get at the thing you're

2    trying to measure.  Again, we don't always need a

3    census of information.

4        Q.   And if someone is able to provide you with

5    more information that allows you to determine

6    damages on a more precise basis, that's

7    appropriate.  Is that correct?

8            MS. JOSELSON:  Object to the form.

9        A.   It may be or it may not be necessary.  For

10   example, we -- as I mentioned, we build economic

11   models all the time, and I can always go gather

12   more data.  It may make the estimates more

13   statistically precise, but it may not be useful or

14   purposeful to spend the time doing that.

15       Q.   But if someone provides you with that

16   information and it does make the model more

17   precise, it's appropriate to consider that

18   information.  Is that correct?

19       A.   Again, I wouldn't say that's necessarily

20   true.  We've actually done research on how

21   additional information improves precision and, you

22   know, is it worth it to gather that additional

23   information; is it worth it to consider it?

24            So I think that you do reach a point at

25   which you do have enough information to have an

1    opinion to draw an inference, and having more

2    information may not be necessary.

3        Q.   But let's say someone walks into your

4    office and says, "Hey, Mr. Unsworth, I've got this

5    additional information about this project I've

6    collected myself.  I've gone through the work to do

7    it.  I think it makes your estimate more precise."

8            It's appropriate for you to consider that

9    information.  Right?

10           MS. JOSELSON:  Object to the form.

11       A.   Again, I may not need that precision.

12   Precision is -- describes how statistically

13   confident we are in the result or how confident

14   I am.  If that information just makes me more

15   confident, depending on the level of effort

16   required to look at it or to include it, it would

17   depend.  It would depend.

18           We go through this a lot in my field.  So

19   the question is when is it useful to get more

20   information and when is it -- when is it not useful

21   to do that.

22       Q.   Let's say you're estimating the total bill

23   to your client or total cost to your client of

24   something, and someone provides you with additional

25   information that shows that, under a more precise

1  model, the cost is actually significantly lower

2  than you estimated.

3          Is it appropriate for you to consider that

4  information?

5      A.   So I guess the confusion here is that's

6  not what in statistics you refer to as precision.

7  Precision is how closely and how -- with what

8  statistical confidence you have in, or -- or other

9  confidence you have in the result.

10          So if I've estimated that a party has lost

11  $7, plus or minus a dollar, precision would mean

12  I -- okay, now I know it's $7 plus or minus 50

13  cents.  So that that's different than someone

14  coming to me and saying, "Hey, it turns out the

15  number's 14."  That's an accuracy problem.

16      Q.   Okay.  Okay.  That's really helpful.

17          So if someone comes in and shows not just

18  additional information that makes your model more

19  precise but makes it more accurate, then that's

20  something that you really should consider.  Is that

21  correct?

22      A.   Yeah, possibly.  Again, it has -- it would

23  have to do with magnitude and what the level of

24  effort required to incorporate that information.

25  But I say that in both of my reports that if

Page 52

```
 1     information came in that I thought was relevant, I
 2     would consider it.
 3         Q.   So when you're calculating economic costs,
 4     you have to properly account for the timing of cash
 5     flows.  Is that correct?
 6         A.   You're mixing accounting and economics
 7     there, so you'll have to unpack that.
 8         Q.   Okay.  When you're calculating economic
 9     costs, you need to use an appropriate discount rate
10     or interest rate.  Is that correct?
11         A.   It's -- sometimes when we're looking at
12     economic damages, they occur over a certain time
13     period, and we may account for those losses either
14     by compounding or discounting to reflect the
15     presence of time in the analysis.
16         Q.   And you have to consider the possibility
17     of contingent and future events when you're
18     evaluating economic damages, don't you?
19              MS. JOSELSON:  Objection.
20         A.   Again, I'm not sure what that means.  You
21     have to give me more than that.  Contingent in what
22     sense?
23         Q.   If there's the possibility of future
24     events that may affect an estimate of damages going
25     into the future, those future events need to be
```

1 considered in your analysis.  Is that correct?

2          MS. JOSELSON:  Object to the form.

3     A.   We may want to consider them.  They may be

4 irrelevant to the analysis, but in some cases we

5 may want to consider them.

6     Q.   And when you're calculating economic

7 damages, you shouldn't be treating periodic

8 expenditures that are incurred infrequently in the

9 same way that you would treat regular annual

10 expenses.  Is that correct?

11          MS. JOSELSON:  Object to the form.

12     A.   Well, typically if they're periodic, like

13 if they were quarterly versus annual, you would

14 incorporate that in the analysis.  So that that

15 would depend on how you did the calculation.

16     Q.   I'm sorry.  "Periodic" was the wrong word.

17 Maybe "extraordinary" would be a better word.

18 Something that occurs infrequently and is out of

19 the ordinary course, that should be treated

20 differently than a regularly recurring expense.  Is

21 that correct?

22          MS. JOSELSON:  Object to the form.

23     A.   I think within that hypothetical, I think

24 what you're saying is correct.  I'm not -- you'd

25 have to give me more information.

1    Q.   Under what circumstances would you not

2   consider contingent events in evaluating future

3   damages?

4    A.   So define for me what a contingent event

5   is.

6    Q.   A contingent event that may or may not

7   happen, that may affect the damages in the future.

8    A.   Can you read the question again?

9    Q.   Under what circumstances -- you mentioned

10   that sometimes it would be appropriate to consider

11   contingent events and sometimes it wouldn't.

12        Under what circumstances would it not be

13   appropriate to consider a contingent event that may

14   affect damages in the future?

15        MS. JOSELSON:   Object to the form.

16    A.   I think I actually didn't say that.   What

17   I said was there may be events that could occur in

18   the future that are irrelevant to my damages.   If I

19   thought that they could affect the damages, I might

20   want to consider them.

21    Q.   Might want to or would want to?

22    A.   Might want to.   Again, it would depend on

23   the magnitude of the effect.   It would depend on

24   how confident I was in those things happening.

25   It's . . .

1        Q.   So we're talking about annual expenses

2   versus extraordinary expenses -- is an example of

3   an extraordinary expense, would that be something

4   that is maybe a $1,000 expense but it only occurs

5   once every 12 years?  Would that be something that

6   needs to be treated differently than an annual

7   expense?

8        A.   Well, within that hypothetical, if I had a

9   series of expenses that were annual and then one of

10   the items occurs every N years, I may need to treat

11   it differently.  I may need to capitalize it, for

12   example, or include it within the calculations

13   every Nth year.  So -- but that's, you know, a

14   pretty hypothetical, broad statement.  So . . .

15        Q.   Now, you state in your merits report, and

16   you're citing Dr. Siegel's report and the MSK

17   Engineering report, that it is expected that the

18   PFOA will persist for an indefinite period of time.

19   Is that correct?

20        A.   Those are some of the statements made in

21   Dr. Siegel's report.  It's not -- my analysis isn't

22   dependent on that statement, but that is a

23   statement that comes out of the Siegel report.

24        Q.   So if the presence of PFOA did not

25   continue indefinitely, would that affect your

1    opinion on damages?

2        A.    In this case it wouldn't, no.

3        Q.    Why not?

4        A.    The remedy that the state has imposed at

5    the site involves folks closing their wells and

6    sealing them, so sealing it effectively destroys

7    the well.  There's also an indication from what the

8    state has said that once the wells are closed,

9    they're going to declare the area within the -- I

10   forget what they call the area -- it's like the

11   area of concern or something like that, the box --

12   that they're going to declare that to be Class IV,

13   which means the groundwater can't be used for

14   residential purposes or related residential

15   purposes.

16            So once that happens, it would -- it would

17   be my expectation that folks won't be going back to

18   their wells; that they're going to continue with

19   municipal water; that, you know, for example, if

20   the concentrations fall low enough, you know, 30

21   years from now or 40 years from now, that they

22   wouldn't go back to their wells.

23            So I'm not dependent on Siegel for that

24   determination.  That's driven by the new

25   classification and by the fact -- people's actions

1   which are committing them to municipal water.  And

2   I also calculate -- you know, there's a footnote

3   that shows a calculation for 30 years, so I'm also

4   demonstrating what the losses would be if it isn't

5   indefinite.

6       Q.   Now, you mentioned also, though, in your

7   report -- it's in your merits report at page 9 if

8   you want to look at it -- you describe that

9   Saint-Gobain will bear the cost of maintaining and

10  operating POETs for those residences on the western

11  side of the contamination zone that cannot be added

12  to the municipal systems.

13          And then in a footnote, you say, "At some

14  point these residences may become responsible for

15  the costs of operating the POET systems if

16  Saint-Gobain has demonstrated a stable or

17  decreasing trend of PFOA levels for eight

18  consecutive rounds of quarterly sampling."

19          Did I read that correctly?

20      A.   You did.

21      Q.   So if PFOA did not continue indefinitely,

22  would it be relevant to those individuals' -- the

23  damages that you calculate?

24      A.   It may be.  I'm also aware that there is

25  an attempt -- since it's not desirable to have

1   people on POETs, there's also an ongoing attempt to

2   either get those folks deeper wells or get them

3   hooked up to the municipal system.  But as of now,

4   as of when I wrote the report, there were, as I

5   understood it, 12 residents that were stuck in that

6   situation with that uncertainty.

7       Q.   Would that be a good -- a good example of

8   contingent events in the future that may affect

9   your damages opinion?

10          MS. JOSELSON:  Object to the form.

11      A.   So it does affect my opinion, and that's

12  why I have the footnote.  I note that there's that

13  uncertainty.  I make the calculation based on them

14  being in a condition that effectively has them

15  bearing the same loss as people who have been moved

16  to municipal system, because I believe that they're

17  sort of -- as worse off as those folks are.

18      Q.   We'll talk about that a little bit later.

19          But we would know -- need to know -- to

20  determine the damages for these individuals, these

21  12 individuals, we'd need to know more specific

22  facts, what remedy is ultimately going to be

23  created for them, whether Saint-Gobain is going to

24  bear the costs, what those costs are of the POETs.

25  Is that correct?

1           MS. JOSELSON:  Object to the form.

2      A.   So, to unpack that, would I -- would I

3  love to be able to see the future perfectly?  Sure.

4  I can't, so I'm taking the information we have

5  today when we have to assess damages.  So we don't

6  need to see the future perfectly.  We just need to

7  use the best information we have available now.

8           And in addition, you said that it would be

9  whether Saint-Gobain bears it.  It actually doesn't

10  matter to my model who bears the cost.  It's still

11  a cost.  It may matter to my client who is

12  recovering the damages, but from a damages

13  perspective, it doesn't matter.

14      Q.   But if you're comparing -- if you're

15  comparing costs -- let me rephrase that.

16           You didn't attempt, though, in determining

17  damages for those individuals to determine what the

18  costs of operating the POETs would be into the

19  future, did you?

20           MS. JOSELSON:  Object to the form.

21      A.   No.  What I do is I assign them a loss

22  associated with that.

23      Q.   And so I understand your model on a big

24  perspective, as your model says for the people on

25  municipal water, it says -- it compares the water

1    rates that they pay to the cost that they would

2    have in maintaining a well, and assigns them the

3    difference that you determine between the costs of

4    the water usage and the costs of operating a well.

5    Is that correct?

6         A.   Yes.  Just to correct, you say people on

7    municipal water.  There are obviously people in the

8    community who are on municipal water currently who

9    don't have wells.  So what you're describing is

10   what the impact is associated with the individuals

11   who will now be on the municipal system who were

12   previously on wells.

13        Q.   So -- and the whole measure of damages is

14   the difference between the costs of municipal water

15   and the costs of a well.  Is that correct?

16             MS. JOSELSON:  Object to the form.

17        A.   For that particular component of damage

18   that I estimate.  So there's three components.

19   That's one.

20        Q.   And so then you say that for the people

21   who are staying on the wells, that they have the

22   same damages as the people who switched?

23        A.   So what I -- so what I -- I have to

24   estimate the impact to those individuals.  There

25   aren't very many of them.  There's 12 of them, as I

1    understand it.

2         So what I say is -- in the report is that

3    I'm going to address their losses by assigning them

4    the higher of the estimates of the per-residence

5    losses for people going to municipal water, because

6    one solution is that they, in fact, would

7    ultimately be placed on municipal water, and that

8    they would -- given that their wells are

9    contaminated -- would prefer that.

10        Q.   So there's a lot to unpack there.  Because

11   doesn't your opinion also assume that people prefer

12   to be on wells rather than on municipal water?

13        A.   As I said in my report, given that very

14   few individuals in this community who were on wells

15   asked to be added to municipal water, as an

16   economist, that's a revealed preference that I

17   think is clear.  And, of course, that's given the

18   absence of contamination.  Their opinions would

19   have changed when the contamination occurred.

20        Q.   But for the people that are staying on

21   POETs, you're assuming that those people, those 12,

22   they want to be on municipal water?

23        A.   I'm -- I'm estimating that I -- it's my

24   opinion that their losses would be at least that of

25   the people who are going on municipal water.

1    Q.   And you didn't attempt to evaluate other

2   possible contingent events in the future for those

3   individuals, did you?

4    A.   Well, as I said here, we did consider that

5   at some point they may be able to use their water,

6   although they have to keep testing it, and I'm also

7   aware that they may provide them with deeper wells.

8   But those are uncertainties.  So . . .

9    Q.   And you didn't attempt to quantify either

10  the likelihood of those uncertainties or the amount

11  of those costs if they were incurred, did you?

12   A.   Didn't have the information to do it.  If

13  you --

14   Q.   Did you get the information?

15   A.   If you told me today that we know we're

16  going to provide a certain number of them with

17  deeper wells and that those wells would be

18  unaffected by the contamination, that then they

19  would no longer experience that loss.  But I didn't

20  know that at the time I wrote the report.

21   Q.   But you also don't know that those people

22  are going to be eventually connected to municipal

23  water, do you?

24   A.   No, but I do know that the state and the

25  municipality would have connected them had it been

1    feasible to.  They would have included them in the

2    same group of people being connected.  But for

3    physical reasons, they can't connect them.

4        Q.   So you know that it's not feasible to

5    connect them to municipal water, but you're

6    nevertheless assuming that they have -- that they

7    will be and that they have the losses equal to that

8    outcome?

9            MS. JOSELSON:  Object to the form.

10       A.   Of at least that magnitude, yes.

11       Q.   And how do you know that that's the low

12   value when you haven't attempted to quantify the

13   other contingent events?

14       A.   Because I don't have the information to

15   quantify the other contingent events and because

16   that would be the desirable condition right now.

17   That's the remedy that would be desirable.

18       Q.   But you know that it's not feasible?

19       A.   I think they're still considering it.

20       Q.   Did you attempt to quantify the costs of

21   drilling a deeper well or the costs of POET

22   maintenance going forward?

23       A.   As I understood it, based on the public

24   statements, the state or Saint-Gobain have

25   committed to paying those costs.  So that's not a

Page 64

1   loss to the individual.

2       Q.   But your report says that the individuals

3   may incur the costs later?

4       A.   If -- if that -- if that current agreement

5   was not upheld, yes.

6       Q.   And you told me it didn't matter to your

7   opinion who ultimately pays those costs.  Isn't

8   that correct?

9       A.   No.  No, not necessarily.  That's not what

10  I said.

11      Q.   I think you said it matters to your client

12  but it doesn't matter to your model?

13      A.   Sure.  But there's no reason for me to

14  estimate a damage that I know my client isn't --

15  doesn't think that they're going to have to recover

16  for.

17      Q.   And you didn't attempt to quantify the

18  costs of operating a POET, did you?

19      A.   No, I did not.

20      Q.   And you didn't attempt to quantify the

21  costs of drilling a deeper well, did you?

22      A.   No, not in this report.

23      Q.   But you nevertheless opine that the amount

24  of damages for switching to municipal water is the

25  low end of the value?

1       A.   Right.  Because if the individual isn't

2   going to pay for the POET, then that's not a

3   measure, appropriate measure of loss to that

4   individual.  They do have to bear that they're on a

5   POET, but they're not going to pay for the POET.

6            MS. JOSELSON:  I'll just say it's a little

7        after 10.  I'd like to take breaks every hour or

8        so and -- whenever you're ready.

9            MR. WILSON:  Let me take a quick look.  I

10       think now might be a good time, but let me

11       just -- I might have a couple more questions and

12       then we can take a break.

13           THE WITNESS:  Yeah.  If we could take a

14       water break, that would be great.  Then I'll

15       remember to detach.

16   BY MR. WILSON:

17       Q.   So your report states -- just a couple

18   more questions here -- that individuals may become

19   responsible for maintaining the costs of the POETs

20   if Saint-Gobain has demonstrated a stable or

21   decreasing trend of PFOA levels for eight

22   consecutive rounds of quarterly sampling.

23           So is it your understanding that PFOA is

24   not present at the same levels and concentrations

25   at every putative class member's property?

1          MS. JOSELSON:  Object to the form.

2     A.    Based on the information I've seen, it

3  appears that concentrations that were measured in

4  people's wells were not the same at every single

5  well.  So there are graphs that show varying

6  concentrations.

7     Q.    And since it is not, it may be that PFOA

8  is no longer detected in the groundwater at one

9  putative class member's property before it leaves

10 another putative class member's property.  Is that

11 correct?

12         MS. JOSELSON:  Object to the form.

13    A.    I'm not sure what you mean by "leaves."

14 You mean physically moves in the environment or --

15    Q.    Yes.  That it may be that one property

16 gets nondetect readings for eight consecutive

17 rounds of quarterly sampling and yet it's still

18 detectible in another class member's property.

19         MS. JOSELSON:  Object to the form.

20    Q.    Is that correct?

21    A.    I think that's a hypothetical, but I can

22 imagine that could happen, yes.

23    Q.    And if that's the case, those two people

24 would be responsible for resuming POET costs at

25 different times.  Is that correct?

Page 67

```
 1      A.   They could be.  I mean, it depends on,
 2   again, what their -- what the ultimate remedy for
 3   these 12 properties are.
 4      Q.   And they'd be entitled to different
 5   periods of damage based on those different testing
 6   results.  Is that correct?
 7      A.   It depends.  It depends on the -- on what
 8   happens after that.  It depends on whether they've
 9   already been switched to municipal water or a
10   deeper well.  So it would -- it would depend.
11           But based on the best available
12   information I have right now and when I wrote the
13   report, we don't know what's going to happen with
14   these 12 people.
15           MR. WILSON:  Okay.  We can take a break
16      now.
17           THE VIDEOGRAPHER:  The time is
18      approximately 10:07 and this is the end of Media
19      No. 1.
20           (Recess taken from 10:07 to 10:16 a.m.)
21           THE VIDEOGRAPHER:  We are back on the
22      record.  The time is approximately 10:16 a.m.
23      and this is the start of Media No. 2.
24           Counsel, you may proceed.
25   BY MR. WILSON:
```

 1      Q.   So Mr. Unsworth, you began your opinion at

 2  page 1 of your merits report by noting that 10 VSA

 3  Section 1410(c) describes a cause of action for

 4  unreasonable harm caused to Vermont's groundwater.

 5  Is that correct?

 6      A.   That's the beginning of that bullet point,

 7  yes.

 8      Q.   Is it fair to say that your opinion is

 9  evaluating and attempting to quantify the

10  unreasonable harm that plaintiffs alleged to their

11  groundwater?

12      A.   The damages I estimate are associated with

13  changes in behavior and changes in expenses, and a

14  measure of replacement cost.

15           Whether the definition of unreasonable

16  harm goes beyond that would be a legal question.

17  It's not something I'm addressing.

18      Q.   Did you attempt to consider any of the

19  facts relevant to whether there's been unreasonable

20  harm in this case?

21      A.   I would leave that to the court.

22      Q.   Did plaintiffs' counsel ask you to

23  evaluate those factors?

24      A.   As to whether this -- the presence of

25  contaminants in groundwater in Bennington is

1    unreasonable harm?

2        Q.   Yes.

3        A.   No.

4             MR. WILSON:  Let's mark this as Unsworth

5        6.

6             (Unsworth Exhibit 6 marked for

7             identification.)

8    BY MR. WILSON:

9        Q.   The court reporter has just handed you

10   what's been marked as Unsworth 6, and I'm going to

11   represent to you that this was produced to us as

12   one of the materials that you relied on in

13   connection with forming your opinion.

14            Do you recognize this?

15       A.   I do.

16       Q.   And can you tell me what this is?

17       A.   It's a -- it's a printout of the

18   statute -- the section of the statute that deals

19   with groundwater protection.

20       Q.   So you considered this statute, but you

21   didn't consider whether there had been unreasonable

22   harm in this case?

23            MS. JOSELSON:  Object to the form.

24       A.   I considered this statute, and then I

25   think there may be other documents that I relied

1    upon that cited that -- to give me context.  But

2    it's not -- my damages aren't dependent on a

3    particular definition of unreasonable harm.

4         Q.   So under section E of this statute, it

5    says, "Factors in determining reasonableness.

6    Factors to be considered into determining the

7    unreasonableness of any harm referred to in

8    subsection C above shall include but need not be

9    limited to the following:

10   1.  The purpose of the respective uses or

11   activities affected."

12             Did I read that correctly?

13        A.   You did.

14        Q.   And the purpose of the respective uses or

15   activities affected, that would depend on how each

16   putative class member uses their water.  Is that

17   correct?

18             MS. JOSELSON:  Object to the form.

19        A.   I don't -- no, I don't believe that would

20   affect my damages model, whether they use it, for

21   example, to water their lawn versus bathe a child

22   versus drink it.  I'm looking at the cost increase

23   of having water.  So . . .

24        Q.   It wouldn't affect your model, but it

25   would affect unreasonable harm.  Is that correct?

1          MS. JOSELSON:  Object to the form.

2     A.   I've already said that I'm not going to

3   testify as to what is unreasonable harm.  That's a

4   legal question.

5     Q.   And since you're not testifying to that,

6   you don't know whether any of the damages that

7   you've modeled would actually be compensable by

8   the -- for or to the class members.  Is that

9   correct?

10         MS. JOSELSON:  Object to the form.

11    Q.   Excuse me.  Putative class members.

12    A.   It's my opinion that these are real losses

13  and real measures of damage, and that these

14  measures of damage would make them partly whole for

15  their losses.  Whether there are legal limits to

16  their recovery of those would be a question for the

17  court.

18    Q.   But to know whether they are recoverable,

19  we'd have to consider whether the harm was

20  unreasonable.  Is that correct?

21         MS. JOSELSON:  Object to the form.

22    A.   Apparently, within the law, yes, that

23  would be required.  But, again, that wouldn't be my

24  role.

25    Q.   So even if your model doesn't consider the

1  purposes and respective uses of the activities,

2  determining unreasonable harm would require that.

3  Is that correct?

4          MS. JOSELSON:  Object to the form.

5      A.   I don't understand that question.

6      Q.   It was pretty impenetrable.  I'll give you

7  that.

8          So even if your damages model does not

9  consider these factors, determining whether they're

10  the damages that you have analyzed are legally

11  recoverable would require considering these

12  factors.  Is that correct?

13          MS. JOSELSON:  Object to the form.

14      A.   I think it's -- I think it's tautological.

15  You've presented a -- the statute, and the statute

16  apparently provides the conditions under which you

17  can get damages.  So, by definition, whether folks

18  can recover or not is dependent on the statutory

19  interpretation.  Whether my damages model is

20  correctly measuring the loss and whether it would

21  have to be adjusted to reflect some specific

22  conclusion of the law, that would be a different

23  issue.

24      Q.   And by "tautological," you mean yes.

25          MS. JOSELSON:  Object to the form.

1      Q.   Is that correct?

2      A.   I think you're asking me is the statute --

3   does the statute provide the legal remedy.

4           One approach to the legal remedy -- there

5   are other -- as I understand it, there were also

6   other causes of actions that were specified, so I

7   don't know whether those would come into play.

8      Q.   And section E of this statute states that

9   "The factors to be considered in determining the

10  unreasonableness of any harm shall include."

11          Is that mandatory language?

12     A.   I'm not a lawyer.

13     Q.   Would you expect that the purpose of the

14  respective uses or activities affected discussed in

15  Factor 1 is going to be specific to each putative

16  class member?

17          MS. JOSELSON:  Object to the form.

18     A.   You have to -- I'm not sure what you mean

19  by that.  I'm not sure what you mean by the

20  purposes.  The purpose of the way they used water

21  or the purpose of the recovery of damage or the --

22     Q.   The purposes of the respective uses or

23  activities affected with regard to groundwater.

24  Would you expect as an economist that that will be

25  different for each of the putative class members?

1      A.   So within my calculations for the -- for

2    the added cost component, I am providing a measure

3    of the increased cost to the resident of paying

4    municipal water versus operating a well.  Both

5    within the data that indicate that most residences

6    in Bennington are on a fixed quarterly bill and

7    where Bennington has implied in their materials

8    they provide to people as a fixed quarterly bill,

9    it doesn't matter to me how much or how -- or how

10   people use the water.  They're switching from one

11   source of water to another.

12          I'm not sure that's what you meant, but

13   that's --

14      Q.   It doesn't matter to you, but it does

15   matter to the law.  Is that correct?

16      A.   I'm not the law, so I don't know.

17      Q.   And as an economist evaluating these

18   damages, you do have to come up with reasonable

19   assumptions and projections about the heterogeneity

20   or the homogeneity of the group that you're

21   evaluating.  Is that correct?

22          MS. JOSELSON:  Object to the form.

23      A.   So I do consider differences, and that's

24   why there's several columns of calculations in my

25   analysis, because I do consider differences between

1   what I'm calling subclasses.

2       Q.   And although you did not consider the

3   differences in the respective uses or activities

4   affected with regard to groundwater in this case,

5   as an economist looking at this issue, would you

6   expect those uses and activities to vary among the

7   putative class members?

8           MS. JOSELSON:  Object to the form.

9       A.   I would expect that people do, in fact,

10  use water differently, household to household.  But

11  it doesn't -- the way I constructed my model,

12  I'm -- I'm incorporating that in the damages.

13      Q.   And although your model did not consider

14  in Factor 2 the economic, social, and environmental

15  value of the respective uses, including protection

16  of public health, you would expect that that would

17  also vary according to the different uses of the

18  water by the putative class members.  Is that

19  correct?

20          MS. JOSELSON:  Objection.

21      A.   So now you're wandering more into the

22  economics.  And the individuals who had wells were

23  able to use groundwater unimpeded, and they were

24  able to put that water to whatever economic,

25  social, or environmental purpose they chose.

Page 76

1    The -- and they -- and they were drinking water

2    that, absent the contamination, didn't represent a

3    public health threat from the position of the state

4    of Vermont.  Now that it's contaminated, it does

5    present a public health threat and that impedes

6    their ability to use that water, so it impedes

7    their ability to have a well.  They're going to be

8    provided a substitute which will protect their

9    health moving forward, which is great.  But I would

10   say that it had an economic, social, environmental,

11   and public health impact with the contamination.

12       Q.   So you're telling me that you did not

13   consider Factor 1 in this analysis but you did

14   consider Factor 2?

15            MS.  JOSELSON:   Object to the form.

16       A.   No.   It's purpose of respected uses or

17   activities affected.  The activity of the

18   groundwater is the withdrawal of it from the

19   ground.  So I did consider it.

20            What I said was I'm not going to legally

21   interpret the meaning of this -- of the statutory

22   language.  That would be for the court.  And I also

23   said that it -- I don't know whether the other

24   causes of actions would negate the need for the

25   statutory language.

1      Q.   So are you telling me that you believe

2   that the economic, social, environmental value of

3   the respective uses is identical for all of the

4   1,000 some class members you estimate?

5           MS. JOSELSON:   Object to the form.

6      A.   I think some individuals, for example,

7   might have had larger families, but because of the

8   nature of my calculations, that doesn't affect the

9   damages.

10     Q.   It may not affect damages under your

11   model, but do you believe that the economic,

12   social, and environmental value of the respective

13   uses is likely to vary among the putative class

14   members?

15          MS. JOSELSON:   Object to the form.

16     A.   I'd have to know how the court interprets

17   that language, and what I do know is everyone

18   outside of the 12 individuals we talked to is -- is

19   going to have to move to municipal water.   So

20   that's the same across the members.   They live in

21   different communities so they might have different

22   cost effects, and some people had different

23   equipment to treat their water than others did, and

24   that's incorporated in the model.   But I don't see

25   any factors here that would vary that would cause

Page 78

1   my damages to vary.

2        Q.   So it wouldn't cause your damages to vary,

3   but you would expect that those things, those

4   conditions would vary among the putative class.  Is

5   that correct?

6             MS. JOSELSON:  Object to the form.

7        A.   I don't know how these are defined within

8   the law, so I don't know if they vary.  I don't

9   know whether it's defined at an individual level or

10  what the definition of these -- whether the courts

11  have interpreted what this sentence means.

12       Q.   Well, you seemed comfortable applying the

13  definition of this language when I first asked you

14  about it and you told me about economic analysis.

15  So you seemed to understand the language here

16  enough to be able to know what these words mean.

17            And would you -- would you believe that

18  the economic, social, and environmental value of

19  the respective uses is likely to vary among the

20  putative class?

21            MS. JOSELSON:  Object to the form.

22       A.   My answer was that I could imagine that

23  there's been economic, social, environmental, and

24  public health uses or values associated with this

25  water that have changed, and that's being addressed

```
 1   by providing a substitute, which is municipal
 2   water.  And it's also being addressed within my
 3   model by providing a replacement.
 4        Q.   So you're telling me that it's changed --
 5             MS. JOSELSON:  Wait a minute.  Did you
 6      finish your answer?
 7        Q.   I'm sorry.
 8             THE WITNESS:  Yes.
 9             MS. JOSELSON:  Okay.
10             Sorry, Lincoln.
11        Q.   So you're telling me that it's been
12   change, you believe, by the presence of PFOA.  But
13   even before that, the economic, social, and
14   environmental value of the respective uses would
15   vary among the putative class members.  Is that
16   correct?
17             MS. JOSELSON:  Object to the form.
18        A.   The individual values that an individual
19   might hold for groundwater might vary, but the
20   remedy here is the same for all of them, so the
21   harm is the same.
22        Q.   Would you expect the nature and extent of
23   the harm caused to vary among the putative class
24   members?
25             MS. JOSELSON:  Object to the form.
```

1       A.    Within my report, I show different

2    magnitudes of the class change, for example.  So,

3    yes, I would expect it to vary by subclass.

4       Q.    And the harm -- the alleged harm to the

5    groundwater itself, would you expect that to vary

6    among the class members?

7            MS. JOSELSON:  Object to the form.

8       A.    Not for purposes of my analysis.  So if

9    someone had higher concentrations observed at some

10   time in their well versus someone else, if both of

11   them have to hook up to the system and both of them

12   have lost the use of that groundwater, I wouldn't

13   see a great deal of variation based on

14   concentration.

15      Q.    What do you mean, you wouldn't see a great

16   deal of variation based on concentration?

17      A.    In terms of the damages within my model.

18   The impact on them is the same and the remedy is

19   the same.

20      Q.    But is it possible that those differences

21   in concentration might constitute differences in

22   whether there was unreasonable harm?

23           MS. JOSELSON:  Object to the form.

24      A.    I'd go all the way back to the beginning.

25   I'm not going to testify as to what the court views

1   on reasonable harm is.

2       Q.   And it is your understanding that there

3   are differences in concentration among the various

4   putative class members here.  Is that correct?

5       A.   That's correct.

6       Q.   Are there any subclasses identified in the

7   motion -- are there any subclasses identified in

8   the motion for class certification for the

9   groundwater class?

10      A.   Not that I'm aware of.  I'm using the term

11  "subclass" here in a nonlegal sense.  It's just a

12  portion of the class.  I'm using it in a common

13  language sense.

14      Q.   Now, Factor 4 is the practicality of

15  avoiding the harm, if any.

16      A.   Mm-hmm.

17      Q.   Your opinion does make clear that there

18  are differences among the putative class members in

19  the practicality of avoiding harm.  Is that

20  correct?

21          MS. JOSELSON:  Object to the form.

22      A.   I'm not sure if that's -- I'm not sure how

23  the court would interpret that.  I mean, it could

24  be that this language means the practicality that

25  the responsible party could have avoided creating

```
 1    the situation we have.  So if it was -- you know,
 2    that may be a different topic entirely.
 3         Q.   In either case, would you expect that to
 4    vary among the putative class members?
 5              MS. JOSELSON:  Object to the form.
 6         A.   If it's the definition I just gave, no.
 7    It was either practical or impractical for the
 8    facility to not release PFOAs to cause this
 9    situation.
10         Q.   Wouldn't that vary, though, according to
11    the location of each putative class member relative
12    to the alleged source of the PFOA?
13              MS. JOSELSON:  Object to the form.
14         Q.   That it may be more or less practical
15    depending upon where they're located?
16              MS. JOSELSON:  Object to the form.
17         A.   I don't know.  That's -- there's a lot of
18    issues there:  legal, hydrological, atmospheric.
19    So . . .
20         Q.   It would be fair to consider those,
21    wouldn't it?
22              MS. JOSELSON:  Object to the form.
23         A.   I don't know.  I'm not interpreting the
24    law here.  I'm just looking at the economic effect
25    of the current situation.
```

1      Q.   And you can't tell me that, after having

2   evaluated the potential damages to this putative

3   class, whether you think that the differences in

4   location among those class members might affect how

5   practical it is to avoid the harm for them?

6           MS. JOSELSON:   Object to the form.

7      A.   The harm is, from my model's perspective,

8   is the need to connect to the municipal water

9   system and incur those costs, and the need to

10  provide a substitute.  So it -- that is common to

11  all class members, although some of my calculations

12  vary across what I call subclasses.

13     Q.   Factor 5 --

14     A.   So if this Bullet Point No. 4 is a

15  question of causality or liability, that's not

16  relevant to my calculations.

17     Q.   But it is relevant under the law because

18  it states that these factors shall be considered.

19  Is that correct?

20          MS. JOSELSON:   Object to the form.

21     A.   You're the attorney, not me.  So . . .

22     Q.   Factor 5 is the practicality of adjusting

23  the quantity or the quality of water used or

24  affected and the method of use by each party.

25          That would be something that your opinion

1    does make clear varies among the class -- putative

2    class members.  Is that correct?

3              MS. JOSELSON:  Objection.

4         A.    In -- within the group of 12, if this

5    relates to the practicality of the harmed party in

6    adjusting their behavior as opposed to the -- I

7    don't know whether this was written from the

8    perspective of the harmed party or the responsible

9    party.  But if it's written from the perspective of

10   the harmed party, that does relate to the model,

11   because there are 12 homes that can't practically

12   be connected to the municipal system -- practicably

13   be connected.

14        Q.    And Factor 7 is the protection of existing

15   values of land investments, enterprises, and

16   productive uses.

17              To determine that, we'd need to know the

18   value of the specific land enterprise and use,

19   wouldn't we?

20              MS. JOSELSON:  Objection.

21        A.    I'm not -- my report doesn't address

22   whether the values of the land have changed.  The

23   values of properties have changed.

24        Q.    It does say the protection of existing

25   values of land investments, enterprises, and

1  productive uses.

2        Would you expect that existing values of

3  land investments, enterprises, and productive uses

4  would vary among the thousand class members,

5  putative class members in this case?

6        MS. JOSELSON:  Object to the form.

7     A.   You're asking whether the values would

8  vary for that, across the class?  The value of

9  their land?

10    Q.   Yes.

11    A.   I would expect the value of the home

12  varies depending on the attributes of the home.

13    Q.   What attributes would those be?

14    A.   How nice the home is.  How many bathrooms

15  it has.  Size of lot.  Things like that.

16    Q.   Granite countertops?

17    A.   Yes.  Yes.  I presume it would be Vermont

18  slate, but -- yeah.

19    Q.   So your damages analysis in this case is

20  based on the properties and characteristics --

21  excuse me.  Let me restart that.

22        Your damages analysis in this case is

23  based on the properties in the proposed class area

24  to have wells with elevated PFOA.  Is that correct?

25        MS. JOSELSON:  Objection.

1       A.    A portion of my damages are the added

2    costs to residences in Bennington and North

3    Bennington who had wells which have to join the

4    municipal system or will be unable to and have to

5    have some other remedy.

6       Q.    And so you're looking at properties

7    relative to those wells.  Is that correct?

8       A.    I'm not sure what you mean by that.

9       Q.    Your analysis is considering specific

10   parcels of land.

11      A.    So we estimate the number of affected

12   parties based on the expectation of connections.  I

13   don't know if there could be more than one

14   connection per property or that some properties

15   don't have a connection, for example.  So --

16   they're largely residential properties.

17      Q.    And you're using "property" as a proxy for

18   "party."  Is that fair to say?

19           MS. JOSELSON:  Object to the form.

20      A.    In a damage calculation sense, yes.  I

21   don't know -- I don't know legally what the

22   definition of a party is.  But that could vary.

23   But I'm using the number of wells as a measure.

24

25

```
                                         Page 87
 1           MR. WILSON:  Would you mark this as
 2      Exhibit 7.
 3              (Unsworth Exhibit 7 marked for
 4              identification.)
 5   BY MR. WILSON:
 6      Q.   So we just handed you what's been marked
 7   as Exhibit 7 to your deposition.
 8           Do you recognize this document,
 9   Mr. Unsworth?
10      A.   I do.
11      Q.   And can you me what it is?
12      A.   It's an email from Emily Joselson to
13   myself and one of my staff members, and it's -- it
14   gives the class definitions in the second
15   complaint.  I don't remember if the first complaint
16   had the class definition in it, but this gives the
17   definitions.
18      Q.   And is this what you relied on in
19   determining the -- your opinion in this case with
20   regard to the damages of the putative class?
21           MS. JOSELSON:  Object to the form.
22      A.   I did and I didn't.  So I -- it's
23   interesting for me to know and it provides me
24   context.  The -- my damages are a function of the
25   number of wells that will have to be closed and
```

Page 88

```
 1    hooked to the municipal system, and it's a function

 2    of a desire to replace wash groundwater services

 3    across the community.  So it -- my damages are not

 4    a direct function of -- of this except for the fact

 5    that I -- I'm looking at across the community at

 6    all the potential class members.

 7                I interpreted -- I interpreted the

 8    definition -- the thing I was asked to do is

 9    provide damages to everyone who was affected by

10    this contamination effect -- impact in Bennington

11    and North Bennington.  But I didn't -- I didn't

12    parse this language to determine any specifics of

13    my damages.

14        Q.   So if we take a look at paragraph 76

15    there, it says, "Property damages and Groundwater

16    Protection Act class.  All natural persons, whether

17    minor or adult, including any person claiming by,

18    through, or under a class member of interests in

19    real property within the bracketed class area,

20    including but not limited to those persons whose

21    private property wells have been found to include

22    PFOA or to have PFOA above 20 parts per trillion."

23                Did I read that more or less correctly?

24                MS. JOSELSON:  Object to the form.

25        A.   You read it more or less correctly.
```

1      Q.   And so the class here is limited to

2   natural persons.  Is that correct?

3      A.   At the risk of offending Mitt Romney, I'm

4   not sure what a natural person is.  So . . .

5      Q.   It does not include corporations?

6      A.   According to Mitt, it might.  I don't know

7   legally.  So -- I don't know.  I don't know what

8   those definitions mean.

9      Q.   Does it include municipalities?

10      A.   I don't know.

11      Q.   Is it your understanding that a

12   municipality is a natural person?

13      A.   I don't know.  Within the law, I don't

14   know.

15      Q.   If a municipality is not a natural person,

16   would that affect your opinion in this case?

17      A.   No.

18      Q.   Now, since ultimately it's individuals who

19   are class members in this case and who have -- the

20   plaintiffs allege have experienced damages, is

21   there some level of a mismatch between your

22   analysis and the class definition since your

23   analysis relates to properties rather than to

24   individuals?

25              MS. JOSELSON:  Object to the form.

1      A.   I think that would be a legal question.  I

2  don't -- presuming the properties are owned by

3  individuals, so I -- and the well impacted.  So I

4  don't -- that's a legal question, not a question of

5  my model.

6      Q.   So if one of the individuals who had an

7  interest in the property in this class area, if

8  they didn't intend to remain at the property -- say

9  they intended to sell it --

10      A.   Mm-hmm.

11      Q.   -- would that affect damages in this case?

12      A.   No.

13           MS. JOSELSON:   Object to the form.

14      A.   No, it wouldn't.

15      Q.   That's not a future contingent effect that

16  would affect your damages opinion here?

17      A.   So my damages opinion is that folks, some

18  folks are going to experience an increase in the

19  cost of obtaining water.  And to the extent that

20  they remain in a home, that's a cost they're going

21  to bear if they're the person who is responsible

22  for expenses.  And to the extent they sell the

23  home, economic theory and practice would tell you

24  it gets capitalized in the value of the home, so

25  they would suffer the loss in that manner.  The

```
 1    person who buys the home that that's an attribute

 2    and they know that that's a future condition, just

 3    like you would look -- typically look at water

 4    bills and electric bills and heating bills in

 5    deciding how much to pay for a home.

 6             So I wouldn't expect -- I wouldn't expect

 7    either of my damage components to be affected by

 8    the sale of a home or the sale of a property.

 9       Q.   So say someone sells their home in this

10    class area one year from now.

11       A.   Mm-hmm.

12       Q.   And so for 29 of the years that your

13    opinion runs through, they're not accruing these

14    added costs that your opinion describes.

15             Would that person --

16       A.   See, I would disagree with that.

17    That's -- what I just said was I think they will

18    incur it.  They'll incur it in a lower-value home.

19    It's now a cost burden on the home.

20       Q.   So you're telling me that the reduction in

21    value of their home will be identical to the cost

22    of 29 years of water bills minus the cost of well

23    maintenance?

24             MS. JOSELSON:  Object to the form.

25       A.   I would -- I think actually my model runs
```

1    99 years.  I also calculate it for 30 years.  And

2    yes, economic theory would tell you yes, that the

3    cost of owning the home is capitalized in its

4    value.

5         Q.   That they are identical?

6         A.   That's what economic theory will tell you,

7    yes.  The market is efficient and it will be

8    capitalized in the value, just as the number of

9    bathrooms would, or your heating bill.

10        Q.   Economic theory with regard to property

11   values is different from the reality of how

12   property values change, isn't it?

13             MS. JOSELSON:  Object.

14        A.   I think it's very well established both

15   within economics and within -- within the appraisal

16   field that the value of a piece of real estate

17   relates to the cost associated with owning that

18   real estate.  So that's a pretty well founded

19   concept, and pretty well founded in practice.

20        Q.   So are you telling me that if someone

21   wanted to purchase that home in a year, they could

22   come to the seller and say, "See the report of

23   Robert Unsworth here?  I demand a discount to the

24   listing price equal to 99 years of water usage at

25   this home minus the costs of well maintenance,

Page 93

1   capitalized to present value based on the 30-year

2   mortgage rate in Bennington.  Economic theory

3   dictates this is the result.  Please give me my

4   discount."

5          Are you telling me that someone could do

6   that?

7          MS. JOSELSON:  Object to the form.

8     A.   As you go into negotiations over

9   purchasing a home, you can bring whatever evidence

10  you want.  And I -- I would expect that an

11  individual, taking all other factors into account,

12  would consider that as they look at substitute

13  possibilities of home purchases, yes.  I would

14  expect that a rational buyer will keep in -- will

15  account for all the expected future costs of the

16  home.

17    Q.   And if a local real estate appraiser in

18  Bennington said, "No.  The costs of municipal

19  water, that's not going to discount the value by

20  that much," would you tell -- tell that real estate

21  appraiser that your model was a better description

22  of the effect on value than his?

23         MS. JOSELSON:  Objection.

24    A.   I would say two things.  One is yes,

25  economists do a better job valuing homes than

1    appraisers do; and, two, not that much.  It says in

2    my report that it's around 7 percent.  So that

3    statement actually may be correct.

4        Q.   Is it possible that the connection to

5    municipal water increases property values?

6        A.   It's possible for some individuals it does

7    and for others it would be -- it would be lower.

8    So . . .

9        Q.   It's not possible that a connection to

10   municipal water may make a home more attractive to

11   potential buyers?

12            MS. JOSELSON:  Object to the form.

13       A.   Knowing that the home was connected to

14   municipal water because the groundwater was

15   contaminated might actually have the opposite

16   effect.

17       Q.   But it might have a positive effect.  Is

18   that correct?

19            MS. JOSELSON:  Object to the form.

20       A.   I think -- again, this deals with your

21   but-for conditions.  So if you're asserting that

22   homes that are attached to a municipal system may

23   sell for more, all else equal, than a home with a

24   well, that's not the right question.

25            The right question is would a home that

1   has the presence of contaminants and for which you

2   can't have a well, would that sell for the same

3   amount as it would absent the contamination.  And

4   I'm saying that's not true.

5          I would also say that folks chose these

6   homes, and very few people asked to be connected to

7   the municipal system.  So if there was arbitrage to

8   be had there, it would have been had.

9      Q.   We'll get to that in a bit.

10         So you're saying that when you value the

11  damages in this case, the added cost damages,

12  you're comparing the connection to municipal water

13  and the additional water rates to the costs of well

14  maintenance.  But in accounting for any potential

15  effect on property values, you don't look at the

16  connection to municipal water at all; you only look

17  at the fact that the water, the groundwater at the

18  home has PFOA in it.  Is that correct?

19         MS. JOSELSON:  Objection.

20     A.   I'm not actually looking at the impact on

21  property values, so it's -- I don't account -- I

22  don't do that at all.

23     Q.   Well, you told me about the appropriate

24  way to look at that issue would be to only look at

25  the fact that the groundwater has PFOA in it, not

```
 1   at the fact that the home is connected to municipal
 2   water.
 3            So you have an opinion on that issue,
 4   don't you?
 5            MS. JOSELSON:  Object to the form.
 6       A.   I think that oversimplifies my comment.
 7   My statement was that I believe firmly that the
 8   increased cost of owning a home that has municipal
 9   water -- in some of these cases.  For some of the
10   North Bennington homes, it's actually less
11   expensive to be on municipal water, and I show
12   that.  But for the homeowners who currently have
13   wells, the majority of them, they will see an
14   increased cost of operating their home.  And I
15   firmly believe that will be capitalized into their
16   home value, consistent with appraisal science and
17   consistent with economics.
18       Q.   Would it be legitimate for someone to
19   challenge your opinion by looking at surveys on
20   local Vermont residents and preference for
21   municipal water?
22            MS. JOSELSON:  Objection.
23       A.   I would have to see the analysis.  I do
24   know that I don't -- I didn't see individuals
25   seeking to hook to the municipal system, so their
```

Page 97

1    revealed preference did not indicate that.  And I'm

2    also skeptical that someone could do an analysis at

3    this point because the presence of PFOA has made

4    the market different.

5         Q.   Okay.  That's a good time to switch to

6    that topic.

7              So your report states that there was

8    little interest among the affected groundwater

9    users in joining either municipal systems prior to

10   the event, and over the past decade only a small

11   number of connections were added to these systems,

12   and neither system reports having had many requests

13   for additional service.  Is that correct?

14        A.   That's correct.

15        Q.   And based on this, you state that this

16   reflects the preference of these residents for well

17   water, the preference for having an independent

18   source of water, and the desire not to incur the

19   added cost of municipal water?

20        A.   I'm providing some explanation for why

21   that -- that may have been.  Well, we know it was

22   the case, and I'm providing explanation for why it

23   may have been the case.

24        Q.   So let's say you're wrong.  Is it possible

25   you're wrong about that assumption?

1           MS. JOSELSON:  Object to the form.

2      A.   It's possible there are other factors that

3  were in people's minds that led them to not want

4  municipal water over well water.

5      Q.   Okay.  And if we knew something about

6  those other factors in their minds, that would be

7  relevant to this analysis, wouldn't it?

8           MS. JOSELSON:  Objection.

9      A.   Well, I know that they have an increased

10  cost.  So I -- no, it wouldn't relevant to my

11  analysis, because I know they're paying

12  out-of-pocket costs that are higher than they were

13  before.

14      Q.   But if, in fact, residents prefer

15  municipal water, then they have no damages by the

16  fact that Saint-Gobain has provided for them to be

17  connected to municipal water free of charge?

18           MS. JOSELSON:  Object to the form.

19      A.   I think that would be a vast

20  overstatement.  Their damages would -- that would

21  ignore the fact that they had exposure to PFOA and

22  they had a home with PFOA for years.  It ignores

23  the fact they had to go on a POET system, and it

24  ignores the fact that this change was not one that

25  anyone was exhibiting prior to the event.

1          So I'm -- I'm very comfortable with the

2     concept that folks had a preference for well water

3     based on their -- these individuals had a

4     preference for well water based on their observed

5     behavior.

6          Q.   So if those persons had a preference for

7     municipal water, then to know whether they had

8     damages or the amount of their damages, we would

9     need to know more about, as I said, how long PFOA

10    was in their water, and we would need to know more

11    about the costs of the POET.  Is that correct?

12          MS. JOSELSON:  Object to the form.

13          A.   Not for my damages model.  What I was

14    saying is that you made -- you made the statement

15    that someone might have felt better off being on

16    municipal water, and I question that assumption

17    that individuals would have chosen this path to

18    municipal water as one that's preferable to staying

19    on a well.

20          Q.   You don't question that assumption.  You

21    assume the opposite.  Is that correct?

22          A.   Yes.  I assume that absent this event,

23    they would have stayed on well water.

24          Q.   But if you're wrong about that assumption,

25    and if they do prefer municipal water, then to

1   determine their damages, you're telling me we need

2   to know more about these other factors for them

3   that affect the amount of their damages.  Is that

4   correct?

5        A.   Well, if I'm wrong on that, they are, too,

6   because they weren't requesting municipal water.

7        Q.   So you talk about revealed preferences

8   there.  Do you know what the preference of the

9   individual homeowners would be if they could obtain

10   a connection to municipal water at no out-of-pocket

11   cost as opposed to remaining on well water?

12           MS. JOSELSON:  Object to the form.

13       A.   What I do know is that there have been

14   residences added to Bennington -- the town of

15   Bennington over the decades who chose to go with

16   wells, who were in areas that could have accessed

17   municipal water but they still chose wells.

18       Q.   Do you know the amount of those

19   individuals?

20           MS. JOSELSON:  Object to the form.

21       A.   No.  That's based on interviews with the

22   municipal staff.

23       Q.   And --

24       A.   But, again, if you're assuming that

25   individuals would have preferred this path to

1    municipal water and that they are better off

2    because of that, I am very skeptical.

3         Q.   Now, is it possible to test your

4    assumption?

5         A.   That's a good question.  I mean, you now

6    have a -- you have a new condition.  I think it

7    would be difficult to build a reliable model in

8    Bennington to test that premise.

9         Q.   Did you attempt to?

10        A.   No.  For that reason.

11        Q.   Let's say we had a map prior to the

12   contamination -- excuse me -- prior to the presence

13   of PFOA -- let me strike that the question.

14             Let's say we had a map of the system of

15   municipal water in Bennington prior to the presence

16   of PFOA in the water.

17        A.   So in the 1950s?

18        Q.   No.  Let me restart the question, then.

19             Let's say we had a map of the municipal

20   water system prior to the discovery of PFOA in the

21   water that showed all the areas in Bennington where

22   the municipal water system was available.  And then

23   if we could look and see within that area how many

24   of the people who had ready and free access to the

25   system, what percentage of those people requested

```
 1    to be connected to the municipal water.

 2            Would that be a fair way of measuring the

 3    frequency with which people who have access to the

 4    water for free seek to be connected to the

 5    municipal water?

 6            MS. JOSELSON:  Objection.

 7        A.   No.  And part of that relates to what the

 8    attributes of your property are that allows for a

 9    well.  So there's large parts of Bennington that

10    are too dense for folks to have individual wells.

11    So you'd have to control for the potential for

12    holding a well.

13        Q.   Does it provide better data than your

14    assumption based on the conversation with the

15    municipal water staff?

16        A.   Absolutely not.  The conversation was --

17    gave me the fact that very few people were asking

18    to sign up.  And that's the best data of all, which

19    is the revealed preference, not a model preference.

20        Q.   Did they give any number for

21    quantification of that?

22        A.   A handful.

23        Q.   A handful is -- tell me how many a handful

24    is.

25        A.   Both towns indicated that there were very
```

```
 1    few instances of folks requesting to be hooked up.
 2    And these municipal systems have been in place for
 3    many years, so there was a lot of opportunity for
 4    homeowners to do that.
 5         Q.    The individuals who chose to remain on
 6    well water, did they have to pay costs in order to
 7    be hooked up to the municipal system?
 8              MS. JOSELSON:  Object to the form.
 9         A.    My understanding is that they will be --
10    and I don't charge within my model.  I don't
11    calculate damages for the cost of hookup, which,
12    for example, we did in Lockformer.  So the cost --
13    the out-of-pocket cost of bringing water into the
14    home, it appears from the agreements, will be borne
15    by another party, not the household.  There may be
16    other costs that individuals have, like their lawns
17    getting dug up and all that, but I didn't
18    incorporate that.
19         Q.    So you're saying that it's not relevant to
20    the analysis at all that people would have to pay
21    in the ordinary course to be connected to municipal
22    water?
23              MS. JOSELSON:  Object to the form.
24         A.    Again, you have a -- this is a very long
25    time period over which they didn't see much demand
```

1    to be added to the system.  So those costs would be

2    capitalized, and I would think if people had a true

3    preference for municipal water, we would have seen

4    a move in that direction.

5              You also -- if you were going to construct

6    a property model here the way you've described, I

7    would be constructing a property model of the

8    effect of PFOA as well.  If you think you can

9    measure the value of the well, then you can measure

10   the value of the PFOA.

11       Q.   Are you aware of how much Saint-Gobain is

12   paying to make these municipal connections to these

13   individuals?

14             MS. JOSELSON:  Objection.

15       A.   There's two numbers that are in the public

16   domain that I've seen, so I'm not -- I'm not

17   certain what the actual cost is.  There's a

18   3-point-something-million-dollar number, and then

19   there's a $20 million cap.  I don't know what it's

20   actually costing.  I don't think we know yet what

21   it's going to actually cost to put people on wells.

22       Q.   Prior to the detection of PFOA in this

23   area, the homeowners who chose to stay on private

24   wells, would they have had to pay in order to be

25   hooked up to the municipal water system?

1          MS. JOSELSON:  Object to the form.

2     A.   As I understand it, they would, yes.

3     Q.   Did you attempt to determine how much

4  they'd have to pay?

5     A.   No.

6     Q.   So would those costs affect their

7  preference for -- or affect determining whether

8  their preference was for municipal water or for

9  well water?

10    A.   It could affect their preference, but over

11 the time period we're talking about here, I would

12 think that would be capitalized out.  And some of

13 these are homes that were built during the time

14 there's been a water system, so they had to develop

15 a well, so they still chose to go with a well.

16 So . . .

17    Q.   So Saint-Gobain is paying several millions

18 of dollars to connect all these individuals to the

19 municipal water supply?

20    A.   As I understand it.  I don't actually know

21 how many people have been hooked up yet, but as I

22 understand it, that's the agreement.

23    Q.   So wouldn't it be more correct to say

24 whatever the preference of these individuals was,

25 that their preference for municipal water was not

1   as great as the cost it would take to be connected

2   to municipal water?

3          MS. JOSELSON:   Objection.

4      Q.   Would that be more accurate?

5          MS. JOSELSON:   Object to the form.

6      A.   I think we -- we know it is at least that

7   and it could be actually significantly higher.   So

8   as I point out in my report, they may, in fact,

9   have been -- they might have required a

10  compensation to hook up to the municipal system

11  that exceeds my numbers.   They might not have

12  wanted it.   Which isn't to say that it's not great

13  that it's being provided.   That's providing a

14  public health benefit.   But they may not have

15  wanted it.

16     Q.   But you don't know -- you don't have any

17  information about those individual preferences, do

18  you?

19          MS. JOSELSON:   Object to the form.

20     A.   I think I've already answered that several

21  times.   So . . .

22     Q.   Just to be clear, you don't know what

23  those individual preferences were for municipal

24  water or well water?

25          MS. JOSELSON:   Objection.

1    A.   I think I've answered that several times,
2  yeah.
3    Q.   To be clear for the record, I'm not sure
4  you have answered it.
5         You don't know what those individual
6  preferences were for municipal water versus well
7  water?
8    A.   What I do know is that very few
9  individuals were asking to be hooked up to the
10  municipal system and that that occurred over a very
11  long time period, and that those individuals
12  appeared by the fact that they purchased these
13  homes at some point that had well water and the
14  fact that they weren't then requesting to be added
15  to the municipal system, that there was a
16  preference for well water.  That was an attribute
17  that they chose in a home.
18    Q.   So that's what you do know, but I'm
19  interested in what you don't know, which is whether
20  those individuals preferred municipal water versus
21  well water.
22         MS. JOSELSON:  Object to the form.
23    A.   I think I just asked -- answered that.
24  And also, I think that that's framing the question
25  incorrectly from the but-for condition here.  I

1    just don't think it's relevant.

2        Q.   So --

3        A.   It's an incomplete hypothetical.

4        Q.   You're telling me that based on one

5    conversation that you had with a municipal utility

6    person who described a handful of municipal

7    connections, you have the power to authoritatively

8    ascertain and determine the preferences of all

9    thousand members, alleged members of this putative

10   class for well water over municipal water, and that

11   is authoritative and cannot be contradicted?

12            MS. JOSELSON:   Object to the form.

13       A.   It was several conversations, and it was a

14   fact that they were relaying, which is they've had

15   very few requests for additions.   So the fact that

16   it was a conversation or a short conversation, it's

17   still a fact.   And yes, I feel authoritative in

18   saying that folks prefer well water to municipal

19   water based on their behavior.

20       Q.   Wouldn't another authority on this be the

21   individuals?   If someone came in here and said,

22   "Sorry, Mr. Unsworth.   I actually did prefer

23   municipal water," would that be a better authority

24   than your conversation with the municipal utility

25   administrator and your analysis of revealed

```
 1   preferences?
 2          MS. JOSELSON:  Objection.
 3      A.   I would say that's actually the wrong
 4   question to ask the person.
 5      Q.   What would be the right question?
 6      A.    "Would you have preferred not to have
 7   contaminated groundwater and been able to continue
 8   to use your well or would you prefer the current
 9   situation, which is being required to go on
10   municipal water and to pay a water bill because of
11   contamination?"  That is the correct measure of the
12   but-for condition.
13      Q.   Would it be appropriate to ask that
14   question to the individual class members, putative
15   class members?
16          MS. JOSELSON:  Object to the form.
17      A.   Sure, but you'd have to ask them not -- if
18   you're asking the class members, I would also not
19   ask them what they would prefer.  I would ask them
20   what would their required compensation be to make
21   that change.
22      Q.   Okay.  Because stated preferences are also
23   relevant to an economic analysis, not only revealed
24   preferences.  Is that correct?
25      A.   I prefer revealed preference over stated
```

Page 110

 1    preference.
 2        Q.    But a stated preference is relevant to
 3    analysis, isn't it?
 4            MS. JOSELSON:   Objection.
 5        A.    Depends how it's asked and how it's
 6    developed.
 7        Q.    Economists do consider stated preferences
 8    as relevant to such an analysis, don't they?
 9        A.    It's very difficult to do, but in the
10    absence of revealed preference, you might consider
11    stated preference.
12        Q.    And so it would be appropriate to ask
13    those individual putative class members the
14    question that you just described as additional data
15    on this question?
16        A.    I would say no.  I wouldn't do that.
17        Q.    Why?
18        A.    Because I have their revealed preference,
19    and I also can't ask an objective question about
20    preferences for well water over municipal water
21    given the situation.
22        Q.    Isn't that kind of paternalistic for you
23    to say that based on your conversation with the
24    municipal utility administrator, you know
25    everyone's preferences in this area better than

```
 1   they do?
 2          MS. JOSELSON:  Objection.
 3      A.   I wouldn't use the term "paternalistic."
 4   I would say that as an economist, I view revealed
 5   preference to be a better measure of damage than
 6   stated preference, and we only use stated
 7   preference when we can't get a revealed preference.
 8   We do -- we do use stated preference.  We're forced
 9   to use it in situations where we do not have a
10   revealed preference.
11          And I don't -- I would not consider it
12   paternalistic.  I would consider it analysis.
13   So . . .
14      Q.   So you're saying you know what's best for
15   them?
16          MS. JOSELSON:  Object to the form.
17      A.   Absolutely not.  I'm not saying that at
18   all.
19      Q.   You know what they like best?
20          MS. JOSELSON:  Object to the form.
21      A.   I'm not saying that, either.
22          MR. WILSON:  Would you mark this as
23      Exhibit 8.
24          (Unsworth Exhibit 8 marked for
25          identification.)
```

1   BY MR. WILSON:

2       Q.   I've just handed you what's been marked

3   for identification as Exhibit 8 to your deposition.

4           Can you tell me what this is?

5       A.   It seems to be a declaration by what I

6   presume to be one of the class members.

7       Q.   Did you review this in connection with

8   formulating your opinion in this case?

9       A.   I may have seen this.  I don't remember

10  reviewing it for my opinion.

11      Q.   So take a look at paragraph 7 of this

12  declaration.  Mrs. Crawford says, "I have a unique

13  medical issue which causes me concern about being

14  connected to the Bennington municipal water system.

15  I have a hypersensitivity to fluorine (fluoride).

16  Ingesting fluoride has led to angioedema, which has

17  required emergency treatment including injections

18  of epinephrine.  There is ongoing effort by a group

19  of individuals in Bennington to fluoridate the

20  municipal water supply.  If this were to happen, I

21  would be put in the position of my home water

22  supply being contaminated by a chemical that would

23  do me great harm."

24          Did I read that correctly?

25      A.   Mm-hmm.  Yes.

1      Q.   And you did not consider this declaration

2   in the course of forming an opinion, did you?

3      A.   It didn't affect my opinion.  I do

4   remember reading that, but . . .

5      Q.   Did you -- you do remember reading this?

6      A.   Yeah.  I had never heard before of a

7   hypersensitivity to fluoride, so it was an

8   interesting thing to read.

9      Q.   But you didn't list this declaration in

10   the materials that you considered in your reports,

11   did you?

12      A.   I don't think I relied upon it, no.

13      Q.   But you reviewed it?

14      A.   I may have reviewed it or I may have heard

15   that.  I'm not sure -- I'm not sure I read this.  I

16   don't remember the angioedema or the ephedrine --

17   epinephrine.

18      Q.   So this was material you reviewed in the

19   course of forming your opinion but you did not

20   disclose in your reports?

21          MS. JOSELSON:  Object to the form.

22      A.   I think my knowledge of this actually came

23   from a conversation with the attorneys who

24   mentioned it.

25      Q.   But you did read it?

1    A.   I don't --

2         MS. JOSELSON:  Object to the form.

3    A.   I don't know if I did, actually.  I'm not

4    sure if I remember reading this.  It may have been

5    in the pile; it may not have been.  I just don't

6    remember.

7    Q.   You testified earlier that you do remember

8    reading this, yeah.

9         So do you remember reading this or do you

10   not remember reading this?

11   A.   I remember the story.  I'm not sure I

12   remember reading this.  So . . .

13   Q.   Is there anything else in your -- that you

14   reviewed in the course of forming your opinions in

15   this case that you haven't disclosed to us?

16        MS. JOSELSON:  Object to the form.

17   A.   No.  We turned over everything we had.  So

18   if it's not in that pile, it wasn't -- I didn't

19   have it on paper.

20   Q.   Is Mrs. Crawford's preference to remain on

21   well water relevant to your economic analysis?

22   A.   It would mean my economic analysis is

23   understating her damages.

24   Q.   So it is relevant?

25   A.   It would be one of the factors, just as I

1  state in my report, that would cause me to

2  underestimate damages.

3      Q.   And it should be considered?

4          MS. JOSELSON:  Object to the form.

5      A.   Well, I didn't say that.  I said there

6  were a variety of factors that would cause me to

7  underestimate damages.  Those factors may be hard

8  to get at a value for.

9      Q.   And to know and evaluate Mrs. Crawford's

10  damages, what other information would we need to

11  have?

12          MS. JOSELSON:  Object to the form.

13      A.   If you wanted to -- if she is, in fact,

14  being required to join the municipal system, I've

15  incorporated her costs of doing so.  Presumably

16  there would -- might need to be some assurance that

17  she could treat her water to avoid this.  I don't

18  know.  I didn't incorporate it.  It would be in

19  addition to what my damages are, but I don't know

20  how I would measure it.

21      Q.   And it's possible that there are other

22  class members similarly situated to Mrs. Crawford

23  who might also have different damages than your

24  model.  Is that correct?

25          MS. JOSELSON:  Object.

1      A.    They would have the same damages that are
2  in my model and then some.
3      Q.    And we would need to know more information
4  about their unique circumstances in order to
5  evaluate those damages, wouldn't we?
6           MS. JOSELSON:   Object to the form.
7      A.    If you were to include, for example, the
8  cost of assuring that she has a clean supply of
9  water, that would be in addition to that.
10     Q.    And we would know in Mrs. Crawford's -- we
11  would need to know in Mrs. Crawford's case how
12  likely it is that the Bennington water supply will
13  become fluoridated.  Is that correct?
14          MS. JOSELSON:   Object.
15     A.    I think it would -- I don't know if it
16  would be possible to know.  That's a future
17  situation.  I don't know if it would be possible to
18  know that.
19     Q.    Don't we take into account contingent
20  events and their likelihood in making an economic
21  damages analysis?
22          MS. JOSELSON:   Object to the form.
23     A.    If you can quantify them and if they
24  matter to the analysis.  So for my damages, this
25  doesn't matter to the analysis.  The cost increase

1   is the same.  And I would only incorporate a

2   contingent event if I had some reasonable basis on

3   which to predict it.

4       Q.   So you're saying that Mrs. Crawford has

5   additional and different damages that your model

6   does not address, very unique to her?

7           MS. JOSELSON:  Object to the form.

8       A.   It sounds as though she may have concerns

9   that are the concerns of the type that led people

10  to have well water, and it would have to be

11  measured.  But it wouldn't make my damages go down.

12  It would only make them go up.

13          MS. JOSELSON:  It's been an hour in.  Let

14     me know what your thoughts are.

15          MR. WILSON:  When do you want to break for

16     lunch?

17          MS. JOSELSON:  Your choice.  Everyone's

18     choice.

19          MR. WOLFF:  Let's go off the record and

20     talk about it.

21          MR. WILSON:  Off the record for a moment.

22          THE VIDEOGRAPHER:  The time is

23     approximately 11:15 and we are off the record.

24          (Recess taken from 11:15 to 11:23 a.m.)

25          THE VIDEOGRAPHER:  We are back on the

1    record.  The time is approximately 11:23 and

2    this is the beginning of Media No. 3.

3         Counsel, you may proceed.

4   BY MR. WILSON:

5       Q.   So, Mr. Unsworth, your opinion on added

6   cost for the putative class members depends on the

7   water rates that they will pay for municipal water.

8   Is that correct?

9       A.   That's one of the factors.

10      Q.   Now, among other things, individual water

11  usage will differ from household to household based

12  on differences in household size.  Is that correct?

13           MS. JOSELSON:  Object to the form.

14      A.   That could be correct, yes.

15      Q.   And among other things, individual water

16  usage will differ from household to household based

17  on differences in property size.  Is that correct?

18      A.   Possibly, yeah.  Bennington's a relatively

19  damp area, but it may.

20      Q.   And among other things, individual water

21  usage will differ from household to household based

22  on differences in idiosyncratic usage patterns.  Is

23  that correct?

24           MS. JOSELSON:  Object to the form.

25      A.   Without any value judgment given to

1   idiosyncratic, yes.

2       Q.   Now, your merits report states that the

3   water rates is generally a flat charge per quarter,

4   but for some water customers in the town of

5   Bennington and all water customers in North

6   Bennington, the rate is based on usage.  Is that

7   correct?

8       A.   In part, yes.  There's a -- also a capital

9   fee in North Bennington.

10      Q.   So usage is relevant to the amount that

11  people will pay for their water in Bennington and

12  North Bennington.  Is that correct?

13      A.   No, that's not correct.  The -- most

14  residences in Bennington are on the flat-rate

15  system and they're encouraging the new connections

16  to go to the flat-rate system.  So that is

17  generally considered a better deal because it's

18  predictable.  And so, in Bennington, usage won't

19  matter.

20      Q.   Is most all?

21      A.   Most is not all.

22      Q.   The fact that the government encourages

23  something, does that mean people will follow the

24  encouragement?

25           MS. JOSELSON:  Objection.

1      A.   I don't know about that.  But I do know

2   that most residences already are on the flat-rate

3   system.

4      Q.   Now, to someone who has high water

5   usage -- say a family of seven with a washer and

6   dryer and a sprinkler system -- paying the flat

7   rate is advantageous, isn't it?

8      A.   I would -- I would assume so.  I don't --

9   yeah, within that hypothetical, yes.

10     Q.   For a single man living in an apartment

11  with no washer and dryer, no lawn, paying the flat

12  rate is not advantageous, is it?

13          MS. JOSELSON:  Objection.

14     A.   It may not be.  It depends on their water

15  use.  But you actually -- we looked at the

16  distribution and we back-calculated -- I didn't

17  include it in the report, but I back-calculated how

18  much water you'd have to use for the flat rate to

19  make sense, and it's not a great deal of water.

20          So it's a good deal, and I think it's

21  being offered as a good deal because there's less

22  work for the municipality in terms of pricing.

23  It's not a particular good mechanism for

24  discouraging water use, but it's what they do.

25     Q.   Some people don't pay the flat rate, do

1    they?

2        A.    Some people by -- as I understand it, by

3    sort of a dint of history, have a meter and choose

4    to pay by the gallon.

5        Q.    Do you have any basis for predicting that,

6    going forward, all persons who can select the flat

7    rate will?

8            MS. JOSELSON:  Object to the form.

9        A.    The -- sorry, I forget the name of the

10   town manager of the water system, but he felt that

11   most people would choose the flat rate and he

12   thought that was a better deal for them.  And if

13   you look at the documents that have been provided

14   to the potential members of the system being added

15   to the system, it effectively encourages them to go

16   with a flat rate.

17           I would also say that the characteristics

18   of this year's water consumption would only be 1

19   out of 99 or 1 out of 30, depending on which time

20   period you pick.  So it would vary with time as

21   well.

22       Q.    Have you studied any of the economics

23   literature on government encouragement for people

24   to participate in behavior that the government

25   deems good?

1          MS. JOSELSON:   Objection.

2      A.    I've actually done quite a bit of work on

3   the use of pricing to discourage water consumption.

4   It comes up in a lot of our work.

5      Q.    But this is pricing that encourages water

6   consumption?

7      A.    You could argue that.  Or at least it

8   doesn't discourage it.  I'm not sure why -- I'm

9   sure nobody is leaving the tap on for fun.  But

10  it's not a -- having a fixed rate does not

11  encourage using less water.

12     Q.    Are you aware any literature that would

13  support an opinion that 100 percent of those who

14  can select the flat rate will select the flat rate?

15          MS. JOSELSON:   Object to the form.

16     A.    So, interestingly, in the Atlanta area, I

17  worked on a case between Atlanta and Florida on

18  water usage, and there were two factors relevant to

19  this.  One is that a lot of the older neighborhoods

20  were, in fact, on flat rate, and people generally

21  didn't want to move to a metered system.

22          In addition, more so now than before,

23  people pay their bills electronically, and so

24  people in effect don't know what they're paying.

25  It just gets withdrawn from their account and

```
 1   they're not paying attention to it.  So . . .

 2       Q.   And does everyone do that?

 3       A.   No.

 4       Q.   No.

 5            So if someone doesn't select the flat

 6   rate, then they will have a different quantum of

 7   damages than is estimated in your report under your

 8   methods, because the rate that they're paying for

 9   municipal water is lower?

10            MS. JOSELSON:  Object.

11       A.   And, similarly, someone who decides to use

12   a meter and winds up using more would incur a

13   different -- so there's some -- we talked about

14   precision before, so there's some issues of

15   precision, not being able to perfectly predict the

16   future.

17       Q.   And --

18       A.   But I would expect that those individuals

19   may -- may choose to go with the metered water use.

20       Q.   And there's variability as well as

21   precision.  Is that correct?

22            MS. JOSELSON:  Object to the form.

23       A.   Within my model, it would be a question of

24   precision because I have assumed an average.  So in

25   North Bennington, I have assumed an average.  So
```

Page 124

```
 1   I've taken the current average consumption and
 2   imposed that on those water users.
 3       Q.   So let's just talk about your model, big
 4   picture.  Your model purports to describe the total
 5   damages experienced by the putative class and
 6   various informally defined subclasses.  Is that
 7   correct?
 8           MS. JOSELSON:  Objection.
 9       A.   Without the word "total."
10       Q.   It does not purport to describe the
11   damages of any individual within that putative
12   class, does it?
13           MS. JOSELSON:  Object.
14       A.   Well, I think it does estimate damages for
15   individuals within the class, yes.
16       Q.   But if we had more information about any
17   individual in the putative class, we could come to
18   a more precise and potentially more accurate
19   measure of damages for that individual.  Is that
20   correct?
21           MS. JOSELSON:  Object.
22       A.   And if you could see the future, that also
23   might be correct.  But we can't.  So we measure it
24   as best we can based on reliable and appropriate
25   information.
```

1      Q.   But we can get other specific information

2   like Mrs. Crawford's declaration that tell us about

3   her unique circumstances, that provide us with more

4   particularized information that might allow us to

5   have a more accurate and more precise picture of

6   the damages of an individual class member.  Is that

7   correct?

8            MS. JOSELSON:   Object.

9      A.   I think what I said before is that

10   information about Ms. Crawford would provide

11   me with more -- could provide me with a more

12   complete measure of damage.

13            So I'm not currently estimating total

14   damages.  I'm estimating damages in three

15   categories.  So I don't -- I don't get at other

16   categories of damage.

17      Q.   And so if we have individualized

18   information about these putative class members, we

19   could find that some class members have lower

20   damages than is estimated in your report under your

21   methods, and some class members have higher damages

22   than is estimated in your report under your

23   methods?

24      A.   I think we --

25            MS. JOSELSON:   Object to the form.

1    A.   I think we won't know for sure till the

2    future plays out.  What I provide is a reasonable

3    basis using typical calculations of what I think

4    the losses will be -- reasonable estimate of losses

5    to these individuals will be.

6    Q.   Are there any dangers to using averages,

7    methodologically?

8    A.   Well, it depends on the -- depends on the

9    problem.  I'm not sure what "danger" means and I'm

10   not sure what the problem would be.

11   Q.   Are there any problems of either accuracy

12   or precision in using averages?

13        MS. JOSELSON:  Object to the form.

14   A.   I think that typically within my work, I

15   am looking at information that's known with some

16   level of precision, and often with environmental

17   damages, we're dealing with future conditions that

18   are unknown until they occur.  And so we use

19   averages because we expect on average we will be

20   correct.  And there are also -- you know, as far as

21   the water bill issue goes, it depends on how the --

22   how much is recovered and how those recoveries are

23   provided.  And it also depends on the nature of

24   those homes in the future.

25             So there's a lot of -- you know, we're

Page 127

 1  providing a reasonable estimate based on the best

 2  available information.

 3      Q.   Doesn't the propriety of using an average

 4  depend upon the variability of the data set?

 5           MS. JOSELSON:  Object.

 6      A.   It might.  You may not have confidence in

 7  the average.  It also would depend on the shape of

 8  the distribution.

 9      Q.   Did you look at the shape of distribution

10  for any of the data that you averaged in this case?

11      A.   So we -- what we did is we asked to North

12  Bennington, which doesn't have a flat-rate system,

13  how much variability they have in their water

14  usage.  And if you take out nonresidential

15  properties, they actually don't experience a great

16  deal of variability.

17      Q.   How much variability is it?

18      A.   He didn't quantify it, but he said there's

19  not that much variability household to household.

20      Q.   And you didn't ask him to?

21      A.   No.

22      Q.   But if we looked at that data, we could

23  come up with a better picture of what the actual

24  losses would be to an individual putative class

25  member using your methodology?

```
 1            MS. JOSELSON:  Object.
 2       A.   You might be able to get more precise for
 3  the current condition.  Again, we're going out 99
 4  years here for the property, so I'm not sure it
 5  would be actually more accurate.  The average may
 6  actually be more accurate than the current year.
 7       Q.   But if we go out longer periods of time,
 8  doesn't even a small difference multiply into a big
 9  difference over time?
10       A.   No.  You would move towards the average
11  over time.
12       Q.   Well, I mean --
13       A.   So if a residence was unusual, the
14  residents prob -- those individuals wouldn't be
15  there for 99 years, so you would move back towards
16  the average.
17       Q.   I mean, over time if there's a difference
18  of $100 a month between two different individuals
19  and their water rates, multiplying that by 12
20  months and then 99 years and then to present value,
21  you're going to end up with a big difference,
22  aren't you?
23            MS. JOSELSON:  Object.
24       A.   If what you were trying to calculate is
25  that one number, yes.  But, again, if you're taking
```

1    average, you would also have individuals that fall

2    on the other side of the distribution.  And so it

3    would -- it may not make a difference.

4         Q.   So under your model, or under your

5    methodology, someone who paid -- would pay a lot

6    for municipal water should have greater damages

7    than someone who pays a little bit for municipal

8    water, assuming the same costs of well operation.

9              MS. JOSELSON:  Object to form.

10        Q.   Is that correct?

11        A.   It would depend on how you compensated

12   them.  So . . .

13        Q.   But if we're compensating them based on

14   the difference between municipal water costs and

15   well costs, then someone who pays more for

16   municipal water should have more damages than

17   someone who pays less for municipal water, under

18   your model?

19        A.   My model calculates the damage.  It

20   doesn't calculate distribution of the damages.

21             So the individuals -- you could compensate

22   the individuals differentially or you could provide

23   compensation in the form of reduced water bills

24   across the class.

25        Q.   Okay.  So how would we compensate -- how

1   would we determine the distribution here?  Once you

2   determine the total amount, how do we determine how

3   to distribute that amount to the putative class

4   members?

5               MS. JOSELSON:  Object to the form.

6       A.   I haven't been asked to do that, but in

7   other similar situations, we have factors that we

8   use to distribute it.

9       Q.   What factors would those be?

10      A.    It could have to do with -- well, I mean,

11  in this case, I think probably what I would

12  encourage would be a system that compensates people

13  through the municipal water system, so you don't

14  have to pay each individual over time.  You would

15  just -- you know who has joined the system and you

16  would discount their water.

17      Q.   But in this case, where the municipal

18  water system isn't a party to this case that we can

19  make them take any kind of action, where it's just

20  private individuals, what information do we need to

21  know about those private individuals to determine

22  how they should be distributed?

23              MS. JOSELSON:  Object to the form.

24      A.   So I don't know if that first part is

25  true.  You may be right.  I don't know.  I don't

```
 1    know whether we're not able to use the municipality
 2    as the mechanism.
 3              I would say based on what I know right
 4    now, I would use the factors that are in my model,
 5    which is which town they're in and whether or not
 6    they had a water softener, which relates to how
 7    deep their well is.
 8        Q.   But if someone comes in and they say,
 9    "Mr. Unsworth, I have a -- I pay a lot for
10    municipal water because I've got a -- I've got
11    seven kids and a washer/dryer and a lawn, and your
12    model is only giving me an average, and over time
13    that's not enough," is that fair and appropriate to
14    give that person the average?
15              MS. JOSELSON:  Object to the form.
16        A.   If it's paid as a one-time payment, it may
17    be, because they're not going to be in that
18    situation forever.  So it's a present value of a
19    series of future damages.
20              On average, it will be correct.  That's
21    the beauty of the average.
22        Q.   But whether it's correct on average
23    doesn't -- again depends on the distribution of the
24    data?
25              MS. JOSELSON:  Object.
```

1      A.   I have no reason to believe that this is

2   not a normally distributed data set.

3      Q.   So let's talk about the other side of your

4   added cost model, which is the costs of operating a

5   well.

6           Your opinion on added cost damages is

7   based on what you determined to be the difference

8   between the cost of municipal water and the cost of

9   operating a well.  Is that correct?

10     A.   That's correct.

11          I would probably say having a well as your

12  source of water, not -- the operations costs are a

13  piece of those calculations.

14     Q.   Did you attempt to explore whether those

15  costs are variable among proposed class members?

16     A.   I did -- I did do that.  That's what my

17  model does.

18     Q.   In what ways does it explore those

19  differences?

20     A.   There's a pretty significant cost of

21  having a water softener, for having the equipment

22  and having the operations of it.  And so that's --

23  that differs across the class.

24     Q.   So you found one cost to be variable among

25  class members, and that was the water softener?

1      A.    And the need to test water.

2      Q.    So two costs you determined were variable.

3  Is that correct?

4      A.    That's right.  That's right.

5            Well, and as mentioned, the water rates

6  North Bennington are extremely low by comparative

7  sake, and so that's taken into account as well.

8      Q.    If there were additional variations among

9  class members, would that affect your opinion on

10  class certification?

11           MS. JOSELSON:  Object to the form.

12     A.    No.  I would say I still believe that

13  they're -- the preponderance of the factors are

14  similar and the average is correct.

15     Q.    Doesn't the use of averages overcompensate

16  some putative class members and undercompensate

17  others?

18           MS. JOSELSON:  Object.

19     A.    For this particular category of damage or

20  for their overall loss?

21     Q.    Overall.

22     A.    Overall, I would say may calculations are

23  undercompensating everyone.

24     Q.    But simply looking at the use of averages,

25  that methodological decision that you made, that

 1  means you will be overcompensating some individuals

 2  and undercompensating others.  Is that correct?

 3          MS. JOSELSON:  Object.

 4      A.   I think we've already talked about that,

 5  and I think on average over the time period of the

 6  analysis, it will be a sound measure and something

 7  we would typically use in my business.

 8      Q.   On average, a sound -- so you're saying on

 9  average, averages do the job?

10          MS. JOSELSON:  Object to form.

11      A.   If on -- on average, I believe this is a

12  reasonable measure of the added costs to the

13  members of these communities.

14      Q.   What comfort is that to someone who has

15  been undercompensated by the use of an average?

16          MS. JOSELSON:  Object to the form.

17      A.   So assuming someone out there has a

18  substantially lower cost of operating a well, for

19  example, and you think their damages are higher,

20  presumably they'd opt out of the class.  They

21  wouldn't feel fairly compensated if they believed

22  that.

23      Q.   Do you agree that among the costs for a

24  groundwater well is the cost of an annual

25  maintenance inspection?

1      A.    No.

2      Q.    Would you agree that among the costs for a

3   groundwater well would be water tests?

4      A.    I include that.

5      Q.    Would you agree that among those tests

6   would be a test for bacteria?

7      A.    That's what this test is.

8      Q.    Would you agree that among those water

9   tests would be one for inorganic chemicals?

10      A.    So we -- folks can do that.  You can

11   submit a packet to Vermont.  And in conversations

12   we had with Vermont, very few Vermont residents

13   choose to submit those tests on a regular basis.

14      Q.    Would you agree that among those water

15   tests would be one for gross alpha radiation?

16      A.    Some people do do radon tests,

17   particularly when you're selling a home.  So you

18   take a sample from the tap and you send it in.

19   That's not something that people typically do once

20   they're in a home.  It's typically required by the

21   Realtor or by the -- when they sell the home.

22      Q.    Should damages be determined for the class

23   based on what people typically do or based on

24   what's recommended?

25           MS. JOSELSON:  Object to the form.

1     A.    What people typically do.

2     Q.    So if one individual does a radon test

3  every year on his well, then that should be

4  accounted for in the determination of his damages.

5  Is that correct?

6          MS. JOSELSON:   Object.

7     A.    I don't know why anybody would test radon

8  every year.  It's not the kind of water problem

9  that arises year to year.  It's typically

10  associated with your source water and you typically

11  do it when you sell a home, because the mortgagee

12  or the mortgage lender wants to know.

13     Q.    Suppose someone with a unique sensitivity

14  tests for radon.  It doesn't have to be every year,

15  but they test for it every five years.

16          Should that -- those unique circumstances

17  be accounted for in determining their added cost

18  damages under your model?

19          MS. JOSELSON:   Object.

20     A.    If I had data on that, I could include it,

21  but I also would ask whether folks are testing the

22  municipal water year to year to see, for example,

23  if they have lead problems or salt problems.

24     Q.    And this would be the same for those who

25  choose to perform the test for inorganic chemicals.

```
                                        Page 137
 1    Is that correct?
 2            MS. JOSELSON:  Object.
 3        A.   I would ask the same way.  We'd have to --
 4    if I was going to include all those tests that are
 5    infrequent, I would also, for example, see whether
 6    people test their municipal water.
 7        Q.   So -- and why did you choose only to
 8    include the tests for bacteria but not these other
 9    tests?
10            MS. JOSELSON:  Object to the form.
11        A.   Because in conversations with the state --
12    so Vermont's a little unique.  You can order a kit
13    and you can order several different kinds of kits.
14    So we simply ask them which kits most people buy,
15    and most people who are doing the water testing buy
16    the bacteriological kit.  I'm actually
17    overestimating the frequency with which people do
18    that.  Usually people do it -- excuse me -- when
19    they have a problem.  Not every year.
20        Q.   So people -- the use of testing by all
21    these individuals in the class is going to be
22    variable.  Is that correct?
23            MS. JOSELSON:  Object.
24        A.   It will be, but I think the number here is
25    reasonable, given what we understand that --
```

Page 138

```
 1        Q.   And what was --
 2             MS. JOSELSON:  Wait.  I'm not sure he
 3     finished.
 4             Did you?
 5        A.   I was saying I think it's reasonable,
 6   given what we understand about how many folks and
 7   what types of kits they submit to the state.
 8        Q.   And do you have any data on how frequently
 9   these tests are performed?
10        A.   Not for -- not for Bennington.  The state
11   wasn't willing to provide that information for
12   Bennington.
13        Q.   For North Bennington, do you have data?
14        A.   Not for the well users, no.  And I don't
15   know if it's available.
16        Q.   So do you have --
17        A.   I'm not sure the state distinguishes the
18   two towns in their response to that question.
19   But -- I'm not sure.
20        Q.   So your decision to include one of these
21   tests in your model but not the others was not
22   based on data but just based on an informal
23   conversation with the utilities.  Is that correct?
24             MS. JOSELSON:  Object.
25        A.   It was based on formal questions we asked
```

1  of the utilities and the answers we got.

2      Q.   But it was not based on data?

3          MS. JOSELSON:  Object.

4      A.   They did not -- they were not willing to

5  provide the data on number of samples that are run.

6      Q.   So you tried to obtain data on the number

7  of tests for inorganic chemicals in Vermont?

8      A.   As I said, there are a variety of packs

9  you can get for testing.  And we asked whether data

10 on that were available, and they said no, but they

11 did say that it's unusual for folks to buy the more

12 expensive pack, except when they're selling a home.

13     Q.   So you attempted to obtain this data and

14 it was not available?

15     A.   That's correct.

16     Q.   So you just picked one test to use in your

17 model but not the others?

18         MS. JOSELSON:  Object.

19     A.   For the reasons I stated.  And I would say

20 that an awful a lot of people don't test their well

21 water at all.

22         This is not an average.  This is the cost

23 of the bacteriological test imposed on all the

24 people in those particular categories.

25     Q.   When you say imposed on all those people,

1    what do you mean?

2         A.    Imposed on the calculations.  It assumes

3    they're doing it.

4         Q.   So you're assuming that everyone will do

5    that test, even though you know that not everyone

6    does?

7              MS. JOSELSON:  Objection.

8         A.    That's right.  Because it -- because it

9    makes the damages number smaller.  Conservative.

10        Q.   And you're assuming that no one will do

11   the test for inorganic chemicals even though you

12   know some do?

13        A.    That is not incorporated into my analysis.

14        Q.   And you're assuming that no one will do

15   the test for gross alpha radiation even though you

16   know that some do?

17        A.    That's correct.  I didn't see it as an

18   annual cost that would be recurring.

19             You also mentioned that some people may

20   have a sensitivity to radon.  I'm not aware of that

21   as a physical phenomenon.

22             (Unsworth Exhibit 9 marked for

23             identification.)

24   BY MR. WILSON:

25        Q.   The court reporter is handing you what has

Page 141

```
 1    been marked for identification as Exhibit 9.
 2              Have you seen this before?
 3         A.   I'm not sure I've seen this exact same
 4    thing.  I own a home in Vermont, so I'm familiar
 5    with the information the Department of Health
 6    provides.  But I'm not sure -- I'm not sure this
 7    was in our --
 8         Q.   And just to be clear, your home is not in
 9    Bennington or North Bennington, is it?
10         A.   No, it is not.
11         Q.   Okay.  Just want to make sure the expert
12    is not a class member.
13         A.   No.
14         Q.   So do you see that it says, in the top
15    section there, that total coliform bacterial test
16    is recommended every year?
17         A.   Yeah.  "Coliform."
18         Q.   The inorganic chemical test is recommended
19    every five years, and the gross alpha radiation
20    screen is recommended every five years?
21         A.   Yes.
22         Q.   I read that correctly?
23         A.   Yes.
24         Q.   Do these recommendations by the Vermont
25    Department of Health change anything about your
```

1    opinion either on whether these tests should be

2    included in your model or how frequently they're

3    performed?

4        A.   No.  I think it's interesting that that's

5    what they're recommending.  But we asked a

6    different question, going back to the revealed

7    preference, which is how often do people really do

8    this.  And it's not done frequently.

9        Q.   And you're determining real -- revealed

10   preference based on the statement of individuals at

11   the water utilities?

12       A.   No.  At the state department of health.

13       Q.   At the state.  Okay.

14            And --

15       A.   We did ask about that.  I'm familiar with

16   these tests, and we asked do people do these on a

17   regular basis, and they said they recommend that.

18   And I said, "Well, do people actually do it?"  And

19   they said based on the numbers they receive, no.

20       Q.   But you included the total coliform

21   bacteria for everyone in your analysis, didn't you?

22       A.   No.  We didn't include -- include it for

23   the folks who don't use softener.  So . . .

24       Q.   Because it's only necessary for those who

25   use a softener?  Is that your --

1     A.    No.   It's related to the depth of the well

2   and also the effect of having a -- the water

3   softening equipment in the homes to us seemed like

4   more likely that people would be -- would be doing

5   the test.

6     Q.    So those are your approximations or

7   guesses about who is going to be doing these tests?

8         MS. JOSELSON:   Objection.

9     A.    Based on -- based on talking with the

10   water utilities and talking with the state folks

11   about whether they're likely to see problems in

12   their water, et cetera.

13    Q.    And if we had information or data about

14   which individuals actually do these tests and how

15   frequently they do them, we'd have a measure of

16   damages that would be both more accurate and more

17   precise under your methods.

18         MS. JOSELSON:   Object.

19    Q.    Is that correct?

20    A.    You may, or you may find the average is

21   represented here.  We don't know.

22    Q.    And you don't know until you look.  Is

23   that correct?

24         MS. JOSELSON:   Object.

25    A.    We don't know, but I don't have reason to

```
 1   believe that that's a factor that causes my number
 2   to be incorrect.
 3        Q.   And you don't have reason to believe,
 4   because you didn't look?
 5        A.   No.  We did look and we got information
 6   about how frequently people do these things.
 7        Q.   But you don't have data?
 8        A.   Did not get data from the state on that.
 9        Q.   So you included a well pump and expansion
10   tank as expenses that would be required -- let's
11   start that question over.
12             You included a well pump and expansion
13   tank as expenses that would be required for
14   operation of a well to offset against the cost of
15   municipal water.  Is that correct?
16        A.   That's correct.
17             MR. WILSON:  Exhibit 10.
18             (Unsworth Exhibit 10 marked for
19             identification.)
20   BY MR. WILSON:
21        Q.   The court reporter has handed you what's
22   been marked for identification as Exhibit 10.
23             With apologies for the nature of Excel
24   printouts, can you tell me what this is?
25        A.   It appears to be the spreadsheet that we
```

1   provided that do some of the calculations.

2       Q.   And if you look at the second page of this

3   printout, you'll see a number of URLs and then

4   numbers next to them, dollar amounts.

5            Are these the sources that you used to

6   determine the amount and frequency of the expenses

7   of a pump and a tank?

8            MS. JOSELSON:  Object.

9       A.   Sorry.  The format is getting me.

10           Can you point to where you're looking at?

11      Q.   It's second page of the printout, I

12  believe.  It's double-sided.  It might be the back

13  of the first page.

14      A.   So the page that starts with "factor" at

15  the top?

16      Q.   I don't see "factor."  You know, I think

17  mine might be slightly different.  Okay.

18           Oh.

19           MS. JOSELSON:  My second page is

20      different.

21      Q.   Yeah.  It looks like it's -- in your

22  version it's the -- the first page.

23      A.   So these are -- these are the sources we

24  stuck in the spreadsheet.  I'd actually have to go

25  back and look at the text and our other files to

```
 1   see if there were other sources.  I believe there
 2   were -- typically there was more than one source
 3   for the -- for each factor.  So this --
 4       Q.   Are these sources that are listed in your
 5   damages spreadsheet identified as sources in your
 6   report?
 7       A.   I'm not sure about that.  I think if they
 8   were in the spreadsheet, we may not have included
 9   them in the report.  So . . .
10       Q.   To the extent there were other sources,
11   they're not identified either in your report or in
12   your spreadsheet.  Is that correct?
13            MS. JOSELSON:  Objection.
14       A.   They may be a document or an item in the
15   pile that we gave you.  The intention was to
16   identify them in the report or in the -- or in the
17   source spreadsheet.  But there may have been an
18   item that was in the paper.
19       Q.   What method did you use to select or
20   identify these articles as the basis for
21   determining the expenses for operation and
22   replacement of a pump and tank?
23       A.   So we looked at a variety of sources
24   online, including these websites that help
25   homeowners understand the cost of owning a well or
```

 1   of doing a repair, and then we triangulated those

 2   to make sure that we weren't seeing variation.  If

 3   we were seeing variation, we tended to select the

 4   higher cost or the more frequent replacement.  And

 5   then we also compared it to, you know, expected

 6   total costs of operating the well, for example, the

 7   work we did out in Lockformer, you know, whether it

 8   made sense.

 9           MR. WILSON:  We'll go with Exhibit 11

10       here, please.

11           (Unsworth Exhibit 11 marked for

12           identification.)

13   BY MR. WILSON:

14       Q.   The court reporter has handed you what's

15   been marked for identification as Exhibit 11.

16           Can you tell me what this is,

17   Mr. Unsworth?

18       A.   It looks like an article from the Chicago

19   Tribune on pressure tanks.

20       Q.   Can you tell me whether this is the

21   article from the Chicago Tribune that's cited in

22   your damages calculation spreadsheet?

23       A.   It appears to be.  One of the articles.

24       Q.   So you see -- the second sentence of the

25   second paragraph of the article says, "The water

```
1   tank requires annual maintenance.  If the storage
2   tank isn't serviced annually, not only is the
3   pressure tank at risk, but your water pump is at
4   risk as well."
5           Did I read that correctly?
6       A.   Yes.
7       Q.   And do you agree with that document?
8       A.   I'm not an engineer, so I'll take it at
9   face value.
10          MR. WILSON:  We can go up to 12 now.
11          (Unsworth Exhibit 12 marked for
12          identification.)
13  BY MR. WILSON:
14      Q.   The court reporter handed you what's been
15  marked as Exhibit 12 to your deposition.
16          Is this also one of the articles that you
17  relied on?
18      A.   It appears to be.
19      Q.   Do you see where on the third page at the
20  bottom, it says, "It's a good idea, well experts
21  say, to schedule regular well maintenance.  An
22  annual inspection should cost 100 to $120."
23          Did I read that correctly?
24      A.   You did.
25      Q.   And do you agree with that statement?
```

1      A.   I'm not a well expert, and I don't know

2   if -- I don't know if that's a good idea.  It

3   sounds like it is.  From the folks who wrote this

4   article, it is.  Presumably those are folks who

5   provide well maintenance services.  So . . .

6      Q.   And you would have to basis to disagree

7   with that statement?

8           MS. JOSELSON:  Objection.

9      A.   I don't have a basis to disagree with it,

10  but I would say that to the extent that someone

11  incurs these costs, their well would -- pump would

12  last longer.  And we're going with averages, so it

13  would reflect the average of whether people do

14  annual well maintenance.

15          I can tell you the sample of one, I

16  haven't done well maintenance on 20 years on my

17  well, so I don't know whether that statement is

18  correct.  It's not correct for me.  So . . .

19     Q.   An example perhaps of the fact that even

20  rational actors don't always follow what's

21  recommended?

22     A.   At 100 to $120 a year, I would argue,

23  actually, that wouldn't be rational to . . .

24     Q.   Now, just right after that paragraph that

25  I read, it says --

1    A.   You're also assuming economists are

2    rational.  That's a totally different issue.

3        Q.   You talk about rational actors, but you're

4    not necessarily rational yourself?  Is that the --

5        A.   I don't know whether anyone's rational

6    being rational actors, yes.

7        Q.   Okay.  We'll get into that philosophy

8    later.

9             Right after that paragraph we just talked

10   about, it says, "Meanwhile, prepare for a

11   significant cost if you need a new well pump.  It

12   costs about 1,000 to replace and install a pump and

13   related components in a shallow bored well.  For a

14   drilled well, the price may approach $2,000

15   depending on shaft depth and pump horsepower."

16       A.   Yes.

17       Q.   Did I read that correctly?

18       A.   You did.

19       Q.   And do you have any reason to disagree

20   with that statement?

21       A.   I mean, we saw a variety of costs.  The

22   $2,000 seemed high.  But there was a range of

23   costs, depending on market and which equipment you

24   buy.  They're also -- wells or well pumps and

25   pressure tanks and other things are getting less

1    expensive.  They're producing less expensive

2    versions of them.

3        Q.   On what basis did you determine that

4    $2,000 seemed high?

5        A.   Based on the distribution of looking

6    online and the prices people were reporting for

7    them.

8        Q.   Are any of those materials cited in your

9    report?

10       A.   To the extent I included them, they're

11   included.  Otherwise, they're -- no, they're not

12   cited, obviously.

13       Q.   And the information that you have about

14   decreasing prices of these tanks going forward, are

15   any of those materials cited in your report?

16       A.   No.  That's based on my knowledge of --

17   from other cases and engineering cost estimates.

18       Q.   And you don't state anything about that in

19   your report, do you?

20       A.   I do not.  We didn't take that factor into

21   account.  In fact, we assumed that costs would

22   increase at 2 percent per year.

23       Q.   So based on the articles that we just

24   talked about, would it be appropriate to include an

25   annual charge for well maintenance in your damages

1    analysis?

2          MS. JOSELSON:  Object.

3      A.   No.  I would say no because the cost of

4    doing that is disproportionate to the benefit of

5    it.  So it's not something I would expect people to

6    do.

7      Q.   So you relied on these articles for some

8    propositions, but you're ignoring them for others.

9    Is that correct?

10         MS. JOSELSON:  Object to the form.

11     A.   Well, I'm not ignoring them.  So if you --

12   if we look at how long well pumps tend to last,

13   that presumably reflects people's average behavior.

14   So some of those people may maintain them and that

15   might benefit them.  Other people don't.  But you

16   would still expect the average to be correct.  So

17   when they report an average time period over which

18   wells last -- well pumps last, that that would be

19   incorporated in that average.

20     Q.   So if we have one class member who is --

21   let's call him Mr. Rational Actor, and he does all

22   the recommended maintenance every year that's

23   recommended in these articles, and we have another

24   class member who is not -- who doesn't do that

25   maintenance, those two class -- putative class

1  members will have different damages, won't they?

2          MS. JOSELSON:   Object.

3      A.   It depends.  I think one person is paying

4  for more pumps and the other one is paying for more

5  maintenance.  The total cost may wind up being the

6  same.

7      Q.   It may, but you don't know without

8  looking, do you?

9      A.   I think that I'm comfortable with the

10 average.

11     Q.   But if someone provided you with

12 information on the varying different maintenance

13 habits of people in the putative class, that would

14 provide you with a more accurate and more precise

15 measurement of each individual class member's

16 damages, wouldn't it?

17         MS. JOSELSON:   Object.

18     A.   I don't know.  It would -- it may provide

19 a different measure of loss of that individual for

20 the given year you're in.  But whether it would

21 reflect their loss and the total cost, I don't

22 know.  It would depend on other factors like how

23 much it cost them to -- what benefit they get for

24 maintaining it.  Right?  So . . .

25     Q.   What other factors would it depend on?

1    A.   I mean, you would think rationality would

2  tell you that folks would invest in maintenance up

3  to the point where it doesn't pay.  And so you

4  either don't maintain and don't pay that cost, or

5  you maintain and get the benefit of it, but you

6  would net out the same.

7    Q.   Assuming people are rational actors?

8    A.   Assuming people are reasonable, yeah.

9    Q.   Yeah.

10        So more information on those factors will

11  provide a more informed, more accurate, more

12  precise determination of damages of putative class

13  members, wouldn't it?

14        MS. JOSELSON:  Object.

15    A.   Again, it may not change my average.

16    Q.   It wouldn't change your average, but it

17  would be more accurate and precise?

18        MS. JOSELSON:  Object.

19    Q.   Is that correct?

20    A.   I don't know, because a lot of this is

21  forecasting forward.  Because that's what we're

22  stuck with, is a problem that goes forward.  So it

23  would be a different number.  Whether it's more

24  accurate or not, I don't know.

25    Q.   Averages are less accurate and precise.

Page 155

1   Is that correct?

2           MS. JOSELSON:  Objection.

3       A.   No.

4       Q.   Why is it not correct?

5       A.   An average is an average.  That's all it

6   is.  It's measured with -- it's measured with some

7   precision, but it's -- an average itself isn't less

8   accurate.

9           MR. WILSON:  Let's go ahead and break for

10      lunch.

11          MR. WOLFF:  No, no.  A quick break.

12          MR. WILSON:  Never mind?

13          THE WITNESS:  You just took lunch away

14      from me.  That's --

15          THE VIDEOGRAPHER:  Off the record?

16          MR. WILSON:  Yeah.

17          THE VIDEOGRAPHER:  The time is

18      approximately 12:08 and we are off the record.

19          (Recess taken from 12:08 to 12:13 p.m.)

20          THE VIDEOGRAPHER:  The time is

21      approximately 12:13 and we are back on the

22      record.

23          MR. WILSON:  Exhibit 13.

24          (Unsworth Exhibit 13 marked for

25          identification.)

1   BY MR. WILSON:

2       Q.   The court reporter is handing you what's

3   been marked for identification as Exhibit 13.

4            Do you recognize this document,

5   Mr. Unsworth?

6       A.   It appears to be a PDF.  It doesn't look

7   like a website, so it's a little hard for me to

8   recognize it.  But, yeah.

9       Q.   I'll represent to you that this was

10  another one of the articles that was cited in your

11  damages calculation spreadsheet.  At the top it

12  says, "How much does a well pump cost to replace or

13  install?"  The national average, it states, is

14  1,531.

15      A.   Mm-hmm.

16      Q.   The typical range is 847 to 2,241.  The

17  low end is $200 and the high end is $4,000.

18           Your report used the average value to

19  determine the cost to replace or install a well

20  pump.  Is that correct?

21      A.   That's correct.

22      Q.   But that cost could be as low as $200 and

23  as high as $4,000.  Isn't that correct?

24      A.   I mean, that's what's cited here.  I

25  don't -- I find it not credible that it could be as

Page 157

1    low as 200.

2         Q.   But you relied on this document?

3         A.   I did, for the average, yeah.

4         Q.   For the -- now, if -- does the average

5    incorporate that 200 value?

6         A.   That's what somebody reported.  So I

7    believe what this data set does is it -- people

8    report values and they average them.  So it does --

9         Q.   So if the 200 value is not credible, then

10   the average isn't credible, either?

11            MS. JOSELSON:  Objection.

12        A.   No, that's not true.  It depends on how

13   much data there is.

14        Q.   But you don't know?

15        A.   No.  But I wouldn't expect that everyone

16   in Bennington could get their well replaced for

17   $200.

18        Q.   But some may.  Is that correct?

19        A.   I doubt it.  I think the average is a more

20   reasonable estimate.

21        Q.   So this is a pretty big range here, isn't

22   it, from $200 to $4,000 for the cost to replace a

23   well pump?

24        A.   Yeah, but there's also a typical range

25   given that's far smaller.

1      Q.   You say it's far smaller, but the

2   difference between $847 and $2,241, that's more

3   than $1,000 of difference.  It's more than a

4   50 percent difference, isn't it?

5      A.   Well, I said it was quite a bit smaller.

6   It's quite a bit smaller than the other range.

7      Q.   Doesn't this illustrate the problem with

8   averages?

9           MS. JOSELSON:  Objection.

10      A.   No, I don't think it does.

11      Q.   Really a wide range of data that you've

12   distilled into a single number here.  How is that

13   single number of the average fair to people who are

14   on extremes of the range?

15           MS. JOSELSON:  Object.

16      A.   Well -- so, again, whether it's fair or

17   not is a different question.  Fairness would relate

18   to the total damages and what the case settles for

19   and how the damages are awarded.  So fairness is a

20   different issue.

21           Whether you're saying that could an

22   individual experience a cheaper well pump

23   replacement in the future and therefore municipal

24   water actually costs them more, I would say, as

25   I've said before, I think I'm right on average.

1  That's way the calculation is done.  So I don't
2  expect that number to be exactly the same, but I do
3  expect it to be right on average.
4      Q.   Now, I don't mean to be flippant, but if
5  you have a situation where there's a sharpshooter
6  shooting at someone, and they shoot twice, one time
7  they shoot directly to the left and one time they
8  shoot directly to the right, they miss both times,
9  but on average the guy is dead.
10          MS. JOSELSON:  I'm not sure there's a
11      question.
12      A.   Yeah.  Yeah.
13      Q.   Isn't that a situation where averages can
14  really distort reality?
15          MS. JOSELSON:  Object to the form.
16      A.   Well, it's not normally distributed.  So I
17  wouldn't use the average.
18      Q.   Is this normally distributed?
19      A.   I would guess it is, based on the -- I
20  mean, just understand -- based on the way data
21  typically behave, yes.  But you just described a
22  situation in which there were two observations, so
23  I don't know if it's normally distributed.
24      Q.   You would guess this is normally
25  distributed?

1          MS. JOSELSON:  Object.

2      A.   Most data are normally distributed,

3   particularly data like these, yes.  I would not

4   expect them to not be normally distributed.

5      Q.   With a wide typical range in the middle.

6   Is that correct?

7      A.   I don't know how they would define a

8   typical range here.  I'm using the average.  I

9   don't know if the typical range actually has a

10   statistical meaning or whether it's just typical.

11      Q.   Now, based on the articles that we've

12   discussed and that were cited in your damages

13   calculation spreadsheet, you determined that a well

14   pump would need to be replaced every 17 years and

15   an expansion tank would need to be replaced every

16   25 years.  Is that correct?

17      A.   Yes, that's correct.

18      Q.   There's going to be different costs for a

19   shallow well pump versus a deep well pump.  Right?

20      A.   There could be.  There could be.

21      Q.   Do you know of any reason why there

22   wouldn't be?

23      A.   Yeah.  The price you get from the -- from

24   the -- whoever is providing it to you.

25      Q.   So there can be a difference in the

1  vendors as well?

2       A.   There could be, and there could be a

3  difference in when it fails, what the economy is

4  like, et cetera.

5       Q.   There could be a difference in operating

6  costs between shallow well pumps and deep well

7  pumps as well?

8       A.   I would expect the electricity to be

9  higher for the deep well pump.  You're lifting

10 water more.  But on average, I would expect it to

11 be the number I have.

12      Q.   And do all well pumps and expansion tanks

13 have the same lifespan?

14      A.   I wouldn't -- I would expect there's --

15 no.  They don't all last exactly the same number of

16 years.  They fail in some random distribution.

17      Q.   And as we discussed, their price is

18 variable as well?

19      A.   They can be, yes.

20      Q.   Significantly variable?

21           MS. JOSELSON:   Object.

22      A.   I don't know if they're significantly

23 variable.  Remember, this is a national average, so

24 whether they're significantly variable in

25 Bennington or not, I don't know.  I would think

1    that at any given time, there's probably a pretty

2    competitive market for installing them.  So I'm not

3    sure how variable they would be to an individual at

4    a given time.

5         Q.   But you don't have any data that suggest

6    that they're not?

7         A.   No.  I just have an expectation that --

8         Q.   And the only data that you've cited in

9    your analysis spreadsheet shows that they are

10   highly variable?

11            MS. JOSELSON:  Object.

12        A.   Again, in a range across a national

13   average, yes.

14        Q.   They range from $200 to $4,000.  Is that

15   correct?

16        A.   As self-reported, yes.

17        Q.   And the typical range spans more than

18   $1,200 -- more than $1,300, in fact?

19        A.   That would be the difference between those

20   two numbers, yes.

21        Q.   The cost of operating and maintaining

22   these pumps could also depend on household water

23   usage, couldn't it?

24        A.   Well, the electricity could vary depending

25   on household water usage.  So, yes.

1      Q.   Might also vary based on the soil quality.
2   Is that correct?
3      A.   I'm not -- I'm not familiar with that
4   factor.  I'm not sure what you mean by that.
5   Typically these are drilled into bedrock, so I'm
6   not sure what you mean by "soil quality."
7      Q.   Now, it's also possible that different
8   members of the proposed class would be at different
9   stages of the life cycle of their well equipment at
10  the time that they switched to municipal water.
11  Isn't that correct?
12     A.   I would expect that, yes.
13     Q.   So if one proposed class member was
14  reaching the end of the life cycle of their
15  equipment at the time of the switch to municipal
16  water, their expected expenses going forward would
17  be vastly different than someone who was at the
18  beginning of that lifestyle -- life cycle?  Excuse
19  me.
20          MS. JOSELSON:  Objection.
21     A.   I wouldn't say vastly different.  The way
22  the calculation does it is I simply calculate an
23  average cost per year.  So they would incur that
24  expense at a different time so their financing
25  would vary.  But I actually -- over the time

1    periods I'm talking about here, I would not expect

2    it to be vastly different.

3        Q.   Now, when you determined the cost of

4    electricity to operate the well, there's nothing

5    cited in your report for the basis of that cost.

6    Can you tell us how you derived that number of $47

7    annually?

8        A.   I think the report does actually state.

9    So it's -- we spent quite a bit of energy on the

10   Lockformer case in calculating the cost of -- or

11   the number of kilowatts required to lift water and

12   what a typical kilowatt would be for lifting water.

13   That hasn't changed.  That physical function hasn't

14   changed.  That's the amount of energy needed to

15   lift water.

16            What we did do is we adjusted for the fact

17   that Vermont has slightly different electricity

18   prices, so the cost of those kilowatt hours are

19   different.  But the physical cost of lifting the

20   water is -- the physical requirement of lifting the

21   water hasn't changed with time.

22       Q.   Is this something that's in your damages

23   analysis spreadsheet but not in your report?

24       A.   I thought it was in both, actually, but

25   maybe it doesn't say that.  If it doesn't say it,

```
 1   that's a -- that was left out.  I'd have to go back
 2   through it to see whether we failed to cite that.
 3       Q.   So if we have that equation for
 4   determining electrical cost, don't we also need to
 5   know the amount of volume of water that's being
 6   transmitted?
 7       A.   So we were looking at -- the household
 8   size in the Lockformer case and here are very
 9   similar.  So I assumed a similar water usage and
10   then you have a certain amount of lift.
11       Q.   But average household size is deceptive,
12   isn't it?  Because you have -- there's a big
13   difference between someone who is a single-family
14   household, or a single-person household, and a
15   family of seven?
16       A.   Again, there's no value judgment on an
17   average.  It's not deceptive.  It is what is it is.
18   It's the -- we're calculating an average lift.
19       Q.   But it's not accurate?
20            MS. JOSELSON:  Object.
21       A.   No, it is the average.
22       Q.   It's accurate as the average, but is it
23   accurate with respect to the cost for a family of
24   seven versus the cost for a single individual
25   household?
```

```
                                        Page 166
 1            MS. JOSELSON:  Object.
 2       A.   I think individual households we talked
 3   earlier could consume different quantities of water
 4   depending on their behaviors.
 5       Q.   And we don't know; we'd have to look at
 6   that?
 7       A.   It's -- it's --
 8            MS. JOSELSON:  You have to let him finish
 9     his answer.
10       A.   But I don't think you have to look at it,
11   no.  I would disagree with that.  I am presenting
12   an average, and I believe it's going to be right on
13   average.  So it's going to correctly calculate
14   damages for the class.
15       Q.   But for an individual within the class,
16   the putative class, more information about how much
17   water they use would give a more accurate and more
18   precise picture of their damages under your model.
19   Is that correct?
20            MS. JOSELSON:  Object.
21       A.   Already discussed.  It would -- it would
22   give a more accurate quantity of water currently
23   consumed.  It would not necessarily be more
24   accurate from the 99-year perspective or the
25   30-year perspective for that household.  It would
```

1   depend.

2        Q.   So we would need to know not only their

3   current usage but their projected usage going into

4   the future?

5        A.   You would have to live out the next 99

6   years, and you would have to have lived out a world

7   in which there was no PFOA.

8        Q.   And accounting for those usage base facts,

9   you're saying it would not be accurate to the

10  extent it predicted future usage, but it would be

11  more accurate than the average.

12            MS. JOSELSON:  Objection.

13       Q.   Is that correct?

14       A.   Not across the class, no.  I would think

15  the average would be correct across the class.

16       Q.   But for some individuals -- in fact, for

17  every individual -- their actual usage is more

18  accurate than an average.  Is that correct?

19            MS. JOSELSON:  Object.

20       A.   If you're trying to measure what?

21       Q.   If you're trying to measure their damages

22  under your model.

23            MS. JOSELSON:  Object.

24       A.   I am trying to measure damages to the

25  class, and I use averages for various factors to

```
 1    predict the damages for the class.  On average, it
 2    will be correct.
 3         Q.   If we were going to look at damages for an
 4    individual within the class, the proposed class,
 5    and we have your framework of added cost of
 6    municipal water versus well water, looking at that
 7    individual, is it more accurate to use the average
 8    or is it more accurate to use the data with respect
 9    to the individual?
10              MS. JOSELSON:  Object to the form.
11         A.   More accurate from what perspective?
12         Q.   The perspective of truth.
13              MS. JOSELSON:  Object to the form.
14         A.   Well, for truth, what would be more
15    accurate would be measured total damages.  We're
16    measuring a portion of truth here.  So truth takes
17    you to a totally different answer.
18         Q.   Well, if we're talking about the truth as
19    to that individual, is the average more accurate or
20    is the data relating to the individual more
21    accurate?
22              MS. JOSELSON:  Object to the form.
23         A.   So these are being done at the -- at the
24    class level, and so the average I think is
25    accurate.
```

1     Q.   Well, I'm not asking about the class --
2     A.    Is there a distribution in the average?
3  Yes, we've already talked about the various
4  factors.  But it is correct to use the average.
5     Q.   I'm not asking about the class level.  I'm
6  asking if we want to determine the damages of an
7  individual within the class, is it more accurate to
8  use the individual's information or to use the
9  average?
10          MS. JOSELSON:  Object to the form.
11    A.    Would you have information on the future?
12    Q.    Assume information on the future both for
13  the average and for the individual.
14          MS. JOSELSON:  Object to the form.
15    A.    I'm not sure what you mean, then.
16    Q.    Okay.  If --
17    A.    It would give -- you're -- if you had
18  knowledge of the future, the average would be more
19  accurate, if I knew the future.
20    Q.    I'm saying that if we have equal knowledge
21  of the future both for the average and on the
22  individual level, is it -- if we're trying to
23  determine the damages of the individual, is it more
24  accurate to use the information relating to that
25  individual or to use an average?

1          MS. JOSELSON:  Objection.

2     A.   It would depend.  It would depend.

3     Q.   Describe to me --

4     A.   Because I'm going out for 99 years.

5  So . . .

6     Q.   Can you describe to me one situation where

7  if you're determining damages for an individual and

8  you have data for that individual, it's more

9  accurate to use an average than it is to use the

10 data relating to that individual?

11          MS. JOSELSON:  Object.

12    A.   If that individual's behavior in that

13 given year is on the distribution of the average,

14 and I'm going out 99 years, it may actually be more

15 accurate.

16    Q.   If you want to know someone's salary, is

17 it more accurate to look at their W-2 or to look at

18 an online survey of salaries in their state, on

19 average?

20          MS. JOSELSON:  Object.

21    A.   If I wanted to know the average salary for

22 a person in a household in Bennington for a given

23 household over the next 99 years, I might actually

24 be more accurate with the average.

25    Q.   But that's not what I'm asking about.  I'm

1    saying if you want to know someone's salary, what

2    they currently make, is it more accurate to look at

3    their W-2 or is it more accurate to look at an

4    average across the state?

5             MS. JOSELSON:  Object.

6        A.   I think under the hypothetical, if you

7    want to know right now what they're earning, their

8    own salary would be more accurate.

9        Q.   So wouldn't it be also be more accurate,

10   if you're trying to determine other facts about

11   that person, to look at data relating to that

12   person rather than data relating to averages?

13            MS. JOSELSON:  Objection.

14       A.   It depends on what you're trying to

15   measure.  So we're not measuring here something

16   that's happening right now that we know with

17   certainty.  We're measuring something as best we

18   can over an extended period of time, across a class

19   of individuals.

20       Q.   But wouldn't you say that data relating to

21   the individual at present is a more accurate

22   predictor of the individual in the future than

23   average data at the present with regard to the

24   individual in the future?

25            MS. JOSELSON:  Object.

1    A.   Well, I've already stated that I think
2  that the future cost of the well is going to get
3  capitalized in the home value.  So, actually, that
4  individual's behavior wouldn't -- no.  The average
5  would actually be more accurate, because the
6  average person is going to come along and buy their
7  home.
8         I'm just -- I'm not -- I've already stated
9  that there is a distribution around these
10 variables.  I don't agree that the average is an
11 incorrect measure for loss.  And I've also already
12 stated that it depends on what the total damage,
13 ultimately, number is, whether it's fair or not,
14 or, as you say, is the truth.  And it also depends
15 how the money is distributed.  So it's not -- there
16 isn't one factor here.
17    Q.   In formulating your opinion in this case,
18 did you review any of the data from any of the
19 named plaintiffs in this case?
20    A.   I don't think we did look at the
21 individuals, no.  I've seen data on, like,
22 contaminated concentrations of wells, but not -- I
23 did not look at the individual plaintiff data.
24    Q.   If you were trying to determine the
25 damages of, say, Mrs. Crawford, would it be more

1   accurate to look at her well expenses than to look
2   at an average?
3        A.   It would be more precise for this year to
4   look at her data.  But whether that -- whether her
5   well pump would last as long as I say or whether
6   her electricity costs will stay the same, those
7   things all have to play out over time.
8        Q.   And how they play out over time, wouldn't
9   it be better to look at her well pump and her
10  current usage to predict the life of her pump and
11  the extent of her future usage?
12       A.   I don't know if it would be better.  It
13  remains to be seen.
14       Q.   Do you have any reason to think that
15  averages would be better than looking at Mrs.
16  Crawford's information specifically?
17            MS. JOSELSON:  Object to the form.
18       A.   Yeah, I've already stated why I think the
19  averages might make more sense.
20       Q.   Why didn't you look at any of the data for
21  the class members in this case?
22       A.   Why didn't we survey the class members?
23  Is that what you're asking?
24       Q.   Yeah.  Why didn't you look at their data
25  on how they used their wells and what their

1   expenses are?

2        A.   Well, first of all, I wouldn't -- if we

3   were to look at how individuals use their wells

4   currently, that wouldn't be a terribly sound

5   measure because the situation already exists.

6             We also -- frankly, from an economic

7   perspective, interviewing class members about those

8   factors, I don't know whether that information is

9   reliable, given that they're members of the class.

10       Q.   So you're telling me that if we have a

11  family of seven with large water consumption in

12  Bennington, that it's more accurate to predict

13  their future water usage based on an average than

14  to look at the fact that they're a family of seven?

15       A.   I didn't say that actually.  What I said

16  was --

17       Q.   You told me --

18       A.   What I said was my average is going to be

19  correct.

20       Q.   But you told me that an average is a

21  better predictor of future behavior than individual

22  data.  Didn't you tell me that?

23       A.   Well, because that family is not going to

24  remain a family of seven in the household.  They're

25  going to change with time.  So . . .

1      Q.   And still, you think that an average --
2   that an average is a better predictor of that?
3      A.   I think average is perfectly reasonable
4   for those time periods, yes.
5      Q.   Is it more precise?  Without regard to
6   whether it's reasonable, is it more precise and is
7   it more accurate than the individual data?
8          MS. JOSELSON:  Object.
9      A.   Since I can't measure the future, having
10  lots of detail about today would not significantly
11  increase my confidence.
12     Q.   So you're saying an average based on data
13  from today is a better prediction than actual data
14  based on the situation today?
15         MS. JOSELSON:  Object.
16     A.   Well, I don't have actual data.  I don't
17  know when the pumps will fail.  I don't know how
18  much electricity will cost in the future.  I don't
19  know whether an individual's water softening costs
20  could change in the future.  So what I have an
21  average cost today that I'm using to forecast these
22  costs.
23     Q.   And you don't have actual data because you
24  didn't ask for it?
25     A.   No, because I can't see the future.

1      Q.   No.  We're talking about actual data for

2   the present.

3      A.   I did not ask for actual data from

4   these -- from these class members currently.

5      Q.   So your average is predicting out into the

6   future 99 years.  Is that correct?

7      A.   At a 2 percent increase, yes.

8      Q.   How many people stay in the same house for

9   99 years?

10      A.   Probably almost no one.

11      Q.   Okay.  And you're telling me that your

12   average is a good way of predicting what's going to

13   happen in the future?

14           MS. JOSELSON:  Object to the form.

15      A.   I think we already went over this earlier.

16   It's my belief that costs of owning a home are

17   capitalized in their value, and so that's why I

18   believe that's correct.  We already covered that.

19           MR. WILSON:  Okay.  We can break for

20      lunch.

21           THE VIDEOGRAPHER:  The time is

22      approximately 12:37 and this is the end of Media

23      No. 3.

24           (Lunch recess taken from 12:37 to 1:35

25           p.m.)

Page 177

```
 1          A F T E R N O O N   S E S S I O N
 2          (Unsworth Exhibit 14 marked for
 3          identification.)
 4          THE VIDEOGRAPHER:  The time is
 5      approximately 1:37.  We are back on the record.
 6      This is the beginning of Media No. 4.
 7          Counsel, you may proceed.
 8  BY MR. WILSON:
 9      Q.   Good afternoon, Mr. Unsworth.  I'd like to
10  talk now about your discounting for present value
11  in your report.
12          You discounted the estimated costs of
13  water usage for the putative class members
14  according to the 30-year mortgage rate issued by
15  the Bank of Bennington.  Is that correct?
16      A.   Yes.  I'm trying to -- so, within
17  economics, we believe people have a time value for
18  money.  And so I'm trying to come up with what I
19  think is the nominal discount rate, since I'm --
20  since I'm forecasting costs into the future.  And
21  to do that, I made the assumption that -- standard
22  assumption -- that when people capitalize costs
23  into their homeownership that it would get
24  capitalized at the after-tax mortgage interest
25  rate, since it's a sort of a standard.
```

1      Q.   And that's based your assumption that

2   mortgage financing would be available to homeowners

3   in this community.  Is that correct?

4          MS. JOSELSON:  Object to the form.

5      A.   It doesn't have to assume that.  It's

6   actually not an unreasonable estimate of the

7   nominal rate.  But over time, I would -- you know,

8   I would think that's a reasonable estimate.

9          The other alternative would be to go with,

10  you know, some conventional estimates of what the

11  real rate of discount is, and those could yield

12  slightly different numbers.  But I think this one

13  is the best for this particular situation.

14     Q.   And the reason you used the rate given by

15  the Bank of Bennington was because you wanted to

16  pick the rate that was available at the time of

17  your report to the local class members.  Is that

18  correct?

19         MS. JOSELSON:  Object.

20     A.   Within -- sorry.

21         Within the local community, yeah.  There

22  is some regional variation in mortgage rates,

23  so . . .

24     Q.   Yeah.

25         So I'm going to hand you what's been

```
 1    marked for identification as Exhibit 14, I believe.
 2              MR. WILSON:  Emily, here's your copy.
 3         Q.   If you turn to page 6-1.  So it's the
 4    first page in section 6.
 5              You got right to it, didn't you.
 6              So this chapter is entitled "Discounting
 7    Future Benefits and Costs," and in the second
 8    paragraph there -- I'm sorry.  Let me take a step
 9    back.
10              Can you tell me what this document is?
11         A.   It seems to be the most recent version, I
12    believe, of EPA's guidance document for preparing
13    economic analysis under federal regulations.  So
14    under various federal rules and presidential
15    orders, the federal government is supposed to
16    provide an economic analysis of new rules, and this
17    is a guidance document that was developed in part
18    for that purpose.
19              The -- I don't think this one says it, but
20    a previous version of this actually listed me as
21    one of the authors.  So . . .
22         Q.   And so you cited this document in your
23    report as material you relied upon in connection
24    with preparing your report.  Is that correct?
25         A.   I believe that's true.  Let me look.
```

1          Yeah, I don't think I cited it for the

2    purposes of discounting, but I -- yeah.  I cited it

3    for section 7314.

4        Q.   And you are a former coauthor of this

5    volume?

6        A.   Well, EPA issued contracts to a bunch of

7    folks to help author different sections of the

8    analysis, and I was one of the folks who wrote some

9    sections of it.  But there were quite a few other

10   people who contributed as well.

11       Q.   So in this section 6 on discounting future

12   benefits and costs, the first sentence of the

13   second paragraph says --

14          MS. JOSELSON:  I'm sorry.  I apologize.

15      What --

16          THE WITNESS:  6-1.

17          MS. JOSELSON:  6.1?

18          MR. WILSON:  6-1.  If you look at the

19      bottom, there's pages.

20          Let me know when you're there.

21          MS. JOSELSON:  Yes.

22   BY MR. WILSON:

23       Q.   So that first sentence of the second

24   paragraph says, "Social discounting, the type of

25   discounting discussed in this chapter, is

Page 181

1    discounting from the broad society as a whole point
2    of view that is embodied in benefit cost analysis
3    (BCA).  Private discounting, on the other hand, is
4    discounting from the specific limited perspective
5    of private individuals or firms."
6            Did I read that correctly?
7        A.   Yes.
8        Q.   Would you agree that the type of
9    discounting that you did based on the mortgage rate
10   and the Bank of Bennington is an example of private
11   discounting as opposed to social discounting?
12       A.   Yes.
13       Q.   Now, you applied a discount rate to the
14   cost of municipal water, but you did not apply a
15   discount rate to any of the capital costs of
16   maintaining a well, did you?
17       A.   No.  What I did was I calculated the
18   difference and assumed that those -- if you wanted
19   to capitalize the difference over time, you would
20   discount the difference.  So I did discount the
21   capital costs.
22       Q.   I'm sorry.  I understood that your opinion
23   discounted the water usage costs themselves.  Is
24   that not correct?
25       A.   So what my analysis does is it takes

1    the -- it calculates a difference in a given year

2    for the costs between owning a well versus having

3    municipal water, which vary depending on which

4    group you're in.  And then it assumes that some

5    components of that cost increase over time, and

6    then it discounts that difference.  So it does --

7    there is some discounting going on of the capital

8    cost.

9            Now, what I did for the replacement is I

10   used a simple straight line replacement.  I assumed

11   that if it was a thousand-dollar expense over 20

12   years, there would be -- there would be $50 of

13   expense that would have to be put aside each year,

14   an average of $50.

15       Q.   Okay.  I think I understand your method

16   and that's helpful.  Thank you for clarifying.

17            So, just for example, suppose you had a --

18   in year 15, you had an estimated water charge in

19   year 15 for municipal water; and then you also had

20   a potential, say, tank replacement in year 15, just

21   by way of example, and the other associated

22   expenses with maintaining the well.

23            You then calculated the difference between

24   the water usage charge and the well operation and

25   maintenance costs, and then that difference, along

1    with all the other differences in all the other

2    years, was capitalized over time.  Is that correct?

3        A.   Was -- was -- I calculated a present

4    value.

5        Q.   I'm sorry.

6        A.   I didn't capitalize it.

7             But, effectively, I'm assuming that the

8    increased cost to the individual is the same every

9    single year except that it goes up by a small

10   amount.  But it's discounted back, that amount.

11   That same amount is discounted back every year.

12            So it's the same number every year.  It

13   just is -- gets larger in the future -- the

14   difference gets larger in the future because I am

15   inflating some costs, but it's being discounted at

16   a higher rate, so the number actually gets smaller.

17       Q.   Would it be more accurate to separately

18   discount these expenses based on the nature of the

19   expense, for instance, to discount the cost of

20   replacing a tank based on the capital cost to the

21   individual in the year that it's expected to occur?

22            MS. JOSELSON:  Object to the form.

23       A.   So as we talked about this morning, I'm

24   assuming on average, so I use more of an accounting

25   principle for the capital cost.  And, again, if

Page 184

1    it's a thousand-dollar expense every 20 years, I'm

2    assuming on average it will be a $50 expense for

3    the individual.

4         That is, for the individual who is -- if

5    you actually compensate them with the dollar amount

6    today, it would on average be enough that they'd be

7    able to pay those costs into the future.

8    Q.   But would it be more accurate to determine

9    the year in which those expenses were expected to

10   occur and then discount those costs to present

11   value based on the financing that would be

12   associated with them?

13        MS. JOSELSON:   Object.

14   A.   As we talked about this morning, I

15   don't -- I don't know exactly when each of these

16   components will fail and need to be replaced.  So I

17   think it's reasonable over these time periods to

18   use the -- to use the simple average cost of it per

19   year.

20   Q.   Because it will -- it will vary putative

21   class member to putative class member when those

22   components will fail.  Is that correct?

23        MS. JOSELSON:   Object.

24   A.   It could.  But, again, as we talked about

25   this morning, on average it's going to be right.

Page 185

1   There's presumably a difference of ages of pumps

2   and tanks and things like that.  So . . .

3            From a discounting perspective, that

4   wouldn't make any difference because I'd be

5   assuming a certain percentage of items would fail

6   in any given year, and it would have the same

7   effect in the math.

8       Q.   I'd like you to take a look at page 6-7 of

9   the EPA manual.  And on that page, if you take a

10  look at section 6.2.2.1 -- I'm sorry.  6.2.2.  So

11  right above 6.2.2.1.

12           If you look at the beginning of that

13  paragraph, it starts, "Generally a distinction is

14  made between individual rates of time preference

15  and that of society as a whole, which should inform

16  public policy decisions.  The individual rate of

17  time preference includes factors such as the

18  probability of death, where society can be presumed

19  to have a longer planning horizon.  Additionally,

20  individuals routinely are observed to have several

21  different types of savings, each possibly yielding

22  different returns while simultaneously borrowing at

23  different rates of interest."

24           Do you agree with that statement?

25      A.   I agree with it, but the -- in the context

1  of what we're doing here, where I'm calculating a

2  damage which I believe will be paid at a given time

3  certain and then that capital will be used to pay

4  costs in the future, the individual preferences

5  aren't relevant.  Because I'm not calculating a

6  loss in -- I'm not calculating the individual's

7  belief in their own loss or their sense of loss in

8  a given year.  I'm capitalizing a series of future

9  expenses.

10     Q.   Well, you also see the sentence that says,

11  "Individuals routinely are observed to have several

12  different types of savings, each possibly yielding

13  different returns while simultaneously borrowing at

14  different rates of interest."

15     A.   Right.

16     Q.   Wouldn't that suggest that individuals

17  each have different discount rates for present

18  value based on their capital cost for incurring a

19  given expense?

20          MS. JOSELSON:  Object.

21     A.   So the cost to the individual does not

22  represent their own time preference.  So I'm not

23  trying to get an individual time preference here,

24  so I'm not asking the question how does an

25  individual in Bennington feel about a dollar today

1  versus a dollar tomorrow.  I'm calculating a dollar

2  amount which, if given to the individual, would

3  provide a stream of payments for 99 years that

4  would let them cover these costs.  So it's a

5  different -- it's a different calculation.

6      Q.   But --

7      A.   It's not a -- it's not a time preference

8  for money.  It's literally how much money do I have

9  to have today to make these individuals whole.

10      Q.   Whether that money works to allow those

11  individuals to cover their future expenses, though,

12  depends in part on the availability of financing to

13  those individuals and the capital costs that they

14  would incur if they are going to take on those

15  expenses.  Isn't that correct?

16          MS. JOSELSON:   Object.

17      A.   It would -- it would better relate to

18  their -- to their ability to get a return in an

19  individual cost of capital.  So . . .

20      Q.   Because individual homeowners might

21  finance their costs in a variety of different ways.

22  Isn't that correct?

23      A.   Well, if -- I'm not sure I follow that.

24  Financing the costs in what regard?  Given a

25  settlement or given an award or not?

1      Q.   Well, suppose the individual had to incur

2   the expense of replacing a pump or tank that's in

3   the thousands of dollars and they don't have

4   thousands of dollars of cash on hand.  They might

5   use a home equity line of credit, for instance.

6      A.   That would be one option.

7      Q.   They might take out a personal loan.  Is

8   that correct?

9      A.   That's correct.

10     Q.   That home equity line of credit could be a

11  fixed-rate product or it could be a variable-rate

12  product.  Right?

13     A.   That's right.

14     Q.   They might use a credit card?

15     A.   They might.  It would be an expensive way

16  to finance it, but yes.

17     Q.   They might choose to pay cash.  Is that

18  correct?

19     A.   That's correct.  Yes.  Sorry.

20     Q.   And each of those different means of

21  financing carries a different interest rate and

22  different financing charges.  Isn't that correct?

23     A.   Right.  So in those cases, the cost of the

24  capital might be more expensive to those

25  individuals if they did not have access to, say, an

                                        Page 189

1    inexpensive home equity line.

2         Q.   So to accurately determine the total cost

3    of those future expenses, we would need to know the

4    methods of financing that are available to the

5    individual putative class members.  Isn't that

6    correct?

7              MS. JOSELSON:  Object.

8         A.   Well, I don't think you can know that,

9    because, again, you're dealing with a 99-year or a

10   30-year time period.  So we don't actually know

11   what the cost would be.

12             To get an accurate -- what we're trying to

13   do is come up with a correct measure and a reliable

14   measure of the effective return they're going get

15   on their money to pay these expenses.  And given

16   that we're only going over that time period, I

17   would expect that effectively the ownership of that

18   well that isn't there anymore would change.  And so

19   it would get capitalized in the home value.

20        Q.   You said, "I don't think we can know

21   that."

22             Couldn't we find out what methods of

23   financing are available to these class members by

24   asking them?

25             MS. JOSELSON:  Object.

```
1        A.   You could find out what it is right now,
2    given their personal situation and markets right
3    now.  But had we done this analysis in 1980, we
4    would have gotten the answer completely wrong,
5    because the cost of capital has changed so
6    dramatically.
7        Q.   But by at least addressing the variety of
8    different methods of financing that are available
9    to those class members now, wouldn't we get a more
10   accurate picture for each of them than we would by
11   just using one one-size-fits-all rate?
12            MS. JOSELSON:  Object.
13       A.   It would -- you'd have to present it to
14   me.  Then I'd have to look at it and see whether I
15   thought it was a better measure of the -- of the
16   capitalization rate.
17       Q.   But are you suggesting the possibility of
18   future events, given that in 1980 we couldn't
19   predict the current financial conditions -- doesn't
20   that mean that we need to consider more data, not
21   less?
22            MS. JOSELSON:  Object.
23       A.   Well, again, what we're trying to get at
24   here is to assure there's enough cash there, and we
25   need to do it at a risk-free -- towards a risk-free
```

1    rate.  Not a social discount rate, but towards a

2    risk-free rate.  Because we don't want -- I mean,

3    folks can obviously invest the money in the stock

4    market and they might lose it all.

5            But what we're trying to do here is give a

6    sound measure of how you could -- how you could

7    take these expenses.  If an individual had to incur

8    these expenses and they weren't paid for them, how

9    they could capitalize it in their mortgage, for

10   example, which would be a pretty predictable,

11   inexpensive form of capital.

12       Q.   Can you tell me what the estimated

13   lifespan is of a groundwater well?

14       A.   The components or the well itself?

15       Q.   The well itself.

16       A.   I've heard that -- you know, 50 years plus

17   if it's constructed correctly.

18       Q.   Do they all have the same lifespan?

19       A.   I wouldn't expect they would, no.

20       Q.   Would it vary from household to household?

21            MS. JOSELSON:  Object to the form.

22       A.   I think by definition if they're not all

23   the same, it's varying across households.  So . . .

24       Q.   Can you tell me anything about the costs

25   to an individual homeowner if a well decreases its

```
 1   output to less than is required by the particular
 2   household?
 3        A.   I'm not sure what you mean by that.
 4        Q.   If a well stops producing the water that's
 5   necessary for a household, can you tell me what
 6   costs the house -- the homeowner will incur to
 7   bring it up to full production?
 8             MS. JOSELSON:  Object to the form.
 9        A.   So what -- I guess what would cause it to
10   fail in terms of production?
11        Q.   I guess that was part of the -- would be
12   part of your answer.
13             What are the potential things that would
14   cause the well to fail, and how would they be
15   remedied?
16             MS. JOSELSON:  Object.
17        A.   I mean, typically, it's the pump that
18   goes, not the well itself.  Typically the screening
19   wouldn't go.
20             So it would have to mean that either --
21   well, the most common reason why a well fails is
22   the water table drops below the well.  That's the
23   most common reason.  That doesn't happen in the
24   Bennington area.  It's a pretty wet area.  Other
25   parts of the country, that's not unusual at all.
```

1    All of a sudden you don't have any water.

2         Q.   You cited material from Skilling & Sons in

3    your damage analysis spreadsheet, didn't you?

4         A.   Looks like I did.  I'd have to look at the

5    actual document.  Looks like we used it for well

6    pump replacement.

7         Q.   And can you tell me what you described

8    Skilling & Sons as in your damages spreadsheet?

9              I think it's there.

10        A.   Well, if I'm reading this correctly --

11   again, it's hard to read in this format -- but it

12   looks like the number that was associated with it

13   is a 20-year period for well pump replacement.  It

14   looks like I actually used 17 in the actual

15   calculation.

16             MR. WILSON:  Can we mark another exhibit

17      here.  What are we up to now?

18             THE REPORTER:  15.

19             (Unsworth Exhibit 15 marked for

20             identification.)

21   BY MR. WILSON:

22        Q.   So this is -- can you tell me what this

23   is, Mr. Unsworth, Exhibit 15?

24        A.   Looks like it's a printout from the

25   website of the organization we were just talking

1    about.

2        Q.   Now, if you turn to the second page of

3    that document, the first -- the second full

4    paragraph says that "Another problem can be well

5    age.  A well's lifespan is considered to be roughly

6    20 to 30 years."

7             Do you agree with that statement?

8        A.   No, not based on the information we saw.

9    The well itself -- I'm not sure when they're saying

10   the well here whether they're referring to the

11   whole contraption.

12            That's a technical term.

13       Q.   And this article is entitled "What to Do

14   If a Well" -- "If a Water Well Runs Dry"?

15       A.   Yes.  That's the situation I was just

16   describing.

17       Q.   And did you consider that possibility in

18   your analysis?

19       A.   Well, what we did is we talked with folks

20   out there about -- there's a paragraph in the

21   report that says we talked to folks out there about

22   whether Bennington has had a problem with -- with

23   the aquifer being drawn down.  Again, not an

24   uncommon problem in the rest of the country.  Not a

25   terribly common problem in this part of the world.

1       Q.    When you say "terribly common," do you

2    know what the incidence is?

3       A.    I think it's not heard of is what we were

4    told.  The water quality is pretty good and it's

5    pretty high yield.

6       Q.    Do you have any data to support that?

7       A.    I just have the conversations that I did.

8    So . . .

9       Q.    So your merits report states that the

10   recovery for any putative class member on municipal

11   water needs to be offset against the potential

12   savings on --

13      A.    Can you tell me where you're reading?

14      Q.    Yeah.  This is a general description at

15   this point, but it's page 12 of your report.

16            It states that the recovery for any

17   putative class member on municipal water --

18      A.    Which report are you looking at?

19      Q.    Merits report at page 12.

20            MS. JOSELSON:  Exhibit 3.  Is that right?

21            MR. WILSON:  I think that's right, yeah.

22       Exhibit 3.

23      A.    And you're reading from where?

24      Q.    I'm sorry.  I'm paraphrasing at this

25   point.  I'm paraphrasing your methodology and you

1    can tell me if it's correct or not.

2        A.    Okay.

3        Q.    Your report states that the recovery for

4    any putative class member on municipal water would

5    need to be offset against the potential savings

6    that they would have on home insurance.

7        A.    That's correct.

8        Q.    And you also state in your report at Note

9    17 that whether a particular putative class member

10   experiences this savings "depends on the protection

11   class they are assigned to (that is, some residents

12   may already have this discount if, for example,

13   they are near a hydrant) and other factors

14   associated with their insurance policy and

15   provider."

16            Did I read that correctly?

17       A.    You did.

18       Q.    So based on what you've stated in your

19   report, it would be fair to say that to accurately

20   determine damages for a putative class member on

21   municipal water, we would need to know their

22   insurance policy information, their provider, their

23   protection class, and their rating.  Is that

24   correct?

25            MS. JOSELSON:   Object.

1      A.   Or you could do what I did, which is
2   assume that people improve their class.  So they
3   move to a better insurance class.
4      Q.   So this is strange to me because it's a
5   situation where your report acknowledges a
6   particularized individual issue that affects
7   different class members differently based on a
8   variety of different factors and then ignores it
9   and assumes a uniform value.
10          Why did you do that?
11          MS. JOSELSON:   Object.
12     A.   Well, I think you're mischaracterizing the
13   question I was answering and the methodology.
14          As I understand it, the factors that
15   determine damages need to be the same across class
16   members, and these factors are true for all class
17   members.  Whether they're class members or not,
18   it's true for everybody in Bennington.  So --
19     Q.   Is that --
20          MS. JOSELSON:   Wait.
21     Q.   Pardon me.  I'm sorry.  I thought he was
22   done.
23     A.   So the question is whether I can use the
24   same method and consider the same factors for class
25   members, and that's what I'm doing.  In this case,

1   I'm picking a number that I believe is likely to be

2   high for some members but is a typical discount you

3   get when your insurance class changes.

4           So why would that happen?  You'd be close

5   enough to a hydrant in order to be able to tell

6   your insurer, "I want a discount because I'm near a

7   hydrant now."

8       Q.   I'd like -- I want to drill in on

9   something you said early on in that response.  You

10  said, as I understand it, the factors that

11  determine damages need to be the same across class

12  members, and these factors are true for all class

13  members.

14          Can you tell me what you mean by that?

15      A.   Well, it means that the -- effectively,

16  for an economist, it means you could have a formula

17  to estimate losses and that formula would have the

18  same variables for everyone in the group.  And you

19  would recover damages and then you could award

20  damages to the members of that group based on

21  reversing that formula.

22      Q.   And that formula gets more complex as

23  there are more variables.  Is that correct?

24          MS. JOSELSON:  Object.

25      A.   I don't know -- I don't know if it's

1   complex or not.  It has more variables if there's

2   more variables.  I don't know whether it's complex

3   or not.

4        Q.   And -- well, more variables is more

5   complex.  Wouldn't you agree?

6        A.   I'm a math guy, so I'm not sure.  So, more

7   fun, but I'm not sure it's more complex.

8        Q.   Do you have any data to support your

9   assumption that the factors apply to any or all of

10  the named plaintiffs?

11            MS. JOSELSON:  Object to the form.

12       A.   I did not -- what I'm estimating this for

13  are these are factors that allow me to understand

14  how the cost of water would increase when you move

15  from wells to municipal water in these two

16  communities.  I did not test those against factors

17  for the named plaintiffs.  But they -- to the

18  extent that they have a well -- and I understand

19  some of the named plaintiffs may not have a well --

20  and to the extent that they live in one of these

21  two towns and to the extent that they have this

22  offer or not, it would apply to them.

23       Q.   So it seems to me to be a pattern

24  throughout your report that you identify a factor

25  that would affect your analysis.  You state that

1   it's individualized and then you input it as a

2   constant into your analysis, like the insurance

3   cost.

4          Am I wrong about that?

5          MS. JOSELSON:  Objection.

6     A.   Well, you started out by saying "it would

7   seem to me," so I don't know what it seems to you,

8   first of all.

9          But my analysis says here are the things

10   that will determine the increase in cost, if any,

11   to these -- to individuals in these communities.

12   And I estimate each of those as best I can based on

13   the information that's available, and that

14   calculates an increase in cost per year for each

15   well.

16     Q.   But we've discussed a variety of ways

17   where you could make your estimates more accurate

18   and more precise by evaluating more data with

19   respect to individual class members.

20     A.   We --

21          MS. JOSELSON:  I didn't think you were

22     done.  But when you are --

23          MR. WILSON:  Okay.

24          MS. JOSELSON:  Are you done?

25          MR. WILSON:  There's no question yet.

1          MS. JOSELSON:  Exactly.  That's what I was

2     going to say.

3     Q.   So we've discussed a variety of ways in

4     which -- now I lost it.  Okay.

5          We've discussed a variety of ways where

6     you could make your estimates more accurate and

7     more precise by evaluating more data with respect

8     to individual class members, and yet in each of

9     those cases, even where you've acknowledged that

10    the data is individualized and the data is

11    available, you've decided to use an average.

12         Why is that?

13         MS. JOSELSON:  Object to the form.

14    A.   So I disagree with the first part of that

15    statement.  We've talked about areas where you

16    believe that more information on the individual

17    level for this whole group of homeowners would make

18    what you believe to be a more accurate and precise

19    estimate.

20         What I've said is I believe the average is

21    reasonable to get a total damage estimate across

22    the whole class.

23    Q.   Well, it seems like to be apples and

24    oranges there, because you said -- I believe it's

25    more accurate and precise, and you said you believe

```
1    it's more reasonable.  That's not the same thing.
2            I don't think you've ever disagreed with
3    me that individual data is both more accurate and
4    more precise with respect to individual class
5    members.  Is that correct?
6            MS. JOSELSON:  Object.
7        A.   Well, I think I did.  I think what I said
8    was, for the individual class members, having more
9    information about what's happening right now and
10   using that information may not be the best estimate
11   of the long-term difference, which is what I said.
12       Q.   You said --
13       A.   And I also said that I felt that the
14   estimates were reliable to calculate an average
15   loss.
16       Q.   Now, I think you suggested that for the
17   long term.  But at least for year one, would you
18   concede that individual data is more reliable than
19   long-term averages?
20           MS. JOSELSON:  Object to the form.
21       A.   I don't -- I don't know.  You could get
22   the exact same answer if you had a whole ton of
23   individual data.  So whether it's more reliable or
24   not, I don't know.
25       Q.   So you're telling me that if I have
```

```
 1   information that Mrs. Crawford paid $1,200 in 2017
 2   to replace a well pump -- let's say she paid 2,000
 3   instead.
 4          If I have that information, you're telling
 5   me that it's actually more accurate to use an
 6   average than to look at the amount that she paid;
 7   that if I have a receipt that shows this is the
 8   amount she paid for her well tank, you're telling
 9   me it's better to look at your average for that
10   year?
11          MS. JOSELSON:  Objection.
12      Q.   Is that correct?
13      A.   Which -- what individuals paid for past
14   investments isn't in my model.  Those are sunk
15   costs.
16      Q.   Now, I take it that if Mrs. Crawford paid
17   $1,200 to replace a tank in 2017 and therefore
18   would not need to replace her tank again for
19   another 10 or 20 years, looking at that information
20   is less accurate than making your generalized
21   predictions about how frequently she needs to
22   replace her tank?
23          MS. JOSELSON:  Object.
24      A.   I might -- by knowing when a person
25   replaced a piece of equipment, I might have more
```

Page 204

1    information about when it would fail.  But the way

2    my calculations go is I'm assigning -- I'm taking

3    the cost of replacement and spreading it over the

4    average years.  And so someone who recently

5    replaced the tank would accumulate those -- those

6    monies to replace it again.  Someone who needs to

7    replace it more -- sooner would also get that

8    stream of payments.

9           So it's aiming not at the individual

10   failure time, which I don't know, but it's aiming

11   at the average cost.

12   Q.   I guess I can see why that's easier, but I

13   don't see why it's more accurate or more precise.

14          Can you tell me, is there any way in which

15   that's more accurate -- an average is more accurate

16   than individualized data?

17          MS. JOSELSON:  Asked and answered many,

18      many times.  But I'll object to the form.

19   A.   Yeah, I think I've already stated why.  I

20   think you're trying to forecast a number of

21   variables here, and knowing what's happening right

22   now -- I mean, unless you told me that nobody's

23   using water softener, for example, then that would

24   change my numbers.  But the particulars of an

25   individual is not necessary for the compensation

1    formula.

2        Q.   So your report here states, "Whether or

3    not a particular residence will experience this

4    savings depends on," and then you list a number of

5    factors.

6        A.   Where are you looking?

7        Q.   Page 12, Note 17.

8             You're stating in your report that whether

9    this savings happens depends on a number of

10   factors, but it seems like you're testifying now

11   that whether or not the particular residents will

12   experience the savings actually just depends on the

13   average of those costs and those factors?

14           MS. JOSELSON:   Objection.

15       A.   So what -- I do state here that that --

16   whether the particular residents would experience

17   that savings.  I then assume they do.  And so my

18   damage estimate, if I had more information, it

19   would actually make the damages larger.

20       Q.   Your report also states at Note 20 on the

21   same page that it is possible that some residents

22   will experience increased lead levels in tap water

23   as a result of the switching of source water from

24   well water to municipal water.

25           Did I read that correctly?

1      A.    That's correct.

2      Q.    So to determine the total damages for an

3  individual member of the putative class, we would

4  also need to know whether the switch to municipal

5  water would cause an increase in lead, wouldn't we?

6          MS. JOSELSON:   Objection.

7      A.    If we were calculating -- well, so whether

8  or not someone is going to see an increase in lead

9  levels really will depend upon the chemistry of the

10  water, which includes where it is in the system,

11  which time period, all of those things.  But it

12  also depends on their own fixtures.

13          I don't actually calculate a damage for

14  replacing fixtures, so it's not in my model.  It's

15  just noted here that the state has said there may

16  be an increase in lead.

17          I will say that both utilities have

18  indicated to me that they are quite cognizant of

19  this, that they're going to test, that they're

20  going to act quickly to resolve this problem if it

21  occurs, and so that's why I didn't include it in

22  the damage model.

23      Q.    Now, in science, when a scientist

24  recognizes in a particular study that there may be

25  an individual factor or variable that could affect

1  the analysis, it's appropriate for them to then

2  attempt to control for that variable in their

3  analysis.  Is that correct?

4        MS. JOSELSON:  Object to form.

5     A.   If they can, if that's what they're trying

6  to measure.

7        In this case, I'm not trying to measure an

8  increase in -- I'm not trying to measure the cost

9  of replacing fixtures.

10    Q.   Now, if that variable has been identified,

11 good science dictates that you either attempt to

12 control for it or you acknowledge the imprecision

13 of your results and potential inaccuracy of your

14 results because you can't control for it.  Is that

15 correct?

16       MS. JOSELSON:  Object.

17    A.   I think that's what Footnote 20 is doing.

18 It's saying that I am aware that there could be

19 costs to these individuals that are not

20 incorporated in my report, but I'm also aware that

21 the municipality following good practice is going

22 to try to avoid it.

23    Q.   And if we got that information, then we

24 could refine on and improve your damages model?

25    A.   You could add to it.

1    Q.   Yes.  Add to it in a way that would be

2    more correct and more accurate.  Is that correct?

3         MS. JOSELSON:  Objection.

4    A.   It would be only more accurate in that it

5    would be more inclusive of possible -- all of the

6    possible damages.

7    Q.   I'd like to turn back to your definition

8    about the class definition.  As we talked about,

9    the class definition is limited to natural persons

10   within the area who have interest in real property.

11        Does your analysis assume an ownership

12   interest?

13        MS. JOSELSON:  Objection.

14   A.   So the -- my analysis, I would assume --

15   well, I'm certain there's no properties there which

16   aren't owned by someone, and if that person lives

17   in the home, they're bearing the costs.  If they're

18   renting the home, the renter is now bearing the

19   costs, and that would affect the rental value they

20   could get.

21        So I'm assuming that -- economic -- again,

22   as we talked about this morning, economic theory

23   would say that the cost of this rolls to the land

24   owner.

25   Q.   Do all renters bear water costs?

1      A.    No idea.  Doesn't matter to me.

2      Q.    But if we are determining how to

3  distribute the funds that you've opined are due to

4  the class, wouldn't we need to know who bears what

5  expense?

6          MS. JOSELSON:   Object.

7      A.    I think I just answered that.  I said that

8  I -- economic theory says that the cost increase

9  associated with this will roll to the land owner.

10  So I would compensate the land owner for this

11  particular cost component.

12      Q.    Even if the land owners's lease with the

13  tenant says that the tenant is responsible for

14  water charges but not responsible for the well

15  maintenance?

16      A.    I'm not sure why a lease would say that,

17  because it would imply there's -- both conditions

18  exist in the same home.  I can't imagine why that

19  situation would exist.

20      Q.    Well, let's -- perhaps not a good

21  hypothetical.  Let me -- if the -- if the default

22  were that the landlord was responsible for well

23  maintenance but that the tenant would be

24  responsible for the water charges based on usage.

25          Now, I know that in an individual home,

1    that would not be the case because you wouldn't

2    have -- you wouldn't have both.  But if that's the

3    default arrangement, doesn't that affect how you

4    calculate damages for people in the area who are

5    renters and not owners?

6              MS. JOSELSON:   Object.

7        A.    I mean, how you would go about paying

8    people out in the class, I haven't been -- I mean,

9    I've thought about that, but I haven't been asked

10   to calculate that.

11             I would -- from an economic perspective, I

12   would pay the land owner, and the land owner is --

13   has an arm's-length transaction with the renter, so

14   I would assume some sort of transaction would take

15   place there.  Or the land owner would, you know, be

16   able to be more competitive in the rental market or

17   something like that.  So --

18       Q.    Even though that land owner wouldn't have

19   any added costs because they wouldn't be paying for

20   the municipal water charges by being hooked up?

21             MS. JOSELSON:   Objection.

22       Q.    You would still compensate them as if they

23   did have those costs?

24             MS. JOSELSON:   Objection.

25       A.    Yeah, because I would assume there's an

1    efficient market for rental and that the renter is

2    going to ask to have it discounted, that the rent

3    is effectively now more expensive and so they'll

4    want some sort of difference.  Particularly true

5    for the renter who wasn't paying -- in your

6    scenario, wasn't paying the well cost previously.

7    They're now seeing a substantial increase in costs.

8         Q.   Is it possible that the switch of homes

9    from private wells to municipal water has affected

10   the value of the real property?

11             MS. JOSELSON:  Objection.

12        A.   We talked about that a little bit this

13   morning and your assertion that people might value

14   a home that's on municipal water differently than

15   they value a home on a well.

16             In this particular case, the but-for

17   condition is would homes that previously were on

18   wells, did they experience a decrement in property

19   value associated with now being unable to use water

20   because it's contaminated and having to switch to

21   municipal water.

22             So the but-for isn't the simple model you

23   describe.  So . . .

24        Q.   But is it possible that as a result of the

25   but-for model that you've opined on in your report,

 1   that there's also been a change in real property

 2   value?

 3            MS. JOSELSON:  Object.

 4       A.   So no one's actually gone to municipal

 5   water yet, from what I understand.  I think there

 6   were a couple of folks that were hooked up because

 7   they happened to be near mains.

 8            My model assumes that the capitalized cost

 9   of being on municipal water will be capitalized in

10   the home values, the only thing that's changing.

11   And so I would expect that that will show up, all

12   else equal, in the home value.  Whether you could

13   measure it or not statistically, I don't know.

14   There's a lot of variables that affect home value.

15       Q.   If you could measure it statistically,

16   could you measure it on a case-by-case basis

17   through appraisal?

18       A.   No.

19       Q.   Why not?

20       A.   I don't think appraisers could pick up

21   anything like that.

22       Q.   That the amenity or disamenity of a

23   connection to municipal water is just not a

24   relevant factor for an appraiser?

25            MS. JOSELSON:  Object.

1     A.   Oh, it may be.  I just find appraisers'

2   judgments to be too subjective.

3     Q.   Aren't appraiser judgments, though, based

4   on review of comparable sales in the area and the

5   all the data relevant to a property?

6          MS. JOSELSON:   Object.

7     A.   Not -- not from my review of what

8   appraisers do.  They -- and I don't mean to put

9   down appraisers everywhere.  But appraisers look

10   at -- at several comparable sales which they select

11   based on professional experience, and they don't --

12   they don't use large data to determine factors.

13   The fact that appraisers have a hard time knowing

14   the true value of real estate I think was pretty

15   well demonstrated during the economic collapse when

16   appraisers kept assuming that home values were

17   going up continuously and would continue to go up

18   continuously.

19          So it's a different technique.  It's used

20   for -- appraisers are useful for things like banks

21   not overinvesting in homes, but even in that case,

22   they failed during the Depression.

23     Q.   When parties negotiate the sale or

24   purchase of a home, do they consult economists who

25   provide them with a comprehensive analysis of the

1    effect that various environmental conditions have

2    on being capitalized into the value of their home,

3    increasing it or decreasing it?

4              MS. JOSELSON:  Objection.

5        A.   Unfortunately not.

6        Q.   In fact, they'll have more of a discussion

7    informally based on the condition of the home.

8    Isn't that right?

9              MS. JOSELSON:  Objection.

10       A.   I think it would be -- I mean,

11   individuals -- I mean, just from my observation, I

12   haven't built any models in decision making by home

13   buyers, but they look at the market.  They talk to

14   a Realtor and they are selecting homes looking for

15   the attributes that most closely match what they're

16   looking for.

17       Q.   And one thing you might see in a property

18   listing would be whether the property has a well or

19   whether it is on municipal water or how recently

20   various well maintenance was performed.  Is that

21   correct?

22       A.   I would think so, yes.

23       Q.   So that would be a factor that a potential

24   buyer will consider in deciding how much to pay for

25   a given property.

1          MS. JOSELSON:  Object.

2     Q.   Is that correct?

3     A.   They could be factors that would determine

4     that.  It will influence it.

5          As I also stated this morning, I think

6     some people may view the presence of a well as a --

7     as an amenity, that they prefer homes with wells.

8     And, in fact, you would -- intuition would tell you

9     that people who have bought homes with wells prefer

10    homes with wells.

11    Q.   That's certainly possible.

12         And so wouldn't -- isn't the gold

13    standard --

14    A.   I should say we're getting beyond

15    economics here, because now we're talking about

16    people's preferences for real estate, which is --

17    Q.   But isn't the gold standard of economics

18    ultimately what a willing buyer and a willing

19    seller agree is the price of an asset?

20         MS. JOSELSON:  Objection.

21    A.   As we talked about this morning, that's

22    using revealed preferences through market

23    transactions.  And so if you can -- if you have a

24    market that's rich enough in terms of transactions

25    and you have homes that are homogeneous enough,

1    properties that are similar enough, you may be able

2    to control for all the variables and detect all of

3    those things that we just discussed.  So . . .

4         Q.   And so if there is any change in the value

5    of a home due to the connection to municipal water,

6    is that something that would need to be offset or

7    added to your damages calculation in this case?

8              MS. JOSELSON:  Objection.

9         A.   So if you could show that homes that have

10   municipal water, that have all the same attributes,

11   trade higher than homes on wells that have all of

12   the exact same attributes, then that would indicate

13   the market value of the home changes.  It may not

14   change the preferences for the individual in the

15   home, because the individual in the home purchased

16   it for their own reasons.

17        Q.   I'd like to turn now to your replacement

18   cost opinion.

19        A.   Are we done with this?

20        Q.   I think so.

21             You told me earlier, I believe this is

22   fair to say, that an economic analysis of

23   environmental damages must relate to the person

24   whose loss you're evaluating and not to the losses

25   of another person.  Is that correct?

Page 217

```
 1            MS. JOSELSON:  Objection.
 2       Q.   Withdraw the question.
 3            MR. WILSON:  We'd like to take a break.
 4            THE VIDEOGRAPHER:  Okay.  The time is
 5       approximately 2:26 and we are off the record.
 6            (Recess taken from 2:25 to 2:32 p.m.)
 7            THE VIDEOGRAPHER:  The time is
 8       approximately 2:32.  We are back on the record.
 9            Counsel, you may proceed.
10   BY MR. WILSON:
11       Q.   Mr. Unsworth, would you agree that an
12   economic analysis of environmental damages must
13   relate to the person whose loss you are evaluating
14   and does not quantify the losses of another person?
15            MS. JOSELSON:  Objection.
16       A.   You'd have to -- that's too philosophical.
17   You'd have to tell me more.
18       Q.   We had a hypothetical earlier, I think,
19   about Andy and Barry.  And if you've been retained
20   to evaluate Andy's damages, you don't look at
21   Barry's damages and say those are Andy's damages,
22   unless you have some basis to believe that Barry's
23   damages are representative of Andy's.  Is that
24   correct?
25            MS. JOSELSON:  -- objection.
```

1      A.   Assuming they're representative, I'd be

2   comfortable doing that, and if -- yeah, I would

3   agree they should be representative.

4           I didn't understand whether you were

5   asking whether I could use information from one

6   individual to infer damages to another, which I do

7   all the time in economics, or whether you're giving

8   the damages to the wrong person.  So . . .

9      Q.   So you agree it's wrong to give the

10   damages to the wrong person?

11           MS. JOSELSON:  Objection.

12      A.   It wouldn't make the party who was harmed

13   whole.

14      Q.   Now, here, the proposed class consists of

15   natural persons with interest in real property

16   whose ground water has elevated PFOA.  Is that

17   correct?

18           MS. JOSELSON:  Objection.

19      A.   I think you read the class definition

20   correctly, yes.

21      Q.   And your replacement cost opinion involves

22   various improvements to the water infrastructure to

23   the town of Bennington.  Is that right?

24      A.   Well, the water infrastructure is managed

25   by the town of Bennington for the betterment of all

1   of its residents.  And so the improvements would

2   have to be managed by the town of Bennington but

3   the benefits would accrue to the community, just

4   like -- you're probably aware these -- the two

5   water systems in Bennington and North Bennington

6   were donated to the community.  So it went to the

7   betterment of everyone in the community.

8       Q.   But the infrastructure is owned by the

9   town of Bennington.  Is that correct?

10      A.   For the -- for the use of the residents of

11  the town who have access to water.

12      Q.   The town of Bennington is not a plaintiff

13  in this action, is it?

14      A.   I don't know whether they are or not.

15      Q.   You're not aware that it is, are you?

16      A.   I'm not aware that they are, no.  And I'm

17  also not assuming that the town of Bennington would

18  be made better off by the projects I've suggested.

19  They would be given funding, they would accomplish

20  those projects at that funding cost, and that would

21  be to the betterment of the citizens of Bennington.

22      Q.   And the town of Bennington is not a

23  natural person, is it?

24      A.   That's a legal determination.  I don't

25  know the answer to that.

Page 220

```
 1        Q.   Is the town of Bennington a human being?
 2        A.   I don't know if that's defined within the
 3   law or not.  So -- as far as I know, the town of
 4   Bennington is not, in a -- in a -- sort of a normal
 5   language, nonlegal sense a human being, no.
 6        Q.   And it's not a member of the putative
 7   class, is it?
 8        A.   I think we just answered that I don't -- I
 9   don't know if that's true or not, but I'll accept
10   that they're not if you say that.
11        Q.   Do you know whether the natural persons
12   who do own property in the class area and have
13   elevated PFOA, whether they have a legal interest
14   in the water infrastructure of the town of
15   Bennington?
16             MS. JOSELSON:  Objection.
17        A.   I don't.  That's a good question, though,
18   because of the unusual way in which the town of
19   Bennington and the village of Bennington got their
20   water systems.  I don't know if those agreements
21   implied some legal rights to the residents.  I
22   don't know.
23        Q.   So if you took the total damages that you
24   estimated here and divided it among the members of
25   the putative class, would those putative class
```

1  members have the ability to undertake the

2  infrastructure property -- projects that you

3  recommended in your opinion?

4          MS. JOSELSON:  Objection.

5      A.   I'm not making that assumption.  I'm

6  making the assumption that the -- that the town of

7  Bennington would need to undertake those projects

8  to benefit the community.

9      Q.   So those projects don't really represent

10  damages of the class members at all, do they?

11          MS. JOSELSON:  Objection.

12      A.   They represent the cost of a remedy to the

13  class members.  The damages, I would expect, would

14  be significantly higher.  But the -- it's a remedy

15  to help -- to help alleviate the harm.

16      Q.   How do these water infrastructure projects

17  relate to the presence of PFOA in the water?

18      A.   So there's -- what we did in working with

19  the town and the village water folks who understand

20  their systems is we asked the question are there

21  improvements that would assure the quality of water

22  now that there's additional people who have been

23  added to the system, as well as the fact that the

24  community is now wholly dependent on the water

25  system, not on the groundwater underneath the

1    homes; whether there's ways in which capacity could
2    be enhanced or -- if needed.  If there's no need
3    for that, then that wouldn't be on the list -- and
4    whether or not there's a way to protect the quality
5    of the source water.
6         Q.   We'll talk about that a bit.
7              (Unsworth Exhibit 16 marked for
8              identification.)
9    BY MR. WILSON:
10        Q.   The court reporter is handing you what's
11   been marked for identification as Exhibit 16 to
12   your deposition.
13             Can you tell me what this is?
14        A.   This is -- looks like the town's outside
15   engineer, Mark -- I'm going to forget his last
16   name.  It's his report on how they would go about
17   providing the additional properties that were being
18   added to the water system with water and what the
19   cost of that would be.
20        Q.   And for which system?
21        A.   For the North Bennington system.
22        Q.   And if you take a look at page 6 under
23   section 4.3, at the end of that first paragraph
24   under 4.3, it says that "Using a per property water
25   demand of 121 gallons per day, the total water

1    additional consumption is estimated to be 6,500

2    gallons per day for the proposed system expansion.

3    The village has this reserve capacity available to

4    serve this expanded area."

5            Did I read that correctly?

6        A.    You did.

7        Q.    And you noted in your report on this basis

8    that representatives of the village of North

9    Bennington have expressed the opinion that there's

10   no need for expansion or changes to their system to

11   meet the expected future demands imposed by

12   additional users.  Is that correct?

13       A.    That is their -- that's their statements,

14   yes.

15       Q.    And for that reason, you didn't attempt to

16   calculate damages for North Bennington because you

17   believed that their statements that their systems

18   were adequate to meet the additional demand meant

19   that there were no damages.  Is that correct?

20           MS. JOSELSON:  Objection.

21       A.    It's Mark Youngston, by the way.

22   Y-o-u-n-g-s-t-o-n.

23           What I would say is that the -- so what

24   I'm calculating here is the cost of a remedy that

25   would harden, in effect, the water systems, given

1    that the towns are now dependent on the municipal

2    systems more so than before.

3           And in the case of North Bennington, their

4    opinions are that there are no available options or

5    reasonable actions that are either required or

6    necessary to, again, guarantee quality, guarantee

7    capacity, or -- or protect or enhance the source

8    waters.

9           I think that there is -- I'm a little bit

10   confused by that, given the data that North

11   Bennington has provided to the state regarding

12   where they are relative to their capacity

13   constraint.  But that's their opinion and so I'm

14   living with the opinion.

15       Q.   Okay.  And just to be clear, they

16   stated -- in your report, you state,

17   "Representatives of the village of North

18   Bennington, however, have expressed the opinion

19   that there is no need for expansion or changes to

20   their system to meet the expected future demands

21   imposed by additional users."

22           When you stated that, were you referring

23   to this conclusion of the Otter Creek report?

24       A.   That, and conversations with Mark and the

25   representative from the water utility.

Page 225

1          Again, it's not that there aren't any

2    damages.  It's that there's no available actions

3    here that would -- that would help to remedy that

4    situation.  There's -- the system simply doesn't

5    have any alternatives available to make things

6    better.

7         Q.   Where does it state in that report or in

8    anything in your report that there are no

9    alternatives and that's the reason that you're

10   finding no damages?

11          MS. JOSELSON:  Object to the form.

12        A.   So as I describe in my report and as is

13   contained in some of the reference materials we

14   provided, we worked through a series of questions

15   with the two town -- the town and the village, as

16   to whether there were actions that would -- that

17   would be available.

18          So a typical action, for example, would be

19   to protect the watershed that the water comes from.

20   Another typical action would be to improve

21   redundancy, since people who are now dependent on

22   the system would be better off with a redundant

23   system.

24          You know, in the case of the village, the

25   village is confident that their system is good as

1    it can be, and so there's no way they can improve

2    it and so there's no way to compensate for

3    improvements.  And so that's what we're saying

4    here.

5             I actually -- you know, just based on

6    simple calculations, I believe they actually may

7    run into a capacity problem in the future, but

8    they're not -- they're not worried about that right

9    now.

10   Q.   And so you're accepting their stated

11   preference that they don't need any additional --

12   A.   I'm -- I'm accepting their judgment that

13   there's no project that makes sense to them --

14             MR. WILSON:  Okay.  Can you mark this.

15   A.   -- that meet my criteria for proximity to

16   the damages and to remedying the situation.

17             (Unsworth Exhibit 17 marked for

18             identification.)

19   BY MR. WILSON:

20   Q.   I'm handing you now what's been marked as

21   Exhibit 17 to your deposition.

22             Can you tell me what this is?

23   A.   So this is the equivalent report by Jason

24   Dolmetsch asking the question -- answering the

25   question how is the town of Bennington going to

```
 1    serve these new neighborhoods, so to speak, and
 2    what the cost of that would be.
 3        Q.   So, to be clear, this is an equivalent
 4    report to the Otter Creek report that we just
 5    discussed that said there was no additional need
 6    for additional capacity based on new service in
 7    North Bennington.  Is that correct?
 8            MS. JOSELSON:  Objection.
 9        A.   That's a different question.  This is an
10    equivalent report.  The purpose of this report is
11    to estimate the cost of providing water, and they
12    did not include in this any capacity increases.
13    But that's not what this report -- that wasn't the
14    question they were answering.
15        Q.   Look at page 11 of this report.
16    Underneath the chart there, the second sentence
17    says, "This total daily demand would equally
18    approximately 74 percent of existing total source
19    capacity and thus would not create a need for
20    additional source capacity."
21            Did I read that correctly?
22        A.   You did.  And that's based on the Vermont
23    statute -- I don't know if it's a statute or it's a
24    regulation, but it says that the towns have to hit
25    90 percent of their capacity before they need to
```

1  plan for additional capacity.  And so he's not near

2  the 90 percent.

3      Q.   So why -- why do you treat these two

4  similar statements in these two reports

5  differently?

6          MS. JOSELSON:  Objection.

7      Q.   Do you still --

8          MS. JOSELSON:  I'm sorry.

9      A.   I don't.

10          MS. JOSELSON:  Wait a minute.  Did you

11    finish?

12      Q.   I'll just try -- I'll start over again.

13          Why do you treat these two similar

14  statements in these two reports differently?

15          MS. JOSELSON:  Objection.

16      A.   I don't.  I did ask these utilities

17  whether -- I treat them the same, actually.  I did

18  ask these utilities whether they felt that the

19  change was going to increase the need for source

20  water capacity.  Neither community felt that was

21  true.  As I said, in the case of North Bennington,

22  I'm skeptical, but that's their judgment that

23  they're not interested in it.

24          What I did ask them is are there ways in

25  which the systems could be hardened, which this --

1    what this document is answering -- asking the

2    question, "Okay.  We're not going to be providing

3    additional water to people.  Do we have enough

4    water to give to people?"  Both communities do.  I

5    don't think it will be a problem in either

6    community.

7            But the projects I'm proposing are not

8    increasing capacity.  They're increasing -- they're

9    hardening other attributes of the system.

10   Q.    What methodology did you use to determine

11   which projects were necessary to harden those

12   attributes of the system?

13   A.    So what we did is we had a series of

14   conversations with both communities where we talked

15   through the typical things one does to harden a

16   water system.  So typical things are to protect the

17   source water, to make sure that you have sufficient

18   and balanced storage, that you have redundancy in

19   your systems, and that you can withstand unusual

20   events that affect the quality or the availability

21   of water.

22           So the idea here is to go beyond simply

23   providing water to individuals, which is being

24   addressed through the stuff we talked about

25   already, and instead to answer the question how can

1   we make these communities better off, to offset the

2   fact that now their groundwater is contaminated and

3   people can't use it.

4       Q.   Is that the duty of the tort law for a

5   defendant to make the plaintiff better off?

6       A.   No.  To make them whole.

7            MS. JOSELSON:  Objection.

8       A.   We're making them whole.  We're not making

9   them better off.

10      Q.   So the hardening of the attributes of the

11  system that you referred to, that will benefit

12  everyone who is on the municipal water system.  Is

13  that correct?

14      A.   Now and in the future, yes.

15      Q.   And many of those people, because they

16  were already on the municipal system, they never

17  had contaminated water to begin with.  Is that

18  correct?

19           MS. JOSELSON:  Objection.

20      A.   Presumably not.  And once the new folks

21  are added to the system, they won't have

22  contaminated water, either.  So they'll be in the

23  same position.

24      Q.   And so because they never had water with

25  PFOA in it, they were never class members.  Is that

1   correct?

2        MS. JOSELSON:  Objection.

3        A.   I don't know.  I thought the definition of

4   the class was whether you were over the

5   concentrations.  You're inside the box, in other

6   words, the area of concern.

7        Q.   And the municipal water supply has not had

8   any PFOA in it.  Is that correct?

9        A.   Not that I'm aware of.

10        Q.   So if these people had municipal water to

11   begin with, then they never had water with PFOA in

12   it?

13        A.   No, but they did have homes that were

14   located above PFOA.  They lived in a community with

15   a groundwater contamination problem.

16        Q.   How is -- the municipal water system

17   serves homes that are outside of that box, doesn't

18   it?

19        A.   There are -- it's a good question in

20   Bennington whether there are homes.  There may be

21   homes that are outside the box, yes.

22        Q.   If you take a look at the class definition

23   again -- I don't recall which exhibit number it

24   was -- it states that the class includes those

25   persons whose private water supply wells have been

1   found to be contaminated with PFOA above 20 parts

2   per trillion.

3          MS. JOSELSON:  I think I'm going to

4      object.  You're referring to an email the date

5      after which the complaint was amended.

6          If you want to ask him about the current

7      class the way it's defined in the complaint,

8      that would be one thing.  I frankly don't know

9      if there's a change between them.  But using an

10     email as the basis for asking him questions

11     about who is in the class and who isn't is not

12     fair and not accurate.

13         MR. WILSON:  I believe they are the same

14     definitions.  And your objection is taken.  But

15     I simply used this email because this is what he

16     produced in his reliance materials to show what

17     he relied on.  But I believe they are the same.

18         MS. JOSELSON:  I think he earlier

19     testified he didn't rely on that class

20     definition.  But you have to read the whole

21     definition in order to be accurately questioning

22     him.

23  BY MR. WILSON:

24     Q.   So if there are people within the -- who

25  are on the municipal water system to begin with and

1    never had PFOA in their water, these infrastructure

2    projects that you're proposing would inure to their

3    benefit as well?

4        A.   As we already discussed, I have no reason

5    to believe that there was PFOA in the municipal

6    system at measurable concentrations.  So those

7    individuals definitely -- the individuals who were

8    on the municipal system did not have PFOA.  That

9    was not their problem.  And they don't have any

10   added costs or anything.  Their life as far as

11   their costs go along the same.  They do live in a

12   community and they do live -- that has a

13   groundwater contamination problem now, and they do

14   live in a community that is now dependent upon that

15   municipal system solely for their water supply.

16           And they -- if they're within the box that

17   has been defined by the state of Vermont, they will

18   not be able to develop a well even if they wanted

19   to.  So they are -- they are affected.

20       Q.   But it's possible that there are members,

21   people who are on the municipal water supply, who,

22   because they're outside of the box and never had

23   PFOA in their water, are not class members.  Is

24   that correct?

25           MS. JOSELSON:  Objection.

1    A.    I'd have to look at a map of the municipal

2    system, and I'm trying to remember if there's

3    anybody who is not inside the box who is on the

4    municipal water system.  I don't know that sitting

5    here.

6    Q.    And just to be clear, when we say that

7    these infrastructure projects would inure to their

8    benefit, it's not a direct benefit, is it?

9         MS. JOSELSON:  Objection.

10   A.    Well, it would -- it's direct in that it

11   improves the reliability and the soundness of the

12   system and the quality of the water.  And it -- and

13   it would provide a sound substitute, in my mind,

14   for -- a sound and reasonable substitute for the

15   loss of the groundwater.

16   Q.    And the degree to which any of the

17   individual class members would actually experience

18   any harm related to these infrastructure projects

19   would only be if those projects were not undertaken

20   by this action and that they had to be undertaken

21   by the town and they had to be financed publicly,

22   and then water rates had to be increased or a bond

23   had to be issued, and only then would these class

24   members experience any cost related to these

25   infrastructure projects.  Is that correct?

Page 235

1              MS. JOSELSON:  Objection.

2      A.   I didn't follow any of that.

3      Q.   Okay.  Probably my fault.

4           So regardless of whether these

5    infrastructure projects are undertaken or not, the

6    people in the class who are on municipal water are

7    going to be receiving water with no PFOA in all the

8    capacity that's necessary to their homes.  Is that

9    correct?

10             MS. JOSELSON:  Objection.

11     A.   As far as I know, there's not a PFOA

12   problem, and there's -- there appears to be a

13   sufficient quantity that folks would receive the

14   water.  There are issues associated with

15   reliability.  I mean, there are system improvements

16   that provide reliability.

17           The analogy here would be here would be

18   the case we did the Virgin Islands where -- in

19   which a portion of the St. Thomas water supply was

20   provided by groundwater.  When that was lost, there

21   were added costs, just like there were here,

22   calculated differently because it's a different

23   situation; and then there was a part of the demand

24   was to enhance the desal facility, because now at

25   that point we no longer have groundwater, so we've

1  lost one resource, and we want to harden the other

2  resource.

3          So that's exactly what we're doing here.

4  It's the same thing.

5      Q.   And who was the plaintiff in that St.

6  Thomas case?

7      A.   The plaintiff there was the Virgin Islands

8  government, acting for the citizens of the Virgin

9  Islands.

10     Q.   And here, the government is not a

11 plaintiff, is it?

12     A.   Not that I'm aware of.

13     Q.   And it's private citizens acting directly

14 based on their own right side.  Is that correct?

15     A.   I would assume so, yes.

16     Q.   Now, would the benefits from the

17 infrastructure projects that you propose inure to

18 the benefit of homeowners within the zone of

19 contamination who were already connected to the

20 municipal water supply?

21     A.   Yes, it would.

22     Q.   Would that benefit be a windfall to them

23 if they're not class members?

24         MS. JOSELSON:  Objection.

25     A.   Because they decided not to join the class

1    or because they weren't in the definition of the

2    class or --

3         Q.   Because they're not in the definition of

4    the class.

5              MS. JOSELSON:  Objection.  States facts

6         not in evidence.

7         A.   I would argue no in that the groundwater

8    in the Bennington area provided a service to the

9    public, whether or not people were using it,

10   whether or not they were individual owners of

11   wells.  And so I don't think they would have a

12   windfall in that they also are worse off.

13        Q.   But those people are not putative class

14   members.  So --

15             MS. JOSELSON:  Same ob -- I'm sorry.

16        Q.   Why is it proper to evaluate making them

17   whole?

18             MS. JOSELSON:  I think that's a -- I'm

19        going to object that you're misstating the

20        definition of the class and misrepresenting the

21        facts to the witness in your question.

22        Q.   Assuming that these individuals are not in

23   the putative class but are on municipal water and

24   have been on municipal water, is it proper for your

25   damages opinion to provide relief that inures to

 1   their benefit?

 2           MS. JOSELSON:  Objection.

 3      A.   So these are the individuals whom are --

 4   receive town of Bennington water but are not above

 5   the PFOA plume at all is what you're arguing, would

 6   they receive a benefit from this.

 7      *Q.  I'm asking not whether they would receive

 8   a benefit, which I think you've already said they

 9   would, but whether it's proper for your opinion to

10   provide those people with a benefit when they are

11   not members of the class.

12           MS. JOSELSON:  Same objection, for all the

13      same reasons.

14      A.   I don't know legally whether it's proper.

15   I don't have any way to provide a benefit to the

16   class members through a replacement that might not,

17   I suppose, spill over to somebody else's benefit.

18   So . . .

19      *Q.  Isn't this the Andy and Barry problem,

20   though, that you've been retained to evaluate

21   damages to the putative class, but you're providing

22   damages to some other third person?

23           Is that correct?

24           MS. JOSELSON:  Absolutely misstates the

25      evidence.  You do it over and over.  It's

 1    totally improper.

 2         MR. WILSON:  Emily, "object to the form"

 3    will be sufficient.

 4         MS. JOSELSON:  No.  You cannot ask him

 5    questions that misstate what the complaint says

 6    and ask him if that's appropriate.

 7         MR. WILSON:  I'm not asking any question

 8    that misstates the complaint.  I've asked him to

 9    assume about the class definition, assume that

10    that's true.  Because I don't think you can say

11    that it's absolutely certain that every single

12    person on the municipal water supply is a class

13    member.

14         And in any event, we're not going to get

15    into that here.  If you have any further

16    objections, objection to the form is what's

17    permitted by the rules.  So let's leave it at

18    that.

19         Would the court reporter please reread the

20    question.

21         *(Question read back by the reporter.)

22         MS. JOSELSON:  Same objection.

23    A.   So I don't -- I don't know if there's

24    anybody in that situation.  I'd have to look at the

25    maps to see where the municipal system is and

1   whether it's fully within the area of concern.  So,

2   first of all, I'll caveat by saying that.

3           Secondly, I would say that we're providing

4   improvements to the system here.  To the extent

5   that the benefits of that spills over, it's still

6   necessary to compensate the class members.  I don't

7   have any other alternatives that I can go directly

8   to those class members, unless we go to some sort

9   of model that models their willingness to accept

10  payment, which I would expect would be

11  significantly higher.

12      Q.   Have you attempted to allocate those costs

13  only to the people who are class members, not to

14  those who are not?

15           MS. JOSELSON:  Objection.

16      A.   So by "allocate," you mean calculate a

17  dollar amount per -- per individual?

18      Q.   That would be one example.

19      A.   So within the report, I calculate the

20  implied cost of the project per year, I believe for

21  residences -- I'd have to look at it -- that fall

22  within the contaminant plume areas.

23      Q.   I think that, in trying to unpack this, I

24  think the problem is a little bit deeper and a

25  little bit different.  Because supposing your

1   opinion is correct and supposing it's ultimately

2   accepted by the court and the amount of damages

3   that you've estimated is paid to the members of the

4   putative class in shares, and those damages

5   represent the cost that's necessary to undertake

6   these infrastructure improvements, those would be

7   costs that would be necessary for those

8   infrastructure improvements that would benefit

9   other persons who were outside of the class, but

10  those projects might never actually be undertaken

11  because the money is being paid to individual class

12  members and not to the town of Bennington.  Is that

13  correct?

14          MS. JOSELSON:  Objection.

15      A.   No.  That's wrong in a bunch of ways.  I

16  mean, first off, if the monies were allocated out

17  to the individual class members, the projects

18  wouldn't take place.  And so there would be no

19  benefit to anyone who's in the community but not a

20  member of the class.  So that wouldn't be true in

21  itself.  But the presumption here is that you could

22  use the municipal system as the mechanism to make

23  people whole by providing them an equivalent

24  replacement.

25      Q.   Have you ever undertaken any analysis to

1    allocate those costs pro rata between class members

2    and nonclass members who live within the class

3    area?

4             MS. JOSELSON:  Objection.

5        A.   I've already said I don't know if those

6    people exist.  And, no, I haven't.

7        Q.   So you proposed in your merits report at

8    page 16 to -- that Saint-Gobain should purchase

9    properties around the Balles Brook intake through

10   arm's-length transactions with willing sellers, to

11   allow for control of land uses on these properties

12   that could impact the town's water source.

13       A.   It's "Bolles Brook."

14       Q.   Bolles Brook.  Thank you.

15       A.   That is one of the projects I looked at.

16       Q.   What are those potential impacts?

17       A.   It's described in a separate town document

18   that talks about the fact that without control of

19   the land use by having private ownership of the

20   land, the intake water could be affected by poorer

21   waste management --

22       Q.   What's --

23       A.   -- by those land owners.

24       Q.   Apologies.

25            What is that separate town document?

1      A.   I'd have to go through -- yeah, I'm not

2   sure which one it is.  But the town described

3   actions they're trying to take, so they are -- this

4   has already been raised as an issue that Vermont

5   prefers towns to have control over their

6   watersheds.  Which the town -- because the majority

7   of the watershed here is the national forest, is

8   not a huge problem.  There are some privately held

9   properties there.

10     Q.   If we end up discussing that document, if

11  it's something I end up showing to you later on in

12  the deposition, would you please let me know so I

13  know that's what you're talking about?

14     A.   Sure.  Yeah.

15     Q.   None of those potential impacts concern

16  PFOA, though, do they?

17          MS. JOSELSON:  Objection.

18     A.   No.  As I say in the report, the only

19  thing you could do for PFOA at this point is a

20  fantastically expensive remedy.  So there's --

21  we're trying to offset the effects of the PFOA with

22  actions we can do.

23     Q.   So they wouldn't be part of the but-for

24  world that's attributable to PFOA, because the

25  potential harms would have existed without it.  Is

Page 244

1    that correct?

2          MS. JOSELSON:  Objection.

3      A.    Right.  And, in fact, that's part of my

4    goal here.  I'm looking for things that could be

5    due -- that could be done to improve and harden the

6    system, to offset the fact that the PFOA is there.

7    So I need -- I need those things to exist in order

8    to calculate a cost of a remedy for the harm here.

9      Q.    And the problems with the Bolles Brook

10   intake were a regular problem well before there was

11   any issue with PFOA.  Is that correct?

12         MS. JOSELSON:  Objection.

13     A.    The challenges associated with that source

14   as it relates to sediment load has been an ongoing

15   problem.

16     Q.    And you state in your report that Jason

17   Dolmetsch of MSK Engineering estimated those

18   improvements to cost $6 million.  Is that correct?

19     A.    That's correct.

20     Q.    Do you know the basis for that figure?

21     A.    He said he did a basic cost estimate.

22   It's not a -- it's not a buildout cost estimate.

23   That would be significantly more.  But he's

24   considered systems like this and he has a sense of

25   what these things cost.  It's a storage tank.  It's

1   not a terribly complex system.  It's a storage

2   tank.  It's an electronic system to cut off the

3   water when it's heavy in sediment load and it's a

4   filtering system.

5        Q.   Did you ask for any substantiation for his

6   opinion in that regard?

7        A.   No.  I asked him for the cost of it, what

8   he felt the cost would be.

9        Q.   Is that something you typically do, just

10  ask someone what something costs to determine a

11  value?

12       A.   It's -- I mean, it's typical in our

13  business that we would ask an engineer who is

14  familiar with the system, who is qualified to make

15  cost estimates, what the cost might be.  And he

16  came back with that cost estimate.

17       Q.   And he didn't provide you with any

18  itemization, did he?

19       A.   He did not.

20       Q.   No breakdown or analysis?

21       A.   He did not.

22            MS. JOSELSON:  Objection.

23       Q.   You also propose that the Chapel Road

24  storage tank should be replaced to improve overall

25  system and liability at an estimated cost of

1  $5 million.  Is that correct?

2      A.   Right.  And they were also -- he felt that

3  that tank is at risk due to its age and he also

4  wanted -- felt that a redundant line to the tank

5  would help with balancing the system and provide a

6  source of water for, you know, like another

7  Hurricane Irene or something.

8      Q.   And so when you say "due to its age," this

9  means that that tank was already at the end of its

10  useful life before there was any issue with PFOA.

11  Is that correct?

12          MS. JOSELSON:  Objection.

13      A.   That's correct.  Again, we're looking for

14  things we could do to harden the system to offset

15  the PFOA.  We've done as much as we can do with the

16  PFOA.

17          (Unsworth Exhibit 18 marked for

18          identification.)

19  BY MR. WILSON:

20      Q.   The court reporter is handing you what's

21  been marked for identification as Exhibit 18.

22          Do you recognize this document?

23      A.   I do.

24      Q.   Can you tell me what it is?

25      A.   It looks like Jason was providing

1    Patrick -- who is one of the attorneys in the case,

2    I believe -- and Terry Morse with cost estimates

3    for projects.  This was early on and when we were

4    asking questions about what projects might be

5    relevant.

6         Q.   And if you look at the original email in

7    this chain on page 3, it says, "Hi, Jason.  I am at

8    Bennington town offices meeting with Terry Morse.

9    Terry is hoping you could give me a copy of the

10   town's water plans for 5, 10, and 20 years."

11            Did I read that correctly?

12        A.   That's right.

13        Q.   And then in the final email in the chain,

14   when a list is ultimately provided, Jason Dolmetsch

15   says, "Hi, Patrick.  Here is the list of

16   infrastructure projects that we have identified,

17   the following water improvement projects for the

18   system.  Please note that this list is an internal

19   wish/planning list that we use for future planning

20   and budgeting and not an officially duly adopted

21   capital plan."

22            Did I read that correctly?

23        A.   You did.

24        Q.   So this wish list and planning list

25   predates any issue with PFOA.  Is that correct?

1      A.   That's a good question.  I don't know when

2   these things came onto the list.  I'm not aware if

3   any of these items had -- were necessitated by the

4   PFOA.

5      Q.   And the Chapel Road tank replacement is

6   listed as one of the items on that list.  Is that

7   correct?

8      A.   Right, as one item.  As I understand it --

9   I mean, the town of Bennington's water system is

10   pretty small and their budget's pretty modest, but

11   they do ask their engineer on a regular basis

12   whether there are things he would do to improve the

13   system and upgrade the system, and this was -- that

14   was the list at that time.

15      Q.   What is the economic methodology that

16   would require the defendant in this case to pay for

17   the wish list of the town utility?

18      A.   I don't think we're making that assertion.

19      Q.   You are asking that an item on this wish

20   list to be paid for by Saint-Gobain.  Is that

21   correct?

22           MS. JOSELSON:  Objection.

23      A.   One of the -- a part of one of the items

24   on this list, this is the tank replacement.  As I

25   understand it, that did not include the redundant

1    line to the tank.  One of those items we determined

2    would satisfy the criteria of making the system

3    more reliable, better capacity, maintain quality,

4    or replace the services of groundwater.

5              So we -- based on conversations with them,

6    we selected one item from this list that we felt

7    had -- would provide that offsetting benefit.

8    There aren't a lot of alternatives at this point in

9    Bennington to offset the damage caused to

10   groundwater, short of an incredibly expensive

11   remedy.  So what we're trying to do is make the

12   community members as well off by making their

13   remaining water supply reliable.

14             Can we go off the record for a second?

15      Q.    What's that?

16      A.    Can we go off the record?

17      Q.    Sure.

18      A.    I just want to grab some water.

19             THE VIDEOGRAPHER:  The time is

20      approximately 3:13 and we are off the record.

21             (Recess taken from 3:13 to 3:19 p.m.)

22             (Unsworth Exhibit 19 marked for

23             identification.)

24             THE VIDEOGRAPHER:  The time is

25      approximately 3:19 and we are back on the

```
 1      record.
 2   BY MR. WILSON:
 3        Q.   Mr. Unsworth, thank you for your time
 4   today.  I think I have just one more question for
 5   you, and this is really just a housekeeping
 6   question to help us understand things.
 7             If you'll take a look at what's been
 8   marked as Exhibit 19 in front of you.  I'm going to
 9   represent to you that this was material that we
10   received produced to us as part of your reliance
11   materials in this matter, and we frankly have no
12   idea what it is.  And so if you could tell us what
13   it is, it would be appreciated.
14        A.   It's a really good economic graph because
15   it doesn't label either of the axes, so it
16   satisfies the behavior of economists.
17             I believe what this is -- and I could
18   confirm it -- but I believe what it is is these are
19   water production numbers for North Bennington over
20   a certain time period.  And I -- that's what this
21   is.  So I think what you're seeing there is a
22   little seasonality, but I'm not positive.
23        Q.   So do you have any idea what the units are
24   on the axes?
25        A.   I believe those are in gallons, and
```

1    there's -- yeah.

2        Q.   On --

3        A.   I'd have to go back to look at it.  But

4    that's a general sense of what these numbers are.

5        Q.   So the Y axis would be gallons and the X

6    axis would be --

7        A.   Rows of observations on given days.

8    Whether they're all specifically days or not, I

9    don't remember, because they don't actually -- it's

10   such a small system, they don't actually have

11   anybody at the plant on some days.  So they might

12   be, like, long weekends and things.

13       Q.   And would this be for Bennington or North

14   Bennington?

15       A.   This is North Bennington.

16       Q.   I thought that Jason Dolmetsch was with

17   Bennington.

18       A.   He is.  I -- I asked him a casual question

19   where I said, "Gee, when we were at North

20   Bennington, they indicated that they were close to

21   their capacity on filtration, and there's some

22   actual documentation of that."

23            And he said yeah, that was his

24   understanding, too, and he sent me this graph.

25       Q.   Okay.  And it ultimately ends up being a

1  nonissue because you're not offering any opinion on

2  damages for North Bennington with regard to source

3  capacity or infrastructure improvements.  Is that

4  correct?

5          MS. JOSELSON:  Objection.

6      A.   So I offered the opinion.  I -- and

7  appreciating that they know their system and they

8  have their own policies, it is my opinion, and I

9  think Jason shares it, that they're actually closer

10 to the line than they think they are.

11     Q.   But you've not attempted to estimate any

12 damages for North Bennington in that regard, have

13 you?

14         MS. JOSELSON:  Objection.

15     A.   So I was unable to identify projects for

16 North Bennington that could be used to offset the

17 effects of the PFOA in groundwater, and there's

18 no -- therefore, there's no damages with that

19 category.

20         MR. WILSON:  No further questions.

21         MS. JOSELSON:  I just have one.

22                    EXAMINATION

23 BY MS. JOSELSON:

24     Q.   You've been asked about a lot of future

25 potential contingencies.

Page 253

```
1            Does your methodology include an analysis
2    of the losses for people who, for whatever reason,
3    within the contamination zone, are not able to
4    connect to municipal water?
5            MR. WILSON:  Object to the form.
6       A.   So -- so my -- my model includes -- we
7    talked about it this morning -- there were a dozen
8    properties for which at the moment it's uncertain
9    how they're going to be dealt with.  They're too
10   far from the system where they physically can't get
11   pipes there.  If there are other individuals who
12   could not connect and would have to remain on
13   POETs, I could use that damage model to address
14   those individuals.
15      Q.   So it's all there in your methodology in
16   your report?
17      A.   It's all there, yeah.
18           MR. WILSON:  Object to the form.
19           MS. JOSELSON:  That's all.
20           THE VIDEOGRAPHER:  The time is
21   approximately 3:23 and this is the end of Media
22   No. 4.
23           (Witness excused and deposition concluded
24           at 3:23 p.m.)
25
```

```
1          WITNESS CERTIFICATION and ERRATA SHEET
2       In accordance with the rules of procedure
    governing depositions, you are entitled to read and
3   correct your deposition transcript.  Please read
    your deposition and on this errata sheet make any
4   necessary corrections or changes, either in form or
    substance.  Identify those corrections/changes by
5   page and line number, stating the change and the
    reason.  Please do not mark the actual transcript.
6   (Make extra copies of this sheet if you need to
    indicate more changes or corrections than will fit
7   on this one page.)  When completed, date and sign
    the errata sheet and have your signature notarized.
8
9   Page/Line      Correction            Reason
    _____   _____   _____
10
    _____   _____   _____
11
    _____   _____   _____
12
    _____   _____   _____
13
    _____   _____   _____
14
    _____   _____   _____
15
    _____   _____   _____
16
    _____   _____   _____
17
    _____   _____   _____
18
    _____   _____   _____
19
    _____   _____   _____
20
21  Date:  _____   _____
                    ROBERT UNSWORTH
22
        Subscribed and sworn to before me this _____
23  day of _____, 20___.
24
25               _____
                 Notary Public/Justice of the Peace
```

Page 255

1          C E R T I F I C A T E

2

3     I, Deanna J. Dean, a Registered Diplomate

4     Reporter, Certified Realtime Reporter, and

5     Massachusetts Notary Public, do hereby certify

6     that the foregoing, to the best of my

7     knowledge, skill and ability, is a true and

8     accurate transcript of the deposition of

9     ROBERT UNSWORTH, who was duly sworn, as

10    reported by me at the place and under the

11    circumstances present on the date hereinbefore

12    set forth.

13    I further certify that I am neither attorney or

14    counsel for, nor related to or employed by any

15    of the parties to the action in which this

16    deposition was taken, and further that I am not

17    a relative or employee of any attorney or

18    counsel employed in this case, nor am I

19    financially interested in this action.

20

21

22    _____

23          Deanna J. Dean, RDR, CRR

24        Signed this 3rd day of April, 2018

25     My MA commission expires December 28, 2018

| & |
| --- |
| **&**   1:20 2:3,7 4:22 5:6 6:21 7:12,16 193:2,8 |

| 0 |
| --- |
| **00125**   1:3 |
| **02199**   1:22 |
| **05753**   2:4 |

| 1 |
| --- |
| **1**   3:12 6:14 10:2,6 12:12,13 67:19 68:2 70:10 73:15 76:13 121:18,19 |
| **1,000**   55:4 77:4 150:12 158:3 |
| **1,200**   162:18 203:1 203:17 |
| **1,300**   162:18 |
| **1,531**   156:14 |
| **10**   3:12,21 4:11 25:10 28:17 65:7 68:2 144:17,18,22 203:19 247:10 |
| **100**   17:2 122:13 128:18 148:22 149:22 |
| **10010**   2:8 |
| **10:07**   67:18,20 |
| **10:16**   67:20,22 |
| **11**   3:14 4:12 147:9 147:11,15 227:15 |
| **111**   2:3 4:4 |
| **11:15**   117:23,24 |
| **11:23**   117:24 118:1 |
| **12**   4:14 17:24 55:5 58:5,21 60:25 61:21 67:3,14 77:18 84:4,11 128:19 148:10,11 |

148:15 195:15,19 205:7
**12.5**   28:10
**12/12/17**   3:17
**12/15/17**   3:15
**12/17/10**   4:20
**120**   148:22 149:22
**121**   222:25
**12:08**   155:18,19
**12:13**   155:19,21
**12:37**   176:22,24
**13**   4:17 155:23,24 156:3
**14**   3:15 4:20 51:15 177:2 179:1
**140**   4:7
**1410**   68:3
**144**   4:11
**147**   4:12
**148**   4:14
**15**   4:22 28:17 182:18,19,20 193:18,19,23
**155**   4:17
**16**   5:4 222:7,11 242:8
**17**   3:17 5:6 160:14 193:14 196:9 205:7 226:17,21
**177**   4:20
**18**   5:9 246:17,21
**19**   5:10 249:22 250:8
**193**   4:22
**1950s**   101:17
**1980**   190:3,18
**1:37**   177:5

| 2 |
| --- |
| **2**   3:14 11:1,5,16 12:11 67:23 75:14 76:14 151:22 |

170:17 171:3 176:7
**2,000**   150:14,22 151:4 203:2
**2,241**   156:16 158:2
**20**   18:9 27:10 28:2 88:22 104:19 149:16 182:11 184:1 193:13 194:6 203:19 205:20 207:17 232:1 247:10 254:23
**200**   156:17,22 157:1,5,9,17,22 162:14
**2010**   3:20
**2016**   18:10
**2017**   17:24 203:1 203:17
**2018**   1:18 6:4 255:24,25
**212**   2:9
**222**   5:4
**226**   5:6
**22nd**   2:8
**246**   5:9
**249**   5:10
**25**   160:16
**252**   3:6
**28**   255:25
**29**   1:18 6:4 91:12 91:22
**2:25**   217:6
**2:26**   217:5
**2:32**   217:6,8

| 3 |
| --- |
| **3**   3:15 14:10,14 104:18 118:2 176:23 195:20,22 247:7 |

| 30   56:20 57:3 92:1 93:1 121:19 166:25 177:14 189:10 194:6 |
| --- |
| **30th**   1:21 |
| **316**   36:22 |
| **32**   3:19 |
| **351**   2:3 |
| **388-6356**   2:4 |
| **3:13**   249:20,21 |
| **3:19**   249:21,25 |
| **3:23**   253:21,24 |
| **3rd**   255:24 |

| 4 |
| --- |
| **4**   3:17 17:11,15 81:14 83:14 177:6 253:22 |
| **4,000**   156:17,23 157:22 162:14 |
| **4.3**   222:23,24 |
| **40**   56:21 |
| **47**   164:6 |
| **48**   3:22 |

| 5 |
| --- |
| **5**   3:19 32:1,2 83:13,22 246:1 247:10 |
| **5/25/16**   5:7 |
| **50**   28:8 51:12 158:4 182:12,14 184:2 191:16 |
| **51**   2:8 |
| **5:16**   1:3 |

| 6 |
| --- |
| **6**   3:20 69:5,6,10 179:4 180:11 222:22 244:18 |
| **6,500**   223:1 |
| **6-1**   179:3 180:16 180:18 |

**6-7**   185:8
**6.1**   180:17
**6.2.2.**   185:10
**6.2.2.1**   185:10
**6.2.2.1.**   185:11
**6/2016**   5:4
**69**   3:20

**7**

**7**   3:5,23 29:16
  51:11,12 84:14
  87:2,3,7 94:2
  112:11
**7314**   180:3
**74**   227:18
**76**   88:14

**8**

**8**   4:4 111:23,24
  112:3
**8/31/17**   3:12
**80**   27:10
**80/20**   27:16
**800**   1:21 6:21
**802**   2:4
**847**   156:16 158:2
**849-7000**   2:9
**87**   3:23
**8:56**   1:18 6:5

**9**

**9**   4:7 57:7 140:22
  141:1
**9/1/17**   3:23
**90**   227:25 228:2
**99**   92:1,24 121:19
  128:3,15,20
  166:24 167:5
  170:4,14,23 176:6
  176:9 187:3 189:9

**a**

**a.m.**   1:18 6:5
  67:20,22 117:24
**ability**   76:6,7
  187:18 221:1
  255:7
**able**   23:9 35:18
  37:11,13 40:16
  48:6,10 49:4 59:3
  62:5 75:23,24
  78:16 109:7
  123:15 128:2
  131:1 184:7 198:5
  210:16 216:1
  233:18 253:3
**absence**   45:8
  61:18 110:10
**absent**   76:2 95:3
  99:22
**absolutely**   102:16
  111:17 238:24
  239:11
**accept**   220:9 240:9
**accepted**   241:2
**accepting**   226:10
  226:12
**access**   101:24
  102:3 188:25
  219:11
**accessed**   100:16
**accident**   38:11
**accomplish**   219:19
**account**   52:4,13
  93:11,15 95:21
  116:19 122:25
  133:7 151:21
**accounted**   136:4
  136:17
**accounting**   52:6
  95:14 167:8
  183:24

**accra**   20:11
**accrue**   30:8 38:13
  39:23 219:3
**accrued**   39:20
**accrues**   37:23
**accruing**   91:13
**accumulate**   204:5
**accuracy**   51:15
  126:11
**accurate**   13:19,20
  13:23 16:8 51:19
  106:4 124:18
  125:5 128:5,6
  143:16 153:14
  154:11,17,24,25
  155:8 165:19,22
  165:23 166:17,22
  166:24 167:9,11
  167:18 168:7,8,11
  168:15,19,21,25
  169:7,19,24 170:9
  170:15,17,24
  171:2,3,8,9,21
  172:5 173:1
  174:12 175:7
  183:17 184:8
  189:12 190:10
  200:17 201:6,18
  201:25 202:3
  203:5,20 204:13
  204:15,15 208:2,4
  232:12 255:8
**accurately**   189:2
  196:19 232:21
**accused**   36:11
**acknowledge**
  207:12
**acknowledged**
  201:9
**acknowledges**
  197:5

**accra**

**act**   36:22 41:4
  88:16 206:20
**acting**   41:5 236:8
  236:13
**action**   1:3 7:2 35:7
  68:3 130:19
  219:13 225:18,20
  234:20 255:15,19
**actions**   31:14 44:4
  56:25 73:6 76:24
  224:5 225:2,16
  243:3,22
**activities**   70:11,15
  72:1 73:14,23
  75:3,6 76:17
**activity**   76:17
**actor**   152:21
**actors**   149:20
  150:3,6 154:7
**actual**   45:19 46:1
  46:12,19,21 47:3
  47:16 48:8 104:17
  127:23 167:17
  175:13,16,23
  176:1,3 193:5,14
  251:22 254:5
**add**   207:25 208:1
**added**   33:2 57:11
  61:15 74:2 86:1
  91:14 95:11 97:11
  97:19 100:14
  104:1 107:14
  118:5 121:14
  132:4,6 134:12
  136:17 168:5
  210:19 216:7
  221:23 222:18
  230:21 233:10
  235:21
**adding**   23:10

**addition** 59:8
115:19 116:9
122:22
**additional** 49:21
49:22 50:5,24
51:18 95:13 97:13
110:14 117:5
133:8 221:22
222:17 223:1,12
223:18 224:21
226:11 227:5,6,20
228:1 229:3
**additionally**
185:19
**additions** 108:15
**address** 61:3
84:21 117:6
253:13
**addressed** 16:4
78:25 79:2 229:24
**addressing** 68:17
190:7
**adequate** 223:18
**adjusted** 72:21
164:16
**adjusting** 83:22
84:6
**administrator**
108:25 110:24
**adopted** 247:20
**adult** 88:17
**advantageous**
120:7,12
**adverse** 19:17
**advocacy** 44:17
**affect** 52:24 54:7
54:14,19 55:25
58:8,11 70:20,24
70:25 77:8,10
83:4 89:16 90:11
90:16 100:3 105:6

105:7,10 113:3
133:9 199:25
206:25 208:19
210:3 212:14
229:20
**affidavit** 35:23
**afternoon** 177:9
**age** 194:5 246:3,8
**agencies** 23:21
24:1
**agency** 23:19,22
23:24 24:2 29:10
**agent** 22:22
**ages** 185:1
**agree** 6:13 37:3
45:5 47:15 134:23
135:2,5,8,14 148:7
148:25 172:10
181:8 185:24,25
194:7 199:5
215:19 217:11
218:3,9
**agreement** 64:4
105:22
**agreements**
103:14 220:20
**ahead** 155:9
**aiming** 204:9,10
**air** 20:6,8,9,12,16
20:18 21:1 36:12
**al** 1:5 6:17
**allege** 89:20
**alleged** 68:10 80:4
82:12 108:9
**alleviate** 221:15
**allocate** 240:12,16
242:1
**allocated** 241:16
**allow** 43:13,23
125:4 187:10
199:13 242:11

**allowed** 39:23
45:3
**allows** 43:8,17
49:5 102:8
**alpha** 135:15
140:15 141:19
**alternative** 178:9
**alternatives** 225:5
225:9 240:7 249:8
**amended** 232:5
**amenities** 22:21
22:25
**amenity** 212:22
215:7
**amount** 31:14
62:10 64:23 95:3
99:8 100:3,18
119:10 130:2,3
145:6 164:14
165:5,10 183:10
183:10,11 184:5
187:2 203:6,8
240:17 241:2
**amounts** 145:4
**analogy** 235:17
**analyses** 4:21
36:22
**analysis** 12:7 18:8
20:17 21:25 22:19
22:20 37:3 39:2
45:6 52:15 53:1,4
53:14 55:21 74:25
76:13 78:14 80:8
85:19,22 86:9
89:22,23 96:23
97:2 98:7,11
103:20 108:25
109:23 110:3,8
111:12 114:21,22
116:21,24,25
134:6 140:13

142:21 152:1
162:9 164:23
179:13,16 180:8
181:2,25 190:3
193:3 194:18
199:25 200:2,9
207:1,3 208:11,14
213:25 216:22
217:12 241:25
245:20 253:1
**analyzed** 72:10
**analyzing** 37:6
**andy** 39:6 41:14
41:15 217:19
238:19
**andy's** 39:8
217:20,21,23
**angie's** 4:14
**angioedema**
112:16 113:16
**annual** 53:9,13
55:1,6,9 134:24
140:18 148:1,22
149:14 151:25
**annually** 148:2
164:7
**answer** 9:1,5,15
78:22 79:6 166:9
168:17 190:4
192:12 202:22
219:25 229:25
**answered** 106:20
107:1,4,23 204:17
209:7 220:8
**answering** 197:13
226:24 227:14
229:1
**answers** 8:12
139:1
**anybody** 136:7
234:3 239:24

251:11
anymore  189:18
anyone's  150:5
apartment  23:11
  120:10
apologies  144:23
  242:24
apologize  180:14
apparently  71:22
  72:16
appear  15:16
appeared  107:12
appears  11:9 19:5
  32:7 66:3 103:14
  144:25 147:23
  148:18 156:6
  235:12
apples  201:23
applied  10:16 24:7
  24:8 181:13
apply  10:16 42:17
  181:14 199:9,22
applying  78:12
appraisal  92:15
  96:16 212:17
appraiser  93:17
  93:21 212:24
  213:3
appraisers  94:1
  212:20 213:1,8,9,9
  213:13,16,20
appreciated  8:20
  9:6 250:13
appreciating
  252:7
approach  73:4
  150:14
appropriate  48:16
  48:22,25 49:7,17
  50:8 51:3 52:9
  54:10,13 65:3

95:23 109:13
  110:12 124:24
  131:13 151:24
  207:1 239:6
approximately  6:5
  16:24 36:25 67:18
  67:22 117:23
  118:1 155:18,21
  176:22 177:5
  217:5,8 227:18
  249:20,25 253:21
approximations
  143:6
april  255:24
aquifer  194:23
arbitrage  95:7
arbitration  26:8
area  26:5 56:9,10
  56:11 85:23 88:19
  90:7 91:10 101:23
  104:23 110:25
  118:19 122:16
  192:24,24 208:10
  210:4 213:4
  220:12 223:4
  231:6 237:8 240:1
  242:3
areas  19:22,24
  45:3 100:16
  101:21 201:15
  240:22
argue  122:7
  149:22 237:7
arguing  238:5
arises  136:9
arm's  210:13
  242:10
arrange  8:22
arrangement
  210:3

article  4:12,14,17
  147:18,21,25
  149:4 194:13
articles  146:20
  147:23 148:16
  151:23 152:7,23
  156:10 160:11
asap  18:14
ascertain  108:8
aside  182:13
asked  9:23 45:11
  61:15 78:13 88:8
  95:6 107:23 110:5
  127:11 130:6
  138:25 139:9
  142:5,16 204:17
  210:9 221:20
  239:8 245:7
  251:18 252:24
asking  31:4 42:21
  46:5 73:2 85:7
  102:17 107:9
  109:18 169:1,5,6
  170:25 173:23
  186:24 189:24
  218:5 226:24
  229:1 232:10
  238:7 239:7 247:4
  248:19
asserting  94:21
assertion  211:13
  248:18
assess  30:17 31:5
  37:13 38:17 45:13
  59:5
assessing  40:16
assessment  19:16
  25:14 27:21 31:10
  31:20 34:3
assessments  26:1
  27:18 29:3,14

asset  215:19
assets  24:21,21
  30:4
assign  59:21
assigned  196:11
assigning  61:3
  204:2
assigns  60:2
assist  39:2
associated  10:14
  19:19 32:9 33:3
  34:21 42:4 48:12
  59:22 60:10 68:12
  78:24 92:17
  136:10 182:21
  184:12 193:12
  196:14 209:9
  211:19 235:14
  244:13
assume  23:15
  61:11 99:21,22
  120:8 169:12
  178:5 197:2
  205:17 208:11,14
  210:14,25 236:15
  239:9,9
assumed  123:24
  123:25 151:21
  165:9 181:18
  182:10
assumes  140:2
  182:4 197:9 212:8
assuming  61:21
  63:6 100:24 129:8
  134:17 140:4,10
  140:14 150:1
  154:7,8 183:7,24
  184:2 185:5
  208:21 213:16
  218:1 219:17
  237:22

**assumption**  97:25
99:16,20,24 101:4
102:14 177:21,22
178:1 199:9 221:5
221:6
**assumptions**  74:19
**assurance**  115:16
**assure**  190:24
221:21
**assuring**  116:8
**atlanta**  122:16,17
**atmospheric**  82:18
**attached**  11:11
12:13 94:22
**attempt**  57:25
58:1 59:16 62:1,9
63:20 64:17,20
68:18 101:9 105:3
132:14 207:2,11
223:15
**attempted**  63:12
139:13 240:12
252:11
**attempting**  68:9
**attending**  7:5,6
**attention**  38:16,21
123:1
**attorney**  10:10
45:2 83:21 255:13
255:17
**attorneys**  113:23
247:1
**attractive**  94:10
**attributable**
243:24
**attribute**  22:2
91:1 107:16
**attributes**  21:23
23:4 85:12,13
102:8 214:15
216:10,12 229:9

**229:12 230:10**
**atypical**  30:9
**audio**  6:11,11
**august**  10:9,13
13:22
**author**  180:7
**authoritative**
108:11,17
**authoritatively**
108:7
**authorities**  16:21
**authority**  108:20
108:23
**authors**  179:21
**availability**  42:9
187:12 229:20
**available**  13:1
22:4,13 39:1
40:13 48:17 59:7
67:11 101:22
127:2 138:15
139:10,14 178:2
178:16 189:4,23
190:8 200:13
201:11 223:3
224:4 225:2,5,17
**avenue**  2:8
**average**  123:24,25
124:1 126:19
127:3,7 128:5,10
128:16 129:1
131:12,14,20,21
131:22 133:14
134:5,8,9,11,15
139:22 143:20
149:13 152:13,16
152:17,19 153:10
154:15,16 155:5,5
155:7 156:13,18
157:3,4,8,10,19
158:13,25 159:3,9

159:17 160:8
161:10,23 162:13
163:23 165:11,17
165:18,21,22
166:12,13 167:11
167:15,18 168:1,7
168:19,24 169:2,4
169:9,13,18,21,25
170:9,13,19,21,24
171:4,23 172:4,6
172:10 173:2
174:13,18,20
175:1,2,3,12,21
176:5,12 182:14
183:24 184:2,6,18
184:25 201:11,20
202:14 203:6,9
204:4,11,15
205:13
**averaged**  127:10
**averages**  126:6,12
126:19 133:15,24
134:9 149:12
154:25 158:8
159:13 167:25
171:12 173:15,19
202:19
**avoid**  83:5 115:17
207:22
**avoided**  81:25
**avoiding**  81:15,19
**award**  187:25
198:19
**awarded**  158:19
**aware**  8:8 15:19
16:21 18:19 41:10
43:7,12,16,22 44:1
44:13,16,17,22
45:1 57:24 62:7
81:10 104:11
122:12 140:20

207:18,20 219:4
219:15,16 231:9
236:12 248:2
**awful**  139:20
**axes**  250:15,24
**axis**  251:5,6

**b**

**b**  3:9 4:1 5:1 36:22
**back**  29:1,15
31:13 35:17 56:17
56:22 67:21 80:24
117:25 120:16,17
128:15 142:6
145:12,25 155:21
165:1 177:5 179:9
183:10,11 208:7
217:8 239:21
245:16 249:25
251:3
**bacteria**  135:6
137:8 142:21
**bacterial**  141:15
**bacteriological**
137:16 139:23
**balance**  25:11
26:16 27:3
**balanced**  229:18
**balancing**  246:5
**balles**  242:9
**bank**  177:15
178:15 181:10
**banks**  213:20
**barry**  39:8 217:19
238:19
**barry's**  41:15,15
217:21,22
**base**  167:8
**based**  42:6 58:13
63:23 66:2 67:5
67:11 80:13,16
85:20,23 86:12

93:1 97:15 99:3,4
100:21 102:14
108:4,19 110:23
118:11,16,21
119:6 124:24
127:1 129:13
131:3 132:7
135:23,23 138:22
138:22,25 139:2
142:10,19 143:9,9
151:5,16,23
159:19,20 160:11
163:1 174:13
175:12,14 178:1
181:9 183:18,20
184:11 186:18
194:8 196:18
197:7 198:20
200:12 209:24
213:3,11 214:7
226:5 227:6,22
236:14 249:5

**basic** 244:21

**basis** 9:25 10:16
12:16 15:22 33:2
35:5,6 48:7 49:6
117:2 121:5 126:3
135:13 142:17
146:20 149:6,9
151:3 164:5
212:16 217:22
223:7 232:10
244:20 248:11

**bathe** 70:21

**bathrooms** 85:14
92:9

**baxter** 33:10

**bca** 181:3

**beach** 39:21 40:23

**beaches** 40:5,5,6
43:25

**bear** 57:9 58:24
65:4 90:21 208:25

**bearing** 58:15
208:17,18

**bears** 59:9,10
209:4

**beauty** 131:21

**bedrock** 163:5

**bedroom** 23:10
32:11

**began** 68:1

**beginning** 68:6
80:24 118:2
163:18 177:6
185:12

**behalf** 1:6 18:7
31:10 34:3 35:1
39:19

**behave** 159:21

**behavior** 30:3
42:16 68:13 84:6
99:5 108:19
121:24 152:13
170:12 172:4
174:21 250:16

**behaviors** 24:20
166:4

**belief** 176:16
186:7

**believe** 13:18,22
15:25 16:8 35:23
44:5 58:16 70:19
77:1,11 78:17
79:12 96:7,15
132:1 133:12
134:11 144:1,3
145:12 146:1
157:7 166:12
176:18 177:17
179:1,12,25 186:2
198:1 201:16,18

201:20,24,25
216:21 217:22
226:6 232:13,17
233:5 240:20
247:2 250:17,18
250:25

**believed** 134:21
223:17

**benefit** 106:14
152:4,15 153:23
154:5 181:2 221:8
230:11 233:3
234:8,8 236:18,22
238:1,6,8,10,15,17
241:8,19 249:7

**benefits** 19:19
179:7 180:12
219:3 236:16
240:5

**bennington** 68:25
74:6,7 86:2,3
88:10,11 93:2,18
96:10 100:14,15
101:8,15,21 102:9
112:14,19 116:12
119:5,6,9,11,12,14
119:18 123:25
127:12 133:6
138:10,12,13
141:9,9 157:16
161:25 170:22
174:12 177:15
178:15 181:10
186:25 192:24
194:22 197:18
218:23,25 219:2,5
219:5,9,12,17,21
219:22 220:1,4,15
220:19,19 221:7
222:21 223:9,16
224:3,11,18

226:25 227:7
228:21 231:20
237:8 238:4
241:12 247:8
249:9 250:19
251:13,14,15,17
251:20 252:2,12
252:16

**bennington's** 18:7
118:18 248:9

**bert** 2:10 7:14

**bertwolff** 2:11

**best** 13:24 16:10
59:7 67:11 102:18
111:14,19 124:24
127:1 171:17
178:13 200:12
202:10 255:6

**better** 13:4 28:7
53:17 93:21,25
99:15 101:1
102:13 108:23
110:25 111:5
119:17 121:12
127:23 173:9,12
173:15 174:21
175:2,13 187:17
190:15 197:3
203:9 219:18
225:6,22 230:1,5,9
249:3

**betterment** 218:25
219:7,21

**beyond** 68:16
215:14 229:22

**big** 59:23 124:3
128:8,21 157:21
165:12

**bill** 33:4 50:22
74:6,8 92:9
109:10 126:21

**bills** 91:4,4,4,22
  122:23 129:23
**biophysical** 20:21
**bit** 58:18 95:9
  122:2 129:7 158:5
  158:6 164:9
  211:12 222:6
  224:9 240:24,25
**blaskopf** 2:14 6:23
**block** 34:15
**bolles** 242:13,14
  244:9
**bond** 234:22
**bored** 150:13
**borne** 103:14
**borrowing** 185:22
  186:13
**boston** 1:22 6:22
**bothered** 38:12
**bottom** 148:20
  180:19
**bought** 215:9
**box** 56:11 231:5
  231:17,21 233:16
  233:22 234:3
**boylston** 1:21 6:21
**bracketed** 88:19
**break** 8:21 35:18
  65:12,14 67:15
  117:15 155:9,11
  176:19 217:3
**breakdown**
  245:20
**breaks** 65:7
**bring** 93:9 192:7
**bringing** 103:13
**broad** 48:18 55:14
  181:1
**broader** 42:17
**broadly** 15:23
  26:2 47:20

**brochure** 4:8
**brook** 242:9,13,14
  244:9
**brought** 36:8
**budget's** 248:10
**budgeting** 247:20
**build** 22:23 49:10
  101:7
**building** 42:2,13
  42:14
**buildout** 244:22
**built** 105:13
  214:12
**bullet** 68:6 83:14
**bunch** 180:6
  241:15
**burden** 91:19
**business** 20:1 48:5
  134:7 245:13
**buy** 137:14,15
  139:11 150:24
  172:6
**buyer** 93:14
  214:24 215:18
**buyers** 94:11
  214:13
**buys** 91:1

**c**

**c** 2:1 6:1 68:3 70:8
  255:1,1
**calculate** 57:2,23
  92:1 103:11
  128:24 129:20
  163:22 166:13
  202:14 206:13
  210:4,10 223:16
  240:16,19 244:8
**calculated** 120:16
  120:17 181:17
  182:23 183:3
  235:22

**calculates** 129:19
  182:1 200:14
**calculating** 52:3,8
  53:6 164:10
  165:18 186:1,5,6
  187:1 206:7
  223:24
**calculation** 53:15
  57:3 58:13 86:20
  147:22 156:11
  159:1 160:13
  163:22 187:5
  193:15 216:7
**calculations** 33:16
  55:12 74:1,24
  77:8 83:11,16
  126:3 132:13
  133:22 140:2
  145:1 204:2 226:6
**call** 35:6 46:20
  56:10 83:12
  152:21
**called** 7:18
**calling** 75:1
**cap** 104:19
**capacity** 222:1
  223:3 224:7,12
  226:7 227:6,12,19
  227:20,25 228:1
  228:20 229:8
  235:8 249:3
  251:21 252:3
**capital** 119:8
  181:15,21 182:7
  183:20,25 186:3
  186:18 187:13,19
  188:24 190:5
  191:11 247:21
**capitalization**
  190:16

**capitalize** 55:11
  177:22 181:19
  183:6 191:9
**capitalized** 90:24
  92:3,8 93:1 96:15
  104:2 105:12
  172:3 176:17
  177:24 183:2
  189:19 212:8,9
  214:2
**capitalizing** 186:8
**card** 188:14
**carries** 188:21
**case** 9:9,20 10:8
  10:22 14:5 15:7
  15:16,21 16:2,25
  17:5 24:4 30:5
  31:11,19,20 32:16
  32:17,23,25 33:7
  34:1,2,7,8,23 35:9
  37:1 38:18,25
  41:9,12 56:2
  66:23 68:20 69:22
  75:4 82:3 85:5,19
  85:22 87:19 89:16
  89:19 90:11 95:11
  97:22,23 112:8
  114:15 116:11
  122:17 127:10
  130:11,17,18
  158:18 164:10
  165:8 172:17,19
  173:21 197:25
  207:7 210:1
  211:16 212:16,16
  213:21 216:7
  224:3 225:24
  228:21 235:18
  236:6 247:1
  248:16 255:18

**cases** 25:6,14
  27:11 31:17 33:22
  33:23,24 39:14
  44:13,16,22 53:4
  96:9 151:17
  188:23 201:9
**cash** 52:4 188:4,17
  190:24
**casual** 251:18
**categories** 30:7
  125:15,16 139:24
**category** 133:19
  252:19
**causality** 83:15
**cause** 68:3 77:25
  78:2 82:8 115:1,6
  192:9,14 206:5
**caused** 68:4 79:23
  249:9
**causes** 20:12 73:6
  76:24 112:13
  144:1
**caveat** 240:2
**cc'ed** 17:21
**cell** 6:9
**cellular** 6:8
**census** 22:12
  42:19 49:3
**cents** 51:13
**certain** 14:4 17:6
  42:6 52:12 62:16
  104:17 165:10
  185:5 186:3
  208:15 239:11
  250:20
**certainly** 215:11
**certainty** 171:17
**certification** 4:6
  9:20 10:7,11,23
  11:23 12:1,4,15,21
  13:10,13,18,25

**certified** 2:15
  255:4
**certify** 255:5,13
**cetera** 25:16
  143:12 161:4
**chain** 5:9 17:18,23
  18:4 247:7,13
**challenge** 96:19
**challenges** 244:13
**change** 24:23
  48:11 79:12 80:2
  92:12 98:24
  109:21 141:25
  154:15,16 174:25
  175:20 189:18
  204:24 212:1
  216:4,14 228:19
  232:9 254:5
**changed** 47:7
  61:19 78:25 79:4
  84:22,23 164:13
  164:14,21 190:5
**changes** 12:6
  13:21 19:17 20:21
  20:22 24:18 30:3
  42:15,16 68:13,13
  198:3 216:13
  223:10 224:19
  254:4,4,6
**changing** 212:10
**chapel** 245:23
  248:5
**chapman** 3:18
  17:20
**chapter** 3:22
  179:6 180:25
**characteristics**
  85:20 121:17
**charge** 98:17
  103:10 119:3

151:25 182:18,24
**charges** 188:22
  209:14,24 210:20
**chart** 227:16
**cheap** 23:17
**cheaper** 158:22
**chemical** 20:22
  112:22 141:18
**chemicals** 135:9
  136:25 139:7
  140:11
**chemistry** 206:9
**chicago** 4:12 31:19
  32:11 147:18,21
**child** 70:21
**choice** 117:17,18
**choose** 121:3,11
  123:19 135:13
  136:25 137:7
  188:17
**chose** 75:25 95:5
  100:15,17 103:5
  104:23 105:15
  107:17
**chosen** 99:17
**circumstances**
  54:1,9,12 116:4
  125:3 136:16
  255:11
**cite** 19:12 165:2
**cited** 32:15,19
  70:1 147:21 151:8
  151:12,15 156:10
  156:24 160:12
  162:8 164:5
  179:22 180:1,2
  193:2
**cites** 18:20
**citing** 55:16
**citizens** 219:21
  236:8,13

**city** 20:11
**civil** 1:3
**claim** 26:12 32:8
  36:8,20
**claiming** 88:17
**claims** 25:14,15
  26:23 31:13 36:13
**clarifying** 182:16
**class** 1:7 4:6 9:20
  10:7,11,23 11:23
  12:1,3,15,20 13:10
  13:13,15,16,18,25
  31:10,14 34:4
  35:1,2,6,7 56:12
  65:25 66:9,10,18
  70:16 71:8,11
  73:16,25 75:7,18
  77:4,13 78:4,20
  79:15,23 80:2,6
  81:4,8,9,12,18
  82:4,11 83:3,4,11
  84:1,2 85:4,5,8,23
  87:14,16,20 88:6
  88:16,18,19 89:1
  89:19,22 90:7
  91:10 108:10
  109:14,15,18
  110:13 112:6
  115:22 118:6
  124:5,12,15,17
  125:6,18,19,21
  127:24 129:24
  130:3 132:15,23
  132:25 133:9,10
  133:16 134:20
  135:22 137:21
  141:12 152:20,24
  152:25,25 153:13
  153:15 154:12
  163:8,13 166:14
  166:15,16 167:14

167:15,25 168:1,4
168:4,24 169:1,5,7
171:18 173:21,22
174:7,9 176:4
177:13 178:17
184:21,21 189:5
189:23 190:9
195:10,17 196:4,9
196:11,20,23
197:2,3,7,15,16,17
197:24 198:3,11
198:12 200:19
201:8,22 202:4,8
206:3 208:8,9
209:4 210:8
218:14,19 220:7
220:12,25,25
221:10,13 230:25
231:4,22,24 232:7
232:11,19 233:23
234:17,23 235:6
236:23,25 237:2,4
237:13,20,23
238:11,16,21
239:9,12 240:6,8
240:13 241:4,9,11
241:17,20 242:1,2
**classes**  31:15
**classification**
12:23 56:25
**classwide**  9:25
10:16
**clean**  8:10 11:13
36:22 116:8
**clear**  9:2 61:17
81:17 84:1 106:22
107:3 141:8
224:15 227:3
234:6
**clearly**  8:18,19

**client**  27:14 29:6
39:1 40:15 50:23
50:23 59:11 64:11
64:14
**clients**  38:24
**close**  198:4 251:20
**closed**  56:8 87:25
**closely**  51:7
214:15
**closer**  252:9
**closing**  56:5
**coauthor**  180:4
**cognizant**  206:18
**coliform**  141:15
141:17 142:20
**collapse**  213:15
**collected**  50:6
**columns**  74:24
**come**  35:17 73:7
74:18 92:22
124:17 127:23
172:6 177:18
189:13
**comes**  51:17 55:23
122:4 131:8
225:19
**comfort**  134:14
**comfortable**  78:12
99:1 153:9 218:2
**coming**  51:14
**comment**  96:6
**commercial**  22:23
**commission**
255:25
**committed**  63:25
**committing**  57:1
**common**  81:12
83:10 192:21,23
194:25 195:1
**communities**
77:21 134:13

199:16 200:11
229:4,14 230:1
**community**  32:11
60:8 61:14 88:3,5
178:3,21 219:3,6,7
221:8,24 228:20
229:6 231:14
233:12,14 241:19
249:12
**companies**  36:23
**company**  37:25
**comparable**  213:4
213:10
**comparative**
133:6
**compared**  147:5
**compares**  59:25
**comparing**  46:8
59:14,15 95:12
**compensable**  71:7
**compensate**
129:21,25 184:5
209:10 210:22
226:2 240:6
**compensated**
129:11 134:21
**compensates**
130:12
**compensating**
129:13
**compensation**
106:10 109:20
129:23 204:25
**competitive**  162:2
210:16
**complaint**  87:15
87:15 232:5,7
239:5,8
**complete**  12:2,8
12:14,21 15:5
125:12

**completed**  20:11
254:7
**completely**  190:4
**complex**  198:22
199:1,2,5,7 245:1
**complicated**  41:7
**component**  60:17
74:2 209:11
**components**  60:18
91:7 150:13 182:5
184:16,22 191:14
**compounding**
52:14
**comprehensive**
213:25
**concede**  202:18
**concentration**
80:14,16,21 81:3
**concentrations**
56:20 65:24 66:3
66:6 80:9 172:22
231:5 233:6
**concept**  92:19
99:2
**concern**  56:11
112:13 231:6
240:1 243:15
**concerns**  117:8,9
**concluded**  253:23
**conclusion**  72:22
224:23
**condition**  46:8
58:14 63:16 91:2
101:6 107:25
109:12 128:3
211:17 214:7
**conditions**  19:20
24:9,11 72:16
78:4 94:21 126:17
190:19 209:17
214:1

condo  23:12,16
conduct  45:8
conducted  35:4
  37:4
confidence  51:8,9
  127:6 175:11
confident  50:13,13
  50:15 54:24
  225:25
confirm  250:18
confused  224:10
confusion  51:5
connect  63:3,5
  83:8 105:18 253:4
  253:12
connected  62:22
  62:25 63:2 84:12
  84:13 94:13 95:6
  96:1 98:17 102:1
  102:4 103:21
  106:1 112:14
  236:19
connection  69:13
  86:14,15 94:4,9
  95:12,16 100:10
  112:7 179:23
  212:23 216:5
connections  86:12
  97:11 104:12
  108:7 119:15
consecutive  57:18
  65:22 66:16
consequence
  46:10,12,16,20,21
  47:13
consequences
  48:13,14
conservation  44:4
  44:8,13
conservative
  140:9

consider  48:16,22
  48:25 49:17,23
  50:8 51:3,20 52:2
  52:16 53:3,5 54:2
  54:10,13,20 62:4
  68:18 69:21 71:19
  71:25 72:9 74:23
  74:25 75:2,13
  76:13,14,19 82:20
  93:12 110:7,10
  111:11,12 113:1
  190:20 194:17
  197:24 214:24
considered  12:17
  15:13 53:1 69:20
  69:24 70:6 73:9
  83:18 113:10
  115:3 119:17
  194:5 244:24
considering  33:2
  63:19 72:11 86:9
consistent  96:16
  96:17
consists  218:14
constant  200:2
constitute  80:21
constraint  224:13
construct  104:5
constructed  75:11
  191:17
constructing
  104:7
consult  213:24
consultant  20:2
  23:20,25
consulting  25:4
  26:4,10,21 27:8
consume  166:3
consumed  166:23
consumption
  121:18 122:3,6

124:1 174:11
  223:1
cont'd  4:1 5:1
contain  12:2,21
  13:14 15:5,12
contained  19:9
  225:13
contains  12:13
contaminant
  240:22
contaminants
  68:25 95:1
contaminated
  61:9 76:4 94:15
  109:7 112:22
  172:22 211:20
  230:2,17,22 232:1
contamination
  19:18 31:21,22
  32:10 57:11 61:18
  61:19 62:18 76:2
  76:11 88:10 95:3
  101:12 109:11
  231:15 233:13
  236:19 253:3
context  43:20 70:1
  87:24 185:25
contingencies
  252:25
contingent  52:17
  52:21 54:2,4,6,11
  54:13 58:8 62:2
  63:13,15 90:15
  116:19 117:2
continue  6:12
  55:25 56:18 57:21
  109:7 213:17
continuously
  213:17,18
contracts  180:6

contradicted
  108:11
contraption
  194:11
contribute  26:11
contributed
  180:10
control  102:11
  207:2,12,14 216:2
  242:11,18 243:5
conventional
  178:10
conversation
  38:24 102:14,16
  108:5,16,16,24
  110:23 113:23
  138:23
conversations  6:8
  38:23 108:13
  135:11 137:11
  195:7 224:24
  229:14 249:5
cooperative  26:1
copies  254:6
copy  10:9 11:6,15
  14:15,24 17:17
  18:5 179:2 247:9
corp  7:13
corporation  1:12
  6:18 36:19
corporations
  36:21 89:5
correct  9:12,16,18
  9:21 10:9,23,24
  13:7 14:1,5,24
  17:24,25 18:2,3
  19:20,24 20:4,19
  21:17 23:2 24:5
  24:16 27:4 30:12
  31:2 32:13,17
  38:4 39:9,14,15

40:2,3,11 43:3
45:23 46:3,14
48:9,17 49:7,18
51:21 52:5,10
53:1,10,21,24
55:19 58:25 60:5
60:6,15 64:8
66:11,20,25 67:6
68:5 70:17,25
71:9,20 72:3,12
73:1 74:15,21
75:19 78:5 79:16
81:4,5,20 83:19
84:2 85:24 86:7
89:2 94:3,18
95:18 97:13,14
99:11,21 100:4
105:23 109:11,24
115:24 116:13
118:8,12,14,17,23
119:7,12,13
123:21 124:7,20
124:23 125:7
126:20 129:10
131:20,22 132:9
132:10 133:3,14
134:2 136:5 137:1
137:22 138:23
139:15 140:17
143:19,23 144:15
144:16 146:12
149:18,18 152:9
152:16 154:19
155:1,4 156:20,21
156:23 157:18
160:6,16,17
162:15 163:2,11
166:19 167:13,15
167:18 168:2
169:4 174:19
176:6,18 177:15

178:3,18 179:24
181:24 183:2
184:22 187:15,22
188:8,9,18,19,22
189:6,13 196:1,7
196:24 198:23
202:5 203:12
206:1 207:3,15
208:2,2 214:21
215:2 216:25
217:24 218:17
219:9 223:12,19
227:7 230:13,18
231:1,8 233:24
234:25 235:9
236:14 238:23
241:1,13 244:1,11
244:18,19 246:1
246:11,13 247:25
248:7,21 252:4
254:3
**correction** 254:9
**corrections** 254:4
254:4,6
**correctly** 12:18
18:11,17 57:19
70:12 72:20 88:23
88:25 112:24
141:22 148:5,23
150:17 166:13
181:6 191:17
193:10 196:16
205:25 218:20
223:5 227:21
247:11,22
**cost** 4:18 42:16
50:23 51:1 57:9
59:10,11 60:1
68:14 70:22 74:2
74:3 77:22 90:19
90:20 91:19,21,22

92:3,17 95:11
96:8,14 97:19
98:10 100:11
103:11,12,13
104:17,21 106:1
116:8,25 118:6
132:4,6,8,8,20,24
134:18,24 136:17
139:22 140:18
144:14 146:25
147:4 148:22
150:11 151:17
152:3 153:5,21,23
154:4 156:12,19
156:22 157:22
162:21 163:23
164:3,5,10,18,19
165:4,23,24 168:5
172:2 175:18,21
181:2,14 182:5,8
183:8,19,20,25
184:18 186:18,21
187:19 188:23
189:2,11 190:5
199:14 200:3,10
200:14 204:3,11
207:8 208:23
209:8,11 211:6
212:8 216:18
218:21 219:20
221:12 222:19
223:24 227:2,11
234:24 240:20
241:5 244:8,18,21
244:22,25 245:7,8
245:15,15,16,25
247:2
**costa** 36:8
**costing** 104:20
**costs** 33:2 52:3,9
57:15 58:24,24

59:15,18 60:3,4,14
60:15 62:11 63:20
63:21,25 64:3,7,18
64:21 65:19 66:24
83:9 86:2 91:14
92:25 93:15,18
95:13 98:12 99:11
103:6,16 104:1
105:6 115:15
129:8,14,15 132:4
132:12,15 133:2
134:12,23 135:2
147:6 149:11
150:12,21,23
151:21 158:24
160:18 161:6
173:6 175:19,22
176:16 177:12,20
177:22 179:7
180:12 181:15,21
181:23 182:2,25
183:15 184:7,10
186:4 187:4,13,21
187:24 191:24
192:6 203:15
205:13 207:19
208:17,19,25
210:19,23 211:7
233:10,11 235:21
240:12 241:7
242:1 245:10
**counsel** 6:16 7:4
7:10,18 8:22 17:5
17:7,10,19 37:1
67:24 68:22 118:3
177:7 217:9
255:14,18
**count** 29:2,14
**countertops** 23:10
23:16 85:16

**country** 192:25 194:24
**couple** 8:7 65:11 65:17 212:6
**course** 17:4 33:25 53:19 61:17 103:21 113:2,19 114:14
**court** 1:1 6:19,24 7:8 8:9,18 9:3 13:6,8 26:8 35:24 36:9 68:21 69:9 71:17 76:22 77:16 80:25 81:23 140:25 144:21 147:14 148:14 156:2 222:10 239:19 241:2 246:20
**courts** 37:19 78:10
**cover** 187:4,11
**covered** 176:18
**covers** 15:8,10
**crawford** 4:4 112:12 115:22 117:4 125:10 172:25 203:1,16
**crawford's** 114:20 115:9 116:10,11 125:2 173:16
**create** 8:9 227:19
**created** 58:23
**creating** 81:25
**credible** 156:25 157:9,10
**credit** 188:5,10,14
**creek** 5:4 224:23 227:4
**crime** 23:7
**criteria** 226:15 249:2

**crr** 1:25 255:23
**current** 64:4 82:25 109:8 124:1 128:3 128:6 167:3 173:10 190:19 232:6
**currently** 60:8 96:12 125:13 166:22 171:2 174:4 176:4
**customers** 119:4,5
**cut** 245:2
**cv** 1:3
**cycle** 163:9,14,18

**d**

**d** 1:5 3:1 6:1,16
**daily** 227:17
**damage** 25:14 30:8 36:20 38:14 39:4 40:17,23 60:17 64:14 67:5 71:13,14 73:21 86:20 91:7 111:5 125:12,16 129:19 133:19 172:12 186:2 193:3 201:21 205:18 206:13,22 249:9 253:13
**damages** 3:16 9:10 9:11,24 10:19 13:15 14:7,8,21 19:16 27:24 28:15 28:20 29:23 30:13 30:14,17,21,24 31:1,2,5,7,24 32:9 34:3 36:14 37:4,6 37:11,13,13,17 38:3,8,14,17 39:6 39:12 40:8,10 41:14 42:3,15

44:11,15,18 45:6 45:19 46:1,14,23 47:5,11 49:6 52:12,18,24 53:7 54:3,7,14,18,19 56:1 57:23 58:9 58:20 59:5,12,12 59:17 60:13,22 64:24 68:12 70:2 70:20 71:6 72:8 72:10,17,19 74:18 75:12 77:9,10 78:1,2 80:17 83:2 85:19,22 86:1 87:20,24 88:3,9,13 88:15 89:20 90:11 90:16,17 95:11,11 98:15,20 99:8,8,13 100:1,3 103:11 114:23 115:2,7,10 115:19,23 116:1,5 116:21,24 117:5 117:11 123:7 124:5,11,14,19 125:6,14,14,20,21 126:17 129:6,16 129:20 131:19 132:6 134:19 135:22 136:4,18 140:9 143:16 146:5 147:22 151:25 153:1,16 154:12 156:11 158:18,19 160:12 164:22 166:14,18 167:21,24 168:1,3 168:15 169:6,23 170:7 172:25 193:8 196:20 197:15 198:11,19 198:20 205:19

206:2 207:24 208:6 210:4 216:7 216:23 217:12,20 217:21,21,23 218:6,8,10 220:23 221:10,13 223:16 223:19 225:2,10 226:16 237:25 238:21,22 241:2,4 252:2,12,18
**damp** 118:19
**danger** 126:9
**dangers** 126:6
**data** 15:13 20:13 21:23 22:7,8,9,11 22:11,12,13,14,15 24:13,13 33:15 42:6,9,13 48:17,19 48:19,23 49:12 74:5 102:13,18 110:14 127:4,10 127:22 131:24 132:2 136:20 138:8,13,22 139:2 139:5,6,9,13 143:13 144:7,8 157:7,13 158:11 159:20 160:2,3 162:5,8 168:8,20 170:8,10 171:11 171:12,20,23 172:18,21,23 173:4,20,24 174:22 175:7,12 175:13,16,23 176:1,3 190:20 195:6 199:8 200:18 201:7,10 201:10 202:3,18 202:23 204:16 213:5,12 224:10

**date** 6:4 17:23 232:4 254:7,21 255:11
**daughter** 48:3
**davis** 3:25
**day** 222:25 223:2 254:23 255:24
**days** 18:1 19:10 251:7,8,11
**dead** 159:9
**deal** 38:7 80:13,16 119:17 120:19,20 120:21 121:12 127:16
**dealing** 37:25 126:17 189:9
**deals** 69:18 94:20
**dealt** 253:9
**dean** 1:25 6:25 255:3,23
**deanna** 1:25 6:25 255:3,23
**death** 185:18
**decade** 97:10
**decades** 100:15
**december** 10:18 12:5 13:3,3,17,22 14:9,25 17:24 255:25
**deceptive** 165:11 165:17
**decide** 48:6
**decided** 201:11 236:25
**decides** 123:11
**deciding** 30:22 91:5 214:24
**decision** 31:8 133:25 138:20 214:12

**decisions** 185:16
**declaration** 3:14 4:4 10:21 11:6,12 11:19 13:5,6 112:5,12 113:1,9 125:2
**declare** 56:9,12
**decreases** 191:25
**decreasing** 57:17 65:21 151:14 214:3
**decrement** 211:18
**deems** 121:25
**deep** 131:7 160:19 161:6,9
**deeper** 58:2 62:7 62:17 63:21 64:21 67:10 240:24
**default** 209:21 210:3
**defendant** 1:13 2:7 7:14,19 35:8 36:10 230:5 248:16
**defendants** 6:16 36:3,4,13,17
**defense** 36:13
**define** 54:4 160:7
**defined** 78:7,9 124:6 220:2 232:7 233:17
**definitely** 233:7
**definition** 68:15 70:3 72:17 78:10 78:13 82:6 86:22 87:16 88:8 89:22 191:22 208:7,8,9 218:19 231:3,22 232:20,21 237:1,3 237:20 239:9

**definitions** 87:14 87:17 89:8 232:14
**degree** 234:16
**delivered** 34:15
**demand** 92:23 103:25 222:25 223:18 227:17 235:23
**demands** 223:11 224:20
**demonstrated** 57:16 65:20 213:15
**demonstrating** 57:4
**dense** 102:10
**department** 36:13 141:5,25 142:12
**depend** 50:17,17 53:15 54:22,23 67:10 70:15 127:4 127:7 129:11 153:22,25 162:22 167:1 170:2,2 206:9
**dependent** 40:18 55:22 56:23 70:2 72:18 221:24 224:1 225:21 233:14
**depending** 50:15 82:15 85:12 121:19 150:15,23 162:24 166:4 182:3
**depends** 15:18 27:11 44:12 67:1 67:7,7,8 110:5 118:6 120:14 126:8,8,21,23 131:23 153:3

157:12 171:14 172:12,14 187:12 196:10 205:4,9,12 206:12
**deposed** 8:6 33:21
**deposition** 1:16 6:11,15,20 8:5,7 8:10 15:4 16:2 87:7 112:3 148:15 222:12 226:21 243:12 253:23 254:3,3 255:8,16
**depositions** 254:2
**depression** 213:22
**dept** 4:7
**depth** 143:1 150:15
**derived** 164:6
**desal** 235:24
**describe** 33:5 57:8 124:4,10 170:3,6 211:23 225:12
**described** 47:16 104:6 108:6 110:14 159:21 193:7 242:17 243:2
**describes** 50:12 68:3 91:14
**describing** 60:9 194:16
**description** 3:11 4:3 5:3 93:21 195:14
**design** 5:6 18:10
**desirable** 57:25 63:16,17
**desire** 88:2 97:18
**destroys** 56:6
**detach** 65:15

**detail** 9:17 175:10
**detect** 216:2
**detected** 66:8
**detectible** 66:18
**detection** 104:22
**determination**
  56:24 136:4
  154:12 219:24
**determine** 39:8
  47:18 49:5 58:20
  59:17 60:3 84:17
  88:12 100:1 105:3
  108:8 130:1,2,2,21
  145:6 151:3
  156:19 169:6,23
  171:10 172:24
  184:8 189:2
  196:20 197:15
  198:11 200:10
  206:2 213:12
  215:3 229:10
  245:10
**determined** 132:7
  133:2 135:22
  160:13 164:3
  249:1
**determining** 59:16
  70:5,6 72:2,9 73:9
  87:19 105:7
  136:17 142:9
  146:21 165:4
  170:7 209:2
**develop** 20:24
  21:3 105:14
  233:18
**developed** 21:1
  110:6 179:17
**developing** 34:1
**dictates** 93:3
  207:11

**differ** 118:11,16
  118:21
**difference** 47:16
  47:18 48:7,16
  60:3,14 128:8,9,17
  128:21 129:3,14
  132:7 158:2,3,4
  160:25 161:3,5
  162:19 165:13
  181:18,19,20
  182:1,6,23,25
  183:14 185:1,4
  202:11 211:4
**differences** 74:23
  74:25 75:3 80:20
  80:21 81:3,18
  83:3 118:12,17,22
  132:19 183:1
**different** 21:20
  29:23 30:2,6,11
  40:9,11 41:17
  43:4 51:13 66:25
  67:4,5 72:22
  73:25 75:17 77:21
  77:21,22 80:1
  82:2 92:11 97:4
  115:23 117:5
  123:6,13 128:18
  137:13 142:6
  145:17,20 150:2
  153:1,12,19
  154:23 158:17,20
  160:18 163:7,8,17
  163:21,24 164:2
  164:17,19 166:3
  168:17 178:12
  180:7 185:21,22
  185:23 186:12,13
  186:14,17 187:5,5
  187:21 188:20,21
  188:22 190:8

  197:7,8 213:19
  227:9 235:22
  240:25
**differentially**
  129:22
**differently** 53:20
  55:6,11 75:10
  197:7 211:14
  228:5,14 235:22
**differs** 132:23
**difficult** 101:7
  110:9
**digit** 29:18
**diminution** 21:13
  21:14 41:21
**dint** 121:3
**diplomate** 255:3
**direct** 88:4 234:8
  234:10
**direction** 33:15,16
  104:4
**directly** 159:7,8
  236:13 240:7
**disagree** 21:11
  91:16 149:6,9
  150:19 166:11
  201:14
**disagreed** 202:2
**disamenities** 22:21
  22:25
**disamenity** 212:22
**discern** 22:1
**disciplines** 24:14
**disclose** 113:20
**disclosed** 114:15
**discount** 52:9
  92:23 93:4,19
  130:16 177:19
  178:11 181:13,15
  181:20,20 183:18
  183:19 184:10

  186:17 191:1
  196:12 198:2,6
**discounted** 177:12
  181:23 183:10,11
  183:15 211:2
**discounting** 52:14
  177:10 179:6
  180:2,11,24,25
  181:1,3,4,9,11,11
  182:7 185:3
**discounts** 182:6
**discourage** 122:3
  122:8
**discouraging**
  120:24
**discovery** 101:20
**discussed** 73:14
  160:12 161:17
  166:21 180:25
  200:16 201:3,5
  216:3 227:5 233:4
**discussing** 42:10
  243:10
**discussion** 214:6
**disproportionate**
  152:4
**dispute** 26:6
**distilled** 158:12
**distinct** 33:18
**distinction** 185:13
**distinguish** 26:17
**distinguishes**
  138:17
**distinguishing**
  25:22
**distort** 159:14
**distribute** 130:3,8
  209:3
**distributed** 130:22
  132:2 159:16,18
  159:23,25 160:2,4

172:15
**distribution** 30:3
  120:16 127:8,9
  129:2,20 130:1
  131:23 151:5
  161:16 169:2
  170:13 172:9
**district** 1:1,2 6:19
  6:19
**divided** 220:24
**docket** 11:10
**doctor** 21:8
**document** 18:5,14
  19:7,11,13 87:8
  146:14 148:7
  156:4 157:2
  179:10,12,17,22
  193:5 194:3 229:1
  242:17,25 243:10
  246:22
**documentation**
  251:22
**documents** 16:14
  16:17,23 17:6,8,9
  69:25 121:13
**doing** 20:17 21:25
  24:17 29:23 33:16
  34:16 44:5 47:24
  49:14 115:15
  137:15 140:3
  143:4,7 147:1
  152:4 186:1
  197:25 207:17
  218:2 236:3
**dollar** 51:11
  104:18 145:4
  182:11 184:1,5
  186:25 187:1,1
  240:17
**dollars** 105:18
  188:3,4

**dolmetsch** 18:6
  226:24 244:17
  247:14 251:16
**domain** 104:16
**donated** 219:6
**double** 145:12
**doubt** 157:19
**dozen** 253:7
**dr** 31:19 32:7
  33:12 55:16,21
**draft** 13:10 16:6
**dramatically**
  190:6
**draw** 50:1
**drawer** 2:3
**drawn** 194:23
**drill** 198:8
**drilled** 150:14
  163:5
**drilling** 63:21
  64:21
**drink** 70:22
**drinking** 4:9 76:1
**driven** 56:24
**driver's** 7:20
**driving** 38:10
**drops** 192:22
**dry** 4:24 194:14
**dryer** 120:6,11
  131:11
**due** 18:15 19:10
  24:23 209:3 216:5
  244:5 246:3,8
**dug** 103:17
**duly** 7:21 247:20
  255:9
**duty** 230:4

**e**

**e** 2:1,1 3:1,9,17,23
  4:1 5:1 6:1,1 70:4
  73:8 177:1,1

255:1,1
**earlier** 24:25
  41:13 43:22 114:7
  166:3 176:15
  216:21 217:18
  232:18
**early** 198:9 247:3
**earning** 171:7
**ease** 11:20,23
**easier** 204:12
**east** 31:23 34:11
  47:2,3
**econometric** 21:18
**economic** 4:21
  5:10 19:16 20:17
  21:17 22:19,20
  27:6 29:25 33:1
  37:3,8 45:5 49:10
  52:3,8,12,18 53:6
  75:14,24 76:10
  77:2,11 78:14,18
  78:23 79:13 82:24
  90:23 92:2,6,10
  93:2 109:23
  114:21,22 116:20
  174:6 179:13,16
  208:21,22 209:8
  210:11 213:15
  216:22 217:12
  248:15 250:14
**economics** 16:19
  21:20,22 24:4,8,15
  25:12 41:19 43:21
  52:6 75:22 92:15
  96:17 121:22
  177:17 215:15,17
  218:7
**economist** 24:12
  28:6 30:16 39:5
  61:16 73:24 74:17
  75:5 111:4 198:16

**economists** 30:2
  93:25 110:7 150:1
  213:24 250:16
**economy** 161:3
**effect** 22:2 34:20
  37:16 54:23 82:24
  88:10 90:15 93:22
  94:16,17 95:15
  104:8 122:24
  143:2 185:7 214:1
  223:25
**effective** 189:14
**effectively** 56:6
  58:14 121:15
  183:7 189:17
  198:15 211:3
**effects** 47:14 77:22
  243:21 252:17
**efficient** 92:7
  211:1
**effort** 31:6 50:15
  51:24 112:18
**eight** 57:17 65:21
  66:16
**either** 25:24 40:4
  52:13 58:2 62:9
  82:3,7 91:7 97:9
  111:21 126:11
  142:1 146:11
  154:4 157:10
  192:20 207:11
  224:5 229:5
  230:22 250:15
  254:4
**ejoselson** 2:5
**electric** 91:4
**electrical** 165:4
**electricity** 161:8
  162:24 164:4,17
  173:6 175:18

electronic  245:2
electronically
  122:23
elevated  85:24
  218:16 220:13
else's  238:17
email  3:17,23 5:9
  17:18,23 18:4,22
  87:12 232:4,10,15
  247:6,13
emanuel  2:7 7:12
embodied  181:2
emergency  112:17
emily  2:5 7:15
  11:8 14:16 17:17
  87:12 179:2 239:2
emissions  20:6,8
  20:10 34:17
employed  255:14
  255:18
employee  23:21
  24:2 255:17
empowered  44:24
encourage  122:11
  130:12
encouragement
  119:24 121:23
encourages  119:22
  121:15 122:5
encouraging
  119:15
ends  26:7 251:25
energy  164:9,14
engineer  148:8
  222:15 245:13
  248:11
engineering  5:4,5
  5:6,7 18:7,9,21
  24:10 55:17
  151:17 244:17

enhance  224:7
  235:24
enhanced  222:2
entered  31:15
enterprise  84:18
enterprises  84:15
  84:25 85:3
entirely  82:2
entities  25:20
  26:25 27:1 36:24
  39:12,19 44:8
entitled  67:4 179:6
  194:13 254:2
entity  29:8 38:1
  43:24 44:6,24
entity's  43:9,18
environment
  19:17 20:22,23
  24:19,24 66:14
environmental
  19:18,20 23:1,3
  24:9 36:14 37:4
  75:14,25 76:10
  77:2,12 78:18,23
  79:14 126:16
  214:1 216:23
  217:12
epa  4:20 180:6
  185:9
epa's  179:12
ephedrine  113:16
epidemiologist
  21:6,7
epinephrine
  112:18 113:17
equal  63:7 92:24
  94:23 169:20
  212:12
equally  227:17
equation  165:3

equipment  77:23
  132:21 143:3
  150:23 163:9,15
  203:25
equity  188:5,10
  189:1
equivalent  226:23
  227:3,10 241:23
errata  254:1,3,7
esq  2:5,9,10
established  92:14
estate  22:16,22,23
  92:16,18 93:17,20
  213:14 215:16
estimate  9:11
  13:14 42:23 50:7
  52:24 60:18,24
  64:14 68:12 77:4
  86:11 124:14
  126:4 127:1
  157:20 178:6,8
  198:17 200:12
  201:19,21 202:10
  205:18 227:11
  244:21,22 245:16
  252:11
estimated  9:24
  51:2,10 123:7
  125:20,22 177:12
  182:18 191:12
  220:24 223:1
  241:3 244:17
  245:25
estimates  49:12
  61:4 151:17
  178:10 200:17
  201:6 202:14
  245:15 247:2
estimating  50:22
  61:23 125:13,14
  199:12

et  1:5 6:17 25:16
  143:12 161:4
evaluate  30:13
  39:6,12 45:6 62:1
  68:23 115:9 116:5
  217:20 237:16
  238:20
evaluated  83:2
evaluating  27:24
  29:22 30:15 31:1
  38:4 40:9 41:14
  52:18 54:2 68:9
  74:17,21 200:18
  201:7 216:24
  217:13
event  45:12,14
  46:7,9,19 48:13
  54:4,6,13 97:10
  98:25 99:22 117:2
  239:14
events  45:18 52:17
  52:24,25 54:2,11
  54:17 58:8 62:2
  63:13,15 116:20
  190:18 229:20
eventually  62:22
everybody  197:18
everyone's  110:25
  117:17
evidence  93:9
  237:6 238:25
exact  141:3 202:22
  216:12
exactly  33:5 159:2
  161:15 184:15
  201:1 236:3
examination  3:3
  7:18,23 252:22
examined  7:21
example  20:10
  27:12 30:5,20

36:22 37:12,14
38:9 39:18,22
41:3,13,20 43:24
44:9 49:10 55:2
55:12 56:19 58:7
70:21 77:6 80:2
86:15 103:12
116:7 134:19
136:22 137:5
147:6 149:19
181:10 182:17,21
191:10 196:12
204:23 225:18
240:18
**examples** 31:18
36:4 45:1
**exceeds** 106:11
**excel** 4:11 144:23
**excuse** 71:11
85:21 101:12
137:18 163:18
**excused** 253:23
**exhibit** 3:12,14,15
3:17,19,20,23 4:4
4:7,11,12,14,17,20
4:22 5:4,6,9,10
10:2,6 11:1,5,16
12:11,13 14:10,14
17:11,15 32:1,2
69:6 87:2,3,7
111:23,24 112:3
140:22 141:1
144:17,18,22
147:9,11,15
148:11,15 155:23
155:24 156:3
177:2 179:1
193:16,19,23
195:20,22 222:7
222:11 226:17,21
231:23 246:17,21

249:22 250:8
**exhibiting** 98:25
**exist** 209:18,19
242:6 244:7
**existed** 45:7
243:25
**existing** 84:14,24
85:2 227:18
**exists** 174:5
**expanded** 223:4
**expansion** 144:9
144:12 160:15
161:12 223:2,10
224:19
**expect** 73:13,24
75:6,9,16 78:3
79:22 80:3,5 82:3
85:2,11 91:6,6
93:10,14 123:18
126:19 152:5,16
157:15 159:2,3
160:4 161:8,10,14
163:12 164:1
189:17 191:19
212:11 221:13
240:10
**expectation** 56:17
86:12 162:7
**expected** 55:17
93:15 147:5
163:16 183:21
184:9 223:11
224:20
**expenditures** 53:8
**expense** 53:20
55:3,4,7 163:24
182:11,13 183:19
184:1,2 186:19
188:2 209:5
**expenses** 53:10
55:1,2,9 68:13

90:22 144:10,13
145:6 146:21
163:16 173:1
174:1 182:22
183:18 184:9
186:9 187:11,15
189:3,15 191:7,8
**expensive** 96:11
139:12 151:1,1
188:15,24 211:3
243:20 249:10
**experience** 16:19
62:19 90:18
127:15 158:22
205:3,12,16,22
211:18 213:11
234:17,24
**experienced** 89:20
124:5
**experiences**
196:10
**expert** 3:12,15,19
9:19 12:13 14:3
15:20 18:15,24
19:15,21,23 20:3,6
20:15 21:10,15
22:16 25:5,6 32:7
33:19,20,24,24
35:13,23 36:3,5,8
141:11 149:1
**experts** 18:14
148:20
**expires** 255:25
**explain** 21:24
**explanation** 97:20
97:22
**explore** 132:14,18
**exposure** 98:21
**express** 12:3,14
15:6,21 16:1

**expressed** 223:9
224:18
**expressing** 24:6
**extended** 171:18
**extension** 18:8
**extent** 13:2 79:22
90:19,22 146:10
149:10 151:10
167:10 173:11
199:18,20,21
240:4
**extra** 29:18 254:6
**extraordinary**
53:17 55:2,3
**extremely** 133:6
**extremes** 158:14

**f**

**f** 177:1 255:1
**face** 148:9
**facility** 34:13,16
34:16 82:8 235:24
**fact** 19:12 39:4,20
44:6 56:25 61:6
75:9 88:4 95:17
95:25 96:1 98:14
98:16,21,23,24
102:17 106:8
107:12,14 108:14
108:15,17 115:13
119:22 122:20
149:19 151:21
162:18 164:16
167:16 174:14
213:13 214:6
215:8 221:23
230:2 242:18
244:3,6
**factor** 73:15 75:14
76:13,14 81:14
83:13,22 84:14
144:1 145:14,16

146:3 151:20
163:4 172:16
199:24 206:25
212:24 214:23
**factors** 68:23 70:5
70:6 72:9,12 73:9
77:25 83:18 93:11
98:2,6 100:2
114:25 115:6,7
118:9 122:18
130:7,9 131:4
133:13 153:22,25
154:10 167:25
169:4 174:8
185:17 196:13
197:8,14,16,24
198:10,12 199:9
199:13,16 205:5
205:10,13 213:12
215:3
**facts** 10:14 15:12
58:22 68:19 167:8
171:10 237:5,21
**fail** 161:16 175:17
184:16,22 185:5
192:10,14 204:1
**failed** 165:2
213:22
**fails** 161:3 192:21
**failure** 204:10
**fair** 10:20 18:25
25:8 42:10 68:8
82:20 86:18 102:2
131:13 158:13,16
172:13 196:19
216:22 232:12
**fairly** 134:21
**fairness** 158:17,19
**fall** 24:12 56:20
129:1 240:21

**falls** 44:19
**familiar** 15:23
20:13 141:4
142:15 163:3
245:14
**families** 77:7
**family** 120:5
165:13,15,23
174:11,14,23,24
**fantastically**
243:20
**far** 126:20 157:25
158:1 220:3
233:10 235:11
253:10
**fault** 235:3
**feasible** 63:1,4,18
**federal** 15:20
23:23 24:1 25:14
25:16 30:19 39:18
39:23 40:6,7,21,21
40:22 179:13,14
179:15
**fee** 119:9
**feel** 8:21 13:6 41:4
108:17 134:21
186:25
**felt** 99:15 121:10
202:13 228:18,20
245:8 246:2,4
249:6
**fertilizer** 34:13,15
**field** 24:4 41:2
50:18 92:16
**fields** 20:4
**figure** 244:20
**file** 33:23 41:3
**filed** 6:18 11:10
13:5
**files** 145:25

**filtering** 245:4
**filtration** 251:21
**final** 247:13
**finance** 187:21
188:16
**financed** 234:21
**financial** 190:19
**financially** 7:2
255:19
**financing** 163:24
178:2 184:11
187:12,24 188:21
188:22 189:4,23
190:8
**find** 39:4 125:19
143:20 156:25
189:22 190:1
213:1
**finding** 225:10
**fine** 35:20
**fingers** 29:13
**finish** 79:6 166:8
228:11
**finished** 9:5 138:3
**firm** 6:23 23:4
26:18,19 33:9,11
**firm's** 28:5
**firmly** 96:7,15
**firms** 27:12 181:5
**first** 7:21 16:1
35:21 36:25 78:13
87:15 130:24
145:13,22 174:2
179:4 180:12,23
194:3 200:8
201:14 222:23
240:2 241:16
**fit** 254:6
**fits** 190:11
**five** 29:15 136:15
141:19,20

**fixed** 74:6,8
122:10 188:11
**fixtures** 206:12,14
207:9
**flat** 119:3,14,16
120:2,6,11,18,25
121:6,11,16
122:14,14,20
123:5 127:12
**flippant** 159:4
**floor** 1:21 2:8
**florida** 31:21 34:7
34:9,11 122:17
**flows** 52:5
**fluoridate** 112:19
**fluoridated** 116:13
**fluoride** 112:15,16
113:7
**fluorine** 112:15
**focused** 28:9
**folks** 33:3 56:5,17
58:2,17 72:17
90:17,18 95:5
99:2 102:10 103:1
108:18 135:10
136:21 138:6
139:11 142:23
143:10 149:3,4
154:2 180:7,8
191:3 194:19,21
212:6 221:19
230:20 235:13
**follow** 119:23
149:20 187:23
235:2
**followed** 45:24
**following** 70:9
207:21 247:17
**follows** 7:22
**footnote** 57:2,13
58:12 207:17

force 36:12
forced 111:8
forecast 175:21
  204:20
forecasting 154:21
  177:20
foregoing 255:6
forest 243:7
forever 131:18
forget 56:10 121:9
  222:15
forgetting 34:10
form 9:14 14:22
  16:22 19:4 21:16
  21:18 31:3 32:24
  34:5,15 37:7 38:5
  38:19 40:25 42:11
  43:2,14 45:9,22
  46:15,25 47:19
  49:8 50:10 53:2
  53:11,22 54:15
  58:10 59:1,20
  60:16 63:9 66:1
  66:12,19 69:23
  70:18 71:1,10,21
  72:4,13,25 73:17
  74:22 75:8 76:15
  77:5,15 78:6,21
  79:17,25 80:7,23
  81:21 82:5,13,16
  82:22 83:6,20
  85:6 86:19 87:21
  88:24 89:25 90:13
  91:24 93:7 94:12
  94:19 96:5 98:1
  98:18 99:12
  100:12,20 103:8
  103:23 105:1
  106:5,19 107:22
  108:12 109:16
  111:16,20 113:21

114:2,16 115:4,12
116:6,22 117:7
118:13,24 121:8
122:15 123:22
125:25 126:13
129:9,23 130:5,23
131:15 133:11
134:10,16 135:25
137:10 152:10
159:15 168:10,13
168:22 169:10,14
173:17 176:14
178:4 183:22
191:11,21 192:8
199:11 201:13
202:20 204:18
207:4 225:11
239:2,16 253:5,18
254:4
formal 138:25
format 145:9
  193:11
former 180:4
forming 12:17
  15:13 17:4 32:23
  69:13 113:2,19
  114:14
forms 33:2
formula 198:16,17
  198:21,22 205:1
formulating 112:8
  172:17
forth 21:5 255:12
forward 63:22
  76:9 121:6 151:14
  154:21,22 163:16
found 88:21
  132:24 232:1
foundation 44:4,9
  44:14

founded 92:18,19
framework 45:16
  45:17 168:5
frameworks 45:15
framing 107:24
frankly 174:6
free 8:21 98:17
  101:24 102:4
  190:25,25 191:2
frequency 102:3
  137:17 145:6
frequent 147:4
frequently 138:8
  142:2,8 143:15
  144:6 203:21
friday 18:16
front 250:8
fugitive 34:17
full 16:14 192:7
  194:3
fully 240:1
fun 122:9 199:7
function 87:24
  88:1,4 164:13
functions 24:23
fundamentals
  30:1
funded 28:22,23
funding 219:19,20
funds 209:3
further 239:15
  252:20 255:13,16
future 52:17,23,25
  52:25 54:2,7,14,18
  58:8 59:3,6,19
  62:2 90:15 91:2
  93:15 116:16
  123:16 124:22
  126:2,17,24
  131:19 158:23

167:4,10 169:11
169:12,18,19,21
171:22,24 172:2
173:11 174:13,21
175:9,18,20,25
176:6,13 177:20
179:7 180:11
183:13,14 184:7
186:4,8 187:11
189:3 190:18
223:11 224:20
226:7 230:14
247:19 252:24

**g**

g 3:24 6:1 223:22
gallon 121:4
gallons 222:25
  223:2 250:25
  251:5
gather 49:11,22
gathering 33:15
gee 251:19
general 42:4
  195:14 251:4
generalized
  203:20
generally 119:3,17
  122:20 185:13
getting 103:17
  145:9 150:25
  215:14
ghana 20:11
give 8:9,12 12:22
  36:4 52:21 53:25
  70:1 72:6 93:3
  102:20 131:14
  166:17,22 169:17
  191:5 218:9 229:4
  247:9
given 11:21 61:8
  61:13,17 110:21

118:25 137:25
138:6 153:20
157:25 162:1,4
170:13,22 174:9
178:14 182:1
185:6 186:2,8,19
187:2,24,25
189:15 190:2,18
214:25 219:19
223:25 224:10
251:7
**gives** 87:14,16
**giving** 8:11 131:12
218:7
**go** 6:13 8:6 12:7
29:1,15 31:12
35:15 37:15 38:25
39:21 49:11 50:18
56:22 80:24 93:8
98:23 100:15
105:15 109:9
117:11,12,19
119:16 121:15
123:19 128:7
145:24 147:9
148:10 155:9
165:1 178:9
192:19 204:2
210:7 213:17
222:16 229:22
233:11 240:7,8
243:1 249:14,16
251:3
**goal** 244:4
**gobain** 1:11 6:17
7:12 57:9,16
58:23 59:9 63:24
65:20 98:16
104:11 105:17
242:8 248:20

**goes** 18:13 68:16
126:21 154:22
183:9 192:18
**going** 9:2,3 11:22
17:1,14 23:11
25:6,25 39:7
40:16 44:1 52:24
56:9,12,17,18
58:22,23 61:3,5,25
62:16,22 63:22
64:15 65:2,5
67:13 69:10 71:2
73:15 76:7,20
77:19 80:25 90:18
90:20 93:19 104:5
104:21 121:6
128:3,21 131:17
137:4,21 142:6
143:7 149:12
151:14 160:18
163:16 166:12,13
167:3 168:3 170:4
170:14 172:2,6
174:18,23,25
176:12 178:25
182:7 184:25
187:14 189:14,16
201:2 206:8,19,20
207:21 211:2
213:17 222:15
226:25 228:19
229:2 232:3 235:7
237:19 239:14
250:8 253:9
**gold** 215:12,17
**good** 7:25 41:1,6
58:7,7 65:10 97:5
101:5 120:20,21
120:23 121:25
148:20 149:2
176:12 177:9

195:4 207:11,21
209:20 220:17
225:25 231:19
248:1 250:14
**gotten** 190:4
**governing** 254:2
**government** 25:16
27:8,10,14 28:13
28:20,22,24 29:23
30:20 39:18,23
40:1,6,21,21,22
41:5 43:25 44:5
119:22 121:23,24
179:15 236:8,10
**governmental**
25:19 29:10 30:9
38:1 39:11
**grab** 249:18
**granite** 23:10,15
85:16
**graph** 5:10 250:14
251:24
**graphs** 66:5
**great** 38:7,9 65:14
76:9 80:13,15
106:1,12 112:23
120:19 127:15
**greater** 129:6
**grinding** 34:13
**gross** 135:15
140:15 141:19
**ground** 8:7 76:19
218:16
**groundwater** 3:20
9:9 27:24 28:1,3
28:10,15,19 29:3
29:22 30:13 31:9
31:21,24 32:9
34:3 56:13 66:8
68:4,11,25 69:19
73:23 75:4,23

76:18 79:19 80:5
80:12 81:9 88:2
88:15 94:14 95:17
95:25 97:8 109:7
134:24 135:3
191:13 221:25
230:2 231:15
233:13 234:15
235:20,25 237:7
249:4,10 252:17
**group** 63:2 74:20
84:4 112:18 182:4
198:18,20 201:17
**groups** 42:17 44:3
44:18
**guarantee** 224:6,6
**guess** 17:1,3 25:22
27:15 51:5 159:19
159:24 192:9,11
204:12
**guesses** 143:7
**guidance** 179:12
179:17
**guidelines** 4:20
**guy** 33:21 159:9
199:6

|                    h                    |
| --- |

**h** 3:9 4:1 5:1
**habitability** 27:18
27:20
**habits** 153:13
**half** 26:15,16,21
**hand** 17:14 29:2
29:14,19,20
178:25 181:3
188:4
**handed** 10:2 11:1
14:10 17:11 69:9
87:6 112:2 144:21
147:14 148:14

handful 102:22,23 102:23 108:6
handing 10:5 11:4 11:17 14:13 140:25 156:2 222:10 226:20 246:20
happen 24:23 54:7 66:22 67:13 112:20 176:13 192:23 198:4
happened 46:6 212:7
happening 54:24 171:16 202:9 204:21
happens 56:16 67:8 205:9
happy 8:22
hard 115:7 156:7 193:11 213:13
harden 223:25 229:11,15 236:1 244:5 246:14
hardened 228:25
hardening 229:9 230:10
harm 68:4,10,16 68:20 69:1,22 70:3,7,25 71:3,19 72:2 73:10 79:21 79:23 80:4,4,22 81:1,15,19 83:5,7 112:23 221:15 234:18 244:8
harmed 84:5,8,10 218:12
harms 243:25
headed 26:3
heads 11:14

health 4:7 75:16 76:3,5,9,11 78:24 106:14 141:5,25 142:12
heard 27:22 36:10 113:6,14 191:16 195:3
heating 91:4 92:9
heavy 245:3
hedonic 21:12,16 21:19,20,22 41:20
held 6:20 40:1 243:8
help 146:24 180:7 221:15,15 225:3 246:5 250:6
helped 16:22
helpful 51:16 182:16
hereinbefore 255:11
heterogeneity 74:19
hey 50:4 51:14
hi 247:7,15
high 34:19 120:4 150:22 151:4 156:17,23 195:5 198:2
higher 61:4 80:9 98:12 106:7 125:21 134:19 147:4 161:9 183:16 216:11 221:14 240:11
highly 162:10
history 121:3
hit 227:24
hmm 8:24 17:16 17:22 81:16 90:10 91:11 112:25

156:15
hold 19:15,23 79:19
holding 102:12
home 85:11,12,14 90:20,23,24 91:1,5 91:8,9,18,19,21 92:3,21,25 93:9,13 93:16 94:10,13,23 94:25 95:18 96:1 96:8,14,16 98:22 103:14 107:17 112:21 135:17,20 135:21 136:11 139:12 141:4,8 172:3,7 176:16 188:5,10 189:1,19 196:6 208:17,18 209:18,25 211:14 211:15 212:10,12 212:14 213:16,24 214:2,7,12 216:5 216:13,15,15
homeadvisor.com 4:17
homeowner 191:25 192:6
homeowners 96:12 100:9 103:4 104:23 146:25 178:2 187:20 201:17 236:18
homeownership 177:23
homes 34:21 35:3 41:24,25 84:11 93:25 94:22 95:6 96:10 105:13 107:13 126:24 143:3 211:8,17 213:21 214:14

215:7,9,10,25 216:9,11 222:1 231:13,17,20,21 235:8
homogeneity 74:20
homogeneous 215:25
hook 80:11 96:25 106:10
hooked 58:3 88:1 103:1,7 104:25 105:21 107:9 210:20 212:6
hookup 103:11
hoping 247:9
horizon 185:19
horsepower 150:15
hour 65:7 117:13
hours 16:24 164:18
house 176:8 192:6
household 75:10 75:10 103:15 118:11,11,12,16 118:16,21,21 127:19,19 162:22 162:25 165:7,11 165:14,14,25 166:25 170:22,23 174:24 191:20,20 192:2,5
households 166:2 191:23
housekeeping 11:9 15:1 250:5
huge 243:8
human 37:23,25 220:1,5

**hurricane** 246:7
**hydrant** 196:13
198:5,7
**hydrological**
82:18
**hypersensitivity**
112:15 113:7
**hypothetical**
53:23 55:8,14
66:21 108:3 120:9
171:6 209:21
217:18

**i**

**idea** 148:20 149:2
209:1 229:22
250:12,23
**identical** 77:3
91:21 92:5
**identification** 10:6
11:5 14:14 17:15
32:3 69:7 87:4
111:25 112:3
140:23 141:1
144:19,22 147:12
147:15 148:12
155:25 156:3
177:3 179:1
193:20 222:8,11
226:18 246:18,21
249:23
**identified** 7:19
81:6,7 146:5,11
207:10 247:16
**identify** 7:7 9:9
35:19 146:16,20
199:24 252:15
254:4
**idiosyncratic**
118:22 119:1
**ignore** 98:21

**ignores** 98:22,24
197:8
**ignoring** 152:8,11
**illinois** 31:23
32:10
**illustrate** 158:7
**imagine** 66:22
78:22 209:18
**impact** 60:10,24
76:11 80:18 88:10
95:20 242:12
**impacted** 90:3
**impacts** 242:16
243:15
**impedes** 76:5,6
**impenetrable** 72:6
**implied** 74:7
220:21 240:20
**imply** 28:2 209:17
**important** 8:8,11
40:12,14
**imposed** 56:4
124:2 139:23,25
140:2 223:11
224:21
**impractical** 82:7
**imprecision**
207:12
**improper** 239:1
**improve** 197:2
207:24 225:20
226:1 244:5
245:24 248:12
**improvement**
247:17
**improvements**
19:19 218:22
219:1 221:21
226:3 235:15
240:4 241:6,8
244:18 252:3

**improves** 49:21
234:11
**improving** 39:3
**inability** 39:21
**inaccuracy** 207:13
**incidence** 195:2
**inclined** 8:17,25
**include** 32:20
47:21,22 50:16
55:12 70:8 73:10
88:21 89:5,9
116:7 120:17
135:4 136:20
137:4,8 138:20
142:22,22 151:24
206:21 227:12
248:25 253:1
**included** 32:18
63:1 142:2,20
144:9,12 146:8
151:10,11
**includes** 185:17
206:10 231:24
253:6
**including** 19:17
75:15 88:17,20
112:17 146:24
**inclusive** 208:5
**incomplete** 108:3
**incorporate** 13:1
19:2 51:24 53:14
103:18 115:18
117:1 157:5
**incorporated**
10:17 19:9 77:24
115:15 140:13
152:19 207:20
**incorporating**
75:12
**incorporation**
18:14

**incorrect** 144:2
172:11
**incorrectly** 107:25
**increase** 23:11
70:22 90:18
116:25 151:22
175:11 176:7
182:5 199:14
200:10,14 206:5,8
206:16 207:8
209:8 211:7
228:19
**increased** 74:3
96:8,14 98:9
183:8 205:22
234:22
**increases** 94:5
227:12
**increasing** 214:3
229:8,8
**incredibly** 249:10
**incur** 64:3 83:9
91:18,18 97:18
123:12 163:23
187:14 188:1
191:7 192:6
**incurred** 53:8
62:11
**incurring** 186:18
**incurs** 149:11
**indefinite** 55:18
57:5
**indefinitely** 55:25
57:21
**independent** 97:17
**indian** 27:13,15
37:14
**indicate** 74:5 97:1
216:12 254:6
**indicated** 102:25
206:18 251:20

**indication** 56:7
**individual** 30:18
  30:23 42:14 44:23
  64:1 65:1,4 78:9
  79:18,18 93:11
  100:9 102:10
  106:17,23 107:5
  109:14 110:13
  118:10,15,20
  124:11,17,19
  125:6 127:24
  130:14 136:2
  153:15,19 158:22
  162:3 165:24
  166:2,15 167:17
  168:4,7,9,19,20
  169:7,13,22,23,25
  170:7,8,10 171:21
  171:22,24 172:23
  174:21 175:7
  183:8,21 184:3,4
  185:14,16 186:4
  186:21,23,25
  187:2,19,20 188:1
  189:5 191:7,25
  197:6 200:19
  201:8,16 202:3,4,8
  202:18,23 204:9
  204:25 206:3,25
  209:25 216:14,15
  218:6 234:17
  237:10 240:17
  241:11,17
**individual's** 169:8
  170:12 172:4
  175:19 186:6
**individualized**
  125:17 200:1
  201:10 204:16
**individually** 1:6

**individuals** 26:23
  26:24,25 39:21
  42:6,16,20 57:22
  58:20,21 59:17
  60:10,24 61:14
  62:3 64:2 65:18
  75:22 77:6,18
  89:18,24 90:3,6
  94:6 96:24 99:3
  99:17 100:19,25
  103:5,16 104:13
  105:18,24 107:9
  107:11,20 108:21
  112:19 123:18
  124:15 126:5
  128:14,18 129:1
  129:21,22 130:20
  130:21 134:1
  137:21 142:10
  143:14 167:16
  171:19 172:21
  174:3 181:5
  185:20 186:11,16
  187:9,11,13
  188:25 200:11
  203:13 207:19
  214:11 229:23
  233:7,7 237:22
  238:3 253:11,14
**industrial** 25:12
**inexpensive** 189:1
  191:11
**infer** 41:25 42:3
  218:6
**inference** 50:1
**inferring** 41:23
**inflating** 183:15
**influence** 215:4
**influenced** 40:18
**inform** 185:15

**informal** 138:22
**informally** 124:6
  214:7
**information** 10:17
  12:25 16:13 19:8
  20:20 22:4 24:9
  24:10 42:23 49:1
  49:3,5,16,18,21,23
  49:25 50:2,5,9,14
  50:20,25 51:4,18
  51:24 52:1 53:25
  59:4,7 62:12,14
  63:14 66:2 67:12
  106:17 115:10
  116:3 124:16,25
  125:1,4,10,18
  126:15 127:2
  130:20 138:11
  141:5 143:13
  144:5 151:13
  153:12 154:10
  166:16 169:8,11
  169:12,24 173:16
  174:8 194:8
  196:22 200:13
  201:16 202:9,10
  203:1,4,19 204:1
  205:18 207:23
  218:5
**informed** 154:11
**infrastructure**
  218:22,24 219:8
  220:14 221:2,16
  233:1 234:7,18,25
  235:5 236:17
  241:6,8 247:16
  252:3
**infrequent** 137:5
**infrequently** 53:8
  53:18

**ingesting** 112:16
**initial** 11:21
**injections** 112:17
**injunctive** 44:10
  44:19
**inorganic** 135:9
  136:25 139:7
  140:11 141:18
**input** 200:1
**inside** 231:5 234:3
**inspection** 134:25
  148:22
**install** 4:19 150:12
  156:13,19
**installing** 162:2
**instance** 183:19
  188:5
**instances** 36:16
  44:17 103:1
**insurance** 196:6
  196:14,22 197:3
  198:3 200:2
**insurer** 198:6
**intake** 242:9,20
  244:10
**intend** 90:8
**intended** 90:9
**intention** 25:24
  146:15
**interest** 41:8 44:23
  52:10 90:7 97:8
  177:24 185:23
  186:14 188:21
  208:10,12 218:15
  220:13
**interested** 7:2
  107:19 228:23
  255:19
**interesting** 87:23
  113:8 142:4

**interestingly**
  122:16
**interests**  88:18
**interfere**  6:10
**interference**  6:8
**internal**  247:18
**interpret**  76:21
  81:23
**interpretation**
  72:19
**interpreted**  78:11
  88:7,7
**interpreting**  20:13
  24:13 82:23
**interprets**  77:16
**interviewing**
  174:7
**interviews**  100:21
**introduced**  8:3
**intuition**  215:8
**inure**  233:2 234:7
  236:17
**inures**  237:25
**invest**  154:2 191:3
**investments**  84:15
  84:25 85:3 203:14
**involve**  27:25
**involved**  23:5
  25:17 31:14,24
  33:1 41:11
**involves**  27:18,24
  56:5 218:21
**involving**  25:14
  31:21
**irene**  246:7
**irrelevant**  53:4
  54:18
**islands**  235:18
  236:7,9
**issue**  9:20 12:3,9
  12:15,23 39:14

42:9 43:4,5 45:8
47:11 72:23 75:5
95:24 96:3 112:13
126:21 150:2
158:20 197:6
243:4 244:11
246:10 247:25
**issued**  177:14
  180:6 234:23
**issues**  14:4 26:2
  33:1 82:18 123:14
  235:14
**item**  146:14,18
  248:8,19 249:6
**itemization**  245:18
**items**  16:20 55:10
  185:5 248:3,6,23
  249:1
**iv**  56:12

**j**

**j**  1:25 2:5 3:24
  255:3,23
**james**  1:5 6:16
**jason**  18:6 226:23
  244:16 246:25
  247:7,14 251:16
  252:9
**jennifer**  33:9,9
**job**  93:25 134:9
**join**  86:3 115:14
  236:25
**joined**  130:15
**joining**  97:9
**joint**  33:23
**joselson**  2:5 3:6,17
  3:23 7:15,15 9:14
  11:15 14:17,22
  17:19 18:4,13,25
  19:4 31:3 32:24
  34:5 37:7 38:5,19
  40:25 42:11 43:2

43:14 44:25 45:9
45:22 46:15,25
47:19 49:8 50:10
52:19 53:2,11,22
54:15 58:10 59:1
59:20 60:16 63:9
65:6 66:1,12,19
69:23 70:18 71:1
71:10,21 72:4,13
72:25 73:17 74:22
75:8,20 76:15
77:5,15 78:6,21
79:5,9,17,25 80:7
80:23 81:21 82:5
82:13,16,22 83:6
83:20 84:3,20
85:6,25 86:19
87:12,21 88:24
89:25 90:13 91:24
92:13 93:7,23
94:12,19 95:19
96:5,22 98:1,8,18
99:12 100:12,20
102:6 103:8,23
104:14 105:1
106:3,5,19,25
107:22 108:12
109:2,16 110:4
111:2,16,20
113:21 114:2,16
115:4,12,25 116:6
116:14,22 117:7
117:13,17 118:13
118:24 119:25
120:13 121:8
122:1,15 123:10
123:22 124:8,13
124:21 125:8,25
126:13 127:5
128:1,23 129:9
130:5,23 131:15

131:25 133:11,18
134:3,10,16
135:25 136:6,19
137:2,10,23 138:2
138:24 139:3,18
140:7 143:8,18,24
145:8,19 146:13
149:8 152:2,10
153:2,17 154:14
154:18 155:2
157:11 158:9,15
159:10,15 160:1
161:21 162:11
163:20 165:20
166:1,8,20 167:12
167:19,23 168:10
168:13,22 169:10
169:14 170:1,11
170:20 171:5,13
171:25 173:17
175:8,15 176:14
178:4,19 180:14
180:17,21 183:22
184:13,23 186:20
187:16 189:7,25
190:12,22 191:21
192:8,16 195:20
196:25 197:11,20
198:24 199:11
200:5,21,24 201:1
201:13 202:6,20
203:11,23 204:17
205:14 206:6
207:4,16 208:3,13
209:6 210:6,21,24
211:11 212:3,25
213:6 214:4,9
215:1,20 216:8
217:1,15,25
218:11,18 220:16
221:4,11 223:20

225:11 227:8
228:6,8,10,15
230:7,19 231:2
232:3,18 233:25
234:9 235:1,10
236:24 237:5,15
237:18 238:2,12
238:24 239:4,22
240:15 241:14
242:4 243:17
244:2,12 245:22
246:12 248:22
252:5,14,21,23
253:19
**joselson's**  18:22
**judgment**  118:25
165:16 226:12
228:22
**judgments**  213:2,3
**jump**  9:1
**justice**  254:25

**k**

**keep**  62:6 93:14
**kept**  213:16
**kids**  131:11
**kilowatt**  164:12,18
**kilowatts**  164:11
**kind**  25:25 110:22
130:19 136:8
**kinds**  137:13
**kit**  137:12,16
**kits**  137:13,14
138:7
**knew**  98:5 169:19
**know**  8:5 11:20
18:23 22:10,13
28:6,25 30:5
31:15 32:18 35:3
35:5,21 39:3 40:4
40:14 41:1 43:5,6
43:20,20 44:3

49:22 51:12 55:13
56:19,20 57:2
58:19,19,21 62:15
62:20,21,24 63:4
63:11,18 64:14
67:13 71:6,18
73:7 74:16 76:23
77:16,17 78:7,8,9
78:16 82:1,17,23
84:7,17 86:13,21
86:21 87:23 89:6
89:7,7,10,13,14
91:2 96:24 97:21
98:9,11 99:7,9,10
100:2,8,13,18
104:19,20 105:20
106:6,16,22 107:5
107:8,18,19
110:24 111:14,19
114:3 115:9,18,19
116:3,10,11,15,16
116:17,18 117:14
120:1,1 122:24
126:1,20,25
130:15,21,24,25
131:1,3 136:7,12
138:15 140:5,12
140:16 143:21,22
143:25 145:16
147:5,7 149:1,2,17
150:5 153:7,18,22
154:20,24 157:14
159:23 160:7,9,21
161:22,25 165:5
166:5 167:2
170:16,21 171:1,7
171:16 173:12
174:8 175:17,17
175:19 178:7,10
180:20 184:15
189:3,8,10,20

191:16 195:2
196:21 198:25,25
199:2 200:7
202:21,24 204:10
206:4 209:4,25
210:15 212:13
219:14,25 220:2,3
220:9,11,20,22
225:24 226:5
227:23 231:3
232:8 234:4
235:11 238:14
239:23 242:5
243:12,13 244:20
246:6 248:1 252:7
**knowing**  94:13
203:24 204:21
213:13
**knowledge**  13:24
16:10 113:22
151:16 169:18,20
255:7
**known**  126:15
**kopp**  3:19 31:20
33:13
**kopp's**  32:7

**l**

**l**  2:10
**label**  250:15
**land**  84:15,18,22
84:25 85:3,9
86:10 208:23
209:9,10,12
210:12,12,15,18
242:11,19,20,23
**landlord**  209:22
**langrock**  2:3 7:15
**langrock.com**  2:5
**language**  12:6
73:11 76:22,25
77:17 78:13,15

81:13,24 88:12
220:5
**large**  102:9 174:11
213:12
**largely**  86:16
**larger**  77:7 183:13
183:14 205:19
**late**  38:12,13
**law**  21:21 24:7,8
27:12 30:21 39:1
39:18 40:7,14
43:7 44:4,9,14
45:3 71:22 72:22
74:15,16 78:8
82:24 83:17 89:13
220:3 230:4
**lawn**  70:21 120:11
131:11
**lawns**  103:16
**lawyer**  9:22 14:6
25:1 41:2 43:10
73:12
**lawyers**  9:8
**lead**  136:23
205:22 206:5,8,16
**lease**  209:12,16
**leave**  68:21 239:17
**leaves**  66:9,13
**leaving**  122:9
**leclercq**  32:8,16
33:7
**led**  98:3 112:16
117:9
**left**  159:7 165:1
**legal**  2:15 31:7
43:5 68:16 71:4
71:15 73:3,4
82:18 90:1,4
219:24 220:13,21
**legally**  38:17
72:10 76:20 86:21

89:7 238:14
**legitimate** 96:18
**lender** 136:12
**length** 210:13
242:10
**lens** 24:15
**level** 50:15 51:23
78:9 89:21 126:16
168:24 169:5,22
201:17
**levels** 34:19 57:17
65:21,24 205:22
206:9
**liability** 83:15
245:25
**license** 7:20
**life** 163:9,14,18
173:10 233:10
246:10
**lifespan** 161:13
191:13,18 194:5
**lifestyle** 163:18
**lift** 164:11,15
165:10,18
**lifting** 161:9
164:12,19,20
**likelihood** 62:10
116:20
**limited** 24:4 70:9
88:20 89:1 181:4
208:9
**limits** 71:15
**lincoln** 2:9 7:11
8:4 79:10
**lincolnwilson** 2:10
**linda** 4:4
**line** 18:8 182:10
188:5,10 189:1
246:4 249:1
252:10 254:5,9

**list** 4:14 16:14,17
113:9 205:4 222:3
247:14,15,18,19
247:24,24 248:2,6
248:14,17,20,24
249:6
**listed** 32:12 35:13
146:4 179:20
248:6
**listing** 92:24
214:18
**literally** 47:21
187:8
**literature** 16:20
121:23 122:12
**litigation** 18:20
25:3,20,25 26:3,4
26:10,21 27:7,17
27:23 28:1,9
**little** 58:18 65:6
97:8 129:7 137:12
156:7 211:12
224:9 240:24,25
250:22
**live** 77:20 167:5
199:20 233:11,12
233:14 242:2
**lived** 167:6 231:14
**lives** 208:16
**living** 120:10
224:14
**llp** 2:3,7
**load** 244:14 245:3
**loan** 188:7
**local** 93:17 96:20
178:17,21
**located** 6:21 82:15
231:14
**location** 82:11
83:4

**lockformer** 31:19
32:8,16 103:12
147:7 164:10
165:8
**long** 99:9 103:24
107:11 152:12
173:5 202:11,17
202:19 251:12
**longer** 62:19 66:8
128:7 149:12
185:19 235:25
**look** 11:19 12:10
19:11 31:13 32:20
38:2 39:7 41:14
45:12,14 46:9
50:16 57:8 65:9
88:14 91:3,3
93:12 95:15,16,24
95:24 101:23
112:11 121:13
127:9 143:22
144:4,5 145:2,25
152:12 156:6
166:5,10 168:3
170:17,17 171:2,3
171:11 172:20,23
173:1,1,4,9,20,24
174:3,14 179:25
180:18 185:8,10
185:12 190:14
193:4 203:6,9
213:9 214:13
217:20 222:22
227:15 231:22
234:1 239:24
240:21 247:6
250:7 251:3
**looked** 120:15
127:22 146:23
242:15

**looking** 20:12
24:14,18 30:3,21
30:24,25 34:20
38:7 41:21,22
52:11 70:22 75:5
82:24 86:6 88:5
95:20 96:19
126:15 133:24
145:10 151:5
153:8 165:7 168:6
173:15 195:18
203:19 205:6
214:14,16 244:4
246:13
**looks** 10:9 14:24
145:21 147:18
193:4,5,12,14,24
222:14 246:25
**lose** 191:4
**loss** 37:20,21,22
38:13 41:15,15
42:4,23,24 43:1,9
43:18,24 44:7,15
44:24 58:15 59:21
62:19 64:1 65:3
72:20 90:25
133:20 153:19,21
172:11 186:6,7,7
202:15 216:24
217:13 234:15
**losses** 37:8 38:2
39:7,8,19,20,24
40:16 41:18,23
42:1,4 52:13 57:4
61:3,5,24 63:7
71:12,15 126:4,4
127:24 198:17
216:24 217:14
253:2
**lost** 51:10 80:12
201:4 235:20

236:1
**lot** 25:17 31:6
  33:22 42:3 50:18
  61:10 82:17 85:15
  103:3 122:4,19
  126:25 129:5
  131:19 139:20
  154:20 212:14
  249:8 252:24
**lots** 175:10
**louis** 31:23
**love** 59:3
**low** 56:20 63:11
  64:25 133:6
  156:17,22 157:1
**lower** 51:1 91:18
  94:7 123:9 125:19
  134:18
**lunch** 117:16
  155:10,13 176:20
  176:24

**m**

**m** 3:18
**ma** 255:25
**madison** 2:8
**magnitude** 9:11
  51:23 54:23 63:10
**magnitudes** 80:2
**mains** 212:7
**maintain** 152:14
  154:4,5 249:3
**maintaining** 57:9
  60:2 65:19 153:24
  162:21 181:16
  182:22
**maintenance**
  63:22 91:23 92:25
  95:14 134:25
  148:1,21 149:5,14
  149:16 151:25
  152:22,25 153:5

153:12 154:2
  182:25 209:15,23
  214:20
**majority** 96:13
  243:6
**making** 116:20
  203:20 214:12
  221:5,6 230:8,8
  237:16 248:18
  249:2,12
**man** 120:10
**managed** 218:24
  219:2
**management**
  242:21
**manager** 121:10
**mandatory** 73:11
**manhattan** 23:11
  23:16
**manner** 39:24
  90:25
**manual** 185:9
**map** 101:11,14,19
  234:1
**maps** 239:25
**march** 1:18 6:4
**mark** 31:25 69:4
  87:1 111:22
  193:16 222:15
  223:21 224:24
  226:14 254:5
**marked** 32:2 69:6
  69:10 87:3,6
  111:24 112:2
  140:22 141:1
  144:18,22 147:11
  147:15 148:11,15
  155:24 156:3
  177:2 179:1
  193:19 222:7,11
  226:17,20 246:17

246:21 249:22
  250:8
**market** 22:4,7,8,9
  22:11,15 92:7
  97:4 150:23 162:2
  191:4 210:16
  211:1 214:13
  215:22,24 216:13
**markets** 190:2
**massachusetts**
  1:22 6:22 255:5
**match** 214:15
**material** 113:18
  179:23 193:2
  250:9
**materials** 12:17
  69:12 74:7 113:10
  151:8,15 225:13
  232:16 250:11
**math** 28:7 29:1
  185:7 199:6
**matt** 17:20
**matter** 6:16 9:10
  10:15 14:21 15:1
  35:22 37:17,18
  59:10,11,13 64:6
  64:12 74:9,14,15
  116:24,25 119:19
  209:1 250:11
**matters** 36:17
  64:11
**mean** 10:11 25:7
  26:5 30:16 31:18
  33:14 37:24 38:20
  41:1,7 42:12,25
  44:3 51:11 66:13
  66:14 67:1 72:24
  73:18,19 78:16
  80:15 81:23 86:8
  89:8 101:5 114:22
  119:23 128:12,17

130:10 140:1
  150:21 154:1
  156:24 159:4,20
  163:4,6 169:15
  190:20 191:2
  192:3,17,20
  198:14 204:22
  210:7,8 213:8
  214:10,11 235:15
  240:16 241:16
  245:12 248:9
**meaning** 21:20
  76:21 160:10
**means** 14:7 20:1
  22:18 27:19 52:20
  56:13 78:11 81:24
  126:9 134:1
  188:20 198:15,16
  246:9
**meant** 74:12
  223:18
**measurable** 233:6
**measure** 46:11,17
  47:13 48:13,14,20
  48:22,24 49:2
  60:13 65:3,3
  68:14 74:2 86:23
  104:9,9 109:11
  111:5 115:20
  124:19,23 125:12
  134:6,12 143:15
  153:19 167:20,21
  167:24 171:15
  172:11 174:5
  175:9 189:13,14
  190:15 191:6
  207:6,7,8 212:13
  212:15,16
**measured** 66:3
  117:11 155:6,6
  168:15

**measurement**
153:15
**measures** 9:9
71:13,14
**measuring** 72:20
102:2 168:16
171:15,17
**mechanism**
120:23 131:2
241:22
**media** 6:14 67:18
67:23 118:2
176:22 177:6
253:21
**mediation** 26:8
**medical** 21:8
112:13
**meet** 223:11,18
224:20 226:15
**meeting** 247:8
**member** 70:16
73:16 82:11 88:18
125:6 127:25
141:12 152:20,24
163:13 184:21,21
195:10,17 196:4,9
196:20 206:3
220:6 239:13
241:20
**member's** 65:25
66:9,10,18 153:15
**members** 13:16
71:8,11 73:25
75:7,18 77:4,14,20
79:15,24 80:6
81:4,18 82:4 83:4
83:11 84:2 85:4,5
87:13 88:6 89:19
108:9,9 109:14,15
109:18 110:13
112:6 115:22

118:6 121:14
125:18,19,21
130:4 132:15,25
133:9,16 134:13
153:1 154:13
163:8 173:21,22
174:7,9 176:4
177:13 178:17
189:5,23 190:9
197:7,16,17,17,25
198:2,12,13,20
200:19 201:8
202:5,8 220:24
221:1,10,13
230:25 233:20,23
234:17,24 236:23
237:14 238:11,16
240:6,8,13 241:3
241:12,17 242:1,2
249:12
**memo** 18:10
**mentioned** 8:16
13:21 24:25 30:18
34:7 36:1 49:10
54:9 57:6 113:24
133:5 140:19
**merits** 14:4,7 15:2
15:5,7,12,16,17
16:6,11 18:2,19
55:15 57:7 68:2
119:2 195:9,19
242:7
**meter** 121:3
123:12
**metered** 122:21
123:19
**method** 83:24
146:19 182:15
197:24
**methodological**
133:25

**methodologically**
126:7
**methodologies**
10:15
**methodology** 35:4
127:25 129:5
195:25 197:13
229:10 248:15
253:1,15
**methods** 123:8
125:21,23 143:17
189:4,22 190:8
**microphones** 6:6
6:10
**middle** 160:5
**middlebury** 2:4
**million** 104:18,19
244:18 246:1
**millions** 105:17
**mind** 155:12
234:13
**minds** 98:3,6
**mine** 28:7 145:17
**minor** 88:17
**minus** 51:11,12
91:22 92:25
**minute** 79:5
228:10
**mischaracterizing**
197:12
**mismatch** 89:21
**misrepresenting**
237:20
**misstate** 239:5
**misstates** 238:24
239:8
**misstating** 237:19
**mitt** 89:3,6
**mixed** 34:16
**mixing** 34:17 52:6

**mm** 8:24 17:16,22
81:16 90:10 91:11
112:25 156:15
**model** 20:18,21
21:19 41:18 42:3
45:10,11,15,18
49:16 51:1,18
59:10,23,24 64:12
70:20,24 71:25
72:8,19 75:11,13
77:11,24 79:3
80:17 84:10 90:5
91:25 93:21 99:13
101:7 102:19
103:10 104:6,7
115:24 116:2
117:5 123:23
124:3,4 129:4,18
129:19 131:4,12
132:4,17 136:18
138:21 139:17
142:2 166:18
167:22 203:14
206:14,22 207:24
211:22,25 212:8
240:9 253:6,13
**model's** 83:7
**modeled** 71:7
**modeling** 20:7,16
21:17,18
**models** 20:8,10,14
20:15,25 21:1,22
22:23 40:17 41:20
42:13,14 49:11
214:12 240:9
**modest** 248:10
**moment** 117:21
253:8
**monetary** 3:16
9:11 13:15 44:10
44:15

**monetization**
47:23
**money** 40:15
172:15 177:18
187:8,8,10 189:15
191:3 241:11
**monies** 204:6
241:16
**month** 128:18
**months** 128:20
**morning** 7:25
183:23 184:14,25
208:22 211:13
215:5,21 253:7
**morse** 247:2,8
**mortgage** 93:2
136:12 177:14,24
178:2,22 181:9
191:9
**mortgagee** 136:11
**motion** 4:6 10:22
81:7,8
**move** 77:19 104:4
122:21 128:10,15
197:3 199:14
**moved** 58:15
**moves** 66:14
**moving** 76:9
**msk** 5:6 18:6,21
55:16 244:17
**multiply** 128:8
**multiplying**
128:19
**mumble** 8:17
**municipal** 33:3
56:19 57:1,12
58:3,16 59:25
60:7,8,11,14 61:5
61:7,12,15,22,25
62:22 63:5 64:24
67:9 74:4 77:19

79:1 83:8 84:12
86:4 88:1 93:18
94:5,10,14,22 95:7
95:12,16 96:1,8,11
96:21,25 97:9,19
98:4,15,17 99:7,16
99:18,25 100:6,10
100:17,22 101:1
101:15,19,22
102:1,5,15 103:2,7
103:21 104:3,12
104:25 105:8,19
105:25 106:2,10
106:23 107:6,10
107:15,20 108:5,6
108:10,18,23,24
109:10 110:20,24
112:14,20 115:14
118:7 123:9 129:6
129:7,14,16,17
130:13,17 131:10
132:8 136:22
137:6 144:15
158:23 163:10,15
168:6 181:14
182:3,19 195:10
195:17 196:4,21
199:15 205:24
206:4 210:20
211:9,14,21 212:4
212:9,23 214:19
216:5,10 224:1
230:12,16 231:7
231:10,16 232:25
233:5,8,15,21
234:1,4 235:6
236:20 237:23,24
239:12,25 241:22
253:4
**municipalities**
24:22 89:9

**municipality**
62:25 89:12,15
120:22 131:1
207:21

**n**

**n** 2:1 3:1 6:1 55:10
177:1,1,1 223:22
223:22
**name** 6:23 8:1,4
32:12 34:10 35:8
121:9 222:16
**named** 35:11
172:19 199:10,17
199:19
**naperville** 32:10
**nation** 27:15
**national** 156:13
161:23 162:12
243:7
**nations** 27:13
37:14
**natural** 24:21
39:13 88:16 89:2
89:4,12,15 208:9
218:15 219:23
220:11
**nature** 23:1,4 77:8
79:22 126:23
144:23 183:18
**navy** 36:12
**near** 34:12 196:13
198:6 212:7 228:1
**necessarily** 40:3
49:19 64:9 150:4
166:23
**necessary** 22:3
49:9 50:2 142:24
192:5 204:25
224:6 229:11
235:8 240:6 241:5
241:7 254:4

**necessitated** 248:3
**need** 4:15 8:21
13:7 18:14 29:14
30:25 41:4 42:13
42:19 48:19,19
49:2 50:11 52:9
52:25 55:10,11
58:19,21 59:6,6
70:8 76:24 83:8,9
84:17 99:9,10
100:1 115:10,16
116:3,11 130:20
133:1 150:11
160:14,15 165:4
167:2 184:16
189:3 190:20,25
196:5,21 197:15
198:11 203:18
206:4 209:4 216:6
221:7 222:2
223:10 224:19
226:11 227:5,19
227:25 228:19
244:7,7 254:6
**needed** 164:14
222:2
**needs** 55:6 195:11
203:21 204:6
**negate** 76:24
**negative** 24:19
**negotiate** 213:23
**negotiations** 25:24
93:8
**neighborhood**
31:22 34:12,18
35:3,5
**neighborhoods**
122:19 227:1
**neither** 97:12
228:20 255:13

net 154:6
never 23:18 24:1
  27:22 113:6
  155:12 230:16,24
  230:25 231:11
  233:1,22 241:10
nevertheless 63:6
  64:23
new 2:8 4:15
  12:25 16:1 56:24
  101:6 119:15
  150:11 179:16
  227:1,6 230:20
nicaragua 36:8,11
nice 33:2 85:14
nitrate 34:19,22
nobody's 204:22
nominal 177:19
  178:7
nonclass 242:2
nondetect 66:16
nonissue 252:1
nonlegal 81:11
  220:5
nonprofits 41:3,11
  41:11
nonresidential
  127:14
normal 220:4
normally 132:2
  159:16,18,23,24
  160:2,4
north 18:7 86:2
  88:11 96:10 119:5
  119:9,12 123:25
  127:11 133:6
  138:13 141:9
  219:5 222:21
  223:8,16 224:3,10
  224:17 227:7
  228:21 250:19

251:13,15,19
252:2,12,16
northern 34:11
notarized 254:7
notary 7:21
  254:25 255:5
note 6:6 11:8
  58:12 196:8 205:7
  205:20 247:18
noted 206:15
  223:7
noting 68:2
notion 48:11
november 18:10
nth 55:13
number 29:2
  62:16 86:11,23
  87:25 92:8 97:11
  102:20 104:18
  128:25 137:24
  139:5,6 140:9
  144:1 145:3
  154:23 158:12,13
  159:2 161:11,15
  164:6,11 172:13
  183:12,16 193:12
  198:1 204:20
  205:4,9 231:23
  254:5
number's 51:15
numbers 104:15
  106:11 142:19
  145:4 162:20
  178:12 204:24
  250:19 251:4
numerous 24:1
ny 2:8

**o**

o 6:1 177:1,1,1
  223:22,22

ob 237:15
object 9:14 14:22
  19:4 31:3 32:24
  34:5 37:7 38:5,19
  40:25 42:11 43:2
  43:14 45:9,22
  46:15,25 47:19
  49:8 50:10 53:2
  53:11,22 54:15
  58:10 59:1,20
  60:16 63:9 66:1
  66:12,19 69:23
  70:18 71:1,10,21
  72:4,13,25 73:17
  74:22 75:8 76:15
  77:5,15 78:6,21
  79:17,25 80:7,23
  81:21 82:5,13,16
  82:22 83:6,20
  85:6 86:19 87:21
  88:24 89:25 90:13
  91:24 92:13 93:7
  94:12,19 96:5
  98:1,18 99:12
  100:12,20 103:8
  103:23 105:1
  106:5,19 107:22
  108:12 109:16
  111:16,20 113:21
  114:2,16 115:4,12
  115:25 116:6,14
  116:22 117:7
  118:13,24 121:8
  122:15 123:10,22
  124:13,21 125:8
  125:25 126:13
  127:5 128:1,23
  129:9 130:5,23
  131:15,25 133:11
  133:18 134:3,10
  134:16 135:25

136:6,19 137:2,10
137:23 138:24
139:3,18 143:18
143:24 145:8
152:2,10 153:2,17
154:14,18 158:15
159:15 160:1
161:21 162:11
165:20 166:1,20
167:19,23 168:10
168:13,22 169:10
169:14 170:11,20
171:5,25 173:17
175:8,15 176:14
178:4,19 183:22
184:13,23 186:20
187:16 189:7,25
190:12,22 191:21
192:8,16 196:25
197:11 198:24
199:11 201:13
202:6,20 203:23
204:18 207:4,16
209:6 210:6 212:3
212:25 213:6
215:1 225:11
232:4 237:19
239:2 253:5,18
objection 44:25
  52:19 75:20 84:3
  84:20 85:25 93:23
  95:19 96:22 98:8
  102:6 104:14
  106:3,25 109:2
  110:4 111:2
  119:25 120:13
  122:1 124:8 140:7
  143:8 146:13
  149:8 155:2
  157:11 158:9
  163:20 167:12

170:1 171:13
200:5 203:11
205:14 206:6
208:3,13 210:21
210:24 211:11
214:4,9 215:20
216:8 217:1,15,25
218:11,18 220:16
221:4,11 223:20
227:8 228:6,15
230:7,19 231:2
232:14 233:25
234:9 235:1,10
236:24 237:5
238:2,12 239:16
239:22 240:15
241:14 242:4
243:17 244:2,12
245:22 246:12
248:22 252:5,14
**objections** 239:16
**objective** 110:19
**observation**
214:11
**observations**
159:22 251:7
**observed** 80:9
99:4 185:20
186:11
**obtain** 100:9 139:6
139:13
**obtaining** 90:19
**obviously** 9:17
16:20 60:7 151:12
191:3
**occur** 37:18 46:1
46:12 52:12 54:17
126:18 183:21
184:10
**occurred** 41:23
45:13,19,20 46:2

46:13,19,21,22
61:19 107:10
**occurs** 53:18 55:4
55:10 206:21
**offending** 89:3
**offer** 15:15 199:22
**offered** 120:21
252:6
**offering** 24:3
252:1
**office** 50:4
**offices** 247:8
**officially** 247:20
**offset** 144:14
195:11 196:5
216:6 230:1
243:21 244:6
246:14 249:9
252:16
**offsetting** 249:7
**oh** 28:12 47:6
145:18 213:1
**oil** 39:22 40:4
**okay** 11:15,25
15:3 26:20 28:6
28:19 29:17 45:25
47:15 48:6 51:12
51:16,16 52:8
67:15 79:9 97:5
98:5 109:22
129:25 141:11
142:13 145:17
150:7 169:16
176:11,19 182:15
196:2 200:23
201:4 217:4
224:15 226:14
229:2 235:3
251:25
**older** 122:19

**once** 47:15 55:5
56:8,16 130:1
135:19 230:20
**one's** 212:4
**ongoing** 58:1
112:18 244:14
**online** 22:13
146:24 151:6
170:18
**operate** 164:4
**operating** 57:10
57:15 59:18 60:4
64:18 74:4 96:14
132:4,9 134:18
147:6 161:5
162:21
**operation** 129:8
144:14 146:21
182:24
**operations** 132:12
132:22
**opine** 64:23
**opined** 209:3
211:25
**opinion** 13:1 16:5
16:22 19:3,10
26:5 34:23 35:22
36:6 50:1 56:1
58:9,11 61:11,24
64:7 68:1,8 69:13
71:12 81:17 83:25
87:19 89:16 90:16
90:17 91:13,14
96:3,19 112:8,10
113:2,3,19 118:5
122:13 132:6
133:9 142:1
172:17 181:22
216:18 218:21
221:3 223:9
224:13,14,18

237:25 238:9
241:1 245:6 252:1
252:6,8
**opinions** 9:25 12:2
12:14,17,22 13:4
15:6,10,10,13,15
15:21 16:1 17:4
24:3,6 32:23 34:1
61:18 114:14
224:4
**opportunity** 8:9
35:18 42:5 103:3
**opposed** 27:9
28:20 84:6 100:11
181:11
**opposite** 22:6
94:15 99:21
**opt** 134:20
**option** 188:6
**options** 224:4
**oranges** 201:24
**order** 103:6
104:24 116:4
137:12,13 198:5
232:21 244:7
**orders** 179:15
**ordinary** 53:19
103:21
**organization**
44:23 193:25
**organizations** 41:8
**original** 247:6
**otter** 5:4 224:23
227:4
**outcome** 7:3 63:8
**output** 192:1
**outside** 77:18
222:14 231:17,21
233:22 241:9
**overall** 28:14
133:20,21,22

245:24
overcompensate
  133:15
overcompensating
  134:1
overestimating
  137:17
overinvesting
  213:21
overland  34:18
oversimplifies
  96:6
overstatement
  98:20
owned  90:2
  208:16 219:8
owner  208:24
  209:9,10 210:12
  210:12,15,18
owners  210:5
  237:10 242:23
owners's  209:12
ownership  189:17
  208:11 242:19
owning  92:3,17
  96:8 146:25
  176:16 182:2

**p**

p  2:1,1 6:1
p.m.  155:19
  176:25 217:6
  249:21 253:24
pack  139:12
packet  135:11
packs  139:8
page  3:3,11 4:3
  5:3 57:7 68:2
  145:2,11,13,14,19
  145:22 148:19
  179:3,4 185:8,9
  194:2 195:15,19

205:7,21 222:22
  227:15 242:8
  247:7 254:5,7,9
pages  180:19
paid  129:5 131:16
  186:2 191:8 203:1
  203:2,6,8,13,16
  241:3,11 248:20
paper  114:19
  146:18
paragraph  12:12
  88:14 112:11
  147:25 149:24
  150:9 179:8
  180:13,24 185:13
  194:4,20 222:23
paraphrasing
  195:24,25
parcels  86:10
pardon  197:21
parse  88:12
part  10:1 102:7
  119:8 130:24
  179:17 187:12
  192:11,12 194:25
  201:14 235:23
  243:23 244:3
  248:23 250:10
participate  121:24
particular  19:13
  22:1 33:20 46:10
  60:17 70:3 120:23
  133:19 139:24
  178:13 192:1
  196:9 205:3,11,16
  206:24 209:11
  211:16
particularized
  125:4 197:6
particularly
  135:17 160:3

211:4
particulars  204:24
parties  6:13 7:7
  25:15,20 26:6
  27:9 28:21 29:4,5
  34:8,12 38:10
  40:20,24 41:4,24
  42:1 86:12 213:23
  255:15
partly  71:14
partners  33:11
parts  88:22 102:9
  192:25 232:1
party  7:1 25:15
  26:12 28:23 29:7
  29:24 30:8,9,14,19
  36:11 38:8 40:10
  43:17 51:10 81:25
  83:24 84:5,8,9,10
  86:18,22 103:15
  130:18 218:12
paternalistic
  110:22 111:3,12
path  99:17 100:25
patrick  2:14 6:23
  247:1,15
pattern  199:23
patterns  118:22
patterson  33:10
pay  33:4 38:16,20
  60:1 65:2,5 91:5
  103:6,20 104:24
  105:4 109:10
  118:7 119:11
  120:25 121:4
  122:23 129:5
  130:14 131:9
  154:3,4 184:7
  186:3 188:17
  189:15 210:12
  214:24 248:16

paying  63:25 74:3
  98:11 104:12
  105:17 120:6,11
  122:24 123:1,8
  153:3,4 210:7,19
  211:5,6
payment  131:16
  240:10
payments  187:3
  204:8
pays  64:7 129:7,15
  129:17
pdf  156:6
peace  254:25
pending  8:23
people  37:19 58:1
  58:15 59:24 60:6
  60:7,20,22 61:5,11
  61:20,21,25 62:21
  63:2 66:23 67:14
  74:8,10 75:9
  77:22 95:6 101:24
  101:25 102:3,17
  103:20 104:2,21
  105:21 117:9
  119:11,23 120:25
  121:2,11,23
  122:20,23,24
  130:12 135:16,19
  135:23 136:1
  137:6,14,15,17,18
  137:20 139:20,24
  139:25 140:19
  142:7,16,18 143:4
  144:6 149:13
  151:6 152:5,14,15
  153:13 154:7,8
  157:7 158:13
  176:8 177:17,22
  180:10 197:2
  210:4,8 211:13

215:6,9 221:22
225:21 229:3,4
230:3,15 231:10
232:24 233:21
235:6 237:9,13
238:10 240:13
241:23 242:6
253:2
**people's** 24:20
56:25 66:4 98:3
152:13 215:16
**percent** 18:9 25:5
25:10 27:10,11
28:2,8,10,18 94:2
122:13 151:22
158:4 176:7
227:18,25 228:2
**percentage** 25:3
27:7 101:25 185:5
**perfectly** 59:3,6
123:15 175:3
**perform** 136:25
**performance** 1:11
6:18 7:13
**performed** 20:18
27:20 138:9 142:3
214:20
**period** 52:13
55:18 103:25
105:11 107:11
121:20 134:5
152:17 171:18
189:10,16 193:13
206:11 250:20
**periodic** 53:7,12
53:16
**periods** 47:8 67:5
128:7 164:1 175:4
184:17
**permissible** 47:25

**permitted** 44:14
239:17
**persist** 55:18
**person** 31:1 37:6,9
37:10 38:3 42:25
88:17 89:4,12,15
90:21 91:1,15
108:6 109:4
131:14 153:3
165:14 170:22
171:11,12 172:6
203:24 208:16
216:23,25 217:13
217:14 218:8,10
219:23 238:22
239:12
**person's** 42:23,24
43:1
**personal** 26:17
28:4,5 188:7
190:2
**persons** 1:7 43:8
88:16,20 89:2
99:6 121:6 208:9
218:15 220:11
231:25 241:9
**perspective** 30:1
59:13,24 83:7
84:8,9 166:24,25
168:11,12 174:7
181:4 185:3
210:11
**pertaining** 14:4
**pesticide** 34:13
**pesticides** 34:14
**pfoa** 55:18,24
57:17,21 65:21,23
66:7 79:12 82:12
85:24 88:22,22
95:18,25 97:3
98:21,22 99:9

101:13,16,20
104:8,10,22 167:7
218:16 220:13
221:17 230:25
231:8,11,14 232:1
233:1,5,8,23 235:7
235:11 238:5
243:16,19,21,24
244:6,11 246:10
246:15,16 247:25
248:4 252:17
**pfoas** 82:8
**phenomenon**
140:21
**philosophical**
217:16
**philosophy** 150:7
**phones** 6:9
**phraseology** 20:1
**physical** 63:3
140:21 164:13,19
164:20
**physically** 66:14
253:10
**pick** 6:7 8:19
121:20 178:16
212:20
**picked** 139:16
**picking** 198:1
**picture** 124:4
125:5 127:23
166:18 190:10
**piece** 27:25 92:16
132:13 203:25
**pile** 114:5,18
146:15
**pipes** 253:11
**place** 6:9,12 103:2
210:15 241:18
255:10

**placed** 61:7
**plaintiff** 37:5
172:23 219:12
230:5 236:5,7,11
**plaintiffs** 1:9 2:2
4:5 7:16 9:8,10
10:22 11:13 17:5
17:7,10,19 35:11
36:2 37:1 38:18
41:9,12 68:10,22
89:20 172:19
199:10,17,19
**plan** 15:15 228:1
247:21
**planning** 185:19
247:19,19,24
**plans** 247:10
**plant** 251:11
**plastics** 1:12 6:18
7:13
**play** 73:7 173:7,8
**plays** 126:2
**pleasant** 2:3
**please** 6:6,9 7:25
8:18 93:3 147:10
239:19 243:12
247:18 254:3,5
**plume** 238:5
240:22
**plus** 51:11,12
191:16
**po** 2:3
**pocket** 98:12
100:10 103:13
**poet** 57:15 63:21
64:18 65:2,5,5
66:24 98:23 99:11
**poets** 57:10 58:1
58:24 59:18 61:21
65:19 253:13

point 26:12 49:24
  57:14 62:5 68:6
  83:14 97:3 104:18
  106:8 107:13
  145:10 154:3
  181:1 195:15,25
  235:25 243:19
  249:8
points 8:25
policies 252:8
policy 25:13 27:4
  27:5 185:16
  196:14,22
pollution 20:12
poorer 242:20
portion 27:17,23
  81:12 86:1 168:16
  235:19
position 76:3
  112:21 230:23
positive 24:19
  94:17 250:22
possibilities 24:10
  93:13
possibility 52:16
  52:23 190:17
  194:17
possible 62:2
  80:20 94:4,6,9
  97:24 98:2 101:3
  115:21 116:16,17
  163:7 205:21
  208:5,6 211:8,24
  215:11 233:20
possibly 29:18
  51:22 118:18
  185:21 186:12
potential 83:2
  88:6 94:11 95:14
  102:11 121:14
  182:20 192:13

195:11 196:5
  207:13 214:23
  242:16 243:15,25
  252:25
potentially 45:25
  124:18
power 36:23 108:7
practicably 84:12
practical 82:7,14
  83:5
practicality 81:14
  81:19,24 83:22
  84:5
practically 84:11
practice 90:23
  92:19 207:21
precise 49:6,13,17
  50:7,25 51:19
  124:18 125:5
  128:2 143:17
  153:14 154:12,17
  154:25 166:18
  173:3 175:5,6
  200:18 201:7,18
  201:25 202:4
  204:13
precision 49:21
  50:11,12 51:6,7,11
  123:14,15,21,24
  126:12,16 155:7
predates 247:25
predict 117:3
  123:15 168:1
  173:10 174:12
  190:19
predictable
  119:18 191:10
predicted 167:10
predicting 121:5
  176:5,12

prediction 175:13
predictions 203:21
predictor 171:22
  174:21 175:2
prefer 61:9,11
  98:14 99:25
  108:18,22 109:8
  109:19,25 215:7,9
preferable 99:18
preference 61:16
  96:20 97:1,16,17
  99:2,4,6 100:8
  102:19,19 104:3
  105:7,8,10,24,25
  107:16 109:25
  110:1,2,10,11,18
  111:5,6,7,8,10
  114:20 142:7,10
  185:14,17 186:22
  186:23 187:7
  226:11
preferences 100:7
  106:17,23 107:6
  108:8 109:1,22,24
  110:7,20,25 186:4
  215:16,22 216:14
preferred 100:25
  107:20 109:6
prefers 243:5
preliminary 5:5,7
  18:8
premarked 10:5
  11:4 14:13 17:15
premise 101:8
prepare 150:10
prepared 12:12
preparing 4:21
  16:15 33:6,17
  179:12,24
preponderance
  133:13

presence 34:22
  52:15 55:24 68:24
  79:12 95:1 97:3
  101:12,15 215:6
  221:17
present 2:14 7:4
  10:19 12:7 20:15
  65:24 76:5 93:1
  128:20 131:18
  171:21,23 176:2
  177:10 183:3
  184:10 186:17
  190:13 255:11
presented 72:15
presenting 166:11
presidential
  179:14
pressure 4:13
  147:19 148:3
  150:25
presumably
  115:15 134:20
  149:4 152:13
  185:1 230:20
presume 85:17
  112:6
presumed 185:18
presuming 90:2
presumption
  241:21
pretty 45:15 55:14
  72:6 92:18,19
  132:20 157:21
  162:1 191:10
  192:24 195:4,5
  213:14 248:10,10
previous 179:20
previously 36:5
  60:12 211:6,17
price 23:12 92:24
  150:14 160:23

161:17 215:19
**prices**  21:24 41:21
151:6,14 164:18
**pricing**  120:22
122:3,5
**principal**  33:8
**principle**  183:25
**printout**  4:22
69:17 145:3,11
193:24
**printouts**  144:24
**prior**  31:10 97:9
98:25 101:11,12
101:15,20 104:22
**private**  4:9 6:7
24:21 25:15,15,20
27:9,11,12 28:21
28:23 29:4,5,6,8
29:24 30:8,19
36:18,21,23 40:5
40:10,20,23,24
41:3 43:8,17,24,25
44:6,8,22 88:21
104:23 130:20,21
181:3,5,10 211:9
231:25 236:13
242:19
**privately**  243:8
**pro**  242:1
**prob**  128:14
**probability**
185:18
**probably**  25:10
26:15 27:10,16
28:1,3,17,22 29:12
31:5 130:11
132:11 162:1
176:10 219:4
235:3
**problem**  51:15
126:9,10 136:8

137:19 154:22
158:7 194:4,22,24
194:25 206:20
226:7 229:5
231:15 233:9,13
235:12 238:19
240:24 243:8
244:10,15
**problems**  126:11
136:23,23 143:11
244:9
**procedure**  254:2
**proceed**  7:9 67:24
118:3 177:7 217:9
**produced**  69:11
232:16 250:10
**producing**  151:1
192:4
**product**  188:11,12
**production**  7:20
192:7,10 250:19
**productive**  84:16
85:1,3
**professional**
213:11
**programmatic**
26:2
**project**  31:23 50:5
226:13 240:20
**projected**  167:3
**projections**  74:19
**projects**  24:18
25:13,23 219:18
219:20 221:2,7,9
221:16 229:7,11
233:2 234:7,18,19
234:25 235:5
236:17 241:10,17
242:15 247:3,4,16
247:17 252:15

**proper**  15:25
237:16,24 238:9
238:14
**properly**  52:4
**properties**  21:24
67:3 84:23 85:20
85:23 86:6,14,16
89:23 90:2 127:15
208:15 216:1
222:17 242:9,11
243:9 253:8
**property**  21:10,13
21:14 22:2,5,7,20
34:21,24 37:5,10
37:16 39:13,17
40:1,11,12,18
41:21 65:25 66:9
66:10,15,18 86:14
86:17 88:15,19,21
90:7,8 91:8 92:10
92:12 94:5 95:15
95:21 102:8 104:6
104:7 118:17
128:4 208:10
211:10,18 212:1
213:5 214:17,18
214:25 218:15
220:12 221:2
222:24
**propose**  236:17
245:23
**proposed**  85:23
132:15 163:8,13
168:4 218:14
223:2 242:7
**proposing**  229:7
233:2
**propositions**  152:8
**propriety**  127:3
**protect**  76:8 222:4
224:7 225:19

229:16
**protection**  3:21
69:19 75:15 84:14
84:24 88:16
196:10,23
**provide**  17:6,7
34:23 37:16 49:4
62:7,16 73:3 74:8
83:10 88:9 102:13
125:3,10,11 126:2
129:22 138:11
139:5 149:5
153:14,18 154:11
179:16 187:3
213:25 234:13
235:16 237:25
238:10,15 245:17
246:5 249:7
**provided**  9:19
10:7,21 11:22
14:3 32:25 34:2
35:22,23 36:5
76:8 98:16 106:13
121:13 126:23
145:1 153:11
224:11 225:14
235:20 237:8
247:14
**provider**  196:15
196:22
**providers**  22:14
**provides**  49:15
50:24 72:16 87:23
141:6
**providing**  26:1,5
33:12 74:2 79:1,3
97:20,22 106:13
127:1 160:24
222:17 227:11
229:2,23 238:21
240:3 241:23

246:25
**provision** 43:7,12
43:16
**provisions** 43:23
**proximity** 226:15
**proxy** 86:17
**public** 7:21 25:13
27:4,5 39:13,17,20
39:25 41:8,11
42:4,7 43:8,17,23
44:15,17,23,24
63:23 75:16 76:3
76:5,11 78:24
104:15 106:14
185:16 237:9
254:25 255:5
**public's** 44:7
**publicly** 234:21
**pump** 4:16,18
144:9,12 145:7
146:22 148:3
149:11 150:11,12
150:15 156:12,20
157:23 158:22
160:14,19,19
161:9 173:5,9,10
188:2 192:17
193:6,13 203:2
**pumps** 150:24
152:12,18 153:4
161:6,7,12 162:22
175:17 185:1
**purchase** 92:21
213:24 242:8
**purchased** 107:12
216:15
**purchases** 93:13
**purchasing** 93:9
**purport** 124:10
**purports** 124:4

**purpose** 11:9 38:7
70:10,14 73:13,20
73:21 75:25 76:16
179:18 227:10
**purposeful** 49:14
**purposes** 56:14,15
72:1 73:20,22
80:8 180:2
**put** 21:5 75:24
104:21 112:21
182:13 213:8
**putative** 13:15
31:10 34:4 35:1
65:25 66:9,10
70:16 71:11 73:15
73:25 75:7,18
77:13 78:4,20
79:15,23 81:4,18
82:4,11 83:2 84:1
85:5 87:20 108:9
109:14 110:13
118:6 124:5,11,17
125:18 127:24
130:3 133:16
152:25 153:13
154:12 166:16
177:13 184:20,21
189:5 195:10,17
196:4,9,20 206:3
220:6,25,25
237:13,23 238:21
241:4

| q |
| --- |

**qualification** 25:8
**qualifications**
11:21
**qualified** 21:3
245:14
**quality** 83:23
163:1,6 195:4
221:21 222:4

224:6 229:20
234:12 249:3
**quantification**
13:14 14:23 47:22
48:7 102:21
**quantify** 46:11
47:18,21 48:15
62:9 63:12,15,20
64:17,20 68:9
116:23 127:18
217:14
**quantities** 166:3
**quantity** 83:23
166:22 235:13
**quantum** 123:6
**quarter** 28:1,9
119:3
**quarterly** 53:13
57:18 65:22 66:17
74:6,8
**question** 8:23 9:5
16:3 37:18 41:1,6
41:18 42:8 43:15
45:11,12 46:5
50:19 54:8 68:16
71:4,16 72:5
83:15 90:1,4,4
94:24,25 99:16,20
101:5,13,18
107:24 109:4,5,14
110:14,15,19
123:23 138:18
142:6 144:11
158:17 159:11
186:24 197:13,23
200:25 217:2
220:17 221:20
226:24,25 227:9
227:14 229:2,25
231:19 237:21
239:7,20,21 248:1

250:4,6 251:18
**questioning**
232:21
**questions** 8:12 9:1
15:18 41:17 65:11
65:18 138:25
225:14 232:10
239:5 247:4
252:20
**quick** 65:9 155:11
**quickly** 206:20
**quinn** 2:7 7:11
**quinnemanuel.c...**
2:10,11
**quite** 46:18 122:2
158:5,6 164:9
180:9 206:18

| r |
| --- |

**r** 2:1 3:12,14,15,19
3:24 6:1 177:1
255:1
**radiation** 135:15
140:15 141:19
**radon** 135:16
136:2,7,14 140:20
**raised** 243:4
**random** 161:16
**range** 25:13
150:22 156:16
157:21,24 158:6
158:11,14 160:5,8
160:9 162:12,14
162:17
**rata** 242:1
**rate** 52:9,10 93:2
119:6,14,16 120:2
120:7,12,18,25
121:7,11,16
122:10,14,14,20
123:6,8 127:12
177:14,19,25

178:7,11,14,16
181:9,13,15
183:16 185:16
188:11,11,21
190:11,16 191:1,1
191:2
**rates** 23:7 60:1
95:13 118:7 119:3
128:19 133:5
178:22 185:14,23
186:14,17 234:22
**rating** 196:23
**rational** 93:14
149:19,20,23 150:2,3
150:4,5,6 152:21
154:7
**rationality** 154:1
**ray** 33:22
**raymond** 3:18
17:20
**rdr** 1:25 255:23
**reach** 49:24
**reaching** 163:14
**read** 12:18 18:11
18:17,23 54:8
57:19 70:12 88:23
88:25 112:24
113:8,15,25
141:22 148:5,23
149:25 150:17
181:6 193:11
196:16 205:25
218:19 223:5
227:21 232:20
239:21 247:11,22
254:2,3
**reading** 113:4,5
114:4,8,9,10,12
193:10 195:13,23
**readings** 66:16

**ready** 65:8 101:24
**real** 22:16,22,23
38:13,15 71:12,13
88:19 92:16,18
93:17,20 142:9
178:11 208:10
211:10 212:1
213:14 215:16
218:15
**reality** 92:11
159:14
**really** 30:6 51:16
51:20 142:7
158:11 159:14
206:9 221:9 250:5
250:14
**realtime** 255:4
**realtor** 135:21
214:14
**reason** 64:13
101:10 132:1
143:25 144:3
150:19 160:21
173:14 178:14
192:21,23 223:15
225:9 233:4 253:2
254:5,9
**reasonable** 74:18
81:1 117:2 126:2
126:4 127:1
134:12 137:25
138:5 154:8
157:20 175:3,6
178:8 184:17
201:21 202:1
224:5 234:14
**reasonableness**
35:25 70:5
**reasons** 12:16
15:22 63:3 139:19
216:16 238:13

**recall** 17:9 19:6,12
35:8,11 38:22
231:23
**receipt** 203:7
**receive** 142:19
235:13 238:4,6,7
**received** 250:10
**receiving** 235:7
**recess** 67:20
117:24 155:19
176:24 217:6
249:21
**recognize** 69:14
87:8 156:4,8
246:22
**recognized** 19:21
**recognizes** 206:24
**recommend**
142:17
**recommendations**
141:24
**recommended**
135:24 141:16,18
141:20 149:21
152:22,23 221:3
**recommending**
142:5
**record** 6:3,13 8:1
8:4,10,16 67:22
107:3 117:19,21
117:23 118:1
155:15,18,22
177:5 217:5,8
249:14,16,20
250:1
**recorded** 6:15
**recording** 6:12
**recover** 31:7 37:11
37:13 38:9,14
39:19 40:7,17,23
41:15 42:25 43:8

43:17,24 44:6,14
44:24 64:15 72:18
198:19
**recoverable** 30:22
38:17 71:18 72:11
**recovered** 126:22
**recoveries** 126:22
**recovering** 43:25
44:7 59:12
**recovery** 71:16
73:21 195:10,16
196:3
**recreate** 42:5
**recreational** 42:2
**recurring** 53:20
140:18
**reduced** 129:23
**reduction** 91:20
**redundancy**
225:21 229:18
**redundant** 225:22
246:4 248:25
**refer** 11:22 14:8
33:25 51:6
**reference** 11:20,24
16:19 32:18,20
39:25 225:13
**referred** 18:21
70:7 230:11
**referring** 15:2
194:10 224:22
232:4
**refine** 207:24
**reflect** 42:15,15
52:14 72:21
149:13 153:21
**reflected** 13:2
**reflects** 13:4 97:16
152:13
**regard** 73:23 75:4
87:20 92:10

171:23 175:5
187:24 245:6
252:2,12
**regarding**   224:11
**regardless**   26:7
235:4
**regional**   178:22
**registered**   255:3
**regression**   21:25
**regular**   53:9
135:13 142:17
148:21 244:10
248:11
**regularly**   53:20
**regulation**   227:24
**regulations**   179:13
**regulatory**   23:18
23:21,22,24 24:1,2
**relate**   10:1 16:21
24:7 84:10 158:17
187:17 216:23
217:13 221:17
**related**   7:1 26:22
56:14 143:1
150:13 234:18,24
255:14
**relates**   84:5 89:23
92:17 102:7 131:6
244:14
**relating**   168:20
169:24 170:10
171:11,12,20
**relative**   37:4 45:19
48:21,23 82:11
86:7 224:12
255:17
**relatively**   118:18
**relaying**   108:14
**release**   82:8
**relevant**   12:3,15
12:22 26:6 46:1

46:14,23 47:4
48:20 52:1 57:22
68:19 83:16,17
98:7,10 103:19
108:1 109:23
110:2,8 114:21,24
119:10 122:18
186:5 212:24
213:5 247:5
**reliability**   234:11
235:15,16
**reliable**   101:7
124:24 174:9
189:13 202:14,18
202:23 249:3,13
**reliance**   232:16
250:10
**relied**   16:13,18,23
32:22 69:12,25
87:18 113:12
148:17 152:7
157:2 179:23
232:17
**relief**   37:19 44:10
44:19 237:25
**rely**   232:19
**remain**   90:8,20
103:5 114:20
174:24 253:12
**remaining**   100:11
249:13
**remains**   173:13
**remedied**   192:15
**remedies**   38:25
39:4
**remedy**   39:24
40:13 56:4 58:22
63:17 67:2 73:3,4
79:20 80:18 86:5
221:12,14 223:24
225:3 243:20

244:8 249:11
**remedying**   226:16
**remember**   32:19
35:2,6 65:15
87:15 112:9 113:4
113:5,16 114:4,6,7
114:9,10,11,12
161:23 234:2
251:9
**remotely**   7:5,6
**renshaw**   33:9
**rent**   211:2
**rental**   208:19
210:16 211:1
**renter**   208:18
210:13 211:1,5
**renters**   208:25
210:5
**renting**   208:18
**repair**   147:1
**repeat**   43:15
**rephrase**   59:15
**replace**   4:19 88:2
150:12 156:12,19
157:22 203:2,17
203:18,22 204:6,7
249:4
**replaced**   157:16
160:14,15 184:16
203:25 204:5
245:24
**replacement**   68:14
79:3 146:22 147:4
158:23 182:9,10
182:20 193:6,13
204:3 216:17
218:21 238:16
241:24 248:5,24
**replacing**   183:20
188:2 206:14
207:9

**report**   3:19 5:5,8
9:19,22 10:7,10,12
10:13,18,18 11:11
11:22,23 12:1,5,13
12:21,24 13:3,4,11
13:13,17,19,25
14:3,9,20,20,25
15:2,5,12,17,20
16:4,6,8,11,14,18
18:2,9,19,20,21
19:1,9 32:7,13,15
32:23,25 33:6,18
33:20,25 35:14
36:1 55:15,16,17
55:21,23 57:7,7
58:4 61:2,13
62:20 64:2,22
65:17 67:13 68:2
80:1 84:21 92:22
94:2 97:7 106:8
115:1 119:2
120:17 123:7
125:20,22 146:6,9
146:11,16 151:9
151:15,19 152:17
156:18 157:8
164:5,8,23 177:11
178:17 179:23,24
194:21 195:9,15
195:18,19 196:3,8
196:19 197:5
199:24 205:2,8,20
207:20 211:25
222:16 223:7
224:16,23 225:7,8
225:12 226:23
227:4,4,10,10,13
227:15 240:19
242:7 243:18
244:16 253:16

**reported** 1:25
157:6 162:16
255:10
**reporter** 6:25 7:8
8:9,18 69:9
140:25 144:21
147:14 148:14
156:2 193:18
222:10 239:19,21
246:20 255:4,4
**reporter's** 9:4
**reporting** 151:6
**reports** 16:15
18:15,24 21:15
32:16 33:23 51:25
97:12 113:10,20
228:4,14
**represent** 7:8 42:7
69:11 76:2 156:9
186:22 221:9,12
241:5 250:9
**representation**
12:8
**representations**
13:7
**representative**
217:23 218:1,3
224:25
**representatives**
223:8 224:17
**represented** 36:7
36:12,16,18
143:21
**representing** 2:2,7
**requested** 19:1
101:25
**requesting** 17:9
100:6 103:1
107:14
**requests** 97:12
108:15

**require** 72:2,11
248:16
**required** 50:16
51:24 71:23 106:9
109:9,20 112:17
115:14 135:20
144:10,13 164:11
192:1 224:5
**requirement**
15:19 164:20
**requires** 45:6
148:1
**reread** 239:19
**research** 27:6
49:20
**reserve** 223:3
**residence** 61:4
128:13 205:3
**residences** 57:10
57:14 74:5 86:2
100:14 119:14
120:2 240:21
**resident** 74:3
**residential** 56:14
56:14 86:16
**residents** 58:5
96:20 97:16 98:14
128:14 135:12
196:11 205:11,16
205:21 219:1,10
220:21
**resolve** 24:10
206:20
**resource** 236:1,2
**resources** 39:13
**respect** 39:12
165:23 168:8
200:19 201:7
202:4
**respected** 76:16

**respective** 70:10
70:14 72:1 73:14
73:22 75:3,15
77:3,12 78:19
79:14
**respectively** 16:16
**response** 138:18
198:9
**responsible** 36:15
57:14 65:19 66:24
81:25 84:8 90:21
209:13,14,22,24
**rest** 26:18,19 42:7
194:24
**restart** 85:21
101:18
**result** 50:13 51:9
93:3 205:23
211:24
**resulting** 19:16
**results** 67:6
207:13,14
**resuming** 66:24
**retained** 9:8 27:12
36:2,25 39:6
217:19 238:20
**return** 187:18
189:14
**returns** 185:22
186:13
**revealed** 61:16
97:1 100:7 102:19
108:25 109:23,25
110:10,18 111:4,7
111:10 142:6,9
215:22
**revenue** 25:10,11
**revenues** 24:22
**reversing** 198:21
**review** 19:2 112:7
172:18 213:4,7

**reviewed** 16:15
113:13,14,18
114:14
**reviewing** 112:10
**rica** 36:8
**rich** 215:24
**right** 9:3 11:24
15:24 29:12 32:14
37:17,21 40:7
45:1 50:9 63:16
65:1 67:12 94:24
94:25 109:5
130:25 131:3
133:4,4 140:8
149:24 150:9
153:24 158:25
159:3,8 160:19
166:12 171:7,16
179:5 184:25
185:11 186:15
188:12,13,23
190:1,2 195:20,21
202:9 204:21
214:8 218:23
226:8 236:14
244:3 246:2
247:12 248:8
**rights** 30:14,18,19
37:5,10,15 39:25
40:11,12,18
220:21
**rises** 47:2,3
**risk** 89:3 148:3,4
190:25,25 191:2
246:3
**road** 245:23 248:5
**robert** 1:16 3:4
6:15 7:17 8:2
33:10 92:23
254:21 255:9

**role**  33:6,17,18
  71:24
**roll**  209:9
**rolls**  208:23
**romney**  89:3
**rong**  3:24
**room**  7:4
**roughly**  194:5
**rounds**  57:18
  65:22 66:17
**routinely**  185:20
  186:11
**rows**  251:7
**rules**  8:7 15:20
  179:14,16 239:17
  254:2
**run**  20:14 139:5
  226:7
**runoff**  34:18
**runs**  4:24 91:13,25
  194:14

**s**

**s**  2:1,3 3:9 4:1 5:1
  6:1 177:1,1,1
  223:22
**saint**  1:11 6:17
  7:12 57:9,16
  58:23 59:9 63:24
  65:20 98:16
  104:11 105:17
  242:8 248:20
**sake**  9:4 133:7
**salability**  34:20
**salaries**  170:18
**salary**  170:16,21
  171:1,8
**sale**  23:12 91:8,8
  213:23
**sales**  213:4,10
**salt**  136:23

**sample**  135:18
  149:15
**samples**  139:5
**sampling**  57:18
  65:22 66:17
**satisfactorily**  7:19
**satisfies**  250:16
**satisfy**  249:2
**savings**  185:21
  186:12 195:12
  196:5,10 205:4,9
  205:12,17
**saw**  150:21 194:8
**saying**  8:20 40:23
  43:23 51:14 53:24
  95:4,10 99:14
  103:19 108:18
  111:14,17,21
  117:4 134:8 138:5
  158:21 167:9
  169:20 171:1
  175:12 194:9
  200:6 207:18
  226:3 240:2
**says**  12:12 18:4
  50:4 59:24,25
  64:2 70:5 88:15
  94:1 112:12
  141:14 147:25
  148:20 149:25
  150:10 156:12
  179:19 180:13,24
  186:10 194:4,21
  200:9 209:8,13
  222:24 227:17,24
  239:5 247:7,15
**scenario**  211:6
**scenarios**  47:9
**schedule**  148:21
**school**  23:7

**science**  96:16
  206:23 207:11
**scientist**  206:23
**screen**  141:20
**screening**  192:18
**sealing**  56:6,6
**seasonality**  250:22
**second**  12:11
  14:20 29:20 87:14
  145:2,11,19
  147:24,25 179:7
  180:13,23 194:2,3
  227:16 249:14
**secondly**  240:3
**section**  16:13 68:3
  69:18 70:4 73:8
  141:15 179:4
  180:3,11 185:10
  222:23
**sections**  180:7,9
**sediment**  244:14
  245:3
**see**  12:11 19:11
  59:3,6 77:24
  80:13,15 91:16
  92:22 96:13,23,24
  101:23 103:25
  124:22 136:22
  137:5 140:17
  141:14 143:11
  145:3,16 146:1
  147:24 148:19
  165:2 175:25
  186:10 190:14
  204:12,13 206:8
  214:17 239:25
**seeing**  147:2,3
  211:7 250:21
**seek**  102:4
**seeking**  18:5 44:10
  96:25

**seen**  66:2 104:3,16
  112:9 141:2,3
  172:21 173:13
**select**  121:6
  122:14,14 123:5
  146:19 147:3
  213:10
**selected**  249:6
**selecting**  214:14
**self**  162:16
**sell**  90:9,22 94:23
  95:2 135:21
  136:11
**seller**  92:22
  215:19
**sellers**  242:10
**selling**  135:17
  139:12
**sells**  91:9
**send**  135:18
**sense**  9:2 52:22
  81:11,13 86:20
  120:19 147:8
  173:19 186:7
  220:5 226:13
  244:24 251:4
**sensitive**  6:7
**sensitivity**  136:13
  140:20
**sent**  251:24
**sentence**  12:11
  78:11 147:24
  180:12,23 186:10
  227:16
**separate**  242:17
  242:25
**separately**  183:17
**series**  55:9 131:19
  186:8 225:14
  229:13

**serve** 223:4 227:1
**serves** 231:17
**service** 97:13
  227:6 237:8
**serviced** 148:2
**services** 88:2
  149:5 249:4
**set** 16:14 127:4
  132:2 157:7
  255:12
**settlement** 25:24
  26:8 35:24,25
  187:25
**settles** 158:18
**seven** 120:5
  131:11 165:15,24
  174:11,14,24
**shaft** 150:15
**shallow** 150:13
  160:19 161:6
**shape** 127:7,9
**shares** 241:4 252:9
**sharpshooter**
  159:5
**sheet** 254:1,3,6,7
**shoot** 159:6,7,8
**shooting** 159:6
**short** 108:16
  249:10
**show** 66:5 80:1
  96:11 212:11
  216:9 232:16
**showed** 101:21
**showing** 243:11
**shows** 50:25 51:17
  57:3 162:9 203:7
**side** 28:13 57:11
  129:2 132:3
  236:14
**sided** 145:12

**siegel** 55:23 56:23
**siegel's** 55:16,21
**sign** 102:18 254:7
**signature** 254:7
  255:21
**signed** 255:24
**significant** 132:20
  150:11
**significantly** 51:1
  106:7 161:20,22
  161:24 175:10
  221:14 240:11
  244:23
**signs** 4:15
**similar** 22:11 23:7
  23:7 30:7 33:1
  35:3 130:7 133:14
  165:9,9 216:1
  228:4,13
**similarly** 1:7 42:2
  115:22 123:11
**simple** 182:10
  184:18 211:22
  226:6
**simply** 133:24
  137:14 163:22
  225:4 229:22
  232:15
**simulate** 22:14
**simultaneously**
  185:22 186:13
**single** 42:14 66:4
  120:10 158:12,13
  165:13,14,24
  183:9 239:11
**sit** 43:19
**site** 56:5
**sitting** 19:5 234:4
**situated** 1:8
  115:22

**situation** 58:6 82:1
  82:9,25 109:9
  110:21 116:17
  131:18 159:5,13
  159:22 170:6
  174:5 175:14
  178:13 190:2
  194:15 197:5
  209:19 225:4
  226:16 235:23
  239:24
**situations** 111:9
  130:7
**size** 85:15 118:12
  118:17 165:8,11
  190:11
**skeptical** 97:2
  101:2 228:22
**skill** 255:7
**skilling** 193:2,8
**skillings** 4:22
**slate** 85:18
**slightly** 12:6
  145:17 164:17
  178:12
**small** 97:10 128:8
  183:9 248:10
  251:10
**smaller** 140:9
  157:25 158:1,5,6
  183:16
**social** 75:14,25
  76:10 77:2,12
  78:18,23 79:13
  180:24 181:11
  191:1
**society** 181:1
  185:15,18
**softener** 131:6
  132:21,25 142:23
  142:25 204:23

**softening** 143:3
  175:19
**soil** 163:1,6
**soils** 31:22
**sold** 41:24
**solely** 233:15
**solution** 61:6
**somebody** 157:6
  238:17
**someone's** 170:16
  171:1
**sons** 4:22 193:2,8
**sooner** 204:7
**sorry** 53:16 79:7
  79:10 108:22
  121:9 145:9
  178:20 179:8
  180:14 181:22
  183:5 185:10
  188:19 195:24
  197:21 228:8
  237:15
**sort** 34:15 44:17
  58:17 121:3
  177:25 210:14
  211:4 220:4 240:8
**sorts** 27:14 38:25
**sought** 44:18
**sound** 134:6,8
  174:4 191:6
  234:13,14
**soundness** 234:11
**sounds** 117:8
  149:3
**source** 74:11
  82:12 97:18
  132:12 136:10
  146:2,17 205:23
  222:5 224:7
  227:18,20 228:19
  229:17 242:12

244:13 246:6
252:2
**sources** 145:5,23
146:1,4,5,10,23
**spans** 162:17
**speak** 8:18 227:1
**speaking** 47:20
**specialist** 2:15
**specific** 16:17,22
17:9 30:13 38:3
44:16 58:21 72:21
73:15 84:18 86:9
125:1 181:4
**specifically** 18:9
26:20 173:16
251:8
**specifics** 88:12
**specified** 73:6
**speculate** 43:11
47:25 48:1,4,5
**spend** 31:6 40:15
49:14
**spent** 16:25 164:9
**sperry** 2:3 7:16
**spill** 39:22 40:4
238:17
**spills** 240:5
**spreading** 204:3
**spreadsheet** 4:11
144:25 145:24
146:5,8,12,17
147:22 156:11
160:13 162:9
164:23 193:3,8
**spring** 37:2
**sprinkler** 120:6
**st** 31:23 235:19
236:5
**stable** 57:16 65:20
**staff** 33:11 87:13
100:22 102:15

**stages** 163:9
**standard** 45:10,15
45:16 177:21,25
215:13,17
**start** 67:23 144:11
228:12
**started** 200:6
**starts** 145:14
185:13
**state** 7:25 12:24
17:20,21 18:6
19:1 23:18,20,22
55:15 56:4,8
62:24 63:24 76:3
97:15 115:1
137:11 138:7,10
138:17 142:12,13
143:10 144:8
151:18 164:8
170:18 171:4
196:8 199:25
205:15 206:15
224:11,16 225:7
233:17 244:16
**stated** 10:14 13:25
16:11 20:3 109:22
109:25 110:2,7,11
111:6,6,8 139:19
172:1,8,12 173:18
196:18 204:19
215:5 224:16,22
226:10
**statement** 3:12,15
12:2,14,22 15:6
55:14,22,23 94:3
96:7 99:14 142:10
148:25 149:7,17
150:20 185:24
194:7 201:15
**statements** 55:20
63:24 223:13,17

228:4,14
**states** 1:1 65:17
73:8 83:18 97:7
119:2 156:13
195:9,16 196:3
205:2,20 231:24
237:5
**stating** 205:8
254:5
**statistical** 51:8
160:10
**statistically** 49:13
50:12 212:13,15
**statistics** 51:6
**statute** 3:21 69:18
69:18,20,24 70:4
72:15,15 73:2,3,8
227:23,23
**statutory** 72:18
76:21,25
**stay** 104:23 173:6
176:8
**stayed** 99:23
**staying** 60:21
61:20 99:18
**step** 179:8
**stock** 191:3
**stops** 192:4
**storage** 148:1
229:18 244:25
245:1,24
**story** 114:11
**straight** 182:10
**strange** 197:4
**stream** 187:3
204:8
**street** 1:21 2:3
6:22
**strike** 101:13
**stuck** 58:5 145:24
154:22

**studied** 121:22
**study** 206:24
**stuff** 229:24
**subclass** 80:3
81:11
**subclasses** 75:1
81:6,7 83:12
124:6
**subjective** 213:2
**submit** 15:20
135:11,13 138:7
**submitted** 12:25
14:21 18:2,5,10
**subscribed** 254:22
**subsection** 70:8
**substance** 254:4
**substantial** 211:7
**substantially**
134:18
**substantiation**
245:5
**substitute** 76:8
79:1 83:10 93:12
234:13,14
**sudden** 193:1
**suffer** 90:25
**sufficient** 49:1
229:17 235:13
239:3
**sugarman** 1:20,20
6:21,21
**suggest** 162:5
186:16
**suggested** 202:16
219:18
**suggesting** 190:17
**suits** 41:3
**sullivan** 1:5 2:7
6:17 7:12
**sun** 47:2

**sunk** 203:14
**supplies** 4:10
**supply** 105:19
 112:20,22 116:8
 116:12 231:7,25
 233:15,21 235:19
 236:20 239:12
 249:13
**support** 4:5 10:22
 26:2 33:12,14
 48:11 122:13
 195:6 199:8
**supporting** 39:3
**suppose** 136:13
 182:17 188:1
 238:17
**supposed** 179:15
**supposing** 240:25
 241:1
**sure** 9:7 10:11
 19:25 22:18 27:19
 30:25 32:21 33:8
 38:20 43:19 44:18
 44:20 45:24 46:18
 52:20 59:3 64:13
 66:13 73:18,19
 74:12 81:22,22
 86:8 89:4 107:3
 109:17 113:15,15
 114:4,11 122:8,9
 126:1,9,10 128:4
 138:2,17,19 141:3
 141:6,6,11 146:7
 147:2 159:10
 162:3 163:4,6
 169:15 187:23
 192:3 194:9 199:6
 199:7 209:16
 229:17 243:2,14
 249:17

**survey** 170:18
 173:22
**surveys** 96:19
**swear** 7:9
**switch** 33:3 97:5
 163:15 206:4
 211:8,20
**switched** 60:22
 67:9 163:10
**switching** 64:24
 74:10 205:23
**sworn** 7:21 10:21
 13:6 254:22 255:9
**system** 58:3,16
 60:11 80:11 83:9
 84:12 86:4 88:1
 94:22 95:7 96:25
 97:12 98:23
 101:14,20,22,25
 103:7 104:1,25
 105:14 106:10
 107:10,15 112:14
 115:14 119:15,16
 120:3,6 121:10,14
 121:15 122:21
 127:12 130:12,13
 130:15,18 206:10
 221:23,25 222:18
 222:20,21 223:2
 223:10 224:20
 225:4,22,23,25
 229:9,12,16
 230:11,12,16,21
 231:16 232:25
 233:6,8,15 234:2,4
 234:12 235:15
 239:25 240:4
 241:22 244:6
 245:1,2,4,14,25
 246:5,14 247:18
 248:9,13,13 249:2

 251:10 252:7
 253:10
**systems** 23:7
 57:12,15 97:9,11
 103:2 219:5
 220:20 221:20
 223:17,25 224:2
 228:25 229:19
 244:24

**t**

**t** 3:9,18 4:1 5:1
 177:1 223:22
 255:1,1
**table** 192:22
**take** 6:12 12:10
 35:15 44:4 65:7,9
 65:12,13 67:15
 88:14 106:1
 112:11 116:19
 127:14 130:19
 135:18 148:8
 151:20 179:8
 185:8,9 187:14
 188:7 191:7
 203:16 210:14
 217:3 222:22
 231:22 241:18
 243:3 250:7
**taken** 6:15 67:20
 117:24 124:1
 133:7 155:19
 176:24 217:6
 232:14 249:21
 255:16
**takes** 168:16
 181:25
**talk** 37:20,20,22
 58:18 100:7
 117:20 124:3
 132:3 150:3
 177:10 214:13

 222:6
**talked** 10:15 41:20
 77:18 123:13
 134:4 150:9
 151:24 166:2
 169:3 183:23
 184:14,24 194:19
 194:21 201:15
 208:8,22 211:12
 215:21 229:14,24
 253:7
**talking** 28:12 48:3
 55:1 105:11 143:9
 143:10 164:1
 168:18 176:1
 193:25 215:15
 243:13
**talks** 242:18
**tampa** 34:12
**tank** 144:10,13
 145:7 146:22
 148:1,2,3 160:15
 182:20 183:20
 188:2 203:8,17,18
 203:22 204:5
 244:25 245:2,24
 246:3,4,9 248:5,24
 249:1
**tanks** 4:13 147:19
 150:25 151:14
 161:12 185:2
**tap** 122:9 135:18
 205:22
**task** 47:17
**tautological** 72:14
 72:24
**tax** 177:24
**technical** 33:12,14
 194:12
**technique** 213:19

techniques   21:13
22:1 30:6 42:22
tell   19:8 23:9
29:22 32:5,22
34:8 69:16 83:1
90:23 92:2,6
93:20,20 102:23
112:4 125:2
144:24 147:16,20
149:15 154:2
164:6 174:22
179:10 191:12,24
192:5 193:7,22
195:13 196:1
198:5,14 204:14
215:8 217:17
222:13 226:22
246:24 250:12
telling   40:22 76:12
77:1 79:4,11
91:20 92:20 93:5
100:1 108:4
174:10 176:11
202:25 203:4,8
tenant   209:13,13
209:23
tend   152:12
tended   147:3
term   14:7 81:10
111:3 194:12
202:11,17,19
terms   25:5,9 80:17
120:22 192:10
215:24
terribly   174:4
194:25 195:1
245:1
terry   247:2,8,9
test   101:3,8 133:1
135:6,7 136:2,7,15
136:25 137:6

139:16,20,23
140:5,11,15
141:15,18 143:5
199:16 206:19
testified   7:22
114:7 232:19
testify   71:3 80:25
testifying   15:9
71:5 205:10
testing   4:8 62:6
67:5 136:21
137:15,20 139:9
tests   135:3,5,9,13
135:15,16 136:14
137:4,8,9 138:9,21
139:7 142:1,16
143:7,14
text   145:25
thank   14:17 15:3
182:16 242:14
250:3
theory   90:23 92:2
92:6,10 93:2
208:22 209:8
thing   23:25 40:24
46:17 48:12,20,21
48:23 49:1 88:8
113:8 141:4 202:1
212:10 214:17
232:8 236:4
243:19
things   23:6,8
24:12,23 25:17
54:24 78:3 85:15
93:24 118:10,15
118:20 144:6
150:25 173:7
185:2 192:13
200:9 206:11
213:20 216:3
225:5 229:15,16

244:4,7,25 246:14
248:2,12 250:6
251:12
think   9:16 12:7
13:9 15:8 16:3
17:2,8 24:6 27:5
29:12,15 31:4
44:20 48:25 49:24
50:7 53:23,23
54:16 61:17 63:19
64:11,15 65:10
66:21 69:25 72:14
72:14 73:2 77:6
83:3 90:1 91:17
91:25 92:14 94:20
96:6 98:19 101:6
104:2,8,20 105:12
106:6,20 107:1,23
107:24 108:1
113:12,22 116:15
120:20 124:14
125:9,24 126:1,3
126:14 130:11
134:4,5,19 137:24
138:5 142:4
145:16 146:7
153:3,9 154:1
157:19 158:10,25
161:25 164:8
166:2,10 167:14
168:24 171:6
172:1,20 173:14
173:18 175:1,3
176:15 177:19
178:8,12 179:19
180:1 182:15
184:17 189:8,20
191:22 193:9
195:3,21 197:12
200:21 202:2,7,7
202:16 204:19,20

207:17 209:7
212:5,20 213:14
214:10,22 215:5
216:20 217:18
218:19 220:8
224:9 229:5 232:3
232:18 237:11,18
238:8 239:10
240:23,24 248:18
250:4,21 252:9,10
third   148:19
238:22
thomas   235:19
236:6
thought   9:24
28:12 47:6 52:1
54:19 121:12
164:24 190:15
197:21 210:9
231:3 251:16
thoughts   117:14
thousand   85:4
108:9 182:11
184:1
thousands   188:3,4
threat   76:3,5
three   18:1 19:10
23:10 60:18
125:14
thursday   1:18
till   126:1
tim   17:19
time   6:5 8:21 16:1
33:8 47:8 49:11
49:14 52:12,15
55:18 62:20 65:10
67:17,22 80:10
97:5 103:25
105:11,13 107:11
117:22 118:1
121:19,20 128:7,9

128:11,17 130:14
131:12,16 134:5
152:17 155:17,20
159:6,7 162:1,4
163:10,15,24,25
164:21 171:18
173:7,8 174:25
175:4 176:21
177:4,17 178:7,16
181:19 182:5
183:2 184:17
185:14,17 186:2
186:22,23 187:7
189:10,16 204:10
206:11 213:13
217:4,7 218:7
248:14 249:19,24
250:3,20 253:20
**times** 29:3 37:12
66:25 106:21
107:1 159:8
204:18
**timing** 52:4
**title** 3:21
**titled** 4:8,14,17,23
**today** 6:4,20 8:5
8:11,13,20 15:18
59:5 62:15 175:10
175:13,14,21
184:6 186:25
187:9 250:4
**told** 43:22 62:15
64:6 78:14 95:23
174:17,20 195:4
204:22 216:21
**tomorrow** 187:1
**ton** 202:22
**top** 141:14 145:15
156:11
**topic** 16:4 21:15
82:2 97:6

**topically** 15:10
**topics** 15:8
**tort** 230:4
**total** 50:22,23
124:4,9 125:13
130:2 141:15
142:20 147:6
153:5,21 158:18
168:15 172:12
189:2 201:21
206:2 220:23
222:25 227:17,18
**totally** 150:2
168:17 239:1
**touched** 38:11
**town** 34:11 100:14
119:4 121:10
131:5 218:23,25
219:2,9,11,12,17
219:22 220:1,3,14
220:18 221:6,19
225:15,15 226:25
234:21 238:4
241:12 242:17,25
243:2,6 247:8
248:9,17
**town's** 222:14
242:12 247:10
**towns** 102:25
138:18 199:21
224:1 227:24
243:5
**trade** 216:11
**transaction**
210:13,14
**transactions** 41:22
215:23,24 242:10
**transcript** 254:3,5
255:8
**transcription** 8:10

**transmitted** 165:6
**treat** 53:9 55:10
77:23 115:17
228:3,13,17
**treated** 53:19 55:6
**treaties** 37:15
**treating** 53:7
**treatment** 112:17
**trend** 57:17 65:21
**trial** 36:9
**triangulated** 147:1
**tribune** 4:13
147:19,21
**tried** 38:17 139:6
**trillion** 88:22
232:2
**true** 12:20 13:25
16:11 37:9 44:21
47:1 49:20 95:4
104:2 130:25
157:12 179:25
197:16,18 198:12
211:4 213:14
220:9 228:21
239:10 241:20
255:7
**truth** 168:12,14,16
168:16,18 172:14
**try** 39:24 45:13
207:22 228:12
**trying** 46:11,17
47:13 48:12,14,15
48:20,22,23 49:2
128:24 167:20,21
167:24 169:22
171:10,14 172:24
177:16,18 186:23
189:12 190:23
191:5 204:20
207:5,7,8 234:2
240:23 243:3,21

249:11
**turn** 6:9 179:3
194:2 208:7
216:17
**turned** 114:17
**turns** 51:14
**twice** 159:6
**two** 26:6 38:10
41:17 47:7,8,10
66:23 93:24 94:1
104:15 122:18
128:18 133:2
138:18 152:25
159:22 162:20
199:15,21 219:4
225:15 228:3,4,13
228:14
**type** 117:9 180:24
181:8
**types** 138:7 185:21
186:12
**typical** 126:3
156:16 157:24
160:5,8,9,10
162:17 164:12
198:2 225:18,20
229:15,16 245:12
**typically** 20:14
22:6 23:3 24:17
30:21 37:22,23,24
41:22 42:12 44:9
46:5 48:1,2,4
53:12 91:3 126:14
134:7 135:19,20
135:23 136:1,9,10
146:2 159:21
163:5 192:17,18
245:9

[u - valuation]

**u**

**u** 223:22
**ultimate** 27:13
  29:6 67:2
**ultimately** 26:7
  58:22 61:7 64:7
  89:18 172:13
  215:18 241:1
  247:14 251:25
**unable** 86:4
  211:19 252:15
**unaffected** 62:18
**uncertain** 253:8
**uncertainties** 62:8
  62:10
**uncertainty** 58:6
  58:13
**uncommon** 194:24
**undercompensate**
  133:16
**undercompensat...**
  134:15
**undercompensat...**
  133:23 134:2
**underestimate**
  115:2,7
**underneath**
  221:25 227:16
**understand** 8:14
  9:23 14:7 20:16
  20:21 34:14 59:23
  61:1 72:5 73:5
  78:15 105:2,20,22
  121:2 137:25
  138:6 146:25
  159:20 182:15
  197:14 198:10
  199:13,18 212:5
  218:4 221:19
  248:8,25 250:6

**understanding**
  24:7 26:9 65:23
  81:2 89:11 103:9
  251:24
**understating**
  114:23
**understood** 28:8
  58:5 63:23 181:22
**undertake** 221:1,7
  241:5
**undertaken**
  234:19,20 235:5
  241:10,25
**unfortunately**
  214:5
**uniform** 197:9
**unimpeded** 75:23
**unique** 37:15
  112:12 116:4
  117:6 125:3
  136:13,16 137:12
**unit** 6:14
**united** 1:1
**units** 250:23
**unknown** 126:18
**unpack** 52:7 59:2
  61:10 240:23
**unreasonable** 68:4
  68:10,15,19 69:1
  69:21 70:3,25
  71:3,20 72:2
  80:22 178:6
**unreasonableness**
  70:7 73:10
**unsworth** 1:16 3:4
  3:11,13,14,16,24
  4:3 5:3 6:15 7:17
  8:2,3 10:2,6 11:1
  11:5 12:10 14:10
  14:14 17:11,15
  32:2,6 50:4 68:1

  69:4,6,10 87:3,9
  92:23 108:22
  111:24 118:5
  131:9 140:22
  144:18 147:11,17
  148:11 155:24
  156:5 177:2,9
  193:19,23 217:11
  222:7 226:17
  246:17 249:22
  250:3 254:21
  255:9
**unsworth's** 11:11
**unusual** 20:9
  21:12 38:23 41:19
  128:13 139:11
  192:25 220:18
  229:19
**upgrade** 248:13
**upheld** 64:5
**urls** 145:3
**urquhart** 2:7 7:12
**usage** 60:4 92:24
  118:11,16,21,22
  119:6,10,18 120:5
  122:18 127:14
  162:23,25 165:9
  167:3,3,8,10,17
  173:10,11 174:13
  177:13 181:23
  182:24 209:24
**use** 19:7 21:13,25
  52:9 59:7 62:5
  70:20 74:10 75:10
  75:23 76:6 80:12
  83:24 84:18 109:8
  111:3,6,8,9 120:15
  120:18,24 122:3
  123:11,19 126:18
  130:8 131:1,4
  133:15,24 134:7

  134:15 137:20
  139:16 142:23,25
  146:19 159:17
  166:17 167:25
  168:7,8 169:4,8,8
  169:24,25 170:9,9
  174:3 183:24
  184:18,18 188:5
  188:14 197:23
  201:11 203:5
  211:19 213:12
  218:5 219:10
  229:10 230:3
  241:22 242:19
  247:19 253:13
**useful** 49:13 50:19
  50:20 213:20
  246:10
**users** 97:9 124:2
  138:14 223:12
  224:21
**uses** 70:10,14,16
  72:1 73:14,22
  75:3,6,15,17 76:16
  77:3,13 78:19,24
  79:14 84:16 85:1
  85:3 242:11
**usually** 30:10
  48:10 137:18
**utilities** 138:23
  139:1 142:11
  143:10 206:17
  228:16,18
**utility** 108:5,24
  110:24 224:25
  248:17

**v**

**v** 1:10 32:16
**valuation** 21:10,12
  21:16 22:23 24:20

**value**  22:4,7 63:12
   64:25 75:15 77:2
   77:12 78:18 79:14
   84:18 85:8,11
   90:24 91:18,21
   92:4,8,16 93:1,19
   93:22 95:10 96:16
   104:9,10 115:8
   118:25 128:20
   131:18 148:9
   156:18 157:5,9
   165:16 172:3
   176:17 177:10,17
   183:4 184:11
   186:18 189:19
   197:9 208:19
   211:10,13,15,19
   212:2,12,14
   213:14 214:2
   216:4,13 245:11
**values**  22:2,20
   34:21,24 78:24
   79:18 84:15,22,23
   84:25 85:2,7
   92:11,12 94:5
   95:15,21 157:8
   212:10 213:16
**valuing**  23:6 93:25
**variability**  123:20
   127:4,13,16,17,19
**variable**  132:15,24
   133:2 137:22
   161:18,20,23,24
   162:3,10 188:11
   206:25 207:2,10
**variables**  172:10
   198:18,23 199:1,2
   199:4 204:21
   212:14 216:2
**variation**  80:13,16
   147:2,3 178:22

**variations**  133:8
**varies**  84:1 85:12
**variety**  115:6
   139:8 146:23
   150:21 187:21
   190:7 197:8
   200:16 201:3,5
**various**  21:23
   22:21 81:3 124:6
   167:25 169:3
   179:14 214:1,20
   218:22
**vary**  75:6,17 77:13
   77:25 78:1,2,4,8
   78:19 79:15,19,23
   80:3,5 82:4,10
   83:12 85:4,8
   86:22 121:20
   162:24 163:1,25
   182:3 184:20
   191:20
**varying**  66:5
   153:12 191:23
**vast**  98:19
**vastly**  163:17,21
   164:2
**vendors**  161:1
**verbal**  8:12
**veritext**  6:24,25
**vermont**  1:2 3:20
   4:7 6:19 17:20,21
   18:6 76:4 85:17
   96:20 135:11,12
   135:12 139:7
   141:4,24 164:17
   227:22 233:17
   243:4
**vermont's**  68:4
   137:12
**versa**  30:10

**version**  145:22
   179:11,20
**versions**  151:2
**versus**  6:17 32:8
   53:13 55:2 70:21
   70:22 74:4 80:10
   107:6,20 160:19
   165:24 168:6
   182:2 187:1
**vice**  30:10
**video**  2:15 6:11,14
**videographer**  6:2
   6:24 8:19 67:17
   67:21 117:22,25
   155:15,17,20
   176:21 177:4
   217:4,7 249:19,24
   253:20
**videotaped**  1:16
**view**  111:4 181:2
   215:6
**views**  80:25
**village**  220:19
   221:19 223:3,8
   224:17 225:15,24
   225:25
**virgin**  235:18
   236:7,8
**volume**  165:5
   180:5
**vsa**  68:2
**vt**  2:4

**w**

**w**  170:17 171:3
**wait**  9:4 79:5
   138:2 197:20
   228:10
**walks**  50:3
**wandering**  75:21
**want**  11:13 31:5
   40:15 43:11 48:10

53:3,5 54:20,21,21
   54:22 57:8 61:22
   93:10 98:3 117:15
   122:21 141:11
   169:6 170:16
   171:1,7 191:2
   198:6,8 211:4
   232:6 236:1
   249:18
**wanted**  92:21
   106:12,15 115:13
   170:21 178:15
   181:18 233:18
   246:4
**wants**  136:12
**wash**  88:2
**washer**  120:5,11
   131:11
**waste**  242:21
**water**  4:9,10,24
   18:7 33:4,4 34:19
   36:22 56:19 57:1
   59:25,25 60:4,7,8
   60:14 61:5,7,12,15
   61:22,25 62:5,23
   63:5 64:24 65:14
   67:9 70:16,21,23
   73:20 74:4,10,11
   75:10,18,24 76:1,6
   77:19,23 78:25
   79:2 83:8,23
   90:19 91:3,22
   92:24 93:19 94:5
   94:10,14 95:12,13
   95:16,17 96:2,9,11
   96:21 97:17,18,19
   98:4,4,15,17 99:2
   99:4,7,10,16,18,23
   99:25 100:6,10,11
   100:17 101:1,15
   101:16,20,21,22

**[water - witness]**

102:1,4,5,15 103:6
103:13,22 104:3
104:25 105:8,9,14
105:19,25 106:2
106:24,24 107:6,7
107:13,16,20,21
108:10,10,18,19
108:23 109:10,10
110:20,20 112:14
112:20,21 114:21
115:17 116:9,12
117:10 118:7,7,10
118:15,20 119:3,4
119:5,11 120:4,14
120:18,19,24
121:10,18 122:3,5
122:11,18 123:9
123:19 124:2
126:21 127:13
128:19 129:6,8,14
129:16,17,23
130:13,16,18
131:6,10 132:8,12
132:21,25 133:1,5
135:3,8,14 136:8
136:10,22 137:6
137:15 139:21
142:11 143:2,10
143:12 144:15
147:25 148:3
158:24 161:10
162:22,25 163:10
163:16 164:11,12
164:15,20,21
165:5,9 166:3,17
166:22 168:6,6
174:11,13 175:19
177:13 181:14,23
182:3,18,19,24
192:4,22 193:1
194:14 195:4,11

195:17 196:4,21
199:14,15 204:23
205:22,23,24,24
206:5,10 208:25
209:14,24 210:20
211:9,14,19,21
212:5,9,23 214:19
216:5,10 218:16
218:22,24 219:5
219:11 220:14,20
221:16,17,19,21
221:24 222:5,18
222:18,24,25
223:25 224:25
225:19 227:11
228:20 229:3,4,16
229:17,21,23
230:12,17,22,24
231:7,10,11,16,25
232:25 233:1,15
233:21,23 234:4
234:12,22 235:6,7
235:14,19 236:20
237:23,24 238:4
239:12 242:12,20
245:3 246:6
247:10,17 248:9
249:13,18 250:19
253:4
**waters**   224:8
**watershed**   225:19
243:7
**watersheds**   243:6
**way**   19:5 44:2
46:4,18 53:9
73:20 75:11 80:24
95:24 102:2 104:6
137:3 159:1,20
163:21 176:12
182:21 188:15
204:1,14 208:1

220:18 222:4
223:21 226:1,2
232:7 238:15
**ways**   132:18
187:21 200:16
201:3,5 222:1
228:24 241:15
**we've**   8:3 47:15
49:20 134:4
160:11 169:3
200:16 201:3,5,15
235:25 246:15
**website**   4:23 156:7
193:25
**websites**   146:24
**weekends**   251:12
**well's**   194:5
**wells**   56:5,8,18,22
58:2 60:9,12,21
61:8,12,14 62:7,17
62:17 66:4 75:22
85:24 86:3,7,23
87:25 88:21 96:13
100:16,17 102:10
104:21,24 150:24
152:18 172:22
173:25 174:3
199:15 211:9,18
215:7,9,10 216:11
231:25 237:11
**went**   176:15 219:6
**western**   57:10
**wet**   192:24
**whispering**   6:7
**wholly**   221:24
**whoops**   14:19
**wide**   158:11 160:5
**willing**   138:11
139:4 215:18,18
242:10

**willingness**   240:9
**wilson**   2:9 3:5
7:11,11,24 8:4
10:4 11:3,8,17,18
14:12,15 17:13,17
31:25 32:4 65:9
65:16 67:15,25
69:4,8 87:1,5
111:22 112:1
117:15,21 118:4
140:24 144:17,20
147:9,13 148:10
148:13 155:9,12
155:16,23 156:1
176:19 177:8
179:2 180:18,22
193:16,21 195:21
200:23,25 217:3
217:10 222:9
226:14,19 232:13
232:23 239:2,7
246:19 250:2
252:20 253:5,18
**wind**   153:5
**windfall**   236:22
237:12
**winds**   123:12
**wish**   247:19,24
248:17,19
**withdraw**   217:2
**withdrawal**   76:18
**withdrawn**   122:25
**withstand**   229:19
**witness**   7:9,18
10:3 11:2 14:11
17:12 25:6 33:19
33:21 36:3 65:13
79:8 155:13
180:16 237:21
253:23 254:1

**witnessing** 25:5
**wolff** 2:10 7:14,14
  117:19 155:11
**wool** 2:3 7:16
**word** 21:19 53:16
  53:17 124:9
**words** 78:16 231:6
**work** 20:8,9,11
  21:12 25:3,12,19
  25:23 26:10,11,18
  26:18,21 27:3,8,13
  27:17,23 28:3,4,5
  28:5,8,14,19 33:22
  36:20,21,23 38:10
  38:12,13 43:6,21
  50:6 120:22 122:2
  122:4 126:14
  147:7
**worked** 23:18,23
  31:13,19,22 32:11
  122:17 225:14
**working** 16:25
  33:11 39:11
  221:18
**works** 23:4 187:10
**world** 36:9 45:7
  45:11,13,20,21
  46:2,3,7,9,12,13
  46:20,22,23 47:3,4
  47:16,17 48:8,8
  167:6 194:25
  243:24
**worlds** 47:10
**worried** 226:8
**worse** 58:17
  237:12
**worth** 49:22,23
**written** 21:15 84:7
  84:9
**wrong** 39:10 53:16
  97:24,25 99:24

100:5 109:3 190:4
200:4 218:8,9,10
241:15
**wrote** 58:4 62:20
  67:12 149:3 180:8

---

**x**

**x** 1:4,14 3:1,9 4:1
  5:1 251:5

---

**y**

**y** 223:22 251:5
**yeah** 10:24 11:7
  15:23 17:25 24:17
  28:17 29:9,11,12
  29:21 31:12 35:20
  36:7 38:20 41:6
  43:4 48:10 51:22
  65:13 85:18 107:2
  113:6 114:8
  118:18 120:9
  141:17 145:21
  154:8,9 155:16
  156:8 157:3,24
  159:12,12 160:23
  173:18,24 178:21
  178:24 180:1,2
  195:14,21 204:19
  210:25 218:2
  243:1,14 251:1,23
  253:17
**year** 37:2 55:13
  91:10 92:21 93:1
  128:6 136:3,8,9,9
  136:14,22,22
  137:19 141:16
  149:22 151:22
  152:22 153:20
  163:23 166:24,25
  170:13 173:3
  177:14 182:1,13
  182:18,19,20

183:9,11,12,21
184:9,19 185:6
186:8 189:9,10
193:13 200:14
202:17 203:10
240:20
**year's** 121:18
**years** 21:2 55:5,10
  56:21,21 57:3
  91:12,22 92:1,1,24
  98:22 103:3 128:4
  128:15,20 136:15
  141:19,20 149:16
  160:14,16 161:16
  167:6 170:4,14,23
  176:6,9 182:12
  183:2 184:1 187:3
  191:16 194:6
  203:19 204:4
  247:10
**yield** 178:11 195:5
**yielding** 185:21
  186:12
**york** 2:8
**youngston** 223:21

---

**z**

**zillow** 22:14
**zone** 57:11 236:18
  253:3

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.