# EXHIBIT 88

                                        Page 1

1           UNITED STATES DISTRICT COURT

2               DISTRICT OF VERMONT

3    - - - - - - - - - - - - - - - - - - - - x

4    JAMES D. SULLIVAN, et al., individually and on

5    behalf of a class of persons similarly situated

6         Plaintiffs

7    vs.                        CA No. 5:16-cv-00125

8    SAINT-GOBAIN PERFORMANCE

9    PLASTICS CORPORATION

10        Defendant

11   - - - - - - - - - - - - - - - - - - - - x

12

13    VIDEOTAPED DEPOSITION of ROBERT E. UNSWORTH

14     Thursday, September 27, 2018 - 9:37 a.m.

15               Sugarman & Sugarman

16               800 Boylston Street

17               Boston, Massachusetts

18

19

20   Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR

21

22

23

24

Page 2

1    APPEARANCES:

2

3    Langrock, Sperry & Wool, LLP

4        Emily J. Joselson, Esq.

5        111 S. Pleasant Street

6        Middlebury, Vermont 05753

7        802.388.6356

8        ejoselson@langrock.com

9        Counsel for plaintiffs

10

11   Dechert LLP

12       Lincoln Wilson, Esq.

13       Rory Gledhill, Esq.

14       Three Bryant Park

15       1095 Avenue of the Americas

16       New York, New York 10036-6797

17       212.698.3500 | 212.698.3599

18       lincoln.wilson@dechert.com

19       rory.gledhill@dechert.com

20       Counsel for defendant

21

22   Also present:  Trevor Phillips

23

24   Videographer:  Gayle Ashton

Page 3

1              I N D E X

2

3   WITNESS:

4

5   ROBERT EDWARD UNSWORTH

6        Examination by Mr. Wilson        8

7

8

9               E X H I B I T S

10

11   Exhibit 1   Expert Statement of Robert E.        5

12              Unsworth

13   Exhibit 2   Expert Statement:  Monetary          5

14              Damages, Robert E. Unsworth

15   Exhibit 3   Expert Statement:  Rebuttal          5

16              of Expert Report Provided by

17              Dr. Charles Mullin

18   Exhibit 4   Expert Statement:  Rebuttal          5

19              of Expert Reports Provided by

20              Dr. Thomas O. Jackson and

21              Trevor E. Phillips

22   Exhibit 5   Deposition transcript of            11

23              Robert Unsworth, 3/29/18

24   Exhibit 6   Expert Report of Charles            45

Page 4

1              Mullin, Ph.D.

2   Exhibit 7   Article, March 2009 -              152

3               Identifying, Scaling, and

4               Evaluating Groundwater

5               Restoration Projects as

6               Compensation for Groundwater

7               Injuries

8   Exhibit 8   Document                          248

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                P R O C E E D I N G S

2

3                    (Exhibits 1-4 marked for

4    identification.)

5

6                    THE VIDEOGRAPHER:  Good

7    morning.  We are going on the record at

8    9:37 a.m. on September 27, 2018.

9                    Please note, the microphones are

10   sensitive and may pick up whispering or private

11   conversations.  Please turn off all cellphones

12   or place them away from the microphones, as they

13   can interfere with the audio.

14                   Audio and video recording will

15   continue to take place unless all parties agree

16   to go off the record.

17                   This is Media Unit 1 of the

18   video-recorded deposition of Robert E. Unsworth,

19   taken by counsel for the defendant, in the

20   matter of James D. Sullivan, et al., versus

21   Saint-Gobain Performance Plastics Corporation,

22   filed in the United States District Court for

23   the District of Vermont, Civil Action

24   No. 5:16-CV-00125-GWC.

Page 6

```
 1                  This deposition is being held at
 2   Sugarman & Sugarman, 800 Boylston Street,
 3   Boston, Massachusetts.  My name is Gayle Ashton,
 4   from Veritext, and I am the videographer.  The
 5   court reporter is Jill Ruggieri, from Veritext.
 6                  I am not authorized to
 7   administer an oath.  I am not related to any
 8   party in this action, nor am I financially
 9   interested in the outcome.
10                  Now counsel and all present in
11   the room will state their appearances and
12   affiliations for the record.
13                  MR. WILSON:  Lincoln1 Wilson
14   with Dechert LLP for Saint-Gobain Performance
15   Plastics Corp.
16                  MR. GLEDHILL:  Rory Gledhill
17   from Dechert LLP for Saint-Gobain.
18                  MR. PHILLIPS:  Trevor Phillips
19   with Alvarez & Marsal.
20                  MS. JOSELSON:   Emily
21   Joselson, Langrock Sperry & Wool, for the
22   plaintiffs.
23                  THE VIDEOGRAPHER:  Will the
24   court reporter please swear in the witness.
```

1              ROBERT EDWARD UNSWORTH, a

2    witness having been duly sworn, on oath

3    deposes and says as follows:

4

5              MS. JOSELSON:  So I just

6    wanted to place on the record, as I said

7    before we started the depo, I'm sure that

8    this will not be a problem, but I wanted to

9    make sure all parties were mindful of the

10   terms of the August 17, 2018 Third Amended

11   Discovery Order, which indicates that the

12   depositions of plaintiffs' rebuttal witnesses

13   will be limited to the opinions in their

14   August 1, 2018 reports.

15              The parties shall not use the

16   rebuttal depositions to reexamine the same

17   witnesses on matters already examined in

18   their initial depositions, except that the

19   depositions may inquire into opinions

20   previously offered only to the extent

21   reasonably necessary to explore opinions

22   stated in the August 1, 2018 reports.

23              MR. WILSON:  Thank you, Emily.

24

Page 8

1                    EXAMINATION

2    BY MR. WILSON:

3         Q     Good morning, Mr. Unsworth.

4         A     Good morning.

5         Q     Just for the record, would you

6    please state your full name.

7         A     Robert Edward Unsworth.

8         Q     Now, this is neither your first

9    rodeo, nor mine, and nor even our first rodeo

10   together, so I know you're very familiar with

11   the rules of the deposition.  But just for

12   the record, I'm going to go over them.

13        A     Okay.

14        Q     You're under oath today, and it's

15   important that you give verbal answers to all

16   the questions that I ask so that the court

17   reporter has a clear record.

18                  And you may often find that

19   you know where I'm going with a particular

20   question and you can anticipate it, but I ask

21   for the court reporter's sake that you wait

22   until I finish with the question before you

23   provide a response.

24                  Is that clear to you?

```
 1      A    Yes.
 2                (Pause.)
 3      Q    And I've also -- the court reporter
 4  has handed you what's been premarked for
 5  identification as Exhibits 1, 2, 3 and 4.
 6                Can you tell me what these
 7  are?
 8                (Deponent read the documents.)
 9      A    So they appear to be accurate
10  printouts of my four expert statements in
11  this matter, including the two rebuttal
12  opinions.  I'll take it from you these are
13  accurate printouts of what I provided.
14      Q    I'm willing to represent that they
15  were printed off at the Westin Business
16  Center this morning.
17      A    Okay.
18      Q    And so just to be clear, Exhibit 1
19  is what I'd like to call, for convenience,
20  your "class certification" report; is that
21  correct?
22      A    That's fine, if you want to call it
23  that, sure.
24      Q    And your Exhibit 2 is what we
```

1   referred to before as your "merits" report?

2        A    Yes, it has some of the -- much of

3   the same material in it, but yes.

4        Q    And Exhibit 3 is your rebuttal to

5   the opinion of Dr. Charles Mullin?

6        A    Yes.

7        Q    I'm going to refer to that either

8   as the "Mullin rebuttal" or as the

9   "groundwater rebuttal," or maybe the

10  "groundwater report," in the course of the

11  deposition.

12              So just so you know, if I

13  refer to that report, that's what we're

14  looking at.

15       A    Okay.  "Mullin rebuttal" is

16  probably clearer, but yes.

17       Q    Yes.

18              And the last report is your

19  rebuttal to the opinion of Dr. Thomas Jackson

20  and Trevor Phillips, and this is what I'm

21  going to be referring to as the "property

22  rebuttal" or the "property report."

23       A    That's fine.

24       Q    Okay.

1                    So are all of the reports that
2    you've offered in this matter true and
3    complete, to the best of your knowledge?
4         A    Yes.
5         Q    Is there anything that you need to
6    change about these reports before we start
7    today?
8         A    No.
9         Q    So as an icebreaker today, for the
10   benefit of Mr. Phillips, since he wasn't here
11   last time, I wanted to read a line from your
12   deposition transcript, and if you'd like
13   to --
14                    MR. WILSON:  Let's actually
15   get that out.
16                    This will be Exhibit 5.
17                    (Exhibit 5 marked for
18   identification.)
19                    THE DEPONENT:  They must love
20   you at the Westin Business Center.
21   BY MR. WILSON:
22        Q    We did that one in-house.
23        A    Okay.
24        Q    So what's been handed you for

1    identification as Exhibit 5 --

2                    MR. WILSON:  Emily, here is a

3    copy for you.

4                    MS. JOSELSON:  Oh, good.

5    BY MR. WILSON:

6        Q    Can you tell me what this is,

7    Mr. Unsworth?

8        A    It appears to be my deposition from

9    March of this year; and I'll accept, if you

10   say that's so, that that's the case.

11       Q    So if you would turn to page 93 of

12   the deposition transcript.

13                    I'd like to read you an

14   excerpt beginning on line 17:

15                    "Question:  And if a local

16   real estate appraiser in Bennington said no,

17   the cost of municipal water, that's not going

18   to discount the value by that much, would you

19   tell that real estate appraiser that your

20   model was a better description of the effect

21   on value than his?

22                    "Ms. Joselson:  Objection.

23                    "Answer:  I would say two

24   things:  One is yes, economists do a better

1   job valuing homes than appraisers do; and

2   two, not that much.  It says in my report

3   that it's around seven percent.  So that

4   statement actually may be correct."

5               Did I read that correctly,

6   Mr. Unsworth?

7       A    You did.

8       Q    Why is it that you think economists

9   do a better job valuing homes than appraisers

10  do?

11      A    I would say that economists tend to

12  use larger data sets which have greater

13  statistical validity than appraisers do.

14               I would say that economists

15  tend to rely on more objective measured

16  criteria rather than subjective criteria.

17               And so if I were, for example,

18  trying to measure how an attribute in a home

19  contributes to its price, I, as an economist,

20  would prefer my methods to those that are

21  sometimes used by appraisers.

22               Although I will say that a lot

23  of the methods we use are the same methods

24  appraisers use.

```
 1        Q    In this case, you've attempted to
 2   quantify the actual economic costs that you
 3   believe that the plaintiffs have incurred
 4   from the switch to municipal water, and you
 5   have, as an economist, capitalized that into
 6   the value of their homes; is that correct?
 7                  MS. JOSELSON:  Object to the
 8   form.
 9        A    So I guess I would call it a
10   financial cost, and it's a cost that they
11   will be incurring, and I think most of that
12   hasn't occurred yet, so...
13        Q    But you -- you testified that
14   it's -- that will be capitalized into the
15   value of their homes; is that correct?
16        A    My expectation would be that, as a
17   cost item on the home, a change in the cost
18   item on the home, that that would be
19   capitalized into the value of the home.
20                  And that's actually consistent
21   with appraisal methodology as well.
22        Q    And, as you mentioned -- so would
23   you say that your opinion on the
24   capitalization of those costs represents a
```

1   better and more accurate objective picture of

2   the diminution in property value than the

3   opinion of an appraiser would in these

4   circumstances?

5       A    So are we limiting this to just the

6   effect of the increased cost of operating --

7   of -- the comparative cost of being on a

8   municipal system versus being on a well?

9               Is that the piece you're

10  referring to here?  Because that's what we

11  were discussing in this part of the

12  deposition, was how the increased cost of

13  owning a home would be capitalized in its

14  value.

15      Q    I'm wondering if -- so the scope of

16  your initial opinion in this case was

17  directed at calculating groundwater damages;

18  is that correct?

19      A    The -- the scope of my opinion was

20  to look at added costs and replacement costs

21  for the fact that the groundwater is

22  contaminated in Bennington.

23              I believe this section of my

24  deposition is asking the question, would a

1   rational buyer of a home incorporate a change

2   in the cost of owning that home into their

3   price, so would it be capitalized in the

4   price.

5                   And I testified that I think

6   it would, as well as other cost items, as

7   well as other attributes of the home; and

8   that I felt that economic methods would do a

9   better job of measuring that than a simple

10  appraisal, as long as the appraiser is also

11  not applying a hedonic analysis or other

12  techniques that economists apply.

13      Q     So when you said in this deposition

14  excerpt that "it says in my report that its

15  around seven percent," were you saying that

16  you believe that the average diminution in

17  value per class member is seven percent?

18      A     No.

19                  What I said was, I felt that

20  it appears that the average increase in cost

21  is about seven percent of the home value in

22  Bennington.

23                  So I was saying that I would

24  expect to see something on the order of that

Page 17

1   regarding the increased cost of municipal

2   water, all else equal.

3        Q    Let's turn to Exhibit 3, which is

4   your groundwater/Mullin rebuttal, and take a

5   look at page 15.

6                 So at the beginning of the

7   first full paragraph, it says, "From my

8   analysis, I am interested in accounting for

9   actual costs incurred."

10                Did I read that correctly?

11       A    That's correct.

12       Q    And this section of your report is

13   talking about testing of wells; is that

14   correct?

15       A    Talking about whether residents

16   would test their wells for certain

17   constituents or characteristics.

18       Q    And so as you were evaluating which

19   tests to include in your valuation, you

20   wanted to include the tests that residents

21   actually perform?

22       A    That's correct.

23       Q    Now, if you take a step back to

24   page 13 of this report, the second bullet of

1    that page says, "Dr. Mullin assumes an annual

2    bacteria testing expense ($14) for all

3    Bennington and North Bennington residents

4    relying on well water.  Since not all

5    residents actually do this test, I assume

6    that this test is only purchased by a portion

7    of private well owners each year."

8                   Did I read that correctly?

9         A     You did.

10        Q     And when you say that "not all

11   residents actually do this test," that

12   implies that some do; is that correct?

13        A     That's correct.  I have assumed

14   that some do, yes.

15        Q     And since you purport to look at

16   the actual costs incurred by the class

17   members, we need to know which and how many

18   of the residents do that test, don't we?

19        A     We need to know how many do it.  We

20   need to have an opinion on how many residents

21   do that, as I calculate my damages to the

22   class.

23        Q     And if we were ultimately going to

24   determine which damages should be awarded to

1    which class members, you would need to know

2    which ones do as well; is that correct?

3         A    You might include that in the

4    formula as you're allocating the damages,

5    yes.

6         Q    Would it be fair to an individual

7    who did not have this test done to receive

8    compensation as though they had had this test

9    done?

10                   MS. JOSELSON:   Object.

11        A    So this is a cost associated with

12   owning a well; and so if a person did not

13   incur this cost, it would mean that municipal

14   water -- the cost of moving municipal water

15   is slightly smaller.   In this case, you know,

16   very much slightly.

17                   And so it -- it -- if you

18   weren't to include that in your allocation

19   scheme, then it -- then your allocation

20   scheme could be incorrect, depending on how

21   you set up the rest of the allocation scheme.

22                   There's various ways you could

23   do the allocation that may render that moot.

24        Q    So let's take a step back over to

                                        Page 20

1   page 15 of this report again and look at the

2   first full paragraph.

3                   The third sentence says, "For

4   example, from January 2011 to January 2018,

5   the Vermont Department of Health recorded

6   about 12,000 samples tested for E.coli.  Only

7   two percent of those samples that were

8   sourced from private wells found presence of

9   E.coli.  Even if the presence of E.coli were

10  detected, the next step would be additional

11  testing and/or sampling to confirm the

12  presence."

13                  Did I read that correctly?

14      A    That's correct.

15      Q    Now, the frequency with which

16  E.coli was detected in wells in this study,

17  that doesn't say anything about how

18  frequently the testing was performed, does

19  it?

20      A    No, but the number of samples does,

21  relative to the number of wells in Vermont.

22      Q    And you didn't analyze the

23  frequency of testing and how often it would

24  be performed in this class, did you?

                                                              Page 21

1       A    I wouldn't say that's true.  I said

2   we looked at how often these tests -- how

3   many of these tests are requested.  We looked

4   at how many private wells there are in the

5   state; and at least in the case of radon, I

6   believe, I think we had the numbers for the

7   county.

8       Q    Does your report provide a number

9   how frequently E.coli testing was done in

10  this putative class?

11      A    It does get entered into my -- my

12  estimate of damages, yes.

13      Q    Doesn't it get entered by not

14  including that test?

15      A    No.

16           If you turn to the calculation

17  of damages, I made assumptions about the

18  proportion of the population that would --

19  that would do this test, that would purchase

20  this test each year.

21      Q    Can you point me to that in your

22  report?

23      A    I would also say, this is getting

24  into the original deposition.  This is --

1   this isn't new material.

2       Q    Since your rebuttal report also

3   addresses testing, we believe that your

4   original opinions are relevant for purposes

5   of this.

6             MS. JOSELSON:  I'm just going

7   to put again on the record, that the extent

8   the questions overlap questions that have

9   already been asked in the first deposition,

10  we will note our objection and may be seeking

11  relief from the court in terms of the costs

12  incurred in those repetitive questions.

13      A    So if you turn to page 13 of my

14  December 15, 2017 report, which I think you

15  referred to as the "merits" report, there's

16  an exhibit, and in that exhibit, there's a

17  line item for annual bacteria test.

18      Q    And so how did you calculate that

19  $14 line item for the annual bacteria test?

20            MS. JOSELSON:  Again, asked in

21  the original deposition.  We believe this is

22  repetitive.

23            You can answer.

24      A    That is the price that the State of

1   Vermont charges for that kit.  They send

2   out -- they send -- if you're a resident of

3   Vermont, you can order a kit, and they send

4   you a tube and you put water in it and submit

5   it.

6        Q    So your line item doesn't actually

7   address the frequency?  It just assumes that

8   everyone who did use a water softener will

9   have this test performed; is that correct?

10        A    This was asked and answered at

11   length in the last deposition.  It's not a

12   new opinion.

13        Q    I don't believe these questions

14   were --

15        A    It's not a new opinion to this

16   deposition.

17        Q    It's relevant to this deposition

18   because you're offering testimony in your new

19   report about these E.coli bacteria tests, and

20   it's important to understand your methodology

21   for evaluating the frequency with which those

22   tests are done.

23                It's integral to your opinions

24   in this case.

 1               MS. JOSELSON:  Again, I hope

 2    we're not going to have a problem throughout

 3    this deposition; but to the extent all of

 4    this was set forth in and inquired into in

 5    his merits and class deposition, revisiting

 6    questions about methodology that have already

 7    been testified to are beyond the scope of

 8    this deposition.

 9               MR. WILSON:  Emily, they're

10    not beyond the scope in any respect.  It's

11    necessary -- when the witness has served four

12    reports in this case, it's necessary for us

13    to understand how those reports interact with

14    one another, whether they're consistent with

15    one another, whether the methodologies that

16    Mr. Unsworth is espousing in these latter

17    reports fit with the ones in his original

18    reports, whether they've modified the

19    methodologies in those original reports.

20               Given the volume of the work that

21    Mr. Unsworth has done, I think we should be

22    allowed significant latitude in asking these

23    kind of questions, and I'm happy to take the

24    issue to Judge Crawford, because I don't think

1   he's going to appreciate your efforts to

2   obstruct our inquiry into the new opinions

3   Mr. Unsworth has offered in these rebuttal

4   reports.

5                   MS. JOSELSON:  You are

6   certainly entitled to ask him questions about

7   methodology utilized in his rebuttal reports.

8                   Asking him questions about

9   methodologies utilized in his method and

10   class reports is clearly inappropriate under

11   the amended discovery order and we believe is

12   pursued in bad faith.

13                   MR. WILSON:  That is patently

14   false, given the terms of the amended

15   discovery order, which allow inquiry into the

16   original opinions, provided they are

17   reasonably related to the opinions in the

18   rebuttal report.

19                   MS. JOSELSON:  Only as

20   necessary.  Only as necessary.  You do not

21   have free reign to reask questions that were

22   asked in the first deposition.

23                   MR. WILSON:  I don't think

24   this question was asked in the first

1    deposition; but even if it were, it's

2    relevant to understanding how it interacts

3    with Mr. Unsworth's current opinions.

4                    Now, unless you would like to be

5    here until the wee hours of the morning, I

6    suggest that we proceed with this deposition so

7    I can ask these questions and develop these --

8                    MS. JOSELSON:  And I would ask

9    that you comply with the terms of the amended

10   discovery order, and I'll take in good faith

11   your intention to do so.

12   BY MR. WILSON:

13       Q    So your line item for bacteria

14   tests here assumes that everyone will take

15   the test, not that only some will; is that

16   correct, Mr. Unsworth?

17       A    No, that's incorrect.

18                    The table I pointed to in

19   Exhibit 2 has a portion of the population

20   assumed to use that test, and what I used was

21   an estimate of the portion of the population

22   and which portion of the population is most

23   likely to do that test.

24       Q    So you assume that everyone who had

1   a water softener will take the bacteria test?

2        A     Yes, I do, yes.

3        Q     Is that supported by or consistent

4   with your statement here about the number of

5   samples tested for E.coli in the Vermont

6   study that you state in your rebuttal report?

7        A     When you say "here," can you point

8   me to where "here" is?

9        Q     Page 15 of your rebuttal report

10  offers data that concern the frequency with

11  which that E.coli test is performed.

12       A     That's right.

13             So the State of Vermont had

14  given us an opinion on what portion of the

15  population they think would get this test.

16  In this report, I provide more detail on it.

17             It appears the proportion is

18  actually lower, so my cost estimate for

19  owning a well may be slightly high, but I

20  stand by the original estimate as a

21  reasonable estimate, so...

22       Q     So, to be clear, your rebuttal

23  report is providing more detail about

24  opinions in your merits report; is that

1  correct?

2              MS. JOSELSON:  Object.

3      A    No.  My rebuttal report is

4  contradicting the assumption that Dr. Mullin

5  makes in his report.

6      Q    Did you just tell me that your

7  rebuttal report is providing more detail

8  about the opinions in your merits report a

9  few moments ago?

10     A    It's providing more detail about

11 the proportion of the population that likely

12 tests for bacteriological contamination each

13 year.

14     Q    So it would be proper for me to ask

15 you about your merits report, then, wouldn't

16 it?

17     A    I'm not a lawyer, so I'll let you

18 figure that out.

19     Q    Okay.

20              So if the State of Vermont

21 says that some people did the E.coli testing,

22 on what basis did you include that all people

23 with a water softener will do the E.coli

24 testing?

```
 1       A    I wanted to be conservative in
 2   terms of my assumptions about who would do
 3   it.
 4                 So based on the depth of well
 5   you would expect with a water softener, and
 6   based on the fact that you are spending time
 7   with your water system when you own a
 8   softener, I made the assumption that people
 9   would get the test if they did that.
10       Q    But you don't know who did --
11   within the putative class who did this
12   bacterial test, do you?
13                 MS. JOSELSON:  Object.  Asked
14   and answered in the first depo.
15       A    Yeah, I think I know -- I think I
16   have a good estimate of the proportion that
17   would have done it, and I think I have an
18   assumption about which portion of the
19   population would have done the test.
20       Q    But you don't know which specific
21   individuals did the test, do you?
22       A    I did not survey specific
23   individuals.
24       Q    Or who did additional tests because
```

1    the presence of E.coli was detected; is that

2    correct?

3         A    Right.  You would normally do the

4    same test.  You would resubmit it to see

5    whether you contaminated the sample when you

6    were taking it or something like that, but it

7    would be the same test.

8         Q    And you don't know who did those

9    additional tests, do you?

10        A    No.

11        Q    And you didn't try to find out?

12        A    No.

13        Q    On page 15 of your rebuttal report,

14   in the last paragraph of the page, third

15   sentence, referring to radon tests, it says,

16   "However, most residents do not do this

17   test."

18                  Did I read that correctly?

19        A    That's correct.

20        Q    So some do incur this -- the cost

21   for this test; is that correct?

22        A    It's possible some do.

23                  I mean, typically, in this

24   part of the world, you might do that test

1   when you sell your home.  Radon is a

2   persistent issue, so you wouldn't typically

3   expect it to arise over time, so you might do

4   it when you purchase a home.

5                   You might -- the resident

6   might actually not pay for it.  The

7   inspector -- it might be included in the

8   inspection, or the buyer may do the test,

9   but...

10        Q    Do you know which residents did

11   this radon test?

12        A    I did not survey residents who did

13   this test, no.

14        Q    Turn to page 16 of your groundwater

15   rebuttal report.

16        A    I want to point out, I do know that

17   a very small proportion of private wells in

18   Vermont are tested for radon each year,

19   extremely small proportion.

20        Q    So if you turn to page 16 of your

21   report, in the second full paragraph, halfway

22   through the second sentence, it says, "We

23   would expect this leaves us with no more than

24   1.4 percent of well owners who tested their

1   wells for inorganics, gross alpha levels or

2   radon in 2017."

3              Did I read that correctly?

4   A   You did.

5   Q   So 1.4 percent of Vermont residents

6   did incur the actual cost of tests for

7   inorganics, gross alpha levels or radon; is

8   that correct?

9   A   It appears that's the case, yes.

10  Q   And you didn't try to find out

11  which residents in the putative class did

12  that test, did you?

13              MR. JOSELSON:  Objection.

14  Asked and answered.

15  A   The purpose of this paragraph is to

16  contradict Dr. Mullin's belief that all

17  individuals performed this test, which is

18  clearly not true, based on this percentage.

19  Q   Where in Dr. Mullin's report does

20  it say that he believes that all individuals

21  do this test?

22  A   He applies it to the same 20

23  percent that I have who are getting the

24  E.coli test.

                                                Page 33

1        Q     Doesn't that, in fact, reflect a
2    different methodology about which tests
3    should be used in evaluating -- I'm sorry,
4    about whether recommended tests as opposed to
5    actual tests should be used in the
6    methodology?
7        A     No, it -- the State recommends a
8    certain testing frequency for certain
9    constituents or characteristics, but he
10   simply applies it to the same 20 percent that
11   I assumed did the E.coli test.
12                    In his math, that's what he's
13   doing.
14       Q     So as a purported expert in this
15   matter, your goal is to offer a scientific
16   opinion in this case; is that correct?
17                    MS. JOSELSON:  Object to the
18   form.
19       A     Leaving aside "purported," yes.
20       Q     And scientific opinions should be
21   rigorous; is that correct?
22       A     I think opinions should be based on
23   reasonable information that can be
24   objectively reviewed by a trier of fact.

1      Q      And they should be accurate?

2      A      They should try to be accurate,

3   yes.

4      Q      And if you are responding to

5   conflicting opinions or theories with regard

6   to the matters in your expert opinion, you

7   have to make sure that you characterize them

8   accurately; is that correct?

9      A      I think you would try to

10  characterize things correctly, yes.

11     Q      It wouldn't be scientific to use a

12  straw man mischaracterization of the other

13  side's argument, would it?

14               MS. JOSELSON:  Object to the

15  form.

16     A      I don't even know what that means.

17     Q      To mischaracterize your opponent's

18  argument in order to defeat it, that wouldn't

19  be a proper thing for a scientist to do,

20  would it?

21               MS. JOSELSON:  Object to the

22  form.

23     A      I don't think I am

24  mischaracterizing his argument.  I'm just

```
 1   taking the calculations he performed and

 2   critiquing them.

 3        Q    But as a general matter, you agree

 4   that it's not appropriate to mischaracterize

 5   an opponent's argument; is that correct?

 6        A    I would -- I would agree that

 7   Dr. Mullin in several cases mischaracterizes

 8   my arguments, so...

 9        Q    I didn't ask you that question.

10                  I'm asking you whether it is

11   proper to mischaracterize an opponent's

12   argument for purposes of defeating it.

13                  MS. JOSELSON:  Object to the

14   form.

15        A    I would say it would be

16   inappropriate to mischaracterize an argument

17   for any purpose, so...

18        Q    So I'd like you to take a look at

19   page 4 of your groundwater rebuttal.

20        A    So this is the Mullin report?

21        Q    Yes.

22        A    Okay.

23        Q    And if you look at the fourth

24   bullet down, the end of that bullet says, "In
```

1  short, Dr. Mullin finds contamination of

2  groundwater in Bennington has" -- in

3  italics~-- "benefited the community."

4              Did I read that correctly?

5      A    You did.

6      Q    That's a mischaracterization of

7  Dr. Mullin's opinion, isn't it?

8      A    Absolutely not.

9      Q    Where in his report does he say

10 that he believes groundwater contamination in

11 Bennington was a benefit to the community?

12     A    Well, he -- he believes that the

13 cost of owning -- of being on municipal water

14 is cheaper than being on a well, and so he

15 believes those individuals have financially

16 benefited.

17              He believes that the community

18 water systems will benefit from the

19 additional customers they're going to have,

20 and so he -- he states that that's going to

21 be a benefit, and that -- that is the

22 totality of his analysis.

23     Q    So I noticed in that answer, you

24 didn't mention contamination being a benefit.

Page 37

```
1                    Is that because Dr. Mullin

2    doesn't say that contamination is a benefit

3    to the community?

4         A    I think Dr. Mullin actually

5    doesn't -- he doesn't straightly acknowledge

6    that the groundwater is contaminated.  He

7    states that it's "purported," I believe, is

8    the terminology he used.

9         Q    But I'm asking you, is there any

10   point that you can identify in Dr. Mullin's

11   report where he says that contamination is a

12   benefit to the community?

13        A    I would say that that is the

14   inference you would draw from his -- from --

15   just as you would draw from my report that

16   the contamination has been a harm to the

17   community financially.

18        Q    So that's your inference; it's not

19   his statement.

20                   MS. JOSELSON:  Object to the

21   form.

22        A    I stand behind my statement based

23   on his report.

24        Q    Doesn't Dr. Mullin, in fact, say
```

1  that the remedies that Saint-Gobain has

2  agreed to fund have removed any alleged harm

3  that may have occurred for the vast majority

4  of proposed class members?

5       A    Sure.  We're both considering what

6  the harm will be beyond the remedy that's

7  been offered, so we're both doing that.

8       Q    So Dr. Mullin says that the remedy

9  has benefited the community, and you accuse

10  him of saying that the contamination has

11  benefited the community; is that correct?

12                 MS. JOSELSON:  Object to the

13  form.

14       A    No, I -- I would not -- if he says

15  that the remedy has benefited the community,

16  that's incorrect.  The community was faced

17  with a groundwater problem, and the remedy is

18  necessary to -- to address the health risks

19  of it.

20                 There's no benefit there.

21  That's just putting people back to --

22  hopefully back to where they were prior to --

23  to the event.

24       Q    I'm not asking about your appraisal

```
 1   of the accuracy of his methodology.  I'm
 2   asking about whether you've even fairly
 3   stated what his opinion is.
 4                Because you said that he's
 5   saying the contamination has benefited the
 6   community; and, in fact, his opinion is that
 7   remediation has benefited the community.
 8                Isn't that correct?
 9                MS. JOSELSON:  Object to the
10   form.
11       A    I think that's a painful
12   reinterpretation of what he said.
13       Q    Do you believe that a direct quote
14   from his report is a painful reinterpretation
15   of what he said?
16       A    I think you have to take his report
17   as a whole, not single sentences in it.
18       Q    So as a whole, you've read his
19   direct statement that remediation has
20   benefited the community as saying that
21   contamination has benefited the community?
22       A    I think that Dr. Mullin needs to
23   stand by his own report and what he wrote
24   originally, so...
```

```
                                        Page 40
 1        Q    I think that you need to stand by
 2   your report.
 3                  MS. JOSELSON:  Object.
 4        A    I -- yeah.  Can we go on a break?
 5   Can we go off the record?
 6                  MR. WILSON:  We can do that.
 7                  THE DEPONENT:  That's
 8   combative and unnecessary, so don't do that.
 9   It will take a lot longer --
10                  THE VIDEOGRAPHER:  The time is
11   10:14.  We are going off the record.
12                  (Recess.)
13                  THE VIDEOGRAPHER:  We are back
14   on the record.  The time is 10:16 a.m.
15   BY MR. WILSON:
16        Q    So in your merits report, you
17   opined that residents of the Village of
18   North Bennington who used a water softener
19   actually benefit by about $65 a year from the
20   switch to municipal water; is that correct?
21        A    I said they have a financial
22   savings as it relates to the cost of
23   obtaining water in the household.
24        Q    Was that opining that those
```

1    residents had benefited from the

2    contamination?

3         A    No.

4         Q    Or that they had any kind of

5    financial savings from the contamination?

6         A    No.

7         Q    So in that case, you, like

8    Dr. Mullin, concluded that the switch to

9    municipal water, at least for some people,

10   could provide a benefit; is that correct?

11        A    What I said is that there would be

12   a cost-savings to them.  It doesn't

13   incorporate -- the -- the rest of my report

14   considers other categories of loss, and there

15   are also other witnesses who are considering

16   other categories of loss.

17        Q    But --

18        A    So I would not -- I would not

19   characterize that I found a benefit to those

20   individuals of the contamination.  I found a

21   financial cost-savings of moving to municipal

22   water, which was necessary as a result of

23   contamination.

24        Q    So when you do it, it's a financial

1    cost-savings from remediation; but when

2    Dr. Mullin does it, it's a benefit from

3    contamination?

4                    MS. JOSELSON:  Objection.

5    Form.  Argumentative.  Asked and answered.

6         A    As I said before, I think if you

7    take my report in its totality and you take

8    his report in totality, I think the tone is

9    different.

10        Q    If you take a look at page 13 of

11   your rebuttal to Dr. Mullin, the first bullet

12   on that page says, "Certain costs are the

13   same between our analyses, including the cost

14   of pressure tank replacement, pump

15   replacement, water softener unit replacement,

16   annual water softener operating costs, annual

17   electricity costs and the expected reduction

18   in home insurance."

19                    Did I read that correctly?

20        A    You did.

21        Q    And the values that you used in

22   your analysis were average values; is that

23   correct?  Or purported to be average values.

24        A    Asked and answered at length in the

1   previous deposition.

2        Q    I understand that you believe it's

3   been asked and answered.  Your attorney can

4   object if she believes it's appropriate.

5                  But I just want to confirm

6   that when you're talking about the

7   differences between these values in your

8   rebuttal report, the values that you used in

9   your original report were average values; is

10  that correct?

11       A    What I'm talking about here in the

12  rebuttal report is that Dr. Mullin does

13  calculations and comes up with his own

14  estimate of damages.  And for these cost

15  items, he uses the same numbers that I use.

16       Q    And the numbers that you used

17  purported to be averages; is that correct?

18                  MS. JOSELSON:  Objection.

19  Again, asked and answered.

20       A    I wouldn't use the term

21  "purported."  They were averages of expected

22  costs for these items, and they varied -- as

23  we've already talked about, they varied

24  depending on whether or not you had a water

1   softener or not.

2       Q    And Dr. Mullin didn't agree with

3   your use of averages, did he?

4       A    Well, he used the same -- what I'm

5   saying here is, in the analysis that he does,

6   in the calculations he performs, he uses the

7   same number that I use.

8                I don't know whether he agrees

9   with averages or not.

10      Q    You mean there's nothing in

11  Dr. Mullin's report that would suggest

12  whether he has an opinion on your use of

13  averages?

14      A    He believes that damages need to be

15  calculated individually, given individual

16  specific factors.  So in that regard, he

17  doesn't like averages.

18                But then he proceeds to use my

19  number, which is an average, in his

20  calculation.

21      Q    Is he using that because he

22  believes that's proper, or is he using that

23  to illustrate other methodological flaws in

24  your analysis?

1    A    I would hope he thinks it's proper.

2    Q    Does his report give you any

3  information about the reason he did that?

4    A    You have to back up.  I'm not sure

5  what you mean by that.

6              (Exhibit 6 marked for

7  identification.)

8  BY MR. WILSON:

9    Q    So I've handed you what's been

10  marked for identification as Exhibit 6 to

11  your deposition.

12              Can you tell me what this is?

13    A    It appears to be Dr. Mullin's

14  report in this matter.  I'll take it that

15  it's a correct copy of that.

16    Q    Turn to page 34 of this report.

17    A    Yes.

18    Q    The first paragraph of that says,

19  "In addition to all the individualized

20  deficiencies that would need to be remedied,

21  Mr. Unsworth's added cost damages suffer from

22  several errors and omissions that render them

23  unreliable.  Once these particular errors and

24  omissions are addressed, the calculations

1   demonstrate that proposed class members, on

2   average, benefit from" -- that is -- or, in

3   parentheses, "are not harmed by the

4   transition to the municipal water supply.

5   Thus, in this section I identify the flaws in

6   Mr. Unsworth's calculations within his

7   framework that utilizes averages to calculate

8   damages.  However, as I discussed elsewhere

9   in this report, including in Section 3,

10  Mr. Unsworth's use of averages is

11  inappropriate to begin with in this matter."

12              Did I read that correctly?

13       A    You did.

14       Q    Does that change your opinion about

15  what Mr. Unsworth [sic] is doing when he uses

16  the same numbers that you did?

17       A    You mean Dr. Mullin?

18       Q    I'm sorry, Dr. Mullin.

19       A    I believe he wants to have his cake

20  and eat it too, here.  He would like to

21  criticize my method, but then he applies my

22  method.

23       Q    Isn't he, in fact, pointing out two

24  different flaws in your report?  One, its

1  failure to address individualized

2  differences; and two, the fact that there are

3  additional costs that your report does not

4  account for?

5       A    And that's why I said he wants his

6  cake and eat it, too.  He wants to say that

7  the analysis is deficient, but then he also

8  wants to say that there's a financial benefit

9  to the folks who had wells in moving to the

10  municipal system.

11                 So he does calculate a sum

12  certain for that number.  So he wants to have

13  that number in his report.  He doesn't simply

14  reject the method and all the numbers in

15  their entirety.

16       Q    Can you tell me, is there anything

17  in here where Dr. Mullin purports to agree

18  with your use of averages?

19       A    I don't think he -- well, he agrees

20  with the use of averages in that he applies

21  those same numbers that I apply in his

22  analysis to demonstrate the point he's trying

23  to make.

24                 But if he didn't like my

1   numbers, he shouldn't have done the analysis.

2       Q    If you just take a look at the

3   table of contents -- I think this will be,

4   hopefully, easy to do.  This is on page

5   little i of the Mullin report.

6                 Under Section III.C, it says,

7   "Individual differences among proposed class

8   members."

9                 And under that, it says,

10  "Water usage, annualized cost of well

11  components, electricity usage and interest

12  rate."

13                 Is that correct?

14      A    That's correct.

15      Q    So those items are all things that

16  Mr. Unsworth [sic] maintains are

17  individualized and not subject to averaging;

18  is that correct?

19      A    You got it backwards again.

20      Q    Dr. Mullin maintains are

21  individualized and not subject to averaging.

22      A    I think he maintains that nearly

23  everything is individualized, would be the

24  conclusion you would draw from his report.

Page 49

1      Q     And at least all the things in that

2   list; is that correct?

3      A     That's right.

4      Q     Let's take a look now at page 3 of

5   your rebuttal to Dr. Mullin.  Hopefully I can

6   stop calling him "Dr. Unsworth."

7              The last bullet on that page

8   says, "In arguing the proposed class members

9   exhibit too much 'material variation' to be

10  treated as a class, Dr. Mullin fails to

11  provide a definition or standard for that

12  term.  As a result, any differences he finds

13  between proposed class members could arguably

14  be considered a material variation."

15              Did I read that correctly?

16     A     You did.

17     Q     Do you think variation among class

18  members would be material if because of that

19  variation it resulted in some experiencing a

20  net benefit from remediation and others not

21  experiencing a net benefit from remediation?

22              MS. JOSELSON:  I'm going to

23  object to the form.

24     A     I guess -- let me unpack that.

1  Neither of us are doing a benefit of

2  remediation.  We're doing -- we're doing a

3  calculation in this case of factors that lead

4  municipal water to be more or less expensive

5  than wells.

6              There is no -- there is no

7  remedy to clean up the groundwater at the

8  site, so we're not calculating a benefit or a

9  remediation, in a classic term, that would be

10  used in the field.

11              This -- so you have to go back

12  to your question.  I apologize.

13      Q    Okay.

14              Semantics aside, I'll use your

15  terminology there.  Would variation among

16  class members be material if because of that

17  variation some class members experienced a

18  net benefit from the switch to municipal

19  water and others did not?

20      A    So they may experience a financial

21  cost-savings associated with their

22  consumption of domestic water.  And I

23  actually reflect that in my numbers.  There's

24  different numbers for different

Page 51

```
 1   subpopulations.
 2        Q    And my question is more about the
 3   material variation.
 4                  Is the kind of difference that
 5   would lead some people to experience a
 6   financial cost-savings and others not to, is
 7   that material variation?
 8                  MS. JOSELSON:  Object to the
 9   form.
10        A    It would depend on the magnitude of
11   the variation and whether -- whether you
12   would think your estimates would be reliable
13   without it.
14        Q    Well, for instance --
15                  MS. JOSELSON:  He's --
16        A    We haven't -- he's introduced the
17   term "material variation" here, so I'm asking
18   him what it means.
19        Q    And I'm wondering if it is apparent
20   in context.
21                  For instance, your report
22   opines that whether someone has a water
23   softener and what town they live in can
24   affect whether they experienced a financial
```

Page 52

```
 1    cost-savings or did not as a result of the
 2    switch to municipal water.
 3                  Is that correct?
 4         A    You could say that, yes.
 5         Q    So those items, of which town they
 6    live in and whether or not they have a water
 7    softener, are a material variation?
 8                  MS. JOSELSON:  Object.
 9         A    They're differences.  I don't -- I
10    didn't use the term "material variation," so
11    I don't know what that term means legally
12    or...
13         Q    Would it be fair to say that that
14    constitutes a material variation insofar as
15    it affects whether or not class members have
16    a financial cost-savings under your analysis?
17                  MS. JOSELSON:  Object to form.
18         A    If you define "material variation"
19    to be whether you have a financial
20    cost-savings or a financial hit, then that
21    would be a variation.
22                  I'm just going to grab some
23    hot water.
24         Q    Yes, we can go off the record.
```

                                                                    Page 53

1                    THE VIDEOGRAPHER:  The time is

2    10:29.  We are going off the record.

3                    (Recess.)

4                    THE VIDEOGRAPHER:  We are back

5    on the record.  The time is 10:30.

6    BY MR. WILSON:

7         Q    If you'll take a look at page 11 of

8    your rebuttal to Dr. Mullin.

9                    The last sentence of the first

10   full paragraph says, "Specifically, there are

11   a common set of inputs that determine damages

12   across the proposed class.  For example, all

13   but a few of the plaintiffs previously

14   reliant on private wells will be moving to

15   the municipal system."

16                    Did I read that correctly?

17        A    You did.

18        Q    Is "all" the same as "most"?

19        A    I would say "all" is -- the way I'm

20   using it here is more than "most."

21        Q    Is "all but a few" the same as

22   "all"?

23        A    I would say "all but a few" is even

24   a smaller number than as I'm using it here.

```
                                    Page 54
```

1       Q    But is "all but a few" the same as

2   "all"?

3       A    No.

4       Q    So if there are some members of the

5   class that are not transitioning, then that

6   issue is not common to the class; is that

7   correct?

8                 MS. JOSELSON:  Object to the

9   form.

10      A    What I'm pointing out here is

11  factors that I believe are common.  And I

12  point out here that for some of the

13  individuals, their factors might differ, and

14  in my report I treat them differently.

15      Q    So is your position that a factor

16  can still be common to the class even though

17  it's not the same for everyone?

18                 MS. JOSELSON:  Object to the

19  form.

20      A    I would say yes.

21      Q    Are you an attorney?

22      A    No.

23      Q    Next bullet there says, "All these

24  plaintiffs will pay easily quantifiable and

```
                                        Page 55
```

1   largely similar water bills following their

2   connection to these systems."

3                   When you say "largely

4   similar," that means there is some

5   dissimilarity; is that correct?

6        A    There could be.  And some of it is

7   reflected in my analysis, and then there is

8   some uncertainty.

9        Q    And that's because some customers

10  won't pay the flat rate; is that correct?

11       A    It's possible.  I'm not aware that

12  any residential customers actually selected

13  the volume rate.

14       Q    And the only way to know the water

15  bill for each individual class member is to

16  look at their water bill; is that correct?

17       A    You would -- well, to know it for

18  sure during my analysis, you'd have to look

19  at it today and be prescient with

20  understanding what it would be in the future.

21  So I'm taking reasonable information -- best

22  available information today and applying it.

23       Q    And -- but the only way to know

24  what their water bill is today is to look at

Page 56

1    their water bill today; is that correct?

2         A    I think that's tautological, but

3    yes.

4         Q    So the amount of the bills of the

5    putative class members is not common to the

6    entire putative class, is it?

7                   MS. JOSELSON:   Objection.

8         A    No, I said -- what I said here is,

9    there's a common set of inputs that determine

10   damages.  So the inputs can vary, but the set

11   of inputs is common.

12                   I didn't say the numbers were

13   the same for all the individuals.  I say a

14   common set of inputs.

15        Q    So when you're saying "common set

16   of inputs," you're actually just talking

17   about the formula for damages is the same for

18   the entire putative class; is that correct?

19                   MS. JOSELSON:   Objection.

20        A    You could -- you could define it as

21   a formula for the entire putative class, yes.

22        Q    Well, that's significant, because

23   you're not making -- you're not making a

24   claim about how individualized the class is,

1   but rather how damages could be calculated

2   for an individual class member; is that

3   correct?

4                   MS. JOSELSON:  Object.

5        A     I don't know what that means.   I

6   didn't follow you.

7        Q     So when you say "common inputs,"

8   you're just saying all of these things are

9   implicated in determining whether someone has

10  experienced damages?

11       A     What I say is, is there's a common

12  set of inputs that determine damages across

13  the proposed class.  So the factors that

14  would determine an individual's loss are

15  common across the individuals in this class.

16       Q     So that is, to determine an

17  individual's damage in this class, for each

18  individual, you need to look to the same set

19  of things; is that correct?

20                  MS. JOSELSON:  I'm also going

21  to object that this was covered extensively

22  in the first deposition.

23                  MR. WILSON:  Emily, this is a

24  sentence that I'm quoting directly out of his

1   rebuttal report, so I think we have

2   discretion to address something that's in his

3   rebuttal report.

4               MS. JOSELSON:  We have

5   disagreement about that.  I'm just putting my

6   objection on the record.

7               MR. WILSON:  Okay.

8       A    So -- so the purpose of this

9   section is that Dr. Mullin rejects the idea

10  that there can be a common methodology.  He

11  says the damages must be individualized.

12              I am disagreeing with that

13  opinion, and I'm saying no, I think that

14  there can be a common methodology and there's

15  a common set of inputs, that there is -- that

16  the similarities here dominate over the

17  differences, and it would be reasonably

18  efficient and effective to address this as a

19  class.

20              This -- and I also in my

21  previous deposition talked about the fact

22  that you can calculate damages and then apply

23  a formula to distribute them, which, by the

24  way, is the opinion of Dr. Jackson, who wrote

1   that in a paper that he wrote, the same

2   opinion.

3        Q     We'll get to Dr. Jackson later.

4              In terms of Dr. Mullin,

5   Dr. Mullin is not saying that we don't use

6   the same formula to determine each

7   individual's damages; is that correct?

8        A     He's rejecting a class-based damage

9   model in its entirety.

10       Q     Because a class-based damages model

11  has to be a situation where you don't need

12  individualized data to determine the claims

13  of each individual; is that correct?

14              MS. JOSELSON:  Objection.

15       A     I don't --

16              MS. JOSELSON:  And again,

17  extensively inquired into.

18       A     I don't know if that's a legal --

19  if you're asking me to have a legal opinion.

20              The question I'm asking from

21  an analytic perspective as an analyst is, do

22  I believe that I can construct an analysis

23  that fairly represents the total damages to

24  the class, given the common factors those

```
                                              Page 60
 1    class members have.
 2         Q     So the third bullet in this list
 3    says, "All of these private well owners have
 4    previously operated and maintained a
 5    groundwater well which involves the use of a
 6    standard set of equipment and an identical
 7    list of operating and maintenance cost
 8    items."
 9              Did I read that correctly?
10         A     You did.
11         Q     Does everyone in the putative class
12    have the same kind of water pump?
13         A     No.   There, I was saying they
14    have -- I don't believe they have the same
15    brand or the same -- but they have a standard
16    set of equipment to get water out of the
17    ground.
18         Q     Do they all have the same well
19    depth?
20         A     No.
21         Q     Do they all have the same expansion
22    tank?
23         A     Probably not.
24         Q     Do they all have the same water
```

```
                                    Page 61
 1   softeners?
 2         A    I've already said that they don't.
 3         Q    Do they all have the same brand of
 4   water softener?
 5         A    I would assume not.
 6         Q    Does all this equipment cost the
 7   same amount for each person?
 8         A    I think it's within reason, yes.
 9   There's similarities there.  But was the
10   exact cost the same for all those
11   individuals?  No.
12         Q    How do you know the cost was the
13   same if you haven't evaluated what the costs
14   were throughout the putative class?
15              MS. JOSELSON:  Objection.
16         A    Well, I'm assuming if they go buy a
17   water pump, they're going to buy the one
18   that's reasonably priced, and that's going to
19   be the same for all individuals.
20         Q    Does all of the equipment cost the
21   same amount to maintain?
22         A    It has the same list of operating
23   and maintenance costs, is what I said.
24   That's how you read it.
```

Page 62

1       Q    So does it cost the same amount to
2   maintain?
3       A    I wouldn't assume it's exactly the
4   same for each household, no.
5       Q    What would you assume is the range
6   of variation in maintenance costs?
7                 MS. JOSELSON:  Objection.
8   Asked extensively in the last depo.
9       A    Leaving aside the fact that we
10  covered this in the last deposition, for the
11  well, I include a cost item for replacing the
12  pump.  I do not include a line item for
13  maintaining the pump.
14      Q    So what would your assumption be
15  about how much variation there is in the
16  operation and maintenance costs of a well?
17      A    I wouldn't assume over time there
18  would be much variation at all.  I would
19  assume the average is accurate.
20      Q    But to know what the average is,
21  don't you need to know something about the
22  range of variation within the class as to
23  those costs?
24                 MS. JOSELSON:  Again, my

1   objection continues.

2        A    We covered this at multiple,

3   multiple pages.  We can pull out the old

4   deposition, if you want.

5        Q    Well, the trouble I have,

6   Mr. Unsworth, is that we did cover this

7   before, but you chose to put this again into

8   your rebuttal report.

9                  Now, our time to move to

10  strike rebuttal opinions in this case has not

11  yet come, and we may indeed need to strike

12  these opinions as having already been raised

13  in your original report.

14                 But I think that it's fair

15  that, at a minimum, if you put it in your

16  rebuttal report, we get to ask about it

17  again.

18                 If you get to say it again, we

19  get to ask you about it again.

20                 MS. JOSELSON:  My objection

21  continues.

22       Q    So how much -- withdrawn.

23                 So to know what the average is

24  for these operation and maintenance costs,

Page 64

```
 1   don't you need to know something about the
 2   range of variation within class with respect
 3   to those costs?
 4                MS. JOSELSON:  Again, asked
 5   and answered in the first depo.
 6       A    What I've done in my report in
 7   doing the calculations, is stated that I
 8   believe there's a reasonable estimate of that
 9   cost item for members of the class, just like
10   there are for other cost items.
11       Q    I'd like to know the methodological
12   question of whether the variation within the
13   class with respect to that item is relevant
14   to the determination of an average.
15                MS. JOSELSON:  Again, asked
16   and answered extensively in the first depo.
17       A    I averaged -- for the cost items
18   that I considered, I took an average of the
19   data that I had available to me on those cost
20   items.
21       Q    And I'm asking you whether in
22   determining that average, the range of
23   variation within the class is a relative
24   consideration?
```

```
 1       A    What would be relevant would be if
 2   the range of variation was so great as to
 3   want to consider different subclasses, so to
 4   speak, which I did in my original report.
 5               I wouldn't consider the
 6   standard deviation around the average to be
 7   relevant in calculating a total damage.
 8       Q    Okay.  So that might be helpful.
 9   That might help us get somewhere.
10               So in your report, you assume,
11   I believe, that 80 percent of the class has
12   water softeners and 20 percent does not; is
13   that correct?
14       A    That's correct.
15       Q    And so you are purporting to assess
16   the distribution of water softeners among the
17   putative class; is that correct?
18               MS. JOSELSON:  Again, asked
19   and answered.
20       A    The frequency of occurrence of
21   water softeners in the -- in the class.
22       Q    And that's an important part of
23   your analysis; is that correct?
24       A    Yes, along with everything else I
```

1  did, yes.

2      Q    And if you were wrong about that

3  80-20 split, if it was, in fact, 90-10 or

4  70-30, that would materially affect your

5  calculation of the total damages to the

6  class; is that correct?

7                 MS. JOSELSON:  Objection.

8  These are exact questions that were asked in

9  the first deposition and are not relevant to

10  his rebuttal opinions.

11     A    If you told me that I had, for

12  example, transposed a digit or something, it

13  would change my calculation, if that's what

14  you're asking.

15     Q    I'm asking also if it turns out

16  that the -- that your assumption that 80

17  percent of the class has water softeners

18  turns out to be factually incorrect and, in

19  fact, 90 percent of the class has water

20  softeners, that would materially reflect the

21  accuracy of your estimate of damages to the

22  class, wouldn't it?

23     A    If that information was presented

24  to me, I'd have to consider it as new

1   information.

2        Q     And if we swapped in the 80 for a

3   90 in your analysis, we'd get a significantly

4   different number, wouldn't we?

5        A     You would get a different number.

6   I don't know if it would be significantly

7   different, but you would get a different

8   number.

9        Q              So the next bullet on

10  page 11 says, "All of the plaintiffs not

11  moving to the municipal system will be forced

12  to operate POETs indefinitely."

13              Did I read that correctly?

14       A     You did, but you left out the

15  footnote, which is important.

16       Q     Just for the record, I'll read the

17  footnote.

18              "In some cases, it may be

19  feasible to drill deeper wells or make other

20  modifications to these plaintiffs' wells to

21  assure safe drinking water, Barr Engineering

22  2018.  However, at this time it is not known

23  how feasible such actions would be for this

24  limited number of plaintiffs."

```
                                        Page 68
 1                  Did I read that correctly?
 2        A     You did.
 3        Q     I'd like you to take a look at
 4   page 66 of your deposition transcript.  The
 5   first question on that page says:
 6                  "And since it is not, it may
 7   be that PFOA is no longer detected in the
 8   groundwater at one putative class" --
 9        A     Wait.  I apologize.  I'm not seeing
10   where you are.  You said page 66 of the
11   deposition?
12        Q     Page 66 of the deposition.  First
13   question on that page.
14        A     Oh, sorry, yes.
15        Q     "And since it is not, it may be
16   that PFOA is no longer detected in the
17   groundwater at one putative class member's
18   property before it leaves another putative
19   class member's property; is that correct?
20                  "Ms. Joselson:  Object to the
21   form.
22                  "Answer:  I'm not sure what
23   you mean by 'leaves.'  You mean physically
24   moves in the environment or --
```

1          "Question:  Yes, that it may

2   be that one property gets non-detect readings

3   for eight consecutive rounds of quarterly

4   sampling, and yet it's still detectable in

5   another class member's property.

6          "Ms. Joselson:  Object to the

7   form.

8          "Question:  Is that correct?

9          "Answer:  I think that's a

10  hypothetical, but I can imagine that could

11  happen, yes."

12          Did I read that correctly?

13      A    Yes.

14      Q    So this testimony that you

15  previously gave was discussing that

16  restrictions on groundwater may be lifted if

17  eight consecutive rounds of sampling showed

18  non-detect results; is that correct?

19          MS. JOSELSON:  Objection.

20  Asked and answered.

21      A    You're saying in my deposition?

22      Q    Yes.

23      A    I don't -- sitting here today, I

24  don't remember how many rounds of results

1   they need to go through, and that would -- of

2   course that's the requirement on the

3   regulated party.

4                The homeowner might obviously

5   choose to continue to operate a POET, not

6   knowing what their concentrations are moving

7   forward.

8        Q    But you acknowledge that it's

9   possible that PFOA could leave the water at

10  one class member's property before leaving

11  the water at another class member's property;

12  is that correct?

13       A    I don't know what you mean by the

14  term "leave" the property.  The variation

15  they would be seeing in PFOA levels would be

16  related to the concentrations that are coming

17  up the well.  I don't know where the PFOA has

18  gone.  I don't -- you know.

19       Q    But it may be that PFOA would no

20  longer be detected at one property before it

21  was no longer detected at another property?

22                You previously acknowledged

23  that that could happen; is that correct?

24       A    Yes, I think physically that could

1  happen.

2       Q    So that means it's not true of

3  everyone who's on POET, that they will all be

4  precluded from using their groundwater

5  indefinitely; is that correct?

6       A    I don't know that to be the case

7  today.

8                 What I do know is that those

9  folks have POETs today and they're trying to

10 find a remedy for them, and I don't know what

11 the future will bring, and neither do they.

12                Just as in your example where

13 the PFOA levels might drop below threshold,

14 it's not unusual to see rebound in a well,

15 and you might go back above threshold.

16      Q    Let's head over to page 11 of your

17 rebuttal to Dr. Mullin.

18      A    I think that's where we were.

19                MS. JOSELSON:  And, Linc, I

20 just noted that I'd like to take a break

21 every hour, but we have had a quite scattered

22 first hour, so whenever you're ready.

23                MR. WILSON:  Yes.

24                Why don't we -- why don't we take

                                    Page 72

1   a break now, and that -- before I start this

2   next question, and then we'll maybe have one

3   more hour before lunch.

4                    Does that sound okay?

5                    MS. JOSELSON:  Up to you.

6                    MR. WILSON:  Okay.  Off the

7   record.

8                    THE VIDEOGRAPHER:  The time is

9   10:48.  We're going off the record.

10                   (Recess.)

11                   THE VIDEOGRAPHER:  We are back

12  on the record.  The time is 11:02 a.m.

13  BY MR. WILSON:

14      Q    Mr. Unsworth, if you would turn to

15  page 11 of your rebuttal to Dr. Mullin.

16      A    Okay.

17      Q    And if you would look at the final

18  sentence of the last full paragraph, it says,

19  "As such, the problems he raises are ones of

20  fair allocation, not monetary damage

21  assessment to a class of individual

22  plaintiffs."

23                   Did I read that correctly?

24      A    Yes.

1     Q     And the "he" there is referring to

2   Dr. Mullin; is that correct?

3     A     That's correct.

4     Q     Is that an acknowledgment that he

5   does raise legitimate problems?

6     A     It's an acknowledgment that he's

7   effectively asking or answering a different

8   question.

9                 I'm estimating damages to a

10   class of plaintiffs, which I believe are

11   based on a set of common factors and common

12   calculations and assumptions.  And what he's

13   asking is, do any of the plaintiffs differ

14   from one another.

15                 And what I'm saying is, that

16   to the extent they differ, it can be

17   addressed through the allocation process,

18   which is very common.

19     Q     So you're saying that instead of

20   considering those individual differences now,

21   we can use average values to determine the

22   total amount of class damages, and then in a

23   separate proceeding, determine each

24   individual plaintiff's share of that total;

Page 74

1   is that correct?

2        A     What I said there would be there's

3   multiple allocation options for those damages

4   that would be fair.

5        Q     I just want to find out how much of

6   what I just said you agree with as a

7   statement of your opinion.

8                   So you're saying that instead

9   of considering individual issues now, we can

10   use average values to determine the total

11   amount of damages to the class, and then by

12   some other allocation process, determine each

13   individual class member's share of that

14   total?

15                  MS. JOSELSON:  Objection.

16       A     That -- well, you go -- you go

17   beyond the sentence when you say that, but

18   that is what I testified to at the previous

19   deposition, that we can calculate a total

20   damage based on common factors, which do vary

21   based on where you are and what kind of

22   assumptions we make about equipment.

23                  And then we could allocate

24   those damages fairly based on either

1    formulaic approach or some other approach.

2         Q    So while you would develop the

3    total award based on values that you

4    determine to be average or representative, at

5    the allocation stage you might find that some

6    plaintiffs have larger values for those

7    inputs and some plaintiffs have smaller

8    values; is that correct?

9                   MS. JOSELSON:   Asked in the

10   first depo.

11        A    I would -- I would expect them to,

12   because that's what my damages model did.

13        Q    And in the allocation process, you

14   might find some plaintiffs to have more

15   damages than the average?

16        A    Depending on how you do the

17   allocation, you may find that.

18        Q    And you might find some that had

19   less?

20        A    By definition, if some have more,

21   some would have less, yes.

22        Q    And you might even find some who

23   had none at all, like the plaintiffs who do

24   not have water softeners in the Village of

1    North Bennington?

2          A     I've already -- I've already

3    testified to that.

4          Q     Is that what -- is that correct?

5          A     That's how my calculations were

6    performed, yes.

7          Q     And the allocation process could

8    reveal additional plaintiffs who, like those

9    people in the Village of North Bennington

10   with water softeners, don't experience any

11   added costs from the switch to municipal

12   water; is that correct?

13                MS. JOSELSON:   Objection.   All

14   asked in the previous depo.

15         A     That's not my expectation based on

16   the work I've done, that there would be

17   someone, for example, in Bennington who did

18   not have a water softener who would -- would

19   actually be better off paying their municipal

20   water bill.   It doesn't appear to be the

21   case.

22         Q     For example, if you found

23   plaintiffs who had, perhaps, an

24   extraordinarily low well depth and high cost

Page 77

```
 1   of maintaining their equipment and expensive
 2   well equipment, those plaintiffs might, by
 3   virtue of those significant costs associated
 4   with maintaining a well, ultimately have a
 5   financial cost-savings, as you put it, from
 6   the transition to municipal water; is that
 7   correct?
 8                MS. JOSELSON:  Objection.
 9        A    You're not using the well term.  A
10   very low well would not be a deep well, so --
11        Q    I meant "deep" by saying --
12        A    Probably better off to use "deep"
13   and "shallow," to be correct.
14                But is it possible somebody
15   out there is like that?  It's possible.  But
16   I think the averages work fine for
17   calculating damages at the class level, and
18   they can be allocated or assigned later.
19        Q    And so those individual factors
20   would be considered in the allocation stage?
21                MS. JOSELSON:  Objection.
22        A    They might be.  Or there might be
23   another methodology.
24        Q    How would you propose to conduct
```

Page 78

1   that allocation?

2        A    I spoke about it, I think, in the

3   first deposition.  I think that you could use

4   a formulaic approach, so you could use the

5   same values that are in our damage

6   calculations.

7                 You could use additional

8   values.  We've done that in cases I'm

9   involved in, where we've calculated damages

10  to a class, so we have an allocations scheme

11  for the damages that are available after

12  they've been awarded.

13                 You also could do what they've

14  done, for example, in the VW matter, which is

15  establish a trust and allow folks to submit

16  their water bills to that trust.  And if the

17  water bills are paid for, they're, by

18  definition, made whole for some period of

19  time.

20                 So there's a variety of ways

21  you could accomplish this that I think would

22  be fair.

23       Q    Are all of those processes that

24  you've described settlement processes as

1   opposed to litigation processes?

2              MS. JOSELSON:  Objection.

3        A    No, I wouldn't say that's the case.

4   I think -- in fact, I've mentioned earlier

5   Dr. Jackson in one of his reports talks about

6   the use of hedonic models to calculate total

7   damages and then the use of a second-phase

8   allocation of those damages.

9        Q    I'm asking, to be clear, when

10  courts have followed the allocation programs

11  that you've described, have any of them done

12  it based on an order as opposed to a

13  settlement of the parties that set up that

14  program?

15       A    I'm not sure, actually.  I'm not a

16  lawyer, so I'm not sure what the -- what the

17  structure of it was.

18       Q    What individual factors would you

19  consider in conducting an allocation?

20       A    I would consider some of the same

21  factors that -- I would consider all the same

22  factors that are in my damage equation.

23       Q    So would you consider the actual

24  water bills of the putative class members?

                                                    Page 80

1        A      You might, yes.

2        Q      Would you consider the actual well

3    pump replacement cost and duration of

4    lifespan?

5        A      No, I would probably use the

6    average for that, because we're talking about

7    compensation over a very long period of time.

8    So I don't know how we would get an accurate

9    measure.

10               If someone happened to replace

11   their well pump the year before versus

12   somebody who didn't, I think -- on average,

13   it's going to work out in the long run.

14       Q      And if someone came to you and

15   said, Mr. Unsworth, I was able to replace my

16   well pump for next to nothing, and I did it

17   right before this class action started, and

18   I'm getting, you know, unfairly treated by

19   this allocation because my costs for well

20   maintenance are extraordinarily low, would it

21   then be appropriate to consider that

22   individual's low well pump replacement costs

23   in allocating damages?

24               MS. JOSELSON:  Again, I'm

Page 81

```
 1   going to object not only to the form but to
 2   the fact that this is replowing ground in
 3   Mr. Unsworth's original reports.
 4                MR. WILSON:  And I'll respond
 5   to that objection and note that we're
 6   discussing, on page 11 of Mr. Unsworth's
 7   rebuttal report, his statements about an
 8   allocation proceeding for the damages here.
 9   We're trying to determine the content of it.
10   BY MR. WILSON:
11       Q    So I'm going to ask that question
12   again.
13                So if someone comes to you and
14   says, Mr. Unsworth, I was able to replace my
15   well pump for next to nothing.  I did it
16   right before this class action started.  And
17   I'm getting unfairly treated by the
18   allocation because my costs for well
19   maintenance are extraordinarily low.  Would
20   it be appropriate to consider that
21   individual's well pump replacement costs and
22   the time in which they performed the work in
23   the allocation proceeding?
24                MS. JOSELSON:  Objection.
```

1     A     And as I said in my earlier
2   deposition, we're trying to assign losses
3   here over a 30- to a 99-year period, and so I
4   think the averages are more reflective than
5   something that happened last year, so the
6   fairness would come through the average.
7                   There are going to be
8   different timings of things, but it's
9   reasonable to --
10     Q     How is it fair to compensate a
11   plaintiff based on less than their
12   demonstrable actual expenses?
13                   MS. JOSELSON:   Objection.
14     A     Because you're talking about what
15   you're considering their demonstrable
16   expenses in a single year over a very long
17   time period.
18     Q     Would it be appropriate to consider
19   the cost of tank replacement and the lifespan
20   of a tank in an allocation proceeding?
21     A     The -- well, my damages analysis
22   considers the cost of a tank and the lifespan
23   of the tank.  And we're not --
24                   You might go to a damages

1   model which reallocates damages based on the

2   tenure of the equipment in the household, the

3   undepreciated tenure.  That's not how my

4   model was constructed.  It was constructed as

5   an expected value.

6        Q    I'm not asking about your model for

7   total class damages, though.  I'm asking

8   about an allocation proceeding.

9                So would it be appropriate to

10  consider if someone comes and says to you,

11  Mrs. Unsworth, your estimate for tank

12  replacement actually overshot my actual cost

13  of tank replacement by quite a bit.  I'd like

14  to submit that to you in connection with this

15  allocation proceeding.  Would you consider

16  it?

17                Will it be appropriate for you

18  to consider that?

19                MS. JOSELSON:  Again, this is

20  all subject of his original reports.

21        A    It would depend on what overall

22  formula you came up with for the allocation

23  to know whether that fits in with the other.

24  As I said, it's an expected value damage, and

1   so I would want the allocation to be placed

2   on expected costs associated with moving to

3   the municipal system, not a one-year cost.  I

4   don't think that would be fair.

5       Q    Or not an actual cost?

6       A    Or not an actual cost if it

7   represents simply a one-year cost.

8       Q    So you think it's appropriate to

9   consider actual costs for water testing but

10  not to consider actual costs for equipment?

11      A    Well, because one is an annual cost

12  and the other one isn't.  One is a -- one is

13  a periodic annual cost, and the other one is

14  one that occurs on a longer time frame.

15      Q    So you do agree that --

16      A    So I take an expected value

17  approach to each of those, and it just

18  happens one of them is an annual.

19      Q    So you do agree that a periodic

20  expense that needs to be capitalized is

21  different than a monthly or an annual expense

22  in terms of how you treat it economically?

23              MS. JOSELSON:  Objection both

24  to form and to the fact that it's the subject

Page 85

```
 1   of his original opinions.
 2        A    So I have to unpack that.
 3             I think a periodic expense,
 4   such as replacing a pressure tank, should be
 5   treated as such, should occur periodically.
 6   I don't -- I don't capitalize it within my
 7   model.  I assume an expected value framework,
 8   and I talk about the problems with that in
 9   Dr. Mullin's report and the problems with
10   capitalization using a high discount rate.
11        Q    Would it be appropriate to consider
12   the actual electric bills of an individual
13   class member in an allocation proceeding?
14        A    I don't think you'd ever be able to
15   draw out the component of the electric bill
16   that deals with the pump.
17        Q    Would it be appropriate to consider
18   the actual maintenance that they performed on
19   their well?
20             MS. JOSELSON:  Again, this
21   whole line was asked in the first depo.
22        A    No, I would say no.  I would say
23   I'm going to go back to my very clear opinion
24   that the averages, I think, work well, and I
```

```
                                            Page 86
1    would not consider that factor of, say, an

2    undepreciated piece of capital equipment in

3    the allocation.  Not the allocation schemes

4    that I'm thinking of.

5         Q    Would it be appropriate to consider

6    the actual water tests that the individual

7    performed?

8                   MS. JOSELSON:  Again, asked in

9    the first depo.

10        A    Again, on average, no, because I

11   would -- well, I do consider it in my damages

12   model, and I would transfer that over if

13   they're in the area that would be expected to

14   typically do costs.

15                   So in that case, it was

16   considered in the damages model, and so it

17   would be reasonable, if we can, to consider

18   it in the allocation scheme.

19                   Or, as I mentioned, there are

20   other methods for compensating the harmed

21   parties besides the formulaic approach.

22        Q    So would it be appropriate to

23   consider the salvage value of equipment?

24        A    That was not considered -- I
```

1   considered an expected value framework, so I

2   would not consider that to be appropriate.

3        Q    Would it be appropriate to consider

4   the individual financing available to a

5   plaintiff class member?

6        A    No.

7        Q    So I'm a little confused here,

8   because you say that the problems that

9   Dr. Mullin raises are ones of fair

10  allocation, not monetary assessment to a

11  class of individual plaintiffs; and yet you

12  say that even in allocation, we shouldn't

13  even be considering, really, any of the

14  problems raised by Dr. Mullin; is that

15  correct?

16               MS. JOSELSON:  Object to the

17  form.

18       A    No, I don't think that is correct.

19               I said that you would -- you

20  would need to come up with a formula that's

21  fair.  It may consider some of the same

22  factors that we're talking about here.

23               Or you could consider a

24  different approach, where you allocate it,

Page 88

```
1    for example, based through a trust that pays
2    water bills.
3                    There are a variety of ways to
4    get to a fair outcome here efficiently
5    without going house by house and item by
6    item.
7         Q    So which individual factors should
8    be considered in an allocation proceeding?
9         A    I would -- I've said before, if the
10   allocation is going to be a dollar-based
11   allocation as opposed to a trust, I would use
12   the same factors I have in my damage model.
13        Q    And you would take individual
14   amounts for those factors?
15                   MS. JOSELSON:  Object to the
16   form.
17        A    If I had them, I would.  And I
18   would expect, on average, they would work.
19   Or I would use a more efficient method of
20   using averages, given the time period we're
21   talking about here.
22                   Because people's costs are
23   going to vary through time, but they're going
24   to go back to the average.
```

1      Q     What method did you use to choose

2   which variables you would include in your

3   damages analysis and which ones you would

4   not?

5                MS. JOSELSON:  Objection.

6   Clearly asked in the first depo, and goes

7   primarily to his merits and class opinions.

8                MR. WILSON:  Emily, I'm going

9   to give you that one.  Withdrawn.

10  BY MR. WILSON:

11     Q     Let's take a look at page 21 of

12  your rebuttal to Dr. Mullin.

13                So in the -- I think, the

14  fourth sentence of the first paragraph, it

15  says, "As such, we can assess the credibility

16  of Dr.~Mullin's opinion by considering the

17  effect his asserted change in the cost of

18  water would have on property values.  He

19  believes the proposed class members who

20  previously relied on private wells will

21  experience $37 a year to $587 a year benefit,

22  that is, cost savings.  Note that this

23  benefit does not incorporate other benefits

24  he asserts.  Incorporating these factors

1    increases his estimated benefits to at least

2    $252 a year to $802 a year."

3              Did I read that correctly?

4         A    You did.

5         Q    So your report doesn't specifically

6    enumerate which of the benefits that

7    Dr. Mullin is talking about that you're

8    trying to account for.

9              My math suggests -- and I'm a

10   lawyer, so I ask you to bear with me -- that

11   you're basically adding $215 to the amounts

12   calculated by Dr. Mullin?

13        A    No, I wouldn't say that.  I would

14   say he explicitly calculates the 37 to 587,

15   but he also says that there are other

16   benefits that he's not incorporating, and so

17   we attempted to include those in, based on

18   the information he provided.

19        Q    Okay.

20              And you've determined that

21   those benefits -- you've priced them at the

22   amount of $215; is that correct?

23        A    Ummm --

24        Q    Because 37 plus 215 equals 252, and

1    587 plus 215 equals 802?

2        A    Yeah, sitting here right now, I'm

3    not sure which -- I'd have to go back to the

4    original report to see which values, but

5    you're doing your math correctly.

6        Q    Okay.

7                    And can you tell me what

8    benefits that number is accounting for?

9        A    I'd have to go back to his original

10   report.

11                   There are some items that he

12   chose to not include in his tables, and so it

13   would be calculations based on those items.

14       Q    Neither your report nor the

15   reliance materials that you produced to us

16   explained how you got to that $215 number, so

17   we're wondering if you could tell us where it

18   came from.

19       A    As I said, I would have to go back

20   and recreate that analysis.  I think it's a

21   pretty simple analysis of -- of the numbers

22   he presents.

23       Q    Okay.

24                   I'll just tell you that we

Page 92

```
 1   haven't received it in any of the materials
 2   that were provided to us.
 3                  Do you have the materials
 4   today that would allow you to reconstruct
 5   that analysis?
 6        A     No.
 7                  MS. JOSELSON:  I'm also going
 8   to just put on the record that there were
 9   many mathematical analyses in Dr. Mullin's
10   report for which we were not provided any
11   methodology tabulation or reliance materials.
12                  MR. WILSON:  So I'll just say
13   that we'll -- Emily, we'll make a request
14   after the deposition to get any additional
15   material that -- information we need about
16   that number; and certainly if there's any
17   information in Dr. Mullin's report that's --
18   any reliance materials that haven't been
19   provided, we'll be happy to give them.
20                  MS. JOSELSON:  Well, we've
21   already met and conferred and have not gotten
22   the requested reliance materials, and we've
23   provided you with all of Mr. Unsworth's
24   reliance materials.
```

Page 93

1              (Pause.)

2    BY MR. WILSON:

3         Q    So in your rebuttal report, is it

4    correct that you disagreed with Dr. Mullin's

5    opinion that you should have included a value

6    for regular well maintenance in your damages

7    model?

8         A    I did, and I explained why I felt

9    that wasn't appropriate.

10        Q    And on page 17 of your rebuttal to

11   Dr. Mullin, you said that, "Despite the

12   suggestion that a well owner spends $110 each

13   year, a rational individual would only

14   conduct maintenance on an item if the cost of

15   doing so was less than the expected savings.

16   For example, if we assume a residential

17   property is owned for 20 years, this owner

18   would incur 2200 in well maintenance

19   expenses.  A rational well owner would only

20   incur this cost if he or she viewed it as

21   likely to reduce operating or equipment

22   costs.  Thus, it's unreasonable to assume

23   that every well owner would assume this cost.

24   What would be reasonable to assume, that well

Page 94

1    owners that conduct maintenance benefit from

2    longer lifespan of equipment."

3                    Did I read that correctly?

4         A    That's right.

5         Q    So although your analysis did not

6    include a number for maintenance on wells,

7    you're suggesting that some class members do

8    conduct maintenance on their wells; is that

9    correct?

10                    MS. JOSELSON:  Object to the

11    form.

12        A    What I say is, if they do, and if I

13    assume they're rational, they're doing it

14    because they see a benefit to it.  And so it

15    nets out of my analysis, because their wells

16    are going to be cheaper to operate or last

17    longer.  Otherwise, you wouldn't do it.

18        Q    And you say that, to know whether

19    maintenance happened, we basically need to

20    know, then, whether maintenance would be

21    cost-effective; is that correct?

22        A    Yes.  And I think the calculation I

23    perform here calls that into question.

24        Q    Is this a calculation that you're

Page 95

1  performing here, or is that just a summary of

2  a -- of a framework for how we should

3  evaluate this?

4      A    Well, it said that if it's 110

5  bucks a year and it's 20 years -- you can do

6  the calculation.

7      Q    I understand what you're referring

8  to now.  Thank you.

9              So in order to know whether an

10  individual would properly incur a maintenance

11  charge for a well, we need to know whether

12  and under what circumstances certain kinds of

13  maintenance would reduce operating or

14  equipment costs; is that correct?

15              MS. JOSELSON:  All asked in

16  the first depo.

17      A    Yes.  I guess I would simplify it.

18  I -- being a homeowner and being an

19  economist, I would say that you -- you spend

20  the money on maintaining things, and you go

21  through the effort of -- of doing the annual

22  maintenance if you think it's beneficial.

23              Otherwise, you basically allow

24  the equipment to live out its life, and you

1    replace it.

2         Q    And so to know whether maintenance

3    would be appropriate, we need to consider

4    those factors, whether the maintenance would

5    reduce operating or equipment costs as to

6    specific equipment?

7                   MS. JOSELSON:  Again, asked

8    and answered.  And objection to form.

9         A    Right.

10                   And what I'm saying is, based

11   on the simple presentation of the numbers

12   here, I would not expect people to do this,

13   unless they saw a benefit from it, in which

14   case it would -- it would net out of my

15   analysis.

16                   So this just flows from a

17   logic of when to maintain something.

18        Q    Now, if maintenance were performed

19   and it reduced equipment costs, we would also

20   need to offset the cost of that maintenance

21   against the cost of replacing the equipment;

22   is that correct?

23        A    I think what you said is if

24   maintenance helps improve the lifespan of the

1    equipment?  Is that what you're saying?

2         Q     Yes.

3         A     Then you would consider whether the

4    maintenance is worth it relative to that.

5         Q     Yes.

6               But I'm wondering whether in

7    your analysis if there's an individual who

8    performs maintenance and it does reduce their

9    equipment costs, then do we need to add the

10   maintenance cost but offset it against a

11   reduction in equipment costs?

12              MS. JOSELSON:  Objection to

13   form and subject to first depo.

14        A     And that's exactly what I say I'm

15   doing, and I'm saying that it likely nets

16   itself.  That would be the rational pricing

17   for maintenance would be the net to the

18   value --

19              I'm saying that I would -- I'm

20   saying that I believe that the benefit of

21   performing maintenance will be the cost --

22   and will be -- will offset the cost of it;

23   and therefore, this is not an item I think

24   needs to be included to come up with an

1   estimate of well maintenance, because I would

2   have to then increase the lifespan of my well

3   equipment.

4       Q    What methodology did you use to

5   determine that those things would equal out?

6       A    Logic.  You would -- prices of

7   goods reflect the benefits provided by those

8   goods, so I would expect that -- the cost of

9   well maintenance to equal the benefit of

10  doing it.  It's --

11              I'm an economist, so I believe

12  the market prices things correctly.

13              MR. WILSON:  Before we go

14  further, Emily, I just want to note for the

15  record, I know you've been objecting to these

16  questions as asked and answered, and

17  certainly you're entitled to do that, but I

18  just want to put it on the record again that

19  I'm asking him questions about statements

20  that are directly stated in his rebuttal

21  report.  We're looking here at page 17.

22              So I think it's entirely

23  appropriate for me to ask those questions,

24  though it may cover subject matter that was

Page 99

```
1    included in Mr. Unsworth's original report,
2    because it's repeated in his rebuttal report,
3    it's proper for me to ask questions about it.
4    And I just wanted to state that for the
5    record.
6                   MS. JOSELSON:  Right.  I
7    understand it.
8                   And I don't see any other way
9    around my unfortunate need to put my objections
10   on the record.  I'm trying to limit them to
11   those which ask him again for information that
12   he already testified to and was available to be
13   asked in his first deposition.
14                  And I understand what the
15   amended order states, but I do believe that
16   you're not permitted to, as Judge Crawford
17   said, replow old ground, except to the extent
18   necessary to understand rebuttal opinions.
19                  MR. WILSON:  And that's fine
20   for you to make your objections.  I have no
21   problem with it.  I just want -- should it
22   ever come before the judge, I want a clear
23   record of the questions that I'm asking and
24   why I'm asking them.
```

1  BY MR. WILSON:

2     Q    Do economists treat a monthly

3  expense the same way they treat a capital

4  cost?

5     A    Depends on how you do the analysis.

6     Q    They often treat them differently;

7  is that correct?

8     A    I would say I don't know how --

9  what the frequency is.  It depends on how you

10  do your analysis.

11     Q    So suppose I had $100 monthly

12  expense for ten years.  That would be a total

13  of $12,000; is that correct?

14     A    Mm-hmm.  That's correct.

15     Q    Now, suppose instead I had a

16  $12,000 expense for an asset that has a life

17  of ten years, but it's due all at once.

18          Would an economist treat that

19  the same economically as the $100 monthly

20  expense?

21     A    It depends on the analysis you

22  construct.  So if you -- if you have a

23  forecast of the occurrence of costs over

24  time, imagine building a spreadsheet to show

Page 101

1    the flow of those costs, you have an expected
2    time period, you might do an analysis where
3    you, for example, calculate the present value
4    of each of them.
5                    The alternative, which I've
6    chosen to do here, is to -- is to use an
7    expected value.  So in any given year there's
8    an expected value of that capital cost, and
9    that's another way of doing analysis to --
10                   Because, on average, the
11   community has an expected value of why
12   they've incurred that capital cost.
13                   So there are two ways to do
14   it.  That's not the way I've chosen to do it.
15        Q    What -- can you cite any
16   peer-reviewed publications that support the
17   use of that methodology in this case?
18        A    I'm not aware of any peer-reviewed
19   publications that support either methodology
20   for a case like this.
21        Q    Are you aware of any textbooks that
22   would support the methodology used here?
23        A    I could probably find a textbook
24   that talks about expected values, yes.

1      Q    But you didn't cite any authorities

2   in the literature for doing your analysis

3   this way, in either your original report or

4   your rebuttal, did you?

5              MS. JOSELSON:  Objection.

6      A    I didn't cite any authorities for

7   doing it either way.

8              (Pause.)

9   BY MR. WILSON:

10     Q    So you're talking about using your

11  model in a case where you're trying to come

12  up with an average expected cost each year to

13  a class member; is that correct?

14     A    Yes.

15     Q    But an individual within the

16  putative class, the reality of their

17  financial situation will likely be different

18  from the average, because they incur costs

19  within a specific year as capital costs; is

20  that correct?

21              MS. JOSELSON:  Again, well

22  plowed, first dep.

23     A    By definition, in the expected

24  value framework, you would expect that some

1    individuals in some years would experience a

2    capital cost, while others would not.

3                    For example, if it's a 20-year

4    item, you would expect 1 in 20 individuals to

5    incur that cost.

6                    So in any given year, I would

7    expect different individuals to have

8    different costs.  But on average, I would

9    expect them to have the expected value cost.

10       Q    Is there any individual in the

11   class who will not incur any capital costs at

12   the moment that they do replace their

13   equipment?

14                    MS. JOSELSON:  Objection.

15   First dep.

16       A    I don't -- I don't know what that

17   means.

18       Q    So every individual, when they do

19   choose to replace their equipment, will incur

20   capital costs as a result of that decision;

21   is that correct?

22                    MS. JOSELSON:  Same objection.

23       A    I would assume, unless someone

24   gives them equipment for free, yes.

```
 1        Q    Does everyone in the putative class
 2   own their own home?
 3        A    I would have to go back to the
 4   class definition.  I'm doing my calculations
 5   on a residential property basis.
 6        Q    But you don't know whether even
 7   those who are residential property owners own
 8   their home as opposed to renting it; is that
 9   correct?
10                 MS. JOSELSON:  I'm going to
11   object.
12        A    Yeah, I think the way you said that
13   is not correct.  You just said residential
14   property owners don't own their home.
15        Q    I'm sorry.
16                 Class members -- some of the
17   residential property class members own their
18   home and some of them rent it; is that
19   correct?
20                 MS. JOSELSON:  Objection.
21        A    So I'm not going to -- I'm not an
22   expert on who's a class member here.  What
23   I -- what I've done is, done an analysis of
24   residential properties within the class.
```

1              So whether there are

2    individuals who live in those homes who are

3    not owners of those homes, I don't know.

4         Q    So if there's a homeowner who is a

5    member of the class and they have a mortgage

6    on their home, can they use that mortgage to

7    pay for new costs, like a water tank, a water

8    softener, a pump?

9         A    If they have a line of credit, they

10   could, sure.

11        Q    Not a mortgage.  They would have to

12   use the line of credit; is that correct?

13        A    Yeah, I don't know how the mortgage

14   is structured, but some mortgages come with a

15   line of credit.

16        Q    Do home equity line of credits --

17   excuse me.

18              Home equity lines of credit,

19   do they have the same interest rate as

20   mortgages?

21              MS. JOSELSON:  Again, last

22   depo.

23        A    Yeah, I do not know what the

24   current distribution of home equity versus --

Page 106

1    depends on the individual.  Depends on the

2    markets they're in.

3         Q    The --

4         A    Depends on how much equity they

5    have in their home, for example.

6         Q    To your knowledge, home equity

7    lines of credit are often variable; is that

8    correct?

9         A    You mean varying between

10   individuals?

11        Q    Variable interest rates.

12        A    You mean varying with time, like

13   a --

14        Q    Yes.

15        A    They could.  I'm not an expert on

16   home equity lines of credit, so I'm not going

17   to give an opinion on that.

18        Q    Does everyone in the putative class

19   have access to credit cards?

20             MS. JOSELSON:  Again, last

21   dep.

22        A    Yeah, I don't know.  You would have

23   to point to something in the Mullin report or

24   one of the other reports that relates to this

1   topic.  We talked at length about this in the

2   first deposition.

3        Q    I don't think I have to point to

4   anything to ask the question, but I will do

5   so, in the interest of...

6                    So just for your reference,

7   I'm looking at pages 17 and 18 of your

8   rebuttal report, which addresses how capital

9   expenditures should be treated in your

10  methodology, or whether they should be

11  treated as capital expenditures at all.

12                   With that in mind, does

13  everyone in the putative class have access to

14  credit cards?

15       A    I have no idea.

16       Q    Because you didn't look?

17       A    Did not look.

18       Q    Now, you say that Dr. Mullin's

19  analysis erred because he failed to account

20  for the cost of stranded equipment; is that

21  correct?

22       A    Well, it's more complicated than

23  that.  He -- Dr. Mullin conducts a different

24  analysis.  So he's assuming that folks would

1   have to finance the capital investments

2   needed to replace equipment, on average.

3   He's, again, using an average.

4                    And he calculates what would

5   be the annual payments associated with those

6   capital investments until they're fully paid

7   for.

8                    So the first part of my

9   opinion is that if he does that, he should be

10  doing it on both sides, so his but-for

11  condition should be similar.

12                   Some of this capital equipment

13  isn't that different from the cost of paying

14  for a water bill, for example, and folks who

15  are -- who may not have cash flow may, in

16  fact, put it -- put their water bill on a

17  credit card.

18                   So he's got to be fair in the

19  analysis to treat those two -- those cash

20  flows correctly if he wants to do it the way

21  he's doing it.

22                   The second thing he needs to

23  do is recognize that if he believes folks

24  have financed all that equipment, that

1    everyone, pretty much except for the person

2    who just happened to have finished paying for

3    the piece of equipment, is going to have

4    undepreciated equipment in their household,

5    so to speak.  In other words, they're still

6    paying finance charges on it.

7                    And he would need to include

8    that, and I do a -- I do a simple calculation

9    to talk about the value of that -- of that

10   stranded equipment, if you want to take the

11   approach he's taken.

12                    So I'm not disagreeing that

13   what he's trying to do isn't valid.  What I'm

14   saying is, he's not doing it correctly and

15   fairly.

16        Q    So I'm real interested in what you

17   described in the second part of your opinion

18   there, the cost of stranded equipment.

19                    Did your opinion consider the

20   cost of stranded equipment?

21        A    No, because I'm using expected

22   value framework, so it incorporates it by --

23   with the expectation that each year you're

24   going to have to, on average, make a capital

1   investment of some amount.

2        Q    Did you consider the salvage value

3   of stranded equipment?

4        A    No, I chose not to do my analysis

5   that way.

6        Q    In critiquing Dr. Mullin's

7   analysis, did you consider the salvage value

8   of stranded equipment?

9        A    What I say is, in his analysis, you

10  have to consider it.  The way he's

11  constructed his analysis, you have to

12  consider it.

13       Q    Where do you refer to the salvage

14  value in your critique of Dr. Mullin's

15  opinion?

16       A    I say here that --

17            MS. JOSELSON:  If you just

18  want to give the page.

19       A    Oh, page 18.

20       Q    And what are we looking at?

21       A    Well, I say that to be true to his

22  analysis, the harmed parties would continue

23  to make payments until the equipment was

24  fully paid for, so that's the stranded

1   equipment, what you're calling salvage value.

2                   So the salvage value is the

3   opposite of the stranded equipment value.

4        Q    Yes.

5                   And you don't address salvage

6   value, do you?

7        A    Whether you could take this

8   equipment and sell it?  Is that what you're

9   referring to?

10       Q    Yes.

11       A    I do not address that, no.

12       Q    And if we're going to determine

13  that salvage value, we would need to know how

14  far into the life cycle of the equipment it

15  was at the time of this switch to municipal

16  water; is that correct?

17       A    As well as the market for used

18  pressure tanks and used pumps, et cetera.

19  I'm certain if you're looking for a used

20  pump, there's a bunch of plumbers out there

21  who would be happy to get you one.

22       Q    Let's take a look at page 19 of

23  your rebuttal to Dr. Mullin.

24                   It says in the paragraph in

1    the middle of the page, "In fact, new

2    customers of the system will largely be on

3    the fixed-price schedule.  That is,

4    Dr. Mullin misunderstands that new water

5    utility customers in the Town of Bennington,

6    with the exception of several commercial and

7    multifamily properties, will all be under a

8    flat-rate billing system."

9                Did I read that correctly?

10        A    You did.

11        Q    And you cite a personal

12   communication with Jason Dolmetsch for this

13   proposition; is that correct?

14        A    Yeah.  In effect, in the totality

15   of my opinion, I say two sources.  One was

16   the expectation in my first report that folks

17   would choose the flat-billing rate; and then

18   I checked with Jason, and he said people were

19   choosing the flat-billing rate.  They were

20   choosing not to install meters.

21        Q    And, just to be clear, was this the

22   same personal communication with him that you

23   cited in your original report or is this a

24   different communication?

1    A   No, it's different, because time

2  had passed, so we knew what people were

3  choosing to do.

4    Q   And was this a phone call with

5  Mr. Dolmetsch?

6    A   Yes.

7    Q   Did you create any memorandum or

8  note about that phone call?

9    A   If I did, it would have been in my

10  discovery materials or it just went in the

11  report.

12    Q   I'll represent to you that there

13  wasn't anything.

14    A   So it was probably a single

15  question, and it went in the report.

16    Q   So your basis -- the basis for your

17  opinion about this rate for Bennington only

18  is based on undocumented oral communication

19  that we did not witness and cannot verify; is

20  that correct?

21           MS. JOSELSON:  Objection.

22    A   I think all oral communication,

23  unless you were there, you wouldn't witness

24  it, so...

1      Q     And there's no documentation of it?

2      A     The documentation is right here in

3  the report.

4      Q     There's no --

5      A     I could write it down on a separate

6  piece of paper, if you'd like, but it was a

7  single question I asked him.

8      Q     You have no contemporaneous notes

9  about that communication, do you?

10      A     If I did, they would have been in

11  discovery materials, but I can go check.

12      Q     Let's take a look also on page 19,

13  the next paragraph, it says, middle of the

14  paragraph, "That is, while Dr. Mullin

15  questions the accuracy of my annual

16  electricity cost figure, as shown in

17  Exhibit 3, I assume an average annual

18  electricity cost of $47.  This value is the

19  same as that presented by Dr. Mullin for a

20  400-foot well pumping 300 gallons per day.

21  Both of these factors are supported by the

22  underlying evidence presented in both my

23  report and by Dr. Mullin."

24      A     Mm-hmm.

1      Q     Did I read that correctly?

2      A     Mm-hmm.

3      Q     Can you describe how you estimated

4   the annual electric costs of $47 for each

5   resident?

6      A     So we had previously done estimates

7   of what it costs to operate a well pump, and

8   the -- that's a function of the amount of

9   energy required to lift water and how much

10  you're lifting it, so that's why it's varying

11  across this chart.  And it's a function of

12  how much electricity costs in the area you're

13  talking about.

14              So we took an estimate that we

15  had for that that we had done previously, and

16  we updated it for this area based on -- there

17  haven't been big changes in efficiencies of

18  pumps during that time period, and the well

19  depths were similar here, on average, to

20  where we had worked before, and so we just

21  updated it for the Vermont electricity

22  pricing.

23      Q     And that was --

24              MS. JOSELSON:  And I'll just

1   point out for the record, this was

2   extensively questioned in the first depo.

3          Q    And just for clarity, that was --

4   that prior work was from the Lockformer case?

5          A    That's right.  And I don't

6   remember, sitting here today, whether those

7   calculations had extended to other venues.

8   They might have.

9          Q    Does everyone in the putative class

10  here have 400-deep -- 400-foot-deep well?

11         A    No, I would expect well depths to

12  vary.

13         Q    Does everyone pump 300 gallons a

14  day?

15         A    I would expect those to vary,

16  although there's some consistency in water

17  use by homeowners.

18         Q    So depending on the depth of the

19  well and the amount of output, your chart

20  shows a range of $6 to $131 in annual

21  electric costs; is that correct?

22              MS. JOSELSON:  Again, asked in

23  the first dep.

24         A    It does.  And I note in my text

1  here that some of those extremes may be

2  unrealistic.  You may not be able to find a

3  well with those characteristics.

4             But this chart is simply a

5  recitation of values if you change those two

6  factors.

7     Q    And so depending on the depth of

8  the well and the amount of output, your chart

9  shows a range of $6 to $131 in annual

10  electric costs; is that correct?

11     A    I believe this chart is actually

12  out of the Mullin report.  I think that's its

13  original...

14     Q    But the chart that's listed on

15  page 20 of your report shows a variation from

16  $6 to $131; is that correct?

17             MS. JOSELSON:  Object.

18     A    It shows that.  And, as I

19  mentioned, I don't know if there's anyone up

20  there with a 100-foot-deep well who only uses

21  100 gallons or if there's someone with a

22  600-foot-depth well that uses 600 gallons a

23  day.

24             That would be a lot of water

1  for a resident to use.

2      Q    Because you didn't evaluate well

3  depths and water usage in the putative class

4  area, did you?

5      A    Asked and answered in the first

6  deposition, but no, I did not.

7      Q    If you have objections, I'll ask

8  your lawyer to assert them --

9      A    Oh, sorry, yes.

10     Q    -- since you represented you're

11 not, in fact, an attorney.

12              MS. JOSELSON:  However, this

13 witness can recall what he was asked and what

14 he testified to in his first deposition, and

15 it's totally reasonable for him to respond to

16 that.

17              It shouldn't be construed as

18 legal objections.

19 BY MR. WILSON:

20     Q    Wouldn't want you to go pro se.

21     A    What does that mean?

22              MS. JOSELSON:  Without a

23 lawyer.  Representing yourself.

24              THE DEPONENT:  Sorry.

1   BY MR. WILSON:

2        Q     A lawyer who represents himself has

3   a fool for a client, they say.

4        A     I've heard that, yes.

5        Q     So it's possible that someone who

6   had a 600-foot-deep well and pumped 600

7   gallons a day, that their electric cost could

8   be almost $100 more than the average cost

9   that you've calculated?

10       A     If there were someone like that, it

11  would be.  And the point of this exhibit was

12  to point out that the value that I applied,

13  which is also the value that Dr. Mullin

14  applies in his analysis, is in the centroid

15  of these values and is supported broadly by

16  typical household consumption and typical

17  well depth in this area.

18       Q     And if that was someone looking

19  from the Town of Bennington who used a water

20  softener, where you're estimating the annual

21  cost increase was $113 a year, then a -- an

22  additional electric charge of nearly a

23  hundred dollars would almost completely

24  eliminate any additional cost they have from

1  switching to municipal water; is that

2  correct?

3            MS. JOSELSON:  Objection.

4       A    In your hypothetical calculation of

5  that hypothetical individual, yes.

6       Q    Let me cover one more topic, and we

7  can break for lunch.  Let's turn to page 5 of

8  your rebuttal to Dr. Mullin.

9            It says at the top of this

10 page, "Dr. Mullin offers no insights into how

11 damages should be estimated for residents

12 forced to remain on POETs.  It fails to

13 consider the obvious use of the cost to

14 connect these homes to the municipal system

15 as a measure of monetary damages."

16            Did I read that correctly?

17      A    You did.

18      Q    Why do you maintain it's obvious

19 that we would measure damages of people who

20 are not connected to the municipal system

21 based on the costs that they would incur if

22 they did connect to the municipal system?

23      A    What I said was, you -- that -- I'm

24 not sure I would word it that way.

1           What I'm saying is, that there
2    is another solution for these individuals,
3    which is to go ahead and incur the cost of
4    getting them hooked up.  It's not -- it's not
5    beyond the realm of possibility.  It's just
6    expensive.  And so that -- that is one way
7    that these folks could be remedied.
8           And my point here is that
9    there -- it's important to have some measure
10   of loss to these folks, and he's not offering
11   one.
12      Q    Is there any statement in your
13   previous reports that these individuals may
14   be connected to the municipal system?
15      A    I don't remember.  When I wrote the
16   original report, there was some uncertainty
17   as to whether they would ultimately be
18   reached, or whether they would have to put in
19   deeper wells, for example, or whether they
20   would be left with POETs until the time they
21   didn't need them.
22           So I'd have to go back to my
23   original report and see if I considered that.
24   I was considering it at the time.  Whether

1  it's in the report or not, I don't know, but

2  I know that's an uncertainty factor.

3       Q    Are you aware of any evidence at

4  this time that connection of these

5  individuals to the municipal water system is

6  still being considered as a potential option?

7       A    I would have to talk with Jason or

8  other folks who were involved in the actual

9  engineering to figure out where they're

10  turning out on these and whether they think

11  it could be addressed in the future.

12       Q    Because you're not aware of any

13  evidence at this time that it's being

14  considered, are you?

15       A    As I sit here right now, I would

16  say that I know it was considered in the

17  past, is what -- by definition, they were

18  trying to figure out whether they could get

19  to these folks.

20              I don't know whether those

21  discussions are continuing.

22       Q    And the last you heard, was there a

23  determination that it was not feasible to

24  connect them; is that correct?

```
 1      A     That there are some number of folks
 2  that it may not be feasible, and they're
 3  looking at some alternatives.
 4                Now, if those alternatives
 5  aren't feasible, I would imagine they would
 6  consider whether they could extend.
 7      Q     So we would also need to know
 8  whether those individuals' wells can or will
 9  be modified, as you mentioned; is that
10  correct?
11      A     Right.
12                MS. JOSELSON:  Object to the
13  form.
14      A     That's right.  That is one possible
15  solution.
16      Q     And is there any way to determine
17  that, except by looking at the circumstances
18  of those individual properties?
19      A     I think they're going to have to
20  drill and determine whether the water is --
21  comes out clean and whether it's -- has the
22  right yield and -- yeah.
23      Q     So we'll need to conduct an inquiry
24  into the circumstances of that future
```

```
 1   drilling and the recommendations that are
 2   made about that to determine whether these
 3   alternative methods of remediation are
 4   feasible in these circumstances; is that
 5   correct?
 6              MS. JOSELSON:  Object to the
 7   form.
 8       A    I'm not sure I followed all that,
 9   so...
10       Q    We would need to inquire into the
11   circumstances of that future drilling that
12   you mentioned and the recommendations that
13   are made about the drilling to determine
14   whether these alternate methods for
15   remediation of these people on POETs are
16   feasible under the circumstances; is that
17   correct?
18              MS. JOSELSON:  Again, same
19   objection.
20       A    I think what I would say is, we're
21   going to have to wait and see how it turns
22   out.
23       Q    And how it turns out depends on the
24   drilling and the reports; is that correct?
```

1      A     Yeah, it depends on whether they're

2   successful in finding clean water in proper

3   quantity and stuff like that.

4      Q     So when there's many potential

5   remediation options for these individuals on

6   POETs that are additional to the POET they

7   already have, and none of them have been

8   finally agreed to, proposed or determined in

9   any respect, how can you characterize any one

10  of those as a loss for purposes of your

11  damages analysis?

12                MS. JOSELSON:   Object to the

13  form.

14      A     I don't think I do.  I don't think

15  that reflects the totality of my report.

16                What I say in the report, in

17  several spots in these reports, is that it

18  remains to be determined how these folks will

19  be -- how their water quality will be

20  addressed.

21                Obviously, I would imagine

22  there's pressure to have it addressed in a

23  manner that doesn't require continuous use of

24  POETs.  You know, something like deeper

Page 126

1   wells.

2            But I also understood from the

3   work that I did earlier and discussions I had

4   with the engineers that there still is the

5   possibility if that's not feasible that they

6   would return to the idea of hooking people

7   up.

8            But that is -- that is one

9   alternative, is to get water to folks.

10       Q    So did you just pick the connection

11  to the municipal water instead of the

12  modifications to the well because that was

13  easier?

14       A    No, but -- the first sentence here

15  says for people forced to remain on POETs.

16  So these are people who don't have the

17  opportunity to modify their well.  These are

18  people for whom they are remaining on POETs.

19       Q    Yes, and we're --

20            But you mentioned that wells

21  may be modified depending on the drilling,

22  but we don't know yet.

23       A    Right.  But the sentence says, for

24  residents forced to remain on POETs, so for

1   folks for whom that remedy doesn't work.

2              And I would be cautious

3   about -- again, within the field of

4   environmental economics, "remedy" typically

5   means remediating the physical environment,

6   not hooking people up to wells -- a municipal

7   system.  That's a different topic.

8              But what I'm saying here is,

9   for folks who are forced to remain on POETs,

10  there may be a consideration of whether --

11  what would it cost to get them off POETs by

12  putting them on the municipal system.  Just

13  spend the money you need to spend to get them

14  a pipe.

15     Q    But you don't have, again, any

16  documentary evidence that suggests that

17  that's going to happen or is still under

18  consideration for these individuals, do you?

19     A    Not as I sit here today, no, but it

20  would seem reasonable.

21     Q    And you're still using that as a

22  measure of damages, is that correct, a

23  hypothetical municipal connection?

24     A    I did not calculate damages based

1  on that cost.

2      Q    You're saying these individuals'

3  damages should be measured as though they've

4  already been connected to the municipal water

5  system, even though they are not; is that

6  correct?

7                MS. JOSELSON:  Objection.

8      A    Yes.  As I said in my first

9  deposition, and as I said in my first report,

10  that that, I believe, is the -- a lower-bound

11  estimate of loss, because the best

12  opportunity for them would be to be hooked up

13  to a municipal system, from a health

14  perspective and...

15      Q    That's -- that's curious to me,

16  because I know you've said before that

17  there's a revealed preference that people

18  don't want to be on municipal water.

19                So why is it that for these

20  people that's the best option and for public

21  health?

22      A    Because if you drill the well

23  deeper, you still could have intrusion of

24  contaminants.  You could also draw

1   contaminants down through the well casing.

2                   I mean, it's -- it's not a

3   permanent solution.  It's a solution that

4   hopefully works.  But from public health

5   perspective, whether they prefer municipal

6   water or not, it would be better to get those

7   folks on the municipal water.

8        Q    Is that better than a POET?

9        A    I would say so, because the POET --

10  operating a POET continuously, you don't know

11  from day to day whether it's operating

12  correctly.

13                  They typically are pretty

14  effective, but you don't know for sure, so

15  you would -- it would be better to go off

16  POET.

17       Q    Who's paying for the maintenance on

18  those POETs?

19       A    I have no idea.  It's not in my

20  damages model.

21       Q    Page 23 of your rebuttal to

22  Dr. Mullin, in the second sentence of the

23  last paragraph, it says, "For example, as an

24  alternative measure of loss, we can estimate

```
 1   the cost to connect these parties to one of
 2   the two municipal systems.  That is, while
 3   the State of Vermont partial consent decree
 4   may not require these connections, there's no
 5   reason why such relief could not be granted
 6   at the class level."
 7                 Did I read that correctly?
 8        A    You did.
 9        Q    Is that opinion stated in your
10   original reports?
11        A    I don't believe so.
12        Q    Did you attempt to estimate the
13   cost of connecting those individuals to the
14   municipal system?
15        A    No.  I'm just saying that's one
16   possible way to get to a remedy.
17        Q    What information would that
18   require?
19        A    I think you would have to have an
20   engineering cost estimate of running the line
21   out further and taking whatever measures are
22   needed to maintain water quality on those
23   lines.
24        Q    So since you didn't attempt to
```

1   estimate the cost of connecting those

2   individuals to the municipal system, to do so

3   would require an engineering cost estimate.

4                Is it correct that there's no

5   reason why such relief could not be granted

6   at the class level?

7                MS. JOSELSON:  Objection.

8        A    What I'm saying here is that the

9   State has had a set of considerations for

10  when they're going to allow individuals to

11  not be connected, in other words, where they

12  feel the cost is too much or technically it's

13  difficult.

14               There's no reason why a judge

15  couldn't simply rule as a matter of relief

16  that it has to be done.

17       Q    But you're not a lawyer; is that

18  correct?

19       A    No.

20       Q    Okay.

21       A    But there's no cost-benefit

22  standard there.  I'm a policy analyst in

23  environmental economics.  I know there's no

24  cost-benefit standard there, so...

1      Q    And to determine the feasibility of

2   that relief would involve individual

3   increation into the circumstances of how to

4   make those municipal connections to each

5   class member; is that correct?

6      A    Yes.

7      Q    So wouldn't that constitute a

8   reason why such relief could not be granted

9   at the class level, understanding, of course,

10  that you're not a lawyer?

11             MS. JOSELSON:  Object.

12     A    I think, by definition, if a judge

13  were to order them to connect folks to the

14  system, the relief would be granted at the

15  class level.

16     Q    Also on page 23, last sentence of

17  the preceding paragraph of the one we were

18  just looking at, it says, "However,

19  anonymously, he" -- that is Dr. Mullin --

20  "notes that at least one named plaintiff does

21  not trust the POET and thus purchases bottled

22  water, indicating that these parties are

23  experiencing an economic loss."

24             Did I read that correctly?

Page 133

1      A      You did.

2      Q      Now, Dr. Mullin's report refers to
3   the plaintiff who did not trust the POET and
4   wants bottled water.

5                  That concerns one of the named
6   plaintiffs who claims that she has unique
7   damages from the POET; is that correct?

8                  MS. JOSELSON:  Object.

9      A      I believe that's the case, yes.

10     Q      Do you believe she's correct that
11  that constitutes damages for her?

12                 MS. JOSELSON:  Object.

13     A      I don't have an opinion on that.
14  I'm not calculating damages for purchasing of
15  bottled water.

16     Q      Does your model address the unique
17  damages that she claims in this case?

18     A      No.

19     Q      Do you know how many other people
20  in the putative class might also claim those
21  damages?

22                 MS. JOSELSON:  Object.

23     A      It's not included in my damage
24  estimate.

1      Q     How would we determine whether her

2   decision to keep purchasing bottled water

3   constitutes damages?

4                  MS. JOSELSON:  Object.

5      A     You're asking me to hypothesize

6   about whether if I were asked by my client to

7   calculate damages to folks who were buying

8   bottled water how I would do that?

9      Q     Yes, or whether it constitutes

10   damages at all.

11                  MS. JOSELSON:  Object.

12      A     So from an economics perspective,

13   if she's changed her behavior to purchase

14   bottled water and that bottled water has some

15   costs associated with it beyond her previous

16   cost, that is a damage.  It is a change.

17                  I've chosen not to estimate

18   here.  It's not in my model.  I wasn't asked

19   to estimate that.

20      Q     Would we have to evaluate at all

21   whether it's reasonable for her to make that

22   decision?

23      A     Not from an economics perspective.

24   There may be issues of whether legally she

1    could get remedy, but it is a true damage;

2    but she may just not have a remedy if for

3    some reason the court doesn't think it's

4    reasonable.  It's still a damage.

5         Q    So --

6         A    From an economist's perspective,

7    there's a difference between what the damages

8    are and what may be recoverable in

9    litigation, and I don't know the latter.

10        Q    So if there were a class member

11   that said, well, because of the defendant's

12   conduct in this case -- not this case, but

13   any case -- I gave my life savings to a

14   Nigerian prince who emailed me about a

15   check --

16        A    You got that same email I did,

17   apparently.

18        Q    Yes.  Okay.

19                 -- can that plaintiff claim

20   that the expenditure of their life savings to

21   that Nigerian prince as damages?

22                 MS. JOSELSON:  I think it's a

23   completely inappropriate question.

24                 He's already said, and you know,

1   he's not a lawyer.  He's not going to testify to

2   what are legally recoverable damages in a purely

3   hypothetical case.

4                   It's a silly question, and he's

5   already answered it in other forms as best he

6   can.

7                   MR. WILSON:  I'm asking him --

8       Q    As an economist, does that

9   constitute damages?

10      A    I would say as a -- as a consulting

11  economist, I would advise my client that that

12  category of damage may be difficult to

13  recover, as opposed to someone making the

14  prudent decision in their minds to protect

15  their health by consuming bottled water as

16  opposed to public water, or what they view as

17  a prudent decision.

18      Q    What disciplines, if not economics,

19  would be relevant to determine whether an

20  individual's behavior in response to a given

21  event constitutes damages?

22                  MS. JOSELSON:  Objection.

23      A    Again, the economist can estimate

24  the damage, which is the cost of the change

1  of behavior that would have taken place

2  otherwise.  Economists would do that.

3                    I would assume a lawyer would

4  determine whether that's recoverable under

5  the law.

6                    So, for example, if I'm

7  driving to work in the morning and someone in

8  front me has an accident -- and I'm not

9  touched; I'm not involved in the accident at

10  all -- and I'm late to work, I incur damage.

11  There's no remedy under Massachusetts law

12  that lets me sue the parties who were

13  involved in the accident, but it's a real

14  damage.

15      Q    And so it might be relevant in this

16  case to look at whether the individual's

17  fears about the water that comes out of the

18  POET is safe -- whether those fears are

19  reasonable might be relevant to determining

20  whether this constitutes damages; is that

21  correct?

22                    MS. JOSELSON:  Same objection.

23  Asked and answered.  You're asking him for a

24  legal conclusion.  He's already given his

```
 1   expert opinion.
 2        A     And I would expect -- you know, I
 3   would probably rely on my folks who do
 4   epidemiological calculations to ask whether
 5   that's a prudent behavior, given the
 6   possibility the POET doesn't work.
 7                    But I wouldn't question the
 8   behavior in calculating losses, but I'm also
 9   not calculating this category of loss.
10   That's entirely hypothetical.
11                    MR. WILSON:  We can break for
12   lunch.
13                    MS. JOSELSON:  Okay.
14                    THE VIDEOGRAPHER:  The time is
15   12:08 p.m.  We are going off the record.
16                    (Lunch recess.)
17                    THE VIDEOGRAPHER:  We are back
18   on the record.  The time is 1:05 p.m.
19   BY MR. WILSON:
20        Q    Mr. Unsworth, just to follow up on
21   a question I asked earlier, I believe you
22   said that you're not aware of who is paying
23   the cost to maintain the POETs for the
24   individuals who are slated to remain on them;
```

1   is that correct?

2        A    Yes.  Sitting here today, I'm not

3   sure how that compensation is being provided.

4        Q    Does it matter to your analysis

5   whether someone else is paying those costs?

6        A    No.  I don't include the POETs in

7   my cost estimate, so it wouldn't matter to my

8   analysis.  They're neither there nor absent.

9        Q    Let's take a look at page 9 of your

10  rebuttal to Dr. Mullin.

11             In the second sentence of the

12  second full paragraph, it says, "While

13  Bennington and North Bennington have

14  municipal systems, there's been no observable

15  trend of residents shifting to those

16  municipal systems.  Dr. Mullin cites no

17  evidence of such a trend.  As I noted in my

18  initial reports, observed behavior of

19  residents of Bennington and North Bennington

20  over the past decades is a clear indicator

21  there was little demand by residents with

22  existing groundwater wells to connect to the

23  municipal systems absent PFOA contamination."

24             Did I read that correctly?

1      A     You did.

2      Q     Did you attempt to assess whether

3 the cost of connecting to municipal water

4 systems affected whether residents who did

5 not have access sought to obtain it?

6      A     We talked about that at length in

7 my initial deposition, and I stated that this

8 is -- these are substantial savings that

9 Dr. Mullin is asserting; and therefore, this

10 savings existed.  And if the revenues

11 existed, what I've said in this report, I

12 would expect there would have been pressure

13 to come onto the system, and there wasn't.

14      Q     I'm not sure if I understand your

15 answer or if it addressed my question.

16              My question is, did you

17 attempt to evaluate whether the cost that a

18 resident would have to pay to connect to

19 municipal water if access wasn't already

20 provided affected whether they had sought to

21 obtain a connection to municipal water prior

22 to the discovery of PFOA?

23              MS. JOSELSON:  Again, I think

24 it's been a subject that was asked/explored

1   during the first depo, but you can answer.

2        A     Yes.  So the question you're asking

3   is whether the cost of hookup would have

4   prevented people from taking advantage of

5   being on the municipal water even if they

6   wanted it.

7                   And as Dr. Mullin points out,

8   there are some number of homes that are

9   actually on streets with connections who have

10  chosen not to.  There are homes on streets

11  that are on nearby connections.

12                   We don't -- as I noted in my

13  original report, and as I noted in

14  deposition, there's only a handful of folks

15  who have joined these systems.  So I'm not

16  seeing any elasticity at all for demand.  I'm

17  not seeing much interest in joining the

18  systems.

19                   Presumably, the cost of hookup

20  might vary from household to household, but

21  given the asserted substantial savings and

22  the benefit to the community, you would have

23  thought there would have been that behavior,

24  and we're not seeing it.

1    Q    So the cost, though, of hooking up

2  to the municipal system is relevant to

3  whether a resident would have wanted it; is

4  that correct?

5              MS. JOSELSON:  Objection.

6  Again, explored.

7    A    What I'm comparing is a but-for

8  condition.  These homes had a pipe that came

9  into the house from their well, and it went

10  into a pressure tank and was distributed

11  within the house, or they have a pipe coming

12  in from the municipal system, and we're

13  comparing those two -- those two conditions.

14    Q    And I'm asking whether the cost of

15  making that hookup prior to discovery of PFOA

16  is relevant to whether a resident would have

17  wanted that hookup.

18    A    I have no idea whether that would

19  have -- would have gone into their

20  considerations.

21    Q    Did you attempt to determine the

22  amount of those costs?

23    A    No.

24    Q    If it was going to cost $20,000 per

1   household on average, do you think that would

2   be relevant to whether residents were

3   interested in making a connection to the

4   municipal water system?

5                MS. JOSELSON:  Objection.

6       A    I think what you would look at is

7   whether there's any action there at all.  You

8   don't look at the most expensive home and ask

9   why they didn't switch.  You would ask

10  whether -- for homes that are directly

11  proximate to the system, why didn't they

12  switch.

13      Q    I'm asking, though, if you had

14  information that showed you that it would

15  cost $20,000 to hook up a given home to the

16  municipal water system.  Is that relevant to

17  your analysis of whether people preferred

18  municipal water to well water?

19                MS. JOSELSON:  Asked and

20  answered.

21      A    Again, you're asking the same

22  question over again.

23                But I'm saying that comparing

24  the but-for condition, that is not my but-for

1   condition, and I also don't see any demand

2   for the system, no matter the cost.

3         Q     I'm -- I know you've pointed out

4   that I'm asking the question over again, but

5   I'm asking over again because you haven't

6   answered it.

7                     I'm asking whether that cost

8   is relevant.  Would a $20,000 cost be

9   relevant to this issue?

10        A     No --

11                    MS. JOSELSON:  Objection.

12        A     -- I'm not including that in my

13   analysis.

14        Q     Okay.

15                    Would an $80,000 cost per

16   household to connect to municipal water be

17   relevant to the incentives at issue here?

18                    MS. JOSELSON:  Objection.

19        A     So would I think that that's

20   relevant to whether people would have chosen

21   to be on the municipal system or not?

22        Q     Yes.

23        A     It depends on what the policy would

24   have been on hooking people up, whether the

1    municipality would charge them or whether it

2    would be built into their rates.

3         Q    So if 80,000 -- if municipal -- if

4    class members would have been charged

5    personally $80,000 to obtain hookup to a

6    municipal water system, do you think that

7    that would be relevant to their decision of

8    whether they preferred to stay on well water

9    or get municipal water?

10                   MS. JOSELSON:  Are you asking

11   giving contamination or with no

12   contamination?

13                   MR. WILSON:  Thanks for the

14   clarification.

15   BY MR. WILSON:

16        Q    Assume before there's been any

17   contamination.  In the abstract, if it -- let

18   me withdraw the question.

19                   Assume before the discovery of

20   PFOA whether -- if the municipal water hookup

21   cost $80,000, would that be relevant to an

22   individual class member's decision of whether

23   they preferred to remain on well water or

24   seek a hookup?

```
 1        A     I don't know what the --
 2                    MS. JOSELSON:  Same
 3   objections.
 4        A     I don't know what -- we talked
 5   about this at the original deposition, and I
 6   do not know what individual homeowners'
 7   preferences are.
 8        Q     Sir --
 9        A     What I look at is the revealed
10   behavior observed in the market.
11        Q     So the revealed behavior shows, at
12   least, that at whatever the cost was to
13   individual class members, there is
14   noninterest in these individuals joining the
15   municipal system; is that correct?
16        A     That seemed to be the case.
17        Q     But the cost would be relevant to
18   that question, wouldn't it?
19        A     I don't know who it would be borne
20   by, so I don't know if it's relevant to that
21   question.
22        Q     If it was borne by the plaintiff,
23   would it be relevant?
24                    MS. JOSELSON:  Object.
```

1      A    It could be relevant to their

2    decision of whether to join, but I didn't see

3    anybody looking to join.

4      Q    But you also didn't look at what

5    the cost was, did you?

6              MS. JOSELSON:   Objection.

7      A    I did not look at individual cost

8    to connect, no.

9              But that also was not covered

10   in Dr. Mullin's report, I'll note on the

11   record.  It was covered in my original

12   deposition.

13     Q    You also say on page 10 at the top,

14   "This conclusion ignores multiple other

15   factors that determine the use of public

16   water supplies:  For example, historical

17   connection to the municipal system,

18   preferences of individual buyers, lot

19   characteristics that preclude a well,

20   availability of properties with desired

21   characteristics.  As such, the fact that many

22   of the residents choose to live in residences

23   served by municipal water does not negate the

24   potential for financial losses to all

 1   residents, including residents who selected

 2   residences with private wells, nor does it

 3   imply anything about the preferences of these

 4   residents for municipal water."

 5                   Other than mispronouncing

 6   "chose" and "choose," did I read that

 7   correctly?

 8        A    You did.

 9        Q    So you acknowledge that there are

10   multiple other factors that determine the use

11   of public water supplies; is that correct?

12        A    What I'm saying is, there's

13   multiple factors to determine whether a

14   property in Bennington or North Bennington

15   has a public water supply, and that's the

16   historical fact of -- of where those homes

17   were when those systems were installed.

18                   The preferences of individual

19   buyers matter.  Some people don't want a home

20   with a well.  Some people want a home with a

21   well, and so those are individual

22   preferences.

23                   And then there are rules on

24   your lot size and characteristics that limit

1    whether you can have a well.  And then you

2    might not be able to find the property you

3    want.  If you really want a large lot, you

4    may not find one that's on the municipal

5    system.

6         Q    So to evaluate why someone does or

7    does not choose to connect to the municipal

8    water system, we need to evaluate the factors

9    that you identify in this paragraph of your

10   report; is that correct?

11                   MS. JOSELSON:  Objection.

12        A    You'll have to repeat that.

13        Q    In order to evaluate why someone

14   does or does not choose to connect and use

15   the municipal water supply, we should

16   evaluate the factors that you identify here,

17   including historical connection to the

18   municipal system, preferences of individual

19   buyers, lot characteristics that preclude a

20   well, and availability of properties with

21   desired characteristics; is that correct?

22                   MS. JOSELSON:  Same objection.

23        A    I guess I don't understand the

24   question.  This is in response to the --

1  Dr. Mullin's statement that everyone who

2  had -- most people who had historical access

3  to the water system were on the water system,

4  and I didn't think that proved his point that

5  folks preferred to be on the municipal water

6  system.

7       Q    And so you've identified a number

8  of other factors that are relevant; is that

9  correct?

10      A    That's correct.

11      Q    And so those factors should be

12  considered; is that correct?

13                MS. JOSELSON:  Objection.

14      A    I don't -- I don't have to consider

15  them.  The individuals who bought the homes

16  with wells considered those factors

17  themselves.

18                I don't -- I don't need to

19  know now why they made those decisions.

20      Q    What methodology allows you to

21  identify a factor as relevant to your

22  analysis and then not consider it?

23                MS. JOSELSON:  Objection.

24      A    I didn't say that.  What I said

1   was, Dr. Mullin didn't consider these factors

2   in his conclusion of his -- the point he was

3   trying to make.  It wasn't the point I was

4   trying to make.  It's the point he was trying

5   to make.

6                   I don't think he understood

7   the historical -- the history of municipal

8   water connections in Bennington and why they

9   are where they are.

10      Q    Let's turn to page 16 of your

11  rebuttal to Dr. Mullin.  I'm sorry, page 24.

12                  So in the last sentence of the

13  paragraph that begins with "in short," it

14  says, "The analysis I conducted, conclusions

15  I've reached with respect to replacement of

16  the services previously provided by

17  groundwater is consistent with this cause of

18  action and consistent with the well-accepted

19  practice in the field of environmental damage

20  assessment," citing Lane, et al., 2009.

21      A    Yes.

22      Q    Did I read that correctly?

23      A    You did.

24                  MR. WILSON:  I'd like to mark

1  this for identification as whatever our next

2  exhibit number is.

3              MS. JOSELSON:  7.

4              (Exhibit 7 marked for

5  identification.)

6  BY MR. WILSON:

7      Q    Mr. Unsworth, the court reporter

8  has handed you what's been marked as

9  Defendant's Exhibit 7 to this deposition.

10             Can you tell me what this is?

11     A    It's the article I cite in that --

12  at the end of that paragraph.

13     Q    So under the introduction on the

14  first page of this article, it says in the

15  second sentence, "Trustees of natural

16  resources, including state and federal

17  agencies and Native American tribes, need to

18  determine the amount of restoration required

19  to compensate the public for injuries to

20  natural resources caused by releases of

21  hazardous substances.  To accomplish this

22  goal" --

23             I'm sorry.  Pardon me.  I'm

24  going to withdraw that question.

1          Let's start with the abstract
2    instead.  In the second sentence of the
3    abstract, it says, "According to the US
4    Department of Interior regulations for NRDA,
5    Trustees of natural resources develop
6    alternatives that will 'restore,
7    rehabilitate, replace, and/or acquire the
8    equivalent of the injured resources.'
9    Identification, scaling, and evaluation of
10   groundwater restoration projects has proven
11   challenging.  This paper describes potential
12   categories of groundwater restoration
13   projects, including:  1) Generating clean
14   water, 2) Conserving water, 3) Storing water
15   for times of scarcity, and 4) Accessing new
16   sources of water that were previously
17   inaccessible or unusable."
18               Did I read that correctly?
19       A     You did.
20       Q     So this article is describing a
21   method of assessing natural resource damages
22   for natural resource trustees; is that
23   correct?
24       A     Well, that's the context that

1    they're describing here.

2         Q    Is there a trustee in this case?

3         A    I don't think there has to be one

4    for this to be relevant.

5         Q    I'm asking whether there's a

6    trustee in this case.

7         A    Well, the State of Vermont is a

8    trustee for natural resources, including

9    groundwater, so there is a trustee.  I don't

10   know if they've chosen to bring a claim.

11        Q    Are you aware of whether the State

12   of Vermont is a plaintiff in this action?

13        A    I just said, I don't know whether

14   they've chosen to bring a claim.

15        Q    There isn't any literature cited in

16   your report that supports the application of

17   replacement cost valuations for natural

18   resource trustees to private plaintiffs

19   alleging a loss of use of groundwater, is

20   there?

21             MS. JOSELSON:  I'm going to

22   object.  This is all subject to his first

23   deposition.

24        A    Yes, that statement, actually, is

1    incorrect.

2                    So trustees act in the public

3    good, so they're acting to restore natural

4    resources so the public has access to those

5    resources, so I wouldn't agree with your

6    characterization.

7        Q    I'm asking whether your report

8    cites any articles that say that the method

9    of analysis described in the Lane article for

10   natural resource trustees is also applicable

11   to private plaintiffs alleging a loss of use

12   of groundwater.

13                   MS. JOSELSON:  Objection.

14       Q    Does your report cite any such

15   articles?

16       A    It doesn't, but that's a basic

17   premise of environmental economics.  It

18   doesn't require this paper to state it.

19                   The context of this paper was

20   a CERCLA paper, but that doesn't affect

21   whether or not the method is applicable in

22   other harms caused to groundwater, and how

23   you get compensation to the public is not

24   relevant to the method.

1      Q     Are you able to cite to me for this

2   allegedly widely used method any

3   peer-reviewed publications that describe its

4   use in the context of private plaintiffs

5   alleging a loss of use of groundwater?

6      A     So the idea of replacing a service

7   provided by groundwater?

8      Q     Under the framework that's outlined

9   here in the Lane article that you cite --

10     A     The Lane article is describing a

11   method.  It's not -- and an application.

12   It's not describing the law.

13     Q     It's important for you to just wait

14   until I'm finished with my questions before

15   you start answering.

16                Are you aware of any articles

17   that describe the application of the Lane

18   method to claims by private plaintiffs

19   alleging a loss of use of groundwater?

20     A     I'm not aware of any articles, but

21   they're restoring the loss of use to the

22   public, so it's to the same individuals.  It

23   wouldn't matter what the cause of action is.

24     Q     Is the public the plaintiff in this

Page 157

1   case?

2        A     Members of the public are

3   plaintiffs in this case.

4        Q     Oh, members of the public?

5        A     Yes.

6        Q     Okay.

7        A     Was that a question or...

8        Q     So damages are typically modeled on

9   but-for conditions; is that correct?

10       A     That's one common damage model,

11  yes.

12       Q     And you stated in your rebuttal

13  report that your replacement cost damages are

14  intended to be above the but-for condition

15  and attributes of the system as a means to

16  provide a partial offset for the lost

17  services associated with groundwater

18  contamination.

19               Is that a correct

20  characterization of your report?

21       A     Well, there -- there -- in other

22  words, these are actions that wouldn't have

23  been taken in the absence of contamination.

24  They would not have been necessary in the

Page 158

1    absence of contamination.

2        Q    Let's just go to the report.  Take

3    a look at page 24 of the rebuttal.

4               The paragraph that begins "In

5    the absence" --

6        A    Yes.

7        Q    -- the second sentence says, "These

8    actions are intended to be above the but-for

9    condition and attributes of the system as a

10   means to provide a partial offset for the

11   lost services associated with groundwater

12   contamination."

13              Did I read that correctly?

14       A    You did.

15       Q    How do costs that are above the

16   but-for condition of the system constitute

17   damages?

18       A    So the but-for, the contamination,

19   we would have a situation with no

20   contamination of groundwater, and these

21   projects wouldn't be necessary.

22              We then have the

23   contamination, and now some action is

24   necessary to restore those services.  So, by

1    definition, these are not things that would
2    have occurred in the but-for condition.
3        Q    But if they are above the but-for
4    condition, they're not making things whole,
5    right?  They're going beyond that?
6                MS. JOSELSON:  Objection.
7        A    No, you're misunderstanding that.
8        Q    In what regard?
9        A    So the but-for contaminant
10   condition, there is no contamination.
11              So if we were to do these
12   projects then, it would be doing things that
13   aren't necessary, given the absence of
14   contamination.
15              So now you -- now with the
16   contamination, you've now lowered the
17   quality, and you need to raise it back up.
18              So it's a -- it's not what you
19   said.  It's the opposite.
20       Q    But there's nothing that said in
21   any of the information that you received from
22   the town that these projects were necessary
23   because of PFOA; is that correct?
24       A    But the -- we went through a

1   process to identify projects that would

2   improve water security and reliability and

3   improve water quality in an attempt to offset

4   the effect that the groundwater is no longer

5   available there.

6           MS. JOSELSON:  And I'm just

7   going to note, this was thoroughly explored

8   in the first depo.

9           MR. WILSON:  And I'll just

10  note for the afternoon session, the same

11  position stands, that since these matters are

12  again stated in Mr. Unsworth's rebuttal

13  report, we're entitled to ask about them

14  again.

15          MS. JOSELSON:  You're entitled

16  to ask about them to understand his rebuttal

17  opinions, not to reexamine him on opinions

18  expressed in his merits and cert report.

19          MR. WILSON:  If they're stated

20  in his rebuttal report, presumably they

21  constitute rebuttal opinions, presumably it

22  is therefore proper for me to ask questions

23  about them.

24          MS. JOSELSON:  They're stated

1    in his rebuttal report because they address

2    Dr. Mullin -- Mr. Mullin's opinions.  You can

3    ask about it in that context, not reexamine

4    him on matters you've already examined him on

5    before.

6                    MR. WILSON:  If the problem is

7    that these matters were raised previously,

8    then the problem is in the fact that he's

9    rehashing opinions in his rebuttal report

10   that he previously expressed in the merits

11   phase.

12                    MS. JOSELSON:  I disagree.

13                    MR. WILSON:  At a minimum,

14   since he's -- since we don't know how

15   Judge Crawford will rule on a motion to

16   strike, we need to be able to ask questions

17   about the text of his -- set forth in his

18   rebuttal report.

19                    Presumably he believes those

20   constitute rebuttal opinions, and I'm

21   entitled to ask about them.

22                    MS. JOSELSON:  I disagree.

23   BY MR. WILSON:

24        Q    So, in fact, the projects that you

1   identify were part of a wish list that was

2   prepared by the town before PFOA was ever

3   discovered; is that correct?

4            MS. JOSELSON:  That's almost

5   verbatim a question you asked him in his

6   first deposition, so I'll continue my

7   objection.

8            MR. WILSON:  And it's relevant

9   to impeachment with regard to the testimony

10   that Mr. Unsworth just gave.

11            MS. JOSELSON:  Not unless you

12   connect it to Dr. Mullin's opinions.

13   BY MR. WILSON:

14     Q    So, in fact, the projects that were

15   proposed in your report here were part of a

16   wish list that was identified by the Town of

17   Bennington prior to discovery of PFOA; is

18   that correct?

19     A    I don't know -- the characterizing

20   it as a wish list, I don't know what that

21   means.  When you start the question with "in

22   fact," I'm going to start by answering "no."

23           But the projects that we

24   identified were things that could be done to

1   improve the reliability and quality of the

2   systems.  They have made the decision not to

3   invest in those items because they didn't see

4   a need to at that time.  Then the situation

5   changed.

6                    The fact that they were on a

7   previous list just means we were doing

8   reasonable due diligence, and so were they,

9   about thinking about ways to improve their

10  system.

11                   So I don't think the fact that

12  they were already on a list has really much

13  to do with anything, other than that it's a

14  well-managed system.

15      Q    What information did you receive

16  from the town that supports your position

17  that these projects were not necessary before

18  the discovery of PFOA but became necessary

19  after it?

20                   MS. JOSELSON:  Object, both to

21  the form and to the repetitiveness.

22      A    So my knowledge of being

23  unnecessary is they didn't invest in them, so

24  they didn't make those investments.  They

Page 164

1    didn't see the need for them.

2                  Why they are reasonable now is

3    that they are the best options available to

4    improve the quality and reliable quantity of

5    water within the system.

6                  It's a reasonable way to

7    provide all residents in the community an

8    offset for the fact that they can't use

9    groundwater now.

10        Q    How do you quantify whether repairs

11   and enhancements for matters unrelated to

12   PFOA constitute a reasonable offset for

13   alleged harms that are related to PFOA?

14                  MS. JOSELSON:  Same double

15   objection.

16        A    I'm not sure the alleged harms

17   makes sense.  I'm going to disagree with the

18   alleged harms.  The groundwater is

19   contaminated with PFOA, so the harm is there

20   and people have to switch water services.

21                  So there will be an area for

22   which people are not going to be able to use

23   groundwater for residential purposes.  So the

24   harm is there.  It's not alleged.  The --

1            Go back to your original

2     question.

3            MR. WILSON:  So I'll just note

4     your objection to "alleged," and I'll repeat

5     the question.

6     BY MR. WILSON:

7        Q    How do you quantify whether repairs

8     and enhancements for matters unrelated to

9     PFOA constitute a reasonable offset for

10    alleged harms that are related to PFOA?

11           MS. JOSELSON:  Same

12    objections.

13       A    So as I discussed in my first

14    report, it appears that the cost of actually

15    remedying the PFOA in the ground is quite

16    expensive.  The ability to go in and remove

17    it from soils and remove from groundwater

18    would be quite expensive.

19           As an alternative, we're

20    trying to provide a reasonable means to

21    assure the quality of the surface water

22    system that exists up on Ball Brook, so that

23    it provides a reliable and predictable flow

24    of clean water in the absence of those

Page 166

1   other -- of those other sources.

2              So that's what those projects

3   are intended to do.  So it was done through

4   consultation with the town, with their

5   engineer, as to what sorts of things could

6   offset what's been lost here.

7       Q    So my question is methodological.

8              What are the standards and

9   criteria for that inquiry in the abstract?

10             How do you determine whether

11  something constitutes an appropriate or

12  reasonable offset?

13             MS. JOSELSON:  Again,

14  thoroughly explored in the first depo.

15      A    Is it -- is it cost-effective, so

16  is it -- are there cheaper ways to achieve

17  the same objective?  Are they engineering

18  reliable -- is it possible to engineer them?

19  So, in other words, can it be actually

20  accomplished, or is it something that's

21  difficult to do?

22             Was it previously considered,

23  which would mean that it was considered

24  reasonable before and not selected.

```
 1                    So those are the kind of
 2      factors.  It's described in the report --
 3      it's described in my first deposition -- that
 4      determine whether those projects are
 5      reasonable, given the -- given the harm.
 6           Q    And I think you say that it
 7      constitutes a partial offset of the alleged
 8      harm attributable to PFOA; is that correct?
 9           A    Yes.
10           Q    How do you calculate that it is a
11      partial offset rather than a complete offset
12      or in excess of the harm caused?
13                    MS. JOSELSON:  Again, same
14      objection.
15           A    I say a "partial" offset because
16      there are other -- as we've already
17      discussed, there's added cost damages here.
18      As I understand it, there may be medical
19      monitoring costs, so it doesn't address
20      those -- those components of the claim.  It's
21      a partial offset.
22           Q    Is there any -- how do you quantify
23      the -- economically, since you've described
24      your profession as seeking objective measures
```

1    of things, how do you quantify economically

2    the loss of the resources and compare that to

3    the offset provided by these infrastructure

4    projects and say that they're comparable?

5                    MS. JOSELSON:  Again,

6    thoroughly explored, first dep.

7         A    The -- what we're trying to do is

8    say, you know, for example, we know that

9    there isn't a quantity problem in the

10   capacity of these systems, so we're not going

11   to accomplish projects that address that

12   issue.  It's not an issue given the PFOA.

13                    What is an issue given the

14   PFOA is the absence of a second source of

15   water, which is this groundwater that can be

16   accessed from residences.  And so that's --

17                    As an economist, what I look

18   to is, are there things that people do that

19   offset those -- and then within my report, I

20   talk about whether the cost per household

21   appears reasonable in light of the

22   literature.

23        Q    And I'm asking how you quantify

24   that one offsets the other, that the loss is

1  comparable to what it's replaced with.

2                    MS. JOSELSON:  Object to the

3  form.  Asked and answered.

4      A    Yes, I think it's my expert opinion

5  that that's the case, that it's addressed in

6  the characteristics and the scale of the

7  problem.

8      Q    Did you consider whether the

9  amenity of a connection to municipal water

10 would, in turn, partially offset the loss of

11 use of groundwater, such that replacement

12 cost damages would be unwarranted?

13                   MS. JOSELSON:  Object.  Same

14 two objections.

15     A    So -- yeah, I'm not sure what this

16 has to do with Mullin's report which

17 addresses a different topic on this issue.

18                   But the -- until those

19 individuals are hooked to the municipal

20 system, they are just --

21                   Well, let me say it this way:

22 Once those individuals are hooked to the

23 municipal system, they're just like everyone

24 else in the community.  They live in a

```
 1    community with contaminated groundwater.
 2    They do have municipal water that's available
 3    to them, which is good, because their health
 4    is protected, but -- but they are just like
 5    the rest of the community.
 6                    This category of loss is
 7    intended to address beyond the losses that
 8    occur to members of the public who are on the
 9    municipal system, who do not have a well, but
10    who live in a community with contaminated
11    groundwater.
12         Q    Did you consider in your opinion
13    whether the connection to municipal water
14    would offset any need for replacement cost
15    damages?
16         A    No, I just said I didn't.  That's
17    not -- I didn't believe it did.  Yes, I did
18    consider it, and I didn't believe it did.
19         Q    Where in your report does it say
20    that you considered it?
21         A    I just said it now.  It's -- I said
22    in my report that -- that once those
23    individuals are on the system, they're just
24    like everyone else.
```

1     Q    So on page 26 of your report,

2  second to the last sentence of the page, it

3  says, "In this case, the town would simply be

4  an agent to implement the projects, not a

5  plaintiff."

6              Did I read that correctly?

7     A    You did.

8     Q    Would the town also be a

9  beneficiary of the projects?

10     A    They would be given the money

11  required to accomplish these projects, so I

12  don't know why the town itself would be a

13  beneficiary, but the cost would be offset by

14  what they're given.

15     Q    So you're proposing to give the

16  money to the town?

17     A    I'm proposing to use the towns as

18  the agent, just like you hire a contractor to

19  do work.  The contractor wouldn't benefit.

20  They would get paid to do work, and they

21  would do it, and they would have certain

22  costs associated with it.

23     Q    And the town would be completing

24  these projects on its property rather than on

1   the property of the putative class members;

2   is that correct?

3        A    In some cases, they're -- part of

4   the cost here is the cost of making offers to

5   landowners who are upgrading from the intake,

6   and that would obviously be accomplished on

7   their properties once they -- once they

8   acquired those properties.

9        Q    So if the putative class were

10  awarded the amount of damages you say they're

11  entitled to, if that amount were allocated

12  among all the putative class members, as

13  you've proposed, how do we make sure that the

14  money that we allocate to those class members

15  gets used to spend on these infrastructure

16  projects for the Town of Bennington?

17             MS. JOSELSON:  Same two

18  objections.  Thoroughly explored last depo,

19  and I object to the form.

20       A    So you're dealing with two

21  different issues.  So one is, how are we

22  going to compensate folks for their added

23  cost and the effects on their property values

24  of those added costs; and the second is, how

Page 173

1   do we compensate the public for the injury of
2   the groundwater resource, in other words, for
3   the presence of contaminants.
4                   So these are two different
5   mechanisms.  They're not -- they're not the
6   same numbers.  They're two different
7   mechanisms, and they're two different groups
8   of people.
9       Q    So your replacement cost damages
10  are actually not the damages of the class;
11  they're the damages of the public.
12                  Is that correct?
13                  MS. JOSELSON:  Objection.
14      A    The damages that the public has
15  suffered who -- as a result of the presence
16  of contaminants in their community and the
17  loss of that drinking water source, of which
18  the members of the class are members of the
19  public.
20      Q    Let's take a look at page 18 of
21  your rebuttal of Dr. Mullin.  Let's take a
22  look at the second to the last sentence of
23  the paragraph at the top that carries over
24  from the previous page.

1                  It says, "As such, any changes

2    in the cost of owning a property will be

3    expressed through a change in the price of

4    the property.  Since most buyers finance home

5    purchases with mortgage debt, the proper rate

6    to use to calculate net present value damage

7    in this matter is the after-tax mortgage

8    interest rate."

9                  Did I read that correctly?

10       A    You did.

11       Q    And let's take a look also at your

12   deposition, page 94.  I'm sorry, 96.

13                  And I'm going to jump into 96,

14   even though there's a little bit of context

15   on 94.  Feel free if you need to, to

16   familiarize yourself what's going on, but I

17   just don't want to have to read you two

18   pages.

19                  So beginning with the answer

20   on page 96, you say:

21                  "I think that oversimplifies

22   my comment.  My statement was that I believe

23   firmly that the increased cost of owning a

24   home that has municipal water -- in some of

```
 1    these cases.  For some of the North
 2    Bennington homes, it's actually less
 3    expensive to be on municipal water, and I
 4    show that.  But for the homeowners who
 5    currently have wells, the majority of them,
 6    they will see an increased cost of operating
 7    their home.  And I firmly believe that will
 8    be capitalized into their home value,
 9    consistent with appraisal science and
10    consistent with economics."
11               Did I read that correctly?
12       A    You did.
13       Q    So is it your opinion that the
14    diminution in the value that's alleged by the
15    plaintiffs here represents a capitalization
16    of the additional expected costs of the homes
17    being switched to municipal water?
18               MS. JOSELSON:  Object.  The
19    same two objections.
20       A    No, that would not be my
21    understanding.  I know that the plaintiffs
22    have expressed what they believe to be their
23    diminution in home value.  I think that that
24    incorporates all of their concerns about
```

1   living above a plume of contaminants and

2   owning a home with a well that might have had

3   to be closed.

4                     So I wouldn't -- I wouldn't

5   say they're the same thing, no.

6        Q    So -- but your opinion on the

7   capitalization of the costs of municipal

8   water into the home value, that would be at

9   least a part of the diminution in value

10  alleged by the plaintiffs; is that correct?

11       A    To the extent that that was on the

12  mind of the plaintiffs when they made their

13  estimate, which I don't know, I wasn't in

14  their heads, and there's only, you know,

15  several of them who have made that -- those

16  estimates.

17                    And, of course, it would only

18  apply to people for whom they had a well,

19  right?  Because folks without wells might

20  have asserted a diminution without any cost

21  increase.

22       Q    And you believe that your analysis

23  in this regard is reliable because you say

24  it's based on objective facts and data; is

1  that correct?

2       A    Yes.

3       Q    Would the plaintiffs' opinions of

4  their own diminution in value be less

5  reliable if they didn't consider the factors

6  you're considering here?

7                 MS. JOSELSON:  Same two

8  objections.

9       A    It would still be reliable.  They

10  just wouldn't incorporate this category of

11  loss.  I don't know what was in their minds

12  when they made their estimates, so...

13       Q    And this answer we looked at on

14  page 96 of your deposition, you also -- you

15  look at appraisal science?

16       A    Mm-hmm.

17       Q    Can appraisal science inform or

18  refine your opinion about the amount of any

19  reduction in value here?

20       A    Yeah, I think there are methods --

21  I have a whole rebuttal report that deals

22  with this, but I think there are methods that

23  can be applied by appraisers as well as by

24  economists that can inform the question of

1  whether there's been a diminution of property

2  value or whether you would expect one to

3  occur.

4      Q    So let's take a look at something

5  we talked about a little earlier.

6                    In your merits report,

7  page 14 --

8      A    Are we done with this?

9                    MS. JOSELSON:  For now, I

10  guess.

11                    Merits report is Exhibit 2.

12      A    So you're talking the December --

13  December report?

14      Q    Yes.

15      A    Okay.

16      Q    So when we started the deposition

17  this morning, we were talking about your

18  opinion on economists versus appraisers, and

19  you said -- in a section of your deposition

20  testimony, you said that the economists do a

21  better job valuing homes than appraisers do,

22  and it says in my report that it's around

23  seven percent.

24                    So this is the section of your

Page 179

```
 1   report that is the seven percent number.
 2   It's Footnote 21 on page 14, and it says,
 3   "For context, the census reports the average
 4   home value in Bennington to be $209,851.  As
 5   such, this cost reflects about seven percent
 6   of home value."
 7               And in the text of Footnote
 8   21, you said that it's an average of $9,167
 9   of present value cost.
10       A    Mm-hmm.
11       Q    So this is a very -- a long way of
12   getting around to a very simple question.  My
13   math suggests that 9,167 over 209,851 is not
14   seven percent.  It's more like four percent.
15               And I'm just wondering, is
16   there something I'm missing in the
17   calculations that got you to seven percent
18   there?
19       A    I'd have to go back and look at how
20   I did the calculation.  I think I might have
21   been using the average of the two numbers.
22               MS. JOSELSON:  And again, I'll
23   just indicate that this is --
24       A    Your math --
```

```
 1              MS. JOSELSON:  -- part of

 2   prior --

 3        A    Your math is correct.

 4        Q    Okay.

 5        A    I don't know.  I'd have to go back

 6   and look at how we calculated the number.

 7        Q    Okay.

 8                  So whether it's seven percent

 9   or four percent, we'd have to determine, but

10   it looks like you're saying in the text of

11   your report that it's an average of 9,167, so

12   it would be that number over 209,000; is that

13   correct?

14              MS. JOSELSON:  Again, prior

15   report.

16        A    You would have to -- you'd have to

17   repeat that.  I'm not follow -- I'm not --

18        Q    Okay.

19                  So in the text --

20              MR. WILSON:  Before I get to

21   this, just to address counsel's objection, I

22   believe that this is important since, at the

23   time that Mr. Unsworth served his merits

24   report, he hadn't offered any formal opinion
```

1   addressing diminution in value.

2                 Now that he served a rebuttal

3   report that addresses diminution in value,

4   responding to the reports of Mr. Phillips and

5   Dr. Jackson, we believe it's important to

6   address those new opinions in the context

7   with and for consistency with the opinions

8   expressed relating to diminution of value in

9   his original report.

10                So that's the proffer of

11  relevance, just for the record.

12                MS. JOSELSON:  Okay.  Thank

13  you.  I disagree.  I think you're limited to

14  his rebuttal reports, but go on.

15  BY MR. WILSON:

16      Q    So --

17      A    The separate issue is whether --

18  how we calculated the seven percent or

19  whether there's a typo there.

20      Q    Yeah.

21                So does it look like since you

22  said that the average is 9,167, that it

23  should be that that average value over the

24  average value for homes in Bennington of

Page 182

1   209,000?

2       A    I'd want to go back and look at it,

3   because I know when we drafted this, we also

4   talked about using median value, so it's

5   possible that the average value fell in here,

6   but the median is lower.

7               I'm not sure.  I'd have to go

8   back and look at it before I clarified that.

9               (Counsel conferred.)

10  BY MR. WILSON:

11      Q    I'm just going to put a pin on what

12  we were talking about there.  We'll come back

13  to it in a minute once he's back with the

14  printouts.  Unfortunately, we did have issues

15  at the hotel with the printer.

16      A    They threw you out?

17      Q    So let's turn to page 1 of your

18  rebuttal.  We're actually going to move on

19  now to the fun one on property.

20              And at the bottom of page 1 of

21  that rebuttal, the very last sentence that

22  crosses over to the next page, it says,

23  "However, the plaintiffs in this case are not

24  in fact seeking class certification for

```
 1    purposes of establishing monetary damages
 2    associated with property value diminution."
 3              Did I read that correctly?
 4        A    You did.
 5        Q    Can you tell me what the source of
 6    that statement is in your report?
 7        A    I -- I could tell you that I was
 8    told that, and that that, I believe, is the
 9    interpretation of the class certification --
10    class definition.
11        Q    Can you tell me when you were told
12    that?
13        A    Prior to doing this report.
14        Q    So prior -- after your merits
15    report but before your rebuttal report?
16        A    Right.  It mattered because, to the
17    extent that they're not seeking class
18    certification for property diminution, I
19    wasn't going to do some things to critique
20    Dr. Jackson, because they're not relevant.
21        Q    Have you been told to do
22    anything -- have you been told that there's
23    any different instruction since that time?
24        A    No.
```

Page 184

```
1        Q     And what do you understand that
2   sentence to mean that we just read?
3        A     I don't know what you mean by that.
4        Q     Basically, can you give a little
5   more elaboration about the issues that
6   plaintiffs are and are not seeking class
7   certification with respect to?
8        A     Well, Dr. Jackson talks about
9   similarity of properties and whether they're
10  too dissimilar to establish a class.  And so
11  what I'm highlighting in this sentence is
12  that he has those opinions.
13              I don't think there's a venue
14  for expressing those opinions, because, as I
15  understand it, no one is asserting a class
16  for purposes of property diminution.  And
17  that's as much as I know.  That's the full
18  extent of my understanding.
19       Q     Since you're not an attorney, I'm
20  not going to press you on the case law.
21       A     That's good.
22       Q     So is it your understanding that
23  each plaintiff will provide their own
24  personal, individual opinion about property
```

1  value for their own property?

2       A    What I do address in this opinion

3  is whether I think the individual plaintiffs

4  are qualified or whether it's reasonable for

5  them to express an opinion.

6                How they're going to go about

7  doing this, I don't know.

8       Q    Is there any aspect of plaintiffs'

9  property claims to which you understand they

10  are seeking class certification?

11      A    You mean their property diminution

12  claims?

13      Q    Yes.

14      A    I would say no, but I would not

15  consider myself an authority on that, so...

16                There may be items I'm not

17  aware of, in other words.

18      Q    Are the plaintiffs seeking

19  diminution-in-value compensation based on

20  their individual property conditions and

21  impacts?

22                MS. JOSELSON:  Asked and

23  answered.  You said he's not a lawyer.

24      A    What I know is that they've

1    expressed what they think their diminution in

2    property value was as a result of the event,

3    and I'm commenting on whether they -- whether

4    it's reasonable for them to have those

5    opinions be listened to.  That's all.

6         Q    Is the basis for that claim of

7    diminution of value different among putative

8    class members?

9         A    I have no idea.  I've not talked to

10   them about their claims.  I do know that

11   they're -- they do have different property

12   characteristics, so...

13        Q    Are properties in the class area

14   that have measurable levels of PFOA impacted

15   the same as properties in the class area that

16   have had no detection of PFOA?

17                  MS. JOSELSON:  Object to the

18   form.

19        A    Don't know.

20        Q    You also say on page 2 of that

21   property rebuttal in the second sentence of

22   the first full paragraph on page 2, you say,

23   "That is, the processes and factors that

24   would lead to diminution of property values

```
 1   would be expected to be common to properties
 2   within the zone of contamination."
 3                    Did I read that correctly?
 4        A    Yes.
 5        Q    How did you determine that the
 6   processes and factors are common to
 7   properties within the zone of contamination?
 8        A    Well, I would -- I would expect
 9   that factors, such as whether you need to
10   notify a buyer that your property has a deed
11   restriction on it for putting a well, would
12   be the same.
13                    I would assume that you
14   would -- you're within the box on a map
15   that's publicly available, that you're --
16   that the factor of whether or not you're near
17   or directly above contamination at measurable
18   levels would be similar.
19                    So I just think there's a lot
20   of similarity of factors here.
21        Q    So --
22        A    There --
23        Q    That's an identification of certain
24   factors that you expect to be the same.
```

1              How did you determine that, in

2     general, the processes and factors that would

3     lead to diminution in value would expect to

4     be common for properties within the zone?

5         A    I think I just said that.  I think

6     that what generates a diminution of property

7     value is the market being aware of a problem,

8     and the market would be similarly aware for

9     similar persons.

10             I'm simply making the point

11    here that -- that it wouldn't be unreasonable

12    to consider this as a group, rather than

13    going individual by individual.

14             But that's the extent of my

15    opinion.

16        Q    Did you identify in the course of

17    making that determination any factors that

18    would be individualized with respect to the

19    class members?

20        A    In terms of their property

21    diminution claim?

22        Q    Yes.

23        A    I would assume the value of their

24    property would make it -- would be different.

1    Would make a difference in diminution.

2         Q    And why would the value of their

3    property be different?

4         A    I would expect more valuable

5    properties to experience a larger diminution.

6         Q    And why -- why are more valuable

7    properties more valuable?

8         A    Because the people in the market

9    will pay more for them.  I'm not sure what

10   you mean by that.

11                  (Pause.)

12   BY MR. WILSON:

13        Q    What's the definition of "market

14   value"?

15        A    The definition of "market value"?

16        Q    Yes.

17        A    I would make the definition that

18   it's the price at which a real asset will

19   trade for in a market that's efficient, at

20   arm's length.

21        Q    And what's the source of that

22   definition?

23        A    That's an economics definition.

24   You could find that -- a very similar

Page 190

1    definition, for example, in the Department of

2    Interior regulations for what is market

3    value.

4         Q    Are you currently or have you ever

5    been a licensed appraiser?

6         A    No.

7         Q    Ever been a realtor?

8         A    No.

9         Q    Broker?

10        A    Nope.

11        Q    Do you know how to appraise a

12   single-family home?

13        A    No.

14        Q    How would you identify comparable

15   sales if you were looking at a given property

16   to value it?

17        A    So if I were looking to purchase

18   property, for example?

19        Q    Yes.

20        A    I would look -- I would look for

21   characteristics that are similar.  So similar

22   neighborhood, similar school, similar crime

23   rate, similar size.

24        Q    Is "similar" an objective criteria?

1      A      It -- it could be objective, and it

2   could be subjective.

3      Q      What are some examples of some

4   objective criteria for similarity and some

5   subjective criteria for similarity?

6      A      Objective would be square foot of

7   the lot, which can be measured the same by

8   everyone.   Subjective would be whether the

9   house is attractive or not.

10     Q      And you might also have to make

11  some comparisons for other properties

12  regarding the degree to which they were

13  similar or dissimilar; is that correct?

14              MS. JOSELSON:   Object to the

15  form.

16     A      I already said I'm not an

17  appraiser, but if I were considering a

18  property, I would consider the full suite of

19  attributes.

20     Q      And some of those will be

21  objective, and some will be subjective; is

22  that correct?

23     A      Yes.   And the subjective criteria

24  could, through econometrics, be converted to

1    objective measures.

2         Q    Are you familiar with the process

3    for applying adjustments to comparable sales?

4         A    Broadly speaking, yes.

5         Q    Can you describe it to me?

6         A    As I understand it, there's a set

7    of rules that appraisers follow when they

8    aren't able to identify an exactly comparable

9    sale, so they're not -- you're not in

10   Leavittown or something where all the houses

11   are the same, and there's a process for

12   adjusting for differences.

13        Q    Did you personally inspect any of

14   the properties in the proposed class area?

15        A    No.

16        Q    Did you photograph any of the

17   properties in the proposed class area?

18        A    I don't believe so.

19        Q    Have you been to the proposed class

20   area?

21        A    Yes.  That's why I'm hesitating on

22   photographing.  We did take pictures.  There

23   might have been a house in the picture.

24        Q    Did you go to the proposed class

1   area in connection with this rebuttal opinion

2   on property?

3        A    Not a second trip, no.

4        Q    So your only visit to the proposed

5   class area was in connection with your merits

6   opinion on groundwater damages; is that

7   correct?

8        A    Visits for which I was paid as a

9   consultant to go to the area.  I'm familiar

10   with Bennington for many years, though.

11                MR. WILSON:  Now, you'll

12   object, because this is covering the first

13   deposition.

14   BY MR. WILSON:

15        Q    Is that because you have a home in

16   Vermont?

17        A    We do have a family home in

18   southern Vermont.

19        Q    Okay.

20        A    It's...

21        Q    That's not prejudicial.

22        A    It's many miles from Bennington.

23        Q    Have you made any attempt to

24   identify the types of properties that are

1   present in the proposed class area?

2        A    I'm not sure what you mean by that.

3        Q    Like, what's the breakdown between

4   residential, single-family residential,

5   commercial, industrial.

6                  Have you attempted to do so?

7        A    No.  I'm aware that it is mixed,

8   depending on where you are in the area.

9        Q    Have you considered the individual

10  characteristics of any properties in the

11  class area?

12       A    No.

13       Q    Would you consider the proposed

14  class area to be diverse or homogeneous?

15                 MS. JOSELSON:  Object to the

16  form.

17       A    I would say if I were constructing

18  a hedonic model, I would consider this to be

19  a heterogeneous area, not homogeneous.

20       Q    What are some examples of the

21  heterogeneity you would find within the

22  proposed class area with regard to

23  properties?

24       A    Different lot size.  You know,

Page 195

1   different neighborhoods have different lot

2   sizes.

3       Q    Other than lot size, anything else?

4       A    Age of home.

5       Q    Anything else?

6       A    Distance to town center.  I could

7   go on all afternoon, so...

8       Q    Please do.

9       A    You could list any number of

10  factors that differ across space and make

11  it -- make it heterogeneous.

12      Q    Can you identify ten for me?

13      A    Factors?

14      Q    Yes.

15      A    By individual home?

16      Q    By a variety of things you'd see in

17  the class area.

18      A    You would see different numbers of

19  bedrooms, bathrooms, lot size, home size, the

20  construction style.  Again, as I said,

21  distance to town center, distance to roads,

22  you know, major intersections, that kind of

23  thing.

24      Q    Okay.  That's seven.

1        Can you give me three more?

2      A    You could have crime.  You could

3  have access to wells or not, right, as we've

4  already gone over.  And you could put access

5  to other amenities, like public parks.

6      Q    There's ten.

7           Have you researched real

8  estate market trends in the Bennington area?

9      A    We have looked.  We did not -- it

10  did not get incorporated in the reports, but

11  we did look at whether there are data

12  available on market trends.

13      Q    Why didn't it get incorporated into

14  the reports?

15      A    Wasn't asked to build a model.

16      Q    Can you tell me what that data

17  said?

18      A    My initial impression is, it showed

19  a reduction in sales frequency following the

20  event.

21      Q    Anything else it showed?

22      A    It showed a market that's

23  relatively variable in prices from time to

24  time -- over time.

1      Q      Did it show anything with regard to

2   prices of homes following the event?

3      A      Didn't analyze it.

4      Q      After the --

5      A      I'd say we didn't analyze that

6   because when we looked at it, it hadn't been

7   very long after the event.  So there's not a

8   pattern there to look at.

9                   We do see a sales frequency.

10  It's a little easier to look at.

11     Q      Did you see anything that you

12  determined was an observable diminution in

13  value in those trends?

14     A      I would be concerned about the

15  sales frequency.  That's -- that is one --

16  one measure of demand in the market.

17     Q      And you haven't looked at it again

18  since that initial look shortly after the

19  event?

20     A      No.

21     Q      And is it generally true that

22  property values will come back up after

23  environmental issues have been remedied in a

24  community?

1          MS. JOSELSON:  Object to the

2    form.

3        A    So as I note in my opinion, the

4    literature seems to indicate that property

5    values recover after the environmental

6    contamination is remedied.  So that factor

7    seems to be a significant determinant of

8    property value.

9               But that -- that -- the remedy

10   there is not connecting people to water.

11   It's actually going and putting in a

12   pump-and-treat systems or something that

13   causes the contamination to go away, or clean

14   up the landfill that's causing the effect, or

15   whatever the disamenity was.

16       Q    So when you were looking at real

17   estate market trends in the Bennington area,

18   what data sources did you rely on?

19       A    Well, there's repeat sale data.

20   Not repeat sale.  There are publicly

21   available sales data, you know, Zillow, those

22   types of things, and there's also census

23   data.

24               Census data is too large a

1   time period between the blocks, but...

2        Q     Anything else that you looked at?

3        A     I'd have to go back and see which

4   data sources we pulled out.  There are some

5   commercially available data sources as well.

6        Q     Although you ultimately didn't

7   include this data in your opinion, did it

8   inform or modify the opinions you did offer

9   in any way?

10       A     No, I'm not offering an opinion on

11  diminishing values.  I would need to do more

12  work on that.

13       Q     What methodology are you proposing

14  for the purposes of evaluating a potential

15  diminution in value for each individual

16  property in the proposed class area?

17                 MS. JOSELSON:  Object to the

18  form.

19       A     So what -- what my opinion says is

20  that I don't think it's unreasonable for

21  owners of real estate to express their own

22  opinion as to diminution.  I don't think

23  that's an unreasonable thing.

24                 As I understand, it's allowed

Page 200

1    for within the law.  It's used by the Census

2    Bureau, and it's -- you know, people do it

3    when we buy homes.  We all participate in

4    markets.

5                   I -- beyond that, I'm not

6    proposing a methodology to get at individual

7    home losses.  I'm just pointing out that I

8    think that that's not unreasonable.

9                   And I think it would be

10   difficult, given the ongoing dynamic

11   situation there, to do a formal econometric

12   hedonic model in the community, because I

13   don't think enough time has passed by.

14        Q    Are there any other considerations

15   that make a hedonic model difficult in this

16   case, other than time?

17        A    Cost.  You know, you decide whether

18   you want to spend the money on it.  And

19   whether or not reasonable control groups can

20   be identified.

21                   But if you do a repeat sale

22   model, which requires more time to pass by,

23   you address the control issue.

24        Q    Anything else?

```
 1        A     Well, there's all sorts of things
 2   you'd want to control for within the model,
 3   but I don't -- those things wouldn't make it
 4   difficult to conduct it.  They'd just be
 5   things you'd have to consider.
 6        Q     Okay.  I guess we'll get to some of
 7   those in a bit.
 8                  MR. WILSON:  Let's take a
 9   break.
10                  MS. JOSELSON:  I was just
11   going to say.
12                  THE VIDEOGRAPHER:  The time is
13   2:07.  We are going off the record.
14                  (Recess.)
15                  THE VIDEOGRAPHER:  We are back
16   on the record.  The time is 2:26 p.m.
17   BY MR. WILSON:
18        Q     Mr. Unsworth, I just wanted to come
19   back to something you mentioned earlier about
20   the falloff in sales frequency that you
21   observed in the sales trend data for
22   Bennington.
23                  Other than the discovery of
24   PFOA, is there anything else that might cause
```

Page 202

1    a falloff in sales frequency?

2         A    Yeah, I guess I would go -- I would

3    go further than that.  I would say we -- we

4    observed those data.  The decision was made

5    not to construct a model, and so I didn't try

6    to explain what was causing that.  I did

7    observe it; it was interesting.

8                   Yes, there could be other

9    factors that would have to be controlled for

10   within a model.  There might -- may be other

11   factors that have to be controlled for.

12        Q    For example, like concerns about

13   the local schools?  Would that be a potential

14   factor that could cause a falloff in sales

15   frequency?

16        A    Well, so you'd want some event

17   that's correlated with the thing you're

18   trying to model, so that -- you know, you --

19   you'd have to have the event be at the same

20   time and the same location compared to your

21   control group.

22        Q    And if there was a public concern

23   about the schools at the same time of the

24   discovery of PFOA, is that a potential

1    confounding variable to attributing the

2    falloff in sales frequency to PFOA?

3              MS. JOSELSON:  Object.

4         A    It could be.  You'd need to --

5    you'd need to determine whether that's --

6    whether there's that correlation.

7         Q    Can you tell me whether you

8    observed this falloff in sales frequency in

9    Bennington or North Bennington, or both?

10        A    I don't recall what the data were

11   for.  I think it was for the county, so...

12              But I'm not going to testify

13   to that.

14        Q    So can you tell me what some of the

15   practical effects of experiencing a

16   diminution in market value on someone's home

17   are?

18              What are the practical effects

19   for that person if their home goes down in

20   value?

21              MS. JOSELSON:  Object to the

22   form.

23        A    You mean besides they've lost asset

24   value that they previously believed they had?

```
 1        Q     I guess it's how did they realize
 2   that loss in asset value?
 3                  MS. JOSELSON:   Object to the
 4   form.
 5        A     So -- so they would -- they would
 6   realize it in a cash term when they sold the
 7   home.   They would realize it potentially in
 8   an ability to get home equity if they tried
 9   to borrow money, and they would realize it in
10   the form of lost services while they own it,
11   the very same services that people aren't
12   willing to pay as much for for the home.
13                  So an example would be that
14   if -- imagine you had a three-bathroom home
15   and one of the bathrooms was no longer
16   functional for some reason.   The -- the
17   market price for that home would decline, but
18   the person who lived in the home would also
19   experience that same loss of service.
20                  So they would experience it as
21   a loss of -- of amenity provided by the home.
22        Q     So --
23        A     Your example of the school system
24   is a good one.   Schools that become poor over
```

1   time may drive down housing prices, and the

2   people who live in the homes, who still live

3   there, would experience the reduction in

4   schools.

5        Q    In that case, though, it's -- is

6   that a chicken-or-the-egg situation?  Or

7   maybe you've got the causation the other way

8   around?  Because there, it's not the

9   diminution in value that's causing the loss

10  of a bathroom or the problems in the schools.

11  It's the problems in the schools or the loss

12  of the bathroom that's causing the diminution

13  in value; is that correct?

14                 MS. JOSELSON:  Object to form.

15       A    Either way, the value is reflective

16  of the services provided by the asset, the

17  amenities minus the cost of owning it.

18                 So if the property value has

19  gone down, there's some loss of amenity value

20  to the current homeowner.

21                 You could -- we've done cases

22  where we've converted it to an economic rent,

23  for example, and you could express it that

24  way.

1      Q    But the two main practical effects
2   of a diminution in market value are realized
3   either with the sale of the home or at the
4   time that you attempt to use your home equity
5   through a line of credit or refinance; is
6   that correct?
7              MS. JOSELSON:  Objection.
8      A    I would say no, that's not -- I
9   wouldn't distinguish the practical effect of
10  the -- of the cash harm from the loss of
11  service.
12              And, as I said, we've modeled
13  that as a loss rental during the period of
14  ownership.
15     Q    Are you telling me that a loss -- a
16  diminution in value itself causes a loss of
17  services?
18     A    No, I'm saying the factors that
19  lead to the diminution in value cause the
20  loss of services.  The diminution in value is
21  simply the market's expression of it.
22     Q    Yes.
23              So I'm asking -- when I
24  mention the home sale and the home equity

1   lines of credit, I'm asking, are those the

2   two primary consequences of the diminution in

3   value?

4        A    And I've already told you several

5   times that I disagree with that.

6                 It's common for the assertion

7   to be made that there's no loss to homeowners

8   who face a disamenity, a new disamenity,

9   until they go to sell their home, and I don't

10  agree with that.  That's not correct.

11       Q    So what disamenity did they face

12  because of the diminution in value itself?

13                 What disamenity did they face

14  that's caused by the diminution in value?

15                 MS. JOSELSON:  Asked and

16  answered.

17       A    The -- the diminution that -- the

18  loss they feel is due to the loss in the

19  amenities or the gain in disamenities.

20                 It's not -- the diminution in

21  value is just the market's expression of it.

22  So a person that lives in a home that's above

23  contamination will still perceive the home to

24  be worth less to them than they did prior to

1  the contamination.

2      Q    So I want to --

3      A    The home is not simply a financial

4  asset.  It's also something people are living

5  in, and they're accruing benefits from living

6  in it.

7      Q    I want to briefly discuss some of

8  the other litigations that you referred to

9  where you provided some kind of an opinion on

10  diminution of value.

11            And if you just tell me, for

12  each one of the litigations that I identify,

13  what was the nature of the claim and whether

14  you were the main author of the report, so --

15      A    There may -- there may need to be

16  other characteristics, but go ahead.

17      Q    Yes.

18            So you identify an Illinois

19  refinery groundwater contamination case.

20            Is that the LeClerc v.

21  Lockformer case?

22      A    No.

23      Q    Okay.

24            So in the refinery groundwater

1    contamination case, were you the main author

2    of the report?

3         A     I don't recall whether a formal

4    report was submitted there.  As I understand

5    it, the case settled.  It was -- the claim

6    involved a refinery that were the plume of

7    contaminants in a community to the east of

8    St. Louis.

9         Q     And what were you retained to

10   evaluate?

11        A     Property diminution.

12        Q     On behalf of the plaintiffs or the

13   defendants?

14        A     Plaintiffs.

15        Q     You identify Indiana Waste

16   Processing Facility contamination case.

17                Were you the lead author of

18   the report in that case?

19        A     In that case, there was no report.

20   We did a -- we did a briefing for the client,

21   and they used it in their settlement

22   negotiations.

23        Q     Were those diminution-in-value

24   claims?

1    A    That was a diminution-in-value

2  claim, yes.

3    Q    You identify a Rhode Island power

4  plant contamination case.

5              Were you the lead author of

6  the report in that case?

7    A    Same thing.  No expert report was

8  submitted.  Case -- the case -- I don't

9  actually remember the -- the disposition of

10  that case.

11    Q    And those were also

12  diminution-in-value claims?

13    A    Yes.

14    Q    You identify an Atlanta, Georgia

15  water supply case.

16              Was there a report in that

17  case?

18    A    There was a confidential report in

19  that case.  It's -- so that case involves the

20  conflict of water use between Georgia and

21  Florida of the Apalachicola and Chattahoochee

22  River, and we were looking at whether a

23  dramatic change in water supply from Lake

24  Lanier would -- could result in loss of

1   regional property values.

2       Q    Was there a Supreme Court case on

3   that?  A long-running Supreme Court dispute?

4       A    Yes, it is.

5       Q    Yes.

6            And there's the Massachusetts

7   New Bennington [sic] Harbor groundwater

8   contamination action.

9       A    New Bedford Harbor.

10      Q    Oh.  Someone typed it wrong.

11      A    Properly pronounced as "New

12  Bedford."

13           MS. JOSELSON:  "Bedford."

14      Q    We've just got Bennington on our

15  minds.

16           So that was a -- was there a

17  report in that case?

18      A    There was a report in the case.  It

19  was done by Robert Mendelsohn at Yale, and I

20  was the analyst who worked on the project.

21      Q    Okay.

22           Is that report confidential?

23      A    That report may be hard to find.  I

24  don't believe it was confidential.  He was

1    deposed on it.

2        Q    Okay.

3              So I'm going to represent to

4    you that of the litigations that we've talked

5    about so far, we haven't received any

6    materials regarding them.

7              And so for the Massachusetts

8    case, you're telling me that we haven't

9    received those materials because they're hard

10   to find; is that correct?

11       A    No.

12             So for the -- for all the ones

13   prior to New Bedford, those are all

14   confidential.

15       Q    Yes.  And that was what I was going

16   to get to next.

17       A    Yes.

18       Q    And the Massachusetts one, it's

19   just hard to find?

20       A    Yeah, I could try to find a -- I

21   probably have it somewhere, but I have to go

22   looking for it.

23             It's very old, yes.

24       Q    And so you're basing --

Page 213

1      A     And the -- and the -- that report

2   is memorialized in a published paper, which

3   you do have.

4      Q     And so you are basing your report

5   in this case on the methodology that was used

6   in those cases; is that correct?

7                 MS. JOSELSON:   Objection.

8      A     No, I'm not.  I mean, that's part

9   of my experience, but I'm not -- my opinions

10  are not based on factors in those cases.

11     Q     Don't you cite those opinions in

12  support -- or cite those litigations in

13  support of your work in this case?

14     A     I cite the -- I cite the Lockformer

15  case in support.  I cite the other ones in

16  support of my qualifications.

17     Q     Don't you cite some of them in

18  support of your methods as well?

19     A     You'd have to go to that page.  I'm

20  not sure.  The New Bedford case I might

21  have -- I might have noted.

22                 (Pause.)

23     Q     Let's move on to a different

24  subject here.

1           So with regard to determining

2  any diminution in value that the class

3  members have experienced in this case as a

4  result of PFOA, who is best qualified, in

5  your opinion, to opine on the amount of that

6  diminution in value?

7                MS. JOSELSON:  Object to the

8  form.

9       A    I've already stated that I think

10 the property owners themselves are qualified

11 to opine.

12      Q    And are they best qualified?

13      A    "Best" as compared to what?

14      Q    As compared to an economist, as

15 compared to an appraiser.

16      A    I think it depends on how the

17 analysis is done.

18                You know, we've already talked

19 about the fact that in this case, doing an

20 econometric model, something an economist

21 would typically do, would be difficult.  So

22 it may be that an economist isn't the right

23 person to opine on the particular

24 quantitative loss.  The homeowner might be

Page 215

1   more qualified.

2        Q    That's --

3        A    Whether the appraiser is more

4   qualified is -- depends on how well the

5   analysis is done, and I think -- I mean,

6   obviously, the appraiser has the opportunity

7   to present their opinion as well.

8        Q    And you testified that an

9   econometric model would be difficult because

10  of the lack of sufficient sales data at this

11  time; is that correct?

12                 MS. JOSELSON:  Objection.

13       A    Right.  So you always have the

14  issue that you want enough sales data.  You

15  also have to observe the market.

16                 In this case, I think the most

17  likely success of modeling would come through

18  the repeat sales model.  And that means not

19  only you have enough sales, but they have to

20  be sales of properties that have prior sales

21  data for them, because that's how you control

22  for the control group.

23                 So, you know, I haven't tried

24  to do it, so I don't know, and I wasn't

1   offering an opinion on what the results would

2   be of that specific model.

3       Q    So, just to be clear, you haven't

4   attempted to develop a hedonic or econometric

5   damages model for this case; is that correct?

6                MS. JOSELSON:   Asked and

7   answered.  You can --

8       A    Not on property value.  That's

9   correct.

10      Q    Are the named plaintiffs in this

11  case better qualified to testify as to the

12  alleged diminution in value they've

13  experienced than you are?

14      A    At this time, yes.

15      Q    So let's take a look at page 2 of

16  your rebuttal on the property issues.

17               MS. JOSELSON:   It's Exhibit 4,

18  I think.

19      A    I'm sorry.  I was looking for the

20  exhibit.  You mean this is the Exhibit 4,

21  yes.

22      Q    So on page 2, there's a bullet in

23  the middle of the page.  It says,

24  "Mr. Phillips' opinions regarding the

1    inability of residents to testify reliably as

2    to the magnitude of property diminution value

3    they have suffered is inconsistent with the

4    plain language of Vermont law.  The owner of

5    real personal property shall be a competent

6    witness to testify as to the value thereof."

7                    Did I read that correctly?

8         A    You did.

9         Q    Does this statute say that the

10   owner of a property is competent to testify

11   to the magnitude of diminution of value of a

12   property they own?

13        A    By definition, if they're competent

14   to testify to the value, they can be

15   competent to say what the value was before or

16   after something happened.

17        Q    Don't they also have to offer a

18   third opinion in that regard, to testify to

19   diminution?

20        A    I don't know what you mean by that.

21        Q    Is it true that a diminution in

22   value that occurs after an event is caused by

23   it?

24        A    That -- what they're talking here

```
 1   is how much they believe their property went
 2   down in value because of the discovery of the
 3   presence of contaminants.
 4                  So it was at the moment of
 5   discovery that the diminution occurred, in
 6   their minds.
 7       Q    So they're also testifying to
 8   causation of diminution in value; is that
 9   correct?
10       A    They believe this factor has caused
11   their property to go down in value, that's
12   right.
13       Q    So does this Vermont statute that
14   you cite, does it say the owner of real or
15   personal property shall be a competent
16   witness as to the causal circumstances that
17   have led to a diminution in value in the
18   property?
19                  MS. JOSELSON:  Object to the
20   form.
21       A    Well, I think that if you're going
22   to allow residents to testify as to the value
23   of their property, all of the factors that
24   lead to those -- to that property value are
```

1    incorporated in their opinion.

2              So I don't know how you would

3    avoid it, right?  I mean, if they -- if they

4    believe their property is worth more because

5    the schools are great, that's a factor that

6    causes the property to be worth more.

7        Q    Does it say that -- in the statute

8    that an owner of property is competent to

9    testify that, because the schools are great,

10   their property value has changed?

11       A    It doesn't, but I think that's

12   implied in the language.  And you're also

13   talking to an economist here, so I'm just

14   reading the plain language of it, so...

15              I guess you can argue the law

16   later.

17       Q    So you're not offering a legal

18   opinion in this case?

19       A    No, I'm reading the plain language

20   of the law, and I read the example case,

21   which is interesting, from Stow.

22       Q    Did you research that law yourself?

23       A    No.

24       Q    How did you find the case?

1      A      I asked whether this had ever come

2   up in court, and Emily sent it to me.

3      Q      Now, because the State of Vermont

4   allows property owners to testify about their

5   property values, does that mean that their

6   opinions about those values are reliable?

7      A      I think that would be judged by the

8   trier of fact.

9      Q      Does it mean that their property

10   value opinions are credible?

11      A      That would be judged by the trier

12   of fact.

13      Q      Does it mean that they're accurate?

14      A      That would be judged by the trier

15   of fact.

16      Q      Let's take a look at page 6 of this

17   report.

18              The bottom of page 6, it says,

19   "Given the existence of other widely accepted

20   methods, including use of self-reported home

21   values, I believe that Mr. Phillips misleads

22   the court in stating that the appraisal

23   approach is the only approach to value a

24   residential property."

1           Did I read that correctly?

2      A     Yes.

3      Q     Implicit in this sentence is the

4  idea that the use of self-reported home

5  values is a widely accepted method of valuing

6  residential property; is that correct?

7           MS. JOSELSON:  Object to the

8  form.

9      A     Well, implicit in that statement is

10  that the Census Bureau asks people what they

11  think the value of their property is, and

12  those data are used by researchers in a

13  variety of fields.

14      Q     So talking about those methods, you

15  mentioned the census uses self-reported home

16  values?

17      A     Well, the census gathers

18  self-reported home values.  I don't know if

19  anyone at the Census Bureau actually -- I

20  don't know that they're responsible for using

21  those data.  They gather them.

22      Q     What other examples can you think

23  of where self-reported home values might be

24  relied upon to establish something?

```
 1       A     You mean from the census?

 2       Q     Not from the census, but just other

 3   contacts besides the census in which

 4   someone's self-report of their home value is

 5   going to be a fact that's going to be relied

 6   on to establish something?

 7       A     I think people self-report values

 8   for real estate all the time for things like

 9   getting loans.

10       Q     So when people -- if I walk down to

11   Citizens Bank downstairs and I walk in and

12   say, I'd like to get a loan against my home

13   as collateral, and they say, What's your home

14   worth?  I say, $8 million.  They say, All

15   right, thank you.  We'll accept an 80 percent

16   loan-to-value on that, and we'll get the loan

17   documents drawn up right away, Mr. Wilson.

18                 Do you think that's likely

19   they'll say that?

20                 MS. JOSELSON:  Object.

21       A     For you in particular, I don't

22   know, but people do report -- you know,

23   inventory their assets and report that to

24   folks who are offering loans.
```

Page 223

1                    People use it when they report

2     assets, for example, when they entered into

3     nursing homes and things like that.

4                    So there is -- people do

5     self-report.

6          Q    They do self-report.

7                    Now, will the bank rely

8     exclusively on my self-report?  Although I am

9     certainly a very reliable individual --

10         A    Yes.

11         Q    -- will the bank rely exclusively

12    on my self-report of my home's value in order

13    to decide to give me a loan?

14         A    It would depend on how close you

15    are to the margin to give you the loan.

16         Q    And how will they determine whether

17    I'm close to the margin?

18         A    How big the loan is relative to

19    your assets.

20         Q    So are you aware of situations

21    where banks give loans based on just

22    someone's self-reported number without any

23    due diligence?

24                    MS. JOSELSON:  Object.

1        A     Well, unrelated, I believe that's

2   part of the problem of the recent problems

3   with some of Trump's people; but no, I

4   think -- my point is that people do

5   self-report values.  I didn't assert that

6   here.  What I asserted is the Census Bureau

7   finds it to be reliable fact.

8        Q     And I'm asking whether other people

9   besides the Census Bureau will rely on those

10  self-reports.

11                 For example, in the course of

12  issuing a home loan, will a lender rely on a

13  self-reported home value or will they conduct

14  additional diligence?

15       A     You would have to ask lenders that.

16  All I know is the Census Bureau has a formal

17  process for determining what a fact is, and

18  they have determined this is a reasonable way

19  to gather that fact.

20       Q     How many mortgages have you had in

21  the course of your life?

22       A     I couldn't say.

23       Q     Approximately?

24                 MS. JOSELSON:  Object.

Page 225

1    Relevance.

2         A    Half dozen.

3         Q    And in each case where you applied

4    for a mortgage, did the bank accept your

5    self-reported home value?

6         A    I believe in one case they did,

7    yes.

8         Q    And what did they do in the other

9    cases?

10        A    They probably had it appraised.

11        Q    Ohhh, they had it appraised.

12                   MS. JOSELSON:  Okay.  I'm

13   going to caution you and urge you to be

14   respectful as we go forward, as I assume you

15   will.

16                   MR. WILSON:  And I'm just

17   saying that we are -- when I'm trying to get

18   to something, it's easier if we get to it

19   right away.

20                   MS. JOSELSON:  Then ask a

21   direct question, Linc.  You know how to do

22   that.

23   BY MR. WILSON:

24        Q    Now, are self-reported home values

1  used to determine the list prices for the

2  sale of real estate?

3       A    Sure, if the person self-lists.

4       Q    When they're listed by the realtor,

5  will the realtor just take whatever the

6  homeowner says is the value of the real

7  estate and list it at that price?

8       A    The realtors I know would take your

9  understanding of what you think your home is

10  worth, and they would include their own

11  understanding, and they would decide what to

12  list it at.  They would include their own

13  understanding of the market.

14       Q    When market value is at issue, do

15  you consider self-reported home values to be

16  more or less reliable than appraisal methods?

17            MS. JOSELSON:  Asked and

18  answered, but you can answer.

19       A    It would depend on the quality of

20  the appraisal method.  I think you're

21  comparing two things here, so I need to know

22  how good either one of them is.

23       Q    So that it depends on how well --

24  well, let me take a step back.

```
 1              So you have no problem with
 2   the reliability of the appraisal method per
 3   se --
 4              MS. JOSELSON:  Object.
 5        Q    -- is that correct?
 6        A    I -- I have no problem with the
 7   appraisal method per se.  I know that there
 8   are a series of steps that an appraiser goes
 9   through.
10              My concern is whether the
11   inferences that are drawn from that can be
12   helpful here.
13        Q    And we've talked about the census
14   data a little bit --
15        A    And I should also say that some
16   people use the census data in the form of
17   mass appraisals, as they refer to.  They mix
18   the two methods.
19        Q    What's different about the use of
20   self-reported home values in census data from
21   the current context, where you're relying on
22   self-reported home values?
23        A    What's different?  I'm not sure
24   what you mean by that.
```

1     Q    What's the difference in the use of

2  the self-reported home values?

3              MS. JOSELSON:  Object to the

4  form.

5     A   In this case, I think the -- the --

6  it sort of seems obvious.  The plaintiffs are

7  asserting that they should be able to testify

8  as to the diminution in their property value.

9              The census data folks are

10  being asked what they think their properties

11  are worth for purposes of really supporting

12  large-scale understanding in changes of

13  demographics and then financial well-being of

14  different geographic areas, et cetera.

15     Q   And census participants are only

16  asked the current value of their homes; is

17  that correct?

18     A   Among other questions in the

19  American Community Survey, that's one of the

20  questions they get asked.

21     Q   They're not asked whether

22  environmental contamination has affected

23  their home value, are they?

24     A   No.  But presumably if they thought

1   it did, they would not report a value as

2   high.  It would be embedded in along with all

3   of the other factors that they believe

4   contributed to their home value.

5        Q    Do census participants have any

6   vested interest in the value that they report

7   to the Census Bureau?

8        A    I don't know if -- I don't know

9   what's on their minds when they fill out the

10  survey, but they don't get any benefit from

11  it directly, no.

12       Q    And that's different from a

13  situation where someone is pursuing a claim

14  in litigation trying to recover for an

15  alleged diminution in value; isn't that

16  correct?

17                 MS. JOSELSON:  Objection.

18       A    I think -- I think you could say

19  that the parties here have an interest,

20  obviously, but so did the party in the Stow

21  case.  They were facing a different tax rate,

22  and they obviously had a -- had an interest

23  there.

24       Q    Does the census use any checks on

1   self-reported home values to eliminate data

2   that are outliers?

3       A    There is a -- there is an outlier

4   analysis they do.  There's also been several

5   published papers on the reliability of those

6   data.

7                 All the data census collects,

8   there's a screening process to get rid of bad

9   data.

10      Q    Would it be appropriate to look at

11  self-reported values here and identified

12  outliers?

13      A    I don't know enough about the

14  self-reported values.  I don't know if you --

15  from a statistical standpoint, you don't have

16  enough observations to have outliers.

17      Q    So on page 2 of your rebuttal on

18  property, second bullet from the bottom, you

19  say -- I'm in the last sentence of that

20  bullet -- that, "Mr. Phillips' opinion

21  ignores the abundance of public information

22  available to these residents in developing

23  their opinions."

24                 Did I read that correctly?

Page 231

```
1        A     No, but you largely got it right.

2        Q     I paraphrased Mr. Phillips' --

3        A     You asked if you read it correctly.

4   I said no.

5        Q     Well, thank you for keeping me

6   honest, Mr. Unsworth.

7                   MS. JOSELSON:  It's hard work,

8   but someone's got to do it.

9                   MR. WILSON:  Slander,

10  Ms. Joselson, slander.

11                  (Laughter.)

12  BY MR. WILSON:

13       Q     What public information do you have

14  in mind that the named plaintiffs could use

15  to develop their value opinions?

16       A     Oh, what I said here is that -- you

17  have to reference back to what I say later,

18  which is that individuals, when they're

19  entering into a market to look at real

20  estate, have all sorts of online stuff and

21  other information they could look at to

22  determine whether the price that's being

23  offered for the home seems reasonable.

24       Q     I think you identified in your
```

Page 232

1   report Zillow and Redfin, different sources?

2        A     Yes, yes.

3        Q     Any other publicly available

4   information sources that you would think of?

5        A     I have not gone to buy a home

6   recently, so I would have to ask my staff,

7   who have been in the market recently, to know

8   whether --

9              The one I'm very familiar with

10  is Zillow, so...

11       Q     Do you think it's important to base

12  opinions on value and property value

13  diminution on market data?

14             MS. JOSELSON:   Objection.

15       A     I think market data might inform

16  understanding of it.

17       Q     Have you looked at the deposition

18  testimony of the named plaintiffs here to

19  evaluate the bases of their opinions on

20  diminution of value?

21       A     No.

22       Q     Is it your understanding that

23  property owners can also testify as to the

24  effect of complex environmental factors on

1    values of their homes?

2        A    I believe that's what they're doing

3    when they have an opinion as to the effect of

4    contamination on their home.

5        Q    And it's your understanding that,

6    not only can they testify as to the value of

7    their home, they can testify to the value of

8    their home and how it's been affected by

9    complex environmental factors?

10                   MS. JOSELSON:  Asked and

11   answered.

12       A    Yes.  I've already said if someone

13   can testify to the value of their home, they

14   should be able to testify to the change in

15   the value of their home.

16       Q    And to the --

17       A    The trier of fact would obviously

18   need to consider how reliable that is.

19       Q    And they can also testify to the

20   complex environmental factors that have

21   allegedly caused that change?

22       A    I don't think they would

23   necessarily have to know how the situation

24   got to the way it is.  They would just have

1   to know that there's new information that

2   indicates the situation has changed.

3        Q    But they need to testify to the

4   conclusion that, regardless of the process,

5   the change in value is something they

6   attribute to complex environmental factors;

7   is that correct?

8              MS. JOSELSON:   Object to the

9   form.

10       A    I don't know how complex it is.  If

11  your well is now contaminated and it didn't

12  used to be contaminated, that's pretty

13  simple.

14             If you're within a box where

15  they say you can't drill a well, that's

16  pretty simple.  Those aren't exactly complex

17  environmental factors.

18       Q    Have you read the expert reports on

19  fate and transport that have been submitted

20  on behalf of the plaintiffs and defendants in

21  this matter?

22       A    No.

23       Q    So you wouldn't know, really,

24  whether the environmental factors in this

1   case are complex or simple?

2                   MS. JOSELSON:  Objection.

3   Asked and answered.

4       A    I think I just said, I think the

5   homeowners are concerned about the poor

6   after-condition.  How it got there and what

7   factors led to that isn't actually relevant

8   to them.

9       Q    So you're saying that a

10  homeowner --

11      A    They're saying their property has

12  gone down in value.  They're not describing

13  the atmospheric conditions that led to that.

14      Q    So you're saying that a homeowner

15  can say my property value was X.  Then PFOA

16  was detected in my home -- I'm sorry, in my

17  groundwater.  Now my property value is less

18  than X.

19      A    Mm-hmm.

20      Q    Therefore, the change is

21  attributable to the detection of PFOA in my

22  groundwater.

23                  MS. JOSELSON:  Objection.

24      A    As I understand it, that is what

1   they're testifying to, yes.

2        Q     Are you familiar with the fallacy

3   of post hoc ergo propter hoc?

4        A     Yes.

5        Q     What is that fallacy?

6        A     Well, just because -- effectively,

7   just because something has changed at the

8   same time something else has changed, they

9   must be related, would be one way of saying

10  it.

11       Q     Yes.

12                Just because something occurs

13  after an event does not mean that it was

14  caused by that event?

15       A     Right.

16       Q     But you're saying that the

17  plaintiffs are allowed to do that here?

18                MS. JOSELSON:  Objection.

19       A     Yes.  And keep in mind, here, for a

20  lot of these folks, the knowledge of the

21  event literally came in a moment.  So there's

22  not a lot of other things changing during

23  that moment.

24                But I'm not -- in my report,

Page 237

1    I'm not -- I'm not asking the reliability of

2    their opinions.  What I'm stating is that it

3    is reasonable that people can have their

4    opinions as to their property values.  That's

5    not -- that -- it's --

6                The sole understanding of

7    property values is not held by appraisers.

8        Q    What information do you think you

9    would need to develop an opinion on the

10   current value on your own home?

11               MS. JOSELSON:  Object.

12       A    So --

13               MS. JOSELSON:  Way beyond the

14   scope of his report, but go ahead.

15       A    I would -- I would look at homes

16   that have transacted recently.  I would

17   probably look at prices over time.  And since

18   I'm an economist, I would probably apply

19   local inflation rates of real estate to it,

20   and I would consider the attributes in my

21   home relative to similar homes, and I would

22   also take into account that my home was

23   exceptional, so...

24       Q    I'd love to hear about it, but I

1    think she would probably object it's outside

2    the scope.

3         A    Yes.  My home is also not for sale.

4         Q    Okay.

5                   But maybe you want to use your

6    home equity.  I'll ask you on a break why

7    it's exceptional.

8                   (Laughter.)

9         Q    Would you consider your opinion as

10   to the value of your home to be reliable?

11        A    Yes.

12        Q    And would its reliability be a

13   function of the fact that you considered that

14   information in developing it?

15                 MS.  JOSELSON:   Object.

16        A    All the things that entered into my

17   understanding of the home value.

18        Q    If you had a PFOA detected in the

19   water at your home, would be capable of

20   developing a reliable opinion of its

21   potential effect on your home's value, using

22   that public information that you referred to

23   earlier?

24        A    Possibly.  I would also -- I would

1    also likely have my own opinion as to how

2    that might affect my home value.

3        Q    How would you use that public

4    information to determine the effect on home

5    value?

6        A    I would look and see what sales are

7    doing of homes that are similarly situated.

8        Q    Out of curiosity, in the one

9    instance where you sought a mortgage and the

10   bank accepted your self-reported home value,

11   do you know why the bank accepted your

12   self-reported home value?

13       A    I would assume it's given our

14   financial situation.  I would also consider

15   that to be personal, so...

16       Q    So Zillow, Redfin and similar

17   sites, they provide an estimate of market

18   value of homes; is that correct?

19       A    Yeah.  I think they also in some

20   cases report actual sales, so those aren't

21   estimates.  Those are actuals.

22       Q    Where they're reporting an

23   estimate, do you know what those estimates

24   are based on?

 1       A    I don't know what their algorithms

 2   are.  I'm not sure they share those

 3   algorithms.

 4       Q    In the absence of knowing the

 5   methods that they use, how do you know those

 6   methods are reliable and reasonably relied

 7   upon?

 8       A    Well, I know they're --

 9            MS. JOSELSON:  Objection.

10       A    I know they're relied upon, because

11   everyone who buys a house these days looks

12   there to see what the prices are in Zillow,

13   and they build that into their estimate of

14   what they're willing to offer.

15            Is that what you mean?

16       Q    I'm wondering why it is reasonable

17   for you as an expert to rely on those Zillow

18   estimates when you don't know the methods by

19   which those Zillow estimates are computed.

20            MS. JOSELSON:  Objection.

21       A    I think you asked me whether folks

22   rely upon.  I think what they see is that,

23   through repeated observation, that Zillow

24   kind of gets it right, that it's not a bad

```
 1  measure of actual price.
 2              I would incorporate that with
 3  they also might feel that some observations
 4  on Zillow wasn't correct.  They incorporate
 5  it with all the other information they had
 6  before them.
 7       Q    Do you know whether the valuation
 8  techniques used by Zillow and Redfin are
 9  discussed in peer-reviewed literature?
10       A    No idea.
11       Q    Did you check?
12       A    I did not.
13       Q    Do you know if they can be tested?
14       A    Yes, I'm sure you could -- I mean,
15  I don't know of anyone who's done it.  I
16  would have to ask somebody like Jeff Zabel,
17  who deals with that a lot.
18              Since Zillow records their
19  estimates of home values and then values
20  transaction to market, you could see whether
21  they're reliable or not over time.
22       Q    Do Zillow and Redfin provide any
23  tools to estimate the impact of local
24  environmental events on market value?
```

1          A    I think you might be able to use
2    those data to observe that.  I haven't tried
3    to do that typically by commercial data, but
4    it would depend on how strong the Zillow data
5    set is in the community you're looking at.
6          Q    But there's not a button on Zillow
7    or a tab where it says, you know, how much is
8    PFOA affecting this value, and you click on
9    it and it tells you?  Is that --
10                   MS. JOSELSON:  Object.
11         A    I believe there -- I believe there
12   may be buttons on there that you click on it
13   and it shows disamenities and amenities.  So
14   it does have that in there, but it's not
15   telling you what the -- it also isn't telling
16   you how much a second bathroom contributes
17   when you click on a house.  Their algorithms
18   are not -- as far as I know, they're not
19   public.
20                   It is a really cool tool that
21   you can waste hours on if you'd like to,
22   so...
23         Q    Yes, I've certainly done that.
24                   Were you aware that none of

Page 243

1  the named plaintiffs in this case cited

2  Zillow or Redfin or any other online tool or

3  any other kind of publicly available

4  information as a basis of their opinion?

5       A    I didn't.  The question I was

6  asking is, can individuals express the value

7  of their homes?  And I was saying yes, I

8  think they can.  And there's a lot of data

9  out there that allows them to do that.

10                 Whether they looked at those

11  particular sources, I don't know.

12       Q    So are you telling me that these

13  plaintiffs' opinions are still reliable even

14  if they didn't look at any publicly available

15  data in support of them?

16                 MS. JOSELSON:  Object to form.

17       A    I'm not saying whether these

18  particular plaintiffs' opinions are reliable.

19  What I'm saying is that individuals are

20  capable of expressing what they believe to be

21  the value of their home, based on whatever

22  evidence they have before them.

23                 The reliability is determined

24  by the trier of fact.

1      Q    So you're just saying that they are

2   capable of expressing an opinion on the value

3   of their home; is that correct?

4                MS. JOSELSON:  Objection.

5      A    More correctly, I'm saying that

6   appraisal methods are not the only means to

7   get to the value of a home.  There are other

8   ways to do it.

9      Q    But you also testified that the

10   named plaintiffs are best qualified -- in

11   fact, better qualified than you -- to express

12   opinion on the value of their homes, even

13   though they didn't look at any of the

14   information that you would look at and that

15   you think is important to determining the

16   value of a home; is that correct?

17                MS. JOSELSON:  Objection.

18      A    Well, you asked me who was more

19   qualified to assess the value of the home,

20   these plaintiffs or me.  I haven't looked at

21   the value of their homes, so I don't have an

22   opinion of the value of their homes.  So, by

23   definition, they're qualified.

24      Q    So they're more qualified by virtue

1   of the fact that they have an opinion?

2       A    By virtue of the fact that they

3   live in the home and they believe they

4   understand what the value is and what the

5   decremented value is.

6       Q    So if these plaintiffs live in the

7   home and don't rely on publicly available

8   information, is that opinion they derived for

9   the valuation of their homes more reliable

10  than the opinion that you would offer if you

11  attempted to analyze the value of their

12  homes?

13              MS. JOSELSON:  Objection.

14      A    Depends on what method I was able

15  to apply, what information I had available to

16  me.

17              But I haven't been asked to do

18  that.  I'm just saying that they have the

19  legal right and the information before them

20  to make those determinations.

21      Q    So you're offering a legal opinion?

22      A    No, it's pos -- it's plain language

23  of the law, says they can testify.

24      Q    I really don't understand this,

Page 246

1   because at the beginning of this deposition,

2   you told me that you think that economists

3   are better at evaluating home values than

4   appraisers because economists rely on

5   objective data rather than subjective

6   considerations; is that correct?

7                    MS. JOSELSON:   Objection.

8        A     In part, yes.

9        Q     And yet you're saying that

10  individual homeowners, even if they rely on

11  no objective data, are more reliable in their

12  estimates of their home value than the

13  opinions you would proffer on that issue; is

14  that correct?

15                   MS. JOSELSON:   Objection.

16       A     That's actually not what I said.

17  You asked who would be more reliable, me or

18  them, and I said them, because I haven't

19  tried to do it.

20                   If I was able to do a model, I

21  might -- I might determine -- my opinion

22  would be that I'm more reliable.  But that's

23  not what I'm doing right now.  I'm just

24  saying, there's no reason to believe that

Page 247

1    they can't offer those opinions.

2         Q    I'm wondering, are they more

3    qualified than you are to opine on their

4    property value?

5                   MS. JOSELSON:  Objection.

6         A    Qualified in what sense?  I mean,

7    do they have -- by training?  By the analysis

8    they conducted?

9         Q    In any and every respect, on

10   balance, are the plaintiffs --

11        A    And I also don't know -- I don't

12   know anything about these individual

13   plaintiffs or the basis of their -- of their

14   estimates, so I don't think I can answer that

15   question.

16        Q    Would -- so you have no basis to

17   think that these plaintiffs are more

18   qualified than you are with regard to

19   offering an opinion on the value of their

20   homes?

21        A    I've already said, by definition,

22   they're more qualified at the moment, because

23   I haven't tried to express a value of their

24   home.

1           And they'll have to present

2    their opinion and they'll have to -- the

3    judge will have to determine whether he

4    accepts it.

5           (Exhibit 1 marked for

6    identification.)

7           MS. JOSELSON:  I'm just

8    noting, 3:15.

9           MR. WILSON:  We'll finish up

10   this line of questioning, and then we'll take

11   a break.

12   BY MR. WILSON:

13        Q    So, Mr. Unsworth, the court

14   reporter has handed you what's been marked as

15   Exhibit 8 to your definition -- sorry, to

16   your deposition.

17           And I'm going to represent to

18   you that this is a chart that we prepared

19   that provides a summary of evidence in this

20   case; that it includes each named plaintiff's

21   property, their self-reported unimpaired

22   estimate of their property's value, their

23   self-reported impaired estimate of the value,

24   both of those being derived from the

Page 249

1   plaintiffs' fourth amended initial

2   disclosures.

3                   And then compared to that, the

4   highest estimate on Zillow of their

5   property's value, historically, and the

6   highest estimate of their property's value on

7   Redfin, historically, along with a date of

8   that valuation.

9                   Does how I described this

10  document -- do you understand what it's

11  reflecting?

12       A    Yes, based on your definition, I

13  would say.  I haven't seen this before, so...

14       Q    So --

15       A    Unless I missed it, it wasn't in

16  any of the experts' reports.

17       Q    No, this is the first time that

18  we've proffered it, though it's a summary of

19  data that is referred to elsewhere, and it

20  has been publicly disclosed.

21                   This is essentially a summary

22  of evidence that's in this case.

23       A    Including the Redfin and Zillow

24  estimates?

1     Q    Insofar as your report referred to
2  Zillow and Redfin and those are publicly
3  available sources of information.
4     A    But these data themselves weren't
5  in one of the experts' reports?
6     Q    No.
7     A    Okay.
8     Q    So if you take a look at plaintiff
9  Knight, the bottom column, just by way of
10  example, plaintiff Knight's estimate of the
11  value of his home before the contamination --
12     A    Mm-hmm.
13     Q    -- or the alleged contamination was
14  as high as $370,000.  And yet the Zillow and
15  Redfin estimates for the highest value are
16  substantially below that; is that correct?
17               MS. JOSELSON:  Objection.
18     A    I don't know what "substantially"
19  means there.  They are less than.
20     Q    By at least 20,000 and as much as
21  40,000 or more below Mr. Knight's estimate;
22  is that correct?
23               MS. JOSELSON:  Objection.
24     A    For the self-reported unimpaired?

1      Q     Yes.

2      A     Yes, I'd get a calculator and check

3  you, but yes.

4      Q     And taking a look in general, would

5  you say that there's a wide variance between

6  the self-reported unimpaired and impaired

7  estimates of these plaintiffs' properties and

8  the publicly available estimates on Zillow

9  and Redfin of their values?

10               MS. JOSELSON:  Objection.

11     A     I would say there are differences.

12 I don't know what the generation process was

13  for these data, you know.

14               The numbers are different.

15 Some of them are actually pretty close.

16     Q     So some of them are close and some

17  of them are off by a wide margin; is that

18  correct?

19               MS. JOSELSON:  Objection.

20     A     Well, you also haven't adjusted for

21  the passage of time.  Some of these estimates

22  are a decade old.

23     Q     Did these plaintiffs adjust for the

24  passage of time in their opinions?

1      A    I would assume so, yes, they -- if

2  they believe the market's gone up, they've

3  added to their home values.

4                But if you're a research

5  analyst working for me, I would send you back

6  to adjust them for the passage of time.

7      Q    So just for example, take a look at

8  plaintiff Hausthor, the top row.  And the

9  column indicates that the highest valuation

10  on Zillow is from 2011 of 282,000.

11      A    Mm-hmm.

12      Q    So by inference, then, the values

13  since then reported on Zillow is lower; is

14  that correct?

15                MS. JOSELSON:  Objection.

16      A    I'm not sure I followed that at

17  all.

18      Q    So that means that after that point

19  in 2011, of January, that the Zillow value

20  for Mr. Hausthor's home has gone down; is

21  that correct?

22                MS. JOSELSON:  Objection.

23      A    I'm not following you at all.

24  What's reported here is the January of 2011

Page 253

1   Zillow value of 282,000.  I don't know what

2   Zillow is reporting it for today.

3       Q    And I'm telling you that this

4   column describes the highest estimate of the

5   value that was on Zillow historically.

6       A    Okay, sorry.  I did not follow

7   that.  Yes.

8       Q    So necessarily, assuming that we're

9   making accurate representations here --

10      A    Yes.

11      Q    -- then necessarily, the values

12  after that time would be lower; is that

13  correct?

14              MS. JOSELSON:  Objection.

15      A    Yes.  And I don't know by how much.

16  I don't know.

17      Q    And yet Mr. Hausthor says that

18  before PFOA was discovered in the water,

19  which was in 2015 and '16 --

20      A    Mm-hmm.

21      Q    -- that his home was actually worth

22  $300,000, more than has ever been reported

23  historically on Zillow; is that correct?

24              MS. JOSELSON:  Objection.

1      A    I'm sure he may know of some

2  attribute of his home that is not available

3  to Zillow.  I don't know why those

4  differences would exist or -- you'd have to

5  know something about the algorithms Zillow

6  uses and you'd have to know something about

7  what process he's using, but he would be the

8  one to judge that.

9      Q    And you didn't look at the process

10  that he used or that any of the plaintiffs

11  used in developing these opinions, did you?

12      A    No, no.  I already said that.

13      Q    So as between Zillow, the

14  plaintiffs and you, who is most reliable in

15  establishing the value of these homes?

16           MS. JOSELSON:  Objection.

17  Asked and answered.

18      A    I've already said, I haven't tried

19  to estimate the value of these homes, so any

20  of those sources, by definition, would be

21  more reliable.

22      Q    In the event of a conflict between

23  Zillow and the plaintiffs, in your

24  professional judgment, is there one that's

Page 255

1  more reliable than the other?

2      A    On -- with a sample this small, no,

3  I wouldn't say in my professional opinion I

4  could say that.

5                I would -- with a sample this

6  small, I would consider whether there's some

7  explanatory basis for the difference,

8  assuming there is a difference once I look at

9  the data and update it for 2018 values.

10     Q    And if you were to try to do an

11 opinion on the values of these properties,

12 would you do a better job than the plaintiffs

13 and Zillow did in this case?

14     A    Well, I'm not usually asked to get

15 the individual value of properties.  That's

16 not typically what I'm asked to do.  I'm

17 asked to estimate diminution or increase in

18 property values due to an amenity or a

19 disamenity.

20                I'm not usually asked -- I'm

21 not in the business of estimating individual

22 property values.

23     Q    Because, in general, economics, as

24 a discipline, is suited more to those

1   large-scale changes based on large data sets

2   rather than individual property values; is

3   that correct?

4                 MS. JOSELSON:  Objection.

5        A     Typically, the economists prefer to

6   use large-scale data sets, yes, and then

7   control for factors within those data sets

8   quantitatively.

9        Q     And that's why --

10       A     And I should -- I should correct

11  that.  The -- what -- where that statement is

12  not complete is that those same tools are

13  used by appraisers.  They just choose whether

14  they're going to use them or not.

15       Q     But the question of -- well, what

16  you just described, that's one of the reasons

17  why, when a bank wants to decide whether to

18  give someone a loan on their home, they

19  doesn't commission an econometric hedonic

20  analysis.

21                 They pay an appraiser; is that

22  correct?

23                 MS. JOSELSON:  Objection.

24       A     The -- that's a long answer.  So

Page 257

```
 1   banks conduct appraiser -- appraisals because
 2   typically they're selling blocks of
 3   mortgages, and the folks buying those blocks
 4   of mortgages want to know that these are
 5   arm's-length transactions, so they're --
 6   that's why they're doing it.
 7              There are people who do mass
 8   appraisal analyses to determine whether there
 9   are patterns that don't make sense, so you
10   could do mass appraisals for that reason and
11   spot problems in markets where mortgages
12   might be underwater.
13      Q    But the reason that financial
14   institutions, whether they are issuing or
15   selling mortgages or purchasing them, the
16   reason that they use appraisals rather than
17   econometric analyses is that appraisals are
18   better suited to determine the value of a
19   specific home than an econometric analysis;
20   is that correct?
21              MS. JOSELSON:  Objection.
22      A    I don't know -- I'm not sure why
23   they do.  I think it probably has more to do
24   with history and tradition.  To avoid
```

Page 258

1   investing in a mortgage that may not be based

2   on an arm's-length transaction, banks have

3   traditionally used appraisers.

4                   I don't know why you couldn't

5   use an econometric model to do that.

6        Q    Are you aware of any published

7   literature that expresses that econometric

8   analyses rather than appraisals should be

9   used in the issuance and sale of mortgages?

10       A    I would have -- no, not in

11  individual mortgages.  I'd have to go back

12  and look at the literature on whether mass

13  appraisal was able to detect problems in --

14  for example, during the Great Recession, that

15  weren't picked up by individual prices.

16       Q    So I'm going to represent to you

17  that Mr. Knight had his home appraised in

18  January of 2017 -- this is after the

19  discovery of PFOA -- and the appraisal came

20  back at $300,000.

21                  Do you have any view on why

22  his personal estimate of the unimpaired value

23  of his home is so much higher than that?

24                  MS. JOSELSON:  Objection to

Page 259

1    the form and lack of any proper basis, but

2    you can attempt to answer.

3         A    I have no idea why he thought the

4    numbers -- I don't know anything about the

5    appraisal, and I don't know what he based his

6    estimate on.

7         Q    Now, thinking a little bit more

8    about Mr. Knight, he claims a diminution in

9    value here that's in the range of 110 to

10   $120,000 that he attributes to PFOA, but

11   he --

12                   Again, he got that appraisal

13   for $300,000 after the discovery of PFOA in

14   2017, and that's inconsistent with his

15   opinion on the $120,000 reduction in value;

16   isn't that correct?

17                   MS. JOSELSON:  Objection.

18        A    His opinion is different.  I don't

19   know whether the appraiser took into account

20   the PFOA.

21        Q    Would PFOA have been a relevant

22   consideration in the appraisal?

23                   MS. JOSELSON:  Objection.

24        A    I would assume so, but I still

1   don't know whether he took it into account.

2       Q     Should Mr. Knight have disclosed

3   PFOA in connection with the appraisal?

4                   MS. JOSELSON:  Objection.

5       A     I would hope a qualified appraiser

6   would know that was the situation in the

7   community and Mr. Knight would need to review

8   it.

9                   And he wasn't selling the

10  home.  He was getting it appraised.

11      Q     So if he was going to get a home

12  equity line of credit on that home and he was

13  going to use that appraisal to take advantage

14  of his home equity, and after the fact, he

15  was awarded the $120,000 that he claims as

16  diminution-in-value damages, wouldn't that

17  essentially constitute a double recovery,

18  since he got to use his equity with the home

19  equity line of credit and also recover for

20  diminution in value?

21                  MS. JOSELSON:  Objection.

22      A     Only if you don't understand

23  accounting.  When he took the home equity

24  line of credit, he has to pay it back.  His

Page 261

```
1    balance sheet didn't change.  He has debt

2    against his home, and he owes money.  He has

3    the money, but he has debt against his home.

4              So only in a world where you

5    don't understand accounting would that be

6    double recovery.

7       Q    But I'm saying that where the

8    evaluation of the appraisal is inconsistent

9    with his opinion on the impaired value of his

10   home, where the appraised value is

11   significantly higher than his estimate.

12             Then doesn't he have a double

13   recovery?

14             MS. JOSELSON:  Objection.

15      A    No.

16      Q    Why not?

17      A    I already said, when he borrowed

18   the money, he has to pay it back.  He wasn't

19   net better off by that amount.  He has to pay

20   the money back.  So there's no double

21   recovery.  That's just nonsense.

22             Are we coming up on a break

23   or~--

24      Q    Yes, we can take a break.
```

Page 262

```
 1       A    Okay.  Thank you.

 2                  THE VIDEOGRAPHER:  The time is

 3    3:28.  We are going off the record.

 4                  (Recess.)

 5                  THE VIDEOGRAPHER:  We are back

 6    on the record.  The time is 3:46 p.m.

 7    BY MR. WILSON:

 8       Q    So, Mr. Unsworth, I think we have

 9    briefly discussed this before, but I just

10    wanted to make sure we're clear on it.

11                  When you have provided an

12    opinion on how -- let me rephrase that.

13                  Is it correct that you

14    provided an opinion on how the added cost you

15    attribute to the transition to municipal

16    water would be capitalized into the value of

17    the class members' homes; is that correct?

18       A    In this case?

19       Q    Yes.

20       A    Yes, I have opined on that, yes.

21       Q    And the individual plaintiffs have

22    offered their own opinions on the total

23    amount of diminution in value that they

24    believe they have experienced in this case;
```

Page 263

1    is that correct?

2         A    From all factors, yes.

3         Q    And their opinions of the

4    diminution in value they've experienced are

5    larger than your estimates of the capitalized

6    costs of the transition to municipal water;

7    is that correct?

8              MS. JOSELSON:  Object.

9         A    As I generally understand their

10   estimates, yes.

11        Q    So without with regard to the

12   reliability of either their opinions or your

13   opinions, is it fair to say that any ultimate

14   award or determination of diminution in

15   value, that if we were going to award the

16   plaintiffs their claims, we'd have to deduct

17   from it your estimate of the capitalized

18   value of those added costs?

19              MS. JOSELSON:  Objection.

20        A    It would depend on what's been

21   awarded, so it would depend on how the game

22   comes out at the end of the day.

23        Q    But it would be double-counting to

24   award the full value that the plaintiffs

```
 1   claim and also to award the amount that
 2   you're purporting to capitalize into their
 3   home value of added costs; is that correct?
 4                MS. JOSELSON:  Objection.
 5        A    I would want to hear from the
 6   plaintiffs as to what was -- what they were
 7   considering in their estimates.  I don't know
 8   enough about that, but -- but I -- it would
 9   not be unreasonable if the entire dollar
10   amount was awarded for all those categories
11   to consider, whether you might need some
12   adjustment.
13        Q    Is there any circumstance in which
14   it would be appropriate to award the entire
15   diminution value that the plaintiffs claim
16   and then also the capitalized added costs
17   that you've calculated?
18        A    Sure, if the plaintiffs didn't know
19   that they were -- that they were going to
20   incur added cost.  I don't know what
21   information they had when they made these
22   estimates.
23                It would also be true that if
24   any of these plaintiffs didn't have a well,
```

1   there wouldn't be any -- obviously wouldn't

2   be any overlap, right?  So...

3        Q    Would the plaintiffs accurately

4   have determined their own diminution in value

5   if they ignored those added costs?

6        A    I would think they should have

7   incorporated them.

8        Q    So assuming that they were able to

9   offer a reliable opinion, they should have

10  incorporated those added costs; is that

11  correct?

12       A    In that hypothetical, yes.

13       Q    So you described Mr. Phillips'

14  analytical approach in this case as the

15  "appraisal" technique.

16                 How would you define the

17  "appraisal" technique?

18       A    I'm using that term to separate it

19  from an econometric technique.  So the

20  appraisal technique.  As I mentioned earlier,

21  appraisers have a set of rules that are

22  followed that allow them to basically do the

23  same thing that economists do, which is

24  compare a property which is the subject

Page 266

1    property to a set of controls.

2                    And so there's a set of rules

3    they follow to identify what those controls

4    should be and how to adjust them and then

5    determine whether or not --

6                    For example, one of the things

7    you can do is determine if a -- if a property

8    that's been purchased by a party, whether the

9    price seems to be too high relative to

10   market, and therefore there might not be an

11   arm's-length transaction there, so...

12        Q    Are you aware of generally accepted

13   appraisal methodologies for appraising

14   properties impacted by environmental

15   contamination?

16        A    I'm aware of a number of papers

17   that discuss a range of approaches that can

18   be used by appraisers to get at that problem.

19        Q    Are you familiar with the Appraisal

20   Standard Boards Advisory Opinion 9?

21        A    I think that's the one I cite, but

22   yes.

23        Q    Are you familiar with the Appraisal

24   Institute Guide Note 6?

1      A     Not while I sit here, no, but...

2      Q     Are you familiar with the paired

3  sales method of evaluating potential change

4  in market value?

5      A     So there's two different uses of

6  that term.

7             So, as I understand it,

8  appraisers use that term differently than

9  economists.  So you could have large-volume

10  data that you can do paired sales analysis

11  on, and you can -- which is effectively what

12  a repeat sales model is, is the pairs itself,

13  and then you can have an appraiser approach

14  that uses paired sales.

15      Q     Have you reviewed any articles or

16  textbooks regarding that use of that method

17  by appraisers?

18      A     Probably over the years, yeah.

19      Q     But none are cited in your report;

20  is that correct?

21      A     I don't believe so.

22      Q     In your own words, can you describe

23  the paired sales method of analysis by

24  appraisers?

1      A     As I understand it, you're trying

2   to find properties that exhibit reasonably

3   similar enough attributes that you can opine

4   as to whether the property of interest -- the

5   price of it falls within the bracket of

6   the -- of the other properties, of the prices

7   of the other properties, all of which are

8   observed from the market.

9      Q     You state in your report that the

10  EPA's guidelines for preparing economic

11  analyses notes the availability of hedonic

12  techniques and other methods, e.g., stated

13  preference, for monetizing environmental

14  factors.

15                Is one purpose of the EPA

16  guidelines to evaluate communitywide effects

17  of environmental factors or impacts on

18  property values?

19      A     Yes.

20      Q     Do the EPA guidelines evaluate the

21  effects of environmental factors on

22  individual property values?

23      A     They could be used for that

24  purpose.  Typically, EPA is more interested

Page 269

1  in the net benefits to society of

2  improvements in environmental quality.

3       Q    Do the guidelines describe the

4  method for evaluating the value of individual

5  properties?

6       A    As I said, you could use the

7  methods that are described there to do that.

8  I don't know why you couldn't.

9       Q    Do the EPA guidelines describe a

10 method that they identify as suitable for

11 that purpose?

12      A    Well, they identify several methods

13 that can be used to understand the importance

14 of environmental quality in real property

15 values.

16            As I said, you could apply

17 that individual -- EPA isn't interested in

18 that problem, so I wouldn't expect that they

19 would be commenting on that.

20      Q    Are you aware of any peer-reviewed

21 published literature that identifies a method

22 of adapting the EPA guidelines for use in

23 determining the values of individual

24 properties?

1      A     Well, not that I'm aware of.  I

2   don't think it's something that's been -- EPA

3   is not interested in that problem.

4      Q     So taking a look at page 6 of your

5   report, you state that Mr. Phillips's opinion

6   is inconsistent with Dr. Jackson's published

7   work, under the second bullet on that page.

8      A     Mm-hmm.

9      Q     Now, without providing a title, you

10   referred to a 2001 article in which

11   Dr. Jackson addresses the use of "the hedonic

12   property valuation method."

13             Do you happen to be aware of

14   the specific article by Dr. Jackson that

15   you're referring to?

16      A     It should have been cited here, but

17   I -- yes, it...

18             It's either a typo -- should

19   be 2010 -- or it's an article I forgot to

20   cite.

21      Q     Let's take a look at page No. 9 of

22   your opinion.

23             The last paragraph on this

24   page says, "Dr. Jackson presents the opinion

1   that the" -- excuse me, "that the...

2   properties within the proposed class are too

3   diverse in location, ownership, property type

4   and characteristics, and the environmental

5   issues in the area are too variable for

6   classwide aggregation of properties for the

7   purpose of uniformly estimating a diminution

8   in value.'"

9        Q    Did I read that correctly?

10       A    Yes, you did.

11       Q    As I understand your report, you

12  don't challenge this quote by Dr. Jackson.

13            Do you agree with it?

14       A    Well, I -- I thought I actually did

15  challenge whether Dr. Jackson is right, that

16  estimation of losses across a large number of

17  properties couldn't be accomplished

18  efficiently and effectively, rather than

19  going property by property.

20            I don't entirely disagree with

21  him.  I mean, he is worried about class

22  certification here, and I note up front that

23  that's apparently not at issue.

24            But I don't necessarily agree

1    with him that he's presented a convincing

2    argument that you couldn't address losses to

3    groups of properties here, effectively.

4         Q    Now, on the next page, you say,

5    beginning of the first full paragraph,

6    "Unfortunately, Mr. Phillips does not explain

7    how these factors considered to be key to

8    sound analysis by Dr. Jackson are considered

9    in his appraisal analysis."

10                  Did I read that correctly?

11        A    Yes.

12        Q    So in the quote from Dr. Jackson

13   above, he said that these factors were too

14   individualized to permit classwide

15   aggregation of properties for the purpose of

16   uniformly estimating diminution in value; is

17   that correct?

18        A    That's correct.

19        Q    Was Mr. Phillips attempting

20   classwide aggregation of properties for the

21   purpose of uniformly estimating diminution in

22   value?

23        A    No, but he doesn't have to be.  If

24   Dr. Jackson believes these factors affect

Page 273

1   property values, you want to consider them,

2   or determine formally that they don't matter.

3            Whether it's a class basis or

4   individual property, you still have to

5   consider factors you think are important.

6       Q    So on page 10 of your report, you

7   quote from Dr. Jackson's 2010 article, Real

8   Property Valuation Issues in Environmental

9   Class Actions, which states, "One technique

10   that has been increasingly employed to

11   estimate environmental risk effects is

12   multiple regression analysis.  This technique

13   can be properly employed to estimate average

14   impacts to groups of properties that share

15   similar characteristics and are similarly

16   situated."

17            Did I read that correctly?

18       A    You did.

19       Q    Do you agree that multiple

20   regression only estimates an average impact?

21       A    Well, the regression estimates an

22   average impact, and you can then apply that

23   regression to a set of properties or to

24   individual properties, if you wanted to, by

1   entering their attributes.

2        Q     But the regression itself only

3   estimates an average impact; is that correct?

4        A     I wouldn't use the term "only."

5   The regression itself uses all the data to

6   develop a relationship between an attribute

7   and price for the data set that you have.

8                 There's other explanatory

9   variables in there, so you can back those in

10  to the actual property and see what you

11  think, say, within a neighborhood what you

12  think the effect would be.

13       Q     But the regression itself does not

14  provide a basis to determine the value of any

15  individual property, does it?

16       A     I'm not sure that's true.  I

17  don't -- I wouldn't say that's true.  And I

18  also -- I believe in the same paper,

19  Dr. Jackson talks about a second stage, then,

20  where you take that analysis and you use that

21  analysis or other analysis to estimate --

22  basically distribute the total dollars.

23       Q     So without more, a regression

24  itself is not sufficient to determine the

1   value of any individual property, is it?

2                    MS. JOSELSON:  Objection.

3       A    I would actually believe that's

4   probably what Zillow is using, if you could

5   get to their algorithm.  They're probably

6   using a regression analysis of some form, and

7   then backing the prices out for individual

8   homes.

9                    They could have some more

10  sophisticated algorithm as well.  This is

11  effectively what they're doing.  They're

12  correlating prices with attributes.

13      Q    So earlier in your opinion, the

14  beginning, you said, the plaintiffs are not

15  in fact seeking class certification for

16  purposes of establishing monetary damages

17  associated with property value diminution.

18                    If that's the case, what

19  purpose does it serve to know an average

20  impact from a regression model?

21      A    Well, the -- there's two -- there's

22  two things at hand here.  Mr. Phillips is

23  asserting that there's no other way to do

24  this other than the appraisal technique he's

1   used.  I'm taking issues with that.  I said

2   there are actually other ways to come up with

3   a diminution estimate, one of which is the

4   method that Dr. Jackson talks about.

5                   I've also stated, outside of

6   class certification, because I don't believe

7   that's at hand here, that there may be ways

8   to use this literature to understand the

9   expected diminution in value, that that could

10  be considered and that that might be

11  considered at a level beyond the individual

12  home, because it's not terribly efficient.

13       Q    But you haven't attempted to

14  develop a model that would allow that

15  multiple regression here, have you?

16       A    No.

17       Q    In fact, you've indicated that the

18  timing and the current volume of sales would

19  make it difficult to do that model?

20       A    In all likelihood, yes.

21       Q    And at this time, you don't know

22  whether it is feasible to do that kind of a

23  model, do you?

24       A    I don't.

1    Q    Would the diversity or

2  heterogeneity within a class area have an

3  impact on the usefulness and reliability of a

4  multiple regression model?

5    A    It could.  I mean, typically, what

6  you would do is you would add dummy variables

7  or some other factor that would --

8            There's two ways you could do

9  it.  You could add a dummy variable to the

10  model and that might separate the market or

11  you could run separate regressions for

12  different submarkets.

13    Q    And particularly in the case where

14  there was a lot of heterogeneity in the class

15  or in the group, you would expect that the

16  hedonic model output would overestimate

17  damage for some properties and underestimate

18  it for others; is that correct?

19    A    Well, by definition, the r-squared

20  says that -- says that your regression

21  analysis is not perfectly predicting the

22  value of anyone home.  There's -- the

23  r-squared indicates how well you're

24  describing those relationships.

1          I would say that the

2   heterogeneity would increase the variance of

3   your estimate.  It doesn't necessarily render

4   the coefficient to be incorrect.  It just

5   increases variance.

6      Q    And the regression model doesn't

7   provide a means that would be able -- that

8   would allow you to tell which specific

9   properties were subject to overestimated

10  damage and which were subject to

11  underestimated damage; is that correct?

12              MS. JOSELSON:  Objection.

13     A    So -- so when you use -- say you're

14  using a really simplistic model.  You're

15  using price as a function of a bunch of

16  attributes and you do a multiple regression.

17  That -- the regression analysis that comes

18  out of that tells you what that function is,

19  how each of those variables go into the

20  price.

21              You actually can do a

22  residuals plot and look and see which --

23  which observations you are more or less

24  accurately estimating.  And it's not unusual

Page 279

1    to do residuals plots, because you're looking

2    for patterns and you're also looking for

3    extreme outliers to figure out, for example,

4    whether you misentered data or something.

5               So I would say from a

6    practical standpoint, you're not correct.

7    You can do that, and often you do in

8    regression analysis.

9        Q    Do you believe that all properties

10   within the proposed class area share similar

11   characteristics and are similarly situated?

12               MS. JOSELSON:  Asked and

13   answered.

14       A    I think they share a lot of similar

15   characteristics, and I think they share a lot

16   of situational similarities.  Situational

17   similarities.

18       Q    So I'd like you to think about the

19   last time you purchased a home.  When you

20   were considering whether to buy that home,

21   how much to pay, did you consider the size of

22   the lot?

23       A    Yes.

24       Q    Did you consider the size of the

```
                                        Page 280
 1   garage?
 2                MS. JOSELSON:  I'm going to
 3   object to this line, but you can answer.
 4        A    I don't remember.
 5        Q    Did you consider --
 6        A    I'm -- I'm older, so I haven't
 7   purchased a home in a while, so...
 8        Q    Did you consider the age of the
 9   home?
10        A    No.
11        Q    Did you consider the size of the
12   living area?
13        A    Actually, that's wrong.  I did
14   consider the age of the home, and I
15   considered the size of -- I considered all
16   the factors that describe the home.
17        Q    That would include just, for
18   example, number of bedrooms, number of
19   bathrooms, how well it was maintained?
20        A    Yes.
21        Q    Did you consider the overall
22   condition of the property?
23        A    Yes.
24        Q    Did you consider the decor and
```

1   whether you or your wife might want to

2   repaint?

3        A    I would we assume we would repaint,

4   so I wouldn't consider the decor, no.

5        Q    Did you consider whether you might

6   want to replace flooring, cabinets, kitchen

7   appliances, bathroom fixtures, et cetera?

8        A    If I were looking at a property, I

9   would consider whether I would need to do

10  that to be comfortable in the property, and

11  that might determine how much I'm willing to

12  pay for it.

13            I would also consider the

14  market, because I obviously have to meet the

15  next bidder's price.

16       Q    So given all these considerations,

17  is it fair to say that it was important for

18  you to visit the home and tour the interior

19  before you decided to purchase it?

20            MS. JOSELSON:  Same objection?

21       A    In one case, yes.  And in one case,

22  no.

23       Q    And it was important for you to

24  also determine how much you would pay for it,

```
 1   to visit the home; is that correct?
 2               MS. JOSELSON:  Continuing
 3   objection.  Assumes facts not in evidence.
 4       A    Yeah, we did visit the home so,
 5   I -- yes.  I don't think I would buy real
 6   property without seeing the property.
 7       Q    Because without visiting the
 8   property and touring the interior, you can't
 9   assess many of the factors that determine
10   whether you're going to buy and how much
11   you're going to pay; is that correct?
12       A    No -- well, it's -- you can't
13   determine whether it has the factors -- the
14   attributes you're looking for.  How much
15   you're going to have to pay is a market
16   question.  It's who you're competing with.
17               So you can have your own
18   opinion as to market value, but you have to
19   compete with others.
20       Q    But it's determinative of how much
21   you are willing to pay what the condition of
22   the interior is?
23       A    It may be determinative of that,
24   yes.
```

1    Q    Would you say that a potential
2  buyer's interior inspection of a home for
3  sale is a critical part of the buying
4  decision and how much they're willing to pay?
5    A    I haven't studied what the buying
6  decisions are based on.
7    Q    Do you agree a hedonic model
8  doesn't include a variable that accounts for
9  the interior condition of the property?
10   A    I am aware of hedonic models that
11 do have condition of property as one of the
12 variables.  That's, for example, commonly
13 done for -- I believe in Vermont, listers use
14 what amounts to hedonic equation that
15 includes condition of property in determining
16 the market value for taxing purposes.
17              So I'm not sure if that's
18 true.  I would have to say, I don't -- I
19 don't believe that's true, but I'd have to
20 look at what the listers use.  And it likely
21 varies across communities.
22   Q    In forming your opinions in this
23 case, did you speak with any of the named
24 plaintiffs?

Page 284

```
 1      A     No.
 2      Q     Did you speak with a local realtor?
 3      A     No.
 4      Q     Did you speak with a local
 5  appraiser?
 6      A     No.
 7      Q     Did you speak with any other
 8  individuals about Bennington market
 9  conditions?
10      A     No.
11      Q     So on page 9 of your report --
12      A     This is still Phillips and Jackson?
13            MS. JOSELSON:  Exhibit 4.
14      Q     Yes.  You state, "It is reasonable
15  to ask whether buyers in the market for a
16  home in the area would make such fine
17  distinctions in considering a purchase and
18  thus whether the analysis conducted by
19  Mr. Phillips is biased by this factor."
20            And that factor referred to
21  there is the zone -- proximity to the zone of
22  contamination?
23      A     That's correct.
24      Q     So do you think buyers have a
```

Page 285

1   preference for properties inside or outside
2   of the proposed class area?
3        A    I would expect that buyers would --
4   all else equal, you would think a disamenity
5   would be considered negative, and I would
6   expect they would consider the zone of
7   contamination to be a disamenity.
8                   Whether they can refine that
9   down and whether they would be willing to
10  refine it to this level of detail, I'm a
11  little skeptical.
12                  I would -- I would prefer
13  controls that were a little more obvious.
14       Q    So if buyers have a real preference
15  one way or the other, is the information that
16  they need to make that determination publicly
17  available?
18       A    That's a good question.  I don't
19  know how available that information is.  I
20  mean, it's publicly available.  I've gotten,
21  so it's in the public domain.
22       Q    So in Footnote 11 of page 11 of
23  your report you state that, "The impact of
24  disamenity, such as presence of" --

Page 286

1                    MS. JOSELSON:  Wait a minute.

2       A     Just give me a moment here.

3                    Yes, go ahead.

4       Q     So Footnote 11 of page 11 says,

5    "The impact of a disamenity, such as the

6    presence of a hazardous waste site, would be

7    expected to be a negative function of a

8    distance to the site."

9                    Did I read that correctly?

10      A     You did.

11      Q     Would you agree that the same logic

12   applies to the proposed class area here?

13      A     It wouldn't surprise me if distance

14   to the zone of contamination matters

15   ultimately propertywide as a disamenity.

16      Q     Would the impacts be a function of

17   distance to the source of PFOA?

18      A     No, I wouldn't expect that.  In

19   this particular case, I would not expect

20   that.  It's not like a plume.  It's not --

21   the discharge point isn't there, so the

22   concentrations don't -- don't show up higher

23   around that facility, the same way you would

24   expect with, like, a groundwater plume.

Page 287

```
 1                    This is more of a box.  It's
 2   not a -- it's not a plume.
 3        Q    Would impacts vary based on whether
 4   PFOA is present at the property in issue?
 5        A    I think it would depend on the
 6   neighboring properties.
 7        Q    So it would depend both on
 8   neighboring properties and on whether PFOA is
 9   detectable in the groundwater at that
10   property; is that correct?
11        A    And whether the person was required
12   to close the well and whether they're going
13   to be within the zone that is -- requires
14   that no wells be dug, all those factors.
15                    Ultimately, it will affect
16   the -- would you think would affect whether
17   or not the property would be affected by --
18   by PFOA.
19        Q    So Footnote 12, in your opinion,
20   says, "While the EPA study found that home
21   prices might rebound once a remedy was put in
22   place, there is no economic theory that would
23   support prices rising as a result of
24   proximity to a disamenity such as
```

Page 288

1    contaminated groundwater."

2                    Did I read that correctly?

3        A     You did.

4        Q     Do you agree that proximity to

5    groundwater with PFOA is only one factor

6    among all the characteristics and attributes

7    considered by the purchaser of a home?

8        A     Yes, and I don't know what that

9    question has to do with what you just read.

10       Q     In Footnote 13, you say, "Note that

11   the timing of when losses are calculated may

12   matter.  For example, if damages are properly

13   expressed at the time of an adverse harm, the

14   fact that the prices may recover some day

15   will be irrelevant to the damage claim."

16                   Did I read that correctly?

17       A     You did.

18       Q     Wouldn't that matter only if the

19   class member was trying to sell their home

20   during the period of temporary diminution?

21                   MS. JOSELSON:  Object.

22       A     That's not the -- that's not the

23   point I'm making here.  The point I'm making

24   here is, I don't know what the rules are as

Page 289

1    to when you calculate loss, so I don't know

2    if the court allows you to recover the damage

3    that happened at the event or whether it

4    recovers it as of the day of trial, or some

5    other date.

6                    So it -- it would matter which

7    date certain you're required to express

8    damages.  That's all I'm saying there.  It's

9    somewhat of an academic point here, because

10   I'm also saying that there is no true remedy

11   here, so I'm not expecting prices to rebound

12   the way you might if you, say, removed a

13   landfill or more traditional remedy.

14       Q     Would you agree that a property's

15   lot size could be relevant to its value?

16       A     Yes.

17       Q     The square footage living area is

18   relevant?

19                    MS. JOSELSON:  Asked and

20   answered.

21       A     Yeah, I think we went through ten

22   factors earlier that I thought might matter.

23       Q     Let me give you just a couple more

24   that maybe we haven't covered.

```
 1              The site improvements are
 2   relevant?
 3        A    Could be.  They also could be
 4   negatives.
 5        Q    The topography is relevant?
 6        A    Could be.  Positive and negative.
 7        Q    Whether the basement is finished or
 8   unfinished is relevant?
 9        A    Could be.
10        Q    Do you know whether buyers in
11   Bennington would have paid more or less for a
12   home that's on municipal water as opposed to
13   a private well?
14        A    I don't know that, and I point that
15   out in my report.  That's not known to any of
16   us.
17        Q    Did you try to check?
18        A    We did not conduct an analysis to
19   control for that.
20        Q    Can you describe benefits transfer
21   analysis?
22        A    So benefit transfer is the use of
23   information from existing studies conducted
24   in particular contexts as applied to a new
```

```
 1   context for which you don't have primary
 2   data.
 3              So an example would be -- a
 4   typical benefit transfer in my business would
 5   be the value of a day of sportfishing down at
 6   Coeur d'Alene.  I may not study sport fishing
 7   down at Coeur d'Alene, but I can look at what
 8   people paid to fish in similar areas and
 9   infer what the value the -- what the value of
10   their sportfishing worth.
11        Q    Is benefits transfer an
12   acceptable -- or, excuse me, an accepted
13   methodology for determining the market value
14   of individual properties?
15        A    I would -- when you say "market
16   value," you mean, like, someone deciding what
17   to put their price -- their home on the
18   market for?
19        Q    Determining -- I think as you
20   defined market value earlier, which I think
21   you said is the price a willing buyer/willing
22   seller will agree on.
23        A    So you're trying to forecast what
24   the value of what a property would be?
```

1     Q     Yes.

2                 Is benefits transfer a

3     generally accepted way of doing that?

4     A     I think that's kind of what the

5     appraisal approach is.  It's a form of

6     benefit transfer.  It's taking information

7     from other sites and applying it to the one

8     at hand.

9     Q     So the appraisal method is, you

10    would say, a particularized version of a

11    benefits transfer analysis?

12    A     I would say loosely construed.

13    Q     If you're applying the results of

14    one study area to a new study area, how do

15    you make adjustments for the difference in

16    the real estate markets?

17    A     Well, I think the example I give

18    here from Dr. Kopp's analysis in Illinois,

19    outside Chicago, was to consider factors that

20    are believed to affect the extent to which a

21    disamenity will effect home values.

22                 So you have a set of

23    attributes, and you adjust based on that.

24    Q     How do you account for different

1   market conditions since the time that the

2   study was performed and the time at which

3   you're trying to make the comparison?

4        A    So you -- yeah, I guess I'm not

5   sure what you mean by that.  You mean

6   different market conditions at your -- at

7   your -- the sites where the studies were done

8   or the sites where you're applying it to?

9        Q    At the sites where -- the

10  difference between the site where the study

11  was done and where you're applying it to in

12  terms of the timing, in the sense that the

13  real estate market, as to the extent it has

14  national ups and downs, may have varied from

15  the time the study was done to the time

16  you're trying to apply it.

17       A    Yes, I guess a more traditional

18  issue of adjustment would be whether the

19  market is, you know, a very competitive

20  market versus one that's less competitive.

21            And that's, of course, the

22  same thing with a mark -- with cycles in the

23  economy.  There are time periods where real

24  estate markets are more competitive or less

Page 294

1    competitive.

2                      So you could adjust for that.

3    I think you -- I would be more concerned with

4    whether the market you're looking at is

5    similar to the markets that were studied in

6    the literature.

7        Q    How do you adjust for the presence

8    of different contaminants or alleged

9    contaminants at the study site and the one

10   that you're trying to compare it to?

11       A    The studies that are done, I've not

12   seen them make a distinction as to the type

13   of contaminant.  You would -- you would think

14   something that's less familiar -- I mean,

15   there's a good literature that says that

16   risks that are less familiar are more of

17   concern to people than risks that are

18   familiar.

19                      So you might, for example,

20   believe that a plume of gasoline from a

21   leaking service station may not have the same

22   effect on a market that a plume of PFOA that

23   residents aren't as familiar with might --

24   might find.

```
 1                    So you would consider those
 2   factors in your transfer in deciding how
 3   confident you are in your transfer.
 4        Q    How do you adjust for a different
 5   mix of contaminated versus uncontaminated
 6   properties in conducting a benefit transfer
 7   analysis?
 8        A    So typically, the -- you -- again,
 9   you would look to the studies and how they
10   were done and how they measure the
11   disamenity.
12                    So you would look to see
13   whether, for example, is it a distance issue,
14   distance from a disamenity, so like distance
15   from a landfill, or is it effectively you're
16   right at the landfill, in other words, you're
17   right on top of the contamination.
18                    I think would you have to --
19   where there's a patchwork of observations of
20   contamination, I think you'd have to answer
21   the question whether you believe the market
22   is -- takes -- is that literal about the --
23   the contamination.
24        Q    And how would you adjust in a
```

1   benefits transfer analysis for a different

2   mix of property types, ages, conditions,

3   attributes and characteristics?

4        A    Again, you'd want to make sure that

5   the studies that you're looking at from the

6   literature are similar to your site, and

7   typically those are reflected in the property

8   prices, and there's usually a percentage

9   diminution that's applied.

10                 So you would expect to see it

11   reflected through the property price.

12        Q    So your report cites testimony from

13   Dr. Sunding in a case that involves

14   allegations of property value diminution

15   stemming from PFCs in groundwater.

16                 Can you tell me what case that

17   is?

18        A    It's the -- I don't actually know

19   what the common name of the case is.  It's

20   out in Minneapolis, St. Paul.

21        Q    Is -- do you know if it's in state

22   court or federal court?

23        A    I don't.

24        Q    Is the defendant 3M?

Page 297

```
 1        A     Yes.  But when you ask me what case
 2   it was, I don't know the name of the case.
 3   I --
 4                  MS. JOSELSON:  Jones versus --
 5   yeah.
 6        A     I know David quite well, so...
 7        Q     Which David?
 8        A     David Sunding.
 9        Q     Oh, okay.
10                  Do you have any documents
11   associated with Mr. Sunding's opinions?
12        A     I have his report.
13                  MR. WILSON:  Has that been
14   produced to us?
15        A     Yes.
16        Q     Our understanding is that it
17   hasn't.
18                  MS. JOSELSON:  Well, do you
19   want to take a break?
20                  THE DEPONENT:  That's just a
21   mistake then.
22                  MR. WILSON:  Well, we are -- I
23   mean, we can address that after the fact.
24   I'm very close to done, if you want to --
```

Page 298

1      A     Pretty much everyone in North

2  American Consulting has that report.  I'm

3  pretty sure we turned it over.

4      Q     Okay.

5              MS. JOSELSON:  Yes, it's in

6  there.

7              THE DEPONENT:  It's probably

8  listed as Sunding~2017.

9              MS. JOSELSON:  State of

10  Minnesota versus 3M, Sunding, David, Final

11  Expert Report.

12              MR. WILSON:  I have it.  Okay.

13              THE DEPONENT:  I believe it's

14  also on the Internet at this point, if you

15  search on it.  I also know David would be

16  happy to send it to you, so yes.

17  BY MR. WILSON:

18      Q     I have enough pen pals.

19      A     Yeah.

20              (Pause.)

21      Q     So in your opinion, are

22  environmental disamenities that are unrelated

23  to PFOA irrelevant to your analysis here?

24              MS. JOSELSON:  Object to the

Page 299

1    form.

2         A    So I'm not conducting a property

3    analysis.  So the question is whether they're

4    relevant to the -- to the matter at hand.

5                   If -- I mean, a typical

6    before-after case of property diminution,

7    those factors would have to change at the

8    same time for them to be -- confound the

9    effect of the discovery of PFOA.

10                  If there's always been an old

11   landfill in town or there's always been a

12   history of -- at a site where it was

13   inspected by the state or something, that

14   doesn't change, so you wouldn't expect that

15   to be correlated with the change on the date.

16                  Now, if you're doing

17   comparisons, if you're going out and looking

18   at a single comparison to 35 Aces Way, you

19   obviously wouldn't compare it.  If it isn't

20   near a major environmental disamenity, you

21   wouldn't want to compare it to a property

22   that is next to a major environmental

23   disamenity, because then you're not

24   controlling appropriately.

1     Q    So if you identified property value

2   diminution at a specific property and then

3   discovered multiple environmental

4   disamenities at that property, would you

5   assign the cause of the diminished value to

6   only one source of contamination and consider

7   the other sources irrelevant?

8               MS. JOSELSON:  Object to the

9   form.

10    A     Well, as I just said, if the

11  property had issues prior to the event, those

12  were already baked into the price, then comes

13  along another contamination event, that would

14  cause a separate effect, which could be

15  observed separately, because presumably the

16  other problems are the same.

17               They -- it's like if the

18  number of bathrooms stayed the same

19  throughout the entire period, you wouldn't

20  think bathrooms were terribly relevant to

21  the -- to the change.

22               Taking a look at page 18 in

23  your report under the bold heading there.

24               MS. JOSELSON:  Page 18?  I'm

Page 301

1    sorry?

2                    MR. WILSON:   18.

3        A    Mm-hmm.

4        Q    You say, "Dr. Jackson's reference

5    to the appraisal literature to define what

6    analysis is required and when a property is

7    harmed is inappropriate and unsupportable for

8    use in this matter, is inconsistent with

9    sound environmental science."

10                    Did I read that correctly?

11        A    You did.

12        Q    Can you explain why the appraisal

13    literature is inappropriate and unsupportable

14    for use in this matter?

15        A    So for reasons I do not understand,

16    the appraisal literature chose to come up

17    with its own standard for when it thinks a

18    property is affected by environmental

19    contamination, and that's what's cited down

20    below.

21                    And I -- this is probably

22    worth a rebuttal to the actual standards

23    board, but I don't know why appraisers or the

24    appraisal industry should be in the business

1  of deciding when property is contaminated or

2  not.  That's a scientific question.

3      Q    So your problem is not really with

4  Dr. Jackson, but rather with the standards of

5  the appraisal profession?

6                MS. JOSELSON:  Objection.

7      A    Exactly.  That's exactly what I

8  say.  I say that his reference to that

9  literature is inappropriate and

10  unsupportable, so...

11     Q    And how is the appraisal literature

12  inconsistent with sound environmental

13  science?

14     A    Sound environmental science would

15  ask the question and the economic analysis,

16  and I would say appraisers should as well,

17  ask the question whether the contamination is

18  causing an effect in the market.

19                Whether it's above or below a

20  standard doesn't matter.  The effect is still

21  there.  So you can imagine, for example, the

22  presence of a toxic substance for which a

23  threshold has not yet been developed.

24                Good God, there's a chemical

1    that's used a lot by the military.  It's not

2    perchloroethylene, but --

3                     There's substances for which

4    there are no thresholds which we believe to

5    be toxic.  They just haven't decided on a

6    threshold yet.  And their presence, I think,

7    could affect property values.  But this says

8    that you have to be above a federal, state or

9    local agency.

10                    The other problem with this

11   definition is that it would vary by state.

12   So depending on the state's regulatory

13   regime, an appraiser could determine that a

14   substance at the same concentration would

15   cause a property effect in one place and not

16   in another.

17                    And I wouldn't -- I just don't

18   believe that's the way markets or toxicity

19   work.

20       Q    So you don't believe that the

21   economics literature supports the notion that

22   regulatory differences between states can

23   affect markets?

24       A    That's so broad, I couldn't answer

Page 304

1    that.

2                    Clearly states' regulatory

3    programs can affect markets because of how

4    stringent they are at allowing for commercial

5    activity, for example.

6                    What I'm talking about here is

7    something much simple, which is, does the

8    average property buyer solely and simply

9    consider the exceedance of a threshold, or

10   would they be bothered by the presence of a

11   contaminant more generally.

12                   And I think a more objective

13   standard would be to let the market speak for

14   itself, not to let the appraisal standard

15   speak for it.

16       Q    Did the appraisal standard speak

17   solely to whether substances exceed

18   environmental thresholds?

19       A    Well, it says here that adverse

20   environmental conditions, generally the

21   concentration of the substance would exceed

22   regulatory limits.

23                   And I just think that that's a

24   statement that -- it shouldn't be presumed

1  that the failure to exceed a regulatory limit

2  would automatically imply there's no property

3  effect, and that's what the guidelines say,

4  in effect.

5           Now, whether an appraiser

6  actually follows this or not or believes it,

7  I don't know; but this seems to be, in my

8  mind, overstepping appraisal science as you

9  move into behavioral science and toxicology

10 and all that stuff.

11     Q    Does the State of Vermont require

12 any party to undertake any remedial action at

13 properties where PFOA concentrations are

14 below regulatory thresholds?

15           MS. JOSELSON:  Objection.

16     A    I believe they're going to.  In the

17 area where the wells are no longer to be

18 allowed for residential purposes, some of

19 those properties are not currently

20 demonstrating concentrations above the

21 threshold.  So they're doing what you just

22 said.

23     Q    But the --

24     A    Because they're recognizing the

Page 306

1  variability in the environment of those

2  concentrations and making prudent decisions

3  about resource management.

4       Q    And so that might be a situation,

5  in your view, where there would be a unique,

6  individual factor with respect to those

7  properties that would require specific

8  consideration in a determination of market

9  value; is that correct?

10                 MS. JOSELSON:  Objection.

11      A    I don't know how you got that

12  extension from what I just said.

13      Q    Let's see if we can break it down.

14      A    We were talking here about whether

15  the appraisal literature should have an

16  opinion on toxicology, and I was saying it

17  shouldn't, and that was the extent of the

18  discussion at the moment.

19      Q    So I said that -- I asked whether,

20  rather, the State of Vermont would require

21  any party to take action where PFOA levels

22  are below regulatory thresholds, and your

23  response was that yes, they do, in cases

24  where, because of the variability of the

1  environment, even if PFOA is not currently

2  detected, it may be soon in the future.

3            Is that a fair statement of

4  what you said?

5       A    Where there's uncertainty about it,

6  yes.

7       Q    And so that would be an example of

8  a situation where you would need to

9  specifically consider that property and its

10 characteristics, because even if it's not

11 exceeding a regulatory threshold, there may

12 still be cause for concern?

13            MS. JOSELSON:  Objection.

14      Q    Is that correct?

15      A    And what I'm saying is in this --

16 in this section is that the appraisal

17 literature might imply that you should ignore

18 that property and conclude that it's not

19 going to be affected by the presence of

20 contaminants.

21      Q    It seems to me the appraisal

22 literature here that are cited says that

23 generally the concentration of these

24 substances would exceed regulatory limits

Page 308

1  established by the appropriate federal, state

2  or local agencies.

3            Does "generally" mean all of

4  the time?

5            MS. JOSELSON:  Objection.

6     A    No, but I don't -- I don't -- I

7  don't even know why they would say

8  "generally."  I don't think there's any

9  evidence of that either.

10    Q    So, for example, this might be a

11 case where you could reason for an

12 individualized departure from that standard;

13 is that correct?

14            MS. JOSELSON:  Objection.

15    A    I would depart from the standard in

16 its entirety for -- for any and all purposes

17 involving environmental contamination.

18    Q    But, at a minimum, there might be

19 individual circumstances here that would

20 warrant departure from that standard?

21            MS. JOSELSON:  Objection.

22 Asked and answered.

23    A    I believe I didn't say that,

24 actually.  I believe what I said was that I

1   would depart from it for all properties in

2   the zone of contamination, regardless of

3   whether they have contaminant concentrations

4   observed in their wells above a regulatory

5   threshold.

6        Q    Let me frame it slightly

7   differently.

8                  Would it be appropriate for an

9   appraiser evaluating those non-detect wells

10  under this guidance to say that this

11  constituted an appropriate exception to the

12  guidance because of the uncertainty and

13  variability in the PFOA levels?

14                  MS. JOSELSON:  Objection to

15  the form.

16       A    I don't -- as I've already

17  mentioned, I'm not an appraiser, so I don't

18  know what the rules are for -- for

19  exceptions.  I think what I was --

20                  I know what I was trying to

21  get at here, is I don't think that this --

22  the appraisal guidance should form the basis

23  for whether a party can be shown to be harmed

24  or not.

1                   It's a much more general

2    conclusion.  I think it's the wrong science

3    to bring to the problem.

4         Q    Do buyers pay attention to seller

5    disclosures?

6         A    I would assume so.

7         Q    If a seller's property had

8    groundwater PFOA concentrations at twice the

9    Vermont regulatory limit, do you think they

10   would have an obligation to disclose that

11   fact to potential buyers?

12        A    I don't know what the law says.

13        Q    So you have no -- no knowledge of

14   what disclosures are required with regard to

15   environmental conditions at a property under

16   Vermont law?

17        A    Under Vermont law, no.  I would --

18   I would assume that even in the absence of

19   Vermont law, you may be placing yourself at

20   risk by not revealing.

21        Q    Okay.  We're closing in on the end

22   here.

23                   If you take a look at page 19

24   of your report, the second sentence under the

Page 311

```
 1    last bolded heading says, "The presence of
 2    PFOA in groundwater throughout the Bennington
 3    community is having a similar impact on all
 4    residential properties in the action area."
 5               Did I read that correctly?
 6         A    You did.
 7         Q    I apologize that I'm stumbling over
 8    my words.
 9         A    That's all right.  You've read a
10    lot today.
11         Q    Yes.
12               How do you know this?
13         A    I'm making this as a professional
14    judgment, and it's -- it's based on the bold
15    header above, which is Sound Practice in
16    Environmental Economics.
17               The -- what -- based on the
18    studies in the literature, many of which are
19    cited in Dr. Kopp's report, but there's also
20    others, have generally found that the effects
21    of contamination are uniform and have
22    definable patterns through space and time.
23               And so I would -- when I used
24    the term "similar" there I mean just that.
```

Page 312

1  It's likely had a similar impact.

2       Q    So --

3       A    It's a similar disamenity across a

4  broad area, particularly when you have zone

5  of contamination that's defined, as opposed

6  to a plume or some other variable factor.

7       Q    So I'm going to represent to you

8  that in the Exhibit 8 chart that we looked at

9  earlier --

10                 It's the one right here.

11      A    Yes.

12      Q    -- that that summary of the

13  plaintiffs' individual opinions on the amount

14  of their diminution in value shows estimated

15  diminution in value ranges from 20 percent to

16  37 percent at the six properties at issue

17  here.

18                 If that's so, why are these

19  self-reported impacts among the main

20  plaintiffs so varied when you claim that the

21  presence of PFOA in groundwater is having a

22  similar impact on all residential properties

23  in the action area?

24      A    Well, I can think of one obvious

1  example would be that some of these folks

2  have a well and some doesn't, so I would

3  expect that to vary, because they're going to

4  have a different experience going through the

5  movement to municipal water.

6              But I would also say that it's

7  a similar impact, and I would -- I would

8  expect variability.  I've also only got five

9  observations, which, from a statistical

10 standpoint, doesn't tell me anything.

11      Q    So how did you have the basis to

12 claim there was a similar impact based on

13 five observations that you didn't even review

14 personally?

15      A    No, I'm making this statement based

16 on the economics literature, which, I said,

17 has generally shown that there are uniform

18 patterns of property impact associated with

19 the presence of contamination.

20      Q    So you're making a statement about

21 the literature, not a statement about

22 Bennington when you say that?

23              MS. JOSELSON:  Objection.

24      A    I'm making a statement about the

1   literature as I would expect it be applied to

2   Bennington.

3              I'm not saying what I think

4   the effect is.  What I'm saying is, it's not

5   unreasonable to think that there's -- that

6   there's somewhat of a uniform effect here and

7   that reasonable people could agree on that

8   effect and award damages based on it.

9        Q    But you've seen no corroboration of

10   that alleged effect in the actual data on

11   property value diminution in Bennington; is

12   that correct?

13        A    I have not been able to do that

14   analysis, no.

15              But that is the analysis that

16   Dr. Sunding did and Dr. Kopp did, and which

17   EPA has done for their studies.

18        Q    Do you agree with Dr. Jackson's

19   opinion that neighborhoods within Bennington

20   are too dissimilar to be submitted as a

21   class?

22        A    I didn't think his arguments there

23   were convincing, because I thought there

24   could be factors that could be controlled for

Page 315

1    if those differences really exist.

2                        But I also -- I don't -- I'm

3    not interested -- we're no longer interested

4    in whether it can be defined as a class, so I

5    didn't address that problem.

6         Q    Why are you no longer interested in

7    it?

8         A    Because they're not asserting class

9    cert for property diminution.

10                        MR. WILSON:  So I'm at the end

11   of my outline.  Let's take a quick break and

12   we'll revisit whether we need to ask anything

13   else, but I think we're likely very close to

14   done here.

15                        THE VIDEOGRAPHER:  The time is

16   4:40.  We are going off the record.

17                        (Recess.)

18                        THE VIDEOGRAPHER:  We are back

19   on the record.  The time is 4:55 p.m.

20   BY MR. WILSON:

21        Q    Mr. Unsworth, I'm pleased to

22   report, I have no further questions at this

23   time.

24        A    Okay.

1                    MR. WILSON:  Do you have any

2    direct?

3                    MS. JOSELSON:  I do not.

4                    THE VIDEOGRAPHER:  The time is

5    4:55 p.m.  We are going off the record, and

6    this is the end of today's deposition of

7    Robert E. Unsworth.

8                    (Whereupon, the proceedings

9    adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                C E R T I F I C A T E

2          I, Jill K. Ruggieri, Registered Merit

3    Reporter and Certified Realtime Reporter, do certify

4    that the deposition of ROBERT E. UNSWORTH, in

5    the above-captioned matter, on September 27, 2018,

6    was stenographically recorded by me; that the

7    witness provided satisfactory evidence of

8    identification, as prescribed by Executive Order 455

9    (03-13) issued by the Governor of the Commonwealth

10   of Massachusetts, before being sworn by me, a Notary

11   Public in and for the Commonwealth of Massachusetts;

12   that the transcript produced by me is a true record

13   and accurate record of the proceedings to the best

14   of my ability; that I am neither counsel for,

15   related to, nor employed by any of the parties to

16   the above action; and further that I am not a

17   relative or employee of any attorney or counsel

18   employed by the parties thereto, nor financially or

19   otherwise interested in the outcome of the action.

20

21

22          Jill K. Ruggieri, RPR, RMR, FCRR, CRR

23

24   Transcript review was requested of the reporter.

Page 318

1               CERTIFICATE OF DEPONENT

2

3           I have read the foregoing transcript of

4    my deposition and except for any corrections or

5    changes noted on the errata sheet, I hereby

6    subscribe to the transcript as an accurate record

7    of the statements made by me.

8

9

                              _____

10                            ROBERT E. UNSWORTH

11

12           SUBSCRIBED AND SWORN before and to me

13    this _____ day of _____, 20____.

14

15

16                      _____

17                            NOTARY PUBLIC

18

19

20    My Commission expires:

21

22

23

24

1              E R R A T A   S H E E T

2      PAGE      LINE                    CORRECTION AND REASON

3      _____     _____     _____

4      _____     _____     _____

5      _____     _____     _____

6      _____     _____     _____

7      _____     _____     _____

8      _____     _____     _____

9      _____     _____     _____

10     _____     _____     _____

11     _____     _____     _____

12     _____     _____     _____

13     _____     _____     _____

14     _____     _____     _____

15     _____     _____     _____

16     _____     _____     _____

17     _____     _____     _____

18     _____     _____     _____

19     _____     _____     _____

20     _____     _____     _____

21     _____     _____     _____

22     _____     _____     _____

23     _____     _____

24     (DATE)              ROBERT E. UNSWORTH

Page 320

1                       E R R A T A   S H E E T

2       PAGE      LINE                    CORRECTION AND REASON

3       _____     _____     _____

4       _____     _____     _____

5       _____     _____     _____

6       _____     _____     _____

7       _____     _____     _____

8       _____     _____     _____

9       _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____        _____

24      (DATE)              ROBERT E. UNSWORTH

[& - 80,000]                                                                    Page 1

| **&** |
| --- |
| **&**   1:15 2:3 6:2,19 6:21 |

| **0** |
| --- |
| **00125**   1:7 5:24 |
| **03-13**   317:9 |
| **05753**   2:6 |

| **1** |
| --- |
| **1**   3:11 5:17 7:14 7:22 9:5,18 103:4 153:13 182:17,20 248:5 |
| **1-4**   5:3 |
| **1.4**   31:24 32:5 |
| **10**   147:13 273:6 |
| **100**   100:11,19 117:20,21 119:8 |
| **10036-6797**   2:16 |
| **1095**   2:15 |
| **10:14**   40:11 |
| **10:16**   40:14 |
| **10:29**   53:2 |
| **10:30**   53:5 |
| **10:48**   72:9 |
| **11**   3:22 53:7 67:10 71:16 72:15 81:6 285:22,22 286:4,4 |
| **110**   93:12 95:4 259:9 |
| **111**   2:5 |
| **113**   119:21 |
| **11:02**   72:12 |
| **12**   287:19 |
| **12,000**   20:6 100:13 100:16 |
| **120,000**   259:10,15 260:15 |
| **12:08**   138:15 |
| **13**   17:24 22:13 42:10 288:10 |

| **131**   116:20 117:9 117:16 |
| --- |
| **14**   18:2 22:19 178:7 179:2 |
| **14726**   317:21 |
| **15**   17:5 20:1 22:14 27:9 30:13 |
| **152**   4:2 |
| **16**   31:14,20 151:10 253:19 |
| **17**   7:10 12:14 93:10 98:21 107:7 |
| **18**   107:7 110:19 173:20 300:22,24 301:2 |
| **19**   111:22 114:12 310:23 |
| **1:05**   138:18 |

| **2** |
| --- |
| **2**   3:13 9:5,24 26:19 153:14 178:11 186:20,22 216:15,22 230:17 |
| **20**   32:22 33:10 65:12 93:17 95:5 103:3,4 117:15 312:15 318:13 |
| **20,000**   142:24 143:15 144:8 250:20 |
| **2001**   270:10 |
| **2009**   4:2 151:20 |
| **2010**   270:19 273:7 |
| **2011**   20:4 252:10 252:19,24 |
| **2015**   253:19 |
| **2017**   22:14 32:2 258:18 259:14 298:8 |
| **2018**   1:14 5:8 7:10 7:14,22 20:4 |

| **67**:22 255:9 317:5 |
| --- |
| **209,000**   180:12 182:1 |
| **209,851**   179:4,13 |
| **21**   89:11 179:2,8 |
| **212.698.3500**   2:17 |
| **212.698.3599**   2:17 |
| **215**   90:11,22,24 91:1,16 |
| **2200**   93:18 |
| **23**   129:21 132:16 |
| **24**   151:11 158:3 |
| **248**   4:8 |
| **252**   90:2,24 |
| **26**   171:1 |
| **27**   1:14 5:8 317:5 |
| **282,000**   252:10 253:1 |
| **2:07**   201:13 |
| **2:26**   201:16 |

| **3** |
| --- |
| **3**   3:15 9:5 10:4 17:3 46:9 49:4 114:17 153:14 |
| **3/29/18**   3:23 |
| **30**   82:3 |
| **300**   114:20 116:13 |
| **300,000**   253:22 258:20 259:13 |
| **34**   45:16 |
| **35**   299:18 |
| **37**   89:21 90:14,24 312:16 |
| **370,000**   250:14 |
| **3:15**   248:8 |
| **3:28**   262:3 |
| **3:46**   262:6 |
| **3m**   296:24 298:10 |

| **4** |
| --- |
| **4**   3:18 9:5 35:19 153:15 216:17,20 284:13 |
| **40,000**   250:21 |
| **400**   114:20 116:10 116:10 |
| **45**   3:24 |
| **455**   317:8 |
| **47**   114:18 115:4 |
| **4:40**   315:16 |
| **4:55**   315:19 316:5 |

| **5** |
| --- |
| **5**   3:11,13,15,18,22 11:16,17 12:1 120:7 |
| **587**   89:21 90:14 91:1 |
| **5:16**   1:7 5:24 |

| **6** |
| --- |
| **6**   3:24 45:6,10 116:20 117:9,16 220:16,18 266:24 270:4 |
| **600**   117:22,22 119:6,6 |
| **65**   40:19 |
| **66**   68:4,10,12 |

| **7** |
| --- |
| **7**   4:2 152:3,4,9 |
| **70-30**   66:4 |

| **8** |
| --- |
| **8**   3:6 4:8 222:14 248:15 312:8 |
| **80**   65:11 66:16 67:2 222:15 |
| **80,000**   144:15 145:3,5,21 |

**80-20** 66:3
**800** 1:16 6:2
**802** 90:2 91:1
**802.388.6356** 2:7

**9**

**9** 139:9 266:20
  270:21 284:11
**9,167** 179:8,13
  180:11 181:22
**90** 66:19 67:3
**90-10** 66:3
**93** 12:11
**94** 174:12,15
**96** 174:12,13,20
  177:14
**99** 82:3
**9:37** 1:14 5:8

**a**

**a.m.** 1:14 5:8
  40:14 72:12
**ability** 165:16
  204:8 317:14
**able** 80:15 81:14
  85:14 117:2 149:2
  156:1 161:16
  164:22 192:8
  228:7 233:14
  242:1 245:14
  246:20 258:13
  265:8 278:7
  314:13
**absence** 157:23
  158:1,5 159:13
  165:24 168:14
  240:4 310:18
**absent** 139:8,23
**absolutely** 36:8
**abstract** 145:17
  153:1,3 166:9

**abundance** 230:21
**academic** 289:9
**accept** 12:9 222:15
  225:4
**acceptable** 291:12
**accepted** 151:18
  220:19 221:5
  239:10,11 266:12
  291:12 292:3
**accepts** 248:4
**access** 106:19
  107:13 140:5,19
  150:2 155:4 196:3
  196:4
**accessed** 168:16
**accessing** 153:15
**accident** 137:8,9
  137:13
**accomplish** 78:21
  152:21 168:11
  171:11
**accomplished**
  166:20 172:6
  271:17
**account** 47:4 90:8
  107:19 237:22
  259:19 260:1
  292:24
**accounting** 17:8
  91:8 260:23 261:5
**accounts** 283:8
**accruing** 208:5
**accuracy** 39:1
  66:21 114:15
**accurate** 9:9,13
  15:1 34:1,2 62:19
  80:8 220:13 253:9
  317:13 318:6
**accurately** 34:8
  265:3 278:24

**accuse** 38:9
**aces** 299:18
**achieve** 166:16
**acknowledge** 37:5
  70:8 148:9
**acknowledged**
  70:22
**acknowledgment**
  73:4,6
**acquire** 153:7
**acquired** 172:8
**act** 155:2
**acting** 155:3
**action** 5:23 6:8
  80:17 81:16 143:7
  151:18 154:12
  156:23 158:23
  211:8 305:12
  306:21 311:4
  312:23 317:16,19
**actions** 67:23
  157:22 158:8
  273:9
**activity** 304:5
**actual** 14:2 17:9
  18:16 32:6 33:5
  79:23 80:2 82:12
  83:12 84:5,6,9,10
  85:12,18 86:6
  122:8 239:20
  241:1 274:10
  301:22 314:10
**actuals** 239:21
**adapting** 269:22
**add** 97:9 277:6,9
**added** 15:20 45:21
  76:11 167:17
  172:22,24 252:3
  262:14 263:18
  264:3,16,20 265:5
  265:10

**adding** 90:11
**addition** 45:19
**additional** 20:10
  29:24 30:9 36:19
  47:3 76:8 78:7
  92:14 119:22,24
  125:6 175:16
  224:14
**address** 23:7
  38:18 47:1 58:2
  58:18 111:5,11
  133:16 161:1
  167:19 168:11
  170:7 180:21
  181:6 185:2
  200:23 272:2
  297:23 315:5
**addressed** 45:24
  73:17 122:11
  125:20,22 140:15
  169:5
**addresses** 22:3
  107:8 169:17
  181:3 270:11
**addressing** 181:1
**adjourned** 316:9
**adjust** 251:23
  252:6 266:4
  292:23 294:2,7
  295:4,24
**adjusted** 251:20
**adjusting** 192:12
**adjustment**
  264:12 293:18
**adjustments** 192:3
  292:15
**administer** 6:7
**advantage** 141:4
  260:13
**adverse** 288:13
  304:19

advise  136:11
advisory  266:20
affect  51:24 66:4
  155:20 239:2
  272:24 287:15,16
  292:20 303:7,23
  304:3
affiliations  6:12
afternoon  160:10
  195:7
age  195:4 280:8,14
agencies  152:17
  308:2
agency  303:9
agent  171:4,18
ages  296:2
aggregation  271:6
  272:15,20
ago  28:9
agree  5:15 35:3,6
  44:2 47:17 74:6
  84:15,19 155:5
  207:10 271:13,24
  273:19 283:7
  286:11 288:4
  289:14 291:22
  314:7,18
agreed  38:2 125:8
agrees  44:8 47:19
ahead  121:3
  208:16 237:14
  286:3
al  1:4 5:20 151:20
algorithm  275:5
  275:10
algorithms  240:1
  240:3 242:17
  254:5
allegations  296:14
alleged  38:2
  164:13,16,18,24

165:4,10 167:7
  175:14 176:10
  216:12 229:15
  250:13 294:8
  314:10
allegedly  156:2
  233:21
alleging  154:19
  155:11 156:5,19
allocate  74:23
  87:24 172:14
allocated  77:18
  172:11
allocating  19:4
  80:23
allocation  19:18
  19:19,21,23 72:20
  73:17 74:3,12
  75:5,13,17 76:7
  77:20 78:1 79:8
  79:10,19 80:19
  81:8,18,23 82:20
  83:8,15,22 84:1
  85:13 86:3,3,18
  87:10,12 88:8,10
  88:11
allocations  78:10
allow  25:15 78:15
  92:4 95:23 131:10
  218:22 265:22
  276:14 278:8
allowed  24:22
  199:24 236:17
  305:18
allowing  304:4
allows  150:20
  220:4 243:9 289:2
alpha  32:1,7
alternate  124:14
alternative  101:5
  124:3 126:9

129:24 165:19
alternatives  123:3
  123:4 153:6
alvarez  6:19
amended  7:10
  25:11,14 26:9
  99:15 249:1
amenities  196:5
  205:17 207:19
  242:13
amenity  169:9
  204:21 205:19
  255:18
american  152:17
  228:19 298:2
americas  2:15
amount  56:4 61:7
  61:21 62:1 73:22
  74:11 90:22 110:1
  115:8 116:19
  117:8 142:22
  152:18 172:10,11
  177:18 214:5
  261:19 262:23
  264:1,10 312:13
amounts  88:14
  90:11 283:14
analyses  42:13
  92:9 257:8,17
  258:8 268:11
analysis  16:11
  17:8 36:22 42:22
  44:5,24 47:7,22
  48:1 52:16 55:7
  55:18 59:22 65:23
  67:3 82:21 89:3
  91:20,21 92:5
  94:5,15 96:15
  97:7 100:5,10,21
  101:2,9 102:2
  104:23 107:19,24

108:19 110:4,7,9
  110:11,22 119:14
  125:11 139:4,8
  143:17 144:13
  150:22 151:14
  155:9 176:22
  214:17 215:5
  230:4 247:7
  256:20 257:19
  267:10,23 272:8,9
  273:12 274:20,21
  274:21 275:6
  277:21 278:17
  279:8 284:18
  290:18,21 292:11
  292:18 295:7
  296:1 298:23
  299:3 301:6
  302:15 314:14,15
analyst  59:21
  131:22 211:20
  252:5
analytic  59:21
analytical  265:14
analyze  20:22
  197:3,5 245:11
annual  18:1 22:17
  22:19 42:16,16
  84:11,13,18,21
  95:21 108:5
  114:15,17 115:4
  116:20 117:9
  119:20
annualized  48:10
anonymously
  132:19
answer  12:23
  22:23 36:23 68:22
  69:9 140:15 141:1
  174:19 177:13
  226:18 247:14

256:24 259:2
280:3 295:20
303:24
**answered** 23:10
29:14 32:14 42:5
42:24 43:3,19
64:5,16 65:19
69:20 96:8 98:16
118:5 136:5
137:23 143:20
144:6 169:3
185:23 207:16
216:7 226:18
233:11 235:3
254:17 279:13
289:20 308:22
**answering** 73:7
156:15 162:22
**answers** 8:15
**anticipate** 8:20
**anybody** 147:3
**apalachicola**
210:21
**apologize** 50:12
68:9 311:7
**apparent** 51:19
**apparently** 135:17
271:23
**appear** 9:9 76:20
**appearances** 2:1
6:11
**appears** 12:8
16:20 27:17 32:9
45:13 165:14
168:21
**appliances** 281:7
**applicable** 155:10
155:21
**application** 154:16
156:11,17

**applied** 119:12
177:23 225:3
290:24 296:9
314:1
**applies** 32:22
33:10 46:21 47:20
119:14 286:12
**apply** 16:12 47:21
58:22 176:18
237:18 245:15
269:16 273:22
293:16
**applying** 16:11
55:22 192:3 292:7
292:13 293:8,11
**appraisal** 14:21
16:10 38:24 175:9
177:15,17 220:22
226:16,20 227:2,7
244:6 257:8
258:13,19 259:5
259:12,22 260:3
260:13 261:8
265:15,17,20
266:13,19,23
272:9 275:24
292:5,9 301:5,12
301:16,24 302:5
302:11 304:14,16
305:8 306:15
307:16,21 309:22
**appraisals** 227:17
257:1,10,16,17
258:8
**appraise** 190:11
**appraised** 225:10
225:11 258:17
260:10 261:10
**appraiser** 12:16
12:19 15:3 16:10
190:5 191:17

214:15 215:3,6
227:8 256:21
257:1 259:19
260:5 267:13
284:5 303:13
305:5 309:9,17
**appraisers** 13:1,9
13:13,21,24
177:23 178:18,21
192:7 237:7 246:4
256:13 258:3
265:21 266:18
267:8,17,24
301:23 302:16
**appraising** 266:13
**appreciate** 25:1
**approach** 75:1,1
78:4 84:17 86:21
87:24 109:11
220:23,23 265:14
267:13 292:5
**approaches**
266:17
**appropriate** 35:4
43:4 80:21 81:20
82:18 83:9,17
84:8 85:11,17
86:5,22 87:2,3
93:9 96:3 98:23
166:11 230:10
264:14 308:1
309:8,11
**appropriately**
299:24
**approximately**
224:23
**area** 86:13 115:12
115:16 118:4
119:17 164:21
186:13,15 192:14
192:17,20 193:1,5

193:9 194:1,8,11
194:14,19,22
195:17 196:8
198:17 199:16
271:5 277:2
279:10 280:12
284:16 285:2
286:12 289:17
292:14,14 305:17
311:4 312:4,23
**areas** 228:14
291:8
**arguably** 49:13
**argue** 219:15
**arguing** 49:8
**argument** 34:13
34:18,24 35:5,12
35:16 272:2
**argumentative**
42:5
**arguments** 35:8
314:22
**arm's** 189:20
257:5 258:2
266:11
**article** 4:2 152:11
152:14 153:20
155:9 156:9,10
270:10,14,19
273:7
**articles** 155:8,15
156:16,20 267:15
**ashton** 2:24 6:3
**aside** 33:19 50:14
62:9
**asked** 22:9,20
23:10 25:22,24
29:13 32:14 42:5
42:24 43:3,19
62:8 64:4,15
65:18 66:8 69:20

75:9 76:14 85:21
86:8 89:6 95:15
96:7 98:16 99:13
114:7 116:22
118:5,13 134:6,18
137:23 138:21
140:24 143:19
162:5 169:3
185:22 196:15
207:15 216:6
220:1 226:17
228:10,16,20,21
231:3 233:10
235:3 240:21
244:18 245:17
246:17 254:17
255:14,16,17,20
279:12 289:19
306:19 308:22
**asking** 15:24
24:22 25:8 35:10
37:9 38:24 39:2
51:17 59:19,20
64:21 66:14,15
73:7,13 79:9 83:6
83:7 98:19 99:23
99:24 134:5 136:7
137:23 141:2
142:14 143:13,21
144:4,5,7 145:10
154:5 155:7
168:23 206:23
207:1 224:8 237:1
243:6
**asks** 221:10
**aspect** 185:8
**assert** 118:8 224:5
**asserted** 89:17
141:21 176:20
224:6

**asserting** 140:9
184:15 228:7
275:23 315:8
**assertion** 207:6
**asserts** 89:24
**assess** 65:15 89:15
140:2 244:19
282:9
**assessing** 153:21
**assessment** 72:21
87:10 151:20
**asset** 100:16
189:18 203:23
204:2 205:16
208:4
**assets** 222:23
223:2,19
**assign** 82:2 300:5
**assigned** 77:18
**associated** 19:11
50:21 77:3 84:2
108:5 134:15
157:17 158:11
171:22 183:2
275:17 297:11
313:18
**assume** 18:5 26:24
61:5 62:3,5,17,19
65:10 85:7 93:16
93:22,23,24 94:13
103:23 114:17
137:3 145:16,19
187:13 188:23
225:14 239:13
252:1 259:24
281:3 310:6,18
**assumed** 18:13
26:20 33:11
**assumes** 18:1 23:7
26:14 282:3

**assuming** 61:16
107:24 253:8
255:8 265:8
**assumption** 28:4
29:8,18 62:14
66:16
**assumptions** 21:17
29:2 73:12 74:22
**assure** 67:21
165:21
**atlanta** 210:14
**atmospheric**
235:13
**attempt** 130:12,24
140:2,17 142:21
160:3 193:23
206:4 259:2
**attempted** 14:1
90:17 194:6 216:4
245:11 276:13
**attempting** 272:19
**attention** 310:4
**attorney** 43:3
54:21 118:11
184:19 317:17
**attractive** 191:9
**attributable** 167:8
235:21
**attribute** 13:18
234:6 254:2
262:15 274:6
**attributes** 16:7
157:15 158:9
191:19 237:20
259:10 268:3
274:1 275:12
278:16 282:14
288:6 292:23
296:3
**attributing** 203:1

**audio** 5:13,14
**august** 7:10,14,22
**author** 208:14
209:1,17 210:5
**authorities** 102:1
102:6
**authority** 185:15
**authorized** 6:6
**automatically**
305:2
**availability**
147:20 149:20
268:11
**available** 55:22
64:19 78:11 87:4
99:12 160:5 164:3
170:2 187:15
196:12 198:21
199:5 230:22
232:3 243:3,14
245:7,15 250:3
251:8 254:2
285:17,19,20
**avenue** 2:15
**average** 16:16,20
42:22,23 43:9
44:19 46:2 62:19
62:20 63:23 64:14
64:18,22 65:6
73:21 74:10 75:4
75:15 80:6,12
82:6 86:10 88:18
88:24 101:10
102:12,18 103:8
108:2,3 109:24
114:17 115:19
119:8 143:1 179:3
179:8,21 180:11
181:22,23,24
182:5 273:13,20
273:22 274:3

275:19 304:8
**averaged** 64:17
**averages** 43:17,21
44:3,9,13,17 46:7
46:10 47:18,20
77:16 82:4 85:24
88:20
**averaging** 48:17
48:21
**avoid** 219:3
257:24
**award** 75:3 263:14
263:15,24 264:1
264:14 314:8
**awarded** 18:24
78:12 172:10
260:15 263:21
264:10
**aware** 55:11
101:18,21 122:3
122:12 138:22
154:11 156:16,20
185:17 188:7,8
194:7 223:20
242:24 258:6
266:12,16 269:20
270:1,13 283:10

**b**

**b** 3:9
**back** 17:23 19:24
38:21,22 40:13
45:4 50:11 53:4
71:15 72:11 85:23
88:24 91:3,9,19
104:3 121:22
138:17 159:17
165:1 179:19
180:5 182:2,8,12
182:13 197:22
199:3 201:15,19
226:24 231:17

252:5 258:11,20
260:24 261:18,20
262:5 274:9
315:18
**backing** 275:7
**backwards** 48:19
**bacteria** 18:2
22:17,19 23:19
26:13 27:1
**bacterial** 29:12
**bacteriological**
28:12
**bad** 25:12 230:8
240:24
**baked** 300:12
**balance** 247:10
261:1
**ball** 165:22
**bank** 222:11 223:7
223:11 225:4
239:10,11 256:17
**banks** 223:21
257:1 258:2
**barr** 67:21
**base** 232:11
**based** 29:4,6 32:18
33:22 37:22 59:8
59:10 73:11 74:20
74:21,24 75:3
76:15 79:12 82:11
83:1 88:1,10
90:17 91:13 96:10
113:18 115:16
120:21 127:24
176:24 185:19
213:10 223:21
239:24 243:21
249:12 256:1
258:1 259:5 283:6
287:3 292:23
311:14,17 313:12

313:15 314:8
**basement** 290:7
**bases** 232:19
**basic** 155:16
**basically** 90:11
94:19 95:23 184:4
265:22 274:22
**basing** 212:24
213:4
**basis** 28:22 104:5
113:16,16 186:6
243:4 247:13,16
255:7 259:1 273:3
274:14 309:22
313:11
**bathroom** 204:14
205:10,12 242:16
281:7
**bathrooms** 195:19
204:15 280:19
300:18,20
**bear** 90:10
**bedford** 211:9,12
211:13 212:13
213:20
**bedrooms** 195:19
280:18
**beginning** 12:14
17:6 174:19 246:1
272:5 275:14
**begins** 151:13
158:4
**behalf** 1:5 209:12
234:20
**behavior** 134:13
136:20 137:1
138:5,8 139:18
141:23 146:10,11
**behavioral** 305:9
**belief** 32:16

**believe** 14:3 15:23
16:16 21:6 22:3
22:21 23:13 25:11
37:7 39:13 43:2
46:19 54:11 59:22
60:14 64:8 65:11
73:10 97:20 98:11
99:15 117:11
128:10 130:11
133:9,10 138:21
170:17,18 174:22
175:7,22 176:22
180:22 181:5
183:8 192:18
211:24 218:1,10
219:4 220:21
224:1 225:6 229:3
233:2 242:11,11
243:20 245:3
246:24 252:2
262:24 267:21
274:18 275:3
276:6 279:9
283:13,19 294:20
295:21 298:13
303:4,18,20
305:16 308:23,24
**believed** 203:24
292:20
**believes** 32:20
36:10,12,15,17
43:4 44:14,22
89:19 108:23
161:19 272:24
305:6
**beneficial** 95:22
**beneficiary** 171:9
171:13
**benefit** 11:10
36:11,18,21,24
37:2,12 38:20

40:19 41:10,19
42:2 46:2 47:8
49:20,21 50:1,8,18
89:21,23 94:1,14
96:13 97:20 98:9
131:21,24 141:22
171:19 229:10
290:22 291:4
292:6 295:6
**benefited** 36:3,16
38:9,11,15 39:5,7
39:20,21 41:1
**benefits** 89:23
90:1,6,16,21 91:8
98:7 208:5 269:1
290:20 291:11
292:2,11 296:1
**bennington** 12:16
15:22 16:22 18:3
18:3 36:2,11
40:18 76:1,9,17
112:5 113:17
119:19 139:13,13
139:19,19 148:14
148:14 151:8
162:17 172:16
175:2 179:4
181:24 193:10,22
196:8 198:17
201:22 203:9,9
211:7,14 284:8
290:11 311:2
313:22 314:2,11
314:19
**best** 11:3 55:21
128:11,20 136:5
164:3 214:4,12,13
244:10 317:13
**better** 12:20,24
13:9 15:1 16:9
76:19 77:12 129:6

129:8,15 178:21
216:11 244:11
246:3 255:12
257:18 261:19
**beyond** 24:7,10
38:6 74:17 121:5
134:15 159:5
170:7 200:5
237:13 276:11
**biased** 284:19
**bidder's** 281:15
**big** 115:17 223:18
**bill** 55:15,16,24
56:1 76:20 85:15
108:14,16
**billing** 112:8,17,19
**bills** 55:1 56:4
78:16,17 79:24
85:12 88:2
**bit** 83:13 174:14
201:7 227:14
259:7
**blocks** 199:1 257:2
257:3
**board** 301:23
**boards** 266:20
**bold** 300:23
311:14
**bolded** 311:1
**borne** 146:19,22
**borrow** 204:9
**borrowed** 261:17
**boston** 1:17 6:3
**bothered** 304:10
**bottled** 132:21
133:4,15 134:2,8
134:14,14 136:15
**bottom** 182:20
220:18 230:18
250:9

**bought** 150:15
**bound** 128:10
**box** 187:14 234:14
287:1
**boylston** 1:16 6:2
**bracket** 268:5
**brand** 60:15 61:3
**break** 40:4 71:20
72:1 120:7 138:11
201:9 238:6
248:11 261:22,24
297:19 306:13
315:11
**breakdown** 194:3
**briefing** 209:20
**briefly** 208:7
262:9
**bring** 71:11
154:10,14 310:3
**broad** 303:24
312:4
**broadly** 119:15
192:4
**broker** 190:9
**brook** 165:22
**bryant** 2:14
**bucks** 95:5
**build** 196:15
240:13
**building** 100:24
**built** 145:2
**bullet** 17:24 35:24
35:24 42:11 49:7
54:23 60:2 67:9
216:22 230:18,20
270:7
**bunch** 111:20
278:15
**bureau** 200:2
221:10,19 224:6,9
224:16 229:7

**business** 9:15
11:20 255:21
291:4 301:24
**button** 242:6
**buttons** 242:12
**buy** 61:16,17
200:3 232:5
279:20 282:5,10
**buyer** 16:1 31:8
187:10 291:21
304:8
**buyer's** 283:2
**buyers** 147:18
148:19 149:19
174:4 284:15,24
285:3,14 290:10
310:4,11
**buying** 134:7
257:3 283:3,5
**buys** 240:11

**c**

**c** 5:1 317:1,1
**ca** 1:7
**cabinets** 281:6
**cake** 46:19 47:6
**calculate** 18:21
22:18 46:7 47:11
58:22 74:19 79:6
101:3 127:24
134:7 167:10
174:6 289:1
**calculated** 44:15
57:1 78:9 90:12
119:9 180:6
181:18 264:17
288:11
**calculates** 90:14
108:4
**calculating** 15:17
50:8 65:7 77:17
133:14 138:8,9

**calculation** 21:16
44:20 50:3 66:5
66:13 94:22,24
95:6 109:8 120:4
179:20
**calculations** 35:1
43:13 44:6 45:24
46:6 64:7 73:12
76:5 78:6 91:13
104:4 116:7 138:4
179:17
**calculator** 251:2
**call** 9:19,22 14:9
113:4,8
**calling** 49:6 111:1
**calls** 94:23
**capable** 238:19
243:20 244:2
**capacity** 168:10
**capital** 86:2 100:3
101:8,12 102:19
103:2,11,20 107:8
107:11 108:1,6,12
109:24
**capitalization**
14:24 85:10
175:15 176:7
**capitalize** 85:6
264:2
**capitalized** 14:5
14:14,19 15:13
16:3 84:20 175:8
262:16 263:5,17
264:16
**captioned** 317:5
**card** 108:17
**cards** 106:19
107:14
**carries** 173:23
**case** 12:10 14:1
15:16 19:15 21:5

23:24 24:12 32:9
33:16 41:7 50:3
63:10 71:6 76:21
79:3 86:15 96:14
101:17,20 102:11
116:4 133:9,17
135:12,12,13
136:3 137:16
146:16 154:2,6
157:1,3 169:5
171:3 182:23
184:20 200:16
205:5 208:19,21
209:1,5,16,18,19
210:4,6,8,8,10,15
210:17,19,19
211:2,17,18 212:8
213:5,13,15,20
214:3,19 215:16
216:5,11 219:18
219:20,24 225:3,6
228:5 229:21
235:1 243:1
248:20 249:22
255:13 262:18,24
265:14 275:18
277:13 281:21,21
283:23 286:19
296:13,16,19
297:1,2 299:6
308:11
**cases** 35:7 67:18
78:8 172:3 175:1
205:21 213:6,10
225:9 239:20
306:23
**cash** 108:15,19
204:6 206:10
**casing** 129:1
**categories** 41:14
41:16 153:12

264:10
**category** 136:12
138:9 170:6
177:10
**causal** 218:16
**causation** 205:7
218:8
**cause** 151:17
156:23 201:24
202:14 206:19
300:5,14 303:15
307:12
**caused** 152:20
155:22 167:12
207:14 217:22
218:10 233:21
236:14
**causes** 198:13
206:16 219:6
**causing** 198:14
202:6 205:9,12
302:18
**caution** 225:13
**cautious** 127:2
**cellphones** 5:11
**census** 179:3
198:22,24 200:1
221:10,15,17,19
222:1,2,3 224:6,9
224:16 227:13,16
227:20 228:9,15
229:5,7,24 230:7
**center** 9:16 11:20
195:6,21
**centroid** 119:14
**cercla** 155:20
**cert** 160:18 315:9
**certain** 17:16 33:8
33:8 42:12 47:12
95:12 111:19
171:21 187:23

289:7
**certainly** 25:6
92:16 98:17 223:9
242:23
**certificate** 318:1
**certification** 9:20
182:24 183:9,18
184:7 185:10
271:22 275:15
276:6
**certified** 317:3
**certify** 317:3
**cetera** 111:18
228:14 281:7
**challenge** 271:12
271:15
**challenging**
153:11
**change** 11:6 14:17
16:1 46:14 66:13
89:17 117:5
134:16 136:24
174:3 210:23
233:14,21 234:5
235:20 261:1
267:3 299:7,14,15
300:21
**changed** 134:13
163:5 219:10
234:2 236:7,8
**changes** 115:17
174:1 228:12
256:1 318:5
**changing** 236:22
**characteristics**
17:17 33:9 117:3
147:19,21 148:24
149:19,21 169:6
186:12 190:21
194:10 208:16
271:4 273:15

279:11,15 288:6
296:3 307:10
**characterization**
155:6 157:20
**characterize** 34:7
34:10 41:19 125:9
**characterizing**
162:19
**charge** 95:11
119:22 145:1
**charged** 145:4
**charges** 23:1
109:6
**charles** 3:17,24
10:5
**chart** 115:11
116:19 117:4,8,11
117:14 248:18
312:8
**chattahoochee**
210:21
**cheaper** 36:14
94:16 166:16
**check** 114:11
135:15 241:11
251:2 290:17
**checked** 112:18
**checks** 229:24
**chemical** 302:24
**chicago** 292:19
**chicken** 205:6
**choose** 70:5 89:1
103:19 112:17
147:22 148:6
149:7,14 256:13
**choosing** 112:19
112:10 113:3
**chose** 63:7 91:12
110:4 148:6
301:16

**chosen** 101:6,14
134:17 141:10
144:20 154:10,14
**circumstance**
264:13
**circumstances**
15:4 95:12 123:17
123:24 124:4,11
124:16 132:3
218:16 308:19
**cite** 101:15 102:1,6
112:11 152:11
155:14 156:1,9
213:11,12,14,14
213:15,17 218:14
266:21 270:20
**cited** 112:23
154:15 243:1
267:19 270:16
301:19 307:22
311:19
**cites** 139:16 155:8
296:12
**citing** 151:20
**citizens** 222:11
**civil** 5:23
**claim** 56:24
133:20 135:19
154:10,14 167:20
186:6 188:21
208:13 209:5
210:2 229:13
264:1,15 288:15
312:20 313:12
**claims** 59:12 133:6
133:17 156:18
185:9,12 186:10
209:24 210:12
259:8 260:15
263:16

**clarification**
145:14
**clarified** 182:8
**clarity** 116:3
**class** 1:5 9:20
16:17 18:16,22
19:1 20:24 21:10
24:5 25:10 29:11
32:11 38:4 46:1
48:7 49:8,10,13,17
50:16,17 52:15
53:12 54:5,6,16
55:15 56:5,6,18,21
56:24 57:2,13,15
57:17 58:19 59:8
59:10,24 60:1,11
61:14 62:22 64:2
64:9,13,23 65:11
65:17,21 66:6,17
66:19,22 68:8,17
68:19 69:5 70:10
70:11 72:21 73:10
73:22 74:11,13
77:17 78:10 79:24
80:17 81:16 83:7
85:13 87:5,11
89:7,19 94:7
102:13,16 103:11
104:1,4,16,17,22
104:24 105:5
106:18 107:13
116:9 118:3 130:6
131:6 132:5,9,15
133:20 135:10
145:4,22 146:13
172:1,9,12,14
173:10,18 182:24
183:9,10,17 184:6
184:10,15 185:10
186:8,13,15
188:19 192:14,17

192:19,24 193:5
194:1,11,14,22
195:17 199:16
214:2 262:17
271:2,21 273:3,9
275:15 276:6
277:2,14 279:10
285:2 286:12
288:19 314:21
315:4,8
**classic** 50:9
**classwide** 271:6
272:14,20
**clean** 50:7 123:21
125:2 153:13
165:24 198:13
**clear** 8:17,24 9:18
27:22 79:9 85:23
99:22 112:21
139:20 216:3
262:10
**clearer** 10:16
**clearly** 25:10
32:18 89:6 304:2
**click** 242:8,12,17
**client** 119:3 134:6
136:11 209:20
**close** 223:14,17
251:15,16 287:12
297:24 315:13
**closed** 176:3
**closing** 310:21
**coefficient** 278:4
**coeur** 291:6,7
**collateral** 222:13
**collects** 230:7
**column** 250:9
252:9 253:4
**combative** 40:8
**come** 63:11 82:6
87:20 97:24 99:22

102:11 105:14
140:13 182:12
197:22 201:18
215:17 220:1
276:2 301:16
**comes** 43:13 81:13
83:10 123:21
137:17 263:22
278:17 300:12
**comfortable**
281:10
**coming** 70:16
142:11 261:22
**comment** 174:22
**commenting** 186:3
269:19
**commercial** 112:6
194:5 242:3 304:4
**commercially**
199:5
**commission**
256:19 318:20
**common** 53:11
54:6,11,16 56:5,9
56:11,14,15 57:7
57:11,15 58:10,14
58:15 59:24 73:11
73:11,18 74:20
157:10 187:1,6
188:4 207:6
296:19
**commonly** 283:12
**commonwealth**
317:9,11
**communication**
112:12,22,24
113:18,22 114:9
**communities**
283:21
**community** 36:3
36:11,17 37:3,12

37:17 38:9,11,15
38:16 39:6,7,20,21
101:11 141:22
164:7 169:24
170:1,5,10 173:16
197:24 200:12
209:7 228:19
242:5 260:7 311:3
**communitywide**
268:16
**comparable** 168:4
169:1 190:14
192:3,8
**comparative** 15:7
**compare** 168:2
265:24 294:10
299:19,21
**compared** 202:20
214:13,14,15
249:3
**comparing** 142:7
142:13 143:23
226:21
**comparison** 293:3
299:18
**comparisons**
191:11 299:17
**compensate** 82:10
152:19 172:22
173:1
**compensating**
86:20
**compensation** 4:6
19:8 80:7 139:3
155:23 185:19
**compete** 282:19
**competent** 217:5
217:10,13,15
218:15 219:8
**competing** 282:16

**competitive**
293:19,20,24
294:1
**complete** 11:3
167:11 256:12
**completely** 119:23
135:23
**completing** 171:23
**complex** 232:24
233:9,20 234:6,10
234:16 235:1
**complicated**
107:22
**comply** 26:9
**component** 85:15
**components** 48:11
167:20
**computed** 240:19
**concentration**
303:14 304:21
307:23
**concentrations**
70:6,16 286:22
305:13,20 306:2
309:3 310:8
**concern** 27:10
202:22 227:10
294:17 307:12
**concerned** 197:14
235:5 294:3
**concerns** 133:5
175:24 202:12
**conclude** 307:18
**concluded** 41:8
**conclusion** 48:24
137:24 147:14
151:2 234:4 310:2
**conclusions**
151:14
**condition** 108:11
142:8 143:24

144:1 157:14
158:9,16 159:2,4
159:10 235:6
280:22 282:21
283:9,11,15
**conditions** 142:13
157:9 185:20
235:13 284:9
293:1,6 296:2
304:20 310:15
**conduct** 77:24
93:14 94:1,8
123:23 135:12
201:4 224:13
257:1 290:18
**conducted** 151:14
247:8 284:18
290:23
**conducting** 79:19
295:6 299:2
**conducts** 107:23
**conferred** 92:21
182:9
**confident** 295:3
**confidential**
210:18 211:22,24
212:14
**confirm** 20:11
43:5
**conflict** 210:20
254:22
**conflicting** 34:5
**confound** 299:8
**confounding**
203:1
**confused** 87:7
**connect** 120:14,22
122:24 130:1
132:13 139:22
140:18 144:16
147:8 149:7,14

162:12
**connected** 120:20
121:14 128:4
131:11
**connecting** 130:13
131:1 140:3
198:10
**connection** 55:2
83:14 122:4
126:10 127:23
140:21 143:3
147:17 149:17
169:9 170:13
193:1,5 260:3
**connections** 130:4
132:4 141:9,11
151:8
**consecutive** 69:3
69:17
**consent** 130:3
**consequences**
207:2
**conservative** 29:1
**conserving** 153:14
**consider** 65:3,5
66:24 79:19,20,21
79:23 80:2,21
81:20 82:18 83:10
83:15,18 84:9,10
85:11,17 86:1,5,11
86:17,23 87:2,3,21
87:23 96:3 97:3
109:19 110:2,7,10
110:12 120:13
123:6 150:14,22
151:1 169:8
170:12,18 177:5
185:15 188:12
191:18 194:13,18
201:5 226:15
233:18 237:20

238:9 239:14
255:6 264:11
273:1,5 279:21,24
280:5,8,11,14,21
280:24 281:4,5,9
281:13 285:6
292:19 295:1
300:6 304:9 307:9
**consideration**
64:24 127:10,18
259:22 306:8
**considerations**
131:9 142:20
200:14 246:6
281:16
**considered** 49:14
64:18 77:20 86:16
86:24 87:1 88:8
121:23 122:6,14
122:16 150:12,16
166:22,23 170:20
194:9 238:13
272:7,8 276:10,11
280:15,15 285:5
288:7
**considering** 38:5
41:15 73:20 74:9
82:15 87:13 89:16
121:24 177:6
191:17 264:7
279:20 284:17
**considers** 41:14
82:22
**consistency**
116:16 181:7
**consistent** 14:20
24:14 27:3 151:17
151:18 175:9,10
**constituents** 17:17
33:9

**constitute** 132:7
136:9 158:16
160:21 161:20
164:12 165:9
260:17
**constituted** 309:11
**constitutes** 52:14
133:11 134:3,9
136:21 137:20
166:11 167:7
**construct** 59:22
100:22 202:5
**constructed** 83:4,4
110:11
**constructing**
194:17
**construction**
195:20
**construed** 118:17
292:12
**consultant** 193:9
**consultation** 166:4
**consulting** 136:10
298:2
**consuming** 136:15
**consumption**
50:22 119:16
**contacts** 222:3
**contaminant**
159:9 294:13
304:11 309:3
**contaminants**
128:24 129:1
173:3,16 176:1
209:7 218:3 294:8
294:9 307:20
**contaminated**
15:22 30:5 37:6
164:19 170:1,10
234:11,12 288:1
295:5 302:1

**contamination**
28:12 36:1,10,24
37:2,11,16 38:10
39:5,21 41:2,5,20
41:23 42:3 139:23
145:11,12,17
157:18,23 158:1
158:12,18,20,23
159:10,14,16
187:2,7,17 198:6
198:13 207:23
208:1,19 209:1,16
210:4 211:8
228:22 233:4
250:11,13 266:15
284:22 285:7
286:14 295:17,20
295:23 300:6,13
301:19 302:17
308:17 309:2
311:21 312:5
313:19
**contemporaneous**
114:8
**content** 81:9
**contents** 48:3
**context** 51:20
153:24 155:19
156:4 161:3
174:14 179:3
181:6 227:21
291:1
**contexts** 290:24
**continue** 5:15 70:5
110:22 162:6
**continues** 63:1,21
**continuing** 122:21
282:2
**continuous** 125:23
**continuously**
129:10

| | | | |
|---|---|---|---|
| **contractor** 171:18 171:19 | 57:3,19 59:7,13 65:13,14,17,23 | 252:14,21 253:13 253:23 256:3,10 | **correlation** 203:6 **corroboration** |
| **contradict** 32:16 | 66:6 68:19 69:8 | 256:22 257:20 | 314:9 |
| **contradicting** 28:4 | 69:18 70:12,23 | 259:16 262:13,17 | **cost** 12:17 14:10 |
| **contributed** 229:4 | 71:5 73:2,3 74:1 | 263:1,7 264:3 | 14:10,17,17 15:6,7 |
| **contributes** 13:19 | 75:8 76:4,12 77:7 | 265:11 267:20 | 15:12 16:2,6,20 |
| 242:16 | 77:13 87:15,18 | 272:17,18 274:3 | 17:1 19:11,13,14 |
| **control** 200:19,23 | 90:22 93:4 94:9 | 277:18 278:11 | 27:18 30:20 32:6 |
| 201:2 202:21 | 94:21 95:14 96:22 | 279:6 282:1,11 | 36:13 40:22 41:12 |
| 215:21,22 256:7 | 100:7,13,14 | 284:23 287:10 | 41:21 42:1,13 |
| 290:19 | 102:13,20 103:21 | 306:9 307:14 | 43:14 45:21 48:10 |
| **controlled** 202:9 | 104:9,13,19 | 308:13 314:12 | 50:21 51:6 52:1 |
| 202:11 314:24 | 105:12 106:8 | **correction** 319:2 | 52:16,20 60:7 |
| **controlling** 299:24 | 107:21 111:16 | 320:2 | 61:6,10,12,20 62:1 |
| **controls** 266:1,3 | 112:13 113:20 | **corrections** 318:4 | 62:11 64:9,10,17 |
| 285:13 | 116:21 117:10,16 | **correctly** 13:5 | 64:19 76:24 77:5 |
| **convenience** 9:19 | 120:2 122:24 | 17:10 18:8 20:13 | 80:3 82:19,22 |
| **conversations** | 123:10 124:5,17 | 30:18 32:3 34:10 | 83:12 84:3,5,6,7 |
| 5:11 | 124:24 127:22 | 36:4 42:19 46:12 | 84:11,13 89:17,22 |
| **converted** 191:24 | 128:6 131:4,18 | 49:15 53:16 60:9 | 93:14,20,23 94:21 |
| 205:22 | 132:5 133:7,10 | 67:13 68:1 69:12 | 96:20,21 97:10,21 |
| **convincing** 272:1 | 137:21 139:1 | 72:23 90:3 91:5 | 97:22 98:8 100:4 |
| 314:23 | 142:4 146:15 | 94:3 98:12 108:20 | 101:8,12 102:12 |
| **cool** 242:20 | 148:11 149:10,21 | 109:14 112:9 | 103:2,5,9 107:20 |
| **copy** 12:3 45:15 | 150:9,10,12 | 115:1 120:16 | 108:13 109:18,20 |
| **corp** 6:15 | 153:23 157:9,19 | 129:12 130:7 | 114:16,18 119:7,8 |
| **corporation** 1:9 | 159:23 162:3,18 | 132:24 139:24 | 119:21,24 120:13 |
| 5:21 | 167:8 172:2 | 148:7 151:22 | 121:3 127:11 |
| **correct** 9:21 13:4 | 173:12 176:10 | 153:18 158:13 | 128:1 130:1,13,20 |
| 14:6,15 15:18 | 177:1 180:3,13 | 171:6 174:9 | 131:1,3,12,21,24 |
| 17:11,14,22 18:12 | 191:13,22 193:7 | 175:11 183:3 | 134:16 136:24 |
| 18:13 19:2 20:14 | 205:13 206:6 | 187:3 217:7 221:1 | 138:23 139:7 |
| 23:9 26:16 28:1 | 207:10 212:10 | 230:24 231:3 | 140:3,17 141:3,19 |
| 30:2,19,21 32:8 | 213:6 215:11 | 244:5 271:9 | 142:1,14,24 |
| 33:16,21 34:8 | 216:5,9 218:9 | 272:10 273:17 | 143:15 144:2,7,8 |
| 35:5 38:11 39:8 | 221:6 227:5 | 286:9 288:2,16 | 144:15 145:21 |
| 40:20 41:10 42:23 | 228:17 229:16 | 301:10 311:5 | 146:12,17 147:5,7 |
| 43:10,17 45:15 | 234:7 239:18 | **correlated** 202:17 | 154:17 157:13 |
| 48:13,14,18 49:2 | 241:4 244:3,16 | 299:15 | 165:14 166:15 |
| 52:3 54:7 55:5,10 | 246:6,14 250:16 | **correlating** 275:12 | 167:17 168:20 |
| 55:16 56:1,18 | 250:22 251:18 | | 169:12 170:14 |

171:13 172:4,4,23
173:9 174:2,23
175:6 176:20
179:5,9 200:17
205:17 262:14
264:20
**costs** 14:2,24
15:20,20 17:9
18:16 22:11 42:12
42:16,17 43:22
47:3 61:13,23
62:6,16,23 63:24
64:3 76:11 77:3
80:19,22 81:18,21
84:2,9,10 86:14
88:22 93:22 95:14
96:5,19 97:9,11
100:23 101:1
102:18,19 103:8
103:11,20 105:7
115:4,7,12 116:21
117:10 120:21
134:15 139:5
142:22 158:15
167:19 171:22
172:24 175:16
176:7 263:6,18
264:3,16 265:5,10
**counsel** 2:9,20
5:19 6:10 182:9
317:14,17
**counsel's** 180:21
**counting** 263:23
**county** 21:7
203:11
**couple** 289:23
**course** 10:10 70:2
132:9 176:17
188:16 224:11,21
293:21

**court** 1:1 5:22 6:5
6:24 8:16,21 9:3
22:11 135:3 152:7
211:2,3 220:2,22
248:13 289:2
296:22,22
**courts** 79:10
**cover** 63:6 98:24
120:6
**covered** 57:21
62:10 63:2 147:9
147:11 289:24
**covering** 193:12
**crawford** 24:24
99:16 161:15
**create** 113:7
**credibility** 89:15
**credible** 220:10
**credit** 105:9,12,15
105:18 106:7,16
106:19 107:14
108:17 206:5
207:1 260:12,19
260:24
**credits** 105:16
**crime** 190:22
196:2
**criteria** 13:16,16
166:9 190:24
191:4,5,23
**critical** 283:3
**criticize** 46:21
**critique** 110:14
183:19
**critiquing** 35:2
110:6
**crosses** 182:22
**crr** 1:20 317:22
**curiosity** 239:8
**curious** 128:15

**current** 26:3
105:24 205:20
227:21 228:16
237:10 276:18
**currently** 175:5
190:4 305:19
307:1
**customers** 36:19
55:9,12 112:2,5
**cv** 1:7 5:24
**cycle** 111:14
**cycles** 293:22

**d**

**d** 1:4 3:1 5:1,20
**d'alene** 291:6,7
**damage** 57:17
59:8 65:7 72:20
74:20 78:5 79:22
83:24 88:12
133:23 134:16
135:1,4 136:12,24
137:10,14 151:19
157:10 174:6
277:17 278:10,11
288:15 289:2
**damages** 3:14
15:17 18:21,24
19:4 21:12,17
43:14 44:14 45:21
46:8 53:11 56:10
56:17 57:1,10,12
58:11,22 59:7,10
59:23 66:5,21
73:9,22 74:3,11,24
75:12,15 77:17
78:9,11 79:7,8
80:23 81:8 82:21
82:24 83:1,7
86:11,16 89:3
93:6 120:11,15,19
125:11 127:22,24

128:3 129:20
133:7,11,14,17,21
134:3,7,10 135:7
135:21 136:2,9,21
137:20 153:21
157:8,13 158:17
167:17 169:12
170:15 172:10
173:9,10,11,14
183:1 193:6 216:5
260:16 275:16
288:12 289:8
314:8
**data** 13:12 27:10
59:12 64:19
176:24 196:11,16
198:18,19,21,23
198:24 199:4,5,7
201:21 202:4
203:10 215:10,14
215:21 221:12,21
227:14,16,20
228:9 230:1,6,7,9
232:13,15 242:2,3
242:4 243:8,15
246:5,11 249:19
250:4 251:13
255:9 256:1,6,7
267:10 274:5,7
279:4 291:2
314:10
**date** 249:7 289:5,7
299:15 319:24
320:24
**david** 297:6,7,8
298:10,15
**day** 114:20 116:14
117:23 119:7
129:11,11 263:22
288:14 289:4
291:5 318:13

**days** 240:11
**dealing** 172:20
**deals** 85:16 177:21
  241:17
**debt** 174:5 261:1,3
**decade** 251:22
**decades** 139:20
**december** 22:14
  178:12,13
**dechert** 2:11 6:14
  6:17
**dechert.com** 2:18
  2:19
**decide** 200:17
  223:13 226:11
  256:17
**decided** 281:19
  303:5
**deciding** 291:16
  295:2 302:1
**decision** 103:20
  134:2,22 136:14
  136:17 145:7,22
  147:2 163:2 202:4
  283:4
**decisions** 150:19
  283:6 306:2
**decline** 204:17
**decor** 280:24
  281:4
**decree** 130:3
**decremented**
  245:5
**deduct** 263:16
**deed** 187:10
**deep** 77:10,11,12
  116:10,10 117:20
  119:6
**deeper** 67:19
  121:19 125:24
  128:23

**defeat** 34:18
**defeating** 35:12
**defendant** 1:10
  2:20 5:19 296:24
**defendant's**
  135:11 152:9
**defendants** 209:13
  234:20
**deficiencies** 45:20
**deficient** 47:7
**definable** 311:22
**define** 52:18 56:20
  265:16 301:5
**defined** 291:20
  312:5 315:4
**definition** 49:11
  75:20 78:18
  102:23 104:4
  122:17 132:12
  159:1 183:10
  189:13,15,17,22
  189:23 190:1
  217:13 244:23
  247:21 248:15
  249:12 254:20
  277:19 303:11
**degree** 191:12
**demand** 139:21
  141:16 144:1
  197:16
**demographics**
  228:13
**demonstrable**
  82:12,15
**demonstrate** 46:1
  47:22
**demonstrating**
  305:20
**dep** 102:22 103:15
  106:21 116:23
  168:6

**depart** 308:15
  309:1
**department** 20:5
  153:4 190:1
**departure** 308:12
  308:20
**depend** 51:10
  83:21 223:14
  226:19 242:4
  263:20,21 287:5,7
**depending** 19:20
  43:24 75:16
  116:18 117:7
  126:21 194:8
  303:12
**depends** 100:5,9
  100:21 106:1,1,4
  124:23 125:1
  144:23 214:16
  215:4 226:23
  245:14
**depo** 7:7 29:14
  62:8 64:5,16
  75:10 76:14 85:21
  86:9 89:6 95:16
  97:13 105:22
  116:2 141:1 160:8
  166:14 172:18
**deponent** 9:8
  11:19 40:7 118:24
  297:20 298:7,13
  318:1
**deposed** 212:1
**deposes** 7:3
**deposition** 1:13
  3:22 5:18 6:1 8:11
  10:11 11:12 12:8
  12:12 15:12,24
  16:13 21:24 22:9
  22:21 23:11,16,17
  24:3,5,8 25:22

26:1,6 43:1 45:11
  57:22 58:21 62:10
  63:4 66:9 68:4,11
  68:12 69:21 74:19
  78:3 82:2 92:14
  99:13 107:2 118:6
  118:14 128:9
  140:7 141:14
  146:5 147:12
  152:9 154:23
  162:6 167:3
  174:12 177:14
  178:16,19 193:13
  232:17 246:1
  248:16 316:6
  317:4 318:4
**depositions** 7:12
  7:16,18,19
**depth** 29:4 60:19
  76:24 116:18
  117:7,22 119:17
**depths** 115:19
  116:11 118:3
**derived** 245:8
  248:24
**describe** 115:3
  156:3,17 192:5
  267:22 269:3,9
  280:16 290:20
**described** 78:24
  79:11 109:17
  155:9 167:2,3,23
  249:9 256:16
  265:13 269:7
**describes** 153:11
  253:4
**describing** 153:20
  154:1 156:10,12
  235:12 277:24
**description** 12:20

desired 147:20
149:21
despite 93:11
detail 27:16,23
28:7,10 285:10
detect 69:2,18
258:13 309:9
detectable 69:4
287:9
detected 20:10,16
30:1 68:7,16
70:20,21 235:16
238:18 307:2
detection 186:16
235:21
determinant 198:7
determination
64:14 122:23
188:17 263:14
285:16 306:8
determinations
245:20
determinative
282:20,23
determine 18:24
53:11 56:9 57:12
57:14,16 59:6,12
73:21,23 74:10,12
75:4 81:9 98:5
111:12 123:16,20
124:2,13 132:1
134:1 136:19
137:4 142:21
147:15 148:10,13
152:18 166:10
167:4 180:9 187:5
188:1 203:5
223:16 226:1
231:22 239:4
246:21 248:3
257:8,18 266:5,7

273:2 274:14,24
281:11,24 282:9
282:13 303:13
determined 90:20
125:8,18 197:12
224:18 243:23
265:4
determining 57:9
64:22 137:19
214:1 224:17
244:15 269:23
283:15 291:13,19
develop 26:7 75:2
153:5 216:4
231:15 237:9
274:6 276:14
developed 302:23
developing 230:22
238:14,20 254:11
deviation 65:6
differ 54:13 73:13
73:16 195:10
difference 51:4
135:7 189:1 228:1
255:7,8 292:15
293:10
differences 43:7
47:2 48:7 49:12
52:9 58:17 73:20
192:12 251:11
254:4 303:22
315:1
different 33:2 42:9
46:24 50:24,24
65:3 67:4,5,7,7
73:7 82:8 84:21
87:24 102:17
103:7,8 107:23
108:13 112:24
113:1 127:7
169:17 172:21

173:4,6,7 183:23
186:7,11 188:24
189:3 194:24
195:1,1,18 213:23
227:19,23 228:14
229:12,21 232:1
251:14 259:18
267:5 277:12
292:24 293:6
294:8 295:4 296:1
313:4
differently 54:14
100:6 267:8 309:7
difficult 131:13
136:12 166:21
200:10,15 201:4
214:21 215:9
276:19
digit 66:12
diligence 163:8
223:23 224:14
diminished 300:5
diminishing
199:11
diminution 15:2
16:16 175:14,23
176:9,20 177:4
178:1 181:1,3,8
183:2,18 184:16
185:11,19 186:1,7
186:24 188:3,6,21
189:1,5 197:12
199:15,22 203:16
205:9,12 206:2,16
206:19,20 207:2
207:12,14,17,20
208:10 209:11,23
210:1,12 214:2,6
216:12 217:2,11
217:19,21 218:5,8
218:17 228:8

229:15 232:13,20
255:17 259:8
260:16,20 262:23
263:4,14 264:15
265:4 271:7
272:16,21 275:17
276:3,9 288:20
296:9,14 299:6
300:2 312:14,15
314:11 315:9
direct 39:13,19
225:21 316:2
directed 15:17
directly 57:24
98:20 143:10
187:17 229:11
disagree 161:12
161:22 164:17
181:13 207:5
271:20
disagreed 93:4
disagreeing 58:12
109:12
disagreement 58:5
disamenities
207:19 242:13
298:22 300:4
disamenity 198:15
207:8,8,11,13
255:19 285:4,7,24
286:5,15 287:24
292:21 295:11,14
299:20,23 312:3
discharge 286:21
discipline 255:24
disciplines 136:12
disclose 310:10
disclosed 249:20
260:2
disclosures 249:2
310:5,14

discount  12:18
  85:10
discovered  162:3
  253:18 300:3
discovery  7:11
  25:11,15 26:10
  113:10 114:11
  140:22 142:15
  145:19 162:17
  163:18 201:23
  202:24 218:2,5
  258:19 259:13
  299:9
discretion  58:2
discuss  208:7
  266:17
discussed  46:8
  165:13 167:17
  241:9 262:9
discussing  15:11
  69:15 81:6
discussion  306:18
discussions  122:21
  126:3
disposition  210:9
dispute  211:3
dissimilar  184:10
  191:13 314:20
dissimilarity  55:5
distance  195:6,21
  195:21 286:8,13
  286:17 295:13,14
  295:14
distinction  294:12
distinctions
  284:17
distinguish  206:9
distribute  58:23
  274:22
distributed  142:10

distribution  65:16
  105:24
district  1:1,2 5:22
  5:23
diverse  194:14
  271:3
diversity  277:1
document  4:8
  249:10
documentary
  127:16
documentation
  114:1,2
documents  9:8
  222:17 297:10
doing  33:13 38:7
  46:15 50:1,2,2
  64:7 91:5 93:15
  94:13 95:21 97:15
  98:10 101:9 102:2
  102:7 104:4
  108:10,21 109:14
  159:12 163:7
  183:13 185:7
  214:19 233:2
  239:7 246:23
  257:6 275:11
  292:3 299:16
  305:21
dollar  88:10 264:9
dollars  119:23
  274:22
dolmetsch  112:12
  113:5
domain  285:21
domestic  50:22
dominate  58:16
double  164:14
  260:17 261:6,12
  261:20 263:23

downs  293:14
downstairs  222:11
dozen  225:2
dr  3:17,20 10:5,19
  18:1 28:4 32:16
  32:19 35:7 36:1,7
  37:1,4,10,24 38:8
  39:22 41:8 42:2
  42:11 43:12 44:2
  44:11 45:13 46:17
  46:18 47:17 48:20
  49:5,6,10 53:8
  58:9,24 59:3,4,5
  71:17 72:15 73:2
  79:5 85:9 87:9,14
  89:12,16 90:7,12
  92:9,17 93:4,11
  107:18,23 110:6
  110:14 111:23
  112:4 114:14,19
  114:23 119:13
  120:8,10 129:22
  132:19 133:2
  139:10,16 140:9
  141:7 147:10
  150:1 151:1,11
  161:2 162:12
  173:21 181:5
  183:20 184:8
  270:6,11,14,24
  271:12,15 272:8
  272:12,24 273:7
  274:19 276:4
  292:18 296:13
  301:4 302:4
  311:19 314:16,16
  314:18
drafted  182:3
dramatic  210:23
draw  37:14,15
  48:24 85:15

128:24
drawn  222:17
  227:11
drill  67:19 123:20
  128:22 234:15
drilling  124:1,11
  124:13,24 126:21
drinking  67:21
  173:17
drive  205:1
driving  137:7
drop  71:13
due  100:17 163:8
  207:18 223:23
  255:18
dug  287:14
duly  7:2
dummy  277:6,9
duration  80:3
dynamic  200:10

**e**

e  1:13 3:1,9,11,14
  3:21 5:1,1,18
  316:7 317:1,1,4
  318:10 319:1,1,1
  319:24 320:1,1,1
  320:24
e.coli  20:9,16 21:9
  23:19 27:5,11
  28:21,23 30:1
  32:24 33:11
e.coli.  20:6,9
e.g.  268:12
earlier  79:4 82:1
  126:3 138:21
  178:5 201:19
  238:23 265:20
  275:13 289:22
  291:20 312:9
easier  126:13
  197:10 225:18

**easily** 54:24
**east** 209:7
**easy** 48:4
**eat** 46:20 47:6
**econometric**
  200:11 214:20
  215:9 216:4
  256:19 257:17,19
  258:5,7 265:19
**econometrics**
  191:24
**economic** 14:2
  16:8 132:23
  205:22 268:10
  287:22 302:15
**economically**
  84:22 100:19
  167:23 168:1
**economics** 127:4
  131:23 134:12,23
  136:18 155:17
  175:10 189:23
  255:23 303:21
  311:16 313:16
**economist** 13:19
  14:5 95:19 98:11
  100:18 136:8,11
  136:23 168:17
  214:14,20,22
  219:13 237:18
**economist's** 135:6
**economists** 12:24
  13:8,11,14 16:12
  100:2 137:2
  177:24 178:18,20
  246:2,4 256:5
  265:23 267:9
**economy** 293:23
**edward** 3:5 7:1
  8:7

**effect** 12:20 15:6
  89:17 112:14
  160:4 198:14
  206:9 232:24
  233:3 238:21
  239:4 274:12
  292:21 294:22
  299:9 300:14
  302:18,20 303:15
  305:3,4 314:4,6,8
  314:10
**effective** 58:18
  94:21 129:14
  166:15
**effectively** 73:7
  236:6 267:11
  271:18 272:3
  275:11 295:15
**effects** 172:23
  203:15,18 206:1
  268:16,21 273:11
  311:20
**efficiencies** 115:17
**efficient** 58:18
  88:19 189:19
  276:12
**efficiently** 88:4
  271:18
**effort** 95:21
**efforts** 25:1
**egg** 205:6
**eight** 69:3,17
**either** 10:7 74:24
  101:19 102:3,7
  205:15 206:3
  226:22 263:12
  270:18 308:9
**ejoselson** 2:8
**elaboration** 184:5
**elasticity** 141:16

**electric** 85:12,15
  115:4 116:21
  117:10 119:7,22
**electricity** 42:17
  48:11 114:16,18
  115:12,21
**eliminate** 119:24
  230:1
**email** 135:16
**emailed** 135:14
**embedded** 229:2
**emily** 2:4 6:20
  7:23 12:2 24:9
  57:23 89:8 92:13
  98:14 220:2
**employed** 273:10
  273:13 317:15,18
**employee** 317:17
**energy** 115:9
**engineer** 166:5,18
**engineering** 67:21
  122:9 130:20
  131:3 166:17
**engineers** 126:4
**enhancements**
  164:11 165:8
**entered** 21:11,13
  223:2 238:16
**entering** 231:19
  274:1
**entire** 56:6,18,21
  264:9,14 300:19
**entirely** 98:22
  138:10 271:20
**entirety** 47:15
  59:9 308:16
**entitled** 25:6 98:17
  160:13,15 161:21
  172:11
**enumerate** 90:6

**environment**
  68:24 127:5 306:1
  307:1
**environmental**
  127:4 131:23
  151:19 155:17
  197:23 198:5
  228:22 232:24
  233:9,20 234:6,17
  234:24 241:24
  266:14 268:13,17
  268:21 269:2,14
  271:4 273:8,11
  298:22 299:20,22
  300:3 301:9,18
  302:12,14 304:18
  304:20 308:17
  310:15 311:16
**epa** 268:15,20,24
  269:9,17,22 270:2
  287:20 314:17
**epa's** 268:10
**epidemiological**
  138:4
**equal** 17:2 98:5,9
  285:4
**equals** 90:24 91:1
**equation** 79:22
  283:14
**equipment** 60:6
  60:16 61:6,20
  74:22 77:1,2 83:2
  84:10 86:2,23
  93:21 94:2 95:14
  95:24 96:5,6,19,21
  97:1,9,11 98:3
  103:13,19,24
  107:20 108:2,12
  108:24 109:3,4,10
  109:18,20 110:3,8
  110:23 111:1,3,8

111:14
**equity** 105:16,18
  105:24 106:4,6,16
  204:8 206:4,24
  238:6 260:12,14
  260:18,19,23
**equivalent** 153:8
**ergo** 236:3
**errata** 318:5
**erred** 107:19
**errors** 45:22,23
**espousing** 24:16
**esq** 2:4,12,13
**essentially** 249:21
  260:17
**establish** 78:15
  184:10 221:24
  222:6
**established** 308:1
**establishing** 183:1
  254:15 275:16
**estate** 12:16,19
  196:8 198:17
  199:21 222:8
  226:2,7 231:20
  237:19 292:16
  293:13,24
**estimate** 21:12
  26:21 27:18,20,21
  29:16 43:14 64:8
  66:21 83:11 98:1
  115:14 128:11
  129:24 130:12,20
  131:1,3 133:24
  134:17,19 136:23
  139:7 176:13
  239:17,23 240:13
  241:23 248:22,23
  249:4,6 250:10,21
  253:4 254:19
  255:17 258:22

259:6 261:11
  263:17 273:11,13
  274:21 276:3
  278:3
**estimated** 90:1
  115:3 120:11
  312:14
**estimates** 51:12
  115:6 176:16
  177:12 239:21,23
  240:18,19 241:19
  246:12 247:14
  249:24 250:15
  251:7,8,21 263:5
  263:10 264:7,22
  273:20,21 274:3
**estimating** 73:9
  119:20 255:21
  271:7 272:16,21
  278:24
**estimation** 271:16
**et** 1:4 5:20 111:18
  151:20 228:14
  281:7
**evaluate** 95:3
  118:2 134:20
  140:17 149:6,8,13
  149:16 209:10
  232:19 268:16,20
**evaluated** 61:13
**evaluating** 4:4
  17:18 23:21 33:3
  199:14 246:3
  267:3 269:4 309:9
**evaluation** 153:9
  261:8
**event** 38:23
  136:21 186:2
  196:20 197:2,7,19
  202:16,19 217:22
  236:13,14,21

254:22 289:3
  300:11,13
**events** 241:24
**evidence** 114:22
  122:3,13 127:16
  139:17 243:22
  248:19 249:22
  282:3 308:9 317:7
**exact** 61:10 66:8
**exactly** 62:3 97:14
  192:8 234:16
  302:7,7
**examination** 3:6
  8:1
**examined** 7:17
  161:4
**example** 13:17
  20:4 53:12 66:12
  71:12 76:17,22
  78:14 88:1 93:16
  101:3 103:3 106:5
  108:14 121:19
  129:23 137:6
  147:16 168:8
  190:1,18 202:12
  204:13,23 205:23
  219:20 223:2
  224:11 250:10
  252:7 258:14
  266:6 279:3
  280:18 283:12
  288:12 291:3
  292:17 294:19
  295:13 302:21
  304:5 307:7
  308:10 313:1
**examples** 191:3
  194:20 221:22
**exceed** 304:17,21
  305:1 307:24

**exceedance** 304:9
**exceeding** 307:11
**exception** 112:6
  309:11
**exceptional**
  237:23 238:7
**exceptions** 309:19
**excerpt** 12:14
  16:14
**excess** 167:12
**exclusively** 223:8
  223:11
**excuse** 105:17
  271:1 291:12
**executive** 317:8
**exhibit** 3:11,13,15
  3:18,22,24 4:2,8
  9:18,24 10:4
  11:16,17 12:1
  17:3 22:16,16
  26:19 45:6,10
  49:9 114:17
  119:11 152:2,4,9
  178:11 216:17,20
  216:20 248:5,15
  268:2 284:13
  312:8
**exhibits** 5:3 9:5
**exist** 254:4 315:1
**existed** 140:10,11
**existence** 220:19
**existing** 139:22
  290:23
**exists** 165:22
**expansion** 60:21
**expect** 16:24 29:5
  31:3,23 75:11
  88:18 96:12 98:8
  102:24 103:4,7,9
  116:11,15 138:2
  140:12 178:2

187:8,24 188:3
189:4 269:18
277:15 285:3,6
286:18,19,24
296:10 299:14
313:3,8 314:1
**expectation** 14:16
76:15 109:23
112:16
**expected** 42:17
43:21 83:5,24
84:2,16 85:7
86:13 87:1 93:15
101:1,7,8,11,24
102:12,23 103:9
109:21 175:16
187:1 276:9 286:7
**expecting** 289:11
**expenditure**
135:20
**expenditures**
107:9,11
**expense** 18:2
84:20,21 85:3
100:3,12,16,20
**expenses** 82:12,16
93:19
**expensive** 50:4
77:1 121:6 143:8
165:16,18 175:3
**experience** 50:20
51:5 76:10 89:21
103:1 189:5
204:19,20 205:3
213:9 313:4
**experienced** 50:17
51:24 57:10 214:3
216:13 262:24
263:4
**experiencing**
49:19,21 132:23

203:15
**expert** 3:11,13,15
3:16,18,19,24 9:10
33:14 34:6 104:22
106:15 138:1
169:4 210:7
234:18 240:17
298:11
**experts** 249:16
250:5
**expires** 318:20
**explain** 202:6
272:6 301:12
**explained** 91:16
93:8
**explanatory** 255:7
274:8
**explicitly** 90:14
**explore** 7:21
**explored** 140:24
142:6 160:7
166:14 168:6
172:18
**express** 185:5
199:21 205:23
243:6 244:11
247:23 289:7
**expressed** 160:18
161:10 174:3
175:22 181:8
186:1 288:13
**expresses** 258:7
**expressing** 184:14
243:20 244:2
**expression** 206:21
207:21
**extend** 123:6
**extended** 116:7
**extension** 306:12
**extensively** 57:21
59:17 62:8 64:16

116:2
**extent** 7:20 22:7
24:3 73:16 99:17
176:11 183:17
184:18 188:14
292:20 293:13
306:17
**extraordinarily**
76:24 80:20 81:19
**extreme** 279:3
**extremely** 31:19
**extremes** 117:1

**f**

**f** 317:1
**face** 207:8,11,13
**faced** 38:16
**facility** 209:16
286:23
**facing** 229:21
**fact** 15:21 29:6
33:1,24 37:24
39:6 46:23 47:2
58:21 62:9 66:3
66:19 79:4 81:2
84:24 108:16
112:1 118:11
147:21 148:16
161:8,24 162:14
162:22 163:6,11
164:8 182:24
214:19 220:8,12
220:15 222:5
224:7,17,19
233:17 238:13
243:24 244:11
245:1,2 260:14
275:15 276:17
288:14 297:23
310:11
**factor** 54:15 86:1
122:2 150:21

187:16 198:6
202:14 218:10
219:5 277:7
284:19,20 288:5
306:6 312:6
**factors** 44:16 50:3
54:11,13 57:13
59:24 73:11 74:20
77:19 79:18,21,22
87:22 88:7,12,14
89:24 96:4 114:21
117:6 147:15
148:10,13 149:8
149:16 150:8,11
150:16 151:1
167:2 177:5
186:23 187:6,9,20
187:24 188:2,17
195:10,13 202:9
202:11 206:18
213:10 218:23
229:3 232:24
233:9,20 234:6,17
234:24 235:7
256:7 263:2
268:14,17,21
272:7,13,24 273:5
280:16 282:9,13
287:14 289:22
292:19 295:2
299:7 314:24
**facts** 176:24 282:3
**factually** 66:18
**failed** 107:19
**fails** 49:10 120:12
**failure** 47:1 305:1
**fair** 19:6 52:13
63:14 72:20 74:4
78:22 82:10 84:4
87:9,21 88:4
108:18 263:13

281:17 307:3

**fairly** 39:2 59:23
74:24 109:15

**fairness** 82:6

**faith** 25:12 26:10

**fallacy** 236:2,5

**falloff** 201:20
202:1,14 203:2,8

**falls** 268:5

**false** 25:14

**familiar** 8:10
192:2 193:9 232:9
236:2 266:19,23
267:2 294:14,16
294:18,23

**familiarize** 174:16

**family** 190:12
193:17 194:4

**far** 111:14 212:5
242:18

**fate** 234:19

**fcrr** 1:20 317:22

**fears** 137:17,18

**feasibility** 132:1

**feasible** 67:19,23
122:23 123:2,5
124:4,16 126:5
276:22

**federal** 152:16
296:22 303:8
308:1

**feel** 131:12 174:15
207:18 241:3

**fell** 182:5

**felt** 16:8,19 93:8

**field** 50:10 127:3
151:19

**fields** 221:13

**figure** 28:18
114:16 122:9,18
279:3

**filed** 5:22

**fill** 229:9

**final** 72:17 298:10

**finally** 125:8

**finance** 108:1
109:6 174:4

**financed** 108:24

**financial** 14:10
40:21 41:5,21,24
47:8 50:20 51:6
51:24 52:16,19,20
77:5 102:17
147:24 208:3
228:13 239:14
257:13

**financially** 6:8
36:15 37:17
317:18

**financing** 87:4

**find** 8:18 30:11
32:10 71:10 74:5
75:5,14,17,18,22
101:23 117:2
149:2,4 189:24
194:21 211:23
212:10,19,20
219:24 268:2
294:24

**finding** 125:2

**finds** 36:1 49:12
224:7

**fine** 9:22 10:23
77:16 99:19
284:16

**finish** 8:22 248:9

**finished** 109:2
156:14 290:7

**firmly** 174:23
175:7

**first** 8:8,9 17:7
20:2 22:9 25:22

25:24 29:14 42:11
45:18 53:9 57:22
64:5,16 66:9 68:5
68:12 71:22 75:10
78:3 85:21 86:9
89:6,14 95:16
97:13 99:13
102:22 103:15
107:2 108:8
112:16 116:2,23
118:5,14 126:14
128:8,9 141:1
152:14 154:22
160:8 162:6
165:13 166:14
167:3 168:6
186:22 193:12
249:17 272:5

**fish** 291:8

**fishing** 291:6

**fit** 24:17

**fits** 83:23

**five** 313:8,13

**fixed** 112:3

**fixtures** 281:7

**flat** 55:10 112:8,17
112:19

**flaws** 44:23 46:5
46:24

**flooring** 281:6

**florida** 210:21

**flow** 101:1 108:15
165:23

**flows** 96:16 108:20

**folks** 47:9 71:9
78:15 107:24
108:14,23 112:16
121:7,10 122:8,19
123:1 125:18
126:9 127:1,9
129:7 132:13

134:7 138:3
141:14 150:5
172:22 176:19
222:24 228:9
236:20 240:21
257:3 313:1

**follow** 57:6 138:20
180:17 192:7
253:6 266:3

**followed** 79:10
124:8 252:16
265:22

**following** 55:1
196:19 197:2
252:23

**follows** 7:3 305:6

**fool** 119:3

**foot** 114:20 116:10
117:20,22 119:6
191:6

**footage** 289:17

**footnote** 67:15,17
179:2,7 285:22
286:4 287:19
288:10

**forced** 67:11
120:12 126:15,24
127:9

**forecast** 100:23
291:23

**foregoing** 318:3

**forgot** 270:19

**form** 14:8 33:18
34:15,22 35:14
37:21 38:13 39:10
42:5 49:23 51:9
52:17 54:9,19
68:21 69:7 81:1
84:24 87:17 88:16
94:11 96:8 97:13
123:13 124:7

125:13 163:21
169:3 172:19
186:18 191:15
194:16 198:2
199:18 203:22
204:4,10 205:14
214:8 218:20
221:8 227:16
228:4 234:9
243:16 259:1
275:6 292:5 299:1
300:9 309:15,22
**formal**   180:24
200:11 209:3
224:16
**formally**   273:2
**forming**   283:22
**forms**   136:5
**formula**   19:4
56:17,21 58:23
59:6 83:22 87:20
**formulaic**   75:1
78:4 86:21
**forth**   24:4 161:17
**forward**   70:7
225:14
**found**   20:8 41:19
41:20 76:22
287:20 311:20
**four**   9:10 24:11
179:14 180:9
**fourth**   35:23 89:14
249:1
**frame**   84:14 309:6
**framework**   46:7
85:7 87:1 95:2
102:24 109:22
156:8
**free**   25:21 103:24
174:15

**frequency**   20:15
20:23 23:7,21
27:10 33:8 65:20
100:9 196:19
197:9,15 201:20
202:1,15 203:2,8
**frequently**   20:18
21:9
**front**   137:8 271:22
**full**   8:6 17:7 20:2
31:21 53:10 72:18
139:12 184:17
186:22 191:18
263:24 272:5
**fully**   108:6 110:24
**fun**   182:19
**function**   115:8,11
238:13 278:15,18
286:7,16
**functional**   204:16
**fund**   38:2
**further**   98:14
130:21 202:3
315:22 317:16
**future**   55:20 71:11
122:11 123:24
124:11 307:2

**g**

**g**   5:1
**gain**   207:19
**gallons**   114:20
116:13 117:21,22
119:7
**game**   263:21
**garage**   280:1
**gasoline**   294:20
**gather**   221:21
224:19
**gathers**   221:17
**gayle**   2:24 6:3

**general**   35:3 188:2
251:4 255:23
310:1
**generally**   197:21
263:9 266:12
292:3 304:11,20
307:23 308:3,8
311:20 313:17
**generates**   188:6
**generating**   153:13
**generation**   251:12
**geographic**   228:14
**georgia**   210:14,20
**getting**   21:23
32:23 80:18 81:17
121:4 179:12
222:9 260:10
**give**   8:15 45:2 89:9
92:19 106:17
110:18 171:15
184:4 196:1
223:13,15,21
256:18 286:2
289:23 292:17
**given**   24:20 25:14
27:14 44:15 59:24
88:20 101:7 103:6
136:20 137:24
138:5 141:21
143:15 159:13
167:5,5 168:12,13
171:10,14 190:15
200:10 220:19
239:13 281:16
**gives**   103:24
**giving**   145:11
**gledhill**   2:13 6:16
6:16
**go**   5:16 8:12 40:4
40:5 50:11 52:24
61:16 70:1 71:15

74:16,16 82:24
85:23 88:24 91:3
91:9,19 95:20
98:13 104:3
114:11 118:20
121:3,22 129:15
158:2 165:1,16
179:19 180:5
181:14 182:2,7
185:6 192:24
193:9 195:7
198:13 199:3
202:2,3 207:9
208:16 212:21
213:19 218:11
225:14 237:14
258:11 278:19
286:3
**goal**   33:15 152:22
**gobain**   1:8 5:21
6:14,17 38:1
**god**   302:24
**goes**   89:6 203:19
227:8
**going**   5:7 8:12,19
10:7,21 12:17
18:23 22:6 24:2
25:1 36:19,20
40:11 49:22 52:22
53:2 57:20 61:17
61:18 72:9 80:13
81:1,11 82:7
85:23 88:5,10,23
88:23 89:8 92:7
94:16 104:10,21
106:16 109:3,24
111:12 123:19
124:21 127:17
131:10 136:1
138:15 142:24
152:24 154:21

159:5 160:7
162:22 164:17,22
168:10 172:22
174:13,16 182:11
182:18 183:19
184:20 185:6
188:13 198:11
201:11,13 203:12
212:3,15 218:21
222:5,5 225:13
248:17 256:14
258:16 260:11,13
262:3 263:15
264:19 271:19
280:2 282:10,11
282:15 287:12
299:17 305:16
307:19 312:7
313:3,4 315:16
316:5
**good** 5:6 8:3,4
12:4 26:10 29:16
155:3 170:3
184:21 204:24
226:22 285:18
294:15 302:24
**goods** 98:7,8
**gotten** 92:21
285:20
**governor** 317:9
**grab** 52:22
**granted** 130:5
131:5 132:8,14
**great** 65:2 219:5,9
258:14
**greater** 13:12
**gross** 32:1,7
**ground** 60:17 81:2
99:17 165:15
**groundwater** 4:4
4:6 10:9,10 15:17

15:21 17:4 31:14
35:19 36:2,10
37:6 38:17 50:7
60:5 68:8,17
69:16 71:4 139:22
151:17 153:10,12
154:9,19 155:12
155:22 156:5,7,19
157:17 158:11,20
160:4 164:9,18,23
165:17 168:15
169:11 170:1,11
173:2 193:6
208:19,24 211:7
235:17,22 286:24
287:9 288:1,5
296:15 310:8
311:2 312:21
**group** 188:12
202:21 215:22
277:15
**groups** 173:7
200:19 272:3
273:14
**guess** 14:9 49:24
95:17 149:23
178:10 201:6
202:2 204:1
219:15 293:4,17
**guidance** 309:10
309:12,22
**guide** 266:24
**guidelines** 268:10
268:16,20 269:3,9
269:22 305:3
**gwc** 5:24

**h**

**h** 3:9 319:1 320:1
**half** 225:2
**halfway** 31:21

**hand** 275:22 276:7
292:8 299:4
**handed** 9:4 11:24
45:9 152:8 248:14
**handful** 141:14
**happen** 69:11
70:23 71:1 127:17
270:13
**happened** 80:10
82:5 94:19 109:2
217:16 289:3
**happens** 84:18
**happy** 24:23 92:19
111:21 298:16
**harbor** 211:7,9
**hard** 211:23 212:9
212:19 231:7
**harm** 37:16 38:2,6
164:19,24 167:5,8
167:12 206:10
288:13
**harmed** 46:3
86:20 110:22
301:7 309:23
**harms** 155:22
164:13,16,18
165:10
**hausthor** 252:8
253:17
**hausthor's** 252:20
**hazardous** 152:21
286:6
**head** 71:16
**header** 311:15
**heading** 300:23
311:1
**heads** 176:14
**health** 20:5 38:18
128:13,21 129:4
136:15 170:3

**hear** 237:24 264:5
**heard** 119:4
122:22
**hedonic** 16:11
79:6 194:18
200:12,15 216:4
256:19 268:11
270:11 277:16
283:7,10,14
**held** 6:1 237:7
**help** 65:9
**helpful** 65:8
227:12
**helps** 96:24
**hesitating** 192:21
**heterogeneity**
194:21 277:2,14
278:2
**heterogeneous**
194:19 195:11
**high** 27:19 76:24
85:10 229:2
250:14 266:9
**higher** 258:23
261:11 286:22
**highest** 249:4,6
250:15 252:9
253:4
**highlighting**
184:11
**hire** 171:18
**historical** 147:16
148:16 149:17
150:2 151:7
**historically** 249:5
249:7 253:5,23
**history** 151:7
257:24 299:12
**hit** 52:20
**hmm** 100:14
114:24 115:2

177:16 179:10
235:19 250:12
252:11 253:20
270:8 301:3
**hoc** 236:3,3
**home** 13:18 14:17
14:18,19 15:13
16:1,2,7,21 31:1,4
42:18 104:2,8,14
104:18 105:6,16
105:18,24 106:5,6
106:16 143:8,15
148:19,20 174:4
174:24 175:7,8,23
176:2,8 179:4,6
190:12 193:15,17
195:4,15,19 200:7
203:16,19 204:7,8
204:12,14,17,18
204:21 206:3,4,24
206:24 207:9,22
207:23 208:3
220:20 221:4,15
221:18,23 222:4
222:12,13 224:12
224:13 225:5,24
226:9,15 227:20
227:22 228:2,23
229:4 230:1
231:23 232:5
233:4,7,8,13,15
235:16 237:10,21
237:22 238:3,6,10
238:17,19 239:2,4
239:10,12 241:19
243:21 244:3,7,16
244:19 245:3,7
246:3,12 247:24
250:11 252:3,20
253:21 254:2
256:18 257:19

258:17,23 260:10
260:11,12,14,18
260:23 261:2,3,10
264:3 276:12
277:22 279:19,20
280:7,9,14,16
281:18 282:1,4
283:2 284:16
287:20 288:7,19
290:12 291:17
292:21
**home's** 223:12
238:21
**homeowner** 70:4
95:18 105:4
205:20 214:24
226:6 235:10,14
**homeowners**
116:17 146:6
175:4 207:7 235:5
246:10
**homes** 13:1,9 14:6
14:15 105:2,3
120:14 141:8,10
142:8 143:10
148:16 150:15
175:2,16 178:21
181:24 197:2
200:3 205:2 223:3
228:16 233:1
237:15,21 239:7
239:18 243:7
244:12,21,22
245:9,12 247:20
254:15,19 262:17
275:8
**homogeneous**
194:14,19
**honest** 231:6
**hook** 143:15

**hooked** 121:4
128:12 169:19,22
**hooking** 126:6
127:6 142:1
144:24
**hookup** 141:3,19
142:15,17 145:5
145:20,24
**hope** 24:1 45:1
260:5
**hopefully** 38:22
48:4 49:5 129:4
**hot** 52:23
**hotel** 182:15
**hour** 71:21,22
72:3
**hours** 26:5 242:21
**house** 11:22 88:5,5
142:9,11 191:9
192:23 240:11
242:17
**household** 40:23
62:4 83:2 109:4
119:16 141:20,20
143:1 144:16
168:20
**houses** 192:10
**housing** 205:1
**hundred** 119:23
**hypothesize** 134:5
**hypothetical**
69:10 120:4,5
127:23 136:3
138:10 265:12

---

**i**

**icebreaker** 11:9
**idea** 58:9 107:15
126:6 129:19
142:18 156:6
186:9 221:4
241:10 259:3

**identical** 60:6
**identification** 5:4
9:5 11:18 12:1
45:7,10 152:1,5
153:9 187:23
248:6 317:8
**identified** 150:7
162:16,24 200:20
230:11 231:24
300:1
**identifies** 269:21
**identify** 37:10
46:5 149:9,16
150:21 160:1
162:1 188:16
190:14 192:8
193:24 195:12
208:12,18 209:15
210:3,14 266:3
269:10,12
**identifying** 4:3
**ignore** 307:17
**ignored** 265:5
**ignores** 147:14
230:21
**iii.c** 48:6
**illinois** 208:18
292:18
**illustrate** 44:23
**imagine** 69:10
100:24 123:5
125:21 204:14
302:21
**impact** 241:23
273:20,22 274:3
275:20 277:3
285:23 286:5
311:3 312:1,22
313:7,12,18
**impacted** 186:14
266:14

**impacts** 185:21
268:17 273:14
286:16 287:3
312:19
**impaired** 248:23
251:6 261:9
**impeachment**
162:9
**implement** 171:4
**implicated** 57:9
**implicit** 221:3,9
**implied** 219:12
**implies** 18:12
**imply** 148:3 305:2
307:17
**importance**
269:13
**important** 8:15
23:20 65:22 67:15
121:9 156:13
180:22 181:5
232:11 244:15
273:5 281:17,23
**impression** 196:18
**improve** 96:24
160:2,3 163:1,9
164:4
**improvements**
269:2 290:1
**inability** 217:1
**inaccessible**
153:17
**inappropriate**
25:10 35:16 46:11
135:23 301:7,13
302:9
**incentives** 144:17
**include** 17:19,20
19:3,18 28:22
62:11,12 89:2
90:17 91:12 94:6

109:7 139:6 199:7
226:10,12 280:17
283:8
**included** 31:7 93:5
97:24 99:1 133:23
**includes** 248:20
283:15
**including** 9:11
21:14 42:13 46:9
144:12 148:1
149:17 152:16
153:13 154:8
220:20 249:23
**inconsistent** 217:3
259:14 261:8
270:6 301:8
302:12
**incorporate** 16:1
41:13 89:23
177:10 241:2,4
**incorporated**
196:10,13 219:1
265:7,10
**incorporates**
109:22 175:24
**incorporating**
89:24 90:16
**incorrect** 19:20
26:17 38:16 66:18
155:1 278:4
**increase** 16:20
98:2 119:21
176:21 255:17
278:2
**increased** 15:6,12
17:1 174:23 175:6
**increases** 90:1
278:5
**increasingly**
273:10

**increation** 132:3
**incur** 19:13 30:20
32:6 93:18,20
95:10 102:18
103:5,11,19
120:21 121:3
137:10 264:20
**incurred** 14:3 17:9
18:16 22:12
101:12
**incurring** 14:11
**indefinitely** 67:12
71:5
**indiana** 209:15
**indicate** 179:23
198:4
**indicated** 276:17
**indicates** 7:11
234:2 252:9
277:23
**indicating** 132:22
**indicator** 139:20
**individual** 19:6
44:15 48:7 55:15
57:2,18 59:13
72:21 73:20,24
74:9,13 77:19
79:18 85:12 86:6
87:4,11 88:7,13
93:13 95:10 97:7
102:15 103:10,18
106:1 120:5
123:18 132:2
145:22 146:6,13
147:7,18 148:18
148:21 149:18
184:24 185:3,20
188:13,13 194:9
195:15 199:15
200:6 223:9
246:10 247:12

255:15,21 256:2
258:11,15 262:21
268:22 269:4,17
269:23 273:4,24
274:15 275:1,7
276:11 291:14
306:6 308:19
312:13
**individual's** 57:14
57:17 59:7 80:22
81:21 136:20
137:16
**individualized**
45:19 47:1 48:17
48:21,23 56:24
58:11 59:12
188:18 272:14
308:12
**individually** 1:4
44:15
**individuals** 29:21
29:23 32:17,20
36:15 41:20 54:13
56:13 57:15 61:11
61:19 103:1,4,7
105:2 106:10
121:2,13 122:5
123:8 125:5
127:18 128:2
130:13 131:2,10
138:24 146:14
150:15 156:22
169:19,22 170:23
231:18 243:6,19
284:8
**industrial** 194:5
**industry** 301:24
**infer** 291:9
**inference** 37:14,18
252:12

**inferences** 227:11
**inflation** 237:19
**inform** 177:17,24
  199:8 232:15
**information** 33:23
  45:3 55:21,22
  66:23 67:1 90:18
  92:15,17 99:11
  130:17 143:14
  159:21 163:15
  230:21 231:13,21
  232:4 234:1 237:8
  238:14,22 239:4
  241:5 243:4
  244:14 245:8,15
  245:19 250:3
  264:21 285:15,19
  290:23 292:6
**infrastructure**
  168:3 172:15
**initial** 7:18 15:16
  139:18 140:7
  196:18 197:18
  249:1
**injured** 153:8
**injuries** 4:7
  152:19
**injury** 173:1
**inorganics** 32:1,7
**inputs** 53:11 56:9
  56:10,11,14,16
  57:7,12 58:15
  75:7
**inquire** 7:19
  124:10
**inquired** 24:4
  59:17
**inquiry** 25:2,15
  123:23 166:9
**inside** 285:1

**insights** 120:10
**insofar** 52:14
  250:1
**inspect** 192:13
**inspected** 299:13
**inspection** 31:8
  283:2
**inspector** 31:7
**install** 112:20
**installed** 148:17
**instance** 51:14,21
  239:9
**institute** 266:24
**institutions** 257:14
**instruction** 183:23
**insurance** 42:18
**intake** 172:5
**integral** 23:23
**intended** 157:14
  158:8 166:3 170:7
**intention** 26:11
**interact** 24:13
**interacts** 26:2
**interest** 48:11
  105:19 106:11
  107:5 141:17
  174:8 229:6,19,22
  268:4
**interested** 6:9 17:8
  109:16 143:3
  268:24 269:17
  270:3 315:3,3,6
  317:19
**interesting** 202:7
  219:21
**interfere** 5:13
**interior** 153:4
  190:2 281:18
  282:8,22 283:2,9
**internet** 298:14

**interpretation**
  183:9
**intersections**
  195:22
**introduced** 51:16
**introduction**
  152:13
**intrusion** 128:23
**inventory** 222:23
**invest** 163:3,23
**investing** 258:1
**investment** 110:1
**investments** 108:1
  108:6 163:24
**involve** 132:2
**involved** 78:9
  122:8 137:9,13
  209:6
**involves** 60:5
  210:19 296:13
**involving** 308:17
**irrelevant** 288:15
  298:23 300:7
**island** 210:3
**issuance** 258:9
**issue** 24:24 31:2
  54:6 144:9,17
  168:12,12,13
  169:17 181:17
  200:23 215:14
  226:14 246:13
  271:23 287:4
  293:18 295:13
  312:16
**issued** 317:9
**issues** 74:9 134:24
  172:21 182:14
  184:5 197:23
  216:16 271:5
  273:8 276:1
  300:11

**issuing** 224:12
  257:14
**italics** 36:3
**item** 14:17,18
  22:17,19 23:6
  26:13 62:11,12
  64:9,13 88:5,6
  93:14 97:23 103:4
**items** 16:6 43:15
  43:22 48:15 52:5
  60:8 64:10,17,20
  91:11,13 163:3
  185:16

**j**

**j** 2:4
**jackson** 3:20
  10:19 58:24 59:3
  79:5 181:5 183:20
  184:8 270:11,14
  270:24 271:12,15
  272:8,12,24
  274:19 276:4
  284:12 302:4
**jackson's** 270:6
  273:7 301:4
  314:18
**james** 1:4 5:20
**january** 20:4,4
  252:19,24 258:18
**jason** 112:12,18
  122:7
**jeff** 241:16
**jill** 1:20 6:5 317:2
  317:22
**job** 13:1,9 16:9
  178:21 255:12
**join** 147:2,3
**joined** 141:15
**joining** 141:17
  146:14

**jones** 297:4
**joselson** 2:4 6:20
  6:21 7:5 12:4,22
  14:7 19:10 22:6
  22:20 24:1 25:5
  25:19 26:8 28:2
  29:13 32:13 33:17
  34:14,21 35:13
  37:20 38:12 39:9
  40:3 42:4 43:18
  49:22 51:8,15
  52:8,17 54:8,18
  56:7,19 57:4,20
  58:4 59:14,16
  61:15 62:7,24
  63:20 64:4,15
  65:18 66:7 68:20
  69:6,19 71:19
  72:5 74:15 75:9
  76:13 77:8,21
  79:2 80:24 81:24
  82:13 83:19 84:23
  85:20 86:8 87:16
  88:15 89:5 92:7
  92:20 94:10 95:15
  96:7 97:12 99:6
  102:5,21 103:14
  103:22 104:10,20
  105:21 106:20
  110:17 113:21
  115:24 116:22
  117:17 118:12,22
  120:3 123:12
  124:6,18 125:12
  128:7 131:7
  132:11 133:8,12
  133:22 134:4,11
  135:22 136:22
  137:22 138:13
  140:23 142:5
  143:5,19 144:11

144:18 145:10
146:2,24 147:6
149:11,22 150:13
150:23 152:3
154:21 155:13
159:6 160:6,15,24
161:12,22 162:4
162:11 163:20
164:14 165:11
166:13 167:13
168:5 169:2,13
172:17 173:13
175:18 177:7
178:9 179:22
180:1,14 181:12
185:22 186:17
191:14 194:15
198:1 199:17
201:10 203:3,21
204:3 205:14
206:7 207:15
211:13 213:7
214:7 215:12
216:6,17 218:19
221:7 222:20
223:24 224:24
225:12,20 226:17
227:4 228:3
229:17 231:7,10
232:14 233:10
234:8 235:2,23
236:18 237:11,13
238:15 240:9,20
242:10 243:16
244:4,17 245:13
246:7,15 247:5
248:7 250:17,23
251:10,19 252:15
252:22 253:14,24
254:16 256:4,23
257:21 258:24

259:17,23 260:4
260:21 261:14
263:8,19 264:4
275:2 278:12
279:12 280:2
281:20 282:2
284:13 286:1
288:21 289:19
297:4,18 298:5,9
298:24 300:8,24
302:6 305:15
306:10 307:13
308:5,14,21
309:14 313:23
316:3
**judge** 24:24 99:16
  99:22 131:14
  132:12 161:15
  248:3 254:8
**judged** 220:7,11
  220:14
**judgment** 254:24
  311:14
**jump** 174:13

## k

**k** 1:20 317:2,22
**keep** 134:2 236:19
**keeping** 231:5
**key** 272:7
**kind** 24:23 41:4
  51:4 60:12 74:21
  167:1 195:22
  208:9 240:24
  243:3 276:22
  292:4
**kinds** 95:12
**kit** 23:1,3
**kitchen** 281:6
**knew** 113:2
**knight** 250:9
  258:17 259:8

260:2,7
**knight's** 250:10,21
**know** 8:10,19
  10:12 18:17,19
  19:1,15 29:10,15
  29:20 30:8 31:10
  31:16 34:16 44:8
  52:11 55:14,17,23
  57:5 59:18 61:12
  62:20,21 63:23
  64:1,11 67:6
  70:13,17,18 71:6,8
  71:10 80:8,18
  83:23 94:18,20
  95:9,11 96:2
  98:15 100:8
  103:16 104:6
  105:3,13,23
  106:22 111:13
  117:19 122:1,2,16
  122:20 123:7
  125:24 126:22
  128:16 129:10,14
  131:23 133:19
  135:9,24 138:2
  144:3 146:1,4,6,19
  146:20 150:19
  154:10,13 161:14
  162:19,20 168:8,8
  171:12 175:21
  176:13,14 177:11
  180:5 182:3 184:3
  184:17 185:7,24
  186:10,19 190:11
  194:24 195:22
  198:21 200:2,17
  202:18 214:18
  215:23,24 217:20
  219:2 221:18,20
  222:22,22 224:16
  225:21 226:8,21

227:7 229:8,8
230:13,14 232:7
233:23 234:1,10
234:23 239:11,23
240:1,5,8,10,18
241:7,13,15 242:7
242:18 243:11
247:11,12 250:18
251:12,13 253:1
253:15,16 254:1,3
254:5,6 257:4,22
258:4 259:4,5,19
260:1,6 264:7,18
264:20 269:8
275:19 276:21
285:19 288:8,24
289:1 290:10,14
293:19 296:18,21
297:2,6 298:15
301:23 305:7
306:11 308:7
309:18,20 310:12
311:12
**knowing**  70:6
240:4
**knowledge**  11:3
106:6 163:22
236:20 310:13
**known**  67:22
290:15
**kopp**  314:16
**kopp's**  292:18
311:19

**l**

**lack**  215:10 259:1
**lake**  210:23
**landfill**  198:14
289:13 295:15,16
299:11
**landowners**  172:5

**lane**  151:20 155:9
156:9,10,17
**langrock**  2:3 6:21
**langrock.com**  2:8
**language**  217:4
219:12,14,19
245:22
**lanier**  210:24
**large**  149:3 198:24
228:12 256:1,1,6
267:9 271:16
**largely**  55:1,3
112:2 231:1
**larger**  13:12 75:6
189:5 263:5
**late**  137:10
**latitude**  24:22
**laughter**  231:11
238:8
**law**  137:5,11
156:12 184:20
200:1 217:4
219:15,20,22
245:23 310:12,16
310:17,19
**lawyer**  28:17
79:16 90:10 118:8
118:23 119:2
131:17 132:10
136:1 137:3
185:23
**lead**  50:3 51:5
186:24 188:3
206:19 209:17
210:5 218:24
**leaking**  294:21
**leave**  70:9,14
**leaves**  31:23 68:18
68:23
**leaving**  33:19 62:9
70:10

**leavittown**  192:10
**leclerc**  208:20
**led**  218:17 235:7
235:13
**left**  67:14 121:20
**legal**  59:18,19
118:18 137:24
219:17 245:19,21
**legally**  52:11
134:24 136:2
**legitimate**  73:5
**lender**  224:12
**lenders**  224:15
**length**  23:11 42:24
107:1 140:6
189:20 257:5
258:2 266:11
**level**  77:17 130:6
131:6 132:9,15
276:11 285:10
**levels**  32:1,7 70:15
71:13 186:14
187:18 306:21
309:13
**licensed**  190:5
**life**  95:24 100:16
111:14 135:13,20
224:21
**lifespan**  80:4
82:19,22 94:2
96:24 98:2
**lift**  115:9
**lifted**  69:16
**lifting**  115:10
**light**  168:21
**likelihood**  276:20
**limit**  99:10 148:24
305:1 310:9
**limited**  7:13 67:24
181:13

**limiting**  15:5
**limits**  304:22
307:24
**linc**  71:19 225:21
**lincoln**  2:12
**lincoln.wilson**
2:18
**lincoln1**  6:13
**line**  11:11 12:14
22:17,19 23:6
26:13 62:12 85:21
105:9,12,15,16
130:20 206:5
248:10 260:12,19
260:24 280:3
319:2 320:2
**lines**  105:18 106:7
106:16 130:23
207:1
**list**  49:2 60:2,7
61:22 162:1,16,20
163:7,12 195:9
226:1,7,12
**listed**  117:14
226:4 298:8
**listened**  186:5
**listers**  283:13,20
**lists**  226:3
**literal**  295:22
**literally**  236:21
**literature**  102:2
154:15 168:22
198:4 241:9 258:7
258:12 269:21
276:8 294:6,15
296:6 301:5,13,16
302:9,11 303:21
306:15 307:17,22
311:18 313:16,21
314:1

litigation  79:1
135:9 229:14
litigations  208:8
208:12 212:4
213:12
little  48:5 87:7
139:21 174:14
178:5 184:4
197:10 227:14
259:7 285:11,13
live  51:23 52:6
95:24 105:2
147:22 169:24
170:10 205:2,2
245:3,6
lived  204:18
lives  207:22
living  176:1 208:4
208:5 280:12
289:17
llp  2:3,11 6:14,17
loan  222:12,16,16
223:13,15,18
224:12 256:18
loans  222:9,24
223:21
local  12:15 202:13
237:19 241:23
284:2,4 303:9
308:2
location  202:20
271:3
lockformer  116:4
208:21 213:14
logic  96:17 98:6
286:11
long  16:10 80:7,13
82:16 179:11
197:7 211:3
256:24

longer  40:9 68:7
68:16 70:20,21
84:14 94:2,17
160:4 204:15
305:17 315:3,6
look  15:20 17:5
18:15 20:1 35:18
35:23 42:10 48:2
49:4 53:7 55:16
55:18,24 57:18
68:3 72:17 89:11
107:16,17 111:22
114:12 137:16
139:9 143:6,8
146:9 147:4,7
158:3 168:17
173:20,22 174:11
177:15 178:4
179:19 180:6
181:21 182:2,8
190:20,20 196:11
197:8,10,18
216:15 220:16
230:10 231:19,21
237:15,17 239:6
243:14 244:13,14
250:8 251:4 252:7
254:9 255:8
258:12 270:4,21
278:22 283:20
291:7 295:9,12
300:22 310:23
looked  21:2,3
177:13 196:9
197:6,17 199:2
232:17 243:10
244:20 312:8
looking  10:14
98:21 107:7
110:20 111:19
119:18 123:3,17

132:18 147:3
190:15,17 198:16
210:22 212:22
216:19 242:5
279:1,2 281:8
282:14 294:4
296:5 299:17
looks  180:10
240:11
loosely  292:12
loss  41:14,16
57:14 121:10
125:10 128:11
129:24 132:23
138:9 154:19
155:11 156:5,19
156:21 168:2,24
169:10 170:6
173:17 177:11
204:2,19,21 205:9
205:11,19 206:10
206:13,15,16,20
207:7,18,18
210:24 214:24
289:1
losses  82:2 138:8
147:24 170:7
200:7 271:16
272:2 288:11
lost  157:16 158:11
166:6 203:23
204:10
lot  13:22 40:9
117:24 147:18
148:24 149:3,19
187:19 191:7
194:24 195:1,3,19
236:20,22 241:17
243:8 277:14
279:14,15,22
289:15 303:1

311:10
louis  209:8
love  11:19 237:24
low  76:24 77:10
80:20,22 81:19
lower  27:18
128:10 182:6
252:13 253:12
lowered  159:16
lunch  72:3 120:7
138:12,16

| m |
| --- |

magnitude  51:10
217:2,11
main  206:1 208:14
209:1 312:19
maintain  61:21
62:2 96:17 120:18
130:22 138:23
maintained  60:4
280:19
maintaining  62:13
77:1,4 95:20
maintains  48:16
48:20,22
maintenance  60:7
61:23 62:6,16
63:24 80:20 81:19
85:18 93:6,14,18
94:1,6,8,19,20
95:10,13,22 96:2,4
96:18,20,24 97:4,8
97:10,17,21 98:1,9
129:17
major  195:22
299:20,22
majority  38:3
175:5
making  56:23,23
136:13 142:15
143:3 159:4 172:4

188:10,17 253:9
288:23,23 306:2
311:13 313:15,20
313:24
**man** 34:12
**managed** 163:14
**management**
306:3
**manner** 125:23
**map** 187:14
**march** 4:2 12:9
**margin** 223:15,17
251:17
**mark** 151:24
293:22
**marked** 5:3 11:17
45:6,10 152:4,8
248:5,14
**market** 98:12
111:17 146:10
188:7,8 189:8,13
189:15,19 190:2
196:8,12,22
197:16 198:17
203:16 204:17
206:2 215:15
226:13,14 231:19
232:7,13,15
239:17 241:20,24
266:10 267:4
268:8 277:10
281:14 282:15,18
283:16 284:8,15
291:13,15,18,20
293:1,6,13,19,20
294:4,22 295:21
302:18 304:13
306:8
**market's** 206:21
207:21 252:2

**markets** 106:2
200:4 257:11
292:16 293:24
294:5 303:18,23
304:3
**marsal** 6:19
**mass** 227:17 257:7
257:10 258:12
**massachusetts**
1:17 6:3 137:11
211:6 212:7,18
317:10,11
**material** 10:3 22:1
49:9,14,18 50:16
51:3,7,17 52:7,10
52:14,18 92:15
**materially** 66:4,20
**materials** 91:15
92:1,3,11,18,22,24
113:10 114:11
212:6,9
**math** 33:12 90:9
91:5 179:13,24
180:3
**mathematical**
92:9
**matter** 5:20 9:11
11:2 33:15 35:3
45:14 46:11 78:14
98:24 131:15
139:4,7 144:2
148:19 156:23
174:7 234:21
273:2 288:12,18
289:6,22 299:4
301:8,14 302:20
317:5
**mattered** 183:16
**matters** 7:17 34:6
160:11 161:4,7
164:11 165:8

286:14
**mean** 19:13 30:23
44:10 45:5 46:17
68:23,23 70:13
106:9,12 118:21
129:2 166:23
184:2,3 185:11
189:10 194:2
203:23 213:8
215:5 216:20
217:20 219:3
220:5,9,13 222:1
227:24 236:13
240:15 241:14
247:6 271:21
277:5 285:20
291:16 293:5,5
294:14 297:23
299:5 308:3
311:24
**means** 34:16 51:18
52:11 55:4 57:5
71:2 103:17 127:5
157:15 158:10
162:21 163:7
165:20 215:18
244:6 250:19
252:18 278:7
**meant** 77:11
**measurable**
186:14 187:17
**measure** 13:18
80:9 120:15,19
121:9 127:22
129:24 197:16
241:1 295:10
**measured** 13:15
128:3 191:7
**measures** 130:21
167:24 192:1

**measuring** 16:9
**mechanisms** 173:5
173:7
**media** 5:17
**median** 182:4,6
**medical** 167:18
**meet** 281:14
**member** 16:17
55:15 57:2 85:13
87:5 102:13
104:22 105:5
132:5 135:10
288:19
**member's** 68:17
68:19 69:5 70:10
70:11 74:13
145:22
**members** 18:17
19:1 38:4 46:1
48:8 49:8,13,18
50:16,17 52:15
54:4 56:5 60:1
64:9 79:24 89:19
94:7 104:16,17
145:4 146:13
157:2,4 170:8
172:1,12,14
173:18,18 186:8
188:19 214:3
262:17
**memorandum**
113:7
**memorialized**
213:2
**mendelsohn**
211:19
**mention** 36:24
206:24
**mentioned** 14:22
79:4 86:19 117:19
123:9 124:12

126:20 201:19
221:15 265:20
309:17
**merit** 317:2
**merits** 10:1 22:15
24:5 27:24 28:8
28:15 40:16 89:7
160:18 161:10
178:6,11 180:23
183:14 193:5
**met** 92:21
**meters** 112:20
**method** 25:9 46:21
46:22 47:14 88:19
89:1 153:21 155:8
155:21,24 156:2
156:11,18 221:5
226:20 227:2,7
245:14 267:3,16
267:23 269:4,10
269:21 270:12
276:4 292:9
**methodological**
44:23 64:11 166:7
**methodologies**
24:15,19 25:9
266:13
**methodology**
14:21 23:20 24:6
25:7 33:2,6 39:1
58:10,14 77:23
92:11 98:4 101:17
101:19,22 107:10
150:20 199:13
200:6 213:5
291:13
**methods** 13:20,23
13:23 16:8 86:20
124:3,14 177:20
177:22 213:18
220:20 221:14

226:16 227:18
240:5,6,18 244:6
268:12 269:7,12
**microphones** 5:9
5:12
**middle** 112:1
114:13 216:23
**middlebury** 2:6
**miles** 193:22
**military** 303:1
**million** 222:14
**mind** 107:12
176:12 231:14
236:19 305:8
**mindful** 7:9
**minds** 136:14
177:11 211:15
218:6 229:9
**mine** 8:9
**minimum** 63:15
161:13 308:18
**minneapolis**
296:20
**minnesota** 298:10
**minus** 205:17
**minute** 182:13
286:1
**mischaracterizat...**
34:12 36:6
**mischaracterize**
34:17 35:4,11,16
**mischaracterizes**
35:7
**mischaracterizing**
34:24
**misentered** 279:4
**misleads** 220:21
**mispronouncing**
148:5
**missed** 249:15

**missing** 179:16
**mistake** 297:21
**misunderstanding**
159:7
**misunderstands**
112:4
**mix** 227:17 295:5
296:2
**mixed** 194:7
**mm** 100:14 114:24
115:2 177:16
179:10 235:19
250:12 252:11
253:20 270:8
301:3
**model** 12:20 59:9
59:10 75:12 83:1
83:4,6 85:7 86:12
86:16 88:12 93:7
102:11 129:20
133:16 134:18
157:10 194:18
196:15 200:12,15
200:22 201:2
202:5,10,18
214:20 215:9,18
216:2,5 246:20
258:5 267:12
275:20 276:14,19
276:23 277:4,10
277:16 278:6,14
283:7
**modeled** 157:8
206:12
**modeling** 215:17
**models** 79:6
283:10
**modifications**
67:20 126:12
**modified** 24:18
123:9 126:21

**modify** 126:17
199:8
**moment** 103:12
218:4 236:21,23
247:22 286:2
306:18
**moments** 28:9
**monetary** 3:13
72:20 87:10
120:15 183:1
275:16
**monetizing** 268:13
**money** 95:20
127:13 171:10,16
172:14 200:18
204:9 261:2,3,18
261:20
**monitoring** 167:19
**monthly** 84:21
100:2,11,19
**moot** 19:23
**morning** 5:7 8:3,4
9:16 26:5 137:7
178:17
**mortgage** 105:5,6
105:11,13 174:5,7
225:4 239:9 258:1
**mortgages** 105:14
105:20 224:20
257:3,4,11,15
258:9,11
**motion** 161:15
**move** 63:9 182:18
213:23 305:9
**movement** 313:5
**moves** 68:24
**moving** 19:14
41:21 47:9 53:14
67:11 70:6 84:2
**mullin** 3:17 4:1
10:5,8,15 17:4

18:1 28:4 35:7,20
36:1 37:1,4,24
38:8 39:22 41:8
42:2,11 43:12
44:2 46:17,18
47:17 48:5,20
49:5,10 53:8 58:9
59:4,5 71:17
72:15 73:2 87:9
87:14 89:12 90:7
90:12 93:11
106:23 107:23
111:23 112:4
114:14,19,23
117:12 119:13
120:8,10 129:22
132:19 139:10,16
140:9 141:7 151:1
151:11 161:2
173:21
**mullin's** 32:16,19
36:7 37:10 44:11
45:13 85:9 89:16
92:9,17 93:4
107:18 110:6,14
133:2 147:10
150:1 161:2
162:12 169:16
**multifamily** 112:7
**multiple** 63:2,3
74:3 147:14
148:10,13 273:12
273:19 276:15
277:4 278:16
300:3
**municipal** 12:17
14:4 15:8 17:1
19:13,14 36:13
40:20 41:9,21
46:4 47:10 50:4
50:18 52:2 53:15

67:11 76:11,19
77:6 84:3 111:15
120:1,14,20,22
121:14 122:5
126:11 127:6,12
127:23 128:4,13
128:18 129:5,7
130:2,14 131:2
132:4 139:14,16
139:23 140:3,19
140:21 141:5
142:2,12 143:4,16
143:18 144:16,21
145:3,6,9,20
146:15 147:17,23
148:4 149:4,7,15
149:18 150:5
151:7 169:9,19,23
170:2,9,13 174:24
175:3,17 176:7
262:15 263:6
290:12 313:5
**municipality**
145:1

## n

**n** 3:1 5:1
**name** 6:3 8:6
296:19 297:2
**named** 132:20
133:5 216:10
231:14 232:18
243:1 244:10
248:20 283:23
**national** 293:14
**native** 152:17
**natural** 152:15,20
153:5,21,22 154:8
154:17 155:3,10
**nature** 208:13
**near** 187:16
299:20

**nearby** 141:11
**nearly** 48:22
119:22
**necessarily** 233:23
253:8,11 271:24
278:3
**necessary** 7:21
24:11,12 25:20,20
38:18 41:22 99:18
157:24 158:21,24
159:13,22 163:17
163:18
**need** 11:5 18:17,19
18:20 19:1 40:1
44:14 45:20 57:18
59:11 62:21 63:11
64:1 70:1 87:20
92:15 94:19 95:11
96:3,20 97:9 99:9
109:7 111:13
121:21 123:7,23
124:10 127:13
149:8 150:18
152:17 159:17
161:16 163:4
164:1 170:14
174:15 187:9
199:11 203:4,5
208:15 226:21
233:18 234:3
237:9 260:7
264:11 281:9
285:16 307:8
315:12
**needed** 108:2
130:22
**needs** 39:22 84:20
97:24 108:22
**negate** 147:23
**negative** 285:5
286:7 290:6

**negatives** 290:4
**negotiations**
209:22
**neighborhood**
190:22 274:11
**neighborhoods**
195:1 314:19
**neighboring** 287:6
287:8
**neither** 8:8 50:1
71:11 91:14 139:8
317:14
**net** 49:20,21 50:18
96:14 97:17 174:6
261:19 269:1
**nets** 94:15 97:15
**new** 2:16,16 22:1
23:12,15,18 25:2
66:24 105:7 112:1
112:4 153:15
181:6 207:8 211:7
211:9,11 212:13
213:20 234:1
290:24 292:14
**nigerian** 135:14
135:21
**non** 69:2,18 309:9
**noninterest**
146:14
**nonsense** 261:21
**nope** 190:10
**normally** 30:3
**north** 18:3 40:18
76:1,9 139:13,19
148:14 175:1
203:9 298:1
**notary** 317:10
318:17
**note** 5:9 22:10
81:5 89:22 98:14
113:8 116:24

147:10 160:7,10
165:3 198:3
266:24 271:22
288:10
**noted**  71:20
139:17 141:12,13
213:21 318:5
**notes**  114:8 132:20
268:11
**noticed**  36:23
**notify**  187:10
**noting**  248:8
**notion**  303:21
**nrda**  153:4
**number**  20:20,21
21:8 27:4 44:7,19
47:12,13 53:24
67:4,5,8,24 91:8
91:16 92:16 94:6
123:1 141:8 150:7
152:2 179:1 180:6
180:12 195:9
223:22 266:16
271:16 280:18,18
300:18
**numbers**  21:6
43:15,16 46:16
47:14,21 48:1
50:23,24 56:12
91:21 96:11 173:6
179:21 195:18
251:14 259:4
**nursing**  223:3

**o**

**o**  3:20 5:1
**oath**  6:7 7:2 8:14
**object**  14:7 19:10
28:2 29:13 33:17
34:14,21 35:13
37:20 38:12 39:9
40:3 43:4 49:23

51:8 52:8,17 54:8
54:18 57:4,21
68:20 69:6 81:1
87:16 88:15 94:10
104:11 117:17
123:12 124:6
125:12 132:11
133:8,12,22 134:4
134:11 146:24
154:22 163:20
169:2,13 172:19
175:18 186:17
191:14 193:12
194:15 198:1
199:17 203:3,21
204:3 205:14
214:7 218:19
221:7 222:20
223:24 224:24
227:4 228:3 234:8
237:11 238:1,15
242:10 243:16
263:8 280:3
288:21 298:24
300:8
**objecting**  98:15
**objection**  12:22
22:10 32:13 42:4
43:18 56:7,19
58:6 59:14 61:15
62:7 63:1,20 66:7
69:19 74:15 76:13
77:8,21 79:2 81:5
81:24 82:13 84:23
89:5 96:8 97:12
102:5 103:14,22
104:20 113:21
120:3 124:19
128:7 131:7
136:22 137:22
142:5 143:5

144:11,18 147:6
149:11,22 150:13
150:23 155:13
159:6 162:7
164:15 165:4
167:14 173:13
180:21 206:7
213:7 215:12
229:17 232:14
235:2,23 236:18
240:9,20 244:4,17
245:13 246:7,15
247:5 250:17,23
251:10,19 252:15
252:22 253:14,24
254:16 256:4,23
257:21 258:24
259:17,23 260:4
260:21 261:14
263:19 264:4
275:2 278:12
281:20 282:3
302:6 305:15
306:10 307:13
308:5,14,21
309:14 313:23
**objections**  99:9,20
118:7,18 146:3
165:12 169:14
172:18 175:19
177:8
**objective**  13:15
15:1 166:17
167:24 176:24
190:24 191:1,4,6
191:21 192:1
246:5,11 304:12
**objectively**  33:24
**obligation**  310:10
**observable**  139:14
197:12

**observation**
240:23
**observations**
230:16 241:3
278:23 295:19
313:9,13
**observe**  202:7
215:15 242:2
**observed**  139:18
146:10 201:21
202:4 203:8 268:8
300:15 309:4
**obstruct**  25:2
**obtain**  140:5,21
145:5
**obtaining**  40:23
**obvious**  120:13,18
228:6 285:13
312:24
**obviously**  70:4
125:21 172:6
215:6 229:20,22
233:17 265:1
281:14 299:19
**occur**  85:5 170:8
178:3
**occurred**  14:12
38:3 159:2 218:5
**occurrence**  65:20
100:23
**occurs**  84:14
217:22 236:12
**offer**  33:15 199:8
217:17 240:14
245:10 247:1
265:9
**offered**  7:20 11:2
25:3 38:7 180:24
231:23 262:22
**offering**  23:18
121:10 199:10

216:1 219:17
222:24 245:21
247:19
**offers** 27:10
120:10 172:4
**offset** 96:20 97:10
97:22 157:16
158:10 160:3
164:8,12 165:9
166:6,12 167:7,11
167:11,15,21
168:3,19 169:10
170:14 171:13
**offsets** 168:24
**oh** 12:4 68:14
110:19 118:9
157:4 211:10
231:16 297:9
**ohhh** 225:11
**okay** 8:13 9:17
10:15,24 11:23
28:19 35:22 50:13
58:7 65:8 72:4,6
72:16 90:19 91:6
91:23 131:20
135:18 138:13
144:14 157:6
178:15 180:4,7,18
181:12 193:19
195:24 201:6
208:23 211:21
212:2 225:12
238:4 250:7 253:6
262:1 297:9 298:4
298:12 310:21
315:24
**old** 63:3 99:17
212:23 251:22
299:10
**older** 280:6

**omissions** 45:22
45:24
**once** 45:23 100:17
169:22 170:22
172:7,7 182:13
255:8 287:21
**ones** 19:2 24:17
72:19 87:9 89:3
212:12 213:15
**ongoing** 200:10
**online** 231:20
243:2
**operate** 67:12 70:5
94:16 115:7
**operated** 60:4
**operating** 15:6
42:16 60:7 61:22
93:21 95:13 96:5
129:10,11 175:6
**operation** 62:16
63:24
**opine** 214:5,11,23
247:3 268:3
**opined** 40:17
262:20
**opines** 51:22
**opining** 40:24
**opinion** 10:5,19
14:23 15:3,16,19
18:20 23:12,15
27:14 33:16 34:6
36:7 39:3,6 44:12
46:14 58:13,24
59:2,19 74:7
85:23 89:16 93:5
106:17 108:9
109:17,19 110:15
112:15 113:17
130:9 133:13
138:1 169:4
170:12 175:13

176:6 177:18
178:18 180:24
184:24 185:2,5
188:15 193:1,6
198:3 199:7,10,19
199:22 208:9
214:5 215:7 216:1
217:18 219:1,18
230:20 233:3
237:9 238:9,20
239:1 243:4 244:2
244:12,22 245:1,8
245:10,21 246:21
247:19 248:2
255:3,11 259:15
259:18 261:9
262:12,14 265:9
266:20 270:5,22
270:24 275:13
282:18 287:19
298:21 306:16
314:19
**opinions** 7:13,19
7:21 9:12 22:4
23:23 25:2,16,17
26:3 27:24 28:8
33:20,22 34:5
63:10,12 66:10
85:1 89:7 99:18
160:17,17,21
161:2,9,20 162:12
177:3 181:6,7
184:12,14 186:5
199:8 213:9,11
216:24 220:6,10
230:23 231:15
232:12,19 237:2,4
243:13,18 246:13
247:1 251:24
254:11 262:22
263:3,12,13

283:22 297:11
312:13
**opponent's** 34:17
35:5,11
**opportunity**
126:17 128:12
215:6
**opposed** 33:4 79:1
79:12 88:11 104:8
136:13,16 290:12
312:5
**opposite** 111:3
159:19
**option** 122:6
128:20
**options** 74:3 125:5
164:3
**oral** 113:18,22
**order** 7:11 16:24
23:3 25:11,15
26:10 34:18 79:12
95:9 99:15 132:13
149:13 223:12
317:8
**original** 21:24
22:4,21 24:17,19
25:16 27:20 43:9
63:13 65:4 81:3
83:20 85:1 91:4,9
99:1 102:3 112:23
117:13 121:16,23
130:10 141:13
146:5 147:11
165:1 181:9
**originally** 39:24
**outcome** 6:9 88:4
317:19
**outlier** 230:3
**outliers** 230:2,12
230:16 279:3

outline  315:11
outlined  156:8
output  116:19
  117:8 277:16
outside  238:1
  276:5 285:1
  292:19
overall  83:21
  280:21
overestimate
  277:16
overestimated
  278:9
overlap  22:8 265:2
overshot  83:12
oversimplifies
  174:21
overstepping
  305:8
owes  261:2
owned  93:17
owner  93:12,17,19
  93:23 217:4,10
  218:14 219:8
owners  18:7 31:24
  60:3 94:1 104:7
  104:14 105:3
  199:21 214:10
  220:4 232:23
ownership  206:14
  271:3
owning  15:13 16:2
  19:12 27:19 36:13
  174:2,23 176:2
  205:17

**p**

p  5:1
p.m.  138:15,18
  201:16 262:6
  315:19 316:5

page  12:11 17:5,24
  18:1 20:1 22:13
  27:9 30:13,14
  31:14,20 35:19
  42:10,12 45:16
  48:4 49:4,7 53:7
  67:10 68:4,5,10,12
  68:13 71:16 72:15
  81:6 89:11 93:10
  98:21 110:18,19
  111:22 112:1
  114:12 117:15
  120:7,10 129:21
  132:16 139:9
  147:13 151:10,11
  152:14 158:3
  171:1,2 173:20,24
  174:12,20 177:14
  178:7 179:2
  182:17,20,22
  186:20,22 213:19
  216:15,22,23
  220:16,18 230:17
  270:4,7,21,24
  272:4 273:6
  284:11 285:22
  286:4 300:22,24
  310:23 319:2
  320:2
pages  63:3 107:7
  174:18
paid  78:17 108:6
  110:24 171:20
  193:8 290:11
  291:8
painful  39:11,14
paired  267:2,10,14
  267:23
pairs  267:12
pals  298:18

paper  59:1 114:6
  153:11 155:18,19
  155:20 213:2
  274:18
papers  230:5
  266:16
paragraph  17:7
  20:2 30:14 31:21
  32:15 45:18 53:10
  72:18 89:14
  111:24 114:13,14
  129:23 132:17
  139:12 149:9
  151:13 152:12
  158:4 173:23
  186:22 270:23
  272:5
paraphrased
  231:2
pardon  152:23
parentheses  46:3
park  2:14
parks  196:5
part  15:11 30:24
  65:22 108:8
  109:17 162:1,15
  172:3 176:9 180:1
  213:8 224:2 246:8
  283:3
partial  130:3
  157:16 158:10
  167:7,11,15,21
partially  169:10
participants
  228:15 229:5
participate  200:3
particular  8:19
  45:23 214:23
  222:21 243:11,18
  286:19 290:24

particularized
  292:10
particularly
  277:13 312:4
parties  5:15 7:9,15
  79:13 86:21
  110:22 130:1
  132:22 137:12
  229:19 317:15,18
party  6:8 70:3
  229:20 266:8
  305:12 306:21
  309:23
pass  200:22
passage  251:21,24
  252:6
passed  113:2
  200:13
patchwork  295:19
patently  25:13
pattern  197:8
patterns  257:9
  279:2 311:22
  313:18
paul  296:20
pause  9:2 93:1
  102:8 189:11
  213:22 298:20
pay  31:6 54:24
  55:10 105:7
  140:18 189:9
  204:12 256:21
  260:24 261:18,19
  279:21 281:12,24
  282:11,15,21
  283:4 310:4
paying  76:19
  108:13 109:2,6
  129:17 138:22
  139:5

**payments** 108:5
110:23
**pays** 88:1
**peer** 101:16,18
156:3 241:9
269:20
**pen** 298:18
**people** 28:21,22
29:8 38:21 41:9
51:5 76:9 96:12
112:18 113:2
120:19 124:15
126:6,15,16,18
127:6 128:17,20
133:19 141:4
143:17 144:20,24
148:19,20 150:2
164:20,22 168:18
173:8 176:18
189:8 198:10
200:2 204:11
205:2 208:4
221:10 222:7,10
222:22 223:1,4
224:3,4,8 227:16
237:3 257:7 291:8
294:17 314:7
**people's** 88:22
**perceive** 207:23
**percent** 13:3 16:15
16:17,21 20:7
31:24 32:5,23
33:10 65:11,12
66:17,19 178:23
179:1,5,14,14,17
180:8,9 181:18
222:15 312:15,16
**percentage** 32:18
296:8
**perchloroethylene**
303:2

**perfectly** 277:21
**perform** 17:21
94:23
**performance** 1:8
5:21 6:14
**performed** 20:18
20:24 23:9 27:11
32:17 35:1 76:6
81:22 85:18 86:7
96:18 293:2
**performing** 95:1
97:21
**performs** 44:6
97:8
**period** 78:18 80:7
82:3,17 88:20
101:2 115:18
199:1 206:13
288:20 300:19
**periodic** 84:13,19
85:3
**periodically** 85:5
**periods** 293:23
**permanent** 129:3
**permit** 272:14
**permitted** 99:16
**persistent** 31:2
**person** 19:12 61:7
109:1 203:19
204:18 207:22
214:23 226:3
287:11
**personal** 112:11
112:22 184:24
217:5 218:15
239:15 258:22
**personally** 145:5
192:13 313:14
**persons** 1:5 188:9
**perspective** 59:21
128:14 129:5

134:12,23 135:6
**pfcs** 296:15
**pfoa** 68:7,16 70:9
70:15,17,19 71:13
139:23 140:22
142:15 145:20
159:23 162:2,17
163:18 164:12,13
164:19 165:9,10
165:15 167:8
168:12,14 186:14
186:16 201:24
202:24 203:2
214:4 235:15,21
238:18 242:8
253:18 258:19
259:10,13,20,21
260:3 286:17
287:4,8,18 288:5
294:22 298:23
299:9 305:13
306:21 307:1
309:13 310:8
311:2 312:21
**ph.d.** 4:1
**phase** 79:7 161:11
**phillips** 2:22 3:21
6:18,18 10:20
11:10 181:4
216:24 220:21
230:20 231:2
265:13 272:6,19
275:22 284:12,19
**phillips's** 270:5
**phone** 113:4,8
**photograph**
192:16
**photographing**
192:22
**physical** 127:5

**physically** 68:23
70:24
**pick** 5:10 126:10
**picked** 258:15
**picture** 15:1
192:23
**pictures** 192:22
**piece** 15:9 86:2
109:3 114:6
**pin** 182:11
**pipe** 127:14 142:8
142:11
**place** 5:12,15 7:6
137:1 287:22
303:15
**placed** 84:1
**placing** 310:19
**plain** 217:4 219:14
219:19 245:22
**plaintiff** 82:11
87:5 132:20 133:3
135:19 146:22
154:12 156:24
171:5 184:23
250:8,10 252:8
**plaintiff's** 73:24
248:20
**plaintiffs** 1:6 2:9
6:22 7:12 14:3
53:13 54:24 67:10
67:20,24 72:22
73:10,13 75:6,7,14
75:23 76:8,23
77:2 87:11 133:6
154:18 155:11
156:4,18 157:3
175:15,21 176:10
176:12 177:3
182:23 184:6
185:3,8,18 209:12
209:14 216:10

228:6 231:14
232:18 234:20
236:17 243:1,13
243:18 244:10,20
245:6 247:10,13
247:17 249:1
251:7,23 254:10
254:14,23 255:12
262:21 263:16,24
264:6,15,18,24
265:3 275:14
283:24 312:13,20
**plant** 210:4
**plastics** 1:9 5:21
6:15
**pleasant** 2:5
**please** 5:9,11 6:24
8:6 195:8
**pleased** 315:21
**plot** 278:22
**plots** 279:1
**plowed** 102:22
**plumbers** 111:20
**plume** 176:1 209:6
286:20,24 287:2
294:20,22 312:6
**plus** 90:24 91:1
**poet** 70:5 71:3
125:6 128:8,9,10
129:16 132:21
133:3,7 137:18
138:6
**poets** 67:12 71:9
120:12 121:20
124:15 125:6,24
126:15,18,24
127:9,11 129:18
138:23 139:6
**point** 21:21 27:7
31:16 37:10 47:22
54:12 106:23

107:3 116:1
119:11,12 121:8
150:4 151:2,3,4
188:10 224:4
252:18 286:21
288:23,23 289:9
290:14 298:14
**pointed** 26:18
144:3
**pointing** 46:23
54:10 200:7
**points** 141:7
**policy** 131:22
144:23
**poor** 204:24 235:5
**population** 21:18
26:19,21,22 27:15
28:11 29:19
**portion** 18:6 26:19
26:21,22 27:14
29:18
**pos** 245:22
**position** 54:15
160:11 163:16
**positive** 290:6
**possibility** 121:5
126:5 138:6
**possible** 30:22
55:11 70:9 77:14
77:15 119:5
123:14 130:16
166:18 182:5
**possibly** 238:24
**post** 236:3
**potential** 122:6
125:4 147:24
153:11 199:14
202:13,24 238:21
267:3 283:1
310:11

**potentially** 204:7
**power** 210:3
**practical** 203:15
203:18 206:1,9
279:6
**practice** 151:19
311:15
**preceding** 132:17
**preclude** 147:19
149:19
**precluded** 71:4
**predictable**
165:23
**predicting** 277:21
**prefer** 13:20 129:5
256:5 285:12
**preference** 128:17
268:13 285:1,14
**preferences** 146:7
147:18 148:3,18
148:22 149:18
**preferred** 143:17
145:8,23 150:5
**prejudicial** 193:21
**premarked** 9:4
**premise** 155:17
**prepared** 162:2
248:18
**preparing** 268:10
**prescient** 55:19
**prescribed** 317:8
**presence** 20:8,9,12
30:1 173:3,15
218:3 285:24
286:6 294:7
302:22 303:6
304:10 307:19
311:1 312:21
313:19
**present** 2:22 6:10
101:3 174:6 179:9

194:1 215:7 248:1
287:4
**presentation**
96:11
**presented** 66:23
114:19,22 272:1
**presents** 91:22
270:24
**press** 184:20
**pressure** 42:14
85:4 111:18
125:22 140:12
142:10
**presumably**
141:19 160:20,21
161:19 228:24
300:15
**presumed** 304:24
**pretty** 91:21 109:1
129:13 234:12,16
251:15 298:1,3
**prevented** 141:4
**previous** 43:1
58:21 74:18 76:14
121:13 134:15
163:7 173:24
**previously** 7:20
53:13 60:4 69:15
70:22 89:20 115:6
115:15 151:16
153:16 161:7,10
166:22 203:24
**price** 13:19 16:3,4
22:24 112:3 174:3
189:18 204:17
226:7 231:22
241:1 266:9 268:5
274:7 278:15,20
281:15 291:17,21
296:11 300:12

**priced**  61:18 90:21
**prices**  98:6,12
  196:23 197:2
  205:1 226:1
  237:17 240:12
  258:15 268:6
  275:7,12 287:21
  287:23 288:14
  289:11 296:8
**pricing**  97:16
  115:22
**primarily**  89:7
**primary**  207:2
  291:1
**prince**  135:14,21
**printed**  9:15
**printer**  182:15
**printouts**  9:10,13
  182:14
**prior**  38:22 116:4
  140:21 142:15
  162:17 180:2,14
  183:13,14 207:24
  212:13 215:20
  300:11
**private**  5:10 18:7
  20:8 21:4 31:17
  53:14 60:3 89:20
  148:2 154:18
  155:11 156:4,18
  290:13
**pro**  118:20
**probably**  10:16
  60:23 77:12 80:5
  101:23 113:14
  138:3 212:21
  225:10 237:17,18
  238:1 257:23
  267:18 275:4,5
  298:7 301:21

**problem**  7:8 24:2
  38:17 99:21 161:6
  161:8 168:9 169:7
  188:7 224:2 227:1
  227:6 266:18
  269:18 270:3
  302:3 303:10
  310:3 315:5
**problems**  72:19
  73:5 85:8,9 87:8
  87:14 205:10,11
  224:2 257:11
  258:13 300:16
**proceed**  26:6
**proceeding**  73:23
  81:8,23 82:20
  83:8,15 85:13
  88:8
**proceedings**  316:8
  317:13
**proceeds**  44:18
**process**  73:17
  74:12 75:13 76:7
  160:1 192:2,11
  224:17 230:8
  234:4 251:12
  254:7,9
**processes**  78:23,24
  79:1 186:23 187:6
  188:2
**processing**  209:16
**produced**  91:15
  297:14 317:12
**profession**  167:24
  302:5
**professional**
  254:24 255:3
  311:13
**proffer**  181:10
  246:13

**proffered**  249:18
**program**  79:14
**programs**  79:10
  304:3
**project**  211:20
**projects**  4:5
  153:10,13 158:21
  159:12,22 160:1
  161:24 162:14,23
  163:17 166:2
  167:4 168:4,11
  171:4,9,11,24
  172:16
**pronounced**
  211:11
**proper**  28:14
  34:19 35:11 44:22
  45:1 99:3 125:2
  160:22 174:5
  259:1
**properly**  95:10
  211:11 273:13
  288:12
**properties**  104:24
  112:7 123:18
  147:20 149:20
  172:7,8 184:9
  186:13,15 187:1,7
  188:4 189:5,7
  191:11 192:14,17
  193:24 194:10,23
  215:20 228:10
  251:7 255:11,15
  266:14 268:2,6,7
  269:5,24 271:2,6
  271:17 272:3,15
  272:20 273:14,23
  273:24 277:17
  278:9 279:9 285:1
  287:6,8 291:14
  295:6 305:13,19

  306:7 309:1 311:4
  312:16,22
**property**  10:21,22
  15:2 68:18,19
  69:2,5 70:10,11,14
  70:20,21 89:18
  93:17 104:5,7,14
  104:17 148:14
  149:2 171:24
  172:1,23 174:2,4
  178:1 182:19
  183:2,18 184:16
  184:24 185:1,9,11
  185:20 186:2,11
  186:21,24 187:10
  188:6,20,24 189:3
  190:15,18 191:18
  193:2 197:22
  198:4,8 199:16
  205:18 209:11
  211:1 214:10
  216:8,16 217:2,5
  217:10,12 218:1
  218:11,15,18,23
  218:24 219:4,6,8
  219:10 220:4,5,9
  220:24 221:6,11
  228:8 230:18
  232:12,23 235:11
  235:15,17 237:4,7
  247:4 248:21
  255:18,22 256:2
  265:24 266:1,7
  268:4,18,22
  269:14 270:12
  271:3,19,19 273:1
  273:4,8 274:10,15
  275:1,17 280:22
  281:8,10 282:6,6,8
  283:9,11,15 287:4
  287:10,17 291:24

296:2,7,11,14
299:2,6,21 300:1,2
300:4,11 301:6,18
302:1 303:7,15
304:8 305:2 307:9
307:18 310:7,15
313:18 314:11
315:9
**property's** 248:22
249:5,6 289:14
**propertywide**
286:15
**proportion** 21:18
27:17 28:11 29:16
31:17,19
**propose** 77:24
**proposed** 38:4
46:1 48:7 49:8,13
53:12 57:13 89:19
125:8 162:15
172:13 192:14,17
192:19,24 193:4
194:1,13,22
199:16 271:2
279:10 285:2
286:12
**proposing** 171:15
171:17 199:13
200:6
**proposition**
112:13
**propter** 236:3
**protect** 136:14
**protected** 170:4
**proved** 150:4
**proven** 153:10
**provide** 8:23 21:8
27:16 41:10 49:11
157:16 158:10
164:7 165:20
184:23 239:17

241:22 274:14
278:7
**provided** 3:16,19
9:13 25:16 90:18
92:2,10,19,23 98:7
139:3 140:20
151:16 156:7
168:3 204:21
205:16 208:9
262:11,14 317:7
**provides** 165:23
248:19
**providing** 27:23
28:7,10 270:9
**proximate** 143:11
**proximity** 284:21
287:24 288:4
**prudent** 136:14,17
138:5 306:2
**public** 128:20
129:4 136:16
147:15 148:11,15
152:19 155:2,4,23
156:22,24 157:2,4
170:8 173:1,11,14
173:19 196:5
202:22 230:21
231:13 238:22
239:3 242:19
285:21 317:11
318:17
**publications**
101:16,19 156:3
**publicly** 187:15
198:20 232:3
243:3,14 245:7
249:20 250:2
251:8 285:16,20
**published** 213:2
230:5 258:6
269:21 270:6

**pull** 63:3
**pulled** 199:4
**pump** 42:14 60:12
61:17 62:12,13
80:3,11,16,22
81:15,21 85:16
105:8 111:20
115:7 116:13
198:12
**pumped** 119:6
**pumping** 114:20
**pumps** 111:18
115:18
**purchase** 21:19
31:4 134:13
190:17 281:19
284:17
**purchased** 18:6
266:8 279:19
280:7
**purchaser** 288:7
**purchases** 132:21
174:5
**purchasing** 133:14
134:2 257:15
**purely** 136:2
**purport** 18:15
**purported** 33:14
33:19 37:7 42:23
43:17,21
**purporting** 65:15
264:2
**purports** 47:17
**purpose** 32:15
35:17 58:8 268:15
268:24 269:11
271:7 272:15,21
275:19
**purposes** 22:4
35:12 125:10
164:23 183:1

184:16 199:14
228:11 275:16
283:16 305:18
308:16
**pursued** 25:12
**pursuing** 229:13
**put** 22:7 23:4 63:7
63:15 77:5 92:8
98:18 99:9 108:16
108:16 121:18
182:11 196:4
287:21 291:17
**putative** 21:10
29:11 32:11 56:5
56:6,18,21 60:11
61:14 65:17 68:8
68:17,18 79:24
102:16 104:1
106:18 107:13
116:9 118:3
133:20 172:1,9,12
186:7
**putting** 38:21 58:5
127:12 187:11
198:11

---
### q
---

**qualifications**
213:16
**qualified** 185:4
214:4,10,12 215:1
215:4 216:11
244:10,11,19,23
244:24 247:3,6,18
247:22 260:5
**quality** 125:19
130:22 159:17
160:3 163:1 164:4
165:21 226:19
269:2,14
**quantifiable** 54:24

**quantify** 14:2
164:10 165:7
167:22 168:1,23
**quantitative**
214:24
**quantitatively**
256:8
**quantity** 125:3
164:4 168:9
**quarterly** 69:3
**question** 8:20,22
12:15 15:24 25:24
35:9 50:12 51:2
59:20 64:12 68:5
68:13 69:1,8 72:2
73:8 81:11 94:23
107:4 113:15
114:7 135:23
136:4 138:7,21
140:15,16 141:2
143:22 144:4
145:18 146:18,21
149:24 152:24
157:7 162:5,21
165:2,5 166:7
177:24 179:12
225:21 243:5
247:15 256:15
282:16 285:18
288:9 295:21
299:3 302:2,15,17
**questioned** 116:2
**questioning**
248:10
**questions** 8:16
22:8,8,12 23:13
24:6,23 25:6,8,21
26:7 66:8 98:16
98:19,23 99:3,23
114:15 156:14
160:22 161:16

228:18,20 315:22
**quick** 315:11
**quite** 71:21 83:13
165:15,18 297:6
**quote** 39:13
271:12 272:12
273:7
**quoting** 57:24

**r**

**r** 5:1 277:19,23
317:1 319:1,1
320:1,1
**radon** 21:5 30:15
31:1,11,18 32:2,7
**raise** 73:5 159:17
**raised** 63:12 87:14
161:7
**raises** 72:19 87:9
**range** 62:5,22 64:2
64:22 65:2 116:20
117:9 259:9
266:17
**ranges** 312:15
**rate** 48:12 55:10
55:13 85:10
105:19 112:8,17
112:19 113:17
174:5,8 190:23
229:21
**rates** 106:11 145:2
237:19
**rational** 16:1
93:13,19 94:13
97:16
**reached** 121:18
151:15
**read** 9:8 11:11
12:13 13:5 17:10
18:8 20:13 30:18
32:3 36:4 39:18
42:19 46:12 49:15

53:16 60:9 61:24
67:13,16 68:1
69:12 72:23 90:3
94:3 112:9 115:1
120:16 130:7
132:24 139:24
148:6 151:22
153:18 158:13
171:6 174:9,17
175:11 183:3
184:2 187:3 217:7
219:20 221:1
230:24 231:3
234:18 271:9
272:10 273:17
286:9 288:2,9,16
301:10 311:5,9
318:3
**reading** 219:14,19
**readings** 69:2
**ready** 71:22
**real** 12:16,19
109:16 137:13
189:18 196:7
198:16 199:21
217:5 218:14
222:8 226:2,6
231:19 237:19
269:14 273:7
282:5 285:14
292:16 293:13,23
**reality** 102:16
**realize** 204:1,6,7,9
**realized** 206:2
**reallocates** 83:1
**really** 87:13 149:3
163:12 228:11
234:23 242:20
245:24 278:14
302:3 315:1

**realm** 121:5
**realtime** 317:3
**realtor** 190:7
226:4,5 284:2
**realtors** 226:8
**reask** 25:21
**reason** 45:3 61:8
130:5 131:5,14
132:8 135:3
204:16 246:24
257:10,13,16
308:11 319:2
320:2
**reasonable** 27:21
33:23 55:21 64:8
82:9 86:17 93:24
118:15 127:20
134:21 135:4
137:19 163:8
164:2,6,12 165:9
165:20 166:12,24
167:5 168:21
185:4 186:4
200:19 224:18
231:23 237:3
240:16 284:14
314:7
**reasonably** 7:21
25:17 58:17 61:18
240:6 268:2
**reasons** 256:16
301:15
**rebound** 71:14
287:21 289:11
**rebuttal** 3:15,18
7:12,16 9:11 10:4
10:8,9,15,19,22
17:4 22:2 25:3,7
25:18 27:6,9,22
28:3,7 30:13
31:15 35:19 42:11

43:8,12 49:5 53:8
58:1,3 63:8,10,16
66:10 71:17 72:15
81:7 89:12 93:3
93:10 98:20 99:2
99:18 102:4 107:8
111:23 120:8
129:21 139:10
151:11 157:12
158:3 160:12,16
160:20,21 161:1,9
161:18,20 173:21
177:21 181:2,14
182:18,21 183:15
186:21 193:1
216:16 230:17
301:22
**recall** 118:13
203:10 209:3
**receive** 19:7
163:15
**received** 92:1
159:21 212:5,9
**recess** 40:12 53:3
72:10 138:16
201:14 262:4
315:17
**recession** 258:14
**recitation** 117:5
**recognize** 108:23
**recognizing**
305:24
**recommendations**
124:1,12
**recommended**
33:4
**recommends** 33:7
**reconstruct** 92:4
**record** 5:7,16 6:12
7:6 8:5,12,17 22:7
40:5,11,14 52:24

53:2,5 58:6 67:16
72:7,9,12 92:8
98:15,18 99:5,10
99:23 116:1
138:15,18 147:11
181:11 201:13,16
262:3,6 315:16,19
316:5 317:12,13
318:6
**recorded** 5:18
20:5 317:6
**recording** 5:14
**records** 241:18
**recover** 136:13
198:5 229:14
260:19 288:14
289:2
**recoverable** 135:8
136:2 137:4
**recovers** 289:4
**recovery** 260:17
261:6,13,21
**recreate** 91:20
**redfin** 232:1
239:16 241:8,22
243:2 249:7,23
250:2,15 251:9
**reduce** 93:21
95:13 96:5 97:8
**reduced** 96:19
**reduction** 42:17
97:11 177:19
196:19 205:3
259:15
**reexamine** 7:16
160:17 161:3
**refer** 10:7,13
110:13 227:17
**reference** 107:6
231:17 301:4
302:8

**referred** 10:1
22:15 208:8
238:22 249:19
250:1 270:10
284:20
**referring** 10:21
15:10 30:15 73:1
95:7 111:9 270:15
**refers** 133:2
**refinance** 206:5
**refine** 177:18
285:8,10
**refinery** 208:19,24
209:6
**reflect** 33:1 50:23
66:20 98:7
**reflected** 55:7
296:7,11
**reflecting** 249:11
**reflective** 82:4
205:15
**reflects** 125:15
179:5
**regard** 34:5 44:16
159:8 162:9
176:23 194:22
197:1 214:1
217:18 247:18
263:11 310:14
**regarding** 17:1
191:12 212:6
216:24 267:16
**regardless** 234:4
309:2
**regime** 303:13
**regional** 211:1
**registered** 317:2
**regression** 273:12
273:20,21,23
274:2,5,13,23
275:6,20 276:15

277:4,20 278:6,16
278:17 279:8
**regressions** 277:11
**regular** 93:6
**regulated** 70:3
**regulations** 153:4
190:2
**regulatory** 303:12
303:22 304:2,22
305:1,14 306:22
307:11,24 309:4
310:9
**rehabilitate** 153:7
**rehashing** 161:9
**reign** 25:21
**reinterpretation**
39:12,14
**reject** 47:14
**rejecting** 59:8
**rejects** 58:9
**related** 6:7 25:17
70:16 164:13
165:10 236:9
317:15
**relates** 40:22
106:24
**relating** 181:8
**relationship** 274:6
**relationships**
277:24
**relative** 20:21
64:23 97:4 223:18
237:21 266:9
317:17
**relatively** 196:23
**releases** 152:20
**relevance** 181:11
225:1
**relevant** 22:4
23:17 26:2 64:13
65:1,7 66:9

136:19 137:15,19
142:2,16 143:2,16
144:8,9,17,20
145:7,21 146:17
146:20,23 147:1
150:8,21 154:4
155:24 162:8
183:20 235:7
259:21 289:15,18
290:2,5,8 299:4
300:20
reliability  160:2
163:1 227:2 230:5
237:1 238:12
243:23 263:12
277:3
reliable  51:12
164:4 165:23
166:18 176:23
177:5,9 220:6
223:9 224:7
226:16 233:18
238:10,20 240:6
241:21 243:13,18
245:9 246:11,17
246:22 254:14,21
255:1 265:9
reliably  217:1
reliance  91:15
92:11,18,22,24
reliant  53:14
relied  89:20
221:24 222:5
240:6,10
relief  22:11 130:5
131:5,15 132:2,8
132:14
rely  13:15 138:3
198:18 223:7,11
224:9,12 240:17
240:22 245:7

246:4,10
relying  18:4
227:21
remain  120:12
126:15,24 127:9
138:24 145:23
remaining  126:18
remains  125:18
remedial  305:12
remediating  127:5
remediation  39:7
39:19 42:1 49:20
49:21 50:2,9
124:3,15 125:5
remedied  45:20
121:7 197:23
198:6
remedies  38:1
remedy  38:6,8,15
38:17 50:7 71:10
127:1,4 130:16
135:1,2 137:11
198:9 287:21
289:10,13
remedying  165:15
remember  69:24
116:6 121:15
210:9 280:4
remove  165:16,17
removed  38:2
289:12
render  19:23
45:22 278:3
rent  104:18
205:22
rental  206:13
renting  104:8
repaint  281:2,3
repairs  164:10
165:7

repeat  149:12
165:4 180:17
198:19,20 200:21
215:18 267:12
repeated  99:2
240:23
repetitive  22:12
22:22
repetitiveness
163:21
rephrase  262:12
replace  80:10,15
81:14 96:1 103:12
103:19 108:2
153:7 281:6
replaced  169:1
replacement  15:20
42:14,15,15 80:3
80:22 81:21 82:19
83:12,13 151:15
154:17 157:13
169:11 170:14
173:9
replacing  62:11
85:4 96:21 156:6
replow  99:17
replowing  81:2
report  3:16,24
9:20 10:1,10,13,18
10:22 13:2 16:14
17:12,24 20:1
21:8,22 22:2,14,15
23:19 25:18 27:6
27:9,16,23,24 28:3
28:5,7,8,15 30:13
31:15,21 32:19
35:20 36:9 37:11
37:15,23 39:14,16
39:23 40:2,16
41:13 42:7,8 43:8
43:9,12 44:11

45:2,14,16 46:9,24
47:3,13 48:5,24
51:21 54:14 58:1
58:3 63:8,13,16
64:6 65:4,10 81:7
85:9 90:5 91:4,10
91:14 92:10,17
93:3 98:21 99:1,2
102:3 106:23
107:8 112:16,23
113:11,15 114:3
114:23 117:12,15
121:16,23 122:1
125:15,16 128:9
133:2 140:11
141:13 147:10
149:10 154:16
155:7,14 157:13
157:20 158:2
160:13,18,20
161:1,9,18 162:15
165:14 167:2
168:19 169:16
170:19,22 171:1
177:21 178:6,11
178:13,22 179:1
180:11,15,24
181:3,9 183:6,13
183:15,15 208:14
209:2,4,18,19
210:6,7,16,18
211:17,18,22,23
213:1,4 220:17
222:4,7,22,23
223:1,5,6,8,12
224:5 229:1,6
232:1 236:24
237:14 239:20
250:1 267:19
268:9 270:5
271:11 273:6

284:11 285:23
290:15 296:12
297:12 298:2,11
300:23 310:24
311:19 315:22
**reported** 220:20
221:4,15,18,23
223:22 224:13
225:5,24 226:15
227:20,22 228:2
230:1,11,14
239:10,12 248:21
248:23 250:24
251:6 252:13,24
253:22 312:19
**reporter** 1:20 6:5
6:24 8:17 9:3
152:7 248:14
317:3,3,24
**reporter's** 8:21
**reporting** 239:22
253:2
**reports** 3:19 7:14
7:22 11:1,6 24:12
24:13,17,18,19
25:4,7,10 79:5
81:3 83:20 106:24
121:13 124:24
125:17 130:10
139:18 179:3
181:4,14 196:10
196:14 224:10
234:18 249:16
250:5
**represent** 9:14
113:12 212:3
248:17 258:16
312:7
**representations**
253:9

**representative**
75:4
**represented**
118:10
**representing**
118:23
**represents** 14:24
59:23 84:7 119:2
175:15
**request** 92:13
**requested** 21:3
92:22 317:24
**require** 125:23
130:4,18 131:3
155:18 305:11
306:7,20
**required** 115:9
152:18 171:11
287:11 289:7
301:6 310:14
**requirement** 70:2
**requires** 200:22
287:13
**research** 219:22
252:4
**researched** 196:7
**researchers**
221:12
**residences** 147:22
148:2 168:16
**resident** 23:2 31:5
115:5 118:1
140:18 142:3,16
**residential** 55:12
93:16 104:5,7,13
104:17,24 164:23
194:4,4 220:24
221:6 305:18
311:4 312:22
**residents** 17:15,20
18:3,5,11,18,20

30:16 31:10,12
32:5,11 40:17
41:1 120:11
126:24 139:15,19
139:21 140:4
143:2 147:22
148:1,1,4 164:7
217:1 218:22
230:22 294:23
**residuals** 278:22
279:1
**resource** 153:21
153:22 154:18
155:10 173:2
306:3
**resources** 152:16
152:20 153:5,8
154:8 155:4,5
168:2
**respect** 24:10 64:2
64:13 125:9
151:15 184:7
188:18 247:9
306:6
**respectful** 225:14
**respond** 81:4
118:15
**responding** 34:4
181:4
**response** 8:23
136:20 149:24
306:23
**responsible**
221:20
**rest** 19:21 41:13
170:5
**restoration** 4:5
152:18 153:10,12
**restore** 153:6
155:3 158:24

**restoring** 156:21
**restriction** 187:11
**restrictions** 69:16
**resubmit** 30:4
**result** 41:22 49:12
52:1 103:20
173:15 186:2
210:24 214:4
287:23
**resulted** 49:19
**results** 69:18,24
216:1 292:13
**retained** 209:9
**return** 126:6
**reveal** 76:8
**revealed** 128:17
146:9,11
**revealing** 310:20
**revenues** 140:10
**review** 260:7
313:13 317:24
**reviewed** 33:24
101:16,18 156:3
241:9 267:15
269:20
**revisit** 315:12
**revisiting** 24:5
**rhode** 210:3
**rid** 230:8
**right** 27:12 30:3
49:3 80:17 81:16
91:2 94:4 96:9
99:6 114:2 116:5
122:15 123:11,14
123:22 126:23
159:5 176:19
183:16 196:3
214:22 215:13
218:12 219:3
222:15,17 225:19
231:1 236:15

240:24 245:19
246:23 265:2
271:15 295:16,17
311:9 312:10
**rigorous** 33:21
**rising** 287:23
**risk** 273:11 310:20
**risks** 38:18 294:16
294:17
**river** 210:22
**rmr** 1:20 317:22
**roads** 195:21
**robert** 1:13 3:5,11
3:14,23 5:18 7:1
8:7 211:19 316:7
317:4 318:10
319:24 320:24
**rodeo** 8:9,9
**room** 6:11
**rory** 2:13 6:16
**rory.gledhill** 2:19
**rounds** 69:3,17,24
**row** 252:8
**rpr** 1:20 317:22
**ruggieri** 1:20 6:5
317:2,22
**rule** 131:15 161:15
**rules** 8:11 148:23
192:7 265:21
266:2 288:24
309:18
**run** 80:13 277:11
**running** 130:20
211:3

**s**

**s** 2:5 3:9 5:1 319:1
320:1
**safe** 67:21 137:18
**saint** 1:8 5:21 6:14
6:17 38:1

**sake** 8:21
**sale** 192:9 198:19
198:20 200:21
206:3,24 226:2
238:3 258:9 283:3
**sales** 190:15 192:3
196:19 197:9,15
198:21 201:20,21
202:1,14 203:2,8
215:10,14,18,19
215:20,20 239:6
239:20 267:3,10
267:12,14,23
276:18
**salvage** 86:23
110:2,7,13 111:1,2
111:5,13
**sample** 30:5 255:2
255:5
**samples** 20:6,7,20
27:5
**sampling** 20:11
69:4,17
**satisfactory** 317:7
**savings** 40:22 41:5
41:12,21 42:1
50:21 51:6 52:1
52:16,20 77:5
89:22 93:15
135:13,20 140:8
140:10 141:21
**saw** 96:13
**saying** 16:15,23
38:10 39:5,20
44:5 56:15 57:8
58:13 59:5 60:13
69:21 73:15,19
74:8 77:11 96:10
97:1,15,19,20
109:14 121:1
127:8 128:2

130:15 131:8
143:23 148:12
180:10 206:18
225:17 235:9,11
235:14 236:9,16
243:7,17,19 244:1
244:5 245:18
246:9,24 261:7
289:8,10 306:16
307:15 314:3,4
**says** 7:3 13:2
16:14 17:7 18:1
20:3 28:21 30:15
31:22 35:24 37:11
38:8,14 42:12
45:18 48:6,9 49:8
53:10 54:23 58:11
60:3 67:10 68:5
72:18 81:14 83:10
89:15 90:15
111:24 114:13
120:9 126:15,23
129:23 132:18
139:12 151:14
152:14 153:3
158:7 171:3 174:1
178:22 179:2
182:22 199:19
216:23 220:18
226:6 242:7
245:23 253:17
270:24 277:20,20
286:4 287:20
294:15 303:7
304:19 307:22
310:12 311:1
**scale** 169:6 228:12
256:1,6
**scaling** 4:3 153:9
**scarcity** 153:15

**scattered** 71:21
**schedule** 112:3
**scheme** 19:19,20
19:21 78:10 86:18
**schemes** 86:3
**school** 190:22
204:23
**schools** 202:13,23
204:24 205:4,10
205:11 219:5,9
**science** 175:9
177:15,17 301:9
302:13,14 305:8,9
310:2
**scientific** 33:15,20
34:11 302:2
**scientist** 34:19
**scope** 15:15,19
24:7,10 237:14
238:2
**screening** 230:8
**se** 118:20 227:3,7
**search** 298:15
**second** 17:24
31:21,22 79:7
108:22 109:17
129:22 139:11,12
152:15 153:2
158:7 168:14
171:2 172:24
173:22 186:21
193:3 230:18
242:16 270:7
274:19 310:24
**section** 15:23
17:12 46:5,9 48:6
58:9 178:19,24
307:16
**security** 160:2
**see** 16:24 30:4
71:14 91:4 94:14

99:8 121:23
124:21 144:1
147:2 163:3 164:1
175:6 195:16,18
197:9,11 199:3
239:6 240:12,22
241:20 274:10
278:22 295:12
296:10 306:13
**seeing** 68:9 70:15
141:16,17,24
282:6
**seek** 145:24
**seeking** 22:10
167:24 182:24
183:17 184:6
185:10,18 275:15
**seen** 249:13
294:12 314:9
**selected** 55:12
148:1 166:24
**self** 220:20 221:4
221:15,18,23
222:4,7 223:5,6,8
223:12,22 224:5
224:10,13 225:5
225:24 226:3,15
227:20,22 228:2
230:1,11,14
239:10,12 248:21
248:23 250:24
251:6 312:19
**sell** 31:1 111:8
207:9 288:19
**seller** 291:22
310:4
**seller's** 310:7
**selling** 257:2,15
260:9
**semantics** 50:14

**send** 23:1,2,3
252:5 298:16
**sense** 164:17 247:6
257:9 293:12
**sensitive** 5:10
**sent** 220:2
**sentence** 20:3
30:15 31:22 53:9
57:24 72:18 74:17
89:14 126:14,23
129:22 132:16
139:11 151:12
152:15 153:2
158:7 171:2
173:22 182:21
184:2,11 186:21
221:3 230:19
310:24
**sentences** 39:17
**separate** 73:23
114:5 181:17
265:18 277:10,11
300:14
**separately** 300:15
**september** 1:14
5:8 317:5
**series** 227:8
**serve** 275:19
**served** 24:11
147:23 180:23
181:2
**service** 156:6
204:19 206:11
294:21
**services** 151:16
157:17 158:11,24
164:20 204:10,11
205:16 206:17,20
**session** 160:10
**set** 19:21 24:4
53:11 56:9,10,14

56:15 57:12,18
58:15 60:6,16
73:11 79:13 131:9
161:17 192:6
242:5 265:21
266:1,2 273:23
274:7 292:22
**sets** 13:12 256:1,6
256:7
**settled** 209:5
**settlement** 78:24
79:13 209:21
**seven** 13:3 16:15
16:17,21 178:23
179:1,5,14,17
180:8 181:18
195:24
**shallow** 77:13
**share** 73:24 74:13
240:2 273:14
279:10,14,15
**sheet** 261:1 318:5
**shifting** 139:15
**short** 36:1 151:13
**shortly** 197:18
**show** 100:24 175:4
197:1 286:22
**showed** 69:17
143:14 196:18,21
196:22
**shown** 114:16
309:23 313:17
**shows** 116:20
117:9,15,18
146:11 242:13
312:14
**sic** 46:15 48:16
211:7
**side's** 34:13
**sides** 108:10

**signature** 317:21
**significant** 24:22
56:22 77:3 198:7
**significantly** 67:3
67:6 261:11
**silly** 136:4
**similar** 55:1,4
108:11 115:19
187:18 188:9
189:24 190:21,21
190:22,22,23,24
191:13 237:21
239:16 268:3
273:15 279:10,14
291:8 294:5 296:6
311:3,24 312:1,3
312:22 313:7,12
**similarities** 58:16
61:9 279:16,17
**similarity** 184:9
187:20 191:4,5
**similarly** 1:5
188:8 239:7
273:15 279:11
**simple** 16:9 91:21
96:11 109:8
179:12 234:13,16
235:1 304:7
**simplify** 95:17
**simplistic** 278:14
**simply** 33:10
47:13 84:7 117:4
131:15 171:3
188:10 206:21
208:3 304:8
**single** 39:17 82:16
113:14 114:7
190:12 194:4
299:18
**sir** 146:8

**sit** 122:15 127:19 267:1
**site** 50:8 286:6,8 290:1 293:10 294:9 296:6 299:12
**sites** 239:17 292:7 293:7,8,9
**sitting** 69:23 91:2 116:6 139:2
**situated** 1:5 239:7 273:16 279:11
**situation** 59:11 102:17 158:19 163:4 200:11 205:6 229:13 233:23 234:2 239:14 260:6 306:4 307:8
**situational** 279:16 279:16
**situations** 223:20
**six** 312:16
**size** 148:24 190:23 194:24 195:3,19 195:19 279:21,24 280:11,15 289:15
**sizes** 195:2
**skeptical** 285:11
**slander** 231:9,10
**slated** 138:24
**slightly** 19:15,16 27:19 309:6
**small** 31:17,19 255:2,6
**smaller** 19:15 53:24 75:7
**society** 269:1
**softener** 23:8 27:1 28:23 29:5,8 40:18 42:15,16

44:1 51:23 52:7 61:4 76:18 105:8 119:20
**softeners** 61:1 65:12,16,21 66:17 66:20 75:24 76:10
**soils** 165:17
**sold** 204:6
**sole** 237:6
**solely** 304:8,17
**solution** 121:2 123:15 129:3,3
**somebody** 77:14 80:12 241:16
**someone's** 203:16 222:4 223:22 231:8
**somewhat** 289:9 314:6
**soon** 307:2
**sophisticated** 275:10
**sorry** 33:3 46:18 68:14 104:15 118:9,24 151:11 152:23 174:12 216:19 235:16 248:15 253:6 301:1
**sort** 228:6
**sorts** 166:5 201:1 231:20
**sought** 140:5,20 239:9
**sound** 72:4 272:8 301:9 302:12,14 311:15
**source** 168:14 173:17 183:5 189:21 286:17 300:6

**sourced** 20:8
**sources** 112:15 153:16 166:1 198:18 199:4,5 232:1,4 243:11 250:3 254:20 300:7
**southern** 193:18
**space** 195:10 311:22
**speak** 65:4 109:5 283:23 284:2,4,7 304:13,15,16
**speaking** 192:4
**specific** 29:20,22 44:16 96:6 102:19 216:2 257:19 270:14 278:8 300:2 306:7
**specifically** 53:10 90:5 307:9
**spend** 95:19 127:13,13 172:15 200:18
**spending** 29:6
**spends** 93:12
**sperry** 2:3 6:21
**split** 66:3
**spoke** 78:2
**sport** 291:6
**sportfishing** 291:5 291:10
**spot** 257:11
**spots** 125:17
**spreadsheet** 100:24
**square** 191:6 289:17
**squared** 277:19,23
**st** 209:8 296:20

**staff** 232:6
**stage** 75:5 77:20 274:19
**stand** 27:20 37:22 39:23 40:1
**standard** 49:11 60:6,15 65:6 131:22,24 266:20 301:17 302:20 304:13,14,16 308:12,15,20
**standards** 166:8 301:22 302:4
**standpoint** 230:15 279:6 313:10
**stands** 160:11
**start** 11:6 72:1 153:1 156:15 162:21,22
**started** 7:7 80:17 81:16 178:16
**state** 6:11 8:6 21:5 22:24 27:6,13 28:20 33:7 99:4 130:3 131:9 152:16 154:7,11 155:18 220:3 268:9 270:5 284:14 285:23 296:21 298:9 299:13 303:8,11 305:11 306:20 308:1
**state's** 303:12
**stated** 7:22 39:3 64:7 98:20 130:9 140:7 157:12 160:12,19,24 214:9 268:12 276:5

| | | | |
|---|---|---|---|
| statement 3:11,13 | streets 141:9,10 | subscribed 318:12 | supply 46:4 |
| 3:15,18 13:4 27:4 | strike 63:10,11 | substance 302:22 | 148:15 149:15 |
| 37:19,22 39:19 | 161:16 | 303:14 304:21 | 210:15,23 |
| 74:7 121:12 150:1 | stringent 304:4 | substances 152:21 | support 101:16,19 |
| 154:24 174:22 | strong 242:4 | 303:3 304:17 | 101:22 213:12,13 |
| 183:6 221:9 | structure 79:17 | 307:24 | 213:15,16,18 |
| 256:11 304:24 | structured 105:14 | substantial 140:8 | 243:15 287:23 |
| 307:3 313:15,20 | studied 283:5 | 141:21 | supported 27:3 |
| 313:21,24 | 294:5 | substantially | 114:21 119:15 |
| statements 9:10 | studies 290:23 | 250:16,18 | supporting 228:11 |
| 81:7 98:19 318:7 | 293:7 294:11 | success 215:17 | supports 154:16 |
| states 1:1 5:22 | 295:9 296:5 | successful 125:2 | 163:16 303:21 |
| 36:20 37:7 99:15 | 311:18 314:17 | sue 137:12 | suppose 100:11,15 |
| 273:9 303:22 | study 20:16 27:6 | suffer 45:21 | supreme 211:2,3 |
| 304:2 | 287:20 291:6 | suffered 173:15 | sure 7:7,9 9:23 |
| stating 220:22 | 292:14,14 293:2 | 217:3 | 34:7 38:5 45:4 |
| 237:2 | 293:10,15 294:9 | sufficient 215:10 | 55:18 68:22 79:15 |
| station 294:21 | stuff 125:3 231:20 | 274:24 | 79:16 91:3 105:10 |
| statistical 13:13 | 305:10 | sugarman 1:15,15 | 120:24 124:8 |
| 230:15 313:9 | stumbling 311:7 | 6:2,2 | 129:14 139:3 |
| statute 217:9 | style 195:20 | suggest 26:6 44:11 | 140:14 164:16 |
| 218:13 219:7 | subclasses 65:3 | suggesting 94:7 | 169:15 172:13 |
| stay 145:8 | subject 48:17,21 | suggestion 93:12 | 182:7 189:9 194:2 |
| stayed 300:18 | 83:20 84:24 97:13 | suggests 90:9 | 213:20 226:3 |
| stemming 296:15 | 98:24 140:24 | 127:16 179:13 | 227:23 240:2 |
| stenographically | 154:22 213:24 | suitable 269:10 | 241:14 252:16 |
| 317:6 | 265:24 278:9,10 | suite 191:18 | 254:1 257:22 |
| step 17:23 19:24 | subjective 13:16 | suited 255:24 | 262:10 264:18 |
| 20:10 226:24 | 191:2,5,8,21,23 | 257:18 | 274:16 283:17 |
| steps 227:8 | 246:5 | sullivan 1:4 5:20 | 293:5 296:4 298:3 |
| stop 49:6 | submarkets | sum 47:11 | surface 165:21 |
| storing 153:14 | 277:12 | summary 95:1 | surprise 286:13 |
| stow 219:21 | submit 23:4 78:15 | 248:19 249:18,21 | survey 29:22 |
| 229:20 | 83:14 | 312:12 | 31:12 228:19 |
| straightly 37:5 | submitted 209:4 | sunding 296:13 | 229:10 |
| stranded 107:20 | 210:8 234:19 | 297:8 298:8,10 | swapped 67:2 |
| 109:10,18,20 | 314:20 | 314:16 | swear 6:24 |
| 110:3,8,24 111:3 | subpopulations | sunding's 297:11 | switch 14:4 40:20 |
| straw 34:12 | 51:1 | supplies 147:16 | 41:8 50:18 52:2 |
| street 1:16 2:5 6:2 | subscribe 318:6 | 148:11 | 76:11 111:15 |
| | | | 143:9,12 164:20 |

**switched** 175:17
**switching** 120:1
**sworn** 7:2 317:10
  318:12
**system** 15:8 29:7
  47:10 53:15 67:11
  84:3 112:2,8
  120:14,20,22
  121:14 122:5
  127:7,12 128:5,13
  130:14 131:2
  132:14 140:13
  142:2,12 143:4,11
  143:16 144:2,21
  145:6 146:15
  147:17 149:5,8,18
  150:3,3,6 157:15
  158:9,16 163:10
  163:14 164:5
  165:22 169:20,23
  170:9,23 204:23
**systems** 36:18
  55:2 130:2 139:14
  139:16,23 140:4
  141:15,18 148:17
  163:2 168:10
  198:12

**t**

**t** 3:9 317:1,1 319:1
  319:1 320:1,1
**tab** 242:7
**table** 26:18 48:3
**tables** 91:12
**tabulation** 92:11
**take** 5:15 9:12
  17:4,23 19:24
  24:23 26:10,14
  27:1 35:18 39:16
  40:9 42:7,7,10
  45:14 48:2 49:4
  53:7 68:3 71:20

71:24 84:16 88:13
89:11 109:10
111:7,22 114:12
139:9 158:2
173:20,21 174:11
178:4 192:22
201:8 216:15
220:16 226:5,8,24
237:22 248:10
250:8 252:7
260:13 261:24
270:21 274:20
297:19 306:21
310:23 315:11
**taken** 5:19 109:11
137:1 157:23
**takes** 295:22
**talk** 85:8 109:9
122:7 168:20
**talked** 43:23 58:21
107:1 140:6 146:4
178:5 182:4 186:9
212:4 214:18
227:13
**talking** 17:13,15
43:6,11 56:16
80:6 82:14 87:22
88:21 90:7 102:10
115:13 178:12,17
182:12 217:24
219:13 221:14
304:6 306:14
**talks** 79:5 101:24
184:8 274:19
276:4
**tank** 42:14 60:22
82:19,20,22,23
83:11,13 85:4
105:7 142:10
**tanks** 111:18

**tautological** 56:2
**tax** 174:7 229:21
**taxing** 283:16
**technically** 131:12
**technique** 265:15
  265:17,19,20
  273:9,12 275:24
**techniques** 16:12
  241:8 268:12
**tell** 9:6 12:6,19
  28:6 45:12 47:16
  91:7,17,24 152:10
  183:5,7,11 196:16
  203:7,14 208:11
  278:8 296:16
  313:10
**telling** 206:15
  212:8 242:15,15
  243:12 253:3
**tells** 242:9 278:18
**temporary** 288:20
**ten** 100:12,17
  195:12 196:6
  289:21
**tend** 13:11,15
**tenure** 83:2,3
**term** 43:20 49:12
  50:9 51:17 52:10
  52:11 70:14 77:9
  204:6 265:18
  267:6,8 274:4
  311:24
**terminology** 37:8
  50:15
**terms** 7:10 22:11
  25:14 26:9 29:2
  59:4 84:22 188:20
  293:12
**terribly** 276:12
  300:20

**test** 17:16 18:5,6
  18:11,18 19:7,8
  21:14,19,20 22:17
  22:19 23:9 26:15
  26:20,23 27:1,11
  27:15 29:9,12,19
  29:21 30:4,7,17,21
  30:24 31:8,11,13
  32:12,17,21,24
  33:11
**tested** 20:6 27:5
  31:18,24 241:13
**testified** 14:13
  16:5 24:7 74:18
  76:3 99:12 118:14
  215:8 244:9
**testify** 136:1
  203:12 216:11
  217:1,6,10,14,18
  218:22 219:9
  220:4 228:7
  232:23 233:6,7,13
  233:14,19 234:3
  245:23
**testifying** 218:7
  236:1
**testimony** 23:18
  69:14 162:9
  178:20 232:18
  296:12
**testing** 17:13 18:2
  20:11,18,23 21:9
  22:3 28:21,24
  33:8 84:9
**tests** 17:19,20 21:2
  21:3 23:19,22
  26:14 28:12 29:24
  30:9,15 32:6 33:2
  33:4,5 86:6
**text** 116:24 161:17
  179:7 180:10,19

**[textbook - top]**

**textbook**   101:23
**textbooks**   101:21
   267:16
**thank**   7:23 95:8
   181:12 222:15
   231:5 262:1
**thanks**   145:13
**theories**   34:5
**theory**   287:22
**thereof**   217:6
**thereto**   317:18
**thing**   34:19 108:22
   176:5 195:23
   199:23 202:17
   210:7 265:23
   293:22
**things**   12:24 34:10
   48:15 49:1 57:8
   57:19 82:8 95:20
   98:5,12 159:1,4,12
   162:24 166:5
   168:1,18 183:19
   195:16 198:22
   201:1,3,5 222:8
   223:3 226:21
   236:22 238:16
   266:6 275:22
**think**   13:8 14:11
   16:5 21:6 22:14
   24:21,24 25:23
   27:15 29:15,15,17
   33:22 34:9,23
   37:4 39:11,16,22
   40:1 42:6,8 47:19
   48:3,22 49:17
   51:12 56:2 58:1
   58:13 61:8 63:14
   69:9 70:24 71:18
   77:16 78:2,3,21
   79:4 80:12 82:4
   84:4,8 85:3,14,24

87:18 89:13 91:20
   94:22 95:22 96:23
   97:23 98:22
   104:12 107:3
   113:22 117:12
   122:10 123:19
   124:20 125:14,14
   130:19 132:12
   135:3,22 140:23
   143:1,6 144:19
   145:6 150:4 151:6
   154:3 163:11
   167:6 169:4
   174:21 175:23
   177:20,22 179:20
   181:13 184:13
   185:3 186:1
   187:19 188:5,5
   199:20,22 200:8,9
   200:13 203:11
   214:9,16 215:5,16
   216:18 218:21
   219:11 220:7
   221:11,22 222:7
   222:18 224:4
   226:9,20 228:5,10
   229:18,18 231:24
   232:4,11,15
   233:22 235:4,4
   237:8 238:1
   239:19 240:21,22
   242:1 243:8
   244:15 246:2
   247:14,17 257:23
   262:8 265:6
   266:21 270:2
   273:5 274:11,12
   279:14,15,18
   282:5 284:24
   285:4 287:5,16
   289:21 291:19,20

292:4,17 294:3,13
   295:18,20 300:20
   303:6 304:12,23
   308:8 309:19,21
   310:2,9 312:24
   314:3,5,22 315:13
**thinking**   86:4
   163:9 259:7
**thinks**   45:1 301:17
**third**   7:10 20:3
   30:14 60:2 217:18
**thomas**   3:20 10:19
**thoroughly**   160:7
   166:14 168:6
   172:18
**thought**   141:23
   228:24 259:3
   271:14 289:22
   314:23
**three**   2:14 196:1
   204:14
**threshold**   71:13
   71:15 302:23
   303:6 304:9
   305:21 307:11
   309:5
**thresholds**   303:4
   304:18 305:14
   306:22
**threw**   182:16
**thursday**   1:14
**time**   11:11 29:6
   31:3 40:10,14
   53:1,5 62:17 63:9
   67:22 72:8,12
   78:19 80:7 81:22
   82:17 84:14 88:20
   88:23 100:24
   101:2 106:12
   111:15 113:1
   115:18 121:20,24

122:4,13 138:14
   138:18 163:4
   180:23 183:23
   196:23,24,24
   199:1 200:13,16
   200:22 201:12,16
   202:20,23 205:1
   206:4 215:11
   216:14 222:8
   236:8 237:17
   241:21 249:17
   251:21,24 252:6
   253:12 262:2,6
   276:21 279:19
   288:13 293:1,2,15
   293:15,23 299:8
   308:4 311:22
   315:15,19,23
   316:4
**times**   153:15
   207:5
**timing**   276:18
   288:11 293:12
**timings**   82:8
**title**   270:9
**today**   8:14 11:7,9
   55:19,22,24 56:1
   69:23 71:7,9 92:4
   116:6 127:19
   139:2 253:2
   311:10
**today's**   316:6
**told**   66:11 183:8
   183:11,21,22
   207:4 246:2
**tone**   42:8
**tool**   242:20 243:2
**tools**   241:23
   256:12
**top**   120:9 147:13
   173:23 252:8

295:17
**topic** 107:1 120:6
  127:7 169:17
**topography** 290:5
**total** 59:23 65:7
  66:5 73:22,24
  74:10,14,19 75:3
  79:6 83:7 100:12
  262:22 274:22
**totality** 36:22 42:7
  42:8 112:14
  125:15
**totally** 118:15
**touched** 137:9
**tour** 281:18
**touring** 282:8
**town** 51:23 52:5
  112:5 119:19
  159:22 162:2,16
  163:16 166:4
  171:3,8,12,16,23
  172:16 195:6,21
  299:11
**towns** 171:17
**toxic** 302:22 303:5
**toxicity** 303:18
**toxicology** 305:9
  306:16
**trade** 189:19
**tradition** 257:24
**traditional** 289:13
  293:17
**traditionally**
  258:3
**training** 247:7
**transacted** 237:16
**transaction**
  241:20 258:2
  266:11
**transactions** 257:5

**transcript** 3:22
  11:12 12:12 68:4
  317:12,24 318:3,6
**transfer** 86:12
  290:20,22 291:4
  291:11 292:2,6,11
  295:2,3,6 296:1
**transition** 46:4
  77:6 262:15 263:6
**transitioning** 54:5
**transport** 234:19
**transposed** 66:12
**treat** 54:14 84:22
  100:2,3,6,18
  108:19 198:12
**treated** 49:10
  80:18 81:17 85:5
  107:9,11
**trend** 139:15,17
  201:21
**trends** 196:8,12
  197:13 198:17
**trevor** 2:22 3:21
  6:18 10:20
**trial** 289:4
**tribes** 152:17
**tried** 204:8 215:23
  242:2 246:19
  247:23 254:18
**trier** 33:24 220:8
  220:11,14 233:17
  243:24
**trip** 193:3
**trouble** 63:5
**true** 11:2 21:1
  32:18 71:2 110:21
  135:1 197:21
  217:21 264:23
  274:16,17 283:18
  283:19 289:10
  317:12

**trump's** 224:3
**trust** 78:15,16
  88:1,11 132:21
  133:3
**trustee** 154:2,6,8,9
**trustees** 152:15
  153:5,22 154:18
  155:2,10
**try** 30:11 32:10
  34:2,9 202:5
  212:20 255:10
  290:17
**trying** 13:18 47:22
  71:9 81:9 82:2
  90:8 99:10 102:11
  109:13 122:18
  151:3,4,4 165:20
  168:7 202:18
  225:17 229:14
  268:1 288:19
  291:23 293:3,16
  294:10 309:20
**tube** 23:4
**turn** 5:11 12:11
  17:3 21:16 22:13
  31:14,20 45:16
  72:14 120:7
  151:10 169:10
  182:17
**turned** 298:3
**turning** 122:10
**turns** 66:15,18
  124:21,23
**twice** 310:8
**two** 9:11 12:23
  13:2 20:7 46:23
  47:2 101:13
  108:19 112:15
  117:5 130:2
  142:13,13 169:14
  172:17,20 173:4,6

173:7 174:17
  175:19 177:7
  179:21 206:1
  207:2 226:21
  227:18 267:5
  275:21,22 277:8
**type** 271:3 294:12
**typed** 211:10
**types** 193:24
  198:22 296:2
**typical** 119:16,16
  291:4 299:5
**typically** 30:23
  31:2 86:14 127:4
  129:13 157:8
  214:21 242:3
  255:16 256:5
  257:2 268:24
  277:5 295:8 296:7
**typo** 181:19
  270:18

---

**u**

**ultimate** 263:13
**ultimately** 18:23
  77:4 121:17 199:6
  286:15 287:15
**ummm** 90:23
**uncertainty** 55:8
  121:16 122:2
  307:5 309:12
**uncontaminated**
  295:5
**undepreciated**
  83:3 86:2 109:4
**underestimate**
  277:17
**underestimated**
  278:11
**underlying** 114:22
**understand** 23:20
  24:13 43:2 95:7

99:7,14,18 140:14
149:23 160:16
167:18 184:1,15
185:9 192:6
199:24 209:4
235:24 245:4,24
249:10 260:22
261:5 263:9 267:7
268:1 269:13
271:11 276:8
301:15
**understanding**
26:2 55:20 132:9
175:21 184:18,22
226:9,11,13
228:12 232:16,22
233:5 237:6
238:17 297:16
**understood** 126:2
151:6
**undertake** 305:12
**underwater**
257:12
**undocumented**
113:18
**unfairly** 80:18
81:17
**unfinished** 290:8
**unfortunate** 99:9
**unfortunately**
182:14 272:6
**uniform** 311:21
313:17 314:6
**uniformly** 271:7
272:16,21
**unimpaired**
248:21 250:24
251:6 258:22
**unique** 133:6,16
306:5

**unit** 5:17 42:15
**united** 1:1 5:22
**unnecessary** 40:8
163:23
**unpack** 49:24 85:2
**unrealistic** 117:2
**unreasonable**
93:22 188:11
199:20,23 200:8
264:9 314:5
**unrelated** 164:11
165:8 224:1
298:22
**unreliable** 45:23
**unsupportable**
301:7,13 302:10
**unsworth** 1:13 3:5
3:12,14,23 5:18
7:1 8:3,7 12:7
13:6 24:16,21
25:3 26:16 46:15
48:16 49:6 63:6
72:14 80:15 81:14
83:11 138:20
152:7 162:10
180:23 201:18
231:6 248:13
262:8 315:21
316:7 317:4
318:10 319:24
320:24
**unsworth's** 26:3
45:21 46:6,10
81:3,6 92:23 99:1
160:12
**unusable** 153:17
**unusual** 71:14
278:24
**unwarranted**
169:12

**update** 255:9
**updated** 115:16,21
**upgrading** 172:5
**ups** 293:14
**urge** 225:13
**usage** 48:10,11
118:3
**use** 7:15 13:12,23
13:24 23:8 26:20
34:11 43:15,20
44:3,7,12,18 46:10
47:18,20 50:14
52:10 59:5 60:5
73:21 74:10 77:12
78:3,4,7 79:6,7
80:5 88:11,19
89:1 98:4 101:6
101:17 105:6,12
116:17 118:1
120:13 125:23
147:15 148:10
149:14 154:19
155:11 156:4,5,19
156:21 164:8,22
169:11 171:17
174:6 206:4
210:20 220:20
221:4 223:1
227:16,19 228:1
229:24 231:14
238:5 239:3 240:5
242:1 256:6,14
257:16 258:5
260:13,18 267:8
267:16 269:6,22
270:11 274:4,20
276:8 278:13
283:13,20 290:22
301:8,14
**usefulness** 277:3

**uses** 43:15 44:6
46:15 117:20,22
221:15 254:6
267:5,14 274:5
**usually** 255:14,20
296:8
**utility** 112:5
**utilized** 25:7,9
**utilizes** 46:7

| v |
| --- |

**v** 208:20
**valid** 109:13
**validity** 13:13
**valuable** 189:4,6,7
**valuation** 17:19
241:7 245:9 249:8
252:9 270:12
273:8
**valuations** 154:17
**value** 12:18,21
14:6,15,19 15:2,14
16:17,21 83:5,24
84:16 85:7 86:23
87:1 93:5 97:18
101:3,7,8,11
102:24 103:9
109:9,22 110:2,7
110:14 111:1,2,3,6
111:13 114:18
119:12,13 174:6
175:8,14,23 176:8
176:9 177:4,19
178:2 179:4,6,9
181:1,3,8,23,24
182:4,5 183:2
185:1,19 186:2,7
188:3,7,23 189:2
189:14,15 190:3
190:16 197:13
198:8 199:15
203:16,20,24

204:2 205:9,13,15
205:18,19 206:2
206:16,19,20
207:3,12,14,21
208:10 209:23
210:1,12 214:2,6
216:8,12 217:2,6
217:11,14,15,22
218:2,8,11,17,22
218:24 219:10
220:10,23 221:11
222:4,16 223:12
224:13 225:5
226:6,14 228:8,16
228:23 229:1,4,6
229:15 231:15
232:12,12,20
233:6,7,13,15
234:5 235:12,15
235:17 237:10
238:10,17,21
239:2,5,10,12,18
241:24 242:8
243:6,21 244:2,7
244:12,16,19,21
244:22 245:4,5,11
246:12 247:4,19
247:23 248:22,23
249:5,6 250:11,15
252:19 253:1,5
254:15,19 255:15
257:18 258:22
259:9,15 260:16
260:20 261:9,10
262:16,23 263:4
263:15,18,24
264:3,15 265:4
267:4 269:4 271:8
272:16,22 274:14
275:1,17 276:9
277:22 282:18

283:16 289:15
291:5,9,9,13,16,20
291:24 296:14
300:1,5 306:9
312:14,15 314:11
**values** 42:21,22,23
43:7,8,9 73:21
74:10 75:3,6,8
78:5,8 89:18 91:4
101:24 117:5
119:15 172:23
186:24 197:22
198:5 199:11
211:1 220:5,6,21
221:5,16,18,23
222:7 224:5
225:24 226:15
227:20,22 228:2
230:1,11,14 233:1
237:4,7 241:19,19
246:3 251:9 252:3
252:12 253:11
255:9,11,18,22
256:2 268:18,22
269:15,23 273:1
292:21 303:7
**valuing** 13:1,9
178:21 221:5
**variability** 306:1
306:24 309:13
313:8
**variable** 106:7,11
196:23 203:1
271:5 277:9 283:8
312:6
**variables** 89:2
274:9 277:6
278:19 283:12
**variance** 251:5
278:2,5

**variation** 49:9,14
49:17,19 50:15,17
51:3,7,11,17 52:7
52:10,14,18,21
62:6,15,18,22 64:2
64:12,23 65:2
70:14 117:15
**varied** 43:22,23
293:14 312:20
**varies** 283:21
**variety** 78:20 88:3
195:16 221:13
**various** 19:22
**vary** 56:10 74:20
88:23 116:12,15
141:20 287:3
303:11 313:3
**varying** 106:9,12
115:10
**vast** 38:3
**venue** 184:13
**venues** 116:7
**verbal** 8:15
**verbatim** 162:5
**verify** 113:19
**veritext** 6:4,5
**vermont** 1:2 2:6
5:23 20:5,21 23:1
23:3 27:5,13
28:20 31:18 32:5
115:21 130:3
154:7,12 193:16
193:18 217:4
218:13 220:3
283:13 305:11
306:20 310:9,16
310:17,19
**version** 292:10
**versus** 5:20 15:8
80:11 105:24
178:18 293:20

295:5 297:4
298:10
**vested** 229:6
**video** 5:14,18
**videographer** 2:24
5:6 6:4,23 40:10
40:13 53:1,4 72:8
72:11 138:14,17
201:12,15 262:2,5
315:15,18 316:4
**videotaped** 1:13
**view** 136:16
258:21 306:5
**viewed** 93:20
**village** 40:17
75:24 76:9
**virtue** 77:3 244:24
245:2
**visit** 193:4 281:18
282:1,4
**visiting** 282:7
**visits** 193:8
**volume** 24:20
55:13 267:9
276:18
**vs** 1:7
**vw** 78:14

**w**

**wait** 8:21 68:9
124:21 156:13
286:1
**walk** 222:10,11
**want** 9:22 31:16
43:5 63:4 65:3
74:5 84:1 98:14
98:18 99:21,22
109:10 110:18
118:20 128:18
148:19,20 149:3,3
174:17 182:2
200:18 201:2

202:16 208:2,7
215:14 238:5
257:4 264:5 273:1
281:1,6 296:4
297:19,24 299:21
**wanted** 7:6,8
11:11 17:20 29:1
99:4 141:6 142:3
142:17 201:18
262:10 273:24
**wants** 46:19 47:5
47:6,8,12 108:20
133:4 256:17
**warrant** 308:20
**waste** 209:15
242:21 286:6
**water** 12:17 14:4
17:2 18:4 19:14
19:14 23:4,8 27:1
28:23 29:5,7
36:13,18 40:18,20
40:23 41:9,22
42:15,16 43:24
46:4 48:10 50:4
50:19,22 51:22
52:2,6,23 55:1,14
55:16,24 56:1
60:12,16,24 61:4
61:17 65:12,16,21
66:17,19 67:21
70:9,11 75:24
76:10,12,18,20
77:6 78:16,17
79:24 84:9 86:6
88:2 89:18 105:7
105:7 108:14,16
111:16 112:4
115:9 116:16
117:24 118:3
119:19 120:1
122:5 123:20

125:2,19 126:9,11
128:4,18 129:6,7
130:22 132:22
133:4,15 134:2,8
134:14,14 136:15
136:16 137:17
140:3,19,21 141:5
143:4,16,18,18
144:16 145:6,8,9
145:20,23 147:16
147:23 148:4,11
148:15 149:8,15
150:3,3,5 151:8
153:14,14,14,16
160:2,3 164:5,20
165:21,24 168:15
169:9 170:2,13
173:17 174:24
175:3,17 176:8
198:10 210:15,20
210:23 238:19
253:18 262:16
263:6 290:12
313:5
**way** 53:19 55:14
55:23 58:24 99:8
100:3 101:9,14
102:3,7 104:12
108:20 110:5,10
120:24 121:6
123:16 130:16
164:6 169:21
179:11 199:9
205:7,15,24
224:18 233:24
236:9 237:13
250:9 275:23
285:15 286:23
289:12 292:3
299:18 303:18

**ways** 19:22 78:20
88:3 101:13 163:9
166:16 244:8
276:2,7 277:8
**we've** 43:23 78:8,9
92:20,22 167:16
196:3 205:21,22
206:12 211:14
212:4 214:18
227:13 249:18
**wee** 26:5
**wells** 17:13,16
20:8,16,21 21:4
31:17 32:1 47:9
50:5 53:14 67:19
67:20 89:20 94:6
94:8,15 121:19
123:8 126:1,20
127:6 139:22
148:2 150:16
175:5 176:19
196:3 287:14
305:17 309:4,9
**went** 113:10,15
142:9 159:24
218:1 289:21
**westin** 9:15 11:20
**whispering** 5:10
**wide** 251:5,17
**widely** 156:2
220:19 221:5
**wife** 281:1
**willing** 9:14
204:12 240:14
281:11 282:21
283:4 285:9
291:21,21
**wilson** 2:12 3:6
6:13,13 7:23 8:2
11:14,21 12:2,5
24:9 25:13,23

26:12 40:6,15
45:8 53:6 57:23
58:7 71:23 72:6
72:13 81:4,10
89:8,10 92:12
93:2 98:13 99:19
100:1 102:9
118:19 119:1
136:7 138:11,19
145:13,15 151:24
152:6 160:9,19
161:6,13,23 162:8
162:13 165:3,6
180:20 181:15
182:10 189:12
193:11,14 201:8
201:17 222:17
225:16,23 231:9
231:12 248:9,12
262:7 297:13,22
298:12,17 301:2
315:10,20 316:1
**wish** 162:1,16,20
**withdraw** 145:18
152:24
**withdrawn** 63:22
89:9
**witness** 3:3 6:24
7:2 24:11 113:19
113:23 118:13
217:6 218:16
317:7
**witnesses** 7:12,17
41:15
**wondering** 15:15
51:19 91:17 97:6
179:15 240:16
247:2
**wool** 2:3 6:21
**word** 120:24

**words** 109:5
131:11 157:22
166:19 173:2
185:17 267:22
295:16 311:8
**work** 24:20 76:16
77:16 80:13 81:22
85:24 88:18 116:4
126:3 127:1 137:7
137:10 138:6
171:19,20 199:12
213:13 231:7
270:7 303:19
**worked** 115:20
211:20
**working** 252:5
**works** 129:4
**world** 30:24 261:4
**worried** 271:21
**worth** 97:4 207:24
219:4,6 222:14
226:10 228:11
253:21 291:10
301:22
**write** 114:5
**wrong** 66:2 211:10
280:13 310:2
**wrote** 39:23 58:24
59:1 121:15

**x**

**x** 1:3,11 3:1,9
235:15,18

**y**

**yale** 211:19
**yeah** 29:15 40:4
91:2 104:12
105:13,23 106:22
112:14 123:22
125:1 169:15
177:20 181:20

202:2 212:20
239:19 267:18
282:4 289:21
293:4 297:5
298:19
**year** 12:9 18:7
21:20 28:13 31:18
40:19 80:11 82:3
82:5,16 84:3,7
89:21,21 90:2,2
93:13 95:5 101:7
102:12,19 103:3,6
109:23 119:21
**years** 93:17 95:5
100:12,17 103:1
193:10 267:18
**yield** 123:22
**york** 2:16,16

**z**

**zabel** 241:16
**zillow** 198:21
232:1,10 239:16
240:12,17,19,23
241:4,8,18,22
242:4,6 243:2
249:4,23 250:2,14
251:8 252:10,13
252:19 253:1,2,5
253:23 254:3,5,13
254:23 255:13
275:4
**zone** 187:2,7 188:4
284:21,21 285:6
286:14 287:13
309:2 312:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.