# EXHIBIT 91

Page 1

1          UNITED STATES DISTRICT COURT
                DISTRICT OF VERMONT
2
3    JAMES D. SULLIVAN and LESLIE    )
     ADDISON, WILLIAM S. SUMNER,     )
4    JR., RONALD S. HAUSTHOR,        )
     GORDON GARRISON, and TED and    )
5    LINDA CRAWFORD and BILLY J.     )
     KNIGHT, individually and on     )
6    behalf of a class of persons    )
     similarly situated,             )
7                                    )   Civil Action No.
              Plaintiffs,            )
8                                    )   5:16-cv-00125
     vs.                             )
9                                    )
     SAINT-GOBAIN PERFORMANCE        )
10   PLASTICS CORPORATION,           )
                                     )
11            Defendant.             )
     _____/
12
13
14              VIDEOTAPED DEPOSITION OF
15               GARY THOMAS YODER, MS
16               (Taken by Defendant)
17              Raleigh, North Carolina
18             Tuesday, February 6, 2018
19
20
21
22
23
24             Reported in Stenotype by:
                Judy F. Reins, RMR, CRR
25

                                                      Page 2

1                      APPEARANCES
2

   ON BEHALF OF THE PLAINTIFFS:
3          GARY A. DAVIS, Esquire
           Davis & Whitlock, P.C.
4          21 Battery Park Avenue
           Suite 206
5          Asheville, North Carolina  28801
           (828) 622-0044
6

7   ON BEHALF OF THE DEFENDANT:
           PATRICK D. CURRAN, Esquire
8          NICHOLAS LoCASTRO, Esquire
           Quinn Emanuel Urquhart & Sullivan, LLP
9          51 Madison Avenue
           22nd Floor
10         New York City, New York  10010
           (212) 849-7000
11

12  ALSO PRESENT:
13         Lyle Chinkin, Sonoma Technology
14         Michael Kirby, Videographer
15

16         VIDEOTAPED DEPOSITION OF GARY THOMAS YODER,
17  MS, a witness called on behalf of Defendant, before
18  Judy F. Reins, RMR, CRR, and Notary Public, in and for
19  the State of North Carolina, at the offices of Smith,
20  Anderson, Blount, Dorsett, Mitchell & Jernigan LLP,
21  150 Fayetteville Street, Suite 2300, Raleigh, North
22  Carolina, on Tuesday, the 6th day of February 2018,
23  commencing at 9:04 a.m.
24

25

Page 3

1                    INDEX OF EXAMINATIONS
2                                              PAGE
3   By Mr. Curran                                6
4                    INDEX OF EXHIBITS
5   NUMBER              DESCRIPTION            MARKED
6   Exhibit 1    TRM Expert Report:              5
                 Perfluorooctanoic Acid
7                Deposition Modeling Analysis
                 prepared by Gary T. Yoder
8                dated 9/1/17
9   Exhibit 1-A TRM Expert Report:              11
                 Perfluorooctanoic Acid
10               Deposition Modeling Analysis
                 prepared by Gary T. Yoder
11               dated 8/31/17 (initially
                 marked as Exhibit 3)
12

    Exhibit 2    Declaration of Gary T. Yoder     5
13               in the matter of Sullivan,
                 et al. vs. Saint-Gobain
14               Performance Plastics
                 Corporation filed on
15               10/02/17
16  Exhibit 3    Barr report entitled Draft      65
                 Conceptual Modeling of PFOA
17               Fate and Transport: North
                 Bennington, Vermont dated
18               June 2017, Bates numbers
                 SGPPLVT 10000755 - 10000936
19

    Exhibit 4    Alliance Technologies           77
20               Corporation report entitled
                 Chemfab Corporation
21               Diagnostic Test Program
                 Results dated April 1992,
22               Bates numbers CTMALE
                 010002830 - 010003000
23
24
25

1              INDEX OF EXHIBITS (Continued)

2     NUMBER            DESCRIPTION                    MARKED

3     Exhibit 5   Copy of handwritten notes of              92
                  Gary T. Yoder regarding

4                 Sullivan, et al. vs.
                  Saint-Gobain, etc. matter

5

      Exhibit 6   Report by Catherine Arundel             121

6                 Barton entitled The
                  Measurement, Partitioning

7                 and Near-Field Modeling of
                  Perfluorooctanoate (PFO) in

8                 Air dated Summer 2008

9     Exhibit 7   Email string, top email to             164
                  Gary Yoder, et al. from

10                Philip K. Hopke dated
                  2/22/17

11

      Exhibit 8   Color map with legend                   164

12                entitled Area of Interest,
                  Vermont Agency of Natural

13                Resources

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1           (EXHIBITS 1 AND 2 WERE MARKED FOR

2       IDENTIFICATION)

3           THE VIDEOGRAPHER:  We're on the record at

4       9:04 a.m.  This is the videotape deposition of

5       Gary T. Yoder.  This deposition is being held at

6       Smith, Anderson, Blount, Dorsett, Mitchell &

7       Jernigan, 150 Fayetteville Street, Suite 2300, in

8       Raleigh, North Carolina, 27601, on February 6th,

9       2018.  Court reporter is Judy Reins.

10      Videographer is Michael Kirby.

11          Would counsel please introduce themselves

12      and whom they represent?

13          MR. CURRAN:  Patrick Curran, Quinn Emanuel,

14      for defendant Saint-Gobain.

15          MR. LoCASTRO:  Nicholas LoCastro, Quinn

16      Emanuel, for Saint-Gobain.

17          MR. DAVIS:  Gary Davis for the plaintiffs,

18      the Sullivan plaintiffs.

19          THE VIDEOGRAPHER:  Would the court reporter

20      please swear the witness?

21              GARY THOMAS YODER, MS,

22   being first duly sworn, testified as follows:

23          MR. DAVIS:  Before we start, can we show

24      also present, please?  Can you state your name,

25      please?

```
                                          Page 6
```

 1            MR. CHINKIN:  Lyle Chinkin.

 2            MR. DAVIS:  Thank you.

 3                       EXAMINATION

 4   BY MR. CURRAN:

 5       Q.   Mr. Yoder, can you please state your name

 6   for the record?

 7       A.   Gary Thomas Yoder.

 8       Q.   And, Mr. Yoder, you understand that

 9   you're -- you're under oath today?

10       A.   I do.

11       Q.   And you understand that that oath today is

12   the same oath as if you were testifying in court?

13       A.   I do.

14       Q.   Is there any reason you can't give your best

15   and most accurate testimony today?

16       A.   No.

17       Q.   You submitted an expert report in this case?

18       A.   I did.

19       Q.   And do you recognize that as what's been

20   marked as Exhibit 1 here?

21       A.   That is correct.

22       Q.   And you also submitted a signed declaration

23   in this case.  Is that right?

24       A.   Yes.

25       Q.   And do you recognize that as what we'll mark

1   as Exhibit 2?

2          A.   Yes.

3          Q.   Take a look at Exhibit 2.  You say there in

4   your declaration of the report you've rendered in this

5   case, Contains a complete statement of the opinions I

6   will express on the issue of class certification and

7   the basis and reasons for them as well as the facts or

8   data I considered in forming these opinions.

9               That's at paragraph 3.  Do you see that?

10         A.   I do.

11         Q.   Was that correct at the time you drafted

12  your report?

13         A.   Yes.

14         Q.   And is that still true today?

15         A.   Yes.

16         Q.   Do you plan to offer any opinions that do

17  not appear in your expert report?

18         A.   No.  I plan to be consistent with my expert

19  report.

20         Q.   And you've disclosed to us in your report

21  all the opinions you plan to give in this case.  Is

22  that correct?

23         A.   Yes.

24         Q.   Is there anything in your report that you

25  want to change or correct?

1      A.    As it stands right now, no.

2      Q.    And you understand that you are required to

3  give all the bases for your opinions in your report.

4  Correct?

5      A.    Yes.

6      Q.    And did you do that?

7      A.    To -- yeah, to the most of the extent that I

8  believe that was necessary for the type of report,

9  yes.

10      Q.    Did you ask for any information in the

11  course of conducting your analysis that you didn't

12  receive?

13      A.    I seem to recall maybe asking for some air

14  dispersion modeling data files maybe from the other

15  engineering firm, but there was -- it wasn't

16  available.

17      Q.    Any other information you can think of that

18  asked for that you --

19      A.    Off the top of my head, no, no, most --

20  everything was formulated from what was able -- what

21  was provided to me, so I can't think of anything

22  specifically other than that.

23      Q.    So with the exception of the air modeling

24  files, nothing else that you asked for and didn't

25  receive before preparing and submitting your report.

1    Fair?

2            A.    As -- as best as I -- I can recall, yes.

3            Q.    About how much time did you spend preparing

4    the report we've marked as Exhibit 1?

5            A.    From beginning to submittal, probably three,

6    four months, I guess, maybe total.

7            Q.    And could you --

8            A.    Trying to remember exactly when we were --

9    when I got engaged in the project.  I can't remember

10   that specifically, but it was -- it was probably along

11   that -- along those lines.

12           Q.    For -- strike that.

13                 Have you invoiced your time by the hour in

14   this case?

15           A.    Yes.

16           Q.    Ballpark, how many hours do you believe you

17   spent working on the report we've marked as Exhibit 1?

18           A.    Maybe 75 to 100, I'm guessing.  I didn't

19   look at it before I came, so I'm just trying to

20   recall.

21           Q.    And how much time did you spend preparing

22   for this deposition today?

23           A.    Probably 12 hours, I guess.

24           Q.    What did you do to prepare for today's

25   deposition?

1    A.   I met with Gary and then had some time I

2  prepared, you know, getting prepared before we met

3  yesterday and a little bit after our meeting

4  yesterday.

5    Q.   Other than Mr. Davis, did you meet with

6  anyone else to prepare for today's deposition?

7    A.   No.

8    Q.   About how long did you meet with Mr. Davis

9  to prepare for today's deposition?

10    A.   About seven hours, I guess.

11    Q.   And that was yesterday?

12    A.   That's correct.

13    Q.   And other than that meeting with Mr. Davis

14  yesterday, what did you do to prepare for today's

15  deposition?

16    A.   I just reviewed my report, Phil Hopke's

17  report, some of the air dispersion modeling files,

18  just, you know, modeling guidance documents, things

19  like that.

20    Q.   Did you review any documents other than the

21  documents you just identified to prepare for today's

22  deposition?

23    A.   I'm trying to think if I maybe -- other than

24  maybe some general AERMOD memorandums, maybe things

25  like that, I can't think of anything specifically.  I

1   mean, it was a couple things like that I maybe have

2   looked at to kind of get some details on some things.

3       Q.   You mentioned general AERMOD memorandums.

4   What's an example of a general AERMOD memorandum?

5       A.   So I say "general."  Memorandum on a -- on

6   a -- the version of AERMOD, latest version of AERMOD.

7   I do remember looking at that, for an example.

8       Q.   Anything else you can recall that you

9   reviewed to prepare for the deposition?

10      A.   No.

11      Q.   I believe you brought a copy of your report

12  and a copy of your declaration with you today.  Can I

13  ask, have you marked those up at all?

14      A.   I didn't bring a copy of my declaration.  I

15  only got the one I got -- you -- you gave me.  I did

16  make some just notes here and there on my copy.

17      Q.   So if we could mark as Exhibit 3 the

18  annotated version --

19           MR. DAVIS:  Let me look at it first.

20           THE WITNESS:  Okay.

21           MR. DAVIS:  Okay.  She's going to mark it.

22           (EXHIBIT 1-A (initially marked as Exhibit 3)

23      WAS MARKED FOR IDENTIFICATION)

24  BY MR. CURRAN:

25      Q.   During the course of the deposition today,

Page 12

```
 1   I'll be referring to your report as Exhibit 1, but you
 2   can make reference to the annotated version,
 3   Exhibit 3, if you'd like.
 4        A.   Okay.
 5        Q.   Mr. Yoder, when were you first retained by
 6   plaintiff's counsel in this case?
 7        A.   And, again, I can't remember the specific
 8   date, but it was back in -- I honestly can't remember
 9   off the top of my head -- May, I'm thinking.  I can't
10   remember the exact date.
11        Q.   And that's May of 2017?
12        A.   Yes.
13        Q.   Who first --
14        A.   It may have been as early as April.  I'm not
15   sure.
16        Q.   Who first contacted you about this case?
17        A.   Actually Cathy Dare, TRM Environmental
18   Consultants.
19        Q.   And when Ms. Dare first contacted you, what
20   did she describe the need was for in this case?
21        A.   It was for a case in Bennington, Vermont,
22   and that there was the need for air dispersion
23   modeling services.  And there was really wasn't a
24   whole lot of information given at that time.  I
25   just -- she asked for my resumé, and I gave it to her,
```

1    and she provided it to counsel.

2         Q.   That contact you had with Ms. Dare, is that

3    your first engagement with TRM, or had you worked with

4    them previously?

5         A.   I -- I worked for an associate of hers who's

6    with another consulting firm.  She is -- so I think

7    it's my -- yes, my first actual contract with TRM.

8         Q.   And when did Ms. Dare or others explain to

9    you the specific nature of the air modeling services

10   you'd be asked to provide in this case?

11        A.   Well, Ms. Dare really didn't.  It was

12   probably more along the lines of actually once we

13   were, you know, actually engaged and under contract

14   to -- to do the work, so it would have been after that

15   with conversations with counsel.

16        Q.   As part of your engagement in this case,

17   were you asked to determine the source of PFOA air

18   deposition for specific properties in the Bennington

19   area?

20        A.   Specific properties, can -- I'm not sure

21   what you mean, so rephrase the question.

22        Q.   As part of your engagement in this case,

23   were you asked to determine what the source of PFOA

24   deposition had been for specific sites in Bennington;

25   for example, a specific property address?

1       A.    Yes.

2       Q.    And were you asked --

3       A.    Just -- just to clarify my answer, to

4    simulate PFOA emissions from a specific address.

5       Q.    So you were asked to simulate emissions from

6    a specific address?

7       A.    Correct.

8       Q.    Were you asked to give an expert opinion on

9    the source of -- of PFOA emissions that had settled to

10   a specific address?

11      A.    No.

12      Q.    Were you asked to model -- strike that.

13            What is TRM?

14      A.    They're -- it's a woman-owned consulting

15   firm out of New York.  Again, Cathy Dare is the -- the

16   owner of the company, and just through working with

17   her and -- and actually the gentleman that she used to

18   work with in -- with another environmental firm up

19   there in New York, they've -- they've come to me for

20   some air support services, so I've known Cathy through

21   that relationship.

22      Q.    So what is your position at TRM?

23      A.    I actually worked for the ClimeCo

24   Corporation, so I'm contracted by TRM.

25      Q.    And -- and what is ClimeCo?

1      A.   ClimeCo is a org project development

2   company.  Primarily the services are in the world of,

3   you know, again, developing projects for carbon

4   offsets and -- and regulatory markets and voluntary

5   markets, and regulatory being California, cap and

6   trade programs in Canada, voluntary everywhere else

7   outside of the regulated areas.  That's primarily

8   the -- the focus.  We also do a lot of similar-type

9   market services in non-attainment areas.

10      Q.   Before this engagement for TRM, had you

11   worked with Dr. Hopke?

12      A.   Actually, yes.

13      Q.   And where did you work with Dr. Hopke?

14      A.   Again, through Cathy's association with

15   another firm, the firms change, but Tim McAuley, Tim

16   and -- and Dr. Holly (phonetic) have a long-term

17   relationship, and there was a project that we worked

18   on and that Phil, I believe, is giving some support in

19   that particular project, too.

20      Q.   And do you recall, was there a name for that

21   project?  Was it litigation-related?

22      A.   It was -- it was a potential fracking

23   sandpit in Pennsylvania, and I don't know if there was

24   a specific name of the project.  It was a -- I think a

25   zoning board.  I was just giving similar-type support,

1    air services to Tim who's actually doing the work in

2    front of, you know, I guess the zoning board up there,

3    so I don't know if there was actually a specific

4    project name.

5           Q.    And were you deposed in connection with that

6    work?

7           A.    No, not that project, no.

8           Q.    Did you prepare a report in connection with

9    that work?

10          A.    I -- I -- no, I just supported him with

11   some -- some services, some drawings, and things like

12   that.  No, I did not actually write a report for that

13   particular service.

14          Q.    You mentioned you were working there with,

15   it was Tim McAuley?

16          A.    Yeah.

17          Q.    Were you also working with Phil Hopke on

18   that?

19          A.    I just know that Phil was involved in

20   providing some support, but it -- it wasn't -- you

21   know, I would maybe be on a call or something with him

22   every once in a while, but it wasn't like he and I

23   were exchanging information and, like, working

24   together.

25          Q.    About what time was that, 2015, 2014?

1      A.   2016, I think.

2      Q.   Now, who, if anyone, at TRM helped you

3  prepare the report you submitted in this case?

4      A.   Cathy helped me mostly with -- you know, she

5  put it in her format, some of the graphics, things

6  like that, so it basically went through her.

7      Q.   And what is Ms. Dare's background?

8      A.   She is a civil engineer, I believe,

9  primarily expertise in waste, solid waste, things like

10  that --

11      Q.   And what's her --

12      A.   -- best I can answer.

13      Q.   I'm sorry.  What's her position at TRM?

14      A.   I believe she's -- she is the -- the owner.

15  I don't know if it's a sole proprietorship or an LLC.

16      Q.   Anyone else that you worked with at TRM to

17  prepare the report?

18      A.   No.  Well, Phil technically is associated

19  with TRM too, so, I mean, he would be -- he was

20  involved in -- in ...

21      Q.   The intro to the report says, to accomplish

22  the study objectives, TRM modeled the ChemFab

23  emissions based on the documented operational

24  conditions for the ChemFab production equipment.

25          MR. DAVIS:  Where are you reading from?

```
                                              Page 18
 1        Second paragraph.  Can you direct him?
 2   BY MR. CURRAN:
 3        Q.   Do you see that, sir?
 4        A.   Where is -- I'm sorry.
 5        Q.   Yeah, sure, the second paragraph.
 6        A.   Oh, yes.
 7        Q.   It says here, T -- TRM modeled the ChemFab
 8   emissions.
 9             Is that right?
10        A.   Well, I was prepared, but I -- I did the
11   modeling, so TRM, and I just -- and I was contracted
12   by TRM, so.
13        Q.   So other than yourself, anyone else at TRM
14   or otherwise involved in the modeling of this?
15        A.   No.
16        Q.   Okay.  At the top of the report here, it
17   says, Attorney/client work product, confidential.
18             Did you add that to the report?
19        A.   I believe Cathy did.
20        Q.   Did any attorneys draft any portion of this
21   report?
22        A.   No.
23        Q.   You've been involved in litigation before
24   this case?
25        A.   No.
```

1      Q.    Have you been deposed before?

2      A.    No.

3            MR. DAVIS:  Let me -- let me just object.

4      I'm -- it's not really an objection.  I think he

5      might not have understood what you meant about

6      litigation.  I mean --

7            THE WITNESS:  Oh.

8            MR. DAVIS:  -- you've been in administrative

9      hearings.  Right?

10           THE WITNESS:  Yes, sorry.  I thought you

11     meant in this particular setting.  So I've been

12     to two zoning board hearings, sorry, and provided

13     expert reports in those and testified, I guess,

14     at a zoning board hearing, but I was not deposed.

15  BY MR. CURRAN:

16     Q.    So let me break that down a bit.

17     A.    Sure.

18     Q.    In terms of litigation in a courtroom,

19  putting aside administrative proceedings, have you

20  ever been involved in litigation before?

21     A.    So if that's not included, then no.

22     Q.    And putting aside the zoning board hearings,

23  have you ever been involved in a deposition before?

24     A.    No.

25     Q.    So the testimony that you provided has been

1  in administrative hearings to zoning boards?

2       A.    That's correct.

3       Q.    How many times have you done that?

4       A.    Twice.

5       Q.    And when were those?

6       A.    2015, 2016.

7       Q.    Aside from the zoning board hearings in 2015

8  and 2016, any testimony you've given to a government

9  agency or to a court?

10      A.    No.

11      Q.    What was the nature of the disputes that you

12 were providing testimony for in those two-zoning board

13 meetings?

14      A.    Yeah, the first one was North Carolina.  It

15 was an existing zoned property, agricultural, I

16 believe, across the street from an established

17 community, golf course.  And the -- I was supporting

18 the plaintiff attorney to fight rezoning that property

19 for a gravel pit and just provided general air

20 compliance, you know, air impact services.

21      Q.    And how about the second dispute?

22      A.    The second one was another zoning board

23 hearing in Pennsylvania for a proposed fracking well,

24 and the environmental report that was submitted by the

25 company, the energy firm that was going to install the

1    fracking well as to whether it met the environmental

2    compliance requirements of the zoning ordinances from

3    an air -- from an air standpoint.

4         Q.   Sir, in your declaration, going to

5    paragraph 3 --

6              MR. DAVIS:  Exhibit 2.

7    BY MR. CURRAN:

8         Q.   Here in paragraph 3 it says that your expert

9    report contains a complete statement of the opinions I

10   will express on the issue of class certification and

11   the basis and reasons for it.

12             Is that right?

13        A.   Yes.

14        Q.   As used in your declaration, how do you

15   define the term "the issue of class certification"?

16        A.   How do I define "the issue of class

17   certification"?

18        Q.   Yes, sir.

19        A.   Well, I'm not an attorney, so as I

20   understand it, it's an application process for a

21   potential class action lawsuit, and so the -- the

22   certification process, I guess, to whether the suit

23   should proceed, I guess, is my general understanding.

24        Q.   Do you intend to offer any opinions in this

25   case on issues other than class certification as

1    expressed in your report marked as Exhibit 1?

2         A.    No.

3         Q.    Turn to page 7 of your report that's

4    Exhibit 1.  It lists nine citations.  Correct?

5         A.    Oh, I'm sorry.  Got the wrong page.  Yes.

6         Q.    And you relied on these nine cited materials

7    when you were forming your opinions in this case.  Is

8    that right?

9         A.    I did to some portion or part from them,

10   yes.

11        Q.    Are there any other documents that you

12   relied on that are not listed --

13        A.    Yes, and -- yeah, in going through the

14   process yesterday, I realized I'm just adding one of

15   these, was the Alliance Technologies.  Yeah, I just

16   scribbled roughly the title.  Like Alliance

17   Technologies, April 1992, was something that I should

18   have included in -- in the citations.

19        Q.    So other than that Alliance Technologies

20   document from 1992, any other materials that you

21   relied on that are not listed on page 7?

22        A.    As best of my knowledge, no, I believe that

23   I have them listed here.

24        Q.    Are there any materials that you considered

25   but decided not to rely on --

1      A.   Oh, boy.

2      Q.   -- from your report that are not listed

3   here?

4      A.   I mean, there probably is, but to tell you

5   which ones they are, I -- I'm not sure that I can off

6   the top of my head.

7           MR. DAVIS:   State -- state for the record

8        that we provided those documents to the defendant

9        and so.

10   BY MR. CURRAN:

11      Q.   So best of your recollection, what were the

12   documents you considered but did not rely on?

13      A.   Well, there was a lot of -- I mean, there

14   was a lot of documents on historical -- you know, the

15   Vermont DEC documentation on, you know, inspection

16   records, odor complaints, things like that, coming off

17   the top of my head are some of those that I've looked

18   at, but it really didn't have a bearing on what I was

19   doing here with this particular ...

20      Q.   And so why did you decide not to rely on

21   those materials?

22      A.   Well, just specifically what I was trying to

23   accomplish here with, you know, doing a deposition

24   analysis, it really -- other than the information I

25   collected from some of those documents that I listed

 1    here, like air permits and things like that, which, by

 2    the way, I could maybe -- if I can revise my -- my

 3    last statement on the citations here, there is an air

 4    permit document that I -- should also be listed here

 5    too where I got information from -- for stacks and

 6    building heights and things like that, and so that --

 7    that should also be included.  And I believe it was

 8    provided to you guys, but I -- it should be listed

 9    here also.

10            There was -- there was some air permit

11    documents that had information on building -- building

12    dimensions, stack locations, volumetric flow rates,

13    the process rates, and things like that that I did

14    rely on, and it -- it's -- should be listed here also.

15        Q.   Other than those permitting documents and

16    the Alliance report that you mentioned, anything else

17    that you relied on that isn't listed on page 7?

18        A.    I mean, there was some -- probably some

19    technical journal article -- journal articles that we

20    passed around that I just, you know, reviewed, again,

21    maybe not specifically pulled information from or used

22    for this report.  So, I mean, there is another

23    possibility of some -- some other documents, yes.

24        Q.   One of the things that is not identified

25    here is the -- the Barr Engineering conceptual site

1    model.  Did you review that model in connection --

2         A.    I did.

3         Q.    -- with your report?

4              And did you decide not to rely on that?

5         A.    Yeah, yeah, I didn't really rely on it for

6    anything as far as my input and what I used for my

7    analysis, but yes, I did review that.

8         Q.    And why did you decide not to rely on the

9    Barr Engineering report?

10        A.    Mostly because the approach was to -- to do

11   my own analysis, to -- you know, to just -- well,

12   wait, I did compare, but I didn't actually pull any

13   information from it for what I -- for what I did in my

14   analysis.

15        Q.    Do you recall what versions of the Barr

16   report you --

17        A.    Yeah, it was the last -- specifically, I

18   think the last one, which was -- was it June 2017, if

19   I'm not mistaken.  So the one before that initially,

20   and then the -- the June 2017 in Appendix A that came

21   with that conceptual model report.

22        Q.    And do you recall, did your opinions change

23   after you reviewed any different iterations of the

24   Barr report?

25        A.    No, no.

1      Q.    Skip a little bit over, background here.

2      A.    Okay.

3      Q.    Tell me about your educational background.

4   You have a Master's degree in meteorology?

5      A.    Yes, I do.

6      Q.    Would you say that your expertise relates to

7   meteorology?

8      A.    I would say my expertise really is more in

9   the world of air compliance work, I mean, based on how

10  my career has gone at this point.

11     Q.    Uh-huh.

12     A.    I'm several years removed from, you know,

13  studying meteorology.

14     Q.    So I'll come back to that in a second,

15  but --

16     A.    Okay.

17     Q.    -- you'd agree, you're -- you're not a

18  trained chemist.  Correct?

19     A.    That's correct.

20     Q.    You're not a hydrogeologist?

21     A.    I am not.

22     Q.    You're not an engineer?

23     A.    No.

24     Q.    And you're not a toxicologist?

25     A.    No.

1      Q.   You're not an epidemiologist?

2      A.   No.

3      Q.   The opinions that you're offering in this

4  case are limited to the field of air emissions

5  modeling.  Is that fair?

6      A.   That's correct.

7      Q.   You did not attempt to determine where, if

8  anywhere, PFOA was transported after it had traveled

9  from the air to the ground.  Is that fair?

10      A.   No.

11      Q.   And you did not attempt to determine the

12  effectiveness of any pollution control technology in

13  this case.  Correct?

14      A.   No.

15      Q.   And you didn't attempt to determine whether

16  PFOA is or is not potentially harmful to human health.

17  Correct?

18      A.   I did not.

19      Q.   So would you describe your expertise as air

20  modeling?

21      A.   Yes.

22      Q.   And where did you get your training in air

23  modeling?

24      A.   Initially when I started my career, I went

25  through a training course with Trinity Consultants, I

Page 28

1    believe it was, back in, we're talking 1992, '3 was

2    the initial training.  And then it was probably from

3    there just a series of, you know, workshops, you know,

4    conferences, things like that, EPA training that they

5    make available to the public, anything else that may

6    have been published as public -- public domain

7    information.

8              And then from there, just, you know,

9    obviously I'm working with a gentleman call -- named

10   Kevin Eldridge, who was a meteorologist also that

11   worked for the State at one time and worked for the

12   firm that I worked for initially and hired me.

13       Q.   You mentioned EPA training and workshops and

14   conferences.  What EPA conferences have you attended?

15       A.   You have the -- try -- trying to remember

16   the name of them now.  It's like once every five years

17   they have a -- a national meeting where the primary

18   topic is air dispersion modeling.  They've had -- I

19   don't even know how many they've had now.  I've gone

20   to one of those in Washington, D.C.

21             And I was at -- this past spring, I was at

22   the State -- the State EPA workshop in Chapel Hill,

23   North Carolina, which basically they have -- they

24   discuss recent changes or proposed changes within

25   AERMOD or -- or actually several models, so I've gone

1   to those.

2          Carolinas Air Pollution Control Association

3   conference, which is twice a year, although there's --

4   likely there isn't much in the way of air dispersion

5   modeling discussed at those anymore.  Maybe back in

6   the early days it was -- was a little bit more of a

7   hotter topic and ...

8          Q.    Have you presented at those conferences?

9          A.    I have presented those -- at those

10  conferences, yes -- well, at the -- at Carolinas Air

11  Pollution Control Association conference, yes.

12         Q.    What subject did you present on?

13         A.    One was on class 1 impacts, and that's going

14  back to -- boy, trying to remember that year.  That

15  was related to -- to air dispersion modeling, but it

16  wasn't specifically into the details of air dispersion

17  modeling.  The second one was an ambient sampling

18  program we did for toluene dust cyanine from foam

19  manufacturing operations, but it wasn't air dispersion

20  modeling related.

21         Q.    And I understand there's a -- what's

22  sometimes called an Appendix W conference that's held

23  close to here?

24         A.    Yes.

25         Q.    What is the Appendix W conference?

1      A.    That's -- that's the one I went to in Chapel

2   Hill.

3      Q.    Okay.

4      A.    Thank you.  So you helped me out with

5   answering that question.  So -- but, yeah, they --

6   they basically discussed -- or either -- either

7   accepted changes to Appendix W or maybe ones that may

8   be coming down the road, future changes with all --

9   you know, several models of Appendix W.

10      Q.    What is EPA's Appendix W?

11      A.    It's -- basically it's the published

12   promulgated guidance for -- well, for states -- it's

13   really for state implementation plans, states, and I

14   suppose tribes and things like that, for their guides

15   and basically how -- through state implementation

16   plans, how to comply with the national ambient air

17   quality standards, I think particularly when it comes

18   to new source review regulations or prevention of

19   significant deterioration and things like that.

20      Q.    Is Appendix W considered best practices in

21   the air modeling industry for -- for running an air

22   dispersion model?

23      A.    Yes.

24      Q.    Did you apply Appendix W to your report in

25   this case?

1    A.    Yes.

2    Q.    I believe in your report you say that you

3  followed Appendix W, and you referenced the 2005

4  version?

5    A.    Yes, that's -- that should be probably 2017.

6  There's a new version.

7    Q.    So what about -- so in your mind, no

8  difference between the 2017 protocol and what you

9  followed?

10    A.    Well, there is, but to what I did here, I

11  mean, no, no, it didn't affect anything between those

12  two versions.

13    Q.    And why -- why did you follow the guidance

14  in Appendix W?

15    A.    It's basically standard protocol in what

16  I've been doing my career when I do prepare analyses

17  like this, particularly it's associated with some kind

18  of review from a regulatory agency in that they would

19  require you to follow Appendix W.  So it's just --

20  really today, it's kind of out of habit more than

21  anything.

22    Q.    Someone in the field, if you saw a report

23  that didn't follow Appendix W, would you say that that

24  didn't follow the best practices in the field?

25    A.    Well, I guess it depends, and it depends on

```
 1   what the nature of the analysis is.  There could be a
 2   need for doing something very unique.
 3        Q.   In this case, you didn't deviate from
 4   Appendix W, correct?
 5        A.   As -- yeah, as best I could, I followed
 6   those guidelines.
 7        Q.   Can you think of any situations in which you
 8   didn't follow the Appendix W guidelines?
 9        A.   No, I'm -- no.
10        Q.   You intended to --
11        A.   Not purposely anyway.
12        Q.   You intended to follow the Appendix W --
13        A.   Yes.
14        Q.   -- guidelines in this case?  And you didn't
15   identify any situations that would call for deviating
16   from the Appendix W guidelines in this case?
17        A.   No.
18        Q.   Now, Section 833 of the Appendix W
19   guidelines -- see if we can get a copy of those --
20            MR. DAVIS:  Yeah, I'm going to object unless
21        you provide a copy to the witness.
22            MR. CURRAN:  You can have your objection,
23        so.
24   BY MR. CURRAN:
25        Q.   Tell me what Appendix W says to do about
```

1    multisource emission scenarios.

2         A.   I don't know that.  I'd have to look it up.

3    I don't know it off the top of my head.  Appendix W is

4    huge.

5         Q.   Uh-huh.  In this case, did you model a

6    single source or a multisource emission model?

7         A.   I call it a single source based on my

8    definition.

9         Q.   And what's --

10        A.   It's a single facility.

11        Q.   I'm sorry, I spoke over you.  What's your

12   definition?

13        A.   A single facility.

14        Q.   When you say you model, "it's a single

15   facility," what do you mean by that?

16        A.   Well, I guess in some cases you could have

17   more of a complex of sources, you know, much larger

18   chemical plants or maybe in a contiguous property you

19   have multiple operations that could be separated,

20   maybe two facilities located in close proximity,

21   completely separate from each other but -- but emit

22   the same compound and have to be modeled together.

23        Q.   It's important when conducting air

24   deposition models to determine the appropriate

25   background concentrations of a substance.  Right?

```
                                        Page 34
 1        A.    Yes.
 2              MR. DAVIS:  Object to -- object to the
 3        question, form of the question.  You may answer.
 4              THE WITNESS:  I'm sorry?
 5              MR. DAVIS:  You may answer the question.
 6              THE WITNESS:  Okay, I'm sorry.
 7   BY MR. CURRAN:
 8        Q.    Pause for a second.  This is -- this is your
 9   first deposition?
10        A.    Yeah.
11        Q.    During the course of the day, you may hear
12   objections from counsel.
13        A.    Okay.
14        Q.    You are still required to answer the
15   question --
16        A.    Okay.
17        Q.    -- even if there is an objection.
18        A.    All right.
19        Q.    Does that make sense?
20        A.    Yes.
21        Q.    Okay.  It's important in conducting air
22   dispersion modeling to determine the appropriate
23   background concentration of the substance you're
24   trying to model.  True?
25              MR. DAVIS:  Same objection.
```

```
 1           THE WITNESS:  It would depend on the
 2       compound that you're modeling.
 3  BY MR. CURRAN:
 4       Q.   Is it your testimony that for some
 5  compounds, it's not important to determine the
 6  appropriate background concentration of that
 7  substance?
 8       A.   Yes.
 9       Q.   Why is that?
10       A.   Because it could be a compound that, for
11  example, is state toxic that doesn't have a background
12  concentration requirement to be added in, like in
13  North Carolina, toluene.
14       Q.   You'd agree that under Appendix W, you're
15  instructed to determine the appropriate background
16  concentration for substances before modeling though.
17  Fair?
18       A.   I -- begin, for modeling a standard national
19  ambient air quality standard pollutant, yes.
20       Q.   Did you attempt to determine the background
21  concentration for PFOA in this case?
22       A.   No.
23       Q.   Why is that?
24       A.   As far as I know, there's no -- you know,
25  background data comes from EPA state monitoring
```

```
 1   networks and, as far as I know, the air monitoring

 2   PFOA.

 3        Q.   So for your analysis, it wasn't important to

 4   determine the background concentration of PFOA?

 5        A.   No.

 6        Q.   For your analysis, was it important to

 7   determine whether there were other potential sources

 8   of PFOA in the area?

 9        A.   No.

10        Q.   Why is that?

11        A.   I just wanted to determine what the

12   deposition impact, contours, area, rate for one

13   facility.

14        Q.   And why did you want to limit your analysis

15   to just one facility?

16        A.   Because it was a source of PFOA emissions,

17   known PFOA emissions.

18             THE COURT REPORTER:  I'm sorry, what PFOA

19        emissions?

20             THE WITNESS:  PFOA -- known PFOA emissions,

21        sorry.

22   BY MR. CURRAN:

23        Q.   Did you consider whether this area of

24   Bennington, Vermont, was a single source area or a

25   multisource area for PFOA?
```

1      A.    I did not, no.

2      Q.    And why did you decide not to consider that

3   issue?

4      A.    Based on the understanding that we had a

5   source of -- a significant source of PFOA from a

6   facility, historical emissions of PFOA emissions, we

7   wanted to look at what that facility's potential

8   impact or impact would be from their emissions only.

9      Q.    When you say, "we wanted to look at," who are

10  you referring to as "we"?

11     A.    When I say "we," I say our -- our plaintiff

12  team.

13     Q.    So the plaintiffs' attorneys and yourself

14  collectively decided that you would look at a single

15  source rather than a multisource for your modeling

16  analysis.  Fair?

17     A.    That's correct.

18     Q.    Now, under Appendix W, in multisource areas,

19  determining the appropriate background concentration

20  before model also involves identification and

21  characterization of contributions from nearby sources

22  through explicit modeling.  Does that sound familiar?

23          MR. DAVIS:  Again, I'm going to object

24      unless you provide Appendix W to the witness to

25      look at.  You're quoting, you're reading from

```
 1        something.  He needs to be able to see it.
 2   BY MR. CURRAN:
 3        Q.   You can answer the question.
 4             MR. DAVIS:  No, you can't unless you provide
 5        him the information.  Don't answer until he
 6        provides you the information to look at.
 7             MR. CURRAN:  I'm asking the witness if he
 8        recalls from Appendix W if this is the correct --
 9             THE WITNESS:  I mean, I --
10             MR. CURRAN:  -- methodology.
11             THE WITNESS:  -- I don't recall.  I don't
12        have Appendix W memorized.
13   BY MR. CURRAN:
14        Q.   Well, I'm going to ask it based on your
15   education, training, and your understanding that you
16   apply to Appendix W.  Did you in this case identify
17   and characterize contributions from nearby sources
18   through explicit modeling?
19        A.   No.
20        Q.   Why did you decide not to do that?
21        A.   Because it wasn't a standard national
22   ambient air quality compound that I was modeling, a
23   federal compound, federally-regulated compound --
24        Q.   So can you --
25        A.   -- at this -- at this particular time.
```

1    Q.   In your opinion, it's only important to

2  determine and identify and characterize contributions

3  from nearby sources through explicit modeling for

4  federally regulated compounds?

