**In The Matter Of:**

*JAMES D. SULLIVAN, et al. v.*

*SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION*

---

*EDWARD CANNING*

*April 24, 2018*

---

COVERING ALL UPSTATE NEW YORK



MFReportingNY.com

Office: 518-478-7220          Mail to: 5 Southside Dr., Suite 11
Fax: 518-371-8517                      Clifton Park, NY 12065

EXHIBIT
9

*Min-U-Script® with Word Index*

```
 1   UNITED STATES DISTRICT COURT

 2   FOR THE DISTRICT OF VERMONT

 3   _____

 4   JAMES D. SULLIVAN and LESLIE ADDISON,
     WILLIAM S. SUMNER, JR., RONALD S. HAUSTHOR,
 5   GORDON GARRISON, and TED and LINDA CRAWFORD,
     individually, and on behalf of a Class of
 6   persons similarly situated,

 7                        Plaintiffs,

 8
         -against-            Civil Action No.:
 9                            5:16-cv-000125-GWC

10

11   SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION,

12                        Defendant.

13   _____

14   Videotaped Deposition Of:

15   EDWARD CANNING

16   (Pursuant to Rule 30(b))

17

18      SUBJECT TO AN AGREED-UPON PROTECTIVE ORDER

19
     DATE:          April 24, 2018
20   TIME:          9:13 a.m. - 7:54 p.m.

21   HELD:          HINKLEY ALLEN
                    30 South Pearl Street, Suite 901
22                  Albany, New York 12207

23   BEFORE:        Brenda J. O'Connor-Marello, CSR,
                    Certified Shorthand Reporter and
24                  Notary Public in and for the
                    State of New York.
25
```

```
 1   A P P E A R A N C E S:

 2   APPEARING FOR THE PLAINTIFF(S):

 3        DAVIS & WHITLOCK, P.C.
          21 Battery Park Avenue, Suite 206
 4        Asheville, North Carolina 28801
          828-622-0044
 5        BY:   GARY A. DAVIS, ESQ.
                gadavis@enviroattorney.com
 6

 7

 8        LANGROCK SPERRY & WOOL, L.L.P.
          P.O. Drawer 351
 9        Middlebury, Vermont 05753
          802-388-6356
10        BY:   EMILY J. JOSELSON, ESQ.
                ejoselson@langrock.com
11

12

13

14   APPEARING FOR THE DEFENDANT(S):

15        QUINN EMANUEL URQUHART & SULLIVAN
          51 Madison Avenue
16        New York, New York 10010
          212-849-7000
17        BY:   DOUGLAS E. FLEMING III, ESQ.
                douglasfleming@quinnemanuel.com
18        -and-

19        BY:   MARINA SCHWARZ, ESQ.
                marinaschwarz@quinnemanuel.com
20

21

22   Also Present:

23        David Freedman, Videographer

24

25
```

1  Q.  -- as far as your responsibilities.  One
2      is:  Coordinate all aspects of EHS due
3      diligence as it concerns the acquisition
4      of new businesses in various regions of
5      the world.
6              Is that an accurate description of
7      some -- one of your responsibilities?
8  A.  That would be accurate as it concerns
9      today's responsibilities.
10 Q.  Okay.  Next sentence was:  Also
11     responsible for coordinating integration
12     of new businesses from EHS culture and
13     regulatory perspective.  Does that ring
14     true?
15 A.  Yes, it does.







[redacted]

[redacted]

21   Q.   What is due diligence, by the way?

22   A.   Typically it's in the context of the

23        environmental health and safety function.

24        It would be an attempt to determine if

25        there are environmental liabilities, so

```
 1        contaminated soils; in the case of a stock
 2        purchase, were there prior sites; what was
 3        the history of the prior sites, so
 4        determine what exposures and -- from a
 5        liability standpoint.  Also, what are the
 6        health and safety conditions like in the
 7        interior of a plant?  So it's -- it's dual
 8        purpose to -- to find what liabilities
 9        might exist.  And also, from a planning
10        standpoint, post-acquisition, what sort of
11        work will need to be done in some sort of
12        prioritized manner to address concerns
13        that relate to employee safety and health?
14   Q.   Does it include environmental matters
15        outside the plant fence as well?  I can
16        be --
17   A.   Well --
18   Q.   -- more specific if you want.
19   A.   Sure.
20   Q.   Does it include compliance with permits
21        for air pollution, for instance?
22   A.   Absolutely.  It would -- it would include
23        that, yes.
```