5    A.   According to Appendix W, that -- that is

6  what Appendix W is providing direction on.

7    Q.   Why does the distinction between a federally

8  regulated compound and an unregulated compound matter

9  from a scientific perspective?  As a scientist, to

10  you, why is that an important distinction?

11    A.   Well, because there's a process before a

12  compound becomes regulated, and understanding may not

13  have been gathered on a particular compound before it

14  was regulated.  It can obviously change over time when

15  more information becomes available, and then it may

16  eventually become a regulated compound where they may

17  require providing -- you know, that you provide --

18  include background data.

19    Q.   For an accurate air dispersion model for a

20  particular substance in a multisource area, you'd

21  agree that you need to explicitly model each of those

22  sources.  True?

23    A.   Well, again, it depends on what you're

24  trying to accomplish with your analysis.

25    Q.   Were you trying to accomplish an accurate

1    model in this case?

2          A.    I was.

3          Q.    So for an accurate air dispersion model for

4    a particular substance in a multisource area, you'd

5    agree that you need to explicitly model each of those

6    sources.  True?

7          A.    Okay.  Repeat the question.  I'm trying to

8    understand, so.

9          Q.    For an accurate air dispersion model for a

10   particular substance in a multisource area, you'd

11   agree that you need to explicitly model each of those

12   sources?

13         A.    And, again, it depends on the compound that

14   you're modeling.  In cases I could -- there are cases

15   I would have multi sources of a particular compound

16   and would not have to include other sources.

17         Q.    Why wouldn't you include other sources for

18   an accurate air dispersion model?

19         A.    In -- in some cases, it's -- it depends on

20   the -- the goal of the analysis as to why you're doing

21   it.

22         Q.    What was your goal here?

23         A.    To look at the impact specifically from the

24   ChemFab operations, historical emissions.

25         Q.    Your goal here was only to consider the

1    impact of a single emission source that you

2    identified.  Is that accurate?

3         A.   That's correct.

4         Q.   And you offer no opinion as to whether

5    that's an accurate depiction of air dispersion impacts

6    in a multisource environment.  True?

7         A.   I -- I -- I can't comment on that because I

8    don't know about the other sources from an air

9    dispersion modeling standpoint.

10        Q.   And you didn't consider any other sources

11   from an air dispersion modeling standpoint?

12        A.   That is correct.

13             MR. DAVIS:  Object.  Let me object to the

14        question.  There's been no proof of any other

15        sources.

16             MR. CURRAN:  I'm just going to object now to

17        any further speaking objections.  I've tried to

18        give some latitude, Gary, but that's not a form.

19        That's a speaking objection.

20             MR. DAVIS:  Object to the form of the

21        question and the form of your comment.

22             MR. CURRAN:  So the record's clear.

23   BY MR. CURRAN:

24        Q.   If you knew that Saint-Gobain was not the

25   only source of air emissions for PFOA in this area,

1    how would that have changed your analysis?

2          A.   Again, if I was to determine and asked in --

3    as part of the goal of determining what the impact was

4    specifically from Saint-Gobain, I don't think it would

5    have changed it.

6          Q.   So if you understood that Saint-Gobain was

7    not the only source of PFOA --

8          A.   Well, I had understood -- I'm sorry,

9    probably shouldn't -- go ahead.  Sorry.

10         Q.   No.  Go ahead.

11         A.   I was just going to say, what I wanted to

12   clarify what I understood, though, at the beginning

13   was that there wasn't any other air emission sources.

14         Q.   What's the basis for your understanding that

15   there are no other air emission sources for PFOA in

16   the Bennington area?

17         A.   And, again, I did not do that part of the

18   analysis.  It was based on information that was

19   provided or -- or discussed and what -- what was --

20   the team was doing as far as an overall assessment of

21   other sources.

22         Q.   So --

23         A.   And as I understood, there wasn't anything

24   significant as far as PFOA emission sources in -- in

25   the area.

1      Q.   Who informed you that there were no other

2  sources of PFOA air emissions in the Bennington area?

3      A.   I don't specifically recall.  I think that

4  Cathy helped with some of that.  I think some -- I

5  think some of the -- Ed -- hope I get his last name

6  right -- Hinkey -- no, Hinchey.  I'm sorry, his last

7  name.  Ed and Don, they did a little bit of work in

8  that area too, I believe.  So there was kind of a team

9  effort.  I did not do any work in that area and

10  actually went to look for other air emission sources

11  and so on.

12      Q.   So you -- you have not conducted any

13  investigation to determine if there are other air

14  emission sources for PFOA in the Bennington area?

15      A.   Me personally, no, I have not.

16      Q.   And is it your opinion that Saint-Gobain's

17  the only company that's ever used PFOA in this -- in

18  the Bennington area?

19      A.   I mean, it's -- we used it how?  I mean, as

20  far as manufacturing?  As far as I know, at -- at

21  those quantities, that they are the only one, yes.

22      Q.   My question's a little different, sir.  Are

23  you offering the opinion that Saint-Gobain is the only

24  company to use PFOA in the Bennington area for the

25  last 24 years?

```
 1        A.    No, I'm not providing -- I'm not saying
 2   that.
 3        Q.    And are you aware that other companies have
 4   used substances containing PFOA?
 5        A.    I mean --
 6             MR. DAVIS:  Objection to the form of the
 7        question.  It assumes facts not in evidence.
 8             THE WITNESS:  So --
 9             MR. CURRAN:  Again, I'm going to object to
10        the speaking objection.  Go ahead.
11             MR. DAVIS:  That's not a speaking objection.
12        It's a valid objection.
13             THE WITNESS:  So rephrase the question for
14        me, please.
15   BY MR. CURRAN:
16        Q.    Are you aware that other companies have used
17   substances containing PFOA in the Bennington area over
18   the last three decades?
19        A.    I believe I did -- I believe there may have
20   been some -- some form or another or some quantity or
21   another, yes.
22        Q.    So why did your model assume that
23   Saint-Gobain is the only potential source for PFOA in
24   the air in Bennington?
25        A.    Because it was just -- my goal was to
```

1    just -- to determine what the deposition rates were

2    specifically from PFO -- from ChemFab, Saint-Gobain.

3           Q.   And just to make sure I understand this, if

4    you knew that Saint-Gobain was not the only source of

5    PFOA air emissions in the Bennington area, you would

6    not have made any changes to your model?

7               MR. DAVIS:  Objection to the form of the

8         question.

9               THE WITNESS:  So rephrase the question for

10        me, please.

11   BY MR. CURRAN:

12          Q.   If you knew that Saint-Gobain was not the

13   only source of PFOA emissions in the Bennington area,

14   it's your testimony that you would not have made any

15   changes to your model?

16          A.   If -- were they the only air emission

17   source, I mean, emitting PFOA to the atmosphere?

18   Again, I -- I don't know.  I'd -- I'd have to -- to

19   think about that, but as far as I know, I -- if I'm --

20   my goal was to determine what a specific facility's

21   deposition rates were or concentrations or anything,

22   then I only model that facility.  Based on those

23   results and maybe other circumstances, somebody may

24   want to include other sources, but that wasn't part of

25   this analysis.

1        Q.   Have you ever published a paper where you

2    did not model all sources for a particular compound --

3        A.   Yes, many times.

4        Q.   -- in an area?

5        A.   Yes.

6        Q.   Let me just finish the question.

7        A.   Sorry.

8        Q.   Strike that.  Have you ever published a

9    paper on an air dispersion model that did not model

10   for all sources of that compound in a given area?

11       A.   When you say, "published a paper," I mean,

12   I'd assume -- do you mean something like in a journal

13   article or something like that or?

14       Q.   Start with a journal.

15       A.   No, not in any journals.

16       Q.   Have you -- have you ever published a paper

17   in a peer-reviewed journal?

18       A.   Yeah, not -- no, nothing like that in a -- a

19   peer-reviewed journal.

20       Q.   And have you ever submitted a -- what you

21   consider to be a reliable air dispersion model for

22   permitting purposes --

23       A.   Yeah.

24       Q.   -- that only model a single source of

25   emissions for a compound in an area that you knew had

1   multiple sources of that compound?

2       A.   Yes.

3       Q.   When was that?

4       A.   It was probably within the past six months

5   for North Carolina air toxics permitting.

6       Q.   And why did you only model a single source

7   of emissions if it was a multisource area?

8       A.   Their regulations give me that latitude.

9       Q.   And when regulations give you the latitude,

10  you decided it was scientifically acceptable to only

11  model a single source?

12      A.   The -- the State of North Carolina, when

13  they -- if they think there is an issue with a

14  particular compound in multi sources, perform those

15  analyses.

16      Q.   And if the court in this case determines

17  that a single source analysis is -- is not sufficient

18  and the multisource analysis is required, you're not

19  offering any opinions on a multisource analysis.

20  Correct?

21          MR. DAVIS:  I object to the question.  I

22      think that's an improper question and you're

23      asking him to speculate about what the court

24      might do.

25          MR. CURRAN:  We'll again --

```
 1           MR. DAVIS:  Please don't speculate.
 2           MR. CURRAN:  -- ask counsel to cease from
 3      speaking objections.
 4           MR. DAVIS:  That's not a speaking objection.
 5      That's a valid objection.  You may answer if you
 6      can.
 7           THE WITNESS:  Yeah, I agree, I don't -- I
 8      don't know how to answer based on what the court
 9      might do.
10  BY MR. CURRAN:
11      Q.   And prior to being contacted by plaintiffs'
12  counsel earlier in 2017, had you ever been involved
13  with any work or research relating to PFOA?
14      A.   No.
15      Q.   You never lectured or published any
16  materials relating to the detection of PFOA air
17  emissions.  Is that fair?
18      A.   That is fair, no.
19      Q.   And prior to this case, you've never been
20  involved in any work to try and identify what kinds of
21  methods or analytical techniques exist to detect PFOA
22  air emissions.  Is that fair?
23      A.   No.
24      Q.   Prior to this case, you haven't been
25  involved in any work to try and identify what kinds of
```

 1  methods or techniques exist to detect PFOA
 2  concentrations in stack exhaust?
 3       A.   No.
 4       Q.   Part of this case, you haven't been involved
 5  in any work to try to identify what kinds of methods
 6  or analytical techniques existed to detect PFOA
 7  concentrations in the atmosphere.
 8       A.   No.
 9       Q.   True?  So fair to say the first time you
10  worked on any project involving PFOA air emissions was
11  after you were retained by plaintiffs' counsel in this
12  case?
13       A.   That is correct.
14       Q.   And is it accurate to say that the first
15  time you worked on a project involving the
16  identification of probable off-site footprint for PFOA
17  deposition was after you were retained by plaintiffs'
18  counsel in this case?
19       A.   Can you repeat the question, please?
20       Q.   Sure.  Is it accurate to say that the first
21  time you worked on a project involving the
22  identification of the probable off-site footprint of
23  PFOA deposition was after you were retained by
24  plaintiffs' counsel in this case?
25       A.   Yes.

1      Q.    Fair to say that the first time you worked

2    on a project involving the assessment of PFOA air

3    emissions --

4      A.    Yes.

5      Q.    -- was this case?

6      A.    Yes, sir.

7      Q.    And prior to your work in this case, had you

8    ever studied any kind of emission rate from a facility

9    that coated fabrics with PTFE?

10     A.    I do not believe so, no.

11     Q.    And prior to your work in this case, had you

12   ever quantified emission rates from a facility that

13   coated fabrics with PTFE?

14     A.    No.

15     Q.    What are the steps that you took to

16   familiarize yourself with PFOA in the period between

17   when you were first retained on this case and when you

18   submitted the report marked as Exhibit 1?

19     A.    Document review, historical document review,

20   technical report review, reading, Google searches I'm

21   sure here and there, a standard review of -- of

22   technical journal articles and -- and historical

23   documents which related to the facility.

24     Q.    Are there any papers or publications or

25   materials regarding PFOA that you considered but

1    decided not to rely on in this case?

2         A.   Well, I'm sure I -- there is a couple that

3    were -- were going around that just, I didn't see them

4    apply, and then to tell you what they are, it wasn't

5    anything that was pertaining to what I was doing here,

6    but I -- I can't recall what they were.

7         Q.   Have you studied catalytic abatement

8    pollution control technology?

9         A.   I have.

10        Q.   And what have you -- sorry.  In your own

11   words, what all would you say you've studied --

12        A.   Well, I was going to ask you what you mean

13   by "studied."  I'm just familiar with the technology

14   and have seen it applied.

15        Q.   So what's the basis for your familiarity

16   with the technology?

17        A.   Just standard air permitting work with the

18   different facilities that apply the technology.

19        Q.   Have you ever studied the ability of

20   catalytic abatement pollution control technology to

21   remove perfluorinated chemicals from emission streams?

22        A.   No, no.

23        Q.   Have you ever published about the

24   effectiveness of catalytic abatement pollution control

25   technology?

```
 1        A.    No.
 2        Q.    Have you ever provided any consulting
 3   services regarding catalytic abatement pollution
 4   control technology?
 5        A.    I have.
 6        Q.    And what's the nature of those services?
 7        A.    I typically see them installed on internal
 8   combustion engines for carbon monoxide control.
 9   That's mostly probably my most recent work that I've
10   dealt with catalytic control technologies.
11        Q.    And none of that work has been with
12   perfluorinated chemicals?
13        A.    No, no.
14        Q.    And so in connection with your report in
15   this case, have you done any work to familiarize
16   yourself with the ability of catalytic abatement
17   pollution control technology to remove perfluorinated
18   chemicals from emission streams?
19        A.    No.
20        Q.    And the model you used in this case was
21   called AERMOD.  Is that right?
22        A.    That is correct.
23        Q.    Now, to use AERMOD, you need to set the
24   inputs for the model based on your analysis of the
25   site you're trying to model.  Is that fair?
```

 1      A.    That is fair.

 2      Q.    You'd agree that when you're modeling with

 3 AERMOD, you have to understand what the source is to

 4 be able to estimate what the emissions are.  True?

 5      A.    True.

 6      Q.    And you have to understand what chemicals

 7 are used at the facility to use AERMOD?

 8      A.    Yes.

 9      Q.    And you have to --

10      A.    Well, I mean, to estimate the emission rates

11 that goes in input, yes.

12      Q.    So to use AERMOD to estimate emissions rate

13 from a facility, you need to know what chemicals are

14 being used at the facility.  Right?

15      A.    Well -- and, again, I would maybe revise my

16 last answer, is you can actually run AERMOD and --

17 well, you -- yes, you typically want to know what the

18 emission rates are.

19      Q.    To accurately use --

20      A.    Yeah.

21      Q.    -- AERMOD?

22      A.    Right.  Yeah, to come up with some kind of a

23 concentration or deposition or whatever, you

24 eventually got to know what -- what you're applying as

25 far as an emission rate in most cases, yeah.

1      Q.    And to accurately use AERMOD to model air

2    emissions from the facility, you'd have to know how

3    the chemicals are being used in the facility.  Fair?

4           MR. DAVIS:  I'm going to object to the form

5           of the question as vague.

6           THE WITNESS:  Yeah, so help me out.

7           Rephrase the question, please.

8    BY MR. CURRAN:

9      Q.    I'll repeat the question.

10     A.    Okay.  Repeat the question.

11     Q.    To accurately use AERMOD to model air

12   emissions from a facility, you'd have to know how that

13   facility is using chemicals that are in the emission

14   stream.

15          MR. DAVIS:  I'm going to object to the form

16          of the question, and I'm objecting specifically

17          to the term "accurately" as vague.

18          THE WITNESS:  In most cases, yeah, when

19          you're running the AERMOD, you have to understand

20          or be provided information on how the emission

21          rates come from the process.  There's a lot of

22          times that, you know, my role, I can't figure it

23          out.  I don't know that -- I don't have that

24          information, and some of it is provided by the

25          engineers, for example, at the facility to help

```
 1        with what would actually be emitted.
 2   BY MR. CURRAN:
 3        Q.    To try and provide an accurate AERMOD model,
 4   you attempt to understand how the chemicals that
 5   you're modeling are being used in the facility.  Fair?
 6        A.    As best I can, yes.
 7             MR. DAVIS:  Same objection.
 8   BY MR. CURRAN:
 9        Q.    And to accurately use AERMOD, a modeler
10   should know the design or the layout of the facility.
11   Is that fair?
12             MR. DAVIS:  Objection to the term
13        "accurate."
14             MR. CURRAN:  Gary, I'm going to see if we
15        can come to a resolution here.  Under the --
16             MR. DAVIS:  It's a vague term.
17             MR. CURRAN:  Under the Local Rules, you are
18        entitled to object to form and offer non-speaking
19        objections.
20             MR. DAVIS:  Right.
21             MR. CURRAN:  And we're trying to be careful
22        on both sides of this case to object just to
23        form, and I'm hoping that we can do that here in
24        this case.
25             MR. DAVIS:  I'm trying to instruct you on
```

1    how to ask a question that's not vague.

2        MR. CURRAN:  I appreciate the guidance, and

3    I'm going to ask you not to do that because I

4    don't need your instruction to this case.  I need

5    you to just say, Objection, form, and not speak

6    to the witness through your objections.

7        MR. DAVIS:  I wasn't speaking to the

8    witness.  I was speaking to you.  The objection

9    was to your question.

10        MR. CURRAN:  And I appreciate your desire to

11    tell me what you think is wrong with the

12    question.

13        MR. DAVIS:  Uh-huh.

14        MR. CURRAN:  But I'm going to ask you to

15    object to form for the remainder of this

16    deposition.

17        MR. DAVIS:  I'll object in the manner in

18    which I choose.

19        MR. CURRAN:  We've made the record clear.

20        MR. DAVIS:  I've been practicing under these

21    Local Rules for a long time.

22  BY MR. CURRAN:

23    Q.  So Mr. Yoder, you'd agree that to accurately

24  model facilities' emissions using AERMOD, you want to

25  understand the design and layout of the facility?

1           MR. DAVIS:  Same objection.

2           THE WITNESS:  Well, to the degree that you

3      want to know where the emission points are that

4      you're modeling, simulating at least, yes.

5  BY MR. CURRAN:

6      Q.   If you want to accurately model emissions

7  from the facility, you want to understand the design

8  and layout of those emissions points.  Fair?

9           MR. DAVIS:  Same objection.

10          THE WITNESS:  Yes.

11          MR. DAVIS:  Can I have a -- a standard

12      objection -- a running objection to the term

13      "accurate"?

14          MR. CURRAN:  Absolutely.

15          MR. DAVIS:  Okay.  That will -- that will

16      shorten this.

17          THE WITNESS:  Yes, you need to understand

18      the -- the locations of -- if you're modeling

19      emission points, where the locations are of those

20      points, so, yes, the layout.

21  BY MR. CURRAN:

22      Q.   Why is it important to accurately understand

23  the design of the size of the emissions points when

24  you're conducting an AERMOD analysis for a facility?

25      A.   Well, it affects the -- it affects the -- in

1  how the model simulates the dispersion, and

2  specific -- specifically in short term, when you're

3  dealing with short-term concentrations, it really can

4  have some -- some bearing on -- short term and nearby,

5  near the facility.

6      Q.   How does the -- the height of the emissions

7  point impact the AERMOD analysis or air emissions?

8      A.   Well, generally, I mean, obviously if you

9  have a -- a higher stack, you're releasing the

10  compound in a much, you know, higher elevation.  So

11  depending on where you're trying to determine where

12  your impact is and where that plume impacts, the

13  height is one of the key inputs as determining how --

14  what the model calculates when it does its

15  computation, does a particular location.

16      Q.   And how does the diameter of the emissions

17  point impact the AERMOD analysis for air emissions?

18      A.   Well, it doesn't.  It -- it uses the exit

19  velocity, so diameter is tied to the exit velocity.

20      Q.   And how does exit velocity impact the --

21  strike that.

22          How does exit velocity for a -- a particular

23  emission stream impact the AERMOD analysis for that

24  stream?

25      A.   It affects the -- the term, the -- well, the

```
 1    exit velocity, so you have two -- two terms, two flux
 2    terms.  I -- I call them mechanical basically, the --
 3    the physical release in a vertical direction of the,
 4    whatever you're modeling, a minimum flux I guess is
 5    what they will call it, and you have the heat flux
 6    too, so that exit velocity is -- is tied into that
 7    equation.  I hope you don't ask me about the
 8    mathematics.  I -- I don't know them that well.
 9         Q.   For an accurate AERMOD model, you'd want to
10    be as precise as possible about the -- the height of
11    the -- the emissions point.  Fair?
12              MR. DAVIS:  Objection, vague question.
13              THE WITNESS:  Obviously, yes, if you try
14         and -- you try and -- anytime you build a model,
15         you want to be as accurate as possible with the
16         data that you -- you have and your understanding
17         and building input.
18    BY MR. CURRAN:
19         Q.   And in the field, you'd agree with me that
20    the accepted methodology is to be as accurate as
21    possible about the height of the emissions point?
22         A.   Accurate as possible based on the
23    information you have, yes, of course.
24         Q.   And you'd agree with me that in the field,
25    the accepted methodology is to be as accurate as
```

                                                    Page 60

1     possible about the exit velocity for the stream that

2     you're measuring.  True?

3         A.   As best as you can, yes, from the

4     information that you have.

5         Q.   And that emission stream that exits from a

6     certain point at a certain velocity and then moves

7     into the wind, you'd want to be as accurate as

8     possible about the wind data that you're using for an

9     accurate AERMOD model.  Is that fair?

10        A.   Yes.

11        Q.   In this case when you were deciding on the

12    inputs for your AERMOD model, you estimated different

13    potential emission rates from facilities in Bennington

14    and from North Bennington.  Correct?

15        A.   I'm sorry.  Repeat the question again,

16    please.

17        Q.   Sure.  In this case when you were deciding

18    on the inputs for your AERMOD model --

19        A.   Yes.

20        Q.   -- you had to estimate different potential

21    emissions scenarios for facilities in Bennington, but

22    also in North Bennington.  Correct?

23        A.   Okay, yes.

24        Q.   Did you visit either the Bennington or North

25    Bennington facility to assess their size?

1  A. I did North Bennington, not the Bennington.

2  Q. And when did you visit the North Bennington

3 facility -- I'm sorry, the -- when did you -- yeah,

4 when did you visit North Bennington?

5  A. It was May, I believe.

6  Q. And did anyone accompany you on that visit

7 in -- to the North Bennington facility in May?

8  A. Yes.

9  Q. Who was that?

10  A. Actually, it was -- Cathy was with me when

11 we actually went by the building, the one in North

12 Bennington.

13  Q. Other than Ms. Dare, anyone attend this

14 visit to the North Bennington facility with you?

15  A. No.

16  Q. Describe for me the activities that you and

17 Ms. Dare engaged in to perform that on-site analysis

18 of the facility.

19  A. It really wasn't any more than just putting

20 eyeballs on it.  You know, we were looking at drawings

21 and pictures and -- and reading documents.  It was

22 just an opportunity to actually physically see it, you

23 know, but there wasn't really any analysis done.

24  Q. So you were in the area of the North

25 Bennington facility, but you didn't take specific

1   measurements --

2        A.   No, no.

3        Q.   -- of the facility?  Other than that

4   May 2017 visit to North Bennington, did you do any

5   other facility -- on-site facility visits or

6   measurements to determine your AERMOD inputs?

7        A.   No, I did not.

8        Q.   Prior to this case, did you have any

9   experience with PTFE coating towers?

10       A.   No.

11       Q.   Did you conduct any analysis of PTFE coating

12  towers in connection with your modeling in this case?

13       A.   No.

14       Q.   Did you do anything to try and educate

15  yourself about how PTFE coating towers operate?

16       A.   I did.

17       Q.   And what did -- what was that?

18       A.   It was basically just to understand how the

19  process worked.  It's pretty simple.  But, yeah, just

20  to understand the -- the whole concept of the fabric

21  coating and the solution and the different drying

22  zones and, you know, the up and out or the up and down

23  and out or -- I forget the other terminology, but the

24  different types of -- of ways of -- of coating the

25  cloth, so, yes.

Page 63

```
 1        Q.    How many different dispersions did ChemFab
 2   utilize to coat fabrics at its Northside Drive
 3   facility in Bennington, Vermont, between '69 and '78?
 4        A.    I have no idea.
 5        Q.    Did you try to do anything to determine how
 6   many different dispersions ChemFab used to coat
 7   fabrics at Northside Drive in those years?
 8        A.    I did not, no.
 9        Q.    Did you do anything to analyze the
10   components of each of the dispersions that ChemFab
11   used to coat fabrics at Northside Drive between '69
12   and '78?
13        A.    I did not, no.
14        Q.    I'll ask him the same questions about the
15   other facility.  I'm sorry, I'll strike that.
16              How many different dispersions did ChemFab
17   use to coat fabrics at its Water Street facility in
18   North Bennington, Vermont, between the years '78 and
19   2001?
20        A.    I do not know.
21        Q.    And did you do anything to determine the
22   components of each dispersion utilized by ChemFab to
23   coat fabrics at Water Street between '78 and 2001?
24        A.    I did not.
25        Q.    And did you try to determine how many
```

```
                                          Page 64
 1    different dispersions were used to coat fabrics at
 2    Water Street between '78 and 2001?
 3         A.   I did not, no.
 4              MR. DAVIS:  Counsel, can we ask, we've been
 5         going about an hour, when you come to a
 6         convenient stopping point, that we -- we can take
 7         a break?
 8              MR. CURRAN:  Actually, I think that's a good
 9         stopping point.
10              MR. DAVIS:  Okay.
11              THE VIDEOGRAPHER:  We're off the record at
12         10:07 a.m.
13              (RECESS TAKEN)
14              THE VIDEOGRAPHER:  We're back on the record
15         at 10:22 a.m.
16    BY MR. CURRAN:
17         Q.   As just a housekeeping note, would it be
18    possible, for exhibit numbering -- we have two copies
19    of your report right now, the annotated version and
20    the non-annotated version, and rather than have an
21    Exhibit 1 and an Exhibit 3 that are both the same
22    document, I'd like to relabel your Exhibit 3 as
23    Exhibit 1A.
24         A.   Oh, okay.
25         Q.   It's -- just a 1 annotated.  That will help
```

1   with the numbering as we go through.

2        A.   Okay.

3        Q.   So we'll just relabel what's currently

4   Exhibit 3, I'll just note on this that this is --

5   we're going to relabel this as Exhibit 1A.

6              MR. DAVIS:  We're not on the record, are we?

7              MR. CURRAN:  We are.

8              MR. DAVIS:  Okay.

9              MR. CURRAN:  So -- oh, thank you, thank you.

10        The reason I do that right now, I'm going to mark

11        something else as Exhibit 3, so before we get

12        confused about anything -- thank you very much --

13        I will change this to 1A.  Thank you.  And then

14        I'll -- this one's 3, this one -- oh, thank you.

15              THE COURT REPORTER:  Oh.

16              MR. CURRAN:  I'm sorry, I've used 3, so 3

17        here.  And we'll mark as -- as Exhibit 3 a copy

18        of the conceptual site model.

19              THE WITNESS:  Okay.

20              (EXHIBIT 3 WAS MARKED FOR IDENTIFICATION)

21   BY MR. CURRAN:

22        Q.   Mr. Yoder, are you familiar with the

23   conceptual site model prepared by Barr Engineering?

24   This is the June 2017 version.

25        A.   I am.

1     Q.   What's your understanding of how Barr

2  Engineering modeled air emissions from the former

3  ChemFab facilities in Exhibit 3?

4     A.   That they modeled PFOAs, particulate matter

5  emissions from both the Water Street and Northside

6  Drive facilities using AERMOD, five years of

7  meteorological data, processed meteorological data.

8     Q.   Do you -- do you disagree with any of the

9  air modeling methodologies that Barr Engineering used

10 to prepare this June 2017 conceptual site model?

11    A.   Well, there -- there's a couple inputs I --

12 I was scratching my head about on some of the stack

13 parameters.  What are you talking, the overall

14 approach, the model?  I mean, what specifically --

15    Q.   Let's start with --

16    A.   -- are you asking me?

17    Q.   Let's start with just the overall

18 methodology.

19    A.   Overall methodology.  No, I don't.

20    Q.   So you wouldn't disagree with the overall

21 methodology used by Barr Engineering for the June --

22 June 2017 conceptual site model.  True?

23    A.   True.

24    Q.   Do you use methodologies in your report that

25 differ from those used by Barr Engineering to prepare

1    their conceptual site modeling in June 2017?

2         A.    That is hard to answer because I don't have

3    any of the specifics on their modeling other than

4    their description and figures and some of the input

5    tables, but there's a lot of details that I don't

6    have.

7         Q.    Do you consider the methodologies used in

8    your report to be more accurate than the methodologies

9    used by Barr Engineering?

10             MR. DAVIS:  I'm going to -- I'm going to

11        object -- you got to let him finish the question

12        before you answer, but I'm going to interpose an

13        objection.

14             THE WITNESS:  Umm ...

15             MR. DAVIS:  Objection to the form of the

16        question.

17             THE WITNESS:  Okay.  So -- so -- repeat the

18        question for me.  So do you think -- do I

19        think --

20    BY MR. CURRAN:

21        Q.    Do you consider the methodologies used in

22    your report to be more accurate than the methodologies

23    used by Barr Engineering in Exhibit 3?

24        A.    I may consider, like, some of my decisions

25    on some of the input on the input parameters for a

Page 68

```
 1    couple of the stacks more accurate, but -- yeah, so
 2    there may be some points here and there that I may --
 3    I would consider might be more accurate.
 4         Q.   So we've been talking about overall
 5    methodology.  Let's -- let's move to inputs and
 6    assumptions.
 7         A.   Okay.
 8         Q.   What, if any, assumptions does Barr make
 9    when applying its air emissions model that you
10    disagree with?
```



```
19         Q.   Aside from the assumptions about ambient
20    temperature exhaust, any other assumptions that Barr
21    made in the report that you can recall that you
22    considered unreliable?
23         A.   I'd -- I'd have to go back and -- and look
24    at this a little bit closer, and -- and there may be,
25    but off the top of my head, I can't think of anything.
```

1    Q.   Can you recall any assumption that you made

2   in your report that differ from those made by Barr?

3    A.   Well, I think they had -- you know, again --

4   and it kind of goes back to some of the input

5   parameters.  Maybe it's the way they characterized the

6   particulate for the method 2.  Again, I don't have

7   much information on how they did it, so.

8    Q.   If you had any specific criticisms of the

9   Barr report and you plan to express those opinions in

10  this case, you would have included them in your expert

11  report.  Fair?

12   A.   Yeah, yeah, but I really was trying to do my

13  analysis as a standalone document, as a standalone

14  analysis.

15   Q.   Now, in this case, you modeled PFOA

16  emissions from -- well, strike that.

17       You'd agree that the accuracy of your model

18  output depends on the accuracy of your model inputs.

19  Fair?

20       MR. DAVIS:  Object to the question, to the

21       form of the question.

22       THE WITNESS:  Yes, I mean, of course, yes.

23  BY MR. CURRAN:

24   Q.   So if the inputs to your model are not

25  accurate, then the output of your model won't be

Page 70

1  accurate?

2       A.    Well, not necessarily, no.  I mean, if -- if

3  you're -- you can have some slight inaccuracies that

4  still give you maybe what you're looking for in the

5  analysis.  In other words, going back and correcting

6  some -- some -- some inaccuracies really would not

7  have -- it wouldn't have a significant impact on -- on

8  the results as maybe they were in the first time, so

9  that's always a possibility.

10      Q.    For model outputs to be accurate -- well,

11  strike that.

12            With respect to the Water Street facility in

13  North Bennington, you prepared three different

14  emissions models using three different annual

15  emissions rates?

16      A.    That's correct.

17      Q.    Now, in your paragraph 7 of your

18  declaration -- that's Exhibit 2.

19      A.    Oh, 7.

20      Q.    Paragraph 7, you say that these three PFOA

21  emission rate scenarios are based on information

22  provided by the Vermont DEC and Saint-Gobain and its

23  consultants.  I also relied upon the expert report of

24  Philip K. Hopke.

25            Do you see that?

Page 71

1      A.    Yes.

2      Q.    So taking those in turn, what information

3  did you receive from the Vermont DEC?

4      A.    There was some air dispersion modeling files

5  that they -- they had run the AERMOD also -- no, I

6  take that back.  So you're asking specifically about

7  this scenario, this 100 -- oh, no, that was from a

8  conversation that we had, a conference call, so.

9      Q.    Well, I just want to understand.  You say

10 here that the three PFOA --

11     A.    Uh-huh.

12     Q.    -- emission rate scenarios are based on

13 information from those sources.  So what information

14 did you receive from the Vermont DEC for any of those

15 three PFOA emission rate scenarios you mentioned in

16 paragraph 7?

17     A.    So we just -- we just -- we just hadn't --

18 we had to understand or did -- didn't quite understand

19 completely what the PFOA emission rate was, so we

20 just -- I decided with the team that we would bound

21 these on low end, middle, upper end.  So the bounds

22 were made by, again, what -- what Barr did and then a

23 thousand pounds per year based on what DEC did or what

24 they thought was going on from a conversation that we

25 had with them, and also based on the -- the one

1   reference I have in there, which I told you that I

2   forgot to add to my reference list, was Allied

3   Technologies' 1992 analysis for fluorinated

4   hydrocarbon emission rates, and then the 10,000 pounds

5   per year's potential for, you know, mostly talking to

6   Phil Hopke what -- what may be actually happening

7   there as far as PFOA emissions.

8        Q.    Why did you decide to prepare what you

9   called an upper and lower bound --

10       A.    And, again --

11       Q.    -- emission rate?

12       A.    -- because it's -- as far as modeling input

13  goes, going back to your question, as far as

14  understanding what emission rates would be in a lot of

15  cases, you know enough -- have enough information from

16  an -- I would say from an engineering standpoint to

17  understand what the mass emission rate may be coming

18  from a stack that you're inputting into the -- into

19  the model and would be your typical input.

20            In this case, it's -- it's a point of

21  debate, so we just approached it as where this may

22  fall as far as what -- what is actually ultimately the

23  outcome as far as PFOA emissions or were.

24       Q.    Did you try to make any assessment of

25  whether the upper and lower bounds you used as inputs

1   for your models were reasonable or accurate

2   assessments of PFOA emission rates?

3       A.   Yes, in -- in working with Phil, yeah, that

4   we know is -- yeah.

5       Q.   Describe the steps that you took to assess

6   whether an upper bound of 10,000 pounds per year was

7   reasonable or accurate.

8       A.   And, again, I would rely primarily on Phil

9   Hopke's work, but in his understanding or his belief

10  that the PFOA was emitted prior to any kind of

11  decomposition or control of it from the -- from the

12  drying zone, which is where, if that was the case and

13  it turned out to be the actual fate of PFOA, then we

14  would see something much, much higher as far as

15  emission rate of PFOA.

16      Q.   Why did you decide to identify three

17  different scenarios for PFOA emissions rates rather

18  than determine the most likely PFOA emission rate?

19      A.   Just, you know, to -- well, a little bit of

20  comparison to previous modeling and compared to what

21  other -- what other analysis have -- you know, what's

22  been done also from other --

23      Q.   You just referenced "comparison to previous

24  modeling."  What modeling are you referring to?

25      A.   Well, I know that their -- that the DEC has

1    also done some -- some air modeling too, so a lot of

2    this going in was, would our results be similar?

3        Q.   Was your goal to achieve a model output that

4    was similar to the one that you see?

5        A.   Well, it was not necessarily the goal, but

6    it was -- you know, it was part of the analysis when

7    it was finished, is it similar, and if not, then --

8    then I'd be asking, well, what's the big difference?

9    Why -- why does mine look so much different?  What --

10    what's going on here?

11        Q.   If -- if your air emissions model resulted

12    in different results than the Vermont DEC air

13    emissions model, it's your testimony that you would be

14    then questioning the Vermont DEC air emissions model?

15        A.   I could question Vermont.  I mean, if the

16    initial -- the initial -- initial runs were different,

17    I'd maybe even question myself, but, you know -- and I

18    didn't -- looking at it more from a general deposition

19    contour viewpoint, not a specific deposition rate of a

20    particular receptor, so it was just an overall kind of

21    comparison.

22        Q.   So you weren't attempting to determine the

23    particular deposition rate at any particular receptor

24    as part of your analysis?

25        A.   Well, no, I was.  I mean, to generate the

1   graphics that I have presented, I did, I had to do

2   that, so, yes, that was included in the analysis.

3       Q.   So I want to understand, when you say, "I

4   wasn't looking at it more from a general deposition

5   contour viewpoint, not a specific deposition rate of

6   any particular receptor, just an overall kind of

7   comparison," what does that mean?

8       A.   Yeah, I mean, I should have been a little

9   bit clearer in my -- what I was trying to tell you was

10  that I -- when comparing my analysis to the other

11  analyses, I was generally looking at how the model

12  simulated the deposition within the Bennington area,

13  specifically with the complex terrain that's in --

14  that's in that area.

15      Q.   When you say the complex terrain in the

16  Bennington area, what are you referring to?

17      A.   Oh, so it's a modeling term for terrain

18  elevations over model stack heights, stack -- stack

19  exhaust elevations, and once you've got terrain over

20  that height, it's considered in the modeling world as

21  complex, is what they call it.