[redacted]

[redacted]

**EDWARD CANNING**                     39









[redacted]

[redacted]

[redacted]

Q. Okay. Do you consider yourself an industrial hygienist?

A. I do not.

Q. Do you consider yourself a toxicologist?

A. No.

[redacted]









[redacted]

[redacted]

[redacted]

9  Q.  Okay.

10            MR. DAVIS:  We've been going

11       about an hour.  Why don't we take a

12       short break.

13            MR. FLEMING:  Sure.

14            VIDEOGRAPHER:  The time is

15       10:20.  We are off the record.

16                 * * *

17            (A brief recess was taken.)

18                 * * *

19            VIDEOGRAPHER:  Time is 10:30.

20       We're on the record.

21  BY MR. DAVIS:

22  Q.  Are you ready to proceed, Mr. Canning?

23  A.  Yes, I am.

24  Q.  Okay.  Thanks.

















[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

10   Q.   So do you believe a responsible company,

11        upon being notified by Du Pont of a

12        particular health issue caused by APFO,

13        would -- would inform the state agency

14        about that?

15               MR. FLEMING:  Objection to form.

16   A.   But that's -- you're speaking in, I take

17        it, hypothetical terms here.

18   Q.   Kind of, I am.

19   A.   So --

20               MR. FLEMING:  Objection to form.



[redacted]

**EDWARD CANNING**                                    99

1                          * * *



18              MR. FLEMING:  Objection to form.

19      And the witness is entitled to review

20      the document again if you're going to

21      be asking him questions.

22              MR. DAVIS:  I will.  I will give

23      him time.

24                          * * *

25              (Pause for review of Exhibit 4.)

**EDWARD CANNING**                                        100

```
1                        *  *  *
2   BY MR. DAVIS:
3   Q.  Let me know when you're ready.
4   A.  Okay.  I'm ready.  I don't recall ever
5       having seen this document before.
6   Q.  The -- just so -- I want to point your
7       attention to two sentences here.  One is
8       the second sentence that says:  Current
9       permit data indicates that the facility is
10      operating at 10 percent of the AGC for
11      ammonium perfluorooctanoate.
```

































[redacted]

[redacted]

[redacted]

* * *

[redacted]

* * *

[redacted]

* * *

[redacted]

* * *

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

* * *

[redacted]

* * *

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

* * *

[redacted]

* * *





[redacted]

[redacted]

**EDWARD CANNING**









[redacted]

[redacted]

[redacted]

**EDWARD CANNING**



**EDWARD CANNING**







[redacted]

[redacted]

**EDWARD CANNING**                    167



EDWARD CANNING                    189

```
 1              your answer, Mr. Canning?
 2   A.   So there were -- there was information
 3        provided by suppliers to, you know,
 4        technical personnel, who would have been,
 5        for example, Ruth Jamke and others like
 6        her that were frequently interacting with
 7        suppliers.  There was that information
 8        that was conveyed.  There's probably
 9        additional information that I'm just not
10        privy to or aware of.  But we did find
11        that the actual concentrations during that
12        period were much lower than 5,000 parts
13        per million.
14                  MR. DAVIS:  He needs to take a
15             break.
16                  VIDEOGRAPHER:  Time is 2:14.
17             We're off the record.
18                      * * *
19                  (A brief recess was taken.)
20                      * * *
21                  VIDEOGRAPHER:  The time is 2:19.
22             DVD 3.
23   BY MR. DAVIS:
24   Q.   Mr. Canning, you had suggested that you
25        had gotten back some data from suppliers
```



[redacted]

* * *

[redacted]







[redacted]

[redacted]

* * *

[redacted]

* * *

[redacted]

[redacted]

* * *

[redacted]

* * *

[redacted]





[redacted]

[redacted]

**EDWARD CANNING**                    244















 [redacted]

[redacted]

[redacted]

* * *

[redacted]

* * *

[redacted]

[redacted]

[redacted]

3   Q.   And I asked you -- I think it had to do

 4        with 3M's announcement.  And do you recall

 5        that announcement being in May of 2000?