22      Q.   Let me ask about some of the inputs to your

23  different emission rate scenarios.  Did you rely on

24  information from Vermont DEC to develop your

25  100 pounds-per-year emission scenario?

1     A.   No.  Actually it was, from what I understood

2 from a general -- as I wrote in the -- in my report,

3 the level that Barr was estimating coming from the

4 facility, so around 100 pounds per year.

5     Q.   So the basis for your 100 pounds per year

6 figure is, I believe it's appendix A to the Barr

7 report.  Is that right?

8     A.   Yes.

9     Q.   Okay.  Now, I believe that in appendix A,

10 Barr estimates emissions as 145 pounds per year?

11     A.   That sounds right, yes.

12     Q.   How did you get from 145 pounds a year to

13 100 pounds per year?

14     A.   We're modeling a unit emission rate, so it

15 was -- it was just a -- you know, a bit of an

16 arbitrary approach to what may be happening as far as

17 deposition in the area of the Saint-Gobain facility.

18 I -- you know, for me to say, oh, there's exactly this

19 many grants but the model says there's exactly this

20 many grants per meter squared per year at a particular

21 location goes back to actually knowing what the PFOA

22 emission rate is, and, again, my analysis did not

23 include that.  It's -- it's because it is a bit of a

24 debate, so we used the three scenarios.

25     Q.   Now, you mentioned earlier a 1992, I think,

1   Allied Technologies report?

2         A.   Yes, yes.

3         Q.   So I'll -- I'll mark that as --

4         A.   Yeah, table 10, I believe, is --

5         Q.   -- as Exhibit 4.

6         A.   Yeah, yeah.

7         Q.   And table 10 is located on page 12.  We'll

8   mark that Exhibit 4, the copy.

9         A.   Okay.

10              (EXHIBIT 4 WAS MARKED FOR IDENTIFICATION)

11  BY MR. CURRAN:

12        Q.   So do you recognize what's been marked as

13  Exhibit 4?

14        A.   Yes.

15        Q.   And what is this that we're looking at?

16        A.   This is Alliance Technologies', they call it

17  diagnostics test program results, 1992.

18        Q.   And I believe you testified that you applied

19  table 10 on page 12 for -- as the basis for your

20  1,000 pounds per year?

21        A.   It's a basis, yes.

22        Q.   Describe to me how you used table 10 to --

23  to come up with the 1,000 pounds-per-year emission

24  rate.

25        A.   Well, with Phil Hopke we were trying to get

1   an idea of -- you know, obviously PFOA was not

2   measured directly, you know, back at this time.  It

3   wasn't -- so we were trying to figure out based on

4   the -- some of the analyses that were done, test

5   reports, things like that that would have been an

6   indicator what the PFOA emission rate was, what we

7   were actually looking at.

8           And this document mentioned the -- on

9   table 10, page 12, you said?  Yeah -- the fluorinated

10  hydrocarbon emission rate of .15 pounds per hour,

11  so -- and, again, we had a conversation with DEC,

12  trying to understand some of the permitting history

13  and things that they were looking at.  And they didn't

14  believe it was the total all PFOA, maybe an order of

15  magnitude less, which is where you come up with

16  about -- if you multiplied that emission rate by all

17  the stacks, you came up with about 1400 pounds a year,

18  so that's where we kind of arbitrarily selected the

19  1,000.

20      Q.   I want to unpack that a little bit.  You

21  mentioned multiplying by 11 stacks.  What did you mean

22  by that?

23      A.   I -- I modeled 11 stacks, and, again, this

24  is what I was able to pull from the data.  And I

25  believe, you know, Barr maybe had 12 stacks, so maybe

1    I combined a tower or two that shouldn't have been.

2    It was a little -- it was difficult to decipher.

3    There were several changes at this facility over the

4    course of the years, so I -- I tried to incorporate

5    into my modeling the most recent state of the facility

6    kind of at the end before it was closed, so I have 11

7    stacks, I believe, in my table.

8         So basically it was a pound per hour

9    because, if I understood it correctly from this, it

10   was that it was from a particular source or tower, so

11   we multiplied this emission rate just assuming it was

12   across the board for all the towers, that emission

13   rate.

14   Q.    What was your basis for that assumption?

15   A.    Well, it was really, again, we're just

16   trying to come up with something to -- for a model

17   input as best as we can without having all the data

18   that -- obviously at our disposal that we could have,

19   and so it was -- it was assuming that the -- the

20   facility was operating pretty much around the clock,

21   which I believe it was, and that the towers would

22   have, you know, obviously been all operating for the

23   most part continuously, and it was just an assumption

24   that -- to take that emission rate across the board.

25   Q.    Did you consider and reject any other

Page 80

1   assumptions for the -- the level of operation at

2   either facility?

3         A.    No, I can't recall anything in particular

4   that I would have -- would have rejected.

5         Q.    Let me go back to Exhibit 4, table 10.

6         A.    Yeah.

7         Q.    Can you point me to the -- the data here

8   that you used for your 1,000 pounds-per-year --

9         A.    Yeah.

10        Q.    -- figure?

11        A.    Fluorinated hydrocarbon, emission rate,

12  pound per hour, .15, VOST data summary.

13              THE COURT REPORTER:  The what data summary?

14              THE WITNESS:  It's VOST, sorry, V-O-S-T.

15        It's -- you know, it's -- the PTFE is what they

16        called it.  It's tower E.  Here's what I was

17        referring to.  So it was a particular tower, an

18        emission rate from one tower.

19  BY MR. CURRAN:

20        Q.    This was an emission rate from one tower?

21        A.    Yeah.

22        Q.    From tower E?

23        A.    That's right.

24        Q.    Do you know how many other towers were

25  operational in North Bennington in 1992?

1      A.   1992, not off the top of my head, I don't --

2   it -- again, it changed.  Seemed like every two, three

3   years they were adding a new tower, and I -- I don't

4   know the chronology as -- of what it was at -- at that

5   time.

6      Q.   So you're aware that approximately every few

7   years --

8      A.   Yeah.

9      Q.   -- new towers were coming online or offline

10  at the facility.  Correct?

11     A.   That's correct.

12     Q.   This analysis on tower E --

13     A.   Uh-huh.

14     Q.   -- in Exhibit 4, was this the only tower in

15  which perfluorinated -- I'm sorry, fluorinated

16  hydrocarbons were detected by Alliance?

17     A.   Were detected by what?

18     Q.   By -- by Alliance.

19     A.   Oh, good question.  I'd have to go back and

20  look at this.  I don't remember all of the -- so it

21  says they did E and P, so I'd have to look at the

22  document to see if there was also any data on P, so

23  that's possible.

24     Q.   Did you -- as part of your initial analysis,

25  did you attempt to look for additional data points

1  before you picked the emission rate that you had used

2  to apply to different towers?

3      A.   Well, again, in my approach, I was really

4  just trying to kind of bound what the potential

5  emissions rates could be from a low end to a high end,

6  so, no, I didn't really spend a whole lot of time in

7  coming up with something different than 1,000.  It

8  seemed to be a good fit based on what we have here for

9  that particular tower.

10      Q.   Do you know what product was being run at

11  the time of this tower E run 3 analysis by Alliance

12  Technologies?

13      A.   No, I do not.

14      Q.   Do you know if the product that was being

15  run was representative of other products made in North

16  Bennington, Vermont?

17      A.   I can only assume that it was, but I

18  don't -- yeah.

19      Q.   Do you have any basis for that assumption?

20      A.   I mean, just because it's -- they -- you

21  typically, when you run -- you're doing some kind of a

22  test, you should be running what you typically run

23  through a tower, and, in most cases, to try and

24  challenge the process, meaning to where -- you know,

25  run it as -- as close to design as possible, but I

1  don't -- again, I'm just making an assumption, I -- to

2  answer your question.

3          Q.   Do you know how many different substances

4  could be classified as fluorinated hydrocarbons?

5          A.   I do not.

6          Q.   And this 1992 Alliance report, does it state

7  what fluorinated hydrocarbon was tentatively

8  identified from tower E?

9          A.   I seem to recall that it did not -- well,

10  actually, maybe they did.  They went through the

11  process, through the lab analysis.  But, again, this

12  is getting out of my area of expertise, so I see a lot

13  of that stuff, and I don't know what it means, so.

14          Q.   So fair to say you didn't attempt to

15  determine --

16          A.   No.

17          Q.   -- what fluorinated hydrocarbon in

18  Exhibit 4 --

19          A.   No, no, sir.

20          Q.   -- was PFOE -- sorry, PFOA?

21          A.   Yeah.

22          Q.   Now, I understand that you did have a phone

23  call with the Vermont DEC in May of 2017?

24          A.   That is correct.

25          Q.   Describe for me, why did you have that phone

Page 84

```
 1   call with the Vermont DEC in May 2017?
 2        A.   I -- mostly it was -- it was the air
 3   modeling expert, I believe, conducted AERMOD, air
 4   dispersion modeling, and it was really just to kind of
 5   get a basis for his analysis and what they -- what the
 6   DEC thought was being emitted as far as PFOA, how they
 7   come to that conclusion, and their approach from an
 8   air dispersion modeling standpoint.
 9        Q.   And who from the Vermont DEC did you speak
10   to?
11        A.   I got it in here.
12        Q.   I -- I have it as Philip --
13        A.   Yeah.
14        Q.   -- Cannata, but I'm not sure if it's Cannata
15   or Cannata.
16        A.   Cannata is --
17        Q.   Oh, okay.
18        A.   -- is what I was saying, yes.
19        Q.   So you spoke to Mr. Philip Cannata --
20        A.   Correct.
21        Q.   -- in May 2017?
22        A.   That's right.
23        Q.   Is Mr. Cannata a consultant to the Vermont
24   DEC or a member of the Vermont --
25        A.   As I understand, he was actually an
```

1   employee, a staff member of the DEC.

2       Q.   And what did Mr. Cannata explain to you

3   about the Vermont DEC's emissions modeling?

4       A.   Mostly that, you know, he was involved in

5   the AERMOD side of modeling, but I believe they also

6   ran the CALPUFF model.  And he just -- based on what

7   he understood from -- he did not perform the CALPUFF

8   modeling, but based on what he understood from that

9   analysis, was that there was good agreement between

10  CALPUFF and AERMOD.  So it's -- and some general

11  information on, you know, kind of what they thought --

12  again, this goes back to the 1,000-pound-per-year

13  scenario, is that they thought that there was more

14  PFOA emitted, and his estimate was thousand -- a

15  thousand pounds per year roughly, a thousand -- 1500,

16  I think, maybe what he said.

17      Q.   I understand that -- strike that.

18          What are the differences -- strike that as

19  well.  I'm sorry.

20          Did you run a CALPUFF model in this case?

21      A.   I did not.

22      Q.   Why did you decide not to run a CALPUFF

23  model?

24      A.   Well, CALPUFF is a very difficult model to

25  run.  It's a very data-intensive model to run, and I

1    was not sure if there was data available to even

2    attempt to run it.

3         Q.   Do you consider the CALPUFF model run by

4    Vermont DEC to be reliable?

5         A.   I -- I do.

6         Q.   You decided not to run a CALPUFF model in

7    this case though?

8         A.   Yes.  No, I ...

9         Q.   In your opinion, could a CALPUFF model be

10   reliably run with this data?

11        A.   Well, yeah, I suppose, yes, if the data is

12   available to run, yes, it could be run.

13        Q.   Why did you choose not to run that model if

14   you believed it could be reliably done as a check?

15        A.   An AERMOD is also a reliable and recommended

16   and approved model by the U.S. EPA and -- and quite

17   simpler to run, easier to run, so.

18        Q.   Is CALPUFF currently a recommended model by

19   the U.S. EPA?

20        A.   I do believe it's not, the last I heard.

21        Q.   Would you believe it -- would you consider

22   it best practices to run a CALPUFF model currently,

23   given the U.S. EPA's guidance?

24        A.   Yeah, that's a good question.  I would say

25   probably not.  I -- what I don't know -- honestly, I'm

1   not sure about that answer 'cause I have not run a

2   CALPUFF model in many years myself, so.

3        Q.   Is the reason that you haven't run a CALPUFF

4   model in many years, that the CALPUFF model is not as

5   favored by the EPA?

6        A.   No, mostly because it's not easy to run.

7        Q.   In your report, you reference Mr. Cannata

8   relaying to you a discussion with a Vermont DEC -- I'm

9   sorry, a -- a Vermont DEC discussion with a ChemFab

10  engineer?

11       A.   Ah, yes.

12       Q.   Do you recall that?

13       A.   I do recall that.

14       Q.   Can you describe for us what you recall

15  about that discussion?

16       A.   Yeah.  I don't -- other than the fact that

17  he had mentioned it and it -- it was tied to what he

18  thought was a higher emission rate than what he

19  understood was being presented by Barr, but I don't

20  remember -- he didn't -- I don't think he gave a name

21  of the engineer or much about what that was -- in that

22  discussion other than he just had some more

23  information and thought maybe it would result in -- it

24  should be a higher PFOA emissions from the facility.

25       Q.   What's your understanding of Mr. Cannata's

Page 88

```
 1   role within the Vermont DEC?
 2        A.   My understanding is, and -- is he's a -- a
 3   meteorologist in the air dispersion modeling group.   I
 4   could be wrong about that.  I did not ask him what
 5   his -- his title or role is.
 6        Q.   And of all the people who work for the
 7   Vermont DEC, why did you speak with Mr. Cannata
 8   specifically about this subject?
 9        A.   Again, I think he -- because he was -- if I
10   recall correctly, he was -- he was understand -- he --
11   we were mostly after how the air dispersion modeling
12   was done for the -- their version of the air
13   dispersion modeling and that he was familiar with that
14   and may have been the one who executed it, if I'm not
15   mistaken.
16        Q.   So he may have actually run the modeling?
17        A.   He may have.  I can't remember now exactly.
18        Q.   How did you come to identify Mr. Cannata as
19   the right person to speak to?
20        A.   I believe that was provided by the counsel.
21        Q.   When you say "the counsel," you're referring
22   to counsel for the Sullivan plaintiffs in this case?
23        A.   Yeah, the plaintiffs' counsel, yes.
24        Q.   Now, you state in your report that
25   Mr. Cannata did not believe all of the fluorinated
```

Page 89

```
 1   hydrocarbons measured by Alliance Technologies was
 2   PFOA.
 3        A.   Yeah.
 4        Q.   Is that right?
 5        A.   That's correct.
 6        Q.   Okay.  And possibly an order of magnitude
 7   less?
 8        A.   That's right.  So that was his -- his
 9   opinion.  He didn't give any technical reason for it,
10   which took us back to the .15 for our middle basis,
11   which would be .015.
12        Q.   And did you press Mr. Cannata for his basis
13   for that?
14        A.   I, no, didn't really press him, no.  It was
15   a brief phone call.
16        Q.   Were you allowed to ask questions in the
17   phone call?
18        A.   Oh, yes.
19        Q.   What questions did you ask Mr. Cannata about
20   his analysis or his assumptions?
21        A.   You know, I think Phil was mostly interested
22   to -- on the PFOA of things.  I was the guy mostly
23   interested in how they did the modeling.  Most of my
24   questions were regarding that, meteorology, CALPUFF.
25   That was the other thing, because he mentioned the
```

1   CALPUFF.  I believe on that call is when we found out

2   that -- that the State had also done CALPUFF modeling,

3   so we were curious about that.  That was mostly my --

4   I believe my -- my questions during that call.

5        Q.   Did you do anything to test or confirm

6   Mr. Cannata's assumptions about an order of magnitude

7   less than .15 being the right number for PFOA as the

8   volume of perfluorinated --

9        A.   That's right.

10        Q.   -- hydrocarbons?

11        A.   Sorry.  No.  I mean, to test it, no.  Just

12   used it as a -- as a basis for one of our scenarios.

13        Q.   When Mr. Cannata referenced a ChemFab

14   engineer who roughly estimated 100 pounds of PFOA

15   emitted from each of the 11 stacks per year or

16   1100 pounds per year, did you ask Mr. Cannata for the

17   name of that ChemFab engineer?

18        A.   I believe we did not.

19        Q.   Did you ask what facility the engineer

20   worked in?

21        A.   I did not.

22        Q.   Did you ask when the engineer worked at that

23   facility?

24        A.   I did not specifically ask that, no.

25        Q.   Did you ask when the conversation took place

1   with Mr. Cannata?

2       A.   No, I don't think we specifically asked

3   that.  It's -- my recollection is is that it was a

4   recent understanding through their process and what

5   they were going through that they -- they were able to

6   gather that information, but I don't think I

7   specifically asked him when exactly he talked to this

8   engineer.

9       Q.   How did this engineer perform his rough

10  estimate of PFOA emissions?

11      A.   I have no idea.

12      Q.   Did you ask Mr. Cannata that?

13      A.   I did not.

14      Q.   Why did this engineer perform a rough

15  estimate of PFOA emissions?

16      A.   I do not know.

17      Q.   Did you do anything to independently verify

18  that the information Mr. Cannata provided to you is

19  accurate?

20      A.   I did not.

21      Q.   Let me mark for you Exhibit 5.  So when you

22  were having this conversation -- strike that.

23           During the course of your investigation on

24  the issues addressed in your report and preparation of

25  your report, did you take notes in this case?

```
                                                 Page 92
 1        A.    Yes.
 2        Q.    And you understand that some of what I
 3   believe are your handwritten notes were --
 4        A.    Yes.
 5        Q.    -- were produced in this case.  I'm going to
 6   mark as Exhibit 5 a document that does not have Bates
 7   numbers, but that I believe would be a copy of your --
 8   your notes.
 9        A.    Yeah, those are ...
10        Q.    Do you recognize those?
11        A.    Yeah, I do.
12             MR. DAVIS:  This appears to be what we
13        produced.
14             (EXHIBIT 5 WAS MARKED FOR IDENTIFICATION)
15   BY MR. CURRAN:
16        Q.    So taking a look at these notes that are
17   marked as Exhibit 5, do these appear to be notes that
18   you took in connection with your preparation of your
19   report?
20        A.    They're -- they're notes I took in
21   preparation for doing my analysis, yes.
22        Q.    Now, the first several pages of Exhibit 5, I
23   believe, are notes from the call you had with
24   Mr. Cannata.  Is that right?
25        A.    Yes.
```

```
 1        Q.    There is a reference here to Matt Chapman.

 2   Now --

 3        A.    Ah.

 4        Q.    -- what's your understanding of --

 5        A.    Yes.

 6        Q.    -- Matt Chapman -- who Matt Chapman is?

 7        A.    I believe he's an attorney for the DEC.

 8        Q.    And was anyone else present other than

 9   yourself, Mr. Hopke, Mr. Chapman, and Mr. --

10        A.    Cathy Dare was on this phone call, too.

11        Q.    Okay.  And other than Ms. Dare, Mr. Cannata,

12   yourself, Mr. Hopke, and Mr. Chapman, anyone else on

13   the call?

14        A.    As far as I know, no, unless they had

15   somebody else on that side that didn't speak.

16        Q.    Do you believe that these notes are an

17   accurate reflection of the conversation?

18        A.    I do.

19        Q.    And if you had been told how a former

20   ChemFab engineer made an estimate or how Mr. Cannata's

21   team had conducted their analysis, do you expect those

22   details would have been included in your notes?

23        A.    If you had provided them, yes.

24        Q.    So I think you testified that in your

25   analysis -- strike that.
```

1      In your report, you say that you assumed

2  continuous operation at .15 pounds per hour from 11

3  stacks.  Is that right?

4      A.   Yes, point -- I think .015 would have been

5  the --

6      Q.   Okay.

7      A.   Because we went the order of magnitude less,

8  .015.

9      Q.   So you took an emission rate, and you

10  multiplied that rate -- strike that.

11      You took an emission rate from a single

12  tower, and you then multiplied that by 11 to arrive at

13  your overall facility emission rate.  Is that --

14      A.   For the middle scenario, correct.

15      Q.   For the one -- for the 1,000 pounds for your

16  scenario?

17      A.   That's correct.

18      Q.   Now, you chose 11 because you considered

19  that to be -- well, strike that.

20      Can you explain to me why you chose 11?

21      A.   It was when I was collecting the information

22  and what I saw in the document, historical permitting

23  documents, I came up with 11.  And, again, it was

24  difficult to follow what tower was where.  There

25  seemed to be some contradictory bits of information

1    on -- on what tower was existing when or how they were

2    built.

3              So, again, I -- I may have combined two

4    towers that was actually maybe two separate stacks

5    possibly, but that was my best estimate of what --

6    what -- how the facility was.

7         Q.    What steps did you take to determine how

8    many emissions points there actually were from the

9    facility at various times?

10        A.    Reviewing primarily historical permitting

11   documents.

12        Q.    Now, you applied your -- strike that.

13             You assumed 11 stacks in continuous

14   operation --

15        A.    Yes.

16        Q.    -- for every year of operation from 1978 to

17   2002.  Correct?

18        A.    Well, yes, but for -- really for every year

19   of operation for the five years that I modeled in the

20   analysis.

21        Q.    Do you believe that there were -- it's fair

22   to assume that there were always 11 towers operating

23   at the Water Street facility?

24        A.    No, I know there wasn't.  I know that they

25   moved from the Northside Drive facility to Water

1   Street and then continued to expand from there and

2   adding stacks and towers.

3        Q.   You'd agree that it wouldn't be accurate to

4   model emission rates from non-operational towers.

5   True?

6        A.   I would agree that it wouldn't be -- repeat

7   the question, please.

8        Q.   Sure.  You'd agree it wouldn't be accurate

9   for an -- an air emissions model to assume constant

10  operation from a tower that's not operating.  Fair?

11            MR. DAVIS:  Object to the question.  You may

12       answer.

13            THE WITNESS:  Okay.  I -- yeah, typically if

14       it's not operating, you wouldn't model it, no.

15  BY MR. CURRAN:

16       Q.   The -- you mentioned that you were

17  attempting to model five years of data.  Which five

18  years were you attempting to model?

19       A.   2006 to 2000 -- through 2010.

20       Q.   Now, I believe the 2006 to 2000 --

21       A.   Yeah.

22       Q.   Strike that.  Okay.

23            So 2006 to 2010, those are the dates that

24  you attempted to model for emissions from the -- the

25  Northside Drive facility -- I'm sorry, strike that.

1          2006 to 2010 were the years that you tried

2     to model for emissions from the North Bennington

3     facility?

4          A.   From -- yes.

5          Q.   What -- what year did the Northside -- I'm

6     sorry.   Strike that.

7               What year did the North Bennington facility

8     cease operations?

9          A.   As I understand, 2001.

10         Q.   Why were you trying to model outputs from

11    the North Bennington facility in the period where it

12    wasn't operating?

13              MR. DAVIS:   Object to the question.

14              THE WITNESS:   What the 2006 to 2010 is,

15         representative meteorological data that has been

16         processed for input into AERMOD.   So in my

17         estimation, this meteorological dataset works

18         well whether it is applied to the time the

19         facility was operating historically or during the

20         period of 2006 to 2010.

21    BY MR. CURRAN:

22         Q.   So you were attempting to model the air

23    emissions from these facilities during their entire

24    periods of operation.   Correct?

25         A.   I was attempting to model five years of

```
 1   operation -- well, I take that back.  I was modeling a
 2   typical -- yeah, it -- it was the operation of the
 3   facility continuously with five years of
 4   meteorological data.
 5        Q.   You used five years of meteorological
 6   data -- strike that.
 7             Can I call it wind data?
 8        A.   That's -- that's fine.
 9        Q.   Okay.  You were -- you were attempting to
10   use five years of wind data as a proxy for weather
11   over the full course of operation for the Bennington
12   and North Bennington facilities?
13        A.   That's correct.
14        Q.   And using those five years of wind data, you
15   modeled PFOA emissions from 11 towers over the full
16   course of operation for those two facilities.  Fair?
17        A.   That's correct.
18        Q.   Now, when you were modeling the full course
19   of operations, for example, on Water Street from 1978
20   to 2002, you used five years of wind data from 2006 to
21   2010, and you used the assumption that 11 stacks were
22   operating 24/7, 365.  True?
23        A.   As I recall, yes.  Yeah, there was no --
24   yes.  You said Water Street.  Correct?
25        Q.   That's correct.
```

1      A.    Okay.

2      Q.    Now, why did you decide to assume that 11

3   towers were operating 24/7, 365, from 1978 to 2002 in

4   assembling your air emissions model for Water Street?

5      A.    I guess I should have been clear maybe in my

6   answer.  I modeled five years, so basically what I'm

7   assuming in this analysis is that the facility was

8   operating with 11 stacks for five years in this

9   analysis, so it's not an accumulative-type analysis

10  for the whole -- from 1978 to 2001.

11     Q.    I just want to make sure I understand that.

12  What five years of operation were you trying to model

13  here?

14     A.    I wasn't trying to model any specific five

15  years.  I was doing a unit emission rate analysis in

16  using this five-year meteorological dataset.

17     Q.    So is it your testimony that you did not

18  attempt to model the deposition impacts of the -- of

19  emissions from the Water Street facility for its

20  actual period of operation?

21         MR. DAVIS:  Object to the question as vague.

22     You may answer if you can.

23         THE WITNESS:  I modeled the deposition

24     impacts from the facility using a 2006 to 2010

25     meteorological datasets for five years, using a

```
                                              Page 100
 1        bound emission rate that basically encompasses
 2        the argument, if you will, of what the actual
 3        emission rates were from the facility during that
 4        time on an annual basis.
 5   BY MR. CURRAN:
 6        Q.   Which years of operation at Water Street did
 7   you attempt to model?
 8        A.   I modeled more likely the -- the facility as
 9   it was in the latter years, in the peak, probably --
10   the represent -- my model input represents how the
11   facility was that was built out after -- and I don't
12   know the last time the RS tower was added.  It was, I
13   think in maybe '97, somewhere around there, so it was
14   like -- more like the last few years of the existence
15   of the facility as it was finally constructed.
16        Q.   So in your opinion, your model does not
17   offer a model of cumulative deposition impacts for the
18   period of operation for the Water Street facility?
19        A.   No, it does not.
20        Q.   And your model does not attempt to offer
21   cumulative deposition impacts for the Bennington
22   facility?
23             MR. DAVIS:  Object to the question.  You may
24        answer if you can.
25             THE WITNESS:  Okay.  No, it's a
```

1          deposition -- an annual averaged deposition based

2          on the facility input as it was constructed.

3     BY MR. CURRAN:

4          Q.   And you weren't attempting to model the

5     annual deposition for any period other than the last

6     five years of operation?

7               MR. DAVIS:  Object to the question.

8               THE WITNESS:  That's correct.  It was -- it

9          was an analysis of -- of deposition as it was

10         constructed in -- mostly within the last, you

11         know, handful of years that it was -- it was in

12         operation.

13    BY MR. CURRAN:

14         Q.   Your model, assuming 11 stacks in continuous

15    operation, would not be an accurate proxy for the

16    facility in earlier years of operation when perhaps

17    only five stacks were operational.  True?

18         A.   Possible -- I --

19               MR. DAVIS:  Let me get my objection first.

20         You may answer.

21               THE WITNESS:  All right.  So that's correct,

22         I didn't do a -- a chronological analysis of one,

23         three stacks, five stacks, and then 11 stacks.

24         It was an assumption of -- it was our input of

25         the facility as it was constructed in the latter

```
 1        years when it was operating at its highest,
 2        highest production rate, as I understood.
 3             MR. CURRAN:  Okay.  We've been going about
 4        an hour.  Why don't we take a break.
 5             THE WITNESS:  Okay.
 6             THE VIDEOGRAPHER:  We're off the record at
 7        11:11 a.m.
 8             (RECESS TAKEN)
 9             THE VIDEOGRAPHER:  We are back on the record
10        at 11:28 a.m.
11   BY MR. CURRAN:
12        Q.   Mr. Yoder, we were discussing your three
13   different emissions scenarios.  I want to talk about
14   your 10,000-pound-per-year emission scenario.  In
15   your -- in your own words, why did you use
16   10,000 pounds per year as your upper bound?
17        A.   Well, this was relying on Phil Hopke's
18   expertise in the area of what he thought was going on
19   in the process with respect to the PFOA emissions, you
20   know, data collected, that he was reviewing on the
21   dispersions and amount of PFOA.  So in his estimate,
22   as we put in -- as I put in here, was that it was more
23   likely it could potentially be if the emissions were
24   evaporated or the PFOA was lost out of the process in
25   the bake -- in the drying zone, which is the first
```

1   zone it sees before the baking and sintering, that we

2   would potentially have emissions upwards, you know,

3   7,000 pounds a year.

4          So that was -- this, then, was kind of a

5   little bit of an arbitrary selection of framing it up

6   with the 10,000 pounds, kind of like we did on the

7   lower end, picking a number that was actually lower

8   than what Barr believed was being emitted.

9      Q.   So I believe Dr. Hopke says, and you quote

10  at page 5 of your report --

11     A.   Uh-huh.

12     Q.   -- that in his analysis, if there was no

13  destruction of PFOA and no reduction by the abaters --

14     A.   Yeah.

15     Q.   -- the average PFOA emissions would have

16  been nearly 3,000 pounds per year.

17     A.   Right.

18     Q.   Tell me, how did you get from 3,000 pounds

19  per year to 10,000 pounds per year?

20     A.   Well, then again, if the concentration of --

21  so continuing on, with going on with an -- an upper

22  end of it, the concentration of the APFO and

23  dispersion was taken from them as the essence instead

24  of the -- the 2,000 ppm used by Barr, then it could be

25  up to 7,000.

1          So, again, I'm -- I'm going up -- that's

2     just kind of a step before the 7,000, and the 10,000

3     was kind of the -- the upper bound that we selected.

4          I mean, there was times we -- and I can't --

5     I don't have it cited here, but we were running some

6     numbers where it could have been even more than

7     10,000.  It was -- so that's -- so it was what we just

8     kind of -- where we kind of stuck the fork in it for

9     the upper bound.

10     Q.   You'd agree that Dr. Hopke's analysis that

11     you quoted here resulted in 3,000 pounds per year.

12     Correct?

13     A.   Yeah, yeah, 'cause I -- yeah, I quoted here,

14     so I believe that what he did was accurate.

15     Q.   So if Dr. Hopke is settling at 3,000 pounds

16     per year, why do you settle more than three times

17     higher than that at $10,000 pounds per year?

18     A.   And, again --

19          MR. DAVIS:  Object to the question.  That

20          misrepresents Hopke's testimony.

21          THE WITNESS:  Yeah.  So, again, based on

22          what I'm discussing here, is that this was -- it

23          moved towards something even higher, in more like

24          7,000 pounds, possibly even higher than 10,000,

25          which is why we went with 10,000 pounds, not

1      3,000.

2    BY MR. CURRAN:

3        Q.   Do you stand by 10,000 pounds per year as,

4    in your -- in your opinion as a scientist, the

5    appropriate, most accurate upper bound to use in this

6    analysis?

7        A.   Relying on Phil Hopke's estimation on -- on

8    potentially what was going on in the process and the

9    concentrations of the PFOA and the amount that was

10   used, yes.

11       Q.   And if Dr. Hopke concluded that 3,000 was

12   the appropriate upper bound, would you disagree with

13   his analysis?

14       A.   Likely not because it's his area of

15   expertise digging into that side of things, not mine.

16       Q.   If Dr. Hopke were to conclude that 3,000

17   pounds per year is the appropriate upper bound to use,

18   how would that change your opinions in this case, if

19   at all?

20       A.   What I stated at the back, probably --

21   probably not.  It wouldn't change really.

22       Q.   So your opinions in this case wouldn't

23   change if the upper bound that should be used was

24   higher or lower?

25       A.   No.

1      Q.   And is it your testimony that your opinions

2  in this case wouldn't change if the lower bound that

3  you've used was higher or lower?

4      A.   And lower than the lower bound, I would

5  say -- I would still say no.  I'd expect it would

6  probably have the same results, same -- the same

7  venue.

8      Q.   And why is that?

9      A.   I believe that their -- the PFOA was

10  deposited in the area.  You know, where you're seeing

11  well concentrations above the 20 PPT, the modeling to

12  me demonstrates that there was deposition of PFOA in

13  that area.

14      Q.   You mentioned wells there.

15      A.   Yeah.

16      Q.   Do you think it's scientifically valid to

17  compare soil deposition with -- with water sampling

18  results?

19      A.   You're asking the wrong guy.  I'm an air

20  person, not -- not a soil/water person.

21      Q.   So you have no opinion on whether water

22  sampling should be used as a check against air

23  deposition and the soil?

24      A.   I didn't -- I didn't -- I can't answer that

25  because, again, it's -- it's -- I looked at where the

1   deposition was and not how it was tied to anything,

2   some service.

3        Q.   And you mentioned that you're seeing well

4   concentrations above 20 parts per trillion, and that

5   modeling demonstrates that there was deposition of

6   PFOA in that area.

7             THE COURT REPORTER:  Deposition of?

8             MR. CURRAN:  Sorry, deposition of PFOA in

9        that area.

10  BY MR. CURRAN:

11       Q.   I want to make sure I understand your

12  testimony.

13       A.   Okay.

14       Q.   Are you saying that your opinion wouldn't

15  change in this case regardless of movement on the

16  lower and upper bounds --

17       A.   Well --

18       Q.   -- because -- because you have seen well

19  sampling data in the area?

20       A.   I'm -- no, I probably -- if that's the way I

21  said it, I -- that's -- that's not what I meant.  I'm

22  talking about what the model results would show me.

23  Now, of course, you say on the low end.  Of course,

24  you can go down to something, obviously, much, much

25  lower where you wouldn't see -- likely see much, if

Page 108

1    any, deposition.

2           So, you know, I don't know what you mean by

3    going lower, but based on the -- the three scenarios

4    that I've modeled, I see deposition in the areas

5    around the Saint-Gobain facility, which include,

6    according to the drawing, of monitored data in those

7    locations.

8        Q.   Now, your report says that in order to

9    simplify your approach, you're going to use the stack

10   arrangement and physical parameters at the 2002 plant

11   closure --

12       A.   Right.

13       Q.   -- for the full period of your analysis.  Is

14   that right?

15       A.   But, again, it was just a -- a unit emission

16   rate, so you can take that unit emission rate down to

17   1968 or -- or '78 when they moved the facility there,

18   so it's linear.  You can -- you can -- you can go

19   either direction, umm.

20       Q.   You -- let me make sure I understand that,

21   sir.  You're saying that you can use your average

22   emission rate modeled for the 2002 operating

23   conditions and use that to approximate 1968 emissions?

24       A.   Well, you can -- you can use the results,

25   and, again, it's a unit emission rate, so it's a pound

1  per hour per -- microgram per cubic meter, or per gram

2  per meter squared, or gram per -- however you want to

3  do it, a unit emission rate deposition.  Then you can

4  apply whatever emission rate you want to to come up

5  with a deposition rate.

6           So then you can go back to, for example,

7  when they first moved there and whatever emission rate

8  you want to apply there and -- and literally bring it

9  to -- so you can -- it works that way.

10          Now, so ...  There's flexibility with using

11  the -- the unit emission rate, which is why I did it,

12  because of what we're trying to figure out as far as

13  actual emissions and where it could fall.

14      Q.   And what were you trying to figure out in

15  terms of actual emissions in your report?

16      A.   I wasn't really trying to figure out

17  anything in actual emissions.  I was just modeling the

18  emission rates.

19      Q.   And why were you modeling the unit emission

20  rate?

21      A.   Because of where -- and because of what I

22  said earlier in the fact that it's under debate as to

23  what actually was emitted from the facility.

24      Q.   During the break just now, did you speak to

25  your counsel?

1        A.    I did.

2        Q.    What did you discuss?

3        A.    Just -- just general -- just answering the

4    questions that you -- basically, listen to the

5    questions that you ask me and answer the questions.

6        Q.    Anything else?

7        A.    There was some discussion that kind of

8    helped me remember 'cause you were trying to bring me

9    into or at least tie the -- how I modeled it versus

10   how the facility was historically, and talking to --

11   through it with him was refreshing my memory on how it

12   was -- how I approached it and that it is translatable

13   across the years, so that was pretty much it.

14       Q.    During the deposition --

15       A.    There wasn't any direction from him.

16       Q.    During the deposition break today, you

17   discussed the substance of your testimony and the

18   substance of your report.  True?

19       A.    During -- I'm sorry.  Repeat the question.

20       Q.    During the break we just took from the

21   testimony of this deposition, you discussed with your

22   counsel the subject of your testimony.

23       A.    Mostly just how I was doing.

24       Q.    Anything else you discussed?

25       A.    No, not really.

1        Q.    You'd agree that the height that you used to
2   model an emissions point is an important input for an
3   AERMOD analysis.  True?
4        A.    I guess most every AERMOD analysis, it is an
5   important point --
6        Q.    Fair to say --
7        A.    -- important point.
8        Q.    I'm sorry.
9        A.    Correct.
10        Q.    Is it fair to say that in general, the --
11   the higher the emissions point, the further
12   particulate emissions will travel?
13        A.    In general, yes.
14        Q.    What did you do to determine the appropriate
15   height for emissions in your analysis here?
16        A.    Again, pulled information from historical
17   permitting documents for the facility, which included
18   a -- a three-dimensional hand sketch from -- actually,
19   I think Saint -- or ChemFab provided to the State.
20        Q.    Now, if your assumptions on the height of
21   various emission points were higher than the average
22   height of those emissions points, what would the
23   impact be on your results?
24        A.    Higher than the average?
25        Q.    Strike that.  If your emissions points in

1   your model were higher than the actual emissions

2   points for the facility, what would the impact be on

3   your model?

4        A.   Depends on how far off I was.

5        Q.   Can you explain?

6        A.   Well, I mean, if you're only -- if -- if I

7   was within a foot of what actually was there, then

8   likely very little, if anything, to the results.

9        Q.   And how big a difference would it take to

10  have a meaningful impact on your results?