 6   A.   I don't remember that.

 7   Q.   Let me show you a letter from 3M to

 8        CHEMFAB.

 9             MR. DAVIS:  And we'll make this

10        Exhibit 27.

11                       * * *

12             (Exhibit 27 herein was marked for

13        identification.)

14                       * * *

15   BY MR. DAVIS:

16   Q.   And you'll see -- the Bates stamp on this

17        is a 3M Bates stamp because we also

18        received documents from 3M in this case --

19   A.   Okay.

20   Q.   -- as well as other cases.



[redacted]

Q. So I don't have the May 17th, 2000 letter that's referenced here to talk about phaseout plans for PFOA products, but this letter -- you can take whatever time you need to review it. It does refer to the phaseout of 3M products containing PFOA, does it not?

A. Yes, it seems to. Yes.

[redacted]



[redacted]

**EDWARD CANNING**







[redacted]

[redacted]

Q. There are hundreds of studies that were placed in the administrative records, which was AR-226. Do you recall that?

**EDWARD CANNING**                264

1    A.   I do not, I'm afraid.

14   Q.   Did you, yourself -- and let me back up

15        just one second.

16              The EPA process, do you recall it

17        being called a "product stewardship

18        process"?

19   A.   I have some sort of vague recollection

20        about that, later on, at least.  Like, at

21        which time period are you referring to,

22        like '05 or after?

23   Q.   Well, 2002 up to 2006.

24   A.   Okay.

25   Q.   Do you recall that being the time --







[redacted]

[redacted]

8   BY MR. DAVIS:

9   Q.  Is that a yes?

10  A.  Well, I do recall reading about -- I

11      believe that's the Little Hocking --

12  Q.  Yes.

13  A.  Yes, I do.

14  Q.  And was that in the 2003 time frame?

15          MR. FLEMING:  Objection to form.

16  A.  I have no idea when that was.  I mean, it

17      became an infamous situation.  I don't

18      remember when I first heard about that.

19  Q.  Certainly it was known in the industry

20      around the time that it became public.

21  A.  It was all in the papers and -- yeah.

**EDWARD CANNING**                                        272





[redacted]

* * *

[redacted]

* * *

[redacted]

**EDWARD CANNING**                                          274



15                         *   *   *

17                         *   *   *

**EDWARD CANNING**                                    275



22                    *   *   *

25                    *   *   *



[redacted]

Q. Isn't it true that the first testing was
done in August of 2014 which detected PFOA

in the village water supply?

A. I don't have a specific recollection of when the village tested their water initially.

[redacted]





| 12 | MR. FLEMING:  Could you let us |
| --- | --- |
| 13 | know how much time we're on the |
| 14 | record? |
| 15 | VIDEOGRAPHER:  Sure.  We are |
| 16 | almost six hours. |
| 17 | MR. FLEMING:  Okay.  I will |
| 18 | remind you, Gary, we will have some |
| 19 | direct; so allow that into your |
| 20 | allotment of time. |
| 21 | MR. DAVIS:  Okay.  We're going |
| 22 | to take our seven hours. |
| 23 | What was the last exhibit, |
| 24 | please? |
| 25 | COURT REPORTER:  Thirty-one. |

EDWARD CANNING                    288

```
 1                        * * *
 2                   (Exhibit 32 herein was marked for
 3          identification.)
 4                        * * *
 5   BY MR. DAVIS:
 6   Q.  Let me show you what we've marked as
 7       Exhibit 32.  This is a letter from David
 8       Sarvadi with Keller and Heckman, LLP,
 9       counsel to Saint-Gobain to the EPA, TSCA
10       Confidential Business Information in
11       Washington, D.C. dated December 30th,
12       2014.
13             Is this the letter that we were
14       just discussing that informed the EPA
15       about the contamination in Hoosick Falls?
16   A.  Can I take a moment --
17   Q.  Yes.
18   A.  -- just to quickly look at it?  It's been
19       some time since I've seen this.
20                        * * *
21                   (Pause for review of Exhibit 32.)
22                        * * *
23             THE WITNESS:  Okay.
24   BY MR. DAVIS:
25   Q.  Yes?
```

A. This is it, yes.

[redacted]

[redacted]

[redacted]

[redacted]