11       A.   I don't know.  You run the model, you know,

12  to figure that out.

13       Q.   Did you run the model to try and determine

14  the impact on accuracy of your assumed heights and the

15  actual heights of the stack emissions points?

16       A.   I didn't know what the -- I -- I didn't know

17  what the actuals were other than the information that

18  I was able to get to -- to input in my model.  I mean,

19  the stack -- the stacks aren't there anymore, so.

20       Q.   Uh-huh.  Why did you decide to use the

21  period of operational data that you did in forming

22  your AERMOD analysis?

23       A.   What period?  What do you mean, which

24  period?

25       Q.   Strike that.

1        Why did you decide to use operating

2  conditions at the time of the plant's closure as the

3  operating conditions for your AERMOD analysis?

4     A.   It was the final -- or -- or it was the --

5  the way the facility was constructed and the fact that

6  I could use a unit emission rate, it can be somewhat

7  translatable in -- to whatever emission rate you want

8  to apply to it.

9     Q.   I'm asking a slightly different question.

10    A.   So, go ahead.

11    Q.   Why did you decide to use the -- the

12  operating conditions at the time of the plant's

13  closure for your analysis?

14    A.   Because it was operating that way before it

15  closed.

16    Q.   Any other reason you chose to use the -- the

17  final year of the plant's operation for your analysis?

18    A.   Not really, no.  It was -- that was mostly

19  what it was based on.

20    Q.   You were mentioning earlier that the height

21  of stack emissions is important for analysis.  I

22  believe you even said earlier that also the exhaust

23  volume or the exhaust rate --

24    A.   The --

25    Q.   -- was important.

1          A.    The exit velocity, yes.

2          Q.    The exit velocity?

3          A.    Yes.

4          Q.    Is it true that in general, the higher the

5     exit velocity as it leaves an emissions point, the

6     further the particulate will travel for deposition?

7          A.    In general, yes.

8          Q.    Is particle size also important for modeling

9     particulate deposition?

10         A.    It is.

11         Q.    In general, do smaller particles travel

12    farther than larger particles in particulate

13    deposition analysis?

14         A.    In general, yes.

15         Q.    And so if you assume a larger particle size

16    as part of your model, those particles will not travel

17    as far as a smaller particle would?

18         A.    In general, yes.

19         Q.    Before this analysis, I believe you

20    testified you hadn't worked with PFOAs specifically.

21    Is that right?

22         A.    That is correct.

23         Q.    So what did you do to determine the

24    appropriate particle size to use for PFOA particulate

25    deposition modeling?

 1      A.    Reviewed the Barton -- I think the thesis
 2  document of hers had the particle size distribution of
 3  APFO.
 4      Q.    Why did you use that particular document?
 5      A.    Well, that plus it -- she -- I believe she
 6  even states that APFO was a general family of -- of
 7  those compounds, which included APFO.
 8      Q.    Why did you decide to use the Barton thesis?
 9      A.    Or PFOA, I'm sorry.
10      Q.    Why did you decide to use the --
11            THE COURT REPORTER:  Or PFOA?
12            THE WITNESS:  Yeah, sorry, I -- I spoke
13       wrong.  These acronyms.
14  BY MR. CURRAN:
15      Q.    Why did you decide to use the Barton thesis
16  specifically as your reference?
17      A.    It was -- it was a -- to me, from my
18  scientific opinion, was a -- an excellent fit in what
19  she did for what we were looking at in -- in
20  Bennington.
21      Q.    And did you evaluate and reject other
22  analyses of PFOA size?
23      A.    No, I did not.
24      Q.    Was the Barton thesis the first reference
25  that you considered that discussed PFOA size?

1     A.   It was, yes.

2     Q.   How did you find the Barton thesis?

3     A.   Again, there was, amongst our team, several

4 technical journal articles that were passed around.  I

5 can't remember specifically who provided that one to

6 me.

7     Q.   When you say "among our team," who are you

8 referring to?

9     A.   Again, Phil Hopke and counsel and Cathy Dare

10 was also doing some research for us, too.

11     Q.   In determining whether or not you would use

12 the Barton thesis to identify a particle size for

13 particulate deposition, did you consider the entire

14 thesis?

15     A.   I -- no, for the most part, for what my

16 analysis was, I was looking for things that fit to

17 what I needed to input into the model.

18     Q.   And in determining what the Barton thesis

19 spoke to for the things that you needed, for example,

20 particle size, did you consider the entire thesis?

21     A.   I mean, I considered the entire thesis as a

22 good -- as an accurate and sound scientific work

23 for ...

24     Q.   What about the Barton thesis made it sound

25 scientific work for determining particle size?

 1      A.    She was -- she was measuring, modeling APFO,

 2  and I may have some of the specific compounds as I'm

 3  talking off the top of my head, but her -- and her

 4  work was in line with, again, the same compound that

 5  we were simulating from Bennington.

 6      Q.    Was it important to you that the same

 7  compound that you were addressing in Bennington be

 8  addressed by your reference material for particle

 9  size?

10      A.    Yes.

11      Q.    Why was that important?

12      A.    You know, as you're going to model

13  especially particulate deposition, that particle size

14  distribution and for calculating the input of the

15  model was important.

16      Q.    Why is it important to have an accurate

17  particle size figure for particulate deposition

18  modeling?

19      A.    When I -- and when I say "accurate," I mean

20  a lot of times it's as best -- as best as you can get

21  your hands on.  Sometimes when we do modeling, we

22  don't have the exact information that we need for a

23  particular compound that we're modeling, but -- and

24  sometimes -- and, again, usually going through a

25  process of a protocol as an example for an air

1  dispersion modeling analysis, there's been some

2  agreement with the regulatory authority that's going

3  to be reviewing it that, yes, we agree that this would

4  be a good fit.

5          So in similar type of analysis, approach,

6  I'm looking for what I think is the best, you know,

7  input for the model and for representing the same

8  compound.

9      Q.   So you say you're looking for the best input

10  for the model to represent the compound.  You say it's

11  best modeling practice to use the most accurate or

12  most robust analyses for that given input.  Fair?

13      A.   Yes.

14      Q.   For particulate size, what made Barton's

15  analysis, in your opinion, the most accurate,

16  appropriate proxy for particle size in your inputs?

17      A.   Again, she was -- her study was on the same

18  family of -- of compounds as we were in our analysis.

19      Q.   Are you familiar with AERMOD method 1 and

20  method 2?

21      A.   I am.

22      Q.   What's the difference between AERMOD method

23  1 and method 2?

24      A.   The method 1 is the default setting for EPA,

25  modeling the deposition of particulate matter, and

1    it's generally for a more coarser set of particles, or

2    at least where the larger -- larger fraction in the

3    particle size distribution is in more of the coarse

4    category, wherein method 2 is an EPA non-regulatory

5    default option and AERMOD input for a finer, smaller

6    particle.

7         Q.   Now, in your analysis, you used the

8    non-default option?

9         A.   That's correct.

10        Q.   That -- that was method 2?

11        A.   That's correct.

12        Q.   Why did you select the non-default method 2

13   option for your AERMOD analysis?

14        A.   Again, looking at Barton's particle size

15   distribution is a very small particle, from, like -- I

16   think it was 7 microns down to .28.  So it's -- when a

17   larger percentage of those particles are less than --

18   this is back to the method 2 -- is less than the

19   2.5 microns, it's -- I saw it as a more suitable

20   approach to simulating the particles in this analysis,

21   the particle emissions.

22        Q.   You say in your report on page 4 that you

23   interpret Barton's data as measuring fine particulate

24   matter with diameter ranges below 4 microns.  Is that

25   right?

1        A.    Okay, yes.

2        Q.    And I believe you're relying on particle

3    size data in the Barton report -- Barton thesis --

4        A.    Yes.

5        Q.    -- at page 29?

6        A.    Yes.

7        Q.    And you say in your report that the

8    representative mass mean particle diameter required

9    for method 2 input was calculated from the Barton

10   particle size distribution of PFO.

11       A.    That's correct.

12       Q.    How did you do that?

13       A.    It was a calculation -- that's my table,

14   table 4, and it's a calculation, and Dr. Hopke helped

15   me with this.  I will say that also.  And such

16   calculation of the natural log of the -- the range of

17   the geometric mid-point of each of the particle size

18   distribution categories.

19            And that is multiplied by a calculation of

20   the exponential of the -- of that pre -- this

21   calculation I just mentioned, the natural log.  And

22   then it's -- you basically calculate a -- a weighted

23   mid-point, which is summed, and that divided by 100 is

24   the mean mass particle -- particle diameter in

25   microns.

1      Q.   Let me take a look -- I'll mark as --

2      A.   And that's a method 2 input.  Sorry, adding

3  that.

4      Q.   So, I'm sorry.  What was the method 2 input

5  that you're referring to?

6      A.   That this --

7      Q.   The result --

8      A.   That mean mass particle.

9      Q.   Yeah.

10      A.   That's an -- or particle diameter.

11      Q.   So the 1.157 mean mass particle diameter,

12  that's what you used as your method 2 input?

13      A.   Yes.

14           MR. CURRAN:  I'll mark as the next exhibit

15      the Barton thesis.

16           (EXHIBIT 6 WAS MARKED FOR IDENTIFICATION)

17           MR. DAVIS:  Exhibit 6?

18           THE COURT REPORTER:  Yes.

19  BY MR. CURRAN:

20      Q.   So did you review the -- is it -- strike

21  that.

22           Is this the thesis that you reviewed in

23  preparing your report?

24      A.   Yes.

25      Q.   And the data that you relied on, I believe

1    it's on page 29?

2         A.    That's correct.

3         Q.    So you relied on the data in table 2-4.  Is

4    that right?

5         A.    That's correct.

6         Q.    And why was it that you decided to rely on

7    this data for particle size?

8         A.    And, again, it was -- it -- it was -- what I

9    found was an aha moment of finding the PFOA --

10             THE COURT REPORTER:  I'm sorry, what I found

11        was an?

12             THE WITNESS:  Aha, I said "aha moment,"

13        like, oh, here's what I'm looking for, in -- in

14        her thesis of PFO, particle size distribution

15        information that I needed to -- for my input.

16   BY MR. CURRAN:

17        Q.    And in deciding to use this, did it matter

18   to you how the data was collected or how this -- this

19   average particle size was calculated?

20        A.    I mean, of course it matters from a

21   scientific standpoint.  So my understanding and basis,

22   what -- what this is and how it's been published, that

23   it's gone through the scientific scrutiny that it's

24   needed to go through for it to be accurate data and

25   presented in this -- in this document, so I consider

1    it reliable.  I did not go back and -- 'cause it's not

2    my area of expertise, and I don't know exactly how

3    she -- she measured it.

4        Q.   Did you look at the thesis to determine how

5    this data had been collected or how this analysis was

6    conducted?

7        A.   I generally -- yeah, I generally peruse

8    through some of the upfront stuff in her -- in her

9    approach, yes.

10       Q.   And take a look back at page 14, section 22

11   of this thesis.  Did you consider the description of

12   experimental methods that were used by Barton for her

13   thesis?

14       A.   Not really, no.

15       Q.   And so it didn't matter to your analysis how

16   many sampling events occurred or where in order to

17   determine the particle size?

18       A.   No.  I needed the particle size

19   distribution, and I was having difficulty finding it

20   anywhere else, so.

21       Q.   If you were to -- so -- strike that.

22            It says here on page 17 of the thesis that

23   six sampling events were conducted over a ten-week

24   period from November 2003 to January 2004 in order to

25   collect this data.

Page 124

1            Do you see that?

2       A.   I see -- I see that.

3       Q.   Do you consider that to be a sufficient

4   sample size to calculate particle size?

5       A.   As far as I understand and -- and what this

6   document is and -- and what it presents, I would say

7   yes.

8       Q.   If Barton had data from a longer sampling

9   period or a more robust set of sampling events, would

10  you want to consider that data?

11      A.   Only if she provided the particle size

12  distribution that I was interested in.

13      Q.   You wouldn't be interested in data from a

14  longer sampling period to get a more accurate picture

15  of particle size?

16      A.   Of course I would consider it, yes.

17      Q.   Did you consider whether Barton offered

18  additional data on particle size from a longer

19  sampling period in conducting your analysis?

20      A.   I did not see any information, not that she

21  doesn't have it anywhere, but I did not see it

22  anywhere.

23      Q.   So you did not make a conscious choice to

24  ignore alternative --

25      A.   No.

1      Q.   -- particle size figures in -- in forming

2  your AERMOD inputs?

3      A.   No, I did not.

4      Q.   So this particle size data in table 2-4

5  that's described on page 17 is coming from six

6  sampling events; that's the data that you used?

7      A.   Yes, it appears so.  That's where it falls

8  in -- moves into page 29 where that data is presented,

9  so yes.

10      Q.   Take a look at page 85.

11      A.   Eighty-five.

12      Q.   On page 85 where Barton describes a total of

13  10 Tisch Model High Volume Five-Stage Cascade

14  Impactors being deployed at nine locations and

15  co-located samplers were placed at a fence line

16  location where samples were collected for 24 hours.

17           Do you see that?

18      A.   Oh, yes, I do now.

19      Q.   So here in this period of sampling between

20  August 2005 and January 2006 -- oh, strike that.

21           You see that for the period described on

22  page 85, there are ten receptors at each of nine

23  locations.  Correct?

24      A.   Trying to confirm this, what you're telling

25  me.  I'm -- I'm having trouble locating it here.  Oh,

```
                                        Page 126
 1   nine locations, so yes.
 2        Q.   So 90 samples --
 3        A.   Ten, yeah.
 4        Q.   -- total, 10 receptors, 9 locations each.
 5        A.   Yes.
 6        Q.   If I told you that you could take data from
 7   a sample size of 6 samples or a sample size of 90
 8   samples, all other things being equal, as a scientist,
 9   which would you prefer?
10             MR. DAVIS:  Object to the form of the
11        question.
12             THE WITNESS:  So rephrase the question for
13        me.
14   BY MR. CURRAN:
15        Q.   If I told you that you could use data from a
16   sample size of 6 samples or a sample size of 90
17   samples to determine particle size, as a scientist,
18   which of those would you prefer?
19        A.   I mean, you're asking me things about -- you
20   know, this is really not my area of expertise, so, to
21   answer your question.
22        Q.   So it's your testimony that in your field,
23   there is no accepted preference for larger sample
24   sizes over smaller sample sizes?
25        A.   Well, I believe there is.
```

1          Q.   The data in section 4, I believe it's

2     described on page 87 in table 4-1.  Did you consider

3     the data in table 4-1 before you prepared your report?

4          A.   I did not.

5          Q.   Did you have an opportunity to review the

6     entire Barton thesis --

7          A.   I --

8          Q.   -- before you prepared your report?

9          A.   I'm sure, yes, I had an opportunity to, yes.

10         Q.   No one instructed you not to review the

11    entire --

12         A.   No.

13         Q.   -- Barton thesis?

14         A.   No.

15         Q.   Now, this data indicates that 67 percent of

16    the PFOA particles collected were smaller than 2.58

17    microns.  Is that correct?

18         A.   2.58 microns.

19              MR. DAVIS:  If you can take your time to

20         review this if you --

21              THE WITNESS:  Yeah.

22              MR. DAVIS:  -- if you need to.

23              THE WITNESS:  I need a calculator.  I don't

24         have my calculator with me.

25              THE VIDEOGRAPHER:  Watch your microphone

```
 1        there.
 2              THE WITNESS:  Oh, thank you.
 3    BY MR. CURRAN:
 4        Q.    Perhaps I could direct you to the third
 5    column, Cumulative percentage less than particle size.
 6        A.    Oh, yeah, there you go.  Okay.
 7              THE COURT REPORTER:  Cumulative percentage?
 8              THE WITNESS:  I was actually --
 9    BY MR. CURRAN:
10        Q.    I'm sorry, Cumulative percentage less than
11    particle size.  In the left-hand column -- oh, strike
12    that.
13              In the left-hand column in table 4-1, you'll
14    see that Barton describes the particle diameter in
15    microns.  Is that correct?
16        A.    Oh, you're asking me a question.  I'm sorry.
17    I thought you were still talking to her.
18        Q.    In -- in table 4-1 --
19        A.    Yeah.
20        Q.    -- you'll see that on the left-hand side,
21    Barton describes the particle diameter in microns.
22        A.    Okay.
23        Q.    Is that correct?
24        A.    Yes.
25        Q.    And on the right-hand side of table 4-1,
```

```
 1    Barton describes the cumulative percentage less than a
 2    particle size.
 3          A.    Okay.
 4          Q.    Am I reading that accurately?
 5          A.    Yes.
 6          Q.    According to table 4-1, the cumulative
 7    percentage less than 2.58 microns is 0.67 percent --
 8    or 67 percent.  Is that right?
 9          A.    That's correct.
10          Q.    Did you consider this data before deciding
11    to use method 2 in your AERMOD analysis?
12          A.    I did not.
13          Q.    And if this data is considered an accurate
14    description of particle size, you'd agree that your
15    model doesn't use the most accurate particle size.
16    Fair?
17                MR. DAVIS:  Object to the form of the
18          question.
19                THE WITNESS:  I believe what she presented
20          up front is still accurate.  I just -- yeah,
21          which is what I input.
22    BY MR. CURRAN:
23          Q.    If the particle size that you used in your
24    analysis is smaller --
25          A.    Yeah.
```

1        Q.   -- than what the court concludes is the

2   appropriate model particle size, what impact would

3   that have on your results?

4            MR. DAVIS:  Object to the form of the

5        question, asks for speculation about what the

6        court might conclude, which is very unlikely.

7            THE WITNESS:  Yeah, I -- I don't know

8        exactly.  I'd have to run the model to really do

9        a comparison.

10  BY MR. CURRAN:

11       Q.   In general, when -- I believe you testified

12  that when particles are larger, they don't travel as

13  far.  Is that correct?

14       A.   In general, yes.

15       Q.   So in general, if you understated the size

16  of a PFOA particle, that would have the impact of

17  causing it to travel further into the atmosphere than

18  it would if the particle size was actually larger.

19  Fair?

20       A.   Potentially, yes.

21       Q.   And if a sufficient quantity of particles --

22  strike that.

23            If approximately 10 percent or more of the

24  model PFOA particles have a diameter of 10 microns or

25  larger, you'd agree that method 1 should have been

1  used.  Correct?

2      A.   I have to go back and look at the guidance

3  document.  I can't remember the percentage breakdown,

4  so I don't know.  I -- I'm not sure exactly, to answer

5  that question.

6      Q.   You'd agree that particle size is an

7  important determinator -- strike that.

8           You'd agree that particle size is important

9  when deciding whether to employ method 1 or method 2

10 for AERMOD.  Yes?

11     A.   Yes.

12     Q.   Now, the Barton thesis was measuring

13 particles at a facility in Parkersburg.  Is that

14 right?

15     A.   That's my understanding, yes.

16     Q.   Why did you conclude that measuring

17 particulates at the Parkersburg facility was a good

18 proxy for particles in the area of the Bennington

19 facility?

20     A.   Well, again, we were looking at the same

21 class of compounds as a family and -- and, again, a

22 similar analysis as it would be a good fit for -- for

23 what I needed for my analysis.

24     Q.   Was the facility in Parkersburg processing

25 PTFE?

1      A.   I do not know the specifics of their

2   process.

3      Q.   Did you take any steps to determine whether

4   the Barton thesis was sampling particles that were a

5   good proxy for the particles that were potentially

6   being emitted from Bennington?

7      A.   I did.

8      Q.   And what were those steps?

9      A.   Well, I mean, it was basically her

10   description of the family of compounds that was in the

11   same category, you know, that included PFOA.

12      Q.   Other than that, any steps you took to

13   determine whether the measurements in Parkersburg

14   were -- Parkersburg were a good proxy for -- well,

15   strike that.

16           You mentioned fugitive emissions earlier.

17      A.   I did.

18      Q.   What are fugitive emissions?

19      A.   Oh, those are basically emissions that are

20   not released from a -- a stack or a chimney and what

21   we consider -- consider emission point.

22      Q.   Are fugitive emissions important for air

23   deposition modeling?

24      A.   They can be, yes.

25      Q.   Why can they be important?

1      A.   Well, it's a different nature of emissions,
2  so it's simulated differently in the model.
3      Q.   In your model, how did you -- well, strike
4  that.
5           Were there fugitive emissions from the North
6  Bennington facility?
7      A.   Based on inspections and complaints, I
8  understand there were, even though the facility was
9  not permitted, as I understand, for those fugitive
10 emissions.
11     Q.   How did you model those fugitive emissions?
12     A.   I did not model fugitive emissions.  I
13 modeled the facility as it was permitted to operate,
14 and as a matter of fact, I believe one of the last
15 stack tests that was done at the facility, there was
16 no record of any fugitive emissions at that time, so
17 it was intermittent, I guess.  I don't know, and so it
18 was not a -- I guess a normal form of emissions from
19 the facility.
20     Q.   So in your opinion -- strike that.
21          You did not model fugitive emissions of any
22 sort --
23     A.   I --
24     Q.   -- from North Bennington facility?
25     A.   No, I did not, no.

1       Q.    And you'd agree that fugitive emissions did,

2  in fact, occur at the Bennington facility, the North

3  Bennington facility?

4       A.    Based on documents, yes.

5       Q.    And, in fact, in reality, no facility can

6  operate without any form of fugitive emissions of some

7  sort.

8       A.    Yes, they can.

9       Q.    Okay.

10      A.    Yeah.

11      Q.    Describe that.

12      A.    Well, you have completely enclosed

13 processes, and they can definitely be engineered where

14 you wouldn't have fugitive emissions.

15      Q.    In your experience with permitting Wheeler

16 (phonetic) set analysis, how do you normally deal with

17 fugitive emissions from an industrial site?

18      A.    Repeat the question because I didn't catch

19 the first part.

20      Q.    Sure.  In your experience in industry

21 modeling sites, how do you typically account for

22 fugitive emissions from an industrial site?

23      A.    Well, they would be, first of all, part of

24 the -- the permitting process so they would be

25 accounted for, and then through emission rate

Page 135

```
 1    estimation, depending on what the material is and
 2    what's being emitted, would be included in -- in
 3    whether it's -- it's permitted or modeled or anything.
 4         Q.   Now, in your analysis here, you did not
 5    attempt to calculate fugitive emissions from the
 6    Bennington or North Bennington sites.
 7         A.   No.
 8         Q.   Correct?
 9         A.   No.
10         Q.   And you didn't adjust your model to account
11    for any level of fugitive emissions.  Correct?
12         A.   I did not.
13         Q.   You stated at page 3 of your report,
14    Fugitive particulate emissions were excluded from this
15    analysis.
16         A.   That's right.
17         Q.   You instead assumed that all emissions of
18    PFOA left from the stacks.
19         A.   That's true.
20         Q.   Correct?
21         A.   Yes.
22         Q.   The stacks are the -- the highest point of
23    the facility.  Correct?
24         A.   That's correct.
25         Q.   So as a result of your assumptions, a higher
```

1    than actual amount of PFOA left the facility at its

2    highest point and traveled the farthest.  Is that

3    fair?

4              MR. DAVIS:  Objection to the form of the

5         question.  You may answer.

6              THE WITNESS:  I -- so, again, I modeled the

7         facility the way it was intended to operate and

8         should have operated, as I understand, on a

9         normal basis, and, yes, there was documented

10        fugitives, but I had no idea from anything that I

11        saw, even estimating how much it would have been.

12             So it could have had fugitive emissions, but

13        it could have been a relatively small amount from

14        the overall emissions of -- of PFOA from the

15        facility.

16   BY MR. CURRAN:

17        Q.   And rather than apply a discount rate for

18   fugitive emissions, you -- your model assumed that all

19   fugitive emissions actually were stack emissions that

20   left from those highest emissions points.  Correct?

21        A.   That's correct, which -- and should have

22   been the way it was normally, maybe normally operated

23   through the course of the -- of the operation of the

24   facility.

25        Q.   And if the actual operation of the facility

1   was to have fugitive emissions, your model would take

2   those fugitive emissions, emit them from a high stack

3   point, and send them further than they actually

4   traveled into the atmosphere.

5       A.   It depends --

6       Q.   Fair?

7       A.   It depends on how much we're talking about.

8   Again, we're talking how much -- how much -- how much

9   is emitted from fugitives -- fugitively.

10      Q.   And whatever that amount of fugitive

11  emissions is, we can agree, your analysis assumed that

12  it left from the highest point from the stack and

13  traveled far into the atmosphere?

14      A.   I did not include fugitive emissions, so,

15  yes.

16      Q.   Typically fugitive emissions would be

17  deposited close to the facility because they have a

18  low volume and potentially a low emissions point.

19  Fair?

20           MR. DAVIS:  Object to the form of the

21           question.  It's vague.

22           THE WITNESS:  If you were bottling fugitive

23           emissions, but other facilities -- again, it

24           depends on the source.  It depends on how the

25           fugitive is -- is simulated in the model, but,

1      yes, in -- in general, yeah, it would be more ...
2  BY MR. CURRAN:
3      Q.   Generally fugitive emissions will come to
4  rest closer to the source than emissions from a very
5  high emissions point with a higher exhaust (sic)
6  velocity.
7      A.   Generally, yes.
8      Q.   So if we assume that 10 percent of PFOA
9  emissions from the facility left as fugitive
10 emissions, how would that impact your analysis?
11     A.   I don't know.  I'd have to do it, to run it
12 to give you an answer.
13     Q.   If we're, for example, assuming that 1,000
14 pounds are emitted per year through the stacks and we
15 instead assume that 10 percent of those are fugitive
16 emissions --
17     A.   Uh-huh.
18     Q.   -- so 900 pounds would instead be leaving
19 from the -- the stack emission points?
20     A.   Okay.
21     Q.   And a hundred pounds would be leaving per
22 year from fugitive emission points?
23     A.   Okay.
24     Q.   Is that something that you could have
25 modeled?

1          A.    Of course.

2          Q.    And have you in the past modeled air

3     deposition with some -- with some account for fugitive

4     emission volumes?

5          A.    It's been some time, but, yes, I have done

6     particulate modeling.

7          Q.    And why have you done that in some other

8     models?

9          A.    Why have I done what?

10         Q.    Why have you modeled fugitive emissions in

11    addition to stack emissions for some other deposition

12    models that you've done?

13         A.    Again, it was part of the permitting

14    process, the facility.  It was documented and

15    estimated and engineered and permitted for those

16    emissions.

17         Q.    And did you believe that from a scientific

18    standpoint, it was more accurate to model those

19    fugitive emissions than to assume that they left

20    through the stacks?

21              MR. DAVIS:  Object to the vagueness of the

22         question.

23              THE WITNESS:  Yeah, again, you're --

24         you're -- so, okay, so rephrase the question for

25         me again, so.  I'm trying to -- trying to answer

1      your question for this particular analysis, so.

2   BY MR. CURRAN:

3      Q.   In air models you have constructed where you

4   modeled fugitive emissions in addition to stack

5   emissions, did you believe that from a scientific

6   standpoint, that was the most accurate choice, to have

7   a model for the fugitive emissions and separately a

8   model for the stack emissions?

9      A.   Again, I was simulating what the facility

10  was permitted to do in operating normally.  I have

11  not -- in any recollection of mine, I've not modeled a

12  facility based on incorrect operation, malfunctions,

13  things like that.

14     Q.   So it's your testimony that your modeling

15  typically does not attempt to determine real world

16  emissions, but, instead, to simulate permitted

17  emissions?

18          MR. DAVIS:  Object to the form of the

19      question.

20          THE WITNESS:  No, it -- it is -- it's --

21      it's simulating what the facility should be

22      operating under the understanding between what

23      was presented to the State and -- and what -- as

24      the State understands the facility should be

25      operating and as only that I would know.

Page 141

1    BY MR. CURRAN:

2        Q.   And are you referring to appropriate

3    modeling techniques for the permitting process?

4        A.   Yeah.  And, again, in most cases, air

5    dispersion modeling is for the permitting process.

6        Q.   Outside of the permitting process, speaking

7    as a scientist and an air modeler, is the most

8    accurate way to construct an air model to assume that

9    fugitive emissions leave from the stack points?

10            MR. DAVIS:  Objection to the vague question.

11            THE WITNESS:  So be more specific then, I

12        guess.

13   BY MR. CURRAN:

14       Q.   I'll repeat the question.  Outside of the

15   permitting process, speaking as a scientist and as an

16   air modeler, is the most accurate way to construct an

17   air model to assume that fugitive emissions actually

18   leave from stack emission points?

19            MR. DAVIS:  Same objection.

20            THE WITNESS:  Again, it depends on the

21        information that I have to build the model, so if

22        I was -- specifically knew how much --

23        specifically knew how much was emitted from a

24        normal operation of the facility from a fugitive

25        standpoint, then yes, you would model it that

1      way, but I didn't know that in this case.

2    BY MR. CURRAN:

3      Q.   Why did you decide to in this case use zero

4    as your estimate for fugitive emissions?

5      A.   And, again, I did not -- I -- it was how the

6    facility was supposed to be operated and what is the

7    way I set it up in the model.

8      Q.   Is it your scientific belief that there were

9    zero fugitive emissions from this facility?

10      A.   Well, I know there wasn't, but, again, I

11    didn't know how to quantify it.  I mean, 10 percent,

12    50 percent, 3 percent?

13      Q.   Did you undertake any efforts to analyze the

14    percentage of fugitive emissions from the facility?

15      A.   Not really because it was pretty obvious

16    that there wasn't any information available, what it

17    was.

18      Q.   Did you consider using an upper and lower

19    bound for fugitive emissions from the facility?

20      A.   No.

21      Q.   Why did you decide not to consider using an

22    upper or lower bound for fugitive emissions from the

23    facility?

24      A.   And, again, I didn't know what -- I mostly

25    modeled this facility based on normal operations, and

1    any kind of issue with maintenance or improper air

2    pollution control application or whatever else was

3    going on that was causing fugitive emissions, I didn't

4    really know what they were, and as far as the amount

5    goes and what to not allocate towards the stacks.

6            And, again, I go back to the other -- there

7    were other inspections where there was nothing seen,

8    so I didn't know how frequently it was -- it was

9    emitting fugitives or not.  It's -- it's -- it was

10   just -- there wasn't any information.

11       Q.   In the face of uncertainty over emission

12   rates -- strike that.

13            In the face of uncertainty over fugitive

14   emission rates, why did you decide not to use a lower

15   and upper bound for those emissions when you were

16   using a lower and upper bound for uncertain stack

17   emissions?

18       A.   And, again, normal operation was the PFOA

19   coming out of the stacks, and that's the way I

20   simulated the facility.  That's the way I did the

21   analysis.

22            THE VIDEOGRAPHER:  Five minutes.

23   BY MR. CURRAN:

24       Q.   Was the practical impact of assuming that

25   fugitive emissions left through the stacks to increase

```
 1   the amount of PFOA that your model would assume
 2   traveled into the atmosphere from the facility?
 3              MR. DAVIS:  Objection to the form of the
 4         question.
 5              THE WITNESS:  Yeah, rephrase the question
 6         for me, please.  Ask it again.
 7   BY MR. CURRAN:
 8         Q.   Was the practical impact of assuming the
 9   fugitive emissions left through the stacks to increase
10   the proximity of PFOA emissions from the facility?
11              MR. DAVIS:  Objection.
12              THE WITNESS:  So are you asking me if I was
13         trying to ...
14   BY MR. CURRAN:
15         Q.   I'm asking what the practical numerical
16   impact was --
17         A.   Yeah.
18         Q.   -- of the assumption.  So if we assume that
19   all fugitive emissions are emitted from the stack
20   points, that will increase the -- the amount of model
21   deposition at any given proximity from the facility.
22   Fair?
23         A.   Yeah, that's true.  And as I understood it,
24   the fugitive emissions should have been coming out of
25   the stack anyway.
```

1      Q.   But I believe you also testified, sir, that

2  you understood that they didn't.  Is that correct?

3      A.   I understand, yes, there was reports that

4  there was some record that they weren't.

5      Q.   When did you decide not to employ a fugitive

6  emission rate in your model?

7      A.   But, again, I just -- as I just stated, I

8  was simulating the model or the facility as it was

9  permitted to operate.

10     Q.   And when --

11     A.   And I had no other information on what --

12  you know, was it permitted for fugitives, and, you

13  know, thou shall only emit this much on a fugitive

14  basis.  I did not have any information as to what that

15  quantity would be.

16     Q.   When you're referring to -- well, strike

17  that.

18          Did you only use permanent application

19  parameters for all of your other inputs?

20     A.   Yes, yes -- well, not all, no.

21     Q.   Which input --

22     A.   So, I mean, there are other inputs like --

23  again, we're talking about particulate matter.  That

24  wasn't anything in the permitted documents.  The

25  meteorological data wasn't in the permitted documents.

1   So those are other inputs.

2        Q.   And how about the volume of perfluorinated

3   chemicals?

4        A.   I'm sorry?

5             THE COURT REPORTER:  How would the volume

6        of?

7             MR. CURRAN:  I'm sorry, the volume of

8        perfluorinated chemicals.

9             THE WITNESS:  I'm sorry.  I don't

10       understand -- what's the question?

11   BY MR. CURRAN:

12       Q.   When you were trying to estimate the number

13   of pounds per year --

14       A.   Oh.

15       Q.   -- of perfluorinated chemicals --

16       A.   Yeah.

17       Q.   -- did that come from a permit?

18       A.   Well, no, because they weren't permitted to

19   emit PFOA.  It wasn't a regulated compound.

20       Q.   So the amount of PFOA didn't come from a

21   permit, but you did attempt to provide values for that

22   in your model.  Fair?

23       A.   Yes, yes.

24       Q.   But because the amount of fugitive emissions

25   weren't listed in the permit, you didn't attempt at

1   all to capture the --

2        A.   I, again --

3        Q.   -- fugitive emissions?

4        A.   So PFOA was not a regulated compound, so it

5   wouldn't even have ever been in the permit, so most of

6   my development of input was based on how the facility

7   was permitted and how it was to normally operate.

8        Q.   Where you knew that PFOA had a size and it

9   wasn't listed in the permit, you found a number to use

10  for PFOA size.  Fair?

11       A.   Fair.

12       Q.   But when you knew that fugitive emissions

13  occurred and you couldn't find that number in a

14  permit, you didn't attempt to approximate the amount

15  of fugitive emissions?

16       A.   No.  I mean, PFOA was emitted, so we're

17  going back and doing an -- an analysis of an emerging

18  compound, which may be regulated in the future.  I

19  don't know.  So -- so I'm simulating that -- that

20  particular compound as model input and had to rely on

21  outside -- yes, outside information to get the

22  scientific data I needed for input on that particular

23  compound.  But, yes, it's -- to me, it's two different

24  things, so the fugitive stack thing.

25       Q.   Talked to you earlier about wind data.

1   You'd agree that air modeling -- in air modeling, it's

2   important to have accurate wind data.  Is that fair?

3        A.   Yes, I agree.

4        Q.   And I believe you testified that you used

5   five years of archived meteorological data from 2006

6   to 2010 for your report.  Correct?

7        A.   Correct.

8        Q.   And that data was meteorological surface

9   data from the Bennington, Vermont, airport and upper

10  air data from the Albany, New York International

11  Airport.  Is that right?

12       A.   That's right.

13       Q.   How close to the Bennington airport was the

14  Water Street facility?

15       A.   I believe it's only a couple of miles.

16       Q.   And how close to the Bennington airport was

17  the Northside Drive facility?

18       A.   Probably close to about the same distance, I

19  guess, going east of it.

20       Q.   And what did you do to ensure that the 2006

21  to 2010 data was an accurate representation of

22  meteorological data at the Northside Drive facility

23  between '68 and '78?

24       A.   Okay.  So repeat the question again for me.

25       Q.   What did you do to ensure that the airport

1    meteorological data that you used from 2006 to 2010

2    was an accurate representation of meteorological

3    conditions at the Northside Drive facility between '68

4    and '78?

5         A.   So did I do a -- did I do a comparison of

6    the meteorological data that I used versus actual

7    meteorological data for the operation years of the

8    facility.  Is that your question?

9         Q.   Well, what did you do, if anything --

10        A.   Well.

11        Q.   -- to ensure that the data you used was an

12   accurate representation of conditions at Northside

13   Drive between '68 and '78?

14        A.   And -- and, again, I relied on the DEC, and

15   I stated in there that I did not process the

16   meteorological data.  The DEC provided it to us.  They

17   have already -- they already did that.  And it was, in

18   their opinion, based on the fact they also did a

19   similar analysis using the same meteorological data.

20             THE VIDEOGRAPHER:  Counsel.

21             MR. CURRAN:  We're going to go off.

22             THE VIDEOGRAPHER:  We're off the record at

23        12:27 p.m.

24             (LUNCHEON RECESS TAKEN)

25             THE VIDEOGRAPHER:  We are back on the record

```
                                              Page 150

 1          at 1:16 p.m.

 2     BY MR. CURRAN:

 3          Q.   Mr. Yoder, during the lunch break, did you

 4     discuss the substance of your testimony with counsel?

 5          A.   We just had a nice lunch together and just

 6     discussed our parents.

 7          Q.   Was that a no?

 8          A.   Yes, that's a no.

 9          Q.   During the lunch break, did you discuss any

10     testimony that you will give in this deposition?

11          A.   No.

12          Q.   Does your report that was marked as

13     Exhibit 1 --

14          A.   Yeah.

15          Q.   -- together with your declaration that was

16     marked as Exhibit 2, do those contain a full statement

17     of your methodology?

18          A.   Yes, I mean, the report definitely does.

19          Q.   So there weren't any portions of your

20     methodology that you omitted from your report?

21          A.   No.

22          Q.   Were there any steps that you took in

23     forming your opinions that you omitted from your

24     report?

25          A.   Okay.  Yes, I mean, so the figures that I
```

1    developed, I mean, there was a lot of out -- you know,

2    other softwares that I used to get to the point where

3    I can make that figure.  So, yeah, I didn't fill in

4    those details or provide those details.

5         Q.   Oh, oh.

6         A.   Is that what you mean?

7         Q.   No.  That was a good question, sir.  So I

8    understand that you prepared figures and you used

9    software that you disclosed to come up with graphical

10   representations.

11        I'm wondering just as a -- as you lay out

12   your scientific method and your analysis, were there

13   any steps that you took that you decided, I'm not --

14   I'm not going to disclose that?

15        A.   Oh, no.

16        Q.   What is a sensitivity analysis?

17             THE COURT REPORTER:  Sensitivity?

18             MR. CURRAN:  I'm sorry, sensitivity

19        analysis.

20             THE WITNESS:  Yeah.  So sensitivity analysis

21        is just what it is, is sometimes it's an analysis

22        that someone can use to demonstrate maybe that a

23        particular approach is not affected by a certain

24        parameter or something like that.

25   ///

1   BY MR. CURRAN:

2       Q.   In the context of air modeling, how do you

3   conduct a sensitivity analysis?

4       A.   Well, it depends.  I mean, there's a lot of

5   different ways to do it.

6       Q.   What are some of the -- I'm sorry.  What are

7   some of the ways to conduct a sensitivity analysis in

8   air modeling?

9       A.   It could be, for example, for modeling, may

10  mean multiple stacks and then -- so for annual

11  averaging period, you end up modeling -- you compare

12  it to modeling one stack and -- or two stacks and

13  show -- you know, maybe demonstrate that the -- the

14  difference between that -- those two scenarios is

15  really not that significant.  And you could -- then

16  you could maybe save time in your approach with

17  modeling fewer stacks or something like that.

18      Q.   And are the steps that you took to conduct

19  sensitivity analysis listed in your report?

20      A.   I didn't really do a sensitivity analysis.

21      Q.   What does it generally mean to validate an

22  air model?

23      A.   Well, the only way that I know of is to

24  actually -- I mean, the -- the only thing that comes

25  to my mind is actually go out and measure what the

 1   model is predicting to actual, you know, sampling,
 2   measurement of concentrations, or a deposition or
 3   whatever and compare it to -- to the model results for
 4   a validation process.
 5       Q.   Did you conduct a validation process of the
 6   sort you just described in this case?
 7       A.   No.
 8       Q.   Were you aware of data that you could have
 9   used to conduct a validation of your model in this
10   case?
11       A.   No.
12       Q.   Did you ask for any data that you could have
13   used to validate your model in this case?
14       A.   I did not.
15       Q.   Are you aware of any soil sampling data of
16   the area within -- well, strike that.
17            Are you aware of any soil sample data from
18   Bennington to measure PFOA deposition?
19       A.   Aware of it, maybe, yes, I guess, but I
20   don't know a whole lot of details about the soil side
21   of things.
22       Q.   Are you aware of any well water data that
23   measures PFOA concentrations in the Bennington area?
24       A.   I mean, I know of the fact that there is
25   measured PFOA in well water in the Bennington area.

1     Q.   Did you attempt to use any of that well
2  water data to validate your model?
3     A.   And I did not, no.
4     Q.   If we take a look at figure 8 to your
5  report, that's figure 8 in Exhibit 1.
6     A.   Yes.
7     Q.   So taking a look at figure 8 of Exhibit 1.
8  This represents deposition if ChemFab emitted your
9  upper bound estimate, 10,000 pounds per year?
10    A.   That is correct.
11    Q.   Now, based on scale, can you tell me how --
12 how much PFOA is your model estimating was deposited
13 within the red area seen on figure 8?
14    A.   Yeah -- oh, in this -- this contour right
15 here?
16    Q.   Yes, sir.
17    A.   Just the red area?
18    Q.   Yes, sir.
19    A.   I didn't do an area summary of what the
20 model ...  I'm sorry.  I didn't do an area summary of
21 what's inside that contour to give you a -- so, sorry.
22 I should have completed my answer.
23    Q.   So this may be the same answer, though.
24    A.   Okay.
25    Q.   Just ask -- strike that.

```
                                              Page 155
 1            Can you tell me how much PFOA your model
 2    estimates was deposited within the purple area on
 3    figure 8?
 4        A.   And, again, I did not do an area summary.
 5        Q.   The -- bad with colors, so this is kind of
 6    purplish --
 7        A.   I struggled with colors.
 8        Q.   Can I call this -- if I call this one pink,
 9    will you know what I'm pointing to?
10        A.   I got you, yeah.
11            MR. CURRAN:  Gary, I'm pointing to -- I'm
12        calling this purple and this pink.
13            MR. DAVIS:  Okay.
14            MR. CURRAN:  Okay.  So strike that.
15    BY MR. CURRAN:
16        Q.   On figure 8, the outer boundary -- well, let
17    me do this a little simpler.  Strike that.
18            You have in front of you figure 8 from your
19    report, and I want to understand geographically --
20        A.   Uh-huh.
21        Q.   -- the outer bounds of what you modeled.  Do
22    you think you could draw for me where the outer
23    boundaries are for the model?
24        A.   What the extent of the -- the deposition
25    rate is, total?
```

1      Q.   Well, the -- the --

2      A.   Or just this particular --

3      Q.   The geographic boundaries of your modeled

4  area, is that something you could draw on figure 8?

5      A.   I mean, it's back on the figure that -- my

6  receptor table figure, which is figure 3.  That's my

7  geographic boundary right there.  That's my modeling

8  domain.

9      Q.   And so it extends well beyond --

10     A.   Yeah, so it -- it may be zoomed in a little

11  bit in this particular figure, yeah.

12     Q.   Uh-huh.  And so the -- the area that you

13  have marked here --

14     A.   Yeah.

15     Q.   -- let me see if I can say this in a way

16  that describes the visual.  Strike that.

17          Figure 8 has a solid white line that forms a

18  box --

19     A.   Yeah.

20     Q.   -- around some but not all of the areas that

21  are shaded in purple in this figure?

22     A.   That's right.

23     Q.   And what is that solid white box that you've

24  drawn?

25     A.   So what I did basically was the base -- the

1   base drawing is a Google image, showing terrain and

2   all that, and then I brought into it the -- the

3   sampling area figure.

4        Q.   Uh-huh.

5        A.   So it's kind of a -- and I believe -- I

6   don't know if the DEC developed this.  I believe they

7   did.  So, yeah, it's Vermont's figure.  So that's

8   that -- so figure 4 over top of the Google Earth

9   image, so it's -- the two are in there together as

10  a -- as a base map, a base figure.

11       Q.   Now, what determined the outer boundary of

12  the pink area that you have shaded in figure 8?

13       A.   It was just a selection of where to break

14  down the contour intervals.

15       Q.   Uh-huh, and the -- the contour ending

16  here --

17       A.   Yes.

18       Q.   -- including along these --

19       A.   Yeah.

20       Q.   -- sort of jagged areas.

21       A.   Right.

22       Q.   Why do the contours end at that point in

23  your model?

24       A.   Well, the -- that's -- that's where the

25  model -- of course, I had a 100-meter by 100-meter

1    receptor grid, so I used the Surfer software to -- to

2    grid this data to produce the image that I've -- I'm

3    presenting here.

4            So it's -- it's basically capturing -- you

5    know, there's receptors there that -- that fall within

6    this category of the -- it would be this 5 to the

7    minus 4 contour interval, grams per meter squared per

8    year.

9        Q.   Uh-huh.

10           THE COURT REPORTER:  Sorry, grams per?

11           THE WITNESS:  Grams per meter.  Sorry, grams

12       per meter squared per year.

13   BY MR. CURRAN:

14       Q.   Now, when you were looking at the different

15   model outputs --

16       A.   Yes.

17       Q.   -- in figure 6, figure 7, and figure 8 of

18   your report, did you attempt to validate any of those

19   potential outputs with -- with soil or water data?

20       A.   Yeah, no, I did not.

21       Q.   Sir, do you understand -- well, strike that.

22           Do you have any understanding as to

23   approximately how many residential properties are

24   contained within the proposed class area in this case?

25       A.   Actually, I do not.

1    Q.   Your model doesn't purport to tell us

2    exactly how much PFOA was deposited over time at any

3    specific property within that class area?

4    A.   No, no, I'm not focusing on a particular

5    property.

6    Q.   And so your model doesn't tell us how much

7    PFOA was deposited on a specific property in any given

8    year?

9    A.   No.

10   Q.   Is it correct to say that your model

11   predicts that each home within a certain contoured

12   area on the map would have the same amount of PFOA air

13   deposition.  Fair?

14   A.   Okay.  Repeat the question again.

15   Q.   Sure.  Would it be correct to say that in

16   your model, you're predicting that each home within a

17   particular contoured area of the map would have the

18   same PFOA air particle deposition?

19   A.   They're falling in the same range of that

20   contour, so if they're closer to the next contour

21   level, depending on which direction you go, that home

22   would have less than one that's on the other side of

23   that -- that contour, if you follow what I'm saying.

24   Q.   I do, yes.  Thank you.

25   A.   Okay.

1      Q.   So your model would predict that as

2   proximity from the site increases, the -- the contour

3   of -- of deposition would generally decrease?

4      A.   That's right.

5      Q.   And --

6           MR. DAVIS:  Let me object to that question.

7      I think it was backwards, but that's okay.

8           THE WITNESS:  Okay.  Was it?  The deposition

9      rate --

10          MR. DAVIS:  The proximity increases, you

11     said.  I'm sorry.

12          THE WITNESS:  Yeah, the deposition decreases

13     as you -- but he said that prop -- yeah, you're

14     increasing distance.

15   BY MR. CURRAN:

16     Q.   So -- so your model -- and, again, I'm

17   referring here to figure 8 for -- for colors.  Looking

18   at figure 8, your model predicts that a -- a home in

19   the -- I guess it's the southwest corner of this

20   purple -- this pink area --

21     A.   Uh-huh.

22     Q.   -- would receive as much PFOA air deposition

23   as a home in the northeast corner of the pink area?

24     A.   Well, again, generally speaking, it's within

25   the same contour, so it should be within that same

1   range.  It's going to be -- it is going to be likely

2   different, but, you know, that receptor -- those two

3   receptors aren't going to be identical, but they're

4   within that same decided contour interval.

5       Q.   So your model doesn't distinguish between

6   individual properties or receptors within this pink

7   contour?

8       A.   Well, I mean, technically it does.

9       Q.   Uh-huh.

10      A.   But I did not take the results to that

11  extent, so, in other words, I've got -- you -- you see

12  the domain, so -- so there's my model domain, so those

13  calculations are done for every receptor in this

14  domain.  So if there's a -- if there's a receptor on a

15  particular property that you're interested in, so,

16  yeah, technically that data -- and, again, depending

17  on -- we use the unit emission rate, depending on

18  what -- what other three categories you want to look

19  at.  So, yes, it would look -- it would show you that

20  the deposition rate --

21      Q.   For a given --

22          MR. DAVIS:  Excuse me.  Let him finish.  Did

23      you finish here?

24          THE WITNESS:  Yeah, I slowly finished it,

25      so, yes, sorry.

```
 1   BY MR. CURRAN:
 2        Q.   So for a given assumed emission rate, your
 3   contours treat a home in the southwest portion of this
 4   pink contour the same as a home in the northeast
 5   portion of this pink contour.  Correct?
 6        A.   Yes, so they're falling within that same
 7   contour range, yes.
 8        Q.   Now, your model wasn't designed to tell us
 9   how much PFOA was deposited on property owned by a
10   particular individual at a particular time?
11        A.   No, I did not -- I did not take it to that
12   extent.
13        Q.   So you didn't create a model to tell us the
14   source of PFOA deposited on property owned by, for
15   example, James Sullivan.  True?
16        A.   Yeah, so, no, that's correct, that's not
17   my -- was not my intent.
18        Q.   And that would be true for any individual
19   in --
20        A.   Right.
21        Q.   -- the Bennington area?
22        A.   Right.
23        Q.   And from your model, do you know when PFOA
24   would have been deposited on each putative class
25   member's property?
```

1      A.    When it's -- it's an annual average, so it's

2  over the course of -- of an annual average period.

3      Q.    And so you computed an annual average?

4      A.    That's right.

5      Q.    You didn't attempt to determine when over

6  time PFOA may or may not have actually deposited on to

7  any given --

8      A.    No.

9      Q.    -- property in Bennington?

10      A.    No.

11      Q.    Do you know where the named plaintiffs in

12  this case live?

13      A.    I do not.

14      Q.    Was that important for your analysis?

15      A.    No.

16      Q.    Did you look at PFOA levels at any of the

17  named plaintiffs' properties in an effort to validate

18  your model?

19      A.    I did not.

20      Q.    I'd like to mark as our next two exhibits,

21  so it will be Exhibit 7 and 8, so I'll mark as

22  Exhibit 7 an email dated February 22nd, 2017, and I'll

23  mark as Exhibit 8 an image that is the attachment to

24  that email.

25              (EXHIBITS 7 AND 8 WERE MARKED FOR

```
                                               Page 164

 1         IDENTIFICATION)

 2    BY MR. CURRAN:

 3         Q.   Mr. Yoder, you've seen maps that indicate

 4    where PFOA was detected in water wells within

 5    Bennington.  Correct?

 6         A.   Yes, and I used one in my figures.

 7         Q.   Okay.  So Exhibit 16 is, I believe, an email

 8    between yourself, Mr. Hopke --

 9              MR. DAVIS:  Exhibit 16.

10              MR. CURRAN:  I'm sorry.  Exhibit -- I'm

11         looking at the wrong one here.  Exhibit -- strike

12         that.

13    BY MR. CURRAN:

14         Q.   Exhibit 7 is an email exchange between

15    Philip Hopke, yourself, Ms. Dare --

16         A.   Uh-huh.

17         Q.   -- and Philip at TRM & Consultants.com.  Can

18    you tell me, who is Philip?

19         A.   That's Phil Hopke, Dr. Hopke.

20         Q.   Oh, okay.  So he -- I see.

21         A.   Yes.

22         Q.   Got it.  Okay.  So this is an email -- so --

23              MR. DAVIS:  Which one are we starting with?

24    BY MR. CURRAN:

25         Q.   So Exhibit 7 is an email exchange between
```

1    Mr. Hopke, yourself, and Ms. Dare.  Is that a fair

2    characterization of the email?

3         A.   Yeah.

4         Q.   Okay.  If I could direct your attention to

5    Exhibit 8 for a moment.  Does this appear, what has

6    been marked as Exhibit 8, to be the Vermont DEC area

7    of interest map that I believe Ms. Joselson sent to

8    you in this email exchange?

9              THE COURT REPORTER:  That I believe who sent

10        to you?

11             MR. CURRAN:  I'm sorry, Ms. Joselson,

12        J-O-S-E-L-S-O-N.

13             THE WITNESS:  It appears to be, but I think

14        there -- I know there was a later version of

15        this.  It came out -- honestly, I looked at it

16        quickly and didn't see a big difference for what

17        I needed it for, so I don't know if this is the

18        latest version or the earlier one when she

19        distributed it.

20    BY MR. CURRAN:

21        Q.   So we can agree this is representative of --

22        A.   Oh.

23        Q.   -- what you've seen of --

24        A.   Yes.

25        Q.   -- water well results?

```
                                           Page 166
 1        A.    Yes.
 2              MR. DAVIS:  And I'm going to object to the
 3        question.  I don't know what "representative"
 4        means.  If you --
 5              THE WITNESS:  Okay.
 6              MR. DAVIS:  You may agree or not.
 7              THE WITNESS:  Oh.
 8  BY MR. CURRAN:
 9        Q.    Mr. Yoder, you are -- I'll direct you to
10  your email on the bottom of page 1 of Exhibit 7.
11        A.    Okay.
12        Q.    You wrote this, I believe, in February 22nd,
13  2017.
14        A.    February, yes.
15        Q.    Okay.  And it says, Cathy, Phil, I'm curious
16  about your initial thoughts on this map.
17              Pause there for a moment.  Does this map
18  appear to be -- that we marked as Exhibit 8 --
19        A.    Okay.
20        Q.    -- appear to be the map that you had in
21  mind?
22        A.    It appears to be.  I'm not 100 percent sure,
23  but it looks like --
24              MR. DAVIS:  I'm going to object.  It's
25        obvious from this map that it's April of 2017 --
```

```
 1            THE WITNESS:  I didn't see that.
 2            MR. DAVIS:  -- not February where he's
 3       talking about it, so I object to you using this
 4       map with this line of questioning.
 5            MR. CURRAN:  Okay.  Well, you know,
 6       we'll ...
 7            MR. DAVIS:  Actually -- actually, it says
 8       August at the bottom.
 9  BY MR. CURRAN:
10       Q.   Why don't we take a look actually down in
11  the thread.  I think you said earlier, Mr. Yoder, this
12  is representative.  The exact data points, you'll see,
13  are not necessarily important.
14       A.   Okay.
15       Q.   We'll put that one to the side.  In the
16  email thread itself, there's a similar set on page 2
17  of icons, looks like it's about the same legend, and
18  references to sites.
19       A.   Okay.
20       Q.   Do you see that?
21       A.   I do.
22       Q.   So we can agree at least that this is
23  representative of the type of map you were looking at
24  when you were commenting up the thread about a map.
25  Fair?
```

 1        A.    Yes.

 2        Q.    Okay.  So in February 2017, when you're

 3   speaking to Dr. Hopke and Ms. Dare, you ask, (Reading)

 4   I'm curious about your initial thoughts on this map.

 5   Obvious impacts, but there are -- I believe that's

 6   non-detects -- also mixed in as well, even right next

 7   to the facility.  I can see where local wind patterns

 8   may come into play, but it's hard to say not having

 9   looked at any met data.

10             I believe that's meteorological data?

11        A.    Yeah.

12        Q.    Okay.

13        A.    Right.

14        Q.    (Reading) I guess I was expecting more of a

15   clear, consistent pattern.  What I see is mixed and

16   very widespread.

17             Can you explain what you meant by that?

18        A.    Well, this was -- when you asked earlier

19   when I got started on -- this is back in February, so

20   we started a lot earlier than I thought, so, yeah,

21   this was way early on.  And I was just starting to get

22   some information and looking at things like that, but

23   I hadn't had a chance to really process anything, so

24   it was just kind of an initial, What do you guys think

25   about this?

1      Q.    Uh-huh.

2      A.    That's about it.  It really wasn't any more

3  than that, and I don't even remember that they even --

4  it really -- it didn't go any more, really, than past

5  this, so.

6      Q.    And when you were first looking at the data,

7  you were expecting more of a clear, consistent pattern

8  that there was air deposition.  Right?

9      A.    Well, I was just looking at those -- at

10 these -- these wells.  I was just curious; the first

11 time I had seen that data, so.  But I was just kind

12 of, maybe trying to, in my brain, before having --

13 having done anything, looking in that data or modeling

14 or anything, just kind of see if there was some way

15 from a -- before I did any analysis, if there was a

16 logical fit just visually at the beginning.

17     Q.    And understanding it was the beginning of

18 the analysis.

19     A.    Yeah.

20     Q.    But your initial reaction to this was that

21 it wasn't the clear, consistent pattern that you were

22 expecting if this was purely air deposition.  Correct?

23     A.    It -- no, it was just saying it was -- it

24 was -- I was mostly looking not so much at deposition.

25 I was looking at the wind patterns and trying to line

1  it up with maybe what I thought, and having not even

2  looked at anything, how it would play out.

3          But it really -- it really wasn't much more

4  than just a, What do you guys think about this, 'cause

5  it just, you know.  And then I got into quite a bit

6  more of it with the terrain and the river systems and

7  things like that, so things kind of, you know, made

8  more sense as far as its uniqueness.

9          Q.   And your first reaction, though, was that

10  you were expecting more of a clear, consistent pattern

11  than you saw when you looked at data that had not only

12  PFOA detects but also non-detects mixed in?

13          A.   Yeah.  It's -- it's -- and, again, a normal

14  pattern is -- is based on, you know, typical south --

15  well, eastern United States weather patterns.  It's

16  not typical there in Bennington.

17          Q.   Now, looking at your model, going back to

18  figure 8 in your report.

19          A.   Yeah.

20          Q.   Your model would not predict non-detects,

21  for example, using your 10,000 pounds-per-year

22  emission assumption.

23          A.   Yeah.

24          Q.   You would not predict non-detects in areas

25  of purple or red or pink.  Fair?

1      A.    No.  You're getting into an area of

2  subsurface that I'm not familiar with.  I just

3  predicted what was on the surface.  After that, I

4  understand it's a pretty complicated situation, and, I

5  mean, that's about all I can say about it.  I don't

6  know what happens after it gets to the surface, after

7  it's deposited.

8      Q.    When you were running your air model, did

9  you consider any other sources of airborne PFOA that

10  may have been in the area?

11      A.    I didn't know there was any other sources of

12  PFOA in the area, so as far as I understood, there

13  wasn't.

14      Q.    So -- so that's no?

15      A.    Yeah.

16      Q.    In running your air model, you did not

17  consider any other sources of airborne PFOA --

18      A.    That's correct.

19      Q.    -- in the Bennington area?  And fair to say

20  that your task in modeling was to model only where

21  PFOA emissions might have traveled from the ChemFab

22  facilities?

23      A.    That's correct.

24      Q.    You did not look at any individual property

25  in Bennington as a receptor and then work backwards to

```
                                       Page 172
 1    determine the source of any PFOA depositions at that
 2    property?
 3         A.    Kind of reverse engineering, I guess, yeah.
 4    No, we didn't do that.
 5         Q.    So you started with the conclusion that all
 6    the PFOA depositions came from ChemFab?
 7         A.    I mean, it -- it was the only source that I
 8    know of of PFOA, so yes.
 9         Q.    And you reviewed the -- strike that.
10              You reviewed the Barr conceptual site model
11    before you submitted your report.  Correct?
12         A.    Yes.
13         Q.    You're aware that the Barr conceptual site
14    model lists at least 11 other potential sources of
15    PFOA emissions within the Bennington area.  Right?
16         A.    Of, I guess, some slight form of emissions
17    of that particular compound.  I'm trying to remember
18    where I saw it now.
19         Q.    Did you do anything to rule out those
20    potential sources of PFOA as actual sources?
21         A.    As far as I understood, there wasn't any
22    other significant sources of PFOA from an air emission
23    standpoint in -- in Bennington.
24         Q.    And was your basis for that conclusion an
25    independent investigation of other potential sources
```

1   of PFOA?

2        A.   Well, it was based on -- yeah, it was based

3   on reviewing that, and from what I understood, some of

4   the historical, but operations around Bennington.

5        Q.   How does your model account for non-airborne

6   sources of PFOA?

7        A.   It doesn't.

8        Q.   So your model doesn't account for PFOA

9   deposition on a property if that PFOA, for example,

10  leached from a landfill?

11       A.   No.

12       Q.   In conducting your analysis on PFOA

13  deposition, fair to say that you were told to use just

14  one source?

15       A.   I used one source because, again, it was the

16  only source that I knew of as -- in my analysis in --

17  of significant amounts of PFOA emissions in

18  Bennington.

19            MR. CURRAN:  Pass the witness.

20            MR. DAVIS:  We're done.

21            THE VIDEOGRAPHER:  This concludes the

22       videotape deposition of Gary T. Yoder.  We're off

23       the record at 1:43 p.m.

24                 (SIGNATURE RESERVED)

25            (DEPOSITION CONCLUDED AT 1:43 p.m.)

Page 174

STATE OF NORTH CAROLINA

COUNTY OF FORSYTH


REPORTER'S CERTIFICATE

I, JUDY F. REINS, a Notary Public in and for the State of North Carolina, do hereby certify that there came before me on Tuesday, the 6th day of February, 2018, the person hereinbefore named, GARY THOMAS YODER, who was by me duly sworn or affirmed to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, examination reduced to typewriting under my direction, and the deposition is a true record of the testimony, to the best of my ability and understanding, given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereto set my hand, this the 19th day of February, 2018.


*Judy F. Reins*


JUDY F. REINS, RMR, CRR

Notary Public No. 20031970024

Page 175

ACKNOWLEDGMENT OF DEPONENT

      I have read the foregoing transcript of
my deposition and except for any corrections or
changes noted on the errata sheet, I hereby
subscribe to the transcript as an accurate record
of the statements made by me.


_____
GARY THOMAS YODER, MS


     SUBSCRIBED AND SWORN before and to me
this \_\_\_\_ day of _____, 20\_\_\_.


_____
NOTARY PUBLIC


My Commission expires:

1               **E R R A T A   S H E E T**

2    IN RE:   SULLIVAN, et al. vs. SAINT-GOBAIN

3    DATE:   2/6/2018

4    PAGE     LINE    CORRECTION AND REASON

5    _____    _____   _____

6    _____    _____   _____

7    _____    _____   _____

8    _____    _____   _____

9    _____    _____   _____

10    _____    _____   _____

11    _____    _____   _____

12    _____    _____   _____

13    _____    _____   _____

14    _____    _____   _____

15    _____    _____   _____

16    _____    _____   _____

17    _____    _____   _____

18    _____    _____   _____

19    _____    _____   _____

20    _____    _____   _____

21    _____    _____   _____

22    _____    _____   _____

23

24    _____   _____

25    (DATE)             **GARY THOMAS YODER, MS**

1      **E R R A T A   S H E E T   C O N T I N U E D**

2      IN RE:  SULLIVAN, et al. vs. SAINT-GOBAIN

3      DATE:  2/6/2018

4      PAGE    LINE    CORRECTION AND REASON

5      _____    _____    _____

6      _____    _____    _____

7      _____    _____    _____

8      _____    _____    _____

9      _____    _____    _____

10     _____    _____    _____

11     _____    _____    _____

12     _____    _____    _____

13     _____    _____    _____

14     _____    _____    _____

15     _____    _____    _____

16     _____    _____    _____

17     _____    _____    _____

18     _____    _____    _____

19     _____    _____    _____

20     _____    _____    _____

21     _____    _____    _____

22     _____    _____    _____

23

24     _____    _____

25     (DATE)                    **GARY THOMAS YODER, MS**

[& - 4-1]                                                                    Page 1

| & |
| --- |

**&**   2:3,8,20 5:6
166:17

| 0 |
| --- |

**0.67**   129:7
**00125**   1:8
**010002830**   3:22
**010003000**   3:22
**015**   89:11 94:4,8

| 1 |
| --- |

**1**   3:6,9 5:1 6:20
9:4,17 11:22 12:1
22:1,4 29:13
50:18 64:21,25
118:19,23,24
130:25 131:9
150:13 154:5,7
166:10
**1,000**   77:20,23
78:19 80:8 82:7
85:12 94:15
138:13
**1.157**   121:11
**10**   77:4,7,19,22
78:9 80:5 125:13
126:4 130:23,24
138:8,15 142:11
**10,000**   72:4 73:6
102:14,16 103:6
103:19 104:2,7,17
104:24,25 105:3
154:9 170:21
**10/02/17**   3:15
**100**   9:18 71:7
75:25 76:4,5,13
90:14 120:23
157:25,25 166:22
**10000755**   3:18
**10000936**   3:18

**10010**   2:10
**10:07**   64:12
**10:22**   64:15
**11**   3:9 78:21,23
79:6 90:15 94:2
94:12,18,20,23
95:13,22 98:15,21
99:2,8 101:14,23
172:14
**1100**   90:16
**11:11**   102:7
**11:28**   102:10
**12**   9:23 77:7,19
78:9,25
**121**   4:5
**12:27**   149:23
**14**   123:10
**1400**   78:17
**145**   76:10,12
**15**   78:10 80:12
89:10 90:7 94:2
**150**   2:21 5:7
**1500**   85:15
**16**   164:7,9
**164**   4:9,11
**17**   123:22 125:5
**1968**   108:17,23
**1978**   95:16 98:19
99:3,10
**1992**   3:21 22:17,20
28:1 72:3 76:25
77:17 80:25 81:1
83:6
**19th**   174:21
**1:16**   150:1
**1:43**   173:23,25
**1a**   64:23 65:5,13

| 2 |
| --- |

**2**   3:12 5:1 7:1,3
21:6 69:6 70:18
118:20,23 119:4

**119:10,12,18**
120:9 121:2,4,12
129:11 131:9
150:16 167:16
**2,000**   103:24
**2-4**   122:3 125:4
**2.5**   119:19
**2.58**   127:16,18
129:7
**2/22/17**   4:10
**2/6/2018**   176:3
177:3
**20**   106:11 107:4
175:13
**2000**   96:19,20
**2001**   63:19,23 64:2
97:9 99:10
**2002**   95:17 98:20
99:3 108:10,22
**2003**   123:24
**20031970024**
174:25
**2004**   123:24
**2005**   31:3 125:20
**2006**   96:19,20,23
97:1,14,20 98:20
99:24 125:20
148:5,20 149:1
**2008**   4:8
**2010**   96:19,23 97:1
97:14,20 98:21
99:24 148:6,21
149:1
**2014**   16:25
**2015**   16:25 20:6,7
**2016**   17:1 20:6,8
**2017**   3:18 12:11
25:18,20 31:5,8
48:12 62:4 65:24
66:10,22 67:1
83:23 84:1,21

**163:22 166:13,25**
168:2
**2018**   1:18 2:22 5:9
174:7,21
**206**   2:4
**21**   2:4
**212**   2:10
**22**   123:10
**22nd**   2:9 163:22
166:12
**2300**   2:21 5:7
**24**   43:25 125:16
**24/7**   98:22 99:3
**27601**   5:8
**28**   119:16
**28801**   2:5
**29**   120:5 122:1
125:8

| 3 |
| --- |

**3**   3:11,16 7:9
11:17,22 12:3
21:5,8 28:1 64:21
64:22 65:4,11,14
65:16,16,17,20
66:3 67:23 82:11
135:13 142:12
156:6
**3,000**   103:16,18
104:11,15 105:1
105:11,16
**365**   98:22 99:3

| 4 |
| --- |

**4**   3:19 77:5,8,10,13
80:5 81:14 83:18
119:22,24 120:14
127:1 157:8 158:7
**4-1**   127:2,3 128:13
128:18,25 129:6

**5**

**5** 3:6,12 4:3 91:21
92:6,14,17,22
103:10 158:6
**50** 142:12
**51** 2:9
**575** 68:17
**5:16** 1:8

**6**

**6** 1:18 3:3 4:5
121:16,17 126:7
126:16 158:17
**622-0044** 2:5
**65** 3:16
**67** 127:15 129:8
**68** 148:23 149:3,13
**69** 63:3,11
**6th** 2:22 5:8 174:6

**7**

**7** 4:9 22:3,21
24:17 70:17,19,20
71:16 119:16
158:17 163:21,22
163:25 164:14,25
166:10
**7,000** 103:3,25
104:2,24
**75** 9:18
**77** 3:19
**78** 63:3,12,18,23
64:2 108:17
148:23 149:4,13

**8**

**8** 4:11 154:4,5,7,13
155:3,16,18 156:4
156:17 157:12
158:17 160:17,18
163:21,23,25
165:5,6 166:18
170:18

**8/31/17** 3:11
**80** 68:17
**828** 2:5
**833** 32:18
**849-7000** 2:10
**85** 125:10,12,22
**87** 127:2

**9**

**9** 126:4
**9/1/17** 3:8
**90** 126:2,7,16
**900** 138:18
**92** 4:3
**97** 100:13
**9:04** 2:23 5:4

**a**

**a.m.** 2:23 5:4
64:12,15 102:7,10
**abatement** 51:7,20
51:24 52:3,16
**abaters** 103:13
**ability** 51:19 52:16
174:14
**able** 8:20 38:1
53:4 78:24 91:5
112:18
**absolutely** 57:14
**acceptable** 47:10
**accepted** 30:7
59:20,25 126:23
**accompany** 61:6
**accomplish** 17:21
23:23 39:24,25
**account** 134:21
135:10 139:3
173:5,8
**accounted** 134:25
**accumulative** 99:9
**accuracy** 69:17,18
112:14

**accurate** 6:15
39:19,25 40:3,9,18
41:2,5 49:14,20
55:3,13 57:13
59:9,15,20,22,25
60:7,9 67:8,22
68:1,3 69:25 70:1
70:10 73:1,7
91:19 93:17 96:3
96:8 101:15
104:14 105:5
116:22 117:16,19
118:11,15 122:24
124:14 129:13,15
129:20 139:18
140:6 141:8,16
148:2,21 149:2,12
175:6
**accurately** 53:19
54:1,11,17 55:9
56:23 57:6,22
129:4
**achieve** 74:3
**acid** 3:6,9
**acknowledgment** 175:1
**acronyms** 115:13
**action** 1:7 21:21
174:19
**activities** 61:16
**actual** 13:7 73:13
99:20 100:2
109:13,15,17
112:1,15 136:1,25
149:6 153:1
172:20
**actuals** 112:17
**add** 18:18 72:2
**added** 35:12
100:12

**adding** 22:14 81:3
96:2 121:2
**addison** 1:3
**addition** 139:11
140:4
**additional** 81:25
124:18
**address** 13:25
14:4,6,10
**addressed** 91:24
117:8
**addressing** 117:7
**adjust** 135:10
**administrative** 19:8,19 20:1
**aermod** 10:24
11:3,4,6,6 28:25
52:21,23 53:3,7,12
53:16,21 54:1,11
54:19 55:3,9
56:24 57:24 58:7
58:17,23 59:9
60:9,12,18 62:6
66:6 71:5 84:3
85:5,10 86:15
97:16 111:3,4
112:22 113:3
118:19,22 119:5
119:13 125:2
129:11 131:10
**affect** 31:11
**affirmed** 174:8
**agency** 4:12 20:9
31:18
**agree** 26:17 35:14
39:21 40:5,11
48:7 53:2 56:23
59:19,24 68:16
69:17 96:3,6,8
104:10 111:1
118:3 129:14

130:25 131:6,8
134:1 137:11
148:1,3 165:21
166:6 167:22
**agreement** 85:9
118:2
**agricultural** 20:15
**ah** 87:11 93:3
**aha** 122:9,12,12
**ahead** 42:9,10
44:10 113:10
**air** 4:8 8:13,23
10:17 12:22 13:9
13:17 14:20 16:1
20:19,20 21:3,3
24:1,3,10 26:9
27:4,9,19,22 28:18
29:2,4,10,15,16,19
30:16,21,21 33:23
34:21 35:19 36:1
38:22 39:19 40:3
40:9,18 41:5,8,11
41:25 42:13,15
43:2,10,13 44:24
45:5,16 46:9,21
47:5 48:16,22
49:10 50:2 51:17
54:1,11 58:7,17
66:2,9 68:9 71:4
74:1,11,12,14 84:2
84:3,8 88:3,11,12
96:9 97:22 99:4
106:19,22 117:25
132:22 139:2
140:3 141:4,7,8,16
141:17 143:1
148:1,1,10 152:2,8
152:22 159:12,18
160:22 169:8,22
171:8,16 172:22

**airborne** 171:9,17
173:5
**airport** 148:9,11
148:13,16,25
**al** 3:13 4:4,9 176:2
177:2
**albany** 148:10
**alliance** 3:19
22:15,16,19 24:16
77:16 81:16,18
82:11 83:6 89:1
**allied** 72:2 77:1
**allocate** 143:5
**allowed** 89:16
**alternative** 124:24
**ambient** 29:17
30:16 35:19 38:22
68:13,19
**amount** 102:21
105:9 136:1,13
137:10 143:4
144:1,20 146:20
146:24 147:14
159:12
**amounts** 173:17
**analyses** 31:16
47:15 75:11 78:4
115:22 118:12
**analysis** 3:7,10
8:11 23:24 25:7
25:11,14 32:1
36:3,6,14 37:16
39:24 40:20 42:1
42:18 45:25 47:17
47:18,19 52:24
57:24 58:7,17,23
61:17,23 62:11
69:13,14 70:5
72:3 73:21 74:6
74:24 75:2,10
76:22 81:12,24

82:11 83:11 84:5
85:9 89:20 92:21
93:21,25 95:20
99:7,9,9,15 101:9
101:22 103:12
104:10 105:6,13
108:13 111:3,4,15
112:22 113:3,13
113:17,21 114:13
114:19 116:16
118:1,5,15,18
119:7,13,20 123:5
123:15 124:19
129:11,24 131:22
131:23 134:16
135:4,15 137:11
138:10 140:1
143:21 147:17
149:19 151:12,16
151:19,20,21
152:3,7,19,20
163:14 169:15,18
173:12,16
**analytical** 48:21
49:6
**analyze** 63:9
142:13
**anderson** 2:20 5:6
**annotated** 11:18
12:2 64:19,20,25
**annual** 70:14
100:4 101:1,5
152:10 163:1,2,3
**answer** 14:3 17:12
34:3,5,14 38:3,5
48:5,8 53:16 67:2
67:12 83:2 87:1
96:12 99:6,22
100:24 101:20
106:24 110:5
126:21 131:4

136:5 138:12
139:25 154:22,23
**answering** 30:5
110:3
**anymore** 29:5
112:19
**anytime** 59:14
**anyway** 32:11
144:25
**apfo** 103:22 115:3
115:6,7 117:1
**appear** 7:17 92:17
165:5 166:18,20
**appearances** 2:1
**appears** 92:12
125:7 165:13
166:22
**appendix** 25:20
29:22,25 30:7,9,10
30:20,24 31:3,14
31:19,23 32:4,8,12
32:16,18,25 33:3
35:14 37:18,24
38:8,12,16 39:5,6
76:6,9
**application** 21:20
143:2 145:18
**applied** 51:14
77:18 95:12 97:18
**apply** 30:24 38:16
51:4,18 82:2
109:4,8 113:8
136:17
**applying** 53:24
68:9
**appreciate** 56:2,10
**approach** 25:10
66:14 76:16 82:3
84:7 108:9 118:5
119:20 123:9
151:23 152:16

**approached** 72:21
110:12
**appropriate** 33:24
34:22 35:6,15
37:19 105:5,12,17
111:14 114:24
118:16 130:2
141:2
**approved** 86:16
**approximate**
108:23 147:14
**approximately**
81:6 130:23
158:23
**april** 3:21 12:14
22:17 166:25
**arbitrarily** 78:18
**arbitrary** 76:16
103:5
**archived** 148:5
**area** 4:12 13:19
36:8,12,23,24,25
39:20 40:4,10
41:25 42:16,25
43:2,8,9,14,18,24
44:17 45:5,13
46:4,10,25 47:7
61:24 75:12,14,16
76:17 83:12
102:18 105:14
106:10,13 107:6,9
107:19 123:2
126:20 131:18
153:16,23,25
154:13,17,19,20
155:2,4 156:4,12
157:3,12 158:24
159:3,12,17
160:20,23 162:21
165:6 171:1,10,12
171:19 172:15

**areas** 15:7,9 37:18
108:4 156:20
157:20 170:24
**argument** 100:2
**arrangement**
108:10
**arrive** 94:12
**article** 24:19 46:13
**articles** 24:19
50:22 116:4
**arundel** 4:5
**asheville** 2:5
**aside** 19:19,22
20:7 68:19
**asked** 8:18,24
12:25 13:10,17,23
14:2,5,8,12 42:2
91:2,7 168:18
**asking** 8:13 38:7
47:23 66:16 71:6
74:8 106:19 113:9
126:19 128:16
144:12,15
**asks** 130:5
**assembling** 99:4
**assess** 60:25 73:5
**assessment** 42:20
50:2 72:24
**assessments** 73:2
**associate** 13:5
**associated** 17:18
31:17
**association** 15:14
29:2,11
**assume** 44:22
46:12 82:17 95:22
96:9 99:2 114:15
138:8,15 139:19
141:8,17 144:1,18
**assumed** 94:1
95:13 112:14

135:17 136:18
137:11 162:2
**assumes** 44:7
**assuming** 79:11,19
99:7 101:14
138:13 143:24
144:8
**assumption** 69:1
79:14,23 82:19
83:1 98:21 101:24
144:18 170:22
**assumptions** 68:6
68:8,19,20 80:1
89:20 90:6 111:20
135:25
**atmosphere** 45:17
49:7 130:17 137:4
137:13 144:2
**attachment**
163:23
**attainment** 15:9
**attempt** 27:7,11
27:15 35:20 55:4
81:25 83:14 86:2
99:18 100:7,20
135:5 140:15
146:21,25 147:14
154:1 158:18
163:5
**attempted** 96:24
**attempting** 74:22
96:17,18 97:22,25
98:9 101:4
**attend** 61:13
**attended** 28:14
**attention** 165:4
**attorney** 18:17
20:18 21:19 93:7
174:16,18
**attorneys** 18:20
37:13

**august** 125:20
167:8
**authority** 118:2
**available** 8:16
28:5 39:15 86:1
86:12 142:16
**avenue** 2:4,9
**average** 103:15
108:21 111:21,24
122:19 163:1,2,3
**averaged** 101:1
**averaging** 152:11
**aware** 44:3,16
81:6 153:8,15,17
153:19,22 172:13

**b**

**back** 12:8 26:14
28:1 29:5,14
64:14 68:23 69:4
70:5 71:6 72:13
76:21 78:2 80:5
81:19 85:12 89:10
98:1 102:9 105:20
109:6 119:18
123:1,10 131:2
143:6 147:17
149:25 156:5
168:19 170:17
**background** 17:7
26:1,3 33:25
34:23 35:6,11,15
35:20,25 36:4
37:19 39:18
**backwards** 160:7
171:25
**bad** 155:5
**bake** 102:25
**baking** 103:1
**ballpark** 9:16
**barr** 3:16 24:25
25:9,15,24 65:23

66:1,9,21,25 67:9
67:23 68:8,20
69:2,9 71:22 76:3
76:6,10 78:25
87:19 103:8,24
172:10,13
**barton** 4:6 115:1,8
115:15,24 116:2
116:12,18,24
120:3,3,9 121:15
123:12 124:8,17
125:12 127:6,13
128:14,21 129:1
131:12 132:4
**barton's** 118:14
119:14,23
**base** 156:25 157:1
157:10,10
**based** 17:23 26:9
33:7 37:4 38:14
42:18 45:22 48:8
52:24 59:22 70:21
71:12,23,25 78:3
82:8 85:6,8 101:1
104:21 108:3
113:19 133:7
134:4 140:12
142:25 147:6
149:18 154:11
170:14 173:2,2
**bases** 8:3
**basically** 17:6
28:23 30:6,11,15
31:15 59:2 62:18
79:8 99:6 100:1
110:4 120:22
132:9,19 156:25
158:4
**basis** 7:7 21:11
42:14 51:15 76:5
77:19,21 79:14

82:19 84:5 89:10
89:12 90:12 100:4
122:21 136:9
145:14 172:24
**bates** 3:18,22 92:6
**battery** 2:4
**bearing** 23:18
58:4
**beginning** 9:5
42:12 169:16,17
**behalf** 1:6 2:2,7,17
**belief** 73:9 142:8
**believe** 8:8 9:16
11:11 15:18 17:8
17:14 18:19 20:16
22:22 24:7 28:1
31:2 43:8 44:19
44:19 50:10 61:5
76:6,9 77:4,18
78:14,25 79:7,21
84:3 85:6 86:20
86:21 88:20,25
90:1,4,18 92:3,7
92:23 93:7,16
95:21 96:20 103:9
104:14 106:9
113:22 114:19
115:5 120:2
121:25 126:25
127:1 129:19
130:11 133:14
139:17 140:5
145:1 148:4,15
157:5,6 164:7
165:7,9 166:12
168:5,10
**believed** 86:14
103:8
**bennington** 3:17
12:21 13:18,24
36:24 42:16 43:2

43:14,18,24 44:17
44:24 45:5,13
60:13,14,21,22,24
60:25 61:1,1,2,4,7
61:12,14,25 62:4
63:3,18 70:13
75:12,16 80:25
82:16 97:2,7,11
98:11,12 100:21
115:20 117:5,7
131:18 132:6
133:6,24 134:2,3
135:6,6 148:9,13
148:16 153:18,23
153:25 162:21
163:9 164:5
170:16 171:19,25
172:15,23 173:4
173:18
**best** 6:14 9:2 17:12
22:22 23:11 30:20
31:24 32:5 55:6
60:3 79:17 86:22
95:5 117:20,20
118:6,9,11 174:14
**beyond** 156:9
**big** 74:8 112:9
165:16
**billy** 1:5
**bit** 10:3 19:16 26:1
29:6 43:7 68:24
73:19 75:9 76:15
76:23 78:20 103:5
156:11 170:5
**bits** 94:25
**blount** 2:20 5:6
**board** 15:25 16:2
19:12,14,22 20:7
20:12,22 79:12,24
**boards** 20:1

**bottling** 137:22
**bottom** 166:10
167:8
**bound** 71:20 72:9
73:6 82:4 100:1
102:16 104:3,9
105:5,12,17,23
106:2,4 142:19,22
143:15,16 154:9
**boundaries** 155:23
156:3
**boundary** 155:16
156:7 157:11
**bounds** 71:21
72:25 107:16
155:21
**box** 156:18,23
**boy** 23:1 29:14
**brain** 169:12
**break** 19:16 64:7
102:4 109:24
110:16,20 150:3,9
157:13
**breakdown** 131:3
**brief** 89:15
**bring** 11:14 109:8
110:8
**brought** 11:11
157:2
**build** 59:14 141:21
**building** 24:6,11
24:11 59:17 61:11
**built** 95:2 100:11

| c |
|---|

**c** 177:1
**calculate** 120:22
124:4 135:5
**calculated** 120:9
122:19
**calculates** 58:14

calculating 117:14
calculation 68:16
  120:13,14,16,19
  120:21
calculations
  161:13
calculator 127:23
  127:24
california 15:5
call 16:21 28:9
  32:15 33:7 59:2,5
  71:8 75:21 77:16
  83:23 84:1 89:15
  89:17 90:1,4
  92:23 93:10,13
  98:7 155:8,8
called 2:17 29:22
  52:21 72:9 80:16
calling 155:12
calpuff 85:6,7,10
  85:20,22,24 86:3,6
  86:9,18,22 87:2,3
  87:4 89:24 90:1,2
canada 15:6
cannata 84:14,14
  84:15,16,19,23
  85:2 87:7 88:7,18
  88:25 89:12,19
  90:13,16 91:1,12
  91:18 92:24 93:11
cannata's 87:25
  90:6 93:20
cap 15:5
capture 147:1
capturing 158:4
carbon 15:3 52:8
career 26:10 27:24
  31:16
careful 55:21
carolina 1:17 2:5
  2:19,22 5:8 20:14

28:23 35:13 47:5
  47:12 174:1,5
carolinas 29:2,10
cascade 125:13
case 6:17,23 7:5
  7:21 9:14 12:6,16
  12:20,21 13:10,16
  13:22 17:3 18:24
  21:25 22:7 27:4
  27:13 30:25 32:3
  32:14,16 33:5
  35:21 38:16 40:1
  47:16 48:19,24
  49:4,12,18,24 50:5
  50:7,11,17 51:1
  52:15,20 55:22,24
  56:4 60:11,17
  62:8,12 69:10,15
  72:20 73:12 85:20
  86:7 88:22 91:25
  92:5 105:18,22
  106:2 107:15
  142:1,3 153:6,10
  153:13 158:24
  163:12
cases 33:16 40:14
  40:14,19 53:25
  54:18 72:15 82:23
  141:4
catalytic 51:7,20
  51:24 52:3,10,16
catch 134:18
categories 120:18
  161:18
category 119:4
  132:11 158:6
catherine 4:5
cathy 12:17 14:15
  14:20 17:4 18:19
  43:4 61:10 93:10
  116:9 166:15

cathy's 15:14
cause 87:1 104:13
  110:8 123:1 170:4
  174:11
causing 130:17
  143:3
cease 48:2 97:8
certain 60:6,6
  151:23 159:11
certificate 174:3
certification 7:6
  21:10,15,17,22,25
certify 174:5,16
challenge 82:24
chance 168:23
change 7:25 15:15
  25:22 39:14 65:13
  105:18,21,23
  106:2 107:15
changed 42:1,5
  81:2
changes 28:24,24
  30:7,8 45:6,15
  79:3 175:5
chapel 28:22 30:1
chapman 93:1,6,6
  93:9,12
characterization
  37:21 165:2
characterize 38:17
  39:2
characterized
  69:5
check 86:14
  106:22
chemfab 3:20
  17:22,24 18:7
  40:24 45:2 63:1,6
  63:10,16,22 66:3
  87:9 90:13,17
  93:20 111:19

154:8 171:21
  172:6
chemical 33:18
chemicals 51:21
  52:12,18 53:6,13
  54:3,13 55:4
  146:3,8,15
chemist 26:18
chimney 132:20
chinkin 2:13 6:1,1
choice 124:23
  140:6
choose 56:18
  86:13
chose 94:18,20
  113:16
chronological
  101:22
chronology 81:4
circumstances
  45:23
citations 22:4,18
  24:3
cited 22:6 104:5
city 2:10
civil 1:7 17:8
clarify 14:3 42:12
class 1:6 7:6 21:10
  21:15,16,21,25
  29:13 131:21
  158:24 159:3
  162:24
classified 83:4
clear 41:22 56:19
  99:5 168:15 169:7
  169:21 170:10
clearer 75:9
client 18:17
climeco 14:23,25
  15:1

**clock**  79:20
**close**  29:23 33:20
  82:25 137:17
  148:13,16,18
**closed**  79:6 113:15
**closer**  68:24 138:4
  159:20
**closure**  108:11
  113:2,13
**cloth**  62:25
**coarse**  119:3
**coarser**  119:1
**coat**  63:2,6,11,17
  63:23 64:1
**coated**  50:9,13
**coating**  62:9,11,15
  62:21,24
**collect**  123:25
**collected**  23:25
  102:20 122:18
  123:5 125:16
  127:16
**collecting**  94:21
**collectively**  37:14
**color**  4:11
**colors**  155:5,7
  160:17
**column**  128:5,11
  128:13
**combined**  79:1
  95:3
**combustion**  52:8
**come**  14:19 26:14
  53:22 54:21 55:15
  64:5 77:23 78:15
  79:16 84:7 88:18
  109:4 138:3
  146:17,20 151:9
  168:8
**comes**  30:17 35:25
  152:24

**coming**  23:16 30:8
  72:17 76:3 81:9
  82:7 125:5 143:19
  144:24
**commencing**  2:23
**comment**  41:7,21
**commenting**
  167:24
**commission**
  175:20
**community**  20:17
**companies**  44:3,16
**company**  14:16
  15:2 20:25 43:17
  43:24
**compare**  25:12
  106:17 152:11
  153:3
**compared**  73:20
**comparing**  75:10
**comparison**  73:20
  73:23 74:21 75:7
  130:9 149:5
**complaints**  23:16
  133:7
**complete**  7:5 21:9
**completed**  154:22
**completely**  33:21
  71:19 134:12
**complex**  33:17
  75:13,15,21
**compliance**  20:20
  21:2 26:9
**complicated**  171:4
**comply**  30:16
**components**  63:10
  63:22
**compound**  33:22
  35:2,10 38:22,23
  38:23 39:8,8,12,13
  39:16 40:13,15

46:2,10,25 47:1,14
  58:10 117:4,7,23
  118:8,10 146:19
  147:4,18,20,23
  172:17
**compounds**  35:5
  39:4 115:7 117:2
  118:18 131:21
  132:10
**computation**
  58:15
**computed**  163:3
**concentration**
  34:23 35:6,12,16
  35:21 36:4 37:19
  53:23 103:20,22
**concentrations**
  33:25 45:21 49:2
  49:7 58:3 105:9
  106:11 107:4
  153:2,23
**concept**  62:20
**conceptual**  3:16
  24:25 25:21 65:18
  65:23 66:10,22
  67:1 172:10,13
**concerning**  174:10
**conclude**  105:16
  130:6 131:16
**concluded**  105:11
  173:25
**concludes**  130:1
  173:21
**conclusion**  84:7
  172:5,24
**conditions**  17:24
  108:23 113:2,3,12
  149:3,12
**conduct**  62:11
  152:3,7,18 153:5,9

**conducted**  43:12
  84:3 93:21 123:6
  123:23
**conducting**  8:11
  33:23 34:21 57:24
  124:19 173:12
**conference**  29:3
  29:11,22,25 71:8
**conferences**  28:4
  28:14,14 29:8,10
**confidential**  18:17
**confirm**  90:5
  125:24
**confused**  65:12
**connection**  16:5,8
  25:1 52:14 62:12
  92:18
**conscious**  124:23
**consider**  36:23
  37:2 40:25 41:10
  46:21 67:7,21,24
  68:3 79:25 86:3
  86:21 116:13,20
  122:25 123:11
  124:3,10,16,17
  127:2 129:10
  132:21,21 142:18
  142:21 171:9,17
**considered**  7:8
  22:24 23:12 30:20
  50:25 68:22 75:20
  94:18 115:25
  116:21 129:13
**consistent**  7:18
  168:15 169:7,21
  170:10
**constant**  96:9
**construct**  141:8,16
**constructed**
  100:15 101:2,10
  101:25 113:5

140:3
consultant 84:23
consultants 12:18
  27:25 70:23
consultants.com.
  164:17
consulting 13:6
  14:14 52:2
contact 13:2
contacted 12:16
  12:19 48:11
contain 150:16
contained 158:24
containing 44:4,17
contains 7:5 21:9
context 152:2
contiguous 33:18
continued 4:1 96:1
continuing 103:21
continuous 94:2
  95:13 101:14
continuously
  79:23 98:3
contour 74:19
  75:5 154:14,21
  157:14,15 158:7
  159:20,20,23
  160:2,25 161:4,7
  162:4,5,7
contoured 159:11
  159:17
contours 36:12
  157:22 162:3
contract 13:7,13
contracted 14:24
  18:11
contradictory
  94:25
contributions
  37:21 38:17 39:2

control 27:12 29:2
  29:11 51:8,20,24
  52:4,8,10,17 73:11
  143:2
controversy
  174:10
convenient 64:6
conversation 71:8
  71:24 78:11 90:25
  91:22 93:17
conversations
  13:15
copies 64:18
copy 4:3 11:11,12
  11:14,16 32:19,21
  65:17 77:8 92:7
corner 160:19,23
corporation 1:10
  3:14,20,20 14:24
correct 6:21 7:11
  7:22,25 8:4 10:12
  14:7 20:2 22:4
  26:18,19 27:6,13
  27:17 32:4 37:17
  38:8 41:3,12
  47:20 49:13 52:22
  60:14,22 70:16
  81:10,11 83:24
  84:20 89:5 94:14
  94:17 95:17 97:24
  98:13,17,24,25
  101:8,21 104:12
  111:9 114:22
  119:9,11 120:11
  122:2,5 125:23
  127:17 128:15,23
  129:9 130:13
  131:1 135:8,11,20
  135:23,24 136:20
  136:21 145:2
  148:6,7 154:10

159:10,15 162:5
  162:16 164:5
  169:22 171:18,23
  172:11
correcting 70:5
correction 176:4
  177:4
corrections 175:4
correctly 79:9
  88:10
counsel 5:11 12:6
  13:1,15 34:12
  48:2,12 49:11,18
  49:24 64:4 88:20
  88:21,22,23
  109:25 110:22
  116:9 149:20
  150:4 174:17,18
county 174:1
couple 11:1 51:2
  66:11 68:1 148:15
course 8:11 11:25
  20:17 27:25 34:11
  59:23 69:22 79:4
  91:23 98:11,16,18
  107:23,23 122:20
  124:16 136:23
  139:1 157:25
  163:2
court 1:1 5:9,19
  6:12 20:9 36:18
  47:16,23 48:8
  65:15 80:13 107:7
  115:11 121:18
  122:10 128:7
  130:1,6 146:5
  151:17 158:10
  165:9
courtroom 19:18
crawford 1:5

create 162:13
criticisms 69:8
crr 1:24 2:18
  174:24
ctmale 3:22
cubic 109:1
cumulative 100:17
  100:21 128:5,7,10
  129:1,6
curious 90:3
  166:15 168:4
  169:10
curran 2:7 3:3
  5:13,13 6:4 11:24
  18:2 19:15 21:7
  23:10 32:22,24
  34:7 35:3 36:22
  38:2,7,10,13 41:16
  41:22,23 44:9,15
  45:11 47:25 48:2
  48:10 54:8 55:2,8
  55:14,17,21 56:2
  56:10,14,19,22
  57:5,14,21 59:18
  64:8,16 65:7,9,16
  65:21 67:20 69:23
  77:11 80:19 92:15
  96:15 97:21 100:5
  101:3,13 102:3,11
  105:2 107:8,10
  115:14 121:14,19
  122:16 126:14
  128:3,9 129:22
  130:10 136:16
  138:2 140:2 141:1
  141:13 142:2
  143:23 144:7,14
  146:7,11 149:21
  150:2 151:18
  152:1 155:11,14
  155:15 158:13

160:15 162:1
164:2,10,13,24
165:11,20 166:8
167:5,9 173:19
**currently** 65:3
86:18,22
**cv** 1:8
**cyanine** 29:18

**d**

**d** 1:3 2:7 177:1
**d.c.** 28:20
**dare** 12:17,19 13:2
13:8,11 14:15
61:13,17 93:10,11
116:9 164:15
165:1 168:3
**dare's** 17:7
**data** 7:8 8:14
35:25 39:18 59:16
60:8 66:7,7 78:24
79:17 80:7,12,13
81:22,25 85:25
86:1,10,11 96:17
97:15 98:4,6,7,10
98:14,20 102:20
107:19 108:6
112:21 119:23
120:3 121:25
122:3,7,18,24
123:5,25 124:8,10
124:13,18 125:4,6
125:8 126:6,15
127:1,3,15 129:10
129:13 145:25
147:22,25 148:2,5
148:8,9,10,21,22
149:1,6,7,11,16,19
153:8,12,15,17,22
154:2 158:2,19
161:16 167:12
168:9,10 169:6,11

169:13 170:11
**dataset** 97:17
99:16
**datasets** 99:25
**date** 12:8,10 176:3
176:25 177:3,25
**dated** 3:8,11,17,21
4:8,10 163:22
**dates** 96:23
**davis** 2:3,3 5:17,17
5:23 6:2 10:5,8,13
11:19,21 17:25
19:3,8 21:6 23:7
32:20 34:2,5,25
37:23 38:4 41:13
41:20 44:6,11
45:7 47:21 48:1,4
54:4,15 55:7,12,16
55:20,25 56:7,13
56:17,20 57:1,9,11
57:15 59:12 64:4
64:10 65:6,8
67:10,15 69:20
92:12 96:11 97:13
99:21 100:23
101:7,19 104:19
121:17 126:10
127:19,22 129:17
130:4 136:4
137:20 139:21
140:18 141:10,19
144:3,11 155:13
160:6,10 161:22
164:9,23 166:2,6
166:24 167:2,7
173:20
**day** 2:22 34:11
174:6,21 175:13
**days** 29:6
**deal** 134:16

**dealing** 58:3
**dealt** 52:10
**debate** 72:21
76:24 109:22
**dec** 23:15 70:22
71:3,14,23 73:25
74:12,14 75:24
78:11 83:23 84:1
84:6,9,24 85:1
86:4 87:8,9 88:1,7
93:7 149:14,16
157:6 165:6
**dec's** 85:3
**decades** 44:18
**decide** 23:20 25:4
25:8 37:2 38:20
72:8 73:16 85:22
99:2 112:20 113:1
113:11 115:8,10
115:15 142:3,21
143:14 145:5
**decided** 22:25
37:14 47:10 51:1
71:20 86:6 122:6
151:13 161:4
**deciding** 60:11,17
122:17 129:10
131:9
**decipher** 79:2
**decisions** 67:24
**declaration** 3:12
6:22 7:4 11:12,14
21:4,14 70:18
150:15
**decomposition**
73:11
**decrease** 160:3
**decreases** 160:12
**default** 118:24
119:5,8,12

**defendant** 1:11,16
2:7,17 5:14 23:8
**define** 21:15,16
**definitely** 134:13
150:18
**definition** 33:8,12
**degree** 26:4 57:2
**degrees** 68:17
**demonstrate**
151:22 152:13
**demonstrates**
106:12 107:5
**depend** 35:1
**depending** 58:11
135:1 159:21
161:16,17
**depends** 31:25,25
39:23 40:13,19
69:18 112:4 137:5
137:7,24,24
141:20 152:4
**depiction** 41:5
**deployed** 125:14
**deponent** 175:1
**deposed** 16:5 19:1
19:14
**deposited** 106:10
137:17 154:12
155:2 159:2,7
162:9,14,24 163:6
171:7
**deposition** 1:14
2:16 3:7,10 5:4,5
9:22,25 10:6,9,15
10:22 11:9,25
13:18,24 19:23
23:23 33:24 34:9
36:12 45:1,21
49:17,23 53:23
56:16 74:18,19,23
75:4,5,12 76:17

[deposition - document]                                                                    Page 10

99:18,23 100:17
100:21 101:1,1,5,9
106:12,17,23
107:1,5,7,8 108:1
108:4 109:3,5
110:14,16,21
114:6,9,13,25
116:13 117:13,17
118:25 132:23
139:3,11 144:21
150:10 153:2,18
154:8 155:24
159:13,18 160:3,8
160:12,22 161:20
169:8,22,24 173:9
173:13,22,25
174:13 175:4
**depositions** 172:1
172:6
**describe** 12:20
27:19 61:16 73:5
77:22 83:25 87:14
134:11
**described** 125:5
125:21 127:2
153:6
**describes** 125:12
128:14,21 129:1
156:16
**description** 3:5
4:2 67:4 123:11
129:14 132:10
**design** 55:10 56:25
57:7,23 82:25
**designed** 162:8
**desire** 56:10
**destruction**
103:13
**details** 11:2 29:16
67:5 93:22 151:4
151:4 153:20

**detect** 48:21 49:1
49:6
**detected** 81:16,17
164:4
**detection** 48:16
**detects** 168:6
170:12,12,20,24
**deterioration**
30:19
**determinator**
131:7
**determine** 13:17
13:23 27:7,11,15
33:24 34:22 35:5
35:15,20 36:4,7,11
39:2 42:2 43:13
45:1,20 58:11
62:6 63:5,21,25
73:18 74:22 83:15
95:7 111:14
112:13 114:23
123:4,17 126:17
132:3,13 140:15
163:5 172:1
**determined**
157:11
**determines** 47:16
**determining** 37:19
42:3 58:13 116:11
116:18,25
**develop** 75:24
**developed** 151:1
157:6
**developing** 15:3
**development** 15:1
147:6
**deviate** 32:3
**deviating** 32:15
**diagnostic** 3:21
**diagnostics** 77:17

**diameter** 58:16,19
119:24 120:8,24
121:10,11 128:14
128:21 130:24
**differ** 66:25 69:2
**difference** 31:8
74:8 112:9 118:22
152:14 165:16
**differences** 85:18
**different** 25:23
43:22 51:18 60:12
60:20 62:21,24
63:1,6,16 64:1
70:13,14 73:17
74:9,12,16 75:23
82:2,7 83:3
102:13 113:9
133:1 147:23
152:5 158:14
161:2
**differently** 133:2
**difficult** 79:2
85:24 94:24
**difficulty** 123:19
**digging** 105:15
**dimensional**
111:18
**dimensions** 24:12
**direct** 18:1 128:4
165:4 166:9
**direction** 39:6
59:3 108:19
110:15 159:21
174:13
**directly** 78:2
**disagree** 66:8,20
68:10 105:12
**disclose** 151:14
**disclosed** 7:20
151:9

**discount** 136:17
**discuss** 28:24
110:2 150:4,9
**discussed** 29:5
30:6 42:19 110:17
110:21,24 115:25
150:6
**discussing** 102:12
104:22
**discussion** 87:8,9
87:15,22 110:7
**dispersion** 8:14
10:17 12:22 28:18
29:4,15,16,19
30:22 34:22 39:19
40:3,9,18 41:5,9
41:11 46:9,21
58:1 63:22 71:4
84:4,8 88:3,11,13
103:23 118:1
141:5
**dispersions** 63:1,6
63:10,16 64:1
102:21
**disposal** 79:18
**dispute** 20:21
**disputes** 20:11
**distance** 148:18
160:14
**distinction** 39:7,10
**distinguish** 161:5
**distributed** 165:19
**distribution** 115:2
117:14 119:3,15
120:10,18 122:14
123:19 124:12
**district** 1:1,1
**divided** 120:23
**document** 22:20
24:4 50:19,19
64:22 69:13 78:8

81:22 92:6 94:22
115:2,4 122:25
124:6 131:3
**documentation**
23:15
**documented** 17:23
136:9 139:14
**documents** 10:18
10:20,21 22:11
23:8,12,14,25
24:11,15,23 50:23
61:21 94:23 95:11
111:17 134:4
145:24,25
**doing** 16:1 23:19
23:23 31:16 32:2
40:20 42:20 51:5
82:21 92:21 99:15
110:23 116:10
147:17
**domain** 28:6 156:8
161:12,12,14
**don** 43:7
**dorsett** 2:20 5:6
**dr** 15:11,13,16
103:9 104:10,15
105:11,16 120:14
164:19 168:3
**draft** 3:16 18:20
**drafted** 7:11
**draw** 155:22 156:4
**drawing** 108:6
157:1
**drawings** 16:11
61:20
**drawn** 156:24
**drive** 63:2,7,11
66:6 95:25 96:25
148:17,22 149:3
149:13

**drying** 62:21
73:12 102:25
**duly** 5:22 174:8
**dust** 29:18

**e**

**e** 80:16,22 81:12
81:21 82:11 83:8
165:12 176:1,1,1
177:1,1,1,1
**earlier** 48:12
76:25 101:16
109:22 113:20,22
132:16 147:25
165:18 167:11
168:18,20
**early** 12:14 29:6
168:21
**earth** 157:8
**easier** 86:17
**east** 148:19
**eastern** 170:15
**easy** 87:6
**ed** 43:5,7
**educate** 62:14
**education** 38:15
**educational** 26:3
**effectiveness**
27:12 51:24
**effort** 43:9 163:17
**efforts** 142:13
**eighty** 125:11
**either** 30:6,6 60:24
80:2 108:19
**eldridge** 28:10
**elevation** 58:10
**elevations** 75:18
75:19
**email** 4:9,9 163:22
163:24 164:7,14
164:22,25 165:2,8
166:10 167:16

**emanuel** 2:8 5:13
5:16
**emerging** 147:17
**emission** 33:1,6
41:1 42:13,15,24
43:10,14 45:16
50:8,12 51:21
52:18 53:10,18,25
54:13,20 57:3,19
58:23 60:5,13
70:21 71:12,15,19
72:4,11,14,17 73:2
73:15,18 75:23,25
76:14,22 77:23
78:6,10,16 79:11
79:12,24 80:11,18
80:20 82:1 87:18
94:9,11,13 96:4
99:15 100:1,3
102:14 108:15,16
108:22,25 109:3,4
109:7,11,18,19
111:21 113:6,7
132:21 134:25
138:19,22 139:4
141:18 143:11,14
145:6 161:17
162:2 170:22
172:22
**emissions** 14:4,5,9
17:23 18:8 27:4
36:16,17,19,20
37:6,6,8 40:24
41:25 43:2 45:5
45:13 46:25 47:7
48:17,22 49:10
50:3 53:4,12 54:2
54:12 56:24 57:6
57:8,23 58:6,7,16
58:17 59:11,21
60:21 66:2,5 68:9

69:16 70:14,15
72:7,23 73:17
74:11,13,14 76:10
82:5 85:3 87:24
91:10,15 95:8
96:9,24 97:2,23
98:15 99:4,19
102:13,19,23
103:2,15 108:23
109:13,15,17
111:2,11,12,15,22
111:25 112:1,15
113:21 114:5
119:21 132:16,18
132:19,22 133:1,5
133:10,11,12,16
133:18,21 134:1,6
134:14,17,22
135:5,11,14,17
136:12,14,18,19
136:19,20 137:1,2
137:11,14,16,18
137:23 138:3,4,5,9
138:10,16 139:10
139:11,16,19
140:4,5,7,8,16,17
141:9,17 142:4,9
142:14,19,22
143:3,15,17,25
144:9,10,19,24
146:24 147:3,12
147:15 171:21
172:15,16 173:17
**emit** 33:21 137:2
145:13 146:19
**emitted** 55:1 73:10
84:6 85:14 90:15
103:8 109:23
132:6 135:2 137:9
138:14 141:23
144:19 147:16

154:8
emitting  45:17
  143:9
employ  131:9
  145:5
employed  174:17
  174:18
employee  85:1
enclosed  134:12
encompasses
  100:1
energy  20:25
engaged  9:9 13:13
  61:17
engagement  13:3
  13:16,22 15:10
engineer  17:8
  26:22 87:10,21
  90:14,17,19,22
  91:8,9,14 93:20
engineered  134:13
  139:15
engineering  8:15
  24:25 25:9 65:23
  66:2,9,21,25 67:9
  67:23 72:16 172:3
engineers  54:25
engines  52:8
ensure  148:20,25
  149:11
entire  97:23
  116:13,20,21
  127:6,11
entitled  3:16,20
  4:6,12 55:18
entrainment  68:14
environment  41:6
environmental
  12:17 14:18 20:24
  21:1

epa  28:4,13,14,22
  35:25 86:16,19
  87:5 118:24 119:4
epa's  30:10 86:23
epidemiologist
  27:1
equal  126:8
equation  59:7
equipment  17:24
errata  175:5
especially  117:13
esquire  2:3,7,8
essence  103:23
established  20:16
estimate  53:4,10
  53:12 60:20 85:14
  91:10,15 93:20
  95:5 102:21 142:4
  146:12 154:9
estimated  60:12
  90:14 139:15
estimates  76:10
  155:2
estimating  76:3
  136:11 154:12
estimation  97:17
  105:7 135:1
et  3:13 4:4,9 176:2
  177:2
evaluate  115:21
evaporated  102:24
events  123:16,23
  124:9 125:6
eventually  39:16
  53:24
evidence  44:7
exact  12:10 117:22
  167:12
exactly  9:8 76:18
  76:19 88:17 91:7
  123:2 130:8 131:4

159:2
examination  6:3
  174:12
examinations  3:1
examined  174:11
example  11:4,7
  13:25 35:11 54:25
  98:19 109:6
  116:19 117:25
  138:13 152:9
  162:15 170:21
  173:9
excellent  115:18
exception  8:23
exchange  164:14
  164:25 165:8
exchanging  16:23
excluded  135:14
excuse  161:22
executed  88:14
exhaust  49:2
  68:20 75:19
  113:22,23 138:5
exhausts  68:13
exhibit  3:6,9,11,12
  3:16,19 4:3,5,9,11
  6:20 7:1,3 9:4,17
  11:17,22,22 12:1,3
  21:6 22:1,4 50:18
  64:18,21,21,22,23
  65:4,5,11,17,20
  66:3 67:23 70:18
  77:5,8,10,13 80:5
  81:14 83:18 91:21
  92:6,14,17,22
  121:14,16,17
  150:13,16 154:5,7
  163:21,22,23
  164:7,9,10,11,14
  164:25 165:5,6
  166:10,18

exhibits  3:4 4:1
  5:1 163:20,25
exist  48:21 49:1
existed  49:6
existence  100:14
existing  20:15
  95:1
exit  58:18,19,20
  58:22 59:1,6 60:1
  114:1,2,5
exits  60:5
expand  96:1
expect  93:21 106:5
expecting  168:14
  169:7,22 170:10
experience  62:9
  134:15,20
experimental
  123:12
expert  3:6,9 6:17
  7:17,18 14:8
  19:13 21:8 69:10
  70:23 84:3
expertise  17:9
  26:6,8 27:19
  83:12 102:18
  105:15 123:2
  126:20
expires  175:20
explain  13:8 85:2
  94:20 112:5
  168:17
explicit  37:22
  38:18 39:3
explicitly  39:21
  40:5,11
exponential
  120:20
express  7:6 21:10
  69:9

**expressed** 22:1
**extends** 156:9
**extent** 8:7 155:24
  161:11 162:12
**eyeballs** 61:20

**f**

**f** 1:24 2:18 68:17
  174:4,24
**fabric** 62:20
**fabrics** 50:9,13
  63:2,7,11,17,23
  64:1
**face** 143:11,13
**facilities** 33:20
  51:18 56:24 60:13
  60:21 66:3,6
  97:23 98:12,16
  137:23 171:22
**facility** 33:10,13
  33:15 36:13,15
  37:6 45:22 50:8
  50:12,23 53:7,13
  53:14 54:2,3,12,13
  54:25 55:5,10
  56:25 57:7,24
  58:5 60:25 61:3,7
  61:14,18,25 62:3,5
  62:5 63:3,15,17
  70:12 76:4,17
  79:3,5,20 80:2
  81:10 87:24 90:19
  90:23 94:13 95:6
  95:9,23,25 96:25
  97:3,7,11,19 98:3
  99:7,19,24 100:3,8
  100:11,15,18,22
  101:2,16,25 108:5
  108:17 109:23
  110:10 111:17
  112:2 113:5
  131:13,17,19,24

133:6,8,13,15,19
133:24 134:2,3,5
135:23 136:1,7,15
136:24,25 137:17
138:9 139:14
140:9,12,21,24
141:24 142:6,9,14
142:19,23,25
143:20 144:2,10
144:21 145:8
147:6 148:14,17
148:22 149:3,8
168:7
**facility's** 37:7
  45:20
**fact** 87:16 109:22
  113:5 133:14
  134:2,5 149:18
  153:24
**facts** 7:7 44:7
**fair** 9:1 27:5,9
  35:17 37:16 48:17
  48:18,22 49:9
  50:1 52:25 53:1
  54:3 55:5,11 57:8
  59:11 60:9 69:11
  69:19 83:14 95:21
  96:10 98:16 111:6
  111:10 118:12
  129:16 130:19
  136:3 137:6,19
  144:22 146:22
  147:10,11 148:2
  159:13 165:1
  167:25 170:25
  171:19 173:13
**fall** 72:22 109:13
  158:5
**falling** 159:19
  162:6

**falls** 125:7
**familiar** 37:22
  51:13 65:22 88:13
  118:19 171:2
**familiarity** 51:15
**familiarize** 50:16
  52:15
**family** 115:6
  118:18 131:21
  132:10
**far** 25:6 35:24
  36:1 42:20,24
  43:20,20 45:19
  53:25 72:7,12,13
  72:22,23 73:14
  76:16 84:6 93:14
  109:12 112:4
  114:17 124:5
  130:13 137:13
  143:4 170:8
  171:12 172:21
**farther** 114:12
**farthest** 136:2
**fate** 3:17 73:13
**favored** 87:5
**fayetteville** 2:21
  5:7
**february** 1:18
  2:22 5:8 163:22
  166:12,14 167:2
  168:2,19 174:7,21
**federal** 38:23
**federally** 38:23
  39:4,7
**fence** 125:15
**fewer** 152:17
**field** 4:7 27:4
  31:22,24 59:19,24
  126:22
**fight** 20:18

**figure** 54:22 76:6
  78:3 80:10 109:12
  109:14,16 112:12
  117:17 151:3
  154:4,5,7,13 155:3
  155:16,18 156:4,5
  156:6,6,11,17,21
  157:3,7,8,10,12
  158:17,17,17
  160:17,18 170:18
**figures** 67:4 125:1
  150:25 151:8
  164:6
**filed** 3:14
**files** 8:14,24 10:17
  71:4
**fill** 151:3
**final** 113:4,17
**finally** 100:15
**financially** 174:19
**find** 116:2 147:13
**finding** 122:9
  123:19
**fine** 98:8 119:23
**finer** 119:5
**finish** 46:6 67:11
  161:22,23
**finished** 74:7
  161:24
**firm** 8:15 13:6
  14:15,18 15:15
  20:25 28:12
**firms** 15:15
**first** 5:22 11:19
  12:5,13,16,19 13:3
  13:7 20:14 34:9
  49:9,14,20 50:1,17
  70:8 92:22 101:19
  102:25 109:7
  115:24 134:19,23
  169:6,10 170:9

**fit**   82:8 115:18
116:16 118:4
131:22 169:16
**five**   28:16 66:6
95:19 96:17,17
97:25 98:3,5,10,14
98:20 99:6,8,12,14
99:16,25 101:6,17
101:23 125:11,13
143:22 148:5
**flexibility**   109:10
**floor**   2:9
**flow**   24:12 68:12
**fluorinated**   72:3
78:9 80:11 81:15
83:4,7,17 88:25
**flux**   59:1,4,5
**foam**   29:18
**focus**   15:8
**focusing**   159:4
**follow**   31:13,19,23
31:24 32:8,12
94:24 159:23
**followed**   31:3,9
32:5
**follows**   5:22
**foot**   112:7
**footprint**   49:16,22
**foregoing**   175:3
**forget**   62:23
**forgot**   72:2
**fork**   104:8
**form**   34:3 41:18
41:20,21 44:6,20
45:7 54:4,15
55:18,23 56:5,15
67:15 69:21
126:10 129:17
130:4 133:18
134:6 136:4
137:20 140:18

144:3 172:16
**format**   17:5
**former**   66:2 93:19
**forming**   7:8 22:7
112:21 125:1
150:23
**forms**   156:17
**formulated**   8:20
**forsyth**   174:1
**found**   90:1 122:9
122:10 147:9
**four**   9:6
**fracking**   15:22
20:23 21:1
**fraction**   119:2
**framing**   103:5
**frequently**   143:8
**front**   16:2 129:20
155:18
**fugitive**   132:16,18
132:22 133:5,9,11
133:12,16,21
134:1,6,14,17,22
135:5,11,14
136:12,18,19
137:1,2,10,14,16
137:22,25 138:3,9
138:15,22 139:3
139:10,19 140:4,7
141:9,17,24 142:4
142:9,14,19,22
143:3,13,25 144:9
144:19,24 145:5
145:13 146:24
147:3,12,15,24
**fugitively**   137:9
**fugitives**   136:10
137:9 143:9
145:12
**full**   98:11,15,18
108:13 150:16

**further**   41:17
111:11 114:6
130:17 137:3
174:16
**future**   30:8 147:18

**g**

**garrison**   1:4
**gary**   1:15 2:3,16
3:7,10,12 4:3,9
5:5,17,21 6:7 10:1
41:18 55:14
155:11 173:22
174:7 175:10
176:25 177:25
**gather**   91:6
**gathered**   39:13
**general**   10:24 11:3
11:4,5 20:19
21:23 74:18 75:4
76:2 85:10 110:3
111:10,13 114:4,7
114:11,14,18
115:6 130:11,14
130:15 138:1
**generally**   58:8
75:11 119:1 123:7
123:7 138:3,7
152:21 160:3,24
**generate**   74:25
**gentleman**   14:17
28:9
**geographic**   156:3
156:7
**geographically**
155:19
**geometric**   120:17
**getting**   10:2 83:12
171:1
**give**   6:14 7:21 8:3
14:8 41:18 47:8,9
70:4 89:9 138:12

150:10 154:21
**given**   12:24 20:8
46:10 86:23
118:12 144:21
159:7 161:21
162:2 163:7
174:15
**giving**   15:18,25
**go**   42:9,10 44:10
65:1 68:23 80:5
81:19 107:24
108:18 109:6
113:10 122:24
123:1 128:6 131:2
143:6 149:21
152:25 159:21
169:4
**goal**   40:20,22,25
42:3 44:25 45:20
74:3,5
**gobain**   1:9 3:13
4:4 5:14,16 41:24
42:4,6 43:23
44:23 45:2,4,12
70:22 76:17 108:5
176:2 177:2
**gobain's**   43:16
**goes**   53:11 69:4
72:13 76:21 85:12
143:5
**going**   11:21 20:25
21:4 22:13 29:13
32:20 37:23 38:14
41:16 42:11 44:9
51:3,12 54:4,15
55:14 56:3,14
64:5 65:5,10
67:10,10,12 70:5
71:24 72:13 74:2
74:10 91:5 92:5
102:3,18 103:21

[going - identification]                                        Page 15

104:1 105:8 108:3
108:9 117:12,24
118:2 143:3
147:17 148:19
149:21 151:14
161:1,1,3 166:2,24
170:17
**golf** 20:17
**good** 64:8 81:19
82:8 85:9 86:24
116:22 118:4
131:17,22 132:5
132:14 151:7
**google** 50:20 157:1
157:8
**gordon** 1:4
**government** 20:8
**gram** 109:1,2
**grams** 158:7,10,11
158:11
**grants** 76:19,20
**graphical** 151:9
**graphics** 17:5 75:1
**gravel** 20:19
**grid** 158:1,2
**ground** 27:9
**group** 88:3
**guess** 9:6,23 10:10
16:2 19:13 21:22
21:23 31:25 33:16
59:4 99:5 111:4
133:17,18 141:12
148:19 153:19
160:19 168:14
172:3,16
**guessing** 9:18
**guidance** 10:18
30:12 31:13 56:2
86:23 131:2
**guidelines** 32:6,8
32:14,16,19

**guides** 30:14
**guy** 89:22 106:19
**guys** 24:8 168:24
170:4

**h**

**h** 176:1 177:1
**habit** 31:20
**hand** 111:18
128:11,13,20,25
174:21
**handful** 101:11
**hands** 117:21
**handwritten** 4:3
92:3
**happening** 72:6
76:16
**happens** 171:6
**hard** 67:2 168:8
**harmful** 27:16
**hausthor** 1:4
**head** 8:19 12:9
23:6,17 33:3
66:12 68:25 81:1
117:3
**health** 27:16
**hear** 34:11
**heard** 86:20
**hearing** 19:14
20:23
**hearings** 19:9,12
19:22 20:1,7
**heat** 59:5
**height** 58:6,13
59:10,21 75:20
111:1,15,20,22
113:20
**heights** 24:6 75:18
112:14,15
**held** 5:5 29:22
**help** 54:6,25 64:25

**helped** 17:2,4 30:4
43:4 110:8 120:14
**hereinbefore**
174:7
**hereto** 174:18,20
**high** 82:5 125:13
137:2 138:5
**higher** 58:9,10
73:14 87:18,24
104:17,23,24
105:24 106:3
111:11,21,24
112:1 114:4
135:25 138:5
**highest** 102:1,2
135:22 136:2,20
137:12
**hill** 28:22 30:2
**hinchey** 43:6
**hinkey** 43:6
**hired** 28:12
**historical** 23:14
37:6 40:24 50:19
50:22 94:22 95:10
111:16 173:4
**historically** 97:19
110:10
**history** 78:12
**holly** 15:16
**home** 159:11,16
159:21 160:18,23
162:3,4
**honestly** 12:8
86:25 165:15
**hope** 43:5 59:7
**hoping** 55:23
**hopke** 4:10 15:11
15:13 16:17 70:24
72:6 77:25 93:9
93:12 103:9
104:15 105:11,16

116:9 120:14
164:8,15,19,19
165:1 168:3
**hopke's** 10:16
73:9 102:17
104:10,20 105:7
**hotter** 29:7
**hour** 9:13 64:5
78:10 79:8 80:12
94:2 102:4 109:1
**hours** 9:16,23
10:10 125:16
**housekeeping**
64:17
**huge** 33:4
**huh** 26:11 33:5
56:13 71:11 81:13
103:11 112:20
138:17 155:20
156:12 157:4,15
158:9 160:21
161:9 164:16
169:1
**human** 27:16
**hundred** 138:21
**hydrocarbon** 72:4
78:10 80:11 83:7
83:17
**hydrocarbons**
81:16 83:4 89:1
90:10
**hydrogeologist**
26:20

**i**

**icons** 167:17
**idea** 63:4 78:1
91:11 136:10
**identical** 161:3
**identification** 5:2
11:23 37:20 49:16
49:22 65:20 77:10

92:14 121:16
164:1
**identified** 10:21
24:24 41:2 83:8
**identify** 32:15
38:16 39:2 48:20
48:25 49:5 73:16
88:18 116:12
**ignore** 124:24
**image** 157:1,9
158:2 163:23
**impact** 20:20
36:12 37:8,8
40:23 41:1 42:3
58:7,12,17,20,23
70:7 111:23 112:2
112:10,14 130:2
130:16 138:10
143:24 144:8,16
**impactors** 125:14
**impacts** 29:13
41:5 58:12 99:18
99:24 100:17,21
168:5
**implementation**
30:13,15
**important** 33:23
34:21 35:5 36:3,6
39:1,10 57:22
111:2,5,7 113:21
113:25 114:8
117:6,11,15,16
131:7,8 132:22,25
148:2 163:14
167:13
**improper** 47:22
143:1
**inaccuracies** 70:3
70:6
**include** 39:18
40:16,17 45:24

76:23 108:5
137:14
**included** 19:21
22:18 24:7 69:10
75:2 93:22 111:17
115:7 132:11
135:2
**including** 157:18
**incorporate** 79:4
**incorrect** 140:12
**increase** 143:25
144:9,20
**increases** 160:2,10
**increasing** 160:14
**independent**
172:25
**independently**
91:17
**index** 3:1,4 4:1
**indicate** 164:3
**indicates** 127:15
**indicator** 78:6
**individual** 161:6
162:10,18 171:24
**individually** 1:5
**industrial** 134:17
134:22
**industry** 30:21
134:20
**information** 8:10
8:17 12:24 16:23
23:24 24:5,11,21
25:13 28:7 38:5,6
39:15 42:18 54:20
54:24 59:23 60:4
69:7 70:21 71:2
71:13,13 72:15
75:24 85:11 87:23
91:6,18 94:21,25
111:16 112:17
117:22 122:15

124:20 141:21
142:16 143:10
145:11,14 147:21
168:22
**informed** 43:1
**initial** 28:2 74:16
74:16,16 81:24
166:16 168:4,24
169:20
**initially** 3:11
11:22 25:19 27:24
28:12
**input** 25:6 53:11
59:17 67:4,25,25
69:4 72:12,19
79:17 97:16
100:10 101:2,24
111:2 112:18
116:17 117:14
118:7,9,12 119:5
120:9 121:2,4,12
122:15 129:21
145:21 147:6,20
147:22
**inputs** 52:24 58:13
60:12,18 62:6
66:11 68:5 69:18
69:24 72:25 75:22
118:16 125:2
145:19,22 146:1
**inputting** 72:18
**inside** 154:21
**inspection** 23:15
**inspections** 133:7
143:7
**install** 20:25
**installed** 52:7
**instruct** 55:25
**instructed** 35:15
127:10

**instruction** 56:4
**intend** 21:24
**intended** 32:10,12
136:7
**intensive** 85:25
**intent** 162:17
**interest** 4:12 165:7
**interested** 89:21
89:23 124:12,13
161:15 174:19
**intermittent**
133:17
**internal** 52:7
**international**
148:10
**interpose** 67:12
**interpret** 119:23
**interval** 158:7
161:4
**intervals** 157:14
**intro** 17:21
**introduce** 5:11
**investigation**
43:13 91:23
172:25
**invoiced** 9:13
**involved** 16:19
17:20 18:14,23
19:20,23 48:12,20
48:25 49:4 85:4
**involves** 37:20
**involving** 49:10,15
49:21 50:2
**issue** 7:6 21:10,15
21:16 37:3 47:13
143:1
**issues** 21:25 91:24
**iterations** 25:23

**j**

**j**  1:5 165:12
**jagged**  157:20
**james**  1:3 162:15
**january**  123:24
25:20
**jernigan**  2:20 5:7
**joselson**  165:7,11
**journal**  24:19,19
46:12,14,17,19
50:22 116:4
**journals**  46:15
**jr**  1:4
**judy**  1:24 2:18 5:9
174:4,24
**june**  3:18 25:18,20
65:24 66:10,21,22
67:1

**k**

**k**  4:10 70:24
**kevin**  28:10
**key**  58:13
**kind**  11:2 31:17,20
43:8 50:8 53:22
69:4 73:10 74:20
75:6 78:18 79:6
82:4,21 84:4
85:11 103:4,6
104:2,3,8,8 110:7
143:1 155:5 157:5
168:24 169:11,14
170:7 172:3
**kinds**  48:20,25
49:5
**kirby**  2:14 5:10
**knew**  41:24 45:4
45:12 46:25
141:22,23 147:8
147:12 173:16

**knight**  1:5
**know**  10:2,18
13:13 15:3,23
16:2,3,19,21 17:4
17:15 20:20 23:14
23:15,23 24:20
25:11 26:12 28:3
28:3,8,19 30:9
33:2,3,17 35:24,24
36:1 39:17 41:8
43:20 45:18,19
48:8 53:13,17,24
54:2,12,22,23
55:10 57:3 58:10
59:8 61:20,23
62:22 63:20 68:13
69:3 72:5,15 73:4
73:19,21,25 74:6
74:17 76:15,18
78:1,2,25 79:22
80:15,24 81:4
82:10,14,24 83:3
83:13 85:4,11
86:25 89:21 91:16
93:14 95:24,24
100:12 101:11
102:20 103:2
106:10 108:2,2
112:11,11,16,16
117:12 118:6
123:2 126:20
130:7 131:4 132:1
132:11 133:17
138:11 140:25
142:1,10,11,24
143:4,8 145:12,13
147:19 151:1
152:13,23 153:1
153:20,24 155:9
157:6 158:5 161:2
162:23 163:11

165:14,17 166:3
167:5 170:5,7,14
171:6,11 172:8
**knowing**  76:21
**knowledge**  22:22
174:10
**known**  14:20
36:17,20

**l**

**l**  165:12
**lab**  83:11
**landfill**  173:10
**large**  68:11
**larger**  33:17
114:12,15 119:2,2
119:17 126:23
130:12,18,25
**latest**  11:6 165:18
**latitude**  41:18
47:8,9
**lawsuit**  21:21
**lay**  151:11
**layout**  55:10 56:25
57:8,20
**leached**  173:10
**leave**  141:9,18
**leaves**  114:5
**leaving**  138:18,21
**lectured**  48:15
**left**  68:17,18
128:11,13,20
135:18 136:1,20
137:12 138:9
139:19 143:25
144:9
**legend**  4:11
167:17
**leslie**  1:3
**level**  76:3 80:1
135:11 159:21

**levels**  163:16
**limit**  36:14
**limited**  27:4
**linda**  1:5
**line**  117:4 125:15
156:17 167:4
169:25 176:4
177:4
**linear**  108:18
**lines**  9:11 13:12
**list**  72:2
**listed**  22:12,21,23
23:2,25 24:4,8,14
24:17 146:25
147:9 152:19
**listen**  110:4
**lists**  22:4 172:14
**literally**  109:8
**litigation**  15:21
18:23 19:6,18,20
**little**  10:3 26:1
29:6 43:7,22
68:24 73:19 75:8
78:20 79:2 103:5
112:8 155:17
156:10
**live**  163:12
**llc**  17:15
**llp**  2:8,20
**local**  55:17 56:21
168:7
**locastro**  2:8 5:15
5:15
**located**  33:20 77:7
125:15
**locating**  125:25
**location**  58:15
76:21 125:16
**locations**  24:12
57:18,19 108:7
125:14,23 126:1,4

**log** 120:16,21
**logical** 169:16
**long** 10:8 15:16
  56:21
**longer** 124:8,14,18
**look** 7:3 9:19
  11:19 33:2 37:7,9
  37:14,25 38:6
  40:23 43:10 68:23
  74:9 81:20,21,25
  92:16 121:1 123:4
  123:10 125:10
  131:2 154:4,7
  161:18,19 163:16
  167:10 171:24
**looked** 11:2 23:17
  106:25 165:15
  168:9 170:2,11
**looking** 11:7 61:20
  70:4 74:18 75:4
  75:11 77:15 78:7
  78:13 115:19
  116:16 118:6,9
  119:14 122:13
  131:20 158:14
  160:17 164:11
  167:23 168:22
  169:6,9,13,24,25
  170:17
**looks** 166:23
  167:17
**lost** 102:24
**lot** 12:24 15:8
  23:13,14 54:21
  67:5 72:14 74:1
  82:6 83:12 117:20
  151:1 152:4
  153:20 168:20
**low** 71:21 82:5
  107:23 137:18,18

**lower** 72:9,25
  103:7,7 105:24
  106:2,3,4,4 107:16
  107:25 108:3
  142:18,22 143:14
  143:16
**lunch** 150:3,5,9
**luncheon** 149:24
**lyle** 2:13 6:1

## m

**madison** 2:9
**magnitude** 78:15
  89:6 90:6 94:7
**maintenance**
  143:1
**making** 83:1
**malfunctions**
  140:12
**manner** 56:17
**manufacturing**
  29:19 43:20
**map** 4:11 157:10
  159:12,17 165:7
  166:16,17,20,25
  167:4,23,24 168:4
**maps** 164:3
**mark** 6:25 11:17
  11:21 65:10,17
  77:3,8 91:21 92:6
  121:1,14 163:20
  163:21,23
**marked** 3:5,11 4:2
  5:1 6:20 9:4,17
  11:13,22,23 22:1
  50:18 65:20 77:10
  77:12 92:14,17
  121:16 150:12,16
  156:13 163:25
  165:6 166:18
**market** 15:9

**markets** 15:4,5
**mass** 72:17 120:8
  120:24 121:8,11
**master's** 26:4
**material** 117:8
  135:1
**materials** 22:6,20
  22:24 23:21 48:16
  50:25
**mathematics** 59:8
**matt** 93:1,6,6
**matter** 3:13 4:4
  39:8 66:4 118:25
  119:24 122:17
  123:15 133:14
  145:23
**matters** 122:20
  174:10
**mcauley** 15:15
  16:15
**mean** 11:1 13:21
  17:19 19:6 23:4
  23:13 24:18,22
  26:9 31:11 33:15
  38:9 43:19,19
  44:5 45:17 46:11
  46:12 51:12 53:10
  58:8 66:14 69:22
  70:2 74:15,25
  75:7,8 78:21
  82:20 90:11 104:4
  108:2 112:6,18,23
  116:21 117:19
  120:8,24 121:8,11
  122:20 126:19
  132:9 142:11
  145:22 147:16
  150:18,25 151:1,6
  152:4,10,21,24
  153:24 156:5
  161:8 171:5 172:7

**meaning** 82:24
**meaningful**
  112:10
**means** 83:13 166:4
**meant** 19:5,11
  107:21 168:17
**measure** 152:25
  153:18
**measured** 78:2
  89:1 123:3 153:25
**measurement** 4:6
  153:2
**measurements**
  62:1,6 132:13
**measures** 153:23
**measuring** 60:2
  117:1 119:23
  131:12,16
**mechanical** 59:2
**meet** 10:5,8
**meeting** 10:3,13
  28:17
**meetings** 20:13
**member** 84:24
  85:1
**member's** 162:25
**memorandum**
  11:4,5
**memorandums**
  10:24 11:3
**memorized** 38:12
**memory** 110:11
**mentioned** 11:3
  16:14 24:16 28:13
  71:15 76:25 78:8
  78:21 87:17 89:25
  96:16 106:14
  107:3 120:21
  132:16
**mentioning**
  113:20

**met** 10:1,2 21:1
168:9
**meteorological**
66:7,7 97:15,17
98:4,5 99:16,25
145:25 148:5,8,22
149:1,2,6,7,16,19
168:10
**meteorologist**
28:10 88:3
**meteorology** 26:4
26:7,13 89:24
**meter** 76:20 109:1
109:2 157:25,25
158:7,11,12
**method** 69:6
118:19,20,22,23
118:24 119:4,10
119:12,18 120:9
121:2,4,12 129:11
130:25 131:9,9
151:12
**methodologies**
66:9,24 67:7,8,21
67:22
**methodology**
38:10 59:20,25
66:18,19,21 68:5
150:17,20
**methods** 48:21
49:1,5 123:12
**michael** 2:14 5:10
**microgram** 109:1
**microns** 119:16,19
119:24 120:25
127:17,18 128:15
128:21 129:7
130:24
**microphone**
127:25

**mid** 120:17,23
**middle** 71:21
89:10 94:14
**miles** 148:15
**mind** 31:7 152:25
166:21
**mine** 74:9 105:15
140:11
**minimum** 59:4
**minus** 158:7
**minutes** 143:22
**misrepresents**
104:20
**mistaken** 25:19
88:15
**mitchell** 2:20 5:6
**mixed** 168:6,15
170:12
**model** 14:12 25:1
25:1,21 30:22
33:5,6,14 34:24
37:20 39:19,21
40:1,3,5,9,11,18
44:22 45:6,15,22
46:2,9,9,21,24
47:6,11 52:20,24
52:25 54:1,11
55:3 56:24 57:6
58:1,14 59:9,14
60:9,12,18 65:18
65:23 66:10,14,22
68:9 69:17,18,24
69:25 70:10 72:19
74:3,11,13,14
75:11,18 76:19
79:16 85:6,20,23
85:24,25 86:3,6,9
86:13,16,18,22
87:2,4,4 96:4,9,14
96:17,18,24 97:2
97:10,22,25 99:4

99:12,14,18 100:7
100:10,16,17,20
101:4,14 107:22
111:2 112:1,3,11
112:13,18 114:16
116:17 117:12,15
118:7,10 125:13
129:15 130:2,8,24
133:2,3,11,12,21
135:10 136:18
137:1,25 139:18
140:7,8 141:8,17
141:21,25 142:7
144:1,20 145:6,8
146:22 147:20
152:22 153:1,3,9
153:13 154:2,12
154:20 155:1,23
157:23,25 158:15
159:1,6,10,16
160:1,16,18 161:5
161:12 162:8,13
162:23 163:18
170:17,20 171:8
171:16,20 172:10
172:14 173:5,8
**modeled** 17:22
18:7 33:22 66:2,4
69:15 78:23 95:19
98:15 99:6,23
100:8 108:4,22
110:9 133:13
135:3 136:6
138:25 139:2,10
140:4,11 142:25
155:21 156:3
**modeler** 55:9
141:7,16
**modeling** 3:7,10
3:16 4:7 8:14,23
10:17,18 12:23

13:9 18:11,14
27:5,20,23 28:18
29:5,15,17,20
30:21 34:22 35:2
35:16,18 37:15,22
38:18,22 39:3
40:14 41:9,11
53:2 55:5 57:4,18
59:4 62:12 66:9
67:1,3 71:4 72:12
73:20,24,24 74:1
75:17,20 76:14
79:5 84:3,4,8 85:3
85:5,8 88:3,11,13
88:16 89:23 90:2
98:1,18 106:11
107:5 109:17,19
114:8,25 117:1,18
117:21,23 118:1
118:11,25 132:23
134:21 139:6
140:14 141:3,5
148:1,1 152:2,8,9
152:11,12,17
156:7 169:13
171:20
**models** 28:25 30:9
33:24 70:14 73:1
139:8,12 140:3
**moment** 122:9,12
165:5 166:17
**monitored** 108:6
**monitoring** 35:25
36:1
**monoxide** 52:8
**months** 9:6 47:4
**move** 68:5
**moved** 95:25
104:23 108:17
109:7

**movement** 107:15
**moves** 60:6 125:8
**multi** 40:15 47:14
**multiple** 33:19
  47:1 152:10
**multiplied** 78:16
  79:11 94:10,12
  120:19
**multiplying** 78:21
**multisource** 33:1
  33:6 36:25 37:15
  37:18 39:20 40:4
  40:10 41:6 47:7
  47:18,19

**n**

**n** 165:12 177:1,1
**name** 5:24 6:5
  15:20,24 16:4
  28:16 43:5,7
  87:20 90:17
**named** 28:9
  163:11,17 174:7
**national** 28:17
  30:16 35:18 38:21
**natural** 4:12
  120:16,21
**nature** 13:9 20:11
  32:1 52:6 133:1
**near** 4:7 58:5
**nearby** 37:21
  38:17 39:3 58:4
**nearly** 103:16
**necessarily** 70:2
  74:5 167:13
**necessary** 8:8
**need** 12:20,22 32:2
  39:21 40:5,11
  52:23 53:13 56:4
  56:4 57:17 117:22
  127:22,23

**needed** 116:17,19
  122:15,24 123:18
  131:23 147:22
  165:17
**needs** 38:1
**neither** 174:16
**networks** 36:1
**never** 48:15,19
**new** 2:10,10 14:15
  14:19 30:18 31:6
  81:3,9 148:10
**nice** 150:5
**nicholas** 2:8 5:15
**nine** 22:4,6 125:14
  125:22 126:1
**non** 15:9 55:18
  64:20 96:4 119:4
  119:8,12 168:6
  170:12,20,24
  173:5
**normal** 133:18
  136:9 141:24
  142:25 143:18
  170:13
**normally** 134:16
  136:22,22 140:10
  147:7
**north** 1:17 2:5,19
  2:21 3:17 5:8
  20:14 28:23 35:13
  47:5,12 60:14,22
  60:24 61:1,2,4,7
  61:11,14,24 62:4
  63:18 70:13 80:25
  82:15 97:2,7,11
  98:12 133:5,24
  134:2 135:6 174:1
  174:5
**northeast** 160:23
  162:4

**northside** 63:2,7
  63:11 66:5 95:25
  96:25 97:5 148:17
  148:22 149:3,12
**notary** 2:18 174:4
  174:25 175:17
**note** 64:17 65:4
**noted** 175:5
**notes** 4:3 11:16
  91:25 92:3,8,16,17
  92:20,23 93:16,22
**november** 123:24
**number** 3:5 4:2
  90:7 103:7 146:12
  147:9,13
**numbering** 64:18
  65:1
**numbers** 3:18,22
  92:7 104:6
**numerical** 144:15

**o**

**o** 80:14 165:12,12
  177:1
**oath** 6:9,11,12
  174:12
**object** 19:3 32:20
  34:2,2 37:23
  41:13,13,16,20
  44:9 47:21 54:4
  54:15 55:18,22
  56:15,17 67:11
  69:20 96:11 97:13
  99:21 100:23
  101:7 104:19
  126:10 129:17
  130:4 137:20
  139:21 140:18
  160:6 166:2,24
  167:3
**objecting** 54:16

**objection** 19:4
  32:22 34:17,25
  41:19 44:6,10,11
  44:12 45:7 48:4,5
  55:7,12 56:5,8
  57:1,9,12,12 59:12
  67:13,15 101:19
  136:4 141:10,19
  144:3,11
**objections** 34:12
  41:17 48:3 55:19
  56:6
**objectives** 17:22
**obvious** 142:15
  166:25 168:5
**obviously** 28:9
  39:14 58:8 59:13
  78:1 79:18,22
  107:24
**occur** 134:2
**occurred** 123:16
  147:13
**odor** 23:16
**offer** 7:16 21:24
  41:4 55:18 100:17
  100:20
**offered** 124:17
**offering** 27:3
  43:23 47:19
**offices** 2:19
**offline** 81:9
**offsets** 15:4
**oh** 18:6 19:7 22:5
  23:1 64:24 65:9
  65:14,15 70:19
  71:7 75:17 76:18
  81:19 84:17 89:18
  122:13 125:18,20
  125:25 128:2,6,11
  128:16 132:19
  146:14 151:5,5,15

154:14 164:20
165:22 166:7
**okay** 11:20,21
12:4 18:16 26:2
26:16 30:3 34:6
34:13,16,21 40:7
54:10 57:15 60:23
64:10,24 65:2,8,19
67:17 68:7 76:9
77:9 84:17 89:6
93:11 94:6 96:13
96:22 98:9 99:1
100:25 102:3,5
107:13 120:1
128:6,22 129:3
134:9 138:20,23
139:24 148:24
150:25 154:24
155:13,14 159:14
159:25 160:7,8
164:7,20,22 165:4
166:5,11,15,19
167:5,14,19 168:2
168:12
**omitted** 150:20,23
**once** 13:12 16:22
28:16 75:19
**one's** 65:14
**ones** 23:5 30:7
**online** 81:9
**operate** 62:15
133:13 134:6
136:7 145:9 147:7
**operated** 136:8,22
142:6
**operating** 79:20
79:22 95:22 96:10
96:14 97:12,19
98:22 99:3,8
102:1 108:22
113:1,3,12,14

140:10,22,25
**operation** 80:1
94:2 95:14,16,19
96:10 97:24 98:1
98:2,11,16 99:12
99:20 100:6,18
101:6,12,15,16
113:17 136:23,25
140:12 141:24
143:18 149:7
**operational** 17:23
80:25 96:4 101:17
112:21
**operations** 29:19
33:19 40:24 97:8
98:19 142:25
173:4
**opinion** 14:8 39:1
41:4 43:16,23
86:9 89:9 100:16
105:4 106:21
107:14 115:18
118:15 133:20
149:18
**opinions** 7:5,8,16
7:21 8:3 21:9,24
22:7 25:22 27:3
47:19 69:9 105:18
105:22 106:1
150:23
**opportunity** 61:22
127:5,9
**option** 119:5,8,13
**order** 78:14 89:6
90:6 94:7 108:8
123:16,24
**ordinances** 21:2
**org** 15:1
**outcome** 72:23
**outer** 155:16,21,22
157:11

**output** 69:18,25
74:3
**outputs** 70:10
97:10 158:15,19
**outside** 15:7 141:6
141:14 147:21,21
**overall** 42:20
66:13,17,19,20
68:4 74:20 75:6
94:13 136:14
**owned** 14:14
162:9,14
**owner** 14:16 17:14

**p**

**p** 81:21,22
**p.c.** 2:3
**p.m.** 149:23 150:1
173:23,25
**page** 3:2 22:3,5,21
24:17 77:7,19
78:9 103:10
119:22 120:5
122:1 123:10,22
125:5,8,10,12,22
127:2 135:13
166:10 167:16
176:4 177:4
**pages** 92:22
**paper** 46:1,9,11,16
**papers** 50:24
**paragraph** 7:9
18:1,5 21:5,8
70:17,20 71:16
**parameter** 151:24
**parameters** 66:13
67:25 69:5 108:10
145:19
**parents** 150:6
**park** 2:4
**parkersburg**
131:13,17,24

132:13,14
**part** 13:16,22 22:9
42:3,17 45:24
49:4 74:6,24
79:23 81:24
114:16 116:15
134:19,23 139:13
**particle** 114:8,15
114:17,24 115:2
116:12,20,25
117:8,13,17
118:16 119:3,6,14
119:15,21 120:2,8
120:10,17,24,24
121:8,10,11 122:7
122:14,19 123:17
123:18 124:4,11
124:15,18 125:1,4
126:17 128:5,11
128:14,21 129:2
129:14,15,23
130:2,16,18 131:6
131:8 159:18
**particles** 114:11
114:12,16 119:1
119:17,20 127:16
130:12,21,24
131:13,18 132:4,5
**particular** 15:19
16:13 19:11 23:19
38:25 39:13,20
40:4,10,15 46:2
47:14 58:15,22
74:20,23,23 75:6
76:20 79:10 80:3
80:17 82:9 115:4
117:23 140:1
147:20,22 151:23
156:2,11 159:4,17
161:15 162:10,10
172:17

**particularly** 30:17
31:17
**particulate** 66:4
69:6 111:12 114:6
114:9,12,24
116:13 117:13,17
118:14,25 119:23
135:14 139:6
145:23
**particulates**
131:17
**parties** 174:18
**partitioning** 4:6
**parts** 107:4
**pass** 173:19
**passed** 24:20
116:4
**patrick** 2:7 5:13
**pattern** 168:15
169:7,21 170:10
170:14
**patterns** 168:7
169:25 170:15
**pause** 34:8 166:17
**peak** 100:9
**peer** 46:17,19
**pennsylvania**
15:23 20:23
**people** 88:6
**percent** 127:15
129:7,8 130:23
138:8,15 142:11
142:12,12 166:22
**percentage** 119:17
128:5,7,10 129:1,7
131:3 142:14
**perfluorinated**
51:21 52:12,17
81:15 90:8 146:2
146:8,15

**perfluorooctano...**
4:7
**perfluorooctanoic**
3:6,9
**perform** 47:14
61:17 85:7 91:9
91:14
**performance** 1:9
3:14
**period** 50:16
97:11,20 99:20
100:18 101:5
108:13 112:21,23
112:24 123:24
124:9,14,19
125:19,21 152:11
163:2
**periods** 97:24
**permanent** 145:18
**permit** 24:4,10
146:17,21,25
147:5,9,14
**permits** 24:1
**permitted** 133:9
133:13 135:3
139:15 140:10,16
145:9,12,24,25
146:18 147:7
**permitting** 24:15
46:22 47:5 51:17
78:12 94:22 95:10
111:17 134:15,24
139:13 141:3,5,6
141:15
**person** 88:19
106:20,20 174:7
**personally** 43:15
68:15
**persons** 1:6
**perspective** 39:9

**pertaining** 51:5
**peruse** 123:7
**pfo** 4:7 45:2
120:10 122:14
**pfoa** 3:16 13:17,23
14:4,9 27:8,16
35:21 36:2,4,8,16
36:17,18,20,20,25
37:5,6 41:25 42:7
42:15,24 43:2,14
43:17,24 44:4,17
44:23 45:5,13,17
48:13,16,21 49:1,6
49:10,16,23 50:2
50:16,25 69:15
70:20 71:10,15,19
72:7,23 73:2,10,13
73:15,17,18 76:21
78:1,6,14 83:20
84:6 85:14 87:24
89:2,22 90:7,14
91:10,15 98:15
102:19,21,24
103:13,15 105:9
106:9,12 107:6,8
114:24 115:9,11
115:22,25 122:9
127:16 130:16,24
132:11 135:18
136:1,14 138:8
143:18 144:1,10
146:19,20 147:4,8
147:10,16 153:18
153:23,25 154:12
155:1 159:2,7,12
159:18 160:22
162:9,14,23 163:6
163:16 164:4
170:12 171:9,12
171:17,21 172:1,6
172:8,15,20,22

173:1,6,8,9,12,17
**pfoas** 66:4 114:20
**pfoe** 83:20
**phil** 10:16 15:18
16:17,19 17:18
72:6 73:3,8 77:25
89:21 102:17
105:7 116:9
164:19 166:15
**philip** 4:10 70:24
84:12,19 164:15
164:17,18
**phone** 83:22,25
89:15,17 93:10
**phonetic** 15:16
134:16
**physical** 59:3
108:10
**physically** 61:22
**picked** 82:1
**picking** 103:7
**picture** 124:14
**pictures** 61:21
**pink** 155:8,12
157:12 160:20,23
161:6 162:4,5
170:25
**pit** 20:19
**place** 90:25
**placed** 125:15
**plaintiff** 20:18
37:11
**plaintiff's** 12:6
**plaintiffs** 1:7 2:2
5:17,18 37:13
48:11 49:11,17,24
88:22,23 163:11
163:17
**plan** 7:16,18,21
69:9

plans  30:13,16
plant  108:10
plant's  113:2,12
  113:17
plants  33:18
plastics  1:10 3:14
play  168:8 170:2
please  5:11,20,24
  5:25 6:5 44:14
  45:10 48:1 49:19
  54:7 60:16 96:7
  144:6
plume  58:12
plus  115:5
point  26:10 58:7
  58:17 59:11,21
  60:6 64:6,9 72:20
  80:7 94:4 111:2,5
  111:7,11 114:5
  120:17,23 132:21
  135:22 136:2
  137:3,12,18 138:5
  151:2 157:22
pointing  155:9,11
points  57:3,8,19
  57:20,23 68:2
  81:25 95:8 111:21
  111:22,25 112:2
  112:15 136:20
  138:19,22 141:9
  141:18 144:20
  167:12
pollutant  35:19
pollution  27:12
  29:2,11 51:8,20,24
  52:3,17 143:2
portion  18:20 22:9
  162:3,5
portions  150:19
position  14:22
  17:13

possibility  24:23
  70:9
possible  59:10,15
  59:21,22 60:1,8
  64:18 81:23 82:25
  101:18
possibly  89:6 95:5
  104:24
potential  15:22
  21:21 36:7 37:7
  44:23 60:13,20
  72:5 82:4 158:19
  172:14,20,25
potentially  27:16
  102:23 103:2
  105:8 130:20
  132:5 137:18
pound  79:8 80:12
  85:12 102:14
  108:25
pounds  71:23 72:4
  73:6 75:25 76:4,5
  76:10,12,13 77:20
  77:23 78:10,17
  80:8 85:15 90:14
  90:16 94:2,15
  102:16 103:3,6,16
  103:18,19 104:11
  104:15,17,24,25
  105:3,17 138:14
  138:18,21 146:13
  154:9 170:21
ppm  103:24
ppt  106:11
practical  143:24
  144:8,15
practice  118:11
practices  30:20
  31:24 86:22
practicing  56:20

pre  120:20
precise  59:10
predict  160:1
  170:20,24
predicted  171:3
predicting  153:1
  159:16
predicts  159:11
  160:18
prefer  126:9,18
preference  126:23
preparation  91:24
  92:18,21
prepare  9:24 10:6
  10:9,14,21 11:9
  16:8 17:3,17
  31:16 66:10,25
  72:8
prepared  3:7,10
  10:2,2 18:10
  65:23 70:13 127:3
  127:8 151:8
preparing  8:25
  9:3,21 121:23
present  2:12 5:24
  29:12 93:8
presented  29:8,9
  75:1 87:19 122:25
  125:8 129:19
  140:23
presenting  158:3
presents  124:6
press  89:12,14
pretty  62:19 79:20
  110:13 142:15
  171:4
prevention  30:18
previous  73:20,23
previously  13:4
primarily  15:2,7
  17:9 73:8 95:10

primary  28:17
prior  48:11,19,24
  50:7,11 62:8
  73:10
probable  49:16,22
probably  9:5,10
  9:23 13:12 23:4
  24:18 28:2 31:5
  42:9 47:4 52:9
  86:25 100:9
  105:20,21 106:6
  107:20 148:18
proceed  21:23
proceedings  19:19
process  21:20,22
  22:14 24:13 39:11
  54:21 62:19 82:24
  83:11 91:4 102:19
  102:24 105:8
  117:25 132:2
  134:24 139:14
  141:3,5,6,15
  149:15 153:4,5
  168:23
processed  66:7
  97:16
processes  134:13
processing  131:24
produce  158:2
produced  92:5,13
product  18:17
  82:10,14
production  17:24
  102:2
products  82:15
program  3:21
  29:18 77:17
programs  15:6
project  9:9 15:1
  15:17,19,21,24
  16:4,7 49:10,15,21

50:2
**projects**  15:3
**promulgated**
  30:12
**proof**  41:14
**prop**  160:13
**properties**  13:18
  13:20 158:23
  161:6 163:17
**property**  13:25
  20:15,18 33:18
  159:3,5,7 161:15
  162:9,14,25 163:9
  171:24 172:2
  173:9
**proposed**  20:23
  28:24 158:24
**proprietorship**
  17:15
**protocol**  31:8,15
  117:25
**provide**  13:10
  32:21 37:24 38:4
  39:17 55:3 146:21
  151:4
**provided**  8:21
  13:1 19:12,25
  20:19 23:8 24:8
  42:19 52:2 54:20
  54:24 70:22 88:20
  91:18 93:23
  111:19 116:5
  124:11 149:16
**provides**  38:6
**providing**  16:20
  20:12 39:6,17
  44:1
**proximity**  33:20
  144:10,21 160:2
  160:10

**proxy**  98:10
  101:15 118:16
  131:18 132:5,14
**ptfe**  50:9,13 62:9
  62:11,15 80:15
  131:25
**public**  2:18 28:5,6
  28:6 174:4,25
  175:17
**publications**  50:24
**published**  28:6
  30:11 46:1,8,11,16
  48:15 51:23
  122:22
**pull**  25:12 78:24
**pulled**  24:21
  111:16
**purely**  169:22
**purple**  155:2,12
  156:21 160:20
  170:25
**purplish**  155:6
**purport**  159:1
**purposely**  32:11
**purposes**  46:22
**put**  17:5 102:22,22
  167:15
**putative**  162:24
**putting**  19:19,22
  61:19

**q**

**quality**  30:17
  35:19 38:22
**quantified**  50:12
**quantify**  142:11
**quantities**  43:21
**quantity**  44:20
  130:21 145:15
**question**  13:21
  30:5 34:3,3,5,15
  38:3 40:7 41:14

41:21 44:7,13
45:8,9 46:6 47:21
47:22 49:19 54:5
54:7,9,10,16 56:1
56:9,12 59:12
60:15 67:11,16,18
69:20,21 72:13
74:15,17 81:19
83:2 86:24 96:7
96:11 97:13 99:21
100:23 101:7
104:19 110:19
113:9 126:11,12
126:21 128:16
129:18 130:5
131:5 134:18
136:5 137:21
139:22,24 140:1
140:19 141:10,14
144:4,5 146:10
148:24 149:8
151:7 159:14
160:6 166:3
**question's**  43:22
**questioning**  74:14
  167:4
**questions**  63:14
  89:16,19,24 90:4
  110:4,5,5
**quickly**  165:16
**quinn**  2:8 5:13,15
**quite**  71:18 86:16
  170:5
**quote**  103:9
**quoted**  104:11,13
**quoting**  37:25

**r**

**r**  176:1,1 177:1,1
**raleigh**  1:17 2:21
  5:8

**ran**  85:6
**range**  120:16
  159:19 161:1
  162:7
**ranges**  119:24
**rate**  36:12 50:8
  53:12,25 70:21
  71:12,15,19 72:11
  72:17 73:15,18
  74:19,23 75:5,23
  76:14,22 77:24
  78:6,10,16 79:11
  79:13,24 80:11,18
  80:20 82:1 87:18
  94:9,10,11,13
  99:15 100:1 102:2
  108:16,16,22,25
  109:3,4,5,7,11,20
  113:6,7,23 134:25
  136:17 145:6
  155:25 160:9
  161:17,20 162:2
**rates**  24:12,13
  45:1,21 50:12
  53:10,18 54:21
  60:13 68:12 70:15
  72:4,14 73:2,17
  82:5 96:4 100:3
  109:18 143:12,14
**reaction**  169:20
  170:9
**read**  175:3
**reading**  17:25
  37:25 50:20 61:21
  129:4 168:3,14
**real**  140:15
**reality**  134:5
**realized**  22:14
**really**  12:23 13:11
  19:4 23:18,24
  25:5 26:8 30:13

31:20 58:3 61:19
61:23 69:12 70:6
79:15 82:3,6 84:4
89:14 95:18
105:21 109:16
110:25 113:18
123:14 126:20
130:8 142:15
143:4 152:15,20
168:23 169:2,4,4
170:3,3
**reason** 6:14 65:10
87:3 89:9 113:16
176:4 177:4
**reasonable** 73:1,7
**reasons** 7:7 21:11
**recall** 8:13 9:2,20
11:8 15:20 25:15
25:22 38:11 43:3
51:6 68:21 69:1
80:3 83:9 87:12
87:13,14 88:10
98:23
**recalls** 38:8
**receive** 8:12,25
71:3,14 160:22
**receptor** 74:20,23
75:6 156:6 158:1
161:2,13,14
171:25
**receptors** 125:22
126:4 158:5 161:3
161:6
**recess** 64:13 102:8
149:24
**recognize** 6:19,25
77:12 92:10
**recollection** 23:11
91:3 140:11
**recommended**
86:15,18

**record** 5:3 6:6
23:7 56:19 64:11
64:14 65:6 102:6
102:9 133:16
145:4 149:22,25
173:23 174:13
175:6
**record's** 41:22
**records** 23:16
**red** 154:13,17
170:25
**reduced** 174:12
**reduction** 103:13
**reference** 12:2
72:1,2 87:7 93:1
115:16,24 117:8
**referenced** 31:3
73:23 90:13
**references** 167:18
**referring** 12:1
37:10 73:24 75:16
80:17 88:21 116:8
121:5 141:2
145:16 160:17
**reflection** 93:17
**refreshing** 110:11
**regarding** 4:3
50:25 52:3 89:24
**regardless** 107:15
**regulated** 15:7
38:23 39:4,8,12,14
39:16 146:19
147:4,18
**regulations** 30:18
47:8,9
**regulatory** 15:4,5
31:18 118:2 119:4
**reins** 1:24 2:18 5:9
174:4,24
**reject** 79:25
115:21

**rejected** 80:4
**relabel** 64:22 65:3
65:5
**related** 15:21
29:15,20 50:23
174:17
**relates** 26:6
**relating** 48:13,16
**relationship** 14:21
15:17
**relatively** 136:13
**relaying** 87:8
**release** 59:3
**released** 132:20
**releasing** 58:9
**reliable** 46:21 86:4
86:15 123:1
**reliably** 86:10,14
**relied** 22:6,12,21
24:17 70:23
121:25 122:3
149:14
**rely** 22:25 23:12
23:20 24:14 25:4
25:5,8 51:1 73:8
75:23 122:6
147:20
**relying** 102:17
105:7 120:2
**remainder** 56:15
**remember** 9:8,9
11:7 12:7,8,10
28:15 29:14 81:20
87:20 88:17 110:8
116:5 131:3 169:3
172:17
**remove** 51:21
52:17
**removed** 26:12
**rendered** 7:4

**repeat** 40:7 49:19
54:9,10 60:15
67:17 96:6 110:19
134:18 141:14
148:24 159:14
**rephrase** 13:21
44:13 45:9 54:7
126:12 139:24
144:5
**report** 3:6,9,16,20
4:5 6:17 7:4,12,17
7:19,20,24 8:3,8
8:25 9:4,17 10:16
10:17 11:11 12:1
16:8,12 17:3,17,21
18:16,18,21 20:24
21:9 22:1,3 23:2
24:16,22 25:3,9,16
25:21,24 30:24
31:2,22 50:18,20
52:14 64:19 66:24
67:8,22 68:21
69:2,9,11 70:23
76:2,7 77:1 83:6
87:7 88:24 91:24
91:25 92:19 94:1
103:10 108:8
109:15 110:18
119:22 120:3,7
121:23 127:3,8
135:13 148:6
150:12,18,20,24
152:19 154:5
155:19 158:18
170:18 172:11
**reported** 1:24
**reporter** 5:9,19
36:18 65:15 80:13
107:7 115:11
121:18 122:10
128:7 146:5

151:17 158:10
165:9
**reporter's** 174:3
**reports** 19:13 78:5
145:3
**represent** 5:12
100:10 118:10
**representation**
148:21 149:2,12
**representations**
151:10
**representative**
82:15 97:15 120:8
165:21 166:3
167:12,23
**representing**
118:7
**represents** 100:10
154:8
**require** 31:19
39:17
**required** 8:2 34:14
47:18 120:8
**requirement**
35:12
**requirements** 21:2
**research** 48:13
116:10
**reserved** 173:24
**residential** 158:23
**resolution** 55:15
**resources** 4:13
**respect** 70:12
102:19
**rest** 138:4
**result** 87:23 121:7
135:25
**resulted** 74:11
104:11
**results** 3:21 45:23
70:8 74:2,12

77:17 106:6,18
107:22 108:24
111:23 112:8,10
130:3 153:3
161:10 165:25
**resumé** 12:25
**retained** 12:5
49:11,17,23 50:17
**reverse** 172:3
**review** 10:20 25:1
25:7 30:18 31:18
50:19,19,20,21
121:20 127:5,10
127:20
**reviewed** 10:16
11:9 24:20 25:23
46:17,19 115:1
121:22 172:9,10
**reviewing** 95:10
102:20 118:3
173:3
**revise** 24:2 53:15
**rezoning** 20:18
**right** 6:23 8:1 18:9
19:9 21:12 22:8
33:25 34:18 43:6
52:21 53:14,22
55:20 64:19 65:10
76:7,11 80:23
84:22 88:19 89:4
89:8 90:7,9 92:24
94:3 101:21
103:17 108:12,14
114:21 119:25
122:4 128:25
129:8 131:14
135:16 148:11,12
154:14 156:7,22
157:21 160:4
162:20,22 163:4
168:6,13 169:8

172:15
**river** 170:6
**rmr** 1:24 2:18
174:24
**road** 30:8
**robust** 118:12
124:9
**role** 54:22 88:1,5
**ronald** 1:4
**rough** 91:9,14
**roughly** 22:16
85:15 90:14
**rs** 100:12
**rule** 172:19
**rules** 55:17 56:21
**run** 53:16 71:5
82:10,11,15,21,22
82:25 85:20,22,25
85:25 86:2,3,6,10
86:12,12,13,17,17
86:22 87:1,3,6
88:16 112:11,13
130:8 138:11
**running** 30:21
54:19 57:12 82:22
104:5 171:8,16
**runs** 74:16

### s

**s** 1:3,4 80:14
165:12,12 176:1
177:1
**saint** 1:9 3:13 4:4
5:14,16 41:24
42:4,6 43:16,23
44:23 45:2,4,12
70:22 76:17 108:5
111:19 176:2
177:2
**sample** 124:4
126:7,7,16,16,23
126:24 153:17

**samplers** 125:15
**samples** 125:16
126:2,7,8,16,17
**sampling** 29:17
106:17,22 107:19
123:16,23 124:8,9
124:14,19 125:6
125:19 132:4
153:1,15 157:3
**sandpit** 15:23
**save** 152:16
**saw** 31:22 94:22
119:19 136:11
170:11 172:18
**saying** 44:1 84:18
107:14 108:21
159:23 169:23
**says** 17:21 18:7,17
21:8 32:25 76:19
81:21 103:9 108:8
123:22 166:15
167:7
**scale** 154:11
**scenario** 71:7
75:25 85:13 94:14
94:16 102:14
**scenarios** 33:1
60:21 70:21 71:12
71:15 73:17 75:23
76:24 90:12
102:13 108:3
152:14
**scientific** 39:9
115:18 116:22,25
122:21,23 139:17
140:5 142:8
147:22 151:12
**scientifically**
47:10 106:16
**scientist** 39:9
105:4 126:8,17

141:7,15
scratching 66:12
scribbled 22:16
scrutiny 122:23
searches 50:20
second 18:1,5
20:21,22 26:14
29:17 34:8
section 32:18
123:10 127:1
see 7:9 18:3 32:19
38:1 51:3 52:7
55:14 61:22 70:25
73:14 74:4 81:22
83:12 107:25,25
108:4 124:1,2,2,20
124:21 125:17,21
128:14,20 156:15
161:11 164:20
165:16 167:1,12
167:20 168:7,15
169:14
seeing 106:10
107:3
seen 51:14 107:18
143:7 154:13
164:3 165:23
169:11
sees 103:1
select 119:12
selected 78:18
104:3
selection 103:5
157:13
send 137:3
sense 34:19 170:8
sensitivity 151:16
151:17,18,20
152:3,7,19,20
sent 165:7,9

separate 33:21
95:4
separated 33:19
separately 140:7
series 28:3
service 16:13
107:2
services 12:23
13:9 14:20 15:2,9
16:1,11 20:20
52:3,6
set 52:23 119:1
124:9 134:16
142:7 167:16
174:20
setting 19:11
118:24
settle 104:16
settled 14:9
settling 104:15
seven 10:10
sgpplvt 3:18
shaded 156:21
157:12
sheet 175:5
short 58:2,3,4
shorten 57:16
show 5:23 107:22
152:13 161:19
showing 157:1
sic 138:5
side 85:5 93:15
105:15 128:20,25
153:20 159:22
167:15
sides 55:22
signature 173:24
174:23
signed 6:22
significant 30:19
37:5 42:24 70:7

152:15 172:22
173:17
similar 15:8,25
74:2,4,7 118:5
131:22 149:19
167:16
similarly 1:6
simple 62:19
simpler 86:17
155:17
simplify 108:9
simulate 14:4,5
140:16
simulated 75:12
133:2 137:25
143:20
simulates 58:1
simulating 57:4
117:5 119:20
140:9,21 145:8
147:19
single 33:6,7,10,13
33:14 36:24 37:14
41:1 46:24 47:6
47:11,17 94:11
sintering 103:1
sir 18:3 21:4,18
43:22 50:6 83:19
108:21 145:1
151:7 154:16,18
158:21
site 24:25 49:16,22
52:25 61:17 62:5
65:18,23 66:10,22
67:1 134:17,22
160:2 172:10,13
sites 13:24 134:21
135:6 167:18
situated 1:6
situation 171:4

situations 32:7,15
six 47:4 123:23
125:5
size 57:23 60:25
114:8,15,24 115:2
115:22,25 116:12
116:20,25 117:9
117:13,17 118:14
118:16 119:3,14
120:3,10,17 122:7
122:14,19 123:17
123:18 124:4,4,11
124:15,18 125:1,4
126:7,7,16,16,17
128:5,11 129:2,14
129:15,23 130:2
130:15,18 131:6,8
147:8,10
sizes 126:24,24
sketch 111:18
skip 26:1
slight 70:3 172:16
slightly 113:9
slowly 161:24
small 119:15
136:13
smaller 114:11,17
119:5 126:24
127:16 129:24
smith 2:19 5:6
software 151:9
158:1
softwares 151:2
soil 106:17,20,23
153:15,17,20
158:19
sole 17:15
solid 17:9 156:17
156:23
solution 62:21

**somebody** 45:23
  93:15
**somewhat** 113:6
**sonoma** 2:13
**sorry** 17:13 18:4
  19:10,12 22:5
  33:11 34:4,6
  36:18,21 42:8,9
  43:6 46:7 51:10
  60:15 61:3 63:15
  65:16 80:14 81:15
  83:20 85:19 87:9
  90:11 96:25 97:6
  107:8 110:19
  111:8 115:9,12
  121:2,4 122:10
  128:10,16 146:4,7
  146:9 151:18
  152:6 154:20,21
  158:10,11 160:11
  161:25 164:10
  165:11
**sort** 133:22 134:7
  153:6 157:20
**sound** 37:22
  116:22,24
**sounds** 76:11
**source** 13:17,23
  14:9 30:18 33:6,7
  36:16,24 37:5,5,15
  41:1,25 42:7
  44:23 45:4,13,17
  46:24 47:6,11,17
  53:3 79:10 137:24
  138:4 162:14
  172:1,7 173:14,15
  173:16
**sources** 33:17 36:7
  37:21 38:17 39:3
  39:22 40:6,12,15
  40:16,17 41:8,10

41:15 42:13,15,21
  42:24 43:2,10,14
  45:24 46:2,10
  47:1,14 71:13
  171:9,11,17
  172:14,20,20,22
  172:25 173:6
**south** 170:14
**southwest** 160:19
  162:3
**speak** 56:5 84:9
  88:7,19 93:15
  109:24
**speaking** 41:17,19
  44:10,11 48:3,4
  55:18 56:7,8
  141:6,15 160:24
  168:3
**specific** 12:7 13:9
  13:18,20,24,25
  14:4,6,10 15:24
  16:3 45:20 58:2
  61:25 68:15 69:8
  74:19 75:5 99:14
  117:2 141:11
  159:3,7
**specifically** 8:22
  9:10 10:25 23:22
  24:21 25:17 29:16
  40:23 42:4 43:3
  45:2 54:16 58:2
  66:14 71:6 75:13
  88:8 90:24 91:2,7
  114:20 115:16
  116:5 141:22,23
**specifics** 67:3
  132:1
**speculate** 47:23
  48:1
**speculation** 130:5

**spend** 9:3,21 82:6
**spent** 9:17
**spoke** 33:11 84:19
  115:12 116:19
**spring** 28:21
**squared** 76:20
  109:2 158:7,12
**stack** 24:12 49:2
  58:9 66:12 68:18
  72:18 75:18,18,18
  108:9 112:15,19
  113:21 132:20
  133:15 136:19
  137:2,12 138:19
  139:11 140:4,8
  141:9,18 143:16
  144:19,25 147:24
  152:12
**stacks** 24:5 68:1
  68:11,12,14 78:17
  78:21,23,25 79:7
  90:15 94:3 95:4
  95:13 96:2 98:21
  99:8 101:14,17,23
  101:23,23 112:19
  135:18,22 138:14
  139:20 143:5,19
  143:25 144:9
  152:10,12,17
**staff** 85:1
**stage** 125:13
**stand** 105:3
**standalone** 69:13
  69:13
**standard** 31:15
  35:18,19 38:21
  50:21 51:17 57:11
**standards** 30:17
**standpoint** 21:3
  41:9,11 72:16
  84:8 122:21

139:18 140:6
  141:25 172:23
**stands** 8:1
**start** 5:23 46:14
  66:15,17
**started** 27:24
  168:19,20 172:5
**starting** 164:23
  168:21
**state** 2:19 5:24 6:5
  23:7,7 28:11,22,22
  30:13,15 35:11,25
  47:12 79:5 83:6
  88:24 90:2 111:19
  140:23,24 174:1,5
**stated** 105:20
  135:13 145:7
  149:15
**statement** 7:5 21:9
  24:3 150:16
**statements** 175:7
**states** 1:1 30:12,13
  115:6 170:15
**stenotype** 1:24
**step** 104:2
**steps** 50:15 73:5
  95:7 132:3,8,12
  150:22 151:13
  152:18
**stopping** 64:6,9
**stream** 54:14
  58:23,24 60:1,5
**streams** 51:21
  52:18
**street** 2:21 5:7
  20:16 63:17,23
  64:2 66:5 70:12
  95:23 96:1 98:19
  98:24 99:4,19
  100:6,18 148:14

**strike** 9:12 14:12 46:8 58:21 63:15 69:16 70:11 85:17 85:18 91:22 93:25 94:10,19 95:12 96:22,25 97:6 98:6 111:25 112:25 121:20 123:21 125:20 128:11 130:22 131:7 132:15 133:3,20 143:12 145:16 153:16 154:25 155:14,17 156:16 158:21 164:11 172:9
**string** 4:9
**struggled** 155:7
**stuck** 104:8
**studied** 50:8 51:7 51:11,13,19
**study** 17:22 118:17
**studying** 26:13
**stuff** 83:13 123:8
**subject** 29:12 88:8 110:22
**submittal** 9:5
**submitted** 6:17,22 17:3 20:24 46:20 50:18 172:11
**submitting** 8:25
**subscribe** 175:6
**subscribed** 175:12
**substance** 33:25 34:23 35:7 39:20 40:4,10 110:17,18 150:4
**substances** 35:16 44:4,17 83:3

**subsurface** 171:2
**sufficient** 47:17 124:3 130:21
**suit** 21:22
**suitable** 119:19
**suite** 2:4,21 5:7
**sullivan** 1:3 2:8 3:13 4:4 5:18 88:22 162:15 176:2 177:2
**summary** 80:12 80:13 154:19,20 155:4
**summed** 120:23
**summer** 4:8
**sumner** 1:3
**support** 14:20 15:18,25 16:20
**supported** 16:10
**supporting** 20:17
**suppose** 30:14 86:11
**supposed** 142:6
**sure** 12:15 13:20 18:5 19:17 23:5 45:3 49:20 50:21 51:2 60:17 84:14 86:1 87:1 96:8 99:11 107:11 108:20 127:9 131:4 134:20 159:15 166:22
**surface** 148:8 171:3,6
**surfer** 158:1
**swear** 5:20
**sworn** 5:22 174:8 175:12
**systems** 170:6

**t**

**t** 3:7,10,12 4:3 5:5 18:7 80:14 173:22 176:1,1 177:1,1,1
**table** 77:4,7,19,22 78:9 79:7 80:5 120:13,14 122:3 125:4 127:2,3 128:13,18,25 129:6 156:6
**tables** 67:5
**take** 7:3 61:25 64:6 71:6 79:24 91:25 95:7 98:1 102:4 108:16 112:9 121:1 123:10 125:10 126:6 127:19 132:3 137:1 154:4 161:10 162:11 167:10
**taken** 1:16 64:13 102:8 103:23 149:24
**talk** 102:13
**talked** 91:7 147:25
**talking** 28:1 66:13 68:4 72:5 107:22 110:10 117:3 128:17 137:7,8 145:23 167:3
**task** 171:20
**team** 37:12 42:20 43:8 71:20 93:21 116:3,7
**technical** 24:19 50:20,22 89:9 116:4
**technically** 17:18 161:8,16

**techniques** 48:21 49:1,6 141:3
**technologies** 3:19 22:15,17,19 52:10 72:3 77:1,16 82:12 89:1
**technology** 2:13 27:12 51:8,13,16 51:18,20,25 52:4 52:17
**ted** 1:4
**tell** 23:4 26:3 32:25 51:4 56:11 75:9 103:18 154:11 155:1 159:1,6 162:8,13 164:18
**telling** 125:24
**temperature** 68:13,17,20
**ten** 123:23 125:22 126:3
**tentatively** 83:7
**term** 15:16 21:15 54:17 55:12,16 57:12 58:2,3,4,25 75:17
**terminology** 62:23
**terms** 19:18 59:1,2 109:15
**terrain** 75:13,15 75:17,19 157:1 170:6
**test** 3:21 77:17 78:4 82:22 90:5 90:11
**testified** 5:22 19:13 77:18 93:24 114:20 130:11 145:1 148:4

testify  174:9
testifying  6:12
testimony  6:15
　19:25 20:8,12
　35:4 45:14 74:13
　99:17 104:20
　106:1 107:12
　110:17,21,22
　126:22 140:14
　150:4,10 174:14
tests  133:15
thank  6:2 30:4
　65:9,9,12,13,14
　128:2 159:24
thesis  115:1,8,15
　115:24 116:2,12
　116:14,18,20,21
　116:24 120:3
　121:15,22 122:14
　123:4,11,13,22
　127:6,13 131:12
　132:4
thing  89:25 147:24
　152:24
things  10:18,24
　11:1,2 16:11 17:5
　17:9 23:16 24:1,6
　24:13,24 28:4
　30:14,19 78:5,13
　89:22 105:15
　116:16,19 126:8
　126:19 140:13
　147:24 153:21
　168:22 170:7,7
think  8:17,21
　10:23,25 13:6
　15:24 17:1 19:4
　25:18 30:17 32:7
　42:4 43:3,4,5
　45:19 47:13,22
　56:11 64:8 67:18

67:19 68:12,25
69:3 76:25 85:16
87:20 88:9 89:21
91:2,6 93:24 94:4
100:13 106:16
111:19 115:1
118:6 119:16
155:22 160:7
165:13 167:11
168:24 170:4
thinking  12:9
third  128:4
thomas  1:15 2:16
　5:21 6:7 174:8
　175:10 176:25
　177:25
thou  145:13
thought  19:10
　71:24 84:6 85:11
　85:13 87:18,23
　102:18 128:17
　168:20 170:1
thoughts  166:16
　168:4
thousand  71:23
　85:14,15,15
thread  167:11,16
　167:24
three  9:5 44:18
　70:13,14,20 71:10
　71:15 73:16 76:24
　81:2 101:23
　102:12 104:16
　108:3 111:18
　161:18
tie  110:9
tied  58:19 59:6
　87:17 107:1
tim  15:15,15 16:1
　16:15

time  7:11 9:3,13
　9:21 10:1 12:24
　16:25 28:11 38:25
　39:14 49:9,15,21
　50:1 56:21 70:8
　78:2 81:5 82:6,11
　97:18 100:4,12
　113:2,12 127:19
　133:16 139:5
　152:16 159:2
　162:10 163:6
　169:11
times  20:3 46:3
　54:22 95:9 104:4
　104:16 117:20
tisch  125:13
title  22:16 88:5
today  6:9,11,15
　7:14 9:22 11:12
　11:25 31:20
　110:16
today's  9:24 10:6
　10:9,14,21
told  72:1 93:19
　126:6,15 173:13
toluene  29:18
　35:13
top  4:9 8:19 12:9
　18:16 23:6,17
　33:3 68:25 81:1
　117:3 157:8
topic  28:18 29:7
total  9:6 78:14
　125:12 126:4
　155:25
tower  79:1,10
　80:16,17,18,20,22
　81:3,12,14 82:9,11
　82:23 83:8 94:12
　94:24 95:1 96:10
　100:12

towers  62:9,12,15
　79:12,21 80:24
　81:9 82:2 95:4,22
　96:2,4 98:15 99:3
toxic  35:11
toxicologist  26:24
toxics  47:5
trade  15:6
trained  26:18
training  27:22,25
　28:2,4,13 38:15
transcript  175:3,6
translatable
　110:12 113:7
transport  3:17
transported  27:8
travel  111:12
　114:6,11,16
　130:12,17
traveled  27:8
　136:2 137:4,13
　144:2 171:21
treat  162:3
tribes  30:14
tried  41:17 79:4
　97:1
trillion  107:4
trinity  27:25
trm  3:6,9 12:17
　13:3,7 14:13,22,24
　15:10 17:2,13,16
　17:19,22 18:7,11
　18:12,13 164:17
trouble  125:25
true  7:14 34:24
　39:22 40:6 41:6
　49:9 53:4,5 60:2
　66:22,23 96:5
　98:22 101:17
　110:18 111:3
　114:4 135:19

144:23 162:15,18
174:13
**truth**  174:9,9
**try**  28:15 48:20,25
  49:5 55:3 59:13
  59:14 62:14 63:5
  63:25 72:24 82:23
  112:13
**trying**  9:8,19
  10:23 23:22 28:15
  29:14 34:24 39:24
  39:25 40:7 52:25
  55:21,25 58:11
  69:12 75:9 77:25
  78:3,12 79:16
  82:4 97:10 99:12
  99:14 109:12,14
  109:16 110:8
  125:24 139:25,25
  144:13 146:12
  169:12,25 172:17
**tuesday**  1:18 2:22
  174:6
**turn**  22:3 71:2
**turned**  73:13
**twice**  20:4 29:3
**two**  19:12 20:12
  31:12 33:20 59:1
  59:1,1 64:18 79:1
  81:2 95:3,4 98:16
  147:23 152:12,14
  157:9 161:2
  163:20
**type**  8:8 15:8,25
  99:9 118:5 167:23
**types**  62:24
**typewriting**
  174:12
**typical**  72:19 98:2
  170:14,16

**typically**  52:7
  53:17 82:21,22
  96:13 134:21
  137:16 140:15

**u**

**u**  177:1
**u.s.**  86:16,19,23
**uh**  26:11 33:5
  56:13 71:11 81:13
  103:11 112:20
  138:17 155:20
  156:12 157:4,15
  158:9 160:21
  161:9 164:16
  169:1
**ultimately**  72:22
**umm**  67:14 108:19
**uncertain**  143:16
**uncertainty**
  143:11,13
**understand**  6:8,11
  8:2 21:20 29:21
  40:8 45:3 53:3,6
  54:19 55:4 56:25
  57:7,17,22 62:18
  62:20 71:9,18,18
  72:17 75:3 78:12
  83:22 84:25 85:17
  88:10 92:2 97:9
  99:11 107:11
  108:20 124:5
  133:8,9 136:8
  145:3 146:10
  151:8 155:19
  158:21 171:4
**understanding**
  21:23 37:4 38:15
  39:12 42:14 59:16
  66:1 72:14 73:9
  87:25 88:2 91:4
  93:4 122:21

131:15 140:22
  158:22 169:17
  174:15
**understands**
  140:24
**understated**
  130:15
**understood**  19:5
  42:6,8,12,23 76:1
  79:9 85:7,8 87:19
  102:2 144:23
  145:2 171:12
  172:21 173:3
**undertake**  142:13
**unique**  32:2
**uniqueness**  170:8
**unit**  76:14 99:15
  108:15,16,25
  109:3,11,19 113:6
  161:17
**united**  1:1 170:15
**unpack**  78:20
**unregulated**  39:8
**unreliable**  68:22
**upfront**  123:8
**upper**  71:21 72:9
  72:25 73:6 102:16
  103:21 104:3,9
  105:5,12,17,23
  107:16 142:18,22
  143:15,16 148:9
  154:9
**upwards**  103:2
**urquhart**  2:8
**use**  43:24 52:23
  53:7,12,19 54:1,11
  55:9 63:17 66:24
  98:10 102:15
  105:5,17 108:9,21
  108:23,24 112:20
  113:1,6,11,16

114:24 115:4,8,10
  115:15 116:11
  118:11 122:17
  126:15 129:11,15
  142:3 143:14
  145:18 147:9
  151:22 154:1
  161:17 173:13
**uses**  58:18
**usually**  117:24
**utilize**  63:2
**utilized**  63:22

**v**

**v**  80:14
**vague**  54:5,17
  55:16 56:1 59:12
  99:21 137:21
  141:10
**vagueness**  139:21
**valid**  44:12 48:5
  106:16
**validate**  152:21
  153:13 154:2
  158:18 163:17
**validation**  153:4,5
  153:9
**values**  146:21
**various**  95:9
  111:21
**velocity**  58:19,19
  58:20,22 59:1,6
  60:1,6 114:1,2,5
  138:6
**venue**  106:7
**verify**  91:17
**vermont**  1:1 3:17
  4:12 12:21 23:15
  36:24 63:3,18
  70:22 71:3,14
  74:12,14,15 75:24
  82:16 83:23 84:1

84:9,23,24 85:3
86:4 87:8,9 88:1,7
148:9 165:6
**vermont's** 157:7
**version** 11:6,6,18
12:2 31:4,6 64:19
64:20 65:24 88:12
165:14,18
**versions** 25:15
31:12
**versus** 110:9 149:6
**vertical** 59:3
**videographer** 2:14
5:3,10,19 64:11,14
102:6,9 127:25
143:22 149:20,22
149:25 173:21
**videotape** 5:4
173:22
**videotaped** 1:14
2:16
**viewpoint** 74:19
75:5
**visit** 60:24 61:2,4
61:6,14 62:4
**visits** 62:5
**visual** 156:16
**visually** 169:16
**volume** 90:8
113:23 125:13
137:18 146:2,5,7
**volumes** 139:4
**volumetric** 24:12
68:12
**voluntary** 15:4,6
**vost** 80:12,14
**vs** 1:8 3:13 4:4
176:2 177:2

**w**

**w** 29:22,25 30:7,9
30:10,20,24 31:3
31:14,19,23 32:4,8
32:12,16,18,25
33:3 35:14 37:18
37:24 38:8,12,16
39:5,6
**wait** 25:12
**want** 7:25 36:14
45:24 53:17 56:24
57:3,6,7 59:9,15
60:7 71:9 75:3
78:20 99:11
102:13 107:11
109:2,4,8 113:7
124:10 155:19
161:18
**wanted** 36:11 37:7
37:9 42:11
**washington** 28:20
**waste** 17:9,9
**watch** 127:25
**water** 63:17,23
64:2 66:5 70:12
95:23,25 98:19,24
99:4,19 100:6,18
106:17,20,21
148:14 153:22,25
154:2 158:19
164:4 165:25
**way** 24:2 29:4
69:5 107:20 109:9
113:5,14 136:7,22
141:8,16 142:1,7
143:19,20 152:23
156:15 168:21
169:14
**ways** 62:24 152:5
152:7

**we've** 9:4,17 56:19
64:4 68:4 102:3
**weather** 98:10
170:15
**week** 123:23
**weighted** 120:22
**wells** 106:14 164:4
169:10
**went** 17:6 27:24
30:1 43:10 61:11
83:10 94:7 104:25
**wheeler** 134:15
**whereof** 174:20
**white** 156:17,23
**whitlock** 2:3
**widespread**
168:16
**william** 1:3
**wind** 60:7,8 98:7
98:10,14,20
147:25 148:2
168:7 169:25
**witness** 2:17 5:20
11:20 19:7,10
32:21 34:4,6 35:1
36:20 37:24 38:7
38:9,11 44:8,13
45:9 48:7 54:6,18
56:6,8 57:2,10,17
59:13 65:19 67:14
67:17 69:22 80:14
96:13 97:14 99:23
100:25 101:8,21
102:5 104:21
115:12 122:12
126:12 127:21,23
128:2,8 129:19
130:7 136:6
137:22 139:23
140:20 141:11,20
144:5,12 146:9

151:20 158:11
160:8,12 161:24
165:13 166:5,7
167:1 173:19
174:11,15,20
**woman** 14:14
**wondering** 151:11
**words** 51:11 70:5
102:15 161:11
**work** 13:14 14:18
15:13 16:1,6,9
18:17 26:9 43:7,9
48:13,20,25 49:5
50:7,11 51:17
52:9,11,15 73:9
88:6 116:22,25
117:4 171:25
**worked** 13:3,5
14:23 15:11,17
17:16 28:11,11,12
49:10,15,21 50:1
62:19 90:20,22
114:20
**working** 9:17
14:16 16:14,17,23
28:9 73:3
**works** 97:17 109:9
**workshop** 28:22
**workshops** 28:3
28:13
**world** 15:2 26:9
75:20 140:15
**write** 16:12
**wrong** 22:5 56:11
88:4 106:19
115:13 164:11
**wrote** 76:2 166:12

**y**

**yeah** 8:7 16:16
18:5 20:14 22:13
22:15 25:5,5,17

30:5 32:5,20
34:10 46:18,23
48:7 53:20,22,25
54:6,18 61:3
62:19 68:1 69:12
69:12 73:3,4 75:8
77:4,6,6 78:9 80:6
80:9,21 81:8
82:18 83:21 84:13
86:11,24 87:16
88:23 89:3 92:9
92:11 96:13,21
98:2,23 103:14
104:13,13,13,21
106:15 115:12
121:9 123:7 126:3
127:21 128:6,19
129:20,25 130:7
134:10 138:1
139:23 141:4
144:5,17,23
146:16 150:14
151:3,20 154:14
155:10 156:10,11
156:14,19 157:7
157:19 158:20
160:12,13 161:16
161:24 162:16
165:3 168:11,20
169:19 170:13,19
170:23 171:15
172:3 173:2
**year**   29:3,14 71:23
73:6 75:25 76:4,5
76:10,12,13,20
77:20,23 78:17
80:8 85:12,15
90:15,16 95:16,18
97:5,7 99:16
102:14,16 103:3
103:16,19,19

104:11,16,17
105:3,17 113:17
138:14,22 146:13
154:9 158:8,12
159:8 170:21
**year's**   72:5
**years**   26:12 28:16
43:25 63:7,18
66:6 79:4 81:3,7
87:2,4 95:19
96:17,18 97:1,25
98:3,5,10,14,20
99:6,8,12,15,25
100:6,9,14 101:6
101:11,16 102:1
110:13 148:5
149:7
**yesterday**   10:3,4
10:11,14 22:14
**yoder**   1:15 2:16
3:7,10,12 4:3,9
5:5,21 6:5,7,8
12:5 56:23 65:22
102:12 150:3
164:3 166:9
167:11 173:22
174:8 175:10
176:25 177:25
**york**   2:10,10
14:15,19 148:10

**z**

**zero**   142:3,9
**zone**   73:12 102:25
103:1
**zoned**   20:15
**zones**   62:22
**zoning**   15:25 16:2
19:12,14,22 20:1,7
20:12,22 21:2
**zoomed**   156:10

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.